**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| SARAH ARONSON, M.D. | ) | CASE NO. 1:10-cv-372 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge Christopher A. Boyko |
| v. | ) | |
| | ) | |
| UNIVERSITY HOSPITALS OF | ) | |
| CLEVELAND, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT UNIVERSITY HOSPITALS OF CLEVELAND, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

*/s/Barton A. Bixenstine*
Barton A. Bixenstine (0034130)
Daniel L. Messeloff (0078900)
Ogletree, Deakins, Nash, Smoak, & Stewart, P.C.
4130 Key Tower
Cleveland, OH  44114
Ph:  216.241.6100
Fax:  216.357.4733
Email:  Bart.Bixenstine@OgletreeDeakins.com
Daniel.Messeloff@OgletreeDeakins.com

*Attorneys for Defendant
University Hospitals of Cleveland, Inc.*

# TABLE OF CONTENTS

I.    FACTS ...........................................................................................................1

A.    In her First 2 Years of Residency, Dr. Aronson's
      Performance is Mixed, with Significant Concerns
      Raised about Efficiency and Responsiveness ....................................................1

B.    Concerns about Dr. Aronson's Performance in the
      Intensive Care Unit Lead Dr. Norcia and Dr. Wallace
      to Meet with Her on October 14, 2009 ...............................................1

C.    On November 24, 2009, Drs. Norcia and Wallace Meet
      with Dr. Aronson to Address Her Unsatisfactory Performance
      for the October 2008 ICU Rotation ....................................................2

D.    Dr. Aronson Enters the EAP Program, and is Returned
      to Work her Next Scheduled Work Day After the EAP
      Program Releases Her..........................................................................3

E.    After Raising No Issues with Her Negative Assessments
      or the EAP Referral when She Met with Drs. Norcia and
      Wallace, Dr. Aronson Submits a Written Rebuttal on
      November 28 and Attempts (Without Success) to get Support
      from Other Attending Physicians..........................................................3

F.    When Offered a 6-Month Extension of Her Residency, Dr.
      Aronson Acknowledges the Validity of the Program's Concerns
      and Accepts the Offer Knowing it is a Non-Appealable Decision ...................4

G.    The Residency Program Allows Dr. Aronson to Set Her Schedule,
      so She Forces the Program to Schedule her in the ICU for August,
      and then Claims that Assignment Violated her FMLA Rights..........................6

H.    Based on Dr. Aronson's May 2009 Assessments and Other
      Complaints, Dr. Wallace Judges that She is Not Qualified to
      Graduate, but the Residency Program Concludes She should
      be Permitted to Graduate Despite its Reservations about her
      Performance in Some Non-Routine Situations ...................................6

II.   LAW AND ANALYSIS .................................................................................7

A.    Under the HCQIA, UHC is Entitled to Summary Judgment
      on Every Claim in Dr. Aronson's Complaint ....................................7

      1.  Counts I. II, III, V and VI are Subject to HCQIA Immunity......................9

2.   The Count IV Challenges Action that is Immune
Under § 11112(a)(2) ...........................................................................14

B.   Under the Ohio State Peer Review Immunity Statute, UHC is
Entitled to Summary Judgment as to Dr. Aronson's State-Law Claims..........14

C.   Dr. Aronson Cannot Establish Any of Her Claims against UHC ...................15

1.   Dr. Aronson's Breach of Contract Claim Fails as a
Matter of Law .............................................................................15

2.   Dr. Aronson's Unjust Enrichment Claim Fails as a
Matter of Law .............................................................................17

3.   Dr. Aronson's Tortious Interference Claim Against UHC
with regard to Sheridan Healthcare (Count III) Fails
as a Matter of Law ......................................................................17

4.   Dr. Aronson's Tortious Interference Claim with regard to
Sheridan HealthCorps (Count IV) Fails as a Matter of Law ...................18

5.   Dr. Aronson's Claim for Interference with Her Maternity
Leave under FMLA Fails as a Matter of Law............................................19

6.   Dr. Aronson's Claim for Interference with Her Adoption
Leave under FMLA also Fails as a Matter of Law ...................................20

III.   CONCLUSION....................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Ament v. Reassure Am. Life Ins. Co.*,
    180 Ohio App.3d 440 (Ohio App. 8th Dist. 2009) ..................................................17

*Aultman Hosp. Assn. v. Community Mut. Ins. Co.*,
    46 Ohio St.3d 51 (1989)..................................................................................17

*Board of Curators of University of Missouri v. Horowitz*,
    435 U.S. 78, 98 S.Ct. 948 (1978) ......................................................................13

*Brader v. Alleghany General Hospital*,
    167 F.3d 832 (3d Cir. 1999).......................................................................7, 14

*Doherty v. Southern College of Optometry*,
    862 F.2d 570 (6th Cir. 1988) ............................................................................16

*Dupler v. Mansfield Journal*,
    64 Ohio St. 2d, 413 N.E.2d (1980) ..................................................................17

*El-Shiekh v. Northwest Ohio Cardiology Consultants*,
    2000 WL 1298761 (Ohio App. 6th Dist. Sept. 15, 2000)......................................18

*Lennon v. Cuyahoga Cty. Juvenile Court*,
    2006-Ohio-2587, 2006 WL 1428920 (8th Dist. 2006) .........................................18

*Mathews v. Lancaster Gen. Hosp.*,
    87 F.3d 624 (3rd Cir.1996) .............................................................................14

*Sugarbaker v. SSM Health Care*,
    190 F.3d 905 (8th Cir. 1999) .............................................................................9

*Talwar v. Catholic Healthcare Partners*,
    258 Fed. Appx. 800 (6th Cir. 2007)..................................................................15

