1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

Sarah Aronson, M.D.,          )
                              )
            Plaintiff,        )
                              )
      vs.                     )    Case No. 1:10-CV-372
                              )    Christopher Boyko, J.
University Hospitals of       )
Cleveland,                    )
                              )
            Defendant.        )


- - -


        Deposition of Sarah Aronson, M.D., the

plaintiff herein, called on behalf of the defendants

for cross-examination, pursuant to the Federal Rules

of Civil Procedure, taken before Constance Versagi,

Court Reporter and Notary Public in and for the

State of Ohio, pursuant to notice, at the offices of

Ogletree Deakins, 4130 Key Tower, Cleveland, Ohio on

Monday, December 13, 2010, commencing at 9:12 a.m.

        - - -

41

```
1          afterwards in October.  I would say it was not
2          specific or in any depth.
3    Q     What do you recall him saying then at the
4          October -- we're going to get into the October
5          meeting by the way, you raised it with
6          Dr. Norcia in context of the list, perhaps we
7          can focus on that for the moment, we will
8          follow up with the rest.  What do you recall
9          him saying at the October meeting pertaining
10         to his concerns arising from your work with
11         him earlier in October?
12   A     I remember him saying that he felt that it
13         took me a long time to answer when asked, say
14         if a question came up during rounds, that it
15         took me a long time to answer a question.  He
16         said that when I did get around to answering
17         the question, I would get it correctly.  It
18         did seem to take me a long time to express my
19         thoughts.
20   Q     Is there anything more you can recall than
21         that?
22   A     Not that I can recall.
23   Q     Again this is not a test, so I may have
24         something to help you with that.
25                   (Defendant Exhibit B
```

46

| | | |
|---|---|---|
| 1 | | rotation.   The October meeting might have been |
| 2 | | within a week after the end of the rotation? |
| 3 | A | The rotation was the entire month of October. |
| 4 | Q | Is it fair to say this accurately reflects the |
| 5 | | evaluation period, or was the evaluation |
| 6 | | period something other than October 6th to |
| 7 | | October 10th, that is what it refers to on the |
| 8 | | first page here? |
| 9 | | MR. GORDILLO:      Objection, form. |
| 10 | Q | Go ahead and look at the first page of this |
| 11 | | document. |
| 12 | A | Your question is? |
| 13 | Q | Turn it, I'll ask the question.   Does the |
| 14 | | document accurately reflect that the period |
| 15 | | within which you worked with Dr. Norcia in |
| 16 | | October goes from October 6th to October 10th? |
| 17 | A | I don't remember the exact dates.   I do know |
| 18 | | it was very early in the month that he was |
| 19 | | covering the ICU.   I don't remember the exact |
| 20 | | dates. |
| 21 | Q | You were in the ICU rotation the entire month |
| 22 | | of October? |
| 23 | A | Yes. |
| 24 | Q | That is why, in your best recollection, your |
| 25 | | reference to this being discussed with you |

102

1               time.

2        Q      Did you communicate the same information to

3               each of them, concerning the extension now?

4        A      Approximately, yes.  I don't remember the

5               exact wording that I used in each instance.

6        Q      What was the information you communicated

7               concerning the extension of these

8               institutions?

9        A      I communicated to them that I had an ongoing

10              dispute with my residency.  That it was likely

11              there would be negative information

12              communicated to them when they requested

13              verification of my training.  That I would be

14              available to address any concerns that might

15              arise when they received that paperwork.

16       Q      Anything further that you communicated

17              concerning your extension to those three

18              institutions besides what you just told me?

19       A      That was the gist of it.  I'm not recalling

20              any other specific information that I

21              communicated to them.

22       Q      So none of them asked you to address anything

23              as a follow-up to what you told them when you

24              said you were available to address things, no

25              one followed up to ask you to address

110

1  you communicate concerning the extension in

2  and of itself in writing to the Maryland

3  Medical Board, the Michigan Medical Board,

4  Federal Credentials Verification Service and

5  Comp Health, if you did it, would that have

6  been in writing?

7  A  I believe, yes.

8  Q  You kept copies of that?

9  A  Not in all circumstances.

10  Q  Why not?

11  A  For example with the Maryland licensing

12  process, when I was in the process of

13  obtaining my Maryland license, I had to write

14  a statement to the company -- it was a form --

15  I don't remember exactly.  A form or something

16  I had to write.  I kept a copy of it until the

17  license was approved.  I don't think I

18  retained a copy of what I wrote.  I may have.

19  I don't know that I made a point of doing

20  that.  Once the license went through, it was

21  not --

22  Q  What did you say to -- what do you recall

23  saying in any letter concerning the extension

24  in and of itself, residency extension?  Pick

25  the first letter you can recall, tell me what

111

1          you recall saying in it.

2    A     With the Maryland Medical Board, I chose to

3          frame it as a medical problem because I felt

4          that would be the least damaging to my

5          professional standing.

6    Q     How did you do that, what did you say, what

7          did you write?

8    A     To the best of my memory I said in essence,

9          I'm not quoting, that I had a transient

10         medical issue that caused me to lose some

11         training time, and graduation was delayed.

12         That it was no longer an issue.

13   Q     Did you say something different than that in

14         substance either in writing or orally to

15         anyone else of the group of individuals, I can

16         list them for you again if you need me to?

17   A     Yes.  I would say that my description changed

18         at later dates.

19   Q     What do you recall saying at a later date that

20         was different and to whom?

21   A     At a later time, I communicated that I felt

22         that the extension of my -- I'm not sure I

23         said that.  I communicated that my residency

24         would likely write negative things about me as

25         I mentioned before.  In essence that there was

112

```
1          a training extension that I didn't feel was a
2          valid one, was still an issue under active
3          dispute.
4    Q     Who did you write that to, or say that to?
5    A     Dr. Mishra, Springfield Hospital, Bay City,
6          maybe Dr. Chapetta, Easton, Dr. Wilson,
7          Hammet, Dr. Simon.  Again possibly
8          Youngstown.  I'm not certain about that, how
9          far along in the process I got with them.
10   Q     The Michigan Medical Board and the Federal
11         Credentialing Verification Service, what did
12         you say to them concerning the extension?
13   A     I should correct that with Michigan.  I don't
14         believe that they needed any information.
15         They just needed verification of all my other
16         licenses.  The Michigan Medical Board I don't
17         think needed a residency verification.  I
18         would take that off the list.
19              The Federal Verification when I
20         addressed this question with them, I would
21         like to say year, year-and-a-half ago, I don't
22         remember exactly when, there was a point at
23         which I provided them with the medical
24         explanation essentially as I did with Maryland
25         I think.  I'm pretty sure that is how I
```

113

1       described it to them.  I believe it was a

2       while ago, I believe.

3   Q   Was the medical explanation an honest

4       explanation even if you disputed the need for

5       the extension?

6   A   I think it was at the time.  Those

7       communications were really right in the midst

8       of when I was still in residency, attempting

9       to negotiate this somewhat rocky professional

10      stretch.  It was an honest attempt to explain

11      what was occurring.  It was at the time I was

12      attempting to keep an open mind about why this

13      was occurring.  I think that it was.  Yes, I

14      would say that it was.

15  Q   An honest explanation?

16  A   It was an honest explanation in a situation

17      that was somewhat in flux.

18  Q   Was it a truthful explanation, even if you

19      disputed the need for the extension?

20  A   I would say it was truthful in the sense that

21      the medical issue may well have just been

22      fatigue.  I don't know that -- no, I don't

23      think it was attributable to the medication,

24      no.

25  Q   You don't think what was attributable to the

119

| | | |
|---|---|---|
| 1 | Q | Tell me what you recall.  First of all, how |
| 2 | | many communications do you recall having? |
| 3 | | Let's get that out first, the number, we will |
| 4 | | go each one? |
| 5 | A | I communicated with the EAP nurse, the |
| 6 | | coordinator.  I'm not sure her title.  I |
| 7 | | communicated with Will Rabello. |
| 8 | Q | He's part of the EAP program? |
| 9 | A | No, he's the GME manager. |
| 10 | Q | We will get to that.  My question is focused |
| 11 | | on your communications with people who are |
| 12 | | within the EAP program itself, or involved in |
| 13 | | fitness for duty testing itself. |
| 14 | A | That would be just Jill Fulton-Royer. |
| 15 | Q | You recall conversations, at least one, with |
| 16 | | Jill Fulton-Royer between December 9th, your |
| 17 | | final visit with the evaluator and when you |
| 18 | | returned to work later in December? |
| 19 | A | Yes, e-mail and I believe a telephone |
| 20 | | conversation as well. |
| 21 | Q | What do you recall of the -- one telephone |
| 22 | | conversation, more than one? |
| 23 | A | I don't remember. |
| 24 | Q | As best you can recall of your telephone |
| 25 | | conversation or conversations, whichever it |

120

1    was with Miss Fulton-Royer, what do you recall

2    talking to her about?  Again between the 9th

3    and when you returned to work later in

4    December?

5  A    My agenda was to find out when I was going to

6    return to work.

7  Q    I'm sure you had that agenda.  I am interested

8    in what you communicated with Miss

9    Fulton-Royer?

10  A    I communicated to her that I met with the

11    psychologist.  He had at least verbally to me

12    cleared me with no restrictions.  I wanted to

13    know when that would be officially

14    communicated so I could return to work.  She

15    said to me that she had spoken with

16    Dr. Wallace.  That she didn't really see what

17    the rush was to get me back to work because

18    Dr. Wallace already told her I wasn't going to

19    be graduating anyway.

20  Q    Go ahead.

21  A    That they had not yet received the written

22    report, or they had not gotten -- I don't

23    remember exactly.  There was a paperwork thing

24    that was pending.

25  Q    You understood from Miss Fulton-Royer you

```
1              to be doing the ICU preceding that.
2                   MR. BIXENSTINE:    Can you read back
3              the question, please?
4                   (Question read.)
5    Q         Are you saying you don't understand that
6              question?
7    A         Yes.
8    Q         There was a time you requested days off for
9              adoption, correct, that was a point in time?
10   A         Yes.
11   Q         There is a time when there was an initial
12             first discussion of ICU coming back onto your
13             rotation, it was off, now it's back.  A time
14             for that, right, there has to be, there is
15             always a first time for everything, correct,
16             you may not know when it is, but there is; is
17             that fair?
18   A         Yes.
19   Q         There is a T1 time, requesting the time off
20             for the adoption.  A T2 time, the first time
21             you discuss ICU coming back on the schedule.
22             I want to know is it your testimony that T2
23             occurred after T1?
24   A         I guess my difficulty in giving you a yes or
25             no answer to that question is that as I said,
```

152

1          the discussion about ICU was --

2     Q    Ongoing?

3     A    -- ongoing.  Was also for a period of time in

4          there quite vague.

5     Q    So you can't identify a particular start time

6          for ICU coming back because it wasn't

7          necessarily ever off?

8               MR. GORDILLO:      Objection.  Is that

9          fair?

10    A    I would rephrase that.

11    Q    Go ahead.

12    A    During that time period starting in March and

13         August, there was a period of time in there

14         when I guess maybe I should say between

15         February and August, there was a period of

16         time during which I thought that I was going

17         to be required to be in the ICU.  A period of

18         time when I thought, I was under the

19         impression I was not required to be in the

20         ICU.  There was also times in there, I don't

21         know if I have documentation of this, I was

22         communicating with either Dr. Wallace and

23         Dr. Norcia, or the chief resident, about

24         whether I was going to be in the ICU and what

25         is going on with the whole ICU question.

