Westlaw.

Page 1

Not Reported in N.E.2d, 2000 WL 1298761 (Ohio App. 6 Dist.)
(Cite as: 2000 WL 1298761 (Ohio App. 6 Dist.))

C
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio, Sixth District, Lucas County.
Reda EL-SHIEKH, M.D., Appellant,
v.
NORTHWEST OHIO CARDIOLOGY CONSULT-ANTS, et al., Appellees.

Nos. L-99-1380, CI-97-4238.
Sept. 15, 2000.

David Zoll and Michelle Kranz, for appellant.

William Connelly and Anthony Turley, for appellee Roger A. Miller, M.D.

Fritz Byers, for appellee Northwest Ohio Cardi-ology Consultants, Inc.

Judge GLASSER, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.

*DECISION AND JUDGMENT ENTRY*
SHERCK.

**\*1** This appeal comes to us from a summary judgment issued by the Lucas County Court of Common Pleas in favor of the defendants in an interference with contract action. Because we conclude that the trial court properly granted summary judgment, we affirm.

In 1994, appellant, Dr. Reda El Shiekh, began a cardiovascular fellowship with the Medical College of Ohio ("MCO"). This occurred because Defiance Clinic and MCO entered into an agreement whereby Defiance Clinic agreed to fund part of appellant's fellowship conditioned upon his agreeing

to become the clinic's full-time cardiologist upon completion of his three-year training. Prior to the agreement between MCO and Defiance Clinic, Northwest Ohio Cardiology Consultants ("NWOCC") also sought to provide cardiac services to the clinic. However, according to the clinic's CEO, Chad Peter, once Defiance Clinic entered into the agreement for services and the fellowship program with MCO, NWOCC ceased its solicitation for cardiology services with the clinic. Roger A. Miller, then a physician with NWOCC, initially co-directed the fellowship program with Theodore Fraker, a doctor with MCO. Fellowship participants were scheduled to do cardiology training rotations at both MCO and Toledo Hospital.

Appellant completed his first rotation in the fall of 1994 working under the supervision of cardiologists at MCO. In January and February 1995, appellee completed a rotation at Toledo Hospital, under the supervision of NWOCC.

In late February or early March 1995, at a regularly scheduled NWOCC meeting, several doctors expressed serious concerns about appellant's performance during his rotation at Toledo Hospital. It was decided that these doctors were to submit letters on this matter to Dr. Fraker. By this time, Dr. James F. Bingle had taken the position of co-director of the joint fellowship program, as Dr. Miller was seeking retirement. In a letter to Dr. Fraker dated March 13,1995, Dr. Bingle stated,

"As I had discussed with you by phone, a number of physicians in our group have expressed grave concerns about [appellant's] ability to function as a first year fellow in our cardiology program. A number of their concerns will be outlined in the letters enclosed.

"It is my feeling that we should get together to assess his overall status in the program, particularly as the first year nears a close, addressing the question as to whether he is qualified or not to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2000 WL 1298761 (Ohio App. 6 Dist.)
**(Cite as: 2000 WL 1298761 (Ohio App. 6 Dist.))**

continue."

Three letters from Dr. John L. Schwartz, Dr. Todd L. Monroe, and Dr. John R. Letcher were enclosed with Bingle's letter.

Also in late February or early March, Dr. Miller went to Defiance Clinic on behalf of Toledo Area Health Partners Ltd. ("TAHP"), a group of physicians attempting to establish a new health insurance program. In the course of his conversations at the clinic, Dr. Miller spoke with Chad Peter about appellant. Dr. Miller stated that appellant had received "some bad reviews" from some of the NWOCC doctors. Nothing more specific was said.

**\*2** In a letter dated April 4, 1995 to Dr. Allen Gaspar at the Defiance Clinic, Dr. Fraker acknowledged the receipt of the NWOCC letters on March 23, 1995 and enclosed copies of them. In that letter, Dr. Fraker suggested that while appellant demonstrated some difficulties, he was showing steady improvement, but his clinical abilities were not inadequate. Nevertheless, Dr. Fraker then went on to state that, while MCO still hoped to find a cardiologist for the clinic as part of the mutually beneficial arrangement, he was leaving it to Defiance Clinic to decide for itself whether, based upon the NWOCC concerns, appellant would be the right person for the position.

Apparently (as it is unclear from the record), just prior to sending his letter to Defiance Clinic, Dr. Fraker and appellant met to discuss the letters and allow appellant to respond. In a letter to Dr. Fraker dated April 7, 1995, appellant referenced the previous meeting and expressed his surprise at the opinions of the NWOCC doctors, noting that evaluations from MCO faculty had been very good. Appellant denied that he had ever exhibited incompetence and gave possible alternative explanations for the negative comments which, in his opinion, were inconsistent with the positive feedback he had received during the Toledo Hospital rotation. Appellant suggested that the NWOCC doctors' letters were financially motivated due to their rejected of-

fer to provide a cardiologist to Defiance Clinic. Appellant then stated that he preferred not to do future rotations at Toledo Hospital, "where evaluations may be motivated by some biased physicians who will incur financial losses when I finish my cardiology fellowship and join the Defiance Clinic."

On June 28, 1995, Dr. Gaspar, by letter, informed appellant that Defiance Clinic was releasing appellant from his contract. Dr. Gaspar stated that "[i]t has been our policy in recruiting physicians that *any* feeling of discomfort is sufficient reason to continue to looking [*sic* ] at other options. We hope you can realize that this is not in any way a personal value judgment."

Despite the termination of his Defiance Clinic contract, appellant was permitted to finish his three-year fellowship. He received several employment offers, and in January 1998, accepted a position as a cardiologist at the Green River Heart Institute in Owensboro, Kentucky.

In August 1997, appellant filed suit against NWOCC, with Dr. Miller as its statutory agent, Dr. Bingle, Dr. Monroe, Dr. Schwartz, and Dr. Letcher. Appellant alleged claims of tortious interference with a contract, civil conspiracy, and defamation.

Appellee Dr. Miller moved to dismiss the suit based upon a one year statute of limitations for defamation. The court denied the motion, noting that the underlying claim, tortious interference with a contract, has a four-year limitations period.

Appellees Dr. Miller and NWOCC then moved for summary judgment. After considering the depositions of Chad Peter, Dr. Fraker, Dr. Miller, and appellant, as well as additional affidavits from the NWOCC doctors, the trial court concluded that Dr. Miller's statements to Chad Peter were true, constituting a complete defense to the defamation action upon which the tortious interference with a contract claim was based. The court also determined that the letters submitted by the NWOCC physicians were opinions and were, thus, constitutionally protected

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2000 WL 1298761 (Ohio App. 6 Dist.)
**(Cite as: 2000 WL 1298761 (Ohio App. 6 Dist.))**

as being absolutely privileged communications. The trial court then granted summary judgment in favor of appellees as to all of appellant's claims, including civil conspiracy since it, too, was based upon interference with a contract.

**\*3** Appellant now appeals that judgment, setting forth the following five assignments of error:

"I. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT EL-SHIEKH BY FAILING TO CONSTRUE A KEY FACT/ INTERFERENCE IN FAVOR OF APPELLANT EL-SHIEKH.

"II. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT EL-SHIEKH WHEN IT IMPROPERLY LIMITED ALL ACTS OF INTERFERENCE BY APPELLEES SOLELY TO CONTENT OF APPELLEE MILLER'S STATEMENT TO THE DEFIANCE CLINIC AND THE CONTENT OF APPELLEES' LETTERS TO THE MEDICAL COLLEGE OF OHIO.

"III. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT EL-SHIEKH WHEN IT GRANTED APPELLEES' MOTIONS FOR SUMMARY JUDGMENT AS THE DEFAMATION DEFENSES OF TRUTH AND ABSOLUTE PRIVILEGE DO NOT APPLY TO OHIO TORTIOUS INTERFERENCE WITH CONTRACT CLAIMS.

"IV. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT EL-SHIEKH BECAUSE EVEN IF TRUTH IS A COMPLETE DEFENSE, THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARDING WHETHER APPELLEE MILLER MADE A TRUE STATEMENT OF FACT.

"V. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT EL-SHIEKH BECAUSE EVEN IF ABSOLUTE PRIVILEGE IS A COMPLETE DEFENSE, THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARD-

ING WHETHER APPELLEES' INTERFERENCE CONSTITUTED FALSE STATEMENTS OF FACT AS OPPOSED TO CONSTITUTIONALLY PROTECTED OPINIONS."

Appellant's assignments of error essentially contest the validity of the trial court's grant of summary judgment. The standard of review of a grant or denial of summary judgment is the same for both a trial court and an appellate court. *Lorain Natl. Bank v. Saratoga Apts* (1989), 61 Ohio App.3d 127, 129.

Summary judgment is controlled by Civ.R. 56(C), which states in pertinent part:

"Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of facts, if any, * * * show that there is no genuine issue as to any material fact and, construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law." Civ.R. 56(C).

The moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 294 295, citing to *Celotex Corp. v. Catrett* (1986), 477 U.S. 317.

However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. *Dresher, supra; Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 114-115.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in N.E.2d, 2000 WL 1298761 (Ohio App. 6 Dist.)
**(Cite as: 2000 WL 1298761 (Ohio App. 6 Dist.))**

I.

**\*4** Appellant, in his first assignment of error, claims that the trial court failed to construe a key fact in favor of his tortious interference with a contract claim. Specifically, appellant maintains that the trial court was required to infer from the evidence presented that appellees wrote letters after Dr. Miller's comment to Chad Peter and that their motivation for such comment and letters was a desire to provide cardiology services to Defiance Clinic.

A party opposing a motion for summary judgment is entitled to have all admissible evidence construed most favorably in his behalf. *William v. First United Church of* (1974), 37 Ohio St.2d 150, 152. However, the nonmovant may not rely upon the mere allegations or denial in the pleadings, but must set forth specific facts showing there is a genuine issue for trial. *Dresher, supra; Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 114-115. Thus, if the party opposing a motion for summary judgment can show, through affidavits, depositions, or otherwise, being construed most strongly in his favor, that he has presented a genuine issue of a material fact about which reasonable minds could differ, that party is entitled to have the motion for summary judgment denied. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66.

In this case, appellees submitted affidavits stating that, after the meeting of the NWOCC doctors, Dr. Miller commented to Chad Peter that appellant had received "some bad reviews." Dr. Miller gave no further details. Contrary to appellant's argument, Dr. Fraker could not remember whether he heard from Chad Peter or Dr. Bingle first. In response, appellant offers only his own speculation that Dr. Miller's motivation for making the comment was to get Defiance Clinic's cardiology business. However, we can find nothing in the record to support this "inference."

The record shows that the events involving the NWOCC doctors discussion of appellant at their meeting, the doctors' evaluation letters, Dr. Miller's presentation and comment at the clinic, the call to Dr. Fraker, and Dr. Fraker's letter to Defiance Clinic all occurred within a very short time frame. Even if we presume that Dr. Miller's comment was made prior to the sending of the doctors' letters, appellant has produced nothing to show that this comment was improperly motivated or not based upon verbal "bad reviews." In addition, Chad Peter testified in deposition that after Defiance contracted with MCO for a cardiologist, NWOCC made no further efforts to have the clinic utilize its services. In our view, any inferences must be based upon facts presented, not on mere speculation. Therefore, appellant failed to present some factual evidence to show appellees' improper motives or actions and the trial court properly construed the evidence presented.

Accordingly, appellant's first assignment of error is not well-taken.

II.

Appellant, in his second assignment of error, claims that the trial court erred in limiting the bases for his claim for tortious interference with a contract to certain actions, *i.e.*, Dr. Miller's statement to the clinic and the NWOCC doctors' letters.

**\*5** A claim for tortious interference with contract is comprised of the following elements: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification and (5) resulting damages." *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, paragraph two of the syllabus.

In this case, appellant contends that, in addition to the statements made by Dr. Miller and the NWOCC physicians, the "actions" of appellees should be considered as separate bases for tortious interference, *i.e.*, Dr. Miller's contact with the Defiance Clinic "for illicit purposes and financial gain" and the NWOCC doctors' meeting at which it was agreed that letters would be written by the doctors who had experienced unsatisfactory performance by appellant.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in N.E.2d, 2000 WL 1298761 (Ohio App. 6 Dist.)
**(Cite as: 2000 WL 1298761 (Ohio App. 6 Dist.))**

We agree with the trial court that appellant's underlying claim for his tortious interference claim is that the NWOCC doctors and Dr. Miller, by their statements, caused Defiance Clinic to terminate appellant's contract. In our view, facts about the alleged contact and meeting were offered simply to establish the motive for the statements. Therefore, these "actions" are not separate causes of action, but simply factual evidence to be considered in determining whether or not appellant has met his summary judgment burden.

Upon a complete reading of the record, nothing indicates that Dr. Miller's contact with the Defiance Clinic was for anything other than to present the health insurance proposal. Likewise, other than appellant's speculation or opinion, we can find no factual evidence to indicate the NWOCC physicians' meeting itself was anything but a routine activity. Appellant argues that, because the physicians did not use the regular evaluation forms to communicate their concerns, this demonstrates some improper motivation. However, nothing in the record establishes that MCO did not accept or that there was anything improper about the use of such letters in lieu of a formal evaluation procedure. Therefore, the trial court did not err in its determination that the only actions which actually support appellant's claim are Dr. Miller's statement to the clinic and the NWOCC physician letters.

Accordingly, appellant's second assignment of error is not well-taken.

### III.

We will address appellant's third and fourth assignments of error together. Appellant, in his third assignment of error, argues that truth or privilege for opinions are not defenses to a claim of tortious interference. Appellant, in his fourth assignment of error, states that even if such defenses are permitted, there remain genuine issues of material fact as to whether appellees' statements were truthful or protected opinions.

In *A & B-Abell Elevator Co., Inc. v. Columbus/*

*Central Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 15, the Supreme Court of Ohio held that "where claims such as tortious interference and disparagement are based on statements that are qualifiedly privileged under defamation law, the protection afforded those statements under *Jacobs* [*v. Frank* (1991), 60 Ohio St.3d 111], at paragraph two of the syllabus, must also apply in the derivative claims." Privileged statements may be those which are made to protect some kind of public interest, such as ensuring the quality of health care administered to the general public. *A & B-Abell, supra,* at 9; *Jacobs, supra,* at paragraph one of the syllabus. In order to succeed on a tortious interference claim, a plaintiff must demonstrate clear and convincing evidence that the privileged communication was made with actual malice, that is, with knowledge that the statements are false or with reckless disregard as to their truth or falsity. *A & B-Abell, supra,* at 9.

**\*6** Applying the *Jacobs* rationale, truthful statements, where not confidential, would be a complete defense to tortious interference where the underlying claim is based upon allegations of defamatory statements. See *id.* Likewise, opinions, statements which can be proven neither true nor false, would also be a defense. See *Vail v. The Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279.

In this case, since Dr. Miller was a member of the group of doctors which was, in fact, supervising some of appellant's training, his interest in protecting public health was sufficient to warrant communication as to appellant's progress. Nothing in the record indicates that any of the information disseminated was confidential or that appellees breached any duty of confidentiality. Therefore, regardless of whether it referred to verbal or written evaluations, Dr. Miller's statement to Chad Peter that appellant had received "some bad reviews," was both privileged and true. Appellant has suggested, but offered no proof that Dr. Miller lied and then attempted a "cover up" by having the doctors write

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in N.E.2d, 2000 WL 1298761 (Ohio App. 6 Dist.)
**(Cite as: 2000 WL 1298761 (Ohio App. 6 Dist.))**

letters to substantiate his statement. Therefore, since appellant did not establish that Dr. Miller's statement was either false or made with actual malice, it fails to establish a claim for tortious interference.

For the same reasons, the NWOCC physicians who were in charge of appellant's training at Toledo Hospital were certainly entitled, in the interest of public health and safety, to express concerns or dissatisfaction with appellant's performance. While appellant may have disagreed with the observations made by the NWOCC physicians or the manner of their evaluation, no evidence was presented that these letters were based upon false allegations or made with actual malice. In fact, appellant acknowledged in deposition that the letters sent to Dr. Fraker and forwarded to the clinic included only subjective opinions regarding his performance.

In our view, the physician letters were opinion and were protected as privileged. Since appellant has not presented any evidence that the NWOCC physicians acted with actual malice, he cannot establish the elements required for a claim of tortious interference with a contract. Consequently, the trial court did not err in ruling that appellees' statements were an absolute defense to appellant's claim for tortious interference with a contractual relationship. Therefore, we conclude that, since no genuine issues of material fact exist and appellees are entitled to judgment as a matter of law, the trial court did not err in granting summary judgment as to appellant's claim for tortious interference with a contractual relationship.

Accordingly, appellant's third and fourth assignments of error are not well-taken.

IV.

Appellant, in his fifth assignment of error, contends that the trial court erred in dismissing his civil conspiracy claim.

A civil conspiracy claim cannot succeed without an underlying unlawful act. *Williams v.*

*Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 475. Where all the substantive causes of action on which a conspiracy claim is based are without merit, a conspiracy claim must also fail. See *Minarik v. Nagy* (1963), 8 Ohio App.2d 194, 195.

**\*7** In this case, since we have determined that the underlying substantive causes of action for tortious interference are without merit, appellant's civil conspiracy claim also fails.

Accordingly, appellant's fifth assignment of error is not well-taken.

The judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.

*JUDGMENT AFFIRMED.*

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.

HANDWORK, SHERCK, and GLASSER, JJ., concur.

Ohio App. 6 Dist.,2000.
El-Shiekh v. Northwest Ohio Cardiology Consultants
Not Reported in N.E.2d, 2000 WL 1298761 (Ohio App. 6 Dist.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in N.E.2d, 2006 WL 1428920 (Ohio App. 8 Dist.), 2006 -Ohio- 2587
**(Cite as: 2006 WL 1428920 (Ohio App. 8 Dist.))**

**H**
CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF
LEGAL AUTHORITY.

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.
Kris M. LENNON Plaintiff-Appellant
v.
CUYAHOGA COUNTY JUVENILE COURT, et
al. Defendants-Appellees.

No. 86651.
Decided May 25, 2006.

**Background:** Caucasian woman formerly em-
ployed as probation officer brought action against
county juvenile court, her former employer, al-
leging harassment, tortious interference with em-
ployment relationship, intentional infliction of emo-
tional distress, discrimination, and defamation per
se. The Court of Common Pleas, Cuyahoga County,
No. CV-457655, entered summary judgment in fa-
vor of employer. plaintiff appealed.

**Holdings:** The Court of Appeals, Calabrese, J.,
held that:
(1) transfer from one employment location to an al-
legedly less desirable location in another part of the
city did not constitute adverse employment action;
(2) plaintiff failed to establish claim of racial dis-
crimination and harassment;
(3) employer cannot be the defendant in employee's
claim for interference with employment relation-
ship;
(4) coworkers' conduct in taunting other employees
and in calling employee a racist did not amount to
extreme and outrageous conduct; and
(5) plaintiff failed to establish claim of defamation.

Affirmed.

Colleen Conway Cooney, P.J., concurred in
judgment only and filed opinion.

West Headnotes

**[1] Civil Rights 78 ☞ 1135**

78 Civil Rights
  78II Employment Practices
    78k1135 k. Promotion, Demotion, and Trans-
fer. Most Cited Cases
    Probation officer's transfer from one employ-
ment location to an allegedly less desirable location
in another part of the city did not constitute an ad-
verse employment action for purposes of her dis-
crimination action against employer; change in loc-
ation did not amount to anything more than an in-
convenience, officer's salary and benefits remained
the same, and officer's job responsibilities were
largely identical. R.C. § 4112 et seq.

**[2] Civil Rights 78 ☞ 1234**

78 Civil Rights
  78II Employment Practices
    78k1232 Reverse Discrimination
      78k1234 k. Race, Color, Ethnicity, or Na-
tional Origin. Most Cited Cases
    Caucasian woman formerly employed as proba-
tion officer failed to establish claim of racial dis-
crimination and harassment against county juvenile
court, her former employer, based on her suspen-
sion following her involvement in altercation with
African-American man; employer's legitimate,
nondiscriminatory reason for disciplining officer
was that she violated workplace policy, African-
American employee was also disciplined for his
part in altercation, and there was no evidence sup-
porting allegations that she was harassed on the
basis of race.

