# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OHIO

## EASTERN DIVISION

| | | |
|---|---|---|
| Sarah Aronson, M.D. | ) | CASE NO. 1:10-CV-00372 |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER BOYKO |
| | ) | |
| vs. | ) | |
| | ) | |
| University Hospitals of Cleveland, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF SARAH ARONSON, M.D.'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

/s/Gregory A. Gordillo
GREGORY A. GORDILLO (0063445)
Gordillo & Gordillo LLC
2000 Standard Building
1370 Ontario Street
Cleveland, Ohio 44113
(216) 875-5500 – Voice
(216) 583-0345 – Facsimile
ggordillo@eeoattorney.com

*Attorney for Plaintiff*

## **<u>TABLE OF CONTENTS</u>**

**FACTS IN LIGHT MOST FAVORABLE TO DR. ARONSON** ……………………..4

I.      Dr. Aronson Successfully Begins Her Residency Training With Defendant …….4

II.     Defendant Informs Dr. Aronson That She Has a Potential Problem Based on
        Reports Submitted During a Period For Which Her Performance Was Satisfactory
        …………………………………………………………………………………..5

III.    Dr. Wallace Removes Dr. Aronson From Clinical Service for 12 Days to
        Complete a Fitness for Duty Examination That Proved Negative For Any
        Impairment …………………………………………………………………..8

IV.     Defendant Requires Dr. Aronson to Extend Her Training And Gives Her No
        Opportunity to Appeal …………………………………………………………9

V.      A "Way Too Emotionally Involved" Dr. Wallace Tried to Fail Dr. Aronson Again
        ………………………………………………………………………………15

VI.     Dr. Aronson Fights Against the Hostility Until She Graduates …………………16


**LAW AND ARGUMENT** ………………………………………………………...17

I.      Triable Issues Exist Regarding Whether Defendant Breached Its Contract With
        Dr. Aronson ………………………………………………………………...17

II.     Triable Issues Also Exist Regarding Dr. Aronson's Claim For Unjust Enrichment
        ………………………………………………………………………………19

III.    Triable Issues Exist Regarding Whether Defendant Interfered With Dr. Aronson's
        Right to Take FMLA Leave …………………………………………………..20

IV.     No Immunity Is Available Under The Health Care Quality Improvement Act …22

V.      No Immunity Exists Under R.C. 2305.21 ………………………………………23

**CONCLUSION** ………………………………………………………………...23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Arban v. West Publ'g Co.,* 345 F.3d 390 (6th Cir. 2003) ……………………………21

*DiCarlo v. Potter,* 358 F.3d 408, 421 (6th Cir.2004) …………………………………21

*Ford v. General Motors,* 305 F.3d 545, 554-55 (6th Cir.2002) ………………………21

*Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 ….20

*Hoge v. Honda of Am. Mfg*., 384 F.3d 238, 244 (6th Cir. 2004) ………………………20

*Hunting Valley Builders, Inc. v. Women's Federal Sav. Bank*, 1990 WL 121272 (8th Dist. Ct. App.) …………………………………………………………………………………..20

*Maghie & Savage, Inc. v. P.J. Dick Inc.*, 2009 WL 1263965 (10th Dist. Ct. App.) …..20

*Meyers v. Columbia/HCA Healthcare Corp.,* 341 F.3d 461 (6th Cir. 2003) …………..22

*Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555 (6th Cir.2004) …………………..21

*Ullman v. May* (1947), 147 Ohio St. 468, 475; *S & M Constructors v. Columbus* (1982), 70 Ohio St.2d 69, 71 …………………………………………………………………...20

**Statutes**

29 C.F.R. §825.220(b) ………………..…………………………………………………21

42 U.S.C. §11112(a) ……………………………………………………………………22

42 U.S.C. §11112(b) ………………………………………………………...22, 23

**FACTS IN LIGHT MOST FAVORABLE TO DR. ARONSON**

I.      **Dr. Aronson Successfully Begins Her Residency Training with Defendant**

        Already board certified as a psychiatrist and as a family medicine physician,

Plaintiff Sarah Aronson began training in 2006 to become a board certified

anesthesiologist.  She entered into a contract with Defendant UHC for the training.

(Aronson Declaration, attached as Exhibit 1).  Under the contract, UHC agreed to employ

her as a resident physician and provide her with training that would meet the standards of

the Accreditation Council of Graduate Medicine "ACGME". (Deposition of Dr. Jerry

Shuck at 14-15 attached as Exhibit 2)  Among the ACGME standards that UHC agreed to

provide Dr. Aronson were a promise to limit her work hours (Shuck Dep. 15-17) and an

opportunity to appeal adverse decisions by her Resident Program.

