# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Sarah Aronson, M.D. | ) | CASE NO. 1:10-CV-00372 |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER BOYKO |
| | ) | |
| vs. | ) | **DECLARATION OF SARAH** |
| | ) | **ARONSON, M.D.** |
| University Hospitals of Cleveland, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

I, Dr. Sarah Aronson, being conscious of my duty to testify and declare truthfully, hereby state that I am of majority age, sound mind, and have personal knowledge of the following facts:

1. In 2006 I began training to become a board certified anesthesiologist. In doing so, I entered into a contract with Defendant UHHC for the training. Prior to entering into my training to become a board certified anesthesiologist I was already board certified as a psychiatrist and as a family medicine physician.

2. While in training to become a board certified anesthesiologist often times I was on call. A typical call assignment lasts at least 24 hours but typically it is approximately 28 hours long. During the call assignment, the resident remains in the hospital and available to perform services as required.

3. I was scheduled to be on call during the months of August, September, and October 2008. In August, my call assignments included the 29th and 31st of the month. Then I began a stretch of working 18 of 19 days from September 2 through 20. In October, I was assigned 9 call duties. 3 of my October call assignments were in the first 5 days of the month. From September 29 through October 5, I worked 108 hours. My heavy workload continued through the first half of October. On October 14, I was finishing my fifth call assignment that month.

4. On or about October 14, 2008, after working for a 28 hour shift, I was called into a meeting with Drs. Norcia and Wallace. At this meeting, my response time was the primary concern raised. This was the first time in the reporting period that the issue of my response time was raised with me.



5.      On or about November 24, 2008, I met again with Drs. Norcia and Wallace to discuss my performance. They again raised concerns that I was slow to respond to situations during my practice. At no time during the meeting, however, did they acknowledge that the faculty evaluations I received for November 2008 were satisfactory; nevertheless, that was the case.

6.      Because I had no explanations for the allegations of slow response times, nor specific examples I wondered, and hypothesized that perhaps I was being affected by my usage of the prescription medication Topamax.

7.      Because I know The American Board of Anesthesiologist (ABA) permits no more than 60 days of absence from training during the 36 month schedule, I was carefully monitoring my time away from the residency training program.  As December 2008 began, I had 18 days of absence available to me.  I was expecting my partner to give birth to a child that I would adopt.  I knew this would require time away so I planned accordingly.  I made arrangements months in advance to take time off at the end of December 2008 for the birth.

8.      During the November 24, 2008, meeting with Drs. Norcia and Wallace, I suggested that I could be monitored to determine whether the Topamax was having any adverse affects on me.  I never contemplated that monitoring me would mean removal from duty.  I believed my days away from training were too important to suggest taking additional days off for monitoring based on using a prescription medication that I had been taking for years.

9.      I was required to complete a fitness for duty evaluation upon a referral by Dr. Wallace when I informed him at the November 24th meeting that I was taking Topamax. The testing was completed on December 4th.  5 days later, I met with the evaluator who explained that the results were negative. I had no discernible impairment and I was assessed to be fit for duty.  Nevertheless, neither Dr. Norcia nor Dr. Wallace approved of my return to work until December 15.  By then, I had lost 12 of the 18 days I had saved for maternity leave.

10.     By the time the Residency Program approved my return to work, I only had 3 days scheduled to work in December 2008 before I took my scheduled maternity leave.

11.     Under ABA Requirements, neither the Program Director (Dr. Norcia) nor the Department Chair (Dr. Nearman) was permitted to Chair the Clinical Competence Committee: **"The Program Director or the Department Chair must not chair the clinical competence committee."** (Exhibit 1, ABA Booklet of Information at p.15 [Emphasis in original]).

12.     Attached as Exhibit 2 to my declaration is a copy of the Accreditation Council for Graduate Medical Education (ACGME) Institutional Requirements. The ACGME Institutional Requirements effective during all relevant times provide:

2

> The Sponsoring Institution must provide residents with fair, reasonable, and readily available written institutional policies and procedures for grievances and due process.  These policies and procedures must minimize conflict of interest by adjudicating parties in addressing: Academic or other disciplinary action taken against residents that could result in dismissal, non-renewal of a resident's agreement, non-promotion of a resident to the next level of training, or other actions that could significantly threaten a resident's intended career[.](ACGME Institutional Requirements at p.5)

13. The decision to extend my training period caused me to lose one job and at least three other job opportunities. And instead of being hired as a $350,000 a year Anesthesiologist, I remained a $50,000 a year Resident.

14. When a resident is placed into remediation, a written mediation plan is required. I was never provided with a written remediation plan.

15. The ABA guidelines state: "To receive credit from the ABA for a period of clinical anesthesia training that is not satisfactory, the resident must complete an additional six months of uninterrupted clinical anesthesia training in the same program with receipt of a satisfactory Certificate of Clinical Competence." (Exhibit 1, ABA Booklet of Information at p.12.)

16. On or about June 4, 2009, I had a meeting with Drs. Norcia and Wallace. Late that night after the meeting, I responded by e-mail to Drs. Norcia, Wallace, Shuck, and Emily Vasiliou of the ACGME.  I noted that the meeting came immediately after UHHC got notice of my complaint to the ACGME and that since February, Drs. Norcia and Wallace had otherwise failed to provide me with monthly reviews to assist me with completing the program.  I noted other failures such as the lack of any advance notice given to me regarding alleged unsatisfactory performance even though such notice was required under the Residents' and Fellows' Manual and ACGME standards. I further requested that an objective third party review my performance.  (Exhibit 3, email on June 4, 2009 from Dr. Sarah Aronson to Emily Vasiliou and Drs. Shuck, Wallace, and Norcia).

17. Two days after I requested family leave for child adoption in August 2009, I was informed I would be assigned to an ICU rotation for the last two weeks of August 2009. The ICU rotation was one of the most difficult rotations.  Residents were not permitted to take vacation or meeting time during the ICU rotation because of the hours and staffing required. Placing a resident on a flexible float schedule was the usual assignment at the end of a graduating resident's program.

18. On August 27, 2009, UHHC informed me that effective August 31, 2009, I graduated from its anesthesiology residency program.

19. Exhibit 4 attached to my declaration is a signed copy of my Resident/Fellowship Contract with UHHC and its Department of Anesthesiology for the period of March 1, 2006 through February 28, 2007.

20. Exhibit 5 attached to my declaration is a signed copy of my Resident/Fellowship Contract with UHHC and its Department of Anesthesiology for the period of March 1, 2007 through February 29, 2008.

21. Exhibit 6 attached to my declaration is a signed copy of my Resident/Fellowship Contract with UHHC and its Department of Anesthesiology for the period of March 1, 2008 through February 28, 2009.

22. Exhibit 7 attached to my declaration is a signed copy of my Resident/Fellowship Contract with UHHC and its Department of Anesthesiology for the period of March 1, 2009 through August 31, 2009.


FURTHER DECLARENT SAYETH NAUGHT.


SARAH ARONSON, M.D.

4

# THE AMERICAN BOARD OF ANESTHESIOLOGY, INC.

Member Board of the American Board of Medical Specialties



The above certification mark is a registered certification mark of The American Board of Anesthesiology, Inc.

# BOOKLET OF INFORMATION

## Certification and Maintenance of Certification

## February 2009

4101 Lake Boone Trail, Suite 510
Raleigh, North Carolina 27607-7506
Phone (919) 881-2570  |  Fax (919) 881-2575
www.theABA.org

Copyright 2009 by The American Board of Anesthesiology, Inc.



THE OHIO LEGAL BLANK CO., INC.

**EXHIBIT**

I

CLEVELAND, OHIO 44102-1799

# TABLE OF CONTENTS

FORMER DIRECTORS ................................................................................................4

OFFICERS, BOARD OF DIRECTORS AND EXECUTIVE STAFF .................................5

INTRODUCTION .....................................................................................................6

1.  THE AMERICAN BOARD OF ANESTHESIOLOGY, INC.

    1.01  History ....................................................................................................7
    1.02  Purposes ..................................................................................................7
    1.03  ABA Certification Marks ..........................................................................9

2.  SPECIALTY CERTIFICATION IN ANESTHESIOLOGY

    2.01  Certification Requirements ......................................................................10
    2.02  The Continuum of Education in Anesthesiology .......................................10
    2.03  Absence from Training ............................................................................13
    2.04  Entrance Requirements ...........................................................................14
    2.05  Certificate of Clinical Competence ..........................................................15
    2.06  Application Procedure .............................................................................16
    2.07  Filing and Decision Deadlines ................................................................17
    2.08  Fees ......................................................................................................18
    2.09  The Examination System ........................................................................18
    2.10  Status of Individuals ..............................................................................19
    2.11  Nonstandard Examination Conditions .....................................................20
    2.12  Irregular Examination Behavior ..............................................................21
    2.13  Unforeseeable Events ............................................................................21
    2.14  Reapplication .........................................................................................22

3.  ABA SUBSPECIALTY CERTIFICATION

    3.01  ABA Subspecialty Certificates ...............................................................23
    3.02  Certification Requirements ......................................................................23
    3.03  Fellowship Requirement ..........................................................................24
    3.04  Absence from Training ............................................................................25
    3.05  Entrance Requirements ...........................................................................25
    3.06  Application Procedure .............................................................................26
    3.07  Filing and Decision Deadlines ................................................................27
    3.08  Fees ......................................................................................................27
    3.09  The Examination System ........................................................................27
    3.10  Status of Individuals ..............................................................................28
    3.11  Reapplication .........................................................................................28

# TABLE OF CONTENTS (continued)

**4. MAINTENANCE OF CERTIFICATION AND SUBSPECIALTY RECERTIFICATION**

4.01 Background ...................................................................................................... 29
4.02 Maintenance of Certification in Anesthesiology Program ............................... 29
4.03 Subspecialty Recertification Programs........................................................... 35
4.04 Maintenance of Subspecialty Certification ..................................................... 37


**5. BOARD POLICIES**

5.01 Alcohol and Substance Abuse ....................................................................... 40
5.02 Revocation of Certification ............................................................................. 40
5.03 Certification by Other Organizations .............................................................. 40
5.04 Records Retention .......................................................................................... 41
5.05 Formal Review Process................................................................................... 41
5.06 Professional Standing ..................................................................................... 42
5.07 Re-attaining Certification Status ..................................................................... 42
5.08 Alternate Entry Path to Specialty Certification Examinations.......................... 43
5.09 Independent Practice Requirement................................................................. 45


**6. EXAMINATION UNDER NONSTANDARD CONDITIONS**

6.01 Requesting Accommodation ........................................................................... 46
6.02 Considering a Request .................................................................................... 47


**7. FILING DEADLINES AND TEST DATES**............................................................. 48

# FORMER DIRECTORS

T. Drysdale Buchanan, M.D. .............. 1938-1940
John S. Lundy, M.D. ........................... 1938-1955
E. A. Rovenstine, M.D. ...................... 1938-1948
Henry S. Ruth, M.D. .......................... 1938-1951
H. Boyd Stewart, M.D. ....................... 1938-1946
Ralph M. Tovell, M.D. ........................ 1938-1949
Ralph M. Waters, M.D. ....................... 1938-1946
Paul M. Wood, M.D. ........................... 1938-1948
Philip D. Woodbridge, M.D. ............... 1938-1947
Charles F. McCuskey, M.D. ............... 1940-1953
Meyer Saklad, M.D. ........................... 1944-1956
Rolland J. Whitacre, M.D. ................... 1947-1956
John W. Winter, M.D. ......................... 1947-1950
Curtiss B. Hickcox, M.D. .................... 1948-1959
Donald L. Burdick, M.D. ..................... 1949-1962
Frederick P. Haugen, M.D. ................. 1949-1962
Stuart C. Cullen, M.D. ....................... 1950-1962
Harvey C. Slocum, M.D. ..................... 1950-1961
Scott M. Smith, M.D. .......................... 1950-1960
Edward B. Tuohy, M.D. ...................... 1951-1955
Milton C. Peterson, M.D. .................... 1953-1967
Albert Faulconer, M.D. ....................... 1955-1969
Forrest E. Leffingwell, M.D. ............... 1955-1969
Robert D. Dripps, M.D. ...................... 1956-1967
E. M. Papper, M.D. ............................. 1956-1965
Richard H. Barrett, M.D. ..................... 1959-1971
John Adriani, M.D. .............................. 1960-1972
David M. Little, Jr., M.D. ..................... 1961-1972
William K. Hamilton, M.D. ................... 1962-1974
James H. Matthews, M.D. ................... 1962-1971
Robert T. Patrick, M.D. ...................... 1962-1974
James E. Eckenhoff, M.D. .................. 1965-1973
Albert M. Betcher, M.D. ...................... 1967-1975
Arthur S. Keats, M.D. ......................... 1967-1979
Donald W. Benson, M.D. ..................... 1969-1981
Richard A. Theye, M.D. ...................... 1969-1976
E. O. Henschel, M.D. .......................... 1971-1975
E. S. Siker, M.D. ................................. 1971-1983
Oral B. Crawford, M.D. ....................... 1972-1984
Robert M. Epstein, M.D. ..................... 1972-1984
Harry H. Bird, M.D. ............................. 1973-1985
C. Philip Larson, Jr., M.D. .................. 1973-1985
Martin Helrich, M.D. ........................... 1974-1986
Richard J. Kitz, M.D. .......................... 1974-1986
James F. Arens, M.D. ......................... 1975-1987
Wendell C. Stevens, M.D. .................. 1975-1988
Alan D. Sessler, M.D. ........................ 1977-1989
Robert K. Stoelting, M.D. .................... 1980-1992
Stephen Slogoff, M.D. ........................ 1981-1993
Judith H. Donegan, M.D., Ph.D. .......... 1983-1991
Carl C. Hug, Jr., M.D., Ph.D. .............. 1984-1996
William D. Owens, M.D. ...................... 1984-1996

D. David Glass, M.D. ........................... 1985-1997
Lawrence J. Saidman, M.D. ............... 1985-1997
David E. Longnecker, M.D. ................. 1986-1998
Myer H. Rosenthal, M.D. .................... 1986-1998
John R. Ammon, M.D. ......................... 1987-1999
Francis M. James III, M.D. .................. 1988-2000
Bruce F. Cullen, M.D. ......................... 1989-2001
Stephen J. Thomas, M.D. ................... 1991-2003
M. Jane Matjasko, M.D. ...................... 1992-2004
Raymond C. Roy, Ph.D., M.D. ............ 1993-2005
Orin F. Guidry, M.D. ............................ 1996-2008
Patricia A. Kapur, M.D. ....................... 1996-2008

# THE AMERICAN BOARD OF ANESTHESIOLOGY, INC.

## 2008 – 2009 OFFICERS

**PRESIDENT**
Mark A. Warner, M.D.
Rochester, Minnesota

**SECRETARY**
Mark A. Rockoff, M.D.
Boston, Massachusetts

**VICE PRESIDENT**
Glenn P. Gravlee, M.D.
Aurora, Colorado

**TREASURER**
Douglas B. Coursin, M.D.
Madison, Wisconsin

---

## BOARD OF DIRECTORS

J. Jeffrey Andrews, M.D.
San Antonio, Texas

Glenn P. Gravlee, M.D.
Aurora, Colorado

David L. Brown, M.D.
Cleveland, Ohio

Steven C. Hall, M.D.
Chicago, Illinois

David H. Chestnut, M.D.
La Crosse, Wisconsin

Cynthia A. Lien, M.D.
New York, New York

Daniel J. Cole, M.D.
Phoenix, Arizona

Mark A. Rockoff, M.D.
Boston, Massachusetts

Douglas B. Coursin, M.D.
Madison, Wisconsin

Kenneth J. Tuman, M.D.
Chicago, Illinois

Brenda G. Fahy, M.D.
Lexington, Kentucky

Mark A. Warner, M.D.
Rochester, Minnesota

---

## EXECUTIVE DIRECTOR, ADMINISTRATIVE AFFAIRS

Mary E. Post, MBA, CAE
Raleigh, North Carolina

# INTRODUCTION

The American Board of Anesthesiology, Inc. (the ABA or Board) publishes its Booklet of Information to inform all interested individuals of the policies, procedures, regulations and requirements governing its certification programs.

The official version of the booklet is available on the ABA website at www.theABA.org.

The chair of the anesthesiology department is ultimately responsible for the residency program. The ABA corresponds officially about training matters only with the department chair. If the chair notifies the ABA that a faculty member has been appointed program director with responsibility for administering the program, the ABA corresponds with the program director about training matters and sends the department chair a copy of the correspondence.

The program must ensure that each resident's training fulfills all criteria for entering the ABA examination system. However, it is crucial that the resident know the requirements described in this booklet since the resident ultimately bears responsibility for compliance with the requirements and bears the consequences if one or more aspects of training prove unacceptable. This is especially important when requests are made for special training sequences or sites, or for exemptions. If, after speaking with the program director, there is any question about the acceptability of any portion of training, the resident should write the Secretary of the ABA directly at the ABA office.

Applicants and candidates for ABA examinations have the ultimate responsibility to know and comply with the Board's policies, procedures, requirements and deadlines regarding admission to and opportunities for examination.

# THE AMERICAN BOARD OF ANESTHESIOLOGY, INC.

## 1.01   HISTORY

A committee representing the American Society of Anesthetists, Inc., the American Society of Regional Anesthesia, Inc., and the Section on Surgery of the American Medical Association was established to devise a plan for an organization with the specific purpose of certifying physicians practicing in the field of anesthesiology. The formation of The American Board of Anesthesiology, Inc., an affiliate of The American Board of Surgery, Inc., was completed on June 2, 1937. The Advisory Board for Medical Specialties and the Council on Medical Education of The American Medical Association approved affiliation in 1938. In 1941 the Advisory Board for Medical Specialties approved the establishment of The American Board of Anesthesiology, Inc. as a separate primary Board.

In 1977 the Society of Critical Care Medicine approached the American Board of Medical Specialties (ABMS) to discuss the possibility of obtaining official recognition for physicians with expertise in critical care medicine. In response the ABA and three other interested Member Boards initiated exploratory investigations into both joint and individual mechanisms for awarding such recognition. On March 21, 1985, the ABMS voted to permit the ABA and several other Member Boards to issue certificates in critical care medicine.

The ABA notified the ABMS in 1989 of its intent to subcertify in pain management and subsequently had discussions with other ABMS Member Boards with an interest in this subspecialty. ABMS approved the ABA pain management application at its March 1991 meeting with the condition that the subspecialty certificate be time-limited. On September 26, 1991, ABMS voted to permit the ABA to issue certificates in pain management that would be valid for 10 years. In March 2002, ABMS approved changing the name of the subspecialty to Pain Medicine.

In 1995, the ABA approved a policy of time-limited certification, so that all certificates issued by the ABA on or after January 1, 2000, will be valid for a period of 10 years after the year the candidate passed the certifying examination. The ABMS approved the ABA proposal for recertification in anesthesiology at its March 21, 1996 meeting and the proposals for recertification in critical care medicine and pain management at its September 17, 1998 meeting.

## 1.02   PURPOSES

The ABA exists in order to:

**A.**  Maintain the highest standards of practice by fostering educational facilities and training in anesthesiology, which the ABA defines as the practice of medicine dealing with but not limited to:

(1)  Assessment of, consultation for, and preparation of, patients for anesthesia.

(2)  Relief and prevention of pain during and following surgical, obstetric, therapeutic and diagnostic procedures.

(3)  Monitoring and maintenance of normal physiology during the perioperative period.

(4)  Management of critically ill patients.

(5)  Diagnosis and treatment of acute, chronic and cancer related pain.

(6)  Clinical management and teaching of cardiac and pulmonary resuscitation.

(7)   Evaluation of respiratory function and application of respiratory therapy.

(8)   Conduct of clinical, translational and basic science research.

(9)   Supervision, teaching and evaluation of performance of both medical and paramedical personnel involved in perioperative care.

(10) Administrative involvement in health care facilities and organizations, and medical schools necessary to implement these responsibilities.

**B.**   Establish and maintain criteria for the designation of a Board certified anesthesiologist.

**C.**   Inform the Accreditation Council for Graduate Medical Education (ACGME) concerning the training required of individuals seeking certification as such requirements relate to residency training programs in anesthesiology.

**D.**   Establish and conduct those processes by which the Board may judge whether a physician who voluntarily applies should be issued a certificate indicating that the required standards for certification or recertification as a diplomate of the ABA have been met.

A Board certified anesthesiologist is a physician who provides medical management and consultation during the perioperative period, in pain medicine and in critical care medicine. At the time of application and at the time of initial certification, a diplomate of the Board must possess knowledge, judgment, adaptability, clinical skills, technical facility and personal characteristics sufficient to carry out the entire scope of anesthesiology practice without accommodation or with reasonable accommodation. An ABA diplomate must logically organize and effectively present rational diagnoses and appropriate treatment protocols to peers, patients, their families and others involved in the medical community. A diplomate of the Board can serve as an expert in matters related to anesthesiology, deliberate with others, and provide advice and defend opinions in all aspects of the specialty of anesthesiology. A Board certified anesthesiologist is able to function as the leader of the anesthesiology care team.

Because of the nature of anesthesiology, the ABA diplomate must be able to manage emergent life-threatening situations in an independent and timely fashion. The ability to independently acquire and process information in a timely manner is central to assure individual responsibility for all aspects of anesthesiology care. Adequate physical and sensory faculties, such as eyesight, hearing, speech and coordinated function of the extremities, are essential to the independent performance of the Board certified anesthesiologist. Freedom from the influence of or dependency on chemical substances that impair cognitive, physical, sensory or motor function also is an essential characteristic of the Board certified anesthesiologist.

**E.**   Establish and conduct those processes by which the Board may judge whether a physician who voluntarily applies should be issued a certificate indicating that the required standards for subspecialty certification or recertification in an ABA designated subdiscipline of anesthesiology have been met.

