Page 1

1                          - - - -

2              UNITED STATES DISTRICT COURT

3              NORTHERN DISTRICT OF OHIO

4                  EASTERN DIVISION

5                     - - - - -

6   SARAH ARONSON, M.D.,          )
            Plaintiff,            )
7                                 )
        v.                        )      CASE NO. 1:10-CV-00372
8                                 )      JUDGE BOYKO
    UNIVERSITY HOSPITALS OF       )
9   CLEVELAND,                    )
            Defendant.            )
10

11                    - - - - -

12         DEPOSITION OF JERRY SHUCK, M.D.

13         Wednesday, December 22, 2010

14                     - - - -

15      The deposition of JERRY SHUCK, M.D., a Witness herein,

16   taken by the Plaintiff as if upon examination under the Ohio

17   Rules of Civil Procedure, before me, Mary C. Peck, a

18   Stenographic Reporter and Notary Public within and for the

19   State of Ohio, at the offices of Gordillo & Gordillo, LLC,

20   1370 Ontario Street, Suite 2000, Cleveland, Ohio, commencing

21   at 2:00 p.m., the day and date above set forth.

22                     - - - -

23

24

25

```
 1            APPEARANCES:
              On behalf of the Plaintiff:
 2
              GREGORY A. GORDILLO, ESQUIRE
 3            Gordillo & Gordillo, LLC
              1370 Ontario Street
 4            Suite 2000
              Cleveland, Ohio  44113
 5            ggordillo@eeoattorney.com

 6
              On behalf of the Defendant:
 7
              BARTON A. BIXENSTINE, ESQUIRE
 8            Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
              Key Tower
 9            127 Public Square
              Suite 4130
10            Cleveland, Ohio  44114
              bart.bixenstine@ogletreedeakins.com
11                         - - - -

12            ALSO PRESENT

13            Sarah Aronson, M.D.

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX

2                                                    PAGE

3     EXAMINATION

4     By Mr. Gordillo                                  5

5

6     OBJECTIONS

7     By Mr. Bixenstine                               32

8     By Mr. Bixenstine                               33

9     By Mr. Bixenstine                               40

10    By Mr. Bixenstine                               62

11    By Mr. Bixenstine                               64

12    By Mr. Bixenstine                               69

13    By Mr. Bixenstine                               71

14

15    EXHIBITS

16    Exhibit 6                                       11

17    Exhibit 7                                       12

18    Exhibit 8                                       15

19    Exhibit 9                                       20

20    Exhibit 10                                      21

21    Exhibit 11                                      22

22    Exhibit 12                                      30

23    Exhibit 13                                      37

24    Exhibit 14                                      37

25    Exhibit 15                                      45

Page 4

1   EXHIBITS (CONTINUED)                            PAGE

2   Exhibit 16                                        51

3   Exhibit 17                                        54

4   Exhibit 18                                        54

5   Exhibit 19                                        57

6   Exhibit 20                                        66

7   Exhibit 21                                        72

8   Exhibit 22                                        74

9   Exhibit 23                                        75

10  Exhibit 24                                        81

11  Exhibit 25                                        83

12  Exhibit 26                                        86

13

14

15

16

17

18

19

20

21

22

23

24

25

1               JERRY SHUCK, M.D.

2       called by the Plaintiff for the purpose of examination,

3   as provided by the Ohio Rules of Civil Procedure, being by

4   me first duly sworn, as hereinafter certified, deposed and

5   said as follows:

6                      - - - -

7               EXAMINATION OF

8               JERRY SHUCK, M.D.

9                      - - - -

10      BY MR. GORDILLO:

11   Q   Would you please state your full name for the record?

12   A   Jerry, J-e-r-r-y, Mark, middle name, M-a-r-k, Shuck,

13       S-h-u-c-k.

14   Q   And as we go along with our deposition, how would you

15       like me to address you?

16   A   Any way you'd like; Jerry, Doctor Shuck, hey you,

17       whatever works.

18   Q   Would you please state what your home address is?

19   A   2955 West Belvoir Oval, Shaker Heights 44122.

20   Q   Does anyone else live there with you?

21   A   My spouse at this time.

22   Q   What is your spouse's name?

23   A   Doctor Linda, L-i-n-d-a, Shuck.

24   Q   Have any plans on moving any time soon?

25   A   Not that I know of.  We've been there 30 years, 31

Page 6

```
 1           years.  No, we're not planning on moving.

 2    Q     Are you currently employed?

 3    A     Yes.

 4    Q     Who is your employer?

 5    A     University Hospitals of Cleveland.

 6    Q     Have you had your deposition taken before?

 7    A     Yes.

 8    Q     Have you testified or given testimony as an expert

 9           before?

10    A     Yes.

11    Q     Okay.  Excluding your testimony as an expert, how

12           many times have you been deposed?

13    A     As a surgeon, taking care of the patient, I'd say

14           about three or four times, and one time 27 years ago

15           there was a complaint that I testified on, 27, 28

16           years ago.

17    Q     So in the three or four times that you have testified

18           other than as a capacity as an expert, were they all

19           in connection with medical negligence?

20    A     Yes, yes.

21    Q     Alleged medical negligence?

22    A     Yes.  I testified for the defense.

23    Q     So other than cases involving claims of medical

24           negligence or your testifying as an expert, you've

25           not been deposed; is that right?
```

```
1    A    That's correct.

2    Q    Okay.  I'll be brief since I think you've probably

3         been through the process before, but I'll let you

4         know a little bit about how I go about it.

5              If at any time you need a break, just say so and

6         I'll be happy to give you that break.  I only ask

7         that if there's a question put to you at the time,

8         that you answer the question before you go.

9    A    Sure.

10   Q    The other thing I want to make sure about is when I'm

11        asking you questions, you have every right to make

12        sure I'm clear of the questions I'm asking you, so if

13        for any reason at all you don't understand my

14        question, will you let me know that?

15   A    Sure, sure.  I certainly will.

16   Q    And by the same token, if you don't let me know that

17        you understood the question or didn't understand the

18        question, I'm going to assume that you did understand

19        the question; is that fair?

20   A    That's fair.

21   Q    Is University Hospitals of Cleveland your only

22        employer at the time now?

23   A    Yes.  I'm employed by the hospital and also by the

24        Department of Surgery, and there's a pass-through to

25        my salary from the hospital, so I'm paid by the
```

1        Department of Surgery, but most of my job is for the

2        hospital.

3  Q   Okay.  And do you have a job title for the hospital?

4  A   Yes.  I'm Director of Graduate Medical Education.

5  Q   What are your duties as the Director of Graduate

6        Medical Education?

7  A   That job entails trying to promote excellence in

8        training of residents and fellows, to make sure the

9        programs are accredited, to make sure that not only

10      the programs are treated properly but the residents

11      are treated properly, often an advocate for both, and

12      I'm a repository for what the rules and regulations

13      are to keep it accredited.

14  Q  And when you say you're a repository, what do you

15      mean?

16  A  Well, I'm often the go-to person to see what the

17      rules are from the accrediting body, the ACGME, which

18      is housed in Chicago.  I'm their person, as well.

19        They have a title for me which is an odd title,

20      in my view, called the DIO, which is the designated

21      institutional official, so they hold me accountable

22      for everything and the hospital holds me accountable

23      for everything.  I'm also Associate Dean for the

24      Medical School for Graduate Medical Education, and I

25      keep them apprized, as well.  They do not pay me.

Page 9

```
 1    Q    Can you -- is that a complete description of the
 2         duties that you perform?
 3    A    In this position, yes.  I'm also a surgeon.
 4    Q    Okay.  As director of Graduate Medical Education, do
 5         you have specific responsibilities concerning the
 6         Anesthesiology Residency Program?
 7    A    All 65, including Anesthesiology.
 8    Q    Is there anything unique about your responsibilities
 9         to the Anesthesiology Program?
10    A    Unique?  No.  I don't see anything unique about it.
11    Q    Is it fair to say there may be unique requirements
12         for that program?
13    A    Yes.  They have different requirements.  Each program
14         has specific program requirements, and then there's
15         some common program requirements.
16    Q    So you're, for example, the repository for all of
17         those requirements?
18    A    Yes.  They will call me and say, what are the rules?
19         And when they're accredited, I speak to every
20         accrediting person who looks at each program.
21    Q    Could you describe for me what the relationship is
22         between you and the Department Chair, Doctor Nearman,
23         with respect to the residency, the Anesthesiology
24         Residency Program?
25    A    I communicate with all chairmen, but my direct
```

```
 1           communication for the program is usually with the

 2           program director.

 3    Q      And from the period of October of 2006 through August

 4           of 2009, the program directors for the Anesthesiology

 5           Residency were Doctors Norcia and Wallace, right?

 6    A      Doctor Norcia is the program director.  Doctor

 7           Wallace is the associate program director.  According

 8           to the ACGME, there could only be one program

 9           director, but there are many associate program

10           directors.

11    Q      For the period that I just discussed --

12    A      That's all -- they were in office at that time.

13    Q      And Doctor Wallace was the only associate program

14           director for --

15    A      In the Department of Anesthesiology, yes.

16    Q      And so your communications are more frequently with

17           Doctor Norcia or Doctor Wallace, right?

18    A      Yes.  That's correct.

19    Q      To whom do they report?

20    A      About the program, they report to me and also to

21           their chairman.  They have dual reporting

22           responsibility.

23    Q      Do you know who Will Rebello is?

24    A      Yes.

25    Q      Tell me who he is.
```

```
 1    A    He's the manager of the Graduate Medical Education

 2         Office.  He works with me, for me.

 3    Q    And would you explain to me what the working

 4         relationship is between you and Mr. Rebello relative

 5         to the Anesthesiology Program?

 6    A    Well, it's no different from any other program.  We

 7         are essentially colleagues and partners.  He has

 8         certain responsibilities.  I mean, we talk about

 9         strategy together.  If he has a problem, residents

10         often drop in his office for any reason, such as, the

11         call room last night wasn't cleaned on time.  He gets

12         that kind of thing.  Or if somebody just wants to

13         chat, residents feel comfortable with him.  And yes,

14         he makes himself available.

15    Q    But he reports to you?

16    A    Yes.

17    Q    To what extent are you responsible for the contracts

18         with the residents, if you have any responsibility?

19    A    I sign them all.

20                         - - - -

21    (Thereupon, Exhibit 6 was marked for the purpose of

22                      identification.)

23                         - - - -

24    Q    (By Mr. Gordillo)  You've been handed a document

25         marked as Exhibit Number 6.  As we go through the
```

```
 1              deposition, you're going to be handed a number of

 2              documents, and I want to make sure each time you get

 3              a document that you take all the time you'd like to

 4              look it over and let me know when you've had an

 5              adequate opportunity to review it.

 6      A       Yes.  I think I understand this document.

 7      Q       Do you recognize the document?

 8      A       I recognize the document and my signature.

 9      Q       That's your signature at the bottom, right?

10      A       Yes.

11      Q       Actually on each of the two pages, right?

12      A       Yes.

13      Q       And this is the resident contract for Sarah Aronson

14              the period of March 1, 2009 through August 31, 2009,

15              correct?

16      A       Yes.

17                          - - - -

18      (Thereupon, Exhibit 7 was marked for the purpose of

19                       identification.)

