1                          - - - -

2              UNITED STATES DISTRICT COURT

3              NORTHERN DISTRICT OF OHIO

4                    EASTERN DIVISION

5                        - - - - -

6   SARAH ARONSON, M.D.,          )
              Plaintiff,          )
7                                 )
         v.                       )    CASE NO. 1:10-CV-00372
8                                 )    JUDGE BOYKO
   UNIVERSITY HOSPITALS OF        )
9   CLEVELAND,                    )
              Defendant.          )
10

11                       - - - - -

12        DEPOSITION OF MATTHEW NORCIA, M.D.

13          Wednesday, December 29, 2010

14                       - - - -

15       The deposition of MATTHEW NORCIA, M.D., a Witness

16   herein, taken by the Plaintiff as if upon examination under

17   the Ohio Rules of Civil Procedure, before me, Mary C. Peck,

18   a Stenographic Reporter and Notary Public within and for the

19   State of Ohio, at the offices of Gordillo & Gordillo, LLC,

20   1370 Ontario Street, Suite 2000, Cleveland, Ohio, commencing

21   at 9:30 a.m., the day and date above set forth.

22                       - - - -

23

24

25

```
 1            APPEARANCES:
              On behalf of the Plaintiff:
 2
              GREGORY A. GORDILLO, ESQUIRE
 3            Gordillo & Gordillo, LLC
              1370 Ontario Street
 4            Suite 2000
              Cleveland, Ohio  44113
 5            ggordillo@eeoattorney.com

 6
              On behalf of the Defendant:
 7
              BARTON A. BIXENSTINE, ESQUIRE
 8            Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
              Key Tower
 9            127 Public Square
              Suite 4130
10            Cleveland, Ohio  44114
              bart.bixenstine@ogletreedeakins.com
11                       - - - -

12            ALSO PRESENT

13            Sarah Aronson, M.D., via telephone

14

15

16

17

18

19

20

21

22

23

24

25
```

1                            INDEX

2                                                    PAGE

3    EXAMINATION

4    By Mr. Gordillo                                 5

5

6    OBJECTIONS

7    By Mr. Bixenstine                               27

8    By Mr. Bixenstine                               31

9    By Mr. Bixenstine                               71

10   By Mr. Bixenstine                               76

11   By Mr. Bixenstine                               84

12   By Mr. Bixenstine                               94

13   By Mr. Bixenstine                               102

14   By Mr. Bixenstine                               103

15   By Mr. Bixenstine                               114

16   By Mr. Bixenstine                               150

17   By Mr. Bixenstine                               151

18   By Mr. Bixenstine                               154

19   By Mr. Bixenstine                               156

20

21   EXHIBITS

22   Exhibit 40                                      24

23   Exhibit 41                                      35

24   Exhibit 42                                      40

25   Exhibit 43                                      45

Page 4

1    EXHIBITS (CONTINUED)                                    PAGE

2    Exhibit 44                                              91

3    Exhibit 45                                              94

4    Exhibit 46                                              100

5    Exhibit 47                                              105

6    Exhibit 48                                              110

7    Exhibit 49                                              142

8    Exhibit 50                                              145

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    MATTHEW NORCIA, M.D.

 2        called by the Plaintiff for the purpose of examination,

 3   as provided by the Ohio Rules of Civil Procedure, being by

 4   me first duly sworn, as hereinafter certified, deposed and

 5   said as follows:

 6                         -  -  -  -

 7                      EXAMINATION OF

 8                    MATTHEW NORCIA, M.D.

 9                         -  -  -  -

10        BY MR. GORDILLO:

11   Q    Good morning.

12   A    Good morning.

13   Q    Would you please state your full name for the record?

14   A    Matthew Patrick Norcia.

15   Q    And as we proceed with our deposition today, how

16        would you like to be addressed?

17   A    Matthew would be fine.

18   Q    Matthew, what is your home address?

19   A    2858 Brainard Road, Pepper Pike 44124.

20   Q    Does anybody else live there with you?

21   A    My wife and four daughters.

22   Q    What's your wife's name?

23   A    Susan.

24   Q    How old are your daughters?

25   A    21, 19, 17, and 6.
```

1   Q   What are their names?

2   A   I'll go from the oldest to the youngest.

3   Q   Okay.

4   A   Kayla, Lauren, Jenna, Natalie.

5   Q   All right.  You are currently employed?

6   A   Yes, sir.

7   Q   Who is your employer?

8   A   Case Medical Center, University Hospitals Case

9       Medical Center.

10  Q   Do you have a job title there?

11  A   I'm Staff Anesthesiologist, I'm the Vice-Chairman of

12      Education in the Department of Anesthesiology and

13      Perioperative Medicine.  I'm the Residency Program

14      Director for the Department of Anesthesiology.  I'm

15      Executive Medical Director for the Masters of Science

16      in Anesthesiology, and the Chief of Liver Transplant

17      Anesthesiology.

18  Q   Do you have any other current employers?

19  A   Case Western Reserve University.

20  Q   Do you have job titles with Case Western Reserve

21      University?

22  A   Executive Director of MSA Program.

23  Q   Would you describe for me generally your duties as

24      the program director for the Anesthesiology Residency

25      Program?

Page 7

```
 1    A    As program director, I'm responsible for the

 2         recruitment of residents into the program.  I'm

 3         responsible for maintaining the program according to

 4         ACGME requirements.  I'm responsible for continuing

 5         accreditation of the program.  I'm responsible for

 6         training and evaluation of the residents.

 7    Q    Anything else?

 8    A    On occasion I assist residents in finding employment.

 9    Q    Anything else?

10    A    I think that covers most of it.

11    Q    Okay.  Will you please explain to me a little bit

12         about the extent to which the standards of the

13         American Board of Anesthesiology are incorporated

14         into the resident's program?

15    A    Well, the America Board of Anesthesiology dictates

16         whether or not a resident upon graduation can become

17         a diplomat and receive a certification, so they

18         impose upon residency programs certain guidelines and

19         restrictions in which we have to work so that the

20         residents can graduate and then apply for their Board

21         examinations.

22    Q    In the context of recruiting residents, do you

23         participate in the decision to hire the resident?

24    A    Yes, I do.

25    Q    Okay.  And then with respect to Sarah Aronson, did
```

1           you participate in her hiring?

2    A     Yes, I did.

3    Q     And she entered into a contract with Case Medical

4           Center, right?  UH Hospitals Case Medical Center?

5    A     Correct.

6    Q     And did you understand that as part of that contract

7           she was obligating herself to perform certain

8           services in exchange for which she was going to be

9           paid a stipend and certain conditions of employment

10          were going to be provided to her by UH Case Medical

11          Center?

12   A     Correct.

13   Q     As to your understanding about what was going to be

14          provided to her, did that include a program that

15          would meet the ABA standards?

16   A     To the best of my knowledge, yes.

17   Q     And I think you said that one of the duties that you

18          had was to evaluate residents, right?

19   A     Correct.

20   Q     Did that include Sarah Aronson?

21   A     Correct.

22   Q     Let's talk about that for a moment.

23          Did you evaluate her through her entire residency

24          period?

25   A     Yes.

1   Q   Okay.  And that residency period began when?

2   A   March 1, 2006, I believe.  I don't know the --

3   Q   I don't want you to guess, so if you don't know

4       specifically --

5   A   I know it was March 1st.  It was either 2006 or 2007.

6       I'm not sure.  I think it's pretty well documented.

7   Q   I just wanted to see what your recollection was.

8       It's not a terribly significant point.

9           By the way, let's clear up a few things before we

10      go farther.

11          I know that you have attended some of the

12      depositions, like all the depositions, that have gone

13      forth so far in this case.

14  A   Except for Doctor Nearman's and Doctor Shuck's.

15  Q   Okay.  So you heard me instruct Doctor Wallace, and

16      certainly the same things apply in your case, which

17      are, number one:  If for any reason you need to take

18      a break, just let me know and we'll be happy to take

19      that break as long as if I've asked you a question,

20      I'll ask you to answer the question then we'll take

21      your break.

22          The other thing is to make sure that as I'm

23      asking you questions that I am perfectly clear to you

24      in the manner in which I've asked that question.  So

25      if there's anything at all about the way I've asked

Page 10

1       the question that causes you to have difficulty in

2       understanding it, I'd like you to let me know.  Would

3       you do that?

4   A   Yes.  Thank you.

5   Q   And likewise, if I ask you a question and you don't

6       me tell me there's something about it that you don't

7       understand, I'm going to assume that you did

8       understand it.  Is that fair?

9   A   Fair.

10   Q   And finally, just so that we make things clear, as

11       you know, the court reporter is here today to

12       transcribe what you and I say, and so to be sure that

13       what she gets down for us is going to be clear, I'd

14       like you to keep two things in mind.  First, I'll do

15       the very best I can to make sure I don't cut off your

16       answers, and likewise, please be careful to not cut

17       off my questions so the court reporter only has to

18       type one of us talking at a time.

19       Second, often times I'm going to ask you

20       questions that will require a yes or a no response,

21       and when I do, I'd like you to make sure you use the

22       words yes or no, whichever you think is appropriate,

23       but avoid doing things like nodding or shaking your

24       head or saying things like uh-huh and mm-hmm, things

25       that are pretty normal in normal conversation but

```
 1            don't read so well what you intended to mean in the

 2            transcript, okay?

 3    A       I understand.

 4    Q       The Residency Program Anesthesiology is divided up in

 5            four components, correct?  It would be the base year,

 6            the clinical base year, and then three years of

 7            clinical anesthesia; is that correct?

 8    A       That's correct.

 9    Q       And the demarcations for the Clinical Anesthesia

10            Program is CA1, CA2, CA3, correct?

11    A       That's correct.

12    Q       And for each six months of the calendar year, the

13            residents are evaluated, right?

14    A       Correct.

15    Q       And that evaluation is then submitted to the American

16            Board of Anesthesiology; is that right?

17    A       Correct.

18    Q       And it's done through a -- what's the certification

19            called?  The clinical --

20    A       I know it as the CCC.

21    Q       I think it's the Clinical Competency -- Clinical

22            Competency Certificate perhaps?

23    A       Certification?  I'm not sure.

24    Q       And those reports are submitted in July for reviewing

25            the period of January through June, correct?
```

1    A    Correct.

2    Q    And then in January for the period that is July

3         through December, right?

4    A    Correct.

5    Q    And in each of those periods, a report was submitted

6         for Sarah Aronson, right?

7    A    Correct.

8    Q    Each of those periods during her residency.

9    A    Correct.

10   Q    And the requirement for her to graduate was that her

11        last six months had to be rated as satisfactory,

12        correct?

13   A    That's a standard requirement, correct.

14   Q    Under the ABA standards?

15   A    Yes.

16   Q    Is it ABA or ACGME?

17   A    ABA.

18   Q    So the ABA requires that the last six months of a

19        resident's training must be satisfactory, right?

20   A    Must be satisfactory not for them to graduate, but

21        for them to be able to qualify and sit for their

22        certification Board exam.

23   Q    Does the ABA have any other -- does the ABA have any

24        additional requirements for them to graduate?

25   A    I believe if they've completed the necessary number

1           of satisfactory periods and they have not had any

2           issues outside of their training program, the ABA

3           will allow them to sit for a certification exam.

4      Q    All right.  Under the ABA standards, a resident has

5           to complete 36 months of satisfactory training; is

6           that accurate?

7      A    Correct.

8      Q    Once the resident has completed 36 months of

9           satisfactory training, are there any other

10          requirements that the resident has to meet to

11          graduate from the program?

12     A    They have to meet ACGME requirements at that point.

13     Q    What ACGME requirements exist in addition to

14          completing 36 months of satisfactory training?

15     A    They've had to successfully complete a series of

16          different types of cases.  There's a standard number

17          for each type of case for each rotation, and they

18          have to complete all these successfully.

19               For example, they have to have 20 trauma cases.

20          They also must have fulfilled their obligation in

21          time.  In other words, they had to during those 36

22          months take no more than 60 days away from their

23          training.

24     Q    Okay.

25     A    And they would have to complete their case logs which

1        would certify or support their claim that they did

2        all the appropriate cases.

3    Q   Okay.  So the program, which you direct, is set up so

4        that the residents can complete all of the ABA

5        requirements and the ACGME requirements in 36 months;

6        is that correct?

7    A   Correct.

8    Q   And the only reason they wouldn't complete in 36

9        months, at least to the extent that the program

10       directs, is because some period during that 36 months

11       was not deemed satisfactory; is that fair?

12   A   Correct.

13   Q   And you also understand that if a resident receives

14       an unsatisfactory period in one six-month period, and

15       only one, that completing the next six-month period

16       in a satisfactory fashion results in the prior six

17       months being deemed satisfactory; is that right?

18   A   That's the way I understand it.

19   Q   In October of 2008, you had a meeting with Sarah

20       Aronson at which you and Doctor Wallace informed her

21       that it looked like she was going to receive an

22       unsatisfactory rating for that period, correct?

23   A   I remember having that meeting, yes.

24   Q   Okay.  And during that meeting, you discussed with

25       her concerns about her performance?

Page 15

```
 1    A    Most likely.

