1    A    Okay.

2    Q    Do you recognize the document?

3    A    Yes.

4    Q    Tell me what it is, please.

5    A    It's letter from Doctor Aronson to me.

6    Q    Okay.  And did you in fact receive this document on

7         or about December 4th of 2008?

8    A    I think so.

9    Q    Okay.  And she indicates in the cover letter that she

10        corrected this document based on a typo error, right?

11   A    Yes.

12   Q    And if you look on the second page at the top of the

13        documents dated November 28th of 2008, do you recall

14        having received a document close to that date?

15   A    Yes.

16   Q    Okay.  And she begins the document by saying that

17        she's responding to the recent performance review of

18        mid October and November 24th and the decision of

19        Doctors Wallace and Norcia to remove her from

20        clinical service pending a fitness for duty

21        evaluation; do you see that?

22   A    Yes.

23   Q    When you received this correspondence, you understood

24        that was the subject she was addressing, right?

25   A    Yes.

1    Q    And the next paragraph, she indicates that she did

2         not feel the decision was justified, right?

3    A    Correct.

4    Q    So as of on or about November 28th, you knew that she

5         didn't feel that this decision to remove her from

6         clinical service pending a fitness-for-duty

7         evaluation was justified, right?

8    A    Yes.

9    Q    And the next to last paragraph and the next to last

10        sentence of that paragraph she wrote:  I did not

11        anticipate being removed from clinical duties as a

12        result of that referral and question the necessity of

13        that approach.  Do you see that?

14   A    Yes.

15   Q    And as you sit here today, you have specific

16        recollection of informing her on November 24th that

17        if she was going to be referred for fitness-for-duty

18        that she would be removed from clinical duties; is

19        that correct?

20   A    That's correct.

21   Q    Do you believe she had any reasonable basis to write

22        that she did not anticipate being removed from

23        clinical duties as a result of that referral?

24             MR. BIXENSTINE:  Objection.

25   A    I don't know what the basis of her opinion is there.

Page 103

1    Q    I'm not asking if you knew what her basis is.  I'm

2         asking based on what you know to have occurred during

3         the 24th meeting and having read what she wrote to

4         you on November 28th whether you believe she had any

5         reasonable basis for writing it?

6                    MR. BIXENSTINE:  Objection.

7    A    No.

8    Q    Did you discuss with Doctor Aronson this

9         correspondence that is Exhibit 46?

10   A    Not specifically.

11   Q    Why not?

12   A    I don't remember.

13   Q    You never went back to her and said, hey, what do you

14        mean you didn't anticipate being removed from

15        clinical duties?  We talked about that.

16   A    We did have an unscheduled impromptu meeting one

17        afternoon during that period where we sat down and

18        discussed a lot of things.  Maybe that meeting was in

19        response to this.  I'm not sure.

20   Q    Did you ever tell her she was mistaken for not

21        anticipating that she was going to be removed from

22        clinical duties?

23   A    I don't remember saying that, no.

24   Q    Was there any discussion at the November 24th meeting

25        of involving EAP in the process without removing her

Page 104

1      from clinical duties?

2    A    I don't remember.

3    Q    You knew that Doctor Aronson was planning a family

4         leave the end of December 2008?

5    A    Correct.

6    Q    When did you learn that she was planning that leave?

7    A    I do not remember.

8    Q    Is it fair to say that you knew about it several

9         weeks before that week, correct?

10   A    Probably yes.

11   Q    Before October 14th, you knew about her desire to

12        take that leave at the end of December, right?

13   A    I don't remember if it went back that far.

14   Q    Before November 24th you knew?

15   A    Most likely.

16   Q    How did you learn that she wanted to take the family

17        leave?

18   A    She may have told me.

19   Q    Okay.  And before November 24th, did you discuss with

20        Doctor Wallace that Doctor Aronson wanted to take

21        family leave at the end of December?

22   A    I don't think we had any point of discussions

23        regarding that topic.

24   Q    But one of his responsibilities was scheduling the

25        rotations, right?

1    A    Correct.

2    Q    And he would have needed to know that she was going

3         to take time off at the end of December to schedule

4         the rotations, correct?

5    A    Correct.

6    Q    He would have known that she was planning on taking

7         that time off before -- he would have had to have

8         known that before November 24, 2008, right?

9    A    You'd have to ask him.  I don't know what he knew.

10   Q    When Doctor Aronson returned to work after the

11        fitness-for-duty evaluation, she had concerns about

12        how that time off was going to affect her taking

13        leave, her family leave, in December, right?

14   A    Most likely.

15   Q    She shared those concerns with you.  Do you recall

16        that?

17   A    I believe we discussed that in one of our

18        conversations.

19                       - - - -

20   (Thereupon, Exhibit 47 was marked for the purpose of

21                    identification.)

22                       - - - -

23   Q    (By Mr. Gordillo)  You've been handed a document

24        marked as Exhibit 47.  Please take all the time you'd

25        like to look it over and let me know when you've had

Page 106

```
 1              an adequate opportunity to review it.

 2     A        Thank you.  Okay.

 3     Q        Do you recognize the document?

 4     A        Yes.

 5     Q        Can you tell me what it is, please?

 6     A        This is a series of email messages from Doctor

 7              Aronson to myself and Doctor Wallace.

 8     Q        And as you look at that document, does it refresh

 9              your recollection about Doctor Aronson's discussing

10              with you the impact on her days off of work earlier

11              in the month of December with respect to wanting to

12              take time off for family leave?

13     A        Yes.

14     Q        The email here on this exhibit, the first email is

15              dated December 19th, right, from Doctor Aronson to

16              you and Doctor Wallace, correct?

17     A        Correct.

18     Q        And you see the last email in the string is four days

19              later, December 23rd, right?

20     A        Correct.

21     Q        In between the 19th and the 23rd, were you and Doctor

22              Wallace talking about the concerns being raised by

23              Doctor Aronson in these emails?

24     A        I don't remember.

25     Q        Do you remember responding to any of these emails?
```

1    A    No, I don't.

2    Q    Do you know why you wouldn't have responded?

3    A    No, I don't.

4    Q    Do you know whether you responded?

5    A    I don't remember.  It's right before Christmas.

6         Nothing comes to memory.

7    Q    Before Doctor Aronson took her family leave at the

8         end of December, did you have any conversations with

9         Doctor Wallace about it?

10   A    I'm sure we had conversations about it, but I don't

11        remember details, other than making sure that she got

12        her time off.

