Page 1

1                     - - - -

2              UNITED STATES DISTRICT COURT

3             NORTHERN DISTRICT OF OHIO

4                  EASTERN DIVISION

5                   - - - - -

6   SARAH ARONSON, M.D.,          )
              Plaintiff,          )
7                                 )
         v.                       )     CASE NO. 1:10-CV-00372
8                                 )     JUDGE BOYKO
    UNIVERSITY HOSPITALS OF       )
9   CLEVELAND,                    )
              Defendant.          )
10

11                  - - - - -

12        DEPOSITION OF DAVID WALLACE, M.D.

13         Thursday, December 23, 2010

14                  - - - -

15      The deposition of DAVID WALLACE, M.D., a Witness

16  herein, taken by the Plaintiff as if upon examination under

17  the Ohio Rules of Civil Procedure, before me, Mary C. Peck,

18  a Stenographic Reporter and Notary Public within and for the

19  State of Ohio, at the offices of Ogletree, Deakins, Nash,

20  Smoak & Stewart, P.C., Key Tower, 127 Public Square, Suite

21  4130, Cleveland, Ohio, commencing at 9:00 a.m., the day and

22  date above set forth.

23                  - - - -

24

25

```
 1              APPEARANCES:
                On behalf of the Plaintiff:
 2
                GREGORY A. GORDILLO, ESQUIRE
 3              Gordillo & Gordillo, LLC
                1370 Ontario Street
 4              Suite 2000
                Cleveland, Ohio  44113
 5              ggordillo@eeoattorney.com

 6
                On behalf of the Defendant:
 7
                BARTON A. BIXENSTINE, ESQUIRE
 8              Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
                Key Tower
 9              127 Public Square
                Suite 4130
10              Cleveland, Ohio  44114
                bart.bixenstine@ogletreedeakins.com
11                           - - - -

12              ALSO PRESENT

13              Sarah Aronson, M.D.

14              Matthew Norcia, M.D.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX

 2                                            PAGE

 3  EXAMINATION

 4  By Mr. Gordillo                            5

 5

 6  OBJECTIONS

 7  By Mr. Bixenstine                         22

 8  By Mr. Bixenstine                         38

 9  By Mr. Bixenstine                         39

10  By Mr. Bixenstine                         42

11  By Mr. Bixenstine                         47

12  By Mr. Bixenstine                         48

13  By Mr. Bixenstine                         56

14  By Mr. Bixenstine                         61

15  By Mr. Bixenstine                         62

16  By Mr. Bixenstine                        135

17  By Mr. Bixenstine                        141

18  By Mr. Bixenstine                        148

19  By Mr. Bixenstine                        158

20  By Mr. Bixenstine                        160

21  By Mr. Bixenstine                        161

22  By Mr. Bixenstine                        162

23  By Mr. Bixenstine

24

25
```

1                                                    PAGE

2    EXHIBITS

3    Exhibit 27                                      57

4    Exhibit 28                                      84

5    Exhibit 29                                      85

6    Exhibit 30                                      86

7    Exhibit 31                                      98

8    Exhibit 32                                     100

9    Exhibit 33                                     124

10   Exhibit 34                                     145

11   Exhibit 35                                     147

12   Exhibit 36                                     149

13   Exhibit 37                                     153

14   Exhibit 38                                     167

15   Exhibit 39                                     174

16

17

18

19

20

21

22

23

24

25

```
1                    DAVID WALLACE, M.D.

2        called by the Plaintiff for the purpose of examination,

3    as provided by the Ohio Rules of Civil Procedure, being by

4    me first duly sworn, as hereinafter certified, deposed and

5    said as follows:

6                         - - - -

7                    EXAMINATION OF

8                    DAVID WALLACE, M.D.

9                         - - - -

10        BY MR. GORDILLO:

11   Q    Good morning.

12   A    Hi.

13   Q    Would you please state your full name for the record?

14   A    David Alan Wallace.

15   Q    As we go along today, how would you like me to

16        address you?

17   A    David is fine.

18   Q    Okay.  David, would you please state what your home

19        address is?

20   A    30907 Hilliard Boulevard in Westlake, Ohio.

21   Q    Does anyone else live there with you?

22   A    My wife.

23   Q    What's your wife's name?

24   A    Bonnie.

25   Q    Anyone else?
```

```
 1   A   No one else.

 2   Q   David, have you had your deposition taken before?

 3   A   I have.

 4   Q   Have you testified as an expert witness before?

 5   A   I have not.

 6   Q   Okay.  How many times have you been deposed before?

 7   A   I think twice.

 8   Q   And do you know what the lawsuits were about that you

 9       were deposed in?

10   A   I believe I was deposed -- yes.  I was deposed for a

11       lawsuit in which I had prescribed a patient some

12       medication and the patient overdosed on a bunch of

13       different medications, including the medication I

14       prescribed.

15   Q   That was one case.  Were you deposed in some other

16       case, too?

17   A   I was deposed in another case in which I gave

18       anesthesia, and the patient had, weeks later, the

19       need to come back for surgery and had complications

20       during the hospital stay after a second surgery, so I

21       was deposed in relation to that case.

22   Q   Other than cases involving allegations of negligence,

23       medical negligence, have you given any other

24       testimony?

25   A   I don't believe so.
```

1   Q   Who is your current employer?

2   A   UHMG.

3   Q   UHMG, is that an acronym?

4   A   It's University Hospitals Medical Group, I believe.

5   Q   And is that your only employer right now?

6   A   No.

7   Q   Who else employs you?

8   A   I work part-time for Columbiana Anesthesia.

9   Q   Is that a practice group?

10  A   There's a hospital in East Liverpool, Ohio that I

11      occasionally work at, just some call coverage.

12  Q   What is that hospital?

13  A   East Liverpool City Hospital.

14  Q   And presumably Columbiana has a contract to provide

15      services to the East Liverpool City Hospital; is that

16      right?

17  A   They're the providing group for the hospital's

18      anesthesia services.

19  Q   Okay.  Do you have any other employers right now?

20  A   I do.

21  Q   Who else employs you?

22  A   I work for Jenson Board Prep.

23  Q   What do you do for Jenson Board Prep?

24  A   I teach oral Board preparation courses and pain

25      preparation courses.

Page 8

1   Q   Do you have any other employers right now?

2   A   I don't think so.

3   Q   Okay.  Tell me what you do as an employee of UHMG.

4   A   I'm an anesthesiologist.  I practice clinical

5       anesthesia, and I'm the Vice-Chair of Education,

6       although that title is technically with the School of

7       Medicine.  We're co-appointed faculty to Medical

8       School and staff of the hospital, so I'm also the

9       Residency Program Co-Director.  And I'd say those are

10      my primary responsibilities.

11  Q   So you're the residency co-director for the

12      Anesthesiology Residency Program at University

13      Hospitals of Cleveland; is that right?

14  A   It's University Hospitals Case Medical Center.  It's

15      actually Case Western Reserve University, University

16      Hospitals Case Medical Center.  That's the formal

17      name for our Residency Program.

18  Q   How long have you been the co-director of that

19      program?

20  A   On January 1st, it will be ten years.  January 1,

21      2011, it will be ten years.

22  Q   As the residency co-director, were you responsible

23      for supervising Doctor Sarah Aronson when she went

24      through the program?

25  A   I had part responsibility both as a faculty doing

 1      clinical anesthesia cases, and I had responsibilities

 2      as her program co-director.

 3   Q  All right.  Tell me what your responsibilities were

 4      as a faculty member relative to Sarah Aronson.

 5   A  She was a resident training in our program, and in

 6      order for her to get Board certified during -- or to

 7      complete her program, she had to do clinical

 8      anesthesia cases.  She's not allowed to practice

 9      anesthesia without the supervision of

10      anesthesiologists overseeing that and taking

11      responsibilities for patient care.  So I was a

12      faculty involved with her as a resident in training.

13   Q  And what were your responsibilities relative to

14      Doctor Aronson in your capacity as co-director of the

15      Residency Program?

16   A  Well, Doctor Norcia and I took over as program

17      co-directors on January 1, 2001, and at that time, we

18      sort of delegated responsibilities, and from my

19      recollection, there was about 20 different areas that

20      we decided someone should be responsible for, so we

21      sort of divided those up, and some of those

22      responsibilities that I primarily was responsible for

23      was things like doing the scheduling for residents,

24      clinical schedules.  I did case log coordinating.  I

25      dealt with various problematic resident issues.  I'd

```
 1              say those are some of my primary roles.
 2    Q    Can you recall any of the other roles that were
 3         divided to you among those 20, or so, topics?
 4    A    There were some roles that we shared.  Like, we would
 5         do resident reviews and we would essentially do those
 6         together.  We were responsible for maintaining our
 7         accreditation with the ACGME, and I was responsible
 8         for a lot more of the computer work than Doctor
 9         Norcia, so I did a lot of word processing and Excel
10         Spreadsheet processing.  I was responsible for our
11         residents -- I was partially responsible for our
12         residents' participation in the Midwest Anesthesia
13         Residents Conference, which is held usually in March
14         or April, so I did our residents' abstract proofing,
15         their Powerpoint proofing for their projects.  I did
16         their poster proofing for their projects, and I have
17         had a lot of experience in editing -- doing editing
18         on Powerpoint for poster presentations, so I was
19         primarily responsible for those types of things.
20    Q    Were there any other areas that you were primarily
21         responsible for?
22    A    I'm sure there were.  I don't remember the complete
23         list.
24    Q    Other than the resident reviews and accreditation,
25         were there other areas that you shared with Doctor
```

1         Norcia?

2    A    Yes.  We did education planning together, curriculum

3         developments together.  We worked on ACGME

4         accreditation tasks together.  We were involved with

5         our ACGME site visit for re-accreditation together.

6         We were involved with going to meetings to prepare us

7         for ACGME rules, learning the ACGME rules together.

8    Q    Anything else?

9    A    We planned graduation events together.  We put on a

10        graduation program for the residents together.

11        That's most of what I can think of right now.

12   Q    Okay.  When you mentioned that you did most of the

13        computer work, I think you said -- you gave an

14        example of working with Excel Spreadsheets.  What

15        kind of information were you working with in

16        connection with the computer work that you did?

17   A    I would put together lists of residents if we needed

18        to have them for organizing activities or events that

19        were needed to be done.  I would -- a primary thing I

20        would do with Excel is managing residents' schedules

21        and helping with both intern and our anesthesia

22        residents' 36-month schedule.

23   Q    And with respect to the work that you and Doctor

24        Norcia did concerning education planning, can you

25        tell me more about what that work was?

```
 1    A    Doctor Norcia and I would meet with the residents on

 2         a periodic basis.  We would generally -- the format

 3         was first speaking to the interns, then the CA1s then

 4         the CA2s and then the CA3s and getting specific

 5         feedback from the different classes with all in

 6         attendance as a group.  And based on the feedback, we

 7         would evaluate any pluses that were said or negative

 8         things that were said to see if we should continue

 9         doing some of the different types of things that we

10         did or see if we could change them or alter them.

11    Q    Did education planning involve any one-on-one meeting

12         with residents or interns?

13    A    I wouldn't say that that was a specific thing for

14         curriculum change, no.

15    Q    And you mentioned education planning.  I want to be

16         clear, because I'm going to switch in a second.  So

17         you would not say that one-on-one meetings with the

18         residents was part of what you did in the context of

19         education planning; is that right?

20    A    Well, we met with all the residents individually, and

21         many times throughout the years we would ask them for

22         their opinions, and that may, again, give us some

23         more input or influence some of the things that we

24         did.  But we would have education committee meetings,

25         and we would take things that we would get feedback
```

1          from the residents, and we have an education

2          committee, so we would provide information to the

3          education committee, but that could come from anyone;

4          faculty or residents or other staff.  We would take

5          inputs from everyone.

6     Q    What did you do with Doctor Norcia with respect to

7          curriculum development?

8     A    We first -- in January of 2001 when we took over,

9          soon thereafter we made attendance to our didactics

10         mandatory.  Before that, it wasn't.  So we felt it

11         was important for people to attend didactics.  It's

12         also ACGME required, so that was consistent.  We

13         changed our -- over the years, we changed our

14         curriculum on how we do things.

15              For instance, we used to have a three-year

16         curriculum that would cover the complete curriculum

17         in two years, so there's a 50 percent overlap.  With

18         time, we evolved to having a two-year curriculum and

19         then a separate curriculum for our CA3s.

