Page 101

```
 1              all the time you'd like to look it over and let me

 2              know when you've had an adequate amount of time to

 3              review it.

 4      A       Okay.

 5      Q       I'll represent to you that you see the notes in the

 6              margin there.  Those were made by Doctor Aronson, but

 7              other than those notes in the margins, is this a

 8              document you're familiar with?

 9      A       Yes.  It looks like the evaluation summary for that

10              time period at the top.

11      Q       The time period of December 27, 2007 through

12              October 13, 2008?

13      A       Yes.

14      Q       This is a document that's pulled from computer

15              records, right?

16      A       Yes.

17      Q       And residents don't typically have access to those

18              computer records, right?

19      A       They do.

20      Q       Okay.  Doctor Aronson could have pulled out this

21              document herself?

22      A       Maybe not in this format, but they have the

23              ability -- all these evaluations are sent to them

24              electronically.  Each one of these evaluations are

25              sent to them.
```

1  Q  Do you recognize this as a document that you provided

2     to her at the October 14th meeting?

3  A  I believe that's true, yes.

4  Q  Other than this document, did you present her with

5     any other documentation of her performance evaluation

6     at the October 14th meeting?

7  A  There's at least one other document that I know of.

8  Q  And what other document was that?  Describe it to me.

9  A  There's a summary of the core competency page that

10    gets printed for this time period also.

11 Q  And that summary, does it contain any individual

12    evaluations?

13 A  No.

14 Q  It summarizes the evaluations that are contained in

15    the documents you gave her; is that right?

16 A  I believe -- this is a subset of the total

17    evaluation.  These are just the written comments.

18    There are individual questions that are answered on

19    that, and it's a summary of those.

20 Q  And so the answers to the individual questions should

21    be consistent with the comments, right?

22 A  No.

23 Q  Why would the comments be inconsistent with the --

24 A  The comments are in addition to the questions.

25 Q  But isn't the purpose for the comments to be

Page 103

1          explaining the answers to the questions when

2          necessary?

3     A    No.

4     Q    What's the purpose for having the comments?

5     A    Any question that's rated less than 3, it's required

6          to write a comment.

7     Q    Okay.  But the fact that a comment exists doesn't

8          necessarily mean there was a rating lower than 3,

9          right?

10    A    It's not necessary that you have something less than

11         3 to write a comment.  You can write a comment.

12    Q    And as you look at the document that is Exhibit 32,

13         let's take, for example, the second block at the top

14         of the first page, which appears to be comments by

15         Kathleen Cho, do you see that?

16    A    Yes.

17    Q    And it says:  Additional Comments, Explanation for a

18         score of 2 out of 5 for the Medical Knowledge.  Do

19         you see that?

20    A    Yes.

21    Q    And as you scan through, some of these blocks have

22         similar bold statements about explanations for score

23         2 out of 5, 1 out of 5, and so forth.  Do you see

24         those throughout?

25    A    Yes.

Page 104

1    Q    And any time that language appears, it's always for

2         scores lower than 3, right?

3    A    For the additional comments, yes.

4    Q    But then there's also comments like the first block,

5         right, from Irving Hirsch, where this is no reference

6         to being an explanation of score for X out of 5,

7         right?

8    A    I think that's true.

9    Q    Okay.  Is it accurate to say that when the score is

10        lower than 3, it's going to reflect by the statement

11        that there's an explanation for the score of

12        something lower than 3 out of 5?

13   A    If I understand your question, if you rate something

14        less than 3, there will be a written comment.

15   Q    And it's going to indicate in the comment section

16        that you're making a comment because there was a

17        score lower than 3, right?

18   A    I don't know if that's true or not for this reporting

19        mechanism.  I think it would be, but I don't know for

20        sure.

21   Q    The summary page corresponds in terms of timing,

22        right?  In other words, chronologically the questions

23        match with the comments, right?

24             Let me ask it an easier way.

25             The comments correspond to the questions, right,

1         the answers to the questions?

2   A   Not necessarily.

3         For instance, there's a comment here that it's

4         not apparent to me which question it may have been

5         tagged to or not.

6   Q   So there can be comments that aren't necessarily

7         adding to any answer to the question?

8   A   If someone scores less than 2, they're required to

9         write a comment.  The comment may or may not be

10        related to that question.  The computer system

11        doesn't know what the comment is related to.  It just

12        requires a comment be made.

13  Q   My concern is this:  I want to know whether the

14        answers to the questions correspond to a time period

15        that the comments are aimed at?

16              MR. BIXENSTINE:  I think what he's

17                trying to ask is are all the comments

18                that are in a particular block arising

19                from the same time period of experience

20                with the resident?

21              MR. GORDILLO:  Yes.  Thank you.

22  A   Each block, I believe, is related to a single

23        experience given over a day, a single day; like if

24        it's an operating room.  If it was in the ICU, it

25        could be over maybe multiple days or maybe over a

1       week, but I think each block is a single evaluation.

2    Q    And the blocks appear chronologically?

3    A    I'm not sure.  I'm not sure because they don't give

4       us the date on this.  The dates aren't listed, so I'm

5       not sure about that.

6    Q    Do you have a way to determine the dates that would

7       apply to the comments?

8    A    I do.

9    Q    How do you do that?

10    A    Look at the individual comment.

11    Q    And then how does the individual comment inform you

12       about the relevant time period that the comment

13       applies to?

14    A    Well, the individual comment is generated on the day

15       that it's made.  It doesn't reflect, necessarily, the

16       date of when the experience occurred, but I believe

17       it's possible to go into the system and we can run a

18       report of when reports were generated for the working

19       experience, so I suppose you could backtrack it.

20    Q    So you would generally be able to figure out

21       essentially when Doctor Aronson worked with Doctor

22       Hirsch?

23    A    For all of the faculty, that should be possible.  Not

24       for some of these anonymous ones.

25    Q    Right, right.

1              As you look through this list of evaluation

2        comments, can you point to any negative evaluation

3        comment based on an experience for Sarah Aronson

4        after May of 2008?

5   A   Not from this document I can't.

6   Q   Why not?

7   A   There's no dates on it.

8   Q   Did you present to Doctor Aronson at the October 14,

9        2008 meeting any negative evaluation of her that

10       would have occurred after May of 2008?

11  A   It's possible.

12  Q   And if you did, it would be reflected on this

13       document, correct, that is Exhibit 32?

14  A   For all evaluations in the system.

15  Q   Why do you say for all evaluations in the system?

16  A   This document is the My Evaluation System evaluations

17       that we use from December 27th of 2007 to

18       October 13th of 2008.  So any of those evaluations

19       that were sent out for time periods reflected in that

20       time span, those would be generated in the system.

21       We do have other types of evaluations that may not be

22       included in this, because this is a comments

23       evaluation which is an incomplete evaluation.  This

24       is not all -- this is just a summary of comments, and

25       it's an incomplete evaluation.  There's other

Page 108

1          evaluation information besides this.

2    Q    Did you present any other evaluations that were

3          documented to have occurred after May of 2008 when

4          you met with Doctor Aronson in October?

5    A    I don't know the answer to that.

6    Q    If you look, please, at Exhibit 31, and in the second

7          paragraph where it's written:  A primary concern was

8          the lack of appropriately rapid response, do you see

9          that?

10   A    Yes.

11   Q    Okay.  So now that you read this document, does it

12         refresh your memory whether the lack of appropriately

13         rapid response was discussed with Doctor Aronson on

14         October 14, 2008?

15   A    I believe we did discuss that.

16   Q    And did you -- was it the primary concern that was

17         discussed at that meeting?

18   A    I would say that's not -- it wasn't the primary

19         concern.

20   Q    Okay.  Did you draft this document that is Exhibit

21         31?

22   A    I helped draft it.

23   Q    Along with Doctor Norcia?

24   A    I believe the two of us did it together.

25   Q    And so did you write that the lack -- the discussion

1         about the lack of appropriately rapid response was of

2         primary concern?

3   A   I would say that I either wrote it or helped write it

4         in this letter, yes.

5   Q   But you don't believe it to be accurate?

6   A   Well, it was a primary concern.  It's true.  That was

7         a primary concern.  There were other concerns and

8         there were other -- this was a resident evaluation

9         for a time period, so it was for more than -- when

10        you say the primary concern, there was other reasons

11        that we were meeting with her besides just that to

12        address that issue.  But that was a primary concern.

13   Q   What other concerns were you discussing?

14   A   Her inability to appreciate clinical situations or

15        not processing and reacting to information, and

16        another probably even greater concern was her

17        inability to identify reasons for not being able to

18        respond when she would agree that a response should

19        be done.

20   Q   And all of those things are addressed in the document

21        that's Exhibit 31, right?

22   A   Yes.  I believe.

23   Q   And so you raised these issues with Doctor Aronson

24        during the meeting, right, during the October 14th

25        meeting?

Page 110

```
 1    A    Yes.

 2    Q    Did she ask you for a specific example of how her

 3         performance demonstrated a lack of appropriately

 4         rapid response?

 5    A    I don't recall specifically asking her that.

 6                   MR. BIXENSTINE:  He's asking whether

 7              she asked that of you, could you give her

 8              an example?

 9    A    I don't remember if she asked me that.  Is that what

10         you're asking?

11    Q    Yes.

12    A    I don't remember if she asked me that.

13    Q    And so if she testifies that she did ask you, that

14         could be correct, you just don't recall?

15    A    Yes.  I don't remember if she asked me that question.

16    Q    Do you remember giving her any specific examples to

17         support the concern that she had a lack of

18         appropriately rapid response?

19    A    I believe in the October 14th meeting, we did discuss

20         some of the evaluations here.  There was a question

21         on ARON 0037 Page, about half way down from Doctor

22         Adamek.  I believe we discussed that.

23    Q    The one that indicates Peter Adamek, Anesthesiology:

24         Bigger weakness is awareness, that one?

25    A    Yes.
```

1   Q   Were there any other specific examples that you

2       discussed regarding lack of appropriately rapid

3       response?

4   A   And are you saying lack of appropriate response or

5       delayed response?

6   Q   Lack of appropriately rapid response.

7   A   Okay.  I think that's all I see from these

8       evaluations.  I think that's all I see from these

9       evaluations.

10  Q   Did you discuss any other specific example with

11      Doctor Aronson concerning the lack of appropriately

12      rapid response?

