1                         - - - -

2              UNITED STATES DISTRICT COURT

3               NORTHERN DISTRICT OF OHIO

4                    EASTERN DIVISION

5                    - - - - -

6   SARAH ARONSON, M.D.,          )
              Plaintiff,          )
7                                 )
8        v.                       )      CASE NO. 1:10-CV-00372
                                  )      JUDGE BOYKO
    UNIVERSITY HOSPITALS OF       )
9   CLEVELAND,                    )
              Defendant.          )
10

11                   - - - - -

12        DEPOSITION OF HOWARD NEARMAN, M.D.

13        Wednesday, December 22, 2010

14                   - - - -

15      The deposition of HOWARD NEARMAN, M.D., a Witness

16   herein, taken by the Plaintiff as if upon examination under

17   the Ohio Rules of Civil Procedure, before me, Mary C. Peck,

18   a Stenographic Reporter and Notary Public within and for the

19   State of Ohio, at the offices of Gordillo & Gordillo, LLC,

20   1370 Ontario Street, Suite 2000, Cleveland, Ohio, commencing

21   at 8:30 a.m., the day and date above set forth.

22                   - - - -

23

24

25

```
 1              APPEARANCES:
                On behalf of the Plaintiff:
 2
                GREGORY A. GORDILLO, ESQUIRE
 3              Gordillo & Gordillo, LLC
                1370 Ontario Street
 4              Suite 2000
                Cleveland, Ohio  44113
 5              ggordillo@eeoattorney.com

 6
                On behalf of the Defendant:
 7
                BARTON A. BIXENSTINE, ESQUIRE
 8              Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
                Key Tower
 9              127 Public Square
                Suite 4130
10              Cleveland, Ohio  44114
                bart.bixenstine@ogletreedeakins.com
11                            - - - -

12              ALSO PRESENT

13              Sarah Aronson, M.D.

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         INDEX

2                                                   PAGE

3    EXAMINATION

4    By Mr. Gordillo                                4

5

6    OBJECTIONS

7    By Mr. Bixenstine                              44

8    By Mr. Bixenstine                              49

9    By Mr. Bixenstine                              50

10   By Mr. Bixenstine                              55

11   By Mr. Bixenstine                              72

12

13   EXHIBITS

14   Exhibit 1                                      32

15   Exhibit 2                                      68

16   Exhibit 3                                      75

17   Exhibit 4                                      76

18   Exhibit 5                                      81

19

20

21

22

23

24

25

```
 1                   HOWARD NEARMAN, M.D.

 2        called by the Plaintiff for the purpose of examination,

 3   as provided by the Ohio Rules of Civil Procedure, being by

 4   me first duly sworn, as hereinafter certified, deposed and

 5   said as follows:

 6                        -  -  -  -

 7                     EXAMINATION OF

 8                   HOWARD NEARMAN, M.D.

 9                        -  -  -  -

10        BY MR. GORDILLO:

11   Q    Good morning.

12   A    Good morning.

13   Q    Would you please state your full name for the record?

14   A    Howard Sloman Nearman, N-e-a-r-m-a-n.

15   Q    And during our deposition today, how would you prefer

16        to have me address you?

17   A    Howard is fine.

18   Q    Okay.  Howard, my name is Greg Gordillo.  We met just

19        a few minutes ago, and I represent Sarah Aronson in

20        her lawsuit currently against University Hospitals of

21        Cleveland.

22            We're here to take your deposition in connection

23        with that lawsuit.

24            Have you ever had your deposition taken before?

25   A    Yes.
```

Page 5

```
 1    Q    All right.  Have you testified as an expert in any

 2         kind of litigation before?

 3    A    Yes.

 4    Q    I don't want to know about that, okay?

 5    A    Then don't ask.

 6    Q    But I'm going to ask you, other than expert

 7         testimony, have you been deposed before?

 8    A    Yes.

 9    Q    Okay.  Can you tell me what kind of cases or how many

10         times -- strike that.

11             How many times have you been deposed, other than

12         times you've been deposed as an expert?

13    A    One.

14    Q    What was the nature of the case in which you were

15         deposed?

16    A    Malpractice suit against me.

17    Q    All right.  So I'm sure that you're somewhat familiar

18         with the procession.  I just want to make sure it's

19         clear you understand how I expect things to go.

20             The first thing to know is I don't think we're

21         going to be here too long today, but at any time if

22         you feel the need for a break, just be sure to ask me

23         for that and I'll be happy to give that to you.  The

24         only thing that I'll ask is that if there's a

25         question pending, you answer the question before we
```

Page 6

```
 1          take a break, okay?

 2     A    Sure.

 3     Q    It's also important that when you respond to my

 4          questions affirmatively or negatively, you use the

 5          words yes or no.  Words like mm-hmm or uh-huh don't

 6          get translated so well by our court reporter when we

 7          have to read what those responses are.

 8     A    Sure.

 9     Q    What's your home address?

10     A    32430 Pinebrook Lane, Pepper Pike 44124.

11     Q    Does anyone else live there with you?

12     A    My wife, and for the next week, or so, my son.

13     Q    Okay.  What's your wife's name?

14     A    Barbara.

15     Q    You are currently employed?

16     A    Correct.

17     Q    Who is your employer?

18     A    University Hospital Medical Group.

19     Q    University Hospital Medical Group.

20          Who comprises University Hospitals Medical Group?

21     A    Meaning what?  Meaning who are the employees or who

22          are the employers?

23     Q    Is it a practice group?

24     A    It is essentially a group of the physicians who

25          practice at University Hospitals Case Medical Center,
```

Page 7

```
 1           so I guess it would be a multi-specialty practice
 2           group.
 3     Q     When I say who comprises, is it fair to characterize
 4           it as a group formed by practicing physicians?
 5     A     Yes, sir.
 6     Q     And does the group then provide services to
 7           University Hospital?
 8     A     Provides services to their patients.  I suppose some
 9           of them provide services to the hospital entity
10           itself, as well.
11     Q     Does UH Med Group have a contract to perform services
12           with the hospital?
13     A     I'm not aware of such.
14     Q     And is that your only employer?
15     A     No.
16     Q     Who else employs you?
17     A     Case Western Reserve University.
18     Q     As an employee of University Hospitals Medical Group,
19           what do you do?
20     A     I am the chairman of the Department of
21           Anesthesiology.  I'm also the anesthesiologist in
22           chief for the hospital system, and as such, I run
23           administrative -- I'm the administrative director for
24           the Department of Anesthesiology at Case Medical
25           Center and have administrative function over the
```

Page 8

```
 1            several other anesthesia entities within the

 2            University Hospitals Health System.  I also see

 3            patients, do anesthesia, and spend time in the

 4            intensive care unit.

 5      Q     Okay.  And as an employee of Case Western Reserve

 6            University, what do you do?

 7      A     I'm responsible for the Department of Anesthesiology

 8            that is housed at the Medical School for providing

 9            instruction to the medical students there.

10      Q     Are you chair of that department?

11      A     Correct.

12      Q     And when you were speaking about your role in

13            connection with University Hospitals Medical Group

14            and you talked about being chair of anesthesia,

15            that's for University Hospitals, correct?

16      A     Correct.  They're pretty much one and the same, as I

17            understand it, with the exception of, I think,

18            Emergency Medicine.  The chairs at the department --

19            at the School of Medicine are housed at University

20            Hospitals Case Medical Center.  So if you're chair of

21            Pathology at Case, you're chair of Pathology in the

22            School of Medicine, et cetera, et cetera.

23      Q     All right.  How long have you been the chair of

24            anesthesiology?

25      A     Ten years.
```

Page 9

 1   Q   And you're Board certified in anesthesia?

 2   A   Correct.

 3   Q   Do you have responsibilities for the Anesthesia

 4       Residency Program at UH Case?

 5   A   How would you define responsibilities?

 6   Q   You've heard the word responsibilities before.  What

 7       do you understand the word responsibilities to mean?

 8   A   Am I directly responsible or am I indirectly

 9       responsible?

10   Q   Let's talk first about direct responsibility.

11   A   Direct responsibility for the Anesthesia Residency

12       Program lies with the residency program directors.

13       When I first started, the chair and the program

14       director were one and the same, and they were like

15       that pretty much every program.

16       Since then, the amount of work that is required

17       to both run a department and run a residency is such

18       that in almost every major program, there are

19       separate program directors that the chair delegates

20       responsibility to a certain extent to.

21       In the end, yes.  I mean, as the department

22       chair, it is my responsibility.

23   Q   Okay.  And at UH, there have been separate program

24       directors since, let's say, October of 2006, at

25       least?

Page 10

```
 1    A    Sure.

 2    Q    And between October of 2006 and August of 2009, who

 3         was the program director or directors?

 4    A    They're co-directors.  They function as co-directors,

 5         and those were Matthew Norcia and Dave Wallace.

 6    Q    Is it a fair understanding to say that they have

 7         direct responsibility for the Residency Program at UH

 8         and that they report to you?

 9    A    I think one can say that, yes.

10    Q    Other than the co-directors reporting to you, do you

11         have other indirect responsibilities for the

12         Anesthesia Residency Program?

13    A    They report to me.  Clearly if there are issues, I

14         get consulted, informed.

15            I'm not sure what other responsibilities you're

16         asking about.  I mean, they fill out forms for the

17         Boards.  They fill out the forms for making sure that

18         people register to take the Boards.  If they're

19         eligible, they fill out all the reporting

20         requirements that the American Board of Anesthesia

21         requires.  They run the evaluation system.  I do not

22         have any other direct responsibilities other than

23         through them.

24    Q    Okay.  I think I understood your testimony before

25         that you were making a distinction between direct
```

Page 11

```
 1          responsibilities and indirect responsibilities that

 2          you have for the program.

 3    A     Correct.

 4    Q     And as I understood your testimony, your direct

 5          responsibilities were essentially to supervise Norcia

 6          and Wallace; is that correct?

 7    A     Correct.

 8    Q     Do you have any other direct responsibilities for the

 9          program?

10    A     Not that I can think of at this point.

11    Q     And your earlier testimony suggested -- let me make

12          sure I'm clear about this -- that you have indirect

13          responsibilities for the program; is that right?

14    A     In the sense that I'm supervising them, correct.

15    Q     And what do you consider those indirect

16          responsibilities -- that's what I'm getting at -- if

17          any, other than supervising Doctors Wallace and

18          Norcia?

19    A     I'm not sure I understand what the delineation is.  I

20          mean, if you would like to give me some specific

21          examples, I can answer to that.  But again, they sort

22          of set the rules in consultation with me, perhaps,

23          and they sort of carry out the daily activities of

24          the Residency Program.

25    Q     Okay.  I guess we're like ships passing in the night
```

```
 1          here.

 2     A    Sure.

 3     Q    I'm trying to understand the distinctions you're

 4          making between the direct and indirect

 5          responsibilities.  My purpose here is to get a full

 6          understanding of the scope of your responsibilities.

