```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3                       - - -

 4   Sarah Aronson, M.D.,      )
                               )
 5              Plaintiff,     )
                               )
 6        vs.                  )  Case No. 1:10-CV-372
                               )  Christopher Boyko, J.
 7   University Hospitals of   )
     Cleveland,                )
 8                             )
                Defendant.     )
 9

10                       - - -

11

12        Deposition of Sarah Aronson, M.D., the

13   plaintiff herein, called on behalf of the defendants

14   for cross-examination, pursuant to the Federal Rules

15   of Civil Procedure, taken before Constance Versagi,

16   Court Reporter and Notary Public in and for the

17   State of Ohio, pursuant to notice, at the offices of

18   Ogletree Deakins, 4130 Key Tower, Cleveland, Ohio on

19   Monday, December 13, 2010, commencing at 9:12 a.m.

20                       - - -

21

22

23

24

25
```

```
 1                         INDEX
 2  WITNESS:                  REDIRECT      CROSS
 3  Sarah Aronson, M.D.
 4       By Mr. Bixenstine                    5
 5       By Mr. Gordillo       220
 6                       - - -
 7
 8               E X H I B I T S
 9  Defendant's:                          Marked
10       A                                  5
11       B                                 41
12       C                                122
13       D                                131
14       E                                133
15       F                                136
16       G                                139
17       H                                140
18       I                                141
19       J                                146
20       K                                147
21       L                                153
22       M                                156
23       N                                157
24       O & P                            158
25       Q                                161
```

```
1              E X H I B I T S (CON'T)

2  Defendant's:                          Marked

3        R                               165

4        S                               170

5        T & U                           171

6        V                               172

7        W                               184

8        X                               192

9        Y                               199

10       Z                               201

11       AA                              205

12       BB                              211

13       CC                              213

14       DD                              214

15       EE                              215

16       FF                              216

17                         -  -  -

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2   On behalf of the Plaintiff:

 3        Gregory A. Gordillo, Esq.
          Gordillo & Gordillo
 4        2000 Standard Building
          1370 Ontario Street
 5        Cleveland, Ohio  44113
          216-875-5500
 6

 7

 8   On behalf of the Defendant:

 9        Barton A. Bixenstine, Esq.
          Ogletree Deakins
10        127 Public Square
          4130 Key Tower
11        Cleveland, Ohio  44114
          216-274-6903
12

13

14   Also Present:

15        Matthew Norcia, M.D.
          Marcie Mason
16

17                          - - -

18

19

20

21

22

23

24

25
```

```
 1              (Defendant Exhibit A

 2               Marked for identification.)

 3                SARAH ARONSON, M.D.

 4   of lawful age, being first duly sworn, as

 5   hereinafter certified, was examined and testified as

 6   follows:

 7                CROSS-EXAMINATION

 8   By Mr. Bixenstine:

 9   Q    Dr. Aronson, we just met.  My name is Bart

10        Bixenstine.  I'm here on behalf of University

11        Hospitals of Cleveland.  This is my

12        opportunity to learn about the factual

13        circumstances you are able to provide

14        concerning the lawsuit you filed.

15             Have you ever been deposed before?

16   A    Not in this sort of setting.  I've provided

17        testimony before.

18   Q    The difference perhaps between this and a sort

19        of formal testimony is we take breaks when we

20        want.  There are no judges around.  Similarity

21        is you are under oath as if you were in court,

22        same thing.

23             The critical thing I think from my

24        perspective is that you're clear about the

25        kind of questions that I ask.  They make sense
```

1    to you.  I'm here venturing into areas

2    where -- outside of my personal expertise, so

3    I may not articulate things as they should.

4    You need to make sure you have a question that

5    makes sense before you answer.

6         If I ask about dates, times, which I

7    may do, just give me your best estate of those

8    things, as long as you are not guessing.  Some

9    people remember certain dates very precisely.

10   Other dates are a matter of to the month, or

11   the year, whatever it may be.  Give your best

12   estimate.  If you find yourself guessing, make

13   it clear I would be guessing.  I may ask about

14   conversations, it's a similar thing.  Some

15   people may remember the exact content of

16   certain aspects of some conversations.  Some

17   people have better memories than others.  If

18   you were able to do that, fine.  Otherwise,

19   again your best recollection of the substance

20   or gist, or whatever level of recollection you

21   have is fine.

22        If there is something that I'm asking

23   about that doesn't make sense, simply asking

24   to have it rephrased is fine.  If I'm unclear

25   about what the problem is, I'll ask you.

```
1          Typically it's often times pretty self-evident
2          once you speak up.  We will go from there.
3    A     I understand.
4    Q     We take breaks whenever you ask.  Hopefully we
5          will get done as quick as possible.  I know
6          you've flown in yesterday, you probably intend
7          to fly out today.
8               As a formality, is there any reason by
9          why of medication or any other circumstance
10         that you cannot testify fully and completely
11         and truthfully today?
12   A     No.
13   Q     What I've handed you is a document that is a
14         set of responses that were provided to me
15         through your counsel several months ago.  In
16         some respects I would like to get some updates
17         of those responses.  I'm going to go over some
18         of them.
19               For example, in answer to question 1
20         you indicated your current address as you see
21         it there was in Maryland.  Does that remain
22         your current address?
23   A     No.  My current address is in Shaker Heights,
24         Ohio.  19815 Shelburn Road.
25   Q     How long have you lived there?
```

```
 1    A     Since August of this year.
 2    Q     Before that were you at the address listed
 3          here?
 4    A     Yes.
 5    Q     You lived there with others?
 6    A     Yes.
 7    Q     They would be who?
 8    A     My partner, Virginia Ayers, and our three
 9          children.
10    Q     If you will turn to page 3, I'm focusing on
11          the answer to question 4.  When I went through
12          some of the records myself -- we will start.
13          The first paragraph, you list a set of
14          individuals that you describe as having given
15          written evaluations of you, correct?
16    A     Could you restate your question?
17    Q     There is a set of individuals listed in the
18          first paragraph under the answer.
19    A     Yes.
20    Q     They start with the following individuals have
21          given written evaluations of Dr. Aronson, you
22          see that list?
23    A     Yes.
24    Q     I'm assuming, but I'll ask now, you reviewed
25          this list to make sure it was complete as best
```

```
1          you could recall it?
2    A     Yes.  I did review it at the time.  To the
3          best of my memory, it was complete.
4    Q     It's not a test.  I have a question about one
5          person in particular.  I assume it's a doctor,
6          Dr. Celina Hayak, H A-Y-A-K.  Would that be an
7          individual that belongs on that list?
8          Thankfully whoever put this together, I assume
9          it is Greg, did this in alphabetical order.
10         It makes it reasonably easy to track that
11         down.  I don't see her on the list, I'm
12         wondering if she does belong?
13   A     Yes, I do not see Dr. Hayak's name on this
14         list. He --
15   Q     It's a he, thank you.
16   A     Yes.  He did provide an evaluation.
17   Q     He would belong on the list?
18   A     Yes.
19   Q     What about an individual by the name of
20         Raymond Graber, G-R-A-B-E-R, would that person
21         belong?
22   A     I do see his name on the list.
23   Q     Then I missed it, thank you.  I see Ray
24         Graber.  Thank you.
25              We're going to be going into some
```

```
 1        assessments in particular from these
 2        individuals.  I would first like to ask a
 3        couple of general questions about this group
 4        as a way of moving this along as efficiently
 5        as we can. I'm going to ask it as a group,
 6        then you can pick out any individuals that
 7        either belong in the question I ask or don't.
 8        I'll give you an example of that.
 9             Each of these individuals of course
10        were individuals who gave written evaluations
11        of you.  The first question I have about them
12        is, are there any of these individuals that in
13        your assessment of it did not make their
14        assessments of you in good faith?
15   A    Could you clarify what you mean?
16   Q    Yes.  I mean -- I'll ask it a different
17        direction.  Were any of these individuals in
18        your judgment, in the assessments they made of
19        you, did they make those assessments with
20        anything other than their own -- from anything
21        other than their own objective and good faith
22        view of your performance?
23   A    I would say that is a difficult question to
24        answer as I don't know for certain the
25        motivations.
```

```
 1   Q    Correct.  I can only ask you what you know.
 2        By answering that you don't know, doesn't mean
 3        necessarily that you are admitting that they
 4        did.  I'm merely asking whether you have
 5        reason to believe -- maybe that's the best way
 6        to put it to you.
 7             Do you have any reason to believe any
 8        of these individuals in their assessments of
 9        you acted in anything other than good faith?
10        Perhaps that is the best way to phrase it to
11        deal with the concern you just raised?
12   A    I do feel that there are individuals who
13        provided written evaluations, the content of
14        which was colored by or motivated by something
15        other than a purely objective dispassionate
16        viewpoint.
17   Q    Let's identify who those are.
18   A    I would identify Dr. Hacker.
19   Q    Dr. Lisa Hacker?
20   A    Yes.  Dr. Gerald Johnson, Dr. Norcia,
21        Dr. Rubin, Dr. Zahniser.  I might consider
22        adding Dr. Wallace, but you are asking about
23        written communication.  I'm not certain at
24        this point, I don't remember at this time,
25        what various things he communicated to me in
```

1       writing.  I would have to defer whether I

2       would add him to that list.  Those would be

3       the ones at this time I would identify at

4       first reading.

5    Q  Take another read if you need to.  Keep in

6       mind that the objective of this process is for

7       me to question you one time, one time only.

8       For that reason, I need you to do your best to

9       be as complete in your answers as you are able

10      to.  Understanding -- by the way, that raises

11      a point.

12              Throughout the day, if something comes

13      back to your mind.  For example, with

14      Dr. Wallace, as an example, at 11:00 a.m.

15      This morning I'm asking about something

16      totally  unrelated.  All of a sudden a reason

17      comes into your mind why Dr. Wallace either

18      belongs or doesn't belong n the list, you

19      remember that, speak up.  The record, so to

20      speak, is not set until we're done.  Can

21      always be modified.

22              Do your best, take a review of this.

23      If there is anyone else you feel you should

24      add, based upon your knowledge and best

25      understanding at this time, please let me know

```
 1          who they are.
 2   A      I think I would add Dr. Dumas to that list as
 3          well.
 4   Q      Is your answer complete then, the best you are
 5          able to identify it at this time today?
 6   A      At this time, yes.
 7   Q      Going in alphabetical order for want of
 8          anything else, why did you include -- looks
 9          like Dr. Dumas is first.  Why did you include
10          Dr. Dumas on this list?  Correct question is
11          why did you identify Dr. Dumas in response to
12          the last question?
13   A      Could you clarify more specifically what you
14          are asking for?
15   Q      Go back and please read -- I'll do my best to
16          start.
17                You indicated you felt certain
18          individuals in their written communications
19          were colored by something other than purely
20          objective circumstances; is that a fair
21          characterization of what you said?
22   A      Yes.
23   Q      I want to know why you put Dr. Dumas on that
24          list?
25   A      My reason for putting her on the list is that
```

| | | |
|---|---|---|
| 1 | | I feel in looking at her evaluations of me |
| 2 | | over a roughly three year period, that there |
| 3 | | was a pattern of negative commentary that did |
| 4 | | not appear to reflect either my development as |
| 5 | | an anesthesiologist, or events as they |
| 6 | | occurred, as I worked with her.  So my sense |
| 7 | | was that these comments were not reflective so |
| 8 | | much of criticisms of my developing clinical |
| 9 | | skills, but arising from preformed opinions. |
| 10 | Q | Is that a complete answer to the question for |
| 11 | | her? |
| 12 | A | Yes. |
| 13 | Q | In other words, is there anything that she did |
| 14 | | or said separate and apart from the content of |
| 15 | | her assessments, that contributed to putting |
| 16 | | her on the list that we're going down through |
| 17 | | here? |
| 18 | A | Not that I can remember at this time. |
| 19 | Q | Do you know of any other residents who were |
| 20 | | subject to negative opinions from her, of a |
| 21 | | similar -- that you would characterize in the |
| 22 | | same way as you characterize her assessments |
| 23 | | of you? |
| 24 | A | I'm not privy to that information. |
| 25 | Q | I know you wouldn't be privy to the documents |

```
 1              themselves.  You would only know if people
 2              told you.  Here again, keep in mind what other
 3              people tell you about things is fair game here
 4              today.  It might not be fair game at a trial.
 5              It's fair game as a matter of investigating,
 6              which is what we're doing here today.  If
 7              someone told you something about their
 8              assessments, about her assessments, Dr. Dumas'
 9              assessments, that would be potentially
10              something you could respond with.  I
11              understand you don't have access to the actual
12              written assessments of this doctor to other
13              residents.  I understand.
14   A          I have some memory of comments and opinions
15              from other residents, but I would be unable to
16              produce at this point specifically who I was
17              talking with or when, so it would be somewhat
18              imprecise.
19   Q          You would be guessing?
20   A          I would be guessing as to the who and the when
21              and where.  I remember the gist of comments
22              that have been made.
23   Q          The gist would have been what?
24   A          I think there were comments made that there
25              was a feeling that Dr. Dumas exhibited
```

```
 1            considerable favoritism, was not supportive of
 2            residents, some in particular.
 3   Q        Favoritism on what basis, if you know?
 4   A        I can't say I know.
 5   Q        Was Dr. Dumas, in your judgment, competent to
 6            assess you as a resident at the time she did?
 7   A        Yes.
 8   Q        Are there any reasons besides those you just
 9            mentioned, by that I mean you gave me an
10            answer to why you included her in your list of
11            individuals whose assessments were colored
12            other than by purely objective circumstances.
13            Is there any other reasons you would offer
14            besides those you just gave me, for why the
15            residency program should not have given weight
16            to her assessments of you?
17                 MR. GORDILLO:     Objection,
18            foundation.
19   Q        Go ahead.  Let me explain that if I may.
20            Lawyers have to make objections.  It's
21            required under the Rules.  The objections will
22            get weighed upon down the line.  They may or
23            may not have merit.  Absent asking some sort
24            of scurrilous type of question, Greg can
25            explain what that means, you have to answer as
```

```
 1        best you can.  If I think I can fix the
 2        question to make it better, I normally try.
 3        In this case, I think the reason for his
 4        objection has nothing to do with how the
 5        question was structured, well, foundation.
 6              Read back my question if you would, so
 7        it is back in Dr. Aronson's mind.
 8              (Question read.)
 9  Q     Greg has an objection, go ahead.
10  A     At this point I can't think of any other
11        reasons.
12  Q     Let's go to then Dr. Hacker.  What is it about
13        Dr. Hacker and her actions or statements that
14        led you to include her as someone whose
15        assessments were colored by something other
16        than purely objective circumstances?
17  A     In that circumstance, my reasons for including
18        her on this list would be that she was a
19        faculty member who would -- she would
20        typically be -- she could be critical in many
21        circumstances in an appropriate sort of way.
22        Some faculty lean towards being more critical
23        than others.  It's someone's teaching style,
24        which I had no objection to.  However, during
25        the later part and towards the end of my
```

```
 1            residency there were -- here I am estimating
 2            one or two incidents of criticisms that she --
 3            I'm sorry?
 4   Q    I'm sorry.  I didn't mean to distract you.
 5   A    That she documented, that in my opinion didn't
 6            either reflect the facts accurately, and were
 7            excessively negative.  Again not appropriate
 8            to the circumstances.
 9   Q    Did you -- is that as complete an answer as
10            you can give as to why you included her on the
11            list, or is there more?
12   A    I would say that is it, more or less.
13   Q    Did you have reason to believe her assessments
14            of you were not made in good faith, whether
15            they might have been inaccurate or overly
16            critical as her style, or for some other
17            reason, did you have reason to believe her
18            assessments of you were not made in good
19            faith?
20   A    I believe as we've previously defined the
21            term, I would say that is why she is on the
22            list.
23   Q    Maybe I should ask it this way.  Do you have
24            some sense she had some ancillary motive for
25            why she gave the criticism she did, other than
```

1        the fulfillment of her responsibilities as an
2        assessor?
3    A   I don't know what Dr. Hacker's motivations
4        were.
5    Q   Dr. Dumas same thing, did you have any sense
6        that Dr. Dumas was driven by some ancillary
7        motive in her assessments of you?
8    A   I would say again, I don't think I can comment
9        on her motive.
10   Q   A lot of times in life people can comment on
11       people's motives, sometimes they can't.  I can
12       only find that out by asking.  Sometimes
13       people say or do things that make their
14       motives if not clear, certainly suspect, or
15       whatever.  I can only ask and find out what
16       you know or don't know?
17   A   Understood.
18   Q   Did you consider her, Dr. Hacker, to be
19       competent to assess you as a resident?
20   A   Yes.
21   Q   Were there other reasons you could give me,
22       besides those you've just given me for why the
23       residency program should not give full weight
24       to her assessments of you?
25   A   Not that I can think of at this time.

```
 1   Q    Dr. Johnson then, let's turn to him.  Why did
 2        you include him on the list as someone whose
 3        assessments were based on something other than
 4        purely objective circumstances?
 5   A    I worked with Dr. Johnson in the intensive
 6        care unit periodically --
 7   Q    Could I interrupt you to complete something?
 8   A    Certainly.
 9   Q    Which unit -- were each of these individuals,
10        would they be associated with a particular
11        unit?  Like Dr. Johnson you say you worked
12        with him in ICU.  Would that mean Dr. Hacker
13        you worked in ICU or some other unit, same for
14        Dr. Dumas?
15   A    Dr. Johnson was an exception in that he worked
16        only in the ICU.  There are some faculty who
17        worked in both the ICU and operating room.  I
18        would be supervised by them in different
19        situations.
20   Q    Fine, that is not a good question.  Go ahead,
21        why did you include Dr. Johnson in your list
22        then?
23   A    Dr. Johnson, I, and I would venture to say
24        many residents, found him very difficult to
25        work with.  In my experience of working with
```

```
1          him over the course of several rotations,
2          spread out over the three-and-a-half years, it
3          was my experience that there was usually at
4          least one resident, usually the senior
5          resident, with whom he would be in conflict.
6               During the second half of my residency,
7          I found that when I would work with him, it
8          appeared difficult, if not impossible, to
9          avoid being that person.  My sense was that --
10         how can I put this.  Very concretely what
11         would occur over the last few times that I
12         worked with him, his behavior in my view
13         became increasingly inappropriate, overtly
14         hostile.  Assigning blame inappropriately.
15         Making it difficult to carry out the work of
16         taking care of patients in the ICU.  So the
17         written evaluations he provided for me was in
18         that context.
19   Q     Is that a complete answer then?  I ask that
20         sometimes when the answer goes for a bit of
21         time.  I don't want to interrupt.  I need to
22         make sure there is closure.  If not, please
23         continue.
24   A     No, I would say that summarizes it at last at
25         this time.
```

```
 1   Q    When you talk about behavior being
 2        increasingly inappropriate, you mentioned
 3        being overtly hostile?
 4   A    Yes.
 5   Q    If you put aside -- you also then mentioned
 6        something about content of the hostile
 7        assessments.  That is the content of a
 8        writing.  Putting the writing aside, was there
 9        anything about his behavior that was
10        inappropriate, beyond what you just described,
11        which is overt hostility in his manner toward
12        you, anything else you considered
13        inappropriate about his behavior?
14   A    I'm trying to decide the term hostility
15        encompasses the range of difficulties that
16        occurred.  I think that I would say for the
17        time being, I would say that covers it at
18        least in relation to the working relationship,
19        the difficulties there.
20   Q    Other relationship, was there some other
21        aspect of his relationship with you, in which
22        he was hostile or behaved inappropriately in
23        some other way?
24   A    No, there wasn't any other contact that I had
25        with him.  I think by that I meant one could
```

```
 1          comment on broader issues in terms of the

 2          clinical setting, how that was met.  In terms

 3          of, specifically in terms of his working

 4          relationship with me, I think that is an

 5          adequate summary for the time being.

 6   Q      What would make it change, you talked about

 7          for the time being?  I'm a little troubled by

 8          that.

 9   A      Unless I think of some other better way to

10          describe it.

11   Q      Very well.  Did you consider him competent to

12          assess you as a resident?

13   A      I would say I had serious doubts about his

14          competency to be a faculty member.

15   Q      The reason for that would be what?

16   A      He had a clinical style and a way of doing

17          things that was different.  Occasionally made

18          people uncomfortable.  That would have been

19          not a problem, had his professional behavior

20          been more appropriate.  I think that together

21          with his behavior as a faculty person, raises

22          the question as to his competency.

23   Q      The professional behavior you are talking

24          about, is that the hostility that you are

25          referring to, or something beyond that?
```

```
 1  A    I would say that would be the primary thing.
 2  Q    Is there something else that would fit in even
 3       if it's not primary, as part of the
 4       professional behavior concern you had?
 5  A    I think there were other areas of difficulty
 6       in working with him that had more to do with
 7       efficiency, communication, work flow, that
 8       were not so much taking place in a
 9       relationship to me personally, but more of a
10       general kind of working level of functioning.
11  Q    Can you describe in general terms what that
12       was about?
13  A    In general terms --
14  Q    I'm just a lay personal.
15  A    In my experience, Dr. Johnson was not very
16       efficient.  I think that he became stressed if
17       he had a lot of patients to keep track of.  It
18       took him a long time to get things done.  His
19       general management I think of the ICU when he
20       was -- during those times he was on, in terms
21       of his leadership of the team, I think was he
22       was not as efficient or easy to work with as
23       some faculty were.  That more or less sums it
24       up.
25  Q    Were there other faculty or residents that
```

```
 1          shared your view of Dr. Johnson's -- shared
 2          your view as to the issues you raised with
 3          Dr. Johnson?
 4   A      In my opinion, yes.
 5   Q      Who would those people be?
 6   A      I think there are many.  The most salient that
 7          comes to mind would be there is a
 8          Dr. Abehausen, she became a critical care
 9          Fellow.  She was a year ahead of me.  There
10          was -- I can remember a point at which she was
11          in fact refusing to work with him.  Although I
12          think she did eventually.
13               Dr. Elliot Rowe, who I last I heard was
14          I believe on the faculty now at the residency.
15          He was also a year ahead of me.  I remember
16          Dr. Johnson actually kicking him out of the
17          ICU once during rounds after he was raising,
18          in my view, a fairly appropriate question
19          about patient management.
20               Those are two examples I can think of.
21          Although, it is possible that there are
22          others.  Those are two of the most concrete
23          examples I can think of.
24   Q      Are those the only ones that come to mind as
25          we speak?  You can raise others later if you
```

```
 1        have them.

 2   A    Those are the two that come to mind, that I

 3        can remember the specific individuals

 4        involved.

 5   Q    Did you consider that Dr. Johnson made his

 6        assessments of you in other than good faith,

 7        meaning he acted from some motive other than a

 8        motive to comply with his responsibilities as

 9        an assessor?

10             MR. GORDILLO:    Could you read that

11        question back, please?

12             (Record read.)

13   A    I would say the actual written evaluation he

14        provided, was provided in response to his

15        paperwork responsibilities as a faculty

16        member, fulfilling those responsibilities in

17        writing that evaluation.  I don't feel that

18        the content that he wrote was an objective,

19        good faith evaluation of my abilities.

20   Q    Was it based on some ancillary motive, a

21        personal animosity toward you, any type of

22        motive other than motive to fulfill his

23        responsibilities as best he believed them to

24        be, if you know?

25             MR. GORDILLO:    Objection, form.
```

```
 1  Q    Go ahead if you know.
 2  A    I don't know his motivations, I certainly had
 3       the strong impression he carried a personal
 4       animosity.
 5  Q    Did that impression come from something other
 6       than circumstances you described to me
 7       already?
 8  A    No.  It would be really from that context.
 9  Q    Are there reasons why the residency program
10       should not have given full weight to his
11       assessment, other than what you provided to me
12       already?  Are there circumstances that bear on
13       the weight that the program should have given
14       his assessments, other than what you told me?
15  A    Not that I can think of at this time, other
16       than what I said.
17            MR. GORDILLO:    Can we have
18       Dr. Aronson step out for a second?  I want to
19       address a point that just came up in her
20       testimony but I don't want to discuss it in
21       front of her.
22            MR. BIXENSTINE:   Talk to me?
23            MR. GORDILLO:    Yes, I don't want to
24       give any appearance of coaching Dr. Aronson.
25            MR. BIXENSTINE:   Fine.  Off the
```

```
 1            record.
 2                   (Discussion had off the record.)
 3   Q      What Mr. Gordillo mentioned to me, let me
 4          raise one question with you related to that.
 5                   These individuals are all listed
 6          because, in your judgment, the content of
 7          their assessments was colored by something
 8          other than purely an objective assessment of
 9          you?
10                   MR. GORDILLO:    Objection, form.
11   A      Um-hum.
12   Q      When I ask about then good faith, what I'm
13          asking about is whether they have motives
14          other than to fulfill their responsibilities,
15          which is do you understand the distinction, or
16          do we need to go through that?
17   A      I'm not sure I do understand the distinction.
18   Q      Someone could be motivated by personal
19          animosity.  Someone could be motivated because
20          they don't like women.  Someone could be
21          motivated because they don't like people who
22          already have two degrees, think they need to
23          have a third.  There could be a lot of
24          different reasons why people are motivated for
25          what they do, beyond fulfilling their
```

```
 1              responsibilities as an assessor.  That is what
 2              I'm getting at.  What I'm looking for, if you
 3              need to supply me with anything with respect
 4              to Dr. Dumas or Dr. Hacker, Dr. Johnson in
 5              light of what I just said, that's what I'm
 6              after.  Whether any of those individuals, from
 7              what you observed of what they did or said, or
 8              what other people said about them, doesn't
 9              matter what the source is, you have the
10              assessment they acted from other than the
11              motive of fulfilling their responsibilities.
12              That is what I mean by good faith, lack of
13              good faith.
14   A          So I don't necessarily need to know what their
15              motivations are?
16   Q          I'll ask you what you believe the motivation
17              to be.  If you don't know, you don't know.  I
18              can only find out what you know.  That is all
19              I can do today.  I wanted to clarify for you
20              what I'm getting at when I'm asking about
21              whether they are acting in good faith.  I'm
22              asking whether they are acting from some
23              motive other than to fulfill their
24              responsibility as an assessor.  Could be
25              personal animosity, could be because they
```

1       think there are too many women

2       anesthesiologists.  It could be because they

3       think you had enough education already, why

4       are you in there now, whatever it might be,

5       that is what I'm after.

6   A   I would say, that was I believe in some ways

7       the question that we started with, so the

8       names that I picked out of this list here

9       would be those individuals that I felt were

10      expressing views about me that were not --

11      that were influenced by feelings or opinions

12      or thoughts other than an objective assessment

13      of my abilities.

14  Q   For Dr. Dumas, what kind of motives did you

15      believe that Dr. Dumas was acting under,

16      motive or motives, besides to fulfill her

17      responsibilities as an assessor?

18  A   I would say regarding Dr. Dumas, I don't know

19      what her motivations were, but she appeared to

20      have negative feelings about me that were

21      separate from any dispassionate, clinical

22      assessment of my clinical abilities.  Those

23      were expressed in the context of the

24      evaluations.

25  Q   Correct.  Thank you.  For Dr. Hacker?

```
 1  A     I would say the same thing.

 2  Q     Dr. Johnson?

 3  A     Yeah, same thing.  Yes.

 4  Q     So in the case of all of these, the sense you

 5        have of their acting out of a motive other

 6        than fulfilling their responsibility of an

 7        assessor came from the contents of their

 8        assessments of you, and their interactions

 9        with you on the floor?

10  A     Yes.

11  Q     That you described already?

12  A     Yes.  I would say with Dr. Johnson, there was

13        as I described earlier, there was ongoing

14        interpersonal behavior that I experienced with

15        him that reinforced my opinion of his written

16        evaluations.

17              That was far less than the case with

18        Dr. Hacker, who was generally in my

19        interpersonal work with her was generally

20        appropriate.

21  Q     You had no interpersonal issues with

22        Dr. Hacker then?

23  A     Not that I was aware of or that -- I should

24        rephrase that, because as I would

25        intermittently receive some of these written
```

```
 1              evaluations, it occurred to me perhaps there
 2              were interpersonal problems there that I had
 3              not been aware of.  I would say that she
 4              was -- she behaved appropriately at the time
 5              when we were taking care of a patient
 6              together.  In contrast to Dr. Johnson, who it
 7              was clearly -- it was difficult to work with
 8              him on a day-to-day basis.
 9  Q   Dr. Dumas, same thing, you had no issues in
10      terms of interpersonal behavior?
11  A   I would say with Dr. Dumas it was probably
12      somewhere in between.  I think it was fairly
13      clear to me early on that for whatever reason
14      she didn't like me very much.  Although it was
15      never clear to me why that was.  We could be
16      effective working together.  It was not as
17      interfering as it was with Dr. Johnson.
18  Q   Interpersonal behavior involving Dr. Johnson,
19      I know you mentioned the hostility, you
20      mentioned your various assessments of his
21      efficiency, his getting stressed and so on, is
22      there something else to his interpersonal
23      behavior that contributes to your assessment
24      of him, you haven't told me about yet?
25  A   Not that I can think of at this time.
```

```
 1   Q    Dr. Norcia, what about Dr. Norcia?

 2   A    I would say that going back to we are

 3        discussing the written evaluations at this

 4        point, is that correct, for the most part?

 5   Q    Let's make sure that we're clear on that.  Are

 6        there other types of evaluations besides

 7        written ones that are -- is there something,

 8        is there a portion of the assessment process

 9        that is beyond -- well -- I understand --

10        let's put it this way.  It's fair to say, is

11        it not, in some circumstances, perhaps not all

12        of them, the individuals assessing your

13        performance would give you oral assessments at

14        the time, then would follow-up with their

15        written assessments?

16   A    Giving oral or verbal assessments at the time

17        of when one is taking care of a patient with a

18        supervising faculty, that is the academic

19        ideal, that one would provide some verbal

20        feedback at the time.  Provide written

21        documentation at a later date.  I would say

22        that I couldn't give you a number, that

23        doesn't happen all the time.

24   Q    I understand that.  But I'm saying there are

25        occasions apparently when assessments would
```

Page 34

```
 1            have been provided to you close to
 2            contemporaneous with the circumstances, then
 3            followed up with written material later?
 4    A       Yes, there are times that would occur.
 5    Q       In your responses with respect to Dr. Dumas,
 6            Dr. Hacker and Dr. Johnson, were you only
 7            referring to their written assessments?
 8    A       In the case of Dr. Hacker, to the best of my
 9            memory, her written criticisms and negative
10            statements would often come as a surprise to
11            me after the fact.  In the sense that when we
12            were taking care of patients together, no
13            concerns would be expressed.  So I would
14            conclude that experience with the feeling that
15            there were no -- that she did not have a
16            negative impression or assessment.  Then
17            sometime after the fact, I would receive the
18            written evaluation.
19    Q       So for Dr. Hacker, there was nothing in oral
20            assessments of you that contributed to why you
21            put her on the list that we are describing,
22            fair enough?
23    A       Not that I can remember at this time.  Not
24            that I can remember at this time.
25    Q       Dr. Dumas, would there have been anything in
```

```
 1            any verbal assessments, if there were any,
 2            that would have contributed to why you had
 3            Dr. Dumas on the list we're now going down?
 4   A        I would say my memory of my interactions with
 5            Dr. Dumas are not sufficiently clear to answer
 6            that one way or the other.
 7   Q        Dr. Johnson, anything in any verbal
 8            assessments he provided you, if there were
 9            any, that contributed to why he was placed by
10            you on the list we're going down?
11   A        As I mentioned before, the working, my working
12            relationship with Dr. Johnson was -- his
13            general demeanor toward me was very negative.
14            So I would say that there was a great deal of
15            verbal communication.
16   Q        Was there anything that he communicated to you
17            verbally that you can recall, that contributes
18            to why you placed him on this list?
19   A        I don't know that I could.  I don't know that
20            I could quote him specifically.
21   Q        Remember what I talked about, it is not a
22            question of quoting specifically.  If you can
23            give me any gist, something beyond mere
24            guessing, that is substantive information I
25            would like.  I don't want you to guess.
```

```
 1  A    If I were to give an example, again without
 2       clinical specifics, in the course of making
 3       rounds, from bedside to bedside, in the
 4       intensive care unit, there was a point at
 5       which he would argue with almost every
 6       statement that I would make regarding
 7       patients.  So in that sense, it was I guess I
 8       would consider that a negative feedback as we
 9       would go along.
10  Q    Was there anything in verbal communication to
11       you that contributed to him being on the list,
12       besides substantive communication, meaning
13       communication bearing on the particular
14       clinical process that you and he were going
15       through?
16  A    I'm not entirely sure I understand the
17       question.
18  Q    He could get personal, could be insulting
19       personally.  There are all sorts of ways you
20       can communicate beyond disagreeing with a
21       particular course of clinical action.  I was
22       after whether there was anything in his verbal
23       communications that contributed to why he's on
24       the list we're going through, besides
25       communications that were a matter of
```

```
 1            disagreeing about a clinical course of action?
 2   A    I would say that, I don't remember at this
 3        time any specific personal insults or attack
 4        ranging outside of the work environment.  I
 5        would say that his argumentativeness with me
 6        appeared irrational, in that he would argue
 7        with a point because it was coming from me,
 8        not with the rest of the team that was there.
 9        Of course in that argument he was impugning my
10        clinical abilities, my working, the quality of
11        my work or my clinical thinking.  I would say
12        that it was a pattern that appeared to me to
13        be irrational.
14   Q    Was this in a circumstance where you were the
15        senior resident --
16   A    Yes.
17   Q    -- you are describing?
18   A    Yes, that was when it became the worst, yeah.
19   Q    We were just starting in with Dr. Norcia.  I'm
20        interested in why it is you include him on the
21        list of individuals whose assessments of you
22        were, based on your assessment, something
23        other than purely objective circumstances?
24   A    I would say that regarding his written
25        evaluation of me, that he submitted at the end
```

```
 1              of December, was it 2008?  I would like to be
 2              sure about that.
 3   Q     It is.
 4   A     I felt that was not a good faith evaluation
 5              for a number of reasons.
 6                   One was I felt that the timing of it
 7              was such that it was an attempt to generate
 8              written documentation to support after the
 9              fact a decision that had been made, an adverse
10              decision that had been made in relation to me,
11              or was in the process of being made.
12                   The time period that he identified,
13              during which he states that he observed
14              clinical skills that he felt were not up to
15              par, was a period of time when I was working
16              hours that were beyond the limit imposed by
17              ACGME.  I saw no reflection in his evaluation
18              that he was aware of the potential affect of
19              fatigue during that period of time.  Nor could
20              he provide me with any specifics as to what he
21              observed that raised concern.
22                   A third reason I can think of is that
23              he was referring to an earlier period of time
24              in October, I believe, in that written
25              evaluation.
```

```
 1   Q      Referring to a period of time prior to
 2          October?
 3   A      No, earlier in October.
 4   Q      Okay.
 5   A      I had worked with him in the OR, not long,
 6          sometime in December, not long before he wrote
 7          that written evaluation, and stated to me
 8          following the day we worked together, when I
 9          asked him specifically if he had any feedback
10          at that time, he told me he did not have
11          concerns with performance when I worked with
12          him a few days prior to that written
13          evaluation.  At least at this time that would
14          be the main reasons why I would consider that
15          not to be in good faith.
16   Q      You mentioned timing, you mentioned working
17          beyond certain hours limits, you mentioned his
18          communication to you concerning your working
19          with him in December; those were the three
20          things?
21              MR. GORDILLO:     Objection.
22   A      Yes, there may be others.
23   Q      Go ahead.
24   A      At this time, those are the ones that come to
25          mind.
```

```
 1   Q    You are telling me you cannot recall any
 2        others at this time.  Obviously, like anything
 3        else, something could come to your mind later,
 4        fair enough?
 5   A    Um-hum.
 6             MR. GORDILLO:    You have to say yes
 7        or no.
 8   A    Yes.
 9   Q    Did Dr. Norcia, at the time in October when
10        you and he worked together -- first of all,
11        let me ask.  The written evaluation at the end
12        of December concerned the October time frame,
13        did it not?
14   A    Yes.
15   Q    Did Dr. Norcia at the time that you worked
16        with him in October, communicate to you
17        verbally his assessment of you -- start that
18        again.  Did Dr. Norcia, in October, during or
19        shortly after when you worked with him,
20        communicate his concerns with you at that time
21        verbally?
22   A    During the week in question, no.
23   Q    Shortly afterward?
24   A    There was some mention during the meeting with
25        Dr. Norcia and Dr. Wallace and myself, shortly
```

```
 1           afterwards in October.  I would say it was not
 2           specific or in any depth.
 3    Q      What do you recall him saying then at the
 4           October -- we're going to get into the October
 5           meeting by the way, you raised it with
 6           Dr. Norcia in context of the list, perhaps we
 7           can focus on that for the moment, we will
 8           follow up with the rest.  What do you recall
 9           him saying at the October meeting pertaining
10           to his concerns arising from your work with
11           him earlier in October?
12    A      I remember him saying that he felt that it
13           took me a long time to answer when asked, say
14           if a question came up during rounds, that it
15           took me a long time to answer a question.  He
16           said that when I did get around to answering
17           the question, I would get it correctly.  It
18           did seem to take me a long time to express my
19           thoughts.
20    Q      Is there anything more you can recall than
21           that?
22    A      Not that I can recall.
23    Q      Again this is not a test, so I may have
24           something to help you with that.
25                     (Defendant Exhibit B
```

```
 1              marked for identification.)
 2   Q    I'm handing you what is marked as Deposition
 3        Exhibit B.  I would like you to focus on the
 4        second page of that.  Not without, please
 5        review the first page as well.  My question
 6        will bear on the second page.
 7              First of all, does this reflect, at
 8        least in some part, I don't know if it's
 9        total, in some part the written evaluation at
10        the end, that was entered into the system at
11        the end of December you were referring to?
12   A    This looks like what I perceived in December.
13   Q    Correct.  It's a screen print, it may not have
14        the same exact features of something you may
15        have looked at.  I'm interested in whether the
16        content accurately reflects the written
17        evaluation you are referring to that was
18        entered into the evaluation system I believe
19        you testified at the end of December of 2008?
20   A    To the best of my memory, yes, this is what I
21        received.  I believe it was, when it came to
22        me, I think it was December 31st or
23        something.  I don't know if there is a delay
24        or something.
25   Q    There is an entry down, two-thirds of the way
```

```
 1          down the page, under acknowledgement comments,
 2          would you review that for a minute?
 3   A      Um-hum.
 4   Q      This goes to the question I was asking you a
 5          minute ago.  Take a look at that for a
 6          moment.
 7   A      Um-hum.
 8   Q      Does this give you any help in recollecting
 9          anything that Dr. Norcia communicated to you,
10          at the end of the rotation, using the words
11          that are set forth there under the
12          acknowledgement comment section?
13   A      Well, to clarify, this was referring to
14          October 6th to October 10th.
15   Q      This being the evaluation itself?
16   A      The evaluation is referring to observations
17          from October 6th to October 10th.  I received
18          the written evaluation, as I recall it was
19          December 31st.  In any case, it was more than
20          two months later.
21              When we receive these, if I remember
22          correctly, it's a website.  We would have to
23          log onto the website, see what evaluations
24          were there for us to read.  At the bottom
25          there is a place to electronically
```

```
1        acknowledge, that comes up at the bottom, to

2        electronically acknowledge one has seen the

3        evaluation and you read it.  A place to type

4        in a comment, which I did, I said thank you.

5             So you acknowledge receipt of the

6        evaluation, there is a little, if I remember,

7        a little drop down box, you can say yes, no,

8        it was discussed with me verbally or was not.

9        Then if you said yes, you identify when.  I

10       don't remember exactly, there are a limited

11       number of choices when.  When I say at the end

12       of the rotation, that may have been, that may

13       have been -- one of the few choices, how to

14       identify the time frame.  So, I don't think

15       it's exactly accurate to say it was discussed

16       with me at the end of the rotation.

17            I would say that this particular

18       concern, while I was -- I believe I was

19       informed in November that again that this was

20       a concern, it was never really outlined, or

21       explained, or assigned examples at any point.

22   Q   It was discussed with you in the October

23       meeting, I think that is what you testified

24       earlier?

25   A   I would say more that it was mentioned.  I
```

```
 1            understand we will discuss that meeting in
 2            more detail.
 3   Q    Correct.  I think you described how it was
 4            mentioned previously?
 5   A    Yes.
 6   Q    Is that your best recollection of the first
 7            time it was discussed with you, meaning that
 8            is --
 9   A    Um-hum.
10   Q    Of course this meeting I think was around the
11            14th of October, we will get to it in a
12            minute.  If it was, that is four days after
13            the end of the evaluation period?
14   A    Um-hum.
15   Q    Is that your best recollection that having
16            discussed it at the October meeting was why
17            you checked the box that referred to this as
18            being discussed at the end of the rotation?
19   A    I believe I was perhaps thinking more about
20            the November meeting.  Of course there were --
21            let me think about that.  There was a November
22            meeting.  This was already past the whole
23            December leave.
24   Q    The November meeting was -- the November
25            meeting was six weeks after the end of the
```

```
1            rotation.  The October meeting might have been

2            within a week after the end of the rotation?

3    A       The rotation was the entire month of October.

4    Q       Is it fair to say this accurately reflects the

5            evaluation period, or was the evaluation

6            period something other than October 6th to

7            October 10th, that is what it refers to on the

8            first page here?

9                    MR. GORDILLO:    Objection, form.

10   Q       Go ahead and look at the first page of this

11           document.

12   A       Your question is?

13   Q       Turn it, I'll ask the question.  Does the

14           document accurately reflect that the period

15           within which you worked with Dr. Norcia in

16           October goes from October 6th to October 10th?

17   A       I don't remember the exact dates.  I do know

18           it was very early in the month that he was

19           covering the ICU.  I don't remember the exact

20           dates.

21   Q       You were in the ICU rotation the entire month

22           of October?

23   A       Yes.

24   Q       That is why, in your best recollection, your

25           reference to this being discussed with you
```

```
 1          face-to-face at the end of the rotation --
 2    A     I was likely referring to the more longer
 3          conversation that I had with the program
 4          directors in November.
 5    Q     Let me get back then, you can put that one
 6          aside for the moment.  Let me get back to
 7          questions about Dr. Norcia.
 8               You had referred to his evaluation that
 9          was entered into the system the end of
10          December.  You raised issues with respect to
11          timing, your working beyond hours limits.
12          Also to his communication to you after you
13          worked with him in December.  Those are three
14          things I recall from your testimony.
15    A     Um-hum.
16    Q     As being reasons why you had placed him on
17          this list.  The question now is, are there
18          other reasons?
19    A     Yes.  I would say that those reasons that I
20          already mentioned are specifically pertaining
21          particularly to this written evaluation.
22    Q     How do you mean by that?
23    A     In the sense that I think that they raise
24          questions about the validity of this specific
25          document.
```

```
 1   Q     What raises questions, I'm sorry?

 2   A     The reasons --

 3   Q     The three factors?

 4   A     Yes.

 5   Q     I'm trying to find out if there are any other

 6         reasons why you placed Dr. Norcia on this list

 7         besides what you've given me already?

 8   A     Yes, there are other reasons.

 9   Q     They would be what?

10   A     How best to organize my thoughts.  It was my

11         experience, particularly during the last part

12         of my residency, starting in my best

13         recollection, starting in that October of 2008

14         to the end of August 2009, it was my

15         experience, in my interactions with

16         Dr. Norcia, that what he would communicate to

17         me verbally and would suggest to me as to how

18         he felt things should go, or events he thought

19         should take place would not occur.

20               So there was a disconnect between

21         things he would communicate to me as the

22         program director, and then subsequently what

23         would take place, which led me to wonder

24         whether he was being dishonest with me when I

25         was speaking with him.  Whether he was doing
```

1    so to mislead me.  Whether he was doing so

2    because he had other intentions, was not

3    comfortable expressing those to me.  Or

4    perhaps that he didn't have sufficient control

5    over what occurred.  That perhaps he honestly

6    did think that things should go one way, but

7    was not the person making the decisions in

8    terms of my residency.

9         Just as an example -- you want an

10   example?

11 Q  I'm going to get to the example.  The only

12   reason I'm stopping here, I appreciate you

13   letting me do that, is that keep in mind my

14   question, my list here pertains to people's

15   assessments of you.

16 A  Yes.

17 Q  As distinct from conduct of Dr. Norcia as the

18   head of the program in terms of the overall

19   process of your being a resident.  I certainly

20   want to get to that.  This may be a reason why

21   you consider his assessments to be less than

22   objective.  If it goes to something other than

23   that, let's put it aside for the moment if you

24   don't mind, focus on the reasons why you have

25   him on the list as a person who provided

```
 1          assessment based on something other than
 2          objective information.
 3                 Again, if you choose to continue based
 4          on that premise, fine.  I want to alert you my
 5          sense of it is you are describing something
 6          separate from his assessments of you.  Maybe
 7          I'm wrong.
 8   A      No, I would think that is true.  I would say
 9          an additional reason I would consider -- an
10          additional reason I would consider his faculty
11          evaluation of me suspect, is that I found in
12          the last part of my residency that his
13          interactions with me were potentially
14          dishonest.
15   Q      Along the lines you just described to me?
16   A      Yes.
17   Q      Are there other reasons, we will get into some
18          of the specifics later.  Are there other
19          reasons why you put him on the list as a focus
20          on his assessment, besides those four things,
21          the fourth is kind of a grouping, four
22          categories of things?
23   A      I would say that I had a sense that there may
24          have been motivations that were not in good
25          faith.
```

```
1   Q     Okay.
2   A     For example, altering the plan of action for
3         example regarding adverse actions taken toward
4         me would have appeared as a defeat.  So there
5         was a motivation to provide support for those
6         decisions.
7   Q     Any other reasons to put him on the list now?
8         You referred to his motivations just now about
9         providing support for decisions being made.
10        You referred to a line of communications that
11        took place between August and -- between
12        November and August of 2009, and you referred
13        to the timing issues, the working beyond
14        limits issues, and the communication he had
15        with you at the end of December about his work
16        with you in December, those are the things I
17        have so far in terms of categories.  Anything
18        else?
19  A     Yes.  I would say that as with some of the
20        other faculty, I think that -- I think that
21        there were inconsistencies between his
22        previous assessments of me, and his
23        assessments in the context of this adverse
24        action that made me question his validity.
25  Q     You are referring to inconsistencies between
```

```
1          assessments prior -- strike that.

2               You are referring to inconsistencies

3          between assessments arising from his work with

4          you prior to October, versus the assessment he

5          made with you of your work in October of 2008?

6   A      I would say there were inconsistencies between

7          evaluations provided prior to October.  Then

8          subsequent to October, when we worked

9          together, in December, in which verbally he

10         had no concerns about my performance and his

11         documentation of what occurred in October.

12  Q      Is that what you mean by inconsistencies?

13  A      Yes.

14  Q      Anything else on Dr. Norcia then?

15  A      Not that I can think of at this moment.

16  Q      Dr. Rubin.

17               MR. GORDILLO:    Could we take a short

18         break?

19               MR. BIXENSTINE:  Let's do that.

20               (Recess taken.)

21  Q      We were going to turn to Dr. Rubin.  I ask you

22         to tell me why you considered her assessments

23         of you were based on something other than

24         objective circumstances, assessment of

25         objective circumstances?
```

```
 1   A     I didn't work a great deal with Dr. Rubin.
 2   Q     I think I got myself a little out of whack
 3         here.  The question is why she was on your
 4         list as someone whose assessments of you were
 5         based on something other than objective
 6         circumstances.  That is the question.  Go
 7         ahead.
 8   A     I didn't work a great deal with Dr. Rubin.  My
 9         sense with her was that there may have been
10         more of a personality incompatibility.  I
11         think that our work styles didn't gel very
12         well.  She strikes me as woman who has very
13         strong opinions about things.  Expresses them
14         very strongly.  We had some, I would say not
15         major disagreements about --
16   Q     You say not major?
17   A     Not major disagreements about the management
18         of the case.  Not something out of the range
19         of what might occur in a routine care of a
20         patient.
21               I would put her on this list I think
22         because my memory and my interpretation of
23         what occurred as we were working together, was
24         very different from her written evaluation,
25         which was very critical.  My memory of it, I
```

```
 1          don't remember the specific content.  My
 2          memory was it was very emotional.  Again, I
 3          did not work with her a great deal.  I would
 4          say that more or less general summary of why I
 5          would put her on that list.
 6   Q      She was competent to assess you as a resident?
 7   A      Yes.
 8   Q      Dr. Norcia was?  I didn't ask that question.
 9   A      Yes.
10   Q      Did you have any reason to believe that
11          Dr. Rubin was making her assessments from some
12          motivation other than to fulfill her
13          responsibilities as an assessor?
14   A      Yes, I think she was more emotional than
15          objective.
16   Q      Any other reasons why you questioned her
17          motives, besides that?
18   A      None that I can remember at this point.
19   Q      Are there reasons why the program should not
20          have given full weight to her assessments,
21          besides what you told me already?
22   A      Not other than I've expressed, that I can
23          think of.
24   Q      Dr. Zahniser, why is he on the list?
25   A      I would say similar to Dr. Rubin, in the sense
```

1    I did not work with him a great deal.  His
2    initial evaluation that he wrote for me, if I
3    remember correctly, was very soon after he
4    first came to UH as a faculty member.  It was
5    to supervise the care of a patient undergoing
6    heart surgery, and he expressed no concerns
7    about our care of the patient during the
8    course of the case.  Made no critical
9    comments, did not appear to be concerned at
10   all with how we were managing the case.  If I
11   remember correctly it was myself and a junior
12   resident.  I'm not positive about that, but I
13   believe there were two residents in the room.
14   Yet his written evaluation was extremely
15   critical.
16          My thinking is that if he truly thought
17   those things at that time, when we were taking
18   care of the patient, he would have behaved
19   very differently.  I'm not remembering his
20   exact wording at this time.  He was very
21   negative about my functioning as a clinician
22   in that context.  So I question his
23   objectivity as a supervising faculty person in
24   that context or the accuracy -- I would
25   certainly question the accuracy of what was

```
 1           saying.  I didn't agree with his description
 2           of the facts as well.
 3                I believe there was a subsequent
 4           evaluation in which he offered me no
 5           comments.  Coded it as satisfactory, but made
 6           some very negative comments in the text
 7           directed to the program director.  Again,
 8           communicated nothing to me during the actual
 9           care of the patient.
10                When I see that kind of disconnect,
11           between written and the supervisor's action or
12           behavior, it makes me question his motivation
13           or objectivity.
14   Q       Is there something, do you have any sense of
15           what his motives might have been then, other
16           than to fulfill his responsibilities as an
17           assessor?
18   A       I can't say I know his motives.  There was
19           nothing that he ever actually said to me that
20           would suggest motive to me.
21                It has occurred to me that during that
22           initial interaction, he was new with the
23           faculty.  It was a clinical setting in which I
24           felt fairly comfortable.  It may have been a
25           way to establish dominance.  He's a very
```

```
 1          experienced physician, but he was new, as I
 2          remember it.  He was new at the time.
 3     Q    So he was competent to assess you as a
 4          resident?
 5     A    Yes.
 6     Q    Nothing said, okay.  Was there anything other
 7          than what you described that bears on what his
 8          motives might have been?
 9     A    Not that I can remember at this time.
10     Q    Are there any other reasons why the program
11          should not have given full weight to his
12          assessments, beside what you provided me
13          already?
14     A    Not that I can think of at this point.
15     Q    You know, do you at this point have any better
16          sense of what you want to do with Dr. Wallace,
17          whether you want to put him on the list or
18          not?
19     A    I would put him on the list of faculty who I
20          believe not acted in good faith.
21     Q    In a general sense, I can understand that.  I
22          have reason to -- documentation.  In terms of
23          his -- we will get to again.  In terms of his
24          assessments of you as an evaluator, that is
25          all I am focused on at this point.
```

1    A    I would say yes.

2    Q    What are the reasons you would put him on the

3         list as far as his assessments of you as an

4         evaluator?  For example, I'm not even familiar

5         with it, but I gather there must have been

6         some time you worked with him?

7    A    Um-hum.

8    Q    So go ahead.

9    A    Regarding his evaluations, I would have to

10        actually see the documents to refresh my

11        memory as to what he has written to me as far

12        as feedback.  I can remember some that were

13        positive.  There were many that were

14        satisfactory.

15   Q    The scale is 1 to 5 on various things.  I'm

16        looking at Exhibit B, if you want.  It says

17        here on the second page, explanation for score

18        of 2 out of 5 for the patient care.  I read

19        that to say you have a 1 to 5 scale?

20   A    I believe so.

21   Q    3 would be satisfactory.  4 and 5 are better

22        than satisfactory.  1 and 2 are less than

23        satisfactory, is that a fair summary of the

24        evaluation system?

25   A    Um-hum.

```
 1  Q    Yes?
 2  A    Yes, I believe so.  I would say with I don't
 3       remember at this time whether Dr. Wallace ever
 4       provided me as an individual faculty person to
 5       resident with a negative written evaluation.
 6       He may have.  I don't recall at this moment.
 7       I know there have been at least a few that
 8       were positive or satisfactory.  My reasons for
 9       putting him on that list are based more upon
10       his --
11  Q    Handling of other people's evaluations, that
12       is one example?
13  A    I'm not sure what you mean by that.
14  Q    His review of other people's evaluations with
15       you, other circumstances of that ilk is what
16       I'm getting at.  Distinct from his one
17       evaluations, his work with you?
18  A    I would say that it would be based upon his
19       behavior and actions towards me as an
20       administrative supervisor, as a boss so to
21       speak.  In my assessment of his use of his
22       position of power, to carry out other,
23       potentially other agendas not of an
24       educational nature.  I would say that his
25       verbal communications to me, regarding my
```

1   clinical work, that is clinical work that I

2   did with him, was at times distorted, appeared

3   to be influenced by his emotions.  Also his

4   use of or interpretation of evaluations or

5   performance information that he would receive.

6 Q   Can you give me any examples of when his

7   verbal communications with you were distorted?

8   I believe that was the word you used.

9 A   I think that one example would be it was a

10   situation of a patient that we had taken care

11   of together.  There was -- I can go into the

12   detail of this if you need.  There was

13   essentially a small equipment malfunction that

14   I noticed at the time it occurred.  Documented

15   it, followed up and saw the patient soon after

16   the operation to insure he wasn't harmed by

17   it.  Wrote the appropriate incident report,

18   including the follow-up with the patient.

19        But a few hours after that operation

20   concluded, Dr. Wallace called me at home,

21   essentially said you know I saw that, he

22   meaning, I, he said he had seen that

23   malfunction occur.  Accused me of covering it

24   up, or I was trying to hide it.  That would be

25   one example.

1   Q      Can you give my any other examples where he

2          communicated to you in a way that you

3          considered to involve being distorted in terms

4          of his view?

5   A      I would say another example would be during

6          that October, mid October meeting, in which a

7          large portion of most of that meeting time was

8          taken up by he accused me of misusing the text

9          paging system at the hospital.  Made an

10         accusation I was using the text page system to

11         defer work to other residents.

12  Q      The distortion was what, the accusation

13         itself?

14  A      Yes.

15  Q      Or something more specific?

16  A      I would say the accusation itself.  I would

17         say the accusation itself was in his -- the

18         conclusions that he reached regarding that

19         about me.  He clearly was having negative

20         thoughts about me, based on this accusation.

21  Q      Any other examples of him verbally expressing

22         himself in a distorted way, expressing

23         distortions?

24  A      There were other circumstances in which I felt

25         that he was either soliciting negative

```
 1          information about me, I would speculate I
 2          would guess I would say that he was, or that
 3          he was taking certain events and interpreting
 4          them in a way that could be used against me.
 5   Q      The distortion in there, that is what I'm
 6          after.  Give me some examples of him being
 7          distorted in what he was verbally
 8          communicating to you, other than the two you
 9          have given to me already?
10   A      I think as another example, I don't recall the
11          exact specifics, there was another incident in
12          which there was some discussion about how
13          quickly the on call team had responded to a
14          request for -- it was a very early morning
15          case.  Dr. Wallace as the incoming coordinator
16          of the day, would have been the incoming
17          person to receive that information, that this
18          case had just started or was ongoing as the
19          day shift was coming on.  I don't know this
20          for a fact, typically what happened is the
21          coordinator comes in, you get a report on what
22          has been going on.  If there was somebody had
23          a complaint or concern, you would hear about
24          it.
25               I think it was probably at some time at
```

```
 1         a later date I was called in to meet with
 2         Dr. Wallace and Dr. Norcia regarding this
 3         case.  It was presented to me as something
 4         that I was being criticized or blamed for.  My
 5         feeling was that Dr. Wallace would have seen
 6         this as an opportunity to create a negative
 7         report about me.  I felt he was compiling
 8         them.
 9   Q     That is a separate thing which we may get to,
10         but is there a particular distortion or
11         example that is in there you can give to me?
12   A     Yes, I would say I don't know that I can tell
13         you specifically at this time, kind of
14         specifically what the distortion was.  It was
15         certainly --
16   Q     You felt there was a distortion in there by
17         him of what the factual circumstances were?
18   A     What occurred, getting the patient to the OR
19         that would ultimately allow him to blame me.
20   Q     Are there other examples of his communicating
21         distortions to you besides these three, the
22         third one may be a category, the last one
23         having to do with on-call response time issue,
24         subject of the October meeting, arising at the
25         October meeting, the first one having to do
```

```
 1        with an equipment malfunction?
 2   A    I would say right at this moment, regarding
 3        communication I felt was distorted
 4        specifically, I'm not thinking of any right at
 5        this time.  There may be.
 6   Q    If it comes up, we talked about that.  What
 7        was your understanding -- did you have an
 8        understanding what his ulterior agenda was,
 9        besides fulfilling his responsibilities in
10        managing the program and assessing you?
11   A    I would say that there were other
12        motivations.  My experience in working with
13        Dr. Wallace was that he would intermittently
14        threaten me with termination.
15   Q    If you could, it's up to you, what I would
16        like to understand first is what you believe
17        the motive was, then why.  If there is an
18        ulterior motive, what was it that you believe
19        was motivating Dr. Wallace, besides filling
20        his responsibilities?
21   A    I would say I don't know what his motivation
22        may have been on a personal level.  I do know
23        that in the events that specifically arose
24        towards the end of 2008, then going forward to
25        2009, the timing of actions against me seemed
```

```
 1            intended to maximize the personal harm and
 2            interfere with my -- most specifically to
 3            interfere with my maternity leave in that the
 4            events and actions, were they purely motivated
 5            by a concern for patient care or my education,
 6            I don't believe would have unfolded as they
 7            did.
 8   Q   Do you have any understanding why he wanted to
 9            cause you personal harm?
10   A   I would say I don't have a specific knowledge
11            of facts.  I would be speculating.
12   Q   How do you have a -- more specifically why he
13            wanted to interfere with your maternity leave?
14   A   I would again be speculating whether that was
15            motivated by some prejudice on his part, or
16            purely a desire to not disrupt his resident
17            scheduling, I don't know.
18   Q   You know I added Dr. Hayak to the list?
19   A   Yes.
20   Q   I wanted to make sure you consciously either
21            included him or excluded him from the list we
22            are now talking about.  I don't know whether
23            because it wasn't on the piece of paper you
24            were looking at in front of you, you may have
25            missed considering him.  I wanted to make sure
```

```
 1          he's considered.  Is he someone you would put
 2          on the list of people we're now talking about
 3          or not?
 4   A      I would say no, I wouldn't put Dr. Hayak on
 5          that list.
 6   Q      I forgot to ask you a question about
 7          Dr. Norcia.  When he discussed this response
 8          time matter you referred to in October, was
 9          that the first he ever discussed that with
10          you?
11   A      Yes, I believe so.  In terms of --
12   Q      He raised the issue with you earlier in the
13          year at some point, before it arising again in
14          October, or was October the first time?
15   A      Not that I remember.  I would say October was
16          the first time it was mentioned.
17   Q      I have to do a little legalese with you.  A
18          lot of times people will say I don't recall
19          something because it could have happened, or
20          might not have happened, they just don't
21          recall.  Other times they say I don't recall
22          something, because that is their way of saying
23          it didn't happen.  Common nature.  I need to
24          know which that is.  Are you saying that you
25          can't recall it, it could have, or are you
```

```
 1        saying that in your recollection there was no
 2        prior communication between you and Dr. Norcia
 3        concerning any matter of his concerns about
 4        response time?
 5  A     To the best of my memory, the first time that
 6        was ever mentioned to me was at the meeting in
 7        October.
 8  Q     So it could have happened earlier, you just
 9        don't recall one way or the other?
10  A     Yes, but I think it's unlikely.
11  Q     If you go back to the document for a moment.
12        Turn to the next page, which is page 4.  I'm
13        going to go a little bit in backwards order.
14        Let's update number 6.  My understanding is
15        that your employment -- start that again.
16             My understanding is you are no longer
17        employed with Sheridan Health Corps?
18  A     Yes.
19  Q     That employment ended when?
20  A     October 1, 2010.
21  Q     Why did that employment end?
22  A     It was the end of my contract.  I had a one
23        year contract.  Primarily we wanted to come
24        back to Cleveland.
25  Q     It was your choice -- were you offered a
```

```
1              renewal of the contract for an additional year
2              or years?
3    A    I was.  Then subsequently that -- I was, I
4         declined.  It subsequently became not an
5         option for staffing reasons.
6    Q    What do you mean?
7    A    Had I wanted to stay, there came a point had I
8         wanted to say, I wouldn't have been able to
9         because they were fully staffed.  They hired a
10        replacement basically.
11   Q    Were you offered a renewal for an additional
12        period of time, a year or whatever you were
13        offered, a renewal beyond October 1, 2010?
14   A    Yes.
15   Q    Was that in writing?
16   A    No, I don't believe I ever got that in
17        writing.
18   Q    You turned it down for what reason or reasons?
19   A    Our plan was to return to Cleveland.  We
20        already made arrangements to return here.
21   Q    Why was it you decided to return to Cleveland,
22        instead of staying in Maryland?
23   A    There were a number of family reasons that
24        were related to the kids; schools, their
25        activities, their violin, things we really
```

```
 1              couldn't reproduce where we were.  I think
 2              that was the primary reason.  Had we had those
 3              things where I was, I might have made more of
 4              an effort to stay at Sheridan.  I think that
 5              my work there was -- I enjoyed working there.
 6              It was a good group.  I think that my starting
 7              there was made more challenging and stressful
 8              by virtue of the additional review that was
 9              necessary when I started there.  It created
10              something that I needed to overcome as a new
11              physician.
12   Q    That was a factor in your deciding to leave?
13   A    I think it affected my -- I think it had some
14              affect on my level of satisfaction there.
15   Q    In what way, how did it affect your level of
16              satisfaction?
17   A    In that it made it more difficult to establish
18              myself, particularly with the surgeons.  There
19              is a certain confidence that one wants to
20              elicit in the surgeons with whom one works,
21              that goes a long way to facilitate patient
22              care.  It made it more -- it's hard for me to
23              come up with specific examples.  It made it
24              more difficult to come in and establish myself
25              as somebody that they would feel comfortable
```

```
 1            with.  Having to come in as a new physician,

 2            with a detailed review as my kind of start

 3            there.

 4   Q    Why did it make it more difficult?

 5   A    Because the communication from UH to my

 6            understanding sufficiently impugned my

 7            professionalism, and my reliability and

 8            competency.  From what I was told the hospital

 9            was initially not even willing to look at my

10            application.  Were only willing to do so after

11            some encouragement from the anesthesia group.

12   Q    Understanding from whom, your understanding

13            from whom about communications from UH?

14   A    From Dr. Lawrence who is -- I don't remember

15            his title exactly.  I think vice president.

16   Q    I know who he is.

17   A    Also from Dr. Weiss, who was the

18            anesthesiologist in charge of the group who

19            was recruiting me.

20   Q    Any other sources of communication about --

21            start that again.  Any sources of your

22            understanding about what was communicated by

23            UH?

24   A    Other sources?

25   Q    Dr. Lawrence, Dr. Weiss, any others?
```

```
 1   A    Those were the 2 that were primarily
 2        involved.  I don't recall at this time anyone
 3        else who would have had access to that
 4        information.
 5   Q    It's your understand that the information
 6        communicated by UH to -- that came to the
 7        knowledge of Dr. Lawrence and Dr. Weiss was
 8        then communicated to the surgeons?
 9   A    There are surgeons who sit on the committee,
10        the credential committee.  While these things
11        are intended to be confidential, I don't know
12        of a specific leak or sharing of information.
13        Both Dr. Lawrence and Dr. Weiss, Dr. Weiss in
14        particular, suggested to me, yes, this is
15        intended to be confidential, this is not
16        something that should be spread through the
17        medical staff.  You know, it's not a
18        guarantee.  People talk in the locker room.
19        It's not a guarantee.  Things get around is
20        how it was described to me.  That struck me as
21        a realistic description.
22   Q    Why is that, why did that strike you as a
23        realistic description?
24   A    Because I'm aware that people don't always
25        honor confidentiality.  People gossip.
```

```
 1   Q    Was there something in the conduct or

 2        communication of any physician or -- start

 3        that again.  Is there anything in the conduct

 4        or communication of any physician with which

 5        you worked that they had an understanding what

 6        was communicated from UH?

 7   A    Would you restate that?

 8              MR. BIXENSTINE:    Go ahead, read it.

 9              (Record read.)

10   A    I would say yes.

11   Q    Tell me about it.  What was the conduct, what

12        was the communication?

13   A    There was an interaction that I had with one

14        of the cardiothoracic surgeons who was one who

15        kind of by history or reputation he would tend

16        to, if there was something that he didn't

17        like, he was apparently good friends with the

18        CEO of the hospital.  If there was something

19        he didn't like, he would go over to her office

20        and complain.  This was something I had seen

21        that would occur with various people.  When he

22        had a complaint about me, this would then come

23        back around, passed along to Sheridan.

24              The feeling from Sheridan was that they

25        had to in some ways expend so much political
```

```
 1          capital just to get the credentials committee
 2          to look at my application, consider me for the
 3          medical staff, the moment they got -- there
 4          was no one complaint that was going to create
 5          much more of an issue.  It wasn't leaving them
 6          with anymore leeway.  So it created a more
 7          difficult situation both for Sheridan, and for
 8          me.
 9   Q      Are you testifying this cardiothoracic surgeon
10          had some understanding what was communicated
11          by UH about you?
12   A      It was in response to that.  You can blame
13          this kind of creator of this flurry of
14          concerns, asking Sheridan what is this about.
15          In response to that, a number of other
16          surgeons with whom I had been working, in fact
17          were expressing a sense of -- they were
18          supporting me and essentially saying this
19          was -- saying that what occurred in the
20          credentialing committee made me unreasonably
21          vulnerable to any little concern or complaint
22          that might -- they felt it was unfair.  That I
23          was essentially being made a target based on
24          what had occurred during credentialing
25          committee.
```

```
 1   Q     Let's get back then.  We have a cardiothoracic
 2         surgeon.  My question is, do you have reason
 3         to believe he had any understanding what was
 4         communicated by UH.  You mentioned he made a
 5         complaint about you to the people at Sheridan
 6         eventually.  My question is, did he have an
 7         understanding of what was communicated from UH
 8         about you, did this cardiothoracic surgeon?
 9   A     I would have to say -- this would be I guess
10         it was hearsay, suggested to me by a second
11         party.
12   Q     That being who?
13   A     Possibly Dr. DeMarco.  I'm not absolutely
14         certain of that.
15   Q     Who else could it have been?
16   A     I can't think of who else it may have been.
17         I'm still not positive it was Dr. DeMarco.  I
18         don't remember at this time.
19   Q     Was there anything that the cardiothoracic --
20         what is his name?
21   A     Dr. Wehberg, W-E-H-B-E-R-G.
22   Q     Did Dr. Wehberg say something that told you he
23         knew what UH communicated about you?
24   A     No.
25   Q     Did he beyond complaining about something you
```

```
1          did, did he do anything else that raised the

2          possibility that he knew about what UH

3          communicated?

4   A      Not that I can recall at this time.

5   Q      How many complaints did he raise about you?

6   A      Just the one.

7   Q      Was he the only surgeon that ever raised a

8          complaint about you at --

9   A      As far as I know, yes.

10  Q      -- Sheridan.  Some individual who might be

11         Dr. DeMarco said something to you, that led

12         you to think that Dr. Wehberg knew about the

13         communication from UH?

14  A      Yes.

15  Q      What did this person in your recollection say,

16         whether Dr. DeMarco or someone else?

17  A      The gist of that conversation was that there

18         was a bit of a power struggle between

19         particularly the cardiothoracic surgery group

20         and Sheridan, which was a relatively new

21         anesthesia group for the hospital.

22                The surgeon I was talking to, I don't

23         recall which one it was, expressed the thought

24         he felt Dr. Wehberg was in this context

25         exerting influence for the sake of exerting
```

```
 1            influence.  That my coming in with this,
 2            essentially this mark on my record, made me a
 3            bit of a target.  A way of attacking
 4            Sheridan.  By being able to register that
 5            complaint, they could take back some control
 6            over the conduct of the cardiothoracic surgery
 7            service.
 8   Q   This physician that you can't recall who it is
 9        at this point, said to you he thought
10        Dr. Wehberg was raising this complaint to take
11        advantage of your vulnerability as you
12        describe it?
13   A   Yes.
14   Q   This doctor was a surgeon?  Who was this
15        doctor that told this to you, an
16        anesthesiologist?
17   A   No, one of the surgeons.
18   Q   So this surgeon you can't identify is someone
19        you believe did know about the communications
20        from UH, did know something about your what
21        did you call it extended assessment process
22        that was done with you?  What is the term you
23        used for that?
24   A   Are you referring to the credential
25        committee?
```

```
 1   Q    Yes, the more thorough credentialing that was
 2        done for you, is that what you are referring
 3        to?
 4   A    Yes.
 5   Q    This surgeon knew about the more thorough
 6        credential?
 7   A    Yes.
 8   Q    He told you he thought that is why Dr. Wehberg
 9        had raised this complaint?
10   A    Yes.
11   Q    Who is it you were saying told you that they
12        thought this credentialing process made you
13        vulnerable?  Who said that to you?  Was it the
14        same doctor or some other doctor?
15   A    The same doctor.  I mentioned Dr. DeMarco, I
16        do remember him commenting on that.
17   Q    Dr. DeMarco is?
18   A    A surgeon as well.
19   Q    He knew about the extended credentialing
20        process?
21   A    Yes.
22   Q    Is that the right term for it, extended
23        credentialing process?
24   A    It was --
25   Q    More thorough credentialing processes?
```

```
 1  A    Yes.
 2  Q    Is it your testimony Dr. DeMarco knew what UH
 3       had communicated, or just that he knew about a
 4       more thorough credentialing process?
 5  A    It was my impression that he knew something of
 6       the content of what had been communicated.
 7  Q    Your impression?
 8  A    Yes.
 9  Q    That came from what?
10  A    From comments he made about the committee,
11       about what influence that might have on my
12       standing at the hospital.
13  Q    Those comments were what?
14  A    I don't remember his words exactly.
15  Q    I'm not after that.  I'm after at least the
16       substance or thrust of them that communicated
17       to you he knew something about what UH
18       communicated?
19  A    I remember the gist of what he said was that
20       he felt that what had been communicated to the
21       committee seemed malicious.  I don't know that
22       he used that term.
23  Q    He said something to you to the effect that
24       said -- he said something to you to the effect
25       that -- let me start that.  He said something
```

```
 1        to you that you understood to convey that he
 2        thought what UH wrote was malicious?
 3   A    Yes.
 4   Q    Do you have any sense of what he said to
 5        convey that?
 6   A    Not that I'm remembering specifically from
 7        what Dr. DeMarco said.
 8   Q    Start with him then, move on.  There is
 9        somebody else we have to ask about.  What
10        about Dr. DeMarco?  What is it you recall he
11        said that conveyed to you that he thought UH
12        communicated something that seemed malicious?
13   A    He was a fairly senior surgeon at the
14        hospital.  His --
15   Q    I'm asking what he said.
16   A    I understand.  His comments were coming from
17        that perspective, that he felt that it was
18        unfair to bring in a new physician with that
19        kind of obstacle in their past to becoming
20        integrated into the care team of the
21        hospital.  So by my commenting on him being a
22        senior physician, meaning he had a perspective
23        of several decades of working at this
24        hospital, of seeing people's progress and work
25        over the years.  He felt that the transition
```

```
 1          to private practice was an important phase.
 2          It shouldn't be interfered with in a way that
 3          seemed gratuitous to him.
 4   Q     In this question we have to abide by kind of a
 5          division of labor here.  I'm happy to know
 6          about your impressions about the meaning of
 7          things and so on.  I would like to get at what
 8          you best recall he said.  Then we can talk
 9          about the context of it, so on.  There is what
10          he said, then surrounding context.  I would
11          like to get focused on what it is you recall
12          Dr. DeMarco saying that conveyed to you he
13          felt there was something seemingly malicious
14          about what UH communicated.  Let's focus on
15          what he said.
16   A     That would be again, I can't quote him
17          exactly.  That was his gist was that one has
18          graduated successfully from a residency, they
19          graduated, they means they have been deemed
20          competent.  That that should be communicated
21          and the person should we mentored into
22          practice.
23   Q     That was his gist?
24   A     Yes, his gist was he felt that what was
25          communicated to the committee was communicated
```

```
 1            negative things that did not serve any purpose
 2            in terms of the mission of the committee,
 3            which is to bring in physicians who are safe
 4            and competent.  He felt that --
 5    Q       Again are you talking about what he said to
 6            you now?
 7    A       I am trying to give you the gist of it.  I
 8            wish I could quote him quickly, that would be
 9            more succinct.
10    Q       What were the substance of his words, can you
11            do that?
12    A       I remember him talking about physicians making
13            the transition from residency to private
14            practice.  His view was this was a process
15            that one, as a senior physician, one should be
16            a mentor.  That we should -- this was
17            important to bring people into practice as
18            they come out of training.  Felt that what was
19            communicated was -- appeared to him, after
20            having worked with me for many months, it
21            appeared him to be unnecessary, gratuitous
22            interference was the gist of it.  I don't know
23            he actually used those words.
24    Q       Do you have any sense of the words he used,
25            other than your impression what they meant?
```

```
 1  A    That is the best I can do at this point.

 2  Q    What was it that, in your understanding, was

 3       communicated by UH that he was referring to

 4       from whatever source, what is your

 5       understanding of what was communicated?

 6  A    I would say my two primary sources would be --

 7  Q    We will get to the sources.  My question was

 8       what do you understand was communicated that

 9       you have the issue with?

10  A    What was described to me was that the

11       committee received damaging information about

12       me of sufficient severity to initially make

13       the committee not even move forward reviewing

14       my application.  It was stated to me that the

15       paperwork that was received from UH was in

16       fact somewhat strange because the commentary

17       or check box or assessment recorded there, as

18       was said to me, would not be compatible with

19       someone you just graduated from a residency.

20       They were saying you have someone who

21       graduated, has been deemed competent, at the

22       same time, a piece of paper that one would not

23       think reflects someone that graduated -- that

24       one would graduate from a residency.

25  Q    What we have so far is, it's been described to
```

```
 1        you there was damaging information of
 2        sufficient severity to make this committee
 3        consider not credentialing you?
 4  A     Um-hum.
 5  Q     There was paperwork that had some check box or
 6        boxes recorded that were not compatible with
 7        someone who just graduated, that is what I
 8        have so far.
 9  A     Exactly.
10  Q     Is there any other content to what you
11        understand to have been communicated by UH
12        other than that?
13  A     I was told, I've not seen this document
14        myself.  I was told that the negative
15        evaluation was fairly broad.  It was ranging
16        -- it included both issues of professionalism,
17        competency, reliability.  I don't know the
18        exact, what the categories were.  That it was
19        a very broad condemnation is what I was led to
20        believe.
21  Q     We have damaging information of sufficient
22        severity to make the committee consider not
23        credentialing you, involving check boxes on
24        records that were not compatible with somebody
25        who just graduated.  Negative communication
```

```
 1         that was fairly broad.
 2    A    Yes.
 3    Q    Anything more you understand to be the content
 4         of what was communicated from UH, other than
 5         that?
 6    A    I believe that in that context, I'm not sure
 7         it was if Dr. Weiss, my have been Dr. Weiss,
 8         had a follow-up conversation with somebody at
 9         UH.  I'm not sure whether that was Dr. Norcia
10         or Dr. Nearman, to make a follow-up phone
11         call.
12    Q    Dr. Weiss did this?
13    A    Fairly sure it was Dr. Weiss made a follow-up
14         phone call to clarify the piece of paper he
15         had just received.  During which he told me
16         there were similar opinions communicated.  I
17         don't know the specifics of that conversation.
18    Q    So we have damaging information of sufficient
19         severity to make the committee consider not
20         credentialing you.  It involved check boxes
21         recorded that were not compatible with someone
22         who had just graduated.  Involved negative
23         evidence that was fairly broad and involved a
24         follow-up conversation in which oral
25         communications were made of a similar nature?
```

```
 1  A     Um-hum.
 2  Q     Is that okay so far?
 3  A     I would say yes.
 4  Q     Is there anything more to what you understand
 5        what the communication may have been from UH
 6        than what we just discussed?
 7  A     Not that I can think of at this point.
 8  Q     The source of your understanding of the
 9        damaging information of sufficient severity to
10        make the committee consider not credentialing
11        came from who?
12  A     Dr. Lawrence and Dr. Weiss.
13  Q     The source concerning the paperwork check
14        boxes?
15  A     Dr. Weiss.  I don't know if anybody else gave
16        me information about that.
17  Q     The source for the follow-up communication
18        would have been Dr. Weiss as well?
19  A     I believe so, yes.
20  Q     Your testimony is the only surgeons that
21        raised any complaints about you concerning
22        your entire employment at Maryland was this
23        one cardiothoracic surgeon, Dr. Wheatberg?
24  A     Dr. Wehberg.
25  Q     Excuse me.  I didn't write it down very well.
```

```
 1   A      To my knowledge, yes.
 2   Q      What did you understand to have been the
 3          nature of the concern that he raised, or were
 4          you never told?
 5   A      I know what his concern was.  He and I
 6          actually discussed it at some length the day
 7          following.
 8   Q      What was the nature of the concern?
 9   A      I think the very concrete concern regarded an
10          I.V. tubing that wasn't connected, which was
11          noted and corrected immediately.  I think what
12          that raised for him was I think he had
13          concerns that there were a number of new
14          anesthesiologists, that because it was a new
15          group, they recruited several of us --
16   Q      I'm not concerned about the rest of them.  I'm
17          interested in what was his concern he
18          expressed to you about what you did or didn't
19          do?
20   A      What I'm trying to say is that the actual
21          event that raised the issue --
22   Q      Was nothing more than the connection of I.V.
23          tubing?
24   A      Yes.  I would say that was a very
25          circumscribed -- how can I -- it was not a
```

```
 1          concern that was ongoing beyond that very
 2          specific context.
 3   Q      His only concern with what you did or didn't
 4          do involved an I.V. tubing that was not
 5          connected and was corrected immediately; do I
 6          have that right?
 7   A      Yes, his concern regarding the immediate --
 8          those events that then provoked the other
 9          conversation.
10   Q      I understand.  That other conversation didn't
11          involve him.  That was other conversations you
12          had with others?
13   A      It involved him in the sense that he in
14          general had concern about having a lot of new
15          anesthesia providers, so that event with the
16          I.V. tubing prompted him to complain about
17          sort of general --
18   Q      I understand that.  I'm only concerned with
19          what he communicated to you, about you.  What
20          did he communicate to you, about your conduct
21          as an anesthesiologist, that he had a concern
22          with?  That is all I would like to know for
23          this point in time.  Can you tell me that?
24   A      He informed me he had no other concerns about
25          my practice.
```

```
1   Q    The only concern he informed you about was
2        that there was I.V. tubing that was not
3        connected, you corrected immediately.
4   A    Yes.
5   Q    You corrected it before he even told you?
6   A    I corrected it, then informed him that is what
7        happened.
8   Q    He didn't know about it until after you
9        corrected it?
10  A    Correct.
11  Q    That was the only concern he ever expressed to
12       you about your conduct as an anesthesiologist
13       the entire time you were there?
14  A    Yes.
15  Q    The only concern any physician expressed about
16       you during the entire time you worked in
17       Maryland?
18  A    Yes.
19  Q    So are you aware of any surgeon who ever
20       expressed any lack of confidence in your
21       ability, at any time, to you?
22            MR. GORDILLO:    Are you talking about
23       Sheridan?
24  Q    Sheridan, sorry.
25  A    Not that I'm aware of, no.
```

```
 1   Q    Are you aware of any anesthesiologist working
 2        for Sheridan, others of your same staff, who
 3        ever expressed any lack of confidence in your
 4        abilities to you?
 5   A    No.
 6   Q    Are you aware of any anesthesiologist that
 7        ever expressed any lack of confidence in your
 8        abilities to someone else, besides you, you
 9        heard about through the back door?
10   A    No.
11   Q    Are you aware of any surgeon who expressed any
12        lack of confidence in your ability to someone
13        else, you heard through the back door?
14   A    Not that I can -- no, no that I'm aware of.
15              MR. GORDILLO:    Is this a place we
16        can take a quick break?
17              MR. BIXENSTINE:   Sure.
18              (Recess taken.)
19   Q    Dr. Aronson, there was one little question I
20        wanted to you ask about before I move along in
21        the sequence we are doing.  Do you remember
22        this equipment malfunction matter you referred
23        to with respect to Dr. Wallace?
24   A    Yes.
25   Q    What kind of equipment are we talking about?
```

```
 1   A     It was an endotracheal tube.  There is a
 2         balloon that is deflated before the tube is
 3         removed.
 4   Q     The malfunction was what?
 5   A     The balloon didn't deflate properly.
 6               MR. GORDILLO:    Let's clarify, I
 7         think you said Dr. Wallace.
 8   Q     The issue was between Dr. Aronson and
 9         Dr. Wallace, but if I referred to you as
10         Dr. Wallace, I apologize.
11   A     I don't think you did.  It was Dr. Wallace
12         that was involved in that particular
13         interaction.
14               MR. GORDILLO:    Okay.
15   Q     Referring to a matter you raised with respect
16         to Dr. Wallace and involved an equipment
17         malfunction, you are saying that involved an
18         endotracheal balloon?
19   A     Yes.
20   Q     What is the time frame for that, as best you
21         can recall?
22   A     You mean when that occurred?
23   Q     Correct, as best you can put it in a time
24         frame?
25   A     I believe it was -- I believe it was sometime
```

```
 1              during 2009.
 2   Q    That's close enough.  We were on page 4 of the
 3        interrogatories.  Referring to Sheridan.  You
 4        are currently employed by whom?
 5   A    I'm currently employed by a company called
 6        Comp Health.
 7   Q    Comp Health?
 8   A    Yes.
 9   Q    Located where?  Location of your employment?
10   A    I'm currently working at Easton Hospital in
11        Easton, Pennsylvania.
12   Q    Easton Hospital?
13   A    Yes.
14   Q    How long have you been employed by Comp
15        Health?
16   A    Since November 1st.
17   Q    You've been employed that entire time at
18        Easton Hospital?
19   A    Yes.
20   Q    You have sought employment at various places
21        and we will get to that in a minute I think.
22        Let's go back to this.
23             Do you have any understanding of any
24        communications from UH bearing on your
25        employment at Comp Health analogous to the
```

```
 1        communications we spoke to earlier that bore
 2        on your employment in Maryland?
 3   A    There were communications.  There was
 4        receiving of verification from the residency
 5        is going to be required for credentialing with
 6        almost any employer or hospital.
 7   Q    Do you know anything about what those
 8        communications were?
 9   A    I have incomplete knowledge of what was
10        communicated to Easton Hospital.
11   Q    What do you know was communicated?  Obviously
12        I can't ask for what you don't know.  What do
13        you know was communicated?
14   A    The fact of the training extension was
15        communicated.  I believe there was some
16        reference to performance concerns and possible
17        medication use.  I'm inferring that from
18        comments that were raised by their
19        credentialing committee.
20   Q    So what comments were raised -- let me get
21        this straight.  No one has told you anything
22        about what UH communicated to Comp Health; do
23        I have that right?
24   A    I know that Comp Health -- I'm assuming Comp
25        Health has documentation from UH.
```

```
1   Q    I understand they probably do.

2   A    I don't know, I have not heard anything about

3        what it says.

4   Q    You don't know anything about what was

5        communicated in writing, you're not aware of

6        anything communicated orally as well?

7   A    To Comp Health?

8   Q    To Comp Health.

9   A    Yes, I didn't have a discussion about it with

10       anybody there.

11  Q    You were asked questions by the credentialing

12       committee, from which you drew an inference

13       that certain information was provided by UH?

14  A    At Easton Hospital.

15  Q    What questions were you asked about the

16       extension, you mentioned that as one, what

17       questions were you asked?

18  A    That committee primarily wanted to know if I

19       had anything to add to what documentation they

20       already had.

21  Q    Concerning the extension now, that is what

22       we're focused on?

23  A    Yes --

24  Q    With respect to the extension, what did they

25       ask you, if anything, with regard in terms of
```

```
 1        your being considered for employment at Comp
 2        Health?
 3   A    This wouldn't have been in relation to Comp
 4        Health, if I can explain.
 5   Q    Yes.
 6   A    Comp Health functions as a staffing agency.
 7        They do very thorough credentialing
 8        themselves.  I was already employed by Comp
 9        Health to provide services at Easton Hospital,
10        so I began at Easton Hospital on November 1st
11        with I believe they termed it locum status or
12        temporary status.  After I had been working
13        there for a month, the director there was
14        interested in me coming on as a permanent
15        staff member, so my credentials were submitted
16        to the credentials committee to become a
17        permanent staff there, as opposed to
18        temporary.
19   Q    That is what you are now, permanent staff?
20   A    Yes, I believe it is to be finalized this
21        week.  I'm still in a locums status on paper,
22        yes.
23   Q    A credentialing committee in connection with
24        permanent status at Comp Health asked you
25        questions about the extension, correct?
```

```
 1  A    The committee was from Easton Hospital.
 2  Q    Easton Hospital committee asked you questions
 3       about the extension of your residency?
 4  A    Yes, the extension.
 5  Q    Professional concerns and medical use, I
 6       wanted to start with extension first.  On the
 7       extension question what did they ask you?
 8  A    They asked me if I had anything to add.
 9  Q    To add?
10  A    To add, yes.
11  Q    They then must have told you what they had
12       already, how would you know if you had
13       anything to add unless they told you what they
14       had?
15  A    They in fact didn't tell me in detail what
16       they had.
17  Q    What did they tell you?
18  A    They had -- what did they tell me.  They I
19       believe said there was -- I have to say they
20       didn't tell me in detail.  There was some
21       comment about there was a performance concern.
22  Q    I know you mentioned performance, and medical
23       issues.  I'm interested in the reasons -- what
24       they asked you about concerning the extension
25       of your residency.  I'll get to the
```

```
 1          performance concerns and medical use.
 2  A       I can't say they asked me something
 3          specifically about the extension, the
 4          extension specifically.
 5  Q       What did they tell you about what they knew of
 6          the extension?  They asked you if you had
 7          anything to add.  What did they tell you they
 8          knew already concerning your extension?
 9  A       The fact of an extension is in and of itself a
10          flag for some sort of irregularity or issue.
11  Q       What did they tell you about the extension
12          beyond the fact that you had one?
13  A       Nothing that I'm aware of.
14  Q       They asked you if you had anything to add
15          concerning the extension?  What did you say
16          when they asked you what did you have to add,
17          what did you say about the extension?
18  A       I'm having difficulty with the question.  They
19          were not approaching me specifically about the
20          extension.  Their question wasn't specifically
21          about the extension.  It was more --
22  Q       They asked you a question about whether you
23          had anything to add, correct, you told me
24          that?
25  A       Yes.  Although perhaps that would make more
```

```
 1            sense if I gave that to you in context.
 2    Q    I just want to know what you responded when
 3         they asked you whether you had anything to
 4         add, whatever the context is, I'll get it out
 5         of your response.  What did you respond to
 6         them when they asked if you had anything to
 7         add, what did you say?
 8    A    I told them that in essence my residency was
 9         extended.  That I had an ongoing dispute with
10         my residency program.  The strength of my
11         application to their medical staff was based
12         on my work references, my Board
13         certification.  That they should consider it
14         based on those facts.
15    Q    Did you give them any explanation for the
16         extension?  If you didn't, you didn't, but did
17         you?
18    A    I don't recall whether I attempted to explain
19         or describe any details then.
20    Q    You may have, you may not have, you can't
21         recall?
22    A    I don't recall exactly whether I attempted to
23         describe that to them or not.
24    Q    Did they explain to you what performance
25         concerns they -- did they ask you to say
```

```
 1              anything related to performance concerns?
 2              Were you asked to say anything relating to
 3              performance concerns?
 4    A    No.
 5    Q    Were you asked to say anything regarding
 6              medicine use, is that the Topamax?
 7    A    Again, I didn't see those documents, but no,
 8              they did not ask me anything about medication.
 9    Q    Did you communicate any information to the
10              credentialing committee relating to your
11              Easton employment, relating to your use of
12              Topamax?
13    A    I don't think so, no.  I don't recall saying
14              anything about that.
15    Q    You supplied references to Comp Health.  Did
16              any of the references come from personnel
17              employed by UH?
18    A    I don't think so.
19    Q    Did any of the references come from personnel
20              relating to your employment in Maryland?
21    A    Yes.
22    Q    Those references were from whom?
23    A    These were the references provided to Comp
24              Health?
25    Q    Correct, thank you.
```

```
 1  A    There is a number of people that over the past
 2       months have provided references for me from
 3       Peninsula.  I'm not certain which of those
 4       provided references to Comp Health.
 5  Q    Let me ask you generically.  That's okay.  Who
 6       do you recall providing references for you
 7       from Sheridan?
 8  A    That would be Dr. Gloglover, Dr. Daugherty,
 9       Dr. Franks, Harris, Nagy I believe,
10       Dr. Onwere, O-N-W-E-R-E, Dr. Shaw,
11       Dr. DeMarco, Dr. Dudas, Dr. Todd, Dr. Mah.
12  Q    Mah?
13  A    M-A-H.  I think that is a complete list.  I'm
14       fairly sure I'm remembering all the names from
15       Sheridan.
16  Q    Which of those are anesthesiologists?
17  A    All but Dr. DeMarco, Dr. Dudas and Dr. Todd.
18  Q    DeMarco is what?
19  A    He is a urologist.
20  Q    Urologist.  Dudas?
21  A    General surgery.  Dr. Todd is cardiothoracic.
22  Q    Between the time that you were employed at
23       Sheridan, and you obtained your employment,
24       current employment with Easton Hospital, you
25       applied for employment at Hammet Medical
```

```
 1          Center, correct?
 2    A     Yes.
 3    Q     Was there any other locations you applied for
 4          employment between your Maryland employment
 5          and your Easton Hospital employment, besides
 6          at Hammet Medical Center?
 7    A     Perhaps you could specify what you mean by
 8          applied?
 9    Q     What is your uncertainty?  It seems fairly
10          straightforward to me.  I don't work in your
11          profession.  What is the uncertainty?
12    A     There were several practices that I either
13          interviewed with or spoke to, but didn't go
14          any further in terms of contract negotiations,
15          that kind of thing.
16    Q     Let start with those.  That is a good
17          distinction.  Who did you interview or speak
18          to, in terms of seeking employment between the
19          time you were employed at Sheridan in Maryland
20          and your current employment at Easton?
21    A     I spoke with the practice at Elyria  Hospital,
22          University of Toledo, Affinity in Massillon.
23          There is a group in Stuebenville I spoke with,
24          Bay City, Michigan, Springfield, Ohio,
25          Youngstown, Ohio.  I believe those are all the
```

```
 1        practices.
 2   Q    Which of those applications went to the point
 3        of someone soliciting information from UH?
 4   A    Bay City, Springfield, Hammet you already
 5        mentioned.  Did I say Michigan, Bay City?
 6   Q    Bay City, Springfield, and Hammet.  Those are
 7        the three you mentioned.
 8   A    Youngstown I'm not positive they have
 9        solicited references.  I'm not sure about
10        that.  The other ones I'm more certain they
11        started, engaged in that process.
12   Q    Are you aware of any content of the
13        communication from UH to any of those
14        institutions you mentioned that solicited
15        information from UH?
16   A    No, I've not been privy to the content.
17   Q    Did you communicate any information concerning
18        the extension of your residency to any of the
19        various facilities that you mentioned when
20        they sought information from UH or not?
21   A    Yes.
22   Q    To whom did you communicate information
23        concerning that extension?
24   A    That would be Bay City, Springfield, Hammet.
25        Those are the only ones I'm recalling at this
```

```
 1          time.
 2    Q     Did you communicate the same information to
 3          each of them, concerning the extension now?
 4    A     Approximately, yes.  I don't remember the
 5          exact wording that I used in each instance.
 6    Q     What was the information you communicated
 7          concerning the extension of these
 8          institutions?
 9    A     I communicated to them that I had an ongoing
10          dispute with my residency.  That it was likely
11          there would be negative information
12          communicated to them when they requested
13          verification of my training.  That I would be
14          available to address any concerns that might
15          arise when they received that paperwork.
16    Q     Anything further that you communicated
17          concerning your extension to those three
18          institutions besides what you just told me?
19    A     That was the gist of it.  I'm not recalling
20          any other specific information that I
21          communicated to them.
22    Q     So none of them asked you to address anything
23          as a follow-up to what you told them when you
24          said you were available to address things, no
25          one followed up to ask you to address
```

```
 1         anything; is that right?
 2    A    No, that is not right.
 3    Q    There has been follow-up from one or more of
 4         those institutions to address things as a
 5         follow-up to what you told them about the
 6         extension?
 7    A    Yes.
 8    Q    Which institutions asked you for follow-up?
 9    A    Hammet Medical Center.  With Springfield and
10         Bay City, when the issue or when I informed
11         them verbally they could likely anticipate
12         receiving something negative from UH, they
13         asked me to provide them with that same
14         statement in writing, so they could attach it
15         to my application.
16              With Hammet Medical Center, they
17         reviewed my application, decided to defer a
18         decision for a month, pending my availability
19         to come and be interviewed by the committee.
20    Q    You submitted in writing the substance of what
21         you communicated to me was your input to these
22         three institutions relating to the extension
23         of your residency, you put that in writing?
24    A    Yes.
25    Q    In a letter, three letters?
```

```
 1   A      Yes.
 2   Q      How many letters, how many institutions asked
 3          for it in writing?
 4   A      Those three I mentioned, Bay City,
 5          Springfield, Hammet.  Easton also requested a
 6          letter to accompany the application.
 7   Q      So there are four letters then you prepared?
 8   A      Yes, what I recall at this point, yes.
 9   Q      All with the same content?
10   A      I would say not precisely, but with that same
11          message.
12   Q      One page in length?
13   A      I don't remember.
14   Q      Did Hammet -- did you provide the follow-up
15          information to Hammet?
16   A      I was -- I gave them the letter.  I had a
17          conversation with the chairman of the
18          credentials committee.  We were scheduled to
19          meet the following month.  I was going to come
20          in in person, so that I could meet with the
21          credentials committee, discuss it, much as
22          what happened at Peninsula, very similar
23          scenario.
24   Q      You interviewed with whom?
25              MR. GORDILLO:    Objection, form.
```

```
1   Q     I'm sorry, I could have sworn you said you had
2         an interview with someone?
3   A     I was scheduled.
4   Q     Scheduled for an interview, but you never had
5         it?
6   A     No.
7   Q     Again, first question was I thought maybe a
8         yes or no type question.  Did you provide any
9         follow-up information to Hammet?
10  A     Um-hum, yes, I gave them a letter and had a
11        telephone conversation with the credentials
12        committee.
13  Q     You had a telephone conversation?
14  A     Yes, in anticipation of arranging this
15        interview.
16  Q     The telephone conversation was with who?
17  A     I believe his name was Dr. Scully I think was
18        his name.
19  Q     One person on the line, just you and he?
20  A     Yes.
21  Q     In that telephone conversation, did you
22        communicate anything concerning the
23        circumstances of your extension of residency
24        at UH?
25  A     I don't recall that I discussed with him
```

```
 1        specifics of events at UH.  Our discussion
 2        centered more around the fact that I was
 3        engaged in a dispute with UH.  That if there
 4        was a concern about my performance, that I was
 5        providing him with references of people who
 6        worked with me in order to give him some
 7        reassurance.
 8   Q    So you never told him in this conversation
 9        anything concerning your employment as a
10        resident at UH besides the fact you had a
11        dispute with them?
12   A    As I said, I don't recall discussing with him
13        the specifics of how that dispute evolved.
14   Q    That may be on topic, could by innumerable.
15        I'm interested in whether or not you had any
16        conversation with this Dr. Scully, concerning
17        your residency at UH, besides that you had a
18        dispute with them?
19   A    I don't recall that I did.
20   Q    In the conversation with Dr. Scully, there was
21        no information you provided him concerning
22        your residency at UH, other than the fact you
23        had a dispute with them, concerning that
24        residency, dispute with UH, fair enough?
25   A    So far as I remember, yes.
```

```
 1   Q     Have you ever told anyone outside of UH

 2         concerning -- and outside of your family,

 3         outside of counsel, put those aside, put

 4         counsel aside, Miss Ayers aside, your kids

 5         aside, UH personnel aside.  Have you ever

 6         communicated to anyone else anything

 7         concerning the extension of your residency?

 8   A     I believe that I discussed it with Dr. Weiss.

 9   Q     Dr. Longfellow?

10   A     I'd forgotten about him.  I communicated some

11         information to Dr. Longfellow, that was an

12         attempt to -- yes.

13   Q     Is he in the list, or not at this point?

14   A     Yes, he was on the list.

15   Q     You communicated information concerning the

16         extension of your residency to Dr. Longfellow

17         and Dr. Weiss, any others?

18   A     Regarding the extension.

19   Q     Is that too technical?  I'll make it broader.

20         Did you communicate anything to anyone other

21         that counsel, your family, UH personnel,

22         concerning the circumstances of your residency

23         at UH?

24   A     Well, regarding the extension and

25         circumstances of the extension itself, and the
```

```
 1          circumstances of my residency, I would be
 2          required to provide information about that.
 3    Q     To whom?
 4    A     Any licensing agency.
 5    Q     And you did?
 6    A     Yes.
 7    Q     To whom?
 8    A     That would be the Maryland Medical Board, the
 9          Michigan Medical Board, the Federation
10          Credentials Verification Service, which is
11          part of the Federation of State Medical
12          Boards.  I would -- I believe that when I
13          credentialed with Comp Health for example I'm
14          fairly sure I had to make some statement about
15          that.  Although I'm not positive.  You would
16          think it would be in their paperwork
17          somewhere.  I would have discussed it with the
18          physician who was recruiting me in
19          Springfield.  The physician recruiting me in
20          Bay City.  The physicians recruiting me from
21          Hammet, because it's a fact that requires
22          explanation.
23    Q     What is, the circumstances of your extension?
24    A     The extension in and of itself.
25    Q     The extension in and of itself, that is our
```

```
 1        topic, good enough.
 2   A    So there well may be others.
 3   Q    Who at Springfield?
 4   A    The physician who was recruiting me there was
 5        Dr. Mishra.
 6   Q    Who at Hammet?
 7   A    Mike Simon.
 8   Q    Bay City?
 9   A    That would be Dr. Chapetta.
10   Q    Chiapetta?
11   A    Chapetta.  At Easton, Dr. Wilson.
12   Q    Did you say the same thing to everyone in
13        substance?
14   A    I guess could you perhaps clarify that?
15   Q    Which part?
16   A    To everyone?
17   Q    Correct.  Dr. Weiss, Dr. Longfellow,
18        Dr. Mishra, Dr. Simon, Dr. Chapetta,
19        Dr. Wilson, the Maryland Medical Board, the
20        Michigan Medical Board, the Federal
21        Credentials Verification Service and Comp
22        Health, if you happen to have written them?
23   A    I would say no.  It wasn't exactly the same to
24        all of those.
25   Q    In substance, difference in substance?  Did
```

```
 1        you communicate concerning the extension in

 2        and of itself in writing to the Maryland

 3        Medical Board, the Michigan Medical Board,

 4        Federal Credentials Verification Service and

 5        Comp Health, if you did it, would that have

 6        been in writing?

 7   A    I believe, yes.

 8   Q    You kept copies of that?

 9   A    Not in all circumstances.

10   Q    Why not?

11   A    For example with the Maryland licensing

12        process, when I was in the process of

13        obtaining my Maryland license, I had to write

14        a statement to the company -- it was a form --

15        I don't remember exactly.  A form or something

16        I had to write.  I kept a copy of it until the

17        license was approved.  I don't think I

18        retained a copy of what I wrote.  I may have.

19        I don't know that I made a point of doing

20        that.  Once the license went through, it was

21        not --

22   Q    What did you say to -- what do you recall

23        saying in any letter concerning the extension

24        in and of itself, residency extension?  Pick

25        the first letter you can recall, tell me what
```

```
 1        you recall saying in it.
 2  A     With the Maryland Medical Board, I chose to
 3        frame it as a medical problem because I felt
 4        that would be the least damaging to my
 5        professional standing.
 6  Q     How did you do that, what did you say, what
 7        did you write?
 8  A     To the best of my memory I said in essence,
 9        I'm not quoting, that I had a transient
10        medical issue that caused me to lose some
11        training time, and graduation was delayed.
12        That it was no longer an issue.
13  Q     Did you say something different than that in
14        substance either in writing or orally to
15        anyone else of the group of individuals, I can
16        list them for you again if you need me to?
17  A     Yes.  I would say that my description changed
18        at later dates.
19  Q     What do you recall saying at a later date that
20        was different and to whom?
21  A     At a later time, I communicated that I felt
22        that the extension of my -- I'm not sure I
23        said that.  I communicated that my residency
24        would likely write negative things about me as
25        I mentioned before.  In essence that there was
```

```
 1            a training extension that I didn't feel was a
 2            valid one, was still an issue under active
 3            dispute.
 4   Q    Who did you write that to, or say that to?
 5   A    Dr. Mishra, Springfield Hospital, Bay City,
 6            maybe Dr. Chapetta, Easton, Dr. Wilson,
 7            Hammet, Dr. Simon.  Again possibly
 8            Youngstown.  I'm not certain about that, how
 9            far along in the process I got with them.
10   Q    The Michigan Medical Board and the Federal
11            Credentialing Verification Service, what did
12            you say to them concerning the extension?
13   A    I should correct that with Michigan.  I don't
14            believe that they needed any information.
15            They just needed verification of all my other
16            licenses.  The Michigan Medical Board I don't
17            think needed a residency verification.  I
18            would take that off the list.
19                 The Federal Verification when I
20            addressed this question with them, I would
21            like to say year, year-and-a-half ago, I don't
22            remember exactly when, there was a point at
23            which I provided them with the medical
24            explanation essentially as I did with Maryland
25            I think.  I'm pretty sure that is how I
```

```
 1              described it to them.  I believe it was a
 2              while ago, I believe.
 3     Q    Was the medical explanation an honest
 4              explanation even if you disputed the need for
 5              the extension?
 6     A    I think it was at the time.  Those
 7              communications were really right in the midst
 8              of when I was still in residency, attempting
 9              to negotiate this somewhat rocky professional
10              stretch.  It was an honest attempt to explain
11              what was occurring.  It was at the time I was
12              attempting to keep an open mind about why this
13              was occurring.  I think that it was.  Yes, I
14              would say that it was.
15     Q    An honest explanation?
16     A    It was an honest explanation in a situation
17              that was somewhat in flux.
18     Q    Was it a truthful explanation, even if you
19              disputed the need for the extension?
20     A    I would say it was truthful in the sense that
21              the medical issue may well have just been
22              fatigue.  I don't know that -- no, I don't
23              think it was attributable to the medication,
24              no.
25     Q    You don't think what was attributable to the
```

```
 1        medication?
 2   A    I'll say that I dispute whether there was a
 3        significant performance problem, but --
 4   Q    I understand you dispute the need for the
 5        extension.  My question is, were you being
 6        truthful when you said the extension was due
 7        to a transient medical issue?
 8   A    I would say no, I don't think the extension
 9        was due to a transient medical issue.  I think
10        that there may have been a transient medical
11        issue that drew the attention of my
12        supervisor, which subsequently resulted in the
13        extension.
14   Q    Are you saying that when you told the Maryland
15        Medical Board that this extension was due to a
16        transient medical issue that caused you to
17        miss training time, there are no remaining
18        issues, you were not being truthful; do I
19        understand that right?
20   A    No, I still think that is an accurate --
21   Q    I didn't say accurate.  I said truthful.
22   A    Yes, I believe I was being truthful, yes.
23   Q    Were you being truthful when you said the
24        extension was due to a transient medical
25        issue, even if you disputed the need for the
```

```
 1      extension?
 2  A   No, I still don't think that was accurate.
 3  Q   You were not being truthful?
 4  A   No, I'm not saying that.
 5  Q   You are either truthful or not, aren't you?
 6      Is there somewhere in between?
 7           MR. GORDILLO:    Objection.
 8  A   I don't agree with your rephrasing of the
 9      statement.
10  Q   Which statement?
11  A   That a transient medical issue caused the
12      extension.
13  Q   What did you tell the Maryland Medical Board,
14      let's make sure we get that back in our frame
15      of mind.  We can go get it out of the record,
16      either way?
17  A   I believe, might be -- I'd be happy to see it
18      if I have it there --
19  Q   What did you tell the Maryland Medical Board?
20  A   I indicated that there was a transient medical
21      issue that caused me to lose some training
22      time, therefore graduation was delayed.
23  Q   Was that truthful?
24  A   Yes.  Which is I think slightly different from
25      what you then subsequently said.
```

```
 1    Q    In what respect is that different?
 2    A    As I've said, I feel there may have been a
 3         transient issue that gave my supervisors
 4         opportunity to take an adverse action against
 5         me.
 6    Q    When you refer to a transient medical issue
 7         that caused you to lose training time, what
 8         training time are you referring to that you
 9         lost?
10    A    The six months they took credit away for.
11    Q    I wanted to make sure we're on the same page
12         here.  All right.  I want to ask you now about
13         the fitness for duty evaluation.
14    A    Um-hum.
15    Q    That is my topic.  You were taken off work for
16         what day for purposes of that, or date, do you
17         remember?
18    A    Not precisely, but it was a day or two before
19         Thanksgiving I believe.
20    Q    How soon after your meeting with Dr. Norcia
21         and Dr. Wallace were you taken off duty for
22         purposes of the fitness for duty evaluation,
23         was it the day after?
24    A    I believe the following day.
25    Q    How soon after that was the fitness for duty
```

```
 1        testing completed, December 4th?
 2   A    That sounds correct to me, if that is the date
 3        you have there.
 4   Q    It's not a test.  I'm seeing how quickly we
 5        can go.  I'll bring out documents if you need
 6        it.  You couldn't guess.  If you have
 7        uncertainty, we will deal with it.  It's not a
 8        test here.
 9             Was there any delay in getting the EAP
10        fitness for duty process going between the
11        25th I believe when you were taken off duty
12        and the 4th when it was completed, any delay
13        --
14             MR. GORDILLO:    Objection,
15        foundation.
16   Q    -- that you are aware of?
17   A    No, I don't think there was a delay.  Maybe it
18        took a couple of days.  I think that seemed a
19        reasonable time frame.
20   Q    You had a final visit with the evaluator on
21        December 9th; is that right?
22   A    Sounds roughly correct, yeah.  The following
23        week.
24   Q    Did you have any further communications with
25        EAP representatives concerning the fitness for
```

```
 1        duty test between the 9th and when you
 2        returned to work?
 3   A    Yes.
 4   Q    What do you recall of those communications?
 5   A    I recall -- you asked an EAP individual,
 6        right?
 7   Q    I don't want to be technical here.  Was the
 8        fitness for duty test conducted by EAP
 9        representatives or people retained by EAP, not
10        part of EAP, I don't want to get caught in a
11        thing here, whatever you need to tell me.
12            There was a process -- let's start this
13        again.  This process of getting a fitness for
14        duty was conducted through the EAP program,
15        correct?
16   A    Correct.
17   Q    So what I'm interested in is whether you had
18        any communications concerning the fitness for
19        duty testing with EAP representatives, or with
20        the people who did the testing if they were
21        not part of the EAP program, between the 9th
22        of December, your last meeting with the
23        evaluator, and when you returned to work later
24        in December?
25   A    Yes.
```

```
 1   Q    Tell me what you recall.  First of all, how
 2        many communications do you recall having?
 3        Let's get that out first, the number, we will
 4        go each one?
 5   A    I communicated with the EAP nurse, the
 6        coordinator.  I'm not sure her title.  I
 7        communicated with Will Rabello.
 8   Q    He's part of the EAP program?
 9   A    No, he's the GME manager.
10   Q    We will get to that.  My question is focused
11        on your communications with people who are
12        within the EAP program itself, or involved in
13        fitness for duty testing itself.
14   A    That would be just Jill Fulton-Royer.
15   Q    You recall conversations, at least one, with
16        Jill Fulton-Royer between December 9th, your
17        final visit with the evaluator and when you
18        returned to work later in December?
19   A    Yes, e-mail and I believe a telephone
20        conversation as well.
21   Q    What do you recall of the -- one telephone
22        conversation, more than one?
23   A    I don't remember.
24   Q    As best you can recall of your telephone
25        conversation or conversations, whichever it
```

```
 1         was with Miss Fulton-Royer, what do you recall
 2         talking to her about?  Again between the 9th
 3         and when you returned to work later in
 4         December?
 5    A    My agenda was to find out when I was going to
 6         return to work.
 7    Q    I'm sure you had that agenda.  I am interested
 8         in what you communicated with Miss
 9         Fulton-Royer?
10    A    I communicated to her that I met with the
11         psychologist.  He had at least verbally to me
12         cleared me with no restrictions.  I wanted to
13         know when that would be officially
14         communicated so I could return to work.  She
15         said to me that she had spoken with
16         Dr. Wallace.  That she didn't really see what
17         the rush was to get me back to work because
18         Dr. Wallace already told her I wasn't going to
19         be graduating anyway.
20    Q    Go ahead.
21    A    That they had not yet received the written
22         report, or they had not gotten -- I don't
23         remember exactly.  There was a paperwork thing
24         that was pending.
25    Q    You understood from Miss Fulton-Royer you
```

| 1 | | couldn't be released until this paperwork was |
| 2 | | completed? |
| 3 | | MR. GORDILLO:     Objection. |
| 4 | A | Yes.  That the neuropsychologist's findings or |
| 5 | | his report had to be reviewed by the relevant |
| 6 | | people, signed off before I could be assigned. |
| 7 | Q | That happened on the afternoon of the 15th |
| 8 | | when the written report was finally, or |
| 9 | | official clearance was provided by the EAP to |
| 10 | | the residency program. |
| 11 | A | I didn't have personal knowledge of that, it |
| 12 | | being the 15th.  Yes, that sounds correct.  I |
| 13 | | believe I was contacted on the 16th, informed |
| 14 | | on the 16th, perhaps it happened on the 15th. |
| 15 | Q | Okay.  Your best recollection was it was the |
| 16 | | afternoon of the 15th when EAP released you to |
| 17 | | return to work? |
| 18 | A | I don't recall exactly.  Yes, I believe it was |
| 19 | | somewhere in there. |
| 20 | Q | Then by the next evening, the 16th, there was |
| 21 | | a plan for putting you back to work in place; |
| 22 | | is that right? |
| 23 | A | My memory is the afternoon, sometime in the |
| 24 | | afternoon of the 16th was when I got a |
| 25 | | response, that things had been received, that |

```
 1            I would be going back to work.  That sounds
 2            correct to me.  Again, I would have to see my
 3            e-mail, those things, to confirm that.
 4    Q     As I say it is not a test.  One document I am
 5            going to show you I have to get.  This one I
 6            can.
 7                    (Defendant Exhibit C
 8                     marked for identification.)
 9    Q     I'm handing you what is marked as Deposition
10            Exhibit C.  If you turn, we're going to go
11            over this in a little more detail.  The
12            document itself.  I wanted to focus on the
13            question about returning to work first.  I
14            want to point your attention to paragraph six.
15    A     Um-hum.
16    Q     Are you comfortable based on review of
17            paragraph six the testing was completed the
18            4th, your final visit with the evaluator was
19            the 9th, and that a plan for returning you to
20            work was provided on the evening of the 16th?
21    A     Yes, I would say that looks --
22    Q     As far as time off that was counted, I know
23            you have certain rules about how much time you
24            can take over one year, three years, I've
25            forgotten which.  In terms of that metric, the
```

```
 1           time off are you allowed to take during your
 2           residency, that time off then stopped on the
 3           16th, from that point on you were back
 4           officially within the residency?
 5   A       I'm not positive of the exact dates.  I want
 6           to say I went back on the 18th.  I'm not sure
 7           if there is a weekend in there.
 8   Q       You are right.  We could check that out.
 9   A       It would have stopped the day I actually went
10           back to work.
11   Q       How do you know that?
12   A       Because I didn't work the 16th.
13   Q       There are plenty of days during your residency
14           you don't work, that are not counted against
15           you.  You don't work seven days a week during
16           your residency, correct?  Sometimes.  The
17           point is, you may take days off at various
18           times during your residency because you're not
19           scheduled for that day?
20   A       Correct.
21   Q       You are still part of the residency.  I'm
22           asking you whether it's fair to say as far as
23           the time counted against that 60 days, three
24           years restraint you had as a resident, whether
25           that time stopped being counted against that,
```

```
 1              days stopped being counted against that at the
 2              end of the day on the 16th, even if you didn't
 3              work the 17th?
 4    A    No, I would have to stay it stopped the day I
 5              go back to work.  Might have been there was a
 6              weekend, I don't know.  I'm not back at work
 7              until I'm back at work.  I don't think there
 8              were any subsequent days, but I'm not
 9              positive.
10    Q    Was there availability to work on the 17th you
11              wanted, you couldn't get?
12    A    I don't remember.  I would have to look at a
13              calendar.
14                   MR. BIXENSTINE:   Let's take a break.
15                        (Recess taken.)
16    Q    I'm showing you a calendar here.  I believe
17              that the 16th was a Tuesday.  Do you need my
18              help with where to find it?  December 2008.
19    A    Are you saying it's the 16th?
20    Q    I believe the 16th of December 2008 was a
21              Tuesday?
22    A    So if I'm reading this calendar correctly,
23              that would be correct.  I went back to work --
24    Q    On Thursday, the 18th.
25    A    So the 17th, that is when the clock stopped,
```

```
 1        when the days off --
 2   Q    You know that from adding up all the days you
 3        had left, calculation of what you had going
 4        into the next year, you know the 17th was
 5        actually counted as a day off for the purpose
 6        of the ACGME restraint, you know that?
 7   A    That was my understanding at the time.  If I
 8        didn't work, it would have been a day off.
 9   Q    Was there anything that anyone could have done
10        to make that processing faster, the one that
11        went from the 25th of November through the
12        return to work on the 18th?
13              MR. GORDILLO:    Objection,
14        foundation.
15   Q    That you are aware of, anything that could
16        have been done?
17   A    My opinion is that there could have been more
18        of an effort to communicate with the
19        psychologist, obtain the report, sign off on
20        it.
21   Q    Am I correct in my understanding that as the
22        process worked it was not within the -- that
23        the residency program was not actually
24        entitled to communicate with anyone within the
25        EAP or the assessing psychiatrist about this?
```

```
 1              MR. GORDILLO:    Objection,
 2        foundation.
 3   A    That's correct.
 4   Q    Are you saying that the EAP people should have
 5        communicated to get that written result out
 6        faster, is that what you are saying?
 7   A    I believe the residency program could have
 8        communicated with EAP, encouraged them to
 9        speed the process.
10   Q    In what way could the process have been sped
11        up?
12   A    By obtaining the information from the
13        psychologist.
14   Q    The written statement you mean?
15   A    Whatever information they needed to sign off
16        on, get me back to work.
17   Q    Was it your understanding that it was a
18        written statement from this psychologist that
19        the EAP needed to release you?
20   A    My understanding at that time was that that is
21        what they were waiting for, or that is what
22        was needed.
23   Q    The written statement was what was needed?
24   A    Yes.
25   Q    By the EAP program, in order to issue the
```

Page 127

```
 1        release?
 2  A     I don't know their exact procedures.
 3  Q     So you are critical of the residency program
 4        for not pressuring the EAP to get the release
 5        to them faster?
 6  A     Yes, that would be a criticism, yes.
 7  Q     Did you mention you had one conversation with
 8        Jill Fulton-Royer, verbally.  You had e-mails
 9        with her between the 9th and the time you
10        returned to work?
11  A     I think I did.  Again I don't have my copy of
12        my e-mails in front of me.  I believe I either
13        e-mailed her directly or she was copied on
14        e-mails to other involved individuals.
15  Q     What steps did you take to pressure the EAP to
16        get its release out faster?
17  A     Aside from my telephone conversation --
18  Q     Right.
19  A     -- with Jill.  I think, I'm not positive, I
20        would have to see them, I believe that as I
21        was making -- there were several e-mail
22        communications expressing the similar concerns
23        to Dr. Norcia and to Will Rabello.  I believe
24        Jill was also copied on at least some, if not
25        all of those e-mails.  In a sense I was
```

Page 128

```
 1            including her in that request to facilitate
 2            the process.
 3    Q      If it's the EAP that has to release you, why
 4            weren't you sending the e-mails to their
 5            attention directly, as opposed to copying them
 6            on e-mails to the residency program?
 7    A      I may have also e-mailed her directly,
 8            although I'm not positive.  I would have to
 9            say that my rational I think, or my thinking
10            at the time, was that the EAP was intending to
11            act as a liaison.  It's not going to be
12            particularly -- they are intended to be a
13            neutral party.  I certainly was very clear
14            with Jill.  I don't remember the exact method
15            of my communicating with her.  It was clearly
16            communicated to her, my sense of urgency.
17    Q      How, not on the phone?
18    A      Largely in the telephone conversation.
19    Q      Okay.  We went over that.
20    A      I felt it was also going to be important to
21            engage the residency program in helping to
22            move things along.
23    Q      What did you -- I understand.  You believe the
24            residency program could put pressure on the
25            EAP to get the report out?
```

```
 1   A    Yes.
 2   Q    Your understanding was that the residency
 3        program, Dr. Nearman, Dr. Norcia, Dr. Wallace
 4        did not put any pressure on the EAP at all,
 5        that is your understanding?
 6   A    Not to my knowledge.
 7   Q    You think that was from some inappropriate
 8        motive that they didn't do that?
 9   A    Yes.
10   Q    The motive was?
11   A    I think the two that immediately come to mind
12        is my upcoming leave.  That this was going to
13        directly interfere with it.  And I felt that
14        Dr. Wallace at least wanted to cause me
15        professional harm.
16   Q    How was the timing of your return to work
17        going to interfere with your leave?
18   A    The simple answer is that every day of that
19        involuntary leave was consuming vacation days
20        that I had saved specifically for my maternity
21        leave.  I had saved those days so that I could
22        take a maternity leave, without going beyond
23        the maximum number of days that were allowed
24        to be away from training.  Of those days that
25        I had saved up, for every day that I was out
```

```
 1        on involuntary leave, that number of days
 2        available to me were diminished.
 3   Q    You mean you weren't going to be able to take
 4        this leave?  You mean that if you stayed out
 5        any longer, you could not -- you would be --
 6        UH would withdraw your entitlement to take
 7        FMLA leave, is that what you are saying?
 8   A    It would create a penalty to me to take the
 9        leave.
10   Q    The penalty would be what now?
11   A    I would have to make up those days.
12   Q    To make them up.  You would have January and
13        February, assuming you graduated in the end of
14        February, to make those days up; is that
15        right?
16   A    No, I would have to extend my training beyond
17        the end of February to make those days up.
18   Q    Who is it that told you that?
19   A    I guess that would the American Board of
20        Anesthesiology.
21   Q    You checked with them?
22   A    Yes, those are published rules.
23   Q    The published rules don't allow you to work
24        extra days in January or February?
25   A    That would be possible, but would generate a
```

```
 1            hardship in terms of working weekends and

 2            nights with a baby at home.  The hardship that

 3            should not have been created.

 4                     (Defendant Exhibit D

 5                      marked for identification.)

 6   Q    I've handed you what is marked as Deposition

 7        Exhibit D.  Have you ever seen this before?

 8   A    Yes.

 9   Q    This was an assessment provided to Sheridan by

10        Dr. Norcia on your behalf in September of '08?

11   A    That's correct.

12   Q    Dated September 2, '08, is that your

13        understanding when it was actually prepared?

14   A    Yes, that's my belief.

15   Q    Do you have -- are you aware of any other

16        assessments of this nature that Dr. Norcia

17        provided on your behalf between then and the

18        following calendar year?

19   A    I don't believe I used him as an individual

20        reference.

21   Q    The answer is you are not aware of any

22        between, assessments Dr. Norcia provided on

23        your behalf between September 2nd and sometime

24        in the following calendar year?

25   A    Not outside of those he would have provided as
```

```
 1        program director.
 2   Q    None on your behalf personally is what you are
 3        saying?
 4   A    Not that I remember, no.
 5   Q    You mentioned something about working too many
 6        hours at some point or other?
 7   A    Yes.
 8   Q    That was when?  I didn't get to ask you about
 9        the specific time frame for this.
10   A    The details of the dates I believe we included
11        in one of the documents we previously
12        submitted.  I think the dates in question are
13        in October primarily.
14   Q    How many extra days could you work in October,
15        beyond the maximum permitted on the ACGME
16        rules?
17   A    I would have to refer to what I previously
18        submitted.
19   Q    You weren't over by much, were you?
20   A    How would you define over?
21   Q    Over the ACGME limit, you weren't over by
22        much?
23   A    I guess I'm not sure if I understand what you
24        are saying.
25   Q    It was a very small amount of time you went
```

```
 1        beyond the ACGME limit in October; isn't that
 2        right?
 3  A     No, I wouldn't agree with that.
 4  Q     A substantial amount of time?
 5  A     I guess you would have to define what you mean
 6        by not much and substantial.
 7  Q     In your mind, your understanding of
 8        substantial, was it a substantial amount of
 9        time in your understanding of the term?
10  A     Yes, in my opinion that was a substantial
11        amount of time.
12  Q     How about September of '08, did you have
13        overage in that month?
14  A     I don't remember exactly what -- when we wrote
15        it up for the documents I was going through my
16        calendar, counting.  I believe there were some
17        excessive hours in September.  I'm not -- I
18        can't remember the specifics without seeing
19        what I wrote out.
20             MR. BIXENSTINE:   Off the record.
21             (Discussion had off the record.)
22             (Defendant Exhibit E
23              marked for identification.)
24  Q     Handing you what has been marked as Deposition
25        Exhibit E, which I understand to be the
```

```
 1           complaint.  If you turn to page 4, I think I
 2           understand where the information is provided.
 3   A       Yes.
 4   Q       So, is paragraph 28 then a truthful statement
 5           of the number of hours you worked in the month
 6           of October?
 7   A       Yes, to the best of my knowledge.
 8   Q       How far does that exceed the ACGME maximum for
 9           the month?
10   A       An 80 hours per week limit, average over four
11           weeks would be 320.
12   Q       Correct.  So it certainly would be fair to say
13           that even if you took and added this was
14           October -- which is a little under half a
15           week, if you added on a little under a half a
16           week in there.  It's 80 per week, maximum?
17   A       Um-hum.
18   Q       So say 35 for three days out of seven, a round
19           number, you come up to 355, 320 plus 35?
20   A       I'm not sure I understand.
21   Q       The month of October has 31 days, right?
22   A       Correct.
23   Q       Four weeks is 28 days.  That leaves three more
24           days in the next week, three-sevenths of a
25           week.  So you have 80 times 4 is 320 hours for
```

```
 1            four weeks.  Then three-sevenths of another
 2            80, correct?  For the three days beyond four
 3            weeks that are in the month of October?
 4    A       Go on.
 5    Q       Three-sevenths of 80 is a little over 33.
 6            Let's call it 33, correct?  Three-sevenths of
 7            80 is a little over 33?
 8    A       Probably need to confirm that.
 9    Q       You divide 7 into to, you get 11, to 77.  You
10            get 11 pieces.  11 for each day and three
11            days, 33.  Fair enough?
12                 MR. GORDILLO:    Objection.  You are
13            asking her to confirm your math?
14                 MR. BIXENSTINE:   Sure, you've got a
15            problem with that?
16    A       That would be a little less than half of 80.
17    Q       I said 33, reasonable?
18    A       I would say that sounds reasonable.
19    Q       You add 33 to 320, you come up with 353?
20    A       Yes.
21    Q       You worked 362?
22    A       Um-hum.
23    Q       So you are saying you worked nine hours too
24            much, correct, approximately nine hours; is
25            that right?
```

```
 1   A     Yes.
 2   Q     Would you call that a substantial breach of
 3         the rules, nine hours?
 4   A     Yes, I feel in effect it was.
 5   Q     What was the overage for -- I don't know that
 6         there is enough in here to refer to an overage
 7         for September.  Maybe there is.  Your best
 8         recollection you had an overage for September
 9         as well?
10   A     Yes, it's in the complaint.
11                 (Defendant Exhibit F
12                  marked for identification.)
13   Q     I've handed you what has been marked as
14         Deposition Exhibit F.  Do you recognize this
15         document?
16   A     Yes.
17   Q     Your signature?
18   A     Yes.
19   Q     Am I correct from this document that you
20         actually had a duty to notify them if your
21         hours violated the limits, notify the
22         residency program?
23             MR. GORDILLO:    Object to the form of
24         the question.
25   Q     Did you have a duty to notify the residency
```

```
 1        program if your hours exceed the ACGME limits?
 2  A     We were required to provide this data, yes.
 3  Q     You were also required to contact the program
 4        director, if there was a no answer to any of
 5        those questions, correct?
 6  A     Yes.
 7  Q     Did you do that for September, notify the
 8        program director?
 9  A     No.
10  Q     Why not?
11  A     In September, in the intensive care unit we
12        were trying a different schedule that was
13        essentially the following month was
14        abandoned.  In trying to construct a different
15        work schedule, we were trying having
16        individuals doing night shifts and day shifts,
17        rotating shifts in an effort to meet the
18        service demand, while trying to give people a
19        little bit more time off.  So there was, I
20        think, for the most part, a collaborative
21        attempt to work out a different schedule
22        during September.  It was not my -- I was not
23        concerned at that point if there were some
24        weeks that I worked longer or less or more
25        days in a row or not.
```

```
 1              So yes, I wasn't tallying up the hours
 2         so to speak for myself, during that month.  It
 3         wasn't something I felt needed to be
 4         communicated to the residency.
 5              In general, throughout the residency
 6         there may have been some weeks I worked more
 7         hours, some weeks I worked less.  My general
 8         attitude, these things usually balance out.
 9         It wasn't my tendency to file complaints or
10         create trouble or rock the boat.  It all kind
11         of evens out in the end.  If I got stuck one
12         week being there late, the next week it will
13         all kind of even out.
14              At this time it wasn't something I was
15         concerned about.  The number of hours became a
16         concern to me when I felt that it was being
17         used against me.
18    Q    It was being used against you?
19    A    When I felt that I was under attack, I went
20         back to look at those dates that were cited,
21         realized that the time period for which I was
22         being criticized was a time period in which I
23         was working well beyond what was acceptable.
24         At that point it became important to me to
25         actually count it up.
```

```
 1   Q     Have you given me a complete answer to the

 2         question, is that complete?

 3   A     Yes.  In terms of clarifying my statement on

 4         this form, yes.

 5                 (Defendant Exhibit G

 6                  marked for identification.)

 7   Q     I've handed you what has been marked as

 8         Deposition Exhibit G.  That is the same

 9         document for the month of October that you

10         prepared and signed.  Is that yours?

11   A     Yes, it is.

12   Q     Did you report this overage?

13   A     Well, I think again, this is --

14   Q     Can you answer yes or no to that question?

15   A     I did report?

16   Q     Correct, it says at the bottom if you answered

17         no to any of the above questions, please

18         contact your program director or the graduate

19         medical education office.  Did you do either

20         of those?

21   A     Yes, in the sense this form is turned into the

22         residency program.

23   Q     Did you do anything beyond turn the form in?

24   A     No at that time I did not.

25   Q     Did you ever raise an issue about your hours
```

```
 1          with anyone?
 2  A       With anyone at any time?
 3  Q       Correct.
 4  A       I did inform ACGME.  Again this was at a later
 5          date when I realized the correspondence
 6          between the criticisms that Dr. Norcia raised
 7          and what my working hours were at the time.
 8  Q       Did you inform anyone else besides ACGME of
 9          this later date you are referring to?
10  A       I may have informed Dr. Shuck.  I'm not
11          certain about that, whether I just
12          communicated it to ACGME.
13  Q       You communicated it to ACGME, you may have
14          communicated to Dr. Shuck, but you're not
15          sure, anyone else?
16  A       Not that I recall.
17                  (Defendant Exhibit H
18                   marked for identification.)
19  Q       Do you recognize the document I handed you as
20          Deposition Exhibit H?
21  A       Yes.
22  Q       Who is Michael Jordan?
23  A       Michael Jordan is an attorney.
24  Q       Was he providing you legal representation at
25          the time?
```

Page 141

```
 1  A    I'm sorry, did you say was he?
 2  Q    Was he providing you legal representation as
 3       of the time this document was prepared?
 4  A    I believe he was.
 5  Q    The letter specifies that there is going to be
 6       six additional months of your residency; do I
 7       understand that correctly?
 8  A    Yes.
 9  Q    So the residency would ordinarily end the end
10       of February, now was going to end the end of
11       August according to this?
12  A    Yes.
13                (Defendant Exhibit I
14                 marked for identification.)
15  Q    Handing you what I've marked as Deposition
16       Exhibit I.  Do you recognize this document or
17       the document that this is a copy of, not a
18       very good one?
19  A    I don't remember ever seeing this document
20       before.
21  Q    Did you meet -- I'm looking at the first
22       paragraph.  Did you meet with Dr. Wallace and
23       Dr. Norcia to discuss your current prospective
24       to make plans for the next six months clinical
25       schedule, approximately early February?
```

1      MR. GORDILLO:    Take the time to see

2      the whole document.

3  Q    Please, take your time.

4  A    Could you repeat what your question was?

5  Q    Yes.  Did you meet with Dr. Wallace and

6      Dr. Norcia in early February to discuss your

7      plans for the six month schedule that was

8      going to start March 1st?

9      MR. GORDILLO:    Objection,

10      foundation, go ahead.

11  A    I do remember meeting with them to discuss the

12      schedule.  I don't recall the date, although I

13      do recall it was before March 1st.  I would

14      have to --

15  Q    Let me if see if I can give you another

16      anchor.  Was it before or after you signed the

17      resident Fellowship contract for the six month

18      period?

19  A    That I don't know.

20  Q    Was there a discussion about the fact that you

21      would be entitled to an additional ten days of

22      vacation and three meeting days as referred to

23      in that paragraph, the first paragraph?

24  A    Yes, I remember, I can remember receiving

25      information about that again.  I don't

```
 1          remember if it was at this meeting.  I do
 2          remember getting information about that.
 3   Q      Did you agree to a six month schedule that
 4          would include cardiothoracic, vascular, neuro
 5          anesthesia, ICU, pediatrics and an elective
 6          month in which you expressed an interest in
 7          doing TEE?
 8   A      Yes, I would say that is accurate.
 9   Q      TEE stands for what?
10   A      Transesophageal echocardiography.
11   Q      We will stick with TEE.
12               Was the arrangement that you and
13          Dr. Wallace would decide on the sequence of
14          rotations so that you would get the best
15          experience and accommodate your schedule?
16   A      It was planned that Dr. Wallace and I would
17          arrange, discuss the sequence.
18   Q      Did you have a discussion about having missed
19          a previously scheduled Metro trauma rotation?
20          I'm reviewing the document itself to see to
21          what extent there is anything that is accurate
22          or inaccurate in it.
23   A      There was a conversation about Metro.  I don't
24          remember exactly at this time why it didn't
25          happen when it was scheduled, what the
```

```
 1          interference was subsequently.  We did have a
 2          conversation about it.  I do remember that it
 3          was eventually decided that it wasn't
 4          necessary.
 5   Q      Could that conversation have occurred in early
 6          February?
 7   A      It's possible.
 8   Q      You don't recall?
 9   A      I don't recall exactly.  It is possible.
10   Q      Did you have a discussion about having
11          logged -- do you have a discussion about the
12          fact that if you had logged 20 trauma cases,
13          then it was your choice about whether you
14          would incorporate Metro trauma into your six
15          month schedule?
16   A      Yes.  Again I do remember having a discussion
17          about that at some point.
18              Do you recall having a discussion about
19          being excused to attend the Society of
20          Cardiovascular Anesthesiologists meetings and
21          workshops April 17 to April 22?
22   A      Yes.
23   Q      Had you tentatively signed up for those days
24          on the anesthesia scheduling system, as
25          referred to in the letter?
```

```
 1   A    I think that is possible.  I don't remember
 2        exactly.  I think that is possible.
 3   Q    Do you recall being asked about your
 4        perspective on how you were performing in a
 5        meeting with Dr. Wallace and Dr. Norcia as
 6        referred to in the beginning of the next
 7        paragraph?
 8   A    Again, I think that is possible.  What I
 9        remember about this meeting was largely the
10        scheduling rotation issue.  I don't remember
11        specifics of what we discussed in terms of the
12        performance.
13   Q    Did you refer to having requested feedback
14        from a Dr. Parks as referenced in the letter?
15   A    I don't remember.  I do remember requesting
16        feedback from Dr. Parks.  I don't remember
17        discussing that with Dr. Norcia or
18        Dr. Wallace.  That did happen.  I did request
19        feedback from Dr. Parks.  It is possible I
20        brought it up in the meeting.
21   Q    Did they encourage you to request verbal
22        feedback at the end of the day, so that it
23        would be timely and interactive as discussed?
24   A    Yes, I can remember Dr. Wallace saying
25        something to that effect.  Whether it was at
```

Page 146

```
1          this meeting or another time --
2   Q   Do you remember whether you decided at this
3          meeting you would meet on a monthly basis
4          around the middle of the month, as referred to
5          in the final paragraph?
6   A   That sounded correct.
7   Q   You don't recall seeing this document itself I
8          think was your testimony?
9   A   Right, I've not seen this document before.
10              (Defendant Exhibit J
11               marked for identification.)
12  Q   I've handed you what has been marked as
13         Deposition Exhibit J.  Do you recognize the
14         document this is a copy of?
15  A   Yes.
16  Q   Did you know at the time you signed this
17         document whether or not under ACGME rules you
18         might be able to satisfy your ACGME
19         requirements by the end of June?
20  A   No.
21  Q   Why not?
22  A   That is ABA you are referring to I believe.
23  Q   It is an ABA requirement?
24  A   Yes.
25  Q   Thank you for educating me in that.  You
```

```
 1          didn't know about that at the time?
 2  A       No.
 3  Q       Were you not familiar with ABA rules when it
 4          came to this sort of issue?
 5  A       I was not familiar with their rules to that
 6          level of detail.
 7                  (Defendant Exhibit K
 8                   marked for identification.)
 9  Q       I've handed you what has been marked as
10          Deposition Exhibit K.  Do you recognize this
11          e-mail stream?
12  A       Yes.
13  Q       By the way, I have a little uncertainty.
14          There are two pages.  The second and third
15          page, do they belong with this stream, are
16          they an attachment to anything, or were they
17          attached by me by mistake?
18  A       I don't see that.
19  Q       They don't associated with this e-mail at all?
20  A       Not that I'm aware of.
21  Q       Let's remove those from the exhibit.  Have the
22          exhibit consist of the e-mail itself.
23              Can you describe for me the
24          circumstances leading up to you proposing the
25          schedule that is set forth in the February 24,
```

```
 1          2009 e-mail, that is circumstances pertaining

 2          to your scheduling of your rotations?

 3   A      I see something that doesn't make sense.  In

 4          that previous memo that you gave me that I had

 5          not seen before, that was dated February 4th.

 6   Q      Correct.

 7   A      References the Metro and not needing to go to

 8          Metro.  But, my e-mail here from the 24th

 9          indicates that at least at this point on the

10          24th I still believed Metro was a requirement.

11   Q      A requirement?

12   A      Yes.

13   Q      I thought you were proposing this as your

14          schedule, I didn't realize --

15   A      I was proposing this as a sequence of events.

16          I would not have included Metro as part of the

17          sequence if I did not think I was required to

18          include it.

19   Q      I'm perplexed about that.  Let me ask.  You

20          indicated that you had committed to doing ICU

21          as part of your schedule.  I don't see ICU

22          down here.  Am I missing it?  Maybe I'm not

23          reading it correctly?

24   A      You are not missing it.  I don't seeing it

25          there either.  I don't recall exactly the back
```

```
 1        and forth.  There were a couple of different
 2        proposed sequences of versions during this
 3        time period.  So, I don't recall exactly when
 4        the conversations about Metro took place.
 5              Also there was my belief when I made
 6        out the schedule, I must have been under the
 7        impression at this point that I wasn't
 8        required to be in the ICU again.  There were
 9        conversations that went back and forth, do I
10        need to put ICU in or not, Metro or not.
11        There were other e-mails and conversations.
12        This may be a fragment.
13   Q    You recall conversations about whether you
14        needed to do ICU or not?
15   A    Yes, but I'm not recalling the specifics.
16   Q    Wasn't the October situation that was pointed
17        to, correctly or incorrectly, I think your
18        view incorrectly, as grounds for the
19        unsatisfactory evaluation and ICU rotation?
20   A    Yes.  Although I can also recall Dr. Norcia
21        saying to me when I spoke to him in December,
22        saying he wasn't concerned about my ICU work.
23        That at some other later point I believed
24        there was a point at which I was told that ICU
25        was not going to be in the mix of these
```

```
 1            months, then it came back in.  I think there

 2            were some various -- this changed a few times.

 3  Q    If you were told at some point that ICU was

 4            not necessary, then it came back on, what do

 5            you recall about the circumstances of it

 6            coming back on?  First tell me when the time

 7            frame is it came back on, then tell me what

 8            you recall of the circumstances?

 9  A    I do remember when it came back.

10  Q    I'm not interested in when it came back.  I'm

11            interested in when you had discussions about

12            it coming back.  Then what the circumstances

13            of those discussions were.

14  A    The circumstances of it coming back as part of

15            my schedule was soon after I requested some

16            days off for an adoption.

17  Q    Is it your testimony that the first time you

18            discussed ICU coming back on your schedule was

19            after you requested the days off for your

20            adoption; is that your testimony?

21  A    My testimony is that in this context of these

22            last few months of my residency training, the

23            ICU rotation reappeared soon after I made that

24            request.  As I said, there was some

25            uncertainty as to whether or when I was going
```

```
 1         to be doing the ICU preceding that.
 2              MR. BIXENSTINE:    Can you read back
 3         the question, please?
 4              (Question read.)
 5    Q    Are you saying you don't understand that
 6         question?
 7    A    Yes.
 8    Q    There was a time you requested days off for
 9         adoption, correct, that was a point in time?
10    A    Yes.
11    Q    There is a time when there was an initial
12         first discussion of ICU coming back onto your
13         rotation, it was off, now it's back.  A time
14         for that, right, there has to be, there is
15         always a first time for everything, correct,
16         you may not know when it is, but there is; is
17         that fair?
18    A    Yes.
19    Q    There is a T1 time, requesting the time off
20         for the adoption.  A T2 time, the first time
21         you discuss ICU coming back on the schedule.
22         I want to know is it your testimony that T2
23         occurred after T1?
24    A    I guess my difficulty in giving you a yes or
25         no answer to that question is that as I said,
```

```
 1        the discussion about ICU was --
 2   Q    Ongoing?
 3   A    -- ongoing.  Was also for a period of time in
 4        there quite vague.
 5   Q    So you can't identify a particular start time
 6        for ICU coming back because it wasn't
 7        necessarily ever off?
 8             MR. GORDILLO:     Objection.  Is that
 9        fair?
10   A    I would rephrase that.
11   Q    Go ahead.
12   A    During that time period starting in March and
13        August, there was a period of time in there
14        when I guess maybe I should say between
15        February and August, there was a period of
16        time during which I thought that I was going
17        to be required to be in the ICU.  A period of
18        time when I thought, I was under the
19        impression I was not required to be in the
20        ICU.  There was also times in there, I don't
21        know if I have documentation of this, I was
22        communicating with either Dr. Wallace and
23        Dr. Norcia, or the chief resident, about
24        whether I was going to be in the ICU and what
25        is going on with the whole ICU question.
```

```
1              There was confusion in there.  It was not on
2              my schedule as a set thing.  Then I requested
3              the FMLA for my adoption.  Soon after that, I
4              was informed that I would be in the ICU during
5              those two weeks during which I requested the
6              adoption.  That was --
7    Q    That is your recollection?
8    A    Yes.
9    Q    What does L-I-V-E-R stand for?
10   A    There is a call schedule for the liver
11             transplant time.
12   Q    Liver transplant?
13   A    Yes.
14   Q    If you see liver on your schedule, what would
15             that mean?
16   A    That would mean that whatever else one was --
17             if I'm remembering right -- whatever else one
18             was doing during the day, you would be on the
19             scheduled as a person to be on call, would be
20             notified if there is a liver transplant going
21             to occur.
22                  (Defendant Exhibit L
23                   marked for identification.)
24   Q    And I hand you what is marked as Deposition
25             Exhibit L.  You may notice that in this stream
```

```
1            it incorporates the last document I gave to
2            you, starting at the bottom of the page?
3     A      Yes.
4     Q      So do I understand correctly from this that,
5            three days after the February 24th e-mail of
6            yours in which ICU is not on the schedule, you
7            put it back on?
8     A      Yes.  That was probably, I couldn't remember
9            the exact sequence, probably had a
10           conversation with -- my guess is with
11           Dr. Norcia, about whether I needed to put, did
12           that need to be on the schedule.  Something to
13           that effect.  So as of the 27th I was back
14           under the impression I needed to do ICU.
15    Q      You have a recollection of a conversation with
16           Dr. Norcia between the 24th and 27th about
17           this?
18    A      I don't have a clear recollection of the
19           conversation.  My e-mail would suggest that I
20           had revised information as of the 27th that --
21           I can remember having some exchanges with him
22           that are, I don't remember when or where.
23    Q      You have a recollection of exchanges with
24           Dr. Norcia about ICU but you can't remember
25           when they happened?
```

```
 1   A     No, I don't.  This would imply to me --

 2   Q     Is that fair?

 3   A     Yes, it was probably in this time frame.

 4   Q     Then a week after that, you moved the ICU

 5         portion of your schedule from April to June?

 6   A     Yes, that looks correct.  Although, I don't

 7         know this was a final where we ended up.  Yes.

 8   Q     I assume you have no recollection of why you

 9         moved it from April to June?

10   A     My recollection is that it had more to do with

11         family obligations.  I don't remember exactly

12         what.

13   Q     Metro, what is Metro again, what is going on

14         with respect to Metro, that is trauma care,

15         correct?

16   A     Yes.

17   Q     I understand what ICU stands for, intensive

18         care unit.  I guess I don't know exactly is

19         Metro trauma lab, trauma center?

20   A     Metro Hospital.

21   Q     Is that a specialized ICU then that focuses on

22         trauma, or something different?

23   A     No, it's an anesthesia rotation, but because

24         Metro is the regional trauma center, you would

25         get more clinical exposure.  We had a rotation
```

```
 1          there.
 2   Q      If you have it slashed like this, does that
 3          mean first half of the month doing one, next
 4          half doing the other?
 5   A      Yes, that would be correct.
 6   Q      As of March 3, your proposal was to do Metro
 7          for the first half of August, ASU for the
 8          second?
 9   A      Yes.
10   Q      ASU stands for?
11   A      I'm not sure exactly what the letters stand
12          for, but it's outpatient surgery.
13                  (Defendant Exhibit M
14                   marked for identification.)
15   Q      I have handed you what is marked as Deposition
16          Exhibit M.  I'm hoping this may do something
17          with your recollections about the
18          communication at this time concerning your
19          schedule.
20                  MR. GORDILLO:    The last page looks
21          like it's out of sequence.
22                  MR. BIXENSTINE:  So it is.  Let's take
23          that off.  Looks like it stands on its own.
24          Doesn't belong in the chain.  Hold on to it,
25          to I am going to mark this separately.
```

```
 1                    (Defendant Exhibit N

 2                    marked for identification.)

 3   Q     I will hand you Deposition Exhibit N, which is

 4         another e-mail related to this whole process.

 5         You have before you Deposition Exhibit M,

 6         which is two-page document.  You also have

 7         Deposition Exhibit N which is a one-page

 8         document.  Now what I'm seeing, I need you to

 9         comment on, explain to me, is how you have ICU

10         in April as a revised scheduled you are

11         proposing in a February 27th e-mail.  Above

12         that dropping ICU to June in a March 3rd

13         e-mail.  On the 12th, asking confirmation that

14         you are in ICU in April.  Then finally on the

15         14th getting an e-mail back from Dr. Wallace

16         that April won't work for ICU.  Do you recall

17         what was going on at that time based on this

18         sequence of events?

19   A     I do recall that this was -- I seem to

20         remember this was a mistake on my part.  I was

21         trying to clarify where I was working, and

22         when.  When I looked to see what I should be

23         expecting or asking about, I looked at the

24         wrong revision, which is what I was referring

25         to when I said there was a little bit of back
```

```
 1            and forth as to what the sequence of events
 2            was going to be.  When Dr. Wallace attached
 3            the more recent proposal back to me, I said
 4            that's right that was the more recent one.
 5            That is what that was about.
 6   Q    Is it fair to say that at least as of the
 7            middle of March, ICU was on your schedule for
 8            June, Metro was on your schedule for August?
 9   A    Yes, I would say that was the plan at that
10            time.
11   Q    What happened to June ICU then, you did not do
12            ICU in June?
13   A    No.
14   Q    What happened that led to that not happening?
15   A    I don't remember why that didn't happen.
16                (Defendant Exhibit O
17                 marked for identification.)
18   Q    I'm handing you what has been marked as
19            Deposition Exhibit O.  Do you recognize
20            Exhibit O as a letter confirming that you have
21            been approved for FMLA leave?
22   A    Yes, I recognize this.
23                (Defendant Exhibit P
24                 marked for identification.)
25   Q    I'm handing you what is marked as Deposition
```

```
 1        Exhibit P.  Do you recognize the e-mail at the
 2        top of the page?
 3   A    Yes, I do.
 4   Q    The purpose of your communication was to have
 5        Dr. Norcia find a way to fit additional days
 6        into your schedule to make up for days you
 7        were going to take as FMLA leave, that would
 8        go beyond the ACGME leave authorization for
 9        your residency, is that what is going on here?
10   A    Again, it is the ABA that sets those.
11   Q    Thank you.  I made that mistaken twice, ABA 60
12        day limitation.
13   A    Yes.  I was attempting to find out whether
14        there were additional shifts or ways that I
15        could make those days up.
16   Q    Were you provided the additional shifts that
17        you needed?
18   A    I believe.  There were some additional shifts
19        that were scheduled.
20   Q    Did you take all of the FMLA days that you
21        needed to take?
22   A    No.
23   Q    The reason you didn't take them all was why?
24   A    Because I would have had to make them up.
25        There were some shifts that were available.
```

```
1              It was difficult working extra shifts with
2              being a resident and having three kids at
3              home.
4    Q    What FMLA days off did you want that you
5              missed, that was going to happen, that you
6              were not able to do?
7    A    I remember that for the adoption itself I took
8              a half a day, so I would have a minimum amount
9              of time I would have to make up at another
10             point.  I believe that's -- I think that was
11             the only FMLA time I used.
12   Q    Was there some -- you say you were given some
13             opportunities in terms of extra times to work,
14             but because of family commitments you were
15             unable to take those days, did I say that
16             right?
17   A    I don't remember the specifics in terms of how
18             many hours or when, but I do remember that it
19             appeared far too difficult to try to make use
20             of that approach.
21   Q    It was difficult simply because of why?  The
22             kids I assume, or family, can you explain
23             further?
24   A    This was my last month of residency
25             presumably.  I was in the process of moving my
```

```
 1          family to Maryland.  There were a lot of other
 2          obligations.
 3   Q      Obligations outside of the work you mean?
 4   A      Yes.
 5   Q      Moving your family, so on, so forth?
 6   A      Yes.
 7                 (Defendant Exhibit Q
 8                  marked for identification.)
 9   Q      I've handed you what has been marked as
10          Deposition Exhibit Q.  There is a stream of
11          e-mails here.  I would like to start with the
12          most recent.  Also have P in front of you.
13          You are asking Dr. Norcia about finding ways
14          of working -- of getting make up days on July
15          9.  Two days earlier you are asking whether
16          you had been scheduled in Metro in August?
17   A      Um-hum.
18   Q      You are asking that of Christine Damovich and
19          Marin Manex, who are those people?
20   A      Chris is the residency coordinator.  Marin was
21          the chief resident at the time.
22   Q      What role do they have in the scheduling
23          process, as far as you understood it?
24   A      They both played administrative roles.  Marin
25          was, she was in charge of the call schedule
```

```
 1            under Dr. Wallace's supervision.
 2   Q    In charge of the call schedule?
 3   A    Yes.  She would by extension have to at least
 4        keep track of who was doing what rotation
 5        when, so that the call schedule would
 6        correspond to that.
 7   Q    She kept track of rotations and also set the
 8        call schedule?
 9   A    Yes.
10   Q    Who set the rotation schedule?
11   A    That would be Dr. Wallace primarily.
12   Q    How do you know that?
13   A    That was one of his roles.
14   Q    As far as you knew?
15   A    Yes.
16   Q    So you were asking about being scheduled at
17        Metro.  He responded and asks if you have done
18        a trauma rotation?
19   A    That was Marin who was responding.
20   Q    Correct, excuse me, she.  Forgive me.  You
21        responded you were bumped in January from
22        Metro?
23   A    Um-hum.
24   Q    Then she says you are on Metro for the first
25        two weeks and ICU for the second two weeks,
```

```
 1         correct, that is the stream of the e-mail?
 2    A    Yes.
 3    Q    How was it that ICU got moved from June to the
 4         last part of August?
 5    A    I don't remember how or why that happened.  I
 6         don't remember why it disappeared from June.
 7         I don't remember what occurred there.
 8    Q    For reasons you don't recall at this time, you
 9         didn't do it in June?
10    A    Right.
11    Q    So if you didn't do it in June, did you
12         understand in June that you didn't have to do
13         it anymore?
14    A    I don't remember.  I don't remember.  What I
15         do remember is that when I got this e-mail
16         saying I was going to do it in the second two
17         weeks of August, it came as a significant
18         surprise.
19    Q    Why was that a surprise if all that was left
20         as of mid July would have been sometime in
21         August?  You were already in July, so you knew
22         you weren't doing ICU in July?
23    A    Correct.
24    Q    You hadn't done it in June?
25    A    Correct.
```

```
 1   Q    Where else could it go?
 2   A    Exactly.  What I recall, I don't recall what
 3        occurred, why it didn't happen in June, but
 4        my --
 5   Q    I don't want you to guess now.
 6   A    I won't guess.  I do remember being very
 7        surprised with this e-mail.
 8   Q    Where did you expect the ICU to happen?
 9             MR. GORDILLO:    Objection,
10        foundation.
11   A    I am thinking I was under the belief that it
12        had been taken off the list of required things
13        to do.
14   Q    Do you have any idea how?
15   A    I don't remember how that -- as I said, I
16        don't remember why it didn't happen in June.
17   Q    So you don't are remember why it didn't happen
18        in June.  You don't remember -- you have a
19        belief you no longer had a requirement to do
20        it, but you don't remember how that happened?
21   A    Right.
22   Q    Why do you have the belief you were no longer
23        required to do it?  That is not a fair
24        question.
25             Why did you at the time as of here in
```

```
 1        July, have a belief that you were no longer
 2        required to do it?
 3  A     I don't remember how that dialogue happened.
 4  Q     So you get this thing from Marin, do you have
 5        any idea how it got placed on the August
 6        schedule, how it became part of your August
 7        schedule after you didn't do it in June?
 8  A     My impression at the time was that, that was
 9        Dr. Wallace's decision.
10  Q     What gave you that impression?
11  A     He was the faculty person that directly
12        supervised the schedule.  That was not only
13        the last two weeks of my residency, but the
14        time period in which we were planning the
15        adoption.
16                (Defendant Exhibit R
17                 marked for identification.)
18  Q     I am handing you what is marked as Deposition
19        Exhibit R.  It refers to a discussion between
20        you and Dr. Norcia about revising the
21        schedule?
22  A     Um-hum.
23  Q     It purports to summarize the discussion that
24        you and he had.
25  A     Yes.
```

```
1    Q    It asks you to confirm that those are the
2         terms of a change to your schedule he was
3         going to put in place?
4    A    Yes.
5    Q    I thought you said Dr. Wallace was in charge
6         of the schedule, this is coming from
7         Dr. Norcia?
8    A    Yes.
9    Q    Are they both in charge, one can be in charge
10        whenever they want to, how was your
11        understanding of how it worked, if you had
12        one?
13   A    I can't say I can speak directly how they
14        divided it up.
15   Q    Scheduling?
16   A    Scheduling, however this response from
17        Dr. Norcia was after I wrote a fairly strong
18        letter to Dr. Shuck, who then I believe
19        communicated that to Dr. Norcia, who in
20        response to that arranged the schedule as you
21        see.
22   Q    Did you first communicate directly with either
23        Dr. Wallace or Dr. Norcia about the desire to
24        get your schedule changed before going to
25        Dr. Shuck?
```

```
 1   A     I don't recall exactly.

 2   Q     You don't know whether you did or not?

 3   A     Correct.  I don't remember whether I included

 4         Dr. Norcia directly in my communication with

 5         Dr. Shuck.

 6   Q     I'm not asking that.  I'm asking why you, or

 7         did you communicate first with Dr. Norcia and

 8         Dr. Wallace separate and apart from Dr. Shuck,

 9         before then turning to Dr. Shuck?

10   A     Did you say why?

11   Q     I might have.  I fouled up the question.

12             Did you communicate with Dr. Norcia or

13         Dr. Wallace, separate and apart from

14         Dr. Shuck, concerning your scheduling concerns

15         before raising your concerns with Dr. Shuck?

16   A     I don't recall.

17   Q     You might have?

18   A     It's not impossible.  I don't recall.

19   Q     Do you have some reason to believe that

20         Dr. Norcia or Dr. Shuck were unwilling to

21         alter your schedule, except after getting a

22         letter that you wrote to -- start that again.

23             Are you saying that either Dr. Norcia

24         or Dr. Wallace were unwilling to change your

25         schedule unless you complained to Dr. Shuck
```

```
 1          first?
 2   A      Yes.
 3   Q      What reason did you have for having that
 4          conviction at that time?
 5   A      Dr. Wallace had, because of previous
 6          interactions with him, had been essentially at
 7          least what was communicated to me, he was
 8          essentially removed from playing a role in my
 9          education or supervision.
10   Q      You understand that to include scheduling?
11   A      It was -- I think there are certain
12          administrative things that can't be avoided.
13          But, so he was still in charge of the
14          schedule.  If one is a cog in the wheel, is
15          going to have some role there.  However this
16          was -- he took an action with my schedule in
17          response to the FMLA request and also I think
18          because of my impending graduation.
19               In any case, because of the history
20          leading up to that particular event, I felt it
21          necessary to communicate with Dr. Shuck in
22          order to protect myself.
23   Q      You've offered me an explanation for not
24          communicating with Dr. Wallace.  What is your
25          explanation for not communicating first with
```

```
 1          Dr. Norcia?
 2   A      I'm not positive I didn't communicate with
 3          Dr. Norcia.  I think I would summarize it by
 4          saying that my residency program was becoming
 5          increasingly hostile environment.  I felt that
 6          I needed to go outside the department to
 7          address concerns such as these.
 8   Q      What is it that occurred that connected up for
 9          you your request for FMLA leave to a
10          scheduling in August that you were surprised
11          by?
12   A      The timing.
13   Q      Timing of scheduling, is that what you mean?
14   A      Yes, the timing of the decision to be in the
15          ICU.
16   Q      It occurred after you requested FMLA leave?
17   A      Yes.
18   Q      Any other reasons in your understanding that
19          connect Dr. Wallace's decision about your
20          scheduling, when it caught you by surprise,
21          besides timing, that you know about?
22   A      Not that I can think of at this point.
23   Q      Were you able to satisfactorily establish your
24          schedule for the remainder of your residency
25          with Dr. Norcia in the aftermath of the e-mail
```

```
 1        that is marked there someplace as Deposition

 2        Exhibit R?

 3   A    I believe so, yes.  Although again here it is

 4        July, we seem to, all of us seem to still

 5        think Metro was necessary.  I don't remember

 6        exactly when that conversation happened that

 7        Metro was not necessary.  I was going to put

 8        this away.  Perhaps this will help.

 9             (Defendant Exhibit S

10              marked for identification.)

11   Q    Does the e-mail communication I marked as

12        Deposition Exhibit S do anything to refresh

13        your recollection about how your scheduling

14        was ultimately set up for the month of August?

15   A    Yes, I do remember this e-mail.  Because as I

16        remember, even after this July 15th e-mail,

17        there was some difficulty trying to figure out

18        what to do with Metro, and so it must have

19        been sometime after this e-mail that we

20        discussed that it wasn't necessary.  This

21        would be July 21st.

22   Q    Was the schedule four August ultimately set up

23        to your satisfaction?

24   A    I believe, yes.

25   Q    I have a document here, I finally put two and
```

```
 1          two together.  I'm going to ask what it is.
 2                  MR. BIXENSTINE:   Can we take a quick
 3          break?
 4                  (Recess taken.)
 5                  (Defendant Exhibit T
 6                   marked for identification.)
 7   Q    Handing you what is marked as Deposition
 8          Exhibit T.  Is this a statement what was
 9          submitted with your Maryland application -- in
10          support of your Maryland license that you
11          referred to earlier, that was a statement that
12          included a reference to a transient medical
13          problem?
14   A    Yes, I recognize this.
15                  (Defendant Exhibit U
16                   marked for identification.)
17   Q    Do you recall a document I marked as
18          Deposition Exhibit U?
19   A    Yes.
20   Q    Do you recall the circumstances where you
21          signed this?
22   A    Yes.
23                  MR. GORDILLO:     Let's make a
24          stipulation about that.
25                  MR. BIXENSTINE:   It's going to be off.
```

```
 1          I'll stipulate that I don't believe that was

 2          part of the original.  I don't know, it may be

 3          the only copy I have.  I can certainly through

 4          wonders of technology get rid of it, and I

 5          will.  The original will not have the

 6          highlighting on it.

 7                    MR. GORDILLO:     Why don't we

 8          stipulate the original didn't have it, that

 9          way you don't have to worry about that.

10                    MR. BIXENSTINE:    Correct, I'll

11          stipulate the original did not have it.

12  Q     What were you saying?

13  A     I remember this document.

14                    (Defendant Exhibit V

15                     marked for identification.)

16  Q     I've handed what you what has been marked as

17        Deposition Exhibit V; do you recognize this

18        document?

19  A     Yes, I do.

20  Q     What is it?

21  A     This was a letter that I submitted to

22        Dr. Norcia, to Dr. Nearman, possibly

23        Dr. Shuck, in response to a meeting I had with

24        Dr. Norcia and Dr. Nearman.  Let me correct

25        that.  This was written in response to the
```

```
 1          letter I received on January 7th.
 2    Q     Unsatisfactory performance letter, didn't I
 3          show that to you already?
 4    A     Yes.  But I believe I wrote this prior to the
 5          meeting I had with Dr. Nearman and
 6          Dr. Norcia.  I'm not certain of the sequence.
 7    Q     It was in the aftermath of the receipt of
 8          Deposition Exhibit H, which is the January 7,
 9          2009 letter?
10    A     Yes.
11    Q     Were you being truthful and honest when you
12          said I will comply with whatever plan is
13          ultimately recommended by the committee?
14    A     Yes.
15    Q     Is it true at your meeting with Dr. Norcia and
16          Dr. Wallace in November concerns were raised
17          about quote, cognitive difficulties, unquote,
18          is that true, the last part of the paragraph
19          after the introduction?
20    A     Can you restate?
21    Q     Is it true at the meeting you had with
22          Dr. Wallace and Dr. Norcia at the end of
23          November, they raised concerns about cognitive
24          difficulties?
25    A     Yes.
```

Page 174

```
 1   Q    Did the medication you were taking, I believe
 2        the name was Topamax, have an affect on your
 3        performance -- let me start again.
 4             Were you being truthful and honest when
 5        you stated that Topamax had an affect on your
 6        performance as set forth in the second full
 7        paragraph of the letter?
 8   A    Yes, but with a clarification.
 9   Q    Okay.  The clarification would be what?
10   A    In retrospect I don't feel the medication was
11        having a significant affect on my performance.
12             At this time, when I wrote this letter,
13        I was in a situation of having been presented
14        with a very serious adverse action, with no
15        access to any appeal, or any other way of
16        addressing or having my concerns or my
17        viewpoint heard on this topic.  I was
18        attempting here, and I believe in some other
19        communications, to communicate that I was open
20        to a dialogue on this subject.  I was
21        attempting to be cooperative with the
22        residency, to decrease antagonism.  I would
23        hope at least be able to professionally
24        survive the rest of the residency.  I had few
25        options at that point.  I was not in a
```

```
 1          position of power.
 2    Q     Were you being truthful and honest when you
 3          stated here that you by January 7th, were
 4          aware of a subtle recovery in your verbal
 5          skills and speed of execution since
 6          discontinuing the medication at the end of
 7          November?
 8    A     I don't think in retrospect that is true.
 9          Again, I was trying to find some conceptual
10          middle ground with my residency leadership to
11          find some kind of compromise.
12    Q     You are not saying you were deliberately
13          misrepresenting yourself, are you?
14    A     No.
15    Q     You are saying you deliberately said something
16          that was not true, or are you saying it is
17          just not true as you look at it now, you
18          believed it to be true at that time?
19    A     I believe it to be possible at the time.  I
20          was trying to keep an open mind.
21    Q     Possible.  The words as I read them are, I am
22          now aware of the subtle recovery of my verbal
23          skills and speed of execution since
24          discontinuing the medication at the end of
25          November.  Did you truthfully believe that
```

```
 1          statement at the time you wrote it?
 2    A     I was also considerably less sleep deprived by
 3          that point.
 4    Q     That is not my question.
 5    A     I was willing at the time to attribute that to
 6          the medication.  But --
 7    Q     I'm not asking whether you were willing.  I'm
 8          asking were you truthfully aware at the time
 9          you wrote this, of a subtle recovery in your
10          verbal skills and speed of execution since
11          discontinuing the medication, were you or were
12          you not?
13    A     Yes, but again with clarification.
14    Q     That clarification is?
15    A     That I don't know that the medication had
16          anything to do with it.  I was looking for a
17          simple explanation at the time.  I don't know
18          that truly was the explanation.
19    Q     You didn't know at the time it was the
20          explanation, is that your testimony?
21    A     I thought perhaps at the time it was.  I was
22          willing to go with that explanation if it
23          would be helpful.
24    Q     Even though you didn't believe it?
25    A     I would say I guess I'm not clear what you
```

```
 1         mean, say that again.
 2   Q     Did you believe as of January 7th, that the
 3         subtle recovery in your verbal skills and
 4         speed of execution since discontinuing the
 5         medication at the end of November was
 6         attributable to discontinuing the medication,
 7         did you or not believe that?
 8               MR. GORDILLO:    Objection.
 9               MR. BIXENSTINE:   Go ahead.  I don't
10         want too much coaching on this.  This is very
11         serious stuff.
12               MR. GORDILLO:    That's why I'm
13         objecting here.
14               MR. BIXENSTINE:  All right.  Your
15         objection is noted.
16               MR. GORDILLO:    I want to make clear
17         you are asking about what is in the document,
18         or the statement you just made, because they
19         are two different things?
20   Q     Let's get it right.  I'm asking you, did you
21         believe at the time that the subtle recovery
22         in your verbal skills and speed of execution
23         since discontinuing the medication at the end
24         of November was due to discontinuing the
25         medication at the end of November, did you
```

```
 1        believe that at the time?
 2   A    I thought that was an acceptable hypothesis to
 3        the extent I was willing to communicate that
 4        in the letter.
 5   Q    So when you are saying I am now aware, that is
 6        a way of conveying it is an acceptable
 7        hypothesis, is that what you are saying?
 8   A    Yes, this is not a controlled experiment.  I
 9        don't think anybody could know that to an
10        absolute certainty.
11   Q    When you are saying you were aware of the
12        subtle recovery, you were not being truthful,
13        or were you?  Were you aware at that time, as
14        of January 7th, of a subtle recovery in your
15        verbal skills?  Were you aware of that?  That
16        is what it says here.  The question is were
17        you as it says aware of it?
18   A    I was aware of some change.  But again, I
19        would qualify that.
20   Q    Were you aware as it states here of the subtle
21        recovery in your verbal skills, were you or
22        weren't you?
23   A    I think that I had convinced myself of that at
24        the time.
25   Q    Had you convinced yourself at the time of a
```

```
 1           subtle recovery in speed of execution, had you
 2           done that too?
 3    A      I would say that again, these are subtle, not
 4           quantifiable.  At the time, again, I was
 5           attempting to formulate some kind of
 6           explanation for what was happening.  I was
 7           trying to formulate one that would allow me to
 8           continue to work with the residency, so I
 9           could continue on with my career.  So had I
10           kind of talked myself into that mind-set at
11           that point, that that was okay, maybe that was
12           the problem.
13    Q      It doesn't say maybe there, does it?
14    A      Again these are not --
15    Q      It refers to what you were aware of, does it
16           not, I'm now aware, doesn't it say that?
17    A      Yes, it does.  I was attempting to communicate
18           to my residency program that I was willing to
19           take a step in their direction, say okay this
20           is going to be our interpretation of events,
21           given that this can't be known to a scientific
22           certainty.  I was willing to say this will be
23           the interpretation we will go with, what can
24           we do from here.
25    Q      Are you right now as we speak disavowing that
```

```
 1          you were aware at the time of a subtle
 2          recovery in your verbal skills and speed of
 3          execution, are you disavowing that?  Were you
 4          aware or not, that is my question?
 5    A     I think that after October I certainly felt
 6          better because I was less tired.
 7    Q     I didn't ask whether you felt better because
 8          you were less tired.  That is not what it says
 9          here.  It says you were aware of a subtle
10          recovery in your verbal skills and speed of
11          execution since discontinuing the medication.
12          Were you aware of that or not?
13    A     I would say yes.  I guess I would say I do
14          disavow that statement.  I don't believe that
15          that is true.  At the time I was --
16    Q     You did at the time?
17    A     At the time I thought that was an acceptable
18          hypothesis.  Perhaps it was very subtle,
19          perhaps maybe I do feel better.  I think that
20          there was certainly nothing dramatic.  I felt
21          maybe it is better.  It was difficult to tell.
22    Q     Are you saying you weren't really aware of a
23          subtle recovery or were you aware at the time?
24    A     I think that it is difficult for me to say at
25          this point.  I certainly was not aware of any
```

```
 1        kind of dramatic change.
 2  Q     I'm not asking that.  I'm only asking whether
 3        you were being truthful at the time you wrote
 4        this, in terms of what you were aware of, what
 5        you weren't, were you being truthful?
 6  A     I think I was not being deceptive.
 7  Q     I didn't ask whether you were being deceptive.
 8        I said are you being truthful?
 9  A     I think that I was honestly trying to
10        interpret unquantified data.
11  Q     Were you being truthful in saying you were
12        aware, were you or weren't you?
13  A     I think it's difficult to --
14  Q     You can't answer that question, is that what
15        you are saying?
16  A     Yeah, I would say that I can't provide the
17        kind of answer that you are looking for.
18  Q     I'm just asking whether you were being
19        truthful or not.  You are saying you can't
20        answer that; is that right?
21  A     Yes, in the sense it was a very -- it was a
22        very vague set of circumstances that were
23        being described.
24  Q     Does Topiramate have cognitive side effects as
25        you set forth in this letter, does it?
```

```
 1   A     Yes, it has been described.
 2   Q     Cognitive side effects that are related to
 3         dose and speed of titration, as you describe
 4         in the letter, is that truthful?
 5   A     Yes.
 6   Q     Does the research literature suggest the side
 7         effects tend to be subtle and persistent; is
 8         that truthful?
 9   A     Yes.  I did find one paper at least that
10         suggested that.  Although that is not what is
11         generally -- not what is usually communicated
12         about the medication.  I did find a paper to
13         support that.
14   Q     Your testimony today is that although it's not
15         usually communicated that Topamax has side
16         effects that tend to be subtle and persistent,
17         you nevertheless wrote in this document the
18         research literature you reviewed suggested
19         that?
20   A     Yes.
21   Q     Did you miss the research literature that
22         suggested otherwise, is that what you are
23         saying?
24              MR. GORDILLO:     Objection.
25   A     No.  What I was attempting to communicate
```

```
 1            here, was that in general practice for example
 2            if one looks at the package insert or Topamax,
 3            the general belief is that when cognitive side
 4            effects are seen with Topamax, it's generally
 5            related to speed of dosage increase or
 6            ultimately what dose one is taking.
 7   Q    Me question to you is, did the literature you
 8            reviewed at the time suggest that the side
 9            effects tend to be subtle and persistent?
10   A    There was one paper that I found.
11   Q    Did you look at any other papers besides one?
12   A    I probably did a literature search.  It was at
13            the time -- again, I was trying to find a way
14            to work with my program on this.
15   Q    My question is not about your reasons for what
16            you wrote.  My question is about its
17            truthfulness.
18   A    Yes.
19   Q    Did you review research literature other than
20            one paper?
21   A    Yes.
22   Q    Did the research literature that you reviewed
23            suggest that the side effects tend to be
24            subtle and persistent, the research literature
25            you reviewed?
```

Page 184

```
 1  A    I know that I found one paper to support
 2       that.  There may have been more than one.  I
 3       don't remember exactly.
 4                (Defendant Exhibit W
 5                 marked for identification.)
 6  Q    I've handed you what has been marked as
 7       Deposition Exhibit W.  Do you recognize this
 8       document?
 9  A    Yes.
10  Q    Who is Dr. Longfellow?
11  A    He's the director who I would have been going
12       to work with in Ormond Beach.
13  Q    Did you send this letter to Dr. Longfellow?
14  A    Yes.
15  Q    I'm looking at the first paragraph of the
16       letter.  Is it true that over the past year
17       you had been taking Topamax for migraine
18       prophylaxis?
19  A    Yes, although I had been taking it longer than
20       that.
21  Q    How long had you been taking it?
22  A    I don't remember exactly how many years.
23  Q    Is it true that in recent months, that is
24       months prior to January 15th of 2009 when you
25       wrote the letter, the dose was increased?
```

```
 1   A      Yes.

 2   Q      Is it true that you developed side effects

 3          which affected your clinical performance?

 4   A      At this point I'm not convinced that is true.

 5   Q      Did you believe it at the time?

 6   A      I thought it was possible at the time.

 7   Q      I didn't ask whether you thought it was

 8          possible.  Were you being truthful when you

 9          wrote this in the letter?

10              MR. GORDILLO:      Objection, form.

11   Q      At the time, were you being truthful?

12   A      Again, as with the previous letter, I thought

13          that it was possible.  I was willing to work

14          with that as a hypothesis.  I don't think that

15          is something that can be known as a certainty.

16   Q      The words are, I quote, I developed side

17          effects which affected my clinical

18          performance.  Did I read those right?

19   A      Yes.

20   Q      Did you develop side effects that affected

21          your clinical performance?

22   A      No, I don't believe so.

23   Q      You did not.  So then you misrepresented the

24          circumstances of your condition in this

25          letter?
```

```
 1   A     No.
 2   Q     Well, did you represent the circumstances of
 3         your condition truthfully in this letter?
 4   A     I truthfully represented a practical
 5         interpretation of events.
 6   Q     A practical interpretation, what does that
 7         mean?
 8   A     That means I was working in an extremely
 9         hostile environment, where I had few ways to
10         protect myself professionally.  I had no ways
11         to protect myself professionally other than by
12         accommodating the assessment that was being
13         imposed on me.
14   Q     So you wrote this because you felt it was your
15         best chance of getting a job?
16   A     No.
17   Q     You didn't write the truth though, correct,
18         this wasn't truthful, you didn't develop side
19         effects which affected your clinical
20         performance, that is a false statement, right?
21   A     I feel much more certain now that it was
22         false.  At the time I was not positive that it
23         was true or false, but I was again willing to
24         accept that and go forward from there.
25   Q     Tell me why you were saying it if you didn't
```

```
 1           know whether it was true or false, to
 2           Dr. Longfellow, this fellow at Sheridan, why
 3           were you saying that?
 4    A      Because I felt it was a relatively simple way
 5           to explain to him what was a very complex
 6           situation.
 7    Q      Were you being truthful when you wrote that
 8           you continued to receive satisfactory
 9           evaluations from faculty during the time that
10           this dosage was increased?
11    A      Yes, I believe that is correct.
12    Q      So when you talk about evaluation of
13           Dr. Johnson, how does that fit in with that
14           statement?
15    A      I was referring to the time period of the
16           second half of 2008.
17    Q      Dr. Johnson's evaluations are covering
18           November of 2008, that is the second half,
19           correct?
20    A      Yes.  That was up until that point.  Then in
21           November my evaluations were fine.  I think
22           that this was written in -- when did I write
23           this, in January.
24    Q      Correct.
25    A      I hadn't received any negative evaluations,
```

```
1          written from faculty since May of 2008 I
2          believe at that point.  Until I think --
3          actually, no, that would have postdated
4          Dr. Norcia's statement now that I think about
5          it.
6    Q    Plus you were aware of Dr. Johnson's
7          evaluations, were you not, as well as
8          Dr. Zahniser's, as well as other --
9    A    Dr. Zahniser, that would have been a year
10         prior.  Dr. Johnson I discounted.
11   Q    When you say I continued to receive
12         satisfactory evaluations, what time frame were
13         you talking about?
14   A    I don't know.  I'm not very clear about that.
15   Q    When you say here I did not identify the
16         medication as a problem until December, is
17         that a truthful statement?
18   A    I would say it's not entirely accurate.  It
19         would be the end of December I guess that it
20         came up as an issue.
21   Q    This is about you identifying the medication
22         as a problem, not it becoming an issue.  It
23         says I did not identify the medications above,
24         isn't that what it says?
25   A    Yes.
```

```
 1  Q     Is it true you did not identify the medication
 2        as a problem until December?
 3  A     I would say that is not entirely accurate.
 4        Again, it's a matter of I think I was kind of
 5        approximating.
 6  Q     Meaning what?
 7  A     Meaning that it didn't come up until the end
 8        of November.
 9  Q     The end of November?
10  A     Yes, when we discussed it in the meeting.
11  Q     Is it truthful to say, if I make that
12        correction, I did not identify the medication
13        as a problem until the end of November?
14  A     Yes.
15  Q     So then is it fair for one to conclude at the
16        end of November you did identify the
17        medication as a problem?
18  A     I identified the medication as a possible
19        hypothesis.
20  Q     A possible hypothesis?
21  A     Um-hum.
22  Q     You wrote probable here, you did not write
23        possible hypothesis?
24  A     I was trying to simplify a situation for --
25  Q     For Dr. Longfellow?
```

```
 1   A     Yes.

 2   Q     What is his specialty, what is his background?

 3   A     He is an anesthesiologist.

 4   Q     You were trying to simplify the situation for

 5         another anesthesiologist?

 6   A     Yes.

 7   Q     Why did you feel it needed to be simplified

 8         for him?

 9   A     Because I was hoping that I would still be

10         able to take a position with him.  It would be

11         helpful to have a way to explain or describe

12         the reason for my not being able to show up

13         when we agreed I was going to show up.

14   Q     It says I received an unsatisfactory

15         evaluation for my October ICU rotation; is

16         that a truthful statement?

17   A     Again I don't think it in detail accurately

18         reflects the timing of events.

19   Q     You had an October ICU rotation, correct?

20   A     That's correct.

21   Q     Did have an unsatisfactory evaluation for that

22         rotation, is it truthful when it says that?

23   A     Yes, which I received at the end of December,

24         which is not exactly when the medication issue

25         came up.
```

```
 1  Q    You mean that is when it was entered into the
 2       system, end of December?
 3  A    Yes.
 4  Q    You were informed of it in November?
 5  A    Yes.
 6  Q    You were informed of it October 14th?
 7  A    No, not in any detail at all.
 8  Q    I didn't ask about detail.  I said you were
 9       informed of unsatisfactory evaluations on
10       October 14th, detailed or not, correct?
11  A    Details are important.  Yes, there was mention
12       of it October 14th.
13  Q    It says in the beginning of the second
14       paragraph, as you know, if unsatisfactory
15       performance is identified at any time during
16       our final six months of training, the entire
17       six month block must be repeated, is that a
18       truthful statement?
19  A    Yes.
20  Q    That is UH policy as in its residency program?
21  A    That is the American Board of Anesthesiology.
22  Q    ABA policy?
23  A    Yes.
24  Q    I think I know the answer to this, I'll ask it
25       anyway.  You say to Dr. Longfellow, I stopped
```

```
 1            the medication -- I promptly stopped the
 2            medication as soon as this concern arose, have
 3            noted a significant difference.  Were you
 4            being truthful at the time it was a
 5            significant difference you noted?
 6    A     No, I would say I was coloring things to
 7            describe the situation as resolved.
 8    Q     When you referred to family and colleagues as
 9            also noting a significant difference, that was
10            coloring too?
11    A     I would say yes.
12    Q     Were there any family or colleagues that
13            noticed a difference?
14    A     Not that I'm aware.
15                 (Defendant Exhibit X
16                  marked for identification.)
17    Q     I've handed you a document marked as
18            Deposition Exhibit X; do you recognize it?
19    A     Yes.
20    Q     Is that your signature on it?
21    A     Yes.
22    Q     The document refers to an October 14th
23            meeting, does it not?
24    A     Yes.
25    Q     It says October 14th of 2008 you and
```

| | | |
|---|---|---|
| 1 | | Dr. Wallace and Dr. Norcia met to discuss your |
| 2 | | clinical performance, correct, that is what it |
| 3 | | says? |
| 4 | A | Yes. |
| 5 | Q | Is that a truthful statement? |
| 6 | A | That we meet on October 14th. |
| 7 | Q | To discuss your clinical performance; is that |
| 8 | | truthful? |
| 9 | A | Yes, that was the original agenda. |
| 10 | Q | It states multiple unsatisfactory evaluations |
| 11 | | had been received; is that a truthful |
| 12 | | statement? |
| 13 | A | Yes. |
| 14 | Q | It says that we had met earlier in your |
| 15 | | residency about performance issues.  It says |
| 16 | | that you and Dr. Wallace and Dr. Norcia had |
| 17 | | met earlier in your residency about |
| 18 | | performance issues; is that a truthful |
| 19 | | statement? |
| 20 | A | I don't know exactly what they are referring |
| 21 | | to there. |
| 22 | Q | You don't know? |
| 23 | A | No. |
| 24 | Q | You don't recall now? |
| 25 | A | No. |

```
 1   Q    You wouldn't have signed it, would you, had it
 2        not be truthful at the time you signed it?
 3   A    No, I was signing to acknowledge that I was
 4        given the letter, not to agree with the
 5        statements.
 6   Q    You would sign any letter sent to you because
 7        you received it?
 8   A    No.
 9             MR. GORDILLO:    Objection.
10   Q    Why did you sign this one?
11   A    I was required to acknowledge that I was being
12        given the letter.
13   Q    Does it say anything on there about signing to
14        acknowledge?
15   A    No.
16   Q    Your testimony today is your signature
17        conveyings nothing about your agreement to
18        anything in this letter?
19   A    Correct.
20   Q    You just signed it?
21   A    I signed it, yes, to confirm that I was
22        receiving this piece of paper.
23   Q    Did you tell Dr. Norcia and Dr. Wallace at the
24        time that I don't necessarily agree with
25        things in this letter, I'm just signing it to
```

Page 195

```
 1          acknowledge it, did you tell them that?
 2  A       I don't remember.  No, I don't remember.
 3  Q       Did you give them any reason to believe at
 4          that time that you signed this, that you
 5          disagreed with anything in it?
 6  A       Yes.
 7  Q       What do you recall telling them at the time
 8          concerning a matter in this letter with which
 9          you disagreed?
10  A       I don't recall what specifically I objected to
11          verbally.  I do know I objected in writing.  I
12          don't remember what I objected to verbally at
13          the time.
14  Q       Do you recall objecting in writing to the
15          contents of the November 24 letter and its
16          reference to what happened on October 14; do
17          you recall doing that?
18  A       Yes.
19  Q       The thing you are recalling is an objection
20          you raised after the meeting at the end of
21          November, correct?
22  A       Yes.
23  Q       You are saying at the end of November you
24          decided to raise objections about matters
25          arising at the October 14th meeting?
```

```
 1  A    I objected to a number of things.  The
 2       characterization of the October 14th meeting
 3       itself was one of those.
 4  Q    That is what I'm saying, you decided at the
 5       end of November to raise objections concerning
 6       what occurred at the October 14th meeting?
 7  A    I would say yes, I was not provided with any
 8       documentation of the October 14th meeting.
 9  Q    Until you signed this document on November
10       24th?
11  A    Yes.
12  Q    You decided to sign it, then write objections
13       to it afterward?
14  A    Yes.
15  Q    Were you told at the October 24th meeting that
16       there were evaluation concerns that you're not
17       appreciating the situation, or cannot process
18       and react to the information or situation at
19       hand.  Were you told that at the October 14th
20       meeting?  Middle of the second paragraph.
21  A    I don't recall those exact words were used.
22  Q    How about the substance of them?
23  A    There was some concern raised about my
24       responsiveness but neither Dr. Norcia nor
25       Dr. Wallace could provide me with a specific
```

```
 1        example.

 2   Q    This is something you asked for at the October

 3        14th meeting, give me a specific example, you

 4        asked for that?

 5   A    I remember asking Dr. Wallace that.  I don't

 6        recall at which meeting it was.  He said I

 7        can't give you an example.

 8   Q    Dr. Wallace said he couldn't?

 9   A    Yes.

10   Q    Were you also told about concerning

11        evaluations from pain, OB and ICU at the

12        October 14th meeting, as reflected in this

13        letter?

14   A    Yes.

15   Q    Did you actually respond during the October

16        14th meeting that you could not identify any

17        reason for any delay in response that people

18        might have raised the concern about, as

19        reflected in the third paragraph.

20   A    I don't remember specifically making that

21        statement.

22   Q    Did you offer any explanation for the concern

23        raised to you in the October 14th meeting, any

24        explanation for why those concerns were

25        happening?
```

```
 1   A    No.  The concerns weren't specified in a way
 2        that allowed a response.
 3   Q    Did Dr. Wallace and Dr. Norcia at the October
 4        14th meeting discuss ways for you to improve?
 5   A    Not that I recall.
 6   Q    Is that one of those they might have, might
 7        not have, you don't recall as we speak now?
 8   A    I don't recall a conversation at that time
 9        that was discussing ways to improve.
10   Q    Do you deny there was any discussion of that
11        nature?
12   A    No, I wouldn't say I remember it clearly
13        enough to deny it.
14   Q    Were you told at the October 14th meeting that
15        the competency committee had reason to give
16        you an unsatisfactory for your final six month
17        period?
18   A    No.
19   Q    You were not told that?
20   A    Not to my memory in October.
21   Q    Are you denying that was said to you?
22   A    Again, at the time of that meeting, I had been
23        on duty for about 28 hours, so there may be
24        things in that meeting I don't recall.  Again,
25        the discussion of the clinical issue or the
```

```
 1        performance issue was fairly vague.  I don't

 2        recall being told at that time that that was a

 3        threat.

 4   Q    Were you told that there was going to be a

 5        meeting with you again in four to six weeks to

 6        review further evaluations and update your

 7        progress?

 8   A    Again, I don't remember that exactly.  That

 9        seems very plausible to me.  Makes sense.

10               (Defendant Exhibit Y

11                marked for identification.)

12   Q    Handing you what is marked as Deposition

13        Exhibit Y.  I'm assuming you've never seen the

14        document before.  If you have, let me know.

15   A    No.

16   Q    It refers to a meeting between you and

17        Dr. Norcia and Dr. Aronson on November 24th,;

18        isn't that right?

19   A    Yes, correct.

20   Q    Did Dr. Wallace ask you at that meeting on

21        November 24th if you were on any psychotropic

22        medication that might impair your performance?

23   A    Yes.

24   Q    Did he tell you that from his perspective you

25        had not made the program director aware of any
```

```
 1        such medication?
 2   A    I don't remember making that statement.
 3   Q    You had not made anyone -- you had not made
 4        the program director aware that you were
 5        taking Topamax, correct?
 6   A    Correct.
 7   Q    Did he tell you he believed you were required
 8        to do that?
 9   A    I know he said that at a later date.  I don't
10        remember it during that particular meeting.
11   Q    Did you inform Dr. Norcia and Dr. Wallace at
12        that meeting that you may be on some
13        medication that may or may not impair your
14        performance?
15   A    I brought up the Topamax at that meeting, yes.
16   Q    Did you say at that meeting that the Topamax
17        may or may not impair your performance?
18   A    I don't know that I used exactly those words.
19        I brought it up at a possibility.
20   Q    You had been using it for three years?
21   A    I believe I said something about how long I
22        had been on it.  I would say it had been at
23        least three years.
24            MR. GORDILLO:    Can I step out a
25        minute?
```

```
 1                  (Recess taken.)

 2                  (Defendant Exhibit Z

 3                   marked for identification.)

 4  Q    I've handed you a document marked as

 5       Deposition Exhibit Z.  Do you recognize this

 6       document?

 7  A    Yes.

 8  Q    Is this a document you sent to Dr. Nearman?

 9  A    Yes.

10  Q    In the second paragraph, after the first

11       paragraph, this was a document you prepared

12       after meeting with him?  I ask that because in

13       the first paragraph it says thanks for taking

14       the time to meet with me.

15  A    I don't remember.  I might have been implying

16       that he had scheduled a time to meet with me,

17       that we arranged a time.  I'm not positive.  I

18       don't know.

19  Q    I understand it may be you were thanking him

20       for a meeting that had not yet occurred.  I

21       understand.

22  A    I'm fairly sure that is the sequence.

23  Q    Were you being truthful when you said in this

24       letter to him that the medication was having a

25       negative affect on your functioning?
```

```
 1  A    I would have to respond as with the other
 2       letters, I was willing to accept that as a
 3       possibility and work with it.
 4  Q    You don't believe it now?
 5  A    No, I don't believe it now.
 6  Q    Were you also not saying something you believe
 7       now when you told him I'm alarmed that I
 8       needed a whack in the head to identify Topamax
 9       as a problem, you don't believe that now
10       either?
11  A    No, I don't.  That is how I was thinking about
12       it at the time.
13  Q    Did you believe it at the time?
14  A    Again, I was going with that hypothesis.
15  Q    Did you believe at the time that Dr. Norcia
16       and others were correct in noting a change in
17       your performance?
18  A    I think that, again I think that I was
19       endorsing that interpretation.
20  Q    You don't believe it now?
21  A    No.
22  Q    You didn't believe it?
23  A    Except in the sense as far as that sentence is
24       concerned, except in the sense that upon
25       reviewing my scheduling during that period of
```

```
 1         time, occurred to me there may have been a
 2         fatigue factor.
 3   Q     The only thing you believe now is that any
 4         performance change they noted was just
 5         fatigue?
 6   A     Yes, if there were performance changes.
 7   Q     You don't necessarily even believe that?
 8   A     Correct.
 9   Q     You didn't believe it at the time you wrote it
10         either?
11   A     I was -- at the time I wrote this?
12   Q     Correct.
13   A     You know as in any profession, one has to
14         continuously learn, continually be open to
15         feedback.  If somebody says, gives you some
16         negative feedback, it's important to be open
17         minded, not reject it out of hand.
18   Q     You would agree this is not rejecting
19         something.  You said the words I am sure.  I'm
20         sure that Dr. Norcia and the others were
21         correct.  You weren't sure they were correct
22         at the time, correct, that is not a true
23         statement, you weren't sure they were correct?
24   A     No, I was trying --
25   Q     To appease Dr. Nearman?
```

```
 1   A      Yes.
 2   Q      When you say here while I don't believe
 3          Dr. Wallace and Norcia have intended this
 4          process to be punitive, you see where it says
 5          that?
 6   A      Yes.
 7   Q      At the time you did believe they intended it
 8          to be punitive, correct?
 9   A      I became more and more convinced of that, I
10          didn't want to believe that.
11   Q      I'm saying at the time, did you believe,
12          January 6, 2009 did you believe that
13          Dr. Wallace and Dr. Norcia intended this
14          process to be punitive?
15   A      At that time I was willing to believe that
16          they didn't.
17   Q      You were being truthful about that statement
18          when you said I don't believe, as of January
19          6th, that Wallace and Norcia intended this
20          process to be punitive, that is truthful,
21          right?
22   A      I would say that is also a conciliatory
23          statement.
24   Q      It can be truthful and conciliatory.  But was
25          it truthful?
```

```
 1   A     I would say I was perhaps not convinced at
 2         that point they intended it to be punitive.
 3   Q     You didn't believe it at the time?
 4   A     I would say I considered it a possibility.  I
 5         was willing to keep an open mind, so yes, I
 6         would say I wasn't convinced.
 7   Q     That is not what it says here.  You didn't say
 8         I'm not convinced, you said you didn't believe
 9         it?
10   A     Yes, I think I was --
11   Q     Do you recognize the distinction between
12         saying I'm not convince of something, and
13         saying I don't believe something?
14   A     Yes, I think there is a subtle distinction.
15   Q     At the time, was it truthful to say that you
16         didn't believe they intended the process to be
17         punitive, was that truthful at the time you
18         said it?
19   A     I would say it's not entirely truthful.
20                   (Defendant Exhibit AA
21                    marked for identification.)
22   Q     I've handed you what is marked as Deposition
23         Exhibit AA.  Do you recognize this as a letter
24         you prepared on November 28, as a response to
25         the reviews of mid October, on November 4th?
```

```
 1   A     Yes, although there was the same letter with
 2         one minor revision I resubmitted.
 3   Q     A date or something?
 4   A     Yes, I mistyped it.
 5   Q     So at the beginning of this letter you refer
 6         to the feeling that the decision to remove you
 7         was not justified.  You say I understand
 8         however the highest priority is to insure
 9         patient safety and clinical reliability; do
10         you see that?
11   A     Yes.
12   Q     Was that a truthful statement?
13   A     Yes.
14   Q     It says also in the next paragraph, during my
15         time in this program I received a pattern of
16         evaluation regarding my need to improve my
17         efficiency and speed of response.  Is that a
18         truthful statement?
19   A     Yes.
20   Q     You then go through and refer to a variety of
21         folks here?
22   A     Yes.
23   Q     You refer to Dr. Zahniser?
24   A     Um-hum.
25   Q     His evaluation covered his work with you in
```

```
 1         October of '08, did it not?
 2   A     I had thought it was.  I wasn't positive but I
 3         had though that it was.
 4   Q     Prior to that?
 5   A     I thought it was possibly in January of '08.
 6         I wasn't certain of the dates.
 7   Q     You are referring to -- I think the evaluation
 8         will show when the date is.  You were aware at
 9         the time you wrote this of an evaluation which
10         he said he considered you the worst resident
11         and very weak, that was one you were aware of,
12         whenever it happened?
13   A     Yes, I remember there were two from him.  The
14         first one was the one we discussed back at the
15         beginning.  Then the second one was one which
16         he rated it as satisfactory, but then there
17         were side comments.
18   Q     Dr. Johnson's evaluations, those were from the
19         October ICU, correct?
20   A     I don't recall exactly which dates I worked
21         with him in February.  So I believe that he
22         had something negative to write about me in
23         February.  I don't know that I actually had
24         his September or October evaluation at this
25         point.  I may have.  I don't recall that I
```

```
 1          did.
 2   Q      You mention, the reason I say that is I see
 3          your point.  You were referring to evaluations
 4          both in February and October, were you not, it
 5          says so right there in your references?
 6               MR. GORDILLO:      Objection.  That is
 7          not what it says.
 8   Q      It says I regret I was not able to manage in
 9          February or October?
10   A      Correct.  These were two times I worked with
11          him.  However in this letter, I was referring
12          to some written evaluations that were handed
13          to me at the October meeting.  I believe that
14          the written one from Dr. Johnson, to which I
15          was referring here, referred to February.
16   Q      You were aware at the time though of his
17          negative assessment of you in October, you had
18          been told that by coordinators?
19   A      I didn't have to be told it by anybody.  It
20          was very clear.
21   Q      Let's go over to the November 24 meeting
22          then.  What I would like you to do, I tried to
23          give you as much documentation as I have that
24          relates to that.  What I would like you to do
25          is, it is common for people to both describe a
```

```
 1            conversation and explain it at the same time.
 2            That is human nature.  For our purposes I need
 3            to separate those, for this purpose.  I need
 4            you to describe what happened between you and
 5            Dr. Norcia and Dr. Wallace, and deferred until
 6            you are done explaining what it means, its
 7            significant to you, or any other kind of ways
 8            of commenting on what was going on.  So that I
 9            have these things separate.
10                 What I would like you to do first in
11            your best recollection go through and explain
12            to me what happened at the November 24
13            meeting.  Let me start it off by saying is it
14            not fair to say the beginning of that meeting
15            is when they presented you that letter, that
16            we just went over, that refers to what
17            happened in October?
18     A      I couldn't say.
19     Q      I thought maybe that was something you could
20            remember.  Tell me what you did recall now of
21            the back and forth between you and Dr. Norcia
22            and Dr. Wallace at this November 24 meeting.
23            Again when you are done, we can talk about
24            what it means, your assessment of it, so on.
25     A      I don't remember how the meeting opened.  I
```

1    remember asking for specific examples of

2    something that was causing concern.

3            I remember at least Dr. Wallace saying

4    he couldn't give me an example.  I remember

5    Dr. Wallace asking me if I was taking

6    psychotropic medication and/or if I was on

7    drugs, to which I said no.  Then stated I had

8    been taking Topamax for several years for

9    migraines.  I don't remember how much further

10   discussion there was about that.

11           I believe I brought up EAP, with the

12   thought they could act as a third party

13   monitor, to introduce some objectivity.  I'm

14   not remembering any other real specifics of

15   how the back and forth went at that meeting.

16  Q  I apologize.  You completed as best you can do

17     in terms of your recollection?  I didn't mean

18     to ignore you.  I wasn't sure you were

19     complete.

20  A  No, I'm --

21  Q  Did Dr. Wallace at this meeting tell you that

22     he intended to rate your performance for the

23     period of July 2008 to December 2008 as

24     unsatisfactory, and require you to extend your

25     residency by six months in order to graduate?

```
 1  A    Not at the meeting in November, I don't
 2       believe, no.
 3  Q    Was there a meeting in December when he said
 4       that then?
 5  A    Not in December.  I know in November it was --
 6              (Defendant Exhibit BB
 7               marked for identification.)
 8  A    To the best of my recollection at the November
 9       meeting I believe it was raised as a
10       possibility that action was going to be taken.
11  Q    Not definitive?
12  A    Not definitive.
13  Q    Have a look at Exhibit BB.  If I understand
14       correctly, this is a document you prepared but
15       choose not to submit, correct?
16  A    Correct.  Because I was told it was not an
17       option.
18  Q    So, you mentioned in the second paragraph of
19       that letter that Dr. Wallace indicated to you
20       at a meeting that you refer to as last week,
21       the document is dated December 23rd, that he
22       intended to rate my performance for the period
23       of July 2008 to December 2008 as
24       unsatisfactory, would require to extend the
25       residency by six months in order to graduate.
```

```
 1        Paraphrasing the substance, I think I got it

 2        right.

 3  A     I think that is probably accurate.  I don't

 4        remember having a meeting in December.  It

 5        makes sense to me that there was one.  I can't

 6        picture it in my mind.  I think that is likely

 7        accurate.  I know that I did know he was

 8        intending to do that sometime in that time

 9        frame.  Certainly by the time I got the thing

10        from Dr. Norcia that was entered a few days

11        after this.

12  Q     You had a conversation with an outfit a UH

13        called the GME office, what does that stand

14        for?

15  A     Graduate medical education.

16  Q     It was a conversation about your options in

17        terms of either accepting a six month training

18        extension without an appeal or refusing the

19        extension, being potentially subject to

20        disciplinary action.  Do you recall having a

21        conversation with someone from the office

22        about that?

23  A     Yes.  I think that sounds accurate.

24  Q     Who told you those were your options?  Who

25        from the GME office are we talking about?
```

```
 1   A     It would have been either Will Rabello or
 2         Dr. Shuck.  I don't remember which of the two
 3         verbalized that to me.
 4   Q     I'm not asking you here for any content.  Did
 5         you consult with legal counsel in terms of
 6         deciding which of those options you would
 7         take?
 8   A     Yes.
 9               MR. GORDILLO:     That's the end.
10   Q     Would that be Mr -- the basketball player?
11   A     Jordan.
12   Q     Michael Jordan.  It's up to you, if you don't
13         want her to answer, it is okay.  His name is
14         on it.   Was it Michael Jordan?
15               MR. GORDILLO:     As far as I know.  It
16         wasn't me.
17               MR. BIXENSTINE:  That's the end of it.
18   Q     Was it Michael Jordan?
19   A     Yes.
20               (Defendant Exhibit CC
21                marked for identification.)
22   Q     Handing you what has been marked as Deposition
23         Exhibit CC, this represents itself as an
24         e-mail exchange between you and Dr. Nearman in
25         late January?
```

```
 1   A     Yes.
 2   Q     Do you recognize this as such?
 3   A     Yes.
 4   Q     He asked you in his e-mail to you, he says is
 5         it okay to tell him, referring to
 6         Dr. Longfellow?
 7   A     Yes.
 8   Q     He is asking is it okay to tell him that your
 9         performance was not satisfactory, and that
10         upon evaluating the possibilities as to why,
11         we came up with the potential drug side
12         effect; did I read that correctly?
13   A     Yes.
14   Q     Did you respond to him in terms of whether it
15         was okay or not?
16   A     I believe I told him verbally or in this
17         e-mail that I felt that was an acceptable way
18         to proceed.  It was essentially in line with
19         what I had written to Dr. Longfellow.
20                    (Defendant Exhibit DD
21                     marked for identification.)
22   Q     I handed you what is marked as Deposition
23         Exhibit DD.  Have you ever seen this document
24         before, or any part of it?
25   A     No.
```

```
 1   Q     Is it fair to say that until today you were
 2         unaware of the content of the assessment
 3         provided through this letter by Dr. Norcia in
 4         February?
 5   A     Yes, I've not seen this before.
 6   Q     The assessment is three pages long, followed
 7         by a document which appears to have your
 8         signature on it, am I right, it is document
 9         you signed?
10   A     Yes.
11   Q     Dated 11-25-80?
12   A     Yes.
13   Q     I don't know whether the last two pages are
14         really part of this document or not.  I don't
15         have the competency to tell you.  I'm asking
16         you, do these relate to the documents that go
17         before them, or should these be removed as
18         being somehow extraneous?
19   A     I think they are probably extraneous.
20   Q     It looks like statistics on things you've
21         done, or someone has done, I can't say it was
22         you or not.
23   A     Yes.
24   Q     In that case, let's remove that.
25               (Defendant Exhibit EE
```

```
 1                    marked for identification.)
 2   Q    I've handed you what has been marked as
 3        Deposition Exhibit EE.  Is this a copy of the
 4        complaint you submitted to ACGME?
 5   A    Yes.
 6   Q    Did you ever receive a written response from
 7        them in terms of communicating to you their
 8        resolution of your complaints?
 9   A    Yes, I believe I did.
10   Q    What was the resolution?
11   A    The resolution was that the ACGME doesn't
12        intervene in individual cases.
13               (Defendant Exhibit FF
14                marked for identification.)
15   A    That as long as a program is in substantial
16        compliance with their requirements, they can
17        retain their accreditation.
18   Q    I'm handing you what has been marked as
19        Deposition Exhibit FF.  Do you recognize that?
20   A    Yes.
21   Q    What is that?
22   A    This would have been sent not to me but to the
23        residency program.
24   Q    The first page was not sent to you.  Thank
25        you.
```

```
 1   A      Correct.

 2   Q      The second?

 3   A      The second is the form that FCVS uses that one

 4          has notarized in order to initiate a request

 5          for them to prepare a packet.

 6   Q      That is your signature on that particular

 7          document?

 8   A      Yes.

 9   Q      You had a meeting with Dr. Wallace and maybe

10          Dr. Norcia, it arose shortly after you -- in

11          early June of 2009?

12   A      Um-hum.

13   Q      It was a meeting I believe in which

14          Dr. Wallace raised a variety of performance

15          issues with you; do you remember that meeting?

16   A      Yes, he raised a variety of criticisms.

17   Q      Performance issues for him.  I didn't mean to

18          be judgmental.  Was it just a meeting between

19          you and he, or was Dr. Norcia there as well?

20   A      As I remember Dr. Norcia was also at that

21          meeting.  I believe he had to leave the room

22          several times.

23   Q      Was there a set of documents that were shown

24          to you at that meeting, statements by people?

25   A      I don't remember that they were shown to me.
```

```
 1        I remember Dr. Wallace coming in with a lot of
 2        papers.
 3   Q    Did he review the papers with you?
 4   A    As I remember he referred to them, but I don't
 5        recall him going over the documents or charges
 6        with me in a detailed way.  I don't remember
 7        him handing them to me.
 8   Q    Did he refer to the circumstances of them?
 9        Get into the specifics of them, or was it more
10        general than that?
11   A    I believe he did bring up some specific
12        situations or events.
13   Q    Will you relate to me the same way you did
14        with the November 24th meeting what you can
15        recall of the exchange between you and
16        Dr. Wallace and Dr. Norcia was involved as
17        well at that particular meeting, we can decide
18        whether to talk about any commentary or
19        assessment of what that all means?
20   A    I seem to recall that I was called out of the
21        OR to attend a meeting I believe.  No, that
22        may not be true.  No, that is not true.  This
23        meeting was scheduled.
24            It was with Dr. Wallace and
25        Dr. Norcia.  Dr. Norcia was called out of the
```

```
 1        room I seem to remember several times during
 2        the meeting.  I seem to recall that that
 3        meeting in tone became a little bit more
 4        confrontational between myself and
 5        Dr. Wallace.  Dr. Wallace raised some
 6        criticisms from I think that was when the
 7        evaluation from Dr. Rubin that I think was
 8        referenced at the beginning of this meeting.
 9   Q    Correct.
10   A    Also from Dr. Hacker we similarly discussed
11        earlier.  He indicated to me that he felt
12        that -- I don't remember exactly how he put
13        it.  That he didn't think that I would
14        successfully complete the residency.  I'm
15        trying to remember what the exchange was with
16        Dr. Norcia during that meeting.  I seem to
17        remember him expressing distress that I
18        doubted his good intentions, something to that
19        effect.
20             I don't remember if that was one of
21        the -- if that was one of the conversations in
22        which Dr. Wallace threatened me with
23        termination.  It may have been.  If it was, I
24        probably commented on it in a letter.  I don't
25        recall right at this moment whether that was
```

```
 1        said.  I do remember him asking me if I
 2        considered what I might do if I didn't do
 3        anesthesiology.  My responses during that
 4        meeting, I remember -- I seem to remember were
 5        focused in part around responding to some of
 6        the criticisms regarding Dr. Hacker and
 7        Dr. Rubin.
 8   Q    You said you recall responding with respect to
 9        them?
10   A    Yes, I believe.  At least at this point I'm
11        not remembering much else about the back and
12        forth.
13             MR. BIXENSTINE:  Can you give me a
14        couple minutes?  This may be wrap up time.  I
15        need a chance to go over things here, see if
16        that is the case.
17                  (Recess taken.)
18             MR. BIXENSTINE:  We have no further
19        questions.
20             MR. GORDILLO:    I have a couple I
21        want to follow-up on.
22                  REDIRECT EXAMINATION
23   By Mr. Gordillo:
24   Q    Let's take a look, Dr. Aronson, at Exhibit H.
25        You were asked some questions about that
```

```
 1        document.
 2  A     Yes.
 3  Q     Specifically you were asked what your
 4        understanding was with respect to how that
 5        document might affect the extension of your
 6        training; do you recall that?
 7  A     Yes.
 8  Q     You said you understand that that document was
 9        extending your training six months into
10        August, correct?
11  A     Yes that was what I was told by the program
12        director.
13  Q     Could you explain how you concluded from that
14        letter that is Exhibit H that the program was
15        being extended to August?
16  A     It's not actually stated in this letter.  This
17        letter says there is an additional six
18        months.  I was told by the program director
19        that they were going to start those six months
20        tacked onto the end, so to start in March.
21        That is not stated in this letter.
22  Q     Let's look at Exhibit W.  You were asked some
23        questions about Exhibit W and some of the
24        things you wrote.
25              In particular you were asked about a
```

Page 222

```
 1           statement at the end of the first paragraph
 2           when you wrote that you received -- I'm sorry,
 3           you wrote I did not identify the medication as
 4           a problem until December, when I received an
 5           unsatisfactory evaluation from my October ICU
 6           rotation; do you see that?
 7  A        Yes.
 8  Q        More specifically, I think you gave testimony
 9           that you had received notice of an
10           unsatisfactory evaluation for your October ICU
11           rotation, when you had the meeting that you
12           testified about on October 14th; do you recall
13           that testimony?
14  A        Yes, although that is not entirely accurate.
15  Q        Let's clarify what way that was inaccurate?
16  A        I wasn't -- the October meeting provided me
17           evaluations that were from the first half of
18           the year.  There was some comment about
19           concerns regarding the beginning of October,
20           but I was not given an unsatisfactory
21           evaluation for that month's rotation at that
22           time.  That didn't occur until the end of
23           December I believe.
24  Q        Let's look at Exhibit X, you just mentioned
25           that you had been at this October 14th
```

```
 1        meeting, you had been presented with an
 2        unsatisfactory evaluation, right?
 3   A    Yes.
 4   Q    The Exhibit X, you testified that it was
 5        accurate, the second sentence of that document
 6        was accurate when it says multiple
 7        unsatisfactory evaluations had been received,
 8        right?
 9   A    Yes.
10   Q    How do you know that multiple unsatisfactory
11        evaluations had been received?
12   A    I was given a printout of what evaluations had
13        been turned in.
14   Q    At this October 14, 2008 meeting you discussed
15        those unsatisfactory evaluations?
16   A    I wouldn't say that we discussed them.  They
17        were provided to me and there was some very
18        brief comments about them, not discussed in
19        detail.
20   Q    Is that why you believe it's accurate as
21        written that multiple unsatisfactory
22        evaluations had been received?
23   A    Yes, those were the ones from the first half
24        of the year.
25   Q    Of those multiple unsatisfactory evaluations,
```

```
 1          what was the latest date of those?
 2   A      That would have been May of 2008.
 3   Q      Were any of the multiple unsatisfactory
 4          evaluations that were presented to you at the
 5          October 14, 2008 meeting from your training
 6          period between July and December of 2008?
 7   A      No, none of them were.
 8                 MR. GORDILLO:     That's all.  Thank
 9          you, Dr. Aronson.
10                 MR. BIXENSTINE:   No questions.
11                 MR. GORDILLO:     We will read.
12                 (Deposition concluded at 6:24 p.m.)
13                 (Signature not waived.)
14                          - - -
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   I have read the foregoing transcript from page 1

 2   through 224 and note the following corrections:

 3   PAGE  LINE                    REQUESTED CHANGE

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19                              _____

20                              Sarah Aronson, M.D.

21   Subscribed and sworn to before me this _____

22   day of _____, 2010.

23

24                              _____

25                              Notary Public

     My commission expires:  _____.
```

```
 1  State of Ohio,         )
                           ) SS:  CERTIFICATE
 2  County of Cuyahoga.    )

 3       I, Constance Versagi, Court Reporter and

 4  Notary Public in and for the State of Ohio, duly

 5  commissioned and qualified, do hereby certify that

 6  the within named witness, Sarah Aronson, M.D.,

 7  was by me first duly sworn to testify the truth, the

 8  whole truth, and nothing but the truth in the cause

 9  aforesaid; that the testimony then given by her was

10  by me reduced to stenotypy/computer in the presence

11  of said witness, afterward transcribed, and that the

12  foregoing is a true and correct transcript of the

13  testimony so given by her as aforesaid.

14       I do further certify that this deposition was

15  taken at the time and place in the foregoing caption

16  specified, and was completed without adjournment.

17       I do further certify that I am not a relative,

18  counsel, or attorney of either party, or otherwise

19  Interested in the event of this action.

20       IN WITNESS WHEREOF, I have hereunto set my

21  hand and affixed my seal of office at Cleveland,

22  Ohio, on this 23rd day of December, 2010.

23       _____

24       Constance Versagi, Court Reporter and
         Notary Public in and for the State of Ohio.
25       My Commission expires January 14, 2013.
```