**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SARAH ARONSON | ) | CASE NO. 1:10CV0372 |
| | ) | |
| *Plaintiff,* | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| UNIVERSITY HOSPITALS OF | ) | **PLAINTIFF'S RESPONSE TO** |
| CLEVELAND | ) | **DEFENDANT'S FIRST SET OF** |
| | ) | **INTERROGATORIES AND REQUEST** |
| *Defendant* | ) | **FOR PRODUCTION OF DOCUMENTS** |
| | ) | |

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

Plaintiff Sarah Aronson objects to Defendant's definitions and instructions to the extent that the definitions or instructions are inconsistent with, or in addition to, the requirements set forth in the Federal Rules of Civil Procedure.

**INTERROGATORIES**

1.     State Plaintiff's full name together with any other name by which Plaintiff has ever been known; Plaintiff's date and place of birth; Social Security number; and current address.

**ANSWER:**

Sarah Cymry Aronson.   Dr. Aronson's current address is 6741 Twelve Oaks Dr, Hebron, Maryland 21830. Dr. Aronson was born on January 10, 1962 in New York, New York.



DEFENDANT'S
EXHIBIT

2.    Identify each and every person(s) with whom Plaintiff consulted, upon whom Plaintiff relied, or who otherwise constituted a source of information for Plaintiff in connection with the preparation of the answers to these Interrogatories and Document Requests, listing with respect to each and every such person the number(s) of the Interrogatories or Document Requests for which he or she was consulted, relied upon, or otherwise constituted the source of information.

**ANSWER:**

Dr. Aronson provided the answers and counsel for Dr. Aronson provided the legal objections.

3.    If Plaintiff has ever been involved in any legal action other than the action herein, either as a Plaintiff, grievant, Respondent or Claimant, state the date and place each action, claim or grievance was filed, including the name of the court or agency and the names of the parties involved; describe the nature of each action; describe the disposition of each action, whether or not there was an appeal, and the result of the appeal; and describe the amount of any proceeds, settlement or judgment that Plaintiff was awarded or was awarded against Plaintiff in each action.

**ANSWER:**

Objection. This interrogatory seeks information beyond the scope of discovery as defined in Federal Rule of Civil Procedure 26 because the breadth of information sought is not entirely reasonably calculated to lead to the discovery of admissible evidence. Furthermore, this request seeks information protected by attorney client privilege. Without waiving any objection, however, Dr. Aronson states, she has been a party in the following legal actions: In approximately 1994 or 1995 Dr. Aronson filed an EEOC complaint in the State of Connecticut against Middlesex Hospital regarding domestic partner benefits. In 1996 Dr. Aronson was party to a small claims case in Wolcott Connecticut against a group of masons working on her property. The case resolved by Dr. Aronson paying the group $2,500. In 2000 Dr. Aronson was a party to a lawsuit involving a real estate agency and an individual who sold her a home. The case resolved to satisfaction of all parties with confidentiality. In 2003 in Mayfield, New York, Dr. Aronson was a party to adoption proceedings. And again in 2009, in Erie, Pennsylvania, Dr. Aronson was a party to adoption proceedings.

2

4.     Identify each person (including individuals who are working at or have worked at UHC or any parent or other affiliate of UHC) from whom Plaintiff (or any person(s) other than Plaintiff's legal counsel), has solicited and/or obtained any written or recorded statement that refers to or concerns, in whole or in part, any circumstances or Plaintiff's residency or the residency of others at UHC, and, for each person identified:

    (a)     Identify the person who solicited or obtained the statement and when;

    (b)     State whether such statement was written, oral, or recorded by recording device, *court reporter,* or other means;

    (c)     If the statement was oral, state whether it has been recorded or reduced to writing;

    (d)     Identify and describe the substance of each statement, or if the statement has been recorded or reduced to writing, produce each such recording or written document.

**ANSWER:**

Objection.   This interrogatory is vague, overly broad, and therefore unduly burdensome. Without waiving any objection, however, Dr. Aronson states she assumes the word statement to include written evaluations and other communications between her and other individuals regarding Dr. Aronson's residency. The following individuals have given written evaluations of Dr. Aronson: Peter Adamek, Anjali Adur, Michael Altose, Tracy Bartone, Maura Berkelhamer, Helmut Cascorbi, Kathleen Cho, Barbara Dabb, David Dinny, Susan Dumas, Carl Forrest, Erin Furey, Sherine Ghafoori, Mark Goldfinger, Ray Graber, Evan Goodman, Jeffrey Grass, Adam Haas, Lisa Hacker, Irving Hirsch, Gerald Jonsyn, Gary Cantor, Jana Kirilcuk, Elias Leon-Ruiz, Lora Levin, Peter Matgouranis, Cheryl Modlin, Girish Mulgaokar, Howard Nearman, Matthew Norcia, Annemarie Norenberg, Rachel Parks, David Rapkin, Eliot Ro, James Rowbottom, Kasia Rubin, Pankaj Shah, Subha Sivashankaran, Charles Smith, John Stork, Paul Tripi, David Wallace, and Mark Zahniser

Additionally, Jerry Shuck, M.D., had several conversations with Dr. Aronson about her residency and provided emails regarding Dr. Aronson's residency. Some of those conversations and emails were solicited by Dr. Aronson, and some were initiated by Dr. Shuck. Dr. Aronson also spoke with Chris Adamovich, Residency Office Coordinator, and Jill Fulton-Royer, an Employee Assistance Provider regarding circumstances surrounding her residency.

Will Rebello of the Accreditation Council for Graduate Medical Education also sent emails and spoke directly to Dr. Aronson regarding the residency program. These statements were typically initiated by Dr. Aronson.

And the following individuals provided references about Dr. Aronson's residency: Nathan Levitan, James Liu, Richard Josephson, Paul Linden, James Rowbottom and Evan Goodman.

5.     Identify each person not currently employed at UHC with whom Plaintiff (or any

person(s) other than Plaintiff's legal counsel) has spoken concerning any of the circumstances of

Plaintiff's residency or the residency of others at UHC, and, for each such person:

(a)     Identify the subject(s) of the conversation(s) pertaining to the circumstances of
Plaintiff's residency or the residency of others at UHC.

**ANSWER:**

Objection. This interrogatory is vague, overly broad, and therefore unduly burdensome.
Without waiving any objection, however, Dr. Aronson states she has spoken to the following
people not currently employed at UHC about her residency:  Michelle Capdeville, M.D.,
provided a reference of Dr. Aronson to Peninsula Regional Medical Center, Emily Vasiliou,
Accreditation Council for Graduate Medical Education Resident Services, Marsha Miller,
Director Resident Services for Accreditation Council for Graduate Medical Education, Thomas
Boyd, Carey Weiss Anesthesiologist, Sheridan Healthcorps, Michael Longfellow,
Anesthesiologist, Sheridan Healthcorps, Harold Johnstone, Accreditation Council for Graduate
Medical Education Site Visitor, and  Virginia Ayres.

See also response to interrogatory number 4.

6.     Please identify each and every employer (other than Defendant) for whom

Plaintiff has been employed from January 2009 to the present, including the dates of the

employment.

**ANSWER:**

Sheridan Healthcorps at Peninsula Regional Medical Center, October 2009 through present;
Psychstaffing, Inc., 340 South Broadway Street, Akron ,Ohio 44308, January 2009 through July
2009; and St. Vincent's Charity Hospital, E 22nd Street, Cleveland, Ohio, January 2009 through
July 2009.

7.      Please identify each and every employer (other than Defendant) to whom/which Plaintiff has communicated an interest in employment or concerning employment opportunities at any time from January 1, 2008 to the present, and for each such employer, identify each and every person with whom Plaintiff has communicated.

**ANSWER:**

Sheridan Healthcorps- Ormond Beach Florida, communicated with Michael Longfellow; Karen Block, and Aaron Love. Dr. Aronson has also communicated an interest in employment with Sheridan Healthcorps located in Fort Pierce Florida, Longwood Hospital; Dr. Aronson has also communicated an interest in employment with Chin Fa M.D. private practice in Palm Beach Gardens, Florida; Dr. Aronson also communicated an interest in employment with Mercy Hospital in Pittsburgh, Pennsylvania through Dr. Michael Minton; also Elyria Hospital Anesthesia Group in Elyria, Ohio, contact person Maher Kodsy, M.D., and Hamot Medical Center/Napa Anesthesia in Erie, Pennsylvania, contact person Jeanne Wagner.

8.      Identify any email address used by Plaintiff from January 1, 2008 to the present to communicate any information pertaining to Plaintiff's residency at UHC, or pertaining to any actions by Plaintiff to identify, investigate or pursue employment opportunities, and identify the service provider(s) for each such address.

**ANSWER:**

sarah.aronson@uhhospitals.org; sarah.aronson@uhhs.com; sca4@case.edu; sarah.aronson@case.edu; DRSA5555@gmail.com; sarah.aronson@shcr.com

9.      Identify any email address used by Plaintiff from February 2006 to the present (including the identity of the service provider(s) for each such address) and each computer which Plaintiff has used since February 2006 to read, create, modify, receive, send or store email communications, word processing files and/or other electronically stored information.

**ANSWER:**

See answer to interrogatory number 8. Dr. Aronson has used her home laptop computer and various computers on the campus of UH to receive and send email communications and electronically stored information.

10.     Identify any and all individuals (aside from legal counsel) to whom Plaintiff and/or persons acting on her behalf have provided electronically stored information, or from whom Plaintiff and/or persons acting on her behalf have obtained electronically stored information, which

       (i)     refers to or concerns, in whole or in part, any circumstances or conditions of Plaintiff's residency at UHC or the residency at UHC of others, or

      (ii)    refers to or concerns any actions by Plaintiff to identify, investigate or pursue employment opportunities at any time between January 1, 2008 to the present.

**ANSWER:**

Objection. This interrogatory is vague, overly broad, and therefore unduly burdensome. Without waiving any objection, however, Dr. Aronson states see response to interrogatory numbers 4 and 5. Dr. Aronson further states see documents produced in response to document request.

11.     Identify any and all individuals (aside from legal counsel and those identified in response to Interrogatory No. 10) to whom Plaintiff and/or persons acting on her behalf have provided documents, or from whom Plaintiff and/or persons acting on her behalf have obtained documents, which

       (i)     refer to or concern, in whole or in part, any circumstances or conditions of Plaintiff's residency at UHC or the residency at UHC of others, or

      (ii)    refer to or concern any actions by Plaintiff to identify, investigate or pursue employment opportunities at any time between January 1, 2008 to the present.

6

**ANSWER:**

Objection. This interrogatory is vague, overly broad, and therefore unduly burdensome. Without waiving any objection, however, Dr. Aronson states See response to interrogatory numbers 4 and 5. Dr. Aronson further states see documents produced in response to document request.

12.     Identify every person whom Plaintiff (and/or any person acting on her behalf) has

spoken with, consulted, retained and/or employed, as an expert, to assist in evaluating the matters

underlying the claims in this matter.

**ANSWER:**

Other than her legal counsel, Dr. Aronson states that, to date, she has not yet contacted or attempted to contact an expert to assist in evaluating the claims in this matter.

13.     Identify each person Plaintiff expects to call as an expert witness at trial and for

each such person, state the subject matter and substance of the facts and opinions about which he

or she is expected to testify and identify (or alternatively, produce) any documentation furnished

to the Plaintiff by said expert, or furnished by Plaintiff to said expert, and/or upon which the

expert relies as a basis for his/her opinions.

**ANSWER:**

Dr. Aronson states she has not yet determined whether she will call an expert to testify in this case. Dr. Aronson further states that, to date, she has not yet contacted or attempted to contact an expert for this case.

7

14.     State the total amount of any loss of wages, income or benefits Plaintiff claims to have lost as a result of the alleged conduct of Defendant and identify each and every individual with knowledge of the facts relied upon to determine the stated amount.

**ANSWER:**

Objection. This interrogatory seeks information protected by the attorney work product doctrine. Without waiving any objection, however, Dr. Aronson states she is entitled to all lost wages, benefits, and compensation for her emotional distress suffered as a result of unlawful actions by University Hospital Cleveland. Further, Dr. Aronson seeks punitive damages, prejudgment and post judgment interest, liquidated damages for her FMLA claims; and finally attorneys fees and costs.

Calculated without regard to mitigation, Dr. Aronson suffered lost wages and benefits of approximately $250,833 plus prejudgment interest. This sum is based on her having lost the income she would have earned from March 1, 2009 until approximately October 5, 2010 under the $350,000 plus benefits annual contracts that she lost as a result of Defendant's conduct.

As to Dr. Aronson's claim of unjust enrichment, her services provided to the Defendant after February 28, 2009 were worth $350,000 yearly plus benefits. But she was paid a salary of approximately $55,000 yearly plus benefits. Accordingly, the unjust enrichment for the period from March 1, 2009 until August 31, 2009 was approximately $177,000. Of course, Dr. Aronson does no seek a double recovery and recognizes that this sum is included within her breach of contract damages described in the paragraph above.

Similarly, the economic damages suffered by Dr. Aronson based upon her claims of tortious interference with her business relationship with Sheridan in Florida and Maryland is included within the above calculation. As to her claims of interference with her rights under the Family Medical Leave Act, Dr. Aronson seeks compensation for non-economic losses and liquidated damages. Likewise, because the tortious interference with business relationship claims also permit Dr. Aronson to be compensated for non-economic damages in addition to obtaining punitive damages against the Defendant, she is pursuing these remedies. An estimated amount for these non-economic damages is not presently available until further discovery is conducted. Even then, the amounts will be subject to the reasonable discretion of the fact finder.

Other than legal counsel, People who have knowledge of the facts relied upon in determining the damages are identified in interrogatories 4, 5, and 6.

15.    Identify any and all steps Plaintiff has taken to pursue new employment on or after January 1, 2008 and the terms and conditions of any offer of employment, employment, business proposal made to Plaintiff or business activity Plaintiff has engaged in during that time period other than Plaintiff's employment with Defendant.

**ANSWER:**

In pursuit of employment since January 1, 2008 Dr. Aronson interviewed with the following: Mercy Medical Center, Department of Anesthesiology in Canton, Ohio; Anesthesia Associates, LLC, in Willoughby, Ohio; Adena Regional Medical Center in Chillicothe, Ohio; Florida Hospital in Ormond Beach Florida; Longwood Hospital in Fort Pierce Florida; Mercy Hospital in Pittsburgh, Pennsylvania; Peninsula Regional Medical Center (PRMC) in Salisbury Maryland; and Hamot Medical Center in Erie, Pennsylvania.

Dr. Aronson further states see response to interrogatory no. 7 and documents produced responsive to document request no. 12

16.    For each document for which Plaintiff objects to production of the document based on a claim of attorney-client privilege and/or work product protection, set forth:

1.    Addressor (if applicable);

2.    Addressees (if applicable);

3.    Date (if applicable);

4.    Subject matter;

5.    Number of pages (if applicable);

6.    Document Type (paper or electronic or recorded media or other)

7.    Document Format (correspondence, other communication, notes, statement or other)

8.    Present custodian.

9.    Privilege asserted (attorney client or work produce or other)

**ANSWER:**

Dr. Aronson will produce a privilege log consistent with the Federal Rules of Civil Procedure for any documents withheld due to privilege or protection of trial preparation materials.

As to objections:

_____

Michael J. Gordillo (0073001)

## DOCUMENT REQUESTS

1.      Any and all payroll stubs and/or paycheck stubs setting forth Plaintiff's earnings from January 1, 2009 to the present, other than stubs reflecting earnings as an employee of a Defendant.

**RESPONSE:**

Objection. This request is overly broad and therefore unduly burdensome. Without waiving any objection, however, Dr. Aronson states: Will Supplement.

2.      All federal, state and local income tax returns of Plaintiff from 2007 to the present.

**RESPONSE:**

Objection. This request seeks documents and information outside the scope of discovery. Without waiving any objection, however, Dr. Aronson states: See documents produced.

3.      Any and all documents which contain, relate to or describe any communications between Plaintiff (and/or persons acting on her behalf) and any employee, agent or representative of a Defendant, which pertain or refer to any of the circumstances of Plaintiff's residency with Defendant.

**RESPONSE:**

Objection. This request is overly broad and therefore unduly burdensome. Without waiving any objection, however, Dr. Aronson states: See documents produced.

4.     Any and all calendars, diaries, personal notes or other documents created by or on behalf of Plaintiff that refer or relate to any of the events, occurrences or other circumstances of Plaintiff's residency with Defendant or Plaintiff's pursuit of employment opportunities on or after January 1, 2008.

**RESPONSE:**

See documents produced.

5.     Any and all photographs, videotapes, audiotapes or other recorded media that depict or record any current or former employee, agent or representative of Defendant.

**RESPONSE:**

No documents responsive to this request exist at this time.

6.     Any and all documents which were prepare by Plaintiff or prepared on Plaintiff's behalf, or which reflect any activities by Plaintiff, to identify, investigate or pursue employment opportunities during the period from January 1, 2008 to the present.

**RESPONSE:**

See documents produced.

7.    Any and all documents which refer or pertain in any way to the following individuals and/or their conduct or statements:

   (i)     Any Human Resources personnel of Defendant or any parent or affiliate of Defendant.

   (ii)    Any individuals who are or were residents at UHC.

   (iii)   Dr. Matthew P. Norcia

   (iv)    Dr. David A. Wallace

   (v)     Thomas A. Boyd, Psy.D

   (vi)    Dr. Jerry M. Shuck

   (vii)   Dr. Heather McFarland

   (viii)  Dr. Mark Zahniser

   (ix)    Dr. Gerald Jonsyn

   (x)     Dr. Lora Levin

   (xi)    Dr. Salim Hayek

   (xii)   Dr. Peter Adamek

   (xiii)  Dr. Tracy Bartone

   (xiv)   Dr. Adam Haas

   (xv)    Dr. David Dinniny

   (xvi)   Dr. Marin Mannix

   (xvii)  Jill Fulton-Royer

   (xviii) Will Rebello

   (xix)   Dr. Howard Nearman

   (xx)    Dr. Michael J. Longfellow

13

**RESPONSE:**

Objection.  This request seeks documents and information outside the scope of discovery  Furthermore, this request is overly broad and therefore unduly burdensome.  Without waiving any objection, however, Dr. Aronson states:  See documents produced.

8.    All documents containing ratings and/or other assessments of Plaintiff's performance and/or capabilities and/or accomplishments as a resident at UHC or as an anesthesiologist, including but not limited to evaluations, letters of recommendation, letters of reference and reference verifications.

**RESPONSE:**

See documents produced.

9.    All documents that set forth, pertain or refer to or otherwise shed light on the Plaintiff's residency work assignments, residency work schedule, the hours worked by Plaintiff as a resident at UHC, and/or the periods of leaves of absence taken by Plaintiff during her residency at UHC.

**RESPONSE:**

See documents produced.

10.    Any documents that pertain or refer to Topomax or topiramate, including but not limited to documents that refer or pertain to Plaintiff's use of Topomax or topiramate, and/or that contain communications to or from Plaintiff referring or pertaining to Topomax or topiramate.

**RESPONSE:**

Objection.  This document request seeks private health care information.  Without waiving any objection, however, Dr. Aronson state that she will produce responsive documents after a reasonable protective order is agreed upon by the parties and/or entered by the Court.

14

11.    All documents pertaining or referring to Plaintiff's December 2008 fitness for duty evaluation.

**RESPONSE:**

See documents produced.


12.    All documents which pertain or refer to or set forth offers of employment or terms and conditions of employment of Plaintiff as to employment at any time on or after January 1, 2008 other than with Defendant.

**RESPONSE:**

See documents produced.


13.    Any and all documents not otherwise requested (including but not limited to documents prepared and/or maintained by Plaintiff or persons on Plaintiff's behalf, or prepared and/or maintained by Defendant or by any current or former employee, agent or representative of Defendant), that

> i.      refer to the complaint pursued by Plaintiff against Defendant, or
>
> ii.     refer to, set forth, describe or identify, in whole or in part, any of the facts, events or other circumstances of Plaintiff's residency with Defendant, or
>
> iii.    refer to any actions by Plaintiff to identify, investigate or pursue employment opportunities on or after January 1, 2008.

**RESPONSE:**

Objection. This request is overly broad and therefore unduly burdensome. Without waiving any objection, however, Dr. Aronson states: See documents produced.

14.     Any and all documents that reflect, relate to or describe any damages Plaintiff contends she incurred in connection with the claims raised in this matter.

**RESPONSE:**

Objection. This request seeks documents protected by attorney client privilege and work product. Without waiving any objection, however, Dr. Aronson states: See documents produced.

15.     Any and all documents identified or referred to, or relied upon in responding to Defendant's First Set of Interrogatories to Plaintiff.

**RESPONSE:**

See documents produced.

16.     Any and all records of any communication referred to in Plaintiff's responses to Defendant's First Set of Interrogatories to Plaintiff.

**RESPONSE:**

See documents produced.

17.     A current Curriculum Vitae of any and all experts named in Plaintiff's Responses to Defendant's First Set of Interrogatories to Plaintiff.

**RESPONSE:**

*No documents currently exist responsive to this request.*

18.    Copies of each and every report or other document (including but not limited to billing statements, logs of phone calls and notes, both preliminary and final) prepared in relation to this matter by any and all experts named in Plaintiff's Responses to Interrogatory No. 7 of Defendant's First Set of Interrogatories to Plaintiff.

**RESPONSE:**

No documents currently exist responsive to this request.

19.    Any and all documents not heretofore requested (including but not limited to witness statements, declarations, affidavits and/or factual accounts) that contain, refer or in any way pertain to the actions or omissions complained of in Plaintiff's Complaint.

**RESPONSE:**

Objection. This request is overly broad and therefore unduly burdensome. Without waiving any objection, however, Dr. Aronson states:  See documents produced.

20.    Any and all documents, except as heretofore requested, which shed light on the allegations underlying the allegations contained in Plaintiff's Complaint.

**RESPONSE:**

Objection. This request is overly broad and therefore unduly burdensome. Without waiving any objection, however, Dr. Aronson states:  See documents produced.

21.    All documents which Plaintiff intends to introduce at any of the depositions Plaintiff may seek to take or in the trial of this matter.

**RESPONSE:**

Objection. Work product. Without waiving any objection, however, Dr. Aronson states that she has not yet determined what documents will be used in any depositions that may occur. As for trial, she will agree to a mutual exchange of anticipated exhibits as ordered by the Court or as otherwise agreed upon by counsel.

As to objections:

_____
Michael J. Gordillo (0073001)

18

## CERTIFICATE OF SERVICE

The foregoing Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents was served by regular U.S. Mail on:

Barton A. Bixenstine, Esq.
Ogletree Deakins
127 Public Square
4130 Key Tower
Cleveland, Ohio 44114
Attorneys for Defendant

this 14 day of June, 2010.

MICHAEL J. GORDILLO
*One of the Attorneys for Plaintiff*



ATTORNEYS AT LAW
WWW.EEOATTORNEY.COM

June 14, 2010

<u>**Via E-mail & Regular U.S. Mail**</u>
Barton A. Bixenstine, Esq.
Ogletree Deakins
127 Public Square
4130 Key Tower
Cleveland, Ohio 44114

RE:  *Aronson v. University Hospitals of Cleveland*
     **United States District Court Northern District of Ohio Eastern Division**
     **Case No. 1:10-cv-372; Judge Christopher Boyko**

Dear Mr. Bixenstine:

I have enclosed, *Plaintiff's Response to Defendant's First Set of Interrogatories and Request For Production of Documents.*  A signed verification page will be forthcoming.

Regards,

Michael J. Gordillo

cc:  Gregory A. Gordillo, Esq. (w/o encl.)
     Sarah Aronson, M.D. (w/o encl.)

MyEvaluations.com

Main | Mail | Voluntary | MyPortfolio | Reports | Evaluations | Procedures | Duty-Ho

Welcome, Dr. David Wallace, DO
Main > Program Director's Inbox > Evaluation Details

MyPortfolio        MyHelp        MyQuiz        My

UNIVERSITY HOSPITALS
HEALTH SYSTEM
University Hospitals of Cleveland
DEPARTMENT OF ANESTHESIOL

Thursday, February 18, 2

# ICU Weekly Evaluation Of Resident (V.1)

Resident Physician:  Dr. Sarah Aronson
Evaluation Period:   10/06/2008 to 10/10/2008

Evaluation of Resident Phy

Evaluator:  Dr. Matthew N
Rotation:   Anesthesia

## Core Competencies

### Interpersonal and Communication Skills

| | |
|---|---|
| Nursing and Office Staff | 3 |
| Attendings, Fellows, and Residents | 3 - Performance appropriate for level of training |
| Surgical and Referring Staff | 3 - Performance appropriate for level of training |

### Medical Knowledge

| | |
|---|---|
| Understanding | 3 - Performance appropriate for level of training |
| Pharmacology | 4 - Performance above expected for level of training |
| Reading | 4 - Performance above expected for level of training |

### Patient Care

| | |
|---|---|
| Data Collection | 3 - Performance appropriate for level of training |

DEFENDANT'S
EXHIBIT
PENGAD 800-631-6989

## Overall/Summary

| Resident's overall clinical competence in rotation. | 2 - Performance below average for level (feedback |

### Evaluator Comments

Verbal responses to many questions or statements are delayed, including straight forward issues. She usually gets the work done but it takes considerably longer than expected. I have not had the opportunity to see Dr Aronson perform in a critical situation so I'm not sure if she could respond appropriately. This leads me to conlude that she does not perform at hte level of A CA3 in the last six months of her training.

**Additional Comments:**
Explanation for a score of 2 out of 5 for the Patient Care: see comments
Explanation for a score of 2 out of 5 for the Overall/Summary: see comments
*I did verbally discuss this evaluation with the resident face-to-face. Signed - Dr. Matthew Norcia*

### Optional Evaluator Confidential Comments

N/A

### Acknowledgement Comments

*Thank you for your comments. I acknowledge receipt of this evaluation. - The attending DID verbally discuss this evaluation with me face-to-face, at the end of the rotation. Signed - Dr. Sarah Aronson*

### Review Comments

### Program Director Comments (These are not confidential)

To:    Marsha Miller
       ACGME Resident Services

From: Sarah Aronson, MD
      CA-3, Dept of Anesthesiology
      UH Case Medical Center
      Cleveland OH

Re:    Concern

28 Feb 2009



Ms. Miller:

I am writing to communicate a concern regarding my hospital's existing
policies regarding resident performance review. Specifically, I am concerned
that the hospital policy states that no appeal is available to a resident who is
not promoted or whose training is extended for academic reasons. The
ACGME requirements specifically state that the hospital "must minimize
conflict of interest by adjudicating parties in addressing... academic or other
disciplinary actions...[including] non-promotion of a resident to the next level
of training, or other actions that could significantly threaten a resident's
intended career development."

I apologize for the length of this statement. I understand that your office
does not intervene in the specifics of the evaluation process or the decisions
made regarding promotion. The concerns regarding lack of documentation,
lack of timely intervention and communication of performance concerns, and
most significantly, the lack of access to mediation or appeal do fall under
your jurisdiction, however. I am submitting this to you as a concern rather
than a formal complaint at this point in order to hear an objective opinion
regarding these events.

Here are the events as I see them:

1.    I was scheduled to complete my residency on 2/28/09. I am
      currently a CA-3 in Anesthesiology at University Hospitals Case
      Medical Center, 11100 Euclid Ave, Cleveland, OH 44106.
      Residency office phone (216) 844 7335.

2.    I was informed by my program directors (Drs. Matthew Norcia
      and David Wallace) at the end of November that I may receive an
      "unsatisfactory" for my last 6 months of residency (July 2008 –
      December 2008) though I had received only satisfactory to
      positive evaluations for that time period (attached). I have
      achieved passing scores on the in-training exam every year in
      residency.

3.    At that meeting, I became concerned that perhaps the topiramate that I took for migraine prophylaxis was creating a response delay in me of which I was not aware, and I suggested the option of involving the EAP in this process.

4.    In response, I was pulled from clinical duty and ordered by Dr. Wallace to undergo a Tier 1 "fitness-for-duty" evaluation citing concerns of substance abuse and/or cognitive impairment. No documentation was provided or substantive examples given to justify Tier 1 referral. No other preliminary, less intrusive, interventions were offered or considered at any time, as are outlined in the Resident's and Fellows Manual or the UHCMC Policies and Procedures, nor was Dr. Norcia aware until several days later that this action had been taken.

5.    I discontinued the medication immediately, and complied fully and promptly with the mandated evaluation. No evidence of substance abuse or cognitive impairment was found. I saw a rapid improvement in my speed of execution upon stopping the medication.

6.    Fitness-for-duty testing was completed December 4th. I had a final visit with evaluator on December 9, 2008, to review his report. Despite my calls to the program directors and the EAP liaison, no response or plan for return to work was offered to me until the evening of December 16th. During that period of time out of work, I was sufficiently alarmed by the delay in returning me to clinical duty that I consulted an attorney to clarify my options. At no time did I threaten legal action against the hospital or program.

7.    I was scheduled many months in advance to go out on maternity leave December 22nd (my partner was pregnant and expecting our third child). As a result, I was given only 3 days in December to demonstrate my clinical performance. One of those days was with Dr. Norcia, who told me he had no significant criticisms of my performance and continued to have an "open mind" regarding the decision to extend my training. Roughly 2 weeks later on 12/31/08, while I was out on maternity leave and without any further assessment of my clinical ability, Dr. Norcia submitted his on line evaluation citing poor performance during the first week of October in the ICU. In that evaluation note, based on that week, he stated that he did not feel I was performing at the level of a CA-3 and should therefore repeat the 6 month block. He indicated to me later that he felt pressured by the involvement of

an attorney to beef up their documentation in support of the actions they had taken.  He also stated to me that this influenced the tone and content of the letter presented to me January 7th, which was my formal notification of the training extension.  In that letter, in addition to the concerns of clinical responsiveness, I was cited for unprofessional behavior for not informing the hospital that I was taking the migraine medication in the first place.  He stated that the hospital attorney advised them to include this because it would allow a threat of disciplinary action, including termination, should I pursue legal action against the residency program.

8.      At the outset of this process, I was assured repeatedly by my program directors as well as by Dr. Jerry Schuck (our DIO) and Will Rebello (our GME manager) that I would have opportunity to appeal this decision.  I am attaching the letter I drafted 12/23/09 to request an appeal committee.  When I reviewed the Resident's Manual, however, it clearly states that no appeal is allowed if the intervention is "academic".  When I questioned this with the GME office and my program, I was then told that I had the following options: (1) accept the 6-month training extension without an appeal, or (2) refuse the extension, at which point I would be subject to a disciplinary action or termination without a certificate of completion, which I could then appeal, but with the caveat that I could then be terminated, and any disciplinary action would be reported to the state medical board.

9.      I was in contact with the GME office repeatedly throughout this process, and while Mr. Rebello and Dr. Schuck were readily available to listen to my concerns, they would not take any action to act as an ombudsman on my behalf.  Mr. Rebello advised me at the beginning of this process that they could become more active once I filed an appeal.  When it became clear that no appeal was allowed (unless I invited a disciplinary action), he told me that he really shouldn't be communicating with me at all because I had consulted an attorney.  Dr. Schuck stated to me that he thought the way this had been handled by my program director was "unconscionable", but that "I think at this time I can't be seen as your advocate."  He advised that I speak with Dr. Nearman, our department chairman.  Dr. Nearman has deferred to the program directors' assessment in this case as he has little contact with me clinically, and has offered no advocacy.

10.     In early November, prior to these events, I signed an employment contract to start March 2, 2009, following my anticipated graduation.  I obtained this job offer in part on the strength of Dr. Norcia's strong recommendation, dated September 2008

(attached), in which he described my ability as above average or excellent across the range of clinical duties I would be called upon to perform.

My concerns are these:

The ACGME guidelines require 4 months notice "when a resident will not be promoted to the next level of training". Further, the guidelines allow shorter notice only if "the primary reason(s) for the non-renewal or non-promotion occurs within the four months prior to the end of the agreement" The action on the part of my program regarding my performance was initiated only 3 months before my graduation date, without any preceding remediation or intervention, though the clinical performance of concern was apparently noted 5 months before my completion date. I was formally notified that I would not be graduating on time 7 weeks prior to my completion date. Documentation of the instance of unsatisfactory clinical performance was entered almost 3 months after the fact. Every other documented evaluation I have received since March of 2008 has been satisfactory to excellent.

The ACGME guidelines require that Residents "must be allowed to implement the institution's grievance procedures if they receive a written notice either of intent not to renew their agreement(s) or of intent to renew their agreement(s) but not to promote them to the next level of training". Our GME manager and our DIO both declined to mediate in this process despite my repeated communication to their office of my concerns. I was told I had no option of seeking a review or appeal of this action unless I chose to invite a disciplinary action, placing myself at greater professional risk.

I appreciate your review of these concerns and look forward to hearing your suggestions as to how I should proceed. Thank you for your attention to this matter.

Sincerely,

Sarah Aronson, MD
UHCMC/Case School of Medicine
Home phone:       (216) 721 5945
Email:            sarah.aronson@uhhospitals.org
Page:             31262@pager.uhhospitals.org





1613 N. Harrison Parkway, Suite #200
Sunrise, FL  33323
(800) 437-2672 • (954) 838-2371

## REFERENCE VERIFICATION REQUEST
PLEASE TYPE OR PRINT      PLEASE ANSWER ALL QUESTIONS

**APPLICANT NAME:  Sarah Aronson, MD**
The above named physician has applied to join our organization in the field of Anesthesiology.  To assist in evaluating this physician, please complete the verification form below and return this form in the business reply envelope enclosed, or FAX your response to (866) 292-8482.  Please base your evaluation on demonstrated performance compared to that which is reasonably expected of a physician and his/her level of training, experience and background.  This information will be held in strict confidence.  We appreciate your prompt response.

**Karen Block**
**Recruiting Manager**

In what capacity were you associated with the above physician? _professional  hospital based_
In what facility did you work with physician? _University Hospitals - Case Medical Center_
Dates worked with this physician: _3/06⁺ - present_

| AREAS OF EVALUATION | EXCELLENT | GOOD | AVERAGE | POOR | CANNOT EVALUATE |
|---|---|---|---|---|---|
| Overall Medical Knowledge | ✓ | | | | |
| Professional Judgment | | ✓ | | | |
| Evaluation and Management of Patient | | ✓ | | | |
| Clinical Competence | | ✓ | | | |
| OB Anesthesia (epidurals) | | ✓ | | | |
| Cardiac Anesthesia | | ✓ | | | |
| TEE Proficiency | ✓ | ✓ | | | |
| Neurosurgical Anesthesia | | ✓ | | | |
| Pediatric Anesthesia | | ✓ | | | |
| Spinals | | ✓ | | | |
| Regional Blocks (axillary, interscalene, etc.) | | ✓ | | | |
| Swan Ganz insertion/interpretation | | ✓ | | | |
| CVP insertion/interpretation | | ✓ | | | |
| Arterial Line insertion | | ✓ | | | |
| Record Keeping | | ✓ | | | |
| Rapport with 1. Ancillary Staff | ✓ | | | | |
|     2.  Patients & their families | ✓ | | | | |
|     3.  Surgeons | ✓ | | | | |
|     4.  Administration | | | | | ✓ |
| Communication Skills | ✓ | | | | |
| Motivation-Ambition | | ✓ | | | |
| General Behavior | | ✓ | | | |
| Appearance | | ✓ | | | |
| Emotional Stability | ✓ | | | | |
| Community Participation | | | | | ✓ |
| Career Orientation | | | | | ✓ |
| Sense of Responsibility | | ✓ | | | |

DEFENDANT'S EXHIBIT
D
PENGAD 800-631-6989

## COMMENT ON AREAS OF STRENGTH

*Excellent fund of knowledge, clinical reasoning.*

## COMMENT ON AREAS THAT NEED IMPROVEMENT

*Multitasking.*

## CORRECTIVE ACTION

To your knowledge, has the physician ever been subject to any disciplinary actions
such as a reprimand, suspension or termination?   ☐ Yes    ☐ No

To your knowledge, has this physician been involved in any malpractice litigation?   ☐ Yes    ☐ No

## CONDUCT AND HEALTH STATUS

To your knowledge, has this physician ever displayed any signs which caused suspicion   ☐ Yes    ☐ No
of behavior, drug or alcohol problems?

## RECOMMENDATIONS

1.   Recommended highly without reservations
2.   Recommended as qualified and competent   ✓
3.   Recommended with some reservation
4.   Do not recommend

## REPORT BASED ON THE FOLLOWING

1.   Close personal observation   ✓
2.   General impression
3.   A composite of evaluation by supervisors   ✓
4.   Other

## ADDITIONAL COMMENTS

Signature: *Novcia M*                    Date: *9/2/08*

Name: *Matthew P. Novcia, MD*       Phone: *216-844-7335*

Title: *Residency Co-director*

De Marcia.

Karen Black

Florida Corp

DATE 8/29  TIME

AREA CODE  NUMBER
954-838-2578

EXTENSION  oo

800-437-2672 ext 2578

I would like a verbal reference for
Karen Crosgird, or if you'd prefer
please fill out written reference.

SIGNED

| | RETURNED CALL | | CALL BACK | | WILL CALL AGAIN | | PHONED | | WANTS TO SEE YOU | | WAS IN | |

AMPAD NO. 23-776   400 SETS      RECYCLED PAPER

# HP LaserJet 4100 MFP



URHS Anesthesiology
:6 844 3781
3/03/2008 05:30 PM

## Fax Call Report

| Job | Date/Time | Type | Identification | Duration | Pages | Result |
|-----|-----------|------|----------------|----------|-------|--------|
| 16106 | 09/03 05:28 PM | Send | 919548580136 | 01'21 | 2 | OK |



# SHERIDAN
### HEALTHCARE

1613 N. Harrison Parkway, Suite #200
Sunrise, FL 33323
(800) 437-2672 • (954) 838-2371

## REFERENCE VERIFICATION REQUEST
PLEASE TYPE OR PRINT   PLEASE ANSWER ALL QUESTIONS

**APPLICANT NAME:** Sarah Aronson, MD
The above named physician has applied to join our organization in the field of Anesthesiology. To assist in evaluating this physician, please complete the verification form below and return this form in the business reply envelope enclosed, or FAX your response to (866) 292-8422. Please base your evaluation on demonstrated performance compared to that which is reasonably expected of a physician and his/her level of training, experience and background. This information will be held in strict confidence. We appreciate your prompt response.

Karen Block
Recruiting Manager

In what capacity were you associated with the above physician? _professional  hospital  based_
In what facility did you work with physician? _University hospitals - Case Medical Center_
Dates worked with this physician: _3/05 - present_

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Overall Medical Knowledge | ✓ | | | | |
| Professional Judgment | | ✓ | | | |
| Evaluation and Management of Patient | | ✓ | | | |
| Clinical Competence | | ✓ | | | |
| OB Anesthesia (epidurals) | | ✓ | | | |
| Cardiac Anesthesia | | ✓ | | | |
| TEE Proficiency | ✓ | | | | |
| Neurosurgical Anesthesia | | ✓ | | | |
| Pediatric Anesthesia | | ✓ | | | |
| Spinals | | ✓ | | | |
| Regional Blocks (axillary, interscalene, etc.) | | ✓ | | | |
| Swan Gans insertion/interpretation | | ✓ | | | |
| CVP insertion/interpretation | | ✓ | | | |
| Arterial Line insertion | | ✓ | | | |
| Record Keeping | | ✓ | | | |
| Rapport with 1. Ancillary Staff | ✓ | | | | |
| 2. Patients & their families | ✓ | | | | |
| 3. Surgeons | ✓ | | | | |
| 4. Administration | | | | | ✓ |
| Communication Skills | ✓ | | | | |
| Motivation-Ambition | | ✓ | | | |
| General Behavior | | ✓ | | | |
| Appearance | | | | | |
| Emotional Stability | ✓ | | | | |
| Community Participation | | | | | ✓ |
| Career Orientation | | | | | |
| Sense of Responsibility | | ✓ | | | |

## COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| Sarah Aronson, M.D.<br>6741 Twelve Oaks Drive<br>Hebron, Maryland 21830<br><br>     Plaintiff,<br><br>vs.<br><br>University Hospitals of Cleveland<br>c/o Janet Miller, Statutory Agent<br>3605 Warrensville Center Rd Msc 9110<br>Shaker Heights, Ohio 44122<br><br>     Defendant. | *Judge:* JANET R BURNSIDE<br><br>CV 09 713957<br><br>JUDGE<br><br>**COMPLAINT**<br>[Jury Demand Endorsed Hereon] |

### BACKGROUND

1. Plaintiff Dr. Sarah Aronson was employed as an anesthesiology residency training physician with the Defendant University Hospital of Cleveland/ Case School of Medicine between March 2006 and September 2009.

2. Dr. Aronson received her doctor of medicine degree from Brown University in 1987.

3. Before Dr. Aronson began her residency training with the Defendant, she had successfully completed residency training programs in internal medicine, psychiatry, and family practice. She completed each of these residency programs without any reported unsatisfactory performance evaluations.



DEFENDANT'S
EXHIBIT
E

PENGAD 800-631-6989

4.     Dr. Aronson has now completed her anesthesiology residency training with the Defendant.

5.     Dr. Aronson is a board certified physician in psychiatry and neurology, and family practice. She completed a 1-year internal medicine residency training program at Norwalk Hospital/Yale University School of Medicine in 1988. In 1993, she completed a 3-year psychiatry residency training program at Yale University School of Medicine. In 1995, she completed a 2-year family practice residency training program at Middlesex Hospital/University of Connecticut School of Medicine.

6.     Dr. Aronson earned board certification in psychiatry and neurology in 1994 and again in 2005. She earned board certification in family practice in 1996 and again in 2003.

7.     Before beginning her anesthesiology residency training at the Defendant University Hospitals of Cleveland, Dr. Aronson held professional positions as a consulting psychiatrist at University Hospitals of Cleveland; as a medical director at University Hospitals of Cleveland; as a consulting psychiatrist at Heather Hill Hospital; as Medical Director at Roland E. Miller Family Medicine Center in Erie, Pennsylvania; as an Associate Director at Hamot Family Practice Residency in Erie, Pennsylvania, and as an attending physician in the Emergency Department of Veteran's Memorial Medical Center in Meriden, Connecticut. She has also served as an attending physician at Bristol Hospital in Bristol, Connecticut; at Whiting Forensic Psychiatric Hospital in Middletown, Connecticut; at Rivka Zieff Hospital in Tsfat (Safed), Israel, and on call for Israel Defense Forces/Kibbutz Misgaf Am Galil, Israel.

8.     On August 4 2009, Dr. Aronson passed Part 1 of the anesthesiology board examination with a score in the 95th percentile.

9.     To complete the anesthesiology residency program in accordance with the requirements of the American Board of Anesthesiology, Dr. Aronson had to fulfill 36 months of approved training in anesthesiology.  During the training, she had to receive a satisfactory Certificate of Clinical Competence for each six month period of clinical training.

10.     From the time Dr. Aronson began her residency training with the Defendant through the first half of 2008, she satisfactorily completed each 6-month training period and received nothing but satisfactory Certificates of Clinical Competence.

11.     During each year of the residency training program, Dr. Aronson achieved scores on an In-Training Exam predictive of her passing the written anesthesiology board exam.  These scores included the In-Training Exams she took in July 2006, 2007 and 2008 as well as March of 2009.

12.     In the summer and fall of 2008, Dr. Aronson was anticipating her February 2009 graduation from the program and began to apply for post-residency positions as an anesthesiologist.

13.     In the fall of 2008, Dr. Mathew Norcia, M.D., was Residency Program Director for the Defendant's anesthesiology residency program.

14.     In the fall of 2008, Dr. Norcia wrote letters of reference to Dr. Aronson's prospective employers and described her as "good" or "excellent" in the full range of activities related to those anesthesiologist positions.

15.     On September 2, 2008, Dr. Norcia completed for Dr. Aronson a reference verification request by Sheridan Healthcare in Sunrise, Florida.  On the form, Dr. Norcia indicates that his review of Dr. Aronson was based on close personal observation and a

2

composite of evaluation by supervisors. He rated her as "excellent" or "good" in every category for which he was able to evaluate her. He recommended her as qualified and competent.

16. In September and October 2008, Dr. Aronson was assigned to the Surgical Intensive Care Unit.

17. Throughout Dr. Aronson's employment with the Defendant, she was employed pursuant to a Resident/Fellowship contract. The contract for the period covering her employment from March 2008 through February 2009 was substantially the same as all other contracts throughout Dr. Aronson's residency with the Defendant. Because she is unable to locate a copy of the applicable contract now, the contract for the 2008 years is not attached. But upon information and belief, the contract obligated the Defendant to "provide an educational program that at a minimum meets the standards established by the ACGME. . . ."

18. ACGME is the Accreditation Council for Graduate Medical Education.

19. ACGME has standards regarding duty hours for anesthesiology residents. Those standards limit duty to 80 hours per week subject to an exception upon appropriate approval that allows for a ten percent increase up to 88 hours per week. The 80 hour limit is also applied as an average over four weeks subject to the four week period being shortened by vacation or a rotation not lasting the entire four weeks.

20. The Defendant did not obtain any approval from ACGME to exceed the 80 hour limit for Dr. Aronson's duty during September or October 2008.

21. During September 2008, Defendant scheduled Dr. Aronson to work more than the duty hour limits imposed by the ACGME standards.

22. During October 2008, Defendant scheduled Dr. Aronson to work more than the duty hour limits imposed by the ACGME standards.

3

23.     The ACGME requires that Residents must be provided with 1 day in 7 free from all educational and clinical Responsibilities.

24.     From September 2, 2008 through September 20, 2008, Dr. Aronson worked 18 of the 19 days.

25.     From September 7, 2008 through September 13, 2008, Defendant required Dr. Aronson to work 93 duty hours.

26.     From September 29, 2008 through October 5, 2008, Defendant required Dr. Aronson to work 108 duty hours.

27.     From October 19, 2008 through October 25, 2008, Defendant required Dr. Aronson to work 98 duty hours.

28.     For the month of October 2008, Defendant required Dr. Aronson to work 362 duty hours.

29.     In Mid-October 2008, Dr. Norcia and the Residency Program Co-director for the Defendant's anesthesiology residency program, Dr. David A. Wallace, D.O., presented to Dr. Aronson, for the first time, some critical evaluations of her performance. The criticisms of Dr. Aronson's performance primarily concerned her speed and efficiency. These evaluations pre-dated the Satisfactory Certificate of Completion Dr. Aronson received for the January-July 2008 training period, Dr. Aronson's successful July 2008 In-Training Exam, and Dr. Norcia's letters of recommendation and reference verification described in the paragraphs above.

30.     In early November 2008, Dr. Aronson signed a contract to begin working for Sheridan Healthcare on March 2, 2009. Her employment with Sheridan Healthcare was contingent upon Dr. Aronson's completing her residency training as expected by February 28, 2009. Under the contract, Dr. Aronson was to earn a $350,000.00 annual salary.

4

31.     Under her contract with the Defendant for the period ending February 28, 2009,
Dr. Aronson was paid an annual salary of approximately $55,000.

32.     Between May 2008 and November 23, 2008, Dr. Aronson had received periodic
evaluations from attending physicians supervising her work. All of her evaluations presented to
her by these attending physicians rated her performance from satisfactory to positive. She
received no negative evaluations or comments. For November 2008, Dr. Aronson received an
"above average" faculty evaluation of her work.

33.     On November 24, 2008, Drs. Norcia and Wallace again met with Dr. Aronson and
criticized her performance. She asked for concrete examples of performance deficiencies. They
provided none. Drs. Norcia and Wallace informed Dr. Aronson that she might receive an
"unsatisfactory" rating for her July 2008 – December 2008 training period.

34.     When Dr. Aronson began her employment with Defendant as a resident physician
in 2006, she informed the Defendant that she was taking medications for migraine headaches.
Among the medications she was regularly taking and that she disclosed to the Defendant was
topamax.

35.     During the November 24, 2008 meeting described in paragraph 33, Drs. Norcia
and Wallace asked whether Dr. Aronson was taking any medications. She acknowledged that
she was taking topamax. They discussed whether the medication was causing a response delay
of which she was unaware. So she suggested that she involve the Defendant's Employee
Assistance Program as a third party monitor as she discontinued using the medication.

36.     On the day following the meeting described in the preceding paragraph, and 3
weeks before Dr. Aronson's scheduled maternity leave, Dr. Wallace removed Dr. Aronson from
her clinical duty and ordered her to undergo a fitness for duty evaluation. He cited concerns

5

about substance abuse and/or cognitive impairment. Again, Dr. Aronson asked for an example of any behavior or performance that would justify the allegation that she was impaired. Again, none was given.

37.    On December 4, 2008, the fitness for duty evaluation was completed. No evidence of substance abuse or cognitive impairment was found.

38.    On December 9, 2008, Dr. Aronson met with the fitness for duty evaluator to review the report.  Subsequently, she called Drs. Norcia, Wallace, and the EAP liaison to return to work. Defendant offered Dr. Aronson no response or plan for her return to work until December 16, 2008.

39.    Dr. Aronson only performed clinical duties for three days in December 2008 before she began her previously scheduled maternity leave on December 22, 2008.

40.    Under the requirements of the American Board of Anesthesiology, "the total of any and all absences may not exceed 60 working days (12 weeks)" during the three years of residency training.

41.    While Dr. Aronson was on maternity leave on December 31, 2008, Dr. Norcia submitted an online evaluation of her and cited poor performance by Dr. Aronson in the Surgical Intensive Care Unit during the first week of October. He indicated that based on that week, he did not feel Dr. Aronson was performing at the level of a third year anesthesiology resident and therefore should repeat the 6 month block. She received no other notice of any specific performance concern communicated to either Dr. Norcia or Dr. Wallace.

42.    Defendant is a "Sponsoring Institution" as that term is used by the ACGME in the ACGME's Institutional Requirements.

43.  Under Section II.D.4.d).(1) of the ACGME Institutional Requirements, "when a resident will not be promoted to the next level of training, the Sponsoring Institution must ensure that its programs provide the resident(s) with a written notice of intent no later than four months prior to the end of the resident's current agreement.  If the primary reason(s) for the non-renewal or non-promotion occurs within the four months prior to the end of the agreement, the Sponsoring Institution must ensure that its programs provide the resident(s) with as much written notice of the intent not to renew or not to promote as circumstances will reasonably allow, prior to the end of the agreement."

44.  On January 7, 2009, Defendant gave Dr. Aronson written notice that she had to extend her training for another 6 months.

45.  Under Section II.D.4.e).(1) of the ACGME Institutional Requirements, the Sponsoring Institution must provide "policies and procedures for grievance and due process. These policies and procedures must minimize conflicts of interest by adjudicating parties in addressing: Academic or other disciplinary actions taken against residents that could result in dismissal, non-renewal of a resident's agreement, non-promotion of a resident to the next level of training, or other actions that could significantly threaten a resident's intended career development. . . ."

46.  Dr. Aronson made repeated requests to appeal the decision to extend her training. All of her requests were refused by the Defendant.

47.  Although Defendant notified Dr. Aronson that she had unsatisfactorily completed the July – December 2008 training period, Defendant informed Dr. Aronson that the "six month" additional training period would not begin until after her originally planned, February 28, 2009 graduation date.

7

48.     On March 24, 2009, the American Board of Anesthesiology informed Dr. Aronson that Defendant had filed a Clinical Competency Committee evaluation of her and rated her performance for the six month period that ended December 31, 2008 as unsatisfactory.

49.     As a direct and proximate result of Defendant's extending Dr. Aronson's training beyond the originally planned graduation date, Sheridan Healthcare withdrew its $350,000 a year job that it had offered to Dr. Aronson.

50.     In the Spring of 2009, Dr. Aronson began to look for new anesthesiology positions, and applied for licensure in Maryland.

51.     On or about April 10, 2009, Dr. Aronson wrote a formal complaint about the events that had been occurring in the course of her employment and training with the Defendant and submitted the complaint to the ACGME.

52.     On or about May 27, 2009, the ACGME replied with a letter mailed to Drs. Aronson, Wallace, Norcia and Shuck.

53.     On June 2, 2009 -- the first workday for Dr. Aronson after the ACGME's notice of her complaint had been delivered -- Dr. Aronson was informed that Drs. Norcia and Wallace would meet with her to review her performance. The meeting was held on June 4, 2009.

54.     During the June 4 meeting, Dr. Wallace produced notes and medical records to support a wide range of criticisms and accusations against Dr. Aronson. Dr. Wallace argued that Dr. Aronson's clinical competency and professionalism were unsatisfactory and unlikely to lead to successful completion of the residency program. The accusations and criticisms had never been shared with Dr. Aronson before the June 4 meeting and were inconsistent with prior verbal feedback that she had received from attending physicians when they observed her work during the March 2009 training period.

8

55.    On June 28, 2009, Dr. Aronson submitted a request to the Defendant for a leave of absence during the end of August to finalize the adoption of her son.

56.    On July 10, 2009, Defendant assigned Dr. Aronson to the most demanding and stressful rotation of her training during the last 2 weeks of August – namely the intensive care unit. This was at a time when most graduating residents were on a flexible float schedule.

57.    On July 13, 2009, Dr. Aronson wrote to Dr. Jerry M. Shuck, the Defendant's Director of Graduate Medical Education, and informed Dr. Shuck that she believed that she was being retaliated against because of hr request for time off to adopt her son.

58.    On July 28, 2009, an ACGME representative visited the Defendant as part of a hospital-wide site review.  During the visit, the representative met with Dr. Aronson to discuss her complaints. Upon information and belief, he shared her conversation with the Defendant.

59.    By the end of July 2008, Dr. Aronson had secured another offer of employment for an anesthesiology position in Maryland at an annual salary of $350,000.  Her employment was scheduled to begin on September 3, 2009, immediately following her scheduled August 31, 2009 graduation. The job offer was contingent upon Dr. Aronson's getting credentials in Maryland.

60.    In mid-August 2009, Dr. Aronson discovered that according to the American Board of Anesthesiology, she had completed her additional six months of training as of the end of June 2009. So she informed the Defendant, and on August 27, 2009, the Defendant released Dr. Aronson from her training with a letter indicating that she had satisfied all requirements as of August 31, 2009.

61.    Dr. Aronson's new employment in Maryland did not begin until October 5, 2009. The start date was delayed because her new employer received "damaging information" in

9

Dr. Aronson's records that had been submitted by the Defendant, immediately following Dr. Aronson's discovery and disclosure to the ACGME regarding the Defendant's wrongly requiring her to continue the residency program until August 31, 2009.

## COUNT I
*(Breach of Contract)*

62.     Dr. Aronson incorporates here by reference each and every statement set forth in paragraphs 1-61 above.

63.     Defendant breached the Resident/Fellowship contract that it entered into with Dr. Aronson for the period ending February 28, 2009.

64.     As a direct and proximate result of Defendant's breach, Dr. Aronson has suffered damages not less than $250,000.

## COUNT II
*(Unjust Enrichment)*

65.     Dr. Aronson incorporates here by reference each and every statement set forth in paragraphs 1-64 above.

66.     Defendant continued to employ Dr. Aronson as a resident after she had completed all training required of her to satisfy the residency training standards established by the ACGME.

67.     Defendant continued to pay Dr. Aronson a salary commensurate with that of a physician in residency training while enjoying her services after she had obtained the training.

68.     Defendant was unjustly enriched by Dr. Aronson's providing those services.

69.     As a direct and proximate result of the unjust enrichment, Dr. Aronson suffered damages not less than $147,500.

10

## COUNT III
*(Tortious Interference with Economic Relations)*

70.     Dr. Aronson incorporates here by reference each and every statement set forth in paragraphs 1-69 above.

71.     There was a contract offered by Sheridan Healthcare to Dr. Aronson.

72.     Defendant knew of the contract offer described in paragraph 71.

73.     Defendant acted with the intent to interfere with the contract offer described in paragraph 71.

74.     Defendant lacked a justification for its actions in procuring Sheridan Healthcare's withdrawal of its contract offer from Dr. Aronson.

75.     Dr. Aronson suffered damages as a direct and proximate result of Defendant's interference with her prospective business relationship with Sheridan Healthcare.

76.     Defendant acted with malice in interfering with Dr. Aronson's prospective business relationship with Sheridan Healthcare.

## COUNT IV
*(Tortious Interference with Economic Relations)*

77.     Dr. Aronson incorporates here by reference each and every statement set forth in paragraphs 1-76 above.

78.     There was a contract offered by Sheridan HealthCorps in Maryland to Dr. Aronson.

79.     Defendant knew of the contract offer described in paragraph 78.

80.     Defendant acted with the intent to interfere with the contract offer described in paragraph 80.

11

81.     Defendant lacked a justification for its actions in procuring the delay in Sheridan HealthCorps's employing Dr. Aronson as an anesthesiologist.

82.     Dr. Aronson suffered damages as a direct and proximate result of Defendant's interference with her prospective business relationship with SheridanHealthCorps.

83.     Defendant acted with malice in interfering with Dr. Aronson's prospective business relationship with SheridanHealthCorps.

**COUNT V**
*(FMLA Interference)*

84.     Dr. Aronson incorporates here by reference each and every statement set forth in paragraphs 1-83 above.

85.     In December 2008, Dr. Aronson was a covered employee under the Family Medical Leave Act, 29 U.S.C. §2611(2).

86.     In December 2008, Defendant was a covered employer under the Family Medical Leave Act, 29 U.S.C. §2611(4).

87.     Dr. Aronson requested maternity leave for December 2008. Her request was an attempt to exercise her right to leave under the Family Medical Leave Act, 29 U.S.C. §2612(a).

88.     Defendant interfered with Dr. Aronson's right to maternity leave in violation of 29 U.S.C. §2615(a)(1).

89.     Defendant's actions in violation of 29 U.S.C. §2615(a)(1) were not taken in good faith.

90.     Defendant's acts have caused Dr. Aronson to suffer certain damages in the form of emotional distress, lost wages, benefits, and compensation, all in an amount to be proven at trial.

## COUNT VI
*(FMLA Interference)*

91.     Dr. Aronson incorporates here by reference each and every statement set forth in paragraphs 1-90 above.

92.     In June 2009, Dr. Aronson was a covered employee under the Family Medical Leave Act, 29 U.S.C. §2611(2).

93.     In June 2009, Defendant was a covered employer under the Family Medical Leave Act, 29 U.S.C. §2611(4).

94.     Dr. Aronson requested adoption leave in June 2009. Her request was an attempt to exercise her right to leave under the Family Medical Leave Act, 29 U.S.C. §2612(a).

95.     Defendant interfered with Dr. Aronson's right to maternity leave in violation of 29 U.S.C. §2615(a)(1).

96.     Defendant's actions in violation of 29 U.S.C. §2615(a)(1) were not taken in good faith.

97.     Defendant's acts have caused Dr. Aronson to suffer certain damages in the form of emotional distress, lost wages, benefits, and compensation, all in an amount to be proven at trial.

**WHEREFORE,** Plaintiff Dr. Sarah Aronson, M.D. demands judgment against the Defendant as follows:

a.      On Count One for compensatory damages not less than $250,000 plus prejudgment and post judgment interest;

b.      On Count Two for compensatory damages not less than $147,500 plus prejudgment and post judgment interest;

c.      On Count Three for compensatory damages not less than $250,000 and punitive damages as necessary to deter future tortuous interference with business relations by Defendant, plus costs, attorney fees, and interest.

d.    On Count IV for compensatory damages not less than $29,000 and punitive damages as necessary to deter future tortuous interference with business relations by Defendant, plus costs, attorney fees, and interest;

e.    On Count V for compensatory damages in excess of $25,000 plus, interest, liquidated damages, costs, and reasonable attorney fees as a result of Defendant's violations of the Family Medical Leave Act;

f.    On Count VI for compensatory damages in excess of $25,000 plus, interest, liquidated damages, costs, and reasonable attorney fees as a result of Defendant's violations of the Family Medical Leave Act; and

g.    Any other relief this Court deems just and proper.

GREGORY A. GORDILLO (0063445)
ggordillo@eeoattorney.com
MICHAEL J. GORDILLO (0073001)
Gordillo & Gordillo, LLC
1370 Ontario Street
2000 Standard Building
Cleveland, Ohio 44113
(216) 875-5500
(216) 583-03445 Fax

Attorneys for Plaintiff

14

## JURY ENDORSEMENT

A trial by jury is demanded on all issues so triable.

GREGORY A. GORDILLO (0063445)
MICHAEL J. GORDILLO (0073001)
Gordillo & Gordillo LLC
2000 Standard Building
1370 Ontario Street
Cleveland, Ohio 44113
(216) 875-5500 – Telephone
(216) 583-0345 - Facsimile
ggordillo@eeoattorney.com
mgordillo@eeoattorney.com

15

Resident Duty Hours Tracking Survey

This monthly survey is for compliance with the ACGME Duty Hours Requirements. Every resident/fellow in an accredited ACGME program must complete and submit this monthly survey to their department coordinator or Program Director. The department will compile the results and send an email to the Graduate Medical Education office to log the overall response for each program.

Month **Sept '08**          SICU
                            Rotation

Please circle the appropriate response to the following statements.

1. My duty hours have been limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call activities.

        (YES)                              NO

2. I have received 1 day free in 7 from all educational and clinical responsibilities, averaged over a 4-week period, inclusive of call.

        (YES)                              NO

3. I have received 10 hours off between all daily duty periods and after in-house call.

        (YES)                              NO

**If you answered NO to any of the above questions please contact your Program Director or the Graduate Medical Education office.**

                    S. ARONSON

_____
Resident/Fellow Name (Please Print)

_____
Resident/Fellow Signature
This survey is not valid unless signed by the resident.

DEFENDANT'S
EXHIBIT

### Resident Duty Hours Tracking Survey

This monthly survey is for compliance with the ACGME Duty Hours Requirements. Every resident/fellow in an accredited ACGME program must complete and submit this monthly survey to their department coordinator or Program Director. The department will compile the results and send an email to the Graduate Medical Education office to log the overall response for each program.

Month  _____ SICU _____  | Date

Rotation

Please circle the appropriate response to the following statements.

1. My duty hours have been limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call activities.

   YES  NO   But not over by much

2. I have received 1 day free in 7 from all educational and clinical responsibilities, averaged over a 4-week period, inclusive of call.

    YES          NO

3. I have received 10 hours off between all daily duty periods and after in-house call.

    YES          NO

If you answered **NO** to any of the above questions please contact your Program Director or the Graduate Medical Education office.

_____ SARAH ARONSON MD _____

Resident/Fellow Name (Please Print)

_____

Resident/Fellow Signature
**This survey is not valid unless signed by the resident.**

DEFENDANT'S
EXHIBIT
G
PENGAD 800-651-6989



**University Hospitals**
Case Medical Center

Sarah C. Aronson, M.D.                                                                January 7, 2009
10510 Park Lane #115
Cleveland, OH 44106

Dear Dr. Aronson:

The faculty, through the residency competency committee, has determined that your performance does not meet expectations for a resident of your level of training; therefore, for the reporting period of July 1, 2008 through December 31, 2008 you will receive an unsatisfactory evaluation on the Clinical Competence Report to the American Board of Anesthesiology.

This decision is based on the following criteria. Under the category of Essential Attributes, the committee has determined that you have been unable to demonstrate the ability to react to stressful situations in an appropriate manner. Under the category of Professionalism, you have failed to carry out your professional responsibility of notifying the Residency Program Directors that you were taking a prescribed medication that could impair your judgment and/or job performance, as required by hospital policy. Additionally, under the category of Patient Care, you have failed to demonstrate your ability to recognize and respond appropriately to significant changes in the anesthetic course.

The consequence of reporting an unsatisfactory evaluation during the second six month period of your CA-3 year is that you will be required to remediate for an additional six month period in accordance with the American Board of Anesthesiology guidelines. Accordingly, you must complete a total of thirty-six months with a final satisfactory rating to be eligible to receive a certificate of completion of training.

Please contact the Residency Program Office at 216-844-7335 upon receipt of this letter. Christine Adamovich will assist you with setting up a time to meet and discuss the remedial program plan and to address any questions you may have.

Respectfully,

Matthew P. Norcia, M.D.
Residency Program Director

David A. Wallace, D.O.
Residency Program Co-director

cc: Michael Jordan, Esq.

DEFENDANT'S
EXHIBIT
H



**University Hospitals**
Case Medical Center

Memo Re:  Sarah C. Aronson          February 4, 2009

Dr. Wallace and I met with Dr. Aronson to discuss her current perspective and make plans for her next 6 month clinical schedule, for March 1, 2009 to August 31, 2009.  We also compared schedules and are in agreement that Dr. Aronson has 2 days of vacation remaining through February 28, 2009.  She will be entitled to an additional 10 days of vacation and 3 meeting days through August 31, 2009.

Dr. Aronson has agreed to a 6 month schedule that includes Cardiac/Thoracic, Vascular, Neuroanesthesia, ICU, Pediatrics, and an Elective month which she expressed an interest in doing TEE.  Dr Aronson and Dr. Wallace will decide the sequence of the rotations so that Dr. Aronson will get the best experience and to accommodate her schedule.  Dr. Aronson missed her previously scheduled Metro Trauma rotation.  We discussed that if she has 20 logged trauma cases, then it is her choice if she would like to incorporate the Metro Trauma rotation into her 6 month schedule.

Dr. Aronson requested if she could be excused to attend the Society of Cardiovascular Anesthesiologists Annual Meeting and Workshops from April 17 – 22, 2009.  Even though this meeting occurs during the same time that the MARC 2009 conference is, we feel that if Dr. Rowbottom will approve it, it would be alright.  She has tentatively signed up for these days in the Anesthesia Scheduling system.

Dr. Aronson was asked about her perspective on how she was performing.  She generally felt her performance was adequate and improved, with the ability to increase the pace of her work.  She said that she had requested feedback from Dr. Parks but that she has not heard anything yet.  She was encouraged to request verbal feedback at the end of the day (so that it would be timely and interactive dialogue could be established.)

We decided that the three of us would meet on a monthly basis, around the middle of the month and on an as needed basis otherwise.  Dr. Aronson will contact Christine Adamovich (216-844-7335) to arrange these meetings.

Respectfully,

Matthew P. Norcia, M.D.
Residency Program Director

David A. Wallace, D.O.
Residency Program Co-director

Sarah C. Aronson, M.D.

**Department of Anesthesiology and Perioperative Medicine**
11100 Euclid Avenue  Cleveland, Ohio  44106-5077  Phone 216-844-7335  FAX  216-844-3781
*University Hospitals Case Medical Center and Case Western Reserve University School of Medicine*


DEFENDANT'S
EXHIBIT

# UNIVERSITY HOSPITALS CASE MEDICAL CENTER
## RESIDENT/FELLOWSHIP CONTRACT

Date: 2/06/2009                                    Doctor: Sarah Aronson

I am pleased to inform you that on the recommendation of your department director, the terms of your appointment as a resident physician at University Hospitals of Cleveland DBA University Hospitals Case Medical Center ("UHCMC") are as follows:

Department-Division: Anesthesiology                 PGY Level: 7

Effective Period:    03/01/2009-08/31/2009          Annual Stipend: $54970

All appointments are for the above Effective Period, and may be renewed at the discretion of UHCMC upon continued evidence of satisfactory performance. Further, all appointments are subject to the terms, policies and procedures set forth in the attached Residents' & Fellows' Manual (the "Manual"). This contract may be terminated for any reason or no reason pursuant to the terms of the Manual or the policies and procedures of University Hospitals and UHCMC.

Upon commencement of your employment you are required to show evidence of U.S. citizenship or present a valid visa in a category that permits you to be employed in the program without qualifications or exceptions.

UHCMC agrees to provide an educational program that at a minimum meets the standards established by the ACGME and to provide benefits as outlined in the Manual. You will agree to meet the educational requirements of the program and to provide safe, effective and compassionate care under the supervision of residency faculty.

Read the Residents' & Fellows' Manual carefully. It contains important information about hospital policies. You must familiarize yourself with the following information:

| | | |
|---|---|---|
| • Compensation and Benefits | • Financial Support | • Physician Impairment & Substance Abuse |
| • Conditions for Living Quarters | • Grievance Procedures | • Professional Activities outside the Program |
| • Counseling | • Insurance Coverage (health, disability, liability, liability after program completion) | • Professional Leave of Absence Benefits |
| • Duty Hours | | • Residency Closure and Reduction |
| • Effect of Leave for Satisfying Completion of Program | | • Resident Evaluation & Reappointment |
| • Equal Employment | • Leave of Absence | • Resident Responsibilities |
| • Extracurricular Employment (Moonlighting) | • Meals and Laundry | • Sexual and Other Forms of Harassment |
| • Family Medical Leave Benefits (FMLA) | • Medical & Psychological Support Services | • Sick Leave Benefits |
| | • Non-Renewal of Contract | • Vacation |
| | • Payroll | |

You will be required to follow UHCMC policies and procedures and comply with state and federal laws and regulations. University Hospitals is committed to full compliance with all applicable laws, rules, regulations and state and Federal health care program requirements [collectively, "Laws"], and by signing the Compliance Certification, attached as an addendum to this Contract, you agree to cooperate fully with the University Hospitals Compliance & Ethics Program. Failure to comply with the requirements of the attached Compliance Certification may result in the immediate termination of your appointment to the Residency Program.

By accepting this position you will be bound by the terms of the Residents' & Fellows' Manual as it may be amended from time to time. Kindly acknowledge your acceptance of this offer by signing below and returning the original copy of this letter to:

Graduate Medical Education Office
University Hospitals Case Medical Center
11100 Euclid Ave
Cleveland, Ohio 44106

_____           _____   _____
Jerry M. Shuck, M.D.                        Signature                  Date
Director of Graduate Medical Education

DEFENDANT'S
EXHIBIT
J

PENGAD 800-631-6989

ARON 0167

UNIVERSITY HOSPITALS ("UH")[1]
COMPLIANCE ADDENDUM AND CERTIFICATION

This Compliance Addendum is incorporated into and made a part of the Resident/Fellowship Contract between University Hospitals Case Medical Center and Sarah Aronson (Doctor).

Each party shall perform its obligations under the Contract in compliance with the requirements set forth in the Federal Anti-Kickback Statute and the Stark Self-Referral Law, to the extent such laws may be applicable to the arrangements described in the Contract.

By signing the contract, I certify that:

1.  I have not been debarred, excluded, suspended or otherwise determined to be ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs[2] (collectively, "Ineligible"), or convicted of a criminal offense that could result in becoming Ineligible.

2.  Except as disclosed below, neither I nor an immediate family member[3] makes referrals to UH for health care items or services, or to the best of my knowledge: (a) has a direct or indirect ownership or investment interest in or is directly or indirectly employed by or contracted with any company or person to provide services in connection with my Contract:

   _____

3.  I will conduct myself as a Doctor consistent with the standards set forth in the UH Code of Conduct, and I shall cooperate fully with the UH Compliance & Ethics Program.  The UH Code of Conduct is available electronically at: *http://www.uhhospitals.org/tabid/1806/Default.aspx* .

4.  I shall perform the Contract in compliance with all applicable laws, rules, regulations and Federal health care program requirements (to the extent applicable) (collectively, "Laws").

By signing below, I certify that I:

1.  Have received a copy of the University Hospitals ("UH") Code of Conduct and UH Policies and Procedures regarding the operation of the UH Compliance & Ethics Program and compliance with Federal health care program requirements, specifically including the Federal Anti-Kickback Statute (42 U.S.C. Sec. 1320a-7(b) (the "Anti-Kickback Statute") and the Physician Self Referral Law (42 U.S.C. Sec. 1395nn) (also referred to as the "Stark Law");

2.  Have read, understood and shall abide by the UH Code of Conduct and UH Policies and Procedures;

3.  Shall comply with the UH Compliance Program; and

4.  Shall perform the Contract in compliance with all applicable laws, rules and regulations and Federal health care program requirements, including without limitation, the Federal Anti-Kickback Statute, the Stark Law, and the rules, regulations and administrative guidance promulgated under the authority of such laws.

Each of the parties certifies that to its best knowledge and belief, no part of any consideration paid under the Contract is a prohibited payment for the recommending or arranging for the referral of business or the ordering of items or services; nor are the payments intended to induce illegal referrals of business or other illegal conduct.

This Compliance Certification must be signed by an authorized representative of the entity or individual identified below with knowledge of the matters addressed herein and authority to bind such party, and shall have the same effective date as the Contract.

"DOCTOR"                                            "UH"

_____  2/1/9                     _____

Print Name:  S. Aronson MD  Date:                  Jerry M. Shuck, M.D.
Date:        2/25/09                                Director of Graduate Medical Education

_____

1.Except where otherwise noted, "UH" means all hospitals, ancillary providers, and other entities owned or controlled, directly or indirectly, by University Hospitals Health System.

2.  An individual or entity listed on either the Health and Human Services – Office of Inspector General – List of Excluded Individuals at www.exclusions.oig.hhs.gov or the General Services Administration List of Parties Excluded from Federal Procurement and Non-Procurement Programs at www.epls.gov , as revised from time to time, is Ineligible.

3.  "Immediate family members" include a spouse, natural or adoptive parent, child, sibling, step-parent, step-child, step-brother, step-sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, grandchild, and the spouse of any grandparent or grandchild.

## Wallace, David

**From:**  Aronson, Sarah
**Sent:**  Tuesday, February 24, 2009 9:00 AM
**To:**  Aronson, Sarah; Norcia, Matthew; Wallace, David; Adamovich, Christine
**Subject:** RE: feb mtg

See below - also, I'm attaching a proposed schedule -

| | |
|---|---|
| MARCH | NEURO/FLOAT |
| APRIL | VASCULAR/FLOAT |
| MAY | CARDIOTHORACIC/FLOAT |
| JUNE | ECHO LAB, BACK-UP TEE/CARDIOTHORACIC*, LIVER TXP CALL ―― |
| JULY | METRO/PEDS |
| AUG | ASU/OB/FLOAT |

*As I think I suggested before, what I was thinking here was that I could schedule to be in echo lab for the month, with 1 day per week in the OR (preferably cardiac); in addition (because they don't start in echo until 830-900) I could support the attending and help start cases in the back hall in the AM, and do whatever echo the TEE resident isn't doing.

What should I anticipate in terms of my on-call requirements?  Will I continue on the same frequency or will that change?

Thank you,
SCA

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*


**From:** Aronson, Sarah
**Sent:** Tue 2/17/2009 18:15
**To:** Norcia, Matthew; Wallace, David; Adamovich, Christine
**Subject:** feb mtg

I'd like to set up a time for a mid-month meeting - thanks,
SCA

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*


2/24/2009



DEFENDANT'S EXHIBIT
K

## Wallace, David

| | |
|---|---|
| **From:** | Aronson, Sarah |
| **Sent:** | Tuesday, March 03, 2009 2:27 PM |
| **To:** | Wallace, David |
| **Subject:** | FW: REVISED SCHED |

Actually, I have a change to the below, sorry, hope it's OK.

| | |
|---|---|
| **MARCH** | NEURO/VASCULAR/FLOAT |
| **APRIL** | PEDS/OB/FLOAT |
| **MAY** | CARDIOTHORACIC/FLOAT |
| **JUNE** | ICU/LIVER |
| **JULY** | ECHO LAB, BACK-UP TEE/CARDIOTHORACIC*, LIVER TXP CALL |
| **AUG** | METRO/ASU |

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

---

**From:** Aronson, Sarah
**Sent:** Fri 2/27/2009 14:44
**To:** Aronson, Sarah; Norcia, Matthew; Wallace, David
**Subject:** REVISED SCHED

Here's a revised sched - I figured March I could mix neuro and vascular:

| | |
|---|---|
| **MARCH** | NEURO/VASCULAR/FLOAT |
| **APRIL** | ICU/LIVER CALL |
| **MAY** | CARDIOTHORACIC/FLOAT |
| **JUNE** | ECHO LAB, BACK-UP TEE/CARDIOTHORACIC*, LIVER TXP CALL |
| **JULY** | METRO/ASU |
| **AUG** | PEDS/OB/FLOAT |

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

---

**From:** Aronson, Sarah
**Sent:** Tue 2/24/2009 08:59
**To:** Aronson, Sarah; Norcia, Matthew; Wallace, David; Adamovich, Christine
**Subject:** RE: feb mtg

See below - also, I'm attaching a proposed schedule -

| | |
|---|---|
| **MARCH** | NEURO/FLOAT |
| **APRIL** | VASCULAR/FLOAT |
| **MAY** | CARDIOTHORACIC/FLOAT |
| **JUNE** | ECHO LAB, BACK-UP TEE/CARDIOTHORACIC*, LIVER TXP CALL |
| **JULY** | METRO/PEDS |

5/13/2009

DEFENDANT'S EXHIBIT

AUG      ASU/OB/FLOAT

*As I think I suggested before, what I was thinking here was that I could schedule to be in echo lab for the month, with 1 day per week in the OR (preferably cardiac); in addition (because they don't start in echo until 830-900) I could support the attending and help start cases in the back hall in the AM, and do whatever echo the TEE resident isn't doing.

What should I anticipate in terms of my on-call requirements?  Will I continue on the same frequency or will that change?

Thank you,
SCA

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

---

**From:** Aronson, Sarah
**Sent:** Tue 2/17/2009 18:15
**To:** Norcia, Matthew; Wallace, David; Adamovich, Christine
**Subject:** feb mtg

I'd like to set up a time for a mid-month meeting - thanks,
SCA

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

5/13/2009

**From:** Wallace, David
**Sent:** Saturday, March 14, 2009 7:15 AM
**To:** Aronson, Sarah
**Cc:** Norcia, Matthew
**Subject:** RE: april

Sarah,

I don't think that ICU in April will be possible.  The OR/OB call schedule for April has been completed and you have already been put on the call schedule for April.  In addition, the ICU call schedule has been completed and you have not been put on the schedule.  In addition to that, the last e-mail that I received from you (copied in this e-mail) made no indication of your interest to be in the ICU.  At this late date, I don't think that both schedules can be changed.  Finally, we should meet in person to set up your schedule, as opposed to doing it through e-mail.  Page me and llet me know  when you want to meet.

Thank you,

David Wallace

**From:** Aronson, Sarah
**Sent:** Tuesday, March 03, 2009 2:27 PM
**To:** Wallace, David
**Subject:** FW: REVISED SCHED

**Actually, I have a change to the below, sorry, hope it's OK.**

| | |
|---|---|
| MARCH | NEURO/VASCULAR/FLOAT |
| APRIL | PEDS/OB/FLOAT |
| MAY | CARDIOTHORACIC/FLOAT |
| JUNE | ICU/LIVER |
| JULY | ECHO LAB, BACK-UP TEE/CARDIOTHORACIC*, LIVER TXP CALL |
| AUG | METRO/ASU |

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

**From:** Aronson, Sarah
**Sent:** Fri 2/27/2009 14:44
**To:** Aronson, Sarah; Norcia, Matthew; Wallace, David
**Subject:** REVISED SCHED

**Here's a revised sched - I figured March I could mix neuro and vascular:**

| | |
|---|---|
| MARCH | NEURO/VASCULAR/FLOAT |
| APRIL | ICU/LIVER CALL |
| MAY | CARDIOTHORACIC/FLOAT |
| JUNE | ECHO LAB, BACK-UP TEE/CARDIOTHORACIC*, LIVER TXP CALL |


DEFENDANT'S EXHIBIT
M

JULY      METRO/ASU
AUG       PEDS/OB/FLOAT

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

---

**From:** Aronson, Sarah
**Sent:** Tue 2/24/2009 08:59
**To:** Aronson, Sarah; Norcia, Matthew; Wallace, David; Adamovich, Christine
**Subject:** RE: feb mtg

See below - also, I'm attaching a proposed schedule -

MARCH    NEURO/FLOAT
APRIL      VASCULAR/FLOAT
MAY       CARDIOTHORACIC/FLOAT
JUNE     ECHO LAB, BACK-UP TEE/CARDIOTHORACIC*, LIVER TXP CALL
JULY      METRO/PEDS
AUG       ASU/OB/FLOAT

*As I think I suggested before, what I was thinking here was that I could schedule to be in echo lab for the month, with 1 day per week in the OR (preferably cardiac); in addition (because they don't start in echo until 830-900) I could support the attending and help start cases in the back hall in the AM, and do whatever echo the TEE resident isn't doing.

What should I anticipate in terms of my on-call requirements?  Will I continue on the same frequency or will that change?

Thank you,
SCA

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

---

**From:** Aronson, Sarah
**Sent:** Tue 2/17/2009 18:15
**To:** Norcia, Matthew; Wallace, David; Adamovich, Christine
**Subject:** feb mtg

I'd like to set up a time for a mid-month meeting - thanks,
SCA

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

**From:** Aronson, Sarah
**Sent:** Thursday, March 12, 2009 8:41 PM
**To:** Wallace, David; Norcia, Matthew
**Subject:** april

**just want to confirm that I'm in ICU April, if so I need to get my call requests in to Soozan.
SCA**

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*





**University Hospitals**

July 8, 2009

Sarah Aronson
10510 Park Lane Aptl #115
Cleveland, OH 44106

Dear Sarah,

According to the Family and Medical Leave Act (FMLA) you are entitled up to **12-weeks** of job protected leave within a rolling 12-month period measured backward from the date of any FMLA leave usage. A look back of 12 months from the date of each new FMLA request is used to calculate remaining FMLA leave time available.

Your request for an <u>intermittent FMLA</u> has been approved effective **July 8, 2009** related to the *following:*

- ☒ The birth of a child, or the placement of a child for adoption or foster care;
- ☐ A serious health condition that makes you unable to perform the essential functions of your job;
- ☐ A serious health condition affecting your spouse, child, parent, or same-sex domestic partner, *for which you are needed to provide care.*

Your intermittent FMLA leave is approved until one of the following criteria are met:

- ➢ Through your approval date **August 15, 2009** or sooner if the condition is resolved.
- ➢ Your FMLA entitlement ends. This leave will count towards your 12-week FMLA entitlement.

<u>This intermittent leave of absence excuses those absences from work for the medical condition listed on the PHYSICIAN'S CERTIFICATION form.</u> Employees needing intermittent FMLA leave must make the attempt to schedule their leave so as not to disrupt the employer's operations. When it becomes a necessity that you use FMLA you must inform your supervisor that your absence from work is counted as FMLA.

- ❑ Periodically you may be requested to provide additional physician certification.

Once you have exhausted your approved FMLA time, any absence from work that is not approved time off could be counted as an occurrence according to University Hospitals' no fault attendance policy.

If you have any questions, please feel free to contact HR Services at 1-216-767-8398.

Sincerely,

*Cathy*

Cathy Pietila
HR Services Specialist

Cc: Cynthia Patrzyk



**From:** Aronson, Sarah
**Sent:** Thursday, July 09, 2009 11:49 AM
**To:** Norcia, Matthew
**Subject:** RE: adoption leave
**I have one FMLA day scheduled for Aug 10 that is beyond my allowed PTO, and, I presume, beyond my allowed time away from residency training.  What do I need to do to make that day up?  Also, I may need to use 2-4 days in august depending on how the adoption proceedings go, so I would need to know how those would be made up as well.**


*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

---

**From:** Norcia, Matthew
**Sent:** Tue 7/7/2009 15:50
**To:** Anes_Residents_All
**Cc:** Wallace, David
**Subject:** RE:


To all PGY1's,

I still need a rep from your year. If you're in SICU, CTICU, Anes or Pain you are prime time. Please consider.

Norcia

---

**From:** Norcia, Matthew
**Sent:** Thursday, July 02, 2009 2:42 PM
**To:** Anes_Residents_All
**Cc:** Wallace, David
**Subject:**

To All,

The institutional review by the ACGME is approaching; it's on Tuesday July 29. Dr Shuck needs residents from the 4 biggest programs to meet with the site visitors from 9:30 to 11:00. Anesthesiology is one of those programs. The residents must be" self-selected". I believe that means volunteer in ACGMese. We need 3 residents, at least 1 from PGY1 year and 2 from the CA1-3 years. If you are interested please inform me or Dr Wallace by 7-6-09. The final list needs to be in Shuck's possession on 7-7-09. If you happen to be the lucky few, you MUST show up for the event.
*Thank you for your assistance in advance.*

Norcia



**From:** Mannix, Marin
**Sent:** Friday, July 10, 2009 7:58 AM
**To:** Aronson, Sarah
**Cc:** Wallace, David
**Subject:** RE: metro
Sarah,

You will be on Metro your first two weeks, and ICU your second two weeks.

Marin Mannix, MD
Chief Resident, Department of Anesthesiology and Perioperative Medicine
University Hospitals Case Medical Center



---

**From:** Aronson, Sarah
**Sent:** Tue 7/7/2009 3:58 PM
**To:** Mannix, Marin
**Subject:** RE: metro

**nope, got bumped from january, they weren't expecting me and didn't want to put me in on short notice.**

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

---

**From:** Mannix, Marin
**Sent:** Tue 7/7/2009 11:47
**To:** Aronson, Sarah
**Subject:** RE: metro

have you done your trauma rotation yet?

Marin Mannix, MD
Chief Resident, Department of Anesthesiology and Perioperative Medicine
University Hospitals Case Medical Center



---

**From:** Aronson, Sarah
**Sent:** Tue 7/7/2009 8:55 AM
**To:** Adamovich, Christine
**Cc:** Mannix, Marin
**Subject:** metro

**Do you know whether I've been scheduled at Metro in August?  FYI I am taking the boards Aug 4.**

**Sarah Aronson, MD**
**UHHS/Case School of Medicine**

**From:** Norcia, Matthew
**Sent:** Wednesday, July 15, 2009 1:20 PM
**To:** Aronson, Sarah
**Cc:** Shuck, Jerry; Manson, Marcie; Nearman, Howard; Wallace, David
**Subject:** RE: schedule issue

Sarah,

This memo is to summarize what we discussed yesterday (7-14) afternoon concerning the issues you presented to Dr Shuck.

In regard to the FMLA make up time which will be one day for sure (8-10) and possibly a second day that we do not know at this time, you can cover a single 8 hour shift in the OR for each day that you need or you can cover 2 late-duty shifts (approx 4.5 hours each) for each day that you need.

To make your August work duty schedule less taxing and more flexible we will attempt the following (keeping in mind that you do not have any personal obligations in the last 2 weeks of August):
    -remove the SICU rotation (originally scheduled for the last 2 weeks)
    -reschedule the Metro rotation for the last 2 weeks of the month (so you can get your trauma numbers)
    -replace the first 2 weeks of the month with a "float" rotation
This schedule will make it easier to grant a "reading day" prior to the exam and to allow you to have your FMLA day on 8-10.

Please reply as to whether these are the terms we discussed.
Thanks.

Matt

---

**From:** Shuck, Jerry
**Sent:** Monday, July 13, 2009 4:12 PM
**To:** Norcia, Matthew
**Subject:** FW: schedule issue
**Importance:** High


The letter.

Jerry M. Shuck, MD, D.Sc
Director Graduate Medical Education
Designated Institutional Official
Professor of Surgery
Associate Dean for Graduate Medical Education
Case Western Reserve University
University Hospitals of Cleveland
11100 Euclid Avenue
Cleveland, OH 44106
216-844-3872 (office)
216-844-1949 (facsimile)

---

**From:** Aronson, Sarah
**Sent:** Sunday, July 12, 2009 9:33 PM
**To:** Shuck, Jerry
**Subject:** schedule issue

1 of 2



**Importance:** High

**From:** Aronson, Sarah
**Sent:** Tuesday, July 21, 2009 5:36 PM
**To:** Norcia, Matthew; Modlin, Sheryl
**Cc:** Mannix, Marin
**Subject:** august schedule

Matt,
**This is in f/u to o ur conversation today regarding the trauma rotation that's not been able to be s cheduled at Metro.**

**I need 8 cases fill out my numbers for trauma.**

**We discussed making myself available for peds trauma cases here on campus as as way to achieve that.**

Here's what I'd propose:

During the month of August I will place myself on the peds trauma paging list so I will be aware when those cases are en route to UH, and I will arrange a from-home night/weekend call schedule for the month that I will post in Prentiss with the peds attending call schedule for August.

I can be scheduled as "float" on campus for the month; if/when a trauma patient is admitted requiring surgery/anesthesia, I will work with the co-ordinator and the peds attending to be able to assume care of that patient.

Let me know if this looks like a reasonable way to proceed.

Thanks,
SCA


*Sarah Aronson, MD*
*UHHS/Case School of Medicine*



Maryland License Application Sarah
Cymry Aronson, MD


Explanation of off-cycle residency training:

1.  Family Medicine training from July 1993 to October 1995. I received credit for 9 months of training because of my previous internal medicine and psychiatry experience, and so completed the 36-month program early.

2.  Anesthesiology residency training from March 2006 to September 2009. I began the program off-cycle as I did not apply to the residency through the match but rather through direct contact with the department. I was scheduled to complete the residency at the end of February 2009. In October of 2008, I had a transient medical problem (I was taking topiramate for migraine prophylaxis and experienced side effects) which caused me to lose some training time. During this same span of time, my spouse also had medical difficulties, and we had a new baby in December of that year.

    The American Board of Anesthesiology recognizes successful completion of residency training in 6-month segments; if any section of a 6-month block is lacking, then the entire 6 months must be repeated. As a result, though all issues were entirely resolved by December of 2008, I was required to extend my training period 6 months to September of 2009. The endorsement from the residency program will also document this.



Aug. 14. 2009 4:25PM    PRMC Medical Staff Services                    No. 7308   P. 11/12

## PENINSULA REGIONAL MEDICAL CENTER
## AUTHORIZATION AND RELEASE STATEMENT

### MEDICAL STAFF

By my signature to this Authorization and Release Statement, I acknowledge the following, where applicable.

In connection with my application for clinical privileges and appointment to the Medical Staff of the Peninsula Regional Medical Center, I acknowledge that I have received and read the Medical Staff Bylaws. I agree to be bound by the terms thereof, whether or not appointed to the Medical Staff or granted clinical privileges.

I understand that I bear the burden of establishing my qualifications and competency in the clinical privileges which I am requesting. I understand that I may be asked to provide information in addition to that which is requested in my application. I recognize that my failure to provide sufficient information to evaluate my application will result it being deemed incomplete, and that my application will not be processed further. The determination as to whether sufficient information has been submitted will be in the sole discretion of Peninsula Regional Medical Center.

I signify that I am willing to appear for interviews in regard to application, if required.

I authorize Peninsula Regional Medical Center to consult with members of professional and administrative staffs of other hospitals or other institutions with which I have been associated, with any law enforcement agencies, with state licensing bodies and regulatory agencies, with the National Practitioner Data Bank, and with others who may have information regarding my competence, character, and ethical or professional qualifications. I authorize both oral and written communication.

I authorize Peninsula Regional Medical Center to consult with insurance companies that have carried my professional liability insurance concerning my claims history and authorize such carriers to release this information to Peninsula Regional Medical Center.

I give my consent to Peninsula Regional Medical Center's inspection of my records and documents that may be material to an evaluation of my professional qualifications and competence to carry out the clinical privileges required or moral and ethical qualifications for Medical Staff membership.

I hereby grant a total, complete, unconditional and absolute waiver of any claims, and I release from any and all liability Peninsula Regional Medical Center, all its representatives, and its Medical Staff for their acts performed in connection with the evaluation of my application and credentials.

I hereby grant a total, complete, unconditional and absolute waiver of any claims, and I release from any and all liability all individuals and organizations who provide information to Peninsula Regional Medical Center concerning my competence, ethics, character and other qualifications for Medical Staff appointment, including otherwise privileged or confidential information.

PHOTOSTAT OR OTHER REPRODUCTION OF THIS STATEMENT SHALL BE CONSIDERED VALID.

Sarah C. Aronson, MD

Signature of Applicant                                    7/27/09
                                                         Date

Rev: 11/28/07


DEFENDANT'S EXHIBIT
D
PENGAD 800-631-6989

January 7, 2009
Sarah Aronson, MD

This letter is being written as a brief response to the letter received on 7 January 2009 regarding the unsatisfactory report of my performance and the reasons cited for that evaluation.

I will comply with whatever plan is ultimately recommended by the committee. It is my intention to complete this program successfully, and I have always been willing to work to improve my practice. As soon as the issue of my performance was broached with me clearly at the end of November 2008, I raised the issue of my being on topiramate and discontinued this medication immediately when concerns were raised about 'cognitive difficulties.'

The letter states that I failed in my professional duty to report having been on topiramate for migraine prophylaxis, with which I disagree. I concur that this medication had an effect on my performance, as I am now aware of the subtle recovery in my verbal skills and speed of execution since discontinuing the medication at the end of November. The dose I was taking was in the middle range as used for migraine prophylaxis. The cognitive side effects of topiramate have generally been considered to be related to dose and speed of titration, and have been thought to resolve over a short period of time. The research literature I have since reviewed suggests that the side effects tend to be subtle and persistent, though in general practice the prescription I had was not one that would typically require reporting to one's employer, as one would for a high dose anticonvulsant.

Similarly, the extensive neuropsychological testing to which I submitted over the course of two days did not demonstrate gross cognitive deficits.

To warrant the degree of censure noted in the letter one would expect to see a more consistent and widespread indication of failure over several areas; for example, a pattern of consistent negative evaluations by faculty, earlier intervention by the program directors to address these concerns, failure to provide proper patient care, failure on the in-training exam, neuropsychological testing which indicated a significant cognitive deficits, or being unable to secure a professional position after graduation. As it was, I received several positive evaluations and a strong job reference from my program director throughout the period of July to December 2008.

I would like to respectfully request that the committee in charge of this matter review the above points and consider a course of action that addresses this as a medical issue. If so inclined, this might allow some flexibility in how things could proceed, for instance in the length of clinical time to be made up.

If the committee chooses not revise the plan stated in the letter, in light of these events, it would be helpful to have written documentation of how I will be evaluated going forward. It would be important to avoid a repeat of my securing a job (and the time, effort, finances that need to be spent both by myself and the hospital to which I am



DEFENDANT'S EXHIBIT

January 7, 2009
Sarah Aronson, MD

applying) which I would not be able to start. As it was, I was interviewing at several places that paid for my plane fare, hotel, etc. all as it turns out, under false pretenses that I was ready to graduate as my reference from the Residency Program Director indicated.

Thank you for your consideration of this matter.

15 Jan 2009

Dr. Longfellow:

This is in follow-up to our phone conversation today. I am writing to let you know that I was informed by my program directors that I will be mandated to continue my residency training by another 6 months. The circumstances are as follows: Over the past year I had been taking a medication (Topamax) for migraine prophylaxis. During recent months the dose was increased and I developed side effects which affected my clinical performance. I continued to receive satisfactory evaluations from faculty and received an excellent score on the Anesthesia Residency In-Training Exam. Because of the gradual onset of the symptoms, however, I did not identify the medication as a problem until December, when I received an unsatisfactory evaluation for my October ICU rotation.

As you know, if unsatisfactory performance is identified at any time during our final 6 months of training, the entire 6 month block must be repeated. I promptly stopped the medication as soon as this concern arose, and have noted a significant difference, as have my family and colleagues. I am distraught that this has occurred at this late date, though I'm certainly glad the problem was identified and corrected before I took a position as an independent practitioner.

While I hope I can retain the anesthesiologist position with Sheridan, I will understand if you choose to withdraw your offer of employment. I have not deposited the check that was recently sent from Sheridan to reimburse my Florida license application. I will await your response.

I intend to complete the licensing process for Florida, with a graduation date at the end of August 2009. I will still be eligible to sit for the written boards in August 2009 as planned. I hope to use the time constructively to solidify my skills, particularly in cardiothoracic and vascular anesthesia.

If you would like independent confirmation of these events, feel free to contact the department chairman, Dr. Howard Nearman, at 216 844 7330 (email howard.nearman@uhhospitals.org).

I am very sorry that this obstacle has arisen; if I had anticipated this I certainly would not have proceeded with you and Sheridan as I did. I know that bringing in a new practitioner is a time- and resource-consuming process not to be undertaken lightly.

Thank you for your supportive response today. Let me know how you would like to proceed from here.

Sincerely,

Sarah Aronson, MD
UHHS/Case School of Medicine
216 721 5945


DEFENDANT'S
EXHIBIT

W



**University Hospitals**
Case Medical Center

November 24, 2008

Memo Re:    Sarah C. Aronson

On October 14, 2008, Dr. Wallace and I met with Dr. Aronson to discuss her clinical performance. Multiple unsatisfactory evaluations had been received and since we had met earlier in Dr. Aronson's residency about performance issues, we thought it was necessary to revisit this area.

Of primary concern was the lack of appropriately rapid response (verbally or physically) to events that occur in the OR. Evaluation concerns are that Dr. Aronson is not appreciating the situation or cannot process and react to the information or situation at hand. She also had concerning evaluations from her Pain, OB, and ICU rotations.

This was explained to Dr. Aronson. She responded that she could not identify the reason for delay in response. Because of her inability to identify the problem, she was told that if she does not perceive the problem or identify the problem, then there is no way to correct the problem.

Dr. Wallace and I discussed some ways to improve and Dr. Aronson agreed to try. It was also discussed that the competency committee has reason to give her an "unsatisfactory" for her final 6 month period. We'll meet again in 4-6 weeks to review further evaluations and update any progress.

Respectfully,

Matthew P. Norcia, M.D.
Residency Program Director


David A. Wallace, D.O.
Residency Program Co-director



Sarah C. Aronson, M.D.

DEFENDANT'S
EXHIBIT
X

**Department of Anesthesiology and Perioperative Medicine**
11100 Euclid Avenue Cleveland, Ohio 44106-5077 Phone 216-844-7335 FAX 216-844-3781
*University Hospitals Case Medical Center and Case Western Reserve University School of Medicine*

Page 1 of 1

## Wallace, David

| | |
|---|---|
| **From:** | Wallace, David |
| **Sent:** | Tuesday, November 25, 2008 10:15 AM |
| **To:** | Fulton-Royer, Jill |
| **Subject:** | RE: hr-85.pdf |

Jill,

Yesterday, Dr. Norcia and I met with Dr. Aronson and I asked her if she was on any psychotropic medication that might impair her performance because she has not made her 'Program Director' aware of any and she is required to do so. She had a difficult time answering this question and finally admitted that she may be on some medication (that she thinks she has been on for at least 3 years) that may or may not impair her performance.

It has been difficult to determine if Dr. Aronson has a problem with cognitive processing, communicating her thoughts, and/or responding appropriately to information and circumstances around her. She has a hard time to explain her inability to respond appropriately, and this delayed type response occurs both in clinical and not clinical situations. Making decisions and responding to a changing environment and situations is necessary for the practice on anesthesia and critical care. Her response mode during critical or emergency situations is difficult to contrast to her response to a routine situation. She appears not to have a sense of urgency, ever.

**From:** Fulton-Royer, Jill
**Sent:** Tue 11/25/2008 8:43 AM
**To:** Wallace, David
**Subject:** hr-85.pdf



12/15/2008

**Aronson, Sarah**

| | |
|---|---|
| To... | Nearman, Howard |
| Cc... | |
| Bcc... | |
| Subject: | some info |
| Attachments: | |

*(handwritten: JAN 2009)*

Howard,
Thanks for taking the time to meet with me. I don't know how much you know about my current situation other than the letter I cc'd to you back in November. I've not wanted to involve you in the process.

I want to say first that I'm committed to completing this residency successfully, and can only be grateful that this difficult episode has resulted in my getting rid of a medication that was having a negative effect on my functioning. I'm alarmed that I needed a whack on the head to identify the topamax as a problem. As soon as I considered the possibility I stopped it, any only wish I had done so sooner. I feel significantly better, and my spouse confirms I'm considerably more with it. I'm glad this happened before our baby arrived.

I'm sure that Dr. Norcia and others were correct in noting a change in my performance. It was not so significant that neuropsych testing would show me as being impaired, but this job requires a high level of performance, and small changes would be noticeable.

Ultimately, I'll do whatever the program deems necessary to complete this training. While I don't believe Drs. Wallace and Norcia have intended this process to be punitive, the negative consequences for me are significant, and many were largely avoidable. I wanted to share this information with you in the hope that there may be some way to ameliorate these. I also want to talk about how I can avoid finding myself in this same situation 6 months from now.

When this process began, all my documented evaluations for the past 8 months were good. My October meeting with both directors raised the issues of response speed and efficiency, but the evaluations cited were from 6 months prior, and I had reason to believe I had addressed those problems. My block month in November went well. Our next meeting was at the end of November, the outcome of which was Dr. Wallace's decision to mandate a fitness-for-duty evaluation. I received Dr. Norcia's unsatisfactory evaluation on Dec. 31st.

I interviewed and was offered several positions during August - November with Dr. Norcia as my primary reference. The group with which I signed an employment contract was very strict about not proceeding with anything prior to reviewing my references. Based on my program director's endorsement, they believed that I was ready to graduate and employable. I also requested another letter from Dr. Norcia for my Florida license application in November. I certainly wouldn't have proceeded with a contract or the expense of a license application if he had at any of those times indicated to me that my graduation was in question. Now it appears that I was interviewing under false pretenses, that the endorsement of my program director was not valid.

If this remediation proceeds as Dr Wallace envisions, I will lose the job that I had secured, as well as the time and funds spent interviewing and obtaining licensure. Obviously I will also lose that 6 months of income, and will likely have greater difficulty obtaining another good position with this mark on my record.

More important to me, even though an academic intervention such as this is not reportable to the medical board, it becomes a training extension that I will have report and explain for the rest of my career with every credentialling or licensing process I undergo.

It has been very frightening, as the sole provider for my family, to have this action occur so close to the expected end of my training, not to mention in the midst of the holidays with a baby due. It has left me feeling isolated and unsure as to how to advocate for myself.

I've been practicing medicine for over 20 years without incident, and I'm sure in the long run this will work out fine. I am glad that this problem was identified and corrected. I want to be the best clinician I can be, and I certainly want to demonstrate my competence to everyone's satisfaction. If you and Drs. Wallace and Norcia believe that a 6 month training extension is best for me and the most appropriate way to proceed, then I'll abide by your decision. If you have any ideas or suggestions that might be helpful, I'd like to hear them. In either case, I appreciate your input.

Thank you,
Sarah


Sarah Aronson, MD
UHHS/Case School of Medicine



DEFENDANT'S EXHIBIT Z