STATUTES

29 U.S.C. § 2611....................................................................................19, 20

29 U.S.C. § 2615...........................................................................................19

42 U.S.C. § 1983.............................................................................................7

42 U.S.C. § 11101...........................................................................................7

42 U.S.C. § 11111 .................................................................................................7, 8

42 U.S.C. § 11112 ...............................................................................8, 9, 11, 13, 14

42 U.S.C. § 11151 .............................................................................................7, 8, 9

O.R.C. § 2305.251 ..................................................................................................15

Title VII of the Civil Rights Act of 1964 ................................................................7

**OTHER AUTHORITIES**

29 C.F.R. § 825.122 ................................................................................................19

I.    FACTS

    A.    **In her First 2 Years of Residency, Dr. Aronson's Performance is Mixed,**
          **With Significant Concerns Raised About Efficiency and Responsiveness**

On March 1, 2006, Dr. Aronson began a 3-year program as an anesthesiology resident at

UHC. (Norcia Afft. Ex. GG).[1] By December, 2007, there was a substantial gap between Dr.

Aronson's performance and that of her peers in critical areas of hands-on anesthesiology, with a

a pattern of concern about efficiency and responsiveness. (Norcia Afft. Exs. Exs, JJ, KK, LL at

5,  7,  11 and 14, 35, 55; Ex. MM at 5.) (emphasis added). During the first half of 2008, her

performance declined further, with the same issues of responsiveness and efficiency. (Norcia

Afft. Ex. OO at 1, 2, 3 and 5) (emphasis added).

    B.    **Concerns About Dr. Aronson's Performance in the Intensive Care Unit Lead**
          **Dr. Norcia and Dr. Wallace to Meet with Her on October 14, 2009**

In September and October 2008, Dr. Aronson was assigned to work in the Intensive Care

Unit ("ICU"), where she had previously received negative assessments.  Dr. Aronson worked

with Dr. Matthew Norcia, one of the Co-Chairs of the Residency Program, on October 6-10, and

he assessed that Dr. Aronson's verbal responses to many questions or statements were delayed,

and her work took considerably longer than he expected. (Norcia Tr. 15, 31-32).  Dr. Gerald

Jonsyn  reported her clinical performance as below average. (Norcia Afft. ¶ 9, Ex. NN at 24).

Dr. Tracy Bartone reported to Dr. Norcia that Dr. Aronson had pursued a clinical course on

October 3-4 that was contrary to Dr. Bartone's instructions. (Norcia Afft. ¶ 15, Ex. QQ).

On October 14, 2008, Dr. Norcia and Dr. Matthew Wallace, the other Co-Chair of the

Residency Program, met with Dr. Aronson to address the continued pattern of negative

---

[1] A copy of the cited deposition pages and exhibits from Dr. Aronson's deposition are attached collectively hereto as Appendix 1.  Cited deposition pages from the deposition of Dr. Matthew Norcia are attached collectively hereto as Appendix 2.  Cited deposition pages from the deposition of Dr. David Wallace are attached collectively hereto as Appendix 3.  Cited deposition pages from the deposition of Dr. Jerry Shuck are attached collectively hereto as Appendix 4.  The Affidavit of Dr. Matthew Norcia is attached hereto as Appendix 5. The Affidavit of Dr. David Wallace is attached hereto as Appendix 6.  The Affidavit of Bart Bixenstine, Esq. is attached hereto as Appendix 7. Copies of unpublished decisions are attached collectively hereto in alphabetical order as Appendix 8.

assessments. (Aronson Dep. Ex. X). Dr. Aronson offered no explanation for their concerns, claiming now that "[t]he concerns weren't specified in a way that allowed a response." (Aronson Tr. 196-197). Drs. Norcia and Wallace warned Dr. Aronson that there was a possibility she would receive an overall unsatisfactory evaluation for the July-December 2008 ABA reporting period, urged her to get immediate feedback from faculty, and arranged with her to meet again in approximately six weeks. (Norcia Tr. 18, Norcia Afft. ¶ 11; Aronson Tr. 198-99)

### C. On November 24, 2009, Drs. Norcia and Wallace Meet With Dr. Aronson to Address Her Unsatisfactory Performance for the October 2008 ICU Rotation

Dr. Jonsyn's experiences with Dr. Aronson in the second half of October were even more negative. In his assessment (which was not formally entered into the evaluations database until January, 2009), Dr. Aronson did not take any responsibility for her actions, did not accept any leadership role for the service or the team, and was performing at the level of a first-year resident. (Norcia Afft. ¶ 12, Ex. RR). Dr. James Rowbottom reported to Dr. Norcia that there were many issues surrounding Dr. Aronson's month in the unit, including continued friction with Dr. Jonsyn and not taking responsibility for patients. (Norcia Afft. ¶ 12, Ex. NN at 29).

On November 24, 2008, Drs. Norcia and Wallace met with Dr. Aronson, and informed her that she had received an overall unsatisfactory assessment of her October ICU rotation. (Norcia Afft. ¶ 14; Aronson Tr. 46, 209-10). When Dr. Aronson could provide no explanation or rebuttal, Dr. Wallace asked Dr. Aronson whether she was taking any psychotropic medication. (Norcia Tr. 32-33; Aronson Tr. 199, 209-10). Dr. Aronson disclosed she was taking Topamax for migraine headaches, with a recently increased dosage. (Aronson Tr. 200). She raised as a "possibility" that side effects were impairing her performance, and suggested a referral to UHC's Employee Assistance Program ("EAP"). (Aronson Tr. 200, 210). Dr. Wallace told her he would consult with the EAP about a fitness-for-duty examination, which would require that she be taken off duty. Dr. Aronson offered no objection. (Norcia Tr. 100, 102; Aronson Tr. 210). Drs. Norcia

and Wallace told Dr. Aronson that the Residency Program might have to report her to the ABA as performing unsatisfactorily for the July-December 2008 reporting period, and that she may need to extend her residency by six months. (Norcia Tr. 18, 51 and Afft. ¶ 15, Aronson Tr. 211).

### D. Dr. Aronson enters the EAP Program, and is Returned to Work to Her Next Scheduled Work Day After the EAP Program Releases Her

Dr. Wallace consulted the EAP, and Dr. Aronson was placed on paid leave to obtain a fitness-for-duty examination. (Wallace Afft. Ex. SS). The Residency Program was barred from communicating with the EAP concerning Dr. Aronson, and she could not return to work until the EAP released her. (Aronson Tr. 119-120; Norcia Tr. 98).   The EAP released her on December 15, and she returned to work on her next scheduled work day, December 18. (Wallace Afft. ¶ 6, Ex. TT).  Dr. Aronson then commenced a previously-scheduled FMLA leave on December 22.

### E. After Raising No Issues with Her Negative Assessments or the EAP Referral When She Met with Drs. Norcia and Wallace, Dr. Aronson Submits a Written Rebuttal on November 28 and Attempts (Without Success) To Get Support From Other Attending Physicians

Dr. Aronson had already executed an employment contract with Sheridan Healthcare in Florida, at an annual salary of approximately $350,000 and with a start date of March 1, 2009, the day after the end of her third year of residency. (Bixenstine Afft. Ex. UU).  By November 28, 2008, Dr. Aronson had prepared written statement attacking the grounds for her fitness-for-duty exam and attempting to counter some of her negative evaluations. (Aronson Dep. Ex. AA).  She admitted, however, she had become "concerned that perhaps the topiramate that [she took] for migraine prophylaxis was creating a response delay in [her] of which [she] was not aware." (*Id.*) Though she later acknowledged to the Accreditation Council for Graduate Medical Education ("ACGME") that she "saw a rapid improvement in [her] speed of execution upon stopping the medication" (Aronson Dep. Ex. C), she called the fitness-for-duty examination not "justified."

While on paid leave, Dr. Aronson sought input from two attending physicians, Drs. Adam Haas and David Dininny, to counter the negative assessments of her. (Norcia Afft. Exs. VV and WW).  Dr. Haas said "that *she took longer than most* senior residents to evaluate and assess the patients on the service." (Norcia Afft. Ex.).  Dr. Dinniny said she lacked "*the ability to translate knowledge into action*."(Norcia Afft. Ex. VV and WW) (emphasis added).

F.     **When Offered a 6-Month Extension of Her Residency, Dr. Aronson Acknowledges the Validity of the Program's Concerns and Accepts the Offer Knowing it is a Non-Appealable Decision**

In mid-December, Dr. Wallace told Dr. Aronson that he would rate her performance for the second half of 2008 as unsatisfactory. (Aronson Tr. 211-12).  The Program offered Dr. Aronson the opportunity to extend her residency for six months, through August 2009. An extension would not be reportable to the Ohio State Board of Medical Examiners, although under the UHC Residency Program rules it would not be appealable. (Norcia Afft. ¶ 24).  Dr. Aronson was told she could reject the residency extension offer, which would leave UHC with a decision on whether to pursue disciplinary action, place her on probation, or refuse to graduate her at the end of her residency, all actions reportable to the Ohio State Board of Medical Examiners and for which she could appeal. (Shuck Tr. 34-36; Aronson Tr. 212-213).

Dr. Aronson consulted with legal counsel (Aronson Tr. 213), and chose the extension option.  She then submitted a letter to Dr. Nearman, dated January 6, 2009, admitting the validity of the circumstances leading to the EAP referral and for extending her residency, stating:

> I want to say first that I'm committed to completing this residency successfully, and can only be grateful that *this difficult episode has resulted in my getting rid of a medication that was having a negative effect on my functioning*. *I'm alarmed that I needed a whack on the head to identify the topamax as a problem*. As soon as I considered the possibility I stopped it, any only wish I had done so sooner. *I feel significantly better, and my spouse confirms I'm considerably more with it.  ... I'm sure that Dr. Norcia and others were correct in noting a change in my performance. ... I don't believe Drs. Wallace and Norcia have intended this process to be punitive*.

4

(Aronson Dep. Ex. Z; emphasis added).

On January 7, 2009, the Residency Program formally notified Dr. Aronson that she would receive an unsatisfactory evaluation on the semi-annual Clinical Competence Report to the ABA. (Aronson Dep. Ex. H).  The Program cited three grounds for the evaluation:

> Under the category of Essential Attributes, the committee has determined that you have been unable to demonstrate the ability to react to stressful situations in an appropriate manner. Under the category of Professionalism, you have failed to carry out your professional responsibility of notifying the Residency Program Directors that you were taking a prescribed medication that could impair your judgment and/or job performance, as required by hospital policy. Additionally, under the category of Patient Care, you have failed to demonstrate your ability to recognize and respond appropriately to significant changes in the anesthetic course.

(*Id.*). That same day, Dr. Aronson wrote another letter to Dr. Nearman, in which she "concur[red] that this medication had an effect on [her] performance," and that she was "***aware of the subtle recovery in my verbal skills and speed of execution since discontinuing the medication at the end of November***."(Aronson Dep. Ex. V; emphasis added

On January 15, 2009, Dr. Aronson submitted a letter to Dr. Longfellow, her key contact at Sheridan Healthcare in Florida, in which she stated:

> Over the past year I had been taking a medication (Topamax) for migraine prophylaxis. During recent months the dose was increased and ***I developed side effects which affected my clinical performance***. I continued to receive satisfactory evaluations from faculty and received an excellent score on the Anesthesia Residency In-Training Exam. Because of the gradual onset of the symptoms, however, ***I did not identify the medication as a problem until December, when I received an unsatisfactory evaluation for my October ICU rotation***.
>
> As you know, if unsatisfactory performance is identified at any time during our final 6 months of training, the entire 6 month block must be repeated. ***I promptly stopped the medication as soon as this concern arose, and have noted a significant difference, as have my family and colleagues***. I am distraught that this has occurred at this late date, though I'm certainly glad the problem was identified and corrected before I took a position as an independent practitioner.

(Aronson Dep. Ex. W; emphasis added).

On January 27, 2009, Dr. Nearman emailed to Dr. Aronson, stating:

I find honesty is the best policy, but will leave the final decision to you.  ***Is it OK to tell him that your performance was not satisfactory***, and that, upon evaluating the possibilities as to why, we came up with the potential drug side effect.

(Aronson Dep. Ex. CC; emphasis added).  On or around January 27, 2009, Dr. Aronson gave Dr. Nearman the make that statement to Sheridan Healthcare. (Aronson Tr. 214).

On February 4, 2009, Dr. Aronson met with Drs. Norcia and Wallace to plan for the extension of her residency. (Aronson Dep. Ex. I).  In a remediation plan document, Dr. Aronson agreed to a six-month schedule that would include a month in ICU. (*Id*.)  On February 25, she signed a contract committing to the 6-month extension of her residency, through the end of August, 2009. (Aronson Dep. Ex. J).

### G.  The Residency Program Allows Dr. Aronson to Set Her Schedule, so she Forces the Program to Schedule her in the ICU for August, and then Claims That Assignment Violated Her FMLA Rights

The Residency Program allowed Dr. Aronson to schedule her monthly rotations for the residency extension. Dr. Aronson finally scheduled her ICU rotation for June, but failed to work in the ICU in June, forcing the Program to schedule her for the ICU in August. (Aronson Tr. 155, 158, 163-64; Dep. Exs. L, M, N; Wallace Afft. ¶ 7.)  When she then complained, she was relieved of her commitment to repeat the ICU rotation. (Norcia Afft. Ex. ZZ).

### H.  Based on Dr. Aronson's May 2009 Assessments and Other Complaints, Dr. Wallace Judges that She is Not Qualified to Graduate, But the Residency Program Concludes She Should Be Permitted to Graduate Despite Its Reservations About Her Performance in Some Non-Routine Situations

In May, 2009 there were several strongly-worded negative assessments of Dr. Aronson. (Wallace Afft. Exs. AAA and BBB).  Drs. Norcia and Wallace met with her on June 4, 2009, and Dr. Wallace told her his opinion was that she was not going to get a satisfactory assessment for the six-month period from January-June 2009. (Wallace Tr. 27).  However, the Program's overall assessment of Dr. Aronson (over Dr. Wallace's dissent) was that she was qualified to graduate despite problems in some non-routine situations. (Norcia Afft. ¶ 29; Norcia Tr. 75).

In substance, this was the message that was communicated to credentialing bodies and prospective employers – that Dr. Aronson had previously had a performance issue requiring the extension of her residency that was most likely related to taking medication, and she was qualified to practice anesthesiology, but that the Residency Program had reservations concerning her ability to handle some non-routine situations that involved high stress and the need to multitask.  (Norcia Tr. 69-70; Norcia Afft. ¶ 30).

II.    **LAW AND ANALYSIS**

    A.    **Under the HCQIA, UHC Is Entitled To Summary Judgment on Every Claim in Dr. Aronson's Complaint**

<u>All</u> of the challenged UHC actions were professional review actions that are immune from Dr. Aronson's challenges under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11101, *et seq.*[2] The intent of the HCQIA is "to reinforce the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise." *Brader v. Alleghany General Hospital*, 167 F.3d 832, 849 (3d Cir. 1999).

The HCQIA provides immunity for "professional review actions" which are "taken or made in the conduct of professional review activity." 42 U.S.C. § 11151.  A "professional review activity" is generally an activity taken by a health care entity (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity, (B) to determine the scope or conditions of such privileges or membership, or (C) to change or modify such privileges or membership. 42 U.S.C. § 11151(10).  A "professional review action" is:

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and

---

[2] The only claims exempted from HCQIA immunity are civil rights claims brought under 42 U.S.C. § 1983 or Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 11111.  Neither of these types of claims are at issue here.

which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

42 U.S.C. § 11151(9).

The HCQIA also provides additional qualified immunity as follows:

[N]o person . . . providing information to a professional review body regarding the competence or professional conduct of a physician shall be held, by reason of having provided such information, to be liable in damages under any law of the United States or of any State . . . unless such information is false and the person providing it knew that such information was false.

42 U.S.C. § 11111(a)(2).

A health care entity's "professional review action" is entitled to immunity under the HCQIA if the following four conditions are met:

(1)     it was taken in the reasonable belief that the action was in furtherance of quality healthcare;

(2)     it was taken after a reasonable effort to obtain the facts of the matter;

(3)     it was taken after adequate notice and hearing procedures are afforded to the physician involved or such other procedures as are fair to the physician under the circumstances; and

(4)     in the reasonable belief that the action was warranted by the facts known after such reasonable effect to obtain the facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a). *See Meyers*, 341 F.3d at 467.

The HCQIA creates "a rebuttable presumption of immunity, forcing the plaintiff to prove that the defendant's actions did **not** comply with the relevant standards." *Meyers*, 341 F.3d at 467-468 (emphasis added).  This presumption creates an "unconventional" summary judgment standard, which asks the question: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendant's actions are **outside** the scope of § 11112(a)?" *Id.*, at 468 (emphasis added).  A plaintiff must overcome the presumption by showing that the review process was manifestly

unreasonable. *Id.*  "[B]ad faith on the part of the reviewers is irrelevant…." *Sugarbaker v. SSM Health Care*, 190 F.3d 905, 914 (8th Cir. 1999).

### 1.  Counts I, II, III, V and VI are Subject to HCQIA Immunity

Dr. Aronson challenges UHC's professional review actions as follows:

(i)   directing that she submit to a fitness-for-duty evaluation (Count V, as an FMLA violation relating to maternity leave taken in December 2008);

(ii)   assessing her July-August 2008 performance as unsatisfactory (Count I, as a breach of an alleged contractual "due process" entitlement, and Count III, tortious interference);

(iii)   offering her a six-month remedial residency extension when the ABA would have permitted a 4-month extension (Count II, as unjust enrichment);

(iv)   assigning her to the ICU for the last rotation of her remediation period (which it then changed at her request) (Count VI, as an FMLA violation).

UHC is a "health care entity," since it is a hospital licensed in the state of Ohio. 42 U.S.C. § 11151(4)(A)(i). (Norcia Afft. ¶ 3). Its Anesthesiology Credentials Committee and the attending anesthesiologists who provided assessments of residents are protected as "professional review bod[ies]." 42 U.S.C. § 11151(11). (Norcia Afft. ¶¶ 4-6).  As the product of "professional review activit[ies]," each of the four above-listed actions of which Dr. Aronson complains are "professional review action[s]" under 42 U.S.C. § 11151(9), so that UHC is immune from Dr. Aronson's claims unless she can show by a preponderance of the evidence that UHC's actions "are outside the scope of § 11112(a)," *Meyers*, 341 F.3d at 468.

### a.  Each Challenged Action was Taken in the Reasonable Belief that it Would Further the Quality of Health Care

The "reasonable belief" standard in § 11112(a)(1) of the HCQIA is satisfied if "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Badri*, 691 F.Supp.2d at 765 (quoting *Mathews v. Lancaster Gen. Hosp.*, 87

F.3d 624, 635 (3rd Cir.1996)). This requirement is "an objective standard, rather than a subjective good faith requirement." *Meyers*, 341 F.3d at 468 (citing *Bryan*, 33 F.3d at 1323).

As to the decision that Dr. Aronson undergo a fitness-for-duty examination after disclosing her use of Topamax, she admitted that "the highest priority is to ensure patient safety and clinical reliability" (Aronson Dep. Ex. AA) and that she saw "a rapid improvement in [her] speed of execution upon stopping the medication." (Aronson Dep. Ex. C). Her admissions leave no dispute as to a reasonable belief that the EAP referral furthered the quality of health care.

The decisions to report her as performing unsatisfactorily for July-December 2008, offer her a residency extension, and schedule her for an ICU rotation in August 2009, were also founded on a reasonable belief that they furthered the quality of health care. Dr. Aronson acknowledged that taking Topamax "was having a negative effect on my functioning" (Aronson Dep. Ex. Z), "which affected my clinical performance" (Aronson Dep. Ex. W). Numerous anesthesiologists expressed serious concerns about her efficiency and responsiveness. (Norcia Afft. ¶ 12, Exs. QQ, VV, RR and NN (at 29)). Her failure to disclose that she had been taking Topamax further called her decision-making abilities into question. *See Meyers*, 341 F.3d at 468 (affirming summary judgment under HCQIA in that "'quality health care' is not limited to clinical incompetence, but includes matters of general behavior and ethical conduct.'"). UHC therefore had reasonable concerns about Dr. Aronson's ability to provide quality health care.

### b.    Each Challenged Action was Taken after a Reasonable Effort to Obtain the Facts

The "reasonable efforts" inquiry is "whether the 'totality of the process' leading up to the professional review action evinced a reasonable effort to obtain the facts of the matter." *Meyers*, 341 F.3d at 469 (quoting *Mathews*, 87 F.3d at 637). The HCQIA does not require a comprehensive examination. *Id.*, at 468.

Over several months, many UHC anesthesiologists raised concerns about Dr. Aronson's efficiency and responsiveness. (Aronson Dep. Ex. AA; Norcia Afft. ¶¶ 12, 14, Exs. PP, QQ, RR, and NN (at 29)).  Dr. Norcia and Dr. Wallace met with Dr. Aronson twice in a "reasonable effort to obtain the facts of the matter."  Dr. Aronson finally disclosed to them her use of Topamax and her own concern that "perhaps the topiramate …was creating a response delay in me of which I was not aware." (Aronson Dep. Ex. AA).  The totality of this process satisfies the second prong of immunity under 42 U.S.C. § 11112(a)(2) as to all of UHC's challenged actions.

### c. Each Challenged Action Was Made after Adequate Notice and Fair Procedures

The third element of the HCQIA immunity test requires that the challenged actions were taken "after adequate notice and hearing procedures afforded to physician or other such procedures that are fair to the physician." 42 U.S.C. § 11112(a)(3). "The HCQIA does not require that a professional review body's entire course of investigation conduct meet particular standards in order for it to be immune from liability for its ultimate decision." *Badri*, 691 F.Supp.2d at 768 (*quoting Brader*, 167 F.3d at 842).  The notice and procedure elements may be "waived voluntarily by the physician." 42 U.S.C. § 11112(b).  The notice and procedure elements are not required where "there is no adverse professional review action taken," or where the failure to impose "an immediate suspension or restriction of clinical privileges" "may result in an imminent danger to the health of any individual." 42 U.S.C. § 11112(c)(1)(A) and § 11112(c)(2).

The decision to require Dr. Aronson to undergo a fitness-for-duty examination was not an "adverse professional review action," and was taken immediately after Dr. Aronson disclosed her use of Topamax and her concern about its possible side effects on her cognitive thinking.  That action therefore falls within the scope of 42 U.S.C. § 11112(c)(1)(A) as well as § 11112(c)(2).  She was notified of the decision the same day she disclosed her use of Topamax and her concerns about its effects.  She then expressly waived any entitlement to further procedure

concerning the decision, stating, "I am, however, willing to complete the process as currently laid out in a timely fashion." (Aronson Dep. Ex. AA).

UHC's decision to assign Dr. Aronson to a rotation in the ICU in August 2009 was also not an "adverse professional review action," not only because there was nothing adverse to Dr. Aronson's professional standing in the assignment, but because Dr. Aronson's objections to the assignment led to the assignment being cancelled.  That decision therefore also constitutes a decision for which the notice and procedure requirements of § 11111(a)(3) are not required.

There is also no dispute that Dr. Aronson was provided advance notice of UHC's decision to report to the ABA that she had unsatisfactory performance for the July-December 2008 reporting period.  She was informed of the possibility of such a report on October 14, 2008 and again on November 24, 2008 (Norcia Tr. 18, 51; Norcia Afft. ¶¶ 11, 15; Aronson Tr. 191, 198-99, 211-12).  She was provided advance notice of her options – to accept the offer to extend her residency or face academic disciplinary action that would be appealable. (Aronson Tr. 212).

Dr. Aronson cites in her Complaint the ACGME  notice requirement concerning a decision "not to renew or not to promote." (Complaint, ¶¶ 43-47).  However, Dr. Aronson was in the final months of her residency, so the negative evaluation did not involve a decision "not to renew or not to promote" her.  Dr. Aronson also alleges that UHC failed to comply with the ACGME requirement of an appeal of her negative evaluation (Complaint ¶45), but the ACGME requirement applies only to "disciplinary actions," whether academic disciplinary actions or some other disciplinary actions, and a negative 6-months evaluation is not a disciplinary action.

Even assuming a negative evaluation was a form of discipline, Dr. Aronson received all the due process that was required.  As the U.S. Supreme Court has explained in the case of academic dismissal (for which UHC would have provided an internal appeal):

> [D]ue process requires … "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the

> authorities have and an opportunity to present his side of the story." ... All that [is] required [is] an "informal give-and-take" between the student and the administrative body dismissing him that would, at least, give the student "the opportunity to characterize his conduct and put it in what he deems the proper context."

*Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 85-86, 98 S.Ct. 948, 952-53 (1978) (citations omitted).  As the Supreme Court held further,

> We decline to further enlarge the judicial presence in the academic community and thereby risk deterioration of many beneficial aspects of the faculty-student relationship. We recognize . . . that a hearing may be "useless or harmful in finding out the truth as to scholarship."

*Id.*, at 90 (citation omitted).  Dr. Aronson was presented with the negative assessments that formed the basis for the 6-month unsatisfactory evaluation.  She had the opportunity to object to them and she did so, in her November 28, 2008 letter. (Aronson Dep. Ex. AA).  She had the opportunity to submit input from attending physicians as to her competency, and she took the opportunity to do so, but results that were adverse to her. (Norcia Afft. Exs. VV and WW).

Dr. Aronson also waived her right to appeal, in satisfaction of 42 U.S.C. § 11112(b).  After consulting with her legal counsel, she dropped her objections to the evaluation decision, and chose the extension option. (Aronson Tr. 213).  She then informed UHC that she was "sure that Dr. Norcia and others were correct in noting a change in [her] performance" (Aronson Dep. Ex. Z), and "that this medication had an effect on [her] performance." (Aronson Dep. Ex. V). *See also* Aronson Tr. 214, Dep. Ex. CC; Norcia Afft. Ex. CCC.  On February 25, 2009, she signed a contract committing the Residency Program to continue her residency status for an additional 6 months. (Aronson Dep. Ex. J).  Only when she had the Residency Program contractually committed did she claim an entitlement to appeal the negative evaluation. (Aronson Dep. Ex. C).

### d.    Each Challenged Action Was Made in the <u>Reasonable Belief that It Was Warranted</u>

The final inquiry under 42 U.S.C. § 11112(a) is "whether the professional review action was taken in the reasonable belief that the action was warranted by the facts known after a

reasonable effort to obtain those facts." *Brader*, 167 F.3d at 843.  This analysis closely tracks the analysis under the first inquiry under the HCQIA. *Id.*

Dr. Aronson takes issue with the judgment of most of the anesthesiologists who submitted negative assessments of her, but, "a plaintiff's showing 'that [the] doctors reached an incorrect conclusion on a particular medical issue because of a lack of understanding' does not meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality in participating in the peer review process." *Brader*, 167 F.3d at 843 (quotation omitted).  Dr. Aronson cannot show the facts relied upon by UHC were "so obviously mistaken or inadequate as to make reliance on them unreasonable." *Mathews*, 87 F.3d at 638.

### 2.    Count IV Challenges Action That Is Immune Under § 11112(a)(2)

In Count IV of her Complaint, Dr. Aronson challenges UHC's communication "to a professional review body concerning [her] competence or professional conduct." 42 U.S.C. § 11112(a)(2).  Because Dr. Aronson cannot show that UHC knew that the information it provided was false, UHC's actions are entitled to immunity under the HCQIA.

It is undisputed that UHC received many negative assessments of Dr. Aronson covering her performance in May 2009. (Wallace Afft. Exs. AAA and BBB).  In light of these negative assessments, there can be no triable claim that UHC knew that the information it communicated -- that Dr. Aronson was at least minimally qualified to practice anesthesiology, but that there were reservations concerning her ability to handle some non-routine situations -- was false at the time the information was communicated.

### B.    Under the Ohio State Peer Review Immunity Statute, UHC Is Entitled To Summary Judgment as to Dr. Aronson's State-Law Claims

Ohio's peer review immunity statute provides that "[n]o health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of

the functions of a peer review committee of the health care entity." O.R.C. § 2305.251(A).  Like the HCQIA, Ohio state law also protects the communication of information:

> No person who provides information . . . without malice and in the reasonable belief that the information is warranted by the facts known to the person shall be subject to suit for civil damages as a result of providing the information.

O.R.C. § 2305.251(D).  To overcome this privilege, "the party seeking relief must present clear and convincing evidence that defendants acted with actual malice." *Talwar v. Catholic Healthcare Partners*, 258 Fed. Appx. 800, 809 (6th Cir. 2007) (quotation omitted).  "Actual malice" is established only by proof that UHC made the statements "with knowledge they were false or with reckless disregard for whether they were true or false." *Id.*  For the same reasons that establish immunity under the HCQIA, Dr. Aronson cannot establish that UHC took any action or made any statement in connection with its peer review process of her with "actual malice," i.e., "with knowledge they were false or with reckless disregard for whether they were true or false." *Id.  See Talwar*, 258 Fed. Appx. at 808 (affirming summary judgment under § 2305.251, finding that "mere inaccuracies in statements and alleged improper motivations by speakers are insufficient to show actual malice.")

**C.     Dr. Aronson Cannot Establish Any of Her Claims against UHC**

Separate and apart from immunity under the HCQIA and Ohio state law, Dr. Aronson still cannot establish a triable issue as to any of her claims against UHC.

**1.     Dr. Aronson's Breach of Contract Claim Fails as a Matter of Law**

Dr. Aronson claims that UHC violated its contractual commitment "to provide an educational program that at a minimum meets the standards established by the ACGME" (*id.*, at ¶ 17), by (i) forcing her to work excessive hours in September and October 2008, and (ii) denying her "due process" in the form of an appeal of her unsatisfactory evaluation.

In an academic context, "judicial intervention in any form should be undertaken only with the greatest reluctance." *Doherty v. Southern College of Optometry*, 862 F.2d 570, 576 (6th Cir. 1988) (citing *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985)). As explained in *Doherty*:

> The federal judiciary is ill equipped to evaluate the proper emphasis and content of a school's curriculum. This is the case especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession. This judicial deference to educators in their curriculum decisions is no less applicable in a clinical setting because evaluation in a clinical course "is no less an 'academic' judgment because it involves observation of ... skills and techniques in actual conditions of practice, rather than assigning a grade to ... written answers on an essay question."

*Id.*, at 576-77 (citing *Horowitz*, 435 U.S. at 89-91).

Dr. Aronson cannot claim that she was assigned hours in excess of ACGME standards (*see* Wallace Afft. ¶ 9; Ex. DDD).  She admitted her September hours were within ACGME limits. (Aronson Dep. Ex. F).  She claims her October hours totaled 362, just 9 hours over the limit. (Aronson Tr. 135-37, 139; Dep. Ex. G).  However, the report form all Residents must submit each month concerning their monthly hours, states: "If you answered **NO** to any of the above questions please contact your Program Director or the Graduate Medical Education office." (Aronson Dep. Ex. G) (emphasis in original).  Dr. Aronson admittedly failed to comply with this instruction (Aronson Tr. 139), which bars her contract claim, since it prevented UHC from curing any hours overage or factoring such additional hours into its assessment of her.

Lastly, as explained above, with regard to Dr. Aronson's claim that UHC breached its contract by extending her residency without any opportunity for appeal, UHC provided Dr. Aronson with the requisite level of "due process" as a matter of law.

### 2.      Dr. Aronson's Unjust Enrichment Claim Fails as a Matter of Law

A claim for unjust enrichment cannot apply when an express contract exists. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989).  Dr. Aronson claims that UHC was unjustly enriched by extending her residency. (Complaint, ¶¶ 66-69).  However, Dr. Aronson entered into an express contract with UHC to extend her residency training. (Aronson Dep Ex. J), so she can have no unjust enrichment claim.

### 3.      Dr. Aronson's Tortious Interference Claim Against UHC With Regard to Sheridan Healthcare (Count III) Fails as a Matter of Law

Dr. Aronson claims UHC's negative evaluation of her July-December 2008 performance tortiously interfered with her prospective employment with Sheridan Healthcare. (Complaint, ¶ 71-76).  Separate and apart from the HCQIA and Ohio's peer review law, but based on the same evidence, UHC's conduct was privileged, and Dr. Aronson cannot overcome that privilege by any showing of "actual malice."

> The defense of justification or privilege applies as follows:
>
> One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction.

*Ament v. Reassure Am. Life Ins. Co.*, 180 Ohio App.3d 440, 456-57 (Ohio App. 8th Dist. 2009).

It cannot be disputed that UHC was required to submit semi-annual evaluations of Dr. Aronson to the ABA, so it had a qualified privilege with regard to its actions that Dr. Aronson cannot overcome because, as shown above, she cannot show "actual malice." "[A]ctual malice may not be inferred from evidence of personal spite, ill-will or intention to injure . . . There must be a showing that false statements were made with a 'high degree of awareness of their probable falsity." *Dupler v. Mansfield Journal*, 64 Ohio St. 2d at 119, 413 N.E.2d at 1190.  Dr. Aronson has accused various UHC representatives, Dr. Wallace in particular, of bearing ill will toward

17

her, but Ohio courts have repeatedly rejected such attempts to inject claims of ill will into tortious interference actions. *See A & B-Abell Elevator Co.*, 73 Ohio St.3d at 11 ("The lack of an innocent motive is insufficient to defeat a qualified privilege.").  As shown above, she has no evidence of falsity or any "high degree of awareness of … probable falsity."

### 4.      Dr. Aronson's Tortious Interference Claim With Regard to Sheridan HealthCorps (Count IV) Fails as a Matter of Law

Dr. Aronson signed a written release of all claims she may have against UHC with regard to Sheridan HealthCorps at Peninsula Regional Medical Center. (*See* Aronson Dep. Ex. U). Because Dr. Aronson expressly released UHC from any claims concerning information provided to Sheridan HealthCorps, Dr. Aronson's claim for tortious interference should be denied.

Even ignoring her release, Dr. Aronson's claim against UHC for tortiously causing the delay of her employment with Sheridan HealthCorps should also be denied for the same reasons that Dr. Aronson's claim against UHC for tortious interference with regard to her contract with Sheridan Healthcare should be denied.

"Generally, a communication made in good faith on a matter of common interest between an employer and an employee, or between two employees concerning a third employee, is protected by qualified privilege." *Lennon v. Cuyahoga Cty. Juvenile Court*, No. 86651,2006 WL 1428920, at *6 (8th Dist. May 25, 2006).  Dr. Aronson alleges her start date in employment by Sheridan HealthCorps "was delayed because her new employer received 'damaging information' . . . that had been submitted by [UHC] . . ." (Complaint, ¶ 61).  Dr. Aronson has no evidence that any communication was made with actual malice, or that is was anything more than protected expressions of professional opinion.  *See El-Shiekh v. Northwest Ohio Cardiology Consultants*, 2000 WL 1298761, *5-6 (Ohio App. 6th Dist. Sept. 15, 2000) (affirming dismissal of plaintiff's tortious interference claim, holding that "opinions, statements which can be proven neither true nor false," are a defense to a claim for tortious interference.)

### 5.  Dr. Aronson's Claim for Interference with Her Maternity Leave Under FMLA Fails as a Matter of Law

Dr. Aronson alleges in her Complaint that UHC "interfered with [her] right to maternity leave in violation of 29 U.S. C. § 2615(a)(1)." (Complaint, ¶¶ 88, 95). To prevail on her FMLA interference claims, Dr. Aronson must prove, *inter alia*, that she was entitled to leave under the FMLA; and that UHC denied her FMLA benefits to which she was entitled. *Edgar,* 443 F.3d at 507. However, the FMLA is not a "strict-liability statute." *Id.*, at 507-08.  To show that an employer's interference has prevented the employee's "meaningful exercise of FMLA rights," a plaintiff must show that the interference resulted in harm. *Id.*, at 508 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). Actions also do not violate the FMLA if the employer has a legitimate basis for engaging in the challenged conduct. *Edgar*, 443 F.3d at 508.

Dr. Aronson makes no claim that she was denied the right to take FMLA leave to the full extent of the FMLA.  Her Complaint is that, because she was forced to take 12 days of leave for the fitness-for-duty examination process, her ability to take advantage of her FMLA leave entitlements could, under ABA rules, require her to make up the last time.

Under the FMLA and the regulations applicable at the time, a son or daughter "means a biological, adopted, or foster child, a stepchild, a legal ward, or a child of a person standing in loco parentis." 29 U.S.C. § 2611(12); 29 C.F.R. § 825.122(c).  Dr. Aronson's request for leave in December, 2008 was for the birth of her domestic partner's child, which could be covered by the FMLA only if Dr. Aronson had established, prior to childbirth, a qualifying status under 29 U.S.C. § 2611(12).[3]

---

[3] UHC recognizes that, on June 22, 2010, the U.S. Department of Labor revised the interpretation of "son or daughter" so as to include individuals who care for the child regardless of legal or biological relationship. *See* U.S. Dept. of Labor Admin. Interpretation No. 2010-3 (copy attached hereto with Appendix 8).  However, the interpretation was not in effect at the time Dr. Aronson requested her leave under the FMLA, nor is the interpretation retroactive.

Even if Dr. Aronson were entitled to FMLA leave, there is no dispute that Dr. Aronson was never prevented by UHC from taking leave to the full extent permitted under the FMLA. And the potential consequence of being required <u>academically</u> to make up for FMLA leave days is not a cognizable harm under the FMLA and raises no FMLA issues.

### 6.    Dr. Aronson's Claim for Interference with Her Adoption <u>Leave Under FMLA Also Fails as a Matter of Law</u>

Dr. Aronson alleges that UHC interfered with her FMLA rights by scheduling her for an ICU rotation during August, 2009, after she submitted a request for FMLA leave during the end of August to finalize the adoption of her son. (Complaint, ¶¶ 94-95).  Here, again, she asserts only that the ICU rotation made taking FMLA leave more difficult <u>academically</u>.  In addition, immediately after Dr. Aronson informed UHC that her scheduled rotation conflicted with her FMLA leave, UHC relieved her of the requirement to work the ICU rotation, thereby **accommodating** Dr. Aronson's request for FMLA leave rather than **interfering** with it. (Aronson Tr. 169-170).

## III.    <u>CONCLUSION</u>

For all the foregoing reasons, the Court should grant UHC's motion and dismiss Dr. Aronson's Complaint.

Respectfully submitted,

*/s/Barton A. Bixenstine*_____
Barton A. Bixenstine (0034130)
Daniel L. Messeloff (0078900)
Ogletree, Deakins, Nash, Smoak, & Stewart, P.C.
4130 Key Tower
Cleveland, OH  44114
Ph:  216.241.6100
Fax:  216.357.4733
Email:  Bart.Bixenstine@OgletreeDeakins.com
               Daniel.Messeloff@OgletreeDeakins.com

*Attorneys for Defendant*
*University Hospitals of Cleveland, Inc.*

20

## LOC. R. 7.1(f) CERTIFICATION

I hereby certify that this case is on the standard track and that this Memorandum adheres to the page limitation established in Loc. R. 7.1(f).

/s/Daniel L. Messeloff
Attorney for Defendant
University Hospitals of Cleveland, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2011, a copy of the foregoing *Defendant University Hospitals of Cleveland, Inc.'s Motion for Summary Judgment and Memorandum of Law in Support* was filed electronically with the Court using the CM/ECF system.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/Daniel L. Messeloff
Attorney for Defendant
University Hospitals of Cleveland, Inc.

9602010.1 (OGLETREE)