155

| | | |
|---|---|---|
| 1 | A | No, I don't.  This would imply to me -- |
| 2 | Q | Is that fair? |
| 3 | A | Yes, it was probably in this time frame. |
| 4 | Q | Then a week after that, you moved the ICU |
| 5 | | portion of your schedule from April to June? |
| 6 | A | Yes, that looks correct.  Although, I don't |
| 7 | | know this was a final where we ended up.  Yes. |
| 8 | Q | I assume you have no recollection of why you |
| 9 | | moved it from April to June? |
| 10 | A | My recollection is that it had more to do with |
| 11 | | family obligations.  I don't remember exactly |
| 12 | | what. |
| 13 | Q | Metro, what is Metro again, what is going on |
| 14 | | with respect to Metro, that is trauma care, |
| 15 | | correct? |
| 16 | A | Yes. |
| 17 | Q | I understand what ICU stands for, intensive |
| 18 | | care unit.  I guess I don't know exactly is |
| 19 | | Metro trauma lab, trauma center? |
| 20 | A | Metro Hospital. |
| 21 | Q | Is that a specialized ICU then that focuses on |
| 22 | | trauma, or something different? |
| 23 | A | No, it's an anesthesia rotation, but because |
| 24 | | Metro is the regional trauma center, you would |
| 25 | | get more clinical exposure.  We had a rotation |

158

1       and forth as to what the sequence of events

2       was going to be.  When Dr. Wallace attached

3       the more recent proposal back to me, I said

4       that's right that was the more recent one.

5       That is what that was about.

6    Q  Is it fair to say that at least as of the

7       middle of March, ICU was on your schedule for

8       June, Metro was on your schedule for August?

9    A  Yes, I would say that was the plan at that

10      time.

11   Q  What happened to June ICU then, you did not do

12      ICU in June?

13   A  No.

14   Q  What happened that led to that not happening?

15   A  I don't remember why that didn't happen.

16              (Defendant Exhibit O

17               marked for identification.)

18   Q  I'm handing you what has been marked as

19      Deposition Exhibit O.  Do you recognize

20      Exhibit O as a letter confirming that you have

21      been approved for FMLA leave?

22   A  Yes, I recognize this.

23              (Defendant Exhibit P

24               marked for identification.)

25   Q  I'm handing you what is marked as Deposition

163

1          correct, that is the stream of the e-mail?

2    A     Yes.

3    Q     How was it that ICU got moved from June to the
4          last part of August?

5    A     I don't remember how or why that happened.  I
6          don't remember why it disappeared from June.
7          I don't remember what occurred there.

8    Q     For reasons you don't recall at this time, you
9          didn't do it in June?

10   A     Right.

11   Q     So if you didn't do it in June, did you
12         understand in June that you didn't have to do
13         it anymore?

14   A     I don't remember.  I don't remember.  What I
15         do remember is that when I got this e-mail
16         saying I was going to do it in the second two
17         weeks of August, it came as a significant
18         surprise.

19   Q     Why was that a surprise if all that was left
20         as of mid July would have been sometime in
21         August?  You were already in July, so you knew
22         you weren't doing ICU in July?

23   A     Correct.

24   Q     You hadn't done it in June?

25   A     Correct.

1    Q    Where else could it go?

2    A    Exactly.  What I recall, I don't recall what

3         occurred, why it didn't happen in June, but

4         my --

5    Q    I don't want you to guess now.

6    A    I won't guess.  I do remember being very

7         surprised with this e-mail.

8    Q    Where did you expect the ICU to happen?

9              MR. GORDILLO:    Objection,

10        foundation.

11   A    I am thinking I was under the belief that it

12        had been taken off the list of required things

13        to do.

14   Q    Do you have any idea how?

15   A    I don't remember how that -- as I said, I

16        don't remember why it didn't happen in June.

17   Q    So you don't are remember why it didn't happen

18        in June.  You don't remember -- you have a

19        belief you no longer had a requirement to do

20        it, but you don't remember how that happened?

21   A    Right.

22   Q    Why do you have the belief you were no longer

23        required to do it?  That is not a fair

24        question.

25             Why did you at the time as of here in

169

| | | |
|---|---|---|
| 1 | | Dr. Norcia? |
| 2 | A | I'm not positive I didn't communicate with |
| 3 | | Dr. Norcia.  I think I would summarize it by |
| 4 | | saying that my residency program was becoming |
| 5 | | increasingly hostile environment.  I felt that |
| 6 | | I needed to go outside the department to |
| 7 | | address concerns such as these. |
| 8 | Q | What is it that occurred that connected up for |
| 9 | | you your request for FMLA leave to a |
| 10 | | scheduling in August that you were surprised |
| 11 | | by? |
| 12 | A | The timing. |
| 13 | Q | Timing of scheduling, is that what you mean? |
| 14 | A | Yes, the timing of the decision to be in the |
| 15 | | ICU. |
| 16 | Q | It occurred after you requested FMLA leave? |
| 17 | A | Yes. |
| 18 | Q | Any other reasons in your understanding that |
| 19 | | connect Dr. Wallace's decision about your |
| 20 | | scheduling, when it caught you by surprise, |
| 21 | | besides timing, that you know about? |
| 22 | A | Not that I can think of at this point. |
| 23 | Q | Were you able to satisfactorily establish your |
| 24 | | schedule for the remainder of your residency |
| 25 | | with Dr. Norcia in the aftermath of the e-mail |

1      that is marked there someplace as Deposition

2      Exhibit R?

3   A  I believe so, yes.  Although again here it is

4      July, we seem to, all of us seem to still

5      think Metro was necessary.  I don't remember

6      exactly when that conversation happened that

7      Metro was not necessary.  I was going to put

8      this away.  Perhaps this will help.

9           (Defendant Exhibit S

10            marked for identification.)

11  Q  Does the e-mail communication I marked as

12     Deposition Exhibit S do anything to refresh

13     your recollection about how your scheduling

14     was ultimately set up for the month of August?

15  A  Yes, I do remember this e-mail.  Because as I

16     remember, even after this July 15th e-mail,

17     there was some difficulty trying to figure out

18     what to do with Metro, and so it must have

19     been sometime after this e-mail that we

20     discussed that it wasn't necessary.  This

21     would be July 21st.

22  Q  Was the schedule four August ultimately set up

23     to your satisfaction?

24  A  I believe, yes.

25  Q  I have a document here, I finally put two and

173

1              letter I received on January 7th.

2    Q        Unsatisfactory performance letter, didn't I

3              show that to you already?

4    A        Yes.  But I believe I wrote this prior to the

5              meeting I had with Dr. Nearman and

6              Dr. Norcia.  I'm not certain of the sequence.

7    Q        It was in the aftermath of the receipt of

8              Deposition Exhibit H, which is the January 7,

9              2009 letter?

10   A        Yes.

11   Q        Were you being truthful and honest when you

12             said I will comply with whatever plan is

13             ultimately recommended by the committee?

14   A        Yes.

15   Q        Is it true at your meeting with Dr. Norcia and

16             Dr. Wallace in November concerns were raised

17             about quote, cognitive difficulties, unquote,

18             is that true, the last part of the paragraph

19             after the introduction?

20   A        Can you restate?

21   Q        Is it true at the meeting you had with

22             Dr. Wallace and Dr. Norcia at the end of

23             November, they raised concerns about cognitive

24             difficulties?

25   A        Yes.

174

1    Q    Did the medication you were taking, I believe

2         the name was Topamax, have an affect on your

3         performance -- let me start again.

4              Were you being truthful and honest when

5         you stated that Topamax had an affect on your

6         performance as set forth in the second full

7         paragraph of the letter?

8    A    Yes, but with a clarification.

9    Q    Okay.  The clarification would be what?

10   A    In retrospect I don't feel the medication was

11        having a significant affect on my performance.

12             At this time, when I wrote this letter,

13        I was in a situation of having been presented

14        with a very serious adverse action, with no

15        access to any appeal, or any other way of

16        addressing or having my concerns or my

17        viewpoint heard on this topic.  I was

18        attempting here, and I believe in some other

19        communications, to communicate that I was open

20        to a dialogue on this subject.  I was

21        attempting to be cooperative with the

22        residency, to decrease antagonism.  I would

23        hope at least be able to professionally

24        survive the rest of the residency.  I had few

25        options at that point.  I was not in a

175

```
1              position of power.

2     Q        Were you being truthful and honest when you

3              stated here that you by January 7th, were

4              aware of a subtle recovery in your verbal

5              skills and speed of execution since

6              discontinuing the medication at the end of

7              November?

8     A        I don't think in retrospect that is true.

9              Again, I was trying to find some conceptual

10             middle ground with my residency leadership to

11             find some kind of compromise.

12    Q        You are not saying you were deliberately

13             misrepresenting yourself, are you?

14    A        No.

15    Q        You are saying you deliberately said something

16             that was not true, or are you saying it is

17             just not true as you look at it now, you

18             believed it to be true at that time?

19    A        I believe it to be possible at the time.  I

20             was trying to keep an open mind.

21    Q        Possible.  The words as I read them are, I am

22             now aware of the subtle recovery of my verbal

23             skills and speed of execution since

24             discontinuing the medication at the end of

25             November.  Did you truthfully believe that
```

1          believe that at the time?

2     A    I thought that was an acceptable hypothesis to

3          the extent I was willing to communicate that

4          in the letter.

5     Q    So when you are saying I am now aware, that is

6          a way of conveying it is an acceptable

7          hypothesis, is that what you are saying?

8     A    Yes, this is not a controlled experiment.  I

9          don't think anybody could know that to an

10         absolute certainty.

11    Q    When you are saying you were aware of the

12         subtle recovery, you were not being truthful,

13         or were you?  Were you aware at that time, as

14         of January 7th, of a subtle recovery in your

15         verbal skills?  Were you aware of that?  That

16         is what it says here.  The question is were

17         you as it says aware of it?

18    A    I was aware of some change.  But again, I

19         would qualify that.

20    Q    Were you aware as it states here of the subtle

21         recovery in your verbal skills, were you or

22         weren't you?

23    A    I think that I had convinced myself of that at

24         the time.

25    Q    Had you convinced yourself at the time of a

180

1        you were aware at the time of a subtle

2        recovery in your verbal skills and speed of

3        execution, are you disavowing that?  Were you

4        aware or not, that is my question?

5  A     I think that after October I certainly felt

6        better because I was less tired.

7  Q     I didn't ask whether you felt better because

8        you were less tired.  That is not what it says

9        here.  It says you were aware of a subtle

10       recovery in your verbal skills and speed of

11       execution since discontinuing the medication.

12       Were you aware of that or not?

13  A    I would say yes.  I guess I would say I do

14       disavow that statement.  I don't believe that

15       that is true.  At the time I was --

16  Q    You did at the time?

17  A    At the time I thought that was an acceptable

18       hypothesis.  Perhaps it was very subtle,

19       perhaps maybe I do feel better.  I think that

20       there was certainly nothing dramatic.  I felt

21       maybe it is better.  It was difficult to tell.

22  Q    Are you saying you weren't really aware of a

23       subtle recovery or were you aware at the time?

24  A    I think that it is difficult for me to say at

25       this point.  I certainly was not aware of any

181

```
 1          kind of dramatic change.
 2     Q    I'm not asking that.  I'm only asking whether
 3          you were being truthful at the time you wrote
 4          this, in terms of what you were aware of, what
 5          you weren't, were you being truthful?
 6     A    I think I was not being deceptive.
 7     Q    I didn't ask whether you were being deceptive.
 8          I said are you being truthful?
 9     A    I think that I was honestly trying to
10          interpret unquantified data.
11     Q    Were you being truthful in saying you were
12          aware, were you or weren't you?
13     A    I think it's difficult to --
14     Q    You can't answer that question, is that what
15          you are saying?
16     A    Yeah, I would say that I can't provide the
17          kind of answer that you are looking for.
18     Q    I'm just asking whether you were being
19          truthful or not.  You are saying you can't
20          answer that; is that right?
21     A    Yes, in the sense it was a very -- it was a
22          very vague set of circumstances that were
23          being described.
24     Q    Does Topiramate have cognitive side effects as
25          you set forth in this letter, does it?
```

185

1    A    Yes.

2    Q    Is it true that you developed side effects

3         which affected your clinical performance?

4    A    At this point I'm not convinced that is true.

5    Q    Did you believe it at the time?

6    A    I thought it was possible at the time.

7    Q    I didn't ask whether you thought it was

8         possible.  Were you being truthful when you

9         wrote this in the letter?

10             MR. GORDILLO:    Objection, form.

11   Q    At the time, were you being truthful?

12   A    Again, as with the previous letter, I thought

13        that it was possible.  I was willing to work

14        with that as a hypothesis.  I don't think that

15        is something that can be known as a certainty.

16   Q    The words are, I quote, I developed side

17        effects which affected my clinical

18        performance.  Did I read those right?

19   A    Yes.

20   Q    Did you develop side effects that affected

21        your clinical performance?

22   A    No, I don't believe so.

23   Q    You did not.  So then you misrepresented the

24        circumstances of your condition in this

25        letter?

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Well, did you represent the circumstances of |
| 3 | | your condition truthfully in this letter? |
| 4 | A | I truthfully represented a practical |
| 5 | | interpretation of events. |
| 6 | Q | A practical interpretation, what does that |
| 7 | | mean? |
| 8 | A | That means I was working in an extremely |
| 9 | | hostile environment, where I had few ways to |
| 10 | | protect myself professionally.  I had no ways |
| 11 | | to protect myself professionally other than by |
| 12 | | accommodating the assessment that was being |
| 13 | | imposed on me. |
| 14 | Q | So you wrote this because you felt it was your |
| 15 | | best chance of getting a job? |
| 16 | A | No. |
| 17 | Q | You didn't write the truth though, correct, |
| 18 | | this wasn't truthful, you didn't develop side |
| 19 | | effects which affected your clinical |
| 20 | | performance, that is a false statement, right? |
| 21 | A | I feel much more certain now that it was |
| 22 | | false.  At the time I was not positive that it |
| 23 | | was true or false, but I was again willing to |
| 24 | | accept that and go forward from there. |
| 25 | Q | Tell me why you were saying it if you didn't |

189

1   Q   Is it true you did not identify the medication

2       as a problem until December?

3   A   I would say that is not entirely accurate.

4       Again, it's a matter of I think I was kind of

5       approximating.

6   Q   Meaning what?

7   A   Meaning that it didn't come up until the end

8       of November.

9   Q   The end of November?

10  A   Yes, when we discussed it in the meeting.

11  Q   Is it truthful to say, if I make that

12      correction, I did not identify the medication

13      as a problem until the end of November?

14  A   Yes.

15  Q   So then is it fair for one to conclude at the

16      end of November you did identify the

17      medication as a problem?

18  A   I identified the medication as a possible

19      hypothesis.

20  Q   A possible hypothesis?

21  A   Um-hum.

22  Q   You wrote probable here, you did not write

23      possible hypothesis?

24  A   I was trying to simplify a situation for --

25  Q   For Dr. Longfellow?

190

1   A   Yes.

2   Q   What is his specialty, what is his background?

3   A   He is an anesthesiologist.

4   Q   You were trying to simplify the situation for

5       another anesthesiologist?

6   A   Yes.

7   Q   Why did you feel it needed to be simplified

8       for him?

9   A   Because I was hoping that I would still be

10      able to take a position with him.  It would be

11      helpful to have a way to explain or describe

12      the reason for my not being able to show up

13      when we agreed I was going to show up.

14  Q   It says I received an unsatisfactory

15      evaluation for my October ICU rotation; is

16      that a truthful statement?

17  A   Again I don't think it in detail accurately

18      reflects the timing of events.

19  Q   You had an October ICU rotation, correct?

20  A   That's correct.

21  Q   Did have an unsatisfactory evaluation for that

22      rotation, is it truthful when it says that?

23  A   Yes, which I received at the end of December,

24      which is not exactly when the medication issue

25      came up.

192

```
 1          the medication -- I promptly stopped the

 2          medication as soon as this concern arose, have

 3          noted a significant difference.  Were you

 4          being truthful at the time it was a

 5          significant difference you noted?

 6     A    No, I would say I was coloring things to

 7          describe the situation as resolved.

 8     Q    When you referred to family and colleagues as

 9          also noting a significant difference, that was

10          coloring too?

11     A    I would say yes.

12     Q    Were there any family or colleagues that

13          noticed a difference?

14     A    Not that I'm aware.

15               (Defendant Exhibit X

16               marked for identification.)

17     Q    I've handed you a document marked as

18          Deposition Exhibit X; do you recognize it?

19     A    Yes.

20     Q    Is that your signature on it?

21     A    Yes.

22     Q    The document refers to an October 14th

23          meeting, does it not?

24     A    Yes.

25     Q    It says October 14th of 2008 you and
```

195

1           acknowledge it, did you tell them that?

2    A      I don't remember.  No, I don't remember.

3    Q      Did you give them any reason to believe at

4           that time that you signed this, that you

5           disagreed with anything in it?

6    A      Yes.

7    Q      What do you recall telling them at the time

8           concerning a matter in this letter with which

9           you disagreed?

10   A      I don't recall what specifically I objected to

11          verbally.  I do know I objected in writing.  I

12          don't remember what I objected to verbally at

13          the time.

14   Q      Do you recall objecting in writing to the

15          contents of the November 24 letter and its

16          reference to what happened on October 14; do

17          you recall doing that?

18   A      Yes.

19   Q      The thing you are recalling is an objection

20          you raised after the meeting at the end of

21          November, correct?

22   A      Yes.

23   Q      You are saying at the end of November you

24          decided to raise objections about matters

25          arising at the October 14th meeting?

196

| 1 | A | I objected to a number of things. The |
| 2 | | characterization of the October 14th meeting |
| 3 | | itself was one of those. |
| 4 | Q | That is what I'm saying, you decided at the |
| 5 | | end of November to raise objections concerning |
| 6 | | what occurred at the October 14th meeting? |
| 7 | A | I would say yes, I was not provided with any |
| 8 | | documentation of the October 14th meeting. |
| 9 | Q | Until you signed this document on November |
| 10 | | 24th? |
| 11 | A | Yes. |
| 12 | Q | You decided to sign it, then write objections |
| 13 | | to it afterward? |
| 14 | A | Yes. |
| 15 | Q | Were you told at the October 24th meeting that |
| 16 | | there were evaluation concerns that you're not |
| 17 | | appreciating the situation, or cannot process |
| 18 | | and react to the information or situation at |
| 19 | | hand.  Were you told that at the October 14th |
| 20 | | meeting?  Middle of the second paragraph. |
| 21 | A | I don't recall those exact words were used. |
| 22 | Q | How about the substance of them? |
| 23 | A | There was some concern raised about my |
| 24 | | responsiveness but neither Dr. Norcia nor |
| 25 | | Dr. Wallace could provide me with a specific |

197

1          example.

2    Q     This is something you asked for at the October

3          14th meeting, give me a specific example, you

4          asked for that?

5    A     I remember asking Dr. Wallace that.  I don't

6          recall at which meeting it was.  He said I

7          can't give you an example.

8    Q     Dr. Wallace said he couldn't?

9    A     Yes.

10   Q     Were you also told about concerning

11         evaluations from pain, OB and ICU at the

12         October 14th meeting, as reflected in this

13         letter?

14   A     Yes.

15   Q     Did you actually respond during the October

16         14th meeting that you could not identify any

17         reason for any delay in response that people

18         might have raised the concern about, as

19         reflected in the third paragraph.

20   A     I don't remember specifically making that

21         statement.

22   Q     Did you offer any explanation for the concern

23         raised to you in the October 14th meeting, any

24         explanation for why those concerns were

25         happening?

198

1    A      No.  The concerns weren't specified in a way

2           that allowed a response.

3    Q      Did Dr. Wallace and Dr. Norcia at the October

4           14th meeting discuss ways for you to improve?

5    A      Not that I recall.

6    Q      Is that one of those they might have, might

7           not have, you don't recall as we speak now?

8    A      I don't recall a conversation at that time

9           that was discussing ways to improve.

10   Q      Do you deny there was any discussion of that

11          nature?

12   A      No, I wouldn't say I remember it clearly

13          enough to deny it.

14   Q      Were you told at the October 14th meeting that

15          the competency committee had reason to give

16          you an unsatisfactory for your final six month

17          period?

18   A      No.

19   Q      You were not told that?

20   A      Not to my memory in October.

21   Q      Are you denying that was said to you?

22   A      Again, at the time of that meeting, I had been

23          on duty for about 28 hours, so there may be

24          things in that meeting I don't recall.  Again,

25          the discussion of the clinical issue or the

1   performance issue was fairly vague.  I don't

2   recall being told at that time that that was a

3   threat.

4   Q   Were you told that there was going to be a

5       meeting with you again in four to six weeks to

6       review further evaluations and update your

7       progress?

8   A   Again, I don't remember that exactly.  That

9       seems very plausible to me.  Makes sense.

10          (Defendant Exhibit Y

11          marked for identification.)

12  Q   Handing you what is marked as Deposition

13      Exhibit Y.  I'm assuming you've never seen the

14      document before.  If you have, let me know.

15  A   No.

16  Q   It refers to a meeting between you and

17      Dr. Norcia and Dr. Aronson on November 24th,;

18      isn't that right?

19  A   Yes, correct.

20  Q   Did Dr. Wallace ask you at that meeting on

21      November 24th if you were on any psychotropic

22      medication that might impair your performance?

23  A   Yes.

24  Q   Did he tell you that from his perspective you

25      had not made the program director aware of any

200

| | | |
|---|---|---|
| 1 | | such medication? |
| 2 | A | I don't remember making that statement. |
| 3 | Q | You had not made anyone -- you had not made |
| 4 | | the program director aware that you were |
| 5 | | taking Topamax, correct? |
| 6 | A | Correct. |
| 7 | Q | Did he tell you he believed you were required |
| 8 | | to do that? |
| 9 | A | I know he said that at a later date.  I don't |
| 10 | | remember it during that particular meeting. |
| 11 | Q | Did you inform Dr. Norcia and Dr. Wallace at |
| 12 | | that meeting that you may be on some |
| 13 | | medication that may or may not impair your |
| 14 | | performance? |
| 15 | A | I brought up the Topamax at that meeting, yes. |
| 16 | Q | Did you say at that meeting that the Topamax |
| 17 | | may or may not impair your performance? |
| 18 | A | I don't know that I used exactly those words. |
| 19 | | I brought it up at a possibility. |
| 20 | Q | You had been using it for three years? |
| 21 | A | I believe I said something about how long I |
| 22 | | had been on it.  I would say it had been at |
| 23 | | least three years. |
| 24 | | MR. GORDILLO:    Can I step out a |
| 25 | | minute? |

202

| | | |
|---|---|---|
| 1 | A | I would have to respond as with the other |
| 2 | | letters, I was willing to accept that as a |
| 3 | | possibility and work with it. |
| 4 | Q | You don't believe it now? |
| 5 | A | No, I don't believe it now. |
| 6 | Q | Were you also not saying something you believe |
| 7 | | now when you told him I'm alarmed that I |
| 8 | | needed a whack in the head to identify Topamax |
| 9 | | as a problem, you don't believe that now |
| 10 | | either? |
| 11 | A | No, I don't.  That is how I was thinking about |
| 12 | | it at the time. |
| 13 | Q | Did you believe it at the time? |
| 14 | A | Again, I was going with that hypothesis. |
| 15 | Q | Did you believe at the time that Dr. Norcia |
| 16 | | and others were correct in noting a change in |
| 17 | | your performance? |
| 18 | A | I think that, again I think that I was |
| 19 | | endorsing that interpretation. |
| 20 | Q | You don't believe it now? |
| 21 | A | No. |
| 22 | Q | You didn't believe it? |
| 23 | A | Except in the sense as far as that sentence is |
| 24 | | concerned, except in the sense that upon |
| 25 | | reviewing my scheduling during that period of |

203

```
 1            time, occurred to me there may have been a
 2            fatigue factor.
 3    Q       The only thing you believe now is that any
 4            performance change they noted was just
 5            fatigue?
 6    A       Yes, if there were performance changes.
 7    Q       You don't necessarily even believe that?
 8    A       Correct.
 9    Q       You didn't believe it at the time you wrote it
10            either?
11    A       I was -- at the time I wrote this?
12    Q       Correct.
13    A       You know as in any profession, one has to
14            continuously learn, continually be open to
15            feedback.  If somebody says, gives you some
16            negative feedback, it's important to be open
17            minded, not reject it out of hand.
18    Q       You would agree this is not rejecting
19            something.  You said the words I am sure.  I'm
20            sure that Dr. Norcia and the others were
21            correct.  You weren't sure they were correct
22            at the time, correct, that is not a true
23            statement, you weren't sure they were correct?
24    A       No, I was trying --
25    Q       To appease Dr. Nearman?
```

204

1   A   Yes.

2   Q   When you say here while I don't believe

3       Dr. Wallace and Norcia have intended this

4       process to be punitive, you see where it says

5       that?

6   A   Yes.

7   Q   At the time you did believe they intended it

8       to be punitive, correct?

9   A   I became more and more convinced of that, I

10      didn't want to believe that.

11  Q   I'm saying at the time, did you believe,

12      January 6, 2009 did you believe that

13      Dr. Wallace and Dr. Norcia intended this

14      process to be punitive?

15  A   At that time I was willing to believe that

16      they didn't.

17  Q   You were being truthful about that statement

18      when you said I don't believe, as of January

19      6th, that Wallace and Norcia intended this

20      process to be punitive, that is truthful,

21      right?

22  A   I would say that is also a conciliatory

23      statement.

24  Q   It can be truthful and conciliatory.  But was

25      it truthful?

205

| | | |
|---|---|---|
| 1 | A | I would say I was perhaps not convinced at |
| 2 | | that point they intended it to be punitive. |
| 3 | Q | You didn't believe it at the time? |
| 4 | A | I would say I considered it a possibility.  I |
| 5 | | was willing to keep an open mind, so yes, I |
| 6 | | would say I wasn't convinced. |
| 7 | Q | That is not what it says here.  You didn't say |
| 8 | | I'm not convinced, you said you didn't believe |
| 9 | | it? |
| 10 | A | Yes, I think I was -- |
| 11 | Q | Do you recognize the distinction between |
| 12 | | saying I'm not convince of something, and |
| 13 | | saying I don't believe something? |
| 14 | A | Yes, I think there is a subtle distinction. |
| 15 | Q | At the time, was it truthful to say that you |
| 16 | | didn't believe they intended the process to be |
| 17 | | punitive, was that truthful at the time you |
| 18 | | said it? |
| 19 | A | I would say it's not entirely truthful. |
| 20 | | (Defendant Exhibit AA |
| 21 | | marked for identification.) |
| 22 | Q | I've handed you what is marked as Deposition |
| 23 | | Exhibit AA.  Do you recognize this as a letter |
| 24 | | you prepared on November 28, as a response to |
| 25 | | the reviews of mid October, on November 4th? |

209

1    conversation and explain it at the same time.

2    That is human nature.  For our purposes I need

3    to separate those, for this purpose.  I need

4    you to describe what happened between you and

5    Dr. Norcia and Dr. Wallace, and deferred until

6    you are done explaining what it means, its

7    significant to you, or any other kind of ways

8    of commenting on what was going on.  So that I

9    have these things separate.

10          What I would like you to do first in

11   your best recollection go through and explain

12   to me what happened at the November 24

13   meeting.  Let me start it off by saying is it

14   not fair to say the beginning of that meeting

15   is when they presented you that letter, that

16   we just went over, that refers to what

17   happened in October?

18   A   I couldn't say.

19   Q   I thought maybe that was something you could

20       remember.  Tell me what you did recall now of

21       the back and forth between you and Dr. Norcia

22       and Dr. Wallace at this November 24 meeting.

23       Again when you are done, we can talk about

24       what it means, your assessment of it, so on.

25   A   I don't remember how the meeting opened.  I

210

1        remember asking for specific examples of

2        something that was causing concern.

3             I remember at least Dr. Wallace saying

4        he couldn't give me an example.  I remember

5        Dr. Wallace asking me if I was taking

6        psychotropic medication and/or if I was on

7        drugs, to which I said no.  Then stated I had

8        been taking Topamax for several years for

9        migraines.  I don't remember how much further

10       discussion there was about that.

11            I believe I brought up EAP, with the

12       thought they could act as a third party

13       monitor, to introduce some objectivity.  I'm

14       not remembering any other real specifics of

15       how the back and forth went at that meeting.

16   Q   I apologize.  You completed as best you can do

17       in terms of your recollection?  I didn't mean

18       to ignore you.  I wasn't sure you were

19       complete.

20   A   No, I'm --

21   Q   Did Dr. Wallace at this meeting tell you that

22       he intended to rate your performance for the

23       period of July 2008 to December 2008 as

24       unsatisfactory, and require you to extend your

25       residency by six months in order to graduate?

211

1   A   Not at the meeting in November, I don't

2       believe, no.

3   Q   Was there a meeting in December when he said

4       that then?

5   A   Not in December.  I know in November it was --

6                (Defendant Exhibit BB

7                marked for identification.)

8   A   To the best of my recollection at the November

9       meeting I believe it was raised as a

10      possibility that action was going to be taken.

11  Q   Not definitive?

12  A   Not definitive.

13  Q   Have a look at Exhibit BB.  If I understand

14      correctly, this is a document you prepared but

15      choose not to submit, correct?

16  A   Correct.  Because I was told it was not an

17      option.

18  Q   So, you mentioned in the second paragraph of

19      that letter that Dr. Wallace indicated to you

20      at a meeting that you refer to as last week,

21      the document is dated December 23rd, that he

22      intended to rate my performance for the period

23      of July 2008 to December 2008 as

24      unsatisfactory, would require to extend the

25      residency by six months in order to graduate.

212

1              Paraphrasing the substance, I think I got it

2              right.

3      A      I think that is probably accurate.  I don't

4              remember having a meeting in December.  It

5              makes sense to me that there was one.  I can't

6              picture it in my mind.  I think that is likely

7              accurate.  I know that I did know he was

8              intending to do that sometime in that time

9              frame.  Certainly by the time I got the thing

10             from Dr. Norcia that was entered a few days

11             after this.

12     Q      You had a conversation with an outfit a UH

13             called the GME office, what does that stand

14             for?

15     A      Graduate medical education.

16     Q      It was a conversation about your options in

17             terms of either accepting a six month training

18             extension without an appeal or refusing the

19             extension, being potentially subject to

20             disciplinary action.  Do you recall having a

21             conversation with someone from the office

22             about that?

23     A      Yes.  I think that sounds accurate.

24     Q      Who told you those were your options?  Who

25             from the GME office are we talking about?

213

```
 1   A    It would have been either Will Rabello or

 2        Dr. Shuck.  I don't remember which of the two

 3        verbalized that to me.

 4   Q    I'm not asking you here for any content.  Did

 5        you consult with legal counsel in terms of

 6        deciding which of those options you would

 7        take?

 8   A    Yes.

 9             MR. GORDILLO:     That's the end.

10   Q    Would that be Mr -- the basketball player?

11   A    Jordan.

12   Q    Michael Jordan.  It's up to you, if you don't

13        want her to answer, it is okay.  His name is

14        on it.   Was it Michael Jordan?

15             MR. GORDILLO:     As far as I know.  It

16        wasn't me.

17             MR. BIXENSTINE:   That's the end of it.

18   Q    Was it Michael Jordan?

19   A    Yes.

20             (Defendant Exhibit CC

21              marked for identification.)

22   Q    Handing you what has been marked as Deposition

23        Exhibit CC, this represents itself as an

24        e-mail exchange between you and Dr. Nearman in

25        late January?
```

214

1    A    Yes.

2    Q    Do you recognize this as such?

3    A    Yes.

4    Q    He asked you in his e-mail to you, he says is

5         it okay to tell him, referring to

6         Dr. Longfellow?

7    A    Yes.

8    Q    He is asking is it okay to tell him that your

9         performance was not satisfactory, and that

10        upon evaluating the possibilities as to why,

11        we came up with the potential drug side

12        effect; did I read that correctly?

13   A    Yes.

14   Q    Did you respond to him in terms of whether it

15        was okay or not?

16   A    I believe I told him verbally or in this

17        e-mail that I felt that was an acceptable way

18        to proceed.  It was essentially in line with

19        what I had written to Dr. Longfellow.

20                  (Defendant Exhibit DD

21                   marked for identification.)

22   Q    I handed you what is marked as Deposition

23        Exhibit DD.  Have you ever seen this document

24        before, or any part of it?

25   A    No.

226

State of Ohio,          )
                        ) SS:   CERTIFICATE
County of Cuyahoga.     )

    I, Constance Versagi, Court Reporter and
Notary Public in and for the State of Ohio, duly
commissioned and qualified, do hereby certify that
the within named witness, Sarah Aronson, M.D.,
was by me first duly sworn to testify the truth, the
whole truth, and nothing but the truth in the cause
aforesaid; that the testimony then given by her was
by me reduced to stenotypy/computer in the presence
of said witness, afterward transcribed, and that the
foregoing is a true and correct transcript of the
testimony so given by her as aforesaid.

    I do further certify that this deposition was
taken at the time and place in the foregoing caption
specified, and was completed without adjournment.

    I do further certify that I am not a relative,
counsel, or attorney of either party, or otherwise
Interested in the event of this action.

    IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my seal of office at Cleveland,
Ohio, on this 23rd day of December, 2010.

_____
Constance Versagi, Court Reporter and
Notary Public in and for the State of Ohio.
My Commission expires January 14, 2013.

To:    Marsha Miller
        ACGME Resident Services

From: Sarah Aronson, MD
        CA-3, Dept of Anesthesiology
        UH Case Medical Center
        Cleveland OH

Re:    Concern

28 Feb 2009



DEFENDANT'S EXHIBIT C

Ms. Miller:

I am writing to communicate a concern regarding my hospital's existing
policies regarding resident performance review.  Specifically, I am concerned
that the hospital policy states that no appeal is available to a resident who is
not promoted or whose training is extended for academic reasons.  The
ACGME requirements specifically state that the hospital "must minimize
conflict of interest by adjudicating parties in addressing... academic or other
disciplinary actions...[including] non-promotion of a resident to the next level
of training, or other actions that could significantly threaten a resident's
intended career development."

I apologize for the length of this statement.  I understand that your office
does not intervene in the specifics of the evaluation process or the decisions
made regarding promotion.  The concerns regarding lack of documentation,
lack of timely intervention and communication of performance concerns, and
most significantly, the lack of access to mediation or appeal do fall under
your jurisdiction, however.  I am submitting this to you as a concern rather
than a formal complaint at this point in order to hear an objective opinion
regarding these events.

Here are the events as I see them:

1.    I was scheduled to complete my residency on 2/28/09.  I am
        currently a CA-3 in Anesthesiology at University Hospitals Case
        Medical Center, 11100 Euclid Ave, Cleveland, OH 44106.
        Residency office phone (216) 844 7335.

2.    I was informed by my program directors (Drs. Matthew Norcia
        and David Wallace) at the end of November that I may receive an
        "unsatisfactory" for my last 6 months of residency (July 2008 –
        December 2008) though I had received only satisfactory to
        positive evaluations for that time period (attached).  I have
        achieved passing scores on the in-training exam every year in
        residency.

3.  At that meeting, I became concerned that perhaps the topiramate that I took for migraine prophylaxis was creating a response delay in me of which I was not aware, and I suggested the option of involving the EAP in this process.

4.  In response, I was pulled from clinical duty and ordered by Dr. Wallace to undergo a Tier 1 "fitness-for-duty" evaluation citing concerns of substance abuse and/or cognitive impairment. No documentation was provided or substantive examples given to justify Tier 1 referral. No other preliminary, less intrusive, interventions were offered or considered at any time, as are outlined in the Resident's and Fellows Manual or the UHCMC Policies and Procedures, nor was Dr. Norcia aware until several days later that this action had been taken.

5.  I discontinued the medication immediately, and complied fully and promptly with the mandated evaluation. No evidence of substance abuse or cognitive impairment was found. I saw a rapid improvement in my speed of execution upon stopping the medication.

6.  Fitness-for-duty testing was completed December 4th. I had a final visit with evaluator on December 9, 2008, to review his report. Despite my calls to the program directors and the EAP liaison, no response or plan for return to work was offered to me until the evening of December 16th. During that period of time out of work, I was sufficiently alarmed by the delay in returning me to clinical duty that I consulted an attorney to clarify my options. At no time did I threaten legal action against the hospital or program.

7.  I was scheduled many months in advance to go out on maternity leave December 22nd (my partner was pregnant and expecting our third child). As a result, I was given only 3 days in December to demonstrate my clinical performance. One of those days was with Dr. Norcia, who told me he had no significant criticisms of my performance and continued to have an "open mind" regarding the decision to extend my training. Roughly 2 weeks later on 12/31/08, while I was out on maternity leave and without any further assessment of my clinical ability, Dr. Norcia submitted his on line evaluation citing poor performance during the first week of October in the ICU. In that evaluation note, based on that week, he stated that he did not feel I was performing at the level of a CA-3 and should therefore repeat the 6 month block. He indicated to me later that he felt pressured by the involvement of

an attorney to beef up their documentation in support of the actions they had taken.  He also stated to me that this influenced the tone and content of the letter presented to me January 7th, which was my formal notification of the training extension.  In that letter, in addition to the concerns of clinical responsiveness, I was cited for unprofessional behavior for not informing the hospital that I was taking the migraine medication in the first place.  He stated that the hospital attorney advised them to include this because it would allow a threat of disciplinary action, including termination, should I pursue legal action against the residency program.

8.  At the outset of this process, I was assured repeatedly by my program directors as well as by Dr. Jerry Schuck (our DIO) and Will Rebello (our GME manager) that I would have opportunity to appeal this decision.  I am attaching the letter I drafted 12/23/09 to request an appeal committee.  When I reviewed the Resident's Manual, however, it clearly states that no appeal is allowed if the intervention is "academic".  When I questioned this with the GME office and my program, I was then told that I had the following options: (1) accept the 6-month training extension without an appeal, or (2) refuse the extension, at which point I would be subject to a disciplinary action or termination without a certificate of completion, which I could then appeal, but with the caveat that I could then be terminated, and any disciplinary action would be reported to the state medical board.

9.  I was in contact with the GME office repeatedly throughout this process, and while Mr. Rebello and Dr. Schuck were readily available to listen to my concerns, they would not take any action to act as an ombudsman on my behalf.  Mr. Rebello advised me at the beginning of this process that they could become more active once I filed an appeal.  When it became clear that no appeal was allowed (unless I invited a disciplinary action), he told me that he really shouldn't be communicating with me at all because I had consulted an attorney.  Dr. Schuck stated to me that he thought the way this had been handled by my program director was "unconscionable", but that "I think at this time I can't be seen as your advocate."  He advised that I speak with Dr. Nearman, our department chairman.  Dr. Nearman has deferred to the program directors' assessment in this case as he has little contact with me clinically, and has offered no advocacy.

10.  In early November, prior to these events, I signed an employment contract to start March 2, 2009, following my anticipated graduation.  I obtained this job offer in part on the strength of Dr. Norcia's strong recommendation, dated September 2008

(attached), in which he described my ability as above average or excellent across the range of clinical duties I would be called upon to perform.

My concerns are these:

The ACGME guidelines require 4 months notice "when a resident will not be promoted to the next level of training". Further, the guidelines allow shorter notice only if "the primary reason(s) for the non-renewal or non-promotion occurs within the four months prior to the end of the agreement" The action on the part of my program regarding my performance was initiated only 3 months before my graduation date, without any preceding remediation or intervention, though the clinical performance of concern was apparently noted 5 months before my completion date. I was formally notified that I would not be graduating on time 7 weeks prior to my completion date. Documentation of the instance of unsatisfactory clinical performance was entered almost 3 months after the fact. Every other documented evaluation I have received since March of 2008 has been satisfactory to excellent.

The ACGME guidelines require that Residents "must be allowed to implement the institution's grievance procedures if they receive a written notice either of intent not to renew their agreement(s) or of intent to renew their agreement(s) but not to promote them to the next level of training". Our GME manager and our DIO both declined to mediate in this process despite my repeated communication to their office of my concerns. I was told I had no option of seeking a review or appeal of this action unless I chose to invite a disciplinary action, placing myself at greater professional risk.

I appreciate your review of these concerns and look forward to hearing your suggestions as to how I should proceed. Thank you for your attention to this matter.

Sincerely,

Sarah Aronson, MD
UHCMC/Case School of Medicine
Home phone:     (216) 721 5945
Email:          sarah.aronson@uhhospitals.org
Page:           31262@pager.uhhospitals.org



**University Hospitals**
Case Medical Center

Sarah C. Aronson, M.D.                                                    January 7, 2009
10510 Park Lane #115
Cleveland, OH 44106

Dear Dr. Aronson:

The faculty, through the residency competency committee, has determined that your performance does not meet expectations for a resident of your level of training; therefore, for the reporting period of July 1, 2008 through December 31, 2008 you will receive an *unsatisfactory evaluation on the Clinical Competence Report* to the American Board of Anesthesiology.

This decision is based on the following criteria. Under the category of Essential Attributes, the committee has determined that you have been unable to demonstrate the ability to react to stressful situations in an appropriate manner. Under the category of Professionalism, you have failed to carry out your professional responsibility of notifying the Residency Program Directors that you were taking a prescribed medication that could impair your judgment and/or job performance, as required by hospital policy. Additionally, under the category of Patient Care, you have failed to demonstrate your ability to recognize and respond appropriately to significant changes in the anesthetic course.

The consequence of reporting an unsatisfactory evaluation during the second six month period of your CA-3 year is that you will be required to remediate for an additional six month period in accordance with the American Board of Anesthesiology guidelines. Accordingly, you must complete a total of thirty-six months with a final satisfactory rating to be eligible to receive a certificate of completion of training.

Please contact the Residency Program Office at 216-844-7335 upon receipt of this letter. Christine Adamovich will assist you with setting up a time to meet and discuss the remedial program plan and to address any questions you may have.

Respectfully,

Matthew P. Norcia, M.D.
Residency Program Director

David A. Wallace, D.O.
Residency Program Co-director

cc: Michael Jordan, Esq.

*Department of Anesthesiology and Perioperative Medicine*
11100 Euclid Avenue Cleveland, Ohio 44106-5077 Phone 216-844-7335 FAX 216-844-3781

DEFENDANT'S
EXHIBIT
_H_



**University Hospitals**
Case Medical Center

Memo Re:    Sarah C. Aronson          February 4, 2009

     Dr. Wallace and I met with Dr. Aronson to discuss her current perspective and make plans for her next 6 month clinical schedule, for March 1, 2009 to August 31, 2009. We also compared schedules and are in agreement that Dr. Aronson has 2 days of vacation remaining through February 28, 2009. She will be entitled to an additional 10 days of vacation and 3 meeting days through August 31, 2009.

     Dr. Aronson has agreed to a 6 month schedule that includes Cardiac/Thoracic, Vascular, Neuroanesthesia, ICU, Pediatrics, and an Elective month which she expressed an interest in doing TEE. Dr. Aronson and Dr. Wallace will decide the sequence of the rotations so that Dr. Aronson will get the best experience and to accommodate her schedule. Dr. Aronson missed her previously scheduled Metro Trauma rotation. We discussed that if she has 20 logged trauma cases, then it is her choice if she would like to incorporate the Metro Trauma rotation into her 6 month schedule.

     Dr. Aronson requested if she could be excused to attend the Society of Cardiovascular Anesthesiologists Annual Meeting and Workshops from April 17 – 22, 2009. Even though this meeting occurs during the same time that the MARC 2009 conference is, we feel that if Dr. Rowbottom will approve it, it would be alright. She has tentatively signed up for these days in the Anesthesia Scheduling system.

     Dr. Aronson was asked about her perspective on how she was performing. She generally felt her performance was adequate and improved, with the ability to increase the pace of her work. She said that she had requested feedback from Dr. Parks but that she has not heard anything yet. She was encouraged to request verbal feedback at the end of the day (so that it would be timely and interactive dialogue could be established.)

     We decided that the three of us would meet on a monthly basis, around the middle of the month and on an as needed basis otherwise. Dr. Aronson will contact Christine Adamovich (216-844-7335) to arrange these meetings.

Respectfully,

Matthew P. Norcia, M.D.
Residency Program Director

David A. Wallace, D.O.
Residency Program Co-director

Sarah C. Aronson, M.D.

**Department of Anesthesiology and Perioperative Medicine**
11100 Euclid Avenue Cleveland, Ohio 44106-5077 Phone 216-844-7335 FAX 216-844-3781
*University Hospitals Case Medical Center and Case Western Reserve University School of Medicine*

DEFENDANT'S EXHIBIT

## UNIVERSITY HOSPITALS CASE MEDICAL CENTER
### RESIDENT/FELLOWSHIP CONTRACT

Date: 2/06/2009                                             Doctor:  Sarah Aronson

I am pleased to inform you that on the recommendation of your department director, the terms of your appointment as a resident physician at University Hospitals of Cleveland DBA University Hospitals Case Medical Center ("UHCMC") are as follows:

Department-Division: Anesthesiology                         PGY Level:  7

Effective Period:    03/01/2009-08/31/2009                  Annual Stipend: $54970

All appointments are for the above Effective Period, and may be renewed at the discretion of UHCMC upon continued evidence of satisfactory performance.  Further, all appointments are subject to the terms, policies and procedures set forth in the attached Residents' & Fellows' Manual (the "Manual"). This contract may be terminated for any reason or no reason pursuant to the terms of the Manual or the policies and procedures of University Hospitals and UHCMC.

Upon commencement of your employment you are required to show evidence of U.S. citizenship or present a valid visa in a category that permits you to be employed in the program without qualifications or exceptions.

UHCMC agrees to provide an educational program that at a minimum meets the standards established by the ACGME and to provide benefits as outlined in the Manual. You will agree to meet the educational requirements of the program and to provide safe, effective and compassionate care under the supervision of residency faculty.

Read the Residents' & Fellows' Manual carefully; it contains important information about hospital policies.  You must familiarize yourself with the following information:

- Compensation and Benefits
- Conditions for Living Quarters
- Counseling
- Duty Hours
- Effect of Leave for Satisfying Completion of Program
- Equal Employment
- Extracurricular Employment (Moonlighting)
- Family Medical Leave Benefits (FMLA)
- Financial Support
- Grievance Procedures
- Insurance Coverage (health, disability, liability, liability after program completion)
- Leave of Absence
- Meals and Laundry
- Medical & Psychological Support Services
- Non-Renewal of Contract
- Payroll
- Physician Impairment & Substance Abuse
- Professional Activities outside the Program
- Professional Leave of Absence Benefits
- Residency Closure and Reduction
- Resident Evaluation & Reappointment
- Resident Responsibilities
- Sexual and Other Forms of Harassment
- Sick Leave Benefits
- Vacation

You will be required to follow UHCMC policies and procedures and comply with state and federal laws and regulations. University Hospitals is committed to full compliance with all applicable laws, rules, regulations and state and Federal health care program requirements (collectively, "Laws"), and by signing the Compliance Certification, attached as an addendum to this Contract, you agree to cooperate fully with the University Hospitals Compliance & Ethics Program. Failure to comply with the requirements of the attached Compliance Certification may result in the immediate termination of your appointment to the Residency Program.

By accepting this position you will be bound by the terms of the Residents' & Fellows' Manual as it may be amended from time to time. Kindly acknowledge your acceptance of this offer by signing below and returning the original copy of this letter to:

Graduate Medical Education Office
University Hospitals Case Medical Center
11100 Euclid Ave
Cleveland, Ohio 44106

_____          _____   _____
Jerry M. Shuck, M.D.                      Signature                          Date
Director of Graduate Medical Education

DEFENDANT'S EXHIBIT J

ARON 0167

**UNIVERSITY HOSPITALS ("UH")[1]**
**COMPLIANCE ADDENDUM AND CERTIFICATION**

This Compliance Addendum is incorporated into and made a part of the Resident/Fellowship Contract between University Hospitals Case Medical Center and Sarah Aronson (Doctor).

Each party shall perform its obligations under the Contract in compliance with the requirements set forth in the Federal Anti-Kickback Statute and the Stark Self-Referral Law, to the extent such laws may be applicable to the arrangements described in the Contract.

By signing the contract, I certify that:

1.  I have not been debarred, excluded, suspended or otherwise determined to be ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs[2] (collectively, "Ineligible"), or convicted of a criminal offense that could result in becoming Ineligible.

2.  Except as disclosed below, neither I nor an immediate family member[3] makes referrals to UH for health care items or services, or to the best of my knowledge: (a) has a direct or indirect ownership or investment interest in or is directly or indirectly employed by or contracted with any company or person to provide services in connection with my Contract:

3.  I will conduct myself as a Doctor consistent with the standards set forth in the UH Code of Conduct, and I shall cooperate fully with the UH Compliance & Ethics Program.  The UH Code of Conduct is available electronically at: *http://www.uhhospitals.org/tabid/1806/Default.aspx* .

4.  I shall perform the Contract in compliance with all applicable laws, rules, regulations and Federal health care program requirements (to the extent applicable) (collectively, "Laws").

By signing below, I certify that I:

1.  Have received a copy of the University Hospitals ("UH") Code of Conduct and UH Policies and Procedures regarding the operation of the UH Compliance & Ethics Program and compliance with Federal health care program requirements, specifically including the Federal Anti-Kickback Statute (42 U.S.C. Sec. 1320a-7(b) (the "Anti-Kickback Statute") and the Physician Self Referral Law (42 U.S.C. Sec. 1395nn) (also referred to as the "Stark Law");

2.  Have read, understood and shall abide by the UH Code of Conduct and UH Policies and Procedures;

3.  Shall comply with the UH Compliance Program; and

4.  Shall perform the Contract in compliance with all applicable laws, rules and regulations and Federal health care program requirements, including without limitation, the Federal Anti-Kickback Statute, the Stark Law, and the rules, regulations and administrative guidance promulgated under the authority of such laws.

Each of the parties certifies that to its best knowledge and belief, no part of any consideration paid under the Contract is a prohibited payment for the recommending or arranging for the referral of business or the ordering of items or services; nor are the payments intended to induce illegal referrals of business or other illegal conduct.

This Compliance Certification must be signed by an authorized representative of the entity or individual identified below with knowledge of the matters addressed herein and authority to bind such party, and shall have the same effective date as the Contract.

"DOCTOR"                                          "UH"

Print Name:                                       Jerry M. Shuck, M.D.
Date:                                             Director of Graduate Medical Education

---

1. Except where otherwise noted, "UH" means all hospitals, ancillary providers, and other entities owned or controlled, directly or indirectly, by University Hospitals Health System.

2. An individual or entity listed on either the Health and Human Services – Office of Inspector General – List of Excluded Individuals at www.exclusions.oig.hhs.gov or the General Services Administration List of Parties Excluded from Federal Procurement and Non-Procurement Programs at www.epls.gov , as revised from time to time, is Ineligible.

3. "Immediate family members" include a spouse, natural or adoptive parent, child, sibling, step-parent, step-child, step-brother, step-sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, grandchild, and the spouse of any grandparent or grandchild.

## Wallace, David

**From:** Aronson, Sarah
**Sent:** Tuesday, March 03, 2009 2:27 PM
**To:** Wallace, David
**Subject:** FW: REVISED SCHED

Actually, I have a change to the below, sorry, hope it's OK.

| | |
|---|---|
| MARCH | NEURO/VASCULAR/FLOAT |
| APRIL | PEDS/OB/FLOAT |
| MAY | CARDIOTHORACIC/FLOAT |
| JUNE | ICU/LIVER |
| JULY | ECHO LAB, BACK-UP TEE/CARDIOTHORACIC*, LIVER TXP CALL |
| AUG | METRO/ASU |

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

---

**From:** Aronson, Sarah
**Sent:** Fri 2/27/2009 14:44
**To:** Aronson, Sarah; Norcia, Matthew; Wallace, David
**Subject:** REVISED SCHED

Here's a revised sched - I figured March I could mix neuro and vascular:

| | |
|---|---|
| MARCH | NEURO/VASCULAR/FLOAT |
| APRIL | ICU/LIVER CALL |
| MAY | CARDIOTHORACIC/FLOAT |
| JUNE | ECHO LAB, BACK-UP TEE/CARDIOTHORACIC*, LIVER TXP CALL |
| JULY | METRO/ASU |
| AUG | PEDS/OB/FLOAT |

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

---

**From:** Aronson, Sarah
**Sent:** Tue 2/24/2009 08:59
**To:** Aronson, Sarah; Norcia, Matthew; Wallace, David; Adamovich, Christine
**Subject:** RE: feb mtg

See below - also, I'm attaching a proposed schedule -

| | |
|---|---|
| MARCH | NEURO/FLOAT |
| APRIL | VASCULAR/FLOAT |
| MAY | CARDIOTHORACIC/FLOAT |
| JUNE | ECHO LAB, BACK-UP TEE/CARDIOTHORACIC*, LIVER TXP CALL |
| JULY | METRO/PEDS |

5/13/2009

DEFENDANT'S EXHIBIT L

AUG        ASU/OB/FLOAT

*As I think I suggested before, what I was thinking here was that I could schedule to be in echo lab for the month, with 1 day per week in the OR (preferably cardiac); in addition (because they don't start in echo until 830-900) I could support the attending and help start cases in the back hall in the AM, and do whatever echo the TEE resident isn't doing.

What should I anticipate in terms of my on-call requirements? Will I continue on the same frequency or will that change?

Thank you,
SCA

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

---

**From:** Aronson, Sarah
**Sent:** Tue 2/17/2009 18:15
**To:** Norcia, Matthew; Wallace, David; Adamovich, Christine
**Subject:** feb mtg

I'd like to set up a time for a mid-month meeting - thanks,
SCA

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

5/13/2009

**From:** Wallace, David
**Sent:** Saturday, March 14, 2009 7:15 AM
**To:** Aronson, Sarah
**Cc:** Norcia, Matthew
**Subject:** RE: april

Sarah,

I don't think that ICU in April will be possible.  The OR/OB call schedule for April has been completed and you have already been put on the call schedule for April.  In addition, the ICU call schedule has been completed and you have not been put on the schedule.  In addition to that, the last e-mail that I received from you (copied in this e-mail) made no indication of your interest to be in the ICU.  At this late date, I don't think that both schedules can be changed.  Finally, we should meet in person to set up your schedule, as opposed to doing it through e-mail.  Page me and llet me know  when you want to meet.

Thank you,

David Wallace


**From:** Aronson, Sarah
**Sent:** Tuesday, March 03, 2009 2:27 PM
**To:** Wallace, David
**Subject:** FW: REVISED SCHED

**Actually, I have a change to the below, sorry, hope it's OK.**

| | |
|---|---|
| MARCH | NEURO/VASCULAR/FLOAT |
| APRIL | PEDS/OB/FLOAT |
| MAY | CARDIOTHORACIC/FLOAT |
| JUNE | ICU/LIVER |
| JULY | ECHO LAB, BACK-UP TEE/CARDIOTHORACIC*, LIVER TXP CALL |
| AUG | METRO/ASU |

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*


**From:** Aronson, Sarah
**Sent:** Fri 2/27/2009 14:44
**To:** Aronson, Sarah; Norcia, Matthew; Wallace, David
**Subject:** REVISED SCHED

**Here's a revised sched - I figured March I could mix neuro and vascular:**

| | |
|---|---|
| MARCH | NEURO/VASCULAR/FLOAT |
| APRIL | ICU/LIVER CALL |
| MAY | CARDIOTHORACIC/FLOAT |
| JUNE | ECHO LAB, BACK-UP TEE/CARDIOTHORACIC*, LIVER TXP CALL |



DEFENDANT'S
EXHIBIT
M
PENGAD 800-631-6989

JULY       METRO/ASU
AUG        PEDS/OB/FLOAT

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

---

**From:** Aronson, Sarah
**Sent:** Tue 2/24/2009 08:59
**To:** Aronson, Sarah; Norcia, Matthew; Wallace, David; Adamovich, Christine
**Subject:** RE: feb mtg

See below - also, I'm attaching a proposed schedule -

MARCH      NEURO/FLOAT
APRIL      VASCULAR/FLOAT
MAY        CARDIOTHORACIC/FLOAT
JUNE       ECHO LAB, BACK-UP TEE/CARDIOTHORACIC*, LIVER TXP CALL
JULY       METRO/PEDS
AUG        ASU/OB/FLOAT

*As I think I suggested before, what I was thinking here was that I could schedule to be in echo lab for the month, with 1 day per week in the OR (preferably cardiac); in addition (because they don't start in echo until 830-900) I could support the attending and help start cases in the back hall in the AM, and do whatever echo the TEE resident isn't doing.

What should I anticipate in terms of my on-call requirements?  Will I continue on the same frequency or will that change?

Thank you,
SCA

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

---

**From:** Aronson, Sarah
**Sent:** Tue 2/17/2009 18:15
**To:** Norcia, Matthew; Wallace, David; Adamovich, Christine
**Subject:** feb mtg

I'd like to set up a time for a mid-month meeting - thanks,
SCA

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

**From:** Aronson, Sarah
**Sent:** Thursday, March 12, 2009 8:41 PM
**To:** Wallace, David; Norcia, Matthew
**Subject:** april

just want to confirm that I'm in ICU April, if so I need to get my call requests in to Soozan.
SCA

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*



DEFENDANT'S
EXHIBIT
*N*

Maryland License Application Sarah
Cymry Aronson, MD

Explanation of off-cycle residency training:

1. Family Medicine training from July 1993 to October 1995. I received credit for
   9 months of training because of my previous internal medicine and psychiatry
   experience, and so completed the 36-month program early.

2. Anesthesiology residency training from March 2006 to September 2009. I
   began the program off-cycle as I did not apply to the residency through the
   match but rather through direct contact with the department. I was
   scheduled to complete the residency at the end of February 2009. In
   October of 2008, I had a transient medical problem (I was taking topiramate
   for migraine prophylaxis and experienced side effects) which caused me to
   lose some training time. During this same span of time, my spouse also had
   medical difficulties, and we had a new baby in December of that year.

   The American Board of Anesthesiology recognizes successful completion of
   residency training in 6-month segments; if any section of a 6-month block is
   lacking, then the entire 6 months must be repeated. As a result, though all
   issues were entirely resolved by December of 2008, I was required to extend
   my training period 6 months to September of 2009. The endorsement from the
   residency program will also document this.



DEFENDANT'S
EXHIBIT
7

January 7, 2009
Sarah Aronson, MD

This letter is being written as a brief response to the letter received on 7 January 2009 regarding the unsatisfactory report of my performance and the reasons cited for that evaluation.

I will comply with whatever plan is ultimately recommended by the committee. It is my intention to complete this program successfully, and I have always been willing to work to improve my practice. As soon as the issue of my performance was broached with me clearly at the end of November 2008, I raised the issue of my being on topiramate and discontinued this medication immediately when concerns were raised about 'cognitive difficulties.'

The letter states that I failed in my professional duty to report having been on topiramate for migraine prophylaxis, with which I disagree. I concur that this medication had an effect on my performance, as I am now aware of the subtle recovery in my verbal skills and speed of execution since discontinuing the medication at the end of November. The dose I was taking was in the middle range as used for migraine prophylaxis. The cognitive side effects of topiramate have generally been considered to be related to dose and speed of titration, and have been thought to resolve over a short period of time. The research literature I have since reviewed suggests that the side effects tend to be subtle and persistent, though in general practice the prescription I had was not one that would typically require reporting to one's employer, as one would for a high dose anticonvulsant.

Similarly, the extensive neuropsychological testing to which I submitted over the course of two days did not demonstrate gross cognitive deficits.

To warrant the degree of censure noted in the letter one would expect to see a more consistent and widespread indication of failure over several areas; for example, a pattern of consistent negative evaluations by faculty, earlier intervention by the program directors to address these concerns, failure to provide proper patient care, failure on the in-training exam, neuropsychological testing which indicated a significant cognitive deficits, or being unable to secure a professional position after graduation. As it was, I received several positive evaluations and a strong job reference from my program director throughout the period of July to December 2008.

I would like to respectfully request that the committee in charge of this matter review the above points and consider a course of action that addresses this as a medical issue. If so inclined, this might allow some flexibility in how things could proceed, for instance in the length of clinical time to be made up.

If the committee chooses not revise the plan stated in the letter, in light of these events, it would be helpful to have written documentation of how I will be evaluated going forward. It would be important to avoid a repeat of my securing a job (and the time, effort, finances that need to be spent both by myself and the hospital to which I am

DEFENDANT'S
EXHIBIT

January 7, 2009
Sarah Aronson, MD


applying) which I would not be able to start. As it was, I was interviewing at several places that paid for my plane fare, hotel, etc. all as it turns out, under false pretenses that I was ready to graduate as my reference from the Residency Program Director indicated.

Thank you for your consideration of this matter.

15 Jan 2009

Dr. Longfellow:

This is in follow-up to our phone conversation today. I am writing to let you know that I was informed by my program directors that I will be mandated to continue my residency training by another 6 months. The circumstances are as follows: Over the past year I had been taking a medication (Topamax) for migraine prophylaxis. During recent months the dose was increased and I developed side effects which affected my clinical performance. I continued to receive satisfactory evaluations from faculty and received an excellent score on the Anesthesia Residency In-Training Exam. Because of the gradual onset of the symptoms, however, I did not identify the medication as a problem until December, when I received an unsatisfactory evaluation for my October ICU rotation.

As you know, if unsatisfactory performance is identified at any time during our final 6 months of training, the entire 6 month block must be repeated. I promptly stopped the medication as soon as this concern arose, and have noted a significant difference, as have my family and colleagues. I am distraught that this has occurred at this late date, though I'm certainly glad the problem was identified and corrected before I took a position as an independent practitioner.

While I hope I can retain the anesthesiologist position with Sheridan, I will understand if you choose to withdraw your offer of employment. I have not deposited the check that was recently sent from Sheridan to reimburse my Florida license application. I will await your response.

I intend to complete the licensing process for Florida, with a graduation date at the end of August 2009. I will still be eligible to sit for the written boards in August 2009 as planned. I hope to use the time constructively to solidify my skills, particularly in cardiothoracic and vascular anesthesia.

If you would like independent confirmation of these events, feel free to contact the department chairman, Dr. Howard Nearman, at 216 844 7330 (email howard.nearman@uhhospitals.org).

I am very sorry that this obstacle has arisen; if I had anticipated this I certainly would not have proceeded with you and Sheridan as I did. I know that bringing in a new practitioner is a time- and resource-consuming process not to be undertaken lightly.

Thank you for your supportive response today. Let me know how you would like to proceed from here.

Sincerely,

Sarah Aronson, MD
UHHS/Case School of Medicine
216 721 5945





**University Hospitals**
Case Medical Center

November 24, 2008

Memo Re:     Sarah C. Aronson

On October 14, 2008, Dr. Wallace and I met with Dr. Aronson to discuss her clinical performance. Multiple unsatisfactory evaluations had been received and since we had met earlier in Dr. Aronson's residency about performance issues, we thought it was necessary to revisit this area.

Of primary concern was the lack of appropriately rapid response (verbally or physically) to events that occur in the OR. Evaluation concerns are that Dr. Aronson is not appreciating the situation or cannot process and react to the information or situation at hand. She also had concerning evaluations from her Pain, OB, and ICU rotations.

This was explained to Dr. Aronson. She responded that she could not identify the reason for delay in response. Because of her inability to identify the problem, she was told that if she does not perceive the problem or identify the problem, then there is no way to correct the problem.

Dr. Wallace and I discussed some ways to improve and Dr. Aronson agreed to try. It was also discussed that the competency committee has reason to give her an "unsatisfactory" for her final 6 month period. We'll meet again in 4-6 weeks to review further evaluations and update any progress.

Respectfully,

Matthew P. Norcia, M.D.
Residency Program Director

David A. Wallace, D.O.
Residency Program Co-director

Sarah C. Aronson, M.D.



DEFENDANT'S EXHIBIT
X

**Department of Anesthesiology and Perioperative Medicine**
11100 Euclid Avenue Cleveland, Ohio 44106-5077 Phone 216-844-7335 FAX 216-844-3781
*University Hospitals Case Medical Center and Case Western Reserve University School of Medicine*

**Aronson, Sarah**

To...      Nearman, Howard     'p JAN 2009

Cc...

Bcc...

Subject:     some info

Attachments:

Howard,
Thanks for taking the time to meet with me. I don't know how much you know about my current situation other than the letter I cc'd to you back in November. I've not wanted to involve you in the process.

I want to say first that I'm committed to completing this residency successfully, and can only be grateful that this difficult episode has resulted in my getting rid of a medication that was having a negative effect on my functioning. I'm alarmed that I needed a whack on the head to identify the topamax as a problem. As soon as I considered the possibility I stopped it, any only wish I had done so sooner. I feel significantly better, and my spouse confirms I'm considerably more with it. I'm glad this happened before our baby arrived.

I'm sure that Dr. Norcia and others were correct in noting a change in my performance. It was not so significant that neuropsych testing would show me as being impaired, but this job requires a high level of performance, and small changes would be noticeable.

Ultimately, I'll do whatever the program deems necessary to complete this training. While I don't believe Drs. Wallace and Norcia have intended this process to be punitive, the negative consequences for me are significant, and many were largely avoidable. I wanted to share this information with you in the hope that there may be some way to ameliorate these. I also want to talk about how I can avoid finding myself in this same situation 6 months from now.

When this process began, all my documented evaluations for the past 8 months were good. My October meeting with both directors raised the issues of response speed and efficiency, but the evaluations cited were from 6 months prior, and I had reason to believe I had addressed those problems. My block month in November went well. Our next meeting was at the end of November, the outcome of which was Dr. Wallace's decision to mandate a fitness-for-duty evaluation. I received Dr. Norcia's unsatisfactory evaluation on Dec. 31st.

I interviewed and was offered several positions during August - November with Dr. Norcia as my primary reference. The group with which I signed an employment contract was very strict about not proceeding with anything prior to reviewing my references. Based on my program director's endorsement, they believed that I was ready to graduate and employable. I also requested another letter from Dr. Norcia for my Florida license application in November. I certainly wouldn't have proceeded with a contract or the expense of a license application if he had at any of those times indicated to me that my graduation was in question. Now it appears that I was interviewing under false pretenses, that the endorsement of my program director was not valid.

If this remediation proceeds as Dr Wallace envisions, I will lose the job that I had secured, as well as the time and funds spent interviewing and obtaining licensure. Obviously I will also lose that 6 months of income, and will likely have greater difficulty obtaining another good position with this mark on my record.

More important to me, even though an academic intervention such as this is not reportable to the medical board, it becomes a training extension that I will have report and explain for the rest of my career with every credentialling or licensing process I undergo.

It has been very frightening, as the sole provider for my family, to have this action occur so close to the expected end of my training, not to mention in the midst of the holidays with a baby due. It has left me feeling isolated and unsure as to how to advocate for myself.

I've been practicing medicine for over 20 years without incident, and I'm sure in the long run this will work out fine. I am glad that this problem was identified and corrected. I want to be the best clinician I can be, and I certainly want to demonstrate my competence to everyone's satisfaction. If you and Drs. Wallace and Norcia believe that a 6 month training extension is best for me and the most appropriate way to proceed, then I'll abide by your decision. If you have any ideas or suggestions that might be helpful, I'd like to hear them. In either case, I appreciate your input.

Thank you,
Sarah

Sarah Aronson, MD
UHHS/Case School of Medicine



DEFENDANT'S
EXHIBIT
Z

11/28/08

I am writing this as an initial response to my recent performance review of mid-October and Nov. 24, and the decision of Drs. Wallace and Norcia to remove me from clinical service pending a fitness-for-duty evaluation.

On reviewing the data of the past 9 months, I don't feel this decision was justified. I understand, however, the highest priority is to ensure patient safety and clinical reliability, and I will comply unreservedly in the evaluation that has been mandated.

RECEIVED

NOV 2 8 2008

During my time in this program, I have received a pattern of evaluations regarding my need to improve my efficiency and speed of response. Since March of last year, I have made it a priority to develop this aspect of my practice. For the past 6-7 months I have not received any negative evaluations in this area.

I gave some thought to individual evaluations as well.

Regarding Dr. Zahniser, I was surprised and confused by both of his evaluations. In his second, he rates my performance as satisfactory with no comment to me, but then states that I am the "worst" resident and "very weak".

Regarding Dr. Jonsyn, I will say that I have no doubts regarding his commitment to patient care and his desire to be a good faculty member. In comparison to our other ICU faculty, he has difficulty with time management and has a disorganizing and stressful effect on the team, in my experience. I regret that I was not able to "manage" him in February, or in October, when I knew what to expect but had an extremely busy service and had to work with him for three weeks. I have discussed my concerns regarding his behavior with Drs. Norcia and Rowbottom. I will take serious issue if his evaluation of me forms a substantial basis for any decision regarding my competency as a resident.

In March I believe Dr. Levin commented that I had "no sense of urgency" on OB and that I could speed up my epidural placements, but at the same time commented positively regarding my clinical and supervisory ability. I certainly feel a sense of urgency on the OB service when those situations arise, and proceed accordingly. My temperament is such that my demeanor stays fairly level even in emergencies; I can see that might create an impression that I don't appreciate the urgency if my overall speed is already an issue. I don't think I can change my temperament, but I think my speed has improved. I can see also the importance of verbally communicating my understanding of a situation in order to create a sense of confidence.

In April, Dr. Hayek and I discussed some of these issues. I did find it difficult at the beginning of the month to find the most team-efficient way to divide my attention between the consult service, the clinic, and the MOSC pre-op/procedure room. I take responsibility for that, as it was not for lack of effort, and I'm sure many residents can move in and out of that role with more smoothness than I did. I also took suggestions from the fellows and Dr. Hayek and improved my distribution of effort. I don't feel that Dr. Hayek can comment meaningfully on my vigilance or acute responsiveness as an anesthesiologist.

In May, I remember the case with Dr. Adamek, and I will defer to his experience; while I wasn't dawdling, I'm certain that I could have streamlined my preoperative preparation even more and speeded the process without compromising her care. Dr. Adamek has given me very high ratings on his previous evaluations.

Since May of 2007, I have had satisfactory to positive evaluations. I am approaching faculty with whom I have worked over the past 7 months to request more detailed feedback regarding these concerns. In my last meeting with Dr. Norcia and Wallace together, I became concerned that perhaps the topiramate that I take for migraine prophylaxis was creating a response delay in me of which I was not aware, and I suggested the option of involving the EAP in this process. I did not anticipate being removed from clinical duties as a result of that referral, and question the necessity of that approach given my evaluations since May 2007. I am, however, willing to complete the process as currently laid out in a timely fashion.

It is my hope that we can come to a resolution of these concerns as soon as possible.

Sincerely,
Sarah Aronson, MD

DEFENDANT'S
EXHIBIT
AA
PENGAD 800-631-6989

From: Nearman, Howard
Sent: Tuesday, January 27, 2009 10:58 PM
To: Aronson, Sarah
Subject: RE: f/u


I will be happy to talk with him. I find honesty is the best policy, but will
leave the final decision to you. Is it OK to tell him that your performance was
not satisfactory, and that, upon evaluating the possibilities as to why, we came
up with the potential drug side effect? I acn then tell him of the plan and
perhaps provide progress reports.

Let me know your thoughts.

-----Original Message-----
From: Aronson, Sarah
Sent: Fri 1/23/2009 1:21 PM
To: Nearman, Howard
Subject: f/u

Howard,
Dr. Longfellow, who is the director of the practice that hired me, will likely
contact you next week for comment/confirmation regarding events surrounding this
extension of training.  Can you let me know if that's acceptable to you, and
could you give me some idea of how you think you'll respond?
Thank you,
Sarah


Sarah Aronson, MD
UHHS/Case School of Medicine



To:     Emily Vasiliou
        ACGME Resident Services
        515 N. State St., Suite 2000
        Chicago, IL 60654

From:   Sarah Aronson, MD
        CA-3, Dept of Anesthesiology
        UH Case Medical Center
        Cleveland, OH

Re:     Due Process

10 April 2009

Ms. Vasiliou:

I am writing to communicate a formal complaint regarding my hospital's existing policies
and my residency program's handling of my performance review.

I understand that your office does not intervene in the specifics of the evaluation process
or the decisions made regarding promotion.

The concerns I am presenting for your review include lack of documentation, lack of
timely intervention and communication of performance concerns, and lack of access to
mediation or appeal.  It is my hope that the involvement of your office will improve the
current process and allow me access to a due process review.

Specifically, I am concerned that:

1.  My program directors came to a decision to extend my training by 6 months
    without any documentation or clear examples of deficiencies in performance
    during the period in question.



DEFENDANT'S
EXHIBIT
EL

ARON 0025

- 2 -

2. I was presented with this decision less than 2 months before the scheduled end date of my residency, though the alleged period of unsatisfactory performance occurred over 3 months prior.

3. Hospital policy states that no appeal is available to a resident who is not promoted or whose training is extended for academic reasons.

4. My program directors abused their supervisory authority by mandating a fitness-for-duty evaluation without any documentation or examples of irregular performance, and in the face of documentation of very good performance during the preceding months.

The relevant ACGME guidelines are as follows:

(1) Non-renewal of appointment or non-promotion: In instances where a resident's agreement will not be renewed, or when a resident will not be promoted to the next level of training, the Sponsoring Institution must ensure that its programs provide the resident(s) with a written notice of intent no later than four months prior to the end of the resident's current agreement. If the primary reason(s) for the non-renewal or non-promotion occurs within the four months prior to the end of the agreement, the Sponsoring Institution must ensure that its programs provide the resident(s) with as much written notice of the intent not to renew or not to promote as circumstances will reasonably allow, prior to the end of the agreement.

(2) Residents must be allowed to implement the institution's grievance procedures if they receive a written notice either of intent not to renew their agreement(s) or of intent to renew their agreement(s) but not to promote them to the next level of training.

e) Grievance procedures and due process: The Sponsoring Institution must provide residents with fair, reasonable, and readily available written institutional policies and procedures for grievance and due process. These policies and procedures must minimize conflict of interest by adjudicating parties in addressing:

(1) Academic or other disciplinary actions taken against residents that could result in dismissal, non-renewal of a resident's agreement, non-promotion of a resident to the next level of training, or other actions that could significantly threaten a resident's intended career development.

ARON 0026

- 3 -

Here are the events as I see them:

1.  I was scheduled to complete my residency on 2/28/09.  I am currently a CA-3 in Anesthesiology at University Hospitals Case Medical Center, 11100 Euclid Ave, Cleveland, OH 44106.  Residency office phone (216) 844 7335. Program Director:  Matthew Norcia, MD, Associate Program Director David Wallace, DO.

2.  At a meeting in 10/08 both directors raised concerns regarding my speed and efficiency.  This was an aspect of my practice that, on my own initiative, I had worked to improve during my CA-3 year. The evaluations my directors cited for those concerns predated 5/08, however, and I had reason to believe I had addressed those problems.

    I was called to that meeting after being on call all night in the SICU.  We spent little time discussing my clinical performance.  Dr. Wallace accused me of misusing the text page system to "dump" work on fellow residents on the OB service.  I was confused, then alarmed, and ultimately offended by that accusation, and that occupied much of my attention during that meeting.  I stated clearly that I do not dump work on my colleagues by whatever method, and it's not been mentioned to me again.

3.  In early November, I signed an employment contract to start March 2, 2009, following my anticipated graduation.  I obtained this job offer in part on the strength of Dr. Norcia's recommendation, dated September 2008 (attached), in which he described my ability as above average or excellent across the range of clinical duties I would be called upon to perform.

4.  At a 6-week follow-up meeting at the end of November, I was informed by my program directors that I might receive an "unsatisfactory" for my last 6 months of residency (July 2008 – December 2008) though I had received only satisfactory to positive evaluations for that time period (attached).  I have achieved good to excellent scores on the in-training exam every year in residency.

ARON 0027

- 4 -

5.    At that meeting, I raised a question that perhaps the topiramate that I took
      for migraine prophylaxis was creating a response delay in me of which I
      was not aware. I suggested the option of involving the EAP in this process
      as an objective third party monitor, as I intended to stop the medication.

6.    The following day, I was pulled from clinical duty and ordered by Dr.
      Wallace to undergo a Tier 1 "fitness-for-duty" evaluation citing concerns of
      substance abuse and/or cognitive impairment. No documentation was
      provided or substantive examples given to justify Tier 1 referral. When
      asked directly, Dr. Wallace could not give me an example of behavior or
      performance that would justify such an intervention. No other preliminary,
      less intrusive, interventions were offered or considered at any time, as are
      outlined in the Resident's and Fellows Manual or the UHCMC Policies and
      Procedures, nor was Dr. Norcia aware until several days later that this
      action had been taken. My faculty evaluation for that month was above
      average.

7.    I discontinued the medication immediately, and complied fully and promptly
      with the mandated evaluation.  No evidence of substance abuse or
      cognitive impairment was found.

8.    Fitness-for-duty testing was completed December 4th.  I had a final visit with
      evaluator on December 9, 2008, to review his report.  Despite my calls to
      the program directors and the EAP liaison, no response or plan for return to
      work was offered to me until the evening of December 16th.  During that
      period of time out of work, I was sufficiently alarmed by the delay in
      returning me to clinical duty that I consulted an attorney to clarify my
      options.  At no time did I threaten legal action against the hospital or
      program.

9.    I was scheduled many months in advance to go out on maternity leave
      December 22nd (my partner was pregnant and expecting our third child).  As
      a result, I was given only 3 days in December to demonstrate my clinical
      performance.  One of those days was with Dr. Norcia, who told me he had

ARON 0028

- 5 -

no significant criticisms of my performance and continued to have an "open mind" regarding the decision to extend my training. Roughly 2 weeks later on 12/31/08, while I was out on maternity leave and without any further assessment of my clinical ability, Dr. Norcia submitted his on line evaluation citing poor performance during the first week of October in the ICU. In that evaluation note, based on that week, he stated that he did not feel I was performing at the level of a CA-3 and should therefore repeat the 6 month block. I've not received at any time the specifics of any other performance concerns that may have been communicated to the program directors.

10.     On January 7th, 7 weeks prior to my graduation date, I received written notice that the decision had been made to extend my training 6 months.

11.     At the outset of this process, I was assured repeatedly by my program directors as well as by Dr. Jerry Shuck (DIO) and Will Rebello (GME manager) that I would have opportunity to appeal this decision. I am attaching the letter I drafted (but did not submit) 12/23/09 to request an appeal committee. When I reviewed the Resident's Manual, it clearly states that no appeal is allowed if the intervention is "academic" (see below). When I questioned this with the GME office and my program, I was then told that I had the following options: (1) accept the 6-month training extension without an appeal, or (2) refuse the extension, at which point I would be subject to a disciplinary action or termination without a certificate of completion, which I could then appeal, but with the caveat that I could then be terminated, and any disciplinary action would be reported to the state medical board.

12.     I was in contact with the GME office repeatedly throughout this process. Mr. Rebello and Dr. Shuck were readily available to listen to my concerns. Mr. Rebello advised me at the beginning of this process that they could not be more active, because once I filed an appeal, Dr. Shuck would be called upon to mediate and would want to remain objective. When it became clear that no appeal was allowed (unless I invited a disciplinary action), Mr. Rebello told me that he really shouldn't be communicating with me at all

ARON 0029

- 6 -

because I had consulted an attorney. Dr. Shuck stated to me that he
thought the way this had been handled by my program director was
"unconscionable", but that "I think at this time I can't be seen as your
advocate." He advised that I speak with Dr. Nearman, our department
chairman. Dr. Nearman has deferred to the program directors' assessment
in this case as he has delegated that responsibility to them. More recently,
Dr. Shuck has had conversations with Dr. Nearman and the program
directors, but this has not changed my status in any way.

In summary, the action on the part of my program regarding my performance was taken
only 2 months before my graduation date, without any preceding remediation or
intervention. I was formally notified that I would not be graduating on time 7 weeks prior
to my completion date. Documentation of one instance of unsatisfactory clinical
performance during this reporting period was entered almost 3 months after the fact.

Aside from Dr. Norcia's post-dated entry of 12/31/08, the last negative evaluations I
received dated from the December 2007-July 2008 reporting period. As I mentioned
above, I had taken initiative myself to address and correct the concerns expressed at
that time, and the evaluations I have received since May of 2008 has been satisfactory
to excellent. Had my program directors taken some action with me then, one year ago, it
would have allowed me the subsequent 6 month period to demonstrate my competency,
and, according to the American Board of Anesthesiology requirements, I would not have
been subject to this training extension (see below). My own educational experience
could have been improved, and serious professional consequences to me could have
been avoided.

In addition, my program directors have not explained why, if my performance was so
concerning in early October to justify a fitness-for-duty evaluation, I was kept on duty
through October and November. During that time I supervised a very busy ICU service,
and subsequently a very busy Acute Pain/Regional Anesthesia service, during which I
received good evaluations. .

The ACGME guidelines require that residents "must be allowed to implement the
institution's grievance procedures if they receive a written notice either of intent not to

ARON 0030

- 7 -

renew their agreement(s) or of intent to renew their agreement(s) but not to promote them to the next level of training". Our GME manager and our DIO both declined initially to mediate in this process despite my repeated communication to their office of my concerns, advising that I seek an appeal if I received an adverse action. Only later in the process (after I reviewed the hospital by-laws myself) was I told I had no option of seeking a review or appeal unless I chose to invite a disciplinary action, placing myself at greater professional risk.

*From the beginning of this process, I responded promptly and concretely, in good faith, to correct any possible deficiencies in my performance. My file will show that I have communicated with my supervisors, my chairman, and the GME office from the outset, expressing my concerns as well as my willingness to develop a mutually acceptable plan of action.  This has produced little response other than the continued execution of a remediation plan with severe personal and professional consequences for me, the basis for which remains vague.  My evaluations from faculty who work with me have been and continue to be good.*

Both Dr. Shuck and Dr. Nearman agree that I have exhausted the options for reaching an internal resolution of this situation.  They are aware that I am submitting this complaint to you.

I appreciate your review of these concerns and look forward to hearing your suggestions.  Thank you for your attention to this matter.

Sincerely,

Sarah Aronson, MD
UHCMC/Case School of Medicine
Home phone: (216) 721 5945
Email:        sarah.aronson@uhhospitals.org
Page:         31262@pager.uhhospitals.org

ARON 0031

- 8 -

<u>Current UH Resident Policy:</u>

"A Performance Review Action is an opportunity for the Resident to address expected standards that need improvement. A Performance Review Action is not reportable to the State of Ohio Medical Board; it is not a Disciplinary Action (defined on next page); it cannot be appealed; and it becomes part of the Resident's permanent file.

1. Performance Alert Notice. A Performance Alert Notice is the formal written notification to a Resident concerning areas of marginal or unsatisfactory performance. The Program Director or Faculty Member should initiate a Performance Alert Notice and inform the resident within 7-10 days of identifying an area of concern.

2. Remediation. A remediation period is an opportunity for the resident to correct academic deficiencies and to develop and demonstrate appropriate levels of proficiency for patient care and advancement in the program. Being placed in remediation is notice to the resident of his or her failure to progress satisfactorily as reflected by evaluations and/or other assessment modalities. It is not to be used in lieu of a Disciplinary Action.

Remediation may include, but is not limited to, one or more of the following:

1) Limitations or restrictions on the amount and level of the Resident's patient care activities;

2) Repeating one or more rotations;

3) Participation in a special program;

4) Continuing scheduled rotations with or without special conditions;

5) Supplemental reading assignments;

6) Attending undergraduate or graduate courses and/or additional clinics or rounds;

7) Extending the period of training;

8) Referral to the Employee Assistance Program (see UHCMC Policy HR-85 which shall apply to all aspects of the referral, process and determination); and/or

9) Repeat training year.

ARON 0032

- 9 -

Hospital EAP policy:

4.2.1 Tier 1 Mandatory Referral - Employees may be mandated to attend EAP by their supervisor for the following:

(1) Impaired functioning (fit for duty); or

(2) Violent, hostile, or reckless behavior that endangers the safety of employees, visitors, patients or physicians or that causes others to fear for his/her safety; or

(3) Reasonable suspicion of alcohol/drug use.

The American Board of Anesthesiology requirements:

2.    The period of clinical anesthesia training as an enrolled resident of any single program is at least six months of uninterrupted training.

3.    The six-month period of clinical anesthesia training in any one program ends with receipt of a satisfactory Certificate of Clinical Competence. To receive credit from the ABA for a period of clinical anesthesia training that is not satisfactory, the resident must immediately complete an additional six months of uninterrupted clinical anesthesia training in the same program with receipt of a satisfactory Certificate of Clinical Competence...When a resident receives a satisfactory Certificate of Clinical Competence...the ABA will grant credit...for the period of satisfactory training and the most recent of the periods of unsatisfactory training immediately preceding it.

ARON 0033