**[3] Labor and Employment 231H ☞ 914**

231H Labor and Employment
  231HIX Interference with the Employment Re-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2006 WL 1428920 (Ohio App. 8 Dist.), 2006 -Ohio- 2587
(Cite as: 2006 WL 1428920 (Ohio App. 8 Dist.))

lationship
　　231Hk912 Procurement of Discharge
　　　231Hk914 k. Persons Liable. Most Cited Cases
　Employer cannot be the defendant in employee's claim for interference with employment relationship.

**[4] Damages 115 🔑57.56**

115 Damages
　115III Grounds and Subjects of Compensatory Damages
　　115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
　　　115III(A)2 Mental Suffering and Emotional Distress
　　　　115k57.50 Labor and Employment
　　　　　115k57.56 k. Race and National Origin. Most Cited Cases
　Coworkers' conduct in taunting other employees and in calling employee a racist did not amount to extreme and outrageous conduct as would support employee's claim against employer for intentional infliction of emotional distress.

**[5] Libel and Slander 237 🔑10(3)**

237 Libel and Slander
　237I Words and Acts Actionable, and Liability Therefor
　　237k10 Words Imputing Unfitness for or Misconduct or Criminal Acts in Office or Employment
　　　237k10(3) k. Executive Officers and Employees. Most Cited Cases

**Libel and Slander 237 🔑45(2)**

237 Libel and Slander
　237II Privileged Communications, and Malice Therein
　　237k40 Qualified Privilege
　　　237k45 Common Interest in Subject-Matter
　　　　237k45(2) k. Common Business Interest. Most Cited Cases
　Former probation officer failed to establish claim of defamation against county juvenile court, her former employer, based on one co-worker's statements to another co-worker calling the former officer a racist, where communication was made in good faith on a matter of common interest, and statement was unsubstantiated and merely constituted one employee's opinion.

**[6] Libel and Slander 237 🔑42(2)**

237 Libel and Slander
　237II Privileged Communications, and Malice Therein
　　237k40 Qualified Privilege
　　　237k42 Reports
　　　　237k42(2) k. Executive and Legislative Proceedings and Investigations. Most Cited

**Libel and Slander 237 🔑54**

237 Libel and Slander
　237III Justification and Mitigation
　　237k54 k. Truth as Justification in General. Most Cited Cases
　Former probation officer failed to establish claim of defamation against county juvenile court, her former employer, based on employer's statement that she struck a co-worker during a workplace altercation, where two witness statements supported employer's position that the statement was true, and statement was protected, having been made as a finding in a disciplinary report relating to the altercation.

Civil appeal from Common Pleas Court, Case No. CV-457655, Affirmed.Anne D. Veneziano, Elaine Welsh, Beachwood, for Plaintiff-Appellant.

William D. Mason, Cuyahoga County Prosecutor, James C. Cochran, Assistant, Cleveland, for Defendants-Appellees.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in N.E.2d, 2006 WL 1428920 (Ohio App. 8 Dist.), 2006 -Ohio- 2587
**(Cite as: 2006 WL 1428920 (Ohio App. 8 Dist.))**

ANTHONY O. CALABRESE, Jr., J.

**\*1** {¶ 1} Plaintiff Kris M. Lennon (appellant) appeals the court's granting summary judgment to defendant Cuyahoga County Juvenile Court, et al., (the employer) on her claims for, inter alia, workplace harassment and discrimination. After reviewing the facts of the case and pertinent law, we affirm.

I.

{¶ 2} On December 27, 2001, appellant filed a complaint against her employer, individual supervisors and employees, alleging the following: 1) harassment; 2) tortious interference with employment relationship; 3) intentional infliction of emotional distress; 4) discrimination; and 5) defamation per se. The circumstances leading up to this lawsuit will be detailed as necessary below, but include the following rough sketch of events. Appellant, who is a Caucasian woman, was hired on July 1, 1996 as a probation officer (PO) in the employer's University Circle location (UC). In December 2000, appellant was involved in an altercation with another employee, Gregory Bufford (Bufford), who is an AfricanAmerican male. After an investigation, the employer disciplined appellant by transferring her from UC to the East Cleveland location (EC). The employer also changed her position from an investigative PO to a supervising PO. Appellant began working at EC in January 2001, and she was allegedly immediately subjected to a hostile work environment. Problems arose between appellant and the EC personnel. The employer began a disciplinary investigation on August 27, 2002 and, on October 4, 2002, appellant resigned.

{¶ 3} After appellant filed her complaint, extensive discovery ensued, including multiple depositions of various supervisors and probation officers. The employer filed a motion for summary judgment, which the court granted in favor of the employer on all claims in June 2005.

II.

{¶ 4} In her sole assignment of error, appellant argues that "the trial court erred in granting the de-

fendants' motion for summary judgment." Specifically, appellant argues that genuine issues of material fact remain to be litigated and, for this reason, the court's granting summary judgment was improper. Appellant alleges five causes of action in her complaint, all stemming from workplace discrimination. However, in her appellate brief, not one of the causes of action is defined, and appellant cites to neither case nor statutory law relevant to the five causes of action of which she complains. After noting the standard of review we must apply to this case, we will discuss each cause of action and attempt to connect the facts alleged with the elements of the workplace offenses.

*Summary judgment standard of review*

{¶ 5} Appellate review of the granting of summary judgment is de novo. Pursuant to Civ.R. 56(C), the party seeking summary judgment must prove that 1) there is no genuine issue of material fact; 2) they are entitled to judgment as a matter of law; and 3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Dresher v. Burt,* 75 Ohio St.3d 280, 662 N.E.2d 264, 1996-Ohio-107.

*Hostile work environment harassment and discrimination*

**\*2** {¶ 6} First, it should be established that workplace harassment is a form of illegal employment discrimination. See, e.g., *Hampel v. Food Ingredients Specialists* (2000), 89 Ohio St.3d 169, 179, 729 N.E.2d 726 (holding that "any harassment or other unequal treatment of an employee or group of employees that would not occur but for the [protected class] of the employee or employees may, if sufficiently patterned or pervasive, comprise an illegal condition under [R.C. 4112 et seq.]"). In other words, a claim for workplace harassment is necessarily a claim for discrimination. For this reason, we will address appellant's allegations of harassment and discrimination together.

{¶ 7} Pursuant to R.C. 4112.02(A), it is unlawful for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2006 WL 1428920 (Ohio App. 8 Dist.), 2006 -Ohio- 2587
**(Cite as: 2006 WL 1428920 (Ohio App. 8 Dist.))**

any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

{¶ 8} The first step in proving a discrimination claim is showing that the plaintiff is a member of one of the statutorily protected classes listed above. See, e.g., *Mauzy v. Kelly Services, Inc.* (1996), 75 Ohio St.3d 578, 664 N.E.2d 1272 (holding that a prima facie case of discrimination includes establishing that the plaintiff was 1) a member of the protected class; 2) subject to an adverse employment action; 3) qualified for the position; and 4) replaced by, or treated worse than, a person not belonging to the protected class). Appellant's brief is vague on which protected class she is claiming to belong to in relation to the instant case. She makes no mention of being discriminated against because of her gender or age.[FN1] Peppered throughout her complaint and appellate brief are intimations that she was harassed and discriminated against because of her race, which is Caucasian.

> FN1. Appellant mentions one incident where a co-worker told her she "needed Jesus." However, she does not seem to claim this comment was an example of religious discrimination and, thus, we will not treat it as such.

{¶ 9} The plaintiff has the initial burden of demonstrating a prima facie case of race discrimination in violation of R.C. 4112.02(A) by a preponderance of the evidence. If the plaintiff succeeds, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 197, 421 N.E.2d 128. If the employer meets its burden, the plaintiff must then demonstrate that the reason the employer

offered is pretextual and that the real reason was discriminatory in nature. Id. Additionally, in "a case of reverse discrimination, a plaintiff must also establish that the defendant is the unusual employer who discriminates against the majority." *Stipkala v. Bank One, N.A.,* Summit App. No. 21986, 2005-Ohio-16. See, also, *Carney v. Cleveland Heights-University Heights School Dist.* (2001), 143 Ohio App.3d 415, 428, 758 N.E.2d 234 (holding that in reverse discrimination cases, "the first element has been modified to require the plaintiff to show background circumstances supporting the inference that his employer was the unusual employer who discriminated against nonminority employees"). In summary, to establish a claim for discrimination, a plaintiff must show, either directly or indirectly, the employer's discriminatory intent. See, *Ramacciato v. Argo-Tech Corp.,* Cuyahoga App. No. 84557, 2005-Ohio-506; *Barker v. Scovill, Inc.* (1983), 6 Ohio St.3d 145; *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668.

*3 {¶ 10} A review of employment discrimination case law shows that an adverse employment action

> need not result in pecuniary loss, but must materially affect the plaintiff's terms and conditions of employment. Factors to consider when determining whether an employment action was materially adverse include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' Changes in employment conditions that result in merely inconvenience or an alteration of job responsibilities are not disruptive enough to constitute an adverse employment action.

*Peterson v. Buckeye Steel Casings* (1999), 133 Ohio App.3d 715, 727, 729 N.E.2d 813 (internal citations omitted). See, also, *James v. Delphi Auto. Sys.,* Franklin App. No. 04AP-215,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2006 WL 1428920 (Ohio App. 8 Dist.), 2006 -Ohio- 2587
**(Cite as: 2006 WL 1428920 (Ohio App. 8 Dist.))**

2004-Ohio-5493; *Hart v. Columbus Dispatch/Dispatch Printing Co.,* Franklin App. No. 02AP-506, 2002-Ohio-6963.

{¶ 11} In the instant case, appellant has shown that she is a member of the majority class, being Caucasian in a reverse race discrimination situation. As examples of adverse employment actions, appellant alleges the following: she was suspended for three days as a result of the altercation she had with Bufford; she was transferred to EC, which is a less desirable location than UC; her job title and duties changed from an investigatory PO to a supervisory PO; she was given a case load that was previously "negligently maintained"; she was not trained properly; and certain county employees at EC harassed her, thus subjecting her to a hostile work environment. Furthermore, appellant alleges, and the employer does not dispute, that she was qualified for the position from which she was removed. Finally, appellant alleges that Bufford was treated more favorably in that he was disciplined at least two weeks after she was, he was transferred to a more desirable location, and his job title and duties did not change. Appellant also submits a laundry list of other employees who were allegedly treated differently.

[1] {¶ 12} After careful review, we conclude that appellant's transfer to EC was not an adverse employment action as contemplated by Ohio case law and R.C. 4112, et. seq. The change in location from UC to EC does not amount to anything more than a mere inconvenience. Appellant's salary and benefits remained the same. The employer submitted evidence that the difference in job duties between an investigatory and a supervisory PO is that the former spends more time in the field and the latter does more paperwork. Other than that, the job responsibilities are identical. Furthermore, the employer's evidence shows that, because the two positions are so similar, for an employee who held one position and is being shifted to the other position, training is on the job and as you go.

{¶ 13} Appellant's remaining assertions of ad-

verse employment actions are her suspension, that she was given a "negligently maintained" case load, and that she was harassed. After we apply the burden shifting analysis used in employment discrimination law, we find that appellant fails to present any evidence that the employer acted with discriminatory intent. See, *Courie v. ALCOA,* 162 Ohio App.3d 133, 832 N.E.2d 1230, 2005-Ohio-3483 (holding that when the plaintiff demonstrated only that he was treated differently than all other employees, and not that he was treated differently than employees of other races, he was unable to establish a prima facie case of reverse race discrimination).

*4 [2] {¶ 14} A careful review of the record in the instant case shows that appellant's allegations are supported only by her own affidavit. In the employer's motion for summary judgment, Bufford's disciplinary records for the December 2000 incident with appellant are included. The records clearly state that after the investigation, it was found that appellant initiated the altercation and committed the following workplace violations: striking another person; threatening gestures, hostile work environment; and rude/insulting behavior.

{¶ 15} In contrast, the employer found that Bufford committed the workplace violation of rude/insulting behavior. The investigation included the statements of two witnesses. The records also show that both Bufford and appellant were disciplined because of the altercation. Specifically, appellant was temporarily suspended, Bufford was verbally reprimanded, and they were both transferred to other offices. Neither of them received a demotion, a change in pay, or a change in working hours. The evidence shows both transfers were lateral moves. It is immaterial, or at least not adverse, that appellant was disciplined on January 3, 2001, while Bufford was disciplined on January 17, 2001. Appellant points to nothing in the record showing background circumstances that her employer, both in general and specifically pertaining to her case, is the unusual employer that discriminates against the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in N.E.2d, 2006 WL 1428920 (Ohio App. 8 Dist.), 2006 -Ohio- 2587
**(Cite as: 2006 WL 1428920 (Ohio App. 8 Dist.))**

majority.

{¶ 16} Furthermore, we conclude that the employer's legitimate, nondiscriminatory reason for disciplining appellant was that she violated workplace policy. Caroline Penn, appellant's probation manager at EC, stated that "it was considered a special transfer. There, I guess, had been some difficulty at a former office, and I guess the procedure was for the people involved to be moved. And there was a need for a PO position at my office, at the East Cleveland office, therefore, she was moved there. There was an opening for supervision-open case load is what it amounted to." Having found that appellant failed to show discrimination, as a matter of law, regarding her being disciplined and transferred, we turn to her remaining discrimination allegation-the laundry list of employees who were treated differently than she was treated. Appellant's claim that she suffered disparate treatment at the hands of her employer is simply unsubstantiated by any direct or indirect evidence. Appellant claims that she was given "negligently maintained" cases, that she was not given proper training, that co-workers would not take messages for her and otherwise generally harassed her, and that she was disciplined differently than other employees. However, she fails to submit any evidence to support her allegations. For example, appellant claims that the employees who harassed her at EC violated "regulations 500-502(D), (E), 503(9), (12), and 505(4)," yet were not disciplined. However, appellant did not submit an employee policy manual, nor did she define these regulations or clarify where they came from. She submitted no employment records or deposition testimony to prove how others were disciplined compared to how she was disciplined, or to prove that others were even disciplined at all. Furthermore, there is no evidence of racial motivation. See, e.g., *Tamayo v. Stack Container Servs.*, Cuyahoga App. No. 83228, 2004-Ohio-2161 (holding that to establish a claim for hostile work environment harassment, the harassment complained of must be based on sex or race). Her bare assertions simply are not enough to make a prima facie case of discrimination.

\*5 {¶ 17} The only evidence that appellant submits to corroborate her allegations is her own affidavit. Ohio courts have held that

a nonmoving party may not avoid summary judgment by merely submitting a self-serving affidavit contradicting the evidence offered by the moving party. This rule is based upon judicial economy: Permitting a nonmoving party to avoid summary judgment by asserting nothing more than 'bald contradictions of the evidence offered by the moving party' would necessarily abrogate the utility of the summary judgment exercise. Courts would be unable to use Civ.R. 56 as a means of assessing the merits of a claim at an early stage of the litigation and unnecessarily dilate the civil process.

*Greaney v. Ohio Turnpike Comm.*, Portage App. No. 0012, 2005-Ohio-5284 (internal citations omitted). See, also, *Coleman v. Great Lakes Dredge & Dock Co.* (Aug. 23, 1990), Cuyahoga App. No. 57440.

{¶ 18} Accordingly, the court did not err when it granted summary judgment to the employer on appellant's discrimination and harassment claims. The employer was entitled to judgment as a matter of law because appellant did not submit evidence to support the elements of adverse employment action and discriminatory intent.

*Tortious interference with employment relationship*

[3] {¶ 19} In Ohio, the elements of tortious interference with employment relationship are as follows: 1) the existence of an employment relationship between plaintiff and the employer; 2) the defendant was aware of this relationship; 3) the defendant intentionally interfered with this relationship; and 4) the plaintiff was injured as a proximate result of the defendant's acts. *Costaras v. Dunnerstick*, Lorain App. No. 04CA008453, 2004-Ohio-6266. Thus, there are three players in a tortious interference claim: the plaintiff, the defend-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in N.E.2d, 2006 WL 1428920 (Ohio App. 8 Dist.), 2006 -Ohio- 2587
**(Cite as: 2006 WL 1428920 (Ohio App. 8 Dist.))**

ant, and a third-party employer. In the instant case, however, appellant alleges that other employees interfered with her work, making the defendant in her case, her employer. This is not the type of situation that tortious interference with employment relationship is designed to protect. See *Everhart v. Francioli* (Apr. 29, 1993), Cuyahoga App. No. 62377 (holding that "a supervisor of an employee cannot be held liable for tortious interference with contract")(citing *Anderson v. Minter* (1972), 32 Ohio St.2d 207, 291 N.E.2d 457); *Oliver v. Wagner* (Dec. 8, 1999), Medina App. No. 2832-M (holding that "tortious interference with a business relationship * * * occurs when the result of the interference is * * * that a third party does not enter into or continue a business relationship with the plaintiff").

{¶ 20} Because the employer cannot be the defendant in this type of claim, the court did not err when it granted summary judgment against appellant on her claim of tortious interference with an employment relationship.

*Intentional infliction of emotional distress*
{¶ 21} To establish a claim for intentional infliction of emotional distress (IIED), a plaintiff must show that: 1) the defendant intended to cause the plaintiff serious emotional distress; 2) the defendant's conduct was extreme and outrageous; and 3) the defendant's conduct was the proximate cause of plaintiff's serious emotional distress. *Phung v. Waste Mgt., Inc.* (1991), 71 Ohio St.3d 408, 410, 644 N.E.2d 286. Extreme and outrageous conduct is conduct that goes beyond all possible bounds of decency and is so atrocious that it is "utterly intolerable in a civilized society." *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 375, 453 N.E.2d 666. "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient to sustain a claim for relief. Id.

*6 {¶ 22} In the instant case, appellant's entire argument relating to her claim for IIED is as follows: "The behavior in EC was so outrageous that Ms. Lennon's physician insisted that she take a two, (2), week medical leave." It is unclear exactly what

behavior appellant is referring to as being outrageous; however, for the purpose of analysis, we assume it is the alleged harassment she suffered at the hands of EC co-workers.

[4] {¶ 23} Of appellant's allegations, the following incidents are supported by some evidence in addition to appellant's own assertions: [FN2] 1) that an employee called appellant a racist; and 2) that certain employees chastised and taunted other employees, including appellant. Although this behavior may be childish and unprofessional, it does not amount to extreme and outrageous conduct. Compare, *Rice v. Cuyahoga County Dept. of Justice*, Cuyahoga App. No. 85576, 2005-Ohio-5337 (holding that the following actions did not amount to extreme and outrageous behavior: creating untrue accusations against plaintiff, being aggressive, refusing to speak to plaintiff, looking the other way when plaintiff walked by, and being disrespectful); *Surry v. Cuyahoga Community College*, 149 Ohio App.3d 528, 778 N.E.2d 91, 2002-Ohio-5356 (holding that a supervisor who belittled plaintiff about his age and called him a "dinosaur" and a "relic," coupled with the employer firing plaintiff and filing a criminal proceeding against him, is not outrageous enough to sustain a claim for IIED).

> FN2. As evidence, appellant submitted letters to her employer from her attorney documenting her complaints and emails that she sent to her employer complaining of unfair treatment. This correspondence is nothing more than appellant's assertions of her own allegations. It is self-serving and, despite appellant's argument, does not amount to corroborating evidence.

{¶ 24} Accordingly, the trial court did not err when it granted the employer's motion for summary judgment on appellant's IIED claim.

*Defamation per se*
{¶ 25} To succeed on a defamation claim, a plaintiff must show the following: 1) the defendant made a false statement; 2) the statement was de-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2006 WL 1428920 (Ohio App. 8 Dist.), 2006 -Ohio- 2587
**(Cite as: 2006 WL 1428920 (Ohio App. 8 Dist.))**

famatory; 3) the statement was published; 4) the plaintiff was injured as a result of the statement; and 5) the defendant acted with the required degree of fault. See, *McWeeney v. Dulan,* Warren App. No. CA2003-03-036, 2004-Ohio-1507. To constitute defamation per se, the "words must be of such a nature that courts can presume as a matter of law that they tend to degrade or disgrace the person of whom they are written or spoken, or hold him up to public hatred, contempt or scorn." *Moore v. P.W. Publishing Co.* (1965), 3 Ohio St.2d 183, 188, 209 N.E.2d 412. A statement is defamation per se if it "tends to injure a person in his or her trade, profession, or occupation * * * [and] both damages and actual malice are presumed to exist." *Knowles v. Ohio State Univ.,* Franklin App. No. 02AP-527, 2002-Ohio-6962.

{¶ 26} There is, however, an exception to the rule that the required degree of fault is presumed in a defamation per se action. The exception is when a qualified or conditional privilege exists to rebut the inference of malice, thus making it essential to the right of recovery. See, *Schacht v. Ameritrust Co. N.A.* (Mar. 17, 1994), Cuyahoga App. No. 64782.

A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an Interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty of a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest. The essential elements thereof are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.

*Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 244, 331 N.E.2d 713.

[5] {¶ 27} In the instant case, appellant is inconsistent as to what statements she claims are defamatory per se. In her complaint, appellant alleges

that she was called a racist, she was told she needed to be taught a lesson, and her employer falsely accused her of striking Bufford. She claims that this injured her reputation as a probation officer. However, under what we perceive to be the defamation section of her appellate brief, labeled "The Cookie Jar Caper," appellant argues that her employer falsely accused her of soliciting certain cases from the court.

{¶ 28} Appellant's co-worker stated another co-worker told her the following about appellant: "I was told not to befriend her because she would stab me in my back and she was racist and she really didn't like me because she would come back and tell people that * * * she was doing my work for me." Although being referred to as a racist may, at times, constitute defamation per se, we find that in the instant case, the statement falls under the qualified privilege exception to the rule. "Generally, a communication made in good faith on a matter of common interest between an employer and an employee, or between two employees concerning a third employee, is protected by qualified privilege." *Temethy v. Huntington Bancshares, Inc.,* Cuyahoga App. No. 83291, 2004-Ohio-1253.

{¶ 29} Furthermore, the first element a plaintiff must allege in a defamation claim is "that the defendant has asserted a false statement of fact, rather than just an opinion." *Rothschild v. Humility of Mary Health Partners,* 163 Ohio App.3d 751, 757, 840 N.E.2d 258, 2005-Ohio-5481. The Ohio Supreme Court has ruled that opinions are a form of speech protected by the United States and Ohio constitutions. *Wampler v. Higgins* (2001), 93 Ohio St.3d 111, 752 N.E.2d 962. Additionally, it is a matter of law for the courts to decide whether an allegedly defamatory statement is fact or opinion. See, *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182. The test for fact or opinion determination can be found in *Scott v. The News-Herald* (1986), 25 Ohio St.3d 243, 496 N.E.2d 699: "First is the specific language used, second is whether the statement is verifiable, third

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2006 WL 1428920 (Ohio App. 8 Dist.), 2006 -Ohio- 2587
**(Cite as: 2006 WL 1428920 (Ohio App. 8 Dist.))**

Page 9

is the general context of the statement, and fourth is the broader context in which the statement appeared." Id. at 250, 496 N.E.2d 699.

{¶ 30} In the instant case, the specific language used is unambiguous. One co-worker told another co-worker that appellant was a racist. This weighs heavily toward actionability, as we cannot think of a scenario in which these words are not pejorative. As to whether a statement is verifiable, the Ohio Supreme Court stated that this means "objectively capable of proof or disproof." *Wampler* at 129, 752 N.E.2d 962. If the defendant implies that he or she has additional knowledge to support the declaration, it may seem more verifiable to a reader or listener. See, *Scott*, supra. In the instant case, appellant presents no evidence that there are any undisclosed facts to support the speaker's statement that she is a racist. It is reasonable to assume that the listener would believe that the speaker was expressing her "raw, unsubstantiated opinion." *Rothschild* at 762, 840 N.E.2d 258.

{¶ 31} In the case at hand, the general context in which the statement was made is the workplace. The language surrounding the name-calling makes the entire statement appear to be job-related gossip rather than gospel. Furthermore, in a broader social context, the remarks are more similar to water-cooler chitchat than they are to a formal employee meeting or memorandum that would convey an appearance of fact. Based on the totality of the circumstances, we find that appellant's being called a racist was a matter of one employee's opinion and thus is constitutionally protected speech, not subject to a defamation claim.

[6] {¶ 32} As to the statement that appellant struck Bufford, appellant fails to show that the statement was false, as two witness statements support the employer's position that it was true. In addition, this statement was made as a finding in the disciplinary report relating to appellant's altercation with Bufford; therefore, it falls under the qualified privilege exception to defamation per se. Appellant has not shown that this statement was made with malice or that she was injured by the statement.

{¶ 33} Finally, appellant asserts that her employer stated that she solicited cases, and this statement amounted to defamation. An internal email, dated January 9, 2002, reads in pertinent part as follows: "[An employee] called and told me that he found a case for investigation assigned to Kris. * * * We originally thought that she may be soliciting these cases. But this was not so with this case." In this instance, appellant has not shown that her employer made a false, defamatory statement about her. Additionally, this statement falls under the qualified privilege exception to defamation per se, and appellant certainly has not shown any malice or injury associated with it.

{¶ 34} Accordingly, we find that the court did not err by granting summary judgment to the employer on appellant's defamation claim.

{¶ 35} In conclusion, appellant has failed to establish a prima facie case of any of the five causes of action she asserts in her complaint. While we are aware that appellant may have been unhappy at her job after she felt she was treated unfairly, Ohio law recognizes the general rule of employment at will: absent an employment contract, an employee is hired for an indefinite period of time and either the employee or the employer may terminate this relationship for any reason not contrary to law. In appellant's case, she presented nothing evidencing employer liability, and the court did not err when it granted summary judgment against her in toto.

Judgment affirmed.

PATRICIA ANN BLACKMON, J., concurs.
COLLEEN CONWAY COONEY, P.J., concurs in judgment only. (see separate concurring opinion.)
COLLEEN CONWAY COONEY, P.J.
{¶ 36} I concur in the judgment but write separately on the issue of tortious interference. Lennon repeatedly argues in her brief about "tortuous interference." The only thing tortuous in the instant case is the presentation of her appellate argument.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2006 WL 1428920 (Ohio App. 8 Dist.), 2006 -Ohio- 2587
**(Cite as: 2006 WL 1428920 (Ohio App. 8 Dist.))**

{¶ 37} Lennon alleges that the appellees jeopardized her career as a probation officer because they maliciously and intentionally interfered with her job. She specifically complains about Carmen Johnson, a secretary at the East Cleveland office and a defendant in the instant case.

{¶ 38} Tortious interference with an employment relationship occurs when one party to the relationship is induced to terminate the relationship by the malicious acts of a third person who is not a party to the relationship at issue. *Condon v. Body, Vickers & Daniels* (1994), 99 Ohio App.3d 12, 22, 649 N.E.2d 1259. An employee of a party to the relationship at issue is generally not considered a "third party." Id. Thus, a tortious interference claim generally cannot be brought against an employee of a party to the relationship at issue. Id. In order to maintain a tortious interference claim against an employee of the party to the relationship at issue, the evidence must demonstrate that the employee acted solely in his or her individual capacity and personally benefitted as a result of the interference. *Miller v. Wikel Mfg. Co.* (1989), 46 Ohio St.3d 76, 78-79, 545 N.E.2d 76.

{¶ 39} In *Erebia v. Chrysler Plastic Products Corp.* (C.A.6, 1989), 891 F.2d 1212, 1216, the court held that the personnel manager of a plant where Erebia sought employment was not a third party who could interfere with Erebia's prospective employment with that employer. In *Condon,* supra, the defendant was employed as the office manager of a firm. The court found that the defendant was not a third party subject to liability for tortiously interfering with a contract to which the firm was a party.

{¶ 40} Here, the juvenile court and its employees are not third parties-they are the defendants/appellees in this case. Lennon has not even attempted to prove that Johnson or any other employee interfered with her employment contract, acted in his or her individual capacity, or personally benefitted from any alleged interference. Additionally, Lennon did not produce evidence of a causal connection between Johnson's or anyone else's comments and any adverse employment decision. Lennon resigned; she was not discharged. Therefore, her claim of tortious interference has no merit.

{¶ 41} I also write separately to point out one other flaw in Lennon's argument related to her defamation claim. The majority refers to Lennon's "Cookie Jar Caper." I would add that the allegation regarding soliciting cases cannot be first raised on appeal. Therefore, I would overrule this argument without further analysis.

Ohio App. 8 Dist.,2006.
Lennon v. Cuyahoga Cty. Juvenile Court
Not Reported in N.E.2d, 2006 WL 1428920 (Ohio App. 8 Dist.), 2006 -Ohio- 2587

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio)))**

▷
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Sixth Circuit Rule 28. (Find CTA6 Rule 28)

United States Court of Appeals,
Sixth Circuit.
Raman TALWAR, Plaintiff-Appellant,
v.
CATHOLIC HEALTHCARE PARTNERS; St. Rita's Medical Executive Committee; Herbert Schumm; David Imler; St. Rita's Medical Center, Defendants-Appellees.

No. 07-3156.
Dec. 20, 2007.

**Background:** Surgeon, an immigrant from India, sued hospital, two members of a medical executive committee (MEC) and a medical organization, claiming breach of contract and race discrimination under § 1981 in connection with an investigation of quality of care concerns, during which the surgeon was requested to refrain from exercising his surgical privileges at the hospital. The United States District Court for the Northern District of Ohio, 2006 WL 3526792, granted summary judgment for the defendants, and the surgeon appealed.

**Holdings:** The Court of Appeals, Clay, Circuit Judge, held that:
(1) the surgeon was not subjected to race discrimination;
(2) the hospital did not undertake two separate investigations;
(3) two separate investigations would not have breached hospital bylaws in any event;
(4) surgeon had no contractual right to prior notice of the investigation;

(5) MEC members were entitled to peer review immunity; and
(6) any error in district court's denial of surgeon's discovery motion was harmless.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ☞1041**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1041 k. Contracts, Trade, and Commercial Activity. Most Cited Cases
    Even if hospital bylaws and a credentials manual created a contractual relationship with a surgeon under Ohio law, the surgeon, an immigrant from India, was not subjected to race discrimination violating § 1981 in connection with an investigation of quality of care concerns, during which he was requested to refrain from exercising his surgical privileges at the hospital; investigative procedures were not applied differently to other non-minority members of the hospital staff, nor were those other members treated more favorably in other quality of care investigations, and the proffered basis for the investigation, patient safety, was not pretextual. 42 U.S.C.A. § 1981.

**[2] Health 198H ☞270**

198H Health
    198HI Regulation in General
        198HI(C) Institutions and Facilities
            198Hk268 Staff Privileges and Peer Review
                198Hk270 k. Peer Review in General. Most Cited Cases
    Under Ohio law, a hospital did not undertake two different investigations into quality of care concerns regarding a surgeon, as would allegedly have breached contractual terms reflected in a credentials manual specifying investigation proced-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio)))

ures; consideration of a quality of care complaint prior to the commencement of a formal investigative investigation by seeking additional information was not a separate investigation.

**[3] Health 198H ⟨═══⟩270**

198H Health
   198HI Regulation in General
      198HI(C) Institutions and Facilities
         198Hk268 Staff Privileges and Peer Review
            198Hk270 k. Peer Review in General.
Most Cited Cases
    Under Ohio law, the alleged initiation of two different investigations into quality of care concerns regarding a surgeon did not breach hospital bylaws, so as to support surgeon's breach of contract claim; credentials manual authorized a medical executive committee (MEC) to take "any and all other action deemed appropriate under the circumstances" upon the conclusion of an investigation.

**[4] Health 198H ⟨═══⟩273**

198H Health
   198HI Regulation in General
      198HI(C) Institutions and Facilities
         198Hk268 Staff Privileges and Peer Review
            198Hk273 k. Suspension or Termination of Privileges; Discipline. Most Cited Cases
    Under Ohio law, a credentials manual created no contractual entitlement on the part of a surgeon to notice of a hospital's investigation into quality of care concerns prior to the time he was invited to interview with investigators.

**[5] Health 198H ⟨═══⟩274**

198H Health
   198HI Regulation in General
      198HI(C) Institutions and Facilities
         198Hk268 Staff Privileges and Peer Review
            198Hk274 k. Liability or Immunity.

Most Cited Cases
    Under Ohio law, members of a medical executive committee (MEC) did not act with actual malice toward a surgeon in connection with an investigation of quality of care concerns, during which he was requested to refrain from exercising his surgical privileges at a hospital, and thus, the MEC members were entitled to peer review immunity from liability on the surgeon's breach of contract claims; the members' statement that the surgeon would be reported to a national practitioner's database if he did not voluntarily give up his surgical privileges was not made with knowledge or reckless disregard of its falsity. Ohio R.C. §§ 2305.25(A)(1), (E)(1)(a), 2305.251(A).

**[6] Federal Courts 170B ⟨═══⟩895**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)6 Harmless Error
            170Bk895 k. Pretrial Proceedings; Discovery and Depositions. Most Cited Cases
    Any error in district court's denial of surgeon's discovery motion, seeking inspection of the minutes of a medical executive committee (MEC) at which a vote took place to authorize an investigation into quality of care concerns over the surgeon, was harmless in the surgeon's action for breach of contract and race discrimination under § 1981; the minutes would not have assisted the surgeon in establishing a disputed material fact on either claim for summary judgment purposes. 42 U.S.C.A. § 1981; Ohio R.C. § 2305.252.

**\*801** On Appeal from the United States District Court for the Northern District of Ohio.

Before: MERRITT and CLAY, Circuit Judges; and COX, District Judge. [FN*]

      FN* The Honorable Sean F. Cox, United States District Court for the Eastern District of Michigan, sitting by designation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio)))

CLAY, Circuit Judge.

**\*\*1** Plaintiff, Dr. Raman Talwar, appeals from an order granting summary judgment on Plaintiff's claims of racial discrimination under 42 U.S.C. § 1981 and breach of contract in favor of Defendants Catholic Healthcare Partners, St. Rita's Medical Executive Committee, Herbert Schumm, David Imler and St. Rita's Medical Center. Plaintiff also appeals the district court's denial of his motion to compel discovery **\*802** and its finding that Defendants were entitled to peer review immunity pursuant to Ohio Revised Code § 2305.251. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## BACKGROUND

Plaintiff, Raman Talwar ("Dr. Talwar"), was born in India and immigrated to the United States in 1980. Dr. Talwar later became licensed as a physician and established a medical practice in Lima, Ohio. In 1991, Dr. Talwar was granted medical staff privileges at St. Rita's Medical Center ("St. Rita's") where he practices general and vascular surgery. Dr. Talwar's appointment to the medical staff was made pursuant to the Medical Staff Bylaws ("Bylaws") and the Medical Staff Credentials Manual ("Credentials Manual") of the hospital.

The Surgical and Invasive Procedure Review Committee ("SIPR") of St. Rita's is a committee that reviews medical cases for quality assurance pursuant to St. Rita's Bylaws. In September of 2003, SIPR conducted a quality care review of one of Dr. Talwar's vascular surgery cases. At the conclusion of the review, SIPR concluded that Dr. Talwar's case raised quality of care concerns and forwarded its findings to the St. Rita's Medical Executive Committee ("MEC") for further action. Pursuant to the Bylaws, MEC is responsible for the evaluation of the clinical competency of medical staff at St. Rita's and may request investigations of medical staff.

On September 23, 2003, MEC informed Dr. Talwar of SIPR's findings and asked him to respond to the quality of care concerns in writing. After re-

viewing the case and Dr. Talwar's written response, MEC hired the Greeley Company, a third-party review organization, to conduct a partial review of Dr. Talwar's practice. The Greeley Company found quality of care concerns with Dr. Talwar's practice in eleven of the nineteen cases reviewed.

In April of 2004, after reviewing the findings of the Greeley Company, and pursuant to the Bylaws and Credentials Manual, MEC initiated a formal investigation. Dr. Talwar was advised of the investigation and the Greeley findings by MEC members Dr. Herbert Schumm and Dr. David Imler. Dr. Schumm and Dr. Imler requested that Dr. Talwar refrain from exercising his surgical privileges during the pendency of the investigation. Dr. Talwar was also permitted to present an expert report for the investigative committee's consideration.

After considering the interview with Dr. Talwar, the Greeley report as well as the report of Dr. Talwar's expert, the investigative committee determined that there was insufficient evidence to substantiate the quality of care concerns raised by SIPR and recommended that the investigation be terminated. The committee also recommended that MEC restore Dr. Talwar's surgical privileges.

**\*\*2** Following the conclusion of the investigation, Dr. Talwar brought suit against St. Rita's, Dr. Schumm, Dr. Imler and Catholic Healthcare Partners for a number of claims, including racial discrimination under 42 U.S.C. § 1981 and breach of contract. *Talwar v. Catholic Healthcare Partners,* 2006 WL 3526792 (N.D.Ohio 2006). During the course of discovery, Plaintiff filed a motion to compel discovery of documentation related to MEC deliberations leading up to the request for an external review of his cases as well as the investigatory committee's final report. The district court denied Plaintiff's motion to compel discovery.

Defendants later moved for summary judgment, asserting that Plaintiff failed to present sufficient evidence to support his claims. Moreover, Defendants argued that even if Plaintiff established li-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio)))

ability, *803 they were protected under Ohio's peer review immunity statute. The district court granted summary judgment in favor of Defendants on all claims. Plaintiff now timely appeals.

## DISCUSSION
### *Standard of Review*

This Court reviews a district court's grant of summary judgment *de novo. Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1176 (6th Cir.1996) . Summary judgment is appropriate if, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As the moving parties, Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of Plaintiff's claims. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff, as the nonmoving party, must then present sufficient evidence from which a jury could reasonably find for him. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This Court must then determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52, 106 S.Ct. 2505. In making this determination, this Court must draw all reasonable inferences in favor of Plaintiff. *See National Enters., Inc. v. Smith,* 114 F.3d 561, 563 (6th Cir.1997).

## I. SECTION 1981 CLAIM OF RACIAL DISCRIMINATION

[1] Enacted as part of the Civil Rights Act of 1866, 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts" without regard to race. 42 U.S.C. § 1981. The statute defines the phrase "make and enforce contracts" to include the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Before the district court, Plaintiff alleged that he was discriminated against "with respect [to] the terms, conditions, and privileges of his contract with defendant because of color." (J.A. at 14)

### 1. Contractual Relationship Between the Parties

**3 " Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 476, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006). Defendants argue that Plaintiff may not prevail in his § 1981 claim because he has not established the existence of a contractual right that was allegedly blocked or impaired by racial discrimination. Although Plaintiff acknowledges that he does not have a formal employment contract with the hospital, he submits that the hospital's Bylaws and Credentials Manual constitute contracts. Both parties agree that Ohio law controls for the purpose of determining whether a contract exists. Applying Ohio law, the district court concluded that Plaintiff did not present sufficient evidence from which a jury could find that a contract existed between the parties.

*804 Under Ohio law, staff bylaws may constitute a contract where "there can be found in the bylaws an intent to be bound." *Munoz v. Flower Hosp.,* 30 Ohio App.3d 162, 507 N.E.2d 360, 365 (1985). Accordingly, we examine the language of the Bylaws and Credentials Manual to determine whether the parties evinced an intent to be bound. *See Bouquett v. St. Elizabeth Corp.,* 43 Ohio St.3d 50, 52, 538 N.E.2d 113 (Ohio 1989) ("[B]efore we can determine if appellant medical center is bound by the staff bylaws, we must consider the language of the bylaws at issue.").

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio)))

The Credentials Manual provides that the Manual may be revised or amended by the hospital's Board of Trustees "on its own initiative" after providing notice to MEC. (J.A. at 178) In addition, the preamble to the Bylaws state that the procedures promulgated to insure the quality of medical care at the hospital are "subject to the ultimate authority of the hospital's Board of Trustees." (J.A. at 114) In interpreting similar bylaws and guidelines containing conditional language such as "subject to" or "on its own initiative," Ohio courts have found that the presence of such language is evidence of a lack of mutuality between the parties. *See Munoz v. Flower Hosp.,* 30 Ohio App.3d 162, 507 N.E.2d 360, 365 (1985).

For example, in *Munoz v. Flower Hospital,* the Ohio Court of Appeals considered a breach of contract claim alleged by an anesthesiologist after being denied reappointment by the defendant hospital. 507 N.E.2d at 362. The court rejected the plaintiff's contention that the hospital's staff bylaws constituted a contract because they were "subject to the ultimate authority of the applicable governing bodies," including the hospital's board of trustees. *Id.* at 365. The court concluded that "[t]he obvious interpretation of the bylaws' preamble is that the trustees are, and therefore the hospital is, not to be bound by the staff bylaws and that there is no contractual relationship arising from these staff bylaws because there is no mutuality of obligation between the parties." *Id.; accord Holt v. Good Samaritan Hosp. and Health Ctr.,* 69 Ohio App.3d 439, 590 N.E.2d 1318, 1322 (1990); *Wilkey v. McCullough-Hyde Memorial Hosp.,* 2007 WL 3047234, at * 10 (S.D.Ohio 2007); *Nilavar v. Mercy Health System-Western Ohio,* 494 F.Supp.2d 604, 622-23 (S.D.Ohio 2005). *But see Rahimi v. St. Elizabeth Med. Ctr., Inc.,* 1997 WL 33426269, at *6 (S.D.Ohio 1997) (unpublished) (finding staff bylaws expressed an intent to be bound where the hospital board of trustees vested a right in the medical staff to disciplinary hearing and appeal procedure, which placed an obligation on the board of trustees); *Awadalla v. Robinson Mem'l Hosp.,* 1992

WL 188333, at *3 (Ohio Ct.App.1992) (unpublished) (finding staff bylaws could constitute a contract where the chairman of the board of trustees testified "that the board never relayed to the medical staff an intention not to be bound by the bylaws"). Based upon the similarity of the language contained in the Bylaws and Credentials Manual and the language at issue in *Munoz,* it would seem that no contractual relationship existed between the parties.

**4 Courts applying Ohio law, however, have also examined extrinsic evidence to determine whether a hospital intended to be bound. *See Nilavar,* 494 F.Supp.2d at 622-23 (analyzing evidence of negotiations between hospital and plaintiff in determining whether staff bylaws constituted a contract under Ohio law). Plaintiff in the instant case offers a letter of reappointment dated December 3, 2004 as evidence that Defendant intended to be bound. The letter states, in pertinent part, "[t]his reappointment is subject to all terms and conditions of your initial appointment, any previous appointments, the bylaws, rules *805 and regulations, credentials manual and policies and procedures of this hospital and medical staff that are in force during the term of your reappointment." (J.A. at 294)

The letter, however, sheds little light on the intent of the parties to be contractually bound by the procedures set forth in the Bylaws or the Credentials Manual. The letter merely reaffirms that Plaintiff's appointment will be subject to existing guidelines and policies as represented by the Bylaws and Credentials Manual, both past and present. The self-declared purpose of the Bylaws and Credentials Manual is to protect the best interests of patients, regulate activities of the medical staff, and insure the provision of quality medical care for the hospital's patients, not to declare or create contractual rights of individual members of the medical staff. However, even assuming that the Bylaws and Credentials Manual do create a contractual relationship between the parties, we find that Plaintiff has not produced sufficient evidence

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio)))

to sustain his claim of racial discrimination under §
1981.

**2. Prima Facie Case of Racial Discrimination**
"A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination." *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 572 (6th Cir.2000). In the instant case, Plaintiff has not offered any direct evidence of racial discrimination. "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999). It does not require the fact finder to draw any inferences to reach that conclusion. *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000). We have held that to prevail in a claim of race discrimination under § 1981 based on circumstantial evidence, a plaintiff must meet the tripartite standard of proof for Title VII cases established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Jackson v. Quanex Corp.,* 191 F.3d 647, 658 (6th Cir.1999); *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992).

**\*\*5** Under *McDonnell Douglas- Burdine,* Plaintiff must establish a prima facie case of racial discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. A prima facie case is established where a plaintiff demonstrates that 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside of the protected class or treated less favorably. [FN1] *Johnson,* 215 F.3d at 572-73 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). If this prima facie case is met, "[t]he burden of production then **\*806** shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions." *Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862, 868 (6th Cir.2001).

> FN1. We have recognized that "[t]here is ample precedent for requiring a distinct formulation of the burden shifting framework in differing factual circumstances." *Christian,* 252 F.3d at 869. Although the relationship between the parties is not the kind of employment relationship to which the *McDonnell Douglas- Burdine* test is traditionally applied, we find that the parameters of this test are sufficiently applicable to this context. *See Benjamin v. Brachman,* 2007 WL 2264513, at \*15 (6th Cir.2007) (unpublished). *But see Jeung v. McKrow,* 264 F.Supp.2d 557 (E.D.Mich.2003) (applying modified *McDonnell Douglas- Burdine* test in § 1981 claim arising from termination of medical staff privileges).

To ultimately prevail, Plaintiff must show that Defendants' proffered race neutral explanation "was not its true reason, but a pretext for discrimination." *Id.* Plaintiff may meet this burden by showing 1) that the reasons given have no factual basis; 2) that the stated reasons were not the actual reasons; or 3) that the reasons given were insufficient to justify the defendant's action. *Johnson,* 215 F.3d at 574. While the parties do not dispute the first three elements of the prima facie case, they do dispute, however, whether Plaintiff offered sufficient proof that he was treated less favorably than others outside of his protected class.

Before the district court, Plaintiff asserted that he believed he was the victim of racial discrimination. As proof, Plaintiff submitted an affidavit stating that he had not practiced medicine in a manner warranting investigation. Plaintiff further argued that "the Defendants did with malice and evil intent, wrongfully investigated [sic] Dr. Talwar due to his race and yet did not so treat other similarly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio)))

situated white doctors." (J.A. at 264) Although Plaintiff points to no other doctor outside of his protected class that was treated differently, he argues that the failure of the hospital to comply with the investigative procedures set forth in the Bylaws and Credentials Manual by initiating two investigations demonstrates that he was treated less favorably than individuals outside of his protected class. We disagree.

We have suggested that the failure to follow internal disciplinary procedures constitutes evidence of discrimination. *See Durante v. Ohio Civil Rights Comm'n,* 1990 WL 68856, at *3 (6th Cir.1990) (unpublished) ("Evidence of disparate application of disciplinary procedures in the termination decision is merely evidence relevant to the ultimate question of discriminatory discharge."); *Felder v. Nortel Networks Corp.,* 187 Fed.Appx. 586, 595 (6th Cir.2006) (unpublished) (suggesting that failure to adhere to internal disciplinary procedures may serve as evidence of discrimination). Plaintiff has not, however, established that this process has been applied differently to other non-minority members of the staff, nor has Plaintiff put forward the names of other doctors who were treated more favorably by MEC in other quality of care investigations by being subjected to a single investigation under similar circumstances or evaluated under more lenient standards. Rather, all we have before us on the question of whether Plaintiff was treated less favorably than others outside of his protected class are Plaintiff's conclusory allegations. Such "conclusory and unsupported allegations, rooted in speculation, do not meet the burden" of the prima facie case. *Bell v. Ohio State Univ.,* 351 F.3d 240, 253 (6th Cir.2003).

**6 The district court also correctly concluded that, assuming that Plaintiff can establish a prima facie case of discrimination, Defendants offered a legitimate, race-neutral explanation. Defendants assert that patient safety was the basis for the commencement of an investigation of Plaintiff's practice. According to Defendants, the investigation at

issue stemmed from a September 2003 review of one of Plaintiff's surgical cases. In satisfying their burden of production before the district court, Defendants presented evidence of the Greeley report which suggested that Plaintiff's treatment of patients was inappropriate in eleven out of nineteen cases reviewed. Plaintiff has offered no evidence to refute this explanation as pretextual. Instead, Plaintiff merely argues that patient safety is no excuse to contravene established policy. Again, such a conclusory allegation is *807 wholly insufficient and does little to demonstrate that patient safety "was not [Defendants'] true reason, but a pretext for discrimination." *Christian,* 252 F.3d at 868. Therefore, Plaintiff's § 1981 claim must fail as he did not rebut Defendants' race neutral explanation and therefore failed to meet his burden under the *McDonnell Douglas- Burdine* tripartite test.

## II. BREACH OF CONTRACT

Plaintiff alleges that the district court improperly granted summary judgment with respect to his breach of contract claim. Plaintiff asserts that Defendants breached their contract with him in three ways: 1) the commencement of two separate investigations of alleged improprieties; 2) the failure to disclose the initiation of an investigation; and 3) the ordering of a temporary suspension pending the outcome of the investigation. Assuming the existence of a contract, we address each of these contentions in turn.

### 1. Multiple Investigations of Alleged Improprieties

[2] Plaintiff asserts that Defendants breached their contract by constituting two investigative committees rather than the single committee that is authorized in the Credentials Manual. The Credentials Manual provides that the MEC shall act on all requests for an investigation. It also notes that outside consultants may be used by the MEC. The Credentials Manual's investigation procedure provides as follows:

The Medical Executive Committee shall meet as soon as practical after receiving a request for an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio)))

investigation. If, in the opinion of the Medical Executive Committee, the request contains sufficient information to warrant an investigation, the Medical Executive Committee shall conduct an investigation, or shall appoint an individual or a committee to conduct the investigation.

(J.A. at 166)

[3] Plaintiff asserts that both the MEC and an appointed committee conducted investigations, in contravention of the provisions of the Credentials Manual. After taking all reasonable inferences in Plaintiff's favor, we find that there is insufficient evidence to support a finding that two investigations took place. The Bylaws provide MEC with broad authority to consider "information" prior to initiating a formal investigation, such as the use of outside consultants to substantiate an allegation of inadequate patient care. Consideration of a quality of care complaint prior to the commencement of a formal investigative committee by seeking additional information, therefore, does not constitute a separate investigation. Moreover, as Defendants point out, even if two investigations took place, the Credentials Manual authorizes MEC to take "any and all other action deemed appropriate under the circumstances" upon the conclusion of an investigation. (J.A. at 168) Therefore, the initiation of two investigations does not by itself constitute a violation of the Bylaws. Thus, we find that Defendants were entitled to summary judgment as a matter of law on Plaintiff's claim of breach of contract as a result of "two investigations."

**2. Failure to Disclose the Initiation of an Investigation**

**7 [4] Plaintiff claims that the Defendants breached their contract through their failure to disclose the initiation of an investigation. The Credentials Manual states "[t]he medical staff *may* be notified that an investigation is being conducted...." (J.A. at 166 (emphasis added)) However, before the report of the investigation is made "the individual shall be informed of the general nature of the allegations giving *808 rise to the investigation reques-

ted, and the individual shall be invited to discuss, explain or refute the allegations." (J.A. at 167) Thus, the language of the Credentials Manual is permissive with respect to notification of the initiation of an investigation but mandatory with respect to an individual being notified prior to its conclusion. As the district court correctly noted, "[t]here is no requirement that the individual be informed o[f] the investigation until he is invited to interview with investigators." *Talwar v. Catholic Healthcare Partners,* 2006 WL 3526792, at *4 (N.D.Ohio 2006). Consequently, there was no dispute of a material fact on this point and summary judgment was appropriately granted to Defendants.

**3. Temporary Suspension**

Plaintiff alleges that Defendants breached their contract when two members of MEC, Defendants Schumm and Imler, temporarily suspended his surgical privileges without following the procedure set forth in the Credentials Manual. The relevant provision of the Credentials Manual provides that any Chief of Staff, Department Chief or CEO may summarily suspend the privileges of medical staff "whenever such action is necessary to prevent harm, immediate injury or damage to the mental or physical safety and well being of any patient, employee or other person...." (J.A. at 168) The Credentials Manual also requires that the summary suspension "shall not be for more than fourteen days," and that MEC must be notified for review. (*Id.*) In addition, the impacted staff member must be notified of the suspension. Plaintiff contends that he was "threatened" and involuntarily ceased his surgical privileges, thus constituting a suspension without the proper procedural safeguards. Defendants, however, assert that Plaintiff voluntarily relinquished his surgical privileges.

The district court did not address Plaintiff's allegation of an improper suspension of his surgical privileges as a basis for his breach of contract claim. Nevertheless, because the claim was raised before the district court, we will address it here. In the case at bar, the resolution of this claim essen-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio)))

tially comes down to Plaintiff's word against that of Defendants; however, it is unnecessary for us to decide whether this factual dispute constitutes a material dispute of fact such that it was improper for the court below to grant summary judgment. Rather, the district court's failure to address this claim at summary judgment is harmless inasmuch as Defendants are insulated from liability on this claim under Ohio's peer review immunity statute, as discussed below.

### III. PEER REVIEW IMMUNITY

**\*\*8 [5]** We now consider whether Defendants are insulated from liability with respect to Plaintiff's state law claims under Ohio's peer review immunity statute. Plaintiff alleges that the district court erred in finding that Defendants were protected by peer review immunity under Ohio Rev.Code § 2305.251. Ohio's peer review immunity statute provides, in relevant part, that

> [n]o health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of a peer review committee of the health care entity. No individual who is a member of or works for or on behalf of a peer review committee of a health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of the peer review committee.

Ohio Rev.Code § 2305.251(A). Under Ohio law, a "health care entity" includes those entities that conduct, as part of their **\*809** regular business, professional credentialing or quality review involving the competence, professional conduct, or quality of care provided by health care providers. Ohio Rev.Code § 2305.25(A)(1). A "peer review committee," as used in the statute, includes a committee that "[c]onducts professional credentialing or quality review activities involving the competence of, professional conduct of, or quality care provided by health care providers." Ohio Rev.Code § 2305.25(E)(1)(a).

On appeal, Plaintiff does not challenge the fact that Defendant St. Rita is a covered "health care entity" or that the MEC is a "peer review committee." Nor does Plaintiff contest the fact that Defendants Schumm and Imler are covered as members of the "peer review committee." Rather, Plaintiff asserts that the district court erred in its determination that he did not present sufficient evidence to overcome the immunity provided to Defendants under the statute. We find Plaintiff's argument to be unavailing.

To overcome the peer review immunity privilege, "the party seeking relief must present clear and convincing evidence that defendants acted with actual malice." *Wall v. Ohio Permanente Med. Group, Inc.,* 119 Ohio App.3d 654, 666, 695 N.E.2d 1233 (Ohio Ct.App.1997); *Jacobs v. Frank,* 60 Ohio St.3d 111, 116, 573 N.E.2d 609 (Ohio 1991). "Actual malice in this context requires proof that defendants made statements in connection with the peer review process with knowledge they were false or with reckless disregard for whether they were true or false." *Wall,* 119 Ohio App.3d at 666, 695 N.E.2d 1233.

Plaintiff asserts that Defendants acted with actual malice as a result of statements made by Schumm and Imler during a conversation in which they informed Plaintiff of the ongoing investigation and requested that he voluntarily abstain from exercising his surgical privileges. Specifically, Plaintiff asserts that Defendants acted with actual malice when they informed him that he would be reported to the National Practitioner's Database if he did not voluntarily give up his privileges. Plaintiff asserts that Defendants knew that this statement was false at the time that it was made because such reports can be forwarded only after the imposition of summary suspension proceedings. However, the mere fact that Defendants' statement was inaccurate is insufficient to serve as proof that Defendants were aware of the falsity of the statement at the time it was made. Indeed, "mere inaccuracies in statements and alleged improper motivations by speakers are

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio)))

insufficient to show actual malice." *Wall*, 119 Ohio App.3d at 666, 695 N.E.2d 1233. Because Plaintiff failed to produce evidence regarding Defendants' knowledge or reckless disregard of the falsity of the inaccurate statement, summary judgment was properly granted to Defendants.

## IV. DENIAL OF PLAINTIFF'S MOTION TO COMPEL DISCOVERY

**9 [6] In Plaintiff's last assignment of error, he asserts that the district court abused its discretion by summarily denying his motion to compel discovery regarding the minutes of the MEC meeting where a vote to authorize an investigative committee took place. "[I]t is well established that the scope of discovery is within the sound discretion of the trial court." *Hayes v. Equitable Energy Res. Co.,* 266 F.3d 560, 571 (6th Cir.2001) (quoting *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1240 (6th Cir.1981)). Consequently, we review rulings concerning the scope of discovery for abuse of discretion. *United States v. Dairy Farmers of America, Inc.,* 426 F.3d 850, 862 (6th Cir.2005).

Plaintiff alleges that the district court abused its discretion by failing to conduct *810 an in camera inspection of the minutes to determine which, if any, of the material was discoverable. Defendants argue that the district court properly declined to conduct an in camera inspection of the MEC minutes at issue because such records are not discoverable under Ohio law. *See* Ohio Rev.Code § 2305.252 ("Proceedings and records within the scope of a peer review committee of a health care entity shall be held in confidence and shall not be subject to discovery or introduction in evidence in any civil action against a health care entity or health care provider...."). Even assuming that the district court improperly denied Plaintiff's motion to compel discovery, such an error would not require reversal by this Court as we find the error, if any, to be harmless. In the case at bar, Plaintiff has not demonstrated how he was ultimately prejudiced by the denial of discovery or whether the availability of the committee's records would have estab-

lished a disputed material fact. *See Wolotsky v. Huhn,* 960 F.2d 1331, 1338 (6th Cir.1992) (upholding denial of discovery as nonprejudicial where records to be sought did not address any material element of the plaintiff's claim).

With respect to Plaintiff's § 1981 racial discrimination claim, records regarding MEC's vote to authorize an investigative committee would not have assisted in establishing an element of the prima facie case. The minutes would not have shed light on any contractual right that existed between the parties nor would it have disclosed whether physicians outside of Plaintiff's protected class were subject to a different procedure under the Bylaws. With respect to Plaintiff's breach of contract claim, as discussed above, even assuming that Plaintiff could prove that the committee conducted two investigations, it would not have established that a breach of contract occurred. Because the minutes recording MEC's vote to authorize an investigative committee would not have assisted Plaintiff in establishing a disputed material fact with respect to either his claim of racial discrimination or breach of contract, any error made by the district court in denying his motion to compel discovery was harmless. We need not, therefore, disturb the judgment of the district court.

## CONCLUSION

**10 For the reasons stated above, we AF-FIRM the judgment of the district court.

C.A.6 (Ohio),2007.
Talwar v. Catholic Healthcare Partners
258 Fed.Appx. 800, 2007 WL 4532820 (C.A.6 (Ohio))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))**

**H**
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Sixth Circuit Rule 28. (Find CTA6 Rule 28)

United States Court of Appeals,
Sixth Circuit.
Diana L. VISTEIN, Plaintiff-Appellant,
v.
The AMERICAN REGISTRY OF RADIOLOGIC
TECHNOLOGISTS, Defendant-Appellee.

No. 08-3055.
Aug. 13, 2009.

**Background:** Radiologic technologist brought action in state court against national credentialing and registry organization alleging violation of her due process rights and tortious interference with her contractual or business relationships. After removal, the United States District Court for the Northern District of Ohio, 509 F.Supp.2d 666, granting summary judgment in favor of organization, and technologist appealed.

**Holdings:** The Court of Appeals held that:
(1) waiver and release provision of renewal application was not unconscionable;
(2) indemnification provision was void as against Ohio public policy; and
(3) organization was immune from damages arising from its revocation of radiologic technologist's certification.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Federal Courts 170B ⚙➔616**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
            170BVIII(D)1 Issues and Questions in Lower Court
                170Bk616 k. Grounds of defense. Most Cited Cases
    Absent justification for failure to present issue as to whether a waiver, release and indemnification agreement was in place during the relevant time period to the district court, appellant waived consideration of issue on appeal.

**[2] Health 198H ⚙➔295**

198H Health
    198HI Regulation in General
        198HI(D) Organizations and Groups
            198Hk295 k. Professional societies. Most Cited Cases
    Waiver and release provision of renewal application, which gave national credentialing and registry organization the right to revoke any certification that had previously been issued to radiologic technologist, to censure her, and to cancel her registration, was not procedurally unconscionable under Ohio law; technologist was educated and experienced, having been employed in the profession for approximately 30 years at the time she submitted the renewal application, the entire contract consisted of five paragraphs, the waiver clause appeared in standard print, and the clause was not hidden in a maze of terms, and there was no evidence that technologist was unaware of the impact of the contract terms, that she was otherwise limited in understanding their impact, or that she was precluded from obtaining legal assistance if she needed help in understanding the impact of the contract terms.

**[3] Health 198H ⚙➔295**

198H Health

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))**

198HI Regulation in General
198HI(D) Organizations and Groups
198Hk295 k. Professional societies. Most Cited Cases

Waiver and release provision of renewal application, which gave national credentialing and registry organization the right to revoke any certification that had previously been issued to radiologic technologist, to censure her, and to cancel her registration, was not substantively unconscionable under Ohio law; It was neither unfair nor unreasonable for technologist to agree to waive and release claims against organization arising from the renewal application and the specific categories of activities listed in the application when she was required to pay a very low fee in exchange for the benefits of renewal of her certification.

**[4] Federal Courts 170B ☜617**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
170BVIII(D)1 Issues and Questions in Lower Court
170Bk617 k. Sufficiency of presentation of questions. Most Cited Cases

Radiologic technologist's failure to frame indemnification issue precisely in terms of the analysis performed in cited cases prior to oral argument did not bar appellate court from considering whether the indemnification provision in technologist's application for renewal of her certification, which required payment of national credentialing and registry organization's attorney fees in any suit arising from application, was enforceable under Ohio law as set forth in those cases; rather, technologist adequately raised before the district court the issue of the invalidity of the provision based on the parties' failure to specifically negotiate it by arguing that the renewal application, including the attorney fees provision, was an adhesion contract which contained nonnegotiable terms as to which she had no realistic choice, and she also sufficiently

presented the issue in her initial appellate brief where, in addition to arguing that the renewal application was an adhesion contract, she argued that the language of the agreement unfairly vested all power and control in the organization and held any applicant who sued the organization liable for the organization's attorney fees.

**[5] Indemnity 208 ☜27**

208 Indemnity
208II Contractual Indemnity
208k26 Requisites and Validity of Contracts
208k27 k. In general. Most Cited Cases

Indemnification provision in radiologic technologist's application for renewal of her certification, which required payment of national credentialing and registry organization's attorney fees in any suit arising from application, was void as against Ohio public policy; technologist, who lacked any bargaining power, had no realistic choice regarding the terms of that provision or any other provision of the renewal application but was instead presented the standardized contract on a "take it or leave it" basis.

**[6] Health 198H ☜295**

198H Health
198HI Regulation in General
198HI(D) Organizations and Groups
198Hk295 k. Professional societies. Most Cited Cases

National credentialing and registry organization was immune from damages arising from its revocation of radiologic technologist's certification and the publication of that information; organization was a "health care entity" within meaning of Ohio immunity statute, and did not act with actual malice when it reported ethical violations of technologist to her employers. Ohio R.C. § 2305.251.

**[7] Civil Rights 78 ☜1326(7)**

78 Civil Rights
78III Federal Remedies in General

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

78k1323 Color of Law
78k1326 Particular Cases and Contexts
78k1326(7) k. Public support, license, or regulation; utilities and monopolies. Most Cited Cases

Private, non-profit credentialing and registry organization was not acting under color of state law in its investigation of registrant for allegedly ethically improper conduct, for purpose of registrant's civil rights claim alleging due process violation, since evidence did not show that organization performed functions traditionally exclusively reserved to state, that either entity controlled the actions or management of the other, or that the entities were sufficiently entwined or there was a sufficiently close nexus between the two. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

[8] Health 198H ☞295

198H Health
198HI Regulation in General
198HI(D) Organizations and Groups
198Hk295 k. Professional societies. Most Cited Cases

National credentialing and registry organization's publication of the information regarding registrant's ethics sanction to her employer was qualifiedly privileged because the communications were made to an interested entity at that entity's request and were limited in scope to employer's inquiry; thus, absent actual malice, organization could not be held liable under Ohio law on registrant's tortious interference with contract claim.

*115 On Appeal from the United States District Court for the Northern District of Ohio.

Before: McKEAGUE and GRIFFIN, Circuit Judges; WEBER, Senior District Judge.[FN*]

FN* The Honorable Herman J. Weber, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

PER CURIAM.

**I.**

**1 Plaintiff Diana Vistein appeals the district court's order granting summary judgment in favor of defendant The American Registry of Radiologic Technologists ("ARRT") and denying Vistein's requests for declaratory and injunctive relief, which she sought following the ARRT's revocation of her certification as a radiologic technologist. This court has jurisdiction over the proceeding pursuant to 28 U.S.C. § 1291.

**II.**

The facts are set forth in the district court's decision dated September 13, 2007, which is published at 509 F.Supp.2d 666. To summarize, the ARRT is a national credentialing agency and registry of radiologic technologists. Among its functions are the promotion of education and competence in the radiologic technology profession through continuing education. The ARRT also encourages and monitors ethical practice by registered technologists through the publication and enforcement of the profession's Code of Ethics. The ARRT provides its registrants with a certificate and credential card stating the registrant has satisfied the ARRT's educational, testing and other requirements. The ARRT also grants its registrants the right to state on resumes, job applications and other documents that they have satisfied the ARRT's requirements and are registered with the ARRT.

Vistein is a radiologic technologist who was registered and certified with the ARRT almost continually from 1968 to *116 2003. In June 2003, her registration lapsed after either she failed to submit her Renewal Application or the ARRT failed to receive or process the application. Some time after her registration had lapsed and before June 2004, Vistein altered the date on an ARRT credential card that had previously been issued to her by changing the date from "2003" to "2004." She subsequently explained to the ARRT that she had altered the card because she wished to make "a clerk of [hers] an honorary tech" and was arranging a mock ceremony

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

at which she would present her clerk with the card, but she altered only the date of the card because she realized that to make further alterations "just wasn't right."

In April 2004, the Ohio Department of Health ("ODH") informed Vistein that her Ohio radiologic license would expire on June 15, 2004. Vistein submitted her Renewal Application to the ODH on or about April 21, 2004, and marked the box indicating that she was currently registered with the AR-RT, she was in compliance with the ARRT's requirements, and she was submitting a copy of her current ARRT credential card. Vistein, however, apparently failed to submit a copy of her card with the Renewal Application. On May 18, 2004, the ODH sent Vistein a "Notice of Incomplete Renewal Application," informing her that she must submit to the ODH evidence of continuing education courses or a copy of her current ARRT credential card. In June 2004, Vistein submitted the credential card she had altered to the ODH to demonstrate fulfillment of the necessary continuing education requirements. Upon observing that the date on the card had been altered, the ODH contacted the ARRT to verify Vistein's registration status. The ARRT informed the ODH that Vistein's registration had lapsed and the credential card she had submitted was not valid.

**2 On June 29, 2004, the ARRT sent Vistein a cease and desist letter informing her it had received information that she had presented an invalid document to the ODH to indicate she had been registered as a radiologic technologist with the ARRT when that was not the case. The ARRT informed Vistein that it believed her misrepresentation (a) was false, deceptive and misleading, (b) unlawfully infringed the ARRT's trade name and marks and its copyrights, (c) was a crime under federal and possibly state law, and (d) could seriously jeopardize the health and safety of members of the public. The ARRT further advised Vistein that her conduct could subject her to civil damages and criminal prosecution. The ARRT informed Vistein that its Ethics Committee would be reviewing her conduct at

its next meeting. The ARRT requested that Vistein submit an explanation of her conduct within 30 days of the letter, which she did on July 12, 2004. At the time, she was employed by the Cleveland Clinic Foundation ("CCF") as Department Manager in the Department of Radiology. In order to retain her position, the CCF required that she be registered with the ARRT. After receiving the cease and desist letter, Vistein informed the CCF that she was no longer registered with the ARRT. The CCF gave her the option of taking an unpaid leave until the matter was resolved, but she chose instead to resign.

Prior to her receipt of the cease and desist letter, Vistein had been in contact with a recruiter at Samaritan Regional Health System ("Samaritan"). She interviewed with Samaritan and informed the interviewer that she was resolving some credentialing issues. Samaritan offered her a position as Director of Radiology, which she accepted. It was Vistein's understanding that the position with Samaritan did not require her to be registered with the ARRT.

*117 On or about July 27, 2004, Vistein filed an Application for Reinstatement of Registration with the ARRT. The ARRT informed her by letter dated August 6, 2004, that the application would not be processed until the Ethics Committee review process had been completed and that the $50.00 check Vistein had submitted was undated and was enclosed with its letter.

At its November 2004 meeting, the ARRT Ethics Committee concluded that Vistein had violated its Standards of Ethics, Rules One, Nineteen and Twenty, by submitting an altered ARRT credential card to the ODH. The Ethics Committee stated that it based this decision, in part, upon information that Vistein had misrepresented herself as a registered technologist to the ODH. The Ethics Committee sent Vistein a letter on November 19, 2004, explaining its conclusion and informing her that the Committee was recommending revocation of her ARRT certification. Vistein was allowed to request

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

a hearing within 30 days from the date the letter was mailed. Vistein claims she never received the letter, but she admits she was aware an investigation was underway and that a decision was imminent. She did not attempt to discover the outcome of the Ethics Committee meeting or request a hearing.

**3 In April 2005, the ARRT published in its Annual Report its finding that Vistein had been ethically sanctioned by the Ethics Committee. On April 18, 2005, Samaritan contacted the ARRT regarding Vistein's ethical sanction. In response, the ARRT sent Samaritan a letter dated April 18, 2005, in which it informed Samaritan as follows:

> Ms. Vistein's registration of certification was revoked effective November 19, 2004 for a period of three years due to misrepresentation. Ms. Vistein provided an altered ARRT credential card to the [ODH] in June 2004. Ms Vistein's [sic] has not been registered or certified with the ARRT since June 30, 2003.

Because she was unable to have the sanction lifted, Samaritan terminated Vistein's employment on September 15, 2005.

### III.

Vistein subsequently brought this action against the ARRT for (1) violation of her due process rights under the United States and Ohio Constitutions, claiming that the ARRT had violated her property interest in her continued employment and her liberty interests in her reputation and in the continuation of her chosen profession by revoking her certification without due process of law, and (2) tortious interference with her contractual and/or business relationships, claiming that the ARRT had interfered with her contractual and/or business relationships with the CCF and Samaritan. The ARRT brought various counterclaims based on Vistein's alleged improper use of its mark in securing and maintaining employment as a radiologic technologist.

Both parties filed motions seeking summary

judgment on the claims of the opposing party. The United States magistrate judge issued a Report and Recommendation recommending that each party's motion for summary judgment be granted in part and denied in part. The district judge adopted the Report and Recommendation, dismissed the portion of the ARRT's counterclaims for indemnification and breach of contract arising from Vistein's claim for intentional interference with contract, and allowed the case to proceed on the ARRT's remaining counterclaims. The district judge specifically found that Vistein had contractually waived and released her due process claims; the ARRT is statutorily immune from liability for Vistein's claims for money *118 damages pursuant to O.R.C. § 2305.251; Vistein's due process and tortious interference with contract claims fail on the merits; and because Vistein is barred from asserting her due process claims, she is required to indemnify the ARRT with respect to its losses, costs, expenses, damages, judgments and attorneys fees incurred as a result of her assertion of those claims. The district court, pursuant to stipulation of the parties, subsequently (1) dismissed the ARRT's remaining counterclaims, and (2) established the amount of the ARRT's attorney fees and costs as $150,000, thereby disposing of all claims before the district court.

### IV.

This court reviews a district court's grant of summary judgment *de novo. White v. Baxter Healthcare Corp.,* 533 F.3d 381, 389 (6th Cir.2008) . Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine" dispute is one that would permit a reasonable jury to return a verdict in favor of the non-moving party. *Henderson v. Walled Lake Consol. Schs.,* 469 F.3d 479, 487 (6th Cir.2006). A fact is "material" only if its resolution could affect the outcome of the litigation under the applicable law. *Id.* At the summary judgment stage, the district court must construe the evidence and draw all reas-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

onable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Jones v. Potter,* 488 F.3d 397, 403 (6th Cir.2007).

## V.

**\*\*4** In its motion for summary judgment, the ARRT argued that Vistein's due process and tortious interference with contract claims are barred because she contractually waived and released those claims by signing "the renewal application." The district court held that the application operated to bar Vistein's due process claims but did not bar her tortious interference with contract claims as a party generally cannot limit its contractual liability for intentional torts under Ohio law. *See Diamond Wine & Spirits v. Dayton Heidelberg Distrib. Co.,* 148 Ohio App.3d 596, 604, 774 N.E.2d 775, 781 (2002). Vistein claims that the district court committed clear error by issuing this ruling because the Renewal Application is an adhesion contract which is both procedurally and substantively unconscionable.

As a threshold matter, Vistein argues for the first time in her reply brief filed on appeal that because it is the ARRT's contention that she never submitted a 2003 Renewal Application, there is a "fundamental flaw" underlying the ARRT's argument that a valid waiver, release and indemnification agreement was in place for the 2003 time period in issue. Vistein notes that in its brief on appeal, the ARRT quotes from the waiver and indemnification language contained in the Renewal Application that she submitted on May 24, 2002, whereas she has filed suit based upon events surrounding her 2003 Renewal Application. Vistein contends that she can neither be held to have waived claims related to the ARRT's failure to renew her application in 2003 nor be held to have agreed to indemnify the ARRT for claims related to a Renewal Application for 2003 which she allegedly never submitted.

Vistein first raises the issue of the absence of a waiver, release and indemnification agreement for

the relevant time period in her reply brief on appeal, despite the fact that she had ample opportunity to **\*119** raise the issue before the district court. In the Report and Recommendation, the magistrate judge expressly stated that the ARRT was basing its waiver argument on the 2002 Renewal Application, noting that,

> The ARRT claims that Plaintiff contractually waived and released her due process and tortious interference claims when she submitted her Application for Renewal of Registration on or around May 24, 2002, in which she agreed to be legally bound by the terms and conditions set forth in the Agreement of Applicants for Renewal of Registration ...

Vistein did not argue that the 2002 application had no relevance to her case, instead claiming only that the agreement was not enforceable because it was an unconscionable adhesion contract. Vistein did object to the magistrate judge's finding that she had not submitted her 2003 Renewal Application to the ARRT and argued that she had done so but the ARRT had failed to process it. At no point did Vistein argue, however, that this failure precluded her from waiving her claims against the ARRT. In fact, the district court noted that Vistein had failed to explain how the allegation that she had submitted her 2003 Renewal Application was material to the disposition of the issues before the court and went on the consider Vistein's objection to the magistrate judge's determination that the contract, although an adhesion contract, was not unconscionable.

**\*\*5** [1] An appellate court ordinarily does not consider issues not raised below. *Smoot v. United Transp. Union,* 246 F.3d 633, 648 n. 7 (6th Cir.2001) (citing *Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941)). "The purpose behind the waiver rule is to force the parties to marshal all of the relevant facts and issues before the district court, the tribunal authorized to make findings of fact." *Id.* (citing *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, 325 (6th Cir.1999)). Vistein

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

had ample opportunity to raise before the district court the issue of whether a waiver, release and indemnification agreement was in place during the relevant time period. By waiting until she filed her reply brief on appeal to raise the issue, she deprived both the district court and the ARRT of the opportunity to address the issue. There is no justification for Vistein's failure to present this issue to the district court. By failing to timely raise the issue, she has waived consideration of it by this court.

An examination of the waiver and release provision of the Renewal Application and the circumstances surrounding its signing discloses that the provision is not procedurally and substantively unconscionable.[FN1] It is undisputed that in 2002, Vistein submitted a Renewal Application which contained the following language:

> FN1. This subsection addresses only the waiver and release provision of the Renewal Application. The indemnification provision is addressed separately in subsection "VI" below.

I hereby waive and release, and shall indemnify and hold harmless, the ARRT ... from, against, and with respect to any and all claims, losses, costs, expenses, damages, and judgments (including reasonable attorney's fees) that arise or are alleged to have arisen, from, out of, with respect to, or in connection with this application, ... the failure of the ARRT to renew the registration of a certificate previously issued to me, or the ARRT's notification of legitimately interested persons of such actions taken by the ARRT. I understand and agree that in the event of my breach of or default in any provision of this Application and Agreement in any respect whatsoever, the ARRT shall have the *120 absolute right, in its absolute discretion, to revoke or suspend any certificate issued to me, refuse renewal of the registration of my certificate, censure me, and/or cancel my registration with the ARRT and to provide information regarding such circumstances to all legitimately interested persons without restric-

tion.

Both the magistrate judge and the district judge interpreted this application as governing the revocation of Vistein's certification and her due process claims premised on that revocation. This was appropriate given that the 2002 Renewal Application gave the ARRT the right to revoke any certification that had previously been issued to Vistein, to censure her, and to cancel her registration. The ARRT did not forfeit that right with respect to any previously-issued certification or registration and did not lose its protection from the waiver to which Vistein had agreed based either on Vistein's alleged failure to submit a Renewal Application for 2003 or, assuming she did submit a Renewal Application for that time period, the ARRT's failure to receive or process the application.

**6 Turning to whether the Renewal Application is unconscionable, Vistein claims that it is an adhesion contract because the ARRT has 260,000 registrants to whom it sends a preprinted Renewal Application each year; the terms of the application are non-negotiable and the ARRT would not consider any attempt to alter those terms; virtually all employers in the field require registration with the ARRT in order to obtain employment, and certain Medicare and Medicaid reimbursement requirements state that at least one ARRT registrant must be on duty at all times in order for facilities to receive reimbursement for radiology services; Vistein herself has been virtually shut out of positions in the clinical field despite her decades of experience because of the ARRT's actions; and the alleged "take it or leave it" terms of the Renewal Application, as well as the purported "near mandatory nature of the registration to obtain employment," show that there was never a true agreement between the parties regarding the terms of the application.

Vistein further argues that the Renewal Application is procedurally unconscionable and that the district court committed clear error in determining otherwise based on its finding that she had a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

"reasonable opportunity" to understand it. She claims that the parties have unequal bargaining power because while the ARRT is a national organization with considerable resources, she is an individual with extremely limited resources. In addition, Vistein argues that the fact the renewal form is mailed en masse to registrants with no explanation of its terms to the recipients and that she was not represented by counsel at the time she signed the Renewal Application demonstrates procedural unconscionability.

Vistein claims that in addition to being procedurally unconscionable, the Renewal Application's terms are substantively unconscionable. She argues that the language of the application enables the ARRT to "do anything it wants and that conduct, no matter how outrageous and egregious, cannot be challenged in court," and the "ARRT remains free to sue applicants for anything and everything under the language drafted by ARRT." She further claims that the agreement is unfair because it provides that should an applicant sue the ARRT and prevail, the applicant will be responsible for the ARRT's attorney's fees and any judgment awarded to the applicant against the ARRT, and any applicant who challenges the ARRT's discretion*121 may have their certificate revoked and be censured for their action.[FN2]

> FN2. Vistein makes these allegations despite conceding that the district court found she could not contract away her right to recover for intentional misconduct by the ARRT. Moreover, the district court determined that because the waiver and release does not bar intentional torts, Vistein is not required to indemnify the ARRT for "losses, costs, expenses, damages, judgments, and attorneys' fees arising from her claim of tortious interference with a business relationship." 509 F.Supp.2d at 677.

The ARRT counters that the Renewal Application is not procedurally unconscionable because Vistein had every opportunity to read and under-

stand its terms; she had a long-term relationship with the ARRT and had signed Renewal Applications containing the identical terms for at least the nine preceding years; and she does not claim that she failed to read or understand the application or that it is vague or ambiguous. The ARRT also challenges as unsupported by any evidence of record, apart from her own affidavit which purportedly contains inadmissible hearsay, Vistein's allegations that "virtually all employers in the field require registration with ARRT in order to obtain employment," that "employers overwhelmingly make ARRT certification a condition of employment," and that ARRT registration is "near-mandatory." The ARRT notes that after Vistein resigned her position at the CCF, she obtained a position at Samaritan that did not require ARRT registration.

**7 Unconscionability is characterized by an "absence of meaningful choice on the part of one of the parties to the contract, combined with contract terms that are unreasonably favorable to the other party." *Collins v. Click Camera & Video, Inc.,* 86 Ohio App.3d 826, 834, 621 N.E.2d 1294, 1299 (1993). To establish that a contract is unconscionable under Ohio law, the claimant must prove two elements: (1) procedural unconscionability, i.e., the individualized circumstances surrounding each of the parties to the contract were such that no voluntary meeting of the minds was possible, and (2) substantive unconscionability, meaning that the contract terms were unfair and unreasonable. *Id.*

In determining procedural unconscionability, the critical question is whether "each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or [whether] the important terms [were] hidden in a maze of fine print." *Lake Ridge Academy v. Carney,* 66 Ohio St.3d 376, 382, 613 N.E.2d 183, 189 (1993) (quoting *Wms. v. Walker-Thomas Furniture Co.,* 350 F.2d 445, 449 (C.A.D.C.1965)). Ohio courts examine factors that bear on the relative bargaining positions of the parties to the contract, such as "age, education, in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

telligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, and whether there were alternative sources of supply for the goods in question." *Collins,* 86 Ohio App.3d at 834, 621 N.E.2d at 1299. Courts also look at whether the parties were represented by counsel, although a lack of representation is not dispositive, particularly where a party was not represented by counsel by her own choice and she was sophisticated enough to appreciate the possibility of retaining counsel. *See Ball v. Ohio State Home Servs., Inc.,* 168 Ohio App.3d 622, 627, 861 N.E.2d 553, 556-57 (2006).

In determining whether a contract is unconscionable, the court may take into consideration whether the contract is an adhesion contract. An adhesion contract **122** is a "standardized form contract prepared by one party, and offered to the weaker party, usually a consumer, who has no realistic choice as to the contract terms." *Taylor Bldg. Corp. of Am. v. Benfield,* 117 Ohio St.3d 352, 363, 884 N.E.2d 12, 24 (2008) (citing *Black's Law Dictionary* 342 (8th Ed.2004)). A contract of adhesion is not unconscionable per se. *Id.*

Whether a contract is unconscionable is a question of law to be determined by the court. *Ins. Co. of N. Am. v. Automatic Sprinkler Corp.,* 67 Ohio St.2d 91, 98, 423 N.E.2d 151, 156 (1981). "The test of unconscionability poses a very great burden." *Highway Equip. Co. v. Caterpillar, Inc.,* 908 F.2d 60, 65 (6th Cir.1990).

[2] The district court correctly determined that Vistein had failed to establish procedural unconscionability based on the following facts as found by the magistrate judge:

**8** Ms Vistein is educated and experienced; she makes no claims she failed to read or understand the waiver; she had signed the same renewal form and waiver for the previous nine years. Over the years she has had the opportunity to consult with

counsel as to the import of the limitations of the liability clause, and while Ms. Vistein was not represented by counsel at the time the contract was executed, this is not dispositive.

509 F.Supp.2d at 676-677. The district court's determination was not erroneous as Vistein is an educated and experienced radiologic technician, having been employed in that profession for approximately 30 years at the time she submitted the 2002 Renewal Application. Moreover, the entire contract consisted of five paragraphs, the waiver clause appeared in standard print, and the clause was not hidden in a maze of terms. There is no evidence that shows Vistein was unaware of the impact of the contract terms, that she was otherwise limited in understanding their impact, or that she was precluded from obtaining legal assistance if she needed help in understanding the impact of the contract terms. The fact that the Renewal Application was mailed en masse with no explanation of its terms carries little weight as there is no evidence to show that Vistein was unable to protect her interests in connection with the application or that she was compelled to sign it. Although Vistein alleges that she had no meaningful choice but to sign the application, she has not submitted competent evidence to support her allegation and to show that she was unable to obtain employment in her field without signing the application. In addition, for many years, Vistein received the benefits of certification and registration with the ARRT in exchange for payment of a very low fee.

As for Vistein's allegations regarding the adhesive nature of the Renewal Application, the application is properly characterized as an adhesion contract in that it is a standardized contract drafted by the ARRT and alterations in the printed terms by Vistein were not possible. Vistein has not shown, however, that she had no realistic choice but to submit the Renewal Application or that she did so against her better judgment or wishes. Thus, the adhesive nature of the application does not render it procedurally unconscionable.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

[3] Finally, the evidence does not show that the waiver clause of the Renewal Application is substantively unconscionable. Vistein's broad allegation that the waiver clause precludes her from challenging "outrageous and egregious" conduct by the ARRT does not hold water in light of the district court's determination that she could not contract away her right to recover for intentional misconduct by the ARRT, a determination that the ARRT does not challenge. It was neither unfair *123 nor unreasonable for Vistein to agree to waive and release claims against the ARRT arising from the Renewal Application and the specific categories of activities listed in the application when she was required to pay a very low fee in exchange for the benefits of renewal of her certification, which benefits she had enjoyed for many years.

**9 Because Vistein failed to produce evidence to demonstrate as a matter of law that the waiver clause of the Renewal Application is both procedurally and substantively unconscionable, Vistein waived the right to proceed on her due process claims against the ARRT and the ARRT is entitled to summary judgment on these claims.

## VI.

The district court determined that because the Renewal Application is not substantively unconscionable, the agreement, in addition to effectively barring Vistein's due process claims, requires her "to indemnify the ARRT with respect to its losses, costs, expenses, damages, and judgments, including reasonable attorney fees, arising from her pursuit of [these claims] in the present litigation." 509 F.Supp.2d at 694. Vistein claims that the indemnification provision is unenforceable because the Renewal Application is an unconscionable adhesion contract. Although Vistein raised this argument below, it was not until oral argument before this court that she specifically claimed that the district court erred by awarding attorney fees because Ohio law does not permit an award of attorney fees pursuant to a contractual agreement unless the fee provision is specifically negotiated. Vistein cited three cases

in support of this proposition, including one case which was decided after this appeal had been briefed. *See Big Lots Stores, Inc. v. Luv N' Care, Ltd.,* 302 Fed.Appx. 423 (6th Cir.2008); *Scotts Co. v. Cent. Garden & Pet Co.,* 403 F.3d 781 (6th Cir.2005); *Colonel's Inc. v. Cincinnati Milacron Mktg. Co.,* 149 F.3d 1182 (Table), 1998 WL 321061 (6th Cir.1998) (unpublished decision). Because an appellate court does not ordinarily consider issues not raised below, *see Snoot,* 246 F.3d at 648 n. 7, and a party waives an issue on appeal "when [she] fails to present it in [her] initial briefs before this court," *Marks v. Newcourt Credit Group, Inc.,* 342 F.3d 444, 462 (6th Cir.2003), we must determine as a threshold matter whether Vistein waived her argument that the indemnification clause is unenforceable because the parties failed to specifically negotiate it by failing to raise this issue prior to oral argument.

[4] We find that Vistein's failure to frame the indemnification issue precisely in terms of the analysis performed in *Big Lots, Scotts* and *Colonel's Inc.* prior to oral argument does not bar us from considering whether the indemnification provision regarding attorney fees is enforceable under Ohio law as set forth in those cases. Rather, Vistein adequately raised before the district court the issue of the invalidity of the provision based on the parties' failure to specifically negotiate it by arguing that the Renewal Application, including the attorney fees provision, is an adhesion contract, i.e., a standard preprinted form contract which was prepared by the ARRT and which contained nonnegotiable terms as to which she had no realistic choice. She also sufficiently presented this issue in her initial appellate brief where, in addition to arguing that the Renewal Application is an adhesion contract, she argued that the language of the agreement drafted by the ARRT unfairly vested all power and control in the ARRT and held any applicant who sued the ARRT liable for the ARRT's attorney fees. Vistein's arguments subsume the issue of whether an *124 award of attorney fees pursuant to the boilerplate indemnification provision is invalid under Ohio law

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

as analyzed in *Big Lots*, *Scotts*, and *Colonel's Inc.* Both the district court and this court have therefore been afforded an ample opportunity to address the issue. Accordingly, we will consider whether the boilerplate fee-shifting provision of the Renewal Application is unenforceable under Ohio law on the ground that the parties did not specifically negotiate it.[FN3]

> FN3. Even if Vistein waived this argument before the district court, waiver is " 'a prudential rule, not a jurisdictional one." *United States v. Martin,* 438 F.3d 621, 627 (6th Cir.2006) (quoting *United States v. Hayes,* 218 F.3d 615, 619 (6th Cir.2000)). We have generally considered the following factors in determining whether to exercise our discretion to adjudicate the merits of an issue that has been waived: 1) whether the question is one of law or one that requires some factual development, 2) whether the proper resolution of the issue is clear beyond doubt, 3) whether the failure to take up the issue will result in a miscarriage of justice, and 4) the parties' right to have their issues considered by both a district judge and an appellate court. *Scottsdale Ins. Co. v. Flowers,* 513 F.3d 546, 552-53 (6th Cir.2008). The issue in this case presents a pure question of law, the resolution of which is clear under *Big Lots, Scotts,* and *Colonel's Inc.* Failure to take up the issue would result in a miscarriage of justice, especially considering the similarity between Vistein's arguments before the district court and the argument that the Renewal Application was unenforceable because it was not specifically negotiated. Even assuming waiver then, we would exercise our discretion to reach the merits of this issue.

**\*\*10** In the earliest of our three decisions interpreting Ohio law on this subject, *Colonel's Inc.,* 1998 WL 321061, \*5, we held that because the at-

torney fees provision in the agreement at issue "was not the product of specific free and understanding negotiation" but instead was a preprinted clause that appeared in defendant's standard contract forms, the district court did not err when it concluded the provision was void as against Ohio public policy. In *Scotts,* 403 F.3d at 791, we followed *Colonel's Inc.* and recognized the long-standing rule in Ohio that "a stipulation by parties to a contract which permits attorney fees to be awarded as costs of collection upon default is void and against public policy," while acknowledging that several Ohio courts have carved out an exception where the parties have specifically negotiated the provision. In the recent decision handed down in *Big Lots,* 302 Fed.Appx. 423, we analyzed Ohio law and Sixth Circuit cases interpreting Ohio law and indicated that while this area of the law is not as straightforward as the opinions in *Colonel's Inc.* and *Scotts* may have implied, there was no basis for departing from these precedents. We concluded that Ohio law does not permit recovery of attorney fees pursuant to a contractual provision "unless the parties specifically negotiated the contract term so providing." *Id.* at 428. We held that the fee-shifting provision at issue was not enforceable as the parties had not specifically negotiated the boilerplate.[FN4] *Id.*

> FN4. The provision required the appellees to "indemnify ... and hold harmless [Big Lots] from any and all liabilities, damages, costs, expenses and/or suits (whether actual or alleged), including, without limitation, reasonable attorneys' and experts' fees arising from [Luv n' care's breach]." *Id.* at 425.

[5] Consistent with our prior decisions in *Big Lots, Scotts,* and *Colonel's Inc.,* we find that the indemnification provision relating to attorney fees in the Renewal Application is unenforceable under Ohio law. Although Vistein has not produced evidence to show that the Renewal Application is either procedurally or substantively unconscionable, she and the ARRT did not specifically negotiate the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

boilerplate indemnification provision in the Renewal Application.*125 To the contrary, Vistein, who lacked any bargaining power, had no realistic choice regarding the terms of that provision or any other provision of the Renewal Application but was instead presented the standardized contract on a "take it or leave it" basis. The indemnification provision regarding attorney fees is therefore void as against the public policy of Ohio. The ARRT is precluded from recovering its attorney fees incurred as a result of Vistein's pursuit of her due process claims.

## VII.

[6] The district court held that the ARRT is immune from Vistein's claims for damages under O.R.C. § 2305.251, which provides, in pertinent part, as follows:

(A) No health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of a peer review committee of the health care entity. No individual who is a member of or works for or on behalf of a peer review committee of a health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of the peer review committee.

**11 ....

(D) No person who provides information under this section without malice and in the reasonable belief that the information is warranted by the facts known to the person shall be subject to suit for civil damages as a result of providing the information.

Section 2305.25(A)(1) defines "health care entity" as used in § 2305.251 as
an entity, whether acting on its own behalf or on behalf of or in affiliation with other health care entities, that conducts as part of its regular business activities professional credentialing or quality review activities involving the competence of,

professional conduct of, or quality of care provided by health care providers, including both individuals who provide health care and entities that provide health care.

Subsection (E)(1) defines a "peer review committee" as
... a utilization review committee, quality assessment committee, performance improvement committee, tissue committee, credentialing committee, or other committee that does either of the following:

(a) Conducts professional credentialing or quality review activities involving the competence of, professional conduct of, or quality of care provided by health care providers, including both individuals who provide health care and entities that provide health care; ...

The district court determined that the ARRT is a health care entity as defined under § 2305.25, its Ethics Committee qualifies as a "peer review committee" under that provision, and the conduct of the Ethics Committee in considering the evidence relating to Vistein's alleged violation of the ARRT's Standards of Ethics falls within the scope of § 2305.251(A)'s grant of immunity from liability. The district court further found that the Ethics Committee's consideration of Vistein's alleged ethics violation, the revocation of her certification and the publication of the revocation appear to fall within the scope of the functions of a peer review committee of the ARRT. The district court rejected Vistein's claim that the immunity provided by § 2305.251 could not extend to her federal due process claim on the ground that the cases she cited in support of that proposition are inapposite. Finally, the court determined that Vistein had failed to produce competent evidence to raise a genuine*126 issue of material fact as to whether the ARRT had acted with malice so as to strip it of its entitlement to immunity.

Vistein contends as an initial matter that the ARRT Ethics Committee does not qualify as a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

health care entity under O.R.C. § 2305.25. Vistein apparently argues that the ARRT does not meet the definition because although it has a system in place to verify professional competence, the system does not involve subjective peer review, which Vistein alleges was the legislative concern motivating the passage of § 2305.251. Rather, Vistein contends that the system simply verifies that applicants and registrants have met certain educational and testing requirements as opposed to performing the function of a peer review committee, which looks at a health care provider's professional competence and/or quality of care. Vistein further alleges that the district court's interpretation of § 2305.251 renders the statute unconstitutional because its interpretation prevents her from pursuing her federal due process claim.

**12 The district court did not err in determining that the ARRT is immune from damages under § 2305.251 arising from its revocation of Vistein's certification and the publication of that information. The ARRT is a national credentialing organization of radiologic technicians and, as such, falls within § 2305.25(A)(1)'s definition of a health care entity. Similarly, its Ethics Committee fits the definition of a peer review committee under the statute. The Ethics Committee was clearly acting within the scope of its functions when it reviewed Vistein's conduct relating to her certification and registration with the ARRT, determined to revoke her certification, and subsequently provided that information to Samaritan at its request.

The district court rejected Vistein's argument that the ARRT is nonetheless not entitled to immunity from damages because it acted with actual malice by reporting her ethics sanction. The district court found that Vistein's alteration of her ARRT credential card was conduct prohibited under the ARRT's Rules of Ethics. The district court further found that the motivation for her conduct was not a relevant consideration under the rules. Vistein claims that by communicating to others that she had violated ARRT Rule 20, the ARRT clearly commu-

nicated to third parties that she was deliberately deceitful, despite the fact that the ARRT had not made such a determination in its proceedings.

Vistein has failed to produce any evidence that the ARRT acted with actual malice by communicating to Samaritan that she had violated Rule 20. Rule 20 prohibits a certified radiologic technician from "[e]ngaging in false, fraudulent, deceptive or misleading communications to any person regarding the individual's education, training, credentials, experience or qualifications, or the status of the individual's state permit, license or registration certificate in radiologic technology or certificate of registration with ARRT." An individual need not engage in fraud or deceit in order to commit a violation of Rule 20; it is sufficient that the individual engage in false or misleading communications, which Vistein clearly did. Vistein's communications were false and misleading even if one accepts her allegations that she submitted her 2003 Renewal Application, it was immediately apparent to the ODH that she had altered her credential card, and her explanation as to why she altered the credential card is true. Accordingly, by communicating to Samaritan or to any other party that Vistein had engaged in conduct prohibited by Rule 20, the ARRT did not act with actual malice, i.e., it did not make such statements "with knowledge*127 they were false or with reckless disregard for whether they were true or false." See Wall v. Ohio Permanente Med. Group, Inc., 119 Ohio App.3d 654, 666, 695 N.E.2d 1233 (1997) (citing Jacobs, 60 Ohio St.3d at 114-115, 573 N.E.2d at 612-14).

It is not necessary to address Vistein's claim that the Ohio statute cannot grant the ARRT immunity from damages on Vistein's federal due process claim. For the reasons stated below, Vistein cannot proceed on this claim because the ARRT is not a state actor for due process purposes.

VIII.

**13 [7] The district court held that Vistein could not succeed on the merits of her due process claims under 42 U.S.C. § 1983 and the Ohio Con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

stitution because she could not prove that the AR-RT, a private, non-profit credentialing agency, was acting under color of state law. Vistein claims that the district court erred in holding that the ARRT is not a state actor. She argues that there is a genuine issue of material fact as to whether the ARRT acted jointly with the State and she claims that the State's embrace of the ARRT's findings and actions transformed its actions into state actions with regard to the investigation into her conduct. Vistein argues that in determining otherwise, the district court ignored certain facts that are favorable to her and construed allegedly disputed material facts in favor of the ARRT. She further claims that the Report and Recommendation omitted the following material facts that presumably bear on the issue of whether the ARRT was acting under color of state law: the ARRT administers the test Ohio uses to determine who should be registered as a radiologic technologist; Ohio uses ARRT registration as a way of determining whether technologists have met their continuing education requirements; the ARRT actively encourages such state reliance; and the ARRT and Ohio exchange information regarding possible disciplinary issues against technologists on a regular basis.

To proceed on a claim under 42 U.S.C. § 1983, a plaintiff must show that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States. Similarly, to proceed on a due process claim under state law, a plaintiff must show that a state actor committed the violation. *Vistein,* 509 F.Supp.2d at 696. The principal inquiry to be undertaken in determining whether a private party's actions constitute "state action" under the Fourteenth Amendment to the United States Constitution is whether the party's actions may be "fairly attributable to the State." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

The Supreme Court has established four tests for determining whether the challenged conduct

may be fairly attributable to the State for purposes of a § 1983 claim. These are (1) the public function test; (2) the state compulsion test; (3) the symbiotic relationship or nexus test; and (4) the entwinement test. *Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir.1992); *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288, 298, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (citations omitted). The public function test requires that the private entity exercise powers that are traditionally exclusively reserved to the State, such as holding elections, *Flagg Bros. v. Brooks,* 436 U.S. 149, 157, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), or exercising the power of eminent domain. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The state compulsion test requires that a State has "exercised such *128 coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *See Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). More than mere approval or acquiescence in the initiatives of the private party is necessary to hold the State responsible for those initiatives. *Id.* Under the symbiotic relationship or nexus test, the action of a private party constitutes state action when there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. *See Jackson,* 419 U.S. at 357-58, 95 S.Ct. 449; *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 724-25, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The entwinement test requires that the private entity be "entwined with governmental policies" or that the government be "entwined in [the private entity's] management or control." *Brentwood,* 531 U.S. at 296, 121 S.Ct. 924 (citing *Evans v. Newton,* 382 U.S. 296, 299, 301, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966)). The crucial inquiry under the entwinement test is whether the "nominally private character" of the private entity "is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings [such that] there is no substantial

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

reason to claim unfairness in applying constitutional standards to it." *Id.* at 298, 121 S.Ct. 924. The fact that a public entity has acted in compliance with a private entity's recommendations does not transform the private entity into a state actor. *Nat'l Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988).

**14 Vistein makes numerous allegations which she claims create an issue of fact as to whether the ARRT is a state actor. She points to the fact that the ODH accepts ARRT registration as a means of confirming continuing education compliance without independent verification by the ODH; the ODH contacted the ARRT when she submitted an ARRT card that the State suspected had been altered; the State proposed to deny her license application on the grounds that she had not shown compliance with continuing education requirements and on moral grounds; the States and the ARRT eliminate duplicative efforts by sharing information about ethics violations; there is a disputed issue of fact as to whether the State delayed conducting a hearing on Vistein's state license until after the ARRT had issued a decision regarding the circumstances under which her card had been altered; and the ARRT provided evidence for use in the ODH hearing. In addition to these allegations, the district court noted that there is relatively frequent communication between the ARRT and the ODH, they are in telephonic contact on a weekly basis, the ODH uses the ARRT credentialing test to determine radiologic licensing eligibility, and the ARRT informs the ODH about members who are under sanctions for ethics violations. The district court's findings, together with Vistein's allegations, are insufficient, however, to show that the ARRT is a state actor under any of the tests for determining whether its challenged conduct may be fairly attributable to the State for purposes of Vistein's due process claims. The allegations and findings show that the ARRT and the ODH share information and assist each other in performing various functions, but the evidence does not demonstrate that the ARRT performs functions traditionally reserved to the State, that either

entity controls the actions or management of the other, or that the entities are sufficiently entwined or there is a sufficiently close *129 nexus between the two to support a finding that the ARRT is a state actor.

## IX.

[8] Vistein argues that the district court erred by determining that she could not recover on her tortious interference with contract claim. She contends that all of the elements of a tortious interference with contract claim are met and she did not have to establish actual malice to prevail on this claim. She further argues that even if a showing of actual malice were required, she has made such a showing by demonstrating that the ARRT reported to the CCF and Samaritan that she had engaged in unethical conduct by violating the ARRT's rules against fraud and deceit without considering her intent or motive.

The district court determined that the existence of actual malice is essential to Vistein's tortious interference with contract claim. The court apparently based its determination on the magistrate judge's finding that although the factors for determining whether the ARRT's conduct was improper and therefore unjustified appeared to favor Vistein, the ARRT had demonstrated that its conduct was qualifiedly privileged and it was necessary for Vistein to demonstrate that the ARRT had acted with actual malice in order to overcome the qualified privilege.

**15 The district court's analysis is correct. A showing of actual malice is not required in order to establish a tortious interference with contract claim under Ohio law, which is comprised of the following elements: (1) the existence of a contract or employment relationship, (2) the defendant's knowledge of the contract or employment relationship, (3) the defendant's intentional procurement of the breach of the contract or termination of the employment relationship, (4) lack of justification, and (5) resulting damages. *See Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St.3d 415, 650 N.E.2d 863, syll. ¶ 2 (1995); *Doyle v. Fairfield Mach. Co.,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio)))

*Inc.,* 120 Ohio App.3d 192, 216, 697 N.E.2d 667, 683 (1997). Clear and convincing evidence of actual malice is required, however, to overcome a defense of qualified privilege, *see Jacobs,* 60 Ohio St.3d at 114-115, 573 N.E.2d at 613, which is applicable to tortious interference with contract cases. *See Smith v. Ameriflora 1992, Inc.,* 96 Ohio App.3d 179, 187-188, 644 N.E.2d 1038, 1044 (1994). The district court correctly determined that the ARRT's publication of the information regarding plaintiff's ethics sanction to Samaritan was qualifiedly privileged because the communications "were made to an interested entity at that entity's request and were limited in scope to Samaritan's inquiry." [FN5] 509 F.Supp.2d at 680 (citing *Smith,* 96 Ohio App.3d at 184-85, 644 N.E.2d 1038; *Jacobs,* 60 Ohio St.3d at 113, 573 N.E.2d 609); *see also Hahn v. Kotten,* 43 Ohio St.2d 237, 331 N.E.2d 713 (1975) ("A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do.") The ARRT provided the limited information sought by Samaritan to Samaritan, and it was in the interest of both *130 Samaritan and the ARRT that the information be provided. Because the ARRT's publication of the information was qualifiedly privileged, Vistein was required to show "actual malice," i.e., that the statements were made with knowledge they were false or with reckless disregard as to their truth or falsity, in order to defeat the ARRT's qualified privilege defense. *See Jacobs,* 60 Ohio St.3d at 115-16, 573 N.E.2d at 614.

FN5. It is unnecessary to address the existence of a qualified privilege with respect to the publication of information to the CCF. Plaintiff resigned her position with the CCF and cannot prevail on a tortious interference with contract claim arising from

the termination of her employment with the CCF for this reason.

Vistein failed to produce any evidence to show that the ARRT acted with actual malice. Contrary to Vistein's allegations, the ARRT did not inform Samaritan that she had acted with deliberate deceit or fraud or otherwise provide false information to Samaritan or any other party. The ARRT informed Samaritan that Vistein had provided an altered ARRT credential card to the ODH and that her registration of certification had been revoked due to misrepresentation, which was accurate. Because Vistein has failed to produce evidence of actual malice, she cannot overcome the ARRT's qualified privilege and thus cannot prevail on her tortious interference with contract claim.

X. Conclusion

**16 For the reasons stated above, the judgment of the district court granting summary judgment in favor of the ARRT on Vistein's due process and tortious interference with contract claims is AFFIRMED . The judgment of the district court awarding the ARRT attorney fees is REVERSED. Because the order entered by the district court pursuant to the stipulation of the parties does not distinguish between the amount awarded as attorney fees and the amount awarded as costs, the case is REMANDED for a determination of the amount of costs to be awarded the ARRT and for entry of judgment in accordance with this opinion.

C.A.6 (Ohio),2009.
Vistein v. American Registry of Radiologic Technologists
342 Fed.Appx. 113, 2009 WL 2475330 (C.A.6 (Ohio))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2008 WL 1849617 (Ohio App. 11 Dist.), 2008 -Ohio- 2005
**(Cite as: 2008 WL 1849617 (Ohio App. 11 Dist.))**

**H**
CHECK OHIO SUPREME COURT RULES FOR RE-
PORTING OF OPINIONS AND WEIGHT OF LEGAL
AUTHORITY.

Court of Appeals of Ohio,
Eleventh District, Geauga County.
William WINDSOR, et al., Plaintiffs-Ap-
pellees/Cross-Appellants,
v.
Frank RIBACK, et al., Defendants-Appel-
lants/Cross-Appellees.

Nos. 2007-G-2775, 2007-G-2781.
Decided April 25, 2008.

**Background:** Vendors brought action against prospect-
ive purchasers, who also leased subject residential prop-
erty, to recover money damages for breach of lease
agreement and purchase agreement. Prospective pur-
chasers counterclaimed to recover earnest money depos-
it. After a bench trial, the Court of Common Pleas,
Geauga County, No. 04 M 000468, entered judgment in
favor of landlords. Prospective purchasers appealed, and
vendors cross-appealed.

**Holdings:** The Court of Appeals, Diane V. Grendell,
P.J., held that:
(1) earnest money provision in real estate purchase
agreement was not a liquidated damages provision cap-
ping damages against purchasers;
(2) purchasers' failure to make timely rental payments
precluded the rental monies from being credited against
purchasers' earnest money payment;
(3) vendors were not entitled to delinquent rent for
month in which purchasers were no longer occupying
the premises;
(4) vendors were not entitled to damages for reimburse-
ment of alleged costs incurred to remedy the purchasers'
default on rental agreement; and
(5) the parties' agreement did not expressly permit
vendors to recover attorney fees as part of costs to rem-
edy purchasers' default.

Affirmed as modified.

West Headnotes

**[1] Damages 115 ⚖81**

115 Damages
  115IV Liquidated Damages and Penalties
    115k75 Construction of Stipulations
      115k81 k. Deposit to Be Forfeited on Breach.
Most Cited Cases
    Provision in real estate purchase agreement, which
stated that $20,000 in earnest money would go directly
to vendor and was not refundable in the event the pur-
chaser failed to perform obligations under the agree-
ment, was not a liquidated damages provision capping
damages against purchasers; the earnest money amount
represented only five percent of the purchase amount,
and another provision in a lease portion of the agree-
ment permitted vendors to sue for and recover all rents
and compensation for any violations in the event of de-
fault on the part of the purchasers.

**[2] Vendor and Purchaser 400 ⚖328**

400 Vendor and Purchaser
  400VI Remedies of Vendor
    400VI(C) Actions for Damages
      400k328 k. Pleading. Most Cited Cases
    Prospective purchasers waived, by not raising in
pleadings, the affirmative defense of vendors' failure to
mitigate damages, in vendors' action for breach of real
estate purchase agreement.

**[3] Vendor and Purchaser 400 ⚖69.1**

400 Vendor and Purchaser
  400II Construction and Operation of Contract
    400k69 Purchase Money
      400k69.1 k. In General. Most Cited Cases
    Breach of rental portion of agreement for sale of
residential property, which breach arose from pur-
chasers' failure to make timely rental payments, pre-
cluded the rental monies from being credited against

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1849617 (Ohio App. 11 Dist.), 2008 -Ohio- 2005
**(Cite as: 2008 WL 1849617 (Ohio App. 11 Dist.))**

purchasers' earnest money payment to vendors, pursuant to the terms of the agreement.

**[4] Vendor and Purchaser 400 ☜69.1**

400 Vendor and Purchaser
 400II Construction and Operation of Contract
  400k69 Purchase Money
   400k69.1 k. In General. Most Cited Cases
    Vendors were not entitled to delinquent rent for month in which prospective purchasers, who rented the subject property pursuant to real estate purchase agreement, were no longer occupying the premises, and were not entitled to a pro rata share of monthly rent commensurate to date in which tenants vacated, pursuant to agreement that had no provision for a prorated rent and that expressed obligation for "tenants" to pay "landlord" a rent sum at the beginning of each calendar month; vendors were no longer "landlords" as contemplated by the agreement after prospective purchasers vacated the premises.

**[5] Landlord and Tenant 233 ☜231(6)**

233 Landlord and Tenant
 233VIII Rent and Advances
  233VIII(B) Actions
   233k231 Evidence
    233k231(6) k. Weight and Sufficiency in General. Most Cited Cases
    Landlords were not entitled to damages for reimbursement of alleged expenses incurred to remedy the tenants' default on rental agreement, despite rental agreement provision allowing for such damages and declaring them to be "additional rent" payable with the following rental installment, absent corroborating testimony or receipts to substantiate the alleged expenses.

**[6] Landlord and Tenant 233 ☜285(9)**

233 Landlord and Tenant
 233IX Re-Entry and Recovery of Possession by Landlord
  233k279 Actions for Recovery of Possession
   233k285 Jurisdiction and Proceedings
    233k285(9) k. Costs. Most Cited Cases

In the absence of express language authorizing attorney fees in lease agreement provision providing for "amounts paid to remedy any default," the trial court acted within its discretion in declining to award landlords attorney fees as a cost expended to enforce the agreement and to evict tenants.

Civil Appeal from the Geauga County Court of Common Pleas, Case No. 04 M 000468.Douglas A. King, Chagrin Falls, OH, for plaintiffs-appellees/cross-appellants.

Kevin L. Starrett, Law Office of Kevin L. Starrett, Chagrin Falls, OH, for defendants-appellants/cross-appellees.

DIANE V. GRENDELL, P.J.
 *1 {¶ 1} This is an appeal from a judgment of the Geauga County Court of Common Pleas in which the court found appellants/cross-appellees, Frank and Donatella Riback (the Ribacks) in breach of contract, and awarded damages in the amount of $12,097.60, plus interest, to appellees/cross-appellants, William and Barbara Windsor (the Windsors). For the reasons that follow, we modify the judgment of the lower court, and affirm as modified.

 {¶ 2} On September 20, 2003, the Ribacks executed a standard form purchase agreement with an addendum attached, wherein they agreed to purchase real property, located at 17401 Hawksview Lane in Bainbridge Township, Ohio, from the Windsors for $410,000. The purchase agreement provided for a $20,000 earnest deposit, with $15,000 due four days after the acceptance of the contract, and the remaining $5,000 balance due on November 1, 2003. Per the terms of the purchase agreement, the Ribacks were to take possession of the property on October 1, 2003, and the closing on the property was to take place on January 31, 2005. The Windsors signed the purchase contract and the addendum thereto, on September 29, 2003.

 {¶ 3} The addendum provided as follows:

 {¶ 4} "Seller agrees to rent the property to the Buy-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1849617 (Ohio App. 11 Dist.), 2008 -Ohio- 2005
**(Cite as: 2008 WL 1849617 (Ohio App. 11 Dist.))**

er from 10/1/03 to 1/31/05 for $2,500 [per] month with $500 of the monthly rent going towards downpayment on the property. Buyer agrees to secure renter's insurance for the property for the duration of the rental period. Buyer is responsible for all utility payments, maintenance, repair, yard maintenance and snow removal for the property. Seller is responsible for mortgage and property tax payments. Seller is also responsible for homeowner's insurance.

{¶ 5} "The $20,000 earnest money goes directly to the Seller and is non-refundable to the Buyer if the Buyer fails to perform his obligations per the purchase agreement by 1/31/05."

{¶ 6} On September 29, 2003, the parties also entered into a Rental Agreement, in which the Ribacks agreed to rent the property from the Windsors for a period of 15 months, beginning on October 1, 2003, and ending on January 31, 2005, the closing date for the sale, as provided in the purchase agreement. This agreement provided for the Ribacks to pay a security deposit of $2,500, rent in the sum of $37,500, due in monthly installments of $2,500. The first rental payment was to be made on or before October 1, 2003, with subsequent payments due and payable on the first day of each subsequent calendar month.

{¶ 7} The rental agreement further provided, in relevant part, as follows:

{¶ 8} "Any monthly payment not made by Tenant when due, or within five (5) days thereafter, shall result in additional rent of $10.00 per day for each day that payment remains outstanding. * * * Upon timely payment thereof, the amount of $500.00 shall be credited from each of the fifteen monthly payments toward the purchase price of the subject premises, pursuant to a Real Estate Purchase agreement by and between Landlord and Tenant, dated September 20, 2003, September 25, 2003, September 29, 2003, and otherwise."

*2 {¶ 9} " * * * "

{¶ 10} "Tenant shall pay, in addition to rents specified herein, for utilities serving the premises, including, but not limited to, electricity, telephone, cable television, satellite television, gas, oil, water and sewer. Electricity, telephone, cable television, gas, oil, water and sewer shall be payable through accounts established in the name of Tenant and paid directly by Tenant to Landlord by the service providers. Any utility accounts serving the premises but billed to landlord by the service providers shall be billed by landlord to Tenant. Tenant shall remit such charges to Landlord monthly, said amounts being considered for the purpose of this agreement as additional rent. Landlord shall bear responsibility for payment of mortgage and property tax obligations during the term hereof.

{¶ 11} " * * * "

{¶ 12} "Should Tenant default in payment of rent specified herein, any part thereof, or in fulfillment of the covenants or agreements specified herein to be fulfilled by Tenant, should any waste be committed upon or damage be done to subject premises, Landlord may, at Landlord's selection, at any time as such default occurs or continues or before the replacement of such waste or damage, without notice, declare the rental term ended and enter in possession of the subject premises, sue for and recover all rents and compensation for any violations hereunder."

{¶ 13} On October 1, 2003, the Ribacks moved into the property. Prior to taking possession, they made an earnest money payment of $15,000, pursuant to the purchase agreement and a payment of $2,500 for the first month's rent.

{¶ 14} Almost immediately after taking possession of the property, the Ribacks began experiencing financial difficulties. Mr. Riback called Mr. Windsor to inform him that he was going to have difficulty meeting the November rent payment in a timely fashion. In a letter memorializing the conversation sent to Mr. Windsor on November 3, 2003, Mr. Riback explained that he had written two checks for November's rent, because he was "still digesting moving costs and other payments made this past month." In the letter, Mr. Riback requested that Mr. Windsor delay depositing the second of the checks until November 14, 2003.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1849617 (Ohio App. 11 Dist.), 2008 -Ohio- 2005
**(Cite as: 2008 WL 1849617 (Ohio App. 11 Dist.))**

{¶ 15} Mr. Windsor replied to Mr. Riback in a let-ter dated November 10, 2003. In the letter, Mr. Windsor acknowledged his agreement with Mr. Riback, per their phone conversation, that he would give Mr. Riback an additional month to "delay payment of the $5,000 non-refundable payment due on November 1," and "would consider whether a further delay could be given." However, the letter went on to state that Mr. Windsor was "then shocked to receive the November rental pay-ment late on November 5 * * * and when the payment arrived, half of the rent was on a post-dated check ." As a result of the aforementioned acts, Mr. Windsor in-formed Mr. Riback that, pursuant to the purchase agree-ment, the "late payment means that $500 of the payment will not be applied to the purchase price," and "the lease is in default."

**\*3 {¶ 16}** In December 2003, the Ribacks made a timely lease payment. However, in subsequent months, they again had difficulty making them. On January 7, 2004, the Windsors received notice that a check for January rent from the Ribacks, deposited into their ac-count on January 5, 2004, was returned for non-sufficient funds. In February 2004, the Ribacks again wrote two separate checks for rent, one for $1,500 dated February 4, 2004, and the second one, for $1,000 dated February 13, 2004. In March 2004, the Ribacks remitted their rent check to the Windsors on March 5, 2004, but requested that Mr. Windsor refrain from depositing the check into his account until March 12, 2004. In April 2004, the check for the rent was remitted on time, but the check was returned with a stop payment order.

{¶ 17} On April 20, 2004, Mr. Windsor sent Mr. Riback an e-mail informing him that his rent check for April 2004 had twice been returned to the bank marked "payment stopped." Mr. Windsor demanded that $7,500, representing the unpaid balance of the earnest money payment, and the $2,500 owed for April 2004, be remitted by 3:00 p.m. or he "will be taking the ac-tions provided under the [d]efault terms of our agree-ment." Mr. Riback did not respond to this e-mail until April 23, 2004, at which time he asked Mr. Windsor to "wait 5-10 more days for [him] to get current," prom-ising that the matter would be "resolved in the first

week of May." Mr. Windsor replied back the same day, informing Mr. Riback that he had referred the matter to his attorney.

{¶ 18} The Windsors filed a action in Forcible Entry and Detainer in Chardon Municipal Court. On May 12, 2004, that court granted a writ of restitution, ordering the Ribacks to vacate the property by May 22, 2004. After the Ribacks vacated the premises, the Windsors sold the property to the Gabriels for $425,000.[FN1]

> FN1. Although the Ribacks refer to the sub-sequent purchasers of 17401 Hawksview as the Gabrielsons, the deed memorializing the sale, which is part of the record, refers to them as the Gabriels, and we shall refer to them accord-ingly.

{¶ 19} On May 19, 2004, the Windsors filed the in-stant action for money damages. On November 10, 2004, after receiving leave to plead, the Ribacks filed their answer pro se. On October 31, 2005, the Ribacks, after hiring an attorney and responding to various mo-tions, requested leave to amend their answer, which was granted by the trial court. On December 12, 2005, the Ribacks filed an amended answer and counterclaim, in which the Ribacks sought recovery of the $15,000 earn-est money deposit. The Windsors responded to the Rib-acks counterclaim on December 16, 2005.

{¶ 20} The matter proceeded to bench trial on March 1, 2006. On March 21, 2006, the trial court is-sued its decision, including findings of fact and conclu-sions of law, and issued its judgment granting damages for breach of the lease agreement and purchase agree-ment in the total amount of $12,097.60. It is from this judgment that the Ribacks timely appealed. The Wind-sors filed a cross-appeal which this court consolidated with the Ribacks' appeal, sua sponte, for the purposes of our review.

{¶ 21} On appeal, the Ribacks assign the following as error:

**\*4 {¶ 22}** "[1.] The trial court's determination that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1849617 (Ohio App. 11 Dist.), 2008 -Ohio- 2005
**(Cite as: 2008 WL 1849617 (Ohio App. 11 Dist.))**

this real estate deal was not a single transaction was contrary to the evidence.

{¶ 23} "[2.] The trial court erred, as a matter of law, in its determination of the Windsors' damages incurred after the Ribacks' alleged breach of the real estate contract/lease, when the trial court failed to consider the mitigation that resulted following the Windsors' sale of the subject property to a third party.

{¶ 24} "[3.] The trial court erred, as a matter of law, in permitting the Windsors to obtain a windfall or 'betterment' by awarding them damages which operated to place the Windsors in a better position than had the contract been performed by the Ribacks."

{¶ 25} The Windsors raise the following cross-assignment of error:

{¶ 26} "The trial court's calculation of the plaintiff's damages resulted in the award of a dollar amount substantially less than, and contrary to, the largely uncontroverted[ ] evidence presented at trial, and so the award should be for a greater amount in accord with the proof presented."

{¶ 27} In their first assignment of error, the Ribacks allege that the trial court's determination that the aforementioned real estate deal was not a single transaction was contrary to the evidence, thus allowing the court to improperly "sidestep" the issue of whether the Windsors attempted to mitigate their damages.

{¶ 28} Our review of the trial court's judgment entry reveals that it made no specific finding as to whether the lease/purchase agreement was a single transaction or separate transactions. The Ribacks acknowledge this fact. In addition, the Ribacks fail to cite to any case law in support of this assignment of error. " App.R. 12 directs this court to determine the outcome of the merits on the assignments of error set forth in the briefs required by App.R. 16. The latter rule mandates that a valid argument shall contain the contentions of appellants 'with citations to the authorities, statutes and parts of the re-

{¶ 35} Unpaid Rent

cord relied on.' " *Roosa v. Stokes* (July 28, 1989), 11th Dist. No.1976, 1989 Ohio App. LEXIS 2975, at *4 -*5. "This court is not required to pass upon arguments of law not specifically addressed." *Id.* at *5.

{¶ 29} The Ribacks' first assignment of error is without merit.

{¶ 30} Since the Ribacks' second and third assignments of error essentially allege the same error, in that they challenge the amount of damages awarded by the trial court, they will be addressed together.

{¶ 31} In their second assignment of error, the Ribacks again allege that the trial court erred by "failing to consider the mitigation that resulted from the Windsors' sale of the subject property to a third party." In their third assignment of error, the Ribacks contend that, despite their breach, the Windsors' subsequent sale of the property resulted in a profit which must be offset against any damages they may claim against the Ribacks, otherwise they would reap a "financial windfall" or "betterment."

*5 {¶ 32} As the Ribacks correctly note, in order for plaintiffs to successfully prosecute a breach of contract claim, they must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) a breach by the defendant, and (4) damage or loss to the plaintiff. *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (citation omitted).

{¶ 33} In the instant matter, the Ribacks do not dispute the existence of the first three elements. However, they argue that, had the trial court properly viewed the purchase/lease agreement as a single agreement, the Windsors would only be entitled to compensatory damages as follows:

{¶ 34} Purchase Price (Including unpaid earnest money) $410,000.00

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1849617 (Ohio App. 11 Dist.), 2008 -Ohio- 2005
**(Cite as: 2008 WL 1849617 (Ohio App. 11 Dist.))**

| {¶ 36} April, 2004 | $2,500.00 |
| {¶ 37} May, 2004 | $2,500.00 |
| {¶ 38} June, 2004 | $2,500.00 |
| {¶ 39} Late Rent Penalties | $ 910.00 |
| {¶ 40} Unpaid Water/Sewer Bills | $ 687.00 |
| {¶ 41} Total: | $419.097.00 |

{¶ 42} Based upon the subsequent sale of the property to the Gabriels for $425,000, the Ribacks argue that they are entitled to, at a minimum, a "negation" of the damages or an "offset" in the amount of $5,903, representing the Windsors' "profit" from the sale.

{¶ 43} "As a foundational matter, a reviewing court will not disturb a trial court's decision regarding its determination of damages absent an abuse of discretion." *Williams v. Kondziela,* 11th Dist. No.2002-L-190, 2004-Ohio-2077, at ¶ 19, citing *Roberts v. United States Fid. & Guar. Co.,* 74 Ohio St.3d 630, 634, 1996-Ohio-101; *Bradford v. B & P Wrecking Co., Inc.,* 171 Ohio App.3d 616, 872 N.E.2d 331, 2007-Ohio-1732, at ¶ 44 (citations omitted). "The term discretion itself involves the idea of choice, of an exercise of will, of a determination made between competing considerations." *Williams,* 2004-Ohio-2077, at ¶ 19 (citation omitted). Thus, an abuse of discretion will be found only in circumstances where the trial court's attitude in rendering its judgment is "unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶ 44} The Ribacks correctly note that "the injured party to a written contract is entitled to recover what he has lost by act of the other party" [and] "should have such a sum of money as will put him in the same position as if the contract had been fully performed." *Schwartz v. Baker* (1950), 99 N.E.2d 498, 1950 Ohio App. LEXIS 849, at *8-*9. In other words, "[t]he plaintiff's right is to recover such damages as the defendant's wrong necessarily caused him." *Chandler v. Gen. Motors Acceptance Corp.* (1980), 68 Ohio App.2d 30, 32, 426 N.E.2d 521 (citation omitted). In an action for breach of a real estate sales contract, the proper measure of damages is "the difference between the ori-

ginal contract price and the fair market value of the property at the time of the breach." *Williams,* 2004-Ohio-2077, at ¶ 20 (citation omitted); *Snyder v. Morgan,* 11th Dist. No.2006-P-0065, 2007-Ohio-4630, at ¶ 23 (citation omitted).

*6 {¶ 45} The Ribacks do not dispute that, under ordinary circumstances, the Windsors would have been entitled to damages for unpaid rent in the amount of $7,500, late rent penalties in the amount of $910 for April, May, and June of 2007, and damages for unpaid utilities in the amount of $697 for their breach of the rental contract. However, they maintain that the provision in the purchase contract requiring the $20,000 earnest money deposit prevents the Windsors from recovering damages in excess of the contract price of $410,000, absent some showing that they made an attempt to mitigate their damages. We disagree.

{¶ 46} The Ribacks' argument is based upon two faulty presumptions. First, that the trial court made a finding that the *Windsors* breached the purchase agreement, and second, that the provision in the purchase contract providing for the non-refundable earnest money deposit was a liquidated damages provision.

{¶ 47} With regard to the Ribacks' first presumption, it is a well-settled principle of law, that "[i]f there is some competent, credible evidence to support the trial court's decision, there is no abuse of discretion." *Fickes v. Kirk,* 11th Dist. No.2006-T-0094, 2007-Ohio-6011, at ¶ 16, citing *Middendorf v. Middendorf,* 82 Ohio St.3d 397, 401, 696 N.E.2d 575, 1998-Ohio-403.

{¶ 48} The trial court found that "[d]efendants Frank and Donatella Riback breached the real estate Purchase Agreement and the Rental Agreement." However, the trial court made no such finding that the Windsors' breached the Purchase Agreement and/or the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1849617 (Ohio App. 11 Dist.), 2008 -Ohio- 2005
**(Cite as: 2008 WL 1849617 (Ohio App. 11 Dist.))**

Rental Agreement. Even if we were to accept, for the sake of argument, that the Ribacks were correct in concluding that the Purchase and Rental agreements should be treated as one, the Ribacks' *undisputed* failure to make the $5,000 earnest money deposit on November 1, 2003, as required, was enough to violate the purchase "portion" of the agreement, even in the absence of their later undisputed failure to pay rent and utilities.

[1] {¶ 49} Next, in determining whether or not the earnest money provision constituted a liquidated damages provision, we must, as with all contracts, examine the parties intent based upon the language of the document. See *J.B.H. Properties, Inc. v. N.E.S. Corp.,* 11th Dist. No.2007-L-024, 2007-Ohio-7116, at ¶ 10 ("Absent ambiguity in the language of the contract, the parties' intent must be determined from the plain language of the document.") (citation omitted).

{¶ 50} With regard to the earnest money provision, the form purchase agreement provided for a purchase price of $410,000 for the property, with the earnest money deposit of $20,000 to be "credited against the purchase price." The agreement additionally contained a handwritten notation with regard to the earnest money deposit, which stated "$15,000 is due four (4) day[s] after acceptance. $5,000 is due on 11/1/03-See Addendum I."

{¶ 51} The addendum to the purchase agreement provided "[t]he $20,000 earnest money goes directly to the Seller and is non-refundable to the Buyer if the Buyer fails to perform their obligations per the purchase agreement * * *."

*7 {¶ 52} "If the contract's terms are unambiguous, a court may not interpret the contract in a manner inconsistent with those terms." *In re Murray,* 11th Dist. No.2000-T-0152, 2002-Ohio-1686, 2002 Ohio App. LEXIS 1662, at *9 (citation omitted). Contrary to the Ribacks' assertions, our review of the plain language of the contract and the associated addendum give no indication that these clauses were intended to operate as a liquidated damages provision.

{¶ 53} It is beyond dispute that "[l]iquidated dam-

ages are an agreed upon amount of money to be paid in lieu of actual damages in the event of a breach of contract." *Connour v. Steel,* 2nd Dist. No. 19632, 2004-Ohio-1162, at ¶ 26 (citation omitted) (emphasis sic). By contrast, an earnest money provision in a real estate purchase agreement is commonly viewed in terms of an option contract, in which the "fee is forfeited if the offeree does not exercise the option, as its very purpose is consideration for the privilege of keeping the offer open for a certain stated period of time." *Reedy v. Cincinnati Bengals, Inc.* (2001), 143 Ohio App.3d 516, 528, 758 N.E.2d 678 (Gorman, P.J. dissenting).[FN2]

FN2. Such a finding is particularly appropriate where, as here, the undisputed evidence revealed the contract price of $410,000 was $18,000 less than the sale price of the home when purchased by the sellers.

{¶ 54} "[A] provision in a contract for the sale of real estate allowing the vendor to keep the earnest money paid in the event of a default by the vendee is a valid, enforceable provision." *Cochran v. Schwartz* (1997), 120 Ohio App.3d 59, 61, 696 N.E.2d 656 (citation omitted). "Earnest money * * * is generally subject to forfeit where it is a comparatively small advance payment." *Ottenstein v. Western Reserve Academy* (1977), 54 Ohio App.2d 1, 3, 374 N.E.2d 427 (citation omitted).

{¶ 55} In the instant case, although the $20,000 earnest money payment may, on the surface, *appear* to be a significant amount, it represents less than 5% of the total purchase price of $410,000. The fact that only $15,000 of this amount was received as an advance payment, which represents a little over 3 1/2 % of the purchase price, makes the forfeiture of this amount even *less* onerous to the Ribacks.

{¶ 56} Moreover, this court has held that "an earnest money provision that fail[s] to specify a fixed amount of money to be paid ' *in lieu of actual damages* in the event of a breach of contract' do[es] not constitute a liquidated damages provision." *Reitz v. Giltz & Assoc. Inc.,* 11th Dist. No.2005-T-0126, 2006-Ohio-4175, at ¶ 26 (citation omitted) (emphasis

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1849617 (Ohio App. 11 Dist.), 2008 -Ohio- 2005
**(Cite as: 2008 WL 1849617 (Ohio App. 11 Dist.))**

sic). The provision in the lease portion of the agreement allowing the Windsors to "sue for and recover all rents and compensation for any violations," in the event of default, makes plain that the earnest money provision was not meant to be a liquidated damages provision.

[2] {¶ 57} There is yet another reason to reject the Ribacks' argument. "[F]ailure to mitigate damages is an affirmative defense," which is "waived if not raised in a pleading." *Telmark, Inc. v. Liff* (Sept. 21, 1998), 12th Dist. No. CA98-01-004, 1998 Ohio App. LEXIS 4383, at \*7 (citations omitted). In the instant case, the Ribacks failed to raise this issue in their pleadings. Accordingly, it was waived, and the trial court did not err by not addressing this issue.

**\*8** {¶ 58} Appellants' second and third assignments of error are without merit.

[3] {¶ 59} In their cross-assignment of error, the Windsors assert that the trial court erred in awarding damages. First, they argue that the trial court ignored the uncontroverted evidence that the Ribacks failed to pay the remaining $5,000 of the earnest money deposit, and erred in awarding them only $3,000 for the balance of the earnest money due. While we agree that the trial court erred in awarding the Windsor's only $3,000 for the balance of the earnest money due, the evidence demonstrates that the trial court considered the evidence of the Riback's failure to pay the remaining $5,000 balance when rendering its decision.

{¶ 60} "[W]hen reviewing evidence presented at trial, 'an appellate court will not disturb the findings of the trier of fact unless they are against the manifest weight of the evidence.' " *Welty v. Welty*, 11th Dist. Nos.2007-A-0013 and 2007-A-0015, 2007-Ohio5217, at ¶ 26 (citation omitted). "[I]f the judgment of the trier of fact is supported by some competent, credible evidence, it will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Id.* (citations omitted). However, "[a] reviewing court *may* reverse a damage award if it is manifestly against the weight of the evidence." *Eleven Ten Parkway Co. v. K. Amalia Ents., Inc.* (Dec. 23, 1997), 10th Dist. No. 97APE03-419, 1997 Ohio App. LEXIS 6005, at \*5, cit-

ing *Schendel v. Bradford* (1922), 106 Ohio St. 387, 394, 140 N.E. 155 (emphasis added). "In order to set aside a damage award as inadequate and against the manifest weight of the evidence, a reviewing court must determine that the verdict is so gross as to shock the sense of justice and fairness, cannot be reconciled with the undisputed evidence in the case, or is the result of an apparent failure by the [finder of fact] to include all the items of damage making up the plaintiff's claim." *Sharp v. Clark* (May 20, 1992), 2nd Dist. No. 1285, 1992 Ohio App. LEXIS 2624, at \*4 -\*5 (citation omitted).

{¶ 61} Here, the trial court found that "[t]he Windsors received payments of $15,000 and $1,000 towards the earnest money deposit. The Ribacks are indebted to the Windsors for $3,000 of the earnest money deposit."

{¶ 62} Our review of the record reveals the court's finding that the Ribacks' indebtedness to the Windsors' was $3,000 is not supported by the evidence. The undisputed testimony reveals that the Ribacks never paid the $5,000 outstanding balance of the earnest money payment. However, the trial court took into account the $500 monthly credit due pursuant to the rental agreement for the Ribacks' timely payments in October and December of 2003. Since the rental agreement clearly stated that such credits were to be applied "upon timely payment" of the monthly rent, the court's application of this credit is supported by competent, credible, evid- ence.

**\*9** {¶ 63} As a result, the Windsors are entitled to a payment of $4,000 on the unpaid portion of the earnest money deposit, as opposed to the court's finding of $3,000, since $4,000 is the difference between the $1,000 credit as applied by the trial court and the remaining $5,000 earnest money due. Because the court's award of $3,000 cannot be "reconciled with the undisputed evidence in the case", the Windsors' first argument on cross-appeal has merit.

[4] {¶ 64} The Windsors next argue that the trial court erred in awarding delinquent rent in the amount of $7,500 for the months of April, May, and June 2004. The Windsors argue that the language of the contract entitles them to an additional amount of $2,500 in rent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Slip Copy, 2008 WL 1849617 (Ohio App. 11 Dist.), 2008 -Ohio- 2005
**(Cite as: 2008 WL 1849617 (Ohio App. 11 Dist.))**

for the month of July 2004, or, in the alternative, a pro-rated share of the rent for that month. We disagree.

{¶ 65} Turning to the clause of the rental agreement in question, it states that "[t]enants shall pay to landlord as rent the sum of $37,500, in monthly installments of $2,500 each month. The first such rental payment shall be due and paid by the first day of each calendar month during the term hereof."

{¶ 66} The Windsors acknowledge that the rental agreement "contains no provision for prorated rent." In the absence of such a provision, the Windsors are not entitled to a pro rata share. Furthermore, it is undisputed that the Ribacks were no longer occupying the premises in July of 2004, and, that at some point during the month of July 2004, the Windsors ceased to be the "landlord" as contemplated by the agreement. Based upon the foregoing, we cannot conclude that the trial court abused its discretion by limiting the award of delinquent rent under the lease agreement to the months of April through June of 2004.

{¶ 67} The Windsors' second argument on cross-appeal lacks merit.

[5] {¶ 68} Finally, the Windsors argue that the trial court erred by failing to award them an amount of "at least $7,500.00 * * * to reimburse [them] for other costs incurred to remedy the Appellants' defaults of the subject Rental Agreement."

{¶ 69} In support of their argument, the Windsors rely on the clause of the Rental Agreement which states: "Any amounts paid by landlord to keep their premises in a clean, safe and healthy condition * * * or to remedy any default by the tenant, are hereby agreed and declared to be so much additional rent and said sum shall be due and payable with the next installment of rent hereunder."

{¶ 70} The Windsors cite to myriad alleged expenditures, including "substantial additional charges to repair the premises," the payment of a $2,500 real estate commission, and "utility, landscape, and other fees and costs."

{¶ 71} The trial court, in reviewing the evidence, concluded that "except for the unpaid balance of the earnest money, the unpaid rent, and the unpaid utility bills, Plaintiffs have not produced probative evidence of any other damages." Our review of the record reveals that the Windsors' alleged proof of damages was solely based upon Mr. Windsor's testimony, without the benefit of corroborating testimony or receipts to substantiate these alleged expenses.

**\*10** {¶ 72} "As a general rule, evidence of damages is part of the plaintiff's case, and he must prove damages in order to recover them." *Id.* at \*9 (citation omitted). "[I]n cases involving a breach of contract claim, the plaintiff cannot recover damages beyond the amount that is established with *reasonable certainty.* " *Id.* (citation omitted), (emphasis added).

{¶ 73} As is apparent from the judgment of the court, it determined, based upon the evidence adduced, that the Windsors failed to prove these damages with reasonable certainty. Accordingly, we cannot conclude the trial court's finding was against the manifest weight of the evidence.

[6] {¶ 74} In addition to the aforementioned expenses, the record reveals that the $7,500 the Windsors seek to recover is for attorney fees expended to enforce the contract and to evict the Ribacks from the premises.

{¶ 75} "[I]n Ohio, attorney fees generally are not recoverable as costs in a contract action." *First Bank of Marietta v. L.C. Ltd.* (Dec. 28, 1999), 10th Dist. No. 99AP-304, 1999 Ohio App. LEXIS 6504, at \*21 (citation omitted). It is well-settled that "[w]hen an award of attorney fees is not authorized by * * * contract, the award is a matter of the trial court's sound discretion." *J.B.H. Properties,* 2007-Ohio-7116, at ¶ 10 (citation omitted).

{¶ 76} As is clear from the foregoing contract language, the contract does not explicitly provide for the award of attorney fees, but rather provides for "amounts paid * * * to remedy any default." In the absence of express language authorizing attorney fees, we cannot conclude that the trial court abused its discretion by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1849617 (Ohio App. 11 Dist.), 2008 -Ohio- 2005
**(Cite as: 2008 WL 1849617 (Ohio App. 11 Dist.))**

failing to award them. Cf. *First Bank,* 1999 Ohio App. LEXIS 6504, at \*21 (the trial court did not abuse its discretion by not awarding attorney fees where the contract clause in question allowed for the recovery of "costs of suit" without expressly mentioning attorney fees).

{¶ 77} The Windsors' third argument in their cross-assignment of error is without merit.

{¶ 78} Pursuant to App.R. 12, we modify the damage award to the Windsors from $12,097.60 to $13,097.60, to correctly reflect the unpaid earnest money balance of $5,000, less the $1,000 credit for the Ribacks' timely payment of rent in October and December of 2003. As thus modified, the judgment of the Geauga County Court of Common Pleas, is affirmed. Costs to be taxed against appellants/cross-appellees.

CYNTHIA WESTCOTT RICE and TIMOTHY P. CANNON, JJ., concur.

Ohio App. 11 Dist.,2008.
Windsor v. Riback
Slip Copy, 2008 WL 1849617 (Ohio App. 11 Dist.), 2008 -Ohio- 2005

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.