        To become certified by the American Board of Anesthesiology, Dr. Aronson had

to complete 36 months of clinical anesthesia training in addition the one year of base

training that she already had completed.  The ABA requires that for each six-months of

training, she had to receive a satisfactory evaluation by the Resident Program.  UHC had

to submit the evaluations to the ABA in January and July of each year. (*See* Deposition of

Dr. Mathew Norcia at 11-13 attached as Exhibit 3).  In addition to the six month periodic

evaluations, "In Training Examinations" were given annually to determine whether Dr.

Aronson had knowledge that would likely be sufficient to pass the Board examinations

that are prerequisites to certification. (Deposition of Dr. David Wallace at 81-82 attached

as Exhibit 4).

        In March 2006, Dr. Aronson began her anesthesiology residency training.  Her

anticipated graduation date was February 28, 2009. (Norcia Dep. 148-49).  Until October

2008, all of the feedback Dr. Aronson received about her progress indicated that she was on pace to graduate on time.  Through June 2008, UHC evaluated her performance as satisfactory for each reporting period.  (Norcia Dep. 24).  Each year of her residency, Dr. Aronson's test scores on the In Training Examination were always higher than the level that indicated she would likely pass her board certification exam.  In July 2008, she scored a 33 on the exam, and a 32 score or higher indicated likely success on the board examination. (Wallace Dep. 83-86).

On September 2, 2008, the Residency Program Director, Dr. Mathew Norcia provided a job recommendation for Dr. Aronson.  She was applying for an anesthesiologist position that was scheduled to begin on March 1, 2009.  The start date correlated to the date on which Dr. Aronson anticipated completing her residency.  Dr. Norcia provided a favorable recommendation.  Dr. Norcia held the opinion that based on his close observation of Dr. Aronson's work and a composite evaluation provided by her supervisors, Dr. Aronson was qualified and competent to be an anesthesiologist, and he held that opinion without reservation.  (Norcia Dep. 24-26; see also Norcia Dep. Exhibit 40[1]).

## II.     Defendant Informs Dr. Aronson That She Has a Potential Problem Based On Reports Submitted During a Period For Which Her Performance Was Satisfactory.

In September 2008, Dr. Aronson began the first of two consecutive month rotations in the Surgical Intensive Care Unit.  Under ACGME standards, UHC had to give Dr. Aronson 1 day in 7 free from all educational and clinical responsibilities.  (*See* Shuck Dep. 16, Exhibit 8).  But from September 2 through 20, Dr. Aronson only had one

---

[1] The exhibits for the depositions of Drs. Nearman, Shuck, Wallace, and Norcia are labeled as one sequential set and attached as Exhibit 9.

day off – September 6. (Aronson Dec.)  The ACGME standards also required that UHC limit Dr. Aronson's work in the rotation to no more than 80 hours per week averaged over a four week period.  (Shuck Dep.16, Exhibit 8).  In October, however, she worked at least 362 hours over the four week period of the rotation. (Complaint, ¶28; Aronson Dep. 134)

The ACGME also has standards for the frequency that call assignments can be made to a resident.  (*See* Shuck Dep.16, Exhibit 8).  A typical call assignment lasts at least 24 hours and typically is approximately 28 hours long.  During the call assignment, the resident remains in the hospital and available to perform services as required. (Aronson Dec.)  Although not required to schedule call assignments less frequently than permitted by the ACGME, UHC nevertheless tried to do so.  Its typical practice was to not give more than 4 call assignments per month to its residents in the SICU rotation. (Deposition of Dr. Howard Nearman at 65 attached as Exhibit 5).

Dr. Aronson was scheduled to be on call during the months of August, September, and October 2008.  In August, her call assignments included the 29th and 31st of the Month.  Then she began her stretch of working 18 of 19 days from September 2 through 20.  In October, she was assigned 9 call duties. Three of Dr. Aronson's October call assignments were in the first five days of the month.  From September 29 through October 5, Dr. Aronson worked 108 hours. (Aronson Dec.)

Her heavy workload continued through the first half of October. On October 14, Dr. Aronson was finishing her fifth call assignment that month.  (Aronson Dec.)  After having worked a 28 hour shift, she was called into a meeting with Dr. Norcia and the Associate Program Director, Dr. David Wallace. (*See* Aronson Dep. 198; Shuck Dep.

6

10).  For the first time that Dr. Aronson could recall, they informed her that they were concerned that she was showing slow response times. (Aronson Dep. 66-67; Norcia Dep. 15).   Indeed, Dr. Norcia's negative evaluation arose from his working with Dr. Aronson during the week of October 6-10, 2008.  (Norcia Dep. 39-40).  Her response time was the primary concern raised at the meeting.  (Wallace Dep. 109, Exhibit 31).  This was the first time in the reporting period that the issue was raised with Dr. Aronson (Aronson Dec.).

Dr. Wallace had not supervised Dr. Aronson while she was on the SICU rotations in September or October.  (Wallace Dep. 94).  At the October 14 meeting, he presented to Dr. Aronson documents reflecting negative evaluations as reported by other attending physicians supervising her.  (Aronson Dep. 223; Wallace Dep. 101-106).  But all of the negative evaluations were for Dr. Aronson's work before May 2008 and during periods for which her performance was ultimately rated by the Residency Program as satisfactory. (Aronson Dep. 222-24, Norcia Dep. 22-23, 24).  During the meeting, Dr. Aronson asked Drs. Wallace and Norcia for specific examples of her performance during the reporting period that gave rise to their concerns, but neither Dr. Norcia nor Dr. Wallace could provide any.  (Aronson Dep.196 attached as Exhibit 7[2]).

Drs. Aronson, Norcia, and Wallace met again on November 24 to discuss her performance.  Dr. Norcia's opinion of Dr. Aronson's work had changed between September 2 and October 14.  (Norcia Dep. 27-28).  But he could not recall anything specific about her performance from October 14 to November 24 that would cause his opinion to change one way or the other. (Norcia Dep. 28, 40).  As for Dr. Wallace, there was nothing specific about Dr. Aronson's performance between October 14 and

---

[2] The exhibits to Dr. Aronson's deposition are attached as Exhibit 8.

November 24 that he could recall.  (Wallace Dep.123).  Nevertheless, they again raised concerns with Dr. Aronson that she was slow to respond to situations during her practice. At no time during the meeting did they acknowledge that the faculty evaluations of Dr. Aronson for November were satisfactory; yet that was the case. (Aronson Dec.)

### III. Dr. Wallace Removes Dr. Aronson From Clinical Service for 12 Days to Complete a Fitness For Duty Examination That Proved Negative For Any Impairment.

Drs. Norcia and Wallace asked Dr. Aronson whether she was taking any medications.  She explained that she was taking Topamax. (Aronson Dep.200)  She previously made the disclosure when she began her residency training in 2006 and annually thereafter before she entered into each contract.  Neither Dr. Aronson nor anyone at UHC had ever expressed any concern about the medicine adversely affecting her performance. (Aronson Dec.; *see also* Defendant's Responses to Requests for Admission 1 and UHC Documents 1068-1072 attached as Exhibit 6).  Now, however, with no explanations available for the alleged slow response times, Dr. Aronson hypothesized that perhaps she was being affected by the Topamax. (*See* Aronson Dep.189; Aronson Dec.)  Until Dr. Aronson made the disclosure at the November 24 meeting, neither Dr. Norcia nor Dr. Wallace had considered substance abuse as a problem for Dr. Aronson. (Wallace Dep. 135; *see also* Norcia Dep. 99)  But now both claimed they became concerned about a potential problem concerning her impaired functioning when she told them about her prescription. (Wallace Dep. 127-28; Norcia Dep. 49).

The ABA permits no more than 60 days of absence from training during the 36 month schedule. (*See* Norcia Dep. 95).  So Dr. Aronson was carefully monitoring her time away.  As December 2008 began, she had 18 days of absence available to her.  She

was expecting her partner to give birth to a child that they would adopt, and Dr. Aronson knew this would require time away.  She had made arrangements months in advance to take time off at the end of December 2008 for the child's birth. (See Norcia Dep.104; Aronson Dec.)

During the November 24 meeting, Dr. Aronson suggested that she could be monitored to determine whether the Topamax was having any adverse affects on her.  She never contemplated that monitoring her would mean removing her from duty.  She believed her days away from training were too important to suggest taking additional days off for monitoring her based on using a prescription medication she had been taking for years. (Aronson Dec.)  But Dr. Wallace seized the opportunity, and on the following day he referred her to the Employee Assistance Program for a fitness for duty evaluation that required removing Dr. Aronson from service.  (*See* Wallace Dep.144).

The testing was completed on December 4th.  Five days later, Dr. Aronson met with the evaluator who explained that the results were negative, Dr. Aronson had no discernible impairment, and she was fit for duty.  Nevertheless, neither Dr. Norcia nor Dr. Wallace approved of her return to work until December 15.  By then, she had lost 12 of the 18 days she had saved for her maternity leave. (Aronson Dec.)

IV.    **Defendant Requires Dr. Aronson To Extend Her Training And Gives Her No Opportunity To Appeal.**

By the time the Residency Program approved Dr. Aronson's return to work, she only had three days scheduled to work in December before she took her scheduled maternity leave. (Aronson Dec.)  Despite Dr. Aronson's working only three more days after the November 24 meeting, the Clinical Competence Committee comprised of Drs.

9

Norcia, Wallace and Department Chair, Dr. Howard Nearman failed her for the July through December reporting period.  (Norcia Dep. 23-24).

The failure was reported to both the ABA and Dr. Aronson.  She received a letter signed by Drs. Norcia and Wallace and dated January 7, 2009.  (Norcia Dep. 60 Exhibit 1; Wallace Dep. 63, Exhibit 1).  The Residency Program submitted its report to the ABA dated January 30, 2009.  The report was approved by the UHC Program Director at 4:31:19 p.m. and the Clinical Competence Committee Chair at 4:32:37 p.m. (UHC Documents 1372-1377 attached as Exhibit 6).  Under ABA Requirements, neither the Program Director (Dr. Norcia) nor the Department Chair (Dr. Nearman) was permitted to Chair the Clinical Competence Committee: **"The Program Director or the Department Chair must not chair the clinical competence committee."** (Aronson Dec., Exhibit ABA Booklet of Information [emphasis in original]).

To comply with the ABA requirement, only Dr. Wallace could have appropriately served as Chair of the Clinical Competence Committee.  His objectivity regarding Dr. Aronson, however, would disqualify him from evaluating her.  Dr. Jerry Shuck was the Director of Graduate Medical Education for UHC.  Six months later, in June 2009 he decided that Dr. Wallace should no longer "be a player" regarding Dr. Aronson. (Shuck Dep. 30-31, 54, Exhibit 12).  As Dr. Shuck explained:

> A.     I told Doctor Wallace directly that he was too involved and that it was so uncomfortable for Doctor Aronson, that it would be better if he weren't part of this process since there may be fear of intimidation, whatever the reason was, and I don't like a resident to be in an environment where one faculty member is perceived as being either frightening or inappropriate or mean, or whatever.  I just don't think that's right.  So I asked him to step aside and stay out of these conversations.

> Q.     And how did he respond to that?

A.    He agreed.

Q.    He agreed with your reasoning or he agreed just to step aside?

A.    Both.

Q.    What did you do to come to your conclusions about him?

A.    I was observing Doctor Aronson's extreme discomfort, which I was actually pleased that she was willing to tell me.  I also discussed it with the program director and the chairman of the department to keep David Wallace out of this because it's too uncomfortable, may be destructive, and I didn't want anything to get in the way of fairness or perceived fairness.

(Shuck Dep. 31-32).  The Department Chair, Dr. Nearman echoed Dr. Shuck's opinion

regarding Dr. Wallace's lack of objectivity:

As best I can recall, the process sort of went to the fact that the interactions between Doctor Aronson and Doctor Wallace, in my opinion from the data I can gather, had taken on more of an emotional-type of atmosphere than perhaps an objective discussion, and I felt that perhaps at some point that perhaps Doctor Wallace wasn't the best person to be involved in the process.

(Nearman Dep. 21).

Two weeks before approving the unsatisfactory report to the ABA, the Program

Director, Dr. Norcia provided another letter of recommendation for Dr. Aronson to the

Florida State Medical Board.  He wrote:

During her residency she has had no issues of unprofessionalism or misconduct. She has not been suspended, placed on probation or been named in any actions legal or otherwise.

The consensus of the department's Education Committee supports her licensure in your state.

(UHC 1486-1487 attached as Exhibit 6).

In contrast, he wrote to Dr. Aronson that the report to the ABA indicated that she had been evaluated unsatisfactorily in three areas.  One of them was:

> Under the category of Professionalism, you have failed to carry out your professional responsibility of notifying the Residency Program Directors that you were taking a prescribed medication that could impair your judgment and/or job performance, as required by hospital policy.[3]

(Norcia Dep. 60 Exhibit 1).  He approved the same language in the report to the ABA. (UHC 1372-1377 attached as Exhibit 6).

Dr. Aronson tried to appeal the adverse evaluation and decision to extend her training. (Nearman Dep. 52, 77 Exhibit 4; Norcia Dep. 110; Wallace Dep. 62).  Her Department Chair, Dr. Nearman testified that he told her she had that right: "The conversation was about, you have a right to appeal and you have a right to an objective analysis of it and you can go ahead and do that." (Nearman Dep. 83).  The ABA likewise provides that: "Residents who wish to appeal an Evaluation of Clinical Competence, and applicants who wish to appeal final recommendations from the Program Director or Department Chair, must do so through the reporting institution's grievance and due process procedures." (Norcia Dep. 112-13, Exhibit 48).  Dr. Norcia acknowledged that the unsatisfactory evaluation given to Dr. Aronson was an evaluation of clinical competence.  (Norcia Dep.110, lines 19-21).

By ACGME terms, UHC is a "Sponsoring Institution."  (Complaint ¶ 42; Answer, ¶ 42)  Like the ABA standards, The ACGME standards provide:

> The Sponsoring Institution must provide residents with fair, reasonable, and readily available written institutional policies and procedures for grievances and due process.  These policies and procedures must minimize conflict of interest by adjudicating parties in addressing: Academic or

---

[3] The other two areas for which she was rated unsatisfactory concerned her ability "to react to stressful situations in an appropriate manner" and her ability to "recognize and respond appropriately to significant changes in the anesthetic course." (Norcia 60 Ex 1).

> other disciplinary action taken against residents that could result in
> dismissal, non-renewal of a resident's agreement, non-promotion of a
> resident to the next level of training, or other actions that could
> significantly threaten a resident's intended career[.]

(Aronson Dec.) Dr. Shuck, UHC's Director of Graduate Medical Education, testified that

as a resident satisfactorily completes one six month training period, she moves to another

training level.  (Shuck Dep. 65-66).  Furthermore, Dr. Norcia admitted that the decision

to extend Dr. Aronson's training was likely to have a negative impact on her record.

(Norcia Dep.109).  Indeed, the negative evaluation has since caused Dr. Aronson to lose

one job and at least three job opportunities. (Aronson Dec.)

Nevertheless, UHC took the position that Dr. Aronson was not entitled to appeal

the decision.  (Norcia Dep. 110, 113).  Dr. Shuck testified that Dr. Aronson had been

placed in remediation, and because she was in remediation she had no right to an appeal.

(Shuck Dep. 42).  In the context of determining what remediation is for the purposes of

identifying appealable and non-appealable issues, the term remediation is defined in

UH's Residents' and Fellows' Manual.  (*See* Wallace Dep. 65, Exhibit 14). Contrary to

Dr. Shuck, Dr. Wallace testified that in the context of the Manual's definition of

remediation "This is not what is from this letter [informing Dr. Aronson about her

unsatisfactory evaluation and extended training]." (Wallace Dep. 65). Dr. Aronson's

contract also incorporated the terms of UH's Residents and Fellows' Manual.  (Shuck

Dep. 15).

Remediation is "an opportunity for the resident to correct academic deficiencies

and to develop and demonstrate appropriate levels of proficiency for patient care and

advancement in the program."  (*See* Wallace Dep. 65, Exhibit 14).  As Dr. Wallace

pointed out, the letter to Dr. Aronson did not address academic deficiencies.  (Wallace

Dep. 68-69).  When a resident is placed into remediation, a written remediation plan is required.  (Exhibit 14).  But no written remediation plan was ever provided to Dr. Aronson. (Aronson Dec.)

The Manual sets forth the requirements for the remediation plan document:  "The Resident's deficiencies will be identified, a remedial program will be established, and a frame for completion of the remedial program will be discussed, documented, and signed by the Resident." (Shuck Dep. 41, Exhibit 14).  Dr. Shuck testified that he did not recall seeing such a document for Dr. Aronson. (Shuck Dep. 41).  He also wrote in June 2009 that her file did not contain "any disciplinary actions or letters she reviewed supporting poor performance." (UHC Documents 1254-1255 attached as Exhibit 6).

Despite having testified that remediation was not what was from the January 7 letter to Dr. Aronson, Dr. Wallace claims that a remediation plan document was delivered to Dr. Aronson on February 4, 2009.  (Wallace Dep.153, Exhibit 37).  He admitted, however, that the document says nothing about feedback on Dr. Aronson's performance since being placed into remediation; the document only indicates that, to improve her performance and demonstrate how she can perform, she should seek feedback; and "remediation" is never mentioned in the document.  He added that the document was not a documentation of the meeting held to discuss her remediation. (Wallace Dep.153-58).

In any event, the January 7 letter made clear that UHC had decided to extend Dr. Aronson's training beyond her anticipated February 2009 graduation: "you will be required to remediate for an additional six month period in accordance with the American Board of Anesthesiology guidelines."  (Nearman Dep. 33, Exhibit 1; *see also* Shuck Dep. 37).  The ABA guidelines are: "To receive credit from the ABA for a period of clinical

anesthesia training that is not satisfactory, the resident must complete an additional six months of uninterrupted clinical anesthesia training in the same program with receipt of a satisfactory Certificate of Clinical Competence." (Aronson Dec.; *see also* Norcia Dep. 14). Dr. Norcia admitted that in accordance with the ABA guidelines, the six month reporting period for which Dr. Aronson had to show satisfactory performance began on January 1, 2009. (Norcia Dep. 154).

**V.      A "Way Too Emotionally Involved" Dr. Wallace Tries to Fail Dr. Aronson Again.**

As the 2009 reporting period entered its final month, Dr. Wallace was prepared to give Dr. Aronson another unsatisfactory rating. (Wallace Dep. 22-27). On June 4, he met with Drs. Norcia and Aronson and informed Dr. Aronson of his opinion. (Wallace Dep. 27). But now, Dr. Wallace's criticisms were based on different issues than those he cited as reasons for rating her unsatisfactory in 2008. (Wallace Dep. 31-32).

Late that night after the meeting, Dr. Aronson responded by e-mail to Drs. Norcia, Wallace, Shuck, and Emily Vasiliou of the ACGME. Dr. Aronson noted that the meeting came immediately after UHC got notice of her complaint to the ACGME and that since February, Drs. Norcia and Wallace had otherwise failed to provide her with monthly reviews to assist her with completing the program. She noted other failures such as the lack of any advance notice given to her regarding alleged unsatisfactory performance even though such notice was required under the Residents' and Fellows' Manual and ACGME standards. She further requested that an objective third party review her performance. (Aronson Dec.).

Dr. Shuck forwarded the e-mail to Dr. Nearman and asked whether Dr. Aronson's e-mail was accurate. Dr. Nearman suggested that she may have been accurate. He also

added: "Dave [Wallace] is way too emotionally involved in this now to see any view

other than his own."  Then Dr. Shuck responded on June 8th:

> This becomes very complicated because: 1) The Board has a
> recommendation of a six month extension, 2) the clear negative
> evaluations have come after the decision for extension, 3) any negatives
> before this were not acted upon, 4) the prior negatives were quite mixed
> and did not rise to the level of a dismissal, 5) each year non-renewal was
> not utilized if she were so bad, 6) feedback meeting were sporatic [sic]
> before and after the decision, 7) nowhere in her file were any disciplinary
> actions or letters she reviewed supporting poor performance, 8) at the end
> of three and half years you decide she can't finish.  This is not a situation
> you want to be in.

(UHC Documents 1254-1255 attached as Exhibit 6).

One week after Dr. Shuck's e-mail, Dr. Aronson asked to meet with him.  They

met the next day, and at that June 16 meeting, Dr. Shuck informed Dr. Aronson that Dr.

Wallace would "no longer be a player." (Shuck Dep. 30-31, Exhibit 12).  For the

reporting period ending June 30, 2009, Dr. Aronson received a satisfactory evaluation.

(Norcia Dep.133). Then she had 36 months of satisfactory evaluations (Norcia Dep. 156-

57; Wallace Dep. 80-81).

**VI.**  **Dr. Aronson Fights Against The Hostility Until She Graduates.**

On June 25, Drs. Norcia and Wallace received notice that Dr. Aronson requested

time off to attend the adoption hearing that she had previously anticipated. (UHC

Documents 588-589 attached as Exhibit 6). It was scheduled for July 8.  (*Id.*).  Two days

after the scheduled leave, Dr. Aronson was assigned to an ICU rotation for the last two

weeks of August.  The ICU rotation was one of the most difficult rotations.  (Aronson

Dec.)  Indeed, residents were not permitted to take vacation or meeting time during the

ICU rotation because of the hours and staffing required.  (Wallace Dep. 93-94). In

contrast, placing a resident on a flexible float schedule was the usual assignment at the end of a graduating resident's program. (Aronson Dec.)

Three days after she learned of the ICU rotation assignment, Dr. Aronson sent a memorandum to Dr. Shuck. She outlined the reasons why she believed that Drs. Norcia and Wallace were using the scheduling assignments to retaliate against her and interfering with her FMLA leave rights.  (Shuck Dep.79-80, Exhibit 23).  The day after she sent the e-mail to Dr. Shuck, she met with Dr. Norcia to discuss the scheduling issues she raised, and she was taken off the ICU rotation.  (Aronson Dep.165-66, Exhibit R).

On August 27, 2009, UHC informed Dr. Aronson that effective August 31, 2009, she graduated from its anesthesiology residency program. (Aronson Dec.)

## LAW and ARGUMENT

Defendant's motion for summary judgment should be denied.  Triable issues exist concerning whether Defendant breached its contractual obligation to Dr. Aronson. Tirable issues exist concerning whether Defendant was unjustly enriched by her services. Triable issues exist concerning whether Defendant interfered with Dr. Aronson's right to take family medical leave.[4]

**I.       Triable Issues Exist Regarding Whether Defendant Breached Its Contract With Dr. Aronson.**

For each year of her employment with Defendant as an anesthesiology resident, Dr. Aronson entered into the same form contract.  They all included the following provision: "UHCMC agrees to provide an educational program that at a minimum meets

---

[4] Dr. Aronson has also alleged two counts of tortious interference with business relations, but before Defendant files its reply to this memorandum, Dr. Aronson anticipates seeking leave of Court or a stipulation from the Defendant to amend the Complaint and drop the counts of tortious interference (Counts III and IV in the Complaint).

the standards established by the ACGME and to provide benefits as outlined in the Manual." (*See* Aronson Dec.)  The ACGME standards also require the Defendant to adhere to the ABA standards: "A Sponsoring Institution . . . must ensure that its ACGME accredited programs are in substantial compliance with Institutional, Common, and specialty-specific Program Requirements . . . ."  (See Aronson Dec., Exhibit 1).  Each contract was signed on behalf of the Defendant by Dr. Shuck.  He confirmed that the contract incorporates the ACGME and Residents' and Fellows' Manual. (Shuck Dep.14-15).

Defendants breached the duty hour limitations.  By requiring Dr. Aronson to work 18 of 19 days in September and more than 320 hours in October, the Defendant violated the standard for consecutive days worked and weekly hours worked.  This breach became particularly harmful because Dr. Aronson's performance was called into question based on her slow responses to certain clinical situations. Yet the only time she was so criticized and received an unsatisfactory evaluation during the same period occurred at precisely the time she was overworked by ACGME standards.

Defendant also breached its agreement with Dr. Aronson by refusing to allow her an appeal of the decision to extend her training.  Whether the contract required the Defendant to provide Dr. Aronson has not been argued by the Defendant in its motion.  But an obvious triable issue of fact exists based upon: 1) Dr. Nearman's testimony that Dr. Aronson had the right to an appeal (Nearman Dep. 83); 2) the contradictory positions of Dr. Shuck's asserting that she was not entitled to appeal because the decision was a remediation (Shuck Dep.42) and Dr. Wallace's testimony that the decision was not the kind of remediation excluded from appeal in the Residents' and Fellows' Manual

18

(Wallace Dep. 65); and 3) the failure to follow up the decision as required for non-appealable remediation as described in the same Manual.

Thus, Defendant takes a different tack and argues that the court should not interfere with Defendant's academic judgment.  But while the decision to evaluate Dr. Aronson's clinical competence during the last half of 2008 is dubious, the Court need not examine the issue to find a breach of contract.  A breach existed because Dr. Aronson was denied the opportunity to have the Defendant self-review the decision as required by the ACGME, ABA, and the Defendant's own standards.  If Defendant's position were correct, then employee medical residents would truly have no recourse to address any decision by a resident program no matter how wrong or even malicious the decision may have been.  Indeed, Defendant has argued that it should be permitted to refuse private due process and bar its residents from seeking public due process.

Defendant's factual arguments about why Dr. Aronson cannot claim that the duty hour restrictions are just that: factual arguments.  Her declaration states exactly what Defendants claim she cannot state.  She worked more hours and more consecutive days than permitted under her contract.  Pointing to contrary statements made out of court merely serve as arguments going to the weight of her testimony.

If the breaches occurred, they certainly caused Dr. Aronson to suffer economic loss.  Instead of being hired as $350,000 a year anesthesiologist, she had to continue as a $50,000 a year resident. (Aronson Dec.)

## II.      Triable Issues Also Exist Regarding Dr. Aronson's Claim For Unjust Enrichment.

A triable issue also exists concerning whether the Defendant was unjustly enriched.  While Defendant is correct that, as a general rule, an action for unjust

enrichment cannot co-exist with an action on an enforceable contract, there is an exception to the general rule.

> The courts of this state have refused to find unjust enrichment in cases where the parties have acted pursuant to the terms of a contract, *and where there has been no showing of fraud or bad faith*. [Emphasis added].

*Hunting Valley Builders, Inc. v. Women's Federal Sav. Bank*, 1990 WL 121272 (8th Dist. Ct. App.), *citing*, *Ullman v. May* (1947), 147 Ohio St. 468, 475; *S & M Constructors v. Columbus* (1982), 70 Ohio St.2d 69, 71.  The lack of objectivity by Dr. Wallace and the refusal of due process raise genuine issues about whether the Defendant kept employing a fully trained anesthesiologist as a resident at resident rates and did so in bad faith.

To prove unjust enrichment, Dr. Aronson must also show: "(1) a benefit conferred by the plaintiff upon the defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment."  *Maghie & Savage, Inc. v. P.J. Dick Inc.*, 2009 WL 1263965 (10th Dist. Ct. App.), *citing*, *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 183, 465 N.E.2d 1298.  Genuine issues of fact exist on each element.

## III.  <u>Triable Issues Exist Regarding Whether Defendant Interfered With Dr. Aronson's Right to Take FMLA Leave.</u>

Triable issues also exist regarding Dr. Aronson's claims under the Family Medical Leave Act.  Dr. Aronson asserts two counts of FMLA interference. "To prevail on an FMLA interference claim, a plaintiff must prove by a preponderance of the evidence that (1) she is an eligible employee as defined in the Act; (2) the defendant is an employer as defined in the Act; (3) she was entitled to FMLA leave; (4) she gave proper notice of her intention to take leave; and (5) the defendant denied her FMLA benefits to which she was entitled or otherwise interfered with her FMLA rights." *Hoge v. Honda of*

20

*Am. Mfg.*, 384 F.3d 238, 244 (6th Cir. 2004).  "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. §825.220(b); *see also Arban v. West Publ'g Co.,* 345 F.3d 390 (6th Cir. 2003).

That is precisely what happened to Dr. Aronson.  In December 2008, she had given Drs. Norcia and Wallace notice of her intent to take leave for the birth of her partner's child.[5]  Less than one month before she was scheduled to take the leave, they forced her to use days off for an unnecessary fitness for duty examination.  As a result, they discouraged her from freely using the FMLA leave she had earned.  Likewise, two days after she returned form the adoption proceeding in July, they gave her a punitive assignment to the ICU rotation.  This kind of action has a chilling effect on any resident trying to exercise their FMLA rights.

Temporal proximity alone has been recognized by some Sixth Circuit decisions as sufficient to raise genuine issues of causation.  *See, e.g., Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555 (6th Cir.2004); *DiCarlo v. Potter,* 358 F.3d 408, 421 (6th Cir.2004); *Ford v. General Motors,* 305 F.3d 545, 554-55 (6th Cir.2002).  But here there is more. The temporal proximity between adverse action and exercise of protected activity happened twice in less than 8 months.  The individual responsible in part was recognized by the Defendant to be not objective, intimidating, frightening, and too emotional. (Shuck Dep. 31-32).  And both times, the adverse action proved unwarranted.[6]

---

[5] As Defendant recognizes, the U.S. Dept. of Labor recently expressed the opinion that a birth such as that given by Dr. Aronson's partner entitles Dr. Aronson to FMLA leave.  Defendant's claim that the interpretation has no retroactive effect however is beside the point.  The statute has not changed.  The Department of Labor has merely expressed what the statute always implied.

[6] The fitness for duty exam resulted in a determination that Dr. Aronson was fit for duty. (Norcia Dep. 90). The assignment to the ICU in August 2009 was withdrawn, and Dr. Aronson was released from all obligations before the end of the month.  (Aronson Dec.).

**IV.**     <u>**No Immunity Is Available Under The Health Care Quality Improvement**</u>
<u>**Act.**</u>

Defendant's attempt to seek shelter under the Health Care Quality Improvement
Act also fails.  The immunity is qualified.  Among the qualifications are that the
professional review action must be taken: 1) "After a reasonable effort to obtain the facts
of the matter"; 2) "after adequate notice and hearing procedures are afforded to the
physician involved or after such other procedures as are fair to the physician under the
circumstances; and" 3) "in the reasonable belief that the action was warranted by the facts
known after such reasonable effort to obtain facts and after meeting the requirement of
paragraph [2]."  42 U.S.C. §11112(a); *see also Meyers v. Columbia/HCA Healthcare
Corp.,* 341 F.3d 461 (6th Cir. 2003).

Genuine issues of fact exist in each element.  Dr. Shuck wrote that "the clear
negative evaluations have come after the decision for extension" and "nowhere in [Dr.
Aronson's] file were any disciplinary actions or letters she reviewed supporting poor
performance." (UHC Documents 1254-1255 attached as Exhibit 6).  This raises issues
about whether reasonable efforts were made to obtain the facts.  More obviously,
however, Defendant steadfastly maintains that Dr. Aronson was not entitled to any
hearing procedure.  To suggest that she waived the right ignores the testimony of Drs.
Nearman, Norcia, and Wallace (Nearman Dep. 52, 77 Exhibit 4; Norcia Dep. 110;
Wallace Dep. 62), not to mention Dr. Aronson who all stated that she wanted to appeal
the decision.  Furthermore, the Act specifies what constitutes adequate notice and hearing
under 42 U.S.C. §11112(b).  And the procedure offered by Defendant regarding the
unsatisfactory evaluation of Dr. Aronson in 2008 and extension of her training plainly did

not satisfy the notice and hearing criteria.  As a result, she could not waive the right.  *See* 42 U.S.C. §11112(b).

**V.    No Immunity Exists Under R.C. 2305.21.**

Ohio's peer review immunity statute protects against civil actions for peer review actions.  But Dr. Aronson's state law breach of contract and unjust enrichment claims are premised upon a denial of due process guaranteed by her contract.  Because the claims do not require the Court to examine Defendant's judgment regarding the unsatisfactory evaluation and training extension or the hours assigned to Dr. Aronson, the statute is not at issue.

## CONCLUSION

For the foregoing reasons, Plaintiff Sarah Aronson, M.D. urges this Court to deny Defendant's Motion for Summary Judgment.

/s/Gregory A. Gordillo
GREGORY A. GORDILLO (0063445)
Gordillo & Gordillo LLC
2000 Standard Building
1370 Ontario Street
Cleveland, Ohio 44113
(216) 875-5500 – Voice
(216) 583-0345 – Facsimile
ggordillo@eeoattorney.com

*Attorney for Plaintiff*

## **CERTIFICATE OF SERVICE**

A copy of the foregoing was electronically filed and served on counsel for Defendant this 14th day of February, 2011.

/s/Gregory A. Gordillo
GREGORY A. GORDILLO
*Attorney for Plaintiff*