**F.**   Serve the public, medical profession, health care facilities and organizations, and medical schools by providing the names of physicians certified by the Board.

## 1.03    ABA CERTIFICATION MARKS

The ABA is the owner of the following certification marks:

A.    The ABA seal:



B.    The American Board of Anesthesiology®

C.    Maintenance of Certification in Anesthesiology Program®

D.    MOCA®

Each of these marks is a registered certification mark with the United States Patent and Trademark Office as shown.

# SPECIALTY CERTIFICATION IN ANESTHESIOLOGY

## 2.01   CERTIFICATION REQUIREMENTS

At the time of certification by the ABA, the candidate must:

**A.**   Hold an unexpired license to practice medicine or osteopathy in at least one state or jurisdiction of the United States or province of Canada that is permanent, unconditional and unrestricted. Further, every United States and Canadian medical license the applicant holds must be free of restrictions.

Candidates for initial certification and ABA diplomates have the affirmative obligation to advise the ABA of any and all restrictions placed on any of their medical licenses and to provide the ABA with complete information concerning such restrictions within 60 days after their imposition or notice, **whichever first occurs**. Such information shall include, but not be limited to, the identity of the State Medical Board imposing the restriction as well as the restriction's duration, basis, and specific terms and conditions. Candidates and diplomates discovered **not** to have made disclosure may be subject to sanctions on their candidate or diplomate status.

**B.**   Have fulfilled all the requirements of the continuum of education in anesthesiology.

**C.**   Have on file with the ABA a Certificate of Clinical Competence with an overall satisfactory rating covering the final six-month period of clinical anesthesia training in each anesthesiology residency program.

**D.**   Have satisfied all examination requirements of the Board.

**E.**   Have a professional standing (see Section 5.06) satisfactory to the ABA.

**F.**   Be capable of performing independently the entire scope of anesthesiology practice (see Sections 1.02.A and 1.02.D) without accommodation or with reasonable accommodation.

Although admission into the ABA examination system and success with the examinations are important steps in the ABA certification process, they do not by themselves guarantee certification. The Board reserves the right to make the final determination of whether *each* candidate meets all of the requirements for certification, including A, E and F above, after successful completion of examinations for certification.

ABA certificates in anesthesiology issued on or after January 1, 2000 are valid for 10 years after the year the candidate passes the examination for certification. ABA certificates are subject to ABA rules, regulations and Bylaws, including its Booklet of Information, all of which may be amended from time to time without further notice.

A person certified by the ABA is designated a diplomate in publications of the American Board of Medical Specialties and the American Society of Anesthesiologists.

## 2.02   THE CONTINUUM OF EDUCATION IN ANESTHESIOLOGY

The continuum of education in anesthesiology consists of four years of full-time training subsequent to the date that the medical or osteopathic degree has been conferred. The continuum consists of a clinical base year and 36 months of approved training in anesthesia (CA-1, CA-2 and CA-3 years). Prospective approval by the ABA is required for exceptions to ABA policies regarding the training planned for individual residents.

**A.**   During the clinical base year the physician must be enrolled and training as a resident in a transitional year or primary specialty training program in the United States or its territories that is accredited by the

ACGME or approved by the American Osteopathic Association, or outside the United States and its territories in institutions affiliated with medical schools approved by the Liaison Committee on Medical Education from the date the training begins to the date it ends. **Training as a fellow in a subspecialty program is not an acceptable clinical base experience.**

The **clinical base year** must include at least six months of clinical rotations during which the resident has responsibility for the diagnosis and treatment of patients with a variety of medical and surgical problems, of which at most one month may involve the administration of anesthesia. Acceptable clinical base experiences include training in internal medicine, pediatrics, surgery or any of the surgical specialties, obstetrics and gynecology, neurology, family medicine or any combination of these as approved for the individual resident by the director of his or her training program in anesthesiology. The clinical base year should also include rotations in critical care and emergency medicine, with at least one month, but no more than two months, devoted to each. Other rotations completing the 12 months of broad education should be relevant to the practice of anesthesiology.

The resident must complete the clinical base year before beginning CA-3 year clinical rotations.

**B.** The three-year **clinical anesthesia** curriculum (CA 1-3) consists of experience in basic anesthesia training, subspecialty anesthesia training and advanced anesthesia training. It is a graded curriculum of increasing difficulty and learning that is progressively more challenging of the resident's intellect and technical skills.

(1) Experience in **basic anesthesia training** is intended to emphasize basic and fundamental aspects of the management of anesthesia. It is recommended that at least 12 months of the CA-1 and CA-2 years be spent in basic anesthesia training with a majority of this time occurring during the CA-1 year.

(2) **Subspecialty anesthesia training** is required to emphasize the theoretical background, subject material and practice of subdisciplines of anesthesiology. These subdisciplines include obstetric anesthesia, pediatric anesthesia, cardiothoracic anesthesia, neuroanesthesia, anesthesia for outpatient surgery, recovery room care, regional anesthesia and pain medicine. It is recommended that these experiences be subspecialty rotations and occur in the CA-1 and CA-2 years. The sequencing of these rotations in the CA-1 and CA-2 years is left to the discretion of the program director.

By the end of the CA-3 year, required experiences in perioperative care must include four months of distinct rotations in critical care medicine with progressive responsibility and three months in pain medicine that may include one month in an acute perioperative pain management rotation, one month in a rotation for assessment and treatment of inpatients and outpatients with chronic pain, and one month of regional analgesia experience in pain medicine. Experiences in these rotations must emphasize the fundamental aspects of anesthesia, preoperative evaluation and immediate postoperative care of surgical patients, and assessment and treatment of critically ill patients and those with acute and chronic pain. An acceptable critical care rotation should include active participation in patient care, active involvement by anesthesia faculty experienced in the practice and teaching of critical care, and an appropriate population of critically ill patients. Experience in short-term overnight post-anesthesia units, intermediate step-down units, or emergency rooms, does not fulfill this requirement.

(3) Experience in **advanced anesthesia training** constitutes the CA-3 year. The program director, in collaboration with the resident, will design the resident's CA-3 year of training. The CA-3 year is a distinctly different experience than the CA 1-2 years, requiring progressively more complex training experiences and increased independence and responsibility for the resident. Resident assignments in the CA-3 year should include the more difficult or complex anesthetic procedures and care of the most seriously ill patients. Residents must complete the clinical base and CA 1-2 years of training before they begin clinical rotations in fulfillment of the CA-3 year requirement.

CA-3 residents are required to complete a minimum of six months of advanced anesthesia training. They may spend the remaining months in advanced anesthesia training, in one to three selected subspecialty rotations, or in research. Residents may train in one anesthesia subspecialty for at most six months during the CA-3 year and no more than 12 months during the CA 1-3 years. The training must culminate in sufficiently independent responsibility for clinical decision-making and patient care so that the graduating resident demonstrates sound clinical judgment in a wide variety of clinical situations and can function as a leader of perioperative care teams.

(4)  There are **options for research** during the anesthesiology residency. Interested residents could spend approximately 25% of a 3- or 4-year training program, and 38% of a 5-year program, engaged in scholarly activities. Suggested templates for research during the anesthesiology residency are posted on the ABA website at www.theABA.org. The program director must develop a plan with strict guidelines for research activity and "work product" oversight if a resident's research activities will be more than six months. The resident must be enrolled in an ACGME-accredited anesthesiology program and remain active in the educational component of the program while pursuing research.

Involvement in scholarly activities must result in the generation of a specific permanent "work product." Review of scholarly activity and the permanent work product will occur at the local level by a Scholarship Oversight Committee responsible for overseeing and assessing the trainee's progress and verifying to the ABA that the requirement has been met. The Scholarship Oversight Committee must consist of three or more faculty members. The program director may serve as a trainee's mentor and participate in the activities of the Scholarship Oversight Committee, but should not be a standing member.

By prospective (at least four months in advance) application to the Credentials Committee of the ABA, exceptions will be considered for:

• Aggregating research time normally allocated across the clinical base and clinical anesthesia years into one or more years, allowing a significant amount of time to be used for research as a block

• Leave of absence from the clinical program for research activities

• Additional months in research, especially if the research is prospectively integrated in the training program

A resident must have a satisfactory Clinical Competence Committee report for six months of clinical anesthesia training immediately preceding any research period unless prospectively approved by the ABA Credentials Committee.

**C.**  The ABA grants a resident credit toward the CA 1-3 year requirements for clinical anesthesia training that satisfy **all four** of the following conditions:

(1)  The CA 1-3 years of training are spent as a resident enrolled with the ABA by no more than two ACGME-accredited anesthesiology residency programs in the United States or its territories. An ACGME-accredited program includes the sponsoring (parent) institution and major participating institutions (i.e., institutions that have an RRC-approved integration or affiliation agreement with the sponsoring institution).

(2)  The period of clinical anesthesia training as an enrolled resident of any single program is at least six months of uninterrupted training.

(3)  The six-month period of clinical anesthesia training in any one program ends with receipt of a satisfactory Certificate of Clinical Competence. To receive credit from the ABA for a period of clinical anesthesia training that is not satisfactory, the resident must immediately complete an additional six months of uninterrupted clinical anesthesia training in the same program with receipt of a satisfactory Certificate of Clinical Competence. **If a resident receives consecutive Certificates of Clinical Competence that are not satisfactory, additional training is required.** When a resident receives a satisfactory Certificate of Clinical Competence immediately following consecutive periods of training

that are not satisfactory, the ABA will grant credit only for the period of satisfactory training and the most recent of the periods of unsatisfactory training immediately preceding it.

(4)  Training away from the resident's ACGME-accredited anesthesiology program cannot occur until completion of at least one year of clinical anesthesia or during the last three months of the CA-3 year, unless such training will be in another ACGME-accredited anesthesiology program.

Current Residency Review Committee requirements limit training in institutions not integrated with the resident's ACGME-accredited program to a maximum of 12 months throughout the CA 1-3 years. The ABA will accept no more than six of these three months in institutions not affiliated with the ACGME-accredited program. Therefore, residents must complete a minimum of 24 months of clinical anesthesia training in their ACGME-accredited program's parent and integrated institutions and may complete at most six months of clinical anesthesia training away from their ACGME-accredited program.

**The Credentials Committee of the ABA must prospectively approve clinical anesthesia training away from the ACGME-accredited program even if the training will occur in another ACGME-accredited program** (see Section 2.02.D). The request for approval must include a chronological description of the rotations, information about the supervision of the resident, and assurances that the resident will be in compliance with the limits on training away from his/her ACGME-accredited program. Further, the resident must remain enrolled in his/her program while training away from the ACGME-accredited program, and his/her program must report the training on the Clinical Competence Committee report filed for the period involved.

**D.**  The Credentials Committee of the ABA will assess individually requests for part-time training. Prospective approval is required for alteration in the number of hours per week of training or alteration in the temporal distribution of the training hours (e.g. substantially different night and weekend hours) from other residents in the program.  It is expected that residents will take not more than twice the "standard time" to achieve the level of knowledge and clinical experience comparable to a full-time resident completing the program in standard time.  Residents who train on a part-time basis are expected to meet all the program's didactic requirements before training is complete.

Requests for part-time training must be in writing from the program director and countersigned by the department chair (if that is another person), the hospital's Designated Institutional Officer (DIO), and the resident.  The letter must include:  (1) the reason for the part-time training request, (2) documentation about how all clinical experiences and educational objectives will be met, (3) assurance that the part-time training program will teach continuity-of-care and professionalism, and (4) an explanation about how the part-time training program will maintain the overall quality, content and academic standards/clinical experiences of the training program required of a full-time trainee.

**E.**  **Prospective approval is required** for exceptions to ABA policies regarding the training planned for individual residents (see Sections 2.02.B (3) and 2.02.C (4) above). The Credentials Committee of the ABA considers requests for prospective approval on an individual basis. The ABA office must receive the request from the program director on behalf of a resident at least **four months** before the resident begins the training in question. It is the responsibility of the program director and the resident to assure that the request is received in a timely manner.

## 2.03   ABSENCE FROM TRAINING

The total of any and all absences may not exceed 60 working days (12 weeks) during the CA 1-3 years of training. Attendance at scientific meetings, not to exceed five working days per year, shall be considered a part of the training program. Duration of absence during the clinical base year may conform to the policy of the institution and department in which that portion of the training is served. Absences in excess of those specified will require lengthening of the total training time to the extent of the additional absence.

A lengthy interruption in training may have a deleterious effect upon the resident's knowledge or clinical competence. Therefore, when there is an absence for a period in excess of six months, the Credentials Committee of the ABA shall determine the number of months of training the resident will have to complete subsequent to resumption of the residency program to satisfy the training required for admission to the ABA examination system.

## 2.04  ENTRANCE REQUIREMENTS

At the time of application to enter the examination system of the ABA, the applicant must:

**A.**  Have graduated from a medical school in a state or jurisdiction of the United States or in Canada that was accredited at the date of graduation by the Liaison Committee on Medical Education, the Committee on Accreditation of Canadian Medical Schools, or the American Osteopathic Association. Graduates of medical schools outside the jurisdiction of the United States and Canada must have *one* of the following: a permanent (valid indefinitely) certificate from the Educational Commission for Foreign Medical Graduates, comparable credentials from the Medical Council of Canada, or documentation of training for those who entered postdoctoral medical training in the United States via the Fifth Pathway as proposed by the American Medical Association.

**B.**  Provide evidence satisfactory to the Board of having been awarded a medical or osteopathic degree acceptable to the Board.

**C.**  Provide evidence acceptable to the Board of having satisfied the licensure requirement for certification (see Section 2.01.A). The applicant must inform the ABA of any conditions or restrictions in force on any active medical license he or she holds. When there is a restriction or condition in force on any of the applicant's medical licenses, the Credentials Committee of the ABA will determine whether, and on what terms, the applicant shall be admitted to the ABA examination system.

Residents in training may submit evidence with their application of having qualified on examinations that provide eligibility for medical licensure (e.g., USMLE Steps 1, 2 and 3) on or before the standard application deadline (see Section 2.07). Residents who do so must have evidence of permanent, unconditional, unrestricted and currently unexpired medical licensure on file in the ABA office by November 30 of the year in which the Part 1 examination for which they applied is administered.

**D.**  Have on file in the Board office evidence of having satisfactorily fulfilled all requirements of the continuum of education in anesthesiology before the date of examination and after receiving a medical or osteopathic degree acceptable to the ABA. Such evidence must include a satisfactory Certificate of Clinical Competence covering the final six months of clinical anesthesia training in each residency program (see Sections 2.02.C (3) and 2.05 for details). A **grace period** will be permitted so that applicants completing this requirement by September 30 may apply for the immediately preceding Part 1 examination.

**E.**  Have on file with the Board documentation attesting to the applicant's current privileges and evaluations of various aspects of his or her current practice of anesthesiology. Such evaluations will include verification that the applicant meets the Board's clinical activity requirement by spending, on average, at least one day per week during one of the previous three years in the clinical practice of anesthesiology and/or related subspecialties. The ABA may solicit such documentation and evaluations from the residency program director or others familiar with the applicant's current practice of anesthesiology and use them in determining the applicant's qualifications for admission to the examination system. The Clinical Competence Committee Report from the department **and** the evaluation of the program director and others will be used as the basis for assessing admission qualifications.

**F.**  If residency training was completed more than 12 years before the date of application, or if a second or subsequent application has been declared void, the applicant must have reestablished his or her qualifications for admission to the examination system.

Admission qualifications may be reestablished by qualifying on an entry examination designated by the Board. The Board has designated the examination administered annually by the Joint Council on In-Training Examinations as the entry examination. Information about the entry examination and a registration form may be obtained by writing the Joint Council c/o the American Society of Anesthesiologists. Alternatively, the applicant may complete 12 consecutive months of additional clinical training in anesthesia **as a CA-3 year resident in one ACGME-accredited program or as a fellow in one ACGME-accredited anesthesiology subspecialty program** with receipt of a satisfactory Certificate of Clinical Competence covering the final six months.

The applicant must qualify on the entry examination or satisfactorily complete the year of additional training after the date the ABA declared his or her most recent application void. The applicant must complete the requalifying examination before applying to the ABA. If the applicant will complete the year of additional training by the end of the grace period (see Section 2.04.D), he or she may apply to the ABA for the immediately preceding Part 1 examination. The applicant must apply to the ABA within three years of having reestablished his or her qualifications for admission to examination.

**G.** International medical graduates practicing anesthesiology in the United States may use an alternate path at most once to qualify for entrance into the ABA examination system for initial certification in the specialty (see Section 5.08). They must fulfill all of the above entrance requirements except requirements D and F. In lieu of Entrance Requirement D, the department chair and the international medical graduate should refer to Section 5.08.

**H.** Be capable of performing independently the entire scope of anesthesiology practice (see Sections 1.02.A and 1.02.D) without accommodation or with reasonable accommodation.

**The ABA will *not* validate or report the results to applicants who sit for the Part 1 examination and do not fulfill those conditions identified in Sections 2.04.C and D by the deadlines.**

The ABA shall determine that entry into the examination system is warranted when required information submitted by and on behalf of the applicant is satisfactory. The ABA will notify an applicant who is accepted as a candidate for certification after approval of all credentials.

*Although admission into the ABA examination system and success with the examinations are important steps in the ABA certification process, they do not by themselves guarantee certification.* The Board reserves the right to make the final determination of whether *each* candidate meets all of the requirements for certification (see Section 2.01).

The Board, acting as a committee of the whole, reserves the right not to accept an application. The applicant has the right to seek review of such decision (see Section 5.05).

The Board reserves the right to correct clerical errors affecting its decisions.


## 2.05    CERTIFICATE OF CLINICAL COMPETENCE

The Board requires every residency training program to file, on forms provided by the Board, an Evaluation of Clinical Competence in January and July on behalf of each resident who has spent any portion of the prior six months in clinical anesthesia training in or under the sponsorship of the residency program and its affiliates. **The Program Director or Department Chair must not chair the Clinical Competence Committee.**

Entry into the examination system is contingent upon the applicant having a Certificate of Clinical Competence on file with the Board attesting to satisfactory clinical competence during the final period of clinical anesthesia training in or under the sponsorship of each program (see Section 2.02.C (3) for details). The Board, therefore, will deny entry into the examination system until this requirement is fulfilled.

Residents who wish to appeal an Evaluation of Clinical Competence, and applicants who wish to appeal final recommendations from the Program Director or Department Chair, must do so through the reporting institution's grievance and due process procedures.

## 2.06   APPLICATION PROCEDURE

**A.**   Application for admission to the ABA examination system must be made using the ABA Electronic Application System, via the ABA website at www.theABA.org. Exceptions to this requirement will be considered upon written request. Written requests are to be addressed to the ABA Secretary and must include the basis for the requested exception.

**B.**   The application form includes the following Acknowledgement, which the applicant shall be required to sign by electronic signature.

*I, the undersigned applicant ("Applicant"), hereby apply to the ABA for entrance into its examination system for the purpose of obtaining ABA certification status ("Certification"). I acknowledge that my application is subject to the ABA rules and regulations. I further acknowledge and agree that if I withdraw my application or the ABA does not accept it, the ABA will retain the application fee and any late fee.*

*I represent and warrant to the ABA that all information contained in this application ("Application") is true, correct and complete in all material respects. I understand and acknowledge that any material misstatement in or omission from this Application shall, at any time, constitute cause for disqualification from the ABA examination system or from the issuance of an ABA Certificate or to forfeiture and redelivery of such ABA Certificate.*

*I agree that the Acknowledgement, as submitted by me, shall survive the electronic submission of the Application, regardless of whether or not the information or data provided in the Application has been reformatted in any manner by the ABA. I also agree that this Acknowledgement is a part of and incorporated into the Application whether submitted along with the Application or not.*

*I acknowledge that I have read a copy of the applicable ABA Booklet of Information. I agree to be bound by the policies, rules, regulations and requirements published in the applicable Booklet, in all matters relating to consideration of and action upon this Application and Certification should it be granted. I understand that ABA certificates are subject to ABA rules, regulations and Bylaws, all of which may be amended from time to time without further notice. In addition, I understand and acknowledge that in the event I have violated any of the ABA rules governing my Application and/or Certification, or in the event I fail to comply with any provisions of the ABA Certificate of Incorporation or Bylaws, such violations shall constitute cause for disqualification from the ABA examination system or from the issuance of an ABA Certificate or for revocation of certification and indication of such action in the ABA Diplomate and Candidate Directory.*

**C.**   The Application also includes the following Release, which the applicant shall be required to sign by electronic signature.

*I, the undersigned applicant ("Applicant"), hereby apply to the ABA for entrance into its examination system for the purpose of obtaining ABA certification status ("Certification"). I acknowledge that this application ("Application") is subject to the ABA rules and regulations, all of which may be amended from time to time without further notice.*

*In connection with my Application, (#_____), I authorize all persons holding testimony, records, documents, opinions, information and data relevant to or pertaining to my professional competence and ethical conduct and/or behavior (the "Information") to release such Information to the ABA, its employees and agents. This authorization applies whether or not such persons are listed as a reference on my Application. The Information includes any information relating to any abusive use of alcohol and/or illegal*

*use of drugs, and any treatment or rehabilitation related thereto. The purpose of releasing such Information is to determine or verify my qualifications for entrance into the ABA entrance examination and ABA Certification. A copy of this release may accompany any request made by the ABA for such Information.*

*I authorize the ABA to: (1) report my status in the examination system, including the results of any Part 1 or Part 2 examination, to the Director and Department Chair of the program from which I completed my clinical training; (2) use any score in psychometric analyses to confirm observations and reports of suspected irregularities in the conduct of an examination; and (3) respond to any inquiry about my status in the ABA examination system. I also authorize the ABA to use any and all Information for the purpose of conducting longitudinal studies to assess the ABA certification process. Such Information may be reported or released only in the aggregate, and any results of such studies will have no direct bearing on my Application or Certification status. Subject to applicable state and federal law requirements, the ABA shall hold all Information in confidence.*

*I release and agree to hold harmless each person from any liability to me arising out of the giving or releasing of Information to the ABA. This release and agreement includes liability for the inaccuracy or untruth of the Information, so long as such Information is provided in good faith. I also release and agree to hold harmless the ABA and its agents and employees, including but not limited to its directors, officers and examiners, from any liability to me as a result of any acts or proceedings undertaken or performed in connection with my Application, provided such acts or proceedings are made or conducted in good faith.*

## 2.07    FILING AND DECISION DEADLINES

**A.**   The **ABA Part 1 examination** is administered once each year. Test dates are August 3 – 4, 2009 and August 2 – 3, 2010.

The **standard deadline** for the ABA to receive a completed application and the application fee is December 15 of the year immediately preceding the year in which the Part 1 examination is to be administered.

For examination in 2009, the **late deadline** by which the ABA must receive a completed application, the application fee and the late fee is January 15, 2009.

**For examination in 2010, the late deadline by which the ABA must receive a completed application, the application fee and the late fee is December 31, 2009.**

The late deadline for receipt of a completed application and the appropriate fees is absolute. Regardless of the reason, the ABA will not consider an application for specialty certification that it receives after the late deadline.

The ABA must receive all documentation it requires to make a decision about an applicant's qualifications for admission to the Part 1 examination by March 15 of the examination year. This includes, but is not limited to, references and evidence of having qualified for medical licensure. An application will not be accepted if the required documentation is not received by that date. It **ultimately is the responsibility of every applicant to assure that the ABA receives all required documentation in a timely manner.**

**B.**   The **ABA Part 2 examination** is administered twice each year. In 2009, the test dates are April 20 – 24 and October 5 – 9. In 2010, the test dates are April 19 – 23 and September 27 – October 1. The **registration deadline** is November 30 of the preceding year for the spring oral examination and May 1 of the examination year for the fall oral examination.

## 2.08   FEES

The ABA is a not-for-profit organization.  Fees are based on the cost of maintaining the functions of the ABA.

All fees paid to the ABA are non-refundable.

Current fees are posted on the ABA website at www.theABA.org. The Board reserves the right to change fees when necessary.

## 2.09   THE EXAMINATION SYSTEM

The examination system for the ABA's primary certificate has two distinct parts, the Part 1 examination and the Part 2 examination. Each is designed to assess different qualities of a Board certified anesthesiologist as previously defined in Section 1.02.D.

The **Part 1 examination** is designed to assess the candidate's knowledge of basic and clinical sciences as applied to anesthesiology. Part 1 examinations are held annually in locations throughout the United States and Canada. A passing grade, as determined by the Board, is required.

It is necessary for candidates to pass the Part 1 examination to qualify for the Part 2 examination. Candidates must wait at least six months after passing the Part 1 examination to be eligible to appear for the Part 2 examination.

The **Part 2 examination** is designed to assess the candidate's ability to demonstrate the attributes of an ABA diplomate when managing patients presented in clinical scenarios. The attributes are sound judgment in decision-making and management of surgical and anesthetic complications, appropriate application of scientific principles to clinical problems, adaptability to unexpected changes in the clinical situations, and logical organization and effective presentation of information. The Part 2 examination emphasizes the scientific rationale underlying clinical management decisions. The ABA conducts Part 2 examinations in the spring and fall of each year at a single location in the United States. Examiners are Directors of the Board and other ABA diplomates who assist as associate examiners. A passing grade, as determined by the Board, is required.

The ABA will not schedule candidates to appear at consecutive Part 2 examinations. Candidates who do not take or do not pass the Part 2 examination, for which they are scheduled, for whatever reason, are not eligible to appear at the next regularly scheduled Part 2 examination.

**A.**   The **duration of candidate status** is limited. Every candidate is given one opportunity a calendar year, for three years, to successfully complete each examination requirement. All candidates must satisfy the Part 1 examination requirement within three years of the date of the first Part 1 examination that follows acceptance of the application. All candidates must satisfy the Part 2 examination requirement within three years of the date of the first Part 2 examination for which they become eligible. The ABA will declare the candidate's application void if the candidate does not satisfy an examination requirement within the prescribed number of opportunities or time, whichever comes first.

**B.**   The ABA sends **notification of an examination opportunity** to every candidate eligible to appear for the examination at least four months prior to the examination date. The notification is sent to candidates at their address of record on file in the Board office.

Candidates are required to respond to every Part 1 and Part 2 examination notice via the ABA website at www.theABA.org by the response date established by the ABA, whether or not they accept the examination opportunity.

The ABA notifies candidates of the exact date, time and location of their examination and the rules for its conduct at least two months before the date of examination.

The Board office is not responsible for an interruption in communication with a candidate that is due to circumstances beyond its control. Candidates must immediately notify the ABA of an **address change** via the ABA website at www.theABA.org, or by writing the ABA office. Candidates must call the Board office if they do not receive an examination notice they are expecting within the time frame described above. The candidate's ABA identification number should be included on all correspondence to the Board solely for identification purposes.

C.    The ABA requires every candidate to **accept each examination opportunity**. The ABA must receive the candidate's reply to the notice of an examination opportunity via the ABA website at www.theABA.org by the deadline specified in the notification. The candidate **forfeits the examination opportunity** if the ABA does not receive acceptance of the examination opportunity or the candidate's written request and reason to be excused from the examination opportunity by the response deadline. **The Board will excuse a candidate from at most one opportunity to satisfy an examination requirement without forfeiting the opportunity.**

**The Board expects a candidate who accepts an examination opportunity to keep the examination appointment. Candidates who inform the Board that they are canceling their examination appointment are charged a cancellation fee and may forfeit the examination opportunity.** Notice of cancellation must be in writing and must include a check in the amount of the cancellation fee.

If an event over which they had no control prevented them from keeping their examination appointment, the candidate may submit a written request to be excused from the examination without forfeiting the examination opportunity. The request must include an explanation and independent documentation of the event. The ABA must receive the candidate's request no later than three weeks after the examination date. The Board will consider the request only if it is the candidate's first request to be excused from an opportunity to satisfy the examination requirement.

**A candidate who does not cancel an examination appointment and does not keep the appointment forfeits the examination opportunity and the examination fee.**

D.    The Board reserves the right to limit the number of candidates to be admitted to any examination. Places in the **Part 2 examination schedule** are assigned randomly when more candidates request the examination than can be accommodated. Candidates who are not assigned to the examination they requested are assigned to the next examination for which they are eligible.

E.    ABA examinations are administered to all candidates under the same standardized testing conditions. The Board will consider a candidate's complaint about the testing conditions under which an ABA examination was administered only if the complaint is received within three weeks of the test date.

## 2.10    STATUS OF INDIVIDUALS

The ABA reserves to itself exclusively the right to define an individual's status relative to its examination and certification system. Status is limited to the period of time the physician's certification or application for certification is valid.

The ABA defines **clinically active** as performing, teaching or supervising anesthesia in the operating room or other anesthetizing areas an average of one day per week during 12 consecutive months over the preceding three years in patients having a varied degree of systemic disease and who are undergoing surgery or diagnostic procedures requiring anesthetic care consistent with the knowledge of the currently relevant pharmacology, physiology and medicine.

The ABA has defined the following **certification statuses**:

- Certified
- Certified – Not Clinically Active
- Certified – Retired
- Retired
- Revoked

Diplomates designated by the ABA as Not Clinically Active have attested to the ABA that they do not meet the ABA definition of clinical activity and do not plan to be clinically active for at least three years. Diplomates designated by the Board as Certified – Retired or Retired have attested to the ABA that they do not meet the ABA definition of clinical activity and do not plan to return to the practice of anesthesiology at any time in the future. **Diplomates with a certification status other than Certified have to apply to the ABA to re-attain Certified status (see Section 5.07).**

Inquiries about the current status of individuals should be addressed to the ABA office. In addition to the physician's full name, inquiries should include other identification information if available. The ABA responds to inquiries with one or more of the following statements:

- The physician is certified by the ABA.
- The physician currently is not clinically active.
- The physician is retired from the practice of anesthesiology.
- The physician was certified by the ABA from (date of certification) to (date certification expired).
- The ABA revoked the physician's certification, which had been in effect from (date of certification) to (date of revocation).
- The physician is a candidate in the ABA examination system.
- The physician never was certified by the ABA.

An individual's current status relative to the ABA examination and certification system may be confirmed at no charge via the ABA Diplomate and Candidate Directory at www.theABA.org, which is the official primary source for verification of ABA certification status. **The fee for written confirmation of an individual's status is $35.00.**

The certification marks identified in Section 1.03 are certification marks owned by The American Board of Anesthesiology, Inc., and only the ABA has any legal rights with respect to the ownership of such marks. In the event the ABA has reason to believe that an individual has misappropriated its certification marks for the purpose of misrepresenting his or her ABA certification status or for some other purpose, the ABA will aggressively defend the integrity of such marks, including but not limited to pursuing all legal remedies at law and in equity. After an investigation has been concluded and an individual has been determined to have committed such acts, the ABA may impose any of its own restrictions on the eligibility of the individual to participate in the ABA's examination system, including but not limited to permanent exclusion from entrance to its examination system; and the ABA shall notify any state medical licensure board known by it to have licensed the individual.

## 2.11   NONSTANDARD EXAMINATION CONDITIONS

The ABA supports the intent of the Americans with Disabilities Act (ADA) and has a process for considering requests that its assessment programs be modified to accommodate an individual with a disability (see Section 6). Anyone having questions about the process should write or call the Executive Director, Administrative Affairs of the Board at the ABA office.

## 2.12    IRREGULAR EXAMINATION BEHAVIOR

The Board acts to maintain the integrity of its examination and certification process and to ensure the equitable and objective administration of its examinations to all candidates. Information about behavior that the Board considers a violation of the integrity of its examination and certification process is sent to all candidates scheduled for examination. Statistical analyses may be conducted to verify observations and reports of suspected irregularities in the conduct of an examination. The examination of a candidate whose conduct, in the Board's judgment, violates or attempts to violate the integrity of its examination and certification process will be invalidated and no results will be reported. Furthermore, the candidate will be subject to punitive action as determined by the Board. In that event the candidate would be informed of the reasons for the Board's actions and could request an opportunity to present information deemed relevant to the issue and to petition the Board to reconsider its decision.

Irregular Examination Behavior means any conduct that, in the ABA's sole discretion, may jeopardize the integrity or validity of any ABA examination process or result, including but not limited to cheating, misappropriating, copying or reproducing any element of an examination for personal use or the use of a third-party without the explicit and specific written consent of the ABA. The ABA considers that Irregular Examination Behavior demonstrates unsatisfactory essential attributes related to the competency of Professionalism.

**For residents found to have engaged in Irregular Examination Behavior on the Joint Council In-Training examination:**

- The ABA will give the resident an unsatisfactory rating for appropriate Essential Attributes and for Overall Clinical Competence on the six-month Clinical Competence Committee report for the training period that included the test date for the in-training examination.

- The ABA will first consider an application for examination and certification from the individual no sooner than two years after the initial examination for which he or she otherwise could have qualified.

**For ABA candidates found to have engaged in Irregular Examination Behavior on an ABA examination:**

- The ABA will declare the candidate's application void.

- The ABA will not consider an application from the individual for re-admission to the ABA examination system for at least two years.

The above statements do not limit the Board's ability to impose more severe actions. In its sole discretion, the Board may require an individual who is found to have engaged in Irregular Examination Behavior to wait a longer period of time to apply to the ABA for examination. These decisions are final and not subject to review.


## 2.13    UNFORESEEABLE EVENTS

In the event of a natural disaster, war, government regulations, strikes, civil disorders, curtailment of transportation facilities or other unforeseeable events which make it inadvisable, illegal or impossible for the ABA to administer an examination to a candidate at the appointed date, time and location, or to conclude a candidate's examination, the ABA is not responsible for any personal expense the candidate may have incurred to be present for the examination, nor for any such expense the candidate may incur for any subsequent examination.

## 2.14 REAPPLICATION

The ABA declares void the application of a candidate who does not satisfy the examination requirements in the prescribed number of opportunities or time for whatever reason. The physician may reapply by submitting a new application. Such application shall be subject to the fees, rules, privileges and requirements that apply at the time of reapplication. In particular, individuals who previously applied under the provisions of the Board's now-defunct Royal College Certification policy must complete the continuum of education in anesthesiology (see Section 2.02) satisfactorily before submitting another application. The applicant who meets existing requirements will be readmitted into the examination system.

**The re-applicant for primary certification who has had a second or subsequent application declared void for any cause, or has completed anesthesia residency training more than 12 years before the date of reapplication, must reestablish his or her qualifications for admission to the examination system before filing another application.** The manner in which this may be done is described in Section 2.04.F. In all instances, the candidate must pass both the Part 1 and Part 2 examinations under the new application.

# ABA SUBSPECIALTY CERTIFICATION

## 3.01    ABA SUBSPECIALTY CERTIFICATES

The ABMS has authorized the ABA and other ABMS Member Boards to award certification in the subspecialties of critical care medicine, pain medicine, and hospice and palliative medicine.

**A.**    The discipline of **critical care medicine** (CCM) has evolved over the last few decades in parallel with the development of techniques and technology for acute and long-term life support of patients with multiple organ system derangement. Because problems encountered in the critically ill patient encompass aspects of many different specialties, critical care medicine is a multidisciplinary endeavor that crosses traditional department and specialty lines.

The critical care medicine physician is a specialist whose knowledge is of necessity broad, involving all aspects of management of the critically ill patient, and whose primary base of operation is the intensive care unit (ICU). This physician has completed training in a primary specialty and has received additional training in critical care medicine aspects of many disciplines.  This background enables the physician to work in concert with the various specialists on the patient care team in the ICU; to utilize recognized techniques for vital support; to teach other physicians, nurses, and health professionals the practice of intensive care; and to foster research.

**B.**    **Pain medicine** (PM) is the medical discipline concerned with the diagnosis and treatment of the entire range of painful disorders. Because of the vast scope of the field, pain medicine is a multidisciplinary subspecialty. The expertise of several disciplines is brought together in an effort to provide the maximum benefit to each patient. Although the care of patients is heavily influenced by the primary specialty of physicians who subspecialize in pain medicine, each member of the pain treatment team understands the anatomical and physiological basis of pain perception, the psychological factors that modify the pain experience, and the basic principles of pain medicine.

**C.**    **Hospice and palliative medicine** (HPM) is based on expanding scientific knowledge about symptom control when cure is not possible and appropriate care during the last months of life. Research, teaching, and practice efforts in this field have led to a vast increase in knowledge in the effort to relieve suffering of seriously ill patients and their families. Physicians who acquire subspecialist-level knowledge and skills in hospice and palliative medicine largely practice in one of two distinct professional roles: 1) hospice medical director, and 2) institution-based palliative care practice.

The competencies emphasized in the subspecialty of hospice and palliative medicine are needed so that the health care system can better respond to the steadily increasing number of patients with life-threatening illnesses characterized by prolonged courses during which the burden of illness increases, quality of life declines, suffering from multiple sources becomes manifest, and caregivers experience increasing burden and distress.  Many in this population pose complex problems which the specialist in hospice and palliative medicine is uniquely trained to address.  The subspecialist may take on the primary management of patients, during which he or she will work with a team to address patient and family problems in multiple domains, typically including the management of active dying. Subspecialists also function as consultants, working with the attending physician to accomplish the same goals by providing expertise, particularly where symptoms, ethical issues or communication issues are complex.

## 3.02    CERTIFICATION REQUIREMENTS

At the time of subspecialty certification by the ABA, the candidate must:

**A.**  Be a diplomate of the ABA.

**B.** Fulfill the licensure requirement for certification (see Section 2.01.A).

**C.** Have fulfilled the subspecialty training requirement as defined by the ABA.

**D.** Have satisfied the subspecialty examination requirement as defined by ABA.

**E.** Have a professional standing (see Section 5.06) satisfactory to the ABA.

**F.** Be capable of performing independently the entire scope of subspecialty practice without accommodation or with reasonable accommodation.

Although admission into the ABA examination system and success with the examination are important steps in the ABA certification process, they do not by themselves guarantee certification. The Board reserves the right to make the final determination of whether *each* candidate meets all of the requirements for certification, including B, E and F above, after successful completion of examinations for subspecialty certification.

The ABA awards subspecialty certification only to qualified ABA diplomates who do not hold a valid certificate in the same subspecialty from another ABMS Member Board. ABA subspecialty certificates are valid for 10 years after the year the candidate passes the subspecialty examination. Holders of a time-limited certificate may apply to the ABA to recertify in the subspecialty no sooner than three years before their subspecialty certification ends.

ABA subspecialty certificates are subject to ABA rules, regulations and Bylaws, including its Booklet of Information, all of which may be amended from time to time without further notice.

## 3.03  FELLOWSHIP REQUIREMENT

**A.**  The continuum of education in an anesthesiology subspecialty consists of 12 months of full-time training. The training must be in a subspecialty program in the United States or its territories accredited by the ACGME from the date the training begins to the date it ends. The training must follow completion of the continuum of education in anesthesiology (i.e., clinical base and CA 1-3 years) unless the Credentials Committee of the ABA prospectively approves a different training sequence for the fellow (see Section 2.02.D for details).

The ABA grants a fellow credit towards its subspecialty training requirements in two successive six-month increments, each of which ends with a satisfactory Certificate of Clinical Competence. To receive credit from the ABA for a period of subspecialty training that is not satisfactory, the fellow must immediately complete six months of uninterrupted subspecialty training in the same program with receipt of a satisfactory Certificate of Clinical Competence. If more than one six-month period of subspecialty training ends with a Certificate of Clinical Competence that is not satisfactory, the Credentials Committee of the ABA shall determine the number of months of additional training the fellow will have to complete to satisfy the training required for admission to the ABA examination system.

The ABA will accept no more than two months of training in institutions not recognized by the ACGME as part of the accredited subspecialty program. Therefore, the ABA requires that fellows complete a minimum of 10 months of training in their ACGME-accredited subspecialty program.

**B.**  The initial period during which an applicant was permitted to qualify for subspecialty examination by **temporary criteria** ended in 1993 for critical care medicine certification and in 1998 for pain medicine certification.

For the hospice and palliative medicine examinations in 2008, 2010 and 2012, applicants who have not satisfactorily completed 12 months of formal training in an ACGME-accredited hospice and palliative

medicine fellowship may be admitted to the examination via temporary criteria. The temporary criteria include a Training Pathway and a Practice Pathway that can be fulfilled in one of two ways.

**Training Pathway:**

The satisfactory completion of 12 months of formal fellowship training in hospice and palliative medicine, whose content and setting are acceptable to the ABA, which must meet the following criteria:

(1) Training begun on or after July 1, 2010 must be in an ACGME-accredited hospice and palliative medicine program from the date the training begins to the date it ends.

(2) Hospice and palliative medicine fellowship training completed prior to July 1, 2010, must be conducted within a program affiliated with an ACGME-accredited residency or fellowship program. Until the ACGME establishes formal guidelines, the training experience must be consistent with guidelines established by the ACGME or the Palliative Medicine Review Committee (PRMC).

**Practice Pathway:**

(1) At the time of application, the applicant must demonstrate at least 800 hours of clinical involvement in subspecialty level practice of hospice and palliative medicine during the last five years, including:

    a. At least two years and 100 hours of participation with a hospice and palliative care team, AND

    b. Participation in the active care of at least 50 terminally ill patients or patients requiring palliative care (25 for pediatrics).

**OR**

(2) Prior certification by the American Board of Hospice and Palliative Medicine and evidence of clinical activity in hospice and palliative medicine in the two years preceding the application.


## 3.04    ABSENCE FROM TRAINING

The total of any and all absences during a subspecialty fellowship may not exceed the equivalent of 20 working days (four weeks) per year. Attendance at scientific meetings, not to exceed five working days during the year of training, shall be considered part of the training program. Absences in excess of those specified will require lengthening of the total training time to the extent of the additional absence.

Training in an anesthesiology subspecialty must not be interrupted by frequent or prolonged periods of absence. When there is an absence for a period in excess of two months, the Credentials Committee of the ABA shall determine the number of months of training subsequent to resumption of the program that are necessary to satisfy the training requirement for admission to the ABA subspecialty examination system.


## 3.05    ENTRANCE REQUIREMENTS

At the time of application to enter the subspecialty examination system of the ABA, the applicant must:

**A.** Be certified by the ABA. Applicants for subspecialty certification must be a diplomate of the ABA no later than **December 31** of the year in which the subspecialty examination is administered.

**B.** Have fulfilled the licensure requirement for certification (see Section 2.01.A). The applicant must inform the ABA of any conditions or restrictions in force on any active medical license he or she holds. When there is a restriction or condition in force on any of the applicant's medical licenses, the Credentials Committee of the ABA will determine whether, and on what terms, the applicant shall be admitted to the ABA examination system.

C.   Have on file in the ABA office documentation of having satisfactorily fulfilled the subspecialty training requirement or, if applicable, Temporary Criteria in lieu of formal training in an accredited subspecialty program. Applicants who will complete the subspecialty training requirement by the end of the grace period (see Section 2.04.D) may apply for that year's subspecialty examination.

D.   Have on file with the Board documentation attesting to the applicant's current privileges and evaluations of various aspects of the applicant's current practice of the subspecialty. Such evaluations will include verification that the applicant meets the Board's clinical activity requirement by practicing the subspecialty, on average, at least one day per week during one of the previous three years. The ABA may use such documentation and evaluations as part of its assessment of the applicant's qualifications for admission to its subspecialty examination system. The ABA may solicit such documentation and evaluations from the fellowship program director or others familiar with the applicant's current practice of the subspecialty and use them in determining the applicant's qualifications for admission to the examination system. The Clinical Competence Report from the department **and** the evaluation of the program director and others will be used as the basis for assessing admission qualifications.

E.   If an applicant completed anesthesiology subspecialty fellowship training more than 12 years before the date of application, or if an applicant has had a second or subsequent subspecialty application declared void, the ABA must have evidence that the applicant has reestablished his or her qualifications for admission to the subspecialty examination system. To fulfill the subspecialty requalification requirement, the applicant must complete four more consecutive months of training in the subspecialty. The training must be in an ACGME-accredited anesthesiology subspecialty program and be completed satisfactorily before applying for examination.

F.   Be capable of performing independently the entire scope of anesthesiology subspecialty practice without accommodation or with reasonable accommodation.

The ABA shall determine that entry into the subspecialty examination system is warranted when required information submitted by and on behalf of the applicant is satisfactory. The ABA will notify an applicant who is accepted as a candidate for subspecialty certification after approval of all credentials.

Although admission into the ABA examination system and success with the examination are important steps in the ABA subspecialty certification process, they do not by themselves guarantee certification. The Board reserves the right to make the final determination of whether *each* candidate meets all of the requirements for certification (see Section 3.02).

The Board, acting as a committee of the whole, reserves the right not to accept an application. The applicant has the right to seek review of such decision (see Section 5.05).

The Board reserves the right to correct clerical errors affecting its decisions.


## 3.06   APPLICATION PROCEDURE

A.   Application for admission to the ABA examination system must be made using the ABA Electronic Application System via the ABA website at www.theABA.org.   Exceptions to this requirement will be considered upon written request.   Written requests are to be addressed to the ABA Secretary and must include the basis for the requested exception.

B.   The application form includes the identical Acknowledgement and Release statements included in the application for specialty certification (see Sections 2.06.B and C). The applicant for subspecialty examination shall be required to sign each statement by electronic signature.

## 3.07   FILING AND DECISION DEADLINES

**A.**   The **critical care medicine** certification examination is administered once each year. Test dates are September 12, 2009 and October 23, 2010.

The **pain medicine** certification examination is administered once each year. Test dates are September 12, 2009 and October 23, 2010.

The **hospice and palliative medicine** examination is administered every other year.   There will be no examination in 2009.  The 2010 examination date has not yet been determined.

**B.**   The **standard deadline** for the ABA to receive a completed application and the application fee for subspecialty examination in 2009 is March 15, 2009.  The standard deadline for the ABA to receive a completed application and the application fee for subspecialty examination in 2010 is March 31, 2010.

The **late deadline** by which the ABA must receive a completed application with the application fee is March 31, 2009 for subspecialty examination in 2009.

The late deadline by which the ABA must receive a completed application with the application fee is April 15, 2010 for subspecialty examination in 2010.

The late deadline for receipt of a completed application and the appropriate fees is absolute. Regardless of the reason, the ABA will not consider a subspecialty application it receives after the late deadline.

The ABA must receive all documentation it requires to make a decision about an applicant's qualifications for admission to a subspecialty examination by May 15 of the examination year. This includes, but is not limited to, references and verification that the training requirement is met. An application will not be accepted if the required documentation is not received by that date. **It ultimately is the responsibility of every applicant to assure that the ABA receives all required documentation in a timely manner.**


## 3.08   FEES

The ABA is a not-for-profit organization.  Fees are based on the cost of maintaining the functions of the ABA.

All fees paid to the ABA are non-refundable.

Current fees are posted on the ABA website at www.theABA.org. The Board reserves the right to change fees when necessary.


## 3.09   THE EXAMINATION SYSTEM

The examination in an anesthesiology subspecialty is designed to test for the presence of knowledge that is considered essential for the ABA diplomate to function as a practitioner of the subspecialty. The examination analyzes the cognitive and deductive skills as well as the clinical judgment of the candidates.

Subspecialty examinations in critical care medicine and pain medicine are administered annually. The first hospice and palliative medicine examination was administered in the fall of 2008; subsequently, the examination will be administered every two years.

The ABA will mail notice to all eligible candidates announcing the registration procedure and date of the examination approximately four months prior to the date of its scheduled administration.

The **duration of candidate status** is limited. Every candidate is given one opportunity a calendar year, for three years, to satisfy a subspecialty examination requirement. The candidate must satisfy the examination requirement within three years of the date of the first examination that follows acceptance of the application. Because the hospice and palliative medicine examination is administered every other year, candidates for certification in this subspecialty will have three opportunities to satisfy the examination requirement between the date of the first examination they are eligible to take and the next three consecutive administrations of the examination. The ABA will declare the candidate's application void if the candidate does not pass the examination within the prescribed number of opportunities or time, whichever comes first.  Physicians whose application has been declared void may reapply to the ABA.

The **ABA policies** regarding examination notices, excused absences, candidate responses and address changes are stated at Sections 2.09.B. and C. Its policies regarding examination under nonstandard conditions, irregular examination behavior and unforeseeable events may be found at Sections 2.11, 2.12 and 2.13.

## 3.10    STATUS OF INDIVIDUALS

Inquiries about the current status of physicians relative to the ABA subspecialty certification system should be addressed to the ABA office. The ABA will affirm the status of physicians who are certified in a subspecialty by the ABA. For others, the response to the inquiry will be in keeping with ABA policy (see Section 2.10).

## 3.11    REAPPLICATION

The ABA declares void the application of a candidate who does not satisfy the examination requirements in the prescribed number of opportunities or time for whatever reason. The physician may reapply by submitting a new application. Such application shall be subject to the fees, rules, privileges and requirements that apply at the time of reapplication.   The applicant who is judged to meet existing requirements will be readmitted into the examination system.

**Every re-applicant who qualified previously by Temporary Criteria is required to have completed satisfactorily the one-year continuum of education in the subspecialty before reapplying for the subspecialty certificate.**

# MAINTENANCE OF CERTIFICATION
# AND SUBSPECIALTY RECERTIFICATION

## 4.01   BACKGROUND

**A.**   Initiatives at federal, state and local levels convinced the ABA that some of its diplomates would need or desire a mechanism to demonstrate their continuing qualifications. In May 1989, the ABA announced its intent to develop a program for continued demonstration of qualifications (CDQ), which would afford its diplomates the opportunity to *voluntarily* demonstrate current knowledge and quality of practice. The ABA approved a policy of time-limited certification in 1995. All certificates issued by the ABA on or after January 1, 2000 will expire 10 years after the year the candidate passes the certification examination. The ABA took this step to reassure the public that the diplomate continues to demonstrate the attributes of a Board certified anesthesiologist. The ABMS approved the ABA recertification proposal in March 1996. Subsequently, the ABA changed the name of the CDQ program to recertification.

**B.**   In 1998, the ABMS approved ABA proposals for recertification in the subspecialties of critical care medicine and pain management. The credentialing requirements, examination and passing standard are the same for certification and recertification. The ABA administers the subspecialty examinations to recertification candidates annually.

**C.**   ABA Recertification Programs include a commitment to continuing education, an assessment of the quality of practice in the local environment, and an evaluation of knowledge. Diplomates who hold a certificate that is not time-limited may voluntarily elect to apply to the ABA for recertification. The ABA will not alter the status of their certification if they do not recertify.

**D.**   The voluntary program for recertification in the specialty of anesthesiology is only for diplomates certified by the ABA before the year 2000.  The recertification program ends in 2009 and is replaced by a program for Maintenance of Certification in Anesthesiology (MOCA).

**E.**   The ABMS approved the concept of maintenance of certification (MOC) in 2000. The 24 ABMS Member Boards subsequently endorsed the concept. MOC is a program of continual self-assessment and lifelong learning, along with periodic assessment of professional standing, cognitive expertise and practice performance and improvement. The ABA is committed to evolving its recertification programs to MOC programs.

**F.**   The ABA presented a proposal for the Maintenance of Certification in Anesthesiology Program (MOCA) to ABMS in 2002. The transition from the current recertification program to MOCA began in 2004. This allows adequate time for diplomates issued a time-limited certificate to satisfy all MOCA requirements. The maximum interval between initial certification that is time-limited and successful completion of the requirements to maintain certification for the first time, as well as each time MOCA is required thereafter, is 10 years.

**G.**   The ABA will begin transitioning from Subspecialty Recertification to Maintenance of Certification in Anesthesiology for Subspecialties (MOCA-SUBS) in January 2010.  The last subspecialty recertification examination will be administered in 2013, and the first MOCA-SUBS examination will be administered in 2014.

## 4.02   MAINTENANCE OF CERTIFICATION IN ANESTHESIOLOGY PROGRAM

The ABA issues a certificate that is valid for 10 years to diplomates certified on or after January 1, 2000. They must satisfactorily complete the requirements of MOCA before their time-limited certificate expires to maintain diplomate status in the specialty.

MOCA is a 10-year program of ongoing self-assessment and lifelong learning, continual professional standing assessment, periodic self-directed assessments of practice performance and quality improvement, and an examination of cognitive expertise. A diplomate's MOCA cycle begins the day after the ABA awards initial certification or maintenance of certification in the specialty. The ABA awards a MOCA certificate when a diplomate has completed all MOCA program requirements within the preceding 10 years. At the time of completion of maintenance of certification, the candidate must be capable of performing independently in the specialty or subspecialty, without accommodation or with reasonable accommodation.

Although admission into the MOCA program and success with components of the program are important steps in the ABA maintenance of certification process, they do not by themselves guarantee maintenance of certification. The Board reserves the right to make the final determination of whether *each* candidate meets all of the requirements for maintenance of certification, including Professional Standing and the ability to perform independently in the specialty or subspecialty, without accommodation or with reasonable accommodation, before awarding maintenance of certification.

ABA maintenance of certification certificates are subject to ABA rules, regulations and Bylaws, including its Booklet of Information, all of which may be amended from time to time without further notice.

Physicians should maintain competency in the following general areas: patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, and systems-based practice. The MOCA requirements for Professional Standing, Lifelong Learning and Self-Assessment (LLSA), Cognitive Expertise, and Practice Performance Assessment and Improvement (PPAI) are designed to provide assessments of these six general competencies.

## A.  PROFESSIONAL STANDING ASSESSMENT

ABA diplomates must hold an active, unrestricted license to practice medicine in at least one jurisdiction of the United States or Canada. Further, all US and Canadian medical licenses that a diplomate holds must be unrestricted (see Section 5.06).

The ABA assesses a diplomate's Professional Standing continually. ABA diplomates have the affirmative obligation to advise the ABA of any and all restrictions placed on any of their medical licenses and to provide the ABA with complete information concerning such restrictions within 60 days after their imposition. Such information shall include, but not be limited to, the identity of the medical board imposing the restriction as well as the restriction's duration, basis, and specific terms and conditions. Diplomates discovered not to have made disclosure may be subject to sanctions on their diplomate status. Professional Standing acceptable to the ABA is a prerequisite qualification for cognitive examination and for maintenance of certification.

## B.  LIFELONG LEARNING AND SELF-ASSESSMENT

ABA diplomates should continually seek to improve the quality of their clinical practice and patient care through self-directed professional development. This should be done through self-assessment and learning opportunities designed to meet the diplomate's needs and the MOCA requirement for Lifelong Learning and Self-Assessment (LLSA).

The LLSA requirement for maintenance of certification is 350 credits for continuing medical education (CME) activities. Of the 350 credit total:

(1)  At least 250 credits must be Category 1 credits for ACCME-approved programs or activities.

(2)  At most 100 credits may be for programs and activities for which Category 1 credit is not awarded.

(3) No more than 70 credits may be for CME programs and activities completed in the same calendar year.

(4) All newly certified diplomates and non-time limited diplomates who enter the MOCA program after January 1, 2008, are required to complete 60 Category 1 credits of either the American Society of Anesthesiologists' (ASA) Self-Education and Evaluation (SEE) program or the ASA's Anesthesiology Continuing Education (ACE) program once during their 10-year MOCA cycle. Information about these activities is available on the ASA website at www.ASAhq.org.

(5) All newly certified diplomates and non-time limited diplomates who enter the MOCA program after January 1, 2008, are required to complete 20 Category 1 credits of Patient Safety CME once during their 10-year MOCA cycle.

The prerequisite qualification for cognitive examination is at least 200 credits.

Beginning with the 2006 calendar year, the ABA will grant at most 70 LLSA credits for all CME activities completed in a single calendar year. Thus, MOCA candidates will have to complete some LLSA activity in at least five years of each 10-year MOCA cycle. They are encouraged to complete some LLSA activity in each of the six general competencies for physicians.

CME sponsors may submit CME activities and credits to the ABA electronically for ABA diplomates. ABA diplomates may self report their CME activities and credits to the ABA electronically. Whereas provider-reported CME activities do not require verification, self-reported CME activities are subject to audit and verification by the ABA within three years of their submission. **Therefore, diplomates must keep documentation of every self-reported CME activity for at least three years after they submit it to the ABA for LLSA credit.**

## C.  COGNITIVE EXPERTISE ASSESSMENT

MOCA candidates must demonstrate their cognitive expertise by passing an ABA examination administered via computer under secure, proctored, standardized testing conditions. About 50% of the test items are based on general anesthesia topics, and the remainder of the examination is approximately evenly distributed among the following areas: pediatric anesthesia, cardiothoracic anesthesia, neuroanesthesia, obstetric anesthesia, critical care medicine and pain medicine.

Candidates may satisfy the examination requirement no earlier than the seventh year of their 10-year MOCA cycle. Examination prerequisites for the purpose of satisfying the MOCA program requirement are:

(1) Professional standing acceptable to the ABA.

(2) PPAI participation acceptable to the ABA.

(3) At least 200 LLSA credits submitted to the ABA at least five months prior to the examination date.

For examination in 2009, candidates must register with the ABA to take the examination and pay the appropriate examination fee by September 30 of the preceding year for the January examinations and by April 30 of the examination year for the August examinations.

For examination in 2010, candidates must register with the ABA to take the examination and pay the appropriate examination fee by November 20 of the preceding year for the January examinations and by May 21 of the examination year for the July examinations.

There is no limit to the number of times candidates may take the MOCA examination to satisfy the maintenance of certification requirement. The ABA will inform registered examinees of the procedure for making an examination appointment approximately two months prior to the examination date.

The MOCA cognitive examination is administered twice each year. In 2009, the test dates are January 3 – 17 and July 11 – August 15. In 2010, the test dates are January 16 – 30 and July 17 – 31.

For the August 2009 examination, the ABA must receive all documentation it requires to make a decision about a MOCA candidate's eligibility for examination by March 31, 2009.

For examination in 2010, the ABA must receive all documentation it requires to make a decision about a MOCA candidate's eligibility for examination by October 31, 2009 for the January examinations and by April 30, 2010 for the July examinations.

These deadlines are absolute, and the ABA must have documentation that the candidate has met all of the prerequisites by the appropriate deadline. When the ABA does not have the required documentation by the appropriate deadline, it will evaluate the candidate's eligibility for the next MOCA examination. **It ultimately is the responsibility of MOCA candidates to assure that the ABA receives documentation in a timely manner that they have met all of the MOCA examination prerequisites.**

## D.   PRACTICE PERFORMANCE ASSESSMENT AND IMPROVEMENT

ABA diplomates should be continually engaged in a self-directed program of practice performance assessment and improvement (PPAI). For MOCA, the PPAI process consists of two activities:  1) case evaluation and 2) simulation education.

Diplomates must complete the two PPAI activities over their 10-year MOCA cycle.  Diplomates must complete at least one of the two activities in each of the following segments of their MOCA cycle: Years 1-5, and Years 6-10.  Each activity must be completed at least once in the diplomate's 10-year cycle.

Each year, the ABA will audit a sample of the case evaluations submitted by MOCA candidates.

Evidence of one PPAI activity acceptable to the ABA is a prerequisite for the MOCA Cognitive Examination and two PPAI activities are a requirement for completion of maintenance of certification in anesthesiology.

Additional information about the ABA's PPAI process can be found on the ABA website at www.theABA.org.

## E.   MOCA CYCLE DURING AND AFTER TRANSITION PERIOD

The transition from a voluntary recertification examination program to MOCA began in January 2004.  It will end with the administration of the December 2009 Recertification Examination.

(1)   Diplomates certified before 2000 have a certificate that is not time-limited. They do not have to complete the MOCA program to maintain certification. They may, however, voluntarily participate in either the recertification program until it ends in 2009 or the MOCA program.  The first time they apply for MOCA they may complete the program in as soon as one year. They may complete the expedited MOCA program only once; thereafter, the 10-year MOCA program is their only option.

Diplomates certified before 2000 who choose to complete their first MOCA program within five years of their enrollment must complete one of two PPAI activities (case evaluation or simulation education); those who choose to complete the program in 6-10 years of their enrollment must complete two PPAI activities. The Professional Standing assessment is continual. They can satisfy LLSA requirements on the basis of CME activities completed after certification and within the past 10 years. They can take a secure examination when they have satisfied all of the prerequisite requirements by the appropriate deadline (see Section 4.02.C).

(2)   The MOCA program is the only option for ABA diplomates certified in or after 2000 to maintain their certification. The ABA automatically enrolls diplomates in MOCA upon their certification or

maintenance of certification. They have to maintain Professional Standing acceptable to the ABA and satisfy the Cognitive Examination requirement. Additionally,

- Diplomates certified in 2000, 2001, 2002, or 2003 were issued a time-limited certificate before the MOCA program was available. For these diplomates, the LLSA requirements for the secure examination prerequisite and for the awarding of maintenance of certification are prorated, and, the PPAI requirement consists of the ABA obtaining attestations and evidence of the candidate's clinical activity and ongoing practice performance assessment and improvement in Years 5 and 9 of their MOCA cycle.

- The MOCA program was available when diplomates were issued a time-limited certificate in 2004, 2005, 2006, and 2007. For these diplomates, the LLSA requirements for the secure examination prerequisite and for the awarding of maintenance of certification are **not** prorated. For PPAI, the ABA will obtain attestations and evidence of the candidate's clinical activity and ongoing program of practice performance assessment and improvement in Year 5 of the candidate's MOCA cycle, and they have to complete one of two PPAI activities (case evaluation or simulation education) in Years 6 through 10.

- The LLSA requirements for the secure examination prerequisite and for the awarding of maintenance of certification are **not** prorated for diplomates issued a time-limited certificate in or after 2008. For PPAI, these diplomates have to complete two PPAI activities (case evaluation and simulation education).

Diplomates may visit the ABA website at www.theABA.org or contact the Board office for additional information regarding their MOCA program requirements.

## F.  ENROLLMENT APPLICATION PROCEDURE

Diplomates are automatically enrolled in MOCA when they are awarded time-limited specialty certification and again when they successfully complete each MOCA cycle, including an expedited MOCA cycle. The ABA automatically enrolls diplomates with a non-time limited primary certificate in MOCA upon their completion of the MOCA program in 2005 or thereafter. **All other ABA diplomates have to apply to the ABA to enroll in MOCA.**

There is no MOCA application fee. Diplomates not automatically enrolled in MOCA may apply to enroll at any time. Application for MOCA must be made electronically via the ABA website at www.theABA.org. Exceptions to this requirement will be considered upon written request.  Written requests are to be addressed to the ABA Secretary and must include the basis for the requested exception.

Applicants must provide information about all their medical licenses and current contact information (e.g., postal address) to complete the application process. **It ultimately is the responsibility of every applicant to assure that the ABA receives all required information.**

All MOCA candidates shall be required to sign, by electronic signature, the following Acknowledgement and Release Statement in Years 5 and 10 of their 10-year MOCA cycle.

*I, the undersigned Candidate ("Candidate"), hereby agree to participate in the American Board of Anesthesiology, Inc.'s ("ABA") Maintenance of Certification in Anesthesiology ("MOCA®") program I acknowledge that my participation in the MOCA program is subject to the ABA rules, regulations and Bylaws, all of which may be amended from time to time without further notice. I further acknowledge and agree that all examination fees paid to the ABA are non-refundable.*

*I represent and warrant to the ABA that all information I provide to the ABA is true, correct and complete in all material respects. I understand and acknowledge that any material misstatement in or omission  over the course of my MOCA cycle shall, at any time, constitute cause for disqualification*

*from the MOCA program or from the issuance of an ABA Certificate or to forfeiture and redelivery of such ABA Certificate.*

*I agree that the Acknowledgement, as submitted by me, shall survive my MOCA Application, regardless of whether or not the information or data provided during my participation in the program has been reformatted in any manner by the ABA. I also agree that this Acknowledgement precludes me from claiming the Acknowledgement does not relate to the MOCA Application.*

*I acknowledge that I have read a copy of the applicable ABA Booklet of Information. I agree to be bound by the policies, rules, regulations and requirements published in the applicable Booklet, in all matters relating to consideration of and action upon my participation as a Candidate in the MOCA program, and Certification should it be granted. I understand that ABA certificates are subject to ABA rules, regulations and Bylaws, all of which may be amended from time to time without further notice. In addition, I understand and acknowledge that in the event I have violated any of the ABA rules governing my Application and/or Certification, or in the event I fail to comply with any provisions of the ABA Certificate of Incorporation or Bylaws, such violations shall constitute cause for disqualification from the ABA MOCA program or from the issuance of an ABA Certificate or for revocation of certification and indication of such action in the ABA Diplomate and Candidate Directory.*

*In connection with my Candidate status in the MOCA program, I authorize all persons holding testimony, records, documents, opinions, information and data relevant to or pertaining to my professional competence and ethical conduct and/or behavior (the "Information") to release such Information to the ABA, its employees and agents. This authorization applies whether or not I provided the names of such persons. The Information includes any information relating to any abusive use of alcohol and/or illegal use of drugs, and any treatment or rehabilitation related thereto. The purpose of releasing such Information is to determine or verify my qualifications as a Candidate in the ABA MOCA program. A copy of this release may accompany any request made by the ABA for such Information.*

*I authorize the ABA to: (1) report my status in the MOCA program; (2) use any score in psychometric analyses to confirm observations and reports of suspected irregularities in the conduct of an examination; and (3) respond to any inquiry about my status in the ABA examination system. I also authorize the ABA to use any and all Information for the purpose of conducting longitudinal studies to assess the ABA certification process. Such Information may be reported or released only in the aggregate, and any results of such studies will have no direct bearing on my participation in the MOCA program or Certification status. Subject to applicable state and federal law requirements, the ABA shall hold all Information in confidence.*

*I release and agree to hold harmless each person from any liability to me arising out of the giving or releasing of Information to the ABA. This release and agreement includes liability for the inaccuracy or untruth of the Information, so long as such Information is provided in good faith. I also release and agree to hold harmless the ABA and its agents and employees, including but not limited to its directors, officers and examiners, from any liability to me as a result of any acts or proceedings undertaken or performed in connection with my participation in the MOCA program, provided such acts or proceedings are made or conducted in good faith.*

## G.  FEES

The ABA is a not-for-profit organization.  Fees are based on the cost of maintaining the functions of the ABA.

All fees paid to the ABA are non-refundable.

Current fees are posted on the ABA website at www.theABA.org. The Board reserves the right to change fees when necessary.

## H.  STATUS OF INDIVIDUALS

Inquiries about the current status of physicians should be addressed to the ABA office. For physicians certified by the ABA who subsequently complete the maintenance of certification program, the ABA will affirm their diplomate status and the year in which their MOCA certificate was issued. For others, the response to the inquiry will be in keeping with ABA policy (see Section 2.10).

## 4.03  SUBSPECIALTY RECERTIFICATION PROGRAMS

The ABA established **subspecialty recertification programs** for diplomates whether or not the subspecialty certificate issued to them is time-limited. The soonest diplomates may apply for subspecialty recertification is seven years after their certification or recertification in the subspecialty by the ABA. All diplomates certified in a subspecialty by the ABA are eligible to apply for recertification in that subspecialty. Diplomates with a subspecialty certificate that is not time-limited will not jeopardize their subspecialty certification status by participating in the subspecialty recertification program.

## A.  SUBSPECIALTY RECERTIFICATION REQUIREMENTS

ABA subspecialty recertification programs include two major components: an evaluation of the quality of current practice conducted at the local level and a secure computer-administered examination. At the time of application for an ABA recertification examination, the applicant must:

(1)  Be a physician to whom the ABA previously awarded certification in the subspecialty.

(2)  Have fulfilled the licensure requirement for certification (see Section 2.01.A). The applicant must inform the ABA of any conditions or restrictions in force on any active medical license he or she holds. When there is a restriction or condition in force on any of the applicant's medical licenses, the Credentials Committee of the ABA will determine whether, and on what terms, the applicant shall be admitted to the ABA examination system.

(3)  Have on file in the ABA office documentation solicited by the ABA from the hospital/facility chief of staff, or equivalent, attesting to the applicant's current privileges where a substantial portion of the applicant's practice takes place. The documentation includes evaluations of various aspects of the applicant's current practice and verification that the applicant meets the Board's clinical activity requirement by practicing the medical discipline for which recertification is being sought, on average, at least one day per week during one of the previous three years (see Sections 2.04.E and 3.04.). If the applicant's practice is entirely office-based, three letters of reference solicited by the ABA from referring physicians should be on file.

(4)  Be capable of performing independently in the subspecialty, without accommodation or with reasonable accommodation.

The ABA shall determine that entry into the recertification examination system is warranted when required information submitted by and on behalf of the applicant is satisfactory. The ABA will notify an applicant who is accepted as a candidate for recertification after approval of all credentials.

Although admission into the ABA recertification examination system and success with the examination are important steps in the ABA recertification process, they do not by themselves guarantee recertification. The Board reserves the right to make the final determination of whether *each* candidate meets all of the requirements for recertification (see Section 4.03.A) after successful completion of examinations for recertification.

The Board, acting as a committee of the whole, reserves the right not to accept an application. The applicant has the right to seek review of such decision (see Section 5.05).

The Board reserves the right to correct clerical errors affecting its decisions.

ABA subspecialty recertification certificates are subject to ABA rules, regulations and Bylaws, including its Booklet of Information, all of which may be amended from time to time without further notice.

## B.   APPLICATION PROCEDURE AND DECISION DEADLINES

Application for admission to the ABA recertification examination must be made using the ABA Electronic Application System, via the ABA website at www.theABA.org.   Exceptions to this requirement will be considered upon written request.   Written requests are to be addressed to the ABA Secretary and must include the basis for the requested exception.

The application form includes the identical Acknowledgement and Release statements included in the application for initial certification (see Sections 2.06.B and C). The recertification applicant shall be required to sign each statement by electronic signature.

The **critical care medicine** recertification examination is administered once each year. Test dates are September 19 – October 3, 2009 and October 30 – November 13, 2010.

The **pain medicine** recertification examination is administered once each year. Test dates are September 19 - October 3, 2009 and October 30 – November 13, 2010.

The **standard deadline** for the ABA to receive a completed application and the application fee for subspecialty recertification in 2009 is March 15, 2009.

The standard deadline for the ABA to receive a completed application and the application fee for subspecialty recertification in 2010 is March 31, 2010.

The **late deadline** for the ABA to receive a completed application with the application fee and a late fee for subspecialty recertification in 2009 is March 31, 2009.

The late deadline for the ABA to receive a completed application with the application fee and a late fee for subspecialty recertification in 2010 is April 15, 2010.

The late deadline for receipt of a completed subspecialty recertification application and the appropriate fee are absolute. Regardless of the reason, the ABA will not consider a recertification application it receives after the late deadline for the examination.

The ABA must receive all documentation it requires to make a decision about an applicant's qualifications for admission to a subspecialty recertification examination by May 15 of the examination year. Documentation includes, but is not limited to, verification of current credentialing/hospital privileges. An application will not be accepted if the required documentation is not received by that date. **It ultimately is the responsibility of every applicant to assure that the ABA receives all required documentation in a timely manner.**

## C.   FEES

The ABA is a not-for-profit organization.   Fees are based on the cost of maintaining the functions of the ABA.

All fees paid to the ABA are non-refundable.

Current fees are posted on the ABA website at www.theABA.org. The Board reserves the right to change fees when necessary.

## D.   THE EXAMINATION SYSTEM

The ABA shall determine that admission to a recertification examination is warranted when required information submitted by and on behalf of the applicant is satisfactory. The ABA will notify an applicant who is accepted as a candidate for recertification after approval of all credentials. The ABA will notify all eligible candidates of the location(s) and date of their examination approximately four months prior to the date of its scheduled administration.

The Board, acting as a committee of the whole, reserves the right not to accept an application. The applicant has the right to seek review of such decision (see Section 5.05).

The Board reserves the right to correct clerical errors affecting its decisions.

**Subspecialty recertification examinations** are designed to test for the presence of knowledge considered essential for the ABA diplomate to function as a practitioner of the subspecialty. They are administered annually. Every candidate is given one opportunity a calendar year, for three years, to satisfy the subspecialty recertification examination requirement. The candidate must satisfy the examination requirement within three years of the date of the first examination that follows acceptance of the application. The ABA will declare the candidate's application void if the candidate does not pass the examination within the prescribed number of opportunities or time, whichever comes first. Physicians whose application has been declared void may reapply to the ABA.

The **ABA policies** regarding examination notices, excused absences, candidate responses, and address changes are stated at Sections 2.09.B. and C. Its policies regarding examination under nonstandard conditions, irregular examination behavior and unforeseeable events may be found at Sections 2.11, 2.12 and 2.13.

## E.   STATUS OF INDIVIDUALS

Inquiries about the current status of physicians should be addressed to the ABA office. For physicians certified by the ABA who subsequently complete the recertification program, the ABA will affirm their diplomate status and the year of their recertification. For others, the response to the inquiry will be in keeping with ABA policy (see Section 2.10).

## F.   REAPPLICATION

To reapply for subspecialty recertification, the physician must submit a new application. Such application shall be subject to the fees, rules, privileges and requirements that apply at the time of reapplication. The applicant who is judged to meet existing requirements will be accepted as a candidate for recertification.

## 4.04   MAINTENANCE OF SUBSPECIALTY CERTIFICATION

The transition from subspecialty recertification examination programs to Maintenance of Certification in Anesthesiology for Subspecialties (MOCA-SUBS) will begin January 1, 2010. The last subspecialty recertification examinations will be administered in 2013, and the first MOCA-SUBS examinations will be administered in 2014.

The MOCA-SUBS program is the only option for holders of ABA subspecialty certification or recertification awarded in or after 2007. Diplomates with ABA subspecialty certification or recertification awarded before 2007 may apply for subspecialty recertification through March 31, 2013 but no sooner than seven years after their certification or recertification in the subspecialty.

## A.  TRANSITION TO MOCA-SUBS

Every diplomate whose subspecialty recertification application is accepted by the qualification deadline in 2013 will be given one opportunity per year, for three years, to satisfy the subspecialty recertification examination requirement. When diplomates meet all of the recertification requirements, including the examination requirement, the ABA will issue them a subspecialty recertification certificate.

*After 2013, the MOCA-SUBS program is the only option for ABA diplomates who wish to recertify in an* anesthesiology subspecialty whether to maintain subspecialty certification or for some other reason. The ABA automatically enrolls diplomates in MOCA-SUBS upon their subspecialty certification, subspecialty recertification or maintenance of certification in the subspecialty.

The MOCA-SUBS program opens January 1, 2010. Diplomates issued a <u>time-limited</u> subspecialty certificate in 2007 and 2008 will have less than 10 years to complete their first MOCA-SUBS cycle. For them, the LLSA requirements for the secure examination prerequisite and for the awarding of maintenance of certification in the subspecialty are prorated, as follows:

| Certification Year | LLSA Requirement For | |
|---|---|---|
| | MOCA-SUBS | Secure Exam Prerequisite |
| 2007 | 280 credits | 160 credits |
| 2008 | 315 credits | 180 credits |

Diplomates certified or recertified in a subspecialty in or after 2009 have 10 years to complete all MOCA-SUBS requirements before their certification expires. They have to complete 350 LLSA credits with a minimum of 250 Category 1 credits, complete the PPAI and Cognitive Examination requirements, and have acceptable Professional Standing.  A prerequisite for them to take the cognitive exam is 200 LLSA credits. They can take the secure examination no sooner than the seventh year of their MOCA cycle.

The first time diplomates with a non-time limited subspecialty certificate apply for MOCA-SUBS they may complete the program in as soon as one year. They may expedite the completion of the MOCA-SUBS program only once; thereafter, the 10-year MOCA-SUBS program is *their only option.* Diplomates with a critical care medicine certificate that is not time-limited will not jeopardize their subspecialty certification status by participating in the subspecialty recertification program or MOCA-SUBS.

## B.  COGNITIVE EXPERTISE ASSESSMENT

MOCA-SUBS candidates must demonstrate their cognitive expertise by passing an ABA examination administered via computer under secure, standardized testing conditions. They may take the examination no earlier than the seventh year of their 10-year MOCA-SUBS cycle.

Examination pre-requisites are:

(1)  Professional standing acceptable to the ABA.

(2)  Practice performance assessments acceptable to the ABA.

(3)  At least 200 LLSA credits submitted to the ABA at least five months prior to the examination date.

## C.  ENROLLMENT APPLICATION PROCEDURE

*Diplomates are automatically enrolled in the MOCA-SUBS program when they are awarded time-limited* subspecialty certification and when they successfully complete each MOCA-SUBS cycle.

There is no MOCA-SUBS application fee. Diplomates not automatically enrolled in MOCA-SUBS may apply to enroll at any time after January 1, 2010. Application for MOCA-SUBS must be made electronically via the ABA website at www.theABA.org.  Exceptions to this requirement will be considered upon written request. Written requests must be addressed to the ABA Secretary and must include the basis for the requested exception.

Applicants must provide information about all their medical licenses and current contact information (e.g., postal address) to complete the application process. **It ultimately is the responsibility of every applicant to assure that the ABA receives all required information.**

# BOARD POLICIES

## 5.01    ALCOHOL AND SUBSTANCE ABUSE

The Americans with Disabilities Act protects individuals with a history of alcohol or substance abuse who are not currently abusing alcohol or using drugs illegally. The ABA supports the intent of the ADA.

The ABA will admit qualified applicants and candidates with a history of alcohol abuse to its examination system and to examination if, in response to its inquiries, the ABA receives acceptable documentation that they are not currently abusing alcohol.

The ABA will admit qualified applicants and candidates with a history of illegal use of drugs to its examination system and to examination if, in response to its inquiries, the ABA receives acceptable documentation that they are not currently engaged in the illegal use of drugs.

After a candidate with a history of alcohol abuse or illegal use of drugs satisfies the examination requirements for certification, the ABA will determine whether it should defer awarding its certification to the candidate for a period of time to avoid certifying a candidate who poses a direct threat to the health and safety of others. If the ABA determines that deferral of the candidate's certification is appropriate because the candidate does currently pose a threat to the health and safety of others, the ABA will assess the specific circumstances of the candidate's history of alcohol abuse or illegal use of drugs to determine when the candidate should write the Board to request issuance of its certification.

## 5.02    REVOCATION OF CERTIFICATION

A certificate is issued by the Board with the understanding that it remains the property of the Board. Any certificate issued by the Board shall be subject to revocation in the event that:

**A.**    The issuance of such certificate or its receipt by the person so certified shall have been contrary to, or in violation of, any provision of the Certificate of Incorporation of this Board or its By-Laws; or

**B.**    The person certified shall not have been eligible to receive such certificate whether or not the facts making him or her ineligible were known to, or could have been ascertained by, the Board or any of its Directors at the time of issuance of such certificate; or

**C.**    The person certified shall have made any misstatement or omission of fact in his or her application for such certificate or in any other statement or representation to the Board or its representatives; or

**D.**    The person certified shall fail to maintain a professional standing (see Section 5.06) satisfactory to the Board.

The Board shall be the sole judge of whether or not the evidence or information before it is sufficient to require or permit revocation of any certificate issued by the Board, and the decision of the Board shall be final. The individual has the right to seek review of such decision (see Section 5.05).

## 5.03    CERTIFICATION BY OTHER ORGANIZATIONS

The ABA will make no statement about the comparability of the ABA certificate and another organization's certificate. The ABA will not accept certification by another entity as meeting the requirements for entrance into the ABA examination system for specialty or subspecialty certification or recertification.

## 5.04 RECORDS RETENTION

The ABA retains certain documents pertaining to an individual's residency training, application for certification, examination opportunities, and examination results (Certification Records) for the sole purpose of determining that its requirements for admission to the examination system, certification or recertification are fulfilled.

A complete copy of the Certification Records Retention Policy is available upon written request. The following is a summary of the ABA's Certification Records Retention Policy:

- In the absence of an application for certification, Certification Records pertaining to the ABA entrance requirements are retained for seven years from the date of the most recent correspondence to or from the ABA regarding the requirements.

- Certification Records pertaining to an unsuccessful application are retained until the individual submits another application to the ABA or the aforementioned seven-year period expires, whichever occurs first.

- Certification Records corroborating the results of a candidate's examination are retained until six months after the date of the most recent correspondence to or from the ABA regarding the results.

- Certification Records corroborating the candidate's fulfillment of the ABA certification requirements (e.g., evidence of medical licensure) are retained until one year after the date of the most recent correspondence to or from the ABA regarding the candidate's certification by the ABA.

- Certification Records pertaining to adverse board actions, including termination or other sanctions, are retained for seven years from the date of the most recent correspondence to or from the ABA regarding such board action.

- Certification Records corroborating a diplomate's completion of an ABA maintenance of certification program are retained until the diplomate has completed the current MOCA cycle or 10 years, whichever occurs first. All other Certification Records related to an ABA maintenance of certification program, including supporting documentation and evaluation results, are retained until six months after the date of the most recent correspondence to or from the ABA regarding the results.

- A Certification Record pertaining to a candidate's completion of an ACGME-accredited anesthesiology residency program is retained indefinitely. This Certification Record includes entries that identify the training program, the dates of training and the faculty's overall evaluation of the resident's performance during training.

- Certification Records for candidates issued an ABA certification are retained indefinitely. These Certification Records include documents and entries attesting that each certification requirement was met.

The ABA sees to the secure destruction of the documents in its file for an individual when the period specified for retention of the documents has expired.

## 5.05 FORMAL REVIEW PROCESS

The only actions of the ABA that are subject to formal review are a decision not to accept an application, a decision not to grant a request for an examination under nonstandard testing conditions, and a decision to revoke a certificate issued by the ABA.

The individual must give the ABA written notification of the intention to seek a formal review within 30 days of receiving notification of the Board's decision. The individual shall address the notice to the ABA Secretary at the Board office and shall set forth the grounds upon which the request for formal review is based. If the individual does not give the ABA written notification of the intent to seek formal review within the time and in the manner prescribed, the individual shall be considered to have accepted the decision of the Board and the decision shall become final.

Upon receipt of notice of a request for formal review within the time and in the manner prescribed, the request will be screened to determine whether or not it meets the standards for a formal review to occur. Minimum criteria for a formal review are grounds that the Board's action was inconsistent with ABA policies or not supported by the evidence available to the Board when the action was taken. If it is determined that there are grounds for a formal review, the ABA shall form a Review Panel and schedule a hearing. Otherwise, the decision of the Board shall become final.

## 5.06    PROFESSIONAL STANDING

Professional standing satisfactory to the ABA is a requirement for acceptance as a candidate for ABA certification and for certification, subcertification, recertification and maintenance of certification by the ABA.

Applicants with a medical license that is revoked, suspended or surrendered in lieu of revocation or suspension will not be accepted as a candidate for initial certification in anesthesiology. Applicants with less severe restrictions on a medical license may be accepted into the ABA system and certification may be deferred until the medical license is unrestricted or the Credentials Committee recommends and the Board approves awarding certification to the physician.

Candidates with a medical license that is revoked, suspended or surrendered in lieu of revocation or suspension will not be permitted to take ABA examinations until the license is unrestricted, and then only if the application period is valid. Candidates with less severe restrictions on a medical license may be permitted to take ABA examinations and certification may be deferred until the medical license is unrestricted or the Credentials Committee recommends and the Board approves awarding certification to the physician.

The ABA will initiate proceedings to revoke the certification(s) of diplomates with a medical license that is revoked, suspended or surrendered in lieu of revocation, suspension, inquiry or investigation, upon notice of such action. The ABA has the authority and may decide to undertake proceedings to take action against diplomates with other, less severe medical licensure restrictions (e.g., probation or "conditions"), which may include revocation of the certification.

## 5.07    RE-ATTAINING CERTIFICATION STATUS

The ABA established an application procedure for diplomates with the designation Certified – Not Clinically Active, Certified – Retired, or Retired to re-attain the designation Certified. There also is a procedure for physicians whose ABA certification is revoked to apply to the ABA to re-attain certification. Interested physicians should contact the ABA office for details about these application procedures.

The ABA considers applications for re-attaining ABA certification on an individualized, case-by-case basis. The ABA may require the applicant to do one or more of the following in order to re-attain certification:

- Pass the ABA Part 1 examination.

- Pass the ABA Part 2 examination.

- Undertake continuing medical education.

- Complete additional training acceptable to the ABA.

- Complete other activities as deemed necessary by the ABA.

The ABA may choose to allow an applicant who has been certified in both anesthesiology and one or more anesthesia subspecialties, and who has changed their certification status to "Not Clinically Active", "Certified – Retired", or "Retired", or who has had the certificates "Revoked", to re-attain those certifications at different times. If an applicant had qualified under temporary criteria for a certificate, the status of which the diplomate has changed to either "Not Clinically Active", "Certified – Retired", or "Retired", or which has been "Revoked", the ABA may require the applicant to complete additional training or satisfy other additional conditions acceptable to the ABA.

Certifications that are re-attained are subject to the requirements for recertification and maintenance of certification and to the ABA rules, regulations and Bylaws, including its Booklet of Information, all of which may be amended from time to time without further notice.

## 5.08    ALTERNATE ENTRY PATH TO SPECIALTY CERTIFICATION EXAMINATIONS

The ABA has approved a seven-year pilot program that would allow international medical graduates, certified by the national anesthesiology organization in the country where they trained in the specialty and practicing anesthesiology in the United States, to qualify for entrance into the ABA examination system for initial certification in the specialty at most once via an alternate entry path. The objective of the pilot program is to encourage outstanding internationally trained and certified anesthesiologists, who come to the United States, to become productive research members of U.S. academic anesthesiology programs.

### A.    ALTERNATE ENTRY PATH

International medical graduates interested in using the alternate entry path must complete a total of four years of continuous experience in one anesthesiology department that commences on or after July 1, 2007. The ABA must prospectively approve the four-year program planned for the international medical graduate. At the time the anesthesiology department enrolls the international medical graduate with the ABA, the department must have an ACGME-accredited anesthesiology residency or fellowship training program that has continued full accreditation and a review cycle of three years or more. **An anesthesiology department can have no more than two international medical graduates enrolled in the pilot program at one time.**

### B.    PROSPECTIVE APPROVAL AND ENROLLMENT PROCESSES

The chair of the anesthesiology department that sponsors the internationally certified anesthesiologist must submit to the ABA a four-year plan, co-signed by the physician, for prospective approval by the ABA Credentials Committee. The ABA must receive the four-year plan no later than four months before the department enrolls the internationally certified anesthesiologist with the ABA and the four-year period of continuous experience commences.

The experiences planned for the internationally certified anesthesiologist will consist of four years of resident or fellowship training, research, or faculty experience, or combination thereof. During the four-year period, these anesthesiologists shall demonstrate excellence in teaching, clinical anesthesiology, and discovery of new knowledge in the specialty. The four-year experience must be in the same institution in which the anesthesiology program resides. The four-year plan should be specifically designed and identified for the candidate, including the anticipated research activity.

The department chair also has to submit the following documents with the request for prospective approval of a four-year plan for an internationally trained and certified anesthesiologist:

- Documentation of the physician's anesthesiology certification in a country other than the U.S. that was preceded by postgraduate training in anesthesiology that is comparable in duration to training in the specialty provided by ACGME-accredited anesthesiology programs in the U.S.

- Written verification satisfactory to the Board of the physician's anesthesiology certification from the certifying body.

- Evidence satisfactory to the Board that the physician has been awarded a medical or osteopathic degree acceptable to the ABA.

- Evidence of *one* of the following:
  - A permanent (valid indefinitely) certificate from the Educational Commission for Foreign Medical Graduates; or,
  - Comparable credentials from the Medical Council of Canada; or,
  - An active license to practice medicine or osteopathy in one state of the United States or in Canada that is permanent, unconditional and unrestricted.

## C.   PERIODIC EVALUATION REPORTS

At 6-month intervals, the department chair must submit to the ABA attestations that the physician is currently a resident or fellow in an ACGME-accredited program, or is actively engaged in research, or is a faculty member with a full-time primary appointment in the ACGME-accredited program. At the same time, the department chair will provide the ABA with an assessment of the physician's performance during the preceding six months relative to the ABMS- and ACGME-approved six general physician competencies.

## D.   REQUIREMENTS FOR ENTRANCE INTO THE ABA EXAMINATION SYSTEM

Before the ABA will accept a physician in the alternate entry path program as a candidate for examination and certification, the physician must complete satisfactorily the four-year program of continuous experience in one anesthesiology department that was planned by the department chair and prospectively approved by the ABA. The ABA will permit the physician to apply for the Part 1 examination if he or she will complete the four-year program by the end of the **grace period** (see Section 2.04.D).

The internationally trained and certified anesthesiologist must apply to the ABA for examination. In addition to submitting the application electronically, the ABA requires that the physician:

- Have on file in the ABA office attestations from the department chair that the applicant completed satisfactorily the four-year program planned by the department chair and prospectively approved by the ABA Credentials Committee.

- Provide evidence acceptable to the Board of having an unexpired license to practice medicine or osteopathy in at least one state or jurisdiction of the United States or province of Canada that is permanent, unconditional and unrestricted. Further, every United States and Canadian medical license the applicant holds must be free of restrictions. The applicant must inform the ABA of any conditions or restrictions in force on any active medical license he or she holds. When there is a restriction or condition in force on any of the applicant's medical licenses, the Credentials Committee of the ABA will determine whether, and on what terms, the applicant shall be admitted to the ABA examination system (see Section 2.01.A)

- Have on file with the Board documentation attesting to the applicant's current privileges and evaluations of various aspects of his or her current practice of anesthesiology. Such evaluations will include verification that the applicant meets the Board's clinical activity requirement by spending, on average, at least one day per week during one of the previous three years in the clinical practice of anesthesiology and/or related subspecialties. The ABA may solicit such documentation and evaluations from the chair of the anesthesiology department that enrolled the physician in the alternate entry path program and use them in determining the applicant's qualifications for admission to the examination system. The department's assessment of the physician's performance relative to the ABMS- and ACGME-approved six general physician competencies at six-month intervals **and** the evaluation of the anesthesiology department chair will be used as the basis for assessing admission qualifications.

E.  OUTCOME MEASURES TO ASSESS THE PILOT PROGRAM'S SUCCESS

The ABA will judge the success of this seven-year pilot program and the continued ability of departments to participate in the process on the basis of the certification success and subsequent academic productivity of their participants in the alternate entry path. **Thus, department chairs should encourage participants in this pilot project to actively participate in department educational activities, to take the in-training examination annually, and to otherwise retain or gain basic anesthesiology knowledge and experience that would help them to attain ABA certification.**

The ABA will evaluate the success of the pilot program *in toto*. However, there could be consequences for a specific department's continued participation in the program if its participants do not achieve ABA certification, do not remain in academic anesthesiology or are not academically productive subsequent to completing the program.


5.09  INDEPENDENT PRACTICE REQUIREMENT

Applicants and candidates for initial ABA specialty or subspecialty certification must be capable of performing independently the entire scope of practice in the specialty or subspecialty without accommodation or with reasonable accommodation.

Applicants and candidates for ABA recertification or maintenance of certification must be capable of performing independently in the specialty or subspecialty, without accommodation or with reasonable accommodation.

# EXAMINATION UNDER NONSTANDARD CONDITIONS

The ABA supports the intent of the Americans with Disabilities Act. To accommodate individuals with disabilities, the ABA will make reasonable modifications to its assessment programs that do not impose an undue burden on its programs or fundamentally alter the measurement of skills or knowledge that the programs are intended to test.

## 6.01    REQUESTING ACCOMMODATION

Individuals must request examination under nonstandard conditions in writing no later than the deadline for filing an application for the examination. The request must state the nature of the individual's disabilities and all the modifications or auxiliary aids being requested.

Documentation and other evidence of the nature, severity and impact of the individual's disability must accompany the request. The documentation must include an evaluation report from the professional who assessed the individual's disability that explains why the testing results support the specific diagnosis and how the disability limits the individual's ability to take the examination under standard testing conditions.

Documentation of the individual's disability must include the results of tests performed when the individual is using mitigating measures (e.g. a medication, assistive device, or prosthetic) or compensating behaviors that are available to control or correct the symptoms or limitations of the individual's disability.

The nature and severity of a disability and its impact on the individual's ability to take the examination under standard testing conditions may change with time. Therefore, the ABA requires that the accompanying assessments of an individual's disability and resulting functional limitations be based on testing results and evaluations that are sufficiently recent (generally performed within five years of the examination for which accommodation is requested) to demonstrate the current nature and severity of the disability and its impact on the individual's ability to take the examination under standard testing conditions.

The ABA office must receive all documentation and other evidence substantiating the individual's disabilities no later than four months before the examination date. Documentation includes, but is not limited to:

- Name, address, telephone number and qualifications of each expert who provides a report documenting the individual's disabilities.

- Dates and locations of all assessments performed and included in the documentation.

- A complete history of the diagnosed condition, including evidence of the condition in childhood, whether or not the condition was formally diagnosed in the past, and if so, when and what type of testing accommodations were offered.

- A psychological history that rules out alternative explanations (e.g., anxiety, depression disorders) for the perceived deficit. (Psychometric testing of emotional functioning might be helpful to rule out alternative explanations.)

- Evaluation reports that include standardized testing results and scores or ratings from an individually administered IQ test and from tests of reading comprehension under timed and extended-time conditions that are scored with appropriate norms.

- Testing results and scores or ratings from standardized tests of information processing variables presumed to underlie the diagnosed condition (e.g., a test of sustained attention in cases of attention deficit hyperactivity disorder; tests of phonemic decoding, visual processing, etc. in cases of reading disorder; an individually administered achievement battery in cases of learning disability).

- A specific diagnosis of the individual's disabilities to be accommodated using standard nomenclature; i.e., International Classification of Diseases [ICD]; American Psychiatric Association Diagnostic and Statistical Manual [DSM].

- An explanation of how the diagnosed condition(s) significantly impacts the individual's ability to take the examination under standard testing conditions.

- Reports of any past accommodations on examinations the individual received because of the disabilities.

The ABA reserves the right to verify independently, at its own expense, the nature and severity of an individual's disabilities and their impact on the individual's ability to take the examination under standard testing conditions.


## 6.02    CONSIDERING A REQUEST

A committee of the ABA (hereinafter referred to as "the committee") will consider the individual's request and the documentation submitted to substantiate the basis for it. At its own expense, the committee may obtain the professional opinion of experts of its choosing regarding the documentation of the individual's disabilities and the accommodations requested.

The committee will make reasonable accommodations for individuals with disabilities when there is sufficient evidence of a disability that significantly impairs the individual's ability to take the examination under standard testing conditions. However, auxiliary aids and services, and modifications to the ABA assessment programs, can only be offered if they do not fundamentally alter the measurement of skills or knowledge that the programs are intended to test or result in an undue burden on the ABA programs.

The Secretary of the ABA will send the individual a letter of notification of the committee's action. If the individual's request is not granted, the letter shall include the basis for the committee's action. The individual has the right to seek review of such decision (see Section 5.05).

## FILING DEADLINES AND TEST DATES

### SPECIALTY CERTIFICATION

| Part 1 | 2009 | 2010 |
|---|---|---|
| Test Dates | Aug 3 – 4 | Aug 2 – 3 |
| Application Cycle Begins | Oct 15, 2008 | Oct 15, 2009 |
| Standard Deadline | Dec 15, 2008 | Dec 15, 2009 |
| Late Deadline | Jan 15, 2009 | Dec 31, 2009 |
| Decision Deadline | Mar 15, 2009 | Mar 15, 2010 |

| Part 2 | 2009 | 2010 |
|---|---|---|
| Test Dates: Spring | Apr 20 – 24 | Apr 19 – 23 |
| Registration Deadline | Nov 30, 2008 | Nov 30, 2009 |
| Test Dates: Fall | Oct 5 – 9 | Sep 27 – Oct 1 |
| Registration Deadline | May 1, 2009 | May 1, 2010 |

### SPECIALTY RECERTIFICATION

| | 2009 - ONLY |
|---|---|
| Test Dates: Winter | Jan 3 - 17, 2009 |
| Application Cycle | Open Until Dec 31, 2008 |
| Decision Deadline | Aug 31, 2008 |
| Test Dates: Summer | Jul 11 – Aug 15, 2009 |
| Decision Deadline | Mar 31, 2009 |

### MOCA

| | 2009 | 2010 |
|---|---|---|
| Test Dates: Winter | Jan 3 – 17 | Jan 16 – 30 |
| Application Cycle | Continuous (24/7/365) | |
| Decision Deadline | Aug 31, 2008 | Oct 31, 2009 |
| Test Dates: Summer | Jul 11 – Aug 15 | Jul 17 – 31 |
| Application Cycle | Continuous (24/7/365) | |
| Decision Deadline | Mar 31, 2009 | Apr 30, 2010 |

### CCM & PM CERTIFICATION

| | 2009 | 2010 |
|---|---|---|
| Test Dates | Sep 12 | Oct 23 |
| Application Cycle Begins | Jan 15, 2009 | Feb 1, 2010 |
| Standard Deadline | Mar 15, 2009 | Mar 31, 2010 |
| Late Deadline | Mar 31, 2009 | Apr 15, 2010 |
| Decision Deadline | May 15, 2009 | May 15, 2010 |

### CCM & PM RECERTIFICATION

| | 2009 | 2010 |
|---|---|---|
| Test Dates | Sep 19 – Oct 3 | Oct 30 – Nov 13 |
| Application Cycle Begins | Jan 15, 2009 | Feb 1, 2010 |
| Standard Deadline | Mar 15, 2009 | Mar 31, 2010 |
| Late Deadline | Mar 31, 2009 | Apr 15, 2010 |
| Decision Deadline | May 15, 2009 | May 15, 2010 |

### HPM CERTIFICATION

| | 2009 | 2010 |
|---|---|---|
| Test Dates | NO EXAM | TBD |
| Application Cycle Begins | N/A | Feb 1, 2010 |
| Standard Deadline | N/A | Mar 31, 2010 |
| Late Deadline | N/A | Apr 15, 2010 |
| Decision Deadline | N/A | May 15, 2010 |

# ACGME Institutional Requirements

*Effective: July 1, 2007*

Contents

I       INSTITUTIONAL ORGANIZATION AND RESPONSIBILITIES ........................................1

     A.     Sponsoring Institution.......................................................................................1
     B.     Commitment to Graduate Medical Education (GME) ...........................................1
     C.     Institutional Agreements...................................................................................2
     D.     Accreditation for Patient Care in Sponsoring and Major Participating
           Sites that Are Hospitals ...................................................................................3

II      INSTITUTIONAL RESPONSIBILITIES FOR RESIDENTS ..........................................3

     A.     Eligibility and Selection of Residents................................................................3
     B.     Financial Support for Residents. ......................................................................4
     C.     Benefits and Conditions of Appointment. ..........................................................4
     D.     Agreement of Appointment...............................................................................4
     E.     Resident Participation in Educational and Professional Activities........................8
     F.     Resident Educational and Work Environment.....................................................8

III     GRADUATE MEDICAL EDUCATION COMMITTEE (GMEC) ........................................9

     A.     GMEC Composition and Meetings ....................................................................9
     B.     GMEC Responsibilities.....................................................................................9

IV     INTERNAL REVIEW ............................................................................................12

     A.     Process .........................................................................................................12
     B.     Internal Review Report....................................................................................13



THE OHIO LEGAL BLANK CO., INC.

EXHIBIT
2

CLEVELAND, OHIO  44102-1799

I.      INSTITUTIONAL ORGANIZATION AND RESPONSIBILITIES

I.A.        Sponsoring Institution

I.A.1.              Residency programs accredited by the Accreditation Council for Graduate Medical Education (ACGME) must operate under the authority and control of one Sponsoring Institution. Institutional responsibility extends to resident assignments at all participating sites.

I.A.2.              A Sponsoring Institution must be in substantial compliance with the ACGME Institutional Requirements and must ensure that its ACGME-accredited programs* are in substantial compliance with the Institutional, Common and specialty-specific Program Requirements, and the ACGME Policies and Procedures.

I.A.3.              A Sponsoring Institution's failure to maintain accreditation will jeopardize the accreditation of all its sponsored programs.

I.B.        Commitment to Graduate Medical Education (GME)

I.B.1.              The Sponsoring Institution must provide graduate medical education (GME) that facilitates residents' professional, ethical, and personal development. The Sponsoring Institution and its GME programs, through curricula, evaluation, and resident supervision, must support safe and appropriate patient care.

I.B.2.              A written statement must document the Sponsoring Institution's commitment to provide the necessary educational, financial, and human resources to support GME. It must be reviewed, dated, and signed by representatives of the Sponsoring Institution's governing body, administration, and GME leadership within at least one year prior to the institutional site visit.

I.B.3.              An organized administrative system, led by a Designated Institutional Official (DIO) in collaboration with a Graduate Medical Education Committee (GMEC), must oversee all ACGME-accredited programs of the Sponsoring Institution.

I.B.4.              The DIO and GMEC must have authority and responsibility for the oversight and administration of the Sponsoring Institution's programs and responsibility for assuring compliance with ACGME Common, specialty/subspecialty-specific Program, and Institutional Requirements.

I.B.4.a)                The DIO must establish and implement procedures to ensure that s/he, or a designee in the absence of the DIO, reviews and cosigns all program information forms and any documents or correspondence submitted to the ACGME by program directors (See III.B.10.a-k).

I.B.4.b)                The DIO and/or the Chair of the GMEC must present an annual report to the Organized Medical Staff(s) (OMS) and the governing

body(s) of the Sponsoring Institution. This report must also be given to the OMS and governing body of major participating sites that do not sponsor GME programs. This annual report will review the activities of the GMEC during the past year with attention to, at a minimum, resident supervision, resident responsibilities, resident evaluation, compliance with duty-hour standards, and resident participation in patient safety and quality of care education.

I.B.5.    The Sponsoring Institution must provide sufficient institutional resources to ensure the effective implementation and support of its programs in compliance with the Institutional, Common, and specialty/subspecialty-specific Program Requirements.

I.B.5.a)    The Sponsoring Institution must ensure that the DIO has sufficient financial support and protected time to effectively carry out his/her educational and administrative responsibilities to the Sponsoring Institution.

I.B.5.b)    The Sponsoring Institution must ensure that program directors have sufficient financial support and protected time to effectively carry out their educational and administrative responsibilities to their respective programs.

I.B.5.c)    The Sponsoring Institution and the program must ensure sufficient salary support and resources (e.g., time, space, technology, supplies) to allow for effective administration of the GME Office and all of its programs.

I.B.6.    Faculty and residents must have ready access to adequate communication resources and technological support.

I.B.7.    Residents must have ready access to specialty/subspecialty-specific and other appropriate reference material in print or electronic format. Electronic medical literature databases with search capabilities should be available.

I.B.8.    The Sponsoring Institution must have a policy that addresses administrative support for GME programs and residents in the event of a disaster or interruption in patient care. This policy should include assistance for continuation of resident assignments.

I.C.    Institutional Agreements

I.C.1.    The Sponsoring Institution retains responsibility for the quality of GME, including when resident education occurs in other sites.

I.C.2.    Current master affiliation agreements must be renewed every five years and must exist between the Sponsoring Institution and all of its major participating sites. (See *ACGME Glossary* for definitions.)

I.C.3.    The Sponsoring Institution must assure that each of its programs has

established program letters of agreement with its participating sites in compliance with the Common Program Requirements.

I.D.     Accreditation for Patient Care in Sponsoring and Major Participating Sites that Are Hospitals

I.D.1.     Sponsoring Institutions and/or Major Participating Sites that are hospitals should be:

I.D.1.a)     accredited by The Joint Commission;

I.D.1.b)     accredited by another entity with reasonably equivalent standards as determined by the Institutional Review Committee (IRC);

I.D.1.c)     accredited by another entity granted "deeming authority" for participation in Medicare under federal regulations;

I.D.1.d)     certified as complying with the conditions of participation in Medicare set forth in federal regulations; or,

I.D.1.e)     recognized by another entity with reasonably equivalent standards as determined by the IRC.

I.D.2.     When a Sponsoring Institution or Major Participating Sites that is a hospital and is not so accredited or recognized, the Sponsoring Institution must provide an explanation satisfactory to the IRC of why neither has been granted or sought.

I.D.3.     When a Sponsoring Institution or a Major Participating Sites that is a hospital loses its accreditation or recognition, the Sponsoring Institution must notify and provide a plan of response to the IRC within 30 days of such loss. Based on the particular circumstances, the IRC may request the ACGME to invoke its "egregious or catastrophic" policy.

II.     INSTITUTIONAL RESPONSIBILITIES FOR RESIDENTS

II.A.     Eligibility and Selection of Residents: The Sponsoring Institution must have written policies and procedures for resident recruitment and appointment and must monitor each program for compliance. These eligibility requirements must address the following:

II.A.1.     Resident eligibility: Applicants with one of the following qualifications are eligible for appointment to programs:

II.A.1.a)     Graduates of medical schools in the United States and Canada accredited by the Liaison Committee on Medical Education (LCME).

II.A.1.b)     Graduates of colleges of osteopathic medicine in the United States accredited by the American Osteopathic Association (AOA).

II.A.1.c)     Graduates of medical schools outside the United States and Canada who meet one of the following qualifications:

II.A.1.c).(1)     Have received a currently valid certificate from the Educational Commission for Foreign Medical Graduates prior to appointment, or,

II.A.1.c).(2)     Have a full and unrestricted license to practice medicine in a US licensing jurisdiction in which they are training.

II.A.1.d)     Graduates of medical schools outside the United States who have completed a Fifth Pathway** program provided by an LCME-accredited medical school.

II.A.2.     Resident selection

II.A.2.a)     The Sponsoring Institution must ensure that its ACGME-accredited programs select from among eligible applicants on the basis of residency program-related criteria such as their preparedness, ability, aptitude, academic credentials, communication skills, and personal qualities such as motivation and integrity. ACGME-accredited programs must not discriminate with regard to sex, race, age, religion, color, national origin, disability, or any other applicable legally protected status.

II.A.2.b)     In selecting from among qualified applicants, it is strongly suggested that the Sponsoring Institution and all of its programs participate in an organized matching program, such as the National Resident Matching Program (NRMP), where such is available.

II.B.     Financial Support for Residents: Sponsoring and participating sites must provide all residents with appropriate financial support and benefits to ensure that they are able to fulfill the responsibilities of their educational programs.

II.C.     Benefits and Conditions of Appointment: Candidates for programs (applicants who are invited for an interview) must be informed, in writing or by electronic means, of the terms, conditions, and benefits of their appointment, including financial support; vacations; parental, sick, and other leaves of absence; professional liability, hospitalization, health, disability and other insurance provided for the residents and their families; and the conditions under which the Sponsoring Institution provides call rooms, meals, laundry services, or their equivalents.

II.D.     Agreement of Appointment

II.D.1.     The Sponsoring Institution and program directors must assure that residents are provided with a written agreement of appointment/contract outlining the terms and conditions of their appointment to a program.

II.D.2.            The Sponsoring Institution must monitor programs with regard to implementation of terms and conditions of appointment by program directors.

II.D.3.            The Sponsoring Institution and program directors must ensure that residents are informed of and adhere to established educational and clinical practices, policies, and procedures in all sites to which residents are assigned.

II.D.4.            The resident agreement/contract must contain or provide a reference to at least the following institutional policies:

II.D.4.a)          Residents' responsibilities;

II.D.4.b)          Duration of appointment;

II.D.4.c)          Financial support; and,

II.D.4.d)          Conditions for reappointment

II.D.4.d).(1)              Non-renewal of appointment or non-promotion: In instances where a resident's agreement will not be renewed, or when a resident will not be promoted to the next level of training, the Sponsoring Institution must ensure that its programs provide the resident(s) with a written notice of intent no later than four months prior to the end of the resident's current agreement. If the primary reason(s) for the non-renewal or non-promotion occurs within the four months prior to the end of the agreement, the Sponsoring Institution must ensure that its programs provide the resident(s) with as much written notice of the intent not to renew or not to promote as circumstances will reasonably allow, prior to the end of the agreement.

II.D.4.d).(2)              Residents must be allowed to implement the institution's grievance procedures if they receive a written notice either of intent not to renew their agreement(s) or of intent to renew their agreement(s) but not to promote them to the next level of training.

II.D.4.e)          Grievance procedures and due process: The Sponsoring Institution must provide residents with fair, reasonable, and readily available written institutional policies and procedures for grievance and due process. These policies and procedures must minimize conflict of interest by adjudicating parties in addressing:

II.D.4.e).(1)              Academic or other disciplinary actions taken against residents that could result in dismissal, non-renewal of a resident's agreement, non-promotion of a resident to the next level of training, or other actions that could significantly threaten a resident's intended career

|  | development; and, |
|---|---|
| II.D.4.e).(2) | Adjudication of resident complaints and grievances related to the work environment or issues related to the program or faculty. |
| II.D.4.f) | Professional liability insurance |
| II.D.4.f).(1) | The Sponsoring Institution must provide residents with professional liability coverage and with a summary of pertinent information regarding this coverage. |
| II.D.4.f).(2) | Liability coverage must include legal defense and protection against awards from claims reported or filed after the completion of the program(s) if the alleged acts or omissions of the residents are within the scope of the program(s). |
| II.D.4.g) | Health and disability insurance: The Sponsoring Institution must provide hospital and health insurance benefits for the residents and their families. Coverage for such benefits should begin upon the first recognized day of their respective programs, unless statute or regulation requires a later date to begin coverage. The Sponsoring Institution must also provide access to insurance to all residents for disabilities resulting from activities that are part of the educational program. |
| II.D.4.h) | Leaves of absence |
| II.D.4.h).(1) | The Sponsoring Institution must provide written institutional policies on residents' vacation and other leaves of absence (with or without pay) to include parental and sick leave; these policies must comply with applicable laws. |
| II.D.4.h).(2) | The Sponsoring Institution must ensure that each program provides its residents with: |
| II.D.4.h).(2).(a) | a written policy in compliance with its Program Requirements concerning the effect of leaves of absence, for any reason, on satisfying the criteria for completion of the residency program, and; |
| II.D.4.h).(2).(b) | information relating to access to eligibility for certification by the relevant certifying board. |
| II.D.4.i) | Duty Hours: The Sponsoring Institution must have formal written policies and procedures governing resident duty hours. (See Common Program Requirements, VI) |

| | |
|---|---|
| II.D.4.j) | Moonlighting |
| II.D.4.j).(1) | The Sponsoring Institution must have a written policy that addresses moonlighting. The policy must: |
| II.D.4.j).(1).(a) | Specify that residents must not be required to engage in moonlighting; |
| II.D.4.j).(1).(b) | Require a prospective, written statement of permission from the program director that is included in the resident's file; and, |
| II.D.4.j).(1).(c) | State that the residents' performance will be monitored for the effect of these activities and that adverse effects may lead to withdrawal of permission. |
| II.D.4.j).(2) | Sponsoring Institutions and program directors must closely monitor all moonlighting activities. |
| II.D.4.k) | Counseling services: The Sponsoring Institution should facilitate residents' access to confidential counseling, medical, and psychological support services. |
| II.D.4.l) | Physician impairment: The Sponsoring Institution must have written policies that describe how it will address physician impairment, including that due to substance abuse. |
| II.D.4.m) | Harassment: The Sponsoring Institution must have written policies covering sexual and other forms of harassment. |
| II.D.4.n) | Accommodation for disabilities: The Sponsoring Institution must have a written policy regarding accommodation, which would apply to residents with disabilities. This policy need not be GME-specific. |
| II.D.5. | Closures and Reductions: The Sponsoring Institution must have a written policy that addresses a reduction in size or closure of a residency program or closure of the Institution. The policy must include the following: |
| II.D.5.a) | The Sponsoring Institution must inform the GMEC, the DIO, and the residents as soon as possible when it intends to reduce the size of or close one or more programs, or when the Sponsoring Institution intends to close; and, |
| II.D.5.b) | The Sponsoring Institution must either allow residents already in the program(s) to complete their education or assist the residents in enrolling in an ACGME-accredited program(s) in which they can continue their education. |

II.D.6.     Restrictive Covenants: Neither the Sponsoring Institution nor its programs may require residents to sign a non-competition guarantee.

II.E.     Resident Participation in Educational and Professional Activities

II.E.1.     The Sponsoring Institution must ensure that each program provides effective educational experiences for residents that lead to measurable achievement of educational outcomes in the ACGME competencies as outlined in the Common and specialty/subspecialty-specific Program Requirements.

II.E.2.     The Sponsoring Institution must ensure that residents:

II.E.2.a)     Participate on committees and councils whose actions affect their education and/or patient care; and,

II.E.2.b)     Participate in an educational program regarding physician impairment, including substance abuse and sleep deprivation.

II.F.     Resident Educational and Work Environment

II.F.1.     The Sponsoring Institution and its programs must provide an educational and work environment in which residents may raise and resolve issues without fear of intimidation or retaliation. Mechanisms to ensure this environment must include:

II.F.1.a)     An organization or other forum for residents to communicate and exchange information on their educational and work environment, their programs, and other resident issues.

II.F.1.b)     A process by which individual residents can address concerns in a confidential and protected manner.

II.F.2.     The Sponsoring Institution must provide services and develop health care delivery systems to minimize residents' work that is extraneous to their GME programs' educational goals and objectives. These services and systems must include:

II.F.2.a)     Patient support services: Peripheral intravenous access placement, phlebotomy, and laboratory and transporter services must be provided in a manner appropriate to and consistent with educational objectives and quality patient care.

II.F.2.b)     Laboratory/pathology/radiology services: Laboratory, pathology, and radiology services must be in place to support timely and quality patient care.

II.F.2.c)     Medical records: A medical records system that documents the course of each patient's illness and care must be available at all times and must be adequate to support quality patient care, residents' education, quality assurance activities, and provide a

resource for scholarly activity.

II.F.3.  The Sponsoring Institution must ensure a healthy and safe work environment that provides for:

II.F.3.a)  Food services: Residents must have access to appropriate food services 24 hours a day while on duty in all institutions.

II.F.3.b)  Call rooms: Residents on call must be provided with adequate and appropriate sleeping quarters that are safe, quiet, and private.

II.F.3.c)  Security/safety: Appropriate security and personal safety measures must be provided to residents at all locations including but not limited to: parking facilities, on-call quarters, hospital and institutional grounds, and related facilities.

III.  GRADUATE MEDICAL EDUCATION COMMITTEE (GMEC)

III.A.  GMEC Composition and Meetings

III.A.1.  The Sponsoring Institution must have a GMEC.

III.A.2.  Voting membership on the committee must include the DIO, residents nominated by their peers, representative program directors, and administrators. It may also include other members of the faculty or other members as determined.

III.A.3.  The GMEC must meet at least quarterly and maintain written minutes.

III.B.  GMEC Responsibilities: The GMEC must establish and implement policies and procedures regarding the quality of education and the work environment for the residents in all programs. These policies and procedures must include:

III.B.1.  Stipends and position allocation: Annual review and recommendations to the Sponsoring Institution regarding resident stipends, benefits, and funding for resident positions.

III.B.2.  Communication with program directors: The GMEC must:

III.B.2.a)  Ensure that communication mechanisms exist between the GMEC and all program directors within the institution.

III.B.2.b)  Ensure that program directors maintain effective communication mechanisms with the site directors at each participating site for their respective programs to maintain proper oversight at all clinical sites.

III.B.3.  Resident duty hours: The GMEC must:

III.B.3.a)  Develop and implement written policies and procedures regarding resident duty hours to ensure compliance with the Institutional,

|            | Common, and specialty/subspecialty-specific Program Requirements. |
|------------|---|
| III.B.3.b) | Consider for approval requests from program directors prior to submission to an RRC for exceptions in the weekly limit on duty hours up to 10 percent or up to a maximum of 88 hours in compliance with ACGME Policies and Procedures for duty hour exceptions. |
| III.B.4.   | Resident supervision: Monitor programs' supervision of residents and ensure that supervision is consistent with: |
| III.B.4.a) | Provision of safe and effective patient care; |
| III.B.4.b) | Educational needs of residents; |
| III.B.4.c) | Progressive responsibility appropriate to residents' level of education, competence, and experience; and, |
| III.B.4.d) | Other applicable Common and specialty/subspecialty-specific Program Requirements. |
| III.B.5.   | Communication with Medical Staff: Communication between leadership of the medical staff regarding the safety and quality of patient care that includes: |
| III.B.5.a) | The annual report to the OMS; |
| III.B.5.b) | Description of resident participation in patient safety and quality of care education; and, |
| III.B.5.c) | The accreditation status of programs and any citations regarding patient care issues |
| III.B.6.   | Curriculum and evaluation: Assurance that each program provides a curriculum and an evaluation system that enables residents to demonstrate achievement of the ACGME general competencies as defined in the Common and specialty/subspecialty-specific Program Requirements. |
| III.B.7.   | Resident status: Selection, evaluation, promotion, transfer, discipline, and/or dismissal of residents in compliance with the Institutional and Common Program Requirements. |
| III.B.8.   | Oversight of program accreditation: Review of all ACGME program accreditation letters of notification and monitoring of action plans for correction of citations and areas of noncompliance. |
| III.B.9.   | Management of institutional accreditation: Review of the Sponsoring Institution's ACGME letter of notification from the IRC and monitoring of action plans for correction of citations and areas of noncompliance. |

III.B.10.        Oversight of program changes: Review of the following for approval, prior to submission to the ACGME by program directors:

III.B.10.a)        All applications for ACGME accreditation of new programs;

III.B.10.b)        Changes in resident complement;

III.B.10.c)        Major changes in program structure or length of training;

III.B.10.d)        Additions and deletions of participating sites;

III.B.10.e)        Appointments of new program directors;

III.B.10.f)        Progress reports requested by any Review Committee;

III.B.10.g)        Responses to all proposed adverse actions;

III.B.10.h)        Requests for exceptions of resident duty hours;

III.B.10.i)        Voluntary withdrawal of program accreditation;

III.B.10.j)        Requests for an appeal of an adverse action; and,

III.B.10.k)        Appeal presentations to a Board of Appeal or the ACGME.

III.B.11.        Experimentation and innovation: Oversight of all phases of educational experiments and innovations that may deviate from Institutional, Common, and specialty/subspecialty-specific Program Requirements, including:

III.B.11.a)        Approval prior to submission to the ACGME and/or respective Review Committee;

III.B.11.b)        Adherence to Procedures for "Approving Proposals for Experimentation or Innovative Projects" in *ACGME Policies and Procedures*; and,

III.B.11.c)        Monitoring quality of education provided to residents for the duration of such a project.

III.B.12.        Oversight of reductions and closures: Oversight of all processes related to reductions and/or closures of:

III.B.12.a)        Individual programs;

III.B.12.b)        Major participating sites; and,

III.B.12.c)        The Sponsoring Institution.

III.B.13. Vendor interactions: Provision of a statement or institutional policy (not necessarily GME-specific) that addresses interactions between vendor representatives/corporations and residents/GME programs.

IV. INTERNAL REVIEW

IV.A. Process

IV.A.1. The GMEC must develop, implement, and oversee an internal review process as follows:

IV.A.1.a) An internal review committee(s) for each program must include at least one faculty member and at least one resident from within the Sponsoring Institution but not from within GME programs being reviewed. Additional internal or external reviewers may be included on the internal review committee as determined by the GMEC. Administrators from outside the program may also be included.

IV.A.1.b) A written protocol approved by the GMEC that incorporates, at a minimum, the requirements in this Section IV of the Institutional Requirements.

IV.A.2. *Internal reviews must be in process and documented in the GMEC minutes by approximately the midpoint of the accreditation cycle. The accreditation cycle is calculated from the date of the meeting at which the final accreditation action was taken to the time of the next site visit. (See ACGME Policies and Procedures, II.B.4)*

IV.A.3. When a program has no residents enrolled at the mid-point of the review cycle, the following circumstances apply:

IV.A.3.a) The GMEC must demonstrate continued oversight of those programs through a modified internal review that ensures the program has maintained adequate faculty and staff resources, clinical volume, and other necessary curricular elements required to be in substantial compliance with the Institutional, Common and specialty-specific Program Requirements prior to the program enrolling a resident.

IV.A.3.b) After enrolling a resident, an internal review must be completed within the second six-month period of the resident's first year in the program.

IV.A.4. The internal review should assess each program's:

IV.A.4.a) Compliance with the Common, specialty/subspecialty-specific Program, and Institutional Requirements;

IV.A.4.b) Educational objectives and effectiveness in meeting those objectives;

| | |
|---|---|
| IV.A.4.c) | Educational and financial resources; |
| IV.A.4.d) | Effectiveness in addressing areas of non-compliance and concerns in previous ACGME accreditation letters of notification and previous internal reviews; |
| IV.A.4.e) | Effectiveness of educational outcomes in the ACGME general competencies; |
| IV.A.4.f) | Effectiveness in using evaluation tools and outcome measures to assess a resident's level of competence in each of the ACGME general competencies; and, |
| IV.A.4.g) | Annual program improvement efforts in: |
| IV.A.4.g).(1) | resident performance using aggregated resident data; |
| IV.A.4.g).(2) | faculty development; |
| IV.A.4.g).(3) | graduate performance including performance of program graduates on the certification examination; and, |
| IV.A.4.g).(4) | program quality. (see Common Program Requirements, V.C.) |
| IV.A.5. | Materials and data to be used in the review process must include: |
| IV.A.5.a) | The ACGME Common, specialty/subspecialty-specific Program, and Institutional Requirements in effect at the time of the review; |
| IV.A.5.b) | Accreditation letters of notification from previous ACGME reviews and progress reports sent to the respective RRC; |
| IV.A.5.c) | Reports from previous internal reviews of the program; |
| IV.A.5.d) | Previous annual program evaluations; and, |
| IV.A.5.e) | Results from internal or external resident surveys, if available. |
| IV.A.6. | The internal review committee must conduct interviews with the program director, key faculty members, at least one peer-selected resident from each level of training in the program, and other individuals deemed appropriate by the committee. |
| IV.B. | Internal Review Report |
| IV.B.1. | The written report of the internal review for each program must contain, at a minimum: |
| IV.B.1.a) | The name of the program reviewed; |

| | |
|---|---|
| IV.B.1.b) | The date of the assigned midpoint and the status of the GMEC's oversight of the internal review at that midpoint; |
| IV.B.1.c) | The names and titles of the internal review committee members; |
| IV.B.1.d) | A brief description of how the internal review process was conducted, including the list of the groups/individuals interviewed and the documents reviewed; |
| IV.B.1.e) | Sufficient documentation to demonstrate that a comprehensive review followed the GMEC's internal review protocol; |
| IV.B.1.f) | A list of the citations and areas of non-compliance or any concerns or comments from the previous ACGME accreditation letter of notification with a summary of how the program and/or institution subsequently addressed each item. |
| IV.B.2. | The DIO and the GMEC must monitor the response by the program to actions recommended by the GMEC in the internal review process. |
| IV.B.3. | The Sponsoring Institution must submit the most recent internal review report for each training program as a part of the Institutional Review Document (IRD). If the institutional site visitor simultaneously conducts individual program reviews at the same time as the institutional review, the internal review reports for those programs must not be shared with the site visitor. |

ACGME Approved: February 2007   Effective: July 1, 2007
ACGME Approved Minor Revision: June 14, 2009   Effective: July 1, 2009

Footnote for I.A.2

\*    Further use in this document of the term "program(s)" will refer to "ACGME-accredited program(s)."

Footnote for II.A.1.d

\*\*   A Fifth Pathway program is an academic year of supervised clinical education provided by an LCME-accredited medical school to students who meet the following conditions: (1) have completed, in an accredited college or university in the United States, undergraduate premedical education of the quality acceptable for matriculation in an accredited United States medical school; (2) have studied at a medical school outside the United States and Canada but listed in the World Health Organization Directory of Medical Schools; (3) have completed all of the formal requirements of the foreign medical school except internship and/or social service; (4) have attained a score satisfactory to the sponsoring medical school on a screening examination; and (5) have passed either the Foreign Medical Graduate Examination in the Medical Sciences, Parts I and II of the examination of the National Board of Medical Examiners, or Steps 1 and 2 of the United States Medical Licensing Examination (USMLE).

To:     Jerry Shuck, MD; Emily Vasiliou; David Wallace, DO; Matthew Norcia, MD

From:   Sarah Aronson, MD

Re:     Meeting 6/4/09

4 June 2009

This is in response to the training review meeting held between Dr. Wallace, Dr. Norcia and myself on June 4, 2009.

The ACGME sent a letter to the relevant parties dated May 27, 2009. I received my letter from ACGME on Friday, May 29, 2009. The residency program directors and Dr. Shuck received the same notification from the ACGME (a formal complaint that I had submitted). That complaint cited multiple violations of ACGME institutional requirements with regard to the residency program's handling of a summary evaluation and decision to extend my training period.

On Tuesday, June 2nd, my first workday after this complaint notification was received, I was told that w and n would be available to meet with me on June 4th. This is the first review meeting that has been convened since the beginning of my training extension period on March 1 2009. I was initially told that my performance during this 6 month extension would be reviewed monthly and that I would be provided detailed feedback regarding my status so that I might successfully complete the program. I had made several attempts to schedule a meeting throughout that 3 month time period, only to have any meeting cancelled.

This first performance review (since mid February 2009) occurred on Thursday June 4, 2009, 8 days after the date of the ACGME letter.   At this meeting, Dr. Wallace brought copious and detailed notes as well as copies of OR anesthesia records to support a wide range of criticisms and accusations, on the basis of which he argued that my clinical competence and my professionalism were unsatisfactory and unlikely to lead to successful completion of the residency program.   These criticisms were based in part on work done in collaboration with Dr. Wallace primarily during the months of January to April 2009.  No written negative feedback or documentation of my performance was given prior to this June 4, 2009 meeting.  Verbal feedback was given at the time of the collaborative work and was unremarkable for the level of accusations which arose in the June 4, 2009 meeting.

> The University Hospitals Resident and Fellows Manual states: **"A Performance Alert Notice is the formal written notification to a Resident concerning areas of marginal or unsatisfactory performance. The Program Director or Faculty Member should initiate a Performance Alert Notice and inform the resident within 7-10 days of identifying an area of concern."**

Dr Wallace has not provided me with any such notice since the beginning of the training extension.

> The ACGME Requirements state: **"Non-renewal of appointment or non-promotion: In instances where a resident's agreement will not be renewed, or**

THE OHIO LEGAL BLANK CO., INC.

EXHIBIT
3

**when a resident will not be promoted to the next level of training, the Sponsoring Institution must ensure that its programs provide the resident(s) with a written notice of intent no later than four months prior to the end of the resident's current agreement. If the primary reason(s) for the non-renewal or non-promotion occurs within the four months prior to the end of the agreement, the Sponsoring Institution must ensure that its programs provide the resident(s) with as much written notice of the intent not to renew or not to promote as circumstances will reasonably allow, prior to the end of the agreement."**

If the program directors intend not to provide me with a Certificate of Completion at the end of August 2009 based on Dr. Wallace's stated concerns they were required to notify me of that decision before May 1st of 2009.

**In a Special Message dated September 18, 2008, the CEO of the ACGME wrote: "Finally, in all its reviews and actions, through the Resident Survey, site visit interviews with residents, the formal resident complaint process, and a soon to be announced simplified resident complaint system, the ACGME and its Review Committees will scrupulously look for evidence of resident harassment, resident intimidation, or resident retaliation related to…any aspect of the learning environment."** Dr. David Leach, in the 4/04 ACGME e-Bulletin, states: **"If there is retaliation, even in subtle ways, it violates an institutional requirement. It also speaks to deficiencies in the professional climate in which resident formation occurs and thus has broader implications for society."**

It is striking that this extensive critical documentation was first presented to me at this June 4th meeting, after receipt of the ACGME letter. Before this letter, Dr. Wallace had submitted no negative documentation, in fact, no performance review meeting had even been scheduled. There was no sense of urgency about my performance at all.

Given the appearance of retaliation in the above mentioned events, any further evaluation of my performance as a resident during these last 12 weeks should be conducted by an objective third party.

A potentially related concern may exist in Dr. Wallace's failure to review and process receipts from an approved professional conference I attended in March. His approval is required for any reimbursement. He has been in possession of those receipts, which amount to more than $2300, since the end of March 2009. He has not yet signed off on them.

I am attaching a copy of the email I sent to Dr. Shuck on Wednesday June 3rd in anticipation of this meeting.

Sincerely,


Sarah Aronson, MD
Case School of Medicine

UHC000994

## UNIVERSITY HOSPITALS OF CLEVELAND
## RESIDENT/FELLOWSHIP CONTRACT

Date: 02/06/2006                    Doctor:  Sarah C. Aronson

I am pleased to inform you that on the recommendation of your department director, the terms of your appointment as a resident physician at University Hospitals of Cleveland ("UHC") are as follows:

Department-Division: Anesthesiology                Effective Period: 03/01/2006-02/28/2007

PGY Level: 7                        Annual Stipend: $49569

All appointments are for the above Effective Period, and may be renewed at the discretion of UHC upon continued evidence of satisfactory performance. Further, all appointments are subject to the policies and procedures set forth in the attached Residents' & Fellows' Manual. This contract may be terminated for any reason or no reason pursuant to the terms of the Residents' & Fellows' Manual and the policies and procedures of University Hospitals Health System and University Hospitals of Cleveland.

Upon commencement of your employment you are required to show evidence of U.S. citizenship or present a valid visa in a category that permits you to be employed in the program without qualifications or exceptions.

UHC agrees to provide an educational program that at a minimum meets the standards established by the ACGME and to provide benefits as outlined in the Residents' & Fellows' Manual. You will agree to meet the educational requirements of the program and to provide safe, effective and compassionate care under the supervision of residency faculty.

Read the Residents' & Fellows' Manual carefully; it contains important information about hospital policies. You must familiarize yourself with the following information:

| | |
|---|---|
| Compensation and Benefits | Meals and Laundry |
| Conditions for Living Quarters | Medical & Psychological Support Services |
| Counseling | Non-Renewal of Contract |
| Duty Hours | Payroll |
| Effect of Leave for Satisfying Completion of Program | Physician Impairment & Substance Abuse |
| Equal Employment | Professional Activities outside the Program |
| Extracurricular Employment (Moonlighting) | Professional Leave of Absence Benefits |
| Family Medical Leave Benefits (FMLA) | Residency Closure and Reduction |
| Financial Support | Resident Evaluation & Reappointment |
| Grievance Procedures | Resident Responsibilities |
| Insurance Coverage (health, disability, liability, liability after program completion) | Sexual and Other Forms of Harassment |
| | Sick Leave Benefits |
| Leave of Absence | Vacation |

You will be required to follow Hospital policies and procedures and comply with state and federal laws and regulations.

By accepting this position you will be bound by the terms of the Residents' & Fellows' Manual as it maybe amended from time to time. Kindly acknowledge your acceptance of this offer by signing below and returning the original copy of this letter to:

Graduate Medical Education Office
University Hospitals of Cleveland
11100 Euclid Ave
Cleveland, OH 44106

_____                _____      2/6/06
Jerry M. Shuck, M.D.                    Signature                    Date
Director of Graduate Medical Education

THE OHIO LEGAL BLANK CO., INC.

**EXHIBIT**
4

CLEVELAND, OHIO  44102-1799

UHC000006

# UNIVERSITY HOSPITALS CASE MEDICAL CENTER
## RESIDENT/FELLOWSHIP CONTRACT

Date: <u>02/20/2007</u>                                                    Doctor:  <u>Sarah Aroson</u>

**I am pleased to inform you that on the recommendation of your department director, the terms of your appointment as a resident physician at University Hospitals of Cleveland DBA University Hospitals Case Medical Center ("UHCMC") are as follows:**

Department-Division: <u>Anesthesiology</u>                            PGY Level:  <u>7</u>

Effective Period:      <u>03/01/2007-02/29/2008</u>                 Annual Stipend: <u>$49569</u>

All appointments are for the above Effective Period, and may be renewed at the discretion of UHCMC upon continued evidence of satisfactory performance.  Further, all appointments are subject to the terms, policies and procedures set forth in the attached Residents' & Fellows' Manual (the "Manual"). This contract may be terminated for any reason or no reason pursuant to the terms of the Manual or the policies and procedures of University Hospitals and UHCMC.

**Upon commencement of your employment you are required to show evidence of U.S. citizenship or present a valid visa in a category that permits you to be employed in the program without qualifications or exceptions.**

UHCMC agrees to provide an educational program that at a minimum meets the standards established by the ACGME and to provide benefits as outlined in the Manual.  You will agree to meet the educational requirements of the program and to provide safe, effective and compassionate care under the supervision of residency faculty.

**Read the <u>Residents' & Fellows' Manual</u> carefully; it contains important information about hospital policies.  You must familiarize yourself with the following information:**

| | | |
|---|---|---|
| • Compensation and Benefits | • Financial Support | • Physician Impairment & Substance Abuse |
| • Conditions for Living Quarters | • Grievance Procedures | • Professional Activities outside the Program |
| • Counseling | • Insurance Coverage (health, disability, liability, liability after program completion) | • Professional Leave of Absence Benefits |
| • Duty Hours | | • Residency Closure and Reduction |
| • Effect of Leave for Satisfying Completion of Program | • Leave of Absence | • Resident Evaluation & Reappointment |
| • Equal Employment | • Meals and Laundry | • Resident Responsibilities |
| • Extracurricular Employment (Moonlighting) | • Medical & Psychological Support Services | • Sexual and Other Forms of Harassment |
| • Family Medical Leave Benefits (FMLA) | • Non-Renewal of Contract | • Sick Leave Benefits |
| | • Payroll | • Vacation |

You will be required to follow UHCMC policies and procedures and comply with state and federal laws and regulations. University Hospitals is committed to full compliance with all applicable laws, rules, regulations and state and Federal health care program requirements (collectively, "Laws"), and by signing the Compliance Certification, attached as an addendum to this Contract, you agree to cooperate fully with the University Hospitals Compliance & Ethics Program. Failure to comply with the requirements of the attached Compliance Certification may result in the immediate termination of your appointment to the Residency Program.

By accepting this position you will be bound by the terms of the <u>Residents' & Fellows' Manual</u> as it maybe amended from time to time. Kindly acknowledge your acceptance of this offer by signing below and returning the original copy of this letter to:

Graduate Medical Education Office
University Hospitals Case Medical Center
11100 Euclid Ave
Cleveland, Ohio, 44106

_____                    Signature _____    Date _____
Jerry M. Shuck, M.D.
Director of Graduate Medical Education

THE OHIO LEGAL BLANK CO., INC.

**EXHIBIT**
5

CLEVELAND, OHIO  44102-1799

UHC000007

UNIVERSITY HOSPITALS ("UH")[1]
COMPLIANCE ADDENDUM AND CERTIFICATION

**This Compliance Addendum is incorporated into and made a part of the Resident/Fellowship Contract between University Hospitals Case Medical Center and** ~~Sarath Aronson~~ **(Doctor).**

Each party shall perform its obligations under the Contract in compliance with the requirements set forth in the Federal Anti-Kickback Statute and the Stark Self-Referral Law, to the extent such laws may be applicable to the arrangements described in the Contract.

By signing the contract, I certify that:

1.  I have not been debarred, excluded, suspended or otherwise determined to be ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs[2] (collectively, "Ineligible"), or convicted of a criminal offense that could result in becoming Ineligible.

2.  <u>Except as disclosed below</u>, neither I nor an immediate family member[3] makes referrals to UH for health care items or services, or to the best of my knowledge: (a) has a direct or indirect ownership or investment interest in or is directly or indirectly employed by or contracted with any company or person to provide services in connection with my Contract:

    _____

3.  I will conduct myself as a Doctor consistent with the standards set forth in the UH Code of Conduct, and I shall cooperate fully with the UH Compliance & Ethics Program. The UH Code of Conduct is available electronically at: _http://www.uhhospitals.org/tabid/1806/Default.aspx_ .

4.  I shall perform the Contract in compliance with all applicable laws, rules, regulations and Federal health care program requirements (to the extent applicable) (collectively, "Laws").

By signing below, I certify that I:

1.  Have received a copy of the University Hospitals ("UH") Code of Conduct and UH Policies and Procedures regarding the operation of the UH Compliance & Ethics Program and compliance with Federal health care program requirements, specifically including the Federal Anti-Kickback Statute (42 U.S.C. Sec. 1320a-7(b) (the "Anti-Kickback Statute") and the Physician Self-Referral Law (42 U.S.C. Sec. 1395nn) (also referred to as the "Stark Law");

2.  Have read, understood and shall abide by the UH Code of Conduct and UH Policies and Procedures;

3.  Shall comply with the UH Compliance Program; and

4.  Shall perform the Contract in compliance with all applicable laws, rules and regulations and Federal health care program requirements, including without limitation, the Federal Anti-Kickback Statute, the Stark Law, and the rules, regulations and administrative guidance promulgated under the authority of such laws.

Each of the parties certifies that to its best knowledge and belief, no part of any consideration paid under the Contract is a prohibited payment for the recommending or arranging for the referral of business or the ordering of items or services; nor are the payments intended to induce illegal referrals of business or other illegal conduct.

This Compliance Certification must be signed by an authorized representative of the entity or individual identified below with knowledge of the matters addressed herein and authority to bind such party, and shall have the same effective date as the Contract.

"DOCTOR"                                                 "UH"

_____  2/27/07        _____

Print Name: SARATH ARONSON MD          Jerry M. Shuck, M.D.
Date: __2/27/07__                                        Director of Graduate Medical Education

---

[1] Except where otherwise noted, "UH" means all hospitals, ancillary providers, and other entities owned or controlled, directly or indirectly, by University Hospitals Health System.

[2] An individual or entity listed on either the Health and Human Services – Office of Inspector General – List of Excluded Individuals at www.exclusions.oig.hhs.gov or the General Services Administration List of Parties Excluded from Federal Procurement and Non-Procurement Programs at www.epls.gov , as revised from time to time, is Ineligible.

[3] "Immediate family members" include a spouse, natural or adoptive parent, child, sibling, step-parent, step-child, step-brother, step-sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, grandchild, and the spouse of any grandparent or grandchild.

## UNIVERSITY HOSPITALS CASE MEDICAL CENTER
## RESIDENT/FELLOWSHIP CONTRACT

Date: 02/15/2008                                                   Doctor: Sarah Aronson

I am pleased to inform you that on the recommendation of your department director, the terms of your appointment as a resident physician at University Hospitals of Cleveland DBA University Hospitals Case Medical Center ("UHCMC") are as follows:

Department-Division: Anesthesiology                                 PGY Level: 7

Effective Period: 03/01/2008-02/28/2009                            Annual Stipend: $52603

All appointments are for the above Effective Period, and may be renewed at the discretion of UHCMC upon continued evidence of satisfactory performance.  Further, all appointments are subject to the terms, policies and procedures set forth in the attached Residents' & Fellows' Manual (the "Manual").  This contract may be terminated for any reason or no reason pursuant to the terms of the Manual or the policies and procedures of University Hospitals and UHCMC.

Upon commencement of your employment you are required to show evidence of U.S. citizenship or present a valid visa in a category that permits you to be employed in the program without qualifications or exceptions.

UHCMC agrees to provide an educational program that at a minimum meets the standards established by the ACGME and to provide benefits as outlined in the Manual.  You will agree to meet the educational requirements of the program and to provide safe, effective and compassionate care under the supervision of residency faculty.

Read the Residents' & Fellows' Manual carefully; it contains important information about hospital policies.  You must familiarize yourself with the following information:

| | | |
|---|---|---|
| • Compensation and Benefits | • Financial Support | • Physician Impairment & Substance Abuse |
| • Conditions for Living Quarters | • Grievance Procedures | • Professional Activities outside the Program |
| • Counseling | • Insurance Coverage (health, disability, liability, liability after program completion) | • Professional Leave of Absence Benefits |
| • Duty Hours | | • Residency Closure and Reduction |
| • Effect of Leave for Satisfying Completion of Program | | • Resident Evaluation & Reappointment |
| • Equal Employment | • Leave of Absence | • Resident Responsibilities |
| | • Meals and Laundry | • Sexual and Other Forms of Harassment |
| • Extracurricular Employment (Moonlighting) | • Medical & Psychological Support Services | • Sick Leave Benefits |
| • Family Medical Leave Benefits (FMLA) | • Non-Renewal of Contract | • Vacation |
| | • Payroll | |

You will be required to follow UHCMC policies and procedures and comply with state and federal laws and regulations.  University Hospitals is committed to full compliance with all applicable laws, rules, regulations and state and Federal health care program requirements (collectively, "Laws"), and by signing the Compliance Certification, attached as an addendum to this Contract, you agree to cooperate fully with the University Hospitals Compliance & Ethics Program.  Failure to comply with the requirements of the attached Compliance Certification may result in the immediate termination of your appointment to the Residency Program.

By accepting this position you will be bound by the terms of the Residents' & Fellows' Manual as it may be amended from time to time.  Kindly acknowledge your acceptance of this offer by signing below and returning the original copy of this letter to:

Graduate Medical Education Office
University Hospitals Case Medical Center
11100 Euclid Ave
Cleveland, Ohio 44106

_____                 _____   3/25/08

Jerry M. Shuck, M.D.                              Signature                          Date
Director of Graduate Medical Education



THE OHIO LEGAL BLANK CO., INC.

EXHIBIT
6

CLEVELAND, OHIO  44102-1799

UHC000009

UNIVERSITY HOSPITALS ("UH")[1]
COMPLIANCE ADDENDUM AND CERTIFICATION

**This Compliance Addendum is incorporated into and made a part of the Resident/Fellowship Contract between University Hospitals Case Medical Center and** Sarah Aronson **(Doctor).**

Each party shall perform its obligations under the Contract in compliance with the requirements set forth in the Federal Anti-Kickback Statute and the Stark Self-Referral Law, to the extent such laws may be applicable to the arrangements described in the Contract.

By signing the contract, I certify that:

1. I have not been debarred, excluded, suspended or otherwise determined to be ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs[2] (collectively, "Ineligible"), or convicted of a criminal offense that could result in becoming Ineligible.

2. Except as disclosed below, neither I nor an immediate family member[3] makes referrals to UH for health care items or services, or to the best of my knowledge: (a) has a direct or indirect ownership or investment interest in or is directly or indirectly employed by or contracted with any company or person to provide services in connection with my Contract:

   -------------------------------------------------------------------

3. I will conduct myself as a Doctor consistent with the standards set forth in the UH Code of Conduct, and I shall cooperate fully with the UH Compliance & Ethics Program. The UH Code of Conduct is available electronically at: *http://www.uhhospitals.org/tabid/1806/Default.aspx* .

4. I shall perform the Contract in compliance with all applicable laws, rules, regulations and Federal health care program requirements (to the extent applicable) (collectively, "Laws").

By signing below, I certify that I:

1. Have received a copy of the University Hospitals ("UH") Code of Conduct and UH Policies and Procedures regarding the operation of the UH Compliance & Ethics Program and compliance with Federal health care program requirements, specifically including the Federal Anti-Kickback Statute (42 U.S.C. Sec. 1320a-7(b) (the "Anti-Kickback Statute") and the Physician Self Referral Law (42 U.S.C. Sec. 1395nn) (also referred to as the "Stark Law");

2. Have read, understood and shall abide by the UH Code of Conduct and UH Policies and Procedures;

3. Shall comply with the UH Compliance Program; and

4. Shall perform the Contract in compliance with all applicable laws, rules and regulations and Federal health care program requirements, including without limitation, the Federal Anti-Kickback Statute, the Stark Law, and the rules, regulations and administrative guidance promulgated under the authority of such laws.

Each of the parties certifies that to its best knowledge and belief, no part of any consideration paid under the Contract is a prohibited payment for the recommending or arranging for the referral of business or the ordering of items or services; nor are the payments intended to induce illegal referrals of business or other illegal conduct.

This Compliance Certification must be signed by an authorized representative of the entity or individual identified below with knowledge of the matters addressed herein and authority to bind such party, and shall have the same effective date as the Contract.

"DOCTOR" _____ 3/25/08    "UH" _____

Print Name: S. ALONSON MD      Jerry M. Shuck, M.D.
Date: 3/25/08                  Director of Graduate Medical Education

-------------------------------------------------------------------

1. Except where otherwise noted, "UH" means all hospitals, ancillary providers, and other entities owned or controlled, directly or indirectly, by University Hospitals Health System.

2. An individual or entity listed on either the Health and Human Services – Office of Inspector General – List of Excluded Individuals at www.exclusions.oig.hhs.gov or the General Services Administration List of Parties Excluded from Federal Procurement and Non-Procurement Programs at www.epls.gov , as revised from time to time, is Ineligible.

3. "Immediate family members" include a spouse, natural or adoptive parent, child, sibling, step-parent, step-child, step-brother, step-sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, grandchild, and the spouse of any grandparent or grandchild.

## UNIVERSITY HOSPITALS CASE MEDICAL CENTER
## RESIDENT/FELLOWSHIP CONTRACT

Date: 2/06/2009                                                     Doctor:  Sarah Aronson

I am pleased to inform you that on the recommendation of your department director, the terms of your appointment as a resident physician at University Hospitals of Cleveland DBA University Hospitals Case Medical Center ("UHCMC") are as follows:

Department-Division:  Anesthesiology                                PGY Level:  7

Effective Period:  03/01/2009-08/31/2009                           Annual Stipend:  $54970

All appointments are for the above Effective Period, and may be renewed at the discretion of UHCMC upon continued evidence of satisfactory performance.  Further, all appointments are subject to the terms, policies and procedures set forth in the attached Residents' & Fellows' Manual (the "Manual"). This contract may be terminated for any reason or no reason pursuant to the terms of the Manual or the policies and procedures of University Hospitals and UHCMC.

Upon commencement of your employment you are required to show evidence of U.S. citizenship or present a valid visa in a category that permits you to be employed in the program without qualifications or exceptions.

UHCMC agrees to provide an educational program that at a minimum meets the standards established by the ACGME and to provide benefits as outlined in the Manual. You will agree to meet the educational requirements of the program and to provide safe, effective and compassionate care under the supervision of residency faculty.

Read the Residents' & Fellows' Manual carefully; it contains important information about hospital policies.  You must familiarize yourself with the following information:

| | | |
|---|---|---|
| • Compensation and Benefits | • Financial Support | • Physician Impairment & Substance Abuse |
| • Conditions for Living Quarters | • Grievance Procedures | • Professional Activities outside the Program |
| • Counseling | • Insurance Coverage (health, disability, liability, liability after program completion) | • Professional Leave of Absence Benefits |
| • Duty Hours | | • Residency Closure and Reduction |
| • Effect of Leave for Satisfying Completion of Program | • Leave of Absence | • Resident Evaluation & Reappointment |
| • Equal Employment | • Meals and Laundry | • Resident Responsibilities |
| • Extracurricular Employment (Moonlighting) | • Medical & Psychological Support Services | • Sexual and Other Forms of Harassment |
| • Family Medical Leave Benefits (FMLA) | • Non-Renewal of Contract | • Sick Leave Benefits |
| | • Payroll | • Vacation |

You will be required to follow UHCMC policies and procedures and comply with state and federal laws and regulations. University Hospitals is committed to full compliance with all applicable laws, rules, regulations and state and Federal health care program requirements (collectively, "Laws"), and by signing the Compliance Certification, attached as an addendum to this Contract, you agree to cooperate fully with the University Hospitals Compliance & Ethics Program. Failure to comply with the requirements of the attached Compliance Certification may result in the immediate termination of your appointment to the Residency Program.

By accepting this position you will be bound by the terms of the Residents' & Fellows' Manual as it maybe amended from time to time. Kindly acknowledge your acceptance of this offer by signing below and returning the original copy of this letter to:

Graduate Medical Education Office
University Hospitals Case Medical Center
11100 Euclid Ave
Cleveland, Ohio 44106

_____                    _____   _____
Jerry M. Shuck, M.D.                                Signature                          Date
Director of Graduate Medical Education



THE OHIO LEGAL BLANK CO., INC.

EXHIBIT
7

CLEVELAND, OHIO  44102-1799

UHC000011

UNIVERSITY HOSPITALS ("UH")[1]
COMPLIANCE ADDENDUM AND CERTIFICATION

This Compliance Addendum is incorporated into and made a part of the Resident/Fellowship Contract between University Hospitals Case Medical Center and Sarah Aronson (Doctor).

Each party shall perform its obligations under the Contract in compliance with the requirements set forth in the Federal Anti-Kickback Statute and the Stark Self-Referral Law, to the extent such laws may be applicable to the arrangements described in the Contract.

By signing the contract, I certify that:

1. I have not been debarred, excluded, suspended or otherwise determined to be ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs[2] (collectively, "Ineligible"), or convicted of a criminal offense that could result in becoming Ineligible.

2. Except as disclosed below, neither I nor an immediate family member[3] makes referrals to UH for health care items or services, or to the best of my knowledge: (a) has a direct or indirect ownership or investment interest in or is directly or indirectly employed by or contracted with any company or person to provide services in connection with my Contract:

   _____

3. I will conduct myself as a Doctor consistent with the standards set forth in the UH Code of Conduct, and I shall cooperate fully with the UH Compliance & Ethics Program. The UH Code of Conduct is available electronically at: http://www.uhhospitals.org/tabid/1806/Default.aspx .

4. I shall perform the Contract in compliance with all applicable laws, rules, regulations and Federal health care program requirements (to the extent applicable) (collectively, "Laws").

By signing below, I certify that I:

1. Have received a copy of the University Hospitals ("UH") Code of Conduct and UH Policies and Procedures regarding the operation of the UH Compliance & Ethics Program and compliance with Federal health care program requirements, specifically including the Federal Anti-Kickback Statute (42 U.S.C. Sec. 1320a-7(b) (the "Anti-Kickback Statute") and the Physician Self Referral Law (42 U.S.C. Sec. 1395nn) (also referred to as the "Stark Law");

2. Have read, understood and shall abide by the UH Code of Conduct and UH Policies and Procedures;

3. Shall comply with the UH Compliance Program; and

4. Shall perform the Contract in compliance with all applicable laws, rules and regulations and Federal health care program requirements, including without limitation, the Federal Anti-Kickback Statute, the Stark Law, and the rules, regulations and administrative guidance promulgated under the authority of such laws.

Each of the parties certifies that to its best knowledge and belief, no part of any consideration paid under the Contract is a prohibited payment for the recommending or arranging for the referral of business or the ordering of items or services; nor are the payments intended to induce illegal referrals of business or other illegal conduct.

This Compliance Certification must be signed by an authorized representative of the entity or individual identified below with knowledge of the matters addressed herein and authority to bind such party, and shall have the same effective date as the Contract.

"DOCTOR"                                        "UH"

_____                 _____
Print Name:  S. Aronson, MD          Jerry M. Shuck, M.D.
Date:  2/25/07                   Director of Graduate Medical Education

---

1. Except where otherwise noted, "UH" means all hospitals, ancillary providers, and other entities owned or controlled, directly or indirectly, by University Hospitals Health System.

2. An individual or entity listed on either the Health and Human Services -- Office of Inspector General -- List of Excluded Individuals at www.exclusions.oig.hhs.gov or the General Services Administration List of Parties Excluded from Federal Procurement and Non-Procurement Programs at www.epls.gov , as revised from time to time, is Ineligible.

3. "Immediate family members" include a spouse, natural or adoptive parent, child, sibling, step-parent, step-child, step-brother, step-sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, grandchild, and the spouse of any grandparent or grandchild.

UHC000012