20                          - - - -

21      Q       (By Mr. Gordillo)  And now you've been handed another

22              document marked as Exhibit 7.  Again, take all the

23              time you'd like to look it over and let me know when

24              you've had an adequate opportunity to review it.

25      A       That's fine.
```

1    Q    Do you recognize the document?

2    A    Yes.

3    Q    Will you tell me what it is, please?

4    A    Well, it's a contract for the year March 2007 through

5         February 2008.  The contracts are renewed yearly.

6    Q    And each page of this Exhibit 7 has been signed by

7         you, correct?

8    A    Yes.

9    Q    And do you recognize that it's also been signed by

10        Sarah Aronson, right?

11   A    That's correct.

12   Q    If you look at the third paragraph in the body of

13        Exhibit 6 below the effective period -- see the top

14        where it says Effective Period on Exhibit 6?

15   A    All right.  Here's Exhibit 6 and --

16   Q    Effective Period?

17   A    Yes.

18   Q    I'm look at the third paragraph below that, starts:

19        UHCMC.

20   A    Yes.

21   Q    UHCMC agrees to provide an educational program that

22        at a minimum meets the standards established by the

23        ACGME and to provide benefits as outlined in the

24        Manual.

25             Did I read that correctly?

Page 14

1    A    Yes.

2    Q    And in Exhibit 7, the same language appears, correct,

3         in the same place?

4    A    Yes.

5    Q    Exhibit 6 is for a period that begins March of 2009.

6         Exhibit 7 ends February 29th of 2008.  Presumably

7         Doctor Aronson had a contract in the interim period;

8         is that a fair presumption?

9    A    That's a fair presumption.  I don't see it, but I

10        would think it was there.

11   Q    To your knowledge, did the language we just read that

12        appears in both Exhibit 6 and Exhibit 7 also get used

13        in the typical contract?

14   A    This is a typical contract.  There is not a

15        difference in wording on these contracts.

16   Q    And assuming that there was a contract in the interim

17        year, it likely has the same language, correct?

18   A    That would be my assumption without seeing it, yes.

19   Q    And as you read that language, do you understand that

20        UHCMC is agreeing to incorporate the ACGME Standards

21        as part of this contract?  Is that right?

22   A    Yes.

23   Q    And likewise, in the first paragraph, it defines the

24        Manual as the Residents' and Fellows' Manual.  That

25        is the Residents' and Fellows' Manual of UHCMC; is

```
 1            that right?

 2    A      That's correct.

 3    Q      So the Fellows' Manual has been incorporated into

 4            this contract as well, correct?

 5    A      Yes, sir.

 6    Q      And both the Manual and the ACGME requirements

 7            address duty hours, correct?

 8    A      Yes.

 9    Q      And so the duty hour requirements are part of the

10            contract; is that right?

11    A      Yes.  If it's as outlined in the Manual, yes, the

12            duty hours are part of the contract that they would

13            agree to.  And that's the identical wording from the

14            ACGME, by the way.

15                            -  -  -  -

16    (Thereupon, Exhibit 8 was marked for the purpose of

17                        identification.)

18                            -  -  -  -

19    Q      (By Mr. Gordillo)  You've been handed a document

20            marked as Exhibit 8, and again, take all the time

21            you'd like to look it over and let me know when

22            you've had an adequate opportunity to review it.

23    A      Okay.

24    Q      Do you recognize the document?

25    A      Yes.
```

1    Q    Can you tell me what it is, please?

2    A    It's part of the Manual for residents and fellows,

3         and it sets out the policies for Graduate Medical

4         Education for residents and fellows.  It has --

5         obviously it starts on Page 28, so it's obviously

6         been selected.

7    Q    And you see the section marked Duty Hours towards the

8         bottom of 28?

9    A    Yes, sir.

10   Q    I have the entire manual, and you're welcome to look

11        through that.

12   A    I know the manual.  I wrote it.

13   Q    Is this the portion of the manual that deals with

14        duty hours?

15   A    Yes, it is.

16   Q    Is there any other portion of the manual, that you're

17        aware of, that deals with duty hours?

18   A    No.  There will be an addendum to this, but at this

19        time, this is still the duty hour requirements for

20        ACGME.

21   Q    And this was the duty hour requirement that applied

22        during the period September, October, and November of

23        2008, right?

24   A    That's correct.

25   Q    With respect to the Anesthesiology Department and its

```
 1            Residency Program, did you understand that Doctor

 2            Wallace was the individual responsible for scheduling

 3            the residents?

 4      A     Yes.

 5      Q     And in the context of making sure that scheduling was

 6            within the duty hours requirements, would it have

 7            been his responsibility to do that?

 8      A     Yes.  He does that for the program director, but

 9            that's been one of his major responsibilities, yes.

10      Q     And would you agree with me that the program should

11            be scheduling work hours in accordance with the duty

12            hour requirements?

13      A     Yes.

14      Q     All right.  And in the Anesthesiology Program for the

15            period September through November of 2008, compliance

16            with the duty hour requirement was a matter of

17            self-reporting; is that right?

18      A     There's various ways it's done; self-reporting and

19            residents will confirm that, yes, I held to this

20            schedule.  And they report -- the program director

21            reports that every month, if there's variations or

22            problems, because those are looked at very carefully

23            when the programs are reviewed by the accrediting

24            body.  So we watch that very carefully in our office,

25            as well.  We don't see the schedules, but we make
```

```
 1            sure that that report is given to us.

 2    Q      So there's a self-reporting form that the residents

 3           fill out, correct?

 4    A      It varies.  Many of them have a self-reporting form

 5           and then they sign an attestation that it's correct.

 6    Q      And I'm talking about the Anesthesiology Program

 7           right here now.

 8    A      Yes.

 9    Q      And then the schedules would reflect the hours

10           worked, right?

11    A      Should.

12    Q      Or the hours assigned?

13    A      That's a fair assumption, yes.

14    Q      Are there any other records that are kept to show

15           what hours were worked by the residents?

16    A      I have no knowledge of it in my office.

17    Q      The reports that you were talking about, is that a

18           third kind of documentation, the hours worked?

19    A      These are reported to Will Rebello quite often.

20           That's who gets them and gives a report at the

21           meeting of the Graduate Medical Education Committee,

22           and we discuss duty hours every month, and if there

23           are variances, they are reported to the entire group.

24    Q      I think I understood your testimony earlier was one

25           of your responsibilities was to make sure that the
```

```
 1            programs were in compliance with ACGME requirements.

 2    A       That's correct.

 3    Q       Do you likewise have responsibilities for making sure

 4            that the program was in compliance with the manual?

 5    A       Yes.  The manual was written based upon the

 6            requirements of the ACGME in many areas.

 7    Q       Within the Anesthesiology Residency Program, who

 8            would be considered supervisors of the residents?

 9    A       The program director.

10    Q       Did you have any policies regarding training program

11            directors on how to recognize fatigue symptoms?

12    A       Yes.

13    Q       And where are those policies set forth?

14    A       We have policies from the ACGME.  We require all

15            departments to have education in the area of fatigue,

16            sleep deprivation, et cetera.

17    Q       Do you know whether Doctor Norcia received that

18            training on recognizing fatigue?

19    A       He has to schedule that, and yes.

20    Q       Do you know whether he did schedule it?

21    A       I do know that the residents have gotten that

22            training, and so it had to be scheduled through

23            either Wallace or Norcia.

24    Q       But I'm not asking about the residents now.  I'm

25            asking specifically whether the supervisors were
```

```
 1            trained.

 2    A    Usually I know in other departments -- I can't answer

 3         specifically how many come to the session on fatigue,

 4         but if it's run by Norcia and Wallace, I'm sure

 5         they're there.  I shouldn't say I'm sure they're

 6         there, but I assume they're there.

 7    Q    But you do not know for sure?

 8    A    I do not know for sure.

 9                          - - - -

10    (Thereupon, Exhibit 9 was marked for the purpose of

11                     identification.)

12                          - - - -

13    Q    (By Mr. Gordillo)  You have been handed a document

14         marked as Exhibit 9.  Please take all the time you'd

15         like to look it over and let me know when you've had

16         an adequate opportunity to review it.

17    A    I've looked at the first four pages which relates to

18         Anesthesiology.  All the other ones are in here for

19         other programs.

20    Q    Do you recognize the document?

21    A    Yes.  It's a summary document that helps program

22         directors and people in my position to see what

23         changes are there and how each program has specific

24         requirements on duty hours, but the basic ones are

25         very similar.
```

1    Q    And you recognize that this is a document that was

2         prepared by the ACGME?

3    A    Yes.  This was a document prepared by the ACGME.

4                          - - - -

5    (Thereupon, Exhibit 10 was marked for the purpose of

6                       identification.)

7                          - - - -

8    Q    (By Mr. Gordillo)  Now you've been handed a document

9         marked as Exhibit 10.

10   A    Yes.

11   Q    And again, please take all the time you'd like to

12        look it over and let me know when you've had an

13        adequate opportunity to review it.

14   A    Yes, sir.

15   Q    Do you recognize this document?

16   A    Yes, I do.

17   Q    Can you tell me what it is, please?

18   A    It's further explanation of the common requirements,

19        which means the requirements for all programs, and it

20        should be uniform across all 65 programs.  This

21        states what the common requirements are.

22   Q    And with respect to the provisions in Letter D, Duty

23        Hours --

24   A    Yes.

25   Q    -- was it your understanding that these requirements

1        with respect to duty hours applied to the UH

2        Anesthesiology Residency Program?

3   A    All residency programs.

4   Q    And likewise, Section E with respect to On-Call

5        Activities applied?

6   A    Yes.

7   Q    And Section G with respect to Duty Hours Exceptions.

8   A    Yes.

9   Q    And these terms are incorporated in the contract that

10       you signed, correct?

11  A    These are implied in the contract that they've read,

12       these documents, and let me see --

13  Q    Well, for example in Exhibit 6 --

14  A    I'm looking at this, as well.

15  Q    -- where the documents recited that the program at a

16       minimum meets the standards established by the ACGME,

17       right?

18  A    Yes.

19  Q    And the duty hours addressed in Exhibit 10 are

20       minimum standards established by ACGME, correct?

21  A    That's correct.

22                       - - - -

23  (Thereupon, Exhibit 11 was marked for the purpose of

24                      identification.)

25                       - - - -

1   Q   You've now been handed a document marked as Exhibit

2       11.  Again, please take all the time you'd like to

3       look it over and let me know when you've had an

4       adequate opportunity to review it.

5   A   Okay.  I've looked at the Frequently-Asked Questions.

6       I have not gone over these before.  They always put

7       out a new series of frequently-asked questions, but

8       I'm familiar with the questions that are very

9       commonly asked.

10  Q   Okay.  As you looked through this document, the

11      questions that are identified on the first three

12      pages --

13  A   Okay.

14  Q   -- and the answers that are given, do you see

15      anything inaccurate about the answers to the

16      questions?

17  A   On brief review, I don't see any differences.  These

18      are often the same answers I use when program

19      directors ask me, yes, sir.

20  Q   On Page 4, the question is asked:  Can residents take

21      in-house call every other night for some part of the

22      month, if they get extra time off later in the

23      months?

24          Do you see that question?

25  A   Yes.

Page 24

```
 1    Q    And do you find that answer to be an accurate answer?
 2    A    We prefer that they not take call every other night,
 3         and the answer is correct.  We advise strongly
 4         against it.  The requirement is no more often than
 5         every third night.
 6    Q    Look at the bottom of Page 7, top of Page 8, and you
 7         see the bottom of Page 7 is the question about:  Can
 8         we relax the duty hour standards.
 9    A    That is a frequently-asked question during the
10         holidays.
11    Q    Do you find that the answer given is an accurate
12         answer given to the question?
13    A    Yes.  We don't vary the basic rules of the ACGME.
14    Q    That was going to be my next question.
15              These questions and answers would be equally
16         applicable when applied to the UH Standards for Duty
17         Hours, right?
18    A    Yes, sir.
19    Q    And do you know, were these the standards for duty
20         hours that would have applied for the period of
21         September, October, November of 2008?
22    A    Yes.  These should have applied then, yes.
23    Q    You described one of your duties as being an advocate
24         for both the residents and the program.  I think you
25         said treating residents and the program; is that
```

Page 25

```
 1            fair?

 2     A      That's what I try to do, yes, sir.

 3     Q      What do you mean by being an advocate for the

 4            residents?

 5     A      To make sure that they get what they need.  Residents

 6            will say, we need a better lounge, and I will take

 7            that request to the institution and say, you know, we

 8            need to provide better in-house services to

 9            residents, and when we do that, we're able to get the

10            resources and build a kitchen, and all that stuff,

11            for them.

12                 So I'm an advocate for their needs and for

13            individuals, as well.  They often stop in the office

14            and ask me things and I try to help them.  And for

15            program directors, they will say, can you help us

16            recruit a new faculty because our program is wanting

17            in this area, so I advocate for all of them as best I

18            can and listen and hear the stories.

19     Q      But sometimes the needs or wants of the residents may

20            become inconsistent with what's best for the program;

21            is that fair?

22     A      I think that's possible, yes.

23     Q      So you also serve as an advocate for the program?

24     A      Yes.  I have to be fair.

25     Q      How do you balance one against the other?
```

1    A    I don't have a formula for how I balance that.  I

2         listen to the facts, hear people, do not get into

3         anything confrontational at all, and try to make sure

4         that they feel that if they're having a concern that

5         they're heard fairly and that it is taken nowhere

6         else unless they ask me to take it somewhere else.

7    Q    Has there ever been a time when you have said, I

8         can't advocate for the program at this time?

9    A    I can't advocate for the -- I guess I need some

10        explanation of that.  Do you mean that I would take

11        sides against the program or --

12   Q    Well, I'm just using the word as you've used it, so

13        whatever it means to you to say I advocate for the

14        program, I'm asking you has there ever been a time

15        when you've been presented with a situation that

16        caused you to say, I can't do it.  I cannot advocate

17        for the program?

18   A    There are times when I tell the program, you have to

19        stop doing this, you need to do that if it seems in

20        the best interest of the residents in fairness in

21        accordance with the rules, and the same thing with

22        residents.

23   Q    So if a resident comes to you with a concern --

24   A    Yes.

25   Q    -- and you believe that it's inappropriate, you would

Page 27

1        say, I can't advocate for you?

2    A   I cannot see myself saying it's inappropriate.  I see

3        myself hearing them with a door closed as a mentor

4        and as an educator and as a supporter.  I hope that

5        people are comfortable talking to me.  They come all

6        the time for a variety of reasons.

7    Q   What are the guidelines you would rely upon to decide

8        you would not advocate for a resident?

9    A   I would have to get all the facts.  The guidelines?

10       I don't have guidelines.  I think if a resident has

11       violated policy or violated the rules, I would tell

12       them straight away.

13   Q   The Residency Program was required to provide

14       evaluations of clinical competency for each resident

15       that participated in any portion of a six-month

16       period before January in the year; is that right?

17   A   What was the question?

18   Q   Fair enough.  That was a long pause.

19                 MR. GORDILLO:  Would you read that

20            back?

21                      - - - -

22       (Thereupon, question read by Notary.)

23                      - - - -

24   Q   Isn't it correct that in January of each year, the

25       Anesthesiology Residency Program had to submit an

1        evaluation of clinical competency for each resident

2        that participated in the program for any portion of

3        the prior six months?

4  A    That's done differently by various departments.  I

5        expect and the ACGME expects that the six

6        competencies that they hold as part of their

7        requirements are being met throughout the year, and

8        those should be evaluated certainly every six months,

9        and some do it every month.  It's done variably.

10  Q    But in Anesthesiology, it's done every six months,

11        right?

12  A    Yes.

13  Q    And in particular, it's done July and January?

14  A    I don't know that for sure, but that's how it appears

15        to be.

16  Q    In your capacity as the repository of ACGME

17        requirements, is that something that you should be

18        the person who knows the answer to that question?

19  A    No.

20  Q    And I'm not -- that really is asking, not accusing.

21  A    I got 65 programs, and each one does it variably, and

22        I don't tell them how to do it.  I just want to make

23        sure it's done.

24  Q    Who is it that should be the one who really

25        understands and knows how to comply with the

1               requirement?

2      A        The program director should be knowledgeable about

3               the requirements.

4      Q        Do your responsibilities cause you to become involved

5               in staffing decisions?

6      A        No.  The ACGME states that the program director is in

7               charge of staffing both at our hospital, and if

8               someone goes to another hospital, he has to know

9               who's over there and how that's staffed.  We can't

10              send somebody to another hospital and not know who's

11              supervising.

12     Q        Do your responsibilities result in your participating

13              in the decision-making process about what roles

14              individuals will fill within a particular program?

15     A        No.  If I have a program director I'm working with

16              whom I believe to be doing the job that's expected, I

17              don't get any deeper than that.  Each one manages his

18              team of educators differently.

19     Q        And if you believe that the program director is not

20              doing the job they should be doing, do you take any

21              action?

22     A        Yes.

23     Q        What actions would you take in such a case?

24     A        Calling them in and advising them all the way to --

25              which has recently happened -- telling them that they

Page 30

1    cannot continue to be program director.  The ACGME

2    gives me the authority to do that, but I usually do

3    that in association with the department chairman.  I

4    can do that on my own if I feel it's required.

5                          - - - -

6    (Thereupon, Exhibit 12 was marked for the purpose of

7                     identification.)

8                          - - - -

9    Q    (By Mr. Gordillo)  You've been handed a document

10        marked as Exhibit 12.  Please take all the time you'd

11        like to look it over and let me know when you've had

12        an adequate opportunity to review it.

13   A    Yes.

14   Q    Do you recognize --

15   A    I do recognize it.

16   Q    Okay.  Describe for me what this document represents.

17   A    It's an email from Doctor Aronson to me confirming

18        conversations we had on -- according to this -- the

19        16th of June 2009, and it deals in several items.

20             One is the appeal processes that are available.

21        Another is making sure that the working conditions

22        are appropriate and non-hostile, which I have

23        followed through with.  You indicated that Doctor

24        Wallace was no longer a player, which is correct.  I

25        told him so, and am I'm summarizing this correctly?

```
1           And I thought it would be most appropriate for Doctor

2           Aronson to meet with me to talk about these things.

3               I think emails do not reflect often what's trying

4           to be communicated; body language, types of

5           inflection, and I wanted to make sure everything was

6           clear.

7      Q    At the risk of beating a dead horse, it looks to me

8           like the on the 15th of June, Sarah Aronson asked you

9           to have a meeting.  On the 16th of June, you had the

10          meeting.  On the 20th of June, she wrote you an email

11          summarizing what happened at the meeting, and you

12          then acknowledge that she had accurately summarized

13          the meeting.  Is that a fair characterization of this

14          document?

15     A    I think it's a fair characterization of the document,

16          to my recollection.

17     Q    Were you involved in the decision-making process that

18          led to Doctor Wallace no longer being a player?

19     A    Yes.

20     Q    Tell me what happened in that process.

21     A    I told Doctor Wallace directly that he was too

22          involved and that it was so uncomfortable for Doctor

23          Aronson, that it would be better if he weren't part

24          of this process since there may be fear of

25          intimidation, whatever the reason was, and I don't
```

Page 32

```
 1              like a resident to be in an environment where one

 2              faculty member is perceived as being either

 3              frightening or inappropriate or mean, or whatever.  I

 4              just don't think that's right.  So I asked him to

 5              step aside and stay out of these conversations.

 6    Q         And how did he respond to that?

 7    A         He agreed.

 8    Q         He agreed with your reasoning or he agreed just to

 9              step aside?

10    A         Both.

11    Q         What did you do to come to your conclusions about

12              him?

13    A         I was observing Doctor Aronson's extreme discomfort,

14              which I was actually pleased that she was willing to

15              tell me.  I also discussed it with the program

16              director and the chairman of the department to keep

17              David Wallace out of this because it's too

18              uncomfortable, may be destructive, and I didn't want

19              anything to get in the way of fairness or perceived

20              fairness.

21    Q         Did you see any similar problems with respect to

22              destructiveness in the case of Doctor Norcia's

23              dealing with Sarah Aronson?

24                        MR BIXENSTINE:  Objection.  Go

25                   ahead.
```

Page 33

```
1     A    I didn't go in that direction because I felt that

2          Doctor Norcia understood the problems of being

3          uncomfortable, and he's the program director, and I

4          worked with him and Doctor Nearman.

5     Q    And as you were making inquiry, did you see anything

6          about Doctor Nearman's interaction with Sarah Aronson

7          that would give you reason to believe he was making

8          her uncomfortable?

9                    MR BIXENSTINE:  Objection.

10    A    I don't recall anything like that.

11    Q    What information were you getting that was different

12         about Doctor Wallace that made you believe --

13    A    First, my meetings with Doctor Wallace, who was very

14         outspoken, and also the agreement from both Norcia

15         and Nearman that Doctor Wallace was way too

16         emotionally involved, and I think that's a fair

17         statement.

18             My job was to provide an environment to get this

19         sorted out where people weren't threatened.

20    Q    When you were doing your investigation, did you get

21         any sense of what caused Doctor Wallace to be so

22         emotionally involved?

23    A    No, sir.

24    Q    Did you hold any opinion of your own about what

25         caused him to be so emotionally involved?
```

```
 1    A    Not really.  Some of the -- I will volunteer some of

 2         it is his temperament.  He's very by-the-book and can

 3         be a little rigid.

 4    Q    What did you mean when you indicated in substance to

 5         Doctor Aronson that you would be involved in this

 6         on-going process?

 7    A    I meant that I would hope that she would feel

 8         comfortable letting me know what's going on, and I

 9         felt that I had to step in and be a party, which I'm

10         not always, but once things rise to this level, I

11         become a party to it.  The small things day-to-day,

12         no.

13    Q    With respect to her reference about no plan to offer

14         her an appeal process, what did you understand at

15         that time that she wanted to appeal?

16    A    I wasn't sure, except that I did know that options

17         were provided and remediation or extension of program

18         is not appealable.

19    Q    When you say options were provided, what options are

20         you talking about?

21    A    Well, everything from termination to probation to all

22         sorts of things which would have to be reported, and

23         that was an option provided to extend six months.

24    Q    Option provided to whom?

25    A    To Doctor Aronson to complete -- successfully
```

1            complete the program and to demonstrate improvement

2            in whatever deficiencies they found.

3    Q    I'm sorry.  Repeat for me what the options were.

4    A    I guess one option is termination.  Another option

5            is, since she's in her last year, it's not

6            non-renewal.  Another option is probation.  Another

7            option is remediation.

8    Q    And is it your testimony when you say these options

9            were provided that she was given the choice among

10           those options?

11   A    That's my understanding.

12   Q    Who gave her those options?

13   A    These were provided by, I believe, Doctor Norcia, and

14          I think that she had met with whoever provided the

15          options with counsel and made that decision.

16   Q    So the choice she was faced with was a disciplinary

17          action, ie termination or probation?

18   A    Adverse action, yes, sir.

19   Q    Or remediation?

20   A    Yes.

21   Q    Did you see that as a real choice?

22   A    I thought that -- yes.  I thought it was a choice in

23          that the opportunity -- if she said, then go ahead

24          and fire me, then she could appeal that and really

25          make her case.  That is an option.  I've seen that.

1           The other is if you give some remediation, then

2      that does not have to be reported to the Ohio State

3      Board of Medical Examiners.  That does not follow her

4      as a paper trail forever, and so that option actually

5      provided her -- and I didn't see that it's a big

6      choice, either, in that provided her an opportunity

7      to finish the program and demonstrate that she's

8      doing the job.

9    Q   When a resident is placed in remediation under the

10     manual, isn't the resident supposed to be given a

11     written remediation program?

12   A   Usually we do recommend that.  I don't know if one

13     was given here or not.

14           MR BIXENSTINE:  I'm sorry.  I didn't

15         hear the end of his answer.

16               - - - -

17     (Thereupon, record read by Notary.)

18               - - - -

19   Q   (By Mr. Gordillo)  Did you have any understanding of

20     what Doctor Aronson's remediation program was?

21   A   To continue -- my understanding is to continue

22     certain rotations that were difficult for her where

23     she could show improvement, and that was certainly

24     what most remediations do, which means that it's not

25     a probation, it's a remediation, and we'll fulfill

Page 37

```
 1              this and you finish the program and there we are.
 2        Q    Did you understand that as part of her program her
 3              training was being extended for six months?
 4        A    Yes.
 5        Q    Did you understand that she had received notice of
 6              that decision in January of 2009?
 7        A    I don't know when she was notified of that.
 8                          - - - -
 9   (Thereupon, Exhibit 13 was marked for the purpose of
10                      identification.)
11                          - - - -
12        Q    (By Mr. Gordillo) Now you've been handed a document
13              marked as Exhibit 13.  Would you please take all the
14              time you'd like to look it over and let me know when
15              you've had an adequate opportunity to review it?
16        A    I've read it.
17        Q    Have you seen that document before?
18        A    No.
19        Q    After reading that document, does it refresh your
20              recollection in any way about when Sarah received
21              notice that she was going to be put into remediation?
22        A    No.  I heard about the medication issue, but no, I
23              wasn't -- I'm not sure of the timing.
24                          - - - -
25   (Thereupon, Exhibit 14 was marked for the purpose of
```

```
 1                        identification.)

 2                            - - - -

 3       Q    (By Mr. Gordillo)  You've now been handed a document

 4            marked as Exhibit 14.  Please take all the time you'd

 5            like to look it over and let me know when you've had

 6            an adequate opportunity to review it.

 7       A    I've looked at it.

 8       Q    Do you recognize it?

 9       A    I recognize it.  It's from the Residents' and

10            Fellows' Manual.

11       Q    And I want to turn your attention to the document

12            marked Page 10, Performance Review Actions.

13       A    Yes.

14       Q    And the paragraph is B-2, Remediation.

15       A    Yes, sir.

16       Q    Is that the policy that was in effect from December

17            of 2008 through August of 2009?

18       A    Yes, sir.

19       Q    And so when we're talking about the remediation

20            option for Sarah Aronson, it would be an option

21            pursuant to the standard set forth in Exhibit 14,

22            correct?

23       A    Yes.

24       Q    The first paragraph dealing with remediation, and the

25            last sentence of that first paragraph says:  It is
```

1           not to be used in lieu of a disciplinary action.

2               Did I read that correctly?

3    A    Yes, you did.

4    Q    How is it consistent to offer an option of

5         disciplinary actions while the policy is not to offer

6         remediation in lieu of a disciplinary action?

7    A    I was not at the meeting where this was presented.

8         Remedial -- when one is presented -- one presents

9         what options are, we don't say, we'll use this and

10        not use that.  Sometimes the resident is given the

11        opportunity to choose, and this wasn't then if she

12        hadn't done that -- if she had not accepted the

13        remediation, we would have had to have further

14        discussions about it.  But that was one of the

15        options presented to her.  I was not at that meeting.

16        I don't know who exactly was at that meeting.

17            But in general, the disciplinary action is a very

18        severe thing and we try, if we can, to prevent that,

19        to try to prevent that, and that seemed to be a way,

20        if we could, to allow her to finish the program and

21        not be labeled by having to report to the Ohio State

22        Board.

23   Q    Well, when she was presented with options -- we

24        talked about three, correct?

25   A    Mm-hmm.

1    Q    You need to answer yes or no.

2    A    Yes, sir.

3    Q    Was none of the above an option?

4    A    An option is to say, I'm going to have to think about

5         all this because this may not be appropriate.  Yes.

6         None of the above is an option.

7    Q    Was it presented to her as an option?

8    A    I have no idea if that was presented.

9    Q    You're not aware of any information that suggests

10        that Sarah Aronson was told, well, you can have

11        remediation, probation, termination, or you don't

12        have to have any of these things?

13   A    I don't know that conversation.

14   Q    To your knowledge, was that discussed with you and

15        any other member of the Anesthesiology Residency

16        Program?

17            MR BIXENSTINE:  Objection.  I don't

18            know what that means.

19            MR. GORDILLO:  All right.  Fair

20            enough.

21   Q    (By Mr. Gordillo)  Did you discuss with Doctor Norcia

22        the possibility that there would be neither

23        remediation nor any disciplinary action taken against

24        Sarah Aronson?

25   A    We did not have that conversation.

1    Q    Did you have such a discussion with Doctor Wallace?

2    A    No.  I was not discussing this with him.

3    Q    Did you have such a discussion with Doctor Nearman?

4    A    No.

5    Q    Would there have been any other individual within the

6         Anesthesiology Residency Program with whom such

7         discussion would be appropriate?

8    A    Not for me.

9    Q    If you look at the Paragraph 2-b --

10   A    Yes.

11   Q    -- the second sentence reads:  The Resident's

12        deficiencies will be identified, a remedial program

13        plan will be established, and a frame for completion

14        of the remedial program will be discussed, documented

15        and signed by the Resident.

16             Did I read that correctly?

17   A    Yes, you did.

18   Q    Have you ever seen such a document that was signed by

19        Sarah Aronson?

20   A    I don't recall that one.

21   Q    And the next sentence says:  A copy of the

22        remediation plan will be given to the Resident, and a

23        copy will be placed in the Resident's file.

24             Did I read that correctly?

25   A    You read that correctly.

```
 1    Q    And have you ever seen such a copy of a remediation

 2         plan in her file?

 3    A    No.  I don't keep her file.

 4    Q    Would you agree with me that that Paragraph b

 5         requires a written remediation plan to be provided to

 6         the resident?

 7    A    It appears that that's exactly what it says.

 8    Q    And is it fair to say that UH was taking the position

 9         that because she was in remediation, she had no right

10         to appeal?

11    A    That's true.  She did not have a right to appeal a

12         remediation.  We checked that even with the ACGME.

13    Q    What's it called when you extend training without a

14         written program for extending her training?

15    A    I don't know a name for such a process.

16    Q    Is there any -- would that ever be appropriate?

17    A    I would prefer to have things documented well.

18    Q    Would it ever be appropriate?

19    A    I would have to say no, it wouldn't be appropriate.

20    Q    And it would be contrary to the terms of the

21         resident's contract, correct?

22    A    If the rules that we've written in the manual, which

23         the resident reads, signs that they've read it, that

24         means that this is part of the contract.

25    Q    When did you first become aware that Doctors Norcia
```

Page 43

```
 1              or Wallace had concerns about Sarah Aronson's
 2              performance?
 3     A   I don't know exactly when.  I do know that Doctor
 4              Aronson wanted to meet with me, and I heard about
 5              some of this material from her as we spoke.  I'm not
 6              sure exactly what other information I got from whom
 7              or when, but I do know that in this process, sometime
 8              either December or January, Doctor Aronson met with
 9              me somewhere in that period.  She met with me several
10              times.
11     Q   At some point, did you learn that she had been
12              removed from her duties to undergo a fitness-for-duty
13              examination?
14     A   Yes.
15     Q   When did you learn about that?
16     A   I learned about that essentially when it happened.
17     Q   Were you consulted before it happened?
18     A   At that point, this was a decision made by the
19              program and the HR Department, and perhaps the Legal
20              Department.  The policy has since changed.
21     Q   And the policy that you reference, that's the policy
22              with respect to referral to EAP, correct?
23     A   Yes.
24     Q   Do you consider that policy to be among the policies
25              you're responsible for knowing?
```

Page 44

```
 1   A   Now.  We've met with our team, and it's decided that

 2       now I'm the funnel into which requests to EAP must go

 3       through.

 4   Q   When did that occur?

 5   A   A couple months ago.

 6   Q   Were you familiar generally with the policies for

 7       referral at the time that Sarah Aronson was --

 8   A   Generally, yes.

 9   Q   Did you understand that they were both policies for

10       mandatory referral to EAP at different tiers?

11   A   Yes.

12   Q   Were you consulted about what tier the referral to

13       EAP should occur to for --

14   A   Not at that time.

15   Q   Did you know what tier was relied upon for the

16       referral?

17   A   No.  All I know is what I learned later.

18   Q   And when you say you learned later -- and I don't

19       want to know about discussions with counsel.

20   A   No.

21   Q   Did you learn later from some other source, other

22       than counsel?

23   A   Yes.  From some of these documents and from, I think,

24       the program director.  I learned about it after the

25       fact.
```

Page 45

```
 1    Q    Were you ever asked for your opinion about whether it
 2         was an appropriate referral?
 3    A    No.  This happened before.  We didn't discuss whether
 4         I thought it was appropriate after the fact, and I
 5         didn't know about it at the time.
 6    Q    But you had discussions about it after the fact?
 7    A    I knew about it after the fact.
 8    Q    With whom did you discuss this?
 9    A    Actually, I didn't know about it until fairly
10         recently.
11    Q    Did you know about it before the litigation?
12    A    No.
13                   MR. GORDILLO:  Let's take a quick
14              break.  Is that all right?
15                     - - - -
16         (Thereupon, a recess was had.)
17                     - - - -
18                   MR. GORDILLO:  Back on the record.
19              Would you read the last question
20              and answer?
21                     - - - -
22         (Thereupon, record read by Notary.)
23                     - - - -
24   (Thereupon, Exhibit 15 was marked for the purpose of
25              identification.)
```

1                                    - - - -

2    Q    (By Mr. Gordillo)  Now you've been handed a document

3         marked as Exhibit 15.  Please take all the time you'd

4         like to look it over and let me know when you've had

5         an adequate opportunity to review it.

6    A    I've read it.

7    Q    Do you recognize the document?

8    A    Yes.

9    Q    Tell me what it is, please.

10   A    Well, it's a response -- at the bottom, Doctor

11        Aronson acknowledged talking to me the day before,

12        and she's going to be meeting with Doctor Nearman,

13        and she wanted to know if I had anything that would

14        be useful and wanted to know if I had spoken to him,

15        and she thanked me for the time.

16            My response was that I was glad she was seeing

17        Doctor Nearman.  I hadn't spoken to him.  I think at

18        this time I can't be seen as your advocate.  I can't

19        be in her corner against the others.  But your agenda

20        is to get clarity as to the chances of success from

21        his perspective of this extra time.  He needs to know

22        that you're going to agree with this plan.  Ask for

23        suggestions for improving your performance.  He will

24        have been advised, and I really wanted her to have

25        some face time with Doctor Nearman because I wanted

```
 1              him engaged, to be in contact with his own faculty in

 2              hoping that he could be, as I mentioned, a mentor,

 3              sympathizer, and/or advocate.

 4       Q      What did you understand would be the purpose for the

 5              meeting scheduled between Sarah Aronson and Doctor

 6              Nearman?

 7       A      The reason I thought it was a good idea?  Is that

 8              your question?

 9       Q      What did you understand -- what purpose for the

10              meeting?

11       A      Why did I ask them to meet?

12       Q      Yes.

13       A      As stated, I think that it was a good opportunity for

14              her to talk to people who were not so actively

15              engaged with her, to somebody who's got a more

16              distant view, perhaps, who could see fairness, and to

17              get his advice on what she might do to help her

18              performance, and I really think it's valuable to have

19              people having a decent relationship with people who

20              are the leaders of their department who are not

21              involved in what became a somewhat confrontational

22              activity.

23       Q      So did you understand they were going to meet to

24              discuss her performance?

25       A      My view is they were going to meet for her to talk to
```

Page 48

```
 1                him, to see if he understood what her issues were,

 2                and how he might advise her to make sure she's

 3                successful.

 4        Q       And what did you understand her issues to be at the

 5                time of this email exchange?

 6        A       As far as I knew, a decision was made based upon the

 7                perception that her performance in some areas was

 8                lacking and that what can she do to do that better,

 9                and that was my understanding.  I don't know all the

10                specifics.

11                     Anesthesiology is very demanding about 10 percent

12                of the time.  It has a lot of crises, potential

13                crises, and most of it is kind of like a piolet

14                between take-offs and landings.

15        Q       What was it about the situation, as you understood

16                it, that prevented you from being seen as her

17                advocate?

18        A       Several things.  Number one, that would mean I'm

19                taking sides against her department rather than

20                trying to be a moderator.  The second, if there was

21                some sort of appeal -- I wasn't even sure of what

22                decisions were made.  I thought I knew.  But I have

23                to be the chairman of that committee.  I'd have to

24                recuse myself if I become too close to the resident,

25                which I have to be careful about.
```

1    Q    Which committee is it that you chair?

2    A    I would chair any appeal committee, and I would also

3         be asked by a variety of people what my opinions

4         were, and I couldn't be in this to say that one

5         person is good, the other people are bad.  I have to

6         support both so they can both achieve their

7         objectives.  I didn't think it was right to choose

8         sides if it became confrontational.  Although I made

9         my position clear with both Nearman and Wallace.

10   Q    What did you say to both Nearman and Wallace when you

11        made your position clear?

12   A    That we have to make sure that Doctor Aronson knows

13        what's going on here, that we have to make sure that

14        things are fair, and I would hope documenting

15        performance appropriately and giving her feedback.

16        That's universal with training of residents.

17   Q    Did you have the impression at the time that she was

18        not being given adequate notice, feedback, and

19        documentation?

20   A    I wasn't aware of that.

21   Q    She hadn't made any mention of such concerns?

22   A    Which concerns?

23   Q    Sarah had not made any mention of concerns to you

24        about the lack of notice that she was given with

25        respect --

1    A    The documentation?

2    Q    Yes.

3    A    That may have come up in the conversation, but I

4         don't recall the details of it.

5    Q    Did she describe to you any concerns about a lack of

6         sufficient feedback?

7    A    I don't have anything specific about that, but

8         that's -- if that's not brought up by the resident, I

9         bring it up.

10   Q    Why did you think it would be great if Doctor Nearman

11        could become Sarah's mentor, sympathizer, and/or

12        advocate?

13   A    Because I didn't think he was emotionally engaged,

14        was having -- he's not the program director, but he's

15        the oversight person.  He should be the peacemaker in

16        his department, and his personality is much more laid

17        back.  That was my perception.  That's been my

18        perception.

19   Q    Did you understand that the concerns that Doctor

20        Aronson was raising with you in January of '09 were

21        part of a continuum of concerns that she raised with

22        you in June of '09?

23   A    Not sure I know how to answer that.  Quite often the

24        same subjects come up.  We actually had very long

25        conversations.  I knew how upset she was.

1    Q    Well, look again, please, at Exhibit 12.  And we

2         talked about this exhibit referencing a meeting that

3         you had with Doctor Aronson on June 16th.

4    A    Okay.

5    Q    And now my question is:  Did you understand that the

6         problems she was talking to you about on June 16th

7         were part and parcel the same problems that she was

8         talking to you about in January of 2009 as referenced

9         in Exhibit 15?

10   A    My recollection of that is much of the same pieces of

11        the conversation engaged in earlier as well as later.

12        I mean, a lot of the same issues came up.

13                       - - - -

14   (Thereupon, Exhibit 16 was marked for the purpose of

15                     identification.)

16                       - - - -

17   Q    (By Mr. Gordillo)  Now you've been handed a document

18        marked as Exhibit 16.  Please take all the time you'd

19        like to look it over and let me know when you've had

20        an adequate opportunity to review it.

21   A    I read it.

22   Q    Do you recognize the document?

23   A    Yes.

24   Q    It's a letter from Doctor Aronson to you in March of

25        2009, right?

```
 1      A    Yes.

 2      Q    And do you recognize that again she's talking about

 3           the same problems that she raised with you in January

 4           of 2009 and in June of 2009?  Isn't that true?

 5      A    Yes.

 6      Q    And do you recall what your response was to this

 7           letter?

 8      A    No, I don't at this point, if I responded in writing

 9           or phone call or direct meeting.  I don't recall.

10      Q    Did you speak with Doctor Nearman about the letter?

11      A    I don't remember that.  It's possible, but I don't

12           remember speaking to him specifically about this

13           letter.  I'd have to say no to that.

14      Q    Did you speak with Doctor Norcia about the letter?

15                      MR BIXENSTINE:  I need to take a

16                 break.  I'm sorry.

17                      - - - -

18           (Thereupon, a recess was had.)

19                      - - - -

20                      MR. GORDILLO:  Back on the record.

21                 Would you read back the last

22                 question?

23                      - - - -

24           (Thereupon, record read by Notary.)

25                      - - - -
```

Page 53

```
 1    A    I don't recall if I spoke to him specifically about
 2         the letter.
 3    Q    And do you remember whether you spoke to Doctor
 4         Wallace about the letter?
 5    A    I was not dealing directly with Doctor Wallace any
 6         further.
 7    Q    Did there come a time when you were dealing with
 8         Doctor Wallace?
 9    A    At the beginning until I learned that he was very
10         upset with this whole issue.
11    Q    When did you learn that?
12    A    I can't recall.  About maybe midway through this
13         process.  Whether it was in the spring of '09, I
14         don't recall.  I'd rather not guess.
15    Q    But before March 10th of '09?
16    A    I don't know that.
17    Q    That's what I'm asking.  I understood your testimony
18         to say you knew that you hadn't spoke with Doctor
19         Wallace about this March 10th letter because at this
20         point you weren't --
21    A    That may be true, because it became very clear to me
22         early that we should get him out of this.
23    Q    But the decision to get him out wasn't made until
24         sometime in June, right?
25    A    I don't recall exactly when it was made.  It was
```

```
 1              becoming very apparent that we had to change the

 2              environment.

 3      Q    Look, please, at Exhibit 12 again.

 4      A    Okay.  As I said, he was no longer a player.  I'm not

 5              sure the implication of when that happened is in the

 6              letter.  I can't answer that.

 7      Q    So it may have happened quite some time before this

 8              email exchange on Exhibit 12; is that what you're

 9              saying?

10      A    It's possible.

11                            - - - -

12  (Thereupon, Exhibits 17 and 18 were marked for the

13                  purpose of identification.)

14                            - - - -

15      Q    (By Mr. Gordillo)  Now you've been handed two

16              documents, one Exhibit 17 and the other Exhibit 18,

17              and I've given you those because you kind of need to

18              see them together to piece together the email string,

19              I think.

20      A    Okay.

21      Q    So I'll ask you together for Exhibit 17 and 18, do

22              you recognize both of these documents?

23      A    Yes.

24      Q    Okay.  These are the continued emails regarding the

25              letter that Sarah Aronson sent to you, which is
```

1           Exhibit 16, right?

2     A     Yes.

3     Q     And on the 13th of March, 2009 in Exhibit 17, you

4           responded back to her that you had spoken to Doctor

5           Nearman.  I suggest you meet with him, not Norcia at

6           this point, right?

7     A     Yes.  I said that.

8     Q     As you see that email, does it refresh your

9           recollection about a conversation you may have had

10          with Doctor Nearman about her letter?

11    A     No.  I don't recall discussing the letter with Doctor

12          Nearman.  According to Exhibit 18, I -- I'm not sure

13          which one.  I suggested that she send the letter to

14          Doctor Nearman before she talked to him.

15    Q     Well, on Exhibit 17 --

16    A     Yes.  It says, Doctor Nearman understands the issues

17          and send him this letter and request a meeting.

18    Q     The first part of the email message is, I have spoken

19          to Doctor Nearman?

20    A     That's correct.  But it doesn't mean -- I don't think

21          I sent him this letter.

22    Q     Okay.  What did you mean?

23    A     When Doctor Aronson sends me a letter, I do not share

24          it with anybody she doesn't want me to share it with.

25          I can't maintain my relationship if I were to do

Page 56

```
1              that.

2      Q       Okay.  What did you speak to Doctor Nearman about as

3              referred in Exhibit 17?

4      A       I can't answer what we spoke about.  I don't know --

5              I don't recall what I spoke to him about.  There was

6              a lot of things that happened a couple years ago that

7              I can't remember.

8                  We had a lot of discussions with Doctor Aronson

9              trying every way I could to maintain, to try to

10             establish some sort of comforting conversation.

11     Q       Why did you think she should speak with Doctor

12             Nearman and not Doctor Norcia at this point?

13     A       Because I think Doctor Norcia was too close to it at

14             this time, and Doctor Nearman had, at least in

15             talking to me, had a certain sympathy for the issues.

16     Q       What made you think that Doctor Norcia was too close

17             to it at that time?

18     A       Well, first of all, he's the program director and

19             he's the responsible person now.  I assume by this

20             time -- I don't know this -- I tried to get Doctor

21             Wallace to be less involved, and I wanted to get

22             above the two main players to somebody I've known for

23             a long time who generally is interested in fairness.

24     Q       Did you have reason to doubt whether Doctor Norcia

25             would be fair?
```

```
 1    A    No.  I'm not sure that Doctor Aronson thought it

 2         would be fair, and that's why I thought we would go

 3         this route.  My perception was she might be more

 4         comfortable with this route.

 5                        - - - -

 6    (Thereupon, Exhibit 19 was marked for the purpose of

 7                     identification.)

 8                        - - - -

 9    Q    (By Mr. Gordillo)  All right.  Now that you've been

10         handed Exhibit 19, again, take all the time you'd

11         like to look it over and let me know when you've had

12         an adequate opportunity to review it.

13    A    Okay.

14    Q    Do you recognize the document?

15    A    Yes.

16    Q    And these are emails between you and Sarah Aronson

17         again, right?

18    A    Yes.

19    Q    And do you understand that this was the follow-up

20         meeting that she had with Doctor Nearman as discussed

21         in the prior emails that we were looking at, Exhibits

22         17 and 18?

23    A    Yes.  Yes, that's correct.

24    Q    All right.  And she has informed you that she is

25         considering submitting a formal complaint to the
```

1       ACGME, right?

2   A   Yes.

3   Q   And you asked her to meet with you before she

4       contacted the ACGME, right?

5   A   Yes.

6   Q   And you said you have some concerns for the message.

7   A   I had some concerns for the timing, and then the

8       message, but she doesn't have to tell me what the

9       message is, and it is her right to go ahead and send

10      the letter.

11  Q   You wrote, I have some concerns for the message.

12  A   Mm-hmm.

13  Q   What did you mean by concerns for the message?

14  A   I don't know what she wrote down.  Is the message

15      about poor treatment or is the message about the

16      institution?  What's the message?  I don't have to

17      know that.  That's her right.

18  Q   You were also concerned that the institutional review

19      was coming.

20  A   Absolutely.

21  Q   And why was a concern about the institutional review

22      connected to Sarah's telling you that she was

23      considering filing a complaint with the ACGME?

24  A   The ACGME is coming to visit the institution, which

25      is a big deal.  We prepare a 644-page document.  They

```
 1              look at all programs and processes and look at the

 2              environment and look at a lot of things, and I was

 3              not sure that the institutional reviewer would be

 4              influenced negatively about the entire institution by

 5              this letter, and that's what I was concerned about,

 6              the timing.  I'll stop there.

 7      Q       Was it only the timing that concerned you?

 8      A       Well, the timing of a negative letter about a bad

 9              place, and that's not what you want to communicate to

10              a group that's coming out to evaluate you.  So that

11              was what my concern was, but she can send it, and I

12              believe that they didn't use -- in fact, the reviewer

13              assured me that that wouldn't be part of the review

14              of our institution, so we had a good review and it

15              went well.

16      Q       When the reviewer gave you this assurance that that

17              wouldn't be part of the review of the institution,

18              what was that about?  What were you referring to?

19      A       Well, he mentioned to me that he had met with Sarah.

20              The reviewer had met with Sarah.  And I asked him

21              point blank -- not what he talked to her about,

22              because that's not my business -- in any way is the

23              review related to this complaint, and he said, no.

24              We keep those very separate.  There's a separate

25              office in the ACGME with resident complaints that are
```

Page 60

```
 1              gone directly to them.
 2      Q       Well, you understood that generally her concern was
 3              that she believed she was not being provided the
 4              appropriate due process under ACGME requirements.
 5      A       Yes.  That's what she said.
 6      Q       And you understood that if in fact the UH Program was
 7              not providing due process pursuant to ACGME
 8              requirements, that was sanctionable by the ACGME,
 9              right?
10      A       Well, this was -- they had not investigated this
11              complaint as yet.  This was a process of their
12              learning about it.  I guess I need to hear what the
13              specific question was.
14      Q       If she were right in her complaint about being denied
15              due process, that violation was one for which the
16              ACGME can sanction UH as an institution, right?
17      A       That would be a piece of information that would
18              describe what goes on here.
19                  Of course, the ACGME when they visit, they talk
20              to 12 residents.  They talk to all program directors.
21              They talk to me and others to see what is the
22              environment like here.
23      Q       Okay.  But you knew her concerns were broader than
24              her own, that she was concerned about due process,
25              right?
```

1  A  I don't think that that's correct.  The due process,

2     she was concerned about her own due process.

3  Q  In the context of saying that the policies that UH

4     had did not comply with ACGME requirements, right?

5  A  Where does it -- I don't recall that being said.

6  Q  You never had that conversation with Sarah Aronson?

7  A  About the process of what?

8  Q  That the lack of an appeal process was inconsistent

9     with ACGME requirements?

10  A  That's absolutely incorrect.

11  Q  But you understood that that's what Sarah Aronson

12     believed, right?

13  A  I have no idea about that.

14  Q  She never informed you of it?

15  A  She felt that that was correct.  I don't know her

16     belief in what she said, a number of things.

17  Q  But she told you that's what she thought, right?

18  A  She thought, that's correct.

19  Q  And you knew that that's what she wanted to complain

20     to the ACGME about, right?

21  A  Right.

22  Q  And you understood that if the ACGME had agreed with

23     her and found that the UH policy denied due process,

24     that was a serious sanctionable violation?

25  A  This no appeal process in remediation is an ACGME

1           rule.

2    Q    I understand.

3    A    So it's not inconsistent with what we did, with what

4           the ACGME did.

5    Q    Well, that answers the issue, but she was raising the

6           issue, right?

7    A    Yes, she was.

8    Q    And at the point that she's bringing it up to be

9           resolved by the ACGME, had the ACGME resolved that

10         unfavorably --

11   A    No.

12   Q    If they had, you understood that along with that

13         decision could come some serious sanctions?

14   A    I think that's pure speculation.

15   Q    Really?

16   A    Yeah.

17   Q    You mean the ACGME requirements don't say that they

18         can seriously sanction an --

19   A    You said --

20                  MR BIXENSTINE:  Objection.  Let him

21            finish.

22   Q    Let me finish my question.

23         Is it your testimony that ACGME requirements do

24         not specify that if a sponsoring institution does not

25         comply with due process requirements that the

1         sponsoring institution could be sanctioned by ACGME?

2   A   That is a possibility.

3   Q   Do you recall -- let me rephrase this question.

4         Did you tell Doctor Aronson that the manner in

5       which this issue about her performance was being

6       handled was unconscionable?

7   A   Did I think how she was being treated was

8       unconscionable?

9   Q   Did you say that to her?

10   A   I don't recall saying that.  It may be her

11      perception, but I don't recall saying that.  That's

12      not the kind of thing I generally say.

13   Q   But you might have said it?

14   A   I don't recall ever saying that.

15   Q   If she testifies otherwise and says you told her you

16      thought this was unconscionable, would you contradict

17      that testimony?

18   A   I would have to see the context of our conversation,

19      because I was doing a lot of investigation on my own.

20   Q   So there could have been some context in which you

21      told her the way she was treated was unconscionable?

22   A   I don't recall ever using that word, but I would say

23      that I got to look into this to make sure that you're

24      being treated fairly.  That's my job.

25   Q   And if she testifies that you told her that the

```
 1            manner in which she was being treated was

 2            unconscionable, she would be lying under oath?

 3      A     I was not here.  I don't know.  I don't recall saying

 4            that.

 5                        MR BIXENSTINE:  Objection.

 6      A     I do know that I was concerned about how she was

 7            being treated.  She knew I was concerned and met with

 8            me often and felt that she could trust me.

 9      Q     I guess I want to be clear.  Sometimes people say

10            they don't recall and it means they have no memory

11            one way or the other, and sometimes it means I didn't

12            say it, so I want to be clear about what you're

13            telling me here.

14      A     I don't recall ever saying that, and it's not

15            consistent with the words I use when I talk to

16            residents or program directors.

17      Q     Are you categorically denying using that word in the

18            context I described with Sarah Aronson?

19      A     As I've said, I don't recall that I used that word.

20            That's not exactly categorical, but I don't recall

21            it.

22      Q     In the Anesthesiology Residency Program, how are

23            training levels determined?

24      A     As in every program, they're determined by the

25            competence of the individual and if they meet all the
```

```
 1              competencies they're expected, how they perform, how

 2              they take care of patients, their medical knowledge,

 3              their professionalism, their understanding of a

 4              system-based practice, all these things,

 5              communication skills.

 6    Q         Does the evaluation period demark when the next level

 7              in training occurs?

 8    A         Usually.  If a person is going to go to the next

 9              level, it's because they've met all of the criteria

10              or the measurements that a program director and his

11              faculty see in performance, yes.

12    Q         And I know you testified that you weren't sure, but

13              I'll represent to you, and I don't think there's any

14              dispute, that anesthesiology residents were evaluated

15              every six months, right?

16    A         I think that's correct.

17    Q         That being the case, is each level of training

18              occurring at each six-month interval?

19    A         It's unique to each program.  It could be.  It could

20              be that it's six months level.  There may be also a

21              person could be on a rotation somewhere for a month,

22              and they get an evaluation on that rotation in less

23              than six months.  But at least all of the evaluations

24              have to be looked at every six months.

25    Q         Anesthesiology residents are typically recognized as
```

1           years one, two, and three, right?

2    A    Yes.  But there's a preliminary year.

3    Q    The clinical base year?

4    A    Yes.

5    Q    And that's CA1, CA2, CA3, right?

6    A    Yes.  That's correct.

7    Q    Do you know whether there are training levels within,

8           say, CA1, within CA2, within CA3?

9    A    There'd have to be, because there has to be goals and

10         objectives for each year and each rotation.  Those

11         are the rules that everybody has to follow.

12    Q    So before a resident were at the end of a year, they

13         would have satisfactorily moved from one training

14         level to another?

15    A    Yes.  That's what we hope, yes.

16    Q    And for example, when they got to CA1 and it was time

17         to become CA2, that was one of the series of training

18         levels that they had advanced?

19    A    Yes.

20                 - - - -

21  (Thereupon, Exhibit 20 was marked for the purpose of

22                identification.)

23                 - - - -

24    Q    (By Mr. Gordillo)  You've been handed a document

25         marked as Exhibit 20.  Please take all the time you'd

```
 1          like to look it over.
 2    A     I know the document.
 3    Q     Tell me what it is, please.
 4    A     It's the institutional requirements that the ACGME
 5          holds to the institution itself.
 6    Q     And you see that on -- these were the
 7          institutional -- ACGME institutional requirements in
 8          effect during 2008 and 2009, also, right?
 9    A     Yes.
10    Q     And the section that's Roman Numeral II is the
11          Institutional Responsibilities for Residents, right?
12    A     Mm-hmm, yes, sir.
13    Q     Would you turn to Page 5 of the document?
14    A     I have it.
15    Q     And if you look at Paragraph II.D.4 --
16    A     Yes.
17    Q     Then I'm going to go to a letter, d(1).
18    A     Okay.
19    Q     And about half way through that first paragraph, it
20          indicates if the primary reasons for the non-renewal
21          or non-promotion occurs within the four months prior
22          to the end of the agreement, the Sponsoring
23          Institution must ensure that its programs provide the
24          resident with as much written notice of the intent
25          not to renew or not to promote as circumstances will
```

1         reasonably allow, prior to the end of the agreement.

2             Did I read that correctly?

3    A    Yes.

4    Q    Did you understand this requirement to apply to the

5         circumstance by which Sarah Aronson was prevented

6         from promoting from her training period that ended in

7         December of 2008 that would have begun in 2009?

8    A    The non-renewal of appointment has not been a subject

9         that we ever discussed.

10   Q    But it's not limited to non-renewal of appointment.

11        It says non-renewal or non-promotion, correct?

12   A    That's the definition of non-renewal.  You don't move

13        forward; you don't move up.  And this is to provide

14        when that's the issue, the rule that you have to make

15        this decision at least four months before the

16        person's terminated.

17   Q    And that didn't happen in Sarah's case, right?

18   A    This didn't pertain in Sarah's case.

19   Q    Explain to me why not.

20   A    She didn't have -- what pertained in Sarah's

21        situation was that she was extended for remediation,

22        and this is not about remediation.  This is not the

23        next year.  She didn't have a next year.  She was

24        asked to perform a few months more to demonstrate

25        competence and that she's going to do okay.  This did

1           not pertain.

2    Q    Well, I think your testimony was that the level of

3           training occurred at the point at which the

4           evaluation was made, right?

5    A    That's true.

6    Q    And Sarah received an unsatisfactory evaluation for

7           the training period that ended December 31, 2008?

8    A    That's correct.

9    Q    So had she not received that unsatisfactory

10         evaluation, she would have been promoted January 1st

11         of 2009, correct?

12   A    That was not a promotion, that was a continuation.

13         She was in her final year.  She wasn't going to be

14         promoted to another year.

15   Q    Well, your testimony before was that you could be

16         promoted on a training level before being promoted to

17         another year.

18   A    The context of our conversation before was more

19         general.

20   Q    Oh, it changes now because it's about Sarah?

21               MR BIXENSTINE:  Objection.  Do your

22            best with it.

23   A    I'll try.  That's interesting.  No.  If the program

24         says every six months we'll evaluate to see if they

25         go to the next year, this was at mid year.  They felt

Page 70

1          that performance was to the point that it was

2          unsatisfactory and a decision was made and agreed to

3          continue for six months to take certain rotations,

4          whatever.  I don't know what their major criteria

5          were.

6     Q    Why didn't she graduate six months after January?

7     A    She was not -- six months after January?

8     Q    Right.

9     A    She was not exactly in a January/July type thing.

10         July 1 to July 1, most of them are in, and I think

11         she was off cycle, as I recall.

12    Q    But as I understand the testimony here is that she

13         was remediated to extend training six months, right?

14    A    Mm-hmm.

15    Q    And she received that notice in January of 2009 to

16         remediate by extending her training by six months,

17         correct?

18    A    Right.

19    Q    So my question is why after six months of that

20         remediation beginning in January didn't she graduate?

21    A    The extension began on March 1st, because that's when

22         she should have completed the program, not July 1st.

23    Q    So what was she to do between January and March 1st?

24    A    Complete her -- that's part of her contract.  Her

25         contract was from March 1st to February 28th.

1    Q    Are you suggesting that the remediation didn't begin

2         until March 1st?

3    A    The extension begins when the program should have

4         been over.

5    Q    Why wasn't she permitted to remediate before then?

6    A    I can't answer that question.

7    Q    Is there any good reason for not allowing her to

8         remediate before that?

9    A    The subjects that came up were dealt with, and the

10        deficiencies were dealt with at a specific time when

11        a decision had to be made, and that's how it

12        happened.

13   Q    Is there any process consistent with the ACGME

14        requirements that would suggest that when a resident

15        needed to remediate their performance that the

16        remediation should wait a period of two months before

17        it begins?

18             MR BIXENSTINE:  Objection.

19   A    If you extend a program, it's extended from that

20        point that the program should have ended.  I don't

21        think that the ACGME would disagree with that.

22   Q    Do you know whether Doctor Aronson was given an

23        opportunity to remediate her performance in the

24        window between January 1st of 2009 and the end of her

25        contract in place at that time?

```
1    A    I don't know that.

2    Q    Do you know whether she was given that option?

3    A    I don't know.

4    Q    Beginning in the fall of 2008, Sarah Aronson began

5         applying for jobs anticipating her completion of the

6         Residency Program.

7             Did you assist in any way in her efforts to

8         obtain other employment?

9    A    No.

10   Q    Were you contacted by any prospective employer in

11        connection --

12   A    No.

13   Q    Were you consulted by anyone within the

14        Anesthesiology Residency Program about how to respond

15        to prospective employers regarding Sarah Aronson?

16   A    No.  At that point, I wasn't aware of what position

17        she had.  I found out later she had a position.

18                        - - - -

19   (Thereupon, Exhibit 21 was marked for the purpose of

20                      identification.)

21                        - - - -

22   Q    (By Mr. Gordillo)  Now you've been handed Exhibit 21,

23        and please take all the time you'd like to look it

24        over and let me know when you've had an adequate

25        opportunity to review it.
```

```
1     A    I've read it.

2     Q    Do you recognize the document?

3     A    Vaguely.  This is -- yes.

4     Q    Tell me what it is, please.

5     A    It's a letter to me asking for advice on how to deal

6          with Doctors Norcia and Wallace.  They were

7          tentatively scheduled for the next day.  This was in

8          June.

9     Q    Mm-hmm.

10    A    It will be the first time that the program directors

11         have met with me since February.  I've made several

12         attempts to schedule a review meeting, which were

13         supposed to occur monthly during this time.  Last

14         week I received a letter from the ACGME that

15         notification of my formal complaint had been sent to

16         you and Norcia.  I'm concerned that any meeting I

17         have with the program director at this point stay on

18         the intended topic.  I will not feel comfortable

19         meeting with Norcia and Wallace if they choose to

20         engage in a discussion about concerns I submitted to

21         the ACGME.  That dialogue is between them and the

22         RRC.  Do you have any advise to how I should handle

23         this upcoming meeting?  Should I have someone else

24         join me?  That was it.

25    Q    Did you respond to this email?
```

```
 1    A    I don't recall what I said.  I don't know if I put it

 2         in writing or called her.  I'm sure I responded, but

 3         I don't know exactly what I said.

 4    Q    And with respect to her mentioning that she had sent

 5         the letter to ACGME, notifying about her formal

 6         complaint, did you know she had sent the letter?

 7    A    I knew about it when I met with her.  She said she

 8         was going to send it and I said fine.

 9              Then we got a letter that notified of a formal

10         complaint, that she received that letter, that they

11         were notified of the complaint.

12    Q    Sent to you and Doctor Norcia?

13    A    Yes.  Every time there's something like this, I'm

14         involved.

15                             - - - -

16    (Thereupon, Exhibit 22 was marked for the purpose of

17                      identification.)

18                             - - - -

19    Q    (By Mr. Gordillo)  Now you've been handed a document

20         marked as Exhibit 22.  Again, take all the time you'd

21         like to look it over and let me know when you've had

22         an adequate opportunity to review it.

23    A    Okay.

24    Q    Do you recognize the document?

25    A    Not in this form.
```

1    Q    You've seen it in a different form?

2    A    I recall -- I'm trying to think if I even saw this.

3         I don't recall this document.  Obviously, it's sent

4         to me.  Okay.  All right.  I guess I've seen it.

5    Q    As you sit here today, do you have a specific

6         recollection of having received it before?

7    A    I have -- my stronger recollection is the information

8         I got from the ACGME to respond to these things

9         that -- I think where this came from is -- the bold

10        type is what was in the letter, what we were asked to

11        respond to, which we did.

12   Q    Okay.  Let's look at something else then.

13                        - - - -

14   (Thereupon, Exhibit 23 was marked for the purpose of

15                     identification.)

16                        - - - -

17   Q    (By Mr. Gordillo)  You've now been handed a document

18        marked as Exhibit 23.

19   A    Mm-hmm.

20   Q    Again, take all the time you'd like to look it over

21        and let me know when you've had adequate time to

22        review it.

23   A    Okay.

24   Q    Do you recognize this document?

25   A    Yes.

Page 76

1    Q    Can you tell me what it is, please?

2    A    It's a letter from Sarah to me asking me to

3         intervene.  She'd like to graduate on time.  And she

4         told me this in July.  And she described a series of

5         concerns with HR and FMLA time -- which I did not get

6         involved with -- that's up to HR and the details of

7         the interaction with the department.  And the

8         scheduling, I see that there was concern that she was

9         being scheduled, and much of the letter has to do

10        with, is this retaliation?

11   Q    What actions, if any, did you take after receiving

12        this letter?

13   A    None.  Because these are things that are not in my

14        purview, and there's various dates and times and

15        numbers of days I didn't have access to, and this is

16        something that was being worked on with HR, as far as

17        I knew.

18             As far as the scheduling is concerned, I have to

19        leave the schedule up to the program director, unless

20        I think it is retaliatory, and there were -- some of

21        these rotations were rotations where Doctor Aronson

22        had some difficulty, so they were going to ask her to

23        repeat some of those.  That's what I get from this

24        letter.

25   Q    Did you suggest to Doctor Aronson that she needed to

Page 77

```
 1                report her concerns about retaliation to someone

 2                other than you?

 3     A          I don't think I told her that.  She's already done it

 4                to the ACGME, a more important person than I am.

 5     Q          What did you understand the ACGME could do with

 6                respect to concerns that an individual resident had

 7                about the way an institution was treating its

 8                individual resident?

 9     A          We wrote a letter answering the concerns.  We got no

10                response.  I phoned Marcia Miller of the ACGME who

11                runs this committee for residents, and all she said

12                is, we don't send you our response.  I said:  This is

13                outrageous -- I used that word with them -- in that

14                you've asked us to respond to a tremendous allegation

15                that we deny and put in writing, and you investigated

16                it not only with your committee, but with a site

17                visitor who came to town to talk to everybody, and

18                you haven't told me anything, and she said, that's

19                not our policy.  So had they seen something there --

20                now this is speculation --

21                     MR BIXENSTINE:  I don't want you to

22                     speculate.

23     A          I won't speculate.  I will testify what I know.

24                     I didn't hear that they had responded in any way

25                negatively toward us, nor did the site visitor
```

```
 1              respond negatively toward us.

 2     Q    Did anyone from the ACGME communicate to you that the

 3          ACGME would not intervene in a dispute between an

 4          individual resident and its program director?

 5     A    No.

 6     Q    Would it surprise you to know that that's the

 7          position taken by the ACGME?

 8     A    It would surprise me, particularly since they're

 9          asking for both sides, and one would think that they

10          would try to sort it out and give advice or sanction,

11          or whatever.  That to me -- and I advised the ACGME

12          of my feelings about this.

13     Q    In a context dealing with Sarah's concerns?

14     A    In any context.

15     Q    But specifically --

16     A    Yes.  This is what triggered it.

17              I said, I'm surprised that we haven't heard

18          anything.  That's not our policy.  Then what's this

19          about?  I was very surprised.

20     Q    The ACGME issued citations to the Residency Program,

21          right?

22     A    Based upon this?

23     Q    No.  Based on the institutional review.

24     A    At that review there were two citations.

25     Q    What were the citations?
```

```
 1    A    It had to do with internal reviews and documentation,

 2         of our Graduate Medical Education Committee, of every

 3         citation of every program, they want us to discuss it

 4         in an open meeting, which would mean about 200

 5         citations with 65 programs, and we had a method by

 6         which we did that.  This is a brand new rule, and

 7         across the county, it's a problem, and this rule --

 8         they said -- the site visitor said that looks great,

 9         and ACGME Residency Review Committee cited us for it,

10         said we have to do it differently, so we will next

11         time.

12    Q    And you said there were two things?

13    A    Both relate to the same thing, to internal reviews

14         and discussion of action plans, that is who discussed

15         the action plans.  So those were interesting, and I

16         was surprised with that.

17    Q    I want to go back to Exhibit 23 again.

18             Did you understand that Doctor Aronson believed

19         she was being retaliated against because of her FMLA

20         request?

21    A    From this document, I believe that's what I would

22         conclude.

23    Q    And your belief was that the appropriate action for

24         her to take was to go to the ACGME?

25    A    I never recommended that she go to the ACGME.
```

1    Q    What did you believe was the appropriate action for

2         her to take based on her belief that she was

3         suffering retaliation based on her FMLA request?

4    A    I would expect to hear from the Human Resources that

5         they -- that the FMLA time was being done

6         inappropriately, if it was.  I would have expected to

7         hear from our institution itself, including counsel.

8    Q    All right.  When she forwarded her concerns to you,

9         you did not forward the concerns to HR; is that

10        correct?

11   A    I don't know what I did with this document.  I don't

12        send her documents to anyone unless she asked me to.

13   Q    I think your testimony before was you took no action

14        in response to this document.

15   A    I saw this was not an area where I could take action.

16        I don't have the expertise to discuss FMLA, that type

17        of thing.

18   Q    So you didn't give her any advice about what to do

19        about her concerns about retaliation?

20   A    I don't recall how I responded to her in any other

21        way.  I may have.  I may not.

22   Q    And you understood that she was specifically

23        concerned that her scheduling was the form in which

24        the retaliation was taking place, right?

25   A    According to the letter, that's what she was saying.

Page 81

```
 1                          - - - -

 2   (Thereupon, Exhibit 24 was marked for the purpose of

 3                       identification.)

 4                          - - - -

 5   Q    (By Mr. Gordillo)  You've been handed a document

 6        marked as Exhibit 24.  Would you please take all the

 7        time you'd like to look it over and let me know when

 8        you've had adequate opportunity to review it.

 9   A    This looks like it's a letter from Matt Norcia to

10        Sarah Aronson copying a number of people, including

11        Wallace, Nearman, and counsel, and he was trying

12        to -- he was summarizing the discussion they had on

13        7/14 about make-up time and the fact that Doctor

14        Norcia removed the SICU rotation originally scheduled

15        for the last two weeks and rescheduled the Metro

16        rotation so that she could get her trauma numbers,

17        which means you have to have a certain number of

18        types of cases.

19            This schedule will make it easier to grant a

20        reading day prior to the exam and allow you to have

21        your FMLA day on 8/10.  Please reply as to whether

22        these are the terms we discussed, and that's what the

23        letter says.

24   Q    All right.  The bottom of Exhibit 24 shows that Sarah

25        Aronson sent you an email on the evening of July 12th
```

```
 1            about a scheduling issue, right?

 2     A      I don't have anything other than the letter.

 3     Q      Right.

 4     A      Says schedule issue.

 5     Q      Right.  Subject:  Schedule issue.  Right?  Very

 6            bottom.

 7     A      Right, mm-hmm.

 8                    MR BIXENSTINE:  This thing is

 9                incomplete.

10                    MR. GORDILLO:  It is.  That's all I

11                have.  In fact, I think, if I recall,

12                this was taken from the exhibit you

13                produced at her deposition.

14     A      Yes.  I guess I referred -- I was referring to a

15            letter.

16     Q      Okay.  So the next day you sent an email to Doctor

17            Norcia referring to the letter?

18     A      All I said to Doctor Norcia, and that's the total

19            since my -- all that identity stuff is below it, that

20            was the total thing I responded.

21     Q      Do you know whether the letter referenced the

22            July 13th letter you received?

23     A      I can't answer that.  I don't know.

24     Q      Okay.  But you would agree with me then that the top

25            email, when it references a summary of what we
```

```
 1              discussed yesterday afternoon concerning the issues

 2              you presented to Doctor Shuck, certainly aligns with

 3              the issues that Sarah raised in her letter to you on

 4              July 13th, correct?

 5    A    Yes.  It looks like the Legal Department and the

 6         department itself had agreed upon some action.

 7    Q    Were you involved in any of the decisions regarding

 8         the schedule changes reflected in the top email?

 9    A    No, sir.  I don't interfere with that.  I don't have

10         the expertise for that.

11    Q    And do you recall any discussions with Doctor Norcia

12         about the meeting that is referenced in the top email

13         in Exhibit 24?

14    A    No, I don't.

15                          - - - -

16  (Thereupon, Exhibit 25 was marked for the purpose of

17                     identification.)

18                          - - - -

19    Q    (By Mr. Gordillo)  I have now handed you a document

20         marked as Exhibit 25.  Again, take all the time you'd

21         like to look it over and let me know when you've had

22         an adequate opportunity to review it.

23    A    Okay.

24    Q    Do you recognize the document?

25    A    I don't recall the document.  I just looked at it.
```

1    Q    It's a string of emails.

2    A    I'm copied on everything.  I understand.

3    Q    As you reviewed the document, do you recall the

4         substance of the thread?

5    A    Yes.  There's a number of issues here, and obviously

6         one is is Doctor Aronson finished or not finished?

7         Can she leave now or does she need more time?

8              I got involved in this when I said that I want

9         that certificate expedited so I could sign off on it

10        that she's completed to help her with her job search.

11        And she had asked Norcia and Howard Nearman to have a

12        copy of a letter submitted to the ABA by the end of

13        this week.  She was told that she can take the exam

14        in August, that she was eligible to take the exam in

15        August, and the scheduling of her last days and when

16        it would end.  I don't know -- I was not privy to

17        those discussions after it said I discussed it with

18        Rowbottom, and I'll get back to you when appropriate.

19   Q    She had actually asked you to intervene on the

20        certificate issue about a week earlier, right?

21   A    Someone.  She probably went to Barbara Zuik who came

22        to me and said, can we do this?  And I said,

23        absolutely.  I don't know if she told me or Barbara

24        did.

25   Q    I wasn't going to mark this as an exhibit, but I have

```
 1             a letter --

 2    A        So I said I would push this.  My intent was to push

 3             it.

 4    Q        Right.

 5    A        Who told me to do it, I don't care.

 6    Q        I'm just trying to get timing issues down, that she

 7             was asking you about this actually before this string

 8             of emails came on Exhibit 25.

 9    A        Okay.

10    Q        My question to you is with respect to Exhibit 25.  As

11             I see it, and I want you to confirm for me that I'm

12             saying things accurately, that on the 25th of August,

13             she's raising a concern about whether she's completed

14             her work.  On the 27th of August, she's further

15             asserting that she has completed her work.  And in

16             response on the 27th, Matthew Norcia writes back to

17             her, says he will see if she can be permanently

18             relieved, right?

19    A        That's the intent of this.

20    Q        Do I understand your prior testimony that you had

21             nothing to do with what happened after that email?

22    A        No.

23    Q        Were you aware that she was allowed to leave that

24             same day?

25    A        I was told she was allowed to leave.  I wasn't privy
```

Page 86

```
 1              to the conversation.  I was pleased that she was

 2              allowed to leave.

 3                        MR. GORDILLO:  Off the record.

 4                        - - - -

 5              (Thereupon, a recess was had.)

 6                        - - - -

 7        A     The final days I was not aware of when she was

 8              leaving.  I don't know if she came up or not.  I

 9              can't recall that.  She may have.

10                        - - - -

11   (Thereupon, Exhibit 26 was marked for the purpose of

12                        identification.)

13                        - - - -

14        Q     I'm going to shift gears on you again here and ask

15              you to look at Exhibit 26 that you've just been

16              handed.  Take all the time you'd like to review it

17              and let me know when you've had adequate opportunity

18              to review it.

19        A     Okay.  Yes.

20        Q     Do you recognize the document?

21        A     No.

22        Q     You see what it purports to be, right?  The Glossary

23              of Terms Related to Resident Duty Hours to be

24              inserted into the Glossary of Selected Terms Used in

25              GME Accreditation, right?
```

Page 87

```
 1      A      Yes.  That's what it says on top.

 2      Q      There's the term Duty Hours that's defined.  Do you

 3             see that?

 4      A      Yes, sir.

 5      Q      As you read how it defines duty hours, is that

 6             consistent with your understanding of the definition

 7             of duty hours as used by UH and the ACGME?

 8      A      Yes.

 9      Q      As you sit here today, are you aware of any conduct

10             by Sarah Aronson that would have merited terminating

11             her employment while she was employed at UH?

12      A      If you're asking if I observed anything, the answer

13             is no.  I didn't.  I may have been in the operating

14             room with her.  I don't remember.  And I know nothing

15             else except what I've read here and what we

16             discussed.

17      Q      That's my question.  Have you learned of anything

18             since she's left her employment that now would cause

19             you to think, we should have fired her for that?

20      A      I haven't really thought about that.  No.  I haven't,

21             no.

22                        MR. GORDILLO:  Okay.  Give me just a

23                    few minutes to step out.

24                              -  -  -  -

25                    (Thereupon, a recess was had.)
```

1                    - - - -

2                    MR. GORDILLO:  I'm all done.  Thank

3          you for your patience today.

4                    MR BIXENSTINE:  Good enough.  We'll

5          see you tomorrow morning.

6                    - - - -

7          (Deposition concluded at 5:30 p.m.)

8                    - - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 89

```
 1    State of Ohio,                )
                                     )SS:      CERTIFICATE
 2    County of Cuyahoga,           )
```

3              I, Mary C. Peck, a Notary Public within and for
    the State aforesaid, duly commissioned and qualified, do
4    hereby certify that the above-named JERRY SHUCK, M.D. was by
    me, before the giving of his deposition, first duly sworn to
5    testify the truth, the whole truth, and nothing but the
    truth;

6

7              That the deposition as above set forth was reduced
    to writing by me by means of stenotypy, and was later
    transcribed upon a computer by me;

8

9              That the said deposition was taken in all respects
    pursuant to the stipulations of counsel herein contained;
    that the foregoing is the deposition given at said time and
10   place by said JERRY SHUCK, M.D.

11             That I am not a relative or attorney of either
    party or otherwise interested in the event of this action.

12

13             That I am not nor is the court reporting firm with
    which I am affiliated under a contract as defined by Civil
    Rule 28(D).

14

15             IN WITNESS WHEREOF, I hereunto set my hand and
    seal of office, at Cleveland, Ohio this 10th day of January,
    A.D. 2011.

16

17

18             _____

19             Mary C. Peck, Notary Public

20

21             My commission expires December 30, 2011

22

23

24

25
```