 2    Q    Do you recall yourself raising concerns about her

 3         performance?

 4    A    Yes, I do.

 5    Q    And did you speak to her about concerns that you had

 6         personally working with her?

 7    A    Yes, I did.

 8    Q    Tell me about which issue -- what issues you raised

 9         with her based on your personal working with her.

10    A    My concerns with Doctor Aronson was her inability to

11         act and respond in a rapid fashion during the periods

12         where she was taking care of patients in the ICU or

13         in the operating room.

14    Q    And she asked you for specific examples when you

15         observed that behavior, didn't she?

16    A    I'm not sure if I remember her asking me for specific

17         examples.

18    Q    Do you recall whether you gave her specific examples?

19    A    What I recall is telling her that when she was

20         working with me and I watched her perform in the

21         operating room or the ICU, I noticed that her

22         response time or her pattern of flow of movement was

23         much slower and delayed compared to other residents

24         of the same experience level.

25    Q    Okay.  And you worked with Doctor Aronson in the ICU
```

1          during the first week of October, correct?

2     A    I believe I worked with her in that month.  I don't

3          know what days.

4     Q    And you were giving her your evaluation based, as I

5          said, on your personal working with her.  Would it be

6          based on the week that you worked with her?

7     A    It would have been based on the entire residency

8          program, her duration of her residency training.  But

9          most likely I would have made a reference to the most

10         recent period that I worked with her, as well.

11    Q    Had you worked with her directly before that October

12         rotation within the second half of 2008, so during

13         that latter reporting period?

14    A    I don't recall.

15    Q    Do you recall any specific incident that was

16         discussed with Doctor Aronson during the October 14th

17         meeting that occurred after July 1st of 2008?

18    A    I don't recall any specific incidents.

19    Q    You heard Doctor Wallace testify that he gave to

20         Doctor Aronson some documentation of evaluations at

21         this meeting, right?

22    A    I believe so, yes.

23    Q    Did you provide any different or additional

24         documentation to Doctor Aronson during this meeting?

25    A    No.

1    Q    And do you recall citing any evaluations of Doctor

2          Aronson's work, other than what was documented?

3                MR. BIXENSTINE:  Would you repeat

4              that question?

5              - - - -

6          (Thereupon, question read by Notary.)

7              - - - -

8    A    At that meeting?

9    Q    Yes.

10    A    No, I don't.

11    Q    You had not yet documented your own evaluation of her

12          work, though, correct?

13    A    Not written, no.

14    Q    As you sit here today, can you think of any specific

15          incident that occurred between July 1st of 2008 and

16          October 14th of 2008 which would demonstrate Doctor

17          Aronson's inability to respond as you thought she

18          should have responded in the ICU or the OR?

19    A    I can think of an incident, but I don't know if it

20          fell in that time period or not.

21    Q    Okay.  You met again with Doctor Aronson on November

22          24th of 2008 to discuss her performance, right?

23    A    I believe so, yes.

24    Q    And Doctor Wallace was also at that meeting, right?

25    A    Correct.

Page 18

1    Q    And what do you recall was the gist of the message

2         you were giving Doctor Aronson about her performance

3         at that time?

4    A    At that time, we met to follow up on the meeting in

5         October, and it was again to discuss her performance

6         issues.

7    Q    Did you discuss with her -- well, and at that time,

8         you again -- you being you and Doctor Wallace

9         together -- again indicated to Doctor Aronson that it

10        appeared that she was going to receive an

11        unsatisfactory rating for the period; is that right?

12   A    I believe we did at that time, yes.

13   Q    Okay.  Did you discuss with her any specific

14        performance problems that arose between October 14th

15        and November 24th?

16   A    I don't recall.

17   Q    Okay.  On January 7th of 2009, you and Doctor Wallace

18        authored a letter to inform Doctor Aronson that she

19        was going to receive an unsatisfactory rating for the

20        period that was July through December of 2008, right?

21   A    I believe so.

22   Q    Between November 24th of 2008 and December 31st of

23        2008, was there anything about Doctor Aronson's

24        performance that changed in terms of the quality of

25        her performance?

1   A   Do you want my personal opinion from observation or

2       do you want --

3   Q   Fair enough.  Let me rephrase it.

4       The evaluation that was conducted and led to her

5       receiving an unsatisfactory rating, I want to address

6       that evaluation.  Were there any aspects of her

7       performance between November 24th and December 31st

8       that caused her to receive an unsatisfactory rating?

9              MR. BIXENSTINE:  You mean

10           contributed in some way?

11           MR. GORDILLO:  Yes.

12   A   Not that I recall.

13   Q   When you notified Doctor Aronson about her

14       unsatisfactory rating, you cited three basic points;

15       that she was unable to respond and react in stressful

16       situations, that she had been unprofessional in

17       failing to notify you about her use of Topamax, and

18       that she was unable to respond appropriately in a

19       clinical setting.  I'm paraphrasing.

20       Would you agree with me that generally those are

21       the three areas that caused you to evaluate her

22       unsatisfactory?

23   A   In general, I would agree with that, yes.

24   Q   When you were talking about her inability to respond

25       appropriately in stressful situations, were you

Page 20

1   talking about as you and the faculty observed her in

2   the ICU or OR?

3   A   As I had observed her in the ICU or the OR.  But

4   there are other faculty members who had the same

5   opinion during that period.

6   Q   Okay.

7   A   I don't remember which ones they were exactly.

8   Q   Did you observe Doctor Aronson as being unable to

9   appropriately respond to stressful situations in the

10  OR between July 1st of 2008 and December 31st of

11  2008?

12  A   I don't remember.

13  Q   Okay.  Did you observe her being unable to respond --

14  appropriately respond to stressful situations in the

15  ICU between July 1st of 2008 and December 31st of

16  2008?

17  A   Yes, I did.

18  Q   Did you observe Doctor Aronson as being unable to

19  respond appropriately in a clinical setting in the OR

20  between July 1st and December 31st of 2008?

21  A   I don't recall.

22  Q   Okay.  Did you observe Doctor Aronson being unable to

23  respond appropriately in the clinical setting in the

24  ICU between July 1st of 2008 and December 31st of

25  2008?

1   A    Yes.  I think was that the same question I answered

2         previously.

3   Q    I just asked you about OR.  Now I'm asking you about

4         ICU.

5   A    Before that.

6               MR. BIXENSTINE:  I think that

7               clinical setting is a third of those

8               things you were talking about, not the

9               first one.

10              MR. GORDILLO:  Right.  She was cited

11              for unsatisfactory performance based on

12              --

13              MR. BIXENSTINE:  Significant changes

14              in the aesthetic courses is that what you

15              mean.

16              MR. GORDILLO:  Correct.

17   A    I think I'm getting what you're saying now.

18   Q    I'm talking about this third item, which I think you

19         wrote that she had failed to demonstrate her ability

20         to recognize and respond appropriately to significant

21         changes in the anesthetic course.  That was the exact

22         language that you used, which I paraphrased that she

23         wasn't responding appropriately in the clinical

24         setting, which was different than the first item

25         being able to respond in stressful situations.

Page 22

1   A   Correct.

2   Q   Now I'm asking about this ability to respond

3       appropriately in a clinical setting.

4   A   By clinical setting you mean?

5   Q   Specifically her failure to respond appropriately to

6       significant changes in anesthetic course.

7   A   I did not witness that in that time period because

8       anesthetic course to me means the operating room.

9   Q   Okay.  Did you receive any faculty evaluations

10      reflecting that Doctor Aronson was unable to

11      appropriately respond to stressful situations in the

12      OR during the period July 1st of 2008 through

13      December 31st of 2008?

14  A   I believe so, but I'd have to go back and look at the

15      records to know exactly what the dates were, but I'm

16      not sure.

17  Q   Do you recall sharing any of those negative

18      evaluations with Doctor Aronson?

19  A   I believe we presented those to her on -- in the

20      meeting in October.

21  Q   The document provided to her by Doctor Wallace?

22  A   Yes.  I think we provided the summary of resident's

23      competencies at that meeting, I believe.

24  Q   Other than documentations of evaluations presented to

25      Doctor Aronson at the October meeting, did you share

```
 1          with her any negative evaluations reflecting her

 2          inability to respond appropriately to stressful

 3          situations in the OR during the second half of 2008?

 4     A    Not that I can remember.

 5     Q    And did you receive any faculty evaluations

 6          reflecting that she was unable to respond

 7          appropriately in the clinical setting during the

 8          period of July 1st 2008 through December 31st of

 9          2008?

10                    MR. BIXENSTINE:  That's the

11               anesthetic course?

12                    MR. GORDILLO:  Right.

13     A    I believe so, but again, I'd have to look at the

14          records to see what those dates were.

15     Q    Okay.  And were those evaluations -- did you present

16          any of those evaluations to Doctor Aronson?

17     A    If they existed, then they were presented.

18     Q    And the evaluations that were presented were the ones

19          that Doctor Wallace gave her?

20     A    I believe so.

21     Q    At the October meeting?

22     A    I believe so.

23     Q    The decision to give her an unsatisfactory rating is

24          based on the recommendation of the Clinical

25          Competence Committee; is that correct?
```

Page 24

```
 1     A    Yes.

 2     Q    Who chaired the Clinical Competence Committee at the

 3          time that she received her unsatisfactory evaluation?

 4     A    I'm not sure we had a designated chair for that

 5          committee.

 6     Q    The committee was comprised of you, Doctor Wallace,

 7          and Doctor Nearman, correct?

 8     A    Correct.

 9     Q    From the beginning of Doctor Aronson's residency

10          program -- Anesthesiology Residency Program --

11          through June 30th of 2008, she received satisfactory

12          evaluations of her performance for each six-month

13          period, correct?

14     A    Correct.

15                         - - - -

16  (Thereupon, Exhibit 40 was marked for the purpose of

17                      identification.)

18                         - - - -

19     Q    (By Mr. Gordillo)  You've been handed a document

20          marked as Exhibit 40.  Each time you're handed a

21          document today, I want to make sure you take all the

22          time you'd like to look it over and let me know when

23          you've had an adequate opportunity to review it.

24     A    Thank you.

25     Q    You had time to look it over?
```

```
 1    A    Yes, sir.

 2    Q    Do you recognize this document?

 3    A    Yes.

 4    Q    Tell me what it is, please.

 5    A    It's a request for reference from Sheridan

 6         Healthcare.

 7    Q    Okay.  And was this the reference that you gave for

 8         Doctor Aronson to Sheridan Healthcare?

 9    A    Yes, it is.

10    Q    And at the top right, it indicates faxed 9/3/08.  Is

11         that about the time at which you gave this reference?

12    A    That would make sense.

13    Q    Okay.  And on the first page, there were three areas

14         that you indicated you could not evaluate Doctor

15         Aronson?

16    A    Mm-hmm.

17    Q    And all other areas that you were asked about, you

18         give her a good or excellent rating, correct?

19    A    That's what it says here.

20    Q    And on the second page, the bottom, that's your

21         signature?

22    A    Yes, it is.

23    Q    Dated September 2nd of '08, right?

24    A    Yes.

25    Q    And so on the 2nd of September, you recommended
```

```
 1              Doctor Aronson as qualified and competent, correct?

 2      A       Yes.

 3      Q       And what were you recommending her for?

 4      A       A position at Sheridan Healthcare.

 5      Q       Okay.  And you understood more specifically that she

 6              was applying for a position in the field of

 7              anesthesiology, right?

 8      A       Yes.

 9      Q       As an anesthesiologist?

10      A       Correct.

11      Q       As of September 2, 2008, based on your close personal

12              observation, you believed that Doctor Aronson was

13              qualified and competent to be an anesthesiologist,

14              right?

15      A       She met the minimum requirements at that point.

16      Q       And you had no reservation at that point, right?

17      A       I did not document that I had reservations at that

18              point.

19      Q       Is your answer to my question yes?

20      A       Yes.

21      Q       You also offered your evaluation not only based on

22              your close personal observation but on a composite

23              evaluation of her supervisors, correct?

24      A       Yes.

25      Q       Is it fair to say that your opinion of her
```

Page 27

1       performance changed after September 2, 2008?

2   A   Yes.

3   Q   You testified a little bit ago that your evaluation

4       of Doctor Aronson's performance did not change

5       between November 24th and December 31st of 2008,

6       right?

7                   MR. BIXENSTINE:  Objection.  Go

8               ahead.

9   Q   Well, let's make sure.  I'm not trying to put the

10      words in your mouth, so if I misstated that, please

11      correct me.

12  A   Correct.

13  Q   So between November 24th of 2008 and December 31st of

14      2008, were you prepared to recommend as qualified and

15      competent Doctor Aronson for a position as

16      anesthesiologist?

17  A   Based on the information that I had in November

18      compared to what I had in September, I would have to

19      say no.

20  Q   So is it fair to say that sometime between

21      September 2nd of 2008 and November 24th of 2008, your

22      opinion changed about Doctor Aronson's performance?

23  A   That would be correct.

24  Q   Did your opinion about Doctor Aronson's qualification

25      to be an anesthesiologist change between September

```
 1              2nd of 2008 and October 14th of 2008?

 2     A    I would say yes.

 3     Q    Okay.  And your opinion was lower in terms of her

 4          ability to be an anesthesiologist; is that fair?

 5     A    That's fair.

 6     Q    Was there anything about her performance between

 7          October 14th and November 24th that changed your

 8          opinion one way or the other about her ability to

 9          perform as an anesthesiologist?

10                    MR. BIXENSTINE:  You mean as he

11               observed it?

12                    MR. GORDILLO:  Yes -- well, no.  Let

13               me correct that.

14     Q    Anything.  Leave it open.

15     A    I don't remember anything specific.

16     Q    Okay.  Did Doctor Aronson exhibit problems in her

17          performance during specific rotations?

18                    MR. BIXENSTINE:  Again, this is

19               during this second half of 2008 you're

20               referring to, or just generally?

21                    MR. GORDILLO:  During the second

22               half of 2008.

23     A    I remember evaluations coming from the Critical Care

24          rotation specifically, but I don't remember any other

25          ones.
```

```
 1    Q    And the Critical Care rotation is the same as ICU?

 2    A    Yes.

 3    Q    When you spoke about difficulties with her

 4         performance in the OR, does that include her ICU

 5         rotation?

 6    A    No.  Those are separate.

 7    Q    Separate.  Okay.  You mentioned that one of the ACGME

 8         requirements for the residents was to work on 20

 9         trauma cases; is that right?

10    A    Correct.  That was an example that I used.

11    Q    Right.  What is a trauma case?

12    A    A trauma case would be any procedure that resulted on

13         a patient from major trauma, such as a motor vehicle

14         accident or gunshot wound, stabbing, a fall.

15    Q    Do you know why it's important for a resident to work

16         on a minimum number of trauma cases as specified in

17         the ACGME?

18    A    No.  They changed it from 10 to 20.  They gave us no

19         reason.

20    Q    As program director, do you think it's important for

21         the residents to work on trauma cases?

22    A    Yes, I do.

23    Q    Why?

24    A    It's a typical type of anesthetic case that an

25         anesthesiologist would see out in practice, and I
```

1          believe they need experience taking care of those

2          because they have issues that are particular to that

3          type of anesthetic and that type of patient.

4   Q   Generally, what kind of issues are you talking about?

5   A   Temperature control, fluid management, issues with

6          exsanguination, issues with injuries to the lungs,

7          the heart, major abdominal organs, injuries to the

8          cervical spine and airway.

9   Q   And trauma cases typically come in through emergency?

10   A   Typically, yes.

11   Q   Are there other rotations in which the residents get

12         comparable emergency experience?

13   A   Occasionally when they're in orthopedics, they will

14         get a case involving a bone fracture from a fall, and

15         up until a certain point, the ACGME counted those as

16         major trauma, but I think they changed the definition

17         in the last few years.  I'm not sure.

18   Q   Would you consider the ability to have rapid response

19         more important in trauma cases than perhaps the other

20         anesthesiology cases?

21   A   I would say that it's more likely to be needed in

22         those cases compared to others, but you need it in

23         every case.

24   Q   Sure.  If somebody has a complication, you have to be

25         able to respond no matter what the situation, fair?

Page 31

```
 1     A     Fair.

 2     Q     But like you say, it's most likely to arise in a

 3           trauma case?

 4                       MR. BIXENSTINE:   Objection.

 5     Q     An emergency situation is most likely to arise in a

 6           trauma case; is that fair?

 7     A     More likely.

 8     Q     More likely, okay.

 9     A     I can think of examples that it would be most likely.

10     Q     During which rotations would emergency situations be

11           most likely to arise?

12     A     I would say cardiothoracic cases, liver transplants,

13           and unstable pediatric cases.

14     Q     During the meeting of October 14, 2008 when you and

15           Doctor Wallace informed Doctor Aronson that she was

16           likely to receive an unsatisfactory evaluation, did

17           she express disagreement to you?

18     A     I believe so.

19     Q     All right.  Do you recall what she said and how she

20           disagreed?

21     A     Not specifically.

22     Q     Okay.  Tell me what you do recall in terms of the

23           exchange that went on among you and Doctor Wallace

24           and Doctor Aronson during the October 14th meeting.

25     A     In essence, she wanted to know the basis of our
```

Page 32

1          decision, my personal opinion, and I expressed to her

2          the same opinion that I had done in the past, that I

3          didn't think her response time was adequate in

4          certain situations and that other people at that time

5          had also been expressing concerns that she was

6          getting close to graduation and hadn't sharpened that

7          skill of multitasking and performing quickly in the

8          routine settings and also in stressful situations.

9    Q    Do you remember anything else that was said during

10        that meeting?

11   A    By myself?

12   Q    By anyone.

13   A    Not specifically.

14   Q    During the November 24th meeting when you and Doctor

15        Wallace informed Doctor Aronson again that she might

16        be getting an unsatisfactory rating, do you recall

17        her disagreeing with that opinion at the time?

18   A    I believe so.

19   Q    Okay.  What do you recall about what she said in

20        terms of disagreeing with your opinion?

21   A    She didn't have a reason for what was causing this

22        issue, to the best of my knowledge.

23   Q    So she disagreed with you because she didn't have a

24        reason?

25   A    That's what I remember.  That was the initial part of

1           the discussion.

2      Q    Okay.  What do you recall you and Doctor Wallace

3           having told Doctor Aronson about her performance at

4           the November meeting?

5      A    We tried to find a reason for her inability to

6           respond appropriately in those situations, and we

7           discussed some options, some possible reasons, and

8           one that eventually came out was that she was taking

9           a medication, the Topamax, that could have cognitive

10          effects on her ability to think clearly and rapidly

11          in a situation.

12     Q    Now, that meeting that you had on November 24th was

13          one that had generally be scheduled as a result of

14          the October 14th meeting, right?

15               October 14th you said you were going to meet four

16          to six weeks later?

17     A    I believe that was intended as follow-up, yes.

18     Q    In November of 2008, Doctor Aronson was in the Acute

19          Pain Service rotation; is that right?

20     A    I'd have to check the schedule, but I can't argue

21          with you yes or no.

22     Q    Do you know whether she received satisfactory

23          evaluations for her work in the Acute Pain Service

24          rotation?

25     A    I don't remember any evaluations for that month.

Page 34

```
 1    Q    And at the November 24th meeting, do you recall
 2         discussing with her any particular negative
 3         evaluations of her work from the November rotation
 4         she was in?
 5    A    Nothing in particular, no.
 6    Q    Did you work directly with Doctor Aronson in her
 7         November rotation?
 8    A    No, I did not.
 9    Q    Do you know if Doctor Wallace worked directly with
10         her in her November rotation?
11    A    I do not.
12    Q    With respect to the October 14th meeting, who decided
13         that the meeting was necessary?
14    A    It may have been me because of the recent exposure to
15         her performance in the ICU and some other evaluations
16         or some comments that other attendings were making
17         about Doctor Aronson prompted me to have that
18         meeting.
19    Q    And these were comments from other attendings based
20         on her performance in October?
21    A    I believe so, or even maybe in September, but I'm not
22         sure.
23    Q    What other comments were made to you about her
24         performance in October or maybe even September?
25    A    I don't know specifically.  Things to the effect that
```

```
 1            they didn't think she was ready to graduate.  She

 2            hadn't improved since the last time they saw her,

 3            those kinds of comments.

 4                         - - - -

 5   (Thereupon, Exhibit 41 was marked for the purpose of

 6                        identification.)

 7                         - - - -

 8       Q    (By Mr. Gordillo)  You've been handed a document

 9            marked as Exhibit 41.  Please take all the time you'd

10            like to look it over and let me know when you've had

11            an adequate opportunity to review it.

12       A    Okay.

13       Q    Do you recognize the document?

14       A    I recognize the document as a copy of our

15            evaluation -- an evaluation for Doctor Aronson.

16       Q    And this is your evaluation of Doctor Aronson, right?

17               You see on the first page, the right-hand side

18            there, the evaluator is cut off, but --

19       A    Yes.

20       Q    And it's your evaluation for the period October 6th

21            through October 10th of 2008?

22       A    Correct.

23       Q    Okay.  And as you look at this document, does that

24            refresh your recollection of being a time period

25            during which you worked with Doctor Aronson in the
```

```
 1          ICU?

 2     A    Yes, it does.

 3     Q    And you entered this evaluation into the system in

 4          December of 2008, correct?

 5     A    I'm looking to see when it was entered, but I don't

 6          see it on here.

 7     Q    I'll represent to you, I never saw it on this

 8          document, either, but I gathered from other

 9          information provided in the context of this

10          litigation that it was sometime during December of

11          2008 when you entered this evaluation.  So I ask you

12          if you recall that to be accurate, whether you

13          entered that evaluation sometime in December of 2008?

14     A    I couldn't argue with you that it wasn't in December

15          of 2008.

16     Q    Okay.  You would agree with me it was sometime after

17          October 10th of 2008?

18     A    Yes.

19     Q    And it was after October of 2008?

20     A    Yes.

21     Q    And was after the November 24th meeting?

22     A    That's possible.

23     Q    Okay.

24     A    Yes.

25     Q    Other than this evaluation, did you enter any other
```

Page 37

1        evaluations of Doctor Aronson for the period of,

2        let's say, September 2nd of 2008 through

3        December 31st of 2008?

4    A   Not that I can recall.

5    Q   And you would agree with me that this Exhibit 41

6        reflects your opinion that her overall clinical

7        competence in the rotation was below average?

8    A   Yes.

9    Q   And is it fair to say that for the period that is

10       September 2nd of 2008 through December 31st of 2008,

11       this is the only written evaluation of Doctor Aronson

12       that you provided indicating that she was -- her

13       overall clinical competence in the rotation was below

14       average?

15   A   If that's all you have, then that's it, yes.

16   Q   Okay.  And of course, I'm excluding the CCC Report.

17       We're not talking about that.  We're talking about

18       specific evaluations.

19   A   Yes.

20               MR. BIXENSTINE:  You were talking

21           about his.

22               MR. GORDILLO:  Yes.

23               MR. BIXENSTINE:  Right.

24   Q   This document that is marked as Exhibit 41 is a copy

25       of a document that was marked as Exhibit B during

| | | |
|---|---|---|
| 1 | | Doctor Aronson's deposition.  As I look at the |
| 2 | | document and see the two pages, it appears to me to |
| 3 | | be incomplete.  Can you tell me whether that's true? |
| 4 | A | The only blank space I see is under Program Director |
| 5 | | Comments. |
| 6 | Q | Okay.  But for example, if you see at the bottom of |
| 7 | | the first page with the core competency of Patient |
| 8 | | Care, it indicates Data Collection. |
| 9 | A | Yes. |
| 10 | Q | But that's the only category under Patient Care. |
| 11 | | Does this form typically include more than Data |
| 12 | | Collection under the category Patient Care as a core |
| 13 | | competency? |
| 14 | A | Yes. |
| 15 | Q | Okay.  And I don't see it included in this document. |
| 16 | | Do you? |
| 17 | A | I see three out of the six core competencies. |
| 18 | Q | And so normally the evaluation would include all six |
| 19 | | competencies, right? |
| 20 | A | Correct. |
| 21 | Q | And each category complete under each core |
| 22 | | competency, right? |
| 23 | A | Correct. |
| 24 | Q | So that's what I'm asking you.  Does it appear that |
| 25 | | there are missing core competencies? |

1    A    I understand.

2    Q    So the document is not complete?

3    A    I understand.  Yes.

4    Q    Do you know why your evaluation of Doctor Aronson's

5         performance for the period October 6th through

6         October 10th of 2008 was not entered into the system

7         for at least six weeks?

8    A    The way the system works is after the month of ICU

9         rotation is done, our residency coordinator sends out

10        via computer my evaluation form indicating to us that

11        we have to fill out an evaluation for that resident.

12        There are occasions when that is not sent to us

13        immediately after the rotation is over.  Sometimes

14        it's several weeks.  That's the only thing I can

15        think of, is that I got it several weeks after the

16        rotation.  But I had discussed it with her, her

17        evaluation, at the time of the rotation.

18   Q    You discussed this evaluation reflected in Exhibit 41

19        with Doctor Aronson at the October 14th meeting; is

20        that correct?

21   A    Correct.  I probably discussed it with her during the

22        rotation, as well, but I'm not sure of that part, but

23        I'm pretty sure we discussed it at the October 14th

24        meeting.

25   Q    And your negative evaluations of her based on your

1           personal observation of her work in the second half

2           of 2008 arose from this period that is October 6th

3           through October 10th; is that right?

4    A   Correct.

5    Q   Did your evaluation of her work change in any way

6           between October 10th of 2008 and November 24th of

7           2008?

8    A   My personal impression?

9    Q   Yes.

10   A   I don't recall.

11               MR. BIXENSTINE:  Sometime when you

12              get to a good point, I need to use the

13              restroom here and take a short break.

14               MR. GORDILLO:  This is a good point,

15              actually.

16                  - - - -

17           (Thereupon, a recess was had.)

18                  - - - -

19 (Thereupon, Exhibit 42 was marked for the purpose of

20               identification.)

21                  - - - -

22   Q   (By Mr. Gordillo)  Now you've been handed a document

23           marked as Exhibit 42.  Please take all the time you'd

24           like to look it over and let me know when you've had

25           an adequate opportunity to review it.

```
 1    A    Okay.

 2    Q    Do you recognize the document?

 3    A    I believe so.

 4    Q    Can you tell me what it is, please?

 5    A    It is a Request for Professional Reference by a

 6         Florida Hospital for Doctor Aronson.

 7    Q    Addressed to you, right?

 8    A    Yes.

 9    Q    Or at least it was attempted to be addressed to you,

10         but your name is misspelled.

11    A    Yes.

12    Q    And did you in fact complete this evaluation?

13    A    I incompletely completed this evaluation.

14    Q    To the extent that this document is completed with

15         evaluative remarks, are they your evaluative remarks?

16    A    Yes.

17    Q    Tell me what you recall about the circumstances

18         concerning how you received this request for your

19         evaluation and then subsequently reported it.

20    A    I can't remember why I didn't finish completing this

21         evaluation, this reference.  I didn't sign it so

22         obviously I didn't send it.

23    Q    Did you have any communication with anyone at Florida

24         Hospital, Flagler, about this evaluation?

25    A    No, I didn't.  I don't remember why I didn't finish
```

1           completing this.

2      Q    To the extent that this document is completed, do you

3           know when you completed it?

4      A    Well, it was received February 19th -- or sent

5           February 19th.  Typically I tried to fill these out

6           as quickly as possible, but I don't know.

7      Q    Okay.

8      A    I'm trying to jar some memory, but --

9      Q    Do you believe this document was filled out before

10          June 4th of 2009?

11     A    I would say that I filled this out long before June

12          if it was sent to me in February.

13     Q    As you look at the document that's been marked as

14          Exhibit 42, on the first page under the section that

15          is Roman Numeral II, there are a number of categories

16          that you are asked to rate numerically.

17          Do you see from looking?

18     A    Yes.

19     Q    Would you tell me whether any of these categories

20          correspond to the ability to respond appropriately to

21          significant changes in the anesthetic course?

22     A    If I were to include that, it would be under Patient

23          Management, would be my best guess.

24     Q    Okay.  And a category which sometime between

25          September 19th and June 4th, you would have rated

Page 43

1          Doctor Aronson as average; is that fair?

2    A    5, yes.

3    Q    What caused you to rate Doctor Aronson as an 8 under

4         appearance?

5    A    She dressed neatly.  She was well kempt.  She

6         presented herself well.

7    Q    What prevented her from being a 9 or 10?

8                   MR. BIXENSTINE:  It's all I can do

9               to avoid making a joke about that, but go

10              ahead.

11   A    What could she have done to be a 9 or a 10?  Maybe

12        wear a business suit, which I think is unnecessary in

13        the clinical setting, but that's it.

14   Q    Anything else?

15   A    I can't think of anything else.

16   Q    Look back again at Exhibit 40, please.  Other than

17        Exhibit 40, did you have any communication with

18        Sheridan Healthcare about Doctor Aronson's seeking

19        employment with Sheridan Healthcare?

20   A    No.

21   Q    Did you become aware that she -- go ahead.

22   A    You mean at the time of this?

23   Q    At any time.

24                   MR. BIXENSTINE:  Are you referring

25              to -- you made some distinction between

1          some kind of Sheridan of Florida and a

2          somewhat distinct Sheridan -- are you

3          intending this question to focus on

4          Florida?

5               MR. GORDILLO:  Yes.

6               MR. BIXENSTINE:  Okay.

7    A    I had no conversations regarding Sheridan in regards

8         to an employment in Florida.

9    Q    Okay.  So you were aware that Doctor Aronson was

10        seeking employment with Sheridan Healthcare in

11        Florida, right?

12   A    Correct.

13   Q    And the only communication you had with Sheridan

14        about Doctor Aronson trying to get the employment in

15        Florida was Exhibit 40; is that right?

16   A    Correct.

17   Q    She later tried to get employment in Maryland with

18        Sheridan Healthcorp.  Are you familiar with that?

19   A    Correct.

20   Q    Through Peninsula?

21   A    Correct.

22   Q    And you had communications with Sheridan in that

23        context?

24   A    Yes.

25                    - - - -

```
 1   (Thereupon, Exhibit 43 was marked for the purpose of

 2                     identification.)

 3                       -  -  -  -

 4   Q    (By Mr. Gordillo)  You've now been handed a document

 5        marked as Exhibit 43.  Please take all the time you'd

 6        like to look it over and let me know when you've had

 7        an adequate opportunity to review it.

 8                     MR. BIXENSTINE:  Can you see your

 9                second page?  Okay.

10   A    Okay.

11   Q    Do you recognize the document?

12   A    I do.

13   Q    Can you tell me what it is, please?

14   A    It is a form sent to Maryland Board of Physicians by

15        myself to evaluate or to confirm Doctor Aronson's

16        participation in our residency program.

17   Q    All right.  And on the first page, that starts Part

18        2, a series of questions that continues on to the

19        second page, right?  Do you see Part 2?

20   A    Yes.

21   Q    And those questions that begin on the first page of

22        Question Number 1 and going to the second page to

23        Question Number 8 were completed by you?

24   A    I don't believe Question 1 was completed by me

25        because that's not my handwriting.
```

Page 46

```
 1    Q    Okay.

 2    A    Under Program Specialty it says Anesthesiology.

 3         That's not my handwriting.

 4    Q    Okay.

 5    A    My handwriting is on the back.

 6    Q    So on the second page, you signed the document,

 7         right?

 8    A    Correct.

 9    Q    So you're verifying the information provided in Part

10         2 of the document, right?

11    A    Correct.

12    Q    On the second page of the document, the responses to

13         Questions 6 and 8, are those yours?

14    A    Yes.

15    Q    Is that your handwriting?

16    A    Yes, it is.

17    Q    Did you confer with anyone else about how to respond

18         to Question 6?  And let me qualify my question by

19         saying I don't want to know about conversations you

20         may have had with legal counsel, okay?

21         Other than conversation with legal counsel, did

22         you confer with anyone about how to respond to

23         Question 6?

24                   MR. BIXENSTINE:  By the way, legal

25                   counsel would include me and would also
```

Page 47

```
 1                    include --
 2     A    I don't believe so.
 3     Q    And I don't want to know about the content of any
 4          conversation that you had with any lawyer about how
 5          to respond to this.  So making that clear, did you
 6          complete the answer to Question Number 6 with the
 7          benefit of legal counsel?
 8               And I'm really looking for a yes or no answer
 9          here, because I don't want to know the content if any
10          conversation occurred.
11     A    I don't remember if I discussed this question with
12          legal counsel when I filled it out.
13     Q    This question being Number 6?
14     A    Yes.  Number 6.
15     Q    And with respect to Question Number 8?  Again, I'm
16          looking for a yes or no response, not for any
17          content.
18               Did you answer Question Number 8 with the benefit
19          of legal counsel?
20     A    I don't think so.
21     Q    Did you confer with anyone about how to respond to
22          Question Number 8?
23     A    I think I may have discussed it with Doctor Nearman.
24     Q    Did you discuss how to Answer Number 6 with Doctor
25          Nearman?
```

1    A    I don't remember.  I believe I discussed with Doctor

2         Nearman some of the issues at that time.  I don't

3         believe he was present when I wrote this.

4    Q    But you think you talked to him before you wrote it?

5    A    I think I did.

6    Q    Tell me what you recall from that conversation.

7    A    What I recall is what's on the paper, what we

8         documented.  I don't remember anything specific, but

9         I think I did ask for his opinion.

10   Q    You signed the document on May 6th of 2009?

11   A    Correct.

12   Q    Did you complete the document at about the same time?

13   A    Yes.

14   Q    Okay.  And did you have the discussion with Doctor

15        Nearman close in time to May 6, 2009?

16   A    Most likely.

17   Q    You wrote in response to Number 6 that the most

18        likely cause of Doctor Aronson's performance not

19        being up to expectation was the influence of

20        medication, right?

21   A    Correct.

22   Q    And when you wrote that, did that accurately reflect

23        what you believed to be the cause of any performance

24        problems Doctor Aronson experienced?

25             MR. BIXENSTINE:  Any performance

1           problems ever?

2                    MR. GORDILLO:  Well, as referenced

3                    in Question Number 6.

4     A    I believe what I said at the time, it was the most

5          likely cause of her performance issues.  Yes, I do

6          believe that and believed it then, as well.

7     Q    Was there a time when you held any other belief about

8          the cause of performance problems that you're

9          referencing in response to Question Number 6?

10    A    Prior to knowing that she was taking the Topamax, I

11         had other considerations.  But after the disclosure

12         of that information, that seemed to be the most

13         likely cause.

14    Q    What other considerations did you have before she

15         disclosed her taking of Topamax?

16    A    Some individuals just don't have the capacity to

17         multitask or to perform in a speedy or rapid fashion.

18         That was my initial belief when I first saw her

19         working in early parts of her Anesthesia Program.

20         Often residents do improve and overcome those

21         deficits, and in her case, that never happened.  That

22         was -- prior to November, that was my most likely

23         cause.

24    Q    And you also believed as of May 6, 2009 that she

25         stopped taking the medication, right?

```
1    A    I was under the impression that she had stopped
2         taking it.
3    Q    And you believed that her performance improved as of
4         May 6, 2009?
5    A    I had noticed some increased rapidity in which she
6         responded.
7    Q    Is your answer to my question yes?
8    A    Yes.  I'm sorry.
9    Q    In answer to Question Number 8, you had indicated
10        that because her performance had been affected during
11        her last six-month period, an additional six-month
12        period was added; is that right?
13   A    No.  That's not correct.
14   Q    Well, you wrote:  Since the implication of the
15        medication affecting her performance was determined
16        during her last scheduled six-month period, an
17        additional six-month period was added to her
18        training.  Is that correct?
19   A    That's what I said, what I wrote.
20   Q    Was it your belief that because of her performance
21        problems during her last scheduled six-month period,
22        she needed six more months to show that her
23        performance improved?
24   A    Yes.
25   Q    Who was responsible for deciding that the way to
```

```
 1              address the concerns about Doctor Aronson's

 2              performance was to give her an additional six-month

 3              period to improve?

 4     A        Well, there was one conversation between myself,

 5              Doctor Wallace, and Doctor Aronson.  And then there

 6              was another conversation between myself, Doctor

 7              Nearman, and Doctor Aronson.  And during those

 8              conversations, alternatives to what we should do at

 9              this that point were discussed.

10     Q        When did the conversation among you, Doctor Wallace,

11              and Doctor Aronson occur?

12     A        I believe that was the one on November 24th.

13     Q        Okay.  And when did the conversation among you and

14              Doctor Nearman and Doctor Aronson occur?

15     A        That would have been after that, but I'm not sure of

16              the date.

17     Q        So during the November 24th meeting, you and Doctor

18              Wallace specifically discussed the fact with Doctor

19              Aronson that she may need to add six more months to

20              her training to show that her performance could be

21              improved; is that accurate?

22     A        Yes.

23     Q        Before the meeting with Doctor Aronson, did you

24              discuss the options for Doctor Aronson with Doctor

25              Wallace?
```

Page 52

```
 1    A    Yes.

 2    Q    Okay.  And did the discussion with Doctor Wallace

 3         include as an option extending Doctor Aronson's

 4         training?

 5    A    Yes.

 6    Q    When did that discussion or those discussions with

 7         Doctor Wallace happen?

 8    A    Shortly before the meeting.

 9    Q    Okay.  What were the options that you and Doctor

10         Wallace discussed?

11    A    We could do nothing.  We could give her

12         unsatisfactory for that six-month period and extend

13         the residency training period.  We could terminate

14         the residency program.  We could not graduate her at

15         the end of her completed residency.

16    Q    Did you discuss any other options?

17    A    Those are the ones I remember.

18    Q    Did you discuss whether to confer with any of your

19         other colleagues at UH Case Medical Center about what

20         options might exist?

21    A    No.  I don't think so.

22    Q    Did you consider discussing with Doctor Shuck what

23         options might exist?

24              MR. BIXENSTINE:  You're talking

25              about when he was meeting with Wallace in
```

Page 53

1           advance of this meeting?

2                    MR. GORDILLO:  Yes.

3    A    No.

4                    MR. GORDILLO:  Off the record.

5                    - - - -

6           (Thereupon, a recess was had.)

7                    - - - -

8    Q    (By Mr. Gordillo)  Did you confer with Will Rebello

9          about what options might be discussed with Doctor

10         Aronson at the November 24th meeting with respect to

11         improving her performance?

12   A    I did not.  I think Doctor Wallace did, but I'm not

13         sure.

14   Q    And do you believe that if Doctor Wallace conferred

15         with Mr. Rebello, that happened before you and Doctor

16         Wallace had met to discuss options you were going to

17         present at the November 24th meeting?

18   A    I think it happened after we met, when Doctor Wallace

19         and I met, but before the meeting with Doctor

20         Aronson.

21   Q    Okay.  Did you then confer again with Doctor Wallace

22         about what he may have spoken about when he talked to

23         Mr. Rebello?

24   A    I believe so, right before the meeting.

25   Q    Okay.  And what did Doctor Wallace tell you about the

Page 54

1            conversations he may have had with Mr. Rebello

2            concerning options for Doctor Aronson?

3   A   I think the options we came up with were based on

4            what he had discussed with Will Rebello, to the best

5            of my knowledge.

6   Q   One of the options that you mentioned was rating her

7            as unsatisfactory and extending her residency,

8            correct?

9   A   Correct.

10   Q   In terms of extending her residency, did you discuss

11            what options might be included to address extending

12            her residency?

13   A   No.

14   Q   Okay.  So when you talk about extending her

15            residency, is it fair to say that the only option you

16            considered with regard to extending her residency was

17            to add a six-month training period?

18   A   Correct.

19   Q   Did you consider adding -- instead of adding six

20            months to her training, asking her to repeat any

21            specific rotations?

22   A   At some point, we did discuss if there were

23            additional training, that the ICU rotation would be

24            important because that's where she seemed to have a

25            lot of trouble.

```
 1    Q    All right.  But I'm asking a little bit different
 2         question.  The response was reasonable, but I'm
 3         asking whether you considered having her repeat the
 4         ICU rotation as being sufficient extension of her
 5         residency?
 6    A    I believe we did think about that, but because of the
 7         remaining schedule that would be December, January,
 8         and February, we weren't going to be able to fit her
 9         into the ICU during that period, to the best of my
10         knowledge.
11    Q    There was some discussion about trying to put her
12         into ICU in January, right?
13    A    I believe so.
14    Q    We're talking about January of 2009.  And then there
15         was a determination made that based on the notice
16         being too short, you couldn't put her in; is that
17         right?
18    A    I believe that was the reason.  It's very difficult
19         to change an ICU rotation schedule, but --
20    Q    Did you and Doctor Wallace discuss the possibility
21         before finding out whether she could fit into the ICU
22         rotation whether having her repeat the ICU rotation
23         alone might be sufficient opportunity for her to
24         improve her performance?
25    A    I don't believe we had that discussion.
```

Page 56

1    Q    Were you aware of that being an option as an

2         appropriate means to give her opportunity to improve

3         her performance?

4    A    Yes.

5    Q    And forgive me if you answered this question, but I

6         want to be clear of my understanding.

7             Did you consider that as an option, that being

8         repeating only the ICU rotation?

9    A    Is this a yes or no question?

10                       MR. BIXENSTINE:  Only if yes or no

11                  will work.  Otherwise --

12                       MR. GORDILLO:  I think it is, but --

13   A    I don't believe we thought of that as the sole

14        component of the extension, of giving her another

15        option.

16   Q    Is that because you just didn't consider it at the

17        time or you ruled it out as a possibility?

18   A    I believe we didn't think it was sufficient in

19        itself, although it would help very much if she had

20        been able to go through the SICU, get a good

21        performance, and try to squelch some of the negative

22        evaluations she had before.  That would have been a

23        very good option, very good opportunity for her to

24        show that she was improving.

25   Q    When was the first time you examined whether she

Page 57

1          could be put back into another SICU rotation?

2     A    I don't remember the exact time.

3     Q    Was it after the November 24th meeting?

4     A    Most likely.

5     Q    Looking again at Exhibit 43, this would have been a

6          form submitted to the Maryland Board of Physicians,

7          right?

8     A    Yes.

9     Q    Did you have other communication with Sheridan

10         Healthcorp in connection with Doctor Aronson's trying

11         to obtain employment with Sheridan in Maryland?

12    A    Yes.

13    Q    What other communications did you have with Sheridan

14         Healthcorp?

15    A    It was a telephone communication.

16    Q    When did that occur?

17    A    I don't know the exact date.  It was during the

18         period she was trying to get credentialed.

19    Q    It would have been sometime after May 6th?

20    A    Oh, yes.

21    Q    Was it after she had graduated from the program?

22    A    I believe so.

23    Q    Would it have been in September of 2009?

24    A    That's quite possible.

25    Q    Was your communication with Sheridan Healthcorp one

Page 58

1           time only?

2      A    No.  I think there were two conversations.

3      Q    Were both conversations with the same person at

4           Sheridan?

5      A    No -- well, yes.  The first conversation, I believe,

6           was between myself and another physician.

7      Q    Do you know who it was?

8      A    I think it was Doctor Weiss, but I'm not sure.  And

9           then in the second conversation, one other person was

10          included, but I don't remember the name.

11     Q    So the second conversation was with Doctor Weiss and

12          another person?

13     A    Correct.

14     Q    And the other person you think was a physician?

15     A    I think so.

16     Q    But you don't recall who that other physician would

17          have been?

18     A    No.

19     Q    It was another physician from Sheridan?

20     A    Yes.

21     Q    All right.  Let's talk about the first conversation

22          you had with the physician you think was Doctor

23          Weiss.  What was the gist of that conversation?

24     A    I believe he contacted me because of an evaluation

25          that was filled out and sent to him on Doctor

1          Aronson's behalf.

2    Q   And was that an evaluation that you completed?

3    A   Yes.

4    Q   Did he tell you why he was calling you about the

5          evaluation?

6    A   He said there were some concerns about what I had

7          written.

8    Q   Did he tell you what those concerns were?

9    A   Yes.

10   Q   What did he say the concerns were?

11   A   His concerns surrounded the reason for Doctor

12        Aronson's training extension.  I believe it was

13        presented to them by her that there was a health

14        issue involved, and I believe in my report to him, I

15        stated or indicated that the extension was due to

16        performance and professionalism reasons.  And because

17        those two pieces of information were different, they

18        were concerned.

19   Q   And what did you say to Doctor Weiss about those

20        differences or concerns?

21   A   I told him -- I told him the information that was

22        included in the ABA Report.

23   Q   And by the ABA Report, are you referring to the

24        information summarized in the letter that you sent to

25        Doctor Aronson on January 7th of 2009?

Page 60

1    A    I believe so, yes.

2    Q    Let's take a look at Exhibit 1, and Exhibit 1 is the

3         January 7, 2009 letter you sent to Doctor Aronson

4         explaining what was in the ABA Report; is that right?

5    A    Correct.

6    Q    And so in your conversation with Doctor Weiss, you

7         relayed to him in substance the same information that

8         is in the second paragraph of Exhibit 1; is that

9         right?

10   A    That would be correct.

11   Q    Did you respond in any way to Doctor Weiss's having

12        raised a concern that Doctor Aronson had described

13        the problem as a health issue?

14   A    I don't remember that in particular.  I do remember

15        him stating -- yes.  To some extent it was a health

16        issue that had been rectified eventually, because I

17        believe he was involved with her trying to get the

18        job in Florida.  I'm sorry.  I'm just speculating, so

19        I shouldn't.

20   Q    Well, did he ask you what your views were with

21        respect to her representing that the problem was

22        related to a health issue?

23   A    I don't believe he asked me that specifically.

24   Q    As you understood his communicating to you what she

25        had said about the reasons, did you understand her

Page 61

| | | |
|---|---|---|
| 1 | | explanation to be consistent with what you had |
| 2 | | provided on the evaluation form? |
| 3 | A | It didn't appear to be. |
| 4 | Q | You thought the two responses were inconsistent? |
| 5 | A | I didn't see her response.  All I know is what my |
| 6 | | response was.  They were concerned that there were |
| 7 | | inconsistencies in the responses. |
| 8 | Q | Okay.  Based on what Doctor Weiss shared with you |
| 9 | | about her response, did you believe her response and |
| 10 | | your response were inconsistent? |
| 11 | A | Yes. |
| 12 | Q | Why did you believe the two responses were |
| 13 | | inconsistent? |
| 14 | A | Because her training extension was not due to a |
| 15 | | health issue or a transient medical issue that was |
| 16 | | mentioned earlier. |
| 17 | Q | Why did you inform the Maryland Board of Physicians |
| 18 | | that the most likely cause for performance not being |
| 19 | | up to expectations was the influence of medication? |
| 20 | A | Because that's the mechanism.  But the end result is |
| 21 | | her performance was not up to expectation.  If she |
| 22 | | were under the influence of the medication and her |
| 23 | | performance was okay, there would be no need for an |
| 24 | | extension. |
| 25 | Q | Well, you would agree with me that her being under |

Page 62

1        the influence of medication was a health issue.

2    A   That is a health issue, but that's not the reason why

3        her residency was extended.

4    Q   At the time that you wrote that her performance was

5        not up to expectations, most likely cause was the

6        influence of medication, did you believe there was

7        any other cause for her performance not being up to

8        expectations?

9                    MR. BIXENSTINE:  You mean other

10                   possible cause?

11                   MR. GORDILLO:  That's right.

12   A   As I stated before, there are some individuals who

13       just don't have the capability to function as an

14       anesthesiologist.

15   Q   On May 6, 2009, did you hold that belief about Doctor

16       Aronson?

17                   MR. BIXENSTINE:  That she was not

18                   capable of functioning as an

19                   anesthesiologist?

20                   MR. GORDILLO:  Right.

21   A   What I stated at that point is that I thought that

22       she met the minimum requirements and that she was

23       competent to go out and practice on that day.  That's

24       what I believed.

25   Q   And on that day, May 6, 2009, did you believe that

```
1        the reason that Doctor Aronson had not been able to

2        demonstrate sufficient academic and clinical ability

3        to qualify for advancement without conditional or

4        probationary status to the next year and next

5        progressive level of responsibility was because she

6        was unable to multitask?

7                       MR. BIXENSTINE:  Could you read that

8               back?

9                       MR. GORDILLO:  Just to be clear, I

10              took that language right from Question

11              Number 8.

12                      MR. BIXENSTINE:  That's what I was

13              looking for.  So go ahead.

14                      MR. GORDILLO:  Go ahead.

15                      - - - -

16        (Thereupon, record read by Notary.)

17                      - - - -

18   A    Yes.

19   Q    Ann you're belief that she was unable to multitask is

20        distinguished from your belief that she had been

21        under the influence of medication; is that correct?

22   A    Could you repeat that, please?

23   Q    Yes.  Do you think that her ability to -- inability

24        to multitask is different than her performance being

25        under the influence of medication?
```

1    A    Is it different?  I'm not sure I know how to answer
2         that question.
3    Q    What I'm getting at is, as I understood your prior
4         testimony about possible causes, okay, for her
5         performance not being up to expectation, one was she
6         was under the influence of medication and a different
7         possible cause was that she just didn't have the
8         ability to multitask.
9    A    Correct.
10   Q    So I want to know whether the inability to multitask
11        is difference than being under the influence of
12        medication in that context.
13   A    Yes.
14   Q    So when you answered the question, Number 8, about
15        whether Doctor Aronson had demonstrated sufficient
16        academic and clinical ability to qualify for
17        advancement without conditional or probationary
18        status to the next year and next progressive level of
19        responsibility and your answer to that question was
20        no, did you believe that was because she was unable
21        to multitask as distinct from being under the
22        influence of medication?
23   A    I think it was a combination of the two.
24   Q    Why didn't you say that when you filled out the
25        response to the Maryland Board of Physicians?

1    A    I don't know.  At that time, that's probably what I

2         believed.

3    Q    At what time, May 6th?

4    A    Yes.

5    Q    When you say that was probably what you believed,

6         what do you mean by that?

7    A    What I wrote is what I believed at the time.

8    Q    You believed that what you wrote was a complete

9         answer to those questions, 6 and 8?

10   A    Yes.

11   Q    So you believed that it was not necessary to indicate

12        that she was unable to multitask?

13   A    Correct.  They didn't ask for a specific reason.

14   Q    Before you knew that Doctor Aronson was taking

15        Topamax, you had concerns about her ability to

16        multitask, correct?

17   A    Correct.  Although my concerns were mostly about her

18        response times.

19   Q    Look please at Exhibit 40, and the second page of

20        Exhibit 40 that you filled out on September 2nd of

21        2008, you had informed Sheridan Healthcare in Florida

22        that one of the areas Doctor Aronson needed to

23        improve upon was multitasking, right?

24   A    Correct.

25   Q    By May 6th of 2009, you had learned that she had been

1      taking Topamax.  You had learned that she had been

2      evaluated by UHCMC's Employee Assistance Program.

3      You had learned that her performance had improved

4      after you believe she stopped taking the Topamax, and

5      then completed a response to the Maryland Board of

6      Physicians in which you gave no indication that

7      multitasking might have been a cause for continuing

8      her residency program; isn't that true?

9   A  That's true.

10  Q  Did you discuss with Doctor Weiss during that first

11     conversation how you believe Doctor Aronson's taking

12     Topamax may have affected her performance?

13  A  I'm pretty sure we discussed it.  I don't remember

14     the details.

15  Q  You said that you relayed to him what was reflected

16     on the ABA Report; is that correct?

17  A  Yes.

18  Q  And in the ABA Report, did you indicate that Doctor

19     Aronson had failed to carry out her professional

20     responsibility of notifying you that she was taking a

21     prescribed medication that could impair her judgement

22     and her job performance?

23  A  I think we discussed that, but it wasn't a major

24     point.

25  Q  And you can look at Exhibit 1 again, if you'd like

```
 1              to, to refresh your memory, because that's
 2              essentially what you wrote in that second paragraph.
 3      A       Yes.
 4      Q       And so my question is whether you discussed this
 5              specific issue about her not reporting the prescribed
 6              medication to you.  Did you discuss that specific
 7              issue with Doctor Weiss?
 8      A       I believe we did.
 9      Q       And did you discuss that it was Topamax?
10      A       I don't know if I told him what the medication was.
11      Q       Did you discuss your belief that the medication
12              caused her performance to be below expectations?
13      A       I told him that that's what we had suspected.
14      Q       Did you tell him that she had gone to EAP for
15              evaluation?
16      A       I don't know if I was that specific.  I don't
17              remember.
18      Q       Do you remember whether you told him that EAP had,
19              you know, cleared her to return to work?
20      A       I believe I told him that she was fit for duty.
21      Q       You told him she had undergone a fitness-for-duty
22              examination?
23      A       I don't remember exactly, but I do remember
24              discussing the fact that she was fit for duty.  And
25              most likely, I would have mentioned that in the
```

1       conversation.  I mean, it was a fact, so there was no

2       reason to not mention it, I guess.

3   Q   What else do you recall about that first conversation

4       with Doctor Weiss?

5   A   He said, can I call you back at another time and

6       discuss this?

7   Q   Okay.  Anything else?

8   A   No.  I think we covered everything.

9   Q   And then he did call you back?

10  A   Correct.

11  Q   Or at least the two of you spoke again with another

12      physician from Sheridan on the line?

13  A   Correct.

14  Q   How long after the first conversation did the second

15      conversation occur?

16  A   It was a few days.

17  Q   Okay.  And what do you recall about that second

18      conversation?

19  A   They were concerned about credentialing her and they

20      wanted to know if there was anything that we could do

21      to make them more comfortable about her level of

22      performance, and my suggestion was to get more

23      evaluations from other individuals.

24  Q   What else did you talk about, if anything?

25  A   I remember it being a longer conversation than the

1          first one, and I think they asked me some specific

2          examples about her performance.  I don't believe the

3          professionalism issue was a major focus at that

4          second conversation.

5               At this point, I can't remember anything else,

6          but if it comes to me, I'll let you know.

7     Q    You said they asked you about specific examples

8          regarding her performance.

9     A    Yes.

10    Q    Did you give them any?

11    A    I told them my concerns about her ability to respond

12         rapidly in times of stress and her ability to

13         multitask.  I may have not used that word, but it was

14         the gist of my concerns.  And they did ask me if

15         there were other faculty that had concerns, and I

16         told them, yes, there were several faculty members

17         who had concerns about her ability to function and

18         whether or not she was ready to graduate, whether or

19         not she had improved significantly over the course of

20         her residency, those kinds of things.

21    Q    Did you tell them that she had shown you that she was

22         able to appropriately respond?

23    A    I believe I told them that there was some noticeable

24         improvement after the Topamax had been stopped.

25    Q    When they asked you whether others shared your

```
 1            concerns, did you discuss whether any of those

 2            concerns existed after she stopped the Topamax?

 3     A      I don't remember.

 4     Q      Did they ask you whether you would hire her?

 5     A      I don't believe they asked me that in the

 6            conversation.

 7     Q      Did you offer any specific opinions to them about

 8            whether they should hire her?

 9     A      I suggested that if they had any concerns, to hire

10            her as a -- for a probationary period and could see

11            for themselves if she met expectations, if she could

12            function.

13                 I wanted Doctor Aronson to get that job.

14     Q      Well, if you wanted her to get the job, what

15            prevented you from saying, yes, a health issue caused

16            her performance problems?

17     A      In essence, that's what was stated.  I don't know

18            what she told them.  I don't know if she said it was

19            exclusively a health issue and that my response was

20            contrary to that, because I had stated that it was a

21            performance issue most likely related to the Topamax.

22            I don't know.

23     Q      In filling out the evaluation form for Sheridan, why

24            did you provide information different than what you

25            provided to the Maryland Board of Physicians in terms
```

1      of reasons or concerns about the performance?

2   A  I don't think it's different.

3   Q  Well, in the Exhibit 43, you didn't indicate anything

4      about professionalism as an issue, right?

5   A  No, I did not.

6   Q  But in response to Sheridan's inquiry, you did

7      indicate professionalism as one of the concerns,

8      right?

9   A  I believe so.

10  Q  Why?

11  A  Because that was consistent with the report I gave to

12     the ABA.

13  Q  Why didn't you report to the Maryland Board of

14     Physicians consistent with the report you gave to the

15     ABA?

16                  MR. BIXENSTINE:  Objection.

17  A  Because they didn't ask the same question.

18  Q  How were the questions different?

19  A  It says:  Did the applicant demonstrate sufficient

20     academic and clinical ability to qualify for

21     advancement without condition or probationary status?

22     So I addressed her clinical ability, not her

23     professional ability.

24         If they would have asked me, are there any

25     professional issues?  Then I probably would have

1    included it.

2 Q Other than these two conversations that you mentioned

3    and the Exhibit 43, did you provide any

4    communications in connection with Doctor Aronson's

5    trying to get the job with Peninsula?

6 A No.  That was it.

7 Q In the second conversation with Sheridan, you

8    suggested that they might be able to get more

9    evaluations of Doctor Aronson.  Are you talking about

10    the evaluations of faculty to UH?

11 A Yes, I believe.

12 Q Did you tell them that there were going to be

13    positive evaluations available?

14 A I didn't tell them what to expect.

15 Q Why not?  I mean, if you wanted to have her get the

16    job, why didn't you say, she's got positive

17    evaluations that you can get to see?

18 A I don't know why I did not express it in those terms.

19    I thought by suggesting that they get more

20    evaluations, that would prompt them to move in that

21    direction.

22 Q Before you spoke with Doctor Weiss, did you know who

23    Doctor Weiss was?

24 A No.

25 Q That's the first time you had communication with

```
1              Doctor Weiss?

2    A    I believe so.

3    Q    During the second conversation, you mentioned that

4         Sheridan shared with you that they were concerned

5         about credentialing Doctor Aronson, right?

6    A    Mm-hmm.

7    Q    What did they tell you -- what did they tell you

8         specifically in connection with their being concerned

9         about credentialing her?

10   A    That there was a discrepancy between what she had

11        told them and what I had told them.

12   Q    Okay.  So in the second conversation, Sheridan was

13        telling you that because of a discrepancy between

14        what she told you and what you told them, they had

15        concerns about whether they were going to be able to

16        get her credentialed; is that accurate?

17                   MR. BIXENSTINE:  I think you meant

18              what she told them and what you told

19              them.

20                   MR. GORDILLO:  Yes.  I'm sorry if I

21              misspoke.

22   A    I believe so.

23   Q    Did they tell you anything else about concerns they

24        had regarding her credentialing?

25   A    I don't think so.
```

Page 74

```
 1    Q    Did you make any effort during either the first or
 2         the second conversation you had to help resolve
 3         favorably to Doctor Aronson the concerns that
 4         Sheridan was having about a perceived inconsistency
 5         between what she had told them and what you had told
 6         them?
 7    A    I believe I demonstrated that by cooperating with
 8         them during the conversation and coming up with some
 9         suggestions.
10    Q    Well, you would agree with me you could cooperate and
11         come up with suggests that would help them to
12         unfavorably resolve that concern, right?
13    A    No.  Not unfavorably.
14    Q    Well, my point is that cooperating with Sheridan
15         alone isn't going to determine or even influence how
16         that concern would be resolved, is it?
17    A    I suppose if they didn't like what I was saying or
18         they didn't trust what I was saying, they wouldn't
19         have ultimately credentialed her.
20    Q    Did you make any attempt to provide them with
21         objective or subjective information that would assist
22         them in resolving their concern about the perceived
23         inconsistency favorable to Doctor Aronson?
24                   MR. BIXENSTINE:  Besides what he
25              told you already?
```

Page 75

```
 1                    MR. GORDILLO:  Yes.

 2    A    I don't believe so.

 3    Q    And you made no attempt to try to explain how the two

 4         responses might be consistent; is that accurate?

 5    A    No.  That's not accurate.  In our discussions, we

 6         went over the differences.  Even though we discussed

 7         them, it didn't change the fact that they were

 8         different.

 9    Q    So did you then confirm for them that the answers

10         were inconsistent?

11    A    No.

12                    MR. GORDILLO:  Would you please read

13              back his answer before this one?

14                         - - - -

15         (Thereupon, question read by Notary.)

16                         - - - -

17    Q    (By Mr. Gordillo)  By the time you were having the

18         conversation with Sheridan, you had most likely

19         graduated Doctor Aronson from your program, right?

20    A    Correct.

21    Q    And the graduation signifies your assessment and the

22         program's assessment that Doctor Aronson was

23         competent to practice independently as an

24         anesthesiologist, correct?

25    A    Correct.
```

Page 76

1   Q   And did you understand that Sheridan was contacting

2       you with concerns about whether that was accurate?

3   A   Correct.

4   Q   And can you describe for me anything you said

5       specifically in your two conversations with Sheridan

6       that would have bolstered your opinion that Doctor

7       Aronson was competent to practice independently?

8                   MR. BIXENSTINE:  Objection.

9   A   No.

10  Q   In the middle of October, October 14, 2008, is it

11      fair to say you did not believe that Doctor Aronson

12      was yet competent to practice independently?

13  A   Correct.

14  Q   Did you believe that her performance deficiencies

15      would be a public safety threat at that point?

16  A   Yes.

17  Q   Why didn't you remove her from the ICU rotation?

18  A   She needed to complete a certain number of months in

19      the ICU to meet ACGME requirements.  That could have

20      been one of the reasons.  The other one is that even

21      though she was performing below expectations, there

22      are other individuals who are supervising her that

23      could help in case she needed assistance in managing

24      any patients.

25  Q   After the time that you had communications with

1        Sheridan Healthcorp in Maryland, did you learn that

2        Doctor Aronson subsequently sought employment with

3        the Hamot Group in Pennsylvania?

4    A   Yes.

5    Q   And did you have any communication with anyone in

6        connection with the Hamot Group employment?

7    A   Yes.

8    Q   Tell me about that communication.

9    A   They called me in response to an evaluation that I

10       sent them and wanted more information.

11   Q   Who called you?

12   A   I knew you were going to ask me that.

13           It was an administrator, but it wasn't a

14       physician.  It was a female.  I talked to her

15       briefly.  Then she asked me if I would talk to the

16       chairman, or whoever was in charge of that

17       department, and I can't remember either one of those

18       names.  If you have that information, I can confirm

19       it if I read it.

20   Q   Did you speak with the department chair?

21   A   Yes, I did.

22   Q   How many times did you speak with the department

23       chair?

24   A   I believe twice.

25   Q   Other than the brief conversation with the

1        administrator and the two conversations with the

2        department chair, did you have any communication with

3        Hamot about Doctor Aronson's employment there?

4   A   No.

5   Q   What did the administrator tell you about the purpose

6        for her call?

7   A   They wanted some clarification about what was in the

8        reference form.

9   Q   Did they tell you specifically what they wanted

10       clarified?

11   A   I'm sure they did.  If I had a copy of the form, I

12       could probably recall.  I don't remember.  I remember

13       that it was -- the conversation was insufficient for

14       her, that's why she requested me to talk to the

15       chairman.

16   Q   How long after you spoke with the administrator did

17       you speak with the chairman?

18   A   Well, it was just a couple minutes.  She put me on

19       hold and --

20   Q   And tell me about the conversation -- that first

21       conversation with the chairman.

22   A   He asked me what my opinion was or what -- he asked

23       me to clarify something I wrote in the evaluation.

24   Q   Do you recall what you told him?

25   A   I told him that -- confirmed that Doctor Aronson was

Page 79

1           a resident in our program and that she had met all

2           the requirements for graduation, that her residency

3           was extended by six months, and I believe that was

4           it.

5     Q     Did he ask you why her residency had been extended by

6           six months?

7     A     Yes.

8     Q     What did you tell him?

9     A     I told him because of performance issues.

10    Q     Did he ask you what those performance issues were?

11    A     I believe so.

12    Q     What did you tell him that they were?

13    A     Her inability to respond appropriately and rapidly in

14          times of stress.

15    Q     Anything else?

16    A     Not that I can remember.

17    Q     Did you discuss concerns about her professionalism?

18    A     I don't think he asked me about professionalism.  I

19          think he wanted to focus in on her clinical ability.

20    Q     Did you discuss anything about her health?

21    A     I can't remember if the Topamax issue came up

22          specifically.  I believe I told him that she was on a

23          medication and we thought that it might have impaired

24          her cognitive function and we extended her residency

25          so that we could witness some improvement and then

Page 80

| | | |
|---|---|---|
| 1 | | graduate her.  There some HIPAA issues I have to |
| 2 | | dance around when you're talking about healthcare |
| 3 | | issues with others, so I have to respect some of her |
| 4 | | rights, as well. |
| 5 | Q | Well, you knew she waived everything in terms of your |
| 6 | | right to share information, right? |
| 7 | A | I suppose so, yes.  She probably did sign the waiver. |
| 8 | Q | So you weren't really concerned about HIPAA, were |
| 9 | | you? |
| 10 | A | Yes, I was. |
| 11 | Q | Even though you knew that she had given you a waiver? |
| 12 | A | I recognize that now.  I'm not sure I recognized that |
| 13 | | she had signed a waiver, and that's what I meant at |
| 14 | | the time.  So I didn't think that the name of the |
| 15 | | drug was as important as the fact that she was on the |
| 16 | | medication and we stopped it to see what the response |
| 17 | | would be. |
| 18 | Q | And did you discuss any specific examples of Doctor |
| 19 | | Aronson being unable to respond appropriately? |
| 20 | A | I don't recall. |
| 21 | Q | What else did you discuss with the department chair |
| 22 | | during that first conversation? |
| 23 | A | He asked me if there was a lawsuit. |
| 24 | Q | And what did you tell him about that? |
| 25 | A | I said yes. |

Page 81

1   Q   Did you discuss anything about the details of the

2       lawsuit?

3   A   No, I did not.

4   Q   So he asked you if there was a lawsuit.  You said

5       yes.  That was the end of the conversation about the

6       lawsuit?

7   A   He said, I will find out for myself.

8   Q   Okay.  What else did you discuss in that first

9       conversation with the department chair?

10  A   I think that's about it; performance issue and the

11      lawsuit issue.

12  Q   During that first conversation, did the department

13      chair give you some indication that there might be a

14      follow-up conversation?

15  A   No.

16  Q   You said there were two conversations, though, right?

17  A   Yes.

18  Q   How long after the first conversation did the second

19      conversation occur?

20  A   Again, probably a few days to a week.

21  Q   Before the first conversation occurred, did you

22      confer with anyone, excluding legal counsel, about

23      how you would respond to employment inquiries

24      regarding Doctor Aronson?

25  A   No.  Only discussed that with legal counsel.

Page 82

1   Q   Okay.  And I should have asked, but with respect to

2       your responses to Sheridan Healthcorp, the Maryland

3       job, did you discuss how to respond to those

4       inquiries with anyone other than legal counsel?

5   A   Probably Doctor Nearman.

6   Q   Right.  And I think you testified in terms of

7       providing the information to the Maryland Board of

8       Physicians, you talked to Doctor Nearman?

9   A   Yes.

10  Q   I'm talking specifically now with respect to Sheridan

11      as apart from the Board of Physicians, did you

12      discuss how you would respond with Doctor Nearman?

13  A   No.  I think I discussed the conversation after.

14  Q   And what did Doctor Nearman say to you during that

15      conversation?

16  A   I don't remember.

17  Q   We've been talking about this conversation with the

18      department chair at Hamot, right?

19  A   Correct.

20  Q   That was the Chair of Anesthesia?

21  A   Yes.

22  Q   Doctor Simon?  If I give you a name, does that ring a

23      bell?

24  A   That name is familiar from the past.

25  Q   Okay.

```
1    A    Is it S-y-m-o-n?

2    Q    S-i-m-o-m.

3    A    That name sounds familiar, but I'm not sure.

4    Q    And the two conversations you had was with the same

5         person, right?

6    A    Correct.

7    Q    Is it accurate to say that you did not have the

8         understanding that the person you were speaking to

9         was chair of the Credentialing Committee at Hamot?

10   A    I don't think -- I was not under the impression that

11        this person was the chairman of the Credentialing

12        Committee.

13   Q    Tell me about the second conversation that you had.

14   A    It was very brief.

15   Q    Okay.

16   A    He called and told me that he had confirmed that

17        there was a lawsuit and he was aware of the nature of

18        the lawsuit.  He obtained it through some public

19        forum -- I'm not sure -- and that he wouldn't be

20        contacting me anymore.

21   Q    And that's all he said?

22   A    That's all he said.

23   Q    So during the first conversation -- when the first

24        conversation ended, did you have any reason to expect

25        follow-up contact from the department chair?
```

1    A    No.

2    Q    Is it fair to characterize the second call as one of

3         out of the blue, to you?

4    A    Was I surprised that he called me?

5    Q    Yes.

6    A    Yes.

7    Q    And the only thing he said, was we confirmed the

8         lawsuit and we're not going to contact you again?

9    A    Yes.

10   Q    Do you have any thought about why that call would

11        have been made?

12                  MR. BIXENSTINE:  Objection.  Go

13             ahead.

14   A    Only because he told me at the end of the first

15        conversation that he would look into the possible

16        legal action that was going on at the time.

17   Q    During the second conversation, he didn't ask you any

18        questions about your thoughts about the lawsuit?

19   A    No.  It was very brief.

20   Q    When you completed the evaluation form for Hamot, did

21        you believe that it might cause delay in Doctor

22        Aronson getting credentialed for the Hamot job?

23   A    Based on the nature of this business that I'm in, I

24        believe that it probably would have raised some

25        eyebrows on the other side.

Page 85

```
 1     Q     Is the same thing true of the evaluation form you

 2           completed for Sheridan and the Maryland job that

 3           Doctor Aronson was seeking?

 4     A     Most likely.

 5     Q     Since applying for the job at Hamot, Doctor Aronson

 6           has continued to apply for other jobs.  Were you

 7           aware of that?

 8     A     Yes, sir.

 9     Q     Are you currently involved in providing any

10           information regarding Doctor Aronson's residency to

11           prospective employees for her?

12     A     No, I'm not.

13     Q     Is the last time you provided information regarding

14           Doctor Aronson's residency the communications you had

15           with Hamot?

16     A     No.

17     Q     Since those communications with Hamot, to whom have

18           you communicated in terms of prospective employers

19           about Doctor Aronson's residency?

20     A     I filled out an evaluation form about a month and a

21           half ago, and I don't remember who it was from.  It

22           was five brief questions.  They were all factual

23           information.  They were yes and no answers that

24           required no explanation, and that was the last and

25           only evaluation that I filled out since she applied
```

```
 1              for Hamot.

 2    Q    So other than that one evaluation, you have not

 3         provided any communications to any prospective

 4         employers regarding Doctor Aronson?

 5    A    That's correct.

 6              MR. GORDILLO:  This is probably as

 7              good a place as any to break if we want a

 8              lunch break.

 9              MR. BIXENSTINE:  Okay.

10              - - - -

11         (Thereupon, recess was had.)

12              - - - -

13              MR. GORDILLO:  Back on the record.

14              Would you read the last question

15              and answer, please?

16              - - - -

17         (Thereupon, question read by Notary.)

18              - - - -

19    Q    (By Mr. Gordillo)  I want to talk to you again about

20         the November 24th meeting in 2008 with you and Doctor

21         Wallace and Doctor Aronson.  At that meeting, the

22         three of you discussed having Doctor Aronson undergo

23         evaluation by Employee Assistance, right?

24    A    Correct.

25    Q    The referral of Doctor Aronson was a mandatory Tier 1
```

1              referral.  Are you familiar with that?

2    A    Yes.

3    Q    You did not make the referral?

4    A    No, I did not.

5    Q    It was Doctor Wallace?

6    A    Correct.

7    Q    He did not make that referral on November 24th,

8         right?

9    A    I believe it was the next day.

10   Q    Did he discuss that referral with you after the

11        November 24th meeting?

12   A    Not immediately.

13   Q    Did he tell you about it before he made the referral?

14   A    Yes.

15   Q    When did he tell you?

16   A    We discussed it right after the meeting with Doctor

17        Aronson.

18   Q    Okay.  And the two of you had not decided during the

19        meeting that you were going to make a mandatory

20        referral; is that correct?  The two of you being you

21        and Doctor Wallace.

22   A    I believe at the meeting we discussed EAP evaluation,

23        and in my mind, that meant that we were going to make

24        a referral.  So I was satisfied leaving that meeting

25        that that's what was going to happen.

1    Q    And leaving that meeting, did you believe that Doctor

2         Aronson was going to be removed from service for that

3         referral?

4    A    Yes.  That was my expectation.  That was part of the

5         process.

6    Q    Did you know that Doctor Wallace was going to make

7         the referral on November 25th?

8    A    I believe he told me after the meeting that he was

9         going to make it the next day.

10   Q    Did the two of you discuss whether he should make the

11        referral or you should make the referral?

12   A    No.  He always made the referrals when those

13        situations arose.

14   Q    Why?

15   A    That was unofficially designated his duties as

16        co-director.

17   Q    When did you learn that he had in fact made the

18        referral?

19   A    I think when I came back to work after Thanksgiving.

20   Q    The referral was made before Thanksgiving?

21   A    Correct.

22   Q    Did you have a conversation with Doctor Aronson in

23        which you told her that you didn't know that she had

24        been removed from service?

25   A    I believe I had a conversation with her sometime

```
 1              after that.  I knew she had been relieved from
 2              service because of the evaluation.  I didn't know
 3              what the effective date was.  I believe I was on
 4              vacation that week.
 5       Q      So you learned about her actual removal from service
 6              after you returned from vacation?
 7       A      I believe so.  That was the week of Thanksgiving.
 8       Q      And you may have informed her of that, that you
 9              didn't learn about her actual removal, until you
10              returned from vacation?
11       A      That's possible.
12       Q      And the decision to have her referred to EAP was made
13              by whom?
14       A      By the three of us.
15       Q      You were in agreement with that decision?
16       A      Yes.
17       Q      Why did you think it was a good idea to have her
18              referred to EAP?
19       A      It's almost part of standard process.  If you have a
20              reason to believe someone is not fit for duty, you
21              want them to be evaluated and you want a confirmation
22              that they are fit for duty, and since we had a reason
23              to believe that there was a cause, in other words the
24              Topamax, it was reasonable at that time to have her
25              evaluated.
```

Page 90

1    Q    Okay.  And she was evaluated, right?

2    A    I believe so, yes.

3    Q    And the evaluation was to see whether she was fit for

4         duty, right?

5    A    Correct.

6    Q    And at the conclusion of that evaluation, EAP

7         released her to return to work, right?

8    A    Yes.

9    Q    In other words, EAP's evaluation of whether she was

10        fit for duty came back with an answer of yes, she was

11        fit for duty, correct?

12   A    Correct.

13   Q    What's your understand of what fit for duty means?

14                    MR. GORDILLO:  Off the record.

15                        - - - -

16        (Thereupon, a recess was had.)

17                        - - - -

18                    MR. GORDILLO:  Would you read back

19              the last question?

20                        - - - -

21        (Thereupon, record read by Notary.)

22                        - - - -

23   A    My understanding is that if there are no discernible

24        causes to impair an individual's ability to work or

25        train, then they are fit for duty.

1    Q    And so when EAP released Doctor Aronson to go back to

2         work, did you believe that there were no apparent

3         causes to impair her ability?

4    A    Yes.  Correct.

5    Q    And she was referred to EAP because you believe there

6         might be a cause that was impairing her ability, fair

7         enough?

8    A    Fair enough.

9    Q    In early December or late November of 2008, you gave

10        a letter of recommendation to the Florida License

11        Board regarding Doctor Aronson.  Do you recall that?

12   A    I believe I did.

13   Q    And do you recall whether it was a positive letter of

14        recommendation?

15   A    I do not.  I don't remember the details.

16                  MR. BIXENSTINE:  What time did you

17             say it was?

18                  MR. GORDILLO:  Late November/early

19             December.

20                       - - - -

21   (Thereupon, Exhibit 44 was marked for the purpose of

22                  identification.)

23                       - - - -

24   Q    (By Mr. Gordillo)  You've been handed a document

25        marked as Exhibit 44.  Take all the time you'd like

```
 1              to look it over and let me know when you've had an

 2              adequate opportunity to review it.

 3      A       Okay.

 4      Q       Do you recognize this document?

 5      A       Yes.

 6      Q       Can you tell me what it is, please?

 7      A       It's a series of emails messages; one from Doctor

 8              Aronson to me and one from me to her in reply.

 9      Q       And this is emails about the letter you sent to the

10              Florida Licensing Board, right?

11      A       Yes.

12      Q       Indicating that you wrote and signed it the week

13              before December 8th?

14      A       Yes.

15      Q       And Kathi is someone who would have sent it out at

16              your direction?

17      A       Kathi is my secretary, yes.

18      Q       At the time you sent the letter out, you were not yet

19              aware of EAP's evaluation of Doctor Aronson; is that

20              true?

21      A       Based on the timing, that would probably be true.

22      Q       You knew she had been referred for evaluation but

23              didn't know how that evaluation was coming out; is

24              that fair?

25      A       That's fair.
```

1  Q  How did you learn that EAP had determined that Doctor

2     Aronson was fit for duty?

3  A  I don't remember.

4  Q  Were you given any details about the evaluation of

5     her?

6  A  No.

7  Q  Do you remember whether you learned from someone in

8     EAP directly that she was cleared for return to work?

9  A  No.  I did not hear from anyone from EAP.  I made no

10    communication with them at all.

11 Q  Was Doctor Wallace the primary contact with EAP in

12    connection with her fitness-for-duty evaluation?

13 A  Yes.

14 Q  Were you in communication with Doctor Wallace about

15    getting Doctor Aronson back into service after her

16    referral to EAP?

17 A  Most likely.

18 Q  Did you discuss with Doctor Wallace whether Doctor

19    Aronson's return to work was being delayed for any

20    unnecessary reasons?

21 A  No.

22 Q  Did you discuss whether her return to work was being

23    delayed for any necessary reasons?

24 A  No.

25 Q  Were you aware that she had been evaluated as being

Page 94

1          fit for duty and then a delay occurred between the

2          time that she received that evaluation and the time

3          that she was able to return to work?

4                    MR. BIXENSTINE:  Objection.

5     A    I believe I heard about that at the time, but I don't

6          remember the details.

7                         - - - -

8     (Thereupon, Exhibit 45 was marked for the purpose of

9                    identification.)

10                        - - - -

11    Q    (By Mr. Gordillo)  All right.  You've been handed a

12         document marked as Exhibit 45.  As always, please

13         take all the time you'd like to look it over and let

14         me know when you've had an adequate opportunity to

15         review it.

16    A    Okay.

17    Q    Do you recognize the document?

18    A    Yes.  It's a series of email messages from Doctor

19         Aronson to Will Rebello to me back to her and then

20         back to me.  This refreshes my memory of what you

21         just asked.

22    Q    Okay.  Great.  And specifically about her having her

23         EAP evaluation completed in a time period between the

24         time that her evaluation was completed and the time

25         she returned to work, correct?

1     A     Correct.

2     Q     And on December 12th of 2008, she had written to

3           Mr. Rebello asking about a return to work, right?

4     A     Yes.

5     Q     On December 13th, she forwarded that message to you,

6           right?

7     A     Correct.

8     Q     And she's asking you for what her plan is regarding

9           her return to work, right?

10    A     Correct.

11    Q     The 13th was a Saturday.  She's telling you she got

12          the report on the Tuesday before, correct?

13    A     Right.  Correct.

14    Q     Now, she's particularly concerned about days that she

15          has left.  She refers to to reach the 60 she was

16          allowed away from residency, correct?

17    A     Correct.

18    Q     And she was correct about the fact that she's only

19          allowed 60 days away from the residency, correct?

20    A     Correct.

21    Q     And the 60 days are calendar days, right?

22    A     Yes.

23    Q     In other words, they're not determined by work week

24          or schedules, it's just whatever the days are on the

25          calendar.  Right?

1    A    I believe so, my interpretation of what you're trying

2         to say.

3    Q    I'm just getting at that there isn't -- every day of

4         a year counts as a day in the context of a residency,

5         right?  And if you miss any day in the year --

6    A    Any work day.

7    Q    That's my question.

8         But the work days are taken from the 365 days of

9         the year, right?

10   A    Correct.

11   Q    So as a resident, you can be scheduled to work on any

12        one of those 365 days, right?

13   A    Correct.

14   Q    So is it reasonable for her to assume, as your

15        understanding as program director, that the issue

16        about returning to work is one that matters with each

17        day that passes?

18   A    Correct.

19   Q    You did not -- she sent you an email in the morning

20        of Saturday December 13th, correct?

21   A    Correct.

22   Q    Why did you wait until Monday, 12:33 to respond?

23   A    That's probably when I got back to work.  I didn't

24        have my Blackberry then.

25   Q    And then your response to her is:  We'll discuss this

Page 97

1      with Dave when all the information is together, this

2      week I hope, right?

3   A  Correct.

4   Q  Dave is Doctor Wallace, right?

5   A  Correct.

6   Q  What was it specifically that you had to discuss with

7      Doctor Wallace about returning Doctor Aronson to work

8      at this point, December 15th?

9   A  If he had gotten information from EAP that said it

10     was time for her to return to work.  Just because the

11     evaluation is over, the EAP evaluation is over,

12     doesn't mean we instantly get a letter or document

13     that says she's fit to go back to work.

14        I just recently learned that in a situation we

15     had a few months ago with another resident.

16  Q  All right.  But as of December 15, 2008, what was

17     your concern that you had to discuss with Dave?

18  A  That we had documentation from the EAP that said she

19     was ready to return to work.

20  Q  Okay.

21  A  In her letter she says:  I got the final report from

22     my evaluation on Tuesday.  But I don't know if

23     Dave -- Doctor Wallace -- received information from

24     EAP that stated that even though the evaluation was

25     complete, was she ready to go back to work.  There's

1          usually a few day's delay.  I have found out recently

2          when that occurs.

3    Q   Is there anything that prevented you from contacting

4          EAP directly?

5    A   Once the resident is referred to EAP, we are not

6          supposed to have any contact with them or with the

7          resident, is my understanding.

8    Q   Well, somebody had to have contact with EAP to get

9          the evaluation that was going to release her to work,

10        right?

11   A   The EAP has to contact us.

12   Q   Are you saying you cannot initiate contact with EAP?

13   A   That was my belief, yes, and it still is.  When the

14        resident is under their care or their evaluation, we

15        are not to interfere, and they will let us know when

16        their evaluation is complete and when she can return

17        back to work.

18   Q   Just so I'm clear, Doctor Aronson informed you as of

19        December 13th she believed she completed the

20        evaluation, and you understood that she wanted to get

21        back to work, right?

22   A   Of course.

23   Q   And your belief is that it's the policy of the

24        program to prevent you from following up with EAP at

25        the request of the person referred to EAP so that

1        person can go back to work; is that right?

2    A    That's correct.

3    Q    Did you respond to the top email that is on Exhibit

4        45 that Doctor Aronson sent to you December 15th?

5    A    I don't remember.

6    Q    Did you in fact discuss her EAP evaluation and return

7        to work with Doctor Wallace as you indicated in your

8        email of December 15th?

9    A    I believe I did, but I don't remember the details of

10       the conversation.

11    Q   Before the November 24th meeting, did it occur to you

12       that Doctor Aronson should be referred to EAP?

13    A   No.

14    Q   What happened during the November 24th meeting that

15       caused you to believe that she should be referred to

16       EAP?

17    A   She disclosed the information about the Topamax.

18    Q   And so is it fair to say that before she told you

19       about Topamax, she had not exhibited any symptoms

20       that suggested to you that she should be referred to

21       EAP?

22    A   I had not considered it before then.

23    Q   Is your answer to my question yes?

24    A   Yes.

25    Q   After Doctor Aronson was removed for a

1   fitness-for-duty examination -- removed from service

2   for a fitness-for-duty examination -- she had

3   informed you that she was surprised by that decision;

4   isn't that true?

5   A   I don't remember.

6   Q   Did you learn that she had disagreed with the

7   decision to remove her from clinical service?

8   A   My recollection of that meeting is that she agreed to

9   that, maybe reluctantly, but she agreed to it.  And

10  we were all under the impression that if EAP was

11  consulted, she would most likely be taken off of

12  service.

13  Q   You have a specific recollection of the conversation

14  on the November 24th meeting that Doctor Aronson

15  could expect to be removed from service if there was

16  an EAP referral?

17  A   I know we had that conversation.

18                     - - - -

19  (Thereupon, Exhibit 46 was marked for the purpose of

20                  identification.)

21                     - - - -

22  Q   (By Mr. Gordillo)  You've been handed a document

23  marked as Exhibit 46.  Please take all the time you'd

24  like to look it over and let me know when you've had

25  an adequate opportunity to review it.