13   Q    I asked you earlier this morning about the decision

14        to extend Doctor Aronson's training by six months,

15        and you told me that you'd had a conversation with

16        Doctor Aronson and Doctor Wallace and that you also

17        had a conversation regarding the subject with Doctor

18        Nearman and Doctor Aronson, right?

19   A    Correct.

20   Q    I want to talk about the meeting with Doctor Nearman.

21   A    Okay.

22   Q    Do you recall when that happened?  And you said

23        sometime after November 24th before, but I'm asking

24        if you've had any further recollection about when it

25        might have happened.

```
 1      A    It would have to have been between November 24th and,

 2           I believe, the beginning of January.

 3      Q    Where did the meeting happen?

 4      A    Doctor Nearman's office.

 5      Q    How long did it last?

 6      A    Maybe a half an hour.

 7      Q    And what do you remember being said during the

 8           meeting?

 9      A    We discussed the ramifications of Doctor Aronson's

10           residency extension.

11      Q    And what were the ramifications that were discussed?

12      A    She was concerned about how it would look on her

13           record and how she would have to explain this in the

14           future and if there was any other options that we

15           could pursue.

16      Q    And how did you and/or Doctor Nearman respond to

17           those concerns?

18      A    We basically reiterated the options -- or I

19           reiterated the options that we presented to her on

20           November 24th stating that the residency extension

21           would have the least amount of impact on her record

22           because it was not reportable.  It was not a critical

23           incident, and it would not be reported as a

24           suspension or anything negative, other than the

25           extension itself.
```

```
 1              We also discussed the fact that it was not

 2         appealable, and that was something that Doctor

 3         Aronson was concerned about.  However, the other

 4         options at that time were appealable; the options of

 5         terminating the residency or not allowing her to

 6         graduate at the end of her term.  Those would be

 7         appealable.

 8    Q    They would be appealable, but if she lost, they would

 9         also be reportable, correct?

10    A    They are reportable even if she didn't appeal.

11    Q    Right.  I said if she did appeal and lost, it would

12         also be reported?

13    A    Correct.

14    Q    And by reported would mean reported to the ABA or the

15         National Practitioner's Databank?

16    A    Correct.  National Practitioner's Databank.

17    Q    Did she express to you during which meeting that the

18         fact of an extension was likely to have a negative

19         impact on her record?

20    A    Yes.

21    Q    And you understood that, right?

22    A    Yes.

23    Q    She was correct about that?

24    A    She was correct.

25    Q    Is it accurate then to say the only way she could
```

1          have avoided any negative impact on her record was to

2          have accepted a disciplinary decision, appealed the

3          decision, and prevailed in the appeal?

4   A    That might have been it, yes.

5   Q    When talking about the extension of training and the

6          fact of not having any appeal available, do you

7          believe you were clear about the intent to give her

8          an unsatisfactory rating for the period of July

9          through December of 2008, and in connection with that

10        unsatisfactory rating, extend her training?

11   A    Yes.

12   Q    And you understood she wanted there to be some kind

13        of appeal process?

14   A    She had requested that there be an appeal process,

15        yes.

16   Q    And you and Doctor Nearman were telling her no, there

17        is no appeal for that decision?

18   A    That's what we explained to her, yes.

19   Q    And the unsatisfactory evaluation would be an

20        evaluation of clinical competence, correct?

21   A    Correct.

22                - - - -

23 (Thereupon, Exhibit 48 was marked for the purpose of

24            identification.)

25                - - - -

```
 1    Q    (By Mr. Gordillo)  You've been handed a document

 2         marked as Exhibit 48.  Again, I'll ask you to take

 3         all the time you'd like to look it over and let me

 4         know when you've had an adequate opportunity to

 5         review it.

 6              For the sake of expediency, I'll tell you I'm

 7         going to ask you specifically about the Section 2.05

 8         at the bottom of the first page and at the top of the

 9         second page, and when you've had time to review it,

10         let me know whether you recognize the document.

11    A    Okay.

12    Q    Do you recognize the document?

13    A    I've never seen it before.

14    Q    Okay.  Are you familiar with the American Board of

15         Anesthesiology's Booklet of Information?

16    A    Yes, I am.

17    Q    I'll represent to you that this is an excerpt taken

18         from that book.

19                   MR. BIXENSTINE:  Can you represent

20              anything about the date of it?

21                   MR. GORDILLO:  I can.  It's dated

22              February of 2009.

23                   MR. BIXENSTINE:  Okay.

24                   MR. GORDILLO:  I have here with me

25              the full printout.  You're welcome to
```

```
 1                    take a look at it, if you'd like.  I

 2                    wanted to save some paper and not mark it

 3                    up as an exhibit.

 4                         MR. BIXENSTINE:  That's fine.

 5     Q    (By Mr. Gordillo)  Are you generally familiar with

 6          the ABA Standards?

 7     A    In general, yes.

 8     Q    And would you agree with me that the standards for

 9          certification and maintenance of certification are

10          set forth in the booklet of information?

11     A    Yes, it is.

12     Q    And those standards include what a Residency Training

13          Program needs to do with respect to the certificate

14          of clinical competence, correct?

15     A    Correct.

16     Q    That's what's set forth here in Section 2.05 in the

17          document?

18     A    Correct.

19     Q    And at the top of the second page --

20     A    Mm-hmm.

21     Q    -- it says:  Residents who wish to appeal an

22          Evaluation of Clinical Competence, and applicants who

23          wish to appeal final recommendations from the Program

24          Director or Department Chair, must do so through the

25          reporting institution's grievance and due process
```

1      procedures.

2           Did I read that correctly?

3    A   Yes, you did.

4    Q   Do I also understand that the UHCMC's grievance and

5        due process procedures provided no opportunity to

6        appeal -- for Sarah Aronson to appeal an

7        unsatisfactory clinical competence evaluation that

8        was reported for her for the period that was July

9        through December of 2008?

10   A   I believe so.

11   Q   At the time you met with Doctor Nearman and Doctor

12       Aronson that we were just discussing, had you yet

13       issued to her the letter of January 7, 2009 in which

14       she was informed about the unsatisfactory rating?

15   A   Had we issued it?

16   Q   Yes.

17   A   I don't believe so.

18   Q   I'm going to show you a document that was previously

19       marked as Exhibit 15.  I'm not going to -- it's not

20       necessary for you to identify it, but take all the

21       time you'd like to look it over and let me know when

22       you've had an adequate opportunity to review it.

23   A   Okay.

24   Q   In this document showing the emails between Doctor

25       Aronson and Doctor Shuck, Doctor Shuck wrote to

1    Doctor Aronson on January 6th of 2009 in connection

2    with Doctor Aronson's about to have a meeting with

3    Doctor Nearman, that Doctor Nearman would have been

4    advised by Norcia/Wallace.  That's what he writes.

5    Do you see that in that email?

6   A    Correct.

7   Q    And the context of this email is about the decision

8    to rate her as unsatisfactory.  I provide that as a

9    background to ask you whether before January 6th of

10   2009 you had advised Doctor Nearman in anticipation

11   of a meeting he would have with Doctor Aronson to

12   discuss this unsatisfactory rating.

13            MR. BIXENSTINE:  Objection.  I don't

14            understand, but go ahead.

15            MR. GORDILLO:  I was trying to

16            summarize things, but let me ask it a

17            different way that's a little more

18            direct.

19  Q    (By Mr. Gordillo)  When Doctor Shuck writes he,

20   referring to Doctor Nearman, will be advised

21   Norcia/Wallace, was Doctor Shuck accurate?

22  A    Yes.

23  Q    Okay.  Tell me about the advice that was provided to

24   Doctor Nearman as you know it.

25            MR. BIXENSTINE:  Objection.

1   A   Doctor Nearman and I had probably spoke several times

2       regarding the situation.  It's very difficult to

3       remember details of each meeting.  My discussion with

4       Doctor Nearman up until then would have been to

5       update him on any information or events that Doctor

6       Wallace and I had been involved in.

7           As far as advising him specifically on this

8       meeting with Doctor Aronson, I don't remember priming

9       him or advising him prior to this meeting.

10  Q   The recommendation of the Clinical Competence

11      Committee regarding Doctor Aronson's evaluation for

12      the period July through December of 2008 occurred

13      before January 7, 2009, right?

14  A   The decision?

15  Q   Yes.

16  A   Most likely, yes.

17  Q   Did it occur after the meeting among you and Doctor

18      Nearman and Doctor Aronson when you were discussing

19      her options?

20  A   That seems to be the most accurate timing.

21  Q   Okay.  Did the Clinical Competency Committee actually

22      convene a meeting as a committee?

23  A   Technically with minutes and official attendance, no.

24      Practically as a Clinical Competence Committee, yes,

25      we did.

1    Q    The three of you convened at sometime to discuss

2         together the evaluation of Sarah Aronson?

3    A    Yes.

4    Q    Do you recall when that happened?

5    A    I'm thinking most likely sometime in December of '08.

6    Q    Do you recall when in December?

7    A    No, I don't.

8    Q    How long did the conversation about Doctor Aronson

9         last?

10   A    I don't remember the length of the conversation.

11   Q    What do you recall about the substance of the

12        conversation?

13   A    We discussed the issues that again were discussed

14        back on November 24th.  We discussed our options, and

15        I believe the plan was to do the residency extension

16        with the unsatisfactory.

17   Q    And so as a committee, that would have been the

18        recommendation to you as the program director, and

19        then ultimately you are the one that is responsible

20        for making the decision, right?

21   A    Correct.

22   Q    Did the committee meet after Doctor Aronson had been

23        deemed fit for duty by EAP?

24   A    It's possible that that meeting was after that.  It's

25        possible it was in late December.  It could have been

1          while she was on leave of absence.

2     Q    Do you recall whether there was any discussion of the
3          EAP evaluation during the Clinical Competence
4          Committee meeting?

5     A    There was some discussion about the EAP, the leave of
6          absence, and her fit-for-duty evaluation.

7     Q    And what was the substance of that discussion?

8     A    We discussed it as part of the entire process that
9          was going on at the time.

10    Q    Okay.  And how did it impact -- how did the EAP
11         evaluation impact your consideration as a committee
12         of the entire process going on at the time?

13    A    The meeting must have been while she was still on
14         leave of absence, because I think we were
15         discussing -- we were discussing it in terms of her
16         returning to work, when she'd return to work.

17    Q    What did you discuss about her returning to work?

18    A    I'm not -- I don't remember.  I just remember that
19         now referring to doing -- implementing this plan when
20         she finished her leave of absence.

21    Q    And do you know whether it was her family leave of
22         absence at the end of December or her EAP leave of
23         absence?

24    A    I think her EAP leave of absence.

25    Q    And so is it fair to say you came up with -- as a

```
1        committee came up with the recommendation for what

2        she was going to have to do to complete her training

3        without knowing whether her performance had been

4        affected by Topamax in a way in which she would be

5        unfit for duty?

6    A   No.  We took into consideration that further

7        evaluation would have to occur when the Topamax had

8        been stopped, which would have been after she

9        returned from her leave of absence for the EAP

10       evaluation.

11   Q   Was there ever any discussion at any time with Doctor

12       Aronson about whether she could continue working

13       while remaining on the Topamax?

14   A   I don't recall any discussion to that regard.

15   Q   During the Clinical Competence Committee, did you

16       consider whether she could continue working on the

17       Topamax in the event that EAP had evaluated her as

18       being fit for duty while on Topamax?

19              MR. BIXENSTINE:  During there

20          meeting?

21              MR. GORDILLO:  Yes.

22   A   I don't recall that being a topic in discussion.

23   Q   Did you ever consider that possibility?

24   A   The possibility of her being able to go back on the

25       Topamax?
```

1    Q    Yes.

2    A    Well, if she stopped the Topamax and there were no

3         changes in her ability or her performance and there

4         was a medical indication for her to go back on the

5         Topamax, then she could go back on the Topamax.

6    Q    All right.

7    A    But if there was an impact on her performance, then

8         maybe she'd have to find another medication.

9    Q    Right.  But assuming that EAP determined that she was

10        fit for duty while taking Topamax, then was there

11        anything that precluded her from continuing work?

12   A    On Topamax?

13   Q    Yes.

14   A    I would imagine that would have been okay.

15   Q    Did you ever learn whether her EAP evaluation was

16        done while she was on Topamax?

17   A    I don't recall the exact date that she stopped the

18        Topamax.

19   Q    During the conversations you were involved in

20        regarding the decision to rate Doctor Aronson as

21        unsatisfactory, did you ever recommend that

22        professionalism should not be a factor relied upon to

23        determine her performance was unsatisfactory?

24   A    Did I recommend?

25   Q    Yes.

Page 120

| | | |
|---|---|---|
| 1 | A | No, I did not. |
| 2 | Q | Did you consider excluding that from any report? |
| 3 | A | In the meeting that we had -- we meaning Doctor |
| 4 | | Nearman and Doctor Aronson and I -- that was |
| 5 | | addressed. |
| 6 | Q | Okay. |
| 7 | A | She wanted to know if it could be left out. |
| 8 | Q | What did you say about that? |
| 9 | A | I said I will discuss that with Doctor Wallace. |
| 10 | Q | Did you ever recommend leaving it out? |
| 11 | A | To whom? |
| 12 | Q | Anyone. |
| 13 | A | I never recommended it.  I considered it, but I did |
| 14 | | not recommend it. |
| 15 | Q | In December of 2008, did you learn that Doctor |
| 16 | | Aronson was consulting with legal counsel about her |
| 17 | | employment? |
| 18 | A | I believe she told me that.  I take that back.  She |
| 19 | | did tell me, but that's not the first time I heard |
| 20 | | it. |
| 21 | Q | Okay.  When was the first time you heard it? |
| 22 | A | I believe I was informed by our counsel. |
| 23 | Q | All right.  I don't want to talk about those |
| 24 | | conversations with your counsel. |
| 25 | A | Okay. |

Page 121

1    Q    But I do want to know about timing.

2         So to the best of your recollection, when did you

3         first learn Doctor Aronson was consulting legal

4         counsel regarding her residency?

5    A    Somewhere in December of '08, I would imagine.

6    Q    Look, please, again at Exhibit 31.

7         Did you tell Doctor Aronson that the report that

8         is reflected in part by Exhibit 31 had been

9         influenced by the fact that she was getting legal

10        counsel about her residency?

11   A    No.

12   Q    Did you ever have any discussions with Doctor Aronson

13        indicating that her having legal advice had any

14        influence on the way you prepared the report that's

15        reflected by Exhibit 31?

16   A    No.

17   Q    After informing Doctor Aronson that she was receiving

18        an unsatisfactory evaluation in January of 2009, you

19        met with her again on February 4th of 2009.  Do you

20        recall that meeting?

21   A    I believe so.

22   Q    Let's look at a document that was previously marked

23        as Exhibit 37.

24   A    Thank you.

25   Q    And again, take all the time you'd like to look over

1       the document and just let me know when you've had an

2       adequate opportunity to review it.

3   A   Okay.

4   Q   As you look over that document -- first of all, do

5       you recognize this document?

6   A   Yes, I do.

7   Q   Do you know whether another version of this document

8       that's been signed by you, Doctor Wallace, and Doctor

9       Aronson exists?

10  A   I thought there was, but I may be mistaking it for

11      another document.

12  Q   Did you deliver this document to Doctor Aronson?

13  A   I don't remember, but most likely I'm the one that

14      would deliver this, yes.

15  Q   But as you sit here today, you don't have a specific

16      recollection of having done that; is that accurate?

17  A   Yes.

18  Q   As you see this document, does it refresh your

19      recollection about having met with her on February 4,

20      2009 with Doctor Wallace?

21  A   Yes.

22  Q   You see at the last paragraph of the document you

23      write -- the authors write:  We decided that the

24      three of us would meet on a monthly basis around the

25      middle of the month.  Do you see that?

1    A    Yes.

2    Q    But that didn't happen, did it?

3    A    No, it didn't.

4    Q    Okay.  Why didn't you take steps as program director

5         to make sure that you met on a monthly basis?

6    A    Well, it also says, and on as needed basis otherwise.

7    Q    Okay.

8    A    During the months of March and April of those months,

9         I did not receive any negative evaluations on Doctor

10        Aronson.

11   Q    Okay.

12   A    Things seemed to be getting better.  I felt no

13        urgency to meet with her, however, we still tried.

14        It was unfortunate that our schedules did not

15        coordinate.  I know there were times when we asked

16        Doctor Aronson to meet and she couldn't, and I know

17        there were times when I couldn't make it, and I know

18        there were times when Doctor Wallace couldn't make

19        it.  But because of the lack of urgency that I

20        perceived during those couple of months, it wasn't as

21        necessary.

22   Q    In the second paragraph of the document, her schedule

23        is being addressed, right?

24   A    Correct.

25   Q    And towards the end of that paragraph, whether she's

1    going to incorporate a Metro Trauma rotation into her

2    six-month schedule is discussed, right?

3 A  Right.

4 Q  And it was her choice if she had logged in 20 trauma

5    cases to decide whether she was going to incorporate

6    a Metro Trauma rotation, right?

7 A  Correct.

8 Q  Why was she given the flexibility to choose?

9 A  Because of her unusual schedule, we knew that there

10   was a limited amount of time for her to get in the

11   necessary rotations that we wanted, that we thought

12   would be best for her, and there is no ACGME

13   requirement for a trauma rotation, just that you have

14   20 trauma cases.  So if she would have 20 cases, then

15   we could exempt her from that rotation.

16 Q  Okay.  And ultimately she was exempted from that

17   rotation, correct?

18 A  I believe so.  I don't believe she ever went to

19   Metro.

20 Q  Now, earlier today you testified about the number of

21   required trauma rotations changing from 20 to 10.  Do

22   you know if that happened in 2009?

23 A  No, I don't.  I'd have to look on the latest ACGME

24   requirements to know the exact date.  It would happen

25   on June 1st.  That's usually when they start.  I

Page 125

```
 1              couldn't tell you what year it is.
 2      Q     Okay.  Do you recall some confusion existing with
 3              Doctor Aronson and the program about whether she had
 4              logged sufficient trauma cases?
 5      A     Vaguely.  But Doctor Wallace was in charge of case
 6              logs.
 7      Q     Okay.
 8      A     I rarely got involved in that.
 9      Q     So you don't know when she completed her cases?
10      A     I have no idea.
11      Q     Back to the monthly meetings, did you become aware
12              that Doctor Aronson was concerned about the lack of
13              monthly meetings?
14      A     Yes.
15      Q     Did you discuss that with Doctor Nearman?
16      A     I don't know if I discussed it with Doctor Nearman.
17              I don't remember.
18      Q     Did you at some point discuss with Doctor Aronson her
19              concern about lack of monthly meetings?
20      A     I think we did converse at one point about it.  I
21              don't remember exactly when.  She did voice her
22              concerns.  I think she was most concerned of the fact
23              that she wasn't getting positive feedback and she was
24              afraid that she would not graduate at the end of the
25              new deadline.  That was her primary concern.  And I
```

1    vaguely remember saying at this point, I don't think

2    there's any concern for that.

3         Now, I don't know if that suffices for a meeting,

4    but that's my recollection of an interaction that we

5    had sometime during that period.

6  Q  And during that period would have been between

7    February and June; is that fair?

8  A  Yes.

9  Q  After February, but before June?

10  A  Yes.

11  Q  Between the period of February 4, 2009 and June 4,

12    2009, had Doctor Wallace expressed to you his opinion

13    that Doctor Aronson's performance was unsatisfactory?

14  A  Yes.

15  Q  And when telling Doctor Aronson that she -- and I'm

16    paraphrasing -- needn't be concerned about

17    graduating, were you taking into account Doctor

18    Wallace's opinion?

19  A  I believe when he started expressing those feelings

20    was after the encounter that I had with Doctor

21    Aronson.

22  Q  When did he start expressing those feelings to you?

23  A  I think it was May of '09.  In May, some negative

24    evaluations started to come back in.  And I think

25    there were a couple of events that occurred between

Page 127

1           Doctor Wallace and Doctor Aronson.

2     Q    You and Doctor Wallace met with Doctor Aronson on

3           June 4th?

4     A    Yes.

5     Q    What caused that meeting to happen?

6     A    I think the trigger for that meeting was -- my

7           impression was that things had changed.  February,

8           March, and April, okay.  May, we started to get a lot

9           of negative evaluations again and Doctor Wallace's

10          concern, so that prompted -- I thought at that point

11          it was necessary that we meet, more urgent than

12          before.

13    Q    At that meeting, Doctor Wallace expressed his opinion

14          that he did not think Doctor Aronson could complete

15          the program satisfactorily, correct?

16    A    That's correct.

17    Q    Did you express any opinion of your own about her

18          ability to complete the program?

19    A    Yes, I did.

20    Q    What did you say?

21    A    I said that conclusion has not been made.

22    Q    Did you share Doctor Wallace's opinion at that time?

23    A    I did not share his opinion 100 percent, no.

24    Q    You believed on June 4th it was still possible she

25          was going to be able to complete the program

```
 1              satisfactorily?

 2    A    Yes, I did.

 3    Q    And you understood Doctor Wallace did not believe

 4         that?

 5    A    I understood that.

 6    Q    During the meeting, did you make clear to Doctor

 7         Wallace that you had a difference of opinion with him

 8         about it?

 9    A    I don't believe I mentioned it during the meeting.

10    Q    Did you discuss it with him after the meeting?

11    A    Yes, I did.

12    Q    When did the conversation or communication occur?

13    A    Probably right afterwards.

14    Q    What was the gist of that communication?

15    A    Was that we have to weigh all the evidence and make a

16         decision with more input than just mine and his.

17    Q    Did you suggest to him that she should still be given

18         an opportunity to show that she could complete the

19         program satisfactorily?

20    A    Yes.

21    Q    And what was his response to that suggestion?

22    A    I think he was reluctant, but he eventually agreed.

23    Q    Had you spoken with him before the June 4th meeting

24         about what you were going to say to Doctor Aronson?

25                        MR. BIXENSTINE:  On June 4th?
```

1                    MR. GORDILLO:  Yes.  On June 4th.

2       A    I don't remember a specific conversation prior to the

3            meeting.

4       Q    Between the February 4th meeting and this June 4th

5            meeting, were you aware of any negative feedback

6            shared with Doctor Aronson about her performance

7            during that period?

8       A    From anybody?

9       Q    From anybody.

10      A    Yes.  I believe it was May when some negative

11           evaluations started to show up on my computer.

12      Q    May of 2009?

13      A    Yes.

14      Q    And you shared those negative evaluations with her?

15      A    I believe we made copies and shared them, but she

16           should have received them, as well.  When they're

17           sent out, they're sent to me and the resident.

18      Q    Did you have any conversations with Doctor Nearman

19           about limiting Doctor Wallace's role in any way with

20           respect to Doctor Aronson's residency?

21      A    Yes.

22      Q    Tell me about those communications.

23      A    I want to think about this a minute so I can make

24           sure I get it correct.

25                I was informed at one point, I believe, by Doctor

Page 130

1          Nearman that Doctor Wallace would not be

2          participating in the decision-making process.  I also

3          believe something to that effect came from Doctor

4          Shuck.  Or it could have been that Doctor Shuck told

5          Doctor Nearman and told me, but again, I'm

6          speculating on the chain of information.  But I'm

7          pretty sure that Doctor Nearman told me that.

8     Q    So is it fair to say at some point you learned that

9          both Doctor Shuck and Doctor Nearman did not want

10         Doctor Wallace to participate in the decision-making

11         process?

12    A    That's fair.

13    Q    And do you know when you would have learned that?

14    A    I believe it was after June 4th.

15    Q    And were you informed about the reasoning for that

16         decision by either Doctor Nearman or Doctor Shuck?

17    A    They had concerns that -- or they believed that

18         Doctor Aronson had concerns that Doctor Wallace was

19         not being fair in his judgement of her.  Not those

20         words exactly, but the gist of it.

21    Q    And so your understanding was that because they --

22         because they believe Doctor Aronson had concerns

23         about whether Doctor Wallace was being fair, he

24         should be removed from the decision-making process;

25         is that accurate?

Page 131

1    A    Yes.

2    Q    Is she the first resident to raise that concern about

3         Doctor Wallace?

4    A    Yes.  As far as I know.

5    Q    Has any resident ever raised that concern about you?

6    A    Not that I know of.

7    Q    Did you know that Doctor Aronson had raised that

8         concern about you?

9    A    I think I read it in some letter or memo that she

10        wrote that she no longer had any trust in me.

11   Q    And you knew that before learning that Doctor Nearman

12        and/or Doctor Shuck had decided to remove Doctor

13        Wallace from the decision-making process, right?

14   A    I'm not sure when I read that.

15   Q    Did you agree with the decision to remove Doctor

16        Wallace from the decision-making process?

17   A    No.

18   Q    Did you tell Doctor Nearman or Doctor Shuck that you

19        disagreed with it?

20   A    Yes.

21   Q    What did you say specifically to them about it?

22   A    I knew that Doctor Wallace had valuable information

23        and had a lot at stake with this entire process with

24        Doctor Aronson and that his opinion was worth

25        something.  Doctor Wallace is an emotional type of

```
 1            individual, but the majority of the time he thinks

 2            very clearly.

 3       Q    Did you learn at some point that either Doctor

 4            Nearman or Doctor Shuck believed that Doctor Wallace

 5            was too emotional in the evaluation of Doctor

 6            Aronson?

 7       A    Yes.

 8       Q    And when did you learn that?

 9       A    Probably when they were discussing having him not

10            being involved.

11       Q    So you learned that Doctor Nearman thought that

12            Doctor Wallace was too emotion in evaluating Doctor

13            Aronson?

14       A    I'm not sure who thought that, but I know it was

15            stated.

16       Q    So it was one or the other, maybe both, you're not

17            sure?

18       A    Correct.

19       Q    But for sure, at least one of them thought that?

20       A    Correct.

21       Q    And did you learn that, again, one or the other or

22            both of them believe that Doctor Wallace was not

23            sufficiently objective in evaluating Doctor Aronson?

24       A    No.

25       Q    Did the Clinical Competence Committee meet to provide
```

1         recommendations -- a recommendation for the

2         evaluation of Sarah Aronson in July of 2009?

3  A    No.

4  Q    Did they ever meet -- did the Clinical Competence

5         Committee ever meet to provide a recommendation

6         regarding Sarah Aronson's performance for a period of

7         January 1st through June 30th of 2009?

8  A    Not in its original form.

9  Q    The committee, not in its original form?

10  A    Correct.

11  Q    What do you mean by that?

12  A    Doctor Wallace was no longer involved.

13  Q    So what form did the committee have?

14  A    Doctor Nearman and myself.

15  Q    And when the two of you met to evaluate her

16         performance, did you agree that for the period of

17         January through June of 2009, her performance was

18         satisfactory?

19  A    Yes.

20  Q    And you subsequently as program director adopted that

21         recommendation?

22  A    Yes.

23  Q    And forwarded that recommendation to the ABA, right?

24  A    Yes.

25  Q    Did you learn that Sarah Aronson had made a complaint

```
 1              about the Residency Program to the ACGME?

 2    A    Yes.

 3    Q    When did you learn that?

 4    A    I don't know the date, but I was informed by Doctor

 5         Shuck.

 6    Q    Okay.  And were you shown what her specific

 7         complaints were?

 8    A    I believe so.

 9    Q    Let's look at Exhibit 38.

10              When you were shown that complaint Doctor Aronson

11         made to the ACGME, were you shown this document

12         marked as Exhibit 38?

13    A    I don't recognize this as a document I saw during

14         that time period.

15    Q    Okay.  Had you seen the document that is Exhibit 38

16         before this lawsuit?

17    A    Yes -- no.  Excuse me.

18              What do you mean before this lawsuit?

19    Q    Before the lawsuit was filed.

20    A    No.  The first time I saw this was the other day at

21         Doctor Wallace's deposition.

22    Q    What were you shown to inform you about the substance

23         of Doctor Aronson's complaint to the ACGME?

24    A    It was a letter from the ACGME.

25                        MR. GORDILLO:  I'm going to go for a
```

1                     couple more hours.  Let's take a short

2                     break.

3                          - - - - -

4                 (Thereupon, a recess was had.)

5                          - - - -

6                   MR. GORDILLO:  Back on the record.

7                    Would you read back the last question and

8                    answer?

9                          - - - -

10               (Thereupon, record read by Notary.)

11                        - - - -

12   Q     (By Mr. Gordillo)  Sometime in the summer of 2009,

13          did you learn that Doctor Aronson wanted to take time

14          off for the adoption of her son?

15   A     Yes.

16   Q     When in the summer of 2009 did you learn that?

17   A     During a conversation with her.

18   Q     Do you remember when that conversation occurred?

19   A     I'm thinking sometime in June, or maybe July.  I know

20          we were discussing her July and August schedule, so

21          it happened during that period June or July.

22   Q     After the June 4th meeting?

23   A     Correct.

24   Q     After she informed you that she wanted time off, she

25          had made a complaint about FMLA discrimination.  Did

1       you know about that?

2   A   I believe so, yes.

3   Q   Let's look at a document that was previously marked

4       as Exhibit 23.  As always, please take all the time

5       you'd like to look it over and let me know when

6       you've had an adequate opportunity to review it.

7   A   Yes.  I recognize it.

8   Q   Okay.  That was a letter to Doctor Shuck from Sarah

9       Aronson.  Did he provide you with a copy of that

10      letter?

11   A   I don't believe so.  Although I have seen it before.

12   Q   Before this lawsuit was filed?

13   A   When was the date the lawsuit was filed?

14   Q   That I don't know off the top of my head, to tell you

15      the truth.

16         Well, I'll tell you what, I can help you here.

17   A   I believe it was after she graduated.

18   Q   Okay.  Let's look at a document previously marked as

19      Exhibit 24, and the top of Exhibit 24 is an email

20      from you to Doctor Aronson on July 15th.  Do you see

21      that?

22   A   Yes.

23   Q   And below that is an email from Doctor Shuck to you

24      on July 13th, right?

25   A   Yes.

1    Q    With a reference to only the letter.  Do you see
2         that?

3    A    Okay.  Yes.

4    Q    As you look at Exhibit 24, does it refresh your
5         recollection about when you may have received Exhibit
6         23?

7    A    Yes.

8    Q    When did you receive Exhibit 23?

9    A    It appears to be July 13, 2009.

10   Q    And then on July 14th, you had a meeting about the
11        issues raised in the letter that is Exhibit 23,
12        right?

13   A    Yes.

14   Q    And as a result of that meeting, an agreement was
15        reached to remove Doctor Aronson from the SICU
16        rotation for which she had originally been scheduled
17        in the last two weeks of August; is that right?

18   A    Yes.

19   Q    Her Metro rotation was rescheduled for the last two
20        weeks of the month?  August, right?

21   A    Yes.

22   Q    And as a result of the decisions made on July 15th,
23        or at least those reflected in your July 15th email,
24        it was clear Doctor Aronson was not going to repeat
25        the SICU rotation that she had performed in October

Page 138

```
 1              of 2008, correct?

 2    A    Correct.

 3    Q    And ultimately she did not perform the Metro

 4         rotation, either, did she?

 5    A    I believe that's correct.

 6    Q    At the end of July, the ACGME had a site visit,

 7         right?

 8    A    Correct.

 9    Q    And part of the site visit included an interview with

10         Doctor Aronson, correct?

11    A    I believe she arranged that.

12    Q    But the ACGME beforehand had asked for resident

13         volunteers to interview, right?

14    A    Correct.

15    Q    Doctor Aronson volunteered?

16    A    Correct.

17    Q    Were you the individual responsible for choosing

18         which volunteers would speak to the ACGME?

19    A    No.

20    Q    Who was the individual from UHCMC that made the

21         decision?

22    A    I was the individual in charge of the process of

23         selecting the residents.  The residents were to be

24         peer selected.  I was not to choose them.

25    Q    And when you say peer selected, do you mean by the
```

1        other residents?

2    A    Correct.

3    Q    How did the process work that the other residents

4        selected which volunteers got to speak to the ACGME?

5    A    I believe I sent an email out stating that

6        representatives for the ACGME institutional site

7        visit had to be peer selected, so I asked anyone out

8        there that was interested in nominating someone to

9        select one person from each clinical year.

10    Q    Okay.

11    A    And they were to send it back.  And when the time

12        period was up for nominations, I totaled up the

13        number of nominations, and I don't remember how many

14        went.  The top three or four vote getters were

15        representatives to ACGME site visit.

16    Q    And you were aware that Doctor Aronson had

17        volunteered to be one of those people?

18    A    I believe she did send me an email and said she

19        volunteered.

20    Q    And is it your testimony that she was not one of the

21        three or four top vote getters?

22    A    You weren't supposed to volunteer yourself.

23    Q    Did anyone receive from the -- back up.

24            You were looking for volunteers from each

25        representative class, correct, CA1, CA2, and CA3?

Page 140

| | | |
|---|---|---|
| 1 | A | Yes.  I believe the clinical base year was also |
| 2 | | included. |
| 3 | Q | Doctor Aronson at that point, July 2009, was part of |
| 4 | | the CA3 class, correct? |
| 5 | A | Correct. |
| 6 | Q | Was there any resident from a CA3 class that received |
| 7 | | more than one nomination vote? |
| 8 | A | I believe so. |
| 9 | Q | How many members of the CA3 class got more than one |
| 10 | | vote? |
| 11 | A | I don't remember the details of the numbers. |
| 12 | Q | Did you exclude Doctor Aronson from consideration |
| 13 | | because she nominated herself? |
| 14 | A | Because she didn't follow the due process, her name |
| 15 | | was -- her volunteering was not counted. |
| 16 | Q | Was she nominated by any of her classmates? |
| 17 | A | I don't remember. |
| 18 | Q | Despite not being selected, she did meet with an |
| 19 | | ACGME representative.  Were you aware of that? |
| 20 | A | Yes. |
| 21 | Q | And after she met, did you have any discussions with |
| 22 | | ACGME representatives about the meeting? |
| 23 | A | No, I did not. |
| 24 | Q | Did you have any discussions with anyone at UH who |
| 25 | | had discussed with ACGME the fact of the meeting with |

1           Doctor Aronson?

2    A     I had a brief discussion with Doctor Shuck.

3    Q     What did Doctor Shuck tell you about the meeting

4          between the ACGME representative and Doctor Aronson?

5    A     We had nothing to worry about.

6    Q     And did he say to you why you had nothing to worry

7          about?

8    A     He said that in essence we didn't do anything wrong.

9    Q     And did he tell you what was the basis for his saying

10         to you that you hadn't done anything wrong?

11   A     That's what the representative told him.

12   Q     After the ACGME visit with Doctor Aronson, did you

13         discuss that visit with Doctor Aronson?

14   A     I don't remember.

15   Q     Did you discuss the visit with Doctor Wallace?

16   A     No.

17   Q     At the time you learned about her visit with the

18         ACGME, had a recommendation been made yet regarding

19         her Clinical Competence?

20   A     I believe so.

21   Q     In August, you began the process of preparing Doctor

22         Aronson's completion certificate right?

23   A     Right.

24   Q     There were some delays associated with that, true?

25   A     I believe there were some clerical delays.

```
 1                          -  -  -  -

 2   (Thereupon, Exhibit 49 was marked for the purpose of

 3                        identification.)

 4                          -  -  -  -

 5      Q    (By Mr. Gordillo)  You've been handed a document

 6           marked as Exhibit 49.  As always, take all the time

 7           you'd like to look it over and let me know when

 8           you've had an adequate opportunity to review it.

 9      A    Thank you.  Okay.

10      Q    This is a letter from Sarah Aronson to Doctor Shuck

11           regarding her Residency Completion Certificate; do

12           you see that?

13      A    Yes.

14      Q    In the second paragraph, she writes that she

15           approached you at the end of July to request to

16           receive her certificate in August.  Do you see that?

17      A    Yes.

18      Q    Do you recall that to be true?

19      A    It's possible.  I don't deny it but I don't remember

20           it.

21      Q    She then goes on to write that you informed her that

22           the certificate had been prepared along with those

23           residents that graduated in July.  Do you recall

24           having so informed her?

25      A    I may have believed that that was the case, because I
```

Page 143

1          believe we expected her to show up for graduation,

2          and she did not.

3      Q   When was graduation?

4      A   The graduation ceremony was in early June, maybe the

5          second Saturday in June.

6      Q   In June?

7      A   Yes.

8      Q   Why would her showing up or not showing up at a

9          graduation ceremony in June affect whether a

10         certificate was being prepared in July?

11     A   You asked me what I thought happened, and I thought

12         that her certificate should have been prepared for

13         the June graduation.  So if I told her that it should

14         be -- should have been done, it was based on that

15         belief.  If it wasn't done at the time, then that

16         would be inconsistent to what I thought was the case.

17     Q   And why did you think she was going to participate in

18         the graduation ceremonies at the end of June?

19     A   Because she was expected to graduate, finish at the

20         end of August.  And we always have our off-rotation

21         residents try to participate in the graduation

22         ceremony closest to their finishing date.

23     Q   Okay.  Now skip down to the fourth paragraph, and

24         apparently a discovery was made that her certificate

25         had not been prepared, right?

1    A    That's what she says.

2    Q    And she goes on to write that at her request, you

3         instructed Chris to write a letter that Doctor

4         Aronson could submit for credentialing in lieu of

5         certificate from UHCMC.  Do you see that?

6    A    Yes.

7    Q    Is that accurate?

8    A    That's what she says.

9    Q    You don't know whether you instructed Chris to write

10        a letter?

11   A    I don't remember if I instructed her to write a

12        letter or if I instructed her to get the certificate.

13        I knew it was Chris's responsibility to have that

14        done, so it's very possible that I did.  I just don't

15        remember the communication.

16   Q    Okay.  And so when Doctor Aronson then writes that

17        you apparently had no knowledge as to the status of

18        your certificate, would that be accurate?

19   A    At that point if there was no certificate, then I did

20        not know the status.

21   Q    And did you have any plan to arrange for her to

22        receive a certificate in a timely fashion?

23   A    I believe that was part of the plan with Chris, to

24        make sure that the certificate was available.

25   Q    But you didn't know the status of the certificate?

```
 1    A    I don't believe so, no.

 2                   - - - -

 3  (Thereupon, Exhibit 50 was marked for the purpose of

 4                    identification.)

 5                   - - - -

 6    Q    (By Mr. Gordillo)  Now you've been handed a document

 7         marked as Exhibit 50.  Please take all the time you'd

 8         like to look it over and let me know when you've had

 9         an adequate opportunity to review it.

10    A    Okay.

11    Q    Do you recognize the document?

12    A    Yes.

13    Q    Can you tell me what it is, please?

14    A    It's a letter to confirm that Doctor Aronson would be

15         completing her residency on August 31, 2009.

16    Q    And signed by you?

17    A    Signed by me dated 19 August 2009.

18    Q    And at the bottom the indications are MPN/ca?

19    A    Yes.

20    Q    Is ca Chris?

21    A    Yes.

22    Q    As you look at this document that is Exhibit 50, does

23         it refresh your recollection about asking Chris to

24         prepare a document in lieu of the certificate?

25    A    Yes, it does.
```

1    Q    And this is the letter that was prepared in lieu of

2         the certificate, right?

3    A    Yes, it is.

4    Q    Do you know why no graduate certificate was available

5         as of August 19th?

6    A    No, I don't.

7    Q    Do you recall whether -- let me rephrase that.

8              Doctor Wallace testified that he refused to sign

9         her graduate certificate.  Do you recall that

10        testimony?  Did you hear that testimony?

11   A    Yes.

12   Q    Did that cause a delay in providing the certificate

13        to Doctor Aronson?

14   A    It may have, if we had to produce another

15        certificate.

16   Q    Was that the reason that Doctor Aronson couldn't get

17        the certificate as she was requesting in these

18        exhibits that we've just been looking at?

19   A    I don't know for sure.

20   Q    Did you have a conversation with Doctor Wallace about

21        his refusal to sign the graduation certificate?

22   A    He told me he refused to sign it.

23   Q    What did he tell you about his decision to refuse to

24        sign it?

25   A    He didn't agree with the decision, so he was not

```
 1              going to sign it.
 2      Q    And in the ten years or so that he was a co-director
 3           with you, had he ever done that before?
 4      A    No.
 5      Q    Has he ever done it since?
 6      A    No.
 7      Q    Let's take a look at the document that was previously
 8           marked as Exhibit 25.  Take all the time you'd like
 9           to look it over and let me know when you've had an
10           adequate opportunity to review it.
11      A    Okay.
12      Q    This is a string of emails.  Do you recognize the
13           email string?
14      A    Yes.
15      Q    Doctor Aronson was raising concerns in August about
16           whether she had already completed her requirements
17           under the Residency Program, right?
18      A    Yes.
19      Q    If you look at the first email in the string, which
20           is on the last -- bottom of the next to last page and
21           last page, which is the email from Doctor Aronson to
22           you and Doctor Nearman, in the third paragraph of her
23           email that begins, I also have a question that just
24           occurred to me recently -- do you see that?
25      A    Which page?
```

Page 148

1    Q    On the last page of the exhibit.

2    A    Yes.

3    Q    Okay.  She writes:  Can you explain to me why I

4         wasn't released to graduate at the end of June?

5         Right?

6    A    Mm-hmm.

7    Q    She followed that email up with another one the next

8         day, an email to you indicating that it had appeared

9         that the ABA had already designated her as Board

10        eligible as of July 1st.  Do you see that?

11   A    Yes.

12   Q    And then you provided your response, right?

13   A    Yes.

14   Q    On October 27.

15        You wrote:  Your total of 36 months was

16        anticipated to be completed on August 31, 2009 to

17        make up for the unsatisfactory six-month period

18        July 8 to December 8, right?  How did you calculate

19        that?

20   A    I started from -- I counted all the satisfactory

21        months that she completed from February 1st to the

22        time of, I think, '06 to August 31st of '09.  So I

23        added six months to the end of her anticipated

24        graduation date.

25   Q    She was initially scheduled to complete her training

1         at the end of February 2009, right?

2    A   Correct.

3    Q   So at the end of February 2009, had she received

4         consecutive satisfactory evaluations, she would have

5         had 36 months of satisfactory evaluations, correct?

6    A   Correct.

7    Q   And so through December of 2008, had all of the

8         months been satisfactory, she would have been 34

9         months, right?

10   A   Correct.

11   Q   I guess I'm confused.  I still don't see where -- how

12        did you draw the line of 36 months in that scheme of

13        things?

14   A   I didn't calculate 36 months as satisfactory

15        performance.  I added six months to the end of her

16        expected training time.  And according to the ABA

17        when I contacted them, they said for residents that

18        are out of sync, that's acceptable.  The ABA

19        requires -- in the ABA's mind, they require 36 months

20        of satisfactory work, but our plan was to add six

21        months to the end of her anticipated graduation date

22        to evaluate her for graduation.  It was stated

23        clearly right from the beginning that she would have

24        six more months after February 1st -- after February

25        28th, I mean.

1    Q    As you sit here today, do you recognize that that was

2         an error?

3    A    What was an error?

4    Q    To require her to work through August to complete her

5         36 months of satisfactory performance?

6                   MR. BIXENSTINE:  Objection.

7    A    That was different from what the ABA said we had to

8         do, but it was not inconsistent with what other

9         programs have done when individuals who are out of

10        sync in rotation had an extended residency.

11   Q    You also wrote that because her schedule was out of

12        sync with the ABA reporting cycle does not decrease

13        the number of satisfactory months that you must

14        complete, right?

15   A    Correct.

16   Q    Did you understand at any time that she was

17        suggesting to you that she needed to perform less

18        than 36 months of satisfactory work?

19   A    No.

20   Q    And did you understand from the email string that's

21        Exhibit 25 that Doctor Aronson believed based on

22        communications she had with the ABA that her work had

23        been completed at the latest the end of June 2009?

24   A    That's -- if that's the information she got from the

25        ABA.

1   Q   You understood that's what she was telling you she

2       got, right?

3   A   Yes.

4   Q   And the next email up says exactly that, right, the

5       ones that's dated August 27th from her to you and

6       Doctor Nearman?

7   A   Yes.

8   Q   And Doctor Aronson's informing you that, according to

9       Holly at the ABA, someone from the department -- I

10      assume that meant the Anesthesiology Department,

11      should call Holly at the ABA if there were any

12      questions, right?

13   A   Yes.

14   Q   Did you do that?

15   A   Yes.

16   Q   And the testimony you just gave a few minutes ago

17      about being informed that the off cycle resulted in

18      properly calculating Doctor Aronson's residency

19      through August, was that --

20             MR. BIXENSTINE:  Objection.  Go

21         ahead.

22   Q   -- was that the result of conversation you had with

23      Holly as suggested by Doctor Aronson?

24             MR. BIXENSTINE:  Objection.  Go

25         ahead.

1    A    The conversation I had with Holly included her

2         explanation of what I told you earlier, was that we

3         were in our rights to add six months of additional

4         training to the end of her residency period even

5         though she was off cycle.

6    Q    You understand Doctor Aronson believes that she was

7         four months over her needed 36 months as of the end

8         of June 2009, right?

9    A    Yes.

10   Q    Did you ask Holly specifically whether that was

11        accurate?

12   A    I don't remember.

13   Q    Did you ask Holly whether Doctor Aronson should have

14        been graduated in June?

15   A    She said it was up to the program's discretion.

16   Q    Discretion based on what?

17   A    On the needs to evaluate the resident.  So our

18        thinking was that she needed six months additional

19        training to evaluate her from March 1st to

20        August 31st.

21   Q    Even though by the end of June, you had reported to

22        the ABA that she had completed the last six months of

23        work in a satisfactory condition, right?

24   A    She had completed that time period in a satisfactory

25        manner, yes.

1    Q    Your initial response to Doctor Aronson when she

2         asked you to contact Holly was that you couldn't

3         immediately investigate the matter, that you'd

4         discussed -- that you did discuss the situation

5         briefly with Doctor Rowbottom.  Do you see that?

6    A    Yes.  Okay.

7    Q    Why was it up to Doctor Rowbottom whether Doctor

8         Aronson could be relieved permanently?

9    A    I think she meant to be relieved for that day, and

10        the next two days, because she had told me in the

11        conversation that she had a lot of things to do,

12        trying to move the family and getting everything

13        organized so that she could get to Maryland, so I

14        discussed with Doctor Rowbottom -- he's in charge of

15        granting time off on a daily basis.

16   Q    And ultimately you decided that she would be

17        permanently relieved?

18   A    Yes.

19   Q    Why did you make that decision?

20   A    She said she needed some extra time to move and

21        prepare to go to Maryland.

22   Q    Why didn't you require her to complete her training?

23   A    Because it was up to my discretion at that point, and

24        I thought that two more days would not be a

25        significant amount of time for her to miss.  We have

| | | |
|---|---|---|
| 1 | | already decided that she had met the expectations for |
| 2 | | graduation.  I was trying to do her a favor. |
| 3 | Q | In January of 2009, did you have any discussions with |
| 4 | | anyone to the effect that you needed eight months to |
| 5 | | evaluate Doctor Aronson's performance in light of the |
| 6 | | perception that she was unsatisfactorily performing |
| 7 | | the last half of 2008? |
| 8 | A | No.  We did not say she needed eight months.  We said |
| 9 | | she needed six additional months. |
| 10 | Q | Why didn't you just say eight months from January? |
| 11 | | MR. BIXENSTINE:  Objection. |
| 12 | A | Because she needed six additional months. |
| 13 | Q | Was that different from eight months from January? |
| 14 | A | No, it's not. |
| 15 | Q | Isn't it true that the reason you had recommended in |
| 16 | | January that six additional months of training was |
| 17 | | necessary was because it was in accordance with ABA |
| 18 | | rules? |
| 19 | A | Yes. |
| 20 | Q | And the ABA rules would have required the six months |
| 21 | | to be a consecutive reporting period, right? |
| 22 | A | Yes. |
| 23 | Q | And that consecutive reporting period would have |
| 24 | | begun January 1st of 2009, correct? |
| 25 | A | Correct. |

1    Q    As you sit here today, are you aware of any conduct

2         by Doctor Aronson during her residency that would

3         have merited terminating her employment?

4    A    Yes.

5    Q    Were you aware of that conduct before she finished

6         her program?

7    A    Yes.

8    Q    Have you learned anything since then that would have

9         merited terminating her employment since she

10        graduated from the program?

11                  MR. BIXENSTINE:  In other words,

12             have you learned anything since then that

13             you didn't know before?

14   A    About Doctor Aronson?

15   Q    Yes.

16   A    I learned a couple things about her character through

17        this process.

18   Q    Right.  But I'm talking about things that you learned

19        about her conduct before she finished the program.

20        What you learned after she finished the program about

21        what she did before she finished the program.

22   A    No, sir.

23   Q    And are you aware of any jobs that Doctor Aronson

24        should or could have taken to mitigate any potential

25        losses arising from what happened to her during her

1    residency?

2              MR. BIXENSTINE:  Objection.

3    A    No.

4              MR. GORDILLO:  All right.  Give me a

5         few minutes.

6              Sarah, are you there?

7              DOCTOR ARONSON:  Yes.

8              MR. GORDILLO:  We're going to take a

9         quick break.

10             - - - -

11        (Thereupon, a recess was had.)

12             - - - -

13             MR. GORDILLO:  Back on the record.

14   Q    (By Mr. Gordillo)  Based on your prior testimony, is

15        it accurate that you believe you had discretion to

16        graduate Doctor Aronson from the program at some date

17        after June 30th 2009?

18   A    When we originally made the contract or agreement,

19        the agreement was that we would have an additional

20        six months of training so that we could evaluate her

21        and have confidence in the fact that she was able to

22        meet the minimum requirements and graduate.

23   Q    But you understood that as of June 30, 2009, or at

24        least when you submitted the CCC Report, she then had

25        36 months of satisfactory evaluations?

1    A    According to the ABA, yes.

2    Q    But as I understood what you testified before, you,

3         in conversation with the ABA, were under the belief

4         that you had discretion to continue her in the

5         program after June 30th; is that accurate?

6    A    Yes.

7    Q    And what was it that caused you to exercise the

8         discretion to keep her in the program after

9         June 30th?

10   A    Because we had agreed that she would have six months

11        of additional training ending August 31st.

12   Q    But you had the discretion to change that, right?

13             Any time after June 30th, you could have said,

14        she needs to continue until the end of August or you

15        could have also said, she's free to go, correct?

16   A    Could have.  We did not complete all the necessary

17        rotations; SICU, trauma.  Those needed to be done.

18        We tried to get those in in July and August.  We were

19        unable to do that, so that was another part of the

20        reason why six months was picked, because we wanted

21        certain things to be redone.

22   Q    And those rotations scheduling would have been done

23        under the direction of Doctor Wallace, correct?

24   A    Yes.

25                 MR. GORDILLO:  That's all I have.

```
 1              Thank you.

 2                   MR. BIXENSTINE:  Okay.

 3                   MR. GORDILLO:  Do you want to make

 4            sure he gets to read?

 5                   MR. BIXENSTINE:  Yes.

 6                      -  -  -  -

 7         (Deposition concluded at 4:30 p.m.)

 8                      -  -  -  -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    State of Ohio,              )
                                 )SS:      CERTIFICATE
2    County of Cuyahoga,         )

3            I, Mary C. Peck, a Notary Public within and for
     the State aforesaid, duly commissioned and qualified, do
4    hereby certify that the above-named MATTHEW NORCIA, M.D. was
     by me, before the giving of his deposition, first duly sworn
5    to testify the truth, the whole truth, and nothing but the
     truth;
6
             That the deposition as above set forth was reduced
7    to writing by me by means of stenotypy, and was later
     transcribed upon a computer by me;
8
             That the said deposition was taken in all respects
9    pursuant to the stipulations of counsel herein contained;
     that the foregoing is the deposition given at said time and
10   place by said MATTHEW NORCIA;

11           That I am not a relative or attorney of either
     party or otherwise interested in the event of this action.
12
             That I am not nor is the court reporting firm with
13   which I am affiliated under a contract as defined by Civil
     Rule 28(D).
14
             IN WITNESS WHEREOF, I hereunto set my hand and
15   seal of office, at Cleveland, Ohio this 10th day of January,
     A.D. 2011.
16

17

18           _____

19           Mary C. Peck, Notary Public

20

21           My commission expires December 30, 2011

22

23

24

25
```