20              We changed the Journal Club format to make it a

21         three-month long process for the learning process in

22         putting the responsibility of selecting topics,

23         selecting articles, and presenting articles on the

24         residents' responsibility.  So we changed the whole

25         format of that.  We started -- originally we started

```
 1            something called Barash Club, which was assigning
 2            residents specific sections of a chapter to read
 3            every week, and then portions of the chapter they
 4            would write questions, submit questions to us, and
 5            then we would review the questions after our faculty
 6            gave the lecture or interactive discussion based on
 7            that topic.  And we've done that for Barash and
 8            Stoelting's Book.  And then we went back to Barash,
 9            based on resident feedback, then went to Big Blue,
10            and then Morgan and Machale, and then we went back to
11            Barash.  Over the last ten years, that's the sequence
12            of books that we've read based on feedback from
13            residents and our education committee.
14      Q     Do your responsibilities include counseling with
15            residents about their own curriculum choices?
16      A     I'm not sure I understand what you mean by curriculum
17            choices.
18      Q     Well, residents do have some flexibility in terms of
19            what they want to focus their rotations on, right?
20      A     So over a 36-month period within -- usually they
21            start as -- a CA1 is a first-year resident, a CA2 is
22            a second-year resident, and a CA3 is a third-year, so
23            it's 12 months per year for the traditional track,
24            and over that 36-month span, in the first two months,
25            July and August, we rotate our residents through
```

```
 1              different areas clinically just to get them sort of

 2              basic foundation skills.  And during that period of

 3              time, they essentially take no call and they start

 4              off on a more one-to-one basis until they demonstrate

 5              they can perform independently.

 6                   During usually the second month, in August, is

 7              when I make up a 36-month schedule that is

 8              sequential, and I have 12 different residents with no

 9              name attached to it.  So since we have 12 residents

10              and Doctor Nearman our chairman wanted everyone's

11              training to sort of be transparent or seamless, we

12              have basically the same core rotations in curriculum

13              for all the residents.

14                   Out of that 36-month period, there's about

15              roughly 30 months that are -- somewhere approaching

16              30 months that are core curriculum that everyone

17              does, and then there's an average of about five or

18              six months that there's some flexibility to making

19              choices or decisions.

20       Q      Right.  And that's what I'm really asking about is

21              that five or six months of making choices or

22              decisions.  Do you counsel with residents about those

23              choices or decisions?

24       A      Well, I would say usually -- I'm not sure if the word

25              counsel is -- I would say I negotiate with the
```

1          resident.

2     Q    Okay.  Why do you say negotiate?

3     A    Because the way our program is set up, most residents

4          that are on a flexible month need to be on an OR or

5          an OB rotation, and based on what their interest is,

6          then we can't have too many residents on any one

7          service because it dilutes the experience for the

8          core residents' rotations, and if someone wants to do

9          something, for instance, like research, we have

10         guidelines on what the requirements are for someone

11         to do research.

12              So they have to submit a proposal, which usually

13         is just like a paragraph of what they want to do, and

14         then we talk to the education committee about that

15         for their approval of that, and part of that would

16         then include one day in the operating room -- one day

17         in the operating room a week during that period.  And

18         that can be anywhere -- we've had anywhere from one

19         month to, I believe, three months.  I don't think

20         we've had anybody do anything longer than three

21         months.

22              The ACGME allows up to six months in any one

23         specific area after your core rotations, and we can't

24         have -- just from a staffing standpoint, we can't

25         have five or six people all in the same month doing

```
 1              that.  It just makes it an inequity to provide

 2              service and the amount of calls that the residents

 3              do.  It puts an extra burden on other residents.  So

 4              based on the context of what they want to do, I try

 5              to see what all the other residents are scheduled for

 6              and then try to make a more logical decision of when

 7              someone can do a certain rotation.

 8      Q      Do you find that there are certain rotations that

 9              tend to be more popular or more in demand by

10              residents?

11      A      Yes.

12      Q      Which rotations are those?

13      A      I would say that a more popular request is for doing

14              some pain, extra pain.  We have a lot of requests for

15              residents to do regional anesthesia.  We have a fair

16              number of requests to do extra obstetrics or

17              pediatrics.  We have a lot of requests to do more

18              advanced cases, but not a specific area, and then

19              we've had people wanting to do more cardiac, more

20              thoracic, more neuro.  I would say those are the

21              primary things.  We've had an occasional resident

22              want to do some ambulatory surgery based on where

23              they were planning on practicing.  So I'd say those

24              are the primary interest areas.

25      Q      So are these the areas that you most frequently find
```

1           yourself having to negotiate so you can balance the

2           number of residents in the rotation at one time?

3   A   Well, essentially any month that I would consider a

4           float month or a flex month, I negotiate everyone,

5           because I have to have the residents declare what

6           they want to do, and some of them say, put me in

7           anything, and so that's fairly easy to accommodate.

8           Sometimes they say they want to do a specific

9           rotation, or I'll tell them after I have all of the

10          other residents scheduled for that month, the month

11          to come, I'll say, these are the areas that are open,

12          what would you like to do?  And they could suggest

13          that.

14             Sometimes they have some goals that aren't really

15          assigned to a room specifically, like they want to do

16          a difficult airway management month, which they can

17          do.  They can be assigned to many different rooms or

18          nothing real specific for service.  But every month I

19          have to put down their name, and we have something

20          called a magnet board, which has one name for

21          everybody in the department, and their name has to go

22          somewhere.  No matter what it is, their name has to

23          go somewhere on the board; whether they're on

24          vacation, whether they're on call, whether they're

25          post-call.  Everyone is identified to be somewhere.

1          And in the -- around the middle to the end of the

2     month prior, I have to make a schedule and send it to

3     the scheduler to put into our electronic system, and

4     I have to place every resident name somewhere.

5          So I'll say, essentially always I get feedback

6     from the resident to where they want to be placed if

7     they're not assigned to one of their core rotations.

8     So every month if they have a flexible or float

9     month, it has to be negotiated.  And if they give me

10    enough notice, we to try to optimize them to be in a

11    month where they have flexibility when there's not a

12    lot of other people in that area or someone is taking

13    vacation and won't be on a certain service, then that

14    would give them more of a primary selection for

15    cases, for good cases.

16  Q  And you say flexible or float month.  Is a flexible

17    month and a float month the same thing?

18  A  Not exactly.

19  Q  Okay.  Tell me what the differences are.

20  A  The flexible months tend to be earlier in -- before

21    the core rotations are done, and there are certain

22    rotations that we can have more than one resident in,

23    but all the residents still get assigned to it.

24          For instance, we have six ambulatory surgery

25    operating rooms and we have some that are related to

1    orthopedics generally and some that are related to

2    laparoscopic types of surgeries.  So they have to

3    do -- we can assign multiple residents when they are

4    in a flex month, because everyone has to rotate

5    through there.  In the main ORs, we have a room that

6    we do a lot of bariatric cases, so that's a good

7    general anesthetic room.  It gets them good airway

8    management experiences and dealing with basic cases

9    where there's not a lot of turnover, and we have a

10   transplant room, a second vascular room, so everybody

11   rotates through those types of rooms.  We have a

12   secondary, not a primary, ENT room and plastics room.

13   We rotate all of our residents through.

14        So on any given month, if three residents that

15   haven't completed their core rotations have flexible

16   months, I can go from that sort of sub-pool of rooms

17   and make an assignment for them.

18        As the residents complete their course and then

19   towards the end of their residency have flexibility,

20   then that's more of what I consider a float month

21   where if they met the requirements, then they can

22   just be assigned to whatever they what, whatever

23   their interests are, to sort of gear them toward what

24   they might anticipate they will be doing or what they

25   want to do more because they may not be able to do it

1          later or to meet some of their requirements, but that

2          has more options, I would say, in some regards.

3     Q    Are there certain rotations that you find that are

4          less popular or the residents don't seem to like?

5     A    Let's see.  As far as residents go, I've heard

6          residents sort of joke about neuro anesthesia and

7          about taking their vacation when they're on their

8          core neuro rotation, and I've heard residents joke

9          about pediatric anesthesia, but we do -- in the core

10         rotations -- because we have Rainbow Babies and

11         Children's Hospital, because of the Children's

12         Hospital, we actually in our curriculum have set up

13         three months of pediatric anesthesia when only two

14         months are required, so they do a lot of pediatrics,

15         and some residents may not go out into practice and

16         do pediatrics, so they may not have as much of an

17         interest in that.  Some people like obstetrics.  Some

18         people don't like it.  It's a dipolar service, I

19         would say.  So I would say those are the primary ones

20         that I've heard people may not like.

21    Q    In June of 2009, you had a meeting with Sarah Aronson

22         about her performance.  Do you recall that?

23    A    I do.

24    Q    Tell me what you recall about that meeting.

25    A    I remember that we were -- that I was on call the day

1        before, and in order to meet with Sarah, I stayed

2        post-call, and Doctor Norcia and I met with her in --

3        I believe it was the conference room next to the

4        Mather Operating Room Control Desk.

5  Q    Who ordered you to the meeting?

6               MR. BIXENSTINE:  Objection.

7  A    No one.

8  Q    You said that you were ordered to meet.

9  A    No.  In order to meet.

10  Q    I'm sorry.  In order.

11  A    In order to meet with her, I stayed after call.

12  Q    Who had decided to schedule that meeting?

13  A    I guess it would have been Doctor Norcia and myself.

14  Q    And why did you choose to schedule a meeting on that

15        particular day?

16  A    Because the end of the six-month period for which we

17        report to the ABA the Clinical Competency Committee

18        report, that was going to be coming due, and I can't

19        remember the last time we had met with Doctor

20        Aronson, but we needed to review her evaluations, so

21        we decided to meet with her.

22  Q    Did you meet with any other residents that day to

23        review their evaluations?

24  A    No.

25  Q    Did you meet with any other residents the day before

Page 23

1          to review their evaluations?

2    A    I was on call the day before, so I didn't.

3    Q    And did you meet with any other residents the day

4          after the meeting with Sarah?

5    A    I'd have to look at a calendar.  I can't remember.

6    Q    The reporting period that you mentioned would have

7          been due in July, right?

8    A    It would have been due by the -- I believe the last

9          day in July.

10   Q    Did you meet with all the residents toward the end of

11         that six-month period?  When I say all the residents,

12         separately to review their evaluations.

13   A    I don't believe we met with all the residents.  From

14         my recollection, although I'm not 100 percent sure,

15         but I believe in the month of June, we met with the

16         whole class of graduating residents.  I think that

17         was during that month period.  And I actually -- I

18         want to rephrase a question, now that you mention

19         that.

20             When you asked me if we met with any other

21         residents on June 4th, we may have met with some

22         other residents in that time period, but I don't

23         remember exactly the dates for those, but I believe

24         we met with the whole graduating class in June prior

25         to when they were going to graduate.

1    Q    Before you had the meeting with Doctor Aronson, did

2         you confer with Doctor Norcia about how the meeting

3         would go?

4    A    I don't know how I could have done that.  I wouldn't

5         know how the meeting would go.

6    Q    Well, did you work with Doctor Norcia in any way to

7         prepare for the meeting?

8    A    I don't remember the details completely of the

9         preparation for that meeting.  I do remember that I

10        had some documents that I brought with me to the

11        meeting.  I don't remember if Doctor Norcia had any,

12        and I don't remember what we had prepared.

13   Q    What documents did you bring?

14   A    In that previous six-month period, I had worked with

15        Doctor Aronson probably at least -- or had some type

16        of interaction with Doctor Aronson at least four or

17        five times which I felt was performance that was not

18        acceptable, and so I had some supporting documents in

19        relation to those so that I could present some

20        detailed and specific facts related to those cases or

21        incidences that had occurred.

22   Q    So when you say the prior six months, are you talking

23        about from January of 2009 to June of 2009?

24   A    From January to June of 2009, yes.

25   Q    And during that period of January 2009 before the

Page 25

1      meeting on June 4, 2009, did you have conversations

2      at all with Doctor Aronson to inform her of your

3      concerns about her unacceptable performance on those

4      four or five interactions?

5  A   I believe I spoke to her about all of the ones that

6      were related clinically, and there is one that was

7      related to a day that I was coordinating the

8      operating rooms and about her non-clinical behavior

9      and I confronted her directly about that, but we

10     didn't sit down and talk about it or review it later.

11 Q   Did you share your concerns at the time of the

12     interactions with Doctor Norcia?

13 A   Could you say that -- I'm not sure.

14 Q   Did you share with Doctor Norcia the concerns you had

15     about Doctor Aronson's performance at the time the

16     interactions occurred?

17 A   Not at the specific time.

18 Q   Had you shared them with Doctor Norcia before the

19     June 4th meeting?

20 A   I believe he was aware of all the incidences.

21 Q   Why do you believe he was aware of them?

22 A   Because I think I recall all the incidences, and I --

23     from my memory, I believe I spoke to him about her

24     poor performance during all those incidences because

25     of the nature of them.

Page 26

```
 1    Q    Did you confer with Doctor Norcia about the documents

 2         you were going to bring to the June 4th meeting

 3         before the meeting?

 4    A    I believe I told him maybe in a generalized way about

 5         some of my interactions that he may not have known or

 6         remembered -- well, he knew of previous, but he may

 7         not have recalled what they were, but I told him that

 8         I was going to bring my documents related to my

 9         personal interaction with Doctor Aronson.

10              Then I had other documents from other faculty

11         that had worked with her in that time period, and I

12         had some documents from residents on interactions

13         they had had, and I believe I also had the electronic

14         evaluation tool that we use that are reports that are

15         generated from that for a time period that was, I

16         believe, from the last time we reviewed her to

17         roughly that date.

18    Q    Before the June 4th meeting occurred, had anyone told

19         you that you were too emotional in the way you were

20         evaluating Doctor Aronson?

21    A    I don't believe so.

22    Q    Had anyone told you that you were not sufficiently

23         objective in the way that you were evaluating her?

24    A    I don't believe so.

25    Q    During the meeting, did you discuss with Doctor
```

Page 27

1           Aronson her performance?

2    A      Yes.

3    Q      What did you say to her about her performance?

4    A      Basically I had all of the different interactions

5           that we had had, and at this point, she was past what

6           would have been the normal date of matriculation for

7           her when she first started in Clinical Anesthesia

8           because she had received an unsatisfactory for the

9           prior six-month period.  And based on the evaluation

10          information that I had, I told her that I didn't

11          think she was probably going to get a satisfactory

12          for the six-month period from January of '09 through

13          June of '09.

14   Q      Before you said that to Doctor Aronson, had you

15          shared that opinion with Doctor Norcia?

16   A      We had talked about Doctor Aronson's performance on

17          many, many occasions whenever we would get some

18          evaluation information, because at the end of the

19          six-month period, for all residents, we have to fill

20          out that ABA Clinical Competency Report, and in order

21          to do that for someone to have a successful

22          completion of that six-month credit, all answers have

23          to be answered as a satisfactory.  If there's a

24          single one that's unsatisfactory, then the whole

25          six-month period gets an unsatisfactory result.

Page 28

1           And so in order for us to determine on an

2       on-going basis how her performance was, we would

3       discuss it, I'd say, on the occasions when we'd get

4       more information.

5   Q   Before the June 4th meeting, did you share with

6       Doctor Norcia your opinion that you believed for the

7       current reporting period Doctor Aronson was not going

8       to be able to complete the period satisfactorily?

9   A   I don't remember saying that to him specifically

10      because we hadn't had the meeting yet.  And one of

11      the problems that I had with Doctor Aronson prior to

12      the meeting after the events that her and I had dealt

13      with occurred was that she was unable to explain her

14      behaviors, and my perspective is that if she had an

15      explanation for her behavior, then that would help

16      determine whether things would be considered that she

17      could be graded as satisfactory or not.

18          So without getting an adequate explanation, then

19      I just go by the facts that I have and make my best

20      assessment of what I think her progress is.  But

21      Doctor Norcia and I, we make our own independent

22      assessment and then -- we don't just agree with -- I

23      don't just agree with him and he doesn't just agree

24      with me.  We make our own assessments and evaluate

25      all of the evidence and then come up with a

```
 1            conclusion.

 2      Q     So as far as you know, the first time that Doctor

 3            Norcia would have learned that your opinion was that

 4            Sarah Aronson was not likely to complete that period

 5            satisfactorily was at the June 4th meeting?

 6      A     I can't say that's true.  Because from my

 7            recollection, when an incident would occur and then I

 8            talked to Doctor Aronson and then she would have no

 9            explanation, my conclusion would be, this is not very

10            good for supporting her to have a satisfactory.

11                 But we don't -- we cannot make a decision until

12            the end of the six-month period, and so we have to

13            wait until we have all the information and we have to

14            meet with the resident.  And if a resident does

15            something that I feel is not appropriate and they

16            have a good rationale, then it's doing what I would

17            consider the wrong thing for the right reason.  But

18            the problem I had with Doctor Aronson is she would

19            give no reason, and at that stage in her career, an

20            anesthesia consultant has to be able to at least have

21            a reason for why they do things, in my opinion.

22      Q     Did Doctor Norcia indicate to you in any way whether

23            he agreed or disagreed with your assessment?

24      A     On June 4th?

25      Q     Yes.
```

```
 1    A    No.  I don't believe he did, because we have to go

 2         through to the end of the month, so I just informed

 3         Sarah, because I believe in being more open about

 4         things, and I told her what my impression was.  And

 5         it's not the final conclusion, because if someone --

 6         you know, if a resident thought about something and

 7         came up with an answer the next day and said, well,

 8         this is why I did it, even though she didn't have a

 9         reason for doing things.  But if that were the case,

10         we have to go to the end of the period.  It's graded

11         for the whole six-month period.

12              So when the last day of the month comes and goes,

13         then based on all the information, the decision on

14         how to grade someone is based on all that six-month

15         information.  So on June 4th, it's not the time to

16         make the final conclusion, you know, unless there's

17         something so egregious that would fall into a

18         different realm.

19    Q    So you believed that on June 4th while you had the

20         opinion that she was not satisfactorily completing

21         her work, that she could change and in fact in that

22         month make for the work to be satisfactory?

23    A    I don't know if that's a true statement.  I don't

24         know if her changing -- you know, to say a

25         performance from June 4th to the end of the month,
```

```
 1            someone could do something that would make me believe

 2            that they go from an unsatisfactory to satisfactory.

 3                My statement is if she could come up with

 4            explanations and reasons that seemed reasonable to

 5            justify what she did for the time up to that point,

 6            that would be a possibility.  I just couldn't think

 7            of a reason why she did some of the things that she

 8            did.

 9    Q       Fair enough.  Let me try it again then.

10                If she had come up with an explanation to you for

11            her prior actions, that may have been able to change

12            your mind about whether she had satisfactorily

13            completed the work for the period that was going to

14            end the end of the month in June?

15    A       That would be possible.

16    Q       Were your concerns about her performance in June the

17            same types of issues that you had when she was rated

18            unsatisfactory in January?

19    A       No.

20    Q       How were the issues different?

21    A       Well, the issues -- the issues on June 4th; is that

22            the question?

23    Q       Right.  The issues that were leading you to believe

24            she was not going to be able to complete the January

25            to July period satisfactorily, how were those
```

```
 1            different from the issues that caused her to be

 2            unsatisfactory in the previous July to January

 3            period?

 4    A     Well, she -- from my personal experiences, just

 5            working with my personal experiences, she brought up

 6            some of the -- some core competency issues that were

 7            different than what had been -- what had led to her

 8            getting an unsatisfactory prior to that.

 9    Q     When you say core competency, are you talking about

10            in the context of the six competencies laid out by

11            the ACGME?

12    A     Yes.

13    Q     Which were the core competencies in terms of the

14            ACGME was she showing deficiencies in in June of

15            2009?

16    A     I would say systems-based practice was one.  Patient

17            care was a second.  Interpersonal communication

18            skills was a third.  Professionalism was a fourth.  I

19            might even say that she demonstrated the result of

20            the practice-based learning and improvement core

21            competency -- she demonstrated the lack of that

22            result or didn't demonstrate that she was learning

23            based on her experiences.  So I'd say at least those.

24    Q     Well, that's five.  What's the sixth one that she was

25            satisfactory in?
```

1    A    Medical knowledge is the sixth one, and I think she

2         has what borders on extraordinary medical knowledge.

3    Q    Did you believe that her performance deficiencies in

4         June were more serious than her performance

5         deficiencies that were rated in January?

6    A    I don't know that I could answer that.

7    Q    Do you know why she was able to successfully complete

8         the program despite your opinion?

9    A    I think I can answer that, but that's a big -- that's

10        a -- can you be more specific in that question?

11   Q    Sure.  Let's start this way.

12            You agree with me she successfully completed the

13        program?

14   A    Yes.  She graduated.

15   Q    And she graduated despite your having the opinion in

16        June that she wasn't going to be able to

17        satisfactorily complete her last reporting period,

18        right?

19   A    That's correct.

20   Q    But that's a requirement for her to successfully

21        complete the program, that she complete the last

22        period satisfactorily, right?

23   A    Yes -- well, that's not -- well, the very last six

24        months have to be satisfactory.

25   Q    Right.

Page 34

1    A    Not necessarily that six months.

2    Q    So if she was going to complete in August, she could

3         have been satisfactory from August of the prior six

4         months?

5    A    No.  What I'm saying is if she'd gotten an

6         unsatisfactory for the period of January of '09 to

7         June of '09, then the previous six months of

8         unsatisfactory would not get satisfactory, and she

9         would have to continue for another six months in

10        order to bring the January of '09 to June of '09

11        unsatisfactory to becoming credit.

12   Q    Right.  But in any event, her last six-month rating

13        period had to be satisfactory for her to --

14   A    The last six months have to have a six-month

15        satisfactory period in order to complete.

16   Q    So if your opinion that she wasn't going to be able

17        to complete the six months from January to June

18        satisfactorily was correct, she would not have been

19        able to complete the program; is that right?

20   A    I don't know that -- I think the way you worded that,

21        that's not true.

22   Q    Let me try it this way:  How could she have completed

23        the program if she had been rated unsatisfactory for

24        the reporting period ending in July of 2009?

25   A    She couldn't have.

1   Q   That's what I'm getting at.

2   A   Yes.  The last six months has to be satisfactory for

3        a resident to graduate.

4   Q   And you held the opinion that she was not going to be

5        able to complete that period satisfactorily, correct?

6   A   On June 4th, yes.

7   Q   But she did complete the program satisfactorily,

8        right?

9   A   She did.

10   Q   And she received a satisfactory rating for the period

11        from January to July; is that correct?

12   A   Correct.

13   Q   So my question is:  What happened that caused her

14        rating to be satisfactory when you were of the

15        opinion in June that it was unsatisfactory?

16   A   Well, my opinion is just one person's opinion.

17   Q   Okay.

18   A   And the determination, despite what some people may

19        believe, it's not my decision.  It's Doctor Norcia

20        and I discuss -- we look at the faculty input,

21        others' input, residents' input.  We also in this

22        circumstance had input from Doctor Nearman, and I

23        believe we had some input from Doctor Shuck to make

24        the decision.

25   Q   And the decision was made at about the end of July?

Page 36

1    A    I don't remember when her Clinical Competency Report

2         was filled out, but generally speaking, it's towards

3         the middle to end of July when those reports are

4         filled out.

5    Q    The report would have been due at the end of July,

6         right?

7    A    It's due by the end of July.  I don't remember when

8         it was actually filled out.

9    Q    But presumably, you're going to fill out the form

10        shortly before they're due, right?

11   A    Well, I don't fill out the form.

12   Q    Well, you're going to reach -- the program is going

13        to reach whatever conclusion they reach about the

14        resident's performance shortly before the form is

15        due; is that correct?

16   A    Well, the decision would be made after, in this case,

17        June 30, 2009, and that interval between July 1st

18        and -- well, I'll say at the end of June 30, 2009 to

19        when the report gets filled out, sometime in that

20        period is when the decision was made.

21   Q    I understand.  So is it fair to say that your

22        colleagues; Doctors Norcia, Shuck, and Nearman, and

23        the other faculty members of the Anesthesiology

24        Program collectively did not agree with your

25        assessment?

1    A    I don't believe that's a true statement.

2    Q    Well, did they agree with your assessment that she

3         had not satisfactorily completed the reporting

4         period?

5    A    Well, if you're saying, did everybody in our

6         department except for me agree that she should

7         graduate, I don't think that you -- that that's a

8         globally correct statement.

9    Q    But it was the representation of the department that

10        she had satisfactorily completed the reporting

11        period, correct?

12   A    Yes.  Our program deemed that she had satisfactorily

13        completed the program.

14   Q    And you disagreed with that, didn't you?

15   A    My personal opinion is that she did not do what I

16        would expect of someone that should be ABA Board

17        eligible.  She did not meet what I would personally

18        think was adequate to be a Board certified

19        anesthesiologist.

20   Q    And because you were too emotional and not objective

21        enough, you were removed from the process; isn't that

22        right?

23   A    First of all, I wasn't emotional about the --

24        whatever you had just said.  I wasn't emotional about

25        it.  I had scientific and objective evidence to base

1   my decision.

2 Q Were you removed from the process?

3 A Which process are you talking about?

4 Q The process of evaluating Sarah Aronson.

5 A Well, I was still in the capacity to evaluate her up

6   until June 30th.  That's the last of -- or, no.  No.

7   She was still -- no.  I was still in the process of

8   evaluating her.  Yes.  I was still in the process of

9   evaluating her until the day she graduated.

10 Q Did you ever have a conversation with Doctor Shuck in

11   which Doctor Shuck advised you that you should not be

12   so closely involved in evaluating Doctor Aronson?

13 A I don't specifically recall what you just said as

14   being correct.

15 Q Well, do you generally recall that what I said is

16   correct?

17      MR. BIXENSTINE:  Objection.

18 A Could you just tell me your question again?

19 Q Let me ask a different question.

20   Did you have any conversation with Doctor Shuck,

21   the gist of which was to limit your involvement with

22   Sarah Aronson?

23 A I may have had some conversation like that.  I may

24   have.

25 Q When did that occur?

Page 39

```
1    A    If I had that, I would think it would have been maybe
2         in July or after July.
3    Q    Not in June?
4    A    I don't recall -- I don't recall it being in June
5         because the decision was not made about her
6         satisfactory or unsatisfactory performance for that
7         six-month period.  She hadn't completed that yet, so
8         I don't believe that would have been when it was.
9    Q    What did Doctor Shuck say to you?
10   A    I honestly don't remember having a specific
11        conversation like that.  I don't.
12   Q    Did you have any conversation like that with Doctor
13        Nearman?
14   A    I don't think I ever had a conversation like that
15        with Doctor Nearman.
16   Q    Did you consciously find yourself limiting what role
17        you took with respect to Sarah Aronson in the
18        Residency Program?
19                  MR. BIXENSTINE:  Objection.  Do your
20             best.
21   A    When?
22   Q    At any time.
23   A    Yes.  Could you just ask the question again?
24   Q    Sure.
25                  MR. GORDILLO:  Could you read back
```

```
 1                   the question?

 2                      - - - -

 3          (Thereupon, record read by Notary)

 4                      - - - -

 5    A    Well, I can remember doing what I felt was limiting

 6         my involvement by having her certificate prepared

 7         differently.

 8    Q    And how did you limit your involvement with respect

 9         to preparing her certificate?

10    A    I had the place for my signature removed from that

11         document.

12    Q    Why did you make that choice?

13    A    Because I personally still felt that because of her

14         inability to explain her actions, which I thought

15         were unusual or bizarre behaviors, that I couldn't --

16         I couldn't feel good about signing her certificate.

17    Q    Let's take a look at a document that was previously

18         marked as Exhibit 12.  And David, any time I hand you

19         a document, I want to make sure you take all the time

20         you'd like to look over the document so you can

21         become adequately familiar with it and let me know

22         when you've had fair time to review it.

23    A    Okay.

24    Q    This is, as you see, an email string between Doctor

25         Aronson and Doctor Shuck.
```

```
 1    A    Mm-hmm.

 2    Q    And in the middle of the three emails, you see that

 3         Doctor Aronson was asking Doctor Shuck to confirm her

 4         understanding of a conversation the two of them had

 5         on June 16th; do you see that?

 6    A    I do.

 7    Q    And part of that conversation that Doctor Aronson

 8         understood was that Doctor Shuck informed her that

 9         you were no longer a player, in quotes, and that he,

10         Doctor Shuck, was going to remain in the on-going

11         process.  Did you see that part of her email?

12    A    I do.

13    Q    And do you see his response?

14    A    His response?

15    Q    To her asking about whether she's summarizing the

16         conversation correctly.  And his response is at the

17         top.

18    A    I don't see his response at the top.

19    Q    Right.  At the top he says, yes.

20    A    Oh.  Oh.  I see.  Yes.  Yes, that's his response.

21    Q    So she has accurately summarized that on June 16th,

22         he informed her that you were no longer a player?

23    A    Yes.

24    Q    As you see this document, do you believe that you

25         were no longer a player by June 16th?
```

Page 42

```
 1    A    I'm not sure what no longer a player means.

 2    Q    Ever heard that phrase, no longer a player?

 3    A    I believe I have.

 4    Q    What do you think the phrase no longer a player

 5         means?

 6    A    What I envision -- I don't know.  I envision a

 7         football team and someone is not playing.  I don't

 8         know.  They can't play.

 9    Q    Do you believe that as of June 16, 2009, you were

10         described as being no longer a player with

11         relationship to Sarah Aronson?

12              MR. BIXENSTINE:  Objection.

13    A    I don't know I can make a comment about that because,

14         from my understanding, there were many meetings with

15         Doctor Aronson and others, which I was not part of,

16         and there were lots of things that were said.  I have

17         no idea.  I wasn't there.  I can't make a comment

18         about it, and I don't understand what it means.

19            But my recollection today is that on June 20th,

20         there's a -- we're not past the June 30th date, and

21         unless I put this in some kind of context, like for

22         instance, if on June 16th if Doctor Aronson had two

23         weeks of vacation, or something, maybe I'd be

24         considered no longer a player because we wouldn't be

25         interacting together, but I practice clinical
```

```
 1        anesthesia, and I don't recall what rotation she was
 2        on at the time, but I evaluate every resident.  I see
 3        what they do, and I evaluate all of my residents, so
 4        I don't know what no longer a player really means.  I
 5        didn't quit my job.  It wasn't designated time for
 6        her to graduate at that point.  She hadn't completed
 7        her six-month Triple C Report, so I can't make a
 8        comment.  I don't know.  On that date, I can't
 9        remember exactly what they were saying or if I
10        qualified for what no longer a player means.
11   Q    As you read those words no longer a player, do you
12        connect that in any way to limiting your role
13        concerning Sarah Aronson?
14   A    I could see that, sure.
15   Q    Okay.  By June 16, 2009, had your role with respect
16        to Sarah Aronson been limited?
17                   MR. BIXENSTINE:  You mean in any
18             way?
19                   MR. GORDILLO:  Right.
20                   MR. BIXENSTINE:  Okay.
21   A    I suppose it's possible.  I don't -- there was a
22        point where I would say I voluntarily had a
23        limited -- some limitation in my involvement with
24        her, but I don't know that it was on that date.
25   Q    When you say voluntarily limited, are you talking
```

Page 44

1        about something other than your decision not to have

2        your name or her certificate?

3    A   Well, the filling out of the six month Triple C

4        Report from January of '09 to June of '09, for that

5        six-month period, when the report was filled out and

6        she was deemed satisfactory for that, the program's

7        decision was to give her satisfactory, so by all

8        rights with the evidence that we had for that time

9        period and things that I personally had collected, if

10       that was not enough for our program to decide she was

11       unsatisfactory, then in my guesstimation -- and I

12       respected the decision of our department, our program

13       to give her the satisfactory, I just disagreed with

14       that decision personally.

15           So at that point, I couldn't foresee anything

16       that would occur in July and August that just

17       wouldn't -- unless it was so egregious it was

18       self-declaring, it looked to me like she was on her

19       way to graduating.  So I did all of my -- what I

20       would consider my fiduciary responsibilities as a

21       program director in collecting all of her case log

22       information and all of her -- you know, all of the

23       supporting information and documentation that was

24       required to be supplied for her training.  But I

25       don't believe -- I don't believe or I don't recall if

Page 45

1       I worked with her clinically anymore, and I don't

2       know if there was some effort -- I don't recall if

3       there was some effort to not have me --

4                  MR. BIXENSTINE:  Excuse me.  I have

5                  to get that, because I'm the only guy

6                  around.

7                       - - - -

8           (Thereupon, a recess was had.)

9                       - - - -

10          (Thereupon, record read by Notary.)

11                      - - - -

12   A   -- scheduled with her, and I may have even -- I might

13       have requested to not work with her.  I can't recall

14       if I did or not, but from my recollection, I don't

15       believe we worked together clinically.

16   Q   Do you believe that Doctor Shuck had given you any

17       instructions before June 16, 2009 to limit your role

18       with respect to Sarah Aronson?

19   A   He may have.  I respect Doctor Shuck's opinions and

20       advice, and he may have generally said something that

21       I might have surmised it to limit my involvement with

22       Doctor Aronson, but I don't remember specifically

23       having that kind of a conversation.

24          I don't think we ever had a face-to-face meeting

25       stating anything like that, and I remember with

```
 1          Doctor Shuck, I have talked to him on the phone a lot

 2          to ask for his advice on issues in dealing with

 3          Doctor Aronson, but I can't remember the exact

 4          timeframe, either, if he did allude to something like

 5          that.

 6               But I remember at some point when our program

 7          decided that we were going to complete her six-month

 8          satisfactory and essentially then she'd be graduating

 9          in August, I remember -- and I don't know if I

10          requested not to work with her because I felt if I

11          give -- my personal work ethic is that every case

12          that I do, I evaluate each and every case and each

13          and every resident, and by giving more negative

14          feedback, I don't think would -- there was no point

15          to it, from my opinion, once our program decided we

16          were going to graduate her.  And I'd given my

17          opinions about her and I submitted my evidence to our

18          program, and my opinion was if they felt that overall

19          with this in the context of everything that she was

20          satisfactory, there's no point to me continuing to

21          work with her, so I might have limited my role in

22          either not working with her or she wasn't -- I don't

23          remember what her schedule was at that point in time.

24     Q    Doctor Shuck testified to the effect that he believed

25          that you were emotional in connection with your
```

Page 47

1           dealing with Sarah Aronson and perhaps not

2           sufficiently subjective.

3                     MR. BIXENSTINE:  Objection.  Go

4                ahead.

5    Q     Do you disagree with him?

6    A     Yes.

7    Q     He testified that he told you that he thought that

8           that was the case and that in the context of the

9           conversation told you that's why you ought to be

10          limited in your role.

11                    MR. BIXENSTINE:  Objection.

12   Q     Do you disagree with his testimony?

13   A     You had two points.

14   Q     Fair enough.  Let me be clear.

15            Do you disagree with his testimony that he told

16          you -- whole thing -- he told you that he believed

17          you were emotionally involved and not sufficiently

18          objective and therefore ought to be limited in your

19          role with respect to Sarah Aronson?

20                    MR. BIXENSTINE:  Objection.

21   A     He may have said something to that effect.  I don't

22          recall it being -- I don't recall it being that way.

23          I don't ever recall him specifically saying that he

24          felt I was too emotional.  But I do believe there was

25          a possibility he said for me to limit my involvement

```
 1              in the case.  I don't remember the exact timeframe of

 2              that and there was a point where that's what I also

 3              felt I should do.

 4       Q      Doctor Nearman similarly testified that he made a

 5              decision to limit your role and conveyed that to you.

 6                        MR. BIXENSTINE:  Objection.

 7       Q      Do you disagree that he conveyed that information to

 8              you?

 9       A      About the decision?

10       Q      Yes.  That he made that decision and told you about

11              it.

12                        MR. BIXENSTINE:  Objection.

13       A      I suppose he might have felt he made some type of

14              decision like that, but I believe the decision was

15              mine.

16       Q      Did he tell you he had made such a decision?

17       A      I don't recall him saying that.

18       Q      And you disagree with his testimony that he did tell

19              you that?

20                        MR. BIXENSTINE:  Objection.

21       A      I don't remember him saying that he decided

22              something.  I remember me deciding to limit my

23              involvement with Doctor Aronson because my -- even

24              though I respected what our program's decision was, I

25              disagreed with it, so I felt that I should limit my
```

Page 49

```
 1              involvement.  But that was my decision.  He may feel

 2              he influenced that or he made his own decision about

 3              that or took credit for that.  I don't remember him

 4              ever saying he's decided that.  I don't know what

 5              that even means, because the only way I could see

 6              that that would be the case is Doctor Nearman many

 7              times makes out the schedule on assignments, so he

 8              may have decided not to schedule me working with

 9              Sarah.  I could see how that would be consistent, but

10              I don't remember any discussion of him saying he

11              decided that my involvement was going to be limited.

12       Q      The Clinical Evaluation Report is the result of a

13              conclusion made by the Clinical Competency Committee;

14              is that right.

15       A      The Triple C Report, you're talking about?

16       Q      Yes.

17       A      Yes.

18       Q      Who was on the Clinical Competence Committee in July

19              of 2009?

20       A      In July of 2009?

21       Q      Yes.

22       A      I believe it was Doctor Nearman, Doctor Norcia, and

23              myself.

24       Q      Did that committee meet to discuss how the ratings

25              were going to be submitted on the reports?
```

1    A    I will say yes.

2    Q    And did you have a committee meeting with Doctors

3         Nearman and Norcia to discuss rating Sarah Aronson's

4         performance?

5    A    I know that we did have a meeting -- I don't remember

6         exactly when it was -- because we had to discuss how

7         we were going to fill out this Clinical Competency

8         Report.

9    Q    Did you participate during that meeting?

10   A    I would say I did.

11   Q    Do you recall what Doctor Norcia's opinion was about

12        whether Sarah Aronson's performance should be rated

13        satisfactory or unsatisfactory?

14   A    Well, I don't know what his specific opinion was.  I

15        remember he was weighing the positive things about

16        rating satisfactory and the negative things that

17        would support rating unsatisfactory.  I remember he

18        had some feelings about what he thought about both

19        things, but the end result or the conclusion was that

20        Doctor Aronson was rated satisfactory.

21   Q    Do you recall whether Doctor Nearman's opinion was

22        about whether she should be rated satisfactory or

23        unsatisfactory?

24   A    Yes.  He also felt she should be rated satisfactory.

25   Q    During that committee meeting, did you voice your

```
 1              disagreement?

 2      A      Yes.

 3      Q      How long did the committee meeting discussion about

 4              Sarah Aronson last?

 5      A      I don't have a recollection of the actual time

 6              because it's hard for me to know exactly without

 7              looking at a calendar and putting it into context

 8              because we have had so many meetings, but I don't

 9              think it was -- I don't think it was a very long

10              meeting.

11      Q      Were the three of you the Clinical Competence

12              Committee in January of 2009?

13      A      Yes.

14      Q      So the three of you as a committee would have been

15              responsible for the reports that went out for the

16              period ending in December of 2008, right?

17                      MR. BIXENSTINE:  Greg, are you

18                      starting a new topic?  If you are --

19                      MR. GORDILLO:  Yes.  I'm about to

20                      shift.

21                      MR. BIXENSTINE:  When you shift, can

22                      we take a quick break?

23                      MR. GORDILLO:  Sure.

24      A      Is your question were the three of us the Clinical

25              Competency Committee as of January of 2009?
```

Page 52

1    Q    Yes.

2    A    Yes.

3    Q    So that committee was responsible for completing the

4         reports reflecting performance of the residents for

5         the period of July through December of 2008, right?

6    A    Well, the actual process, the committee meets, but

7         Doctor Norcia is really the one that -- he's the

8         official program director's signature.  He's the one

9         that actually filled out the report.

10   Q    But it's based on the recommendation of the

11        committee?

12   A    Sure.

13   Q    That's my question.  The three of you comprised the

14        committee that made recommendations about the

15        evaluation of the residents for the period that ended

16        December of 2008, right?

17   A    That's correct.

18             MR. GORDILLO:  Okay.  Let's take a

19        break.

20             - - - -

21        (Thereupon, a recess was had.)

22             - - - -

23             MR. GORDILLO:  Back on the record.

24             Could you restate the last

25        question and answer, please?

1                          - - - -

2              (Thereupon, record read by Notary.)

3                          - - - -

4    Q    (By Mr. Gordillo)  So did the committee also meet to

5         discuss as a committee what evaluation would be

6         provided regarding Sarah Aronson for the period that

7         ended in December of 2008?

8    A    For the period -- let's see.  December 2008.  Are you

9         talking about the period she got an unsatisfactory?

10   Q    Yes.

11   A    I'm not sure I understand your question.

12            Did they talk about which evaluations -- we took

13        her evaluations to evaluate her for that period of

14        time.

15   Q    Did you, Doctor Norcia, and Doctor Nearman have a

16        meeting during which you discussed what

17        recommendation to make about Sarah Aronson's

18        performance for the period ending December 2008?

19   A    Yes.

20   Q    Do you recall when that meeting occurred?

21   A    I don't recall when it occurred.

22   Q    How long did it last?

23   A    I don't recall.

24   Q    Did you discuss any other residents during that

25        meeting?

Page 54

1    A    I doubt it.

2    Q    Tell me what you recall in substance of the

3         deliberation that went on during that meeting.

4    A    The way we generally do it and the way we did it in

5         this instance, we went down through the Triple C, the

6         ABA Clinical Competency Report, and we go down

7         through all of the different check boxes and look at

8         each individual item in essential attributes and all

9         the different categories and we see if we would rate

10        it satisfactory or unsatisfactory.

11   Q    And in her case, there was at least one category in

12        which she was rated unsatisfactory, right?

13   A    There were three categories.

14   Q    Was there any disagreement among the three of you

15        about whether she should be rated unsatisfactory in

16        any of the categories?

17   A    For the period from July of 2008 to through December

18        of 2008, there was no disagreement among the three of

19        us about how she should be rated for her Triple C

20        Report.

21   Q    She was rated unsatisfactory in the category of

22        Essential Attributes; is that right?

23   A    Yes.

24   Q    And with respect to Essential Attributes, was there

25        any discussion about whether to rate her satisfactory

```
 1          or unsatisfactory?

 2     A    Essential Attributes is a category.  It's not rated

 3          satisfactory or unsatisfactory.

 4     Q    Okay.  What were the three criteria for which she was

 5          rated unsatisfactory?

 6     A    The three criteria?

 7     Q    The ACGME -- the three of the six, right?  There are

 8          six?

 9     A    I'd have to look at the Clinical Competency Report,

10          but there's a section called Essential Attributes,

11          and there's about four or five questions under that.

12          And then there are different areas, and I don't

13          recall, but I think they're all related to the six

14          core competencies, so there may be seven areas, the

15          essential attributes, and then the six core

16          competencies.  I think they parallel the six core

17          competencies, also.  And she had a question under

18          essential attributes under professionalism and

19          patient care that were listed as unsatisfactory.

20     Q    And did that correspond to any particular

21          competencies?

22     A    Like I said, essential attributes is not a core

23          competency, but professionalism and patient care are

24          two of the six.

25     Q    Was she rated unsatisfactory in professionalism?
```

1  A  There was a question under professionalism which she

2     got a rating of unsatisfactory.

3  Q  And under patient care, was there an unsatisfactory

4     rating?

5  A  There was.

6  Q  And what other unsatisfactory rating did she receive?

7  A  And there was a question under essential attributes,

8     which is not a core competency.

9  Q  Okay.  And as each of those three questions were

10    answered with an unsatisfactory remark, was there any

11    disagreement or discussion among the committee

12    members before concluding that she should be

13    recommended as unsatisfactory?

14 A  We did discuss --

15           MR. BIXENSTINE:  Let me raise an

16           objection.  He answered the disagreement

17           part.

18 A  I don't know that we disagreed.  We discussed it.

19 Q  It was a compound question.

20      So is there any reason for not informing the

21    residents about who the members of the Clinical

22    Competence Committee are?

23 A  I don't understand your question.

24 Q  Is there reason not to inform the residents who the

25    members of the Clinical Competence Committee are?

Page 57

```
 1     A     I can't think of any.

 2     Q     It's not a published list of committee members,

 3           right?

 4     A     I don't think we publish it anywhere, no.

 5                           - - - -

 6  (Thereupon, Exhibit 27 was marked for the purpose of

 7                    identification.)

 8                           - - - -

 9     Q     (By Mr. Gordillo)  David, you're being handed a

10           document being marked as Exhibit 27.  Please take all

11           the time you'd like to look it over and let me know

12           when you've had an adequate opportunity to review it.

13     A     Okay.  I believe I've read it.

14     Q     The top of this email string from Kitty Coneglio --

15           is it Coneglio?

16     A     Kitty Coneglio.

17     Q     -- to you and Doctor Aronson.  Do you see that?

18     A     I see that.

19     Q     And you can tell from the string that Doctor Aronson

20           is asking who chairs the Clinical Competence

21           Committee and who sits on it, right?

22     A     Yes.

23     Q     And eventually the question was referred to you,

24           right?

25     A     Based on this document?
```

| 1 | Q | Yes. |
| 2 | A | That's not my conclusion. |
| 3 | Q | Well, at the top, Kitty writes to Doctor Aronson that |
| 4 | | she spoke with Chris -- assuming that's Christina |
| 5 | | Adamovich -- |
| 6 | A | Yes. |
| 7 | Q | -- and she said she referred your question to Doctor |
| 8 | | Wallace. |
| 9 | A | Yes.  That Kitty said that Chris referred that to me, |
| 10 | | yes. |
| 11 | Q | Yes.  Do you recall having the question referred to |
| 12 | | you? |
| 13 | A | I believe Christine asked me that, yes. |
| 14 | Q | And was it accurate that your response was that you |
| 15 | | plan to address this with Doctor Aronson at your |
| 16 | | meeting? |
| 17 | A | Yes.  I think that's probably accurate. |
| 18 | Q | Why would you have been reluctant just to send her an |
| 19 | | email back with the three names? |
| 20 | A | Because if anybody -- I would say that pretty much |
| 21 | | all the residents know that I do very little email |
| 22 | | correspondence.  I get hundreds of emails, literally |
| 23 | | hundreds, and for some things that may be adequate, |
| 24 | | but I do very little email responses because my |
| 25 | | personal opinion is that email is good for |

```
 1              notification of things, but it can be very inadequate
 2              many times for a lot of different things.
 3                   And as this email states, and since Doctor
 4              Aronson was included in this email, it states that
 5              this was planned to be addressed when we met with
 6              her.  I figured that was the concluding response that
 7              she became aware of, so there was no point for me to
 8              email her, and I did not.
 9     Q        When you met with her, did you tell her who was on
10              the Clinical Competence Committee?
11     A        When?
12     Q        The meeting that's referred here.
13     A        I don't know what meeting that is.
14     Q        Let me rephrase that.
15                   It's accurate that you indicated you were
16              planning to address the Clinical Competence Committee
17              at your meeting; is that right?  I'm reading right on
18              the email.
19     A        Could you say that again?
20     Q        Yes.  I'm reading from the top email here where Chris
21              said she referred the question to you and that you
22              plan to address this with Doctor Aronson at your
23              meeting?
24     A        Yes.
25     Q        Did you have that meeting?
```

1    A    I don't know what -- let's see.  I don't know what

2         meeting that -- well, I'll say that my reading this,

3         the intent of what it is was at our next meeting,

4         this could be addressed.  That's what the intent of

5         this was.  I don't know when our next scheduled or

6         planned or when we met next.  I don't recall when our

7         next meeting was.

8    Q    Did you ever tell her who was on the Clinical

9         Competence Committee?

10   A    I don't recall if I did or not.  I don't think -- I

11        don't recall her ever asking me.

12   Q    Well, you got the question from Chris, right?

13   A    Christine said she wanted to know, that Doctor

14        Aronson wanted to know, and I told Christine that at

15        our next meeting, we could discuss that.  It would be

16        a very easy discussion.  When we met next, I don't

17        know if the topic was ever brought up.  And since

18        Doctor Aronson wanted to know that information, I

19        didn't inherently bring it up at our next meeting, so

20        I figured if she was notified here, that our next

21        meeting I would have that information.

22   Q    You did know that she wanted to know who the Clinical

23        Competence Committee was, right?

24   A    Yes.

25   Q    And you never told her who it was, did you?

```
 1    A    I don't believe I did.

 2    Q    Did you have any discussions with Doctor Norcia about

 3         revealing who was on the Clinical Competence

 4         Committee to Doctor Aronson?

 5    A    Revealing it to her?

 6    Q    Yes.

 7    A    It's nothing that's confidential, no.

 8    Q    No, you had no discussions with Doctor Norcia about

 9         telling Doctor Aronson who was on the Clinical

10         Competence Committee?

11    A    Well, I don't recall specifically having a discussion

12         with Doctor Norcia about revealing who's on the

13         Clinical Competency Committee.  I may have said that

14         Doctor Aronson wants know who's on the Competency

15         Committee, but I don't think I ever had a discussion

16         about revealing it.  It's not a secret.

17    Q    But you didn't tell her, did you?

18    A    She didn't ask.

19              MR. BIXENSTINE:  Objection.  Asked

20           and answered.

21    Q    Did you ever have a discussion with Doctor Nearman

22         about telling Doctor Aronson who was on the Clinical

23         Competence Committee?

24    A    I don't recall having that type of discussion with

25         Doctor Nearman.
```

Page 62

1    Q    By May of 2009, did you know that Doctor Aronson was

2         repeatedly seeking an appeal of the unsatisfactory

3         evaluation that she had received?

4                        MR. BIXENSTINE:  Objection.  Go

5              ahead.

6    A    I don't know because I don't think that's an

7         appealable -- I don't know that there's an appeal for

8         that.

9    Q    I wasn't asking you whether it could be appealed.  My

10        question was whether you knew she was trying to get

11        an appeal?

12   A    She didn't ask me for an appeal.  She never -- I

13        don't recall -- I don't recall what forum I would

14        have been aware of that.  I know we had talked in the

15        meetings with her, and I'm trying to think when our

16        last meeting was.  She wanted to know about the

17        appeal process.  We had had many discussions about

18        that, but what we related to her were the options

19        that she had, which would include something that's

20        appealable or not, and she chose to go a route that

21        wasn't appealable, so I don't know of anything I can

22        say in May, or whenever you said, about her

23        attempting to have an appeal.

24   Q    I'm going to show you a document that was previously

25        marked as Exhibit 1, and as always, take all the time

1    you'd like to look it over and let me know when

2    you've had an adequate opportunity to review it.

3    A    I believe I've reviewed this.

4    Q    You're familiar with the document?

5    A    Yes.

6    Q    That's your signature at the bottom?

7    A    It is.

8    Q    This was the letter that you and Doctor Norcia sent

9         to Doctor Aronson to inform her about her

10        unsatisfactory evaluation, right?

11   A    Yes.

12   Q    Were you part of the decision-making process that

13        resulted in the conclusion that she would be required

14        to remediate for an additional six-month period?

15   A    I was part of the process.

16   Q    And did you agree with that recommendation?

17   A    That she had to do an additional six months?

18   Q    Yes.

19   A    Yes.

20   Q    As remediation.

21   A    I'm not sure the term remediation, in what context,

22        but in this context, I'd say yes.

23   Q    What other context would there be?

24   A    Well, I know -- I don't have the actual documents

25        with me, but there are two documents that the

```
 1          Graduate Medical Education Office has available for

 2          residents, and one relates to remediation and one

 3          relates to discipline, and I'm not sure exactly which

 4          one of those there are, but in the context of this, I

 5          would say she had to do six months of remediation

 6          that I agreed to.

 7   Q      I'm going to hand you a document that was previously

 8          marked as Exhibit 14.  See if that helps you out

 9          some.

10   A      Is there any part?

11   Q      Yes.  Why don't you look at Page 10 of that document?

12                    MR. BIXENSTINE:  I'm sorry?  Which

13              exhibit?

14                    MR. GORDILLO:  Page 10 of Exhibit

15              14.

16   Q      (By Mr. Gordillo)  This document was previously

17          identified as an excerpt from the Resident' and

18          Fellows' Manual, and I turned you to the attention of

19          the portion that deals with remediation.  Do you see

20          that?

21   A      I do.

22   Q      Is this the document and the remediation you were

23          talking about just a moment ago?

24   A      This is not what remediation is from this letter.

25   Q      That's what I want to know about.
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | How is remediation that's referred to in the letter |
| 3 | | that is Exhibit 1 different from remediation that |
| 4 | | you're looking at in Exhibit 14? |
| 5 | A | Well, I guess, you know, reading all of this, this is |
| 6 | | partially out of context, that has things that I can |
| 7 | | see, like HR-85, and things in there, which may be |
| 8 | | consistent with this.  But the remediation in this |
| 9 | | letter refers to the six-month incomplete |
| 10 | | unsatisfactory which would be corrected by a six |
| 11 | | month of satisfactory to follow.  That's what this |
| 12 | | six month remediation is.  I'm not sure if it's |
| 13 | | consistent with this just from a brief glancing at |
| 14 | | it.  I think it might be consistent with this, but |
| 15 | | there's a lot of information here that -- I don't |
| 16 | | know that -- I don't think that -- well, I think it's |
| 17 | | probably consistent, but I haven't read all of this |
| 18 | | to analyze everything, but when I see referral to |
| 19 | | Employee Assistance HR-85, we did -- we implemented |
| 20 | | that policy in the EAP Analysis of the Tier 1 |
| 21 | | referral, so I suspect that this is consistent, but |
| 22 | | the remediation in this letter is related to the six |
| 23 | | months unsatisfactory that would need to be repeated. |
| 24 | Q | You had testified a moment ago that you weren't sure |
| 25 | | about the context of remediation; is that accurate? |

1    A    Well, the context that you were referring to about

2         remediation.  I knew about the context that I was

3         referring to in this letter.

4    Q    So --

5    A    There's many different contexts, though, that

6         remediation falls under.

7    Q    And specifically you mentioned two different

8         contexts?

9    A    I think I mentioned there's two different forms our

10        hospital has, and I don't know which one talks about

11        remediation, if either of them do.

12   Q    Okay.  I'm showing you one form that's been already

13        identified as the Residents' and Fellows' Manual from

14        the hospital.

15   A    That's different than what I was talking about.

16   Q    That's my question.

17   A    Through the Graduate Medical Education on the UH

18        website under Policy -- I think it's Policies and

19        Procedures or Forms, I can't remember which, there

20        are two forms, and I think one of those states about

21        remediation, but without seeing which document it is,

22        I can't say if it's consistent with one of those,

23        because one, they're used in different contexts, and

24        they have different implications, so I didn't know if

25        you were referring to those documents.

1              But this letter, the six-month remediation refers

2         specifically to the six months of unsatisfactory, to

3         repeat that six months in order to gain satisfactory

4         to bring the other six months unsatisfactory

5         complete.

6    Q    Let's look on Exhibit 14 where it addresses

7         remediation.

8    A    Okay.

9    Q    In the first sentence it says:  A remediation period

10        is an opportunity for the resident to correct

11        academic deficiencies and to develop and demonstrate

12        appropriate levels of proficiency for patient care

13        and advancement in the program.

14             Did I read that correctly?

15   A    Yes.

16   Q    Is that what we're talking about in Exhibit 1?

17   A    I would say that at least part of that statement

18        seems like it's very applicable.

19   Q    Which part appears applicable?

20   A    The part about demonstrating appropriate levels of

21        proficiency for patient care.

22   Q    Okay.

23   A    I'd say that's definitely applicable.  Advancement in

24        the program, without this form of remediation, a

25        resident cannot complete the program ending on an

1        unsatisfactory, so I'd say that both of those

2        definitely fall within the definition that would be

3        consistent with this letter in Exhibit 1.

4                MR. GORDILLO:  Would you read that

5          answer again?

6                - - - -

7        (Thereupon, record read by Notary.)

8                - - - -

9   Q   (By Mr. Gordillo)  Is there any part of that first

10       sentence that is not applicable to the reference of

11       remediation in Exhibit 1?

12   A   The only question I have is the use of ands versus

13       ors.  A remediation period is an opportunity for the

14       resident to correct academic deficiencies and -- I'm

15       not sure if that should be and or or -- to develop

16       and/or demonstrate appropriate levels.  It's not

17       necessary that someone has to do all of those, but at

18       least part of those I think fall within the context

19       of when we used remediation here.

20       I don't think, for instance, Doctor Aronson

21       had -- that I can think of at this time -- academic

22       deficiencies.  I don't think she did.  So if you use

23       the word and, I don't think I agree that's part of

24       what needs to be remediated.

25   Q   So the letter that is Exhibit 1 is not intended to be

1                addressing academic deficiencies; is that right?

2    A    I don't think it does, no.

3    Q    And on the bottom of Exhibit 1, there's an indication

4                that Christine Adamovich will assist you with setting

5                up a time to meet and discuss the remedial program

6                plan.  Do you see that?

7    A    I do.

8    Q    Who was supposed to design the remedial program plan?

9    A    Well, Doctor Norcia, Doctor Aronson, and I, the three

10            of us did.

11    Q    You did?

12    A    Yes, we did.

13    Q    Okay.  And did you then give the plan to Christine

14            Adamovich?

15    A    Well, Christine is the Residency Education

16            Coordinator and she's the person that keeps all of

17            our documents, I would say, in, for instance, Doctor

18            Aronson's file.  So I suspect that we gave the copy

19            of that to Christine.  I suspect she had a copy of

20            it.

21    Q    So there was a document that was the remedial program

22            plan that you created for Doctor Aronson?

23    A    Yes.

24    Q    And you created that document with Doctor Aronson?

25    A    Yes.  She signed it.

1    Q    When drafting this letter that is Exhibit 1, did you

2         participate in the drafting of it?

3    A    Yes, I did.

4    Q    Okay.  Who else, if anyone, worked on drafting this

5         letter?

6    A    Well, Doctor Norcia and I, I believe, primarily

7         drafted this letter.  I don't recall, because there

8         was at some point when our hospital Legal Department

9         was reviewing all of our documents and letters -- I

10        don't recall, although I think that either the Legal

11        Department or Doctor Shuck might have reviewed it

12        before we finalized it.

13             But I believe Doctor Shuck or the hospital Legal.

14        I don't remember when the hospital Legal became

15        involved with this, but there was a point where any

16        official documents, our hospital Legal would look at.

17   Q    What was the thought process that went into deciding

18        that an additional six-month period was necessary for

19        remediation?

20   A    Well, when a resident performs unsatisfactorily, then

21        depending on what it was that was unsatisfactory, it

22        has to be corrected.

23                      MR. BIXENSTINE:  I think your focus

24                  is on the duration.  I'm just stepping

25                  in.  Maybe I should shut up.  You're

1          asking six months?

2                    MR. GORDILLO:  He's fine.  More

3          generally.

4                    MR. BIXENSTINE:  Good enough.

5     Q    (By Mr. Gordillo)  One of the three categories that

6          were identified as unsatisfactory was

7          professionalism, right?

8     A    Yes.

9     Q    And specifically it was that you told Doctor Aronson

10         she had failed to carry out her professional

11         responsibility of notifying the Residency Program

12         directors that she was taking a prescribed medication

13         that could impair her judgment and/or job performance

14         as required by hospital policy, right?

15    A    Yes.

16    Q    Did Doctor Norcia at some point suggest that that

17         item should not be included in this letter?

18    A    In which letter?

19    Q    Exhibit 1.

20    A    Did he suggest -- I'm sorry?

21    Q    -- that it should not be identified as a

22         unsatisfactory category in the letter.

23    A    I don't think he suggested it should not be included

24         in the letter.  I remember he said that Doctor

25         Aronson was concerned about having it in the letter,

1           but I don't know that he suggested it not be in the

2           letter.

3    Q    Did he ever say that the issue of professionalism

4           should not be reported to the ABA?

5    A    I don't think Doctor Norcia would have a discussion

6           like that with me because, I mean, if something --

7           let's see.  Report to the ABA.  Yes.  So that would

8           be under the Triple C Report that goes to the ABA, so

9           I don't think -- you know, it's not a reportable

10         thing, so I don't think there's any reason to not

11         report it.

12    Q    Let me untangle that one a minute.

13               MR. BIXENSTINE:  He just wanted to

14                 know whether he told you that.  That's

15                 all.  That was his focus.

16    A    No.  I don't believe he did.

17    Q    What was Doctor Aronson to do in an additional

18           six-month period to remediate her professionalism?

19    A    On February 4th of 2009, we drafted her plan.  I

20           don't have all the details, but it's in that

21           document.

22    Q    Well, if the problem was that she had failed to

23           disclose her use of a prescribed medicine and she

24           subsequently disclosed it, is there anything left for

25           her to do to remediate her professionalism?

1    A    Well, I don't know that it's that concrete.  She has

2         to demonstrate on-going continual professionalism.

3         If someone doesn't disclose something, once it's

4         disclosed, I don't know that you can specifically

5         figure out how to get it undisclosed to disclose it

6         again, or something.  So I don't know that there's --

7         I don't think it's that concrete that you have -- you

8         know, it was just something that was unprofessional,

9         but every six months, professionalism, those

10        questions related to professionalism, have to be

11        checked satisfactory, and in the next six-month

12        period if those questions can be answered

13        satisfactorily, we just have to go with the

14        information we have at the time.  So even if someone

15        does something that's unprofessional, if they

16        demonstrate on-going continual professionalism and

17        don't demonstrate any more unprofessional behavior,

18        then it would be considered satisfactory.

19   Q    Why did she need another six months to do it?

20   A    Because the ABA -- if you answer any one question

21        unsatisfactory, the whole six-month reporting period

22        gets unsatisfactory.  In order to get satisfactory

23        credit for those six months, then you have to

24        complete the subsequent six months as being

25        satisfactory.

1  Q   When did Doctor Aronson's performance reveal to you

2      that she was unable to demonstrate the ability to

3      react to stressful situations in an appropriate

4      manner as reflected by the letter that is Exhibit 1?

5  A   I would have to review her evaluations in order to

6      answer that question.

7  Q   Okay.  So is it fair to say that if she did through

8      her performance show that she was unable to

9      demonstrate that ability, it would be reflected in

10     her performance evaluations?

11 A   Possibly.

12 Q   Well, you just said you'd have to look at her

13     performance evaluations.

14 A   Well, there are other things besides her written

15     evaluations.

16 Q   Other than her performance evaluations, what evidence

17     comes to your mind to show that she was unable to

18     demonstrate the ability to react to stressful

19     situations in an appropriate manner as reflected by

20     this January 7th letter?

21 A   When you say performance evaluations, are you talking

22     about my evaluations, written evaluations?

23 Q   Whenever evaluations you were talking about when you

24     said you'd have to look at the evaluations.

25 A   Well, I would say that it's based upon resident and

1         faculty evaluations, and -- resident, faculty, and

2         staff evaluations.  I'd say that's --

3    Q    Were there any evaluations of her performance in the

4         month of December that would demonstrate that she was

5         unable to react to stressful situations in an

6         appropriate manner?

7    A    When was that?

8    Q    December of 2008.

9    A    I don't recall what she was doing in December of

10        2008.  I don't know what rotation she was on.

11   Q    That's not my question.  My question is:  Do you

12        recall?

13   A    I don't recall.

14   Q    To your knowledge, do you know of any evaluations

15        showing that she was unable to demonstrate the

16        ability to react to stressful situations in an

17        appropriate manner in December of 2008?

18   A    Without looking at her evaluations, I don't recall.

19   Q    Okay.  And do you know of any evidence that she was

20        unable to demonstrate the ability to react to

21        stressful situations in an appropriate manner in

22        November of 2008?

23   A    I don't recall.

24   Q    Do you know of any evidence that in December of 2008,

25        Doctor Aronson failed to demonstrate her ability to

1       recognize and respond appropriately to significant

2       changes in the anesthetic course?

3    A   I don't recall.

4    Q   Do you know of any evidence that would show that in

5       November of 2008, Doctor Aronson failed to

6       demonstrate the ability to recognize and respond

7       appropriately to significant changes in the

8       anesthetic course?

9    A   I don't recall.

10   Q   Did you realize when sending out this letter of

11      January 7, 2009 that Doctor Aronson had two more

12      months left on her scheduled residency program?

13   A   Let's see.  She had -- on January 7th when she first

14      enrolled in our program on January 7th, she would

15      have had less than two months.

16   Q   Right.  She was scheduled to complete at the end of

17      February 2009, right?

18   A   That's correct.

19   Q   Did you have any discussion with Doctor Norcia or

20      Doctor Nearman about whether you believed that Doctor

21      Aronson could demonstrate satisfactory performance in

22      the time remaining between January 7th and the end of

23      February 2009?

24   A   Could you repeat that question again?

25             MR. GORDILLO:  Go ahead and read it

```
 1                    back.

 2                        - - - -

 3           (Thereupon, record read by Notary.)

 4                        - - - -

 5    A    I don't think we ever would have had that discussion.

 6         It's, I guess, irrelevant, on January 7.

 7    Q    Well, did you have that discussion at the time of

 8         recommending that she should be found unsatisfactory

 9         in her performance for the period ending

10         December 2008?

11    A    Again, it's irrelevant.  If she got an unsatisfactory

12         from July of 2008 to December of 2008, she would have

13         to repeat six months.  If she didn't, there would be

14         no question about her ability to remediate.  There's

15         nothing to remediate.

16    Q    Is your answer to my question no?

17    A    Depends on -- if you could read the question again?

18                        - - - -

19           (Thereupon, record read by Notary.)

20                        - - - -

21    A    It's --

22                    MR. BIXENSTINE:  He just wants to

23                know whether it happened or not, simple

24                as that.

25    A    No, we didn't.
```

Page 78

1          MR. GORDILLO:  Right.

2          MR. BIXENSTINE:  I hope you're not

3     offended that I spoke up.

4          MR. GORDILLO:  No.

5  Q   And the remediation that's referenced in the

6     January 7th letter, was it your intent that that

7     remediation would begin immediately?

8  A   The remediation period, the way the Board reports,

9     would be from January 1st through June 30th.

10 Q   Okay.  So your answer to my question is yes?

11 A   Well, when you say begin immediately, that's prior to

12    January 7th.

13 Q   So the remediation period should have already begun?

14 A   Until you give someone an unsatisfactory -- you have

15    to give someone an unsatisfactory, and then it's

16    retroactive to the beginning of that next six-month

17    period.

18 Q   Okay.  Which would be January 1st of --

19 A   That's correct.

20 Q   So her remediation period would have began on January

21    1st 2009?

22 A   That's correct.

23 Q   And assuming that she completed the six-month period

24    satisfactorily, it would have ended June 30th of

25    2009; is that right?

Page 79

1    A    No.

2    Q    Okay.  When would the six-month -- if it starts on

3         January 1, 2009, when does the six-month period end?

4    A    So what we're talking about is getting the six months

5         of unsatisfactory, from January 1, 2009 to June 30th,

6         she has to get six months satisfactory in order to

7         get credit for the previous unsatisfactory six

8         months.  But she was already scheduled for January

9         and February, and her remediation plan that was

10        outlined in the February 4th plan was six months that

11        the three of us discussed that she needed to do from

12        March through August.

13   Q    So she had eight months of remediation?

14   A    Well, there's two different considerations.  In order

15        for her to get credit for the six months, she has to

16        follow by another six months of satisfactory for the

17        previous six months unsatisfactory.  She was already

18        scheduled for January and February because we have to

19        report by January, and in February, we made her

20        remediation plan, and the plan was a six-month period

21        that would start from March 1st through August.

22   Q    What was she doing from January 1st to March relative

23        to remediation?

24   A    Well, if you're talking about the remediation portion

25        to get the six months of unsatisfactory credit

1          converted to six months satisfactory, she was doing

2          her regular clinical duties.

3    Q   Beginning January 1st?

4    A   Beginning January 1st.

5    Q   And ending June 30th?

6    A   That's correct.  That's the ABA requirement.

7    Q   So at the point of June 30th, her reporting period

8          for that six months had ended, right?

9    A   June 30th of 2009?

10   Q   Right.

11   A   Her reporting period for the ABA had ended, right.

12   Q   And if she was rated satisfactory for that period,

13         she would then also have been treated as satisfactory

14         for the prior period, correct?

15   A   She would have brought the unsatisfactory to

16         satisfactory, yes.

17   Q   So as of June 30, 2009, she did get rated

18         satisfactory for that period, right?

19   A   She did.

20   Q   And so at that point, she had a satisfactory rating

21         for the first part of 2009 and the last part of 2008,

22         correct?

23   A   That's correct.

24   Q   And that would have been 36 months of residency

25         training, correct?

1            MR. BIXENSTINE:  You mean 36 months

2         of satisfactory?

3            MR. GORDILLO:  Yes.  I'm sorry.  36

4         months of satisfactory.

5    A    That's not correct.

6    Q    Really?

7    A    If you have a piece of paper, I can tell you what it

8         would be.

9    Q    Is it more than 36 months?

10   A    I think so.

11   Q    Okay.  It's at least 36 months?

12   A    Yes.

13   Q    And you're familiar with the in-training exams?

14   A    I am.

15   Q    Why are they given?

16   A    It's a -- up until about 2008, it was a preview to

17        the actual written Board exam, and it gives the

18        resident the experience to take the written exam,

19        which is one of the Board's requirements to get Board

20        certified.

21   Q    And the scores on the in-training exam, they are

22        predictive of the likelihood of success or failure

23        when taking the actual Board exam, right?

24   A    There is some predictability -- there's a correlation

25        of exam scores from the previous year, yes, from the

1    previous year to the next, based on the old Board

2    results exams.  But the actual examination process

3    has changed, in -- I think it was 2008.  It used to

4    be given in July, and then the in-training exam

5    changed to March, which was no longer in sync with

6    the actual written exam.

7              MR. BIXENSTINE:  Well, he just wants

8         to know whether it's predictive.

9    A    Well, it used to be.  But I don't know that it's

10        considered -- I haven't seen any results that say

11        that it's predictive, but most likely there's a

12        reasonable prediction for it.

13   Q    At what point did it stop being predictive if it

14        stopped being predictive?

15   A    Well, there was a correlation.  Around 2008 I think

16        was the last -- I'm not sure if it's 2008, but I

17        think 2008 is the last in-training exam that was done

18        in July.  That's when the written Board exam is.  So

19        you have a whole year from when you take the

20        in-training to when you graduate for the traditional

21        candidate so it was predictive.

22             Now it's given in March, so you don't have

23        completely a year, so there's been more time to

24        prepare for it, so you would think that someone would

25        score higher on it, but there's less time to react to

1        it before you actually have to take it for real,

2        which is now in August, so I don't know if the

3        recent -- after 2008, I don't know if it's

4        correlative or not.

5   Q   As part of the evaluation process of residents, did

6        you take into account their performance on the

7        in-training examinations?

8   A   Sure.

9   Q   So you were familiar with what in-training

10      examination scores would be predictive of success on

11      the Board; is that right?

12  A   I'm very familiar.

13  Q   And so the in-training exams would provide a scaled

14      score for the entire test, right?

15  A   Yes.

16  Q   And then also provide a breakdown by category, right?

17  A   Well, I'm not sure what you mean by breakdown by

18      category.  There's a scaled score for the exam.

19  Q   For the entire exam?

20  A   Yes.

21  Q   And then the results, they would inform the residents

22      of how many questions were asked in a category and

23      how many were answered correctly and how that rated

24      by percentile?

25  A   Sure, sure.

1    Q    But it's the scaled score that ultimately would be

2         most indicative of likely success or failure?

3    A    That's correct.

4    Q    In 2009, do you know what the break-off point was on

5         the scaled score showing success or failure?

6    A    Well, my experience with what the scaled score would

7         be is roughly a scaled score of 32 is an equivocal

8         pass, basically.

9    Q    Okay.

10                          - - - -

11   (Thereupon, Exhibit 28 was marked for the purpose of

12                    identification.)

13                          - - - -

14   Q    (By Mr. Gordillo)  Now you've been handed a document

15        marked as Exhibit 28.

16            Do you recognize the document?

17   A    I do not.

18   Q    Okay.  Take all the time you'd like to look it over.

19        I will represent to you it's the 2009 In-training

20        Examination Personal Performance Report for Sarah

21        Aronson.

22   A    So I've basically seen this.  I understand the

23        context of what it's about.  I have not seen this

24        report.

25   Q    Assuming that this is a genuine report and her scaled

1       score is 38, you would agree with me that that was

2       predictive of her passing her actual certified test;

3       is that right?

4    A  Absolutely.

5                        - - - -

6    (Thereupon, Exhibit 29 was marked for the purpose of

7                    identification.)

8                        - - - -

9    Q  (By Mr. Gordillo)  Now you've been handed what's been

10      marked as Exhibit 29, and again, I'll represent to

11      you that this is similarly the report on Sarah

12      Aronson's in-training examination from 2008, and as

13      you look at that document, you see that her scaled

14      score was 33.

15   A  I do.

16   Q  Did that score reflect a score predictive of passing

17      the exam, the certified exam, had it been taken the

18      following year?

19   A  Do you know if this is a July or March exam?  I think

20      this was a July exam.  Is that --

21   Q  Yes.

22   A  Yes.  It would be just above or right around an

23      equivocal pass.

24   Q  Of course she's a second year at this point?

25   A  Sure.

Page 86

```
 1                         - - - -
 2    (Thereupon, Exhibit 30 was marked for the purpose of
 3                     identification.)
 4                         - - - -
 5    Q    (By Mr. Gordillo)  Now you've been handed a document
 6         marked as Exhibit 30 and is like the last couple of
 7         exhibits you looked at.  It's the 2007 performance
 8         report of Sarah Aronson's in-training examination,
 9         and you see that it has a scaled score of 34, and
10         I'll ask you whether that's predictive of a pass?
11                     MR. BIXENSTINE:  Answer the
12                     question.
13    A    That would be -- that would correlate with equivocal
14         pass, sure.
15                     MR. GORDILLO:  Let's go off the
16                     record for a second, please.
17                         - - - -
18              (Thereupon, a recess was had.)
19                         - - - -
20    Q    (By Mr. Gordillo)  For the in-training exam, what's
21         the scale range for scores, let's say, for 2009?
22    A    I think someone could potentially have the low score
23         of a zero, I believe, although I've never seen that,
24         and the high, I think it goes at least 50.  I'm not
25         sure what the high end is.
```

1    Q    You were responsible for scheduling the rotations,

2         right, in terms of the residents?

3    A    That's a generally true statement.

4    Q    Did you have responsibility for making sure that

5         residents were scheduled within the duty hours

6         restrictions imposed by the ACGME?

7    A    I had partial responsibility for that.

8    Q    With whom did you share that responsibility?

9    A    The residents.

10   Q    And to the extent you had responsibility for it, what

11        did you have to do to exercise your duties?

12   A    Well, when we made the curriculum and the

13        rotations -- the curriculum for the rotations, we

14        geared them so that the clinical hours would abide by

15        the duty hour rules, and the didactics were scheduled

16        so that duty hour rules could be observed.  And then

17        there were certain didactics which residents were

18        required to not attend because they were post-call

19        and wouldn't attend.

20   Q    What did you do to make sure that the residents were

21        in compliance with the duty hour restrictions?

22   A    Well, I would say that I required them to follow

23        them.  I also would oversee -- like, when we would

24        make call schedules, and things like that, I would

25        oversee some of that to make sure that they were not

```
 1              over.

 2                   If there was questions about a duty hours and

 3              residents' call, and those kinds of considerations, I

 4              would say most all of the time I would get called or

 5              paged, and I also made myself available by cell phone

 6              and pager virtually every evening when residents

 7              would be doing late duty.

 8                   If faculty wanted to keep residents longer hours,

 9              they would consult with me about having the ten-hour

10              separation.  So I would say those are most of the

11              things, along with the design of our program.

12        Q     The ACGME recommends that call periods not be

13              scheduled more than every third night, correct?

14        A     On average.

15        Q     And the average is over what period?

16        A     Over a month's time.

17        Q     Is it unusual -- you would be the one who would

18              schedule the call periods, right?

19        A     Well, in the general ORs and for obstetrics, which is

20              sort of an operating room coverage service, the chief

21              residents usually make the call schedule, and then I

22              review those, and sometimes the chief resident, if

23              they have problems making it, will confer with me

24              before it's made, and we look at those types of call

25              schedules.
```

1   Q   What about in the SICU?

2   A   In the SICU, I don't actually make the call schedules

3       for the SICU, but I do review some of them and our

4       head of ICU confers with me a lot to inquire about

5       how to maintain duty hours.

6   Q   In September and October of 2008, who was the head of

7       ICU?

8                   MR. BIXENSTINE:  You mean the head

9              resident?

10                  MR. GORDILLO:  The director.

11                  MR. BIXENSTINE:  Sorry.

12  A   I think -- I'm not sure if Doctor Hacker was.  I

13      don't know when she took over.  I think it might have

14      been Doctor Hacker.  I think it was Doctor Hacker.  I

15      don't know.

16  Q   So would you and Doctor Hacker have been responsible

17      for scheduling the call periods for the SICU in

18      September and October of 2008?

19  A   Well, there's something different about September

20      that was very different than, I believe, any other

21      month we had done call.  We were instituting a night

22      float system, and I think September was the month

23      that we did that in, so I was privileged to become

24      aware of the actual schedule because it was a

25      schedule design that we had to do, and so for

1        September, I believe I was aware of that, and it's

2        clearly spelled out what the hours are for that.

3           And in October, I think we went back to more of

4        the traditional-type of staffing, so I believe I'm --

5        I believe I'm fairly aware of what was on October.

6        I'd have to look at the actual schedule, but I would

7        say I'm probably familiar with both of the schedules

8        and maybe would know that information.

9   Q   But who was responsible for making the schedules?

10   A   I don't know.

11   Q   It wasn't you?

12   A   I don't make the assignments for the ICU.  I make the

13        assignments for who is in the ICU, but the ICU teams

14        are set up.  I don't make the detailed call schedule.

15   Q   Okay.  And who would be responsible for making sure

16        that the schedules didn't violate ACGME duty hour

17        restrictions?

18   A   Well, I would say I take at least partial

19        responsibility for that.  I might rely on -- I might

20        rely on the people that make the detailed schedule,

21        but I'd say any -- and I've instructed all of our

22        residents if there's a problem with it to inform me,

23        but I would say that pretty much if there's any kind

24        of problems, I get notified, so I would say I take at

25        least partial responsibility.

Page 91

1    Q    I think you testified earlier that -- I'm

2         summarizing -- but generally the responsibility for

3         compliance with ACGME duty hour restrictions was

4         shared between you and the residents; is that fair?

5    A    At least, yes.  I mean -- well, for instance, Doctor

6         Norcia and I have sort of set up the curriculum.  Our

7         education committee sets up the long-term curriculum

8         to make sure it abides by it.  Doctor Nearman's had

9         some input in how to staff things to abide by it.

10        I'm not the only one, but I do accept responsibility.

11   Q    What records, if any, exist to show whether the

12        Anesthesiology Residency Program was in compliance

13        with the duty hour restrictions?

14   A    Well, I'd say I can think of at least two things.

15        One is the actual schedules and the second is our

16        residents fill out duty hour compliance forms.

17   Q    Are there any other records?

18   A    Not that I can think of.

19   Q    Let me make sure I understand what you testified to a

20        moment ago.

21             With respect to staffing the SICU, particularly

22        in September and October of 2008, you would have been

23        responsible for assigning who was going to be there,

24        but someone else decided when they were going to be

25        there; is that fair?

1  A   So on a monthly basis, I say what residents will be

2      assigned to the ICU service.  The details of which

3      day and who's on call which day is more micromanaged

4      by the team, and I believe they have -- like,

5      residents have requests that may have consideration

6      for making the schedule and the -- whoever is the

7      director -- there's a faculty that's in charge of it,

8      and I can't remember at that time if Doctor Hacker

9      was but --

10 Q   In September and October of 2008, did you confer with

11     Doctor Norcia about who would be working in the SICU

12     among residents?

13 A   Every month I make the resident assignments based on

14     their global calendar, and I incorporate the

15     individual assignments into a document.  That gets

16     incorporated into our electronic system.  Many times

17     I carbon copy that document to lots of people, so I

18     may have given Doctor Norcia that or not.  I'm sure

19     at some point he would be aware of it.  He practices

20     in the ICU so he probably has some particular

21     interest in that.  But I don't -- I don't go out of

22     my way to necessarily inform him unless it looks like

23     we're going to have problems with having the full

24     complement of residents assigned to the ICUs for any

25     given month.

1   Q   Do you recall that Doctor Aronson was assigned to the

2       SICU rotations in September and October of 2008?

3   A   I do.

4   Q   Did you have any discussions with Doctor Norcia about

5       that assignment?

6   A   In what regards?

7   Q   Any.

8               MR. BIXENSTINE:  You mean the

9               results of it or the scheduling?

10              MR. GORDILLO:  The scheduling,

11              making the assignment.

12              MR. BIXENSTINE:  That's what I

13              thought.  Okay.

14  A   I believe that that was just her long-term, 36-month

15      assignment, so I don't think I would have had a

16      discussion with him about her necessarily.

17  Q   Did you confer with anyone about the scheduling that

18      was assigned to her during those two months?

19  A   About her assignment?

20  Q   Yes.

21  A   Not that I recall.

22  Q   And let me be clear.  Now I'm not talking about her

23      assignment to the rotation but her actual day-to-day

24      schedule.

25  A   Yes.  Usually the person that makes the schedule

1        doesn't contact me unless there's a problem that the

2        resident has with that.  For instance, if they want

3        to take vacation or go to a meeting during ICU

4        months, that's not -- the rule is you're not allowed

5        to take it during ICU months because of the duty

6        hours and the staffing.  So if there's a question

7        like a resident is presenting at a meeting, or

8        something, which is sort of a conflict, sometimes

9        they'll inquire to me about, do I have any other

10       resources to staff, or something like that.  But

11       there's nothing that comes out in my mind that I

12       recall at this time that anybody would have talked to

13       me about her rotation.  I believe she was just

14       assigned to it as part of her 36-month initial

15       curriculum, and that was her assignment.

16   Q   In October of 2008, did you work in your capacity as

17       a faculty member in the SICU?

18   A   Not as a faculty covering the ICU.

19   Q   Did you have opportunity to have personal

20       observations of Doctor Aronson's work in the SICU in

21       October of 2008?

22   A   It's possible I could have had some observations, but

23       not as a faculty supervising her from an ICU

24       standpoint.

25   Q   Did you have responsibilities for staffing the Acute

```
 1            Pain Service rotation in November of 2008?
 2    A     There's a good likelihood I did.
 3    Q     And would your responsibilities with respect to
 4            staffing and scheduling be similar to those
 5            responsibilities you had concerning the SICU
 6            rotation?
 7    A     No.  It would be different.
 8    Q     Okay.  I was trying to cut it short.  All right.
 9            What were your responsibilities with respect to
10            staffing the Acute Pain Service rotation in November
11            of 2008?
12    A     As a faculty, we have a faculty assigned every day to
13            staff the Acute Pain Service.  The block resident is
14            assigned to the block rotation for the whole month.
15            The block residents aren't allowed to take vacation
16            during the whole month, so I have to make sure that
17            they're present for the whole month, and then they do
18            take some call, like a Friday and a Saturday call,
19            for the whole month, so that on the weekends when
20            they're not on call, they can be post-call from an
21            operating room call standpoint.  So I more directly
22            see the assignments for the call schedule for the
23            Acute Pain Service for the block resident, so I would
24            have some oversight of that.  But I don't oversee the
25            call assignments for the ICU specifically.  That's
```

1                 how it's different.

2      Q     Is it fair to say you have more direct interaction

3            with the scheduling process in the Acute Pain Service

4            rotation?

5      A     Yes.

6      Q     Did you work with anyone else to schedule the

7            residents in the Acute Pain Service rotation for

8            November of 2008?

9      A     Well, I'm not sure exactly your question.

10                On the long-term schedule I make, I make the

11           36-month schedule roughly in the first two months of

12           residency, and who's assigned to the block month, the

13           Acute Pain Service month, is already set, so it's on

14           the schedule.  So unless someone wants to switch

15           months with somebody, then I have to work with it,

16           but I don't remember any changes in the schedule.

17     Q     I'm talking about the day-to-day scheduling now.  Let

18           me make sure we're on the same page.

19                I thought your testimony before was that one of

20           the differences between what you did with respect to

21           SICU rotation and the Acute Pain Service rotation was

22           you had more direct involvement with the scheduling.

23     A     About the Friday and Saturday call, yes.

24     Q     So my question is:  Who else was responsible for the

25           scheduling, the daily scheduling within that

```
 1              rotation, the Acute Pain Service rotation, in

 2              November of 2009?

 3      A       The chief resident and I.

 4      Q       And the chief resident would have been whom?

 5      A       In what?

 6      Q       November of 2009.

 7      A       I believe it was Doctor McFarland.

 8      Q       And together it would be your responsibilities to

 9              make sure that the scheduling would not exceed ACGME

10              duty hour requirements; is that right?

11      A       Yes.  I'd say that's true.

12      Q       Did you work as a faculty member in the Acute Pain

13              Service rotation in November of 2008?

14      A       Probably.

15      Q       And Sarah Aronson was assigned to that rotation in

16              November of 2008, right?

17      A       I don't know.  I don't have her schedule in front of

18              me.

19      Q       Do you have any recollection of having personal

20              observation of her work in November of 2008?

21      A       November of 2008.  I don't recall.

22      Q       On October 14th of 2008, you had a meeting with

23              Doctor Norcia and Sarah Aronson, right?

24      A       October 14th?  I'm trying to think which meeting that

25              was.  I may have.
```

```
 1    Q    Do you recall a meeting in October of 2008 during
 2         which you and Doctor Norcia discussed performance
 3         problems with Doctor Aronson?
 4    A    I don't at this time recall.
 5              I think we did have a meeting in October.  Yes.
 6         I think we did have a meeting in October of 2008.
 7    Q    Do you recall meeting with her to express your
 8         displeasure that you thought she was dumping work on
 9         other residents?
10    A    I may have.  But I know the term dumping is not in my
11         vocabulary, so that might be a paraphrase.
12    Q    Do you recall meeting with Doctor Norcia and Doctor
13         Aronson in October of 2008 to discuss concerns about
14         her lack of appropriately rapid response to events
15         that occur in the OR?
16    A    I don't know if it was at that meeting, but it could
17         have been.
18                         - - - -
19   (Thereupon, Exhibit 31 was marked for the purpose of
20                        identification.)
21                         - - - -
22    Q    (By Mr. Gordillo)  You've been handed a document
23         that's marked as Exhibit 31.  Please take all the
24         time you'd like to look it over and let me know when
25         you've had an adequate opportunity to review it.
```

1    A    Okay.

2    Q    Do you recognize the document?

3    A    I do.

4    Q    Can you tell me what it is, please?

5    A    It's a letter or memo to Doctor Aronson detailing

6         some of the things that we discussed in our

7         October 14, 2008 meeting and some of our concerns

8         that we had and her response to some of the concerns.

9    Q    And you signed this document, right?

10   A    I did.

11   Q    So as you look at this document now, does it refresh

12        your memory about meeting with her on October 14th?

13   A    Yes.  This was a follow-up to that meeting.

14   Q    Okay.

15   A    Subsequent meeting to that meeting.

16   Q    And with your memory refreshed about the October 14th

17        meeting, can you tell me what topics were discussed

18        at the October 14th meeting?

19   A    Multiple unsatisfactory evaluations and Doctor

20        Aronson's lack of ability to identify problems.

21   Q    Okay.  Do you remember what unsatisfactory

22        evaluations were presented to Doctor Aronson at that

23        meeting?

24   A    I don't recall.

25   Q    Did you present any unsatisfactory evaluations to her

1           at that meeting?

2      A    On October 14?

3      Q    Yes.

4      A    I don't recall.

5      Q    Do you recall whether -- strike that.  Let me

6           rephrase it.

7               Were any written unsatisfactory evaluations

8           presented to Doctor Aronson at the October 14th

9           meeting?

10     A    I don't recall.

11               MR. GORDILLO:  Off the record.

12                    - - - -

13          (Thereupon, a recess was had.)

14                    - - - -

15               MR. GORDILLO:  Back on the record.

16               Do you want to read back the

17          last question and answer, please?

18                    - - - -

19          (Thereupon, record read by Notary.)

20                    - - - -

21     (Thereupon, Exhibit 32 was marked for the purpose of

22                    identification.)

23                    - - - -

24     Q    (By Mr. Gordillo)  David, you've been handed a

25          document marked as Exhibit 32.  Again, please take