13              MR. BIXENSTINE:  Besides what's on

14          --

15              MR. GORDILLO:  Yes.

16  A   I don't recall any.

17  Q   With respect to the evaluation by Doctor Adamek, do

18      you recognize what time period that was from?

19  A   Not from this document, other than between

20      December 27, 2007 and October 13, 2008.

21  Q   If Doctor Aronson believes that that comment was from

22      May of 2008, do you have any reason to disagree with

23      that?

24  A   I don't.

25  Q   At the October 14, 2008 meeting, did you discuss any

```
 1            specific examples of Doctor Aronson's not

 2            appreciating the situation or cannot process and

 3            react to the information or situation at hand?

 4    A       I believe we did.

 5    Q       And would those specific examples be contained in the

 6            document that is Exhibit 32?

 7    A       I think some of these in part support that.

 8    Q       Tell me which ones.

 9    A       I would say probably the very first one by Doctor

10            Hirsch.

11    Q       That's on the page marked ARON 0225?

12    A       Yes.  The fourth comment on the same page from Doctor

13            Zahniser.

14    Q       Okay.

15    A       It may be possible, depending on how our discussion

16            went, the second to the last by Doctor Rowbottom on

17            the same page.

18    Q       Okay.

19    A       On Page ARON 0036, the second comment by Doctor

20            Nearman would fall within that.

21    Q       That's the one that began:  There is no question that

22            Sarah is extraordinarily bright?

23    A       Yes.  On Page ARON 0037, the comment by Doctor Adamek

24            that we talked about before.

25    Q       Right.
```

1    A    And that's all I see on this evaluation.

2    Q    Did you discuss any specific examples of Doctor

3         Aronson's not appreciating the situation or cannot

4         process and react to the information or situation at

5         hand which examples are not contained in Exhibit 32?

6    A    I don't recall if we did or not.

7    Q    Did you discuss with her at the October 14th meeting

8         any specific examples concerning evaluations from her

9         Pain, OB, and ICU rotations?

10   A    I believe we did.

11   Q    Were those specific examples contained in Exhibit 32?

12   A    I believe so.

13   Q    Were they different than any of the examples that

14        you've already identified?

15   A    Well, there's more than just these comments.  There's

16        the rest of the evaluations that were done that are

17        tagged with each of these comments that support that.

18   Q    The answers to the questions you're talking about on

19        the summary?

20   A    Yes.  The specific questions that go along with the

21        comments.

22   Q    You mentioned that there was another page.

23   A    And there's another page also that is a summary of

24        the core competencies.

25   Q    Okay.  And is it your belief that you may have

1    pointed out specific examples from one of those

2    documents?

3  A  Yes.

4  Q  And I asked this once before, but let's clarify one

5    more time.

6       The references on these other documents, they

7    corresponded in time to the comments?

8  A  Not necessarily.

9  Q  Okay.  The concerning evaluations from Doctor

10   Aronson's ICU rotation for which you gave specific

11   examples, do you recall when she performed in that

12   ICU rotation?

13  A  No.

14  Q  During the October 14th meeting, Doctor Norcia raised

15   some concerns with Doctor Aronson about her

16   performance, correct?

17  A  I believe so.

18  Q  And specifically had some concerns that arose during

19   her work in approximately the first week of October

20   in her ICU rotation, October of 2008, right?

21  A  I'm not sure about that.

22  Q  Well, do you remember in the October 14, 2008 meeting

23   whether you discussed any performance deficiencies

24   related to Doctor Aronson's performance in the prior

25   two weeks?

Page 115

```
 1    A    It's possible.  I don't recall.

 2    Q    With respect to concerning evaluations about her ICU

 3         rotation, when you mention specific examples, were

 4         you talking about some rotation that would have

 5         occurred before October of 2008?

 6    A    At the October 14th meeting?

 7    Q    Yes.

 8    A    I suppose it could be anywhere from December 27, 2007

 9         to October 13, 2008.

10    Q    Right.  But she performed more than one ICU rotation,

11         right?

12    A    During her residency, her core rotations are

13         scheduled for four rotations during her 36-month core

14         curriculum.

15    Q    That's what I'm getting at.

16              When you had this meeting on October 14, 2008,

17         she was in an SICU rotation?

18    A    Yes.  That's right.  September and October she was in

19         ICU.

20    Q    And what I'm trying to get at is when there's a

21         reference from concerning evaluations from her ICU

22         rotations, and your testimony was you gave her some

23         specific examples of those evaluations, whether those

24         specific examples were from rotations before the

25         September and October --
```

1   A   I'd have to look at what her 36-month schedule was to

2       see if she was scheduled in other rotations and then

3       match it up with the evaluations.

4   Q   During the October 14th meeting, you and Doctor

5       Norcia discussed with Doctor Aronson ways she might

6       be able to improve her performance; is that right?

7   A   I believe so.

8   Q   Tell me about those discussions.

9   A   I believe one of the ways to improve on her

10      performance was to have her specifically solicit

11      feedback from faculty.

12  Q   Was there anything else that you suggested that she

13      do to improve?

14  A   Another thing was that her inability to perceive a

15      problem, if she was able to get feedback, then she

16      could make a self-assessment of what a problem might

17      be in order to correct it.

18  Q   Was there anything else that you suggested she do to

19      improve?

20  A   I believe we also talked about trying to discern

21      between routineness and non-routineness to have a

22      different method of reacting in clinical situations.

23  Q   And what different method of reacting did you want

24      her to exhibit?

25  A   Well, if something was more urgent or emergent, you

1        would do things differently than if it was something

2        that was routine.

3   Q   Let me go back a minute to Exhibit 32.  You're

4        familiar with the system that was used to generate

5        the comments, right?

6   A   My evaluation system, yes.

7   Q   And evaluators are required to indicate something in

8        the comment section, right?

9   A   Not always.

10   Q   Would you look at Exhibit 32 of the page marked ARON

11        0037?

12   A   Yes.

13   Q   At the bottom of that page, you see an entry for

14        David Dininny.

15   A   Yes.

16   Q   T-n-e-m-m-o-c on.  Do you see that?

17   A   Yes.

18   Q   Do you know what that indicates?

19   A   I do.

20   Q   Tell me, please.

21   A   That's the term no comment written backwards.

22   Q   Do you know why he does that?

23   A   That's his way of -- I would say, my opinion is it's

24        his way of being sophisticated in giving a challenge

25        to one's mind when there's nothing that he feels

Page 118

1           should be further commented on.

2    Q    Would you look at the next page?

3    A    ARON 0038.

4    Q    And the third evaluation from the top there from Mark

5           Zahniser.

6    A    Yes.  It's actually -- there's a continuation of

7           that, so it's the second full one, the third one

8           total, yes.

9    Q    Says:  No comments?

10   A    Yes.

11   Q    And there's the next four are David Dininny with his

12          backwards no comments?

13   A    Yes.

14   Q    Do you know why there are no comment entries if

15          they're not required to make comments?

16   A    What this report is is an incomplete evaluation

17          that's a comments-only section.  This is only a

18          report of comments.  This is a comment report.  But

19          there's other evaluations that have no comments that

20          exist.  This is just a type of report generated, an

21          incomplete report of just comments.  These are not

22          all of the evaluations.  This is just the comments

23          that were written between December 27, 2007 and

24          October 13, 2008.

25   Q    Other than Exhibit 31, are you aware of any

1      documentation that memorialized what happened at the

2      October 14th meeting?

3                    MR. BIXENSTINE:  In other words, was

4                    there any other documentation generated

5                    by that meeting besides that?

6      A    I don't recall any other.

7                    MR. GORDILLO:  Good job, counsel.

8                    MR. BIXENSTINE:  I'm just paying

9                    attention to your comment in the hall and

10                    doing my best.

11     A    But other than what I mentioned before.

12          And there's one comment on Page ARON 0225, the

13     second evaluation by Doctor Cho that says:  See other

14     comments from today, but I don't know that -- there

15     may have been some other supporting documentation.  I

16     don't know.

17     Q    Okay.  You and Doctor Norcia met again with Doctor

18     Aronson on November 24th, right, of 2008?

19     A    That's correct.

20     Q    Did you create Exhibit 31 before the November 24th

21     meeting?

22     A    I don't know the -- I'm not sure if it was made -- I

23     don't recall if it was made on or before.

24     Q    Do you know why Exhibit 31 is dated November 24,

25     2008?

Page 120

1    A    I believe that's when we had Doctor Aronson sign it.

2    Q    Okay.  Was the document drafted on or about

3         November 24th?

4    A    I don't remember exactly when it was drawn.

5    Q    Why did you decide to draft the document that's

6         Exhibit 31?

7    A    We put down in writing what our concerns expressed

8         were and we also expressed our concerns in regards to

9         her performance and receiving a possible

10        unsatisfactory for the six-month period ending in

11        December of 2008.

12   Q    Why did you think it important to put down your

13        concerns in writing?

14   A    Because if someone is going to get an unsatisfactory

15        for a six-month time period, we have to give some

16        reasons why.

17   Q    Did you present this document to Doctor Aronson

18        before November 24th of 2008?

19   A    I don't think so.

20   Q    Do you think you presented it to her at the meeting

21        of November 24, 2008?

22   A    I would say that it was either at the meeting on

23        November 24th or following the meeting on

24        November 24th.

25   Q    Why did you wait six weeks to give her documentation

Page 121

1         of a meeting that occurred on October 14th?

2   A   That's the next time we met.

3   Q   Was there any way to give her documents other than

4         meeting with her?

5   A   Well, if we are considering giving someone an

6         unsatisfactory, we would meet someone face-to-face

7         and talk to them about it as opposed to just giving

8         them a piece of paper.

9   Q   You told her that on October 14th, right?

10               MR. BIXENSTINE:  That being?

11   Q   That you were considering giving her an

12        unsatisfactory.

13   A   Yes.  I would say that we -- I don't know if we

14        have -- yes.  I think we discussed that then, too.

15        Yes, because we were talking about ways of improving

16        her performance so we brought that up, yes.

17   Q   But you didn't give her any writing to that effect at

18        that time, did you?

19   A   Because we had just met with her.

20   Q   So why did you wait six weeks to give her the writing

21        about the meeting?

22   A   I would say one reason might be that we gave her an

23        opportunity to perform and see if that made any

24        difference in her performance.

25   Q   What other reasons were there for waiting six weeks

1        before giving her a document reflecting that you've

2        discussed that you had reason to give her an

3        unsatisfactory?

4   A   I don't recall what the specific reasons were for

5        waiting six weeks.

6   Q   The document that is Exhibit 31 doesn't include any

7        reference to the meeting on November 24th, does it?

8           Let me rephrase that.  That's not fair.

9           It talks about, we'll meet again in four to six

10       weeks to review.  Do you see that at the very end?

11  A   Yes.

12  Q   The November 24th meeting, was that the meeting that

13       was anticipated by the reference to we'll meet again

14       in four to six weeks?

15  A   I believe so.  This was -- yeah.  This was a summary

16       of the October meeting that we had to meet in four to

17       six weeks to review her performance.

18  Q   But this document doesn't include any information

19       with respect to what was discussed in the November

20       24th --

21  A   I don't believe so, no.

22  Q   At the November 24th meeting, did you express to

23       Doctor Aronson again a belief that there was reason

24       to give her an unsatisfactory?

25  A   Yes.

```
 1    Q    Did you discuss any specific examples of her
 2         performance between October 14, 2008 and November
 3         24th of 2008 that was giving reason for her to have
 4         an unsatisfactory rating?
 5    A    I believe we did.
 6    Q    Did you give her any documentation to that effect?
 7    A    I don't recall.
 8    Q    What specific examples did you point out to her?
 9    A    I don't remember what -- I don't remember what
10         specific examples had occurred between October and
11         the November 24th meeting.  I don't have her
12         evaluation information with me, so I don't recall.
13    Q    Do you remember what her faculty evaluations were in
14         November of 2008?
15    A    I don't recall.
16    Q    Do you remember whether they were consistent with
17         giving her an unsatisfactory rating?
18    A    I don't recall what they were.
19    Q    Did you take into consideration her faculty
20         evaluations for November when you were informing her
21         at the November 24, 2008 meeting that she was given
22         reason to have an unsatisfactory rating?
23    A    Could you say that question again?
24                   MR. GORDILLO:  Go ahead and read it
25              back.
```

1                              - - - -

2              (Thereupon, record read by Notary.)

3                              - - - -

4      A     The only way I'd know to answer that is to see if

5            they were printed off at the time of the

6            November 24th meeting.  If they were, I did.

7      Q     Did you confer with Doctor Norcia about what the two

8            of you were going to do when you met with Doctor

9            Aronson at the November 24th meeting?

10                         MR. BIXENSTINE:  In other words,

11                    confer in advance of the meeting.

12     A     I'm sure that Doctor Norcia and I talked before the

13           meeting.

14     Q     Okay.  Tell me what you talked about.

15     A     I don't know if we had printed evaluations, so I

16           don't know what the format of the discussion would

17           be.  But generally speaking, in a circumstance where

18           we have a resident that is not performing well, then

19           we will discuss in order to meet with the resident,

20           and it's different every time.  It may just be a very

21           brief discussion, because that's the whole purpose of

22           the meeting, to find out what's gone on in the last

23           interval.

24                              - - - -

25     (Thereupon, Exhibit 33 was marked for the purpose of

```
 1                          identification.)

 2                              - - - -

 3     Q    You've been handed a document marked as Exhibit 33.

 4          Please take all the time you'd like to look it over

 5          and let me know when you've had an adequate

 6          opportunity to review it.

 7     A    I believe I've reviewed it.

 8     Q    Do you recognize the document?

 9     A    I recognize the context of the document, yes.

10               MR. BIXENSTINE:  By the way -- off

11            the record.

12                              - - - -

13          (Thereupon, a recess was had.)

14                              - - - -

15               MR. GORDILLO:  Back on the record.

16     Q    And tell me what the document is, please.

17     A    It's three or four pages of an individual document

18          that was, I believe, printed with someone that signed

19          in using Doctor Aronson's sign-on to my evaluation

20          system, and it was printed off the internet web

21          system.

22     Q    Yes.  And it's an evaluation of Doctor Aronson,

23          right?

24     A    It's an evaluation of Doctor Aronson.

25     Q    For the month of November 2008, right?
```

1    A    I don't think it's a month evaluation.

2    Q    Well, if you look at where it says evaluation period,

3         it indicates November 1st of 2008 to November 30th of

4         2008, right?

5    A    So it appears to me that on February 16, 2009, which

6         was a Monday, that a date range of evaluation -- what

7         I believe something that fell within that evaluation

8         from this evaluator, but I don't think that this is a

9         month evaluation.  I think this is a single

10        evaluation that fell within that time period.

11   Q    When you testified earlier that if you went and

12        looked at specific examples it would have been from

13        printing off evaluations for the November meeting, is

14        the document Exhibit 33 similar to what you'd be

15        talking about?

16   A    Could you say the first part of that question again?

17            MR. GORDILLO:  Go ahead.

18                - - - -

19        (Thereupon, record read by Notary.)

20                - - - -

21   A    No.

22   Q    Is Exhibit 32 similar to what you'd be talking about?

23   A    Exhibit 32 would be part of the documentation that I

24        would expect to have at a resident evaluation with

25        the time period that is run from that time period.

Page 127

1    Q    Before the November 24th meeting, did you discuss

2          with Doctor Norcia whether to raise with Doctor

3          Aronson a concern about medication, her medication?

4    A    I don't believe that that was discussed prior to our

5          meeting with Doctor Aronson.

6    Q    During the meeting, it was discussed, right?

7    A    It was.

8    Q    Did you ask the question of Doctor Aronson whether

9          she was taking any medication that might affect her

10         performance?

11   A    I did.

12   Q    When did it occur to you that she might be taking

13         medication that might affect her performance?

14   A    Well, during the meeting is when I believe I thought

15         of asking her the question.

16   Q    And why was it that you had not thought of the

17         question before that?

18   A    Because when we met in October, we gave Doctor

19         Aronson some suggestions on how she could improve her

20         performance.  And during the interaction with Doctor

21         Aronson on November 24th of 2008, her inability to

22         communicate and just to even express a simple yes or

23         no answer was a concerning behavior, and in my

24         experience, when somebody has any type of concerning

25         behaviors and they are in the field of anesthesia,

1       right off the bat, you have to think about substance

2       abuse, in my experience.  And about 50 percent of the

3       time I've seen where you expect it or not, someone is

4       positive for substance abuse.  So that's based on my

5       experience.  And her behavior in that meeting, I drew

6       on my experiences with others, and that's what made

7       me start asking those types of questions.

8  Q  When you said that meeting, are you talking about the

9       November meeting?

10  A  The November 24th meeting.

11  Q  But before the November 24th meeting, you had not yet

12       put together the possibility that her performance was

13       being affected by medication or substance abuse?

14  A  That's true.

15  Q  What is a psychotropic medication?

16  A  It's a medication that has mind altering effects.

17  Q  And you consider Topamax to be a psychotropic

18       medication?

19  A  It can be.

20  Q  Are there circumstances when it's not?

21  A  I would say I can think of two circumstances that it

22       would not be.

23  Q  What are those two circumstances?

24  A  One is on a dose-dependent basis, meaning someone

25       taking a very low dose, it may not have an effect.

1           And a second might be someone that has a tolerance or

2           it doesn't affect their cognitive function.

3    Q    During the November 24th meeting, Doctor Aronson told

4           you that she was taking Topamax, correct?

5    A    I believe so.

6    Q    You believed that she should have told you that

7           before?

8    A    Well, at the conclusion of the meeting, I felt that

9           she should have told us that.  I would say during

10          that meeting, yes.

11    Q    During the meeting, you came to the conclusion that

12          she should have disclosed to you before the meeting

13          that she was taking Topamax; is that accurate?

14    A    Based on the information I had at the meeting, yes.

15    Q    What information at the meeting led you to conclude

16          that she should have disclosed to you previously that

17          she was talking Topamax?

18    A    The first was that she was taking it.  The second was

19          that she suggested it could have a side effect of

20          word searching, which was her exact words.

21    Q    And you believe that it's a hospital policy that she

22          was to disclose that to you?

23    A    I believe HR9, Policy HR9, and I believe HR35 talks

24          about it also.

25    Q    During the ten years that you have been co-director

```
 1              of the Anesthesiology Residency Program, have you

 2              received any training on how to recognize the

 3              symptoms of fatigue?

 4      A      Yes.

 5      Q      What training have you received?

 6      A      We have an expert that's on the hospital staff and

 7              faculty that has come to our department and given us

 8              lectures on it.

 9      Q      And they talked to you, for example, about delayed

10              responses being a symptom of fatigue?

11      A      I'm pretty confident that was discussed.

12      Q      Did you discuss with Doctor Aronson whether her lack

13              of rapid response might be due to fatigue?

14      A      I don't know if I explicitly asked her that question.

15      Q      Did you somehow some other way ask her the question?

16      A      Well, I figured that she's probably the best one to

17              determine why she has this -- or she potentially

18              would be the best person to determine the reasons.

19              There's so much information that I have no privilege

20              to know about a resident, and I think they are the

21              best people to -- because they're more privileged to

22              other information that I don't know about, so --

23      Q      But you were trained to recognize symptoms of

24              fatigue, correct?

25      A      Sure.
```

1    Q    And her lack of responsiveness would be consistent

2         with symptoms of fatigue, correct?

3    A    I don't agree with that statement.

4    Q    In what ways were they inconsistent with symptoms of

5         fatigue?

6    A    With fatigue, the lack of responding occurs when

7         someone has been sleep deprived or excessively tired

8         or overworked, but with Doctor Aronson, she could

9         demonstrate at virtually any time that you interact

10        with her an inability to respond.  So in my mind,

11        this was just an on-going type of thing and not

12        related to the day or night or time or beginning of

13        the day, end of a call.  It wasn't related in my mind

14        to sleep deprivation or fatigue, and she gave me no

15        indication that it was.

16   Q    Well, I asked you whether the symptoms were

17        consistent with fatigue.

18   A    They are.

19   Q    The answer I got back from you was that the cause was

20        not consistent with fatigue; is that accurate?

21   A    I believe if you look at the question you asked me,

22        you asked me the context of her demonstration of lack

23        of rapid response not the symptoms of lack of

24        response being consistent with fatigue.  The symptoms

25        are consistent with fatigue, but her demonstration of

Page 132

```
 1            it was not consistent with fatigue or sleep

 2            deprivation.

 3       Q    The symptoms she demonstrated were consistent with

 4            someone suffering from fatigue; isn't that true?

 5       A    That could be true, yes.

 6       Q    And one of the primary reasons for duty hour

 7            restrictions being in place is to prevent residents

 8            from suffering from fatigue, right?

 9       A    You said one of the reasons?

10       Q    Yes.

11       A    Yes.  I'd say that's probably a fair statement.

12       Q    And one of the dangers of having residents exceed the

13            restrictions is they will suffer from fatigue, right?

14       A    I suppose that's true.  I suppose that's true.

15       Q    So for example, if a physician were to work three

16            call periods in a week, that physician might be in

17            danger of suffering from fatigue, right?

18       A    It's possible.  It depends on what they do the rest

19            of their time.

20       Q    If a physician works 102 hours in a week, by the end

21            of that week, they might well show symptoms of

22            fatigue; is that right?

23       A    They could.

24       Q    If a physician just finishes a call period during

25            which she's worked 26 hours, she might show symptoms
```

Page 133

1           of fatigue at the end of that, right?

2     A    That's very possible.

3     Q    The October 14th meeting, did you realize that was

4           being held with Doctor Aronson at the end of a shift

5           where she's worked approximately 26 hours?

6     A    I don't recall that.

7     Q    When Doctor Aronson told you that she was taking

8           Topamax, did you consider that she be referred to

9           EAP?

10    A    Yes.

11    Q    She discussed that with you, right?

12    A    Yes.

13    Q    Had you considered before then referring her to EAP?

14    A    I don't recall if I did or not.

15        Any person that has a potential for substance

16          abuse would be a potential for an EAP referral.  I'm

17          not sure if -- the Employee Assistance Program can do

18          other things besides dealing with issues related to

19          potential substance abuse, and I have sent residents

20          over there for other non-substance abuse related

21          issues, but I don't recall that that was the

22          consideration for her prior to the November 24th

23          meeting.

24          MR. GORDILLO:  Could you read that

25            answer back?

```
1                              - - - -

2            (Thereupon, record read by Notary.)

3                              - - - -

4     Q    (By Mr. Gordillo)  I'll represent to you there's some

5          dispute in this litigation about exactly how many

6          hours Doctor Aronson worked in October of 2008.  I

7          think we can all agree that it's somewhere in the

8          neighborhood of 340 and 380 hours.

9     A    I disagree with that.

10    Q    I'm not trying to make that a point.  I'm trying to

11         avoid that.

12    A    Oh.

13    Q    She worked the entire month of October 2008 in the

14         SICU, correct?

15    A    Yes.

16    Q    An important rotation, fair?

17    A    Not the complete month of October.

18    Q    Okay.  What portion of October did she work in SICU?

19    A    She took some vacation in the month of October.

20    Q    Okay.  But the entire time she was working in the

21         residency during October, she spent in the SICU?

22    A    Yes.  She was assigned to ICU for the whole month.

23    Q    Right.

24    A    Yes.

25    Q    If she were exhibiting symptoms of substance abuse,
```

1        why was she permitted to work that whole month in

2        ICU?

3                   MR. BIXENSTINE:  Objection.

4  A   I didn't say she was.  The substance abuse issue in

5        my mind came up in November.

6  Q   Did her behavior change between October and November?

7  A   When?

8  Q   Any time.

9  A   Well, I didn't observe her regularly or specifically,

10       that I recall, in October, but I did on November

11       24th, I was interacting with her then.

12  Q   So it was on that day that you believed she might be

13       abusing some substance?

14  A   That was in my differential.

15  Q   What do you mean that was in your differential?

16  A   I keep a high index of suspicion for everyone in our

17       Department of Anesthesia about substance abuse

18       because of the high abuse potential.  But there are

19       other things that I'm not privileged to know about

20       that could be related to someone demonstrating the

21       same types of signs or symptoms.

22         I was actually shocked when she told me that

23       because that was just part of my differential.  I was

24       surprised.

25  Q   I guess, explain that to me when you say you were

1          surprised and that was part of your differential.

2   A    Well, when Doctor Aronson said that she was on the

3          Topamax medication, and then she started giving

4          spontaneously symptoms that someone that's on Topamax

5          would have, I reflected back on things that we had

6          talked to her about over many times that we had met

7          that had the same symptoms that she was describing,

8          and we had talked about this, and she never brought

9          this up.  And as a result, I was shocked.

10   Q    When you're discussing her use of Topamax, she

11         suggested that if there were concern, you should get

12         EAP involved to monitor her; is that true?

13   A    I don't know if that's the way I would describe it.

14   Q    All right.  She was cooperative in trying to get an

15         answer about whether Topamax was causing the problem;

16         is that true?

17   A    In part, she was cooperative and in part, she was

18         not.

19   Q    How was she not cooperative at the November 24th

20         meeting?

21   A    Yes.  I think she expressed concerns about what the

22         evaluation might be, and I think she had concerns

23         about her either confidentiality or her professional

24         stance in relation to an evaluation, and I think she,

25         in that meeting, expressed concerns about what might

Page 137

1           go on her record if she was evaluated.

2     Q     Did you find any of those concerns unreasonable?

3     A     Can I hear --

4                          - - - -

5           (Thereupon, record read by Notary.)

6                          - - - -

7     A     I think that those concerns are considered

8           reasonable.

9     Q     And so because she expressed reasonable concerns, you

10          viewed that she was in part not being cooperative?

11    A     No.

12    Q     All right.  What was it that she did or said during

13          the November 24th meeting that indicated to you that

14          she was not being cooperative?

15    A     It was because of the concerns that I believe she was

16          reluctant to have the evaluation, but I still think

17          the concerns were valid.

18    Q     She didn't suggest to you that she should be removed

19          from service, right?

20    A     No.

21    Q     Okay.  You ultimately decided that she should be

22          removed for a fitness-for-duty examination, right?

23    A     Yes.

24    Q     During the November 24th meeting, did you discuss

25          that with Doctor Aronson?

Page 138

```
 1    A    It was in part discussed on the 24th and in part on

 2         the 25th, because in order for something like this to

 3         occur, I have to call over to Employee Assistance,

 4         and it's something that has to be discussed about the

 5         appropriate nature of the referral.

 6    Q    On the 24th, you discussed with Doctor Aronson the

 7         possibility of involving EAP to monitor her, right?

 8    A    Not to monitor her.

 9    Q    To evaluate her?

10    A    To evaluate her.

11    Q    Is it your testimony that you also discussed that

12         that evaluation would be a fitness-for-duty

13         evaluation that would require her to stop working?

14    A    Yes.

15    Q    You had that discussion with her in the meeting on

16         November 24th in front of Doctor Norcia?

17    A    Well, I don't remember if it was on the 24th or the

18         25th, because I can't recall when I spoke to Jill

19         Fulton-Royer about this, and I don't remember if it

20         was on the 24th or 25th, and I can't make a Tier 1

21         referral until I speak to her, but it's -- at least

22         the possibility of having it done was discussed.

23    Q    Isn't it true that you did not discuss with Doctor

24         Norcia or in front of Doctor Norcia that you were

25         going to have Doctor Aronson removed for fitness for
```

```
 1              duty evaluation until after it had been done?
 2      A       We talked about it at the meeting with the three of
 3              us on November 24th.
 4      Q       That was not what your testimony was a moment ago.
 5              You were unsure whether you discussed removing her
 6              for a fitness-for-duty evaluation.
 7                      MR. BIXENSTINE:  I don't have that
 8                  recollection.
 9      A       I said the possibility of it, not the recommendation.
10              I couldn't make the recommendation until I spoke to
11              Jill Fulton-Royer, but we discussed the possibility
12              of it, because anybody that has to be evaluated for
13              potential substance abuse has to go through EAP.
14              It's a mandatory Tier 1 evaluation, but I can't make
15              that recommendation without involving Employee
16              Assistance.
17      Q       After Doctor Aronson disclosed to you that she was
18              taking Topamax, did you hold a belief that she had a
19              substance abuse problem?
20      A       I did not.
21      Q       So this was not about a substance abuse referral,
22              right?
23      A       This is not about a substance abuse referral.
24      Q       Did you have discussions with Doctor Aronson during
25              the November 24th meeting about alternatives to a
```

1        fitness-for-duty referral?

2   A   I know I did -- or we had this discussion at some

3        point, and I don't remember if it was on the 24th or

4        not.

5   Q   On the 25th, did you consider alternatives to having

6        her removed from service for a fitness-for-duty

7        evaluation?

8   A   Well, after speaking with Jill Fulton-Royer, I don't

9        know if there was any other alternative discussed at

10       that point, because it would be considered a Tier

11       1 -- well, let me say this:  I guess we did talk

12       about the potential for her being dismissed.  That's

13       another option, I guess.  So we did talk -- we did

14       discuss about that.  That's more than just a Tier 1

15       mandatory evaluation, so I guess we did talk about

16       other options.

17  Q   Did you talk about any other options that would allow

18       her to continue working?

19             MR. BIXENSTINE:  And not go through

20            the fitness exam.  I think that's what he

21            meant.

22  A   I don't think so.  I don't think so.

23  Q   So at least on November 24th, your desire was to stop

24       Doctor Aronson from working?

25  A   No.

1    Q    It was not your desire on November 24th to have her

2         undergo a fitness-for-duty exam?

3    A    I think she needed to be evaluated.

4    Q    And you understood that if she were to undergo a

5         fitness-for-duty exam, it would require that she

6         would stop working?

7    A    It's required.

8    Q    That was your desire.

9    A    To be evaluated.

10                  MR. BIXENSTINE:  Objection.

11   Q    Yes.  In a manner that would require her to stop

12        working.

13   A    I thought that was reasonable.

14   Q    You also knew that several months earlier, Doctor

15        Aronson had scheduled time off for the birth of her

16        child, right?

17   A    I don't know about that.  I mean, I don't know what

18        the exact dates were.  I might have been aware of

19        something about that event, but I'm not sure when

20        that was.

21   Q    Well, it would be important for you to know that she

22        had a scheduled leave of absence for an extended

23        period during the month of December, right?

24   A    In relation to -- well, it depends on what her

25        clinical schedule is.  If she can schedule the time

1        off based on her clinical schedule and it's a

2        rotation she can take the time off, then she doesn't

3        have to disclose anything to me.  If it's one of the

4        rotations where she's not allowed to take time off,

5        then that is something that I should be aware of so

6        that I can help coordinate her schedule.

7    Q    But this was a situation where she was planning for

8        the birth of her child.

9    A    Yes.

10    Q    At a time when many residents want time off, fair,

11        the end of December?

12    A    Sure.

13                MR. BIXENSTINE:  He's asking whether

14            you knew it was scheduled for the end of

15            December.  That's what he wants to know.

16    A    Oh.  I'm not sure that I knew about that.  I'm not

17        sure if I knew it was scheduled at the end of

18        December.

19        The only way I believe I would have been

20        specifically aware of that timing was if it was a

21        scheduled rotation that there would be conflict.

22        Otherwise, she's allowed to take the time off.  It

23        would be of no concern to me.  She's entitled to it.

24        She doesn't have to get pre-approved permission for

25        it.

```
 1              The only time that it would affect me and for me

 2         to be knowledgable about it is if, for instance, she

 3         was scheduled in the ICU, which would be a rotation

 4         she's not allowed to take time off.  If she knows

 5         that, then she would have an obligation to tell me,

 6         to inform me about that, so that we could make

 7         changes in her schedule to accommodate for the lack

 8         of her anticipated not being there.  Otherwise, she

 9         has no obligation to tell me.  She's entitled to take

10         the time off.

11    Q    On November 24th, had you come to the conclusion that

12         Doctor Aronson was not going to graduate as

13         scheduled?

14    A    No.

15    Q    Had you come to the conclusion that she was not going

16         to complete the period ending December 2008

17         satisfactorily?

18    A    No.

19    Q    Do you recall that in connection with Doctor

20         Aronson's wanting to take time off for the birth of

21         her child, her rotation schedule had to be changed?

22    A    I don't recall the specifics.

23    Q    You don't recall changing her SICU rotation?

24    A    When?

25    Q    From January to September.
```

1    A    I may have done that.  To me, a schedule change is as

2         easy as just doing it to accommodate, so I don't

3         recall if I did or not.

4    Q    At the November 24th meeting, did you believe that it

5         was possible for Doctor Aronson to complete the

6         period that would have ended at the end of December

7         and receive a satisfactory rating for those six

8         months?

9    A    It was possible, yes.

10   Q    After you made the referral of her to EAP, did you

11        believe it was possible for her to complete that

12        period with a satisfactory rating?

13            MR. BIXENSTINE:  At what point,

14          Greg?

15            MR. GORDILLO:  Fair enough.  Let me

16          clarify.

17   Q    (By Mr. Gordillo)  You made the referral to EAP on

18        November 25th, correct?

19   A    Yes.

20   Q    On November 25th, did you believe it was going to be

21        possible for Doctor Aronson to complete that

22        six-month period ending December 2008 and do so

23        satisfactorily?

24   A    I figured it could be possible.

25   Q    In other words, you didn't think that the EAP

1     referral was going to prevent her from satisfactorily

2     completing that period?

3  A   I have no way to determine until they make her

4     evaluation.

5  Q   Sure.  But assuming that the evaluation wasn't

6     negative, she still would have the ability to

7     complete the period satisfactorily; is that right?

8  A   Depending on the evaluation, she could very well have

9     completed satisfactorily.

10  Q   When an EAP -- Tier 1 EAP referral is made, I

11     understand that the evaluation is to occur within a

12     day, right?

13  A   I'm not sure I understand that.

14           - - - -

15  (Thereupon, Exhibit 34 was marked for the purpose of

16          identification.)

17           - - - -

18  Q   (By Mr. Gordillo)  You've been handed a document

19     marked as Exhibit 34.  Please take all the time you'd

20     like to look it over and let me know when you've had

21     an adequate opportunity to review it.

22  A   Any particular part or the whole thing?

23  Q   For now I'm going to draw your attention to the

24     Subparagraph marked 4.2.1.1.1.  There's three point

25     ones.

Page 146

1    A    Oh, I see.

2    Q    Right.  And as you look at that, do you understand

3         that the EA assessment was to occur within one

4         business day after the referral?

5    A    That's what it says here.

6    Q    Do you know why it specified that it's to occur

7         within one business day?

8    A    I don't know what the -- I don't know.

9    Q    After the referral on November 25th, do you know how

10        long it took before Doctor Aronson was able to return

11        to work?

12   A    I don't recall.

13   Q    Okay.  If I were to tell you that it was after

14        December 15th, does that refresh your recollection?

15   A    That would sound about right.

16   Q    Okay.  Were you aware that she was making efforts to

17        return to work before then?

18   A    I might have been.  I might have been aware of that.

19   Q    Did you have any communication with anyone in EAP

20        about finalizing EAP's work to allow Doctor Aronson

21        to return to work?

22   A    I can't say that I remember specifics, other than I

23        spoke to Jill Fulton-Royer, and she was going to be

24        the one that would contact Doctor Norcia or myself in

25        order to allow either her return to work with no

Page 147

1        restrictions, meaning fit for duty, or not allowed to

2        return to work, or if there was some accommodation

3        that had to be made.  But she is the one that would

4        contact us.

5    Q   Did you tell Jill Fulton-Royer that there was no rush

6        to complete the evaluation of Doctor Aronson?

7    A   No.

8    Q   Did you ever tell anyone at EAP that there was no

9        rush to complete the evaluation of Doctor Aronson?

10   A   No.

11   Q   Did you ever tell anyone in EAP that Doctor Aronson

12       wasn't going to graduate?

13   A   No.

14   Q   Did you ever tell anyone in EAP that Doctor Aronson

15       wasn't going to be getting a satisfactory rating for

16       that rating period?

17   A   No.

18                    - - - -

19   (Thereupon, Exhibit 35 was marked for the purpose of

20                     identification.)

21                    - - - -

22   Q   I handed you a document marked as Exhibit 35.  Please

23       take all the time you'd like to look it over and let

24       me know when you've had an adequate opportunity to

25       review it.

Page 148

1    A    Yes.  I looked it over.

2    Q    Do you recognize the document?

3    A    Yes.

4    Q    Will you tell me what it is, please?

5    A    It's an email copy that is from me sent on Tuesday,

6         November 25, 2008 at 10:15 a.m. to Jill Fulton-Royer.

7    Q    And why did you send this email?

8    A    I spoke to Jill Fulton-Royer over the phone, and she

9         said that she would need a little background

10        information because she does, like, the initial

11        assessment or the intake and then has to have some

12        kind of context in which to make the referral to

13        whoever would do an evaluation, I guess.

14   Q    Did she ask you for an email?

15   A    Yes.

16   Q    I'm just curious about why you took the time to write

17        out this email when I think your testimony before was

18        you don't do emails very much.

19   A    That's right.

20   Q    And you were able to write a two-paragraph email to

21        Jill Fulton-Royer, but you couldn't send an email to

22        Doctor Aronson with three names on it; is that right?

23                   MR. BIXENSTINE:  Objection.

24   A    No, that's not right.

25   Q    You could have sent an email to Doctor Aronson with

1      three names on it identifying who was on the Clinical

2      Competence Committee, right?

3    A    Yes, I could.

4    Q    But you opted not to?

5    A    I did not.

6                    - - - -

7  (Thereupon, Exhibit 36 was marked for the purpose of

8                    identification.)

9                    - - - -

10   Q    (By Mr. Gordillo)  You've been handed a document

11       marked as Exhibit 36.  Again, take all the time you'd

12       like to look it over and let me know when you've had

13       an adequate opportunity to review it.

14   A    Yes.  I've reviewed it.

15   Q    Tell me what the document is, please.

16   A    It's Attachment A to what I believe is HR35 Policy.

17   Q    And the bottom of the page where it's an indication

18       for a supervisor's signature, is that your signature?

19   A    Yes.

20   Q    This was the EAP referral you made of Doctor Aronson,

21       right?

22   A    Yes.

23   Q    And you indicated there was a Tier 1 mandatory

24       referral, right?

25   A    Yes.

Page 150

1   Q   Why did you leave all the check boxes below that

2       blank?

3   A   I checked Tier 1 and I put in my comments that I felt

4       was appropriate.

5   Q   Was Doctor Aronson exhibiting impaired functioning?

6   A   Sure.

7   Q   Why didn't you check off impaired functioning?

8   A   I guess I felt that my description was more specific

9       than these generalized check-offs.

10  Q   Did you think checking off impaired functioning would

11      be in any way inconsistent with your description?

12  A   Not necessarily.

13  Q   And the only reason you left impaired functioning

14      blank was because you thought that your description

15      would be sufficient; is that accurate?

16  A   The description here was sufficient to get the

17      process started.

18  Q   Have you ever provided any information in response to

19      any inquiry about Doctor Aronson seeking employment

20      after her residency?

21  A   I believe I have.

22  Q   Okay.  Were you aware that in December of 2008 she

23      was in the process of obtaining a job with Sheridan

24      Healthcare in Florida?

25  A   In December of 2008, I might have been generally

1          aware of that, but not to any great detail.

2     Q    Did you provide any information to anyone in response

3          to an inquiry about her seeking that job?

4     A    No.

5     Q    After she completed her residency, she became

6          employed in Maryland.  Were you familiar with the

7          fact of that happening?

8     A    I might have become recently familiar with that, but

9          I don't believe at the time that I was.

10    Q    So you did not provide any information to anyone in

11         connection with her trying to obtain that employment?

12    A    No.

13    Q    She also recently attempted to obtain employment in

14         Erie, Pennsylvania with Hamot.  Are you familiar with

15         Hamot?

16    A    I'm familiar maybe partly with it, or maybe not

17         real -- she's had a bunch of applications that I've

18         heard have come.  They've never been sent to me, so

19         I've heard mention of some of these, but I'm not sure

20         which one Hamot is.

21    Q    Do you remember whether you responded to any

22         inquiries from anyone at Hamot?

23    A    I didn't.

24    Q    Have you responded to any inquiries in connection

25         with her attempts to get licensed in Maryland?

Page 152

```
 1   A    I never talked to anybody about Maryland.

 2   Q    Did you respond to any inquiries in response to her

 3        efforts to get licensed in Florida?

 4   A    I never had opportunity to respond.

 5   Q    Did you respond to any inquiries in connection with

 6        her attempt to get licensed in Pennsylvania?

 7   A    No.

 8   Q    I think you did testify, though, that you have

 9        responded to some inquiries in connection with her

10        attempt to find other employment, right?

11   A    I don't think that's the question you asked me.

12   Q    Have you responded to any inquiries to anyone in

13        connection with Doctor Aronson's trying to get

14        prospective employment?

15   A    No.

16   Q    And just to be clear, you have never provided any

17        negative feedback to anyone in connection with Doctor

18        Aronson's attempting to find prospective employment;

19        is that accurate?

20   A    I have never even talked to anyone.  No one has asked

21        me.  I never had the opportunity to respond.

22             There's only one thing that I may have had input.

23        I don't recall exactly, but I may have had to supply

24        some case log information that she had completed all

25        of her case logs.  I vaguely remember something just
```

```
 1          supplying her case log information, but I didn't

 2          really interact with anybody.

 3                  MR. GORDILLO:  Let's take a short

 4               break.

 5                       - - - -

 6          (Thereupon, a recess was had.)

 7                       - - - -

 8                  MR. GORDILLO:  Back on.

 9                       - - - -

10   (Thereupon, Exhibit 37 was marked for the purpose of

11                    identification.)

12                       - - - -

13   Q    (By Mr. Gordillo)  You've been handed a document

14        marked as Exhibit 37.  Please take all the time you'd

15        like to look it over and let me know when you've had

16        an adequate opportunity to review it.

17   A    Okay.

18   Q    Do you recognize the document?

19   A    I do.

20   Q    Will you tell me what it is, please?

21   A    It's a letter/memo to Doctor Aronson from Doctor

22        Norcia and myself, and the copy you have is unsigned,

23        but the signed copy has the same content.

24   Q    You testified earlier about a remediation plan.  Is

25        this the document you were referencing?
```

```
 1    A    Yes.

 2    Q    Is there anything in this document that identifies

 3         what Doctor Aronson should do to improve her

 4         performance?

 5    A    There is.

 6    Q    Okay.  What do you see in this document indicating

 7         how she should improve her performance?

 8    A    She was encouraged to request verbal feedback at the

 9         end of the day, parenthesis, so that it would be

10         timely and interactive dialogue could be established,

11         period, parenthesis.

12    Q    Okay.  Is there anything else?

13    A    I think that's primarily the only thing in answer to

14         your question.

15    Q    So she had her training extended by six months to

16         remediate, and the only thing that was put in writing

17         for her to give her information about how she should

18         improve that performance that is the basis for her

19         remediation was get feedback?

20    A    Well, the Employee Assistance said she was to be

21         evaluated on a performance basis, which means she was

22         fit for duty with no restrictions, so she has to

23         comply by all the guidelines that we use for all

24         residents.

25    Q    This is the remediation plan that you put into effect
```

```
 1              based on the remediation that was referenced in her

 2              letter of January 7, 2009, which is Exhibit 1,

 3              correct?

 4      A       January 7th?

 5      Q       Yes.

 6      A       And the question was?

 7                              - - - -

 8              (Thereupon, record read by Notary.)

 9                              - - - -

10      A       Yes.

11      Q       So it's your claim that this is the document that you

12              put together to comply with the notion of putting

13              together a remediation plan, but you put this

14              document together without giving any indication,

15              other than seek feedback, to let Sarah Aronson know

16              how she was going to improve in her performance; is

17              that right?

18      A       That's the only part of this document that is

19              written -- has written information about how she can

20              improve.  That's all that's included in this

21              document.

22      Q       Isn't that the purpose for remediation, to improve

23              her performance?

24      A       Not necessarily.

25      Q       What other purpose was there for remediation?
```

Page 156

1    A    To demonstrate that she can perform.

2    Q    And the only guidance she was given about how to

3         demonstrate she could perform was to seek feedback;

4         is that correct, in the written plan?

5    A    In this document, that's all there was.

6    Q    And when the document begins, it's written that

7         Doctor Wallace and I met with Doctor Aronson to

8         discuss her current perspective and make plans for

9         her next six-month clinical schedule for March 1,

10        2009 to August 31, 2009.

11            Did I read that correctly?

12   A    I think so.

13   Q    It doesn't say we met to discuss her remediation

14        plan, does it?

15   A    No.

16   Q    It doesn't mention remediation at all, does it?

17   A    I don't believe remediation is on the page.

18   Q    The truth is, when you met on February 4th, it was to

19        discuss her scheduling and not anything about

20        remediation, was it?

21   A    That's not true.

22   Q    Why didn't you write in the document that you were

23        meeting to talk about remediation?

24   A    This is not a documentation of our meeting.  This is

25        her performance plan.

Page 157

1    Q    Her remediation plan, right?

2    A    Yes.

3    Q    That's what you want it to be?

4    A    Sure.

5    Q    But you didn't talk about remediation in the

6         document?

7    A    We didn't say remediation.

8    Q    In the next to last paragraph, it's written that

9         Doctor Aronson was asked about her perspective on how

10        she was performing.

11             Do you see that?

12   A    Yes.

13   Q    I don't see anything in this document that indicates

14        there was a discussion with her to give her feedback

15        about how she was performing.

16             Do you see something in this document to give her

17        feedback about how she was performing?

18   A    I'm not sure.  What's your question?

19   Q    I'll restate it a different way.

20             In this document that is Exhibit 37, is there

21        anything written that provides her feedback about her

22        performance since January 7th of 2009?

23   A    This was not a document to give her feedback.

24                     MR. BIXENSTINE:  So the answer is

25             no.

```
 1    Q    (By Mr. Gordillo)  So she was in remediation since

 2         January 1st of 2009.  You met on February 4th of 2009

 3         to give her her remediation plan and then provided

 4         her a document that doesn't say anything about

 5         remediation and doesn't talk about any of her

 6         performance during remediation to date; is that

 7         accurate?

 8                   MR. BIXENSTINE:  Objection.

 9    A    If you're asking me is there any words that say

10         remediation on this sheet, no, there is not.

11    Q    And is there anything that addresses what her

12         performance has been during the time that she was in

13         remediation?

14    A    No.

15    Q    The last paragraph says that we decided that the

16         three of us would meet on a monthly basis around the

17         middle of the month?

18              Do you see that?

19    A    Yes.

20    Q    The three of you being you, Doctor Norcia, and Doctor

21         Aronson?

22    A    Yes.

23    Q    Did you meet in the middle of March?

24    A    I don't believe.

25    Q    Did you meet in the middle of April?
```

1   A   I don't -- we have an actual documentation sheet of

2       when we meet.  I don't remember the exact dates when

3       we met, but I don't think it was in April.

4   Q   Did you meet in the middle of May?

5   A   I don't think we met in May.

6   Q   You met June 4th?

7   A   I think that's when we met.

8   Q   So on February 4th, you create a remediation plan and

9       say, we're going to meet on a monthly basis, and then

10      you don't meet again until June 4th, at which time

11      you tell Doctor Aronson that you don't think she's

12      going to satisfactorily complete the period, correct?

13  A   Yes.

14  Q   Why didn't you comply with her remediation plan that

15      said you're going to meet on a monthly basis?

16  A   When we met, we had discussed, and as it states in

17      this letter, it was her responsibility to schedule

18      that, and she did not schedule it in an appropriate

19      fashion.

20  Q   So you're not disputing that she attempted to

21      schedule it.  You're saying she didn't attempt to

22      schedule it appropriately; is that correct?

23  A   What I would consider appropriate, yes.

24  Q   What was inappropriate about her attempts to

25      schedule?

```
 1    A    She's signed that she would call Christine and
 2         coordinate the scheduling.
 3    Q    Well, in her January 7th of 2009 letter, you
 4         instructed her to meet with Christine to go over the
 5         remediation plan, right?
 6    A    When was this?
 7    Q    Exhibit 1, January 7, 2009.
 8    A    January 7, 2009?
 9    Q    Mm-hmm.
10    A    And --
11    Q    In that letter, you instructed her to meet with
12         Christine to go over her remediation plan.
13    A    Yes.
14    Q    But instead of a meeting with Christine, you met with
15         Doctor Aronson on February 4th, correct?
16                   MR. BIXENSTINE:  Objection.
17    A    Well, the intent of this letter was not for
18         Christine -- the January 7th, the intent was not for
19         her to meet with Christine.  It was for her to call
20         and to set up a time to discuss.  Christine is the
21         Residency Education Coordinator.
22    Q    And it's your testimony that the last paragraph of
23         Exhibit 1 where it says:  Christine Adamovich will
24         assist you with setting up a time to meet and discuss
25         the remedial program plan and to address any
```

1          questions you may have --

2     A    She's going to set up the time.

3     Q    Your testimony is that that sentence indicates that

4          Doctor Aronson was going to meet with someone other

5          than Christine Adamovich to address any questions

6          that Doctor Aronson had?

7     A    Yes.

8     Q    Did the meeting that occurred on February 4, 2009

9          result from Christine Adamovich's assisting to set up

10         the meeting?

11    A    I don't recall.

12    Q    Is it really your testimony that if Doctor Aronson

13         didn't go through Christine Adamovich that that was

14         reason not to meet with Doctor Aronson to discuss her

15         performance during remediation?

16    A    That's not my testimony.

17    Q    Okay.  I'll ask again then.  Why didn't you meet with

18         her on a monthly basis?

19              MR. BIXENSTINE:  Objection.

20    A    My opinion is that I don't think she really tried to

21         meet with us or she didn't care to meet with us, and

22         she didn't call to coordinate schedules, which I

23         thought was the appropriate way of doing it, which

24         she also agreed to do.

25    Q    And you believed between February 4th of 2009 and

1            June 4th of 2009 that Doctor Aronson was performing

2            in an unsatisfactory manner, correct?

3                    MR. BIXENSTINE:  When?

4                    MR. GORDILLO:  Between February 4,

5                2009 and June 4th of 2009.

6                    MR. BIXENSTINE:  But I'm saying --

7                you're asking him -- objection.

8   Q   Okay.  During the four-month period, did you believe

9            that Doctor Aronson's performance was unsatisfactory?

10                 MR. BIXENSTINE:  In other words, was

11                there a time during that four months

12                where you believed her performance was

13                unsatisfactory?

14   A   Yes.

15   Q   Throughout that four months, did you think her

16            performance was unsatisfactory?

17   A   From February until June?

18   Q   Yes.

19   A   During that time, I felt she had some unsatisfactory

20            performance, yes.

21   Q   And you knew she was in remediation?

22   A   Yes.

23   Q   But you didn't feel a need to call a monthly meeting

24            with her despite her remediation plan that required

25            those meetings, correct?

1    A    No.

2    Q    Did you think it was better just to allow the

3         resident to continue failing?

4    A    Well, I did have feedback.  I did meet with her and

5         give her feedback.

6    Q    Did you involve Doctor Norcia in those meetings?

7    A    I don't believe he was involved with any of those.

8    Q    But her plan was for you and Doctor Norcia to meet

9         with her monthly, right?

10   A    Yes.

11   Q    And you didn't do that, did you?

12   A    No.

13   Q    Take a look, please, at a document that was

14        previously marked as Exhibit 4, and when you've had

15        an adequate opportunity to review it, please let me

16        know.

17   A    Is this something I reviewed before or not?

18   Q    No.

19   A    Okay.  Shall I read the whole thing or is there any

20        part you want me to focus in on?

21   Q    Let's start with the top.

22            In an email from Doctor Nearman to Doctor

23        Aronson, he indicates that he is going to discuss

24        this with both you and Doctor Norcia, and this refers

25        to the email below from Doctor Aronson to Doctor

Page 164

```
 1              Nearman.  Do you see that?
 2     A    I don't see when that was, though.
 3     Q    Yes.  I don't have a date.
 4     A    This is an email, this top part, you said?
 5     Q    Yes.
 6     A    Okay.
 7     Q    The top part is an email from Doctor Nearman to
 8          Doctor Aronson, and yes, the date and time
 9          information is cut off.
10     A    Okay.
11     Q    Do you see the bottom of the first page, which is a
12          letter from Doctor Aronson to Doctor Nearman?
13     A    A letter or an email?
14     Q    An email.
15     A    Okay.  I see that there's an email that's dated
16          March 14, 2009 at 16:12.
17     Q    Right.  And you understand that Doctor Nearman has
18          indicated to Doctor Aronson that he would discuss the
19          bottom email with you.
20     A    I think that's what it looks like to me.
21     Q    Did he discuss it with you?
22     A    When?
23     Q    At any time.
24     A    I don't recall a specific -- I don't recall him
25          specifically discussing this, although I haven't read
```

1        this whole email, so I'm not sure.

2   Q   Go ahead and read the email.

3   A   So your question is, did he discuss any of the

4        contents in this email with me?

5   Q   Yes.  Any of the subject matter in the email.

6   A   Okay.  Do you mind if I go down paragraph by

7        paragraph and comment?

8   Q   Sure.  That's fine, if you'd like.

9   A   So in the first paragraph, I know that Doctor Nearman

10       may have said that he had -- that Doctor Aronson had

11       meetings with Doctor Shuck.  I'm not sure what the

12       timeframe of those were, because I wasn't present.

13   Q   All right.  Stop there for a second.

14   A   Yes.

15   Q   The first paragraph she also writes:  The longer my

16       training situation continues as is without some

17       substantive response from my department, the more

18       malignant it feels.

19         Did Doctor Nearman discuss with you Doctor

20       Aronson's concern that she was not getting

21       substantive response?

22   A   I can't say that he did or he didn't.

23   Q   Okay.  Go ahead to the next paragraph.

24   A   So I read the next paragraph.  I'm not sure when it

25       says:  My file will show I have attempted to

1       communicate with you and my supervisors from the

2       outset, I assume she's talking about Doctor Nearman,

3       Doctor Norcia, and myself.

4                       MR. BIXENSTINE:  But remember the

5                  question is, did Nearman talk to you

6                  about anything in those letters?  Fair

7                  enough?

8                       MR. GORDILLO:  Yes.

9                       MR. BIXENSTINE:  So he's not asking

10                 you to comment on anything substantive

11                 about the letter.

12  A    Doctor Nearman may have talked to me about meeting

13      with Doctor Aronson.  I believe that -- I can't

14      say -- I don't know when it would have been, though,

15      so I can't make any comment about the timeframe of

16      it, so he may have talked about meeting with her, but

17      I don't remember what the timeframe would have been.

18  Q    On the second paragraph she also writes that her

19      program directors have not, in her opinion, been

20      either timely, honest, or objective in their dealings

21      with her.  Do you see that?

22  A    I see that.

23  Q    Did Doctor Nearman discuss that issue with you?

24  A    I don't recall the discussion about those topics.

25  Q    Okay.  Let me help you speed through some.

Page 167

```
1     A    Okay.
2     Q    Let's skip down to the second page of the document,
3          that paragraph that is third from the bottom that
4          starts:  I have prepared a complaint.  Do you see
5          that?
6     A    Yes, mm-hmm.
7     Q    Did Doctor Nearman discuss with you that Doctor
8          Aronson had prepared a complaint to the ACGME?
9     A    I don't remember any discussion about that.
10    Q    Okay.  That's all I want to show you.
11    A    Okay.
12                        - - - -
13   (Thereupon, Exhibit 38 was marked for the purpose of
14                     identification.)
15                        - - - -
16    Q    (By Mr. Gordillo)  You've been handed a document
17         marked as Exhibit 38.
18    A    Yes.
19    Q    I'll represent to you that this is a document drafted
20         by Sarah Aronson and sent to Emily Vasiliou of the
21         ACGME to make a formal complaint about what was
22         happening to her in the Residency Program.
23    A    Okay.
24    Q    And you're welcome to take all the time you'd like to
25         look through it, but my question is whether you've
```

1           seen this document before this litigation was filed?

2    A      I don't believe I've -- I'm trying to think if I've

3           ever seen this document.  I don't think so.  I don't

4           recall this document.

5    Q      Did you ever come to learn that Doctor Aronson had

6           filed a complaint with ACGME?

7    A      I did.

8    Q      How did you learn?

9    A      I think Doctor Norcia told me.

10   Q      When did he tell you?

11   A      I think it was sometime in May of 2009.

12   Q      And what did he tell you about it?

13   A      I can't remember if he said he received a letter or

14          if Doctor Shuck might have told him -- Doctor Shuck

15          received a letter and maybe told Doctor Norcia.  I

16          can't remember what the circumstance was, but that's

17          what I remember.

18   Q      And do you recall that very soon after you learned

19          about the ACGME complaint, you met with Doctor

20          Aronson on June 4th?

21   A      I do.

22   Q      How soon after you learned about the ACGME complaint

23          did you meet with Doctor Aronson?

24   A      I don't remember the exact timeframe, but it was

25          shortly thereafter.

1    Q    Within a week, right?

2    A    I would say that's probably accurate.

3    Q    Within a couple days?

4    A    Probably.

5    Q    Had you scheduled the June 4th meeting before you

6         knew about the ACGME complaint?

7    A    I don't remember when we actually scheduled the

8         formal meeting.

9    Q    Did the meeting on June 4th get scheduled through

10        Christine Adamovich?

11   A    I don't remember how it was scheduled.  All I

12        remember is that Doctor Norcia and I had to

13        coordinate our schedules, and I remember I was

14        post-call and available, which is not uncommon for me

15        to stay on my post-call day to get work done, but

16        that's basically what I remember about the scheduling

17        of it.

18   Q    So it wasn't particularly important one way or the

19        other whether it was scheduled through Christine

20        Adamovich, right?

21   A    I don't know.  I mean, whether she's coordinating the

22        scheduling or not, if she assisted with it, then it

23        was important.

24   Q    I want to hand you a document that was previously

25        marked as Exhibit 22.  Again, please take all the

1       time you'd like to look it over and let me know when

2       you've had an adequate opportunity to review it.

3    A  Okay.

4    Q  Do you recognize the document?

5    A  I believe I've seen it before.

6    Q  Okay.  It's a letter or a memo from Sarah Aronson to

7       several people, including you, correct?

8    A  It's addressed to me, although I don't think I

9       received this document, even though it's addressed to

10      me.

11   Q  And the content of which is a response to the meeting

12      that you and Doctor Norcia had with Doctor Aronson on

13      June 4, 2009, correct?

14   A  Yes.

15   Q  And she gives some background about the chronology of

16      events concerning her ACGME -- or the ACGME letter

17      that went out regarding her complaint and the meeting

18      that was held on June 4th.

19          Do you see that in the first couple paragraphs?

20   A  Yes.

21   Q  Do you believe that to be an accurate recitation of

22      the chronology of events?

23   A  You mean about when the letter was received and the

24      dates of the meeting?

25   Q  Yes.

1    A    I would have to rely on those.  I don't know them

2         specifically, but it sounds like they're in the right

3         context.

4    Q    Okay.  In the third -- in the middle of the third

5         paragraph, Doctor Aronson wrote:  I was initially

6         told that my performance during the six-month

7         extension would be reviewed monthly and that I would

8         be provided detailed feedback regarding my status so

9         that I might successfully complete the program.

10            Do you see that?

11   A    Yes.

12   Q    Is that accurate?

13   A    That's what it says.

14   Q    But did it happen?

15                MR. BIXENSTINE:  He wants to know

16            whether she was actually told that.

17                MR. GORDILLO:  Fair enough.

18   A    Yes.  I think that's in the February 4th letter about

19         --

20   Q    Right.

21   A    I think that's in the February 4th letter.

22   Q    Now, she, in the sentence before that she writes that

23         this, the June 4th meeting, is the first review

24         meeting that has been convened since the beginning of

25         her training extension period on March 1, 2009.  Is

1           that accurate, what she wrote?

2    A     I think that's accurate.

3    Q     And then she writes that she made several attempts --

4          at the end of the paragraph -- she made several

5          attempts to schedule a meeting throughout that

6          three-month time period only to have any meeting

7          cancelled.  Is that accurate?

8    A     I don't know what that means, only to have any

9          meeting cancelled.

10   Q     Are you aware that she made several attempts to

11         schedule a meeting during the three-month time

12         period?

13   A     I know there were some emails about that.

14   Q     From her, right?

15   A     She sent emails about scheduling a meeting.  I

16         remember there were some emails, yes.

17   Q     Did she send them to you?

18   A     I don't know if she sent them to me or to Christine.

19   Q     Okay.  So she may have been sending emails to

20         Christine that somehow got forwarded to you?

21   A     Sometimes Christine forwards them to me and they may

22         have actually been directed to me.

23   Q     I thought you said the reason that you didn't meet

24         monthly was because Doctor Aronson wasn't working

25         through Christine to schedule it?

1   A   No.  That's not exactly what I said and that's not

2       the complete reason.

3   Q   Okay.  What's the complete reason you didn't meet

4       with Doctor Aronson before June 4th in accordance

5       with the alleged remediation plan that was created on

6       February 4th?

7   A   So we decided that the three of us would meet

8       together, so we had to coordinate all three of our

9       schedules.  There were many days -- I have --

10      traditionally I have an office day on Mondays.  There

11      are many days that Doctor Aronson would schedule

12      vacation on my office days.  There were some days

13      that I was on call on Monday and not having office

14      days, and I think the Midwest Anesthesia Resident

15      Conference fell within that time period, which I had

16      to go out of town for, so there were some -- it was

17      difficult from a scheduling conflict to be able to

18      get all three of us together.  So in part, it was a

19      logistical problem.  And the other part was that she

20      didn't call Christine to have Christine coordinate

21      this, because it was very difficult to get it

22      scheduled.

23  Q   So with respect to her deficiencies in communicating

24      with Christine, the problem was although she may have

25      emailed Christine, she was supposed to have called

Page 174

1         Christine; is that accurate?

2    A    Well, I believe I remember one email that she sent

3         me, and I responded back to her by email for her to

4         page me, and she never contacted me, and it was very

5         difficult based on my schedule and Doctor Norcia's

6         schedule and her schedule to get all three people

7         together, and I don't know of any other way to do it

8         in any reasonable fashion other than just to talk to

9         someone in person or on the phone.

10   Q    Did you ever suggest a time to meet with Doctor

11        Norcia and Doctor Aronson when Doctor Aronson said,

12        no, I won't meet?

13   A    I don't think so.

14                        - - - -

15   (Thereupon, Exhibit 39 was marked for the purpose of

16                    identification.)

17                        - - - -

18   Q    (By Mr. Gordillo)  You've been handed a document

19        marked as Exhibit 39.  Please take all the time you'd

20        like to look it over and let me know when you've had

21        an adequate opportunity to review it.

22   A    I reviewed it.

23   Q    Do you recognize the document?

24   A    I don't know if I seen this one, but I think I've

25        seen some information related to it if not this exact

1        one.

2   Q   This is an email string, right, regarding the

3        scheduling of rotation for Doctor Aronson, right?

4   A   Yes.

5   Q   And it's Marin Mannix?

6   A   Marin Mannix, yes.

7   Q   Were you working with Marin Mannix to schedule

8        rotations in July of 2009?

9   A   So she was the chief resident that I was working with

10        to schedule rotations.

11   Q   Did Marin Mannix confer with you in making the

12        determination that Doctor Aronson would be scheduled

13        for Metro in the first two weeks and ICU in the

14        second two weeks?

15   A   I don't know that specific fact.  The Metro rotation

16        at this time, I believe, was two weeks, and I believe

17        it was supposed to be -- according to this, I would

18        think it would have been scheduled for August, I

19        think, because this is from July.

20   Q   Right.  They're talking about the August schedule.

21   A   Yes.

22   Q   My question is:  Did Marin Mannix confer with you

23        about assigning Doctor Aronson to the Metro rotation

24        in the first two weeks of August and the ICU rotation

25        in the second two weeks?

```
 1    A    I think it might have been the other way around, that
 2         I designated that to her as the time period of the
 3         rotations, if that was the right order.
 4    Q    Approximately a week earlier on June 28th, Doctor
 5         Aronson had requested FMLA time to take for the
 6         adoption of her child.  Did you know that?
 7    A    To take time for when?
 8    Q    Well, sometime between June 28th and August 31st.
 9         Let's put it that way.
10    A    I may have been.
11    Q    Before directing that she should take an ICU rotation
12         during the last two weeks of August, you knew that
13         Doctor Aronson was seeking FMLA leave to deal with
14         the adoption of her son; isn't that correct?
15    A    Well, I think the original schedule -- on the
16         February 4th letter, we spelled out the rotations,
17         and Doctor Aronson picked the month of August to do
18         those rotations.  I believe at some point she decided
19         she was going to have some FMLA for the month of
20         August, and both of those rotations are rotations
21         that you're not allowed to take time off in because
22         of the nature of them.
23    Q    Did you know about her request for FMLA leave to
24         adopt her son before you assigned her to ICU rotation
25         in the second two weeks of August?
```

Page 177

1    A    I didn't assign her.  She selected it.

2    Q    I thought you told me that you directed -- you didn't

3         use the word directed.

4              When I asked you whether you conferred with Marin

5         Mannix about putting Doctor Aronson in the ICU during

6         the last two weeks of August, you said it was the

7         other way around, correct?

8    A    I gave Doctor Mannix the rotation schedule

9         information.  She didn't give it to me.  I gave it to

10        her.

11   Q    And the information you gave to her was that Doctor

12        Aronson would work in ICU during the last two weeks

13        in August, correct?

14   A    Yes.

15   Q    And you did that after learning that she had

16        requested FMLA time off for the adoption of her son?

17   A    That's not true.

18   Q    You did that before she made the request for FMLA

19        time?

20   A    Doctor Aronson was -- when we met with Doctor

21        Aronson, we discussed on February 4th the rotation

22        she had to take, and despite what it says in this

23        letter on February 4th that I would make her

24        schedule, we gave Doctor Aronson the opportunity to

25        arrange her own schedule to meet these rotational

1    requirements.  Doctor Aronson gave that information

2    to me.  I related that information for her August

3    trauma ICU rotation to Doctor Mannix.  Doctor Mannix

4    did the call scheduling interactions.

5  Q  So is it your testimony that Doctor Aronson

6    specifically requested to be placed in the ICU

7    rotation the last two weeks of August?

8  A  That was her request.

9  Q  How did she make that request to you?

10  A  By email.

11  Q  Did you keep a copy of that email?

12  A  I'm sure that I have a copy of it.

13  Q  And I assume if you have a copy of it that you won't

14    mind providing that to UH's counsel, Mr. Bixenstine?

15  A  Yes.  Sure.  Could I break for a moment?

16            MR. GORDILLO:  You can.  Just go off

17        the record.

18              - - - -

19        (Thereupon, a recess was had.)

20              - - - -

21            MR. GORDILLO:  Back on the record.

22  Q  (By Mr. Gordillo)  I'm going to hand you a document

23    that was previously marked as Exhibit 23, and you can

24    take all the time you'd like to look it over, and

25    I'll ask you the questions so you know why you're

 1          looking at it.

 2               This is a document prepared by Doctor Aronson to

 3          Doctor Shuck, and in part she is informing Doctor

 4          Shuck that she believes she has been retaliated

 5          against.

 6               And my question is whether Doctor Shuck had

 7          shared with you that he had received that complaint

 8          dated July 13th?

 9    A     If Doctor Shuck told me that he got this document?

10    Q     Yes.

11    A     I don't believe I've seen this before, so I'm not

12          sure if I would have known that he referred that he

13          got this document.  He may have said -- he may have

14          said something about some of Doctor Aronson's

15          allegations, or something, but there is nothing that

16          really strikes out from this document to me that

17          would say that he told me that he got this document.

18    Q     Okay.  And did he inform you in substance that Doctor

19          Aronson had made a complaint about retaliation on or

20          after July 13th?

21    A     Where is the retaliation part in here?  Do you know

22          where it is, per se?

23    Q     Look at the bottom.

24    A     Point four on the second page?

25    Q     You can look at point two on the bottom of the first

Page 180

1           page.  Do you see --

2   A    Yes.  Gives appearance of retaliation.

3   Q    And then again on the second page in the point four.

4   A    I don't know if he really -- I don't remember him

5        stating anything in these kinds of terms.

6   Q    All right.  The ACGME did a site visit July 28, 2009.

7        You were aware of that?

8   A    That sounds about right.

9   Q    And during that visit, Doctor Aronson was interviewed

10       by an ACGME representative.  Did you know that?

11  A    I was aware that happened.

12  Q    Did you have any communication with the ACGME

13       representative about that interview?

14  A    No.

15  Q    How were you made aware of the interview?

16  A    I think Doctor Shuck might have relayed that

17       information to me.

18  Q    And what did he tell you about it?

19  A    He told me that he's never heard of someone

20       requesting an individualized interview, I guess, at

21       an institutional site visit.

22  Q    Is that the entirety of what was said?

23  A    I think he said to me something to the effect that

24       the site visitor said we were lucky to give her a

25       second chance.

Page 181

1    Q    The site visitor said who was lucky to give her a

2         second chance?  When you said we, who is we?

3    A    That she was lucky that our program gave her a second

4         chance.

5                    MR. GORDILLO:  Give me just a

6              minute.

7                        -  -  -  -

8              (Thereupon, a recess was had.)

9                        -  -  -  -

10                    MR. GORDILLO:  That's all I have.

11             Thank you, Doctor Wallace.  We'd like to

12             reserve the right for him to read his

13             transcript.

14                    MR. BIXENSTINE:  You're going to

15             reserve the right for him?

16                    MR. GORDILLO:  Yes, exactly.

17                    MR. BIXENSTINE:  I'm not sure you

18             have the right to do that.  We're going

19             to do it anyway, so it doesn't matter.

20                    MR. GORDILLO:  Either party can do

21             it.

22                        -  -  -  -

23             (Deposition concluded at 4:48 p.m.)

24                        -  -  -  -

25

Page 182

1    State of Ohio,              )
                                 )SS:       CERTIFICATE
2    County of Cuyahoga,         )

3            I, Mary C. Peck, a Notary Public within and for
     the State aforesaid, duly commissioned and qualified, do
4    hereby certify that the above-named DAVID WALLACE, M.D. was
     by me, before the giving of his deposition, first duly sworn
5    to testify the truth, the whole truth, and nothing but the
     truth;

6

             That the deposition as above set forth was reduced
7    to writing by me by means of stenotypy, and was later
     transcribed upon a computer by me;

8

             That the said deposition was taken in all respects
9    pursuant to the stipulations of counsel herein contained;
     that the foregoing is the deposition given at said time and
10   place by said DAVID WALLACE;

11           That I am not a relative or attorney of either
     party or otherwise interested in the event of this action.

12

             That I am not nor is the court reporting firm with
13   which I am affiliated under a contract as defined by Civil
     Rule 28(D).

14

             IN WITNESS WHEREOF, I hereunto set my hand and
15   seal of office, at Cleveland, Ohio this 10th day of January,
     A.D. 2011.

16

17

18           _____

19           Mary C. Peck, Notary Public

20

21           My commission expires December 30, 2011

22

23

24

25