 7     A    I explained to you the best I can what I feel my

 8          responsibilities are.  If you'd like to pose back to

 9          me questions where you don't have an understanding, I

10          can hone in on those, but I'm afraid I can't express

11          any better than I've just done.

12     Q    Is it fair to say you feel like you have described

13          the totality of your responsibilities, whether direct

14          or indirect, for the Residency Program?

15     A    Yes.

16     Q    Will you describe for me what your responsibilities

17          are as chair of the Anesthesia Department at UH,

18          apart from the Resident Program?

19     A    How long do you want this deposition to last?

20     Q    Well, why don't you give me the basic job description

21          to start?

22     A    I'm responsible for the day-to-day activities of

23          function of the Anesthesia Department.  I'm

24          responsible for strategic planning.  I'm responsible

25          for quality assurance activities.  I'm responsible
```

1       for hiring and dismissing Anesthesia faculty.  I have

2       indirect responsibilities over the anesthetists who

3       are employed at the hospital.  I have

4       responsibilities for the operating rooms for the Post

5       Anesthesia Care Unit, for the Intensive Care Units

6       that we direct, and for Pain Management activities

7       that are part of the Department of Anesthesiology.  I

8       have responsibilities to make sure that we are in

9       compliance with governmental and other regulatory

10      agencies.  I have responsibilities towards fixing a

11      budget and reviewing the financial activities of the

12      department.  And then I have a coffee break.

13          I think that pretty much encompasses most of what

14      I do in broad, sweeping terms.

15  Q   Do your responsibilities include any participation in

16      determining the compensation for anesthesiologists?

17  A   Yes.

18  Q   Other than those physicians going through the

19      Residency Program, are all of the anesthesiologists

20      in fact physicians who have completed Anesthesia

21      Residency Programs?

22  A   Yes.

23  Q   And at UH, are all of the anesthesiologists Board

24      certified?

25  A   There is one that is not.

Page 14

```
 1    Q    Who is that?
 2    A    Jana Kirilcuk, and there are one, two -- there are
 3         three that are not certified yet but are in the
 4         process of.
 5    Q    Who are those three?
 6    A    They are Katya Chiong, C-h-i-o-n-g, Soozan,
 7         S-o-o-z-a-n, Abouhassan, A-b-o-u-h-a-s-s-a-n, and
 8         Sylvia Ashour, A-s-h-o-u-r.
 9    Q    Are you aware of the compensation that each of those
10         physicians are paid by UH?
11    A    Yes.
12    Q    Of those physicians -- I don't want you to identify
13         the physician for me because I don't really care, but
14         I'd like you to tell me what the amount of the lowest
15         compensation package is of those four physicians.
16    A    On a full-time equivalence, because two of those
17         people do not work full time.
18    Q    Yes.  Full-time equivalence.
19    A    So you want FTE.
20    Q    Yes.
21    A    In order for me to tell you that, I have to give you
22         a little bit of an idea of how we're paid.
23    Q    Okay.
24    A    We are paid with a base salary, and then the other
25         part of the compensation comes from clinical
```

1          incentives.

2               The clinical incentives are comprised of a small

3          percent of what you bill for.  And I'm talking about

4          maybe one and a half percent.  And they also are

5          comprised of what is called over practice, which is a

6          fixed amount that you get paid for by staying after a

7          certain time of the day.  So to encourage faculty to

8          stay and finish up cases, you get rewarded for

9          staying.

10              I think the lowest compensation full-time

11         equivalent would be 191 base plus whatever the

12         incentive package is.  And people can earn anywhere

13         from 20,000 a year incentives to 100,000 a year

14         incentives, depending on how much they want to work.

15    Q    And among the four that we're talking about, what's

16         the highest compensation?

17    A    I don't have those memorized.

18    Q    The compensation that you just described, are we

19         talking about what the current compensation structure

20         is?

21    A    Current -- that includes -- we got a little bit of an

22         upward adjustment for next year based upon the

23         national statistics.  I do not determine the overall

24         level.  That is done through consultants that the

25         hospital has who looks at compensation that is

1      standard throughout the country and tries to place us

2      somewhere around the 50th percentile.

3    Q  Is the compensation that you -- the compensation rate

4      that you just described significantly different than

5      what was in place between March of 2009 and August of

6      2009?

7    A  It's about 10,000 higher, the numbers I just gave

8      you, than what was in place back then.

9    Q  Then the numbers would be 10,000 lower, right?

10   A  That's correct.

11        If it helps, I can tell you about what the

12     average clinical practice and over practice is.

13   Q  That was my next question.

14   A  I thought so.

15        The average runs about $50,000.

16   Q  The clinical incentives?

17   A  The clinical incentives run about $50,000.  The ones

18     that are even up on the higher are people that take

19     extra call on weekends or take extra call at the

20     community hospitals at night, cover the beeper call

21     in addition to their regularly assigned call at the

22     main campus.

23   Q  And are the physicians expected to devote their

24     entire practice to UH?

25   A  There are physicians who -- no.  It is allowed to

1       practice elsewhere assuming that as long as I know
2       about it, the Medical Group knows about it, and their
3       malpractice is covered and that it does not interfere
4       with their other duties.  So there are people who may
5       take a weeks vacation and go someplace to moonlight
6       for that week there.  They clear that with me.  They
7       clear that with our risk insurance management group
8       and they get that malpractice, and whatever it is.
9       They're allowed to do that.  It's their vacation.  I
10      can't dictate what they do on vacation time.
11  Q   You know Doctor Johnson?
12  A   Yes, I do.
13  Q   Doctor Johnson worked under your supervision in the
14      department; is that right?
15  A   Correct.
16  Q   And is Doctor Johnson still employed?
17  A   No, he is not.
18  Q   When did his employment with UH end?
19  A   I don't know exactly.  About a year ago, I would
20      guess, maybe a little bit more.
21  Q   Do you know why Doctor Johnson's employment ended?
22  A   Yes.
23  Q   Why?
24  A   There were a number of factors, one of which was the
25      fact that he did not have Boards in critical care.

```
 1              He was not an anesthesiologist.  He was trained as a
 2              surgeon.  He never took his surgical Boards.  He did
 3              do a critical care fellowship, and as such, he worked
 4              as an intensivist.  There was some issues with our
 5              program as far as having Board certified or Board
 6              eligible people teaching residents.  Part of it was
 7              that he had to be at a facility, therefore, that did
 8              not have residents going through it because he was
 9              found -- he was one of the specific people named in
10              one of our citations for our residency review about
11              non-boarded physicians teaching residents.  There was
12              a limit to the number of places where we could
13              then -- we had ICUs that did not have residents in
14              them, and things didn't work out at one of those ICUs
15              so his employment was terminated.
16         Q    When you say things didn't work out, what do you
17              mean?
18         A    He had some issues there that there was some
19              allegations about his availability, responsiveness,
20              and medical record keeping, and they did not renew
21              his contract to work there.
22         Q    When did those issues arise?
23         A    Shortly before he was terminated.  I don't recall
24              exactly the dates.
25         Q    Before August of 2009?
```

```
 1   A    Maybe.  I don't remember.

 2   Q    Were you aware of whether the residents had

 3        complained about Doctor Johnson?

 4   A    Yes.

 5   Q    What did you know about complaints made by residents

 6        concerning Doctor Johnson?

 7   A    I know the residents -- there was some complaints

 8        about his timeliness for rounds as far as showing up

 9        at a certain hour, and there was a complaint or two

10        about his responsiveness, which I alluded to before

11        that.

12             MR. GORDILLO:  Let me step out for

13            one second.

14                  -  -  -  -

15            (Thereupon, a recess was had.)

16                  -  -  -  -

17   Q    (By Mr. Gordillo)  Would you describe for me what you

18        understand to be the program director's

19        responsibilities for the Residency Program?

20   A    They are responsible for -- starting at the

21        beginning, they're responsible for screening

22        applications, inviting prospective resident

23        applicants for interviews, for conducting the

24        evaluations of those -- of the residents, and then

25        turning in a final match list for the program,
```

Page 20

```
 1         responsible for maintaining the accreditation of the
 2         Residency Program, preparing for the Residency Review
 3         Committee periodic inspection.  They're responsible
 4         for filing periodic reports to the ACGME, the ABA.
 5         They're responsible overall for the general education
 6         of the residents, both didactic and clinical.
 7              I think that's a fairly complete listing.  I may
 8         have missed something, but I think that's a fairly
 9         complete listing.
10    Q    Okay.
11    A    They're responsible for the resident budget from the
12         hospital.  We get a certain amount of money each year
13         from the hospital, determining how we spend it on the
14         residents, evaluation and feedback to the residents.
15         Okay.  I'm done.
16    Q    Among Doctor Wallace's responsibilities were then to
17         provide evaluation and feedback to Sarah Aronson when
18         she was a resident; is that correct?
19    A    Both he and Doctor Norcia would.  I mean, I don't
20         know how they split up who each gives feedback to
21         who, whether it was a joint effort.
22    Q    Did you know that at some point Doctor Wallace was
23         removed from that role?
24    A    I know that there were some points where it was felt
25         that he wouldn't be the ideal person to give her
```

```
1              feedback.

2     Q     When did you learn that?

3     A     When did I learn that?

4     Q     Yes.

5     A     I think I was part of that decision process.

6     Q     Okay.  Can you tell me what that process was?

7     A     As best I can recall, the process sort of went to the

8              fact that the interactions between Doctor Aronson and

9              Doctor Wallace, in my opinion from the data I can

10             gather, had taken on more of an emotional-type of

11             atmosphere than perhaps an objective discussion, and

12             I felt that perhaps at some point that perhaps Doctor

13             Wallace wasn't the best person to be involved in the

14             process.

15    Q     Were you ultimately the person that decided to remove

16             him from the role?

17    A     I don't know if removal from the role is -- I felt

18             that -- it wasn't an isolation or removal from the

19             role.  It was just I didn't think he was the best

20             person to provide her with feedback and counseling

21             through the process through the discussions that we

22             had.  There wasn't any -- to the best of my

23             knowledge, there was no, you're not supposed to see

24             her again or I forbid you from interacting with her.

25             I think that the issues that Sarah brought to the
```

```
 1           table were best handled by people other than David,

 2           and that's my understanding of how that went.

 3     Q     Is it fair then to characterize it as limiting his

 4           role?

 5     A     I think that's more fair than a restriction, yes.

 6     Q     Okay.  I'm not trying to mischaracterize what you're

 7           saying.

 8     A     We're dealing with semantics.  I'm trying to say it

 9           wasn't as harsh of a process, my impression, of what

10           you were trying to paint.

11     Q     Who else, if anyone, was involved in that process?

12     A     Process of?

13     Q     Determining what Doctor Wallace's role would be with

14           respect to Sarah Aronson.

15     A     I may have had discussions with Doctor Norcia about

16           it.  I may have had discussions with Doctor Shuck

17           about it.  I don't recall specifically.

18     Q     Do you recall the gist of any conversations you had

19           about the matter with Doctor Norcia?

20     A     No, sir.

21     Q     And do you recall the gist of any conversations you

22           may have had about the matter with Doctor Shuck?

23     A     Nothing more than what I just described.

24     Q     And again, I don't mean to mischaracterize, so feel

25           free to correct me if I misstate this --
```

```
 1    A    I sure will.

 2    Q    -- but what I understood you to say was that the

 3         decision was based on the feeling that perhaps some

 4         of the interactions had become more emotional rather

 5         than objective; is that fair?

 6    A    Correct.

 7    Q    What was it that led you to believe that the

 8         interactions were more emotional rather than

 9         objective?

10    A    It's hard for me to give you specifics a year and a

11         half later.  I don't recall, other than it was a

12         general feeling that -- it was a general feeling that

13         David was not, you know, totally isolating himself

14         from the situation and able not to -- we all have

15         feelings and we all have emotions, and we don't --

16         everything we approach and every decision we make is

17         based upon both subjectivity and objectivity.  I

18         guess I had felt that the objectivity was lagging a

19         little behind the subjectivity in those dealings.

20    Q    When you say he wasn't totally isolating from the

21         situation, what situation are you talking about?

22    A    The situation of Sarah's performance.

23    Q    And in what manner should he have been -- what do you

24         mean by isolating?

25    A    Isolation to me means that you are able to wall off
```

Page 24

```
 1          your emotions and make decisions based totally upon
 2          objective criteria.  Clearly that's not possible in
 3          most areas of life, and when you're working with
 4          somebody in an operating room, you have opinions that
 5          are both subjective and objective.  Maybe some of
 6          your subjectivity colors your objectivity and maybe
 7          not.
 8              It was my feeling that because this was an
 9          emotionally charged issue for everybody involved, I
10          wanted to try to keep it as objective as possible,
11          and I felt perhaps that having David in a restrictive
12          role, at whatever point that was decided, would be
13          better off as far as our looking at the whole
14          process.
15     Q    Did you have some indication of what was causing
16          Doctor Wallace to be more emotional than objective?
17     A    I think that Doctor Wallace had very strong feelings
18          that Sarah was not going to be a competent
19          anesthesiologist, and I think that his feelings were
20          based upon his interactions and performance and some
21          feedback that he got from other attendings and other
22          residents, and yet there were aspects of Sarah's
23          performance and evaluations that were good.  And I
24          wanted to try to strike a fair balance, as fair a
25          balance as I possibly could among those, and I felt
```

```
 1           that David was not looking at everything as objective

 2           as he could based upon his own personal feelings

 3           about her performance.  So I was trying to restore

 4           what I thought to be balance.

 5    Q      Did you discuss with Doctor Wallace your belief that

 6           he was not totally isolating from the situation?

 7    A      We discussed -- I'm not sure I would put it in those

 8           exact words, but something along those lines, yes.

 9    Q      Tell me about those discussions.  What did you say?

10    A      I just did.

11    Q      What did you say specifically to him?

12    A      I said specifically something to the effect of what

13           we just said, that I thought that his view was the

14           view of a single faculty member, albeit the program

15           director, but his own interactions with her as a

16           single faculty member, just like other single faculty

17           members, and I wanted to make sure that we were

18           looking at this, again, as fairly as we possibly

19           could.  I guess that was the gist of the

20           conversation.  I don't remember specifics.

21    Q      How did he respond?

22    A      I don't remember.

23    Q      Did you have the conversation with him with a mindset

24           such that his response was going to make a difference

25           in terms of what you were going to recommend his role
```

```
 1          be?

 2    A     No.

 3    Q     What information had you gathered to lead you to the

 4          decision that his role should change?

 5    A     It was based upon my thought processes at the time.

 6          I can't tell you anything other than what I already

 7          told you.

 8    Q     Well, did you speak to other physicians about Sarah's

 9          performance?

10    A     Yes.

11    Q     Which physicians did you speak to?

12    A     I can't tell you specific names.  I don't remember.

13    Q     Did you have personal observation of her performance?

14    A     At some point I did.  I don't think I -- I do not

15          remember working with Sarah in the operating room.

16          I'm sure I did in the Intensive Care Unit.

17    Q     Were you relying on your personal observations of her

18          performance when you were having these conversations

19          with Doctor Wallace about his evaluation of her?

20    A     Not particularly.

21    Q     Were you relying on your knowledge gathered from your

22          conversations with other physicians when you were

23          talking to Doctor Wallace?

24    A     To some extent, I'm sure I did.

25    Q     Did you agree with Doctor Wallace with respect to his
```

Page 27

```
 1            strong feelings about her performance?

 2    A      That's a broad question.

 3    Q      Well, you testified that he had strong feelings about

 4            her performance.

 5    A      Yes.

 6    Q      You understood what those strong feelings were,

 7            correct?

 8    A      I think some of the things that he said, I agreed

 9            with.  Some of the things that he said, I probably

10            didn't agree with.

11    Q      What were the things that he said that you agreed

12            with?

13    A      You know, I don't recall specifics of the

14            conversation at this point.

15    Q      And do you recall specifics of things he said that

16            you did not agree with?

17    A      Again, I don't recall specifics.  I think that the

18            best way to characterize it is there was a number of

19            broad, sweeping comments about her performance and

20            what his thoughts were about her ability to complete

21            the program satisfactorily versus not, and I think

22            that we had some general discussions about that, and

23            I recall agreeing with some of the things he said,

24            and other things, I didn't agree with.

25                I mean, it was a conversation between two
```

```
 1        professionals who were trying to evaluate somebody on
 2        a spectrum that really there's no distinct cutoff or
 3        score.  There's not a number that flashes up there.
 4        There's generally a type of feeling and a type of
 5        looking at certain criteria that differs from person
 6        to person to person.
 7    Q   Do you recall approximately when you made this
 8        decision regarding his role with respect to Sarah
 9        Aronson?
10    A   Do I remember it now when it was?
11    Q   Yes.
12    A   No, sir.  I don't remember specifically.
13    Q   Did you know that a meeting was held with Sarah
14        Aronson by Doctors Norcia and Wallace on June 4th of
15        2009, during which meeting Doctor Wallace expressed
16        his belief that Sarah Aronson could not
17        satisfactorily complete her Residency Program?
18    A   I was made aware of that, correct.
19    Q   Did you agree with that assessment?
20    A   To the best of my recollection, I think that that --
21        that the assessment was made by Doctor Wallace and
22        Norcia.  I was consulted about that and I did not
23        disagree with that, so if I didn't disagree, then I
24        agreed.
25    Q   So as of June 4th, you agreed that she was not likely
```

Page 29

```
 1              to successfully complete the Residency Program; is
 2              that accurate?
 3     A        June 4th?
 4     Q        Of 2009.
 5     A        I know that there was discussion about that.  I don't
 6              recall specifically whether -- I remember when they
 7              had met with her to extend the training.  That was
 8              the issue.  I don't recall whether that was before
 9              the June 4th meeting.  Is that correct?  I'm trying
10              to --
11     Q        Let me refresh your memory.  Her training was
12              officially extended January 7th of 2009.
13     A        Okay.
14     Q        That's when she received the letter saying that her
15              training was going to be extended.
16     A        Okay.
17     Q        And she completed the program not later than
18              August 31, 2009.
19     A        So the meeting in June was two months before she
20              completed the program?
21     Q        That's right.
22     A        I was not -- I know that there was concern about
23              whether she would be able to complete it.  I don't
24              recall stating that she was not going to be able to
25              complete it at that point.  I mean, I don't -- I
```

1       mean, I was not aware that that was a definitive

2       statement said in that meeting.

3    Q  So let's clear something up, because I think perhaps

4       you had some confusion about dates, and I had asked

5       you earlier whether you agreed with the assessment on

6       June 4, 2009 by Doctor Wallace that Sarah Aronson was

7       not likely to successfully complete the program, and

8       you answered that you did agree with that.

9    A  On that date, I think I had concerns about whether

10      Sarah Aronson was going to successfully complete the

11      program.  I did not necessarily agree with Doctor

12      Wallace's assessment that there was no way that she

13      was going to finish the program.

14   Q  Okay.  And what were the basis of your concerns at

15      that time?

16   A  The same as the basis for Doctor Wallace's concern

17      and other evaluations that she had had up to that

18      point, and the fact that there was -- again, the fact

19      that there seemed to be a mixed bag of evaluations

20      concerning performance.

21   Q  Did you also believe that she had time to

22      demonstration between June 4th of 2009 and the end of

23      August 2009 that she could successfully complete the

24      program?

25   A  I have no opinion on that.  That's the kind of

1    decisions that were left up to the residency

2    directors.

3  Q So you had an opinion about whether she was -- as of

4    June 4th -- whether she could successfully complete

5    or whether she was likely to successfully complete,

6    and no opinion of whether she could --

7  A Let me put this in frame of reference. I did not go

8    over every evaluation that Sarah Aronson was given.

9    I did not go over the timeframe of these evaluations,

10   progress or not. I relied upon Doctor Norcia and

11   Doctor Wallace to give me information about that.

12   They were the best judges of her progress, or lack

13   thereof, about her abilities, or lack thereof, and

14   they were the ones who were going to make that

15   decision. They consulted me on that.

16    Now, you know, was I specifically asked is eight

17   weeks enough time for Sarah to demonstrate that she

18   could complete with success the program? I was not

19   asked that or I don't remember being asked that, so I

20   don't have an opinion on that answer.

21    I know that she was walking the threshold. I

22   know there were concerns about it at that date. Did

23   I have a timetable upon which she either completed or

24   not completed? Not in my mind.

25  Q Did you discuss with either Doctor Wallace or Doctor

1          Norcia whether they had provided Sarah Aronson with

2          any feedback about performance problems between

3          January of 2009 and June 4th of 2009?

4     A    I do recall some discussions we had about that and

5          that there was some issues that they had not gotten

6          back to Sarah for -- I don't recall the exact amount

7          of time, but a specific period that I had felt that

8          it would have been more helpful had they been able to

9          give her feedback on her performance over that period

10         of time.  I don't know exactly what that was.

11                        - - - -

12   (Thereupon, Exhibit 1 was marked for the purpose of

13                    identification.)

14                        - - - -

15    Q    (By Mr. Gordillo)  Howard, I'm going to hand you a

16         document that has been marked as Exhibit 1, and as we

17         go through your deposition, I'll probably hand you

18         documents a number of times.  Every time I do it, I'd

19         like you to make sure you take all the time you'd

20         like to look over the document and let me know when

21         you've had an adequate opportunity to review the

22         document.

23    A    Okay.

24    Q    Do you recognize the document?

25    A    Yes, I do.

Page 33

```
 1   Q    And this is the letter sent to Doctor Aronson to

 2        notify her that her training was going to be

 3        extended, correct?

 4   A    Yes, sir.

 5   Q    In the next to last paragraph, she is informed that

 6        she will be required to remediate for an additional

 7        six-month period.  Do you see that?

 8   A    Mm-hmm.

 9   Q    And then in the final paragraph, she's asked to

10        contact Christine Adamovich to set up a time to meet

11        and discuss the remedial program plan.  Do you see

12        that?

13   A    Yes.

14   Q    Remediation is a specific term in the context of the

15        UH Residency Program, correct?

16   A    I guess.  I don't know.  I mean, I haven't read the

17        book or I don't remember reading specifically that

18        word.  I'm sure it must be there.  I'll take your

19        word for it.

20   Q    Okay.  It's there.

21            Are you familiar with the process that's involved

22        when a resident is placed in remediation?

23   A    In generalities.

24   Q    Okay.  Are you aware of whether a written remediation

25        plan is required to be given to the resident?
```

Page 34

```
 1    A    I'm not aware of that.  There may be.  I just don't
 2         know.
 3    Q    Do you know whether a written remediation plan was
 4         ever given to Sarah Aronson?
 5    A    I'm not aware of one.
 6    Q    Did you ever ask Doctor Wallace or Doctor Norcia
 7         whether a written remediation plan was ever given to
 8         Sarah Aronson?
 9    A    No, I did not.
10    Q    Did you ever discuss with either Doctor Wallace or
11         Doctor Norcia any specific remediation program in
12         place for Doctor Aronson beginning after January 7,
13         2009?
14    A    I may have had the discussion.  I don't recall
15         specifics of that.
16    Q    Did anyone inform you that Doctors Wallace and Norcia
17         had indicated to Sarah Aronson that they were going
18         to meet with her on a monthly basis to review her
19         performance?
20    A    I do remember discussion about setting up some
21         appointments to meet with her again.  I don't recall
22         the frequency, but I do remember some generality
23         centered around that conversation, correct.
24    Q    Did you know the first time that they met with her
25         after January 7th of 2009 was at the June 4th
```

1        meeting?

2   A   My understanding was that she had opportunity for

3        feedback before that, but it was -- I thought that

4        there was some discussions around April, but I can't

5        specifically tell you.

6   Q   Did you ever talk with either Doctor Wallace or

7        Doctor Norcia about whether they had met monthly to

8        give Doctor Aronson feedback about her performance?

9   A   I do recall that they did not meet monthly, and I did

10       have conversations about that.

11  Q   And --

12  A   Probably after the fact.

13  Q   What were the gist of those conversations?

14  A   Pretty much that I thought that there was going to be

15       some sort of regular communication with Sarah, and I

16       had not been aware of such at that point.

17  Q   And what response did you get to that?

18  A   I think that there was some -- there had been some

19       meeting to -- there had been some feedback provided

20       to her, but they had not had a formal meeting, as I

21       recall.

22  Q   Did you have an opportunity to review the letter that

23       is Exhibit 1 before it was sent to Doctor Aronson?

24  A   I don't recall reviewing it.  I do recall discussing

25       the general content of it.

Page 36

1    Q    And you discussed it with whom?

2    A    With Doctors Wallace and Norcia.

3    Q    Okay.  When you say you discussed the general

4         content, can you elaborate on that?

5    A    No.  I don't know what you're asking me.

6    Q    Well, I want to know as much as you can remember

7         about what you discussed with Doctors Norcia and

8         Wallace about this Exhibit 1.

9    A    Okay.  So I remember them feeling that they felt that

10        there was issues with Sarah's performance, that they

11        felt that she needed to have another -- that she was

12        going to get an unsatisfactory for her performance

13        for that past six months.

14             When they had talked to Sarah, there was an issue

15        with medication that she had been taking that she did

16        not inform them about that could have affected her

17        performance, and they discussed all of the reasons

18        that they were putting in the letter with me, and I

19        said that that sounds reasonable, and that was the

20        gist of my discussion, the best I can recall.

21    Q   They wrote that she had been unable to demonstrate

22        the ability to react to stressful situations.

23             Do you see that in the second paragraph?

24    A    Yes.

25    Q    Did they discuss with you any examples in which she

1      was unable to demonstrate the ability to react to

2      stressful situations?

3   A  I don't recall what those situations were.  With

4      phraseology like that, I would certainly have asked

5      them for specifics.  I'm a hard example kind of

6      person, and I'm sure we had that discussion more or

7      less to a certain extent.  I don't recall what the

8      specifics were.

9   Q  Did you ask for any specifics which demonstrated that

10     she had failed to demonstrate her ability to

11     recognize and respond appropriately to significant

12     changes in the anesthetic course?

13  A  Again, we would have had discussions about those.  I

14     don't think those were phrases that would have been

15     thrown in without having some examples.  So, you

16     know, the gist of the conversation would have been to

17     that effect.

18  Q  But as you sit here today, you can't recall any

19     specific examples that either Doctor Norcia or Doctor

20     Wallace gave you for them to justify their statement

21     that she had failed to demonstrate her ability to

22     recognize and respond appropriately to significant

23     changes in the anesthetic course; is that correct?

24  A  That's correct.

25  Q  And likewise, as you sit here today, you don't recall

1        any specific examples they gave you to demonstrate

2        how she was unable to react to stressful situations

3        in an appropriate manner?

4   A   Correct.

5   Q   I think you mentioned that one of your

6        responsibilities was hiring in the Department of

7        Anesthesia, correct?

8   A   Yes, sir.

9   Q   When a physician is hired, as in the Department of

10       Anesthesiology, they have to provide a health

11       inventory to UH, correct?

12  A   I don't know what the Human Resources Department does

13       as far as that is concerned.  I don't know.  I'm sure

14       they probably do.  That's never been a factor in --

15       I've not been made aware of that particular factor.

16       I mean, it's a factor in hiring people.  You want to

17       know, but that's just, you know, not something that I

18       generally put on the table when the interview process

19       is going on.  I'm aware they do have to do that, and

20       if there are issues that are brought up to that, I

21       guess the HR Department would let me know, but I'm

22       not aware of that.

23  Q   Do you know why you are generally not in the loop,

24       let's say, in on the health inventory?

25  A   Because it's -- you know, I'm not the one hiring

1        them.  UHMG is the one hiring them.

2    Q   So what is your role in hiring?

3    A   I make the decisions on who I would like to have on

4        my faculty and I pass those along to HR to get them a

5        contract.  The contract that they sign and all the

6        things that they provide, et cetera, et cetera, is

7        run through UHMGHR.

8    Q   Is it fair to say that you assume that if you

9        recommended a physician for hire, that HR will make

10       sure that the physician is otherwise qualified?

11   A   I would assume -- no, no.  The qualifications of the

12      individual are up to me.  I mean, I'm the one who

13      makes the decision as far as whether they are

14      clinically qualified to go on faculty or desirable to

15      go on faculty.

16         If there are issues in that person's past as far

17      as health issues or reasons they cannot perform their

18      duty to the best of their extent, I mean, some of

19      that is self-reported.  Some of that is through

20      reference letters, which we'll ask about that, and

21      the other, I would guess, would be through screening

22      by HR.  If there's a felony conviction -- I mean, I

23      don't necessarily ask every applicant, have you spent

24      time in jail?  If there's something that comes up on

25      their background check, that's done through HR, not

Page 40

1      me.

2    Q    Is there any reason you're aware of why a physician

3         who is being hired should believe that they have any

4         obligation to make any health-related disclosures

5         beyond what they disclosed during the health

6         inventory?

7    A    I would want to know if there's any health-related

8         issues that that physician may have that may impair

9         their ability to do the job that they need to do.

10   Q    All right.

11   A    So if they are an alcoholic, then they may show up

12        for work late, or worse, drunk.  Or if they are on

13        medications and if they miss a dose, they become

14        psychotic, I need to know that.  If they're on drugs

15        that, you know, they need to get to sleep at night

16        and they come in in the morning still not fully

17        awake, alert, and attentive, that the drug has

18        impaired their cognition, I need to know that.  If

19        there's epilepsy and they're not compliant with their

20        seizure medication and they're going to have a

21        seizure while they're trying to induce a patient in

22        the OR, I need to know that.

23   Q    Is there any understanding on your part that if a

24        physician who is being hired discloses medication

25        they are taking without knowledge that it's effecting

Page 41

```
 1          their performance, that UH is going through a

 2          screening process to catch a potential problem?

 3                    MR. BIXENSTINE:  I'm sorry?  Could

 4               you read that back?

 5                    - - - -

 6          (Thereupon, question read by Notary.)

 7                    - - - -

 8    A     I'm not depending necessarily on UH to have a

 9          pharmacologist in the HR Department to let them know

10          what all the drug effects or side effects are.  I

11          would assume that the person who's taking the

12          medication, because it's their body, to be aware of

13          that or be told that by the physician who prescribed

14          that medication.

15               Again, if there was an opportunity for that

16          medication to affect their performance so it would be

17          clinically significant and potentially harmful for

18          patients, I would need to know that.

19    Q     At the time Doctor Aronson was hired as a resident,

20          she was taking Topamax.  Were you aware that she

21          disclosed that in her health inventory?

22    A     I'm not aware one way or the other.

23    Q     Assuming that she did disclose it, are you aware of

24          any other reason that she should have disclosed it to

25          anyone else?
```

Page 42

1    A    If she is having -- we're getting to the specifics

2         here.  If she was having problems with processing,

3         with reaction, and she was made aware of those

4         performance, then I would think that she would say or

5         put one and one together, well, this is a potential

6         side effect from this medication.  Maybe that's what

7         the reason is for my performance issues.

8    Q    But assuming that she wasn't aware of any side effect

9         that was affecting her performance, did she have any

10        reason to disclose the use of Topamax beyond

11        disclosing it in the health inventory?

12   A    I'm not sure I understand the question.

13   Q    Sure.

14   A    If she wasn't aware of the side effect of the drug?

15   Q    Yes.  The side effect of the drug affecting her job

16        performance.

17   A    Well, then there's lack of insight as to what her job

18        performance would have been.  I mean, if she's been

19        told that she's having issues with reaction time,

20        processing time, and then she doesn't understand that

21        the drug might cause that, then that's a lack of

22        understanding of the side effects of the drug or a

23        lack of understanding of her performance.

24   Q    I'm talking about at the time of hire.

25   A    At the time of hire?  No.  Clearly she hasn't started

Page 43

```
 1              yet, so the premise is incorrect.

 2                  If she hadn't started, how would she know what

 3              her performance is?

 4       Q      That's right.  She wouldn't have any reasonable

 5              expectation to believe that any side effects were

 6              going to affect her performance.

 7       A      At the time of hire, that would be correct.

 8       Q      So assuming that she discloses in her health

 9              inventory that she's taking the Topamax, but doesn't

10              believe that it's going to affect her job

11              performance, she has no other duties to disclose the

12              use of Topamax, right?

13       A      You know, I'm not an employment lawyer, but that

14              would seem to make sense to me at the time of

15              starting.

16       Q      And if I understand what you've said so far, you

17              think at the point she became aware that her

18              performance was affected by the medication, then she

19              might have a responsibility to disclose its use; is

20              that correct?

21       A      Yes.

22       Q      Okay.  Are you aware that Doctor Aronson had a

23              conversation in November of 2008 with Doctors Wallace

24              and Norcia about her use of Topamax?

25       A      I know that she -- yes.  I know that it was a
```

```
 1              conversation.  I don't recall what the date was.

 2    Q    Okay.  Can you tell me what you know about the gist

 3         of that conversation?

 4    A    My understanding was that there was -- that there was

 5         a question put to Sarah, are you on any -- is there

 6         any kind of medical reasons or are you on any kind of

 7         medicines that would affect your performance as far

 8         as recognition, reaction, et cetera, and that's

 9         when -- either that's when it was disclosed that she

10         was taking that or that's what triggered the thought

11         for her to recognize that that was an issue.  I don't

12         remember when that was.  You know, I wasn't there for

13         the conversation, so that's the gist of what I can

14         recall.

15    Q    So the gist of what you recall is it was that

16         conversation that triggered in Sarah's mind the

17         possibility that maybe Topamax is affecting the job;

18         is that accurate?

19                   MR. BIXENSTINE:  Objection.

20    A    I think that the general question was, are you on any

21         medications and what medications are you on, or you

22         know -- again, I don't know.  I don't know exactly

23         what the question that was put to her was, and there

24         was a discovery of that, but I don't know the exact

25         question leading to that discovery, so I can't say.
```

Page 45

```
 1    Q    Are you aware that shortly after that conversation,

 2         the Employee Assistance Program conducted an

 3         evaluation of Sarah?

 4    A    Yes.

 5    Q    And it was directly related to concerns about her use

 6         of Topamax; is that correct?

 7    A    Well, it was directly related to her performance.  I

 8         can tell you that whenever we suspect there are

 9         performance issues in anybody, because the prevalence

10         for medication abuse in anesthesia is so high, we

11         have them go to the Employee Assistance Program.

12         We've had other people who have -- because their

13         performance has been not up to standards or not up to

14         par or there's been a change, or whatever, we will

15         trigger that mechanism early because we are concerned

16         about our people.

17    Q    And she was released back to work by the Employee

18         Assistance Program, right?

19    A    Correct.

20    Q    What did you know about the terms under which she was

21         released back to work?

22    A    I have no knowledge.

23    Q    Were you informed that EAP released her back to work?

24    A    Yes.

25    Q    Who informed you of it?
```

Page 46

```
 1    A    I don't recall.

 2    Q    Did you know whether there was an evaluation done of

 3         her cognitive abilities?

 4    A    I would assume that was part and parcel of their

 5         evaluation, but again, I'm not aware of the

 6         specifics.

 7    Q    Did you understand that she was being referred into

 8         EAP to examine whether her cognitive abilities had

 9         been affected?

10    A    That was my understanding, yes.

11    Q    Did you then assume that if she was being released to

12         work, that her cognitive abilities were satisfactory?

13    A    I would assume that, yes.

14    Q    So if Doctor Aronson gets referred to EAP based on a

15         conversation about her performance during which the

16         parties to the conversation talk about her use of

17         Topamax, and then EAP says, we recognize no

18         performance problems.

19    A    In they recognize no performance problems in their

20         testing assessment.

21    Q    Correct?

22    A    Nothing to do with the operating room?  They do not

23         --

24    Q    Correct.  Talking about her cognitive abilities as

25         they have tested.
```

1   A   Correct.

2   Q   Do you believe that she had any responsibilities to

3       have disclosed her use of Topamax to either Doctor

4       Wallace or Doctor Norcia before the November

5       conversation?

6   A   Yes, I think she did.  Because their assessment was

7       such, it doesn't mean that it wasn't -- I mean, I

8       think that there still is a duty to disclose anything

9       that may affect your performance.  Even though the

10      end result was by some standardized cognitive test,

11      psychological test that they use, doesn't necessarily

12      mean that it didn't happen and doesn't necessarily

13      mean that the potential wasn't there.  So it's the

14      potential we're talking about, not what the actual

15      results are.  And I'm not sure the actual results are

16      that valid.

17          I mean, we've referred people there before who

18      had performance problems, one fairly recently, and,

19      you know, whatever test that they use may not be the

20      same test that one uses in an operating room when you

21      have somebody's life in your hands.

22          So the answer to your question is I think that

23      that's -- whether or not it had anything to do is not

24      relative to the disclosure process.

25  Q   Your belief is that the relevant question is whether

Page 48

```
 1              the Topamax had the potential to effect her

 2              performance?

 3      A       That's correct.

 4      Q       And if Doctor Aronson were unaware of that potential,

 5              you believe she nevertheless should have reported to

 6              Doctor Wallace or Doctor Norcia that she was using

 7              Topamax?

 8      A       I think that it's a gray area here.  I mean, I feel

 9              that people who take medications ought to know what

10              their potential side effects are.  And again, if they

11              don't think it impairs them, then that's fine.  But

12              now they're entering into a new sphere where there's

13              a whole different set of cognitive abilities and

14              functions that need to happen that don't happen in,

15              perhaps, other walks of life, so I think that the

16              potential is out there and people need to be made

17              aware of that.

18                  And I'm not sure what the -- there's some sort

19              of -- you know, I know that there's some sort of

20              regulations written someplace to that effect.  I

21              don't know what they are.  I can't quote them

22              clearly.  But it definitely states that it is

23              something that ought to happen under the rules and

24              regulations of whatever agency that promulgates

25              those.
```

Page 49

1   Q   Now, you understood that when Doctors Norcia and

2       Wallace wrote the letter that is Exhibit 1 and

3       indicated that one of the reasons for extending

4       Doctor Aronson's training was that under the category

5       of professionalism, she failed to carry out her

6       professional responsibility to notify them that she

7       was taking Topamax; is that right?

8               MR. BIXENSTINE:  Objection.

9   A   To notify them that she was taking a drug that could

10      impair her cognitive abilities.

11   Q   Did you know it was Topamax?

12   A   Yes.

13   Q   So you knew that it was the reference to her not

14      having disclosed the use of Topamax to them that

15      caused them to write this portion of the letter?

16   A   That portion of the letter, correct.

17   Q   And you understood that this letter was a significant

18      document in the context of her training and career,

19      correct?

20   A   It's significant in the sense that it was -- in the

21      sense that it required her to have an extended period

22      of training.

23   Q   Did you know that Doctor Norcia had recommended

24      against including the statement about professionalism

25      in this letter?

Page 50

```
 1                    MR. BIXENSTINE:  Objection.  Go
 2              ahead.
 3   A    I know we had discussions about that.  I don't recall
 4        what Doctor Norcia's final judgement was, no.
 5   Q    You don't recall being in a meeting with you and
 6        Doctor Aronson and Doctor Norcia when the three of
 7        you were discussing specifically professionalism and
 8        whether it should be included in any statement about
 9        her performance?
10   A    In any statement going forward, or this specific
11        letter?
12   Q    This specific letter.
13   A    Again, I know that we had discussions about whether
14        or not that would go forward in writing
15        recommendations and in making recommendations to the
16        Board, and I think that we decided that we would not
17        go forward with that.  But as far as this specific
18        letter, I don't recall conversations regarding the
19        letter, per se.
20   Q    What do you mean when you were talking about not
21        making a recommendation to the Board?
22   A    Stating -- I didn't say that.  I said recommendations
23        to -- oh, State Medical Board, not the ABA.
24   Q    Okay.
25   A    I'm sorry I wasn't clear.
```

Page 51

```
 1    Q    After Doctor Aronson received this January 7th letter

 2         that is Exhibit 1, she had communications with you

 3         about it, right?

 4    A    Correct, correct.

 5    Q    Do you recall telling her you thought that the way it

 6         had been handled was unconscionable?

 7    A    I don't think I would have ever used that word.

 8    Q    Do you deny using that word?

 9    A    I don't recall using the word.  I don't think I

10         would -- I don't think that was my feeling about

11         that, so yes, I would deny using that word.

12    Q    And Doctor Aronson, if she testified under oath that

13         you used that word, she's lying under oath?

14    A    I don't recall using the word.  She may recall or it

15         may have been a perception that I used that word.

16         Can I go back and replay my conversations?  No.  But

17         that's not my feeling about that letter now or then.

18    Q    Residents are given in-training exams periodically,

19         correct?

20    A    Yes, sir.

21    Q    Why are they given the exams?

22    A    To mark their progress as far as understanding and

23         retaining the scientific principles underlying giving

24         anesthesia.

25    Q    Do the exams serve to give the residents any
```

```
 1            indication about the likelihood of passing their

 2            Board certification exams?

 3    A       The in-training exam is a fairly reasonable indicator

 4            of your performance on that and your progress on that

 5            on passing the written part of the examination.

 6    Q       What scores do you have to achieve to understand that

 7            you're likely to pass your Board exam?

 8    A       I don't recall the exact number, but they give a

 9            number related to how they score the test.  It's not

10            a percentage.  It's a ordinal number of some sort.  I

11            just don't recall.  But they give a number.  They

12            give sort of graphs about what you should be at each

13            year if you're going to be progressing towards the

14            successful passing of the test after you've done your

15            residency.

16    Q       Doctor Aronson had informed you that she wanted to be

17            able to appeal the decision to extend her training,

18            correct?

19    A       Correct.

20    Q       Were there any appeal mechanisms available to her?

21    A       I'm sure there are through -- I mean, I don't know.

22            I'm sure that there must be.  There must be some sort

23            of way to do that either through the hospital, per

24            se, or the director of ACGME from the hospital or

25            Anesthesia Board process, training process.  I'm not
```

Page 53

```
 1            aware of them.  I don't know the specifics.

 2    Q      Do you know whether she was given any appeal?

 3    A      I know that she contacted the ACGME.  I know that she

 4           was in touch with Doctor Shuck about that.  You would

 5           have to ask him.

 6    Q      Would it surprise you to learn that she was not given

 7           any formal appeal?

 8    A      Would it surprise me?

 9    Q      Yes.

10                    MR. BIXENSTINE:  By the hospital,

11            you mean?

12                    MR. GORDILLO:  Correct.

13    A      I would -- I don't know if I'm surprised or not.  I

14           know that she had asked about that.  I assumed that

15           if she asked about it that if there was an appeal

16           process available, it would have been made available

17           to her.  Whether or not she was eligible based upon

18           the criteria, I can't really speak.

19    Q      Do you know whether there is any difference between a

20           formal appeal and an informal appeal?

21    A      I don't know.

22    Q      If there is a difference, who would know?

23    A      I assume it would be -- I would assume my residency

24           directors would know about that, and I would assume

25           Doctor Shuck would probably know about that.
```

1    Q    At the time that Exhibit 1 was sent to Doctor

2         Aronson, she had a job offer in Florida from Sheridan

3         Healthcare.  Were you aware of that?

4    A    I was aware that she had a job offer.  I don't know

5         the exact timing.  Yes, I was aware she had the job

6         offer.

7    Q    Did you do anything to assist her in getting that

8         job?

9    A    I recall having perhaps some discussions with them to

10        assist her in retaining that after she was due to

11        complete her extension.  I don't recall if I wrote a

12        letter before this letter came out to them or not.  I

13        mean, I fill out lots of forms for lots of residents,

14        and resident who even were done 30 years ago.  I

15        still get forms to fill out to verify their training

16        and verify their performance during the training, so

17        I get five to ten forms a month.  I don't recall what

18        my timing with the Sheridan would have been.

19   Q    Did you have any discussions with Doctor Norcia or

20        Doctor Wallace about how the decision to extend her

21        training might affect her ability to take the job

22        offer that she received in Florida?

23   A    I know that we were aware of that fact.  I don't

24        recall any specific discussions.

25   Q    Do you recall whether Doctor Norcia or Doctor Wallace

Page 55

1     expressed to you that they didn't think Sarah Aronson

2     should begin working as an attending physician?

3  A  At the time of January 2009?

4  Q  Yes.

5  A  Yes.  I mean, clearly the letter states that.  The

6     letter states that she did not complete the last --

7     the previous six months satisfactorily, therefore she

8     didn't -- in our judgement, needed to have an

9     extension of her residency to do that.  I mean, had

10    they thought that she would be ready to go out as an

11    attending, they would have given her a satisfactory.

12 Q  And you were aware that the job offer she had was for

13    a position as an attending physician, correct?

14 A  Correct.

15 Q  Do you know whether Doctors Norcia or Wallace were

16    similarly aware?

17 A  I'm sure they were.  I mean, people don't go from one

18    residency to another residency, so therefore it was

19    as an attending physician.

20 Q  So when this decision reflected by the January 7th

21    letter was written, was the intent of Doctors Norcia

22    and Wallace, and essentially UH, to prevent Doctor

23    Aronson from being hired as an attending physician as

24    of February of 2009?

25                  MR. BIXENSTINE:  Objection.

1    A    No.   That was not the intent.   The intent was that it

2         was felt that Doctor Aronson had not satisfactorily

3         completed the previous six months of her residency

4         training and to give her an opportunity to do so.   It

5         had nothing to do with a job offer that was or wasn't

6         there.

7    Q    Well, you didn't want her to work as an attending,

8         right?

9    A    We did not feel that she could -- we did not feel --

10        no.   If she wanted to have quit at that time and go

11        take up the job offer, that would be great, if they

12        wanted to hire her based upon not completing an

13        anesthesia residency.

14             We didn't feel at that period of her training

15        that she had satisfactorily completed the

16        prerequisite requirements of the previous six months.

17        That's all that that letter says.   That's all that

18        that letter was intended to.   If she wanted to say,

19        okay, I've done my training, I haven't finished but

20        I'm going to go take a job at Sheridan, that was her

21        decision.   Probably wouldn't have been a wise one,

22        but the point of it is is that's not what the letter

23        was written for.

24   Q    Let me talk for a minute about the six-month window

25        that's in the letter.

Page 57

1           Doctor Aronson did not begin her program at the

2      same time as the rest of her class, correct?

3    A   Correct.

4    Q   So she was essentially off cycle; is that a fair

5      characterization?

6    A   Sure.

7    Q   How is a six-month evaluation period applied to a

8      resident who was off cycle?

9    A   I would assume -- and your question is probably

10     better off asked of the resident directors because

11     that's their job -- six months is six months.  It

12     really, you know, depends on when you start and the

13     clock starts ticking.

14   Q   Do you have any recollection of whether there was a

15     specific rotation that Doctor Aronson had

16     unsatisfactory performance which led to the

17     January 7, 2009 letter?

18   A   No.

19   Q   The Residency Program has to send out evaluation of

20     clinical competence for each of its residents in July

21     and January, right?

22   A   Again, details of the Residency Program, I leave to

23     my program directors.

24   Q   Were you aware of Doctor Aronson's application for a

25     job with Sheridan Healthcorp in Maryland for a job

Page 58

1        after her residency was completed?

2    A   Yes.

3    Q   Did you participate in assisting her getting that

4        job?

5    A   I filled out the necessary forms.  I know I was in

6        touch at one point with the Maryland Board of

7        Medicine, so yes.

8    Q   You said you were in touch with the Maryland Board of

9        Medicine?

10   A   Yes.

11   Q   And how were you in touch with them?

12   A   When I filled out the form, there was a question

13       about the medication that she was on, and I answered

14       that question for them.  I don't remember the

15       specific phrase.  And the way I answered it, I also

16       left out a word.  I put medical instead of medical

17       condition, so they got back in touch with me.  I do

18       remember that exchange.

19   Q   Were the exchanges in writing?

20   A   Could have been.  I don't remember.

21   Q   Do you remember having conversations with someone?

22   A   I'm certain that there was a form that I filled out

23       that was in writing.  Whether they had a question on

24       the form, either email or call me, I don't recall.

25       I've had both forms of communication with respect to

Page 59

1          Doctor Aronson's multiple applications to other

2          places, so I don't recall specifically whether that

3          was verbal or written to Maryland.

4     Q    Did you speak with anyone else -- let me rephrase

5          that.

6               Did you speak with anyone at Sheridan Healthcorp

7          about the job?

8     A    I don't think so.  I think it was just the exchange

9          with the Maryland State Board of Medicine.

10    Q    You don't recall speaking with anyone at Peninsula,

11         at the medical center?

12    A    I recall -- I think it was an email form of

13         communication with Peninsula.  I do recall that name,

14         but I don't recall speaking with anybody there, so it

15         must have been a form.

16    Q    What was the gist of the email communication?

17    A    It was not email.  It was perhaps a form.  Perhaps I

18         filled out an evaluation form.

19    Q    Do you know whether anyone else at UH completed forms

20         for her job application at Sheridan Healthcorp?

21                    MR. BIXENSTINE:  You mean Peninsula,

22                the Maryland one?

23                    MR. GORDILLO:  Yes.

24                    MR. BIXENSTINE:  Because I get

25                confused myself, because I thought the

Page 60

```
 1                     original one was not in Maryland, but was
 2                     also a Sheridan.
 3                         MR. GORDILLO:  There's a Sheridan
 4                     Healthcare in Florida and there's a
 5                     Sheridan Healthcorp in Maryland.
 6                         MR. BIXENSTINE:  I see.
 7    A    I do not know if anybody else was involved.
 8    Q    And were you aware that she had later applied for a
 9         job with Hamot in Erie?
10    A    Yes.
11    Q    Did you play any role in assisting her with that job
12         application?
13    A    Again, I'm sure I filled out anything that was sent
14         to me based upon the fact that that's part of my
15         responsibility.  Do I recall specifically for Hamot?
16         No.  I had forms -- I had inquiries from Sheridan,
17         from Hamot, from Easton, and from Springfield.  Do I
18         recall which was verbal and which was not?  No, I
19         don't.
20    Q    Just to be clear, with respect to Hamot, do you
21         recall any conversations you had with anyone at Hamot
22         about Sarah Aronson's job?
23    A    I did receive a phone call from a doctor up there.  I
24         called him back two or three days later.  He wasn't
25         in.  We played phone tag for a bit, but I did
```

Page 61

 1         eventually get in touch with him.

 2    Q    Do you recall who that doctor was?

 3    A    I don't recall the name.

 4    Q    When you spoke, what was the gist of that

 5         conversation?

 6    A    It was a general evaluation type of thing, the same

 7         thing would have been -- I told him whatever I would

 8         have put down on paper.

 9    Q    Did you express any reservations about having Hamot

10         hire Sarah Aronson?

11    A    I don't recall the specifics about that.  I do recall

12         essentially putting out a form stating that she

13         passed our residency and that she had had -- you

14         know, no, I don't recall specifics of that.

15    Q    Have you ever expressed to any prospective employer

16         of Sarah Aronson reservations about hiring her?

17    A    I think the final summary was that -- was that --

18                   MR. BIXENSTINE:  Excuse me.

19              Reservations regarding their hiring her?

20                   MR. GORDILLO:  Yes.  Regarding the

21              prospective employers hiring her.

22                   MR. BIXENSTINE:  Go ahead.

23    A    I think that I put out that -- you know, I don't

24         recall specifically what I said.  I don't recall.  I

25         never checked the box that said, do not recommend.  I

Page 62

```
 1              may have mentioned that there was -- she had a

 2              temporary medical condition or was on medication --

 3              temporarily on medication for a condition that did

 4              affect her performance and caused her to prolong her

 5              residency, but that's all I remember.  I never put

 6              down the unsatisfactory for that.

 7        Q     Did you ever express to any state licensing board any

 8              reservations about having Sarah licensed?

 9        A     Not that I can recall.

10        Q     Let me talk for a minute about duty hours of the

11              residents.

12                  Who is responsible for scheduling the residents?

13        A     That would probably be Doctor Wallace as far as the

14              overall schedule month to month for a year at a time,

15              more or less.

16        Q     And who is responsible for tracking compliance with

17              duty hour requirements?

18        A     We pretty much self-report on that.  We found that

19              the residents -- you know, we don't have them punch

20              in or punch out.  We have a general knowledge of

21              where they are based upon what their call hours

22              are -- I mean what their call schedule is like.  And

23              we have them fill out a self-attestation form that

24              they were either in compliance or not for that

25              particular time.  We've never really had many
```

```
 1           problems with people violating duty hours, other than
 2           in the past when we asked them to come back for a
 3           lecture, if they were on call Tuesday and come back
 4           for lecture Wednesday afternoon, they were only gone
 5           nine hours instead of ten, so if that was a problem,
 6           we changed the date of the lecture for that.
 7                As far as total number of hours in a week, I
 8           don't think we ever had any problems with that.
 9      Q    Other than the self-attestation form that you just
10           mentioned and the scheduling, are there any other
11           records that you're aware that are kept regarding
12           duty hours?
13      A    Not that I'm aware of, no.
14      Q    In the SICU, do you know how long the typical call
15           lasts?
16      A    When you're on call in the SICU?
17      Q    Yes.
18      A    Typically it's 24 hours, 26 hours with rounds.
19      Q    Do you have reason to observe how long the residents
20           work typically when they're on call in the SICU?
21      A    Yes.  I mean, I attend the SICU.  I know when they've
22           been there for 24 hours, we generally conduct rounds
23           to try to see the patients that that call person has
24           been on first, assuming everybody else is stable
25           enough, so that the call person is dismissed as early
```

1      as possible from rounds after the vital information

2      is passed on about what happened to the patients that

3      night.

4            We try to do it 26 hours.  Sometimes it's 27

5      hours, but again, it's depending upon how critical

6      the patients are and what types of communication need

7      to happen to ensure safety for that patient.

8   Q  Do you recall any personal observations of Doctor

9      Aronson's work in the SICU during September and

10     October of 2008?

11  A  No.

12  Q  Do you recall any discussions with Doctors Wallace or

13     Norcia about her performance in the SICU during

14     September and October of 2008?

15  A  Do I recall any conversations?  No.  I'm not denying

16     any conversations took place.  I just don't recall

17     them.

18  Q  Doctor Aronson believes that the typical duty call --

19     I'm sorry.  Start that one over.

20           Doctor Aronson believes that when she was on call

21     in the SICU during September and October of 2008, her

22     shifts were typically 28 to 30 hours.  Do you

23     disagree with that?

24  A  I don't think that's typical.  I'm not saying that it

25     may not have happened if there was some particular

1        thing going on or crisis situation that may have

2        occurred.  Typically, no, that wouldn't be typical.

3    Q   How many times a month do you try to keep the on-call

4        schedule for a resident in the SICU?

5    A   I don't make the call schedule, so I really couldn't

6        tell you.  Probably not -- certainly not more than

7        one to three, and we probably try to get it not one

8        to four, but that would be my --

9    Q   Who's responsible for doing that?

10   A   It would typically be the SICU attending staff.

11       Doctor Hacker is chief of the SICU.  I don't know if

12       she was making the call schedules out at that time or

13       if it was still a function of Doctor Rowbottom or

14       Doctor Norcia.

15   Q   You became aware that Doctor Aronson made a complaint

16       to ACGME about the Residency Program, right?

17   A   Yes, sir.

18   Q   When did you become aware of that?

19   A   Again, I don't have a recall for a specific date.  I

20       think that Doctor Shuck may have emailed me or told

21       me or called me and made me aware.  That would be the

22       first I heard of it, but I don't recall the date.

23   Q   That was my next question, how you learned about it.

24       You may have learned about it from Doctor Shuck?

25   A   I think so, from Doctor Shuck.  Or I may have heard

1        about it from Doctor Aronson.  She may have written

2        or communicated that to me that she was going to.  I

3        don't recall.

4   Q   The ACGME came out to do a site visit in July of

5        2009, right?

6   A   Correct.

7   Q   An ACGME representative met with Doctor Aronson to

8        discuss her views on the program.  Did you know about

9        that?

10   A   Yes.

11   Q   Okay.  How did you learn about it?

12   A   Probably through Doctor Shuck.

13   Q   Do you know how Doctor Shuck learned about it?

14   A   I don't know.

15   Q   Do you recall that ACGME asked for volunteers among

16        the residents to share their views about the program?

17   A   I know that there is a process that they do for the

18        institution, and my understanding of that -- again,

19        you'd best talk to Doctor Shuck about the specifics.

20            My understanding is that the residents sort of

21        self-elect people, representatives to go talk to the

22        ACGME, when there's an institutional review.

23   Q   Do you know any of the details of how the ACGME came

24        to speak specifically with Doctor Aronson?

25   A   That's probably a question better answered by Doctor

1        Shuck.

2    Q   Is your answer no?

3    A   I'm not sure of the details, so I can't tell you.

4    Q   Did anybody from the ACGME share with you the

5        information that Doctor Aronson had conveyed to the

6        ACGME representative in July 2008?

7    A   No.

8    Q   You just knew that she had met with someone.  You

9        didn't know what she had said?

10   A   Correct.

11   Q   Were you consulted in any way about determining when

12       the completion date would be for Sarah Aronson's

13       residency program?

14   A   Was I asked my opinion or was I informed?

15   Q   Were you asked your opinion?

16   A   No.

17   Q   Were you informed?

18   A   Yes.  I was informed.  There was discussion going on

19       about that.  I mean, you know, six months is six

20       months, as far as extension, and once it was

21       determined that she had satisfied the requirements,

22       was I informed of what that specific date was or how

23       many vacation days she had left at the end?  No, I

24       don't know those details.

25   Q   Did you know that she was given a contract to work

```
 1            through August 31st of 2009?

 2    A     I'm not disputing it.  I don't know the details of

 3          that.

 4    Q     Did you know whether there was a decision made to

 5          consider her work completed before December 31, 2009?

 6    A     I'm sorry.  I'm not sure I follow that question.

 7    Q     Did you --

 8    A     She was given a contract through August 31, 2009, so

 9          why would she have been considered to work through

10          December 2009?

11    Q     That wasn't my question.

12    A     That's why I'm saying I don't understand your

13          question.

14    Q     Fair enough.

15              Did you know whether a decision was made to

16          consider her residency completed before August 31st

17          of 2009?

18    A     I'm not aware.

19                          - - - -

20    (Thereupon, Exhibit 2 was marked for the purpose of

21                      identification.)

22                          - - - -

23    Q     (By Mr. Gordillo)  I'm going to hand you a document

24          marked as Exhibit 2.  Please take all the time you'd

25          like to look it over and let me know when you've had
```

Page 69

1          an adequate opportunity to review it.

2     A    All this?

3     Q    Yes.

4     A    Okay.

5     Q    Does that document refresh your memory at all about

6          when Doctor Aronson was released from the Residency

7          Program?

8     A    Apparently the end of August, 27th to be specific.

9     Q    And you see that the decision was made apparently on

10         August 27th, but it followed an email from Sarah

11         Aronson -- I'm looking at the second page on

12         August 27th, right?

13    A    Yes.

14    Q    Do you know why the decision was made on the same day

15         that she sent this email to --

16    A    No.  You would have to ask Doctor Norcia.  He's the

17         one who authored that.

18    Q    Okay.  You were cc'd on the email, right?

19             Did you have any conversation with him about this

20         decision?

21    A    I may have.  I don't recall specifics.  Yes, I was

22         cc'd on this email.  I get cc'd on about 140 emails a

23         day.

24    Q    How many times to residents get released from the

25         program before they're scheduled?

Page 70

 1    A    Lots of resident leave days before they're scheduled.

 2         Depends on what their vacation time is, what kinds of

 3         time they have taken off for other things.

 4              Again, those are the details of the residents

 5         that I really don't keep track of, especially a year

 6         and a half later.

 7    Q    How many residents get to leave early because they

 8         say, I think I completed my requirements two months

 9         early?

10    A    That's unusual.  Two months earlier?  We never had

11         that kind of issue.  I mean, that's -- I remember

12         this chain of emails.  I think it's a matter of

13         perspective on this and what the timing is.  There's

14         probably some misunderstanding about whether or not

15         that was two months early.

16    Q    Do you know who Doctor Gaither is?

17    A    Yes.  Shayla Gaither?

18    Q    Yes.

19    A    Yes.

20    Q    She was a resident at the same time as Sarah Aronson,

21         right?

22    A    Correct.

23    Q    Graduated the program in July 2009, I think, right?

24    A    I think so, yes.

25    Q    Do you know, is she certified, passed her Board yet?

Page 71

1   A   I don't know her status, no.

2   Q   Doctor McFarland, do you know Doctor McFarland?

3   A   Yes.

4   Q   Doctor McFarland was a chief resident for a time

5       during the residency, right?

6   A   Yes.

7   Q   Also at the same time as Doctor Aronson was there,

8       right?

9   A   Correct.

10  Q   Do you know if Doctor McFarland has been Board

11      certified?

12  A   Yes, I do.  She is.

13  Q   Do you know when that happened?

14  A   I mean, I know she just passed her orals.  I don't

15      know when she took her written, if she did a

16      fellowship.  Sometimes people delay taking their

17      Boards until after their fellowship year.  I know she

18      just passed her orals, which means she passed her

19      written at some point before that.  I don't know

20      when.

21  Q   And Doctor Williams was part of the Residency Program

22      with Sarah Aronson, right?

23  A   Which Doctor Williams?

24  Q   Fair question.

25  A   The answer to the question is yes, because there was

Page 72

```
 1          two, so --

 2    Q     Erin Williams.

 3    A     Yes.

 4    Q     Do you know if Erin Williams is certified?

 5    A     Yes, she is.

 6    Q     Do you know when she became certified?

 7    A     No, I don't.  I know she texted me when that

 8          happened, when she got her results back.  I don't

 9          know when.  Doctor Williams did a year of fellowship,

10          so she might not have taken her Boards right away.

11    Q     As you sit here today, are you aware of any conduct

12          by Doctor Aronson during her Residency Program that

13          merited terminating her employment?

14    A     That merited terminating her employment?

15    Q     Yes.

16    A     No.

17    Q     Are you aware of any jobs that she should have taken

18          since February of 2009?  That she should have taken

19          and didn't take?

20                    MR. BIXENSTINE:  I'm sorry?

21    Q     Are you aware of any jobs that she should have taken

22          and didn't take since February of 2009?

23                    MR. BIXENSTINE:  Objection.

24    A     I don't understand the question.  How would I know of

25          any jobs she should have taken and didn't take?
```

1    Q    If your answer to my question is no, that's okay.

2    A    No.

3    Q    Did you know that Doctor Aronson had been scheduled

4         for an ICU rotation at the end of her residency?

5    A    I was aware that she did one, yes.

6    Q    Did you know that she was released from completing

7         that rotation?

8    A    I think we discussed it.  She left her residency on

9         the day that -- you mean released while she was doing

10        it or from doing it?

11   Q    Excused from doing it.

12   A    Yes.  I vaguely remember that, yes.

13   Q    Were you part of the decision-making process that led

14        to that?

15   A    No.

16   Q    How did you become aware that it had happened?

17   A    As it happened or after it happened?  I don't know.

18        Somebody -- it must have come up in discussion or I

19        must have been informed.  I honestly don't recall the

20        details.

21   Q    In January of 2009, did you believe that Doctor

22        Aronson's alleged performance problems were due to

23        the potential drug side effect?

24   A    Was I aware or --

25   Q    Did you think?

Page 74

1   A   Did I think?

2   Q   Yes.

3   A   When the letter was written?

4   Q   Yes.

5   A   I don't know if I -- I don't know, because we hadn't

6       had an opportunity to see what she was like off this

7       medication.

8           Could they have been contributory?  Certainly.

9       Do I have an opinion based upon at that time?  No.

10  Q   Did you subsequently form an opinion?

11  A   Sure.

12  Q   When did you come to that opinion?

13  A   Are you asking me for the hour and the minute?

14  Q   To the best of your recollection, whatever you can

15      do.

16  A   I mean, clearly it was thought that she had improved

17      her ability to react to situations, seemed to have a

18      clearer thought process afterwards.  Did that account

19      for everything?  I don't know.  But it certainly

20      seemed to help.

21  Q   As you sit here today, do you believe that her

22      performance was affected by her use of Topamax?

23  A   I think -- you know, I think it certainly could have

24      been.  I can't tell you.  I mean, again, we're not

25      talking about a test that we can grade and look at

1           before and after.  We're looking at subjective

2           evaluations by multiple people over periods of time,

3           and you have to sort of form an opinion based upon

4           what those are.

5      Q    And you've informed licensing boards that she had

6           extended training based on a medical condition

7           related to her use of Topamax?

8      A    Based upon the drugs she was taking and that she

9           seemed to improve when she was off, like I said, yes.

10     Q    But you weren't sure whether that was what caused her

11          problems?

12     A    As a scientist, am I absolutely convinced?  No.  Did

13          I think it helped?  I said it seemed to improve.

14          Yes, it helped.

15     Q    You are willing to accept that as a hypothesis?

16     A    Correct.

17                         - - - -

18  (Thereupon, Exhibit 3 was marked for the purpose of

19                    identification.)

20                         - - - -

21     Q    (By Mr. Gordillo)  I'm going to hand you a document

22          marked as Exhibit 3.  These are emails between Sarah

23          Aronson and Jerry Shuck, so I don't necessarily

24          expect you to recognize them, but please take all the

25          time you'd like to look them over and let me know

1            when you've had an adequate opportunity to review it.

2    A     Okay.

3    Q     As you look at this document, do you recall that you

4            had a meeting with Doctor Aronson and Doctor Norcia

5            in January?

6    A     Again, do I recall that specific meeting?  No.  But

7            I'm sure that I did.

8    Q     Okay.  And she -- you see in the bottom half of the

9            document where she writes that you had deferred to

10           the assessment of the program directors and had

11           little to say otherwise.  Do you see that?

12   A     That's what she put.  Yes, I see that.

13   Q     Do you believe that's an accurate representation of

14           what happened in this January meeting?

15   A     You know, I mean, I think that generally what my

16           stance would have been that -- again, I'm going to

17           state that I leave the evaluation process to the

18           program directors.  I have input.  There's no

19           question that I'm consulted about it, but it's

20           generally an assessment that they have with some

21           input from me.  Can I overrule both of them?

22           Probably not.  Would I want to?  Probably not.

23                        - - - -

24   (Thereupon, Exhibit 4 was marked for the purpose of

25                     identification.)

```
 1                          - - - -

 2    Q    (By Mr. Gordillo)  Handing you a document marked as

 3         Exhibit 4, please take all the time you'd like to

 4         look it over and let me know when you've had an

 5         adequate opportunity to review it.

 6              Have you had time to review the document?

 7    A    Yes, I have.

 8    Q    Do you recognize it?

 9    A    Yes, I do.

10    Q    Can you tell me what it is, please?

11    A    It's an email from Sarah to me detailing issues that

12         she had with what she felt was unfair evaluation by

13         Doctor Wallace, and to some extent by Doctor Norcia,

14         and telling me about the process that she wanted to

15         go through to try to appeal this, and that's pretty

16         much it.

17    Q    And you write back that you were going to discuss it

18         with Doctors Wallace and Norcia, right?

19    A    Yes, I did.

20    Q    Did you do that?

21    A    I'm sure I did.

22    Q    Did you share this letter specifically with them,

23         this letter being the second and third pages?

24    A    I don't know.  I don't think I sent them the letter.

25         I certainly would have talked about what the contents
```

Page 78

1     were with them.  I don't recall whether I sent them

2     that specific letter or not.

3  Q  On the second page of the exhibit on the second full

4     paragraph, Doctor Aronson wrote to you that Doctor

5     Wallace could not cite a single example to her of

6     cognitive impairment when she asked him directly.  Do

7     you see that?

8  A  Yes.

9  Q  As I understood your testimony before, this is an

10    issue that you would be concerned about; is that

11    fair?

12 A  Correct.

13 Q  Did you specifically ask him about the issue that she

14    was raising with respect to his not providing her

15    with any specific examples of cognitive impairment?

16 A  Yes, I did.

17 Q  Do you recall what his response to that was?

18 A  He had a different recollection of that conversation

19    than she did.

20 Q  Did he tell you what specific examples he gave her?

21 A  I don't know.  I can't recall.  But he told me some

22    specific examples, but I don't recollect his -- I

23    don't know the details of his conversation with her.

24    I would assume that that would be a good question to

25    ask him tomorrow.  I mean, I wasn't there for the

```
 1              conversation.

 2      Q      But I want to know what he told you about the

 3              conversation.

 4      A      He told me that he mentioned them.

 5      Q      Did you discuss with Doctor Wallace whether he had

 6              discussed with Doctor Norcia the decision to take

 7              Doctor Aronson out of work to determine her fitness

 8              for duty?

 9      A      No.  I don't recall that.  I may have.  I may not

10              have.  I just don't recall saying those specific

11              words.

12      Q      Doctor Aronson goes on to write about the inclusion

13              of unprofessional behavior in the report to the ABA.

14              Do you see that?

15      A      Mm-hmm.

16      Q      And she writes that Doctor Norcia had expressed

17              willingness to remove that citation from the report

18              when he met with you and her, right?

19                      MR. BIXENSTINE:  You're asking him

20                  what she wrote?

21                      MR. GORDILLO:  Yes.

22      A      Yes.

23      Q      Do you recall that to be an accurate recitation of

24              what happened?

25      A      Again, my recollection is that we weren't going to
```

Page 80

```
 1              use unprofessional behavior.  We weren't going to
 2              question her professionalism when we were going to
 3              fill out forms for her future employment.  As far as
 4              not mentioning it on that ABA form, I don't recall
 5              that.  I don't recall him saying that.
 6         Q    In the next paragraph, she writes that Doctor
 7              Norcia -- about in the middle of the paragraph -- had
 8              an open mind regarding her status.  And then two
 9              weeks later entered a statement of her unsatisfactory
10              performance and need for remediation.
11                   Do you see where she wrote that?
12         A    Yes.
13         Q    And then she wrote that Norcia indicated to her that
14              the fact that she consulted an attorney influenced
15              that report.  Do you see that?
16         A    Yes.
17         Q    Did you discuss this allegation with Doctor Norcia?
18         A    I don't recall.
19         Q    Did you respond back to Doctor Aronson about this?
20         A    About the letter?
21         Q    About the report that --
22         A    The attorney?
23         Q    Right.
24         A    I don't recall.  I don't think I would have.  I don't
25              recall making that specific -- discussing that
```

1          specific detail.

2     Q    Did that statement that she wrote concern you?

3     A    No.  I mean, I was not surprised that she had

4          consulted an attorney, so it didn't concern me.

5     Q    Well, the fact -- I'm not talking about the fact that

6          she consulted an attorney.  I am talking about the

7          fact that she writes Norcia indicated that her

8          consulting an attorney influenced his report.

9     A    I would have to know how it influenced his report to

10         know whether or not it was a concern or not.  You're

11         asking me to try to interpret what Doctor Norcia was

12         thinking, and I can't do that.

13    Q    Well, you could have asked him, right?

14    A    I could have asked him, but -- I may have asked him.

15         I don't recall.  It's just not a detail that I recall

16         doing.

17                         - - - -

18    (Thereupon, Exhibit 5 was marked for the purpose of

19                      identification.)

20                         - - - -

21    Q    (By Mr. Gordillo)  I handed you a document marked as

22         Exhibit 5.  Take all the time you'd like to look it

23         over and let me know when you've had an adequate

24         opportunity to review it.

25    A    Okay.

1    Q    Again, this is an email from Sarah Aronson to Jerry

2         Shuck with a cc to you.  Do you see that?

3    A    Yes.

4    Q    And she writes that she had an opportunity to meet

5         with you and summarizes that you felt you had

6         delegated the management of the Residency Training

7         Program to Doctors Wallace and Norcia and will not

8         take any active steps to influence the process that

9         has occurred to date.

10             Do you see where she wrote that?

11   A    Yes.

12   Q    Do you believe that to be accurate?

13   A    Yes.  Pretty much consistent with what we talked

14        about all morning.

15   Q    And she then goes on to write that you agreed that an

16        objective review or appeal may be the only way to

17        resolve the issue.  Do you see that?

18   A    I think my thought process was she was free to make

19        it an appeal.

20   Q    And then she writes that you express support of

21        submitting a formal complaint to ACGME if that was

22        the only way to secure due process.  Do you see that?

23   A    Again, if she says -- the gist of the conversation

24        probably went something along these lines, that if

25        she wanted to have an appeal and she feels that would

Page 83

1           be fair, I didn't try to discourage her from doing

2           what she felt was necessary.

3      Q    Is it fair to say that she's portrayed a reasonably

4           accurate summary of the conversation that the two of

5           you had?

6      A    To the extent that I just answered the question.  I

7           did not encourage her to do that.

8                If you're implying that I thought that she was

9           handed a raw deal and the only way she was going to

10          get out of this was to make an appeal, that's not

11          what the conversation was about.  The conversation

12          was about, you have a right to appeal and you have a

13          right to an objective analysis of it and you can go

14          ahead and do that.

15                    MR. GORDILLO:  That's all I have for

16               you today.  Thanks very much.

17                    THE WITNESS:  Thank you.

18                    MR. BIXENSTINE:  I'd like to ask one

19               question.

20                    When you say right to appeal

21               here, appeal to whom?  Did you have

22               any specific notion of who the appeal

23               was to go to?

24                    THE WITNESS:  No.

25                    MR. GORDILLO:  Thank you.

```
 1                        - - - -

 2          (Deposition concluded at 11:20 a.m.)

 3                        - - - -

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 85

1   State of Ohio,              )
                                )SS:      CERTIFICATE
2   County of Cuyahoga,         )

3           I, Mary C. Peck, a Notary Public within and for
    the State aforesaid, duly commissioned and qualified, do
4   hereby certify that the above-named HOWARD NEARMAN, M.D. was
    by me, before the giving of his deposition, first duly sworn
5   to testify the truth, the whole truth, and nothing but the
    truth;

6
            That the deposition as above set forth was reduced
7   to writing by me by means of stenotypy, and was later
    transcribed upon a computer by me;

8
            That the said deposition was taken in all respects
9   pursuant to the stipulations of counsel herein contained;
    that the foregoing is the deposition given at said time and
10  place by said HOWARD NEARMAN;

11          That I am not a relative or attorney of either
    party or otherwise interested in the event of this action.

12
            That I am not nor is the court reporting firm with
13  which I am affiliated under a contract as defined by Civil
    Rule 28(D).

14
            IN WITNESS WHEREOF, I hereunto set my hand and
15  seal of office, at Cleveland, Ohio this 10th day of January,
    A.D. 2011.

16

17

18          _____

19          Mary C. Peck, Notary Public

20

21          My commission expires December 30, 2011

22

23

24

25