

**University Hospitals**
Case Medical Center

Sarah C. Aronson, M.D.                                                    January 7, 2009
10510 Park Lane #115
Cleveland, OH 44106

Dear Dr. Aronson:

The faculty, through the residency competency committee, has determined that your performance does not meet expectations for a resident of your level of training; therefore, for the reporting period of July 1, 2008 through December 31, 2008 you will receive an unsatisfactory evaluation on the Clinical Competence Report to the American Board of Anesthesiology.

This decision is based on the following criteria. Under the category of Essential Attributes, the committee has determined that you have been unable to demonstrate the ability to react to stressful situations in an appropriate manner. Under the category of Professionalism, you have failed to carry out your professional responsibility of notifying the Residency Program Directors that you were taking a prescribed medication that could impair your judgment and/or job performance, as required by hospital policy. Additionally, under the category of Patient Care, you have failed to demonstrate your ability to recognize and respond appropriately to significant changes in the anesthetic course.

The consequence of reporting an unsatisfactory evaluation during the second six month period of your CA-3 year is that you will be required to remediate for an additional six month period in accordance with the American Board of Anesthesiology guidelines. Accordingly, you must complete a total of thirty-six months with a final satisfactory rating to be eligible to receive a certificate of completion of training.

Please contact the Residency Program Office at 216-844-7335 upon receipt of this letter. Christine Adamovich will assist you with setting up a time to meet and discuss the remedial program plan and to address any questions you may have.

Respectfully,

Matthew P. Norcia, M.D.
Residency Program Director

David A. Wallace, D.O.
Residency Program Co-director

cc: Michael Jordan, Esq.

ARON 0007



Department of Anesthesiology and Perioperative Medicine
11100 Euclid Avenue Cleveland, Ohio 44106-5077 Phone 216-844-7335 FAX 216-844-3781

---------- Forwarded message ----------
From: Aronson, Sarah <Sarah.Aronson@uhhospitals.org>
Date: Aug 27, 2009 4:17 PM
Subject: FW: paperwork
To: drsa5555@gmail.com

**

**
*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

----------------------------
*From:* Norcia, Matthew
*Sent:* Thu 8/27/2009 16:09
*To:* Aronson, Sarah
*Cc:* Nearman, Howard; Rowbottom, James; Adamovich, Christine; Wallace,
David; Shuck, Jerry
*Subject:* RE: paperwork

Sarah,

At the end of your day today you may check out with Christine and pick up
your letters. That will conclude your obligations to the Dept of
Anesthesiology and to the residency program.
Good luck!

Matt

----------------------------
*From:* Aronson, Sarah
*Sent:* Thursday, August 27, 2009 2:01 PM
*To:* Norcia, Matthew; Nearman, Howard; Rowbottom, James; Adamovich,
Christine
*Subject:* RE: paperwork


*If your intention is to release me today from the residency as a graduate
without any further obligations, I will need that in writing so that there
are no misunderstandings.  Until then, I will be in the hospital and
available for duty during usual work hours.  *
**
*To reiterate, this discussion has arisen because I was informed by the ABA
that as of the end of June 2009 I had completed my training requirements for
candidacy in the Board examination process.  *

*SCA*

**
*Sarah Aronson, MD*



*UHHS/Case School of Medicine*

--------------------------
*From:* Norcia, Matthew
*Sent:* Thu 8/27/2009 12:09
*To:* Aronson, Sarah
*Cc:* Nearman, Howard; Shuck, Jerry; Wallace, David; Rowbottom, James
*Subject:* RE: paperwork

At this time I am not able to immediately investgate this matter. I did discuss the situation briefly with Dr Rowbottom and asked him to permanently relieve you if he is able. I will get back to you when appropriate.

Matt

--------------------------
*From:* Aronson, Sarah
*Sent:* Thu 8/27/2009 11:02 AM
*To:* Norcia, Matthew; Nearman, Howard
*Cc:* Shuck, Jerry; Wallace, David; Rowbottom, James; mmiller@acgme.org
*Subject:* RE: paperwork

*According to Holly at the ABA - (919) 881 2570 - I completed all requirements as of the end of June.  According to her, my satisfactory completion of the Jan-June 2009 block recoups the 6 months lost from July 2008-Dec 2008, so in fact I was 4 months over my needed 36 months as of the end of June 2009.*

*She suggests someone from the department call her if there are questions.*
**
*Sarah*
**
**
*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

--------------------------
*From:* Norcia, Matthew
*Sent:* Thu 8/27/2009 07:20
*To:* Aronson, Sarah; Nearman, Howard
*Cc:* Shuck, Jerry; Wallace, David; Rowbottom, James
*Subject:* RE: paperwork

Sarah,

The ABA requires satisfactory completion of 12 months of basic clinical training (not applicable to you at this point) and satisfactory completion of a total of 36 months of clinical anesthesia training ( this is noted in your training summary attachment). Your total of 36 months was anticipated to be completed on Aug 31, 2009 to make up for the unsatisfactory 6 month period July 08 to Dec 08. The ABA did not "automatically" designate you as board eligible. We notified them at the end of their reporting cycle that we anticipated that your completion date was within the cut off date for the Aug 3-4 exam.They designated you as a candidate for board certification at that time. Because your schedule is out of sync with the ABA reporting cycle does not decrease the number of satisfactory months that you must complete. Therefore you were not done 2 months ago,but you were determined to be a candidate to sit for the exam 2 months ago.

As far as allowing you to leave early, that decision is up to the OR
coordinator (either Nearman or Rowbottom).

Matt

------------------------------
*From:* Aronson, Sarah
*Sent:* Wednesday, August 26, 2009 9:34 PM
*To:* Aronson, Sarah; Norcia, Matthew; Nearman, Howard
*Cc:* Shuck, Jerry
*Subject:* RE: paperwork


 *It appears that the ABA has already automatically designated me as Board
Eligible as of July 1.  See attached; as they note, in August they post
updates based on the January to June reporting period.*
**
*Given that I apparently was done here 2 months ago, why don't you let me
leave now instead of having me work through this coming Monday?*
**
*I also would point out that I am scheduled to work a late duty tomorrow
night for no pay, to make up a half day I took off for an adoption court
appearance in August - when my tenure here should have already been over by
then.*
**
*I await your response.*
**
*SCA*

**
 *Sarah Aronson, MD*
*UHHS/Case School of Medicine*


------------------------------
*From:* Aronson, Sarah
*Sent:* Tue 8/25/2009 11:59
*To:* Norcia, Matthew; Nearman, Howard
*Cc:* Shuck, Jerry
*Subject:* paperwork


 *Barbara Zulk tells me that the certificate has been forwarded to the
department and only requires  your signatures (Norcia and Nearman).  I would
like to have that completed so I can forward a copy by tomorrow.*
**
*I would like to have a copy of the letter to be submitted to the ABA by the
end of this week as well.  I expect we all would prefer that I have all the
paperwork in hand this week so I won't have to keep inquiring about it after
I leave Monday.*
**
*I also have a question that just occurred to me recently.  Can you explain
to me why I wasn't released to graduate at the end of June?  According to
the ABA rules, a resident receives credit for an "unsatisfactory" 6 month
block once a subsequent satisfactory 6-month block is completed.  In my
case, you claimed my performance for July 2008 - December 2008 was void.
That block was not my "terminal" 6 month period; my "terminal" 6 month block
would occur during January 2009 - June 2009.  *
**
*Once I completed the block of January 2009 - June 2009, I receive credit
for the preceding 6 months and should have been done.  There's no rule that
I can see that says one has to tack 6 months on to the end date, just that
the last 6 months of training have to be satisfactory.  *
**
*SCA*

**

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*


The six-month period of clinical anesthesia training in any one program ends
with receipt of a satisfactory Certificate of Clinical Competence. *To
receive credit* from the ABA for a period of clinical anesthesia training
that is not satisfactory, the resident must immediately complete an
additional six months of uninterrupted clinical anesthesia training in the
same program with receipt of a satisfactory Certificate of Clinical
Competence.
If a resident receives *consecutive* Certificates of Clinical Competence
that are not satisfactory, additional training is required.

Visit us at www.UHhospitals.org <http://www.uhhospitals.org/>.

The enclosed information is STRICTLY CONFIDENTIAL and is intended for the
use of the addressee only. University Hospitals and its affiliates disclaim
any responsibility for unauthorized disclosure of this information to anyone
other than the addressee.

Federal and Ohio law protect patient medical information, including
psychiatric_disorders, (H.I.V) test results, A.I.Ds-related conditions,
alcohol, and/or drug_dependence or abuse disclosed in this email. Federal
regulation (42 CFR Part 2) and Ohio Revised Code section 5122.31 and
3701.243 prohibit disclosure of this information without the specific
written consent of the person to whom it pertains, or as otherwise permitted
by law.

--
Sarah Aronson, MD
UHCMC/Case School of Medicine

You replied on 3/2/2009 09:47.

**Aronson, Sarah**

| | | | |
|---|---|---|---|
| **From:** | Shuck, Jerry | | **Sent:** Mon 3/2/2009 09:29 |
| **To:** | Aronson, Sarah | | |
| **Cc:** | | | |
| **Subject:** | RE: question | | |
| **Attachments:** | | | |

Please talk to me before you go further.


Jerry M. Shuck, MD, D.Sc
Director Graduate Medical Education
Designated Institutional Official
Professor of Surgery
Associate Dean for Graduate Medical Education
Case Western Reserve University
University Hospitals of Cleveland
11100 Euclid Avenue
Cleveland, OH 44106
216-844-3872 (office)
216-844-1949 (facsimile)

---

**From:** Aronson, Sarah
**Sent:** Sunday, March 01, 2009 10:27 PM
**To:** Shuck, Jerry
**Subject:** RE: question
**Importance:** High

Dr. Schuck:
I don't think I provided you with any follow-up to the meeting I had with Drs. Nearman and Norcia in January. Dr. Nearman deferred to the assessment of the program directors and had little to say otherwise.

My documented evaluations from faculty continue to be good, as they were in November prior to this process and were since March of last year. I am receiving minimal supervision in the OR.

I am preparing to submit a "concern" or possibly a formal complaint to the ACGME regarding the lack of timely notification/intervention in my case, the lack of dicumentation, and particularly the lack of access to an appeal process. My recent review of the ACGME institutional requirements suggests that the differentiation of "academic" vs. "disciplinary" interventions when it comes to the right to an appeal is not valid.

I am notifying you of this in confidence as I believe I should seek your thoughts on the topic before I proceed.

Thank you,
Sarah Aronson


*Sarah Aronson, MD*
*UHHS/Case School of Medicine*



THE OHIO LEGAL BLANK CO., INC.

**EXHIBIT**
**3**

ARON 0168

Sarah-

Thanks for your thoughtful email. Clearly, I will need to discuss this with both Drs. Wallace and Norcia before getting back to you. I plan to do this next week.

Howard Nearman, MD, MBA

Professor and Chair

Department of Anesthesiology and Perioperative Medicine

University Hospitals Case Medical Center

Case Western Reserve School of Medicine


From: Aronson, Sarah
Sent: Tuesday, March 24, 2009 7:23 AM
To: Nearman, Howard
Subject: FW: follow up
Importance: High

Howard,

I'm re-sending this to you as I think you've been away, as have I, and I wanted to make sure it wasn't buried under 2 weeks of emails I'm sure you have to deal with. I need to arrange a time to discuss this with you ASAP.

Thanks,

Sarah

Sarah Aronson, MD

UHHS/Case School of Medicine


From: Aronson, Sarah
Sent: Sat 3/14/2009 16:12
To: Nearman, Howard
Subject: follow up

Howard,

I apologize for the length of this message. The longer my training situation continues as is without some substantive response to me from my department, the more malignant it feels. As a result, with some sense of urgency, I met with Dr. Shuck and discussed the issues I'll outline below. He suggests I approach you again to arrange a 1:1 meeting.

From the beginning of this process, I have responded promptly and concretely, in good faith, to correct any possible deficiencies in my performance. My file will show that I have attempted to communicate with you and my supervisors from the outset, expressing my concerns as well as my willingness to develop a mutually acceptable plan of action. This has produced little response other than the continued execution of a remediation plan, the basis for which remains vague. My evaluations from faculty who work with me have been and continue to be good. My program directors have not, in my opinion, been either timely, honest, or objective in their dealings with me.

EXHIBIT

4

MP  12-22-10

ARON 0173

As I've mentioned to you before, in my October meeting both directors raised the issues of response speed and efficiency. The evaluations cited were from 6 months prior, however, and I had reason to believe I had addressed those problems. What I didn't mention is that I was called to that meeting after being on call all night in the SICU. We spent little time discussing my clinical performance. Instead, Dr. Wallace, in a very hostile manner, accused me of misusing the text page system to dump work on fellow residents in Mac House. I was confused, then alarmed, and ultimately offended by that accusation, and that occupied much of my attention during that meeting. I stated clearly that I do not dump work on my colleagues by whatever method, and it's not been mentioned to me again.

I will tell you that Dr. Wallace threatened to fire me 2 years ago citing "unprofessional behavior" when I had a foot surgery, and a longer than anticipated period of non-weight-bearing complicated the call schedule. I believe that he is biased in his assessment of me and was quite eager to impose both the EAP evaluation and the subsequent 6-month penalty, though he could not cite a single example to me of "cognitive impairment" when I asked him directly. He did not discuss that decision with Dr. Norcia, who was not aware I had been pulled off duty until 4 days later. Dr. Wallace threatened termination and disciplinary action again when I questioned the inclusion of "unprofessional behavior" in their report to the ABA. Dr. Norcia, if you remember, had expressed willingness to remove that citation from their report when he met with you and me. The report was never changed and was sent in its original form.

Dr. Norcia can only give me examples when I didn't move or speak as fast as he would have liked or expected, but has said that my actions and/or responses themselves were correct and appropriate. When I was finally given an opportunity to work in December, he said he had no significant concerns regarding my performance. While we did have a case with a difficult airway and a sub-sternal mass, he felt we didn't have any truly critical incidents to evaluate my responsiveness. He said, however, he had an "open mind" regarding my status. Two weeks later, while I was on maternity leave and with no further assessment of my clinical ability, he entered his statement of my unsatisfactory performance and need for remediation, citing the first week in October in the ICU. He has indicated to me that the fact that I consulted an attorney influenced that report. I've not received at any time the specifics of any other performance concerns that may have been communicated to the program directors.

Again, I have tried to be responsive and honest and open-minded during what has become the most difficult period of my professional career. I take responsibility for my own medical practice. I have never threatened legal action. Despite this, I have been met with inappropriate censure, dissembling from those I should be able to trust, and an astonishing lack of kindness or concern for my personal circumstances.

I understand the relative immunity and sovereignty faculty enjoy in the realm of academic appraisal, and the legal precedents and rationale for it. The potential for abuse of power, however, is one reason the ACGME laid out requirements for due process in both academic and disciplinary cases (see below). Being told that at least my extra time won't go on record with the NPDB is about as comforting as hearing that I'll get a misdemeanor instead of a felony, when my Miranda rights were violated and the charge itself is questionable.

I believe my supervisors must be required to account for the lack of procedural justice I feel I have experienced, and respond to the evidence which contradicts their view. Further, I should be allowed a disinterested review that does not put me at additional professional risk by incurring a disciplinary action.

I have prepared a complaint to the ACGME, if only to improve the process for future residents. I have not yet submitted it, as I continue to have some hope that this can be addressed internally. I have no other viable counter to oppose my treatment but the expression of my opinion and my continued commitment to my medical practice.

If an adequate response to my concerns doesn't materialize, I will still bring my best effort and complete my training here, though it will be with little faith in, or respect for, my department leadership. I envision that as an unpleasant but unavoidable circumstance as I work to minimize the adverse consequences for my career.

Dr. Shuck asked me what I want at this point. At this point, I want the decision to extend my training reversed and my permanent record cleared. Failing that, I want the right to an appeal and review of these

ARON 0174

decisions by an impartial committee without incurring the penalty of a recorded and reportable disciplinary action. If that is denied, I want at the very minimum clear documentation in my record that addresses this as a transient medical issue and does not impugn my professionalism.

I would appreciate an opportunity to hear your thoughts on this.

Sincerely,

Sarah

*Sarah Aronson, MD*

*UHHS/Case School of Medicine*

Relevant ACGME Program Requirements:

(1) Non-renewal of appointment or non-promotion: In

instances where a resident's agreement will not be

renewed, or when a resident will not be promoted to

the next level of training, the Sponsoring Institution

must ensure that its programs provide the resident(s)

with a written notice of intent no later than four

months prior to the end of the resident's current

agreement. If the primary reason(s) for the non-renewal

or non-promotion occurs within the four

months prior to the end of the agreement, the

Sponsoring Institution must ensure that its programs

provide the resident(s) with as much written notice of

the intent not to renew or not to promote as

circumstances will reasonably allow, prior to the end

of the agreement.

(2) Residents must be allowed to implement the

institution's grievance procedures if they receive a

written notice either of intent not to renew their

agreement(s) or of intent to renew their agreement(s)

but not to promote them to the next level of training.

e) Grievance procedures and due process: The Sponsoring

Institution must provide residents with fair, reasonable, and

readily available written institutional policies and procedures

for grievance and due process. These policies and

procedures must minimize conflict of interest by adjudicating

parties in addressing:

(1) Academic or other disciplinary actions taken against

residents that could result in dismissal, non-renewal

of a resident's agreement, non-promotion of a

resident to the next level of training, or other actions

that could significantly threaten a resident's intended

career development.

ARON 0176

fu js.txt

From: Aronson, Sarah
Sent: Friday, April 10, 2009 11:09 AM
To: Shuck, Jerry
Cc: Nearman, Howard
Subject: f/u

Dr. Shuck,
I want to let you know that I finally had the opportunity today to talk with Dr.
Nearman about my concerns with the handling of my performance review.  To summarize,
he feels he has delegated the management of the residency training program to Drs.
Wallace and Norcia, and will not  take any active steps to influence the process
that has occurred to date.  He agrees that an objective review or appeal may be the
only way to resolve the issue.  He expressed support of my submitting a formal
complaint to the ACGME if that is the only way to secure due process.  I will plan
to proceed with that this week unless you have some other options.
Thank you,
Sarah


Sarah Aronson, MD
UHHS/Case School of Medicine



Page 1

ARON 0206

## UNIVERSITY HOSPITALS CASE MEDICAL CENTER
## RESIDENT/FELLOWSHIP CONTRACT

Date: 2/06/2009

Doctor: Sarah Aronson

I am pleased to inform you that on the recommendation of your department director, the terms of your appointment as a resident **physician** at University Hospitals of Cleveland DBA University Hospitals Case Medical Center ("UHCMC") are as follows:

Department-Division: Anesthesiology

PGY Level: 7

Effective Period:   03/01/2009-08/31/2009

Annual Stipend: $54970

All appointments are for the above Effective Period, and may be renewed at the discretion of UHCMC upon continued evidence of satisfactory performance. Further, all appointments are subject to the terms, policies and procedures set forth in the attached Residents' & Fellows' Manual (the "Manual"). This contract may be terminated for any reason or no reason pursuant to the terms of the Manual or the policies and procedures of University Hospitals and UHCMC.

Upon commencement of your employment you are required to show evidence of U.S. citizenship or present a valid visa in a category that permits you to be employed in the program without qualifications or exceptions.

UHCMC agrees to provide an educational program that at a minimum meets the standards established by the ACGME and to provide benefits as outlined in the Manual. You will agree to meet the educational requirements of the program and to provide safe, effective and compassionate care under the supervision of residency faculty.

Read the Residents' & Fellows' Manual carefully; it contains important information about hospital policies. You must familiarize yourself with the following information:

- Compensation and Benefits
- Conditions for Living Quarters
- Counseling
- Duty Hours
- Effect of Leave for Satisfying Completion of Program
- Equal Employment
- Extracurricular Employment (Moonlighting)
- Family Medical Leave Benefits (FMLA)

- Financial Support
- Grievance Procedures
- Insurance Coverage (health, disability, liability, liability after program completion)
- Leave of Absence
- Meals and Laundry
- Medical & Psychological Support Services
- Non-Renewal of Contract
- Payroll

- Physician Impairment & Substance Abuse
- Professional Activities outside the Program
- Professional Leave of Absence Benefits
- Residency Closure and Reduction
- Resident Evaluation & Reappointment
- Resident Responsibilities
- Sexual and Other Forms of Harassment
- Sick Leave Benefits
- Vacation

You will be required to follow UHCMC policies and procedures and comply with state and federal laws and regulations. University Hospitals is committed to full compliance with all applicable laws, rules, regulations and state and Federal health care program requirements (collectively, "Laws"), and by signing the Compliance Certification, attached as an addendum to this Contract, you agree to cooperate fully with the University Hospitals Compliance & Ethics Program. Failure to comply with the requirements of the attached Compliance Certification may result in the immediate termination of your appointment to the Residency Program.

By accepting this position you will be bound by the terms of the Residents' & Fellows' Manual as it maybe amended from time to time. Kindly acknowledge your acceptance of this offer by signing below and returning the original copy of this letter to:

Graduate Medical Education Office
University Hospitals Case Medical Center
11100 Euclid Ave
Cleveland, Ohio 44106

Jerry M. Shuck, M.D.
Director of Graduate Medical Education

Signature

Date: 2/25/09

EXHIBIT
6

UNIVERSITY HOSPITALS ("UH")[1]
COMPLIANCE ADDENDUM AND CERTIFICATION

This Compliance Addendum is incorporated into and made a part of the Resident/Fellowship Contract between University Hospitals Case Medical Center and Sarah Aronson (Doctor).

Each party shall perform its obligations under the Contract in compliance with the requirements set forth in the Federal Anti-Kickback Statute and the Stark Self-Referral Law, to the extent such laws may be applicable to the arrangements described in the Contract.

By signing the contract, I certify that:

1. I have not been debarred, excluded, suspended or otherwise determined to be ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs[2] (collectively, "Ineligible"), or convicted of a criminal offense that could result in becoming Ineligible.

2. Except as disclosed below, neither I nor an immediate family member[3] makes referrals to UH for health care items or services, or to the best of my knowledge: (a) has a direct or indirect ownership or investment interest in or is directly or indirectly employed by or contracted with any company or person to provide services in connection with my Contract:

_____

3. I will conduct myself as a Doctor consistent with the standards set forth in the UH Code of Conduct, and I shall cooperate fully with the UH Compliance & Ethics Program. The UH Code of Conduct is available electronically at: *http://www.uhhospitals.org/tabid/1806/Default.aspx* .

4. I shall perform the Contract in compliance with all applicable laws, rules, regulations and Federal health care program requirements (to the extent applicable) (collectively, "Laws").

By signing below, I certify that I:

1. Have received a copy of the University Hospitals ("UH") Code of Conduct and UH Policies and Procedures regarding the operation of the UH Compliance & Ethics Program and compliance with Federal health care program requirements, specifically including the Federal Anti-Kickback Statute (42 U.S.C. Sec. 1320a-7(b) (the "Anti-Kickback Statute") and the Physician Self Referral Law (42 U.S.C. Sec. 1395nn) (also referred to as the "Stark Law");

2. Have read, understood and shall abide by the UH Code of Conduct and UH Policies and Procedures;

3. Shall comply with the UH Compliance Program; and

4. Shall perform the Contract in compliance with all applicable laws, rules and regulations and Federal health care program requirements, including without limitation, the Federal Anti-Kickback Statute, the Stark Law, and the rules, regulations and administrative guidance promulgated under the authority of such laws.

Each of the parties certifies that to its best knowledge and belief, no part of any consideration paid under the Contract is a prohibited payment for the recommending or arranging for the referral of business or the ordering of items or services; nor are the payments intended to induce illegal referrals of business or other illegal conduct.

This Compliance Certification must be signed by an authorized representative of the entity or individual identified below with knowledge of the matters addressed herein and authority to bind such party, and shall have the same effective date as the Contract.

"DOCTOR"

Print Name:
Date:

"UH"

Jerry M. Shuck, M.D.
Director of Graduate Medical Education

---

1. Except where otherwise noted, "UH" means all hospitals, ancillary providers, and other entities owned or controlled, directly or indirectly, by University Hospitals Health System.

2. An individual or entity listed on either the Health and Human Services – Office of Inspector General – List of Excluded Individuals at www.exclusions.oig.hhs.gov or the General Services Administration List of Parties Excluded from Federal Procurement and Non-Procurement Programs at www.epls.gov , as revised from time to time, is Ineligible.

3. "Immediate family members" include a spouse, natural or adoptive parent, child, sibling, step-parent, step-child, step-brother, step-sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, grandchild, and the spouse of any grandparent or grandchild.

## UNIVERSITY HOSPITALS CASE MEDICAL CENTER
## RESIDENT/FELLOWSHIP CONTRACT

Date: 02/20/2007                                    Doctor:  Serah Aroson

I am pleased to inform you that on the recommendation of your department director, the terms of your appointment as a resident physician at University Hospitals of Cleveland DBA University Hospitals Case Medical Center ("UHCMC") are as follows:

Department-Division: Anesthesiology                 PGY Level:      7

Effective Period:     03/01/2007-02/29/2008         Annual Stipend: $49569

All appointments are for the above Effective Period, and may be renewed at the discretion of UHCMC upon continued evidence of satisfactory performance. Further, all appointments are subject to the terms, policies and procedures set forth in the attached Residents' & Fellows' Manual (the "Manual"). This contract may be terminated for any reason or no reason pursuant to the terms of the Manual or the policies and procedures of University Hospitals and UHCMC.

Upon commencement of your employment you are required to show evidence of U.S. citizenship or present a valid visa in a category that permits you to be employed in the program without qualifications or exceptions.

UHCMC agrees to provide an educational program that at a minimum meets the standards established by the ACGME and to provide benefits as outlined in the Manual. You will agree to meet the educational requirements of the program and to provide safe, effective and compassionate care under the supervision of residency faculty.

Read the Residents' & Fellows' Manual carefully; it contains important information about hospital policies. You must familiarize yourself with the following information:

| | | |
|---|---|---|
| • Compensation and Benefits | • Financial Support | • Physician Impairment & Substance Abuse |
| • Conditions for Living Quarters | • Grievance Procedures | • Professional Activities outside the Program |
| • Counseling | • Insurance Coverage (health, disability, liability, liability after program completion) | • Professional Leave of Absence Benefits |
| • Duty Hours | | • Residency Closure and Reduction |
| • Effect of Leave for Satisfying Completion of Program | • Leave of Absence | • Resident Evaluation & Reappointment |
| • Equal Employment | • Meals and Laundry | • Resident Responsibilities |
| • Extracurricular Employment (Moonlighting) | • Medical & Psychological Support Services | • Sexual and Other Forms of Harassment |
| • Family Medical Leave Benefits (PMLA) | • Non-Renewal of Contract | • Sick Leave Benefits |
| | • Payroll | • Vacation |

You will be required to follow UHCMC policies and procedures and comply with state and federal laws and regulations. University Hospitals is committed to full compliance with all applicable laws, rules, regulations and state and Federal health care program requirements (collectively, "Laws"), and by signing the Compliance Certification, attached as an addendum to this Contract, you agree to cooperate fully with the University Hospitals Compliance & Ethics Program. Failure to comply with the requirements of the attached Compliance Certification may result in the immediate termination of your appointment to the Residency Program.

By accepting this position you will be bound by the terms of the Residents' & Fellows' Manual as it maybe amended from time to time. Kindly acknowledge your acceptance of this offer by signing below and returning the original copy of this letter to:

Graduate Medical Education Office
University Hospitals Case Medical Center
11100 Euclid Ave
Cleveland, Ohio, 44106

_____          _____   2/27/07
Jerry M. Shuck, M.D.             Signature   S. ARONSON MD    Date
Director of Graduate Medical Education

EXHIBIT
7

COMPLIANCE ADDENDUM AND CERTIFICATION

This Compliance Addendum is incorporated into and made a part of the Resident/Fellowship Contract between University Hospitals Case Medical Center and ⎯⎯⎯⎯⎯⎯ ("Doctor").

Each party shall perform its obligations under the Contract in compliance with the requirements set forth in the Federal Anti-Kickback Statute and the Stark Self-Referral Law, to the extent such laws may be applicable to the arrangements described in the Contract.

By signing the contract, I certify that:

1. I have not been debarred, excluded, suspended or otherwise determined to be ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs[2] (collectively, "Ineligible"), or convicted of a criminal offense that could result in becoming Ineligible.

2. Except as disclosed below, neither I nor an immediate family member[3] makes referrals to UH for health care items or services, or to the best of my knowledge: (a) has a direct or indirect ownership or investment interest in or is directly or indirectly employed by or contracted with any company or person to provide services in connection with my Contract:

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

3. I will conduct myself as a Doctor consistent with the standards set forth in the UH Code of Conduct, and I shall cooperate fully with the UH Compliance & Ethics Program.  The UH Code of Conduct is available electronically at: *http://www.uhhospitals.org/tabid/1806/Default.aspx* .

4. I shall perform the Contract in compliance with all applicable laws, rules, regulations and Federal health care program requirements (to the extent applicable) (collectively, "Laws").

By signing below, I certify that I:

1. Have received a copy of the University Hospitals ("UH") Code of Conduct and UH Policies and Procedures regarding the operation of the UH Compliance & Ethics Program and compliance with Federal health care program requirements, specifically including the Federal Anti-Kickback Statute (42 U.S.C. Sec. 1320a-7(b) (the "Anti-Kickback Statute") and the Physician Self Referral Law (42 U.S.C. Sec. 1395nn) (also referred to as the "Stark Law");

2. Have read, understood and shall abide by the UH Code of Conduct and UH Policies and Procedures;

3. Shall comply with the UH Compliance Program; and

4. Shall perform the Contract in compliance with all applicable laws, rules and regulations and Federal health care program requirements, including without limitation, the Federal Anti-Kickback Statute, the Stark Law, and the rules, regulations and administrative guidance promulgated under the authority of such laws.

Each of the parties certifies that to its best knowledge and belief, no part of any consideration paid under the Contract is a prohibited payment for the recommending or arranging for the referral of business or the ordering of items or services; nor are the payments intended to induce illegal referrals of business or other illegal conduct.

This Compliance Certification must be signed by an authorized representative of the entity or individual identified below with knowledge of the matters addressed herein and authority to bind such party, and shall have the same effective date as the Contract.

"DOCTOR"                                           "UH"

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯     2/27/07          ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
                              Date

Print Name:  SARAH ARONSON MD                    Jerry M. Shuck, M.D.
Date:        2/27/07                             Director of Graduate Medical Education

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[1] Except where otherwise noted, "UH" means all hospitals, ancillary providers, and other entities owned or controlled, directly or indirectly, by University Hospitals Health System.

[2] An individual or entity listed on either the Health and Human Services – Office of Inspector General – List of Excluded Individuals at www.exclusions.oig.hhs.gov or the General Services Administration List of Parties Excluded from Federal Procurement and Non-Procurement Programs at www.epls.gov , as revised from time to time, is Ineligible.

[3] "Immediate family members" include a spouse, natural or adoptive parent, child, sibling, step-parent, step-child, step-brother, step-sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, grandchild, and the spouse of any grandparent or grandchild.

Immediately after typing, the Autopsy Office will send the attending physician listed in the autopsy permit a copy of the Provisional Anatomical Diagnosis. Any inquiries by physicians in regard to past or current autopsy reports should be directed to the Autopsy Office, extension 43479. The Morticians will give only information concerning the time of performance and sign-out of any autopsy. For more information concerning special circumstances, please contact the Autopsy Director at extension 43478.

## OUTSIDE INQUIRIES CONCERNING AUTOPSY FINDINGS

Matters relating to subpoenaed autopsy findings and reports, as well requests for copies of Provisional and/or Final Anatomic Diagnoses by next of kin, must be referred to HIS, Release of Medical Information Section.

SUPERVISION

Each residency and fellowship training program will provide a level of supervision that complies with all ACGME requirements for the supervision of residents. The attending physician has both an ethical and legal responsibility for the overall care of the individual patient and for the supervision of the resident involved in the patient's care.

The attending staff, based on direct observation and knowledge of each resident's skills and ability, must determine the level of responsibility accorded to each resident and this may vary with the clinical circumstances. Supervision does not imply constant observation. Faculty schedules must be structured so that they are immediately available for consultation and support.

Evidence of resident supervision must be documented in the form of signed notes in patients' charts and other records such an indication of the level of attending presence in procedure notes. Each program must have a policy on supervision in their departmental policy manual.

Faculty and residents must also be educated to recognize the signs of fatigue and adopt and apply policies to prevent and counteract the potential negative effects of fatigue.

DUTY HOURS

University Hospitals strives to meet institutional and program requirements of the Accreditation Council of Graduate Medical Education to ensure that the learning objectives of its residency programs are not compromised by excessive reliance on Residents to fulfill service obligations. Providing Residents with a sound academic and clinical education must be carefully planned and balanced with concerns for patient safety and Resident well-being. Didactic and clinical education has priority in the allotment of Residents' time and energies. Duty hour assignments recognize that faculty and Residents collectively have responsibility for the safety and welfare of patients.



EXHIBIT

1. Duty hours are defined as all clinical and academic activities related to the residency program, i.e., patient care (both inpatient and outpatient), administrative duties related to patient care, the provision for transfer of patient care, time spent in-house during call activities, and scheduled academic activities such as conferences. Duty hours do not include reading and preparation time spent away from the duty site.
2. Duty hours must be limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call activities.
3. Residents must be provided with 1 day in 7 free from all educational and clinical responsibilities, averaged over a four-week period, inclusive of call. One day is defined as one continuous 24-hour period free from all clinical, educational, and administrative activities.
4. A 10-hour time period for rest and personal activities must be provided between all daily duty periods, and after in-house call.

All programs are required to monitor duty hours by a Graduate Medical Education Committee (GMEC) approved method or by using an attestation form. Residents are required to report duty hours on a monthly basis to their program director or assigned designee. The program director or assigned designee will report results via email to the Graduate Medical Education office on a monthly basis. At every GMEC meeting duty hours reporting will be discussed. Any communication of violations will result in a meeting between the Director of GME and program director to determine what caused the violation and to remedy the violation so it does not continue to occur.

The GMEC is committed to assuring that residents are able to report concerns regarding duty hours without retribution.

If a Resident is uncomfortable reporting duty hours issues to the program director; Residents may report issues by:

1.  scheduling an appointment with the Manager of GME office.
2.  scheduling an appointment with the Director of GME.
3.  contacting the Association of Residents & Fellows who will supply a report to the GMEC.

REQUEST FOR DUTY HOURS EXCEPTION

The program director must submit a written proposal to the DIO requesting approval to petition the ACGME for a duty hours exception. The program's responsibility is to clarify that the need for an exception is for educational reasons. Only programs in good standing with the ACGME may apply. Good standing is defined as without a warning or a proposed or confirmed adverse action.

The proposal should include the following:

| | |
|---|---|
| Patient safety: | Information describing how the program will monitor, evaluate, and ensure patient safety with extended resident work hours. |
| Educational Rational: | The relationship between education and the goals & objectives of the program for which the increased hours are necessary. |
| Call Schedules: | Call schedules should reflect the specific times of the exception. |
| Faculty Monitoring: | Faculty must be trained to know the signs of resident fatigue and sleep deprivation. |
| Moonlighting: | Moonlighting is not permitted. |

The Director of GME will review the proposal and if all of the above items are included the proposal will be voted on at the next GMEC meeting.

If approval is granted at by the GMEC the program then can submit a proposal to their RRC following the RRC procedures for granting duty hours exception as outlined on the ACGME website.

ON-CALL ACTIVITIES

The objective of on-call activities is to provide residents with continuity of patient care experiences throughout a 24-hour period. In-house call is defined as those duty hours beyond the normal workday when residents are required to be immediately available in the assigned institution.

1.  In-house call must occur no more frequently than every third night, averaged over a four-week period.
2.  Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to 6 additional hours to participate in didactic activities, maintain continuity of medical and surgical care, transfer care of patients, or conduct outpatient continuity clinics.
3.  No new patients may be accepted after 24 hours of continuous duty, except in outpatient continuity clinics. A new patient is defined as any patient for whom the resident has not previously provided care.
4.  At-home call (pager call) is defined as call taken from outside the assigned institution.
    a.  The frequency of at-home call is not subject to the every third night limitation. However, at-home call must not be so frequent as to preclude rest and reasonable personal time for each resident. Residents taking at-home call must be provided with 1 day in 7 completely free from all educational and clinical responsibilities, averaged over a 4-week period.
    b.  When residents are called into the hospital from home, the hours residents spend in-house are counted toward the 80-hour limit.

    c.  The program director and the faculty must monitor the demands of at-home call in their programs and make scheduling adjustments as necessary to mitigate excessive service demands and/or fatigue.

## MOONLIGHTING

The circumstance of working as a physician outside of one's authorized training program is called "moonlighting". Moonlighting has been discouraged in the past for several reasons. First, it clearly competes with the opportunity to achieve the full measure of the educational objectives of the residency. Not only does the added time burden take away from study; it reduces rest and the ability for a more balanced lifestyle. Nevertheless, many residents wish to use their time away from their training program to meet financial obligations.

The moonlighting workload must not interfere with the ability of the resident to achieve the goals and objectives of their GME program. The program director should monitor resident performance to assure that factors such as resident fatigue are not contributing to diminished learning or performance, or detracting from patient safety. The program director must monitor the number of hours and the nature of the workload of residents engaging in moonlighting experiences. Any adverse effects will result in the withdrawal of permission to moonlight.

Residents must not be required to engage in "moonlighting."

Moonlighting is only permitted if the following requirements are met:

1. The resident must hold a permanent DEA number as well as a permanent license to practice from the Ohio State Medical Board;

2. The resident must obtain their your own professional liability insurance since you will not be covered by the liability insurance that is in place for Residents while in training;

3. A copy of prior written approval must be placed in the resident's file.

4. Residents who are visa holders may receive compensation only for training activities that are part of their defined training program. According to Educational Commission for Foreign Medical Graduates guidelines, employment outside the residency or fellowship program is **not permitted.**

## LICENSURE

## MEDICAL LICENSURE

Under Ohio law, an individual pursuing a residency or fellowship in this state must be licensed by the State Medical Board of Ohio. The individual may either hold a Certificate (permanent license) to practice medicine and surgery in Ohio, or apply to the Board for a Training Certificate (temporary license). The Office of GME will provide the necessary application forms for the Training Certificate, but responsibility for timely completion and fee payment lies with the applicant. A Training Certificate is valid only for a period of one year, but may be renewed annually for a maximum of six years.

The Training Certificate allows Residents to follow the schedule of prescribed services, rotations, and clinical activities that have been issued by their Program Directors. Please be advised of the following limitations regarding temporary licensure:

1. A Resident without a permanent Ohio Medical license cannot "moonlight."
2. A Resident without a permanent Ohio Medical license cannot sign any legal documents that must be filed with the Probate Court in connection with involuntary hospitalization of patients at Hanna Pavilion.

Permanent licensure can be initiated by contacting the State Medical Board of Ohio, Columbus, Ohio, phone (614) 466-3934. The Office of GME must be kept informed of any change in licensure status.

# ACGME-Approved Specialty Specific Duty Hour Language

| SPECIALTY | Common Requirements Section VI.E.2: (six hour post call period) | Common requirements Section VI.E.3: (Definition of new patient) | Other Changes (Common Program Requirements in Bold) |
|---|---|---|---|
| **Allergy & Immunology** | **Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care.** | No new patients may be accepted after 24 hours of continuous duty.<br><br>a) A new patient is defined as any patient for whom the resident has not previously provided care. | |
| **Anesthesiology** | **Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care.**<br><br>a) During the six additional hours, residents may not administer anesthesia in the operating room for a new operative case or manage new admissions to the ICU. The resident should not manage non-continuity patients in the six hours post-call. | No new patients may be accepted after 24 hours of continuous duty.<br><br>a) A new patient is defined as any patient for whom the resident has not previously provided care. | **VI.B.1. The program must ensure that qualified faculty provide appropriate supervision of residents in patient care activities.**<br><br>1. Supervision shall not vary substantially with the time of day or day of the week. In the clinical setting, faculty members should not direct anesthesia at more than two anesthetizing locations simultaneously.<br><br>**VI.D.3. Adequate time for rest and personal activities must be provided. This should consist of a 10-hour time period provided between all daily duty periods and after in-house call.**<br><br>a) The Review Committee will not consider requests for a rest period of less than 10 hours.<br><br>VI.E.5. On-call activities present the resident with the challenges of providing care outside regular duty |



| SPECIALTY | Common Requirements Section VI.E.2: (six hour post call period) | Common requirements Section VI.E.3: (Definition of new patient) | Other Changes (Common Program Requirements in Bold) |
|---|---|---|---|
| | | | hours. Therefore, on-call activities, including those that occur throughout the night, are necessary components of the education of all residents. |
| Colon & Rectal Surgery | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty. <br><br> a) A new patient is defined as any patient for whom the resident has not previously provided care. | VI.G.4. The RRC for Anesthesiology will not consider requests for an exception to the limit to 80 hours per week, averaged monthly. |
| Dermatology | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty. <br><br> a) A new patient is defined as any patient for whom the resident has not previously provided care. | VI.B.1. The program must ensure that qualified faculty provide appropriate supervision of residents in patient care activities. <br><br> 1.   Faculty must be on-site and readily available to see patients at all times. |
| Emergency Medicine | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty. <br><br> a) A new patient is defined as any patient for whom the resident has not previously provided care. | VI.B.1. The program must ensure that qualified faculty provide appropriate supervision of residents in patient care activities. <br><br> 1. All residents assigned to the emergency department must have supervision commensurate to their level of training. <br><br> VI.E.3.d. While on rotations to other |

2

| SPECIALTY | Common Requirements Section VI.E.2: (six hour post call period) | Common requirements Section VI.E.3: (Definition of new patient) | Other Changes (Common Program Requirements in Bold) |
|---|---|---|---|
| | | | services, the above standards apply. However, when emergency medicine residents are on emergency medicine rotations, the following standards apply: <br><br> (1) As a minimum, residents shall be allowed an average of one full day in seven days away from the institution and free of any clinical or academic responsibilities, including planned educational experiences; <br><br> (2) While on duty in the emergency department, residents may not work longer than 12 continuous scheduled hours. There must be at least an equivalent period of continuous time off between scheduled work periods; and, <br><br> (3) A resident should not work more than 60 scheduled hours per week seeing patients in the emergency department and no more than 72 duty hours per week. Duty hours comprise all clinical duty time and conferences, whether spent within or outside the educational program, including all on-call hours. <br><br> VI.F.3. Activities that fall outside the educational program may not be mandated, nor may they interfere with the resident's performance in the educational process as defined in the |

| SPECIALTY | Common Requirements Section VI.E.2: (six hour post call period) | Common requirements Section VI.E.3: (Definition of new patient) | Other Changes (Common Program Requirements in Bold) |
|---|---|---|---|
| **Family Medicine** | **Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care.**<br><br>a) For family medicine programs, the only out-patient activity allowed is the scheduled continuity office hours in the FMC, and/or self-directed activities. No other clinical duties are permitted. FM residents may not have continuity office hours in the afternoon or evening following an overnight call responsibility. Directors are responsible for anticipatory scheduling to avoid having to cancel patient appointments for afternoon FMC continuity sessions following overnight call.<br><br>b) For programs using a night block rotation, residents may have their continuity office hours in the FMC either before or after the night block hours, as long as there are 10 hours of rest between assigned | No new patients may be accepted after 24 hours of continuous duty.<br><br>a) Patients seen past call during a morning continuity session in the FMC are not considered new patients. | agreement between the institution and the resident.<br><br>VI.G.3. The Review Committee will not grant an exception to the applicable duty limits described above.<br><br>VI.D.3. Adequate time for rest and personal activities must be provided. This should consist of a **10-hour time period provided between all daily duty periods and after in-house call.**<br><br>a) The Review Committee will not consider requests for a rest period of less than 10 hours.<br><br>VI.G.2.a. The Review Committee for Family Medicine will not consider requests for an exception to the limit to 80 hours per week, averaged monthly. |

4

| SPECIALTY | Common Requirements Section VI.E.2:<br><br>(six hour post call period) | Common requirements Section VI.E.3:<br><br>(Definition of new patient) | Other Changes<br><br>(Common Program Requirements in Bold) |
|---|---|---|---|
| Internal Medicine | c) Residents should also be available for critical events in the lives of their continuity patients such as obstetrical delivery throughout their three years of training, but with the understanding that their subsequent schedules should be adjusted, as necessary, to comply with the duty hours restrictions.<br><br>Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty.<br><br>a) A new patient is defined as any patient for whom the resident has not previously provided care. | VI.E.1.a) **In-house call must occur no more frequently than every third night, averaged over a four-week period.**<br><br>a) Internal medicine residency programs are not allowed to average in-house call over a four-week period.<br><br>VI.G.3.a. The Review Committee for Internal Medicine will not consider requests for exceptions to the limit to 80 hours per week, averaged monthly |
| Medical Genetics | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty.<br><br>a) A new patient is defined as any patient for whom the resident has not previously provided care. | |
| Neurological Surgery | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may | No new patients may be accepted after 24 hours of continuous duty. | |

| SPECIALTY | Common Requirements Section VI.E.2: (six hour post call period) | Common requirements Section VI.E.3: (Definition of new patient) | Other Changes (Common Program Requirements in Bold) |
|---|---|---|---|
| | remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | a) A new patient is defined as any patient for whom the resident has not previously provided care. | a) Residents must provide on-call duty in the hospital. |
| Neurology | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours.  Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty.<br><br>a) A new patient is defined as any patient for whom the resident has not previously provided care. | **VI.B.1. The program must ensure that qualified faculty provide appropriate supervision of residents in patient care activities.**<br><br>1.  There must be explicit and current written supervisory lines of supervision circulated to all members of the program staff.<br><br>**VI.E.1. In-house call must occur no more frequently than every third night, averaged over a four-week period.**<br><br>a) Residents must provide on-call duty in the hospital.<br><br>b) In-house call is required to provide the experience of primary coverage for already-hospitalized inpatients and initial evaluation and treatment of urgent admissions to neurology or consultation patients. In most instances, practicality and optimal quality of care will necessitate that residents sleep in the hospital when providing such care. Under some conditions, it may be permissible for this call to be taken from home. If at-home call causes frequent interruption or significant deprivation |

| SPECIALTY | Common Requirements Section V.I.E.2: (six hour post call period) | Common requirements Section V.I.E.3: (Definition of new patient) | Other Changes (Common Program Requirements in Bold) |
|---|---|---|---|
| Nuclear Medicine | | No new patients may be accepted after 24 hours of continuous duty.<br><br>a) A new patient is defined as any patient for whom the resident has not previously provided care. | of sleep, it should be considered equivalent to in-house call with respect to duty hours; that is, the entire night must be included in the calculation of total on-duty hours per week, and the 10 hour rest period and the 24+6 rule must be triggered. It will be the program director's responsibility in consultation with residents and other faculty to establish rules to assure that the spirit of the duty hours is respected, regardless of the nature of call.<br><br>V.I.G.3. The Review Committee for Neurology will not consider requests for exceptions to the limit to 80 hours per week, averaged over a four week period. |
| Obstetrics/Gynec ology | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care.<br><br>Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty, except in outpatient continuity clinics. | V.I.B.1. The program must ensure that qualified faculty provide appropriate supervision of residents in patient care activities.<br><br>1.    The program director must provide for the supervision of residents through explicit written descriptions of supervisory lines of responsibility for the care of |

7

| SPECIALTY | Common Requirements Section VI.E.2: (six hour post call period) | Common requirements Section VI.E.3: (Definition of new patient) | Other Changes (Common Program Requirements in Bold) |
|---|---|---|---|
| Ophthalmology | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty.<br><br>a) A new patient is defined as any patient for whom the resident has not previously provided care. | 2. Supervision of residents in obstetrics and gynecology is required to ensure proper (1) quality of care, (2) education, (3) patient safety, and (4) fulfillment of responsibility of the attending physicians to their patients. These considerations must be integrated with the goal of independent competence in the full range of obstetrics and gynecology at the completion of residency. This implies a graduated and increasing level of independent resident action. Each program director must balance quality assurance for patient care, increasing level of independent resident action, and independent resident action. The level of resident supervision should be commensurate with the amount of independent function that is designated at each resident level. Residents, as well as faculty, may provide supervision.<br><br>VI.B.1. **The program must ensure that qualified faculty provide appropriate supervision of residents in patient care activities.**<br><br>1. There should be direct faculty supervision of each resident in at least 1,000 outpatient visits. Direct faculty supervision occurs when |

8

| SPECIALTY | Common Requirements Section VI.E.2: (six hour post call period) | Common requirements Section VI.E.3: (Definition of new patient) | Other Changes (Common Program Requirements in Bold) |
|---|---|---|---|
| Orthopaedic Surgery | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty. <br><br> a) A new patient is defined as any patient for whom the orthopaedic surgery service or department has not previously provided care. The resident should evaluate the patient before participating in surgery. | |
| Otolaryngology | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty. <br><br> a) A new patient is defined as any patient for whom the otolaryngology service or department has not previously provided care. The resident should evaluate the patient before participating in surgery. | 2. For emergency medicine care, faculty must be readily available to see any patient upon request by the resident. |
| Pathology | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in | No new patients may be accepted after 24 hours of continuous duty. <br><br> a) A new patient is defined as any patient for whom the resident has | faculty members also examine the patient with the resident, and discuss the management of the patient with the resident before the patient leaves the clinic. |

a) During this six hour time period, residents may assist in surgery.

| SPECIALTY | Common Requirements Section VI.E.2: (six hour post call period) | Common requirements Section VI.E.3: (Definition of new patient) | Other Changes (Common Program Requirements in Bold) |
|---|---|---|---|
| Pediatrics | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty. <br><br> a) A new patient is defined as any patient for whom the resident has not provided care during the previous 24 hour period, or who is not a part of the resident's continuity panel or the panel of the resident's continuity team, if such exists. <br><br> not previously provided care. | VI.B.1. **The program must ensure that qualified faculty provide appropriate supervision of residents in patient care activities.** <br><br> 1. There must be a written document disseminated to residents and faculty which outlines the supervisory lines of responsibility. <br><br> VI.D.3. **Adequate time for rest and personal activities must be provided. This should consist of a 10-hour time period provided between all daily duty periods and after in-house call.** <br><br> a) The Review Committee will not consider requests for a rest period of fewer than 10 hours. <br><br> VI.G.3. The Review Committee for Pediatrics will not consider requests for exceptions to the 80 hour limit to residents' work week. |
| Physical Medicine & Rehabilitation | a) While continuity of care remains a priority, morning and afternoon continuity clinics after residents have had a 24-hour duty period may be cancelled up to a frequency of one time per month (four weeks) per resident. Post-call residents may not attend other clinics, such as subspecialty clinics. <br><br> Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty. <br><br> a) A new patient is defined as any patient for whom the resident has not previously provided care. | |

10

| SPECIALTY | Common Requirements Section VI.E.2: (six hour post call period) | Common requirements Section VI.E.3: (Definition of new patient) | Other Changes (Common Program Requirements in Bold) |
|---|---|---|---|
| Plastic Surgery | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty. a) A new patient is defined as any patient for whom the resident has not previously provided care. | |
| Preventive Medicine | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty. a) A new patient is defined as any patient for whom the resident has not previously provided care. | |
| Psychiatry | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty. a) A new patient is defined as any patient for whom the resident has not previously provided care. | VI.B.1. The program must ensure appropriate supervision of residents in patient care activities. <br> 1. Each resident must receive a minimum of two hours of direct supervision per week, at least one of which is individual. <br> VI.E.1. In-house call must occur no more frequently than every third night, averaged over a four-week period. <br> a) On psychiatry rotations, in-house call must occur no more frequently than every fourth night, averaged over a four week period. |
| Diagnostic | Continuous on-site duty, including | No new patients may be accepted | |

| SPECIALTY | Common Requirements Section VI.E.2:<br>(six hour post call period) | Common requirements Section VI.E.3:<br>(Definition of new patient) | Other Changes<br>(Common Program Requirements in Bold) |
|---|---|---|---|
| Radiology | in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | after 24 hours of continuous duty.<br><br>a) A new patient is defined as any patient for whom the resident has not previously provided care. | VI.B.1. **The program must ensure that qualified faculty provide appropriate supervision of residents in patient care activities.**<br><br>1. Faculty supervision must be available at all sites of training, and direct faculty supervision is required for all percutaneous invasive procedures, excluding intravenous injection of contrast.<br><br>2. The responsibility or independence given to residents should depend on their knowledge, manual skills, and experience. The resident must have a minimum of 12 moths of training in diagnostic radiology prior to independent in-house on-call responsibilities.<br><br>3. Residents must always have faculty backup when taking night, weekend, or holiday call. All radiologic images must be reviewed and all reports must be signed by faculty. The reviews must occur within 24 hours.<br><br>4. All residents must participate in taking call during the first six months of the final year of diagnostic radiology residency.<br><br>VI.E.3. The Review Committee for Diagnostic Radiology will not consider requests for duty hour exceptions. |
| Radiation | Continuous on-site duty, including | No new patients may be accepted | |

12

| SPECIALTY | Common Requirements Section VI.E.2: (six hour post call period) | Common requirements Section VI.E.3: (Definition of new patient) | Other Changes (Common Program Requirements in Bold) |
|---|---|---|---|
| Oncology | in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty.<br>a) A new patient is defined as any patient for whom the resident has not previously provided care. | |
| Surgery | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty.<br>a) A new patient is defined as any patient for whom the surgery service or department has not previously provided care. The resident should evaluate the patient before surgery. | **VI.D.1. The program must ensure that qualified faculty provide appropriate supervision of residents in patient care activities.**<br>1. The attending physician has both an ethical and a legal responsibility for the overall care of the individual patient and for the supervision of the resident involved in the care of that patient.<br>2. Although senior residents require less direction than junior residents, even the most senior resident must be supervised. The program should establish a chain of command that emphasizes graded authority and increasing responsibility as experience is gained must be established<br>3. A fellow may not supervise chief residents. |
| Thoracic Surgery | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in additional hours to participate in didactic activities, transfer care of | No new patients may be accepted after 24 hours of continuous duty.<br>a) A new patient is defined as any patient for whom the thoracic surgery service or department has | **VI.F.1. Moonlighting must not interfere with the ability of the resident to achieve the goals and objectives of the educational program.** |

| SPECIALTY | Common Requirements Section VI.E.2: (six hour post call period) | Common requirements Section VI.E.3: (Definition of new patient) | Other Changes (Common Program Requirements in Bold) |
|---|---|---|---|
| | patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | not previously provided care. | a) Because the program of thoracic surgery surgical education is demanding, moonlighting is strongly discouraged. |
| Transitional Year | Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | No new patients may be accepted after 24 hours of continuous duty. a) A new patient is defined as any patient for whom the resident has not previously provided care. | **VI.B.1. The program must ensure that qualified faculty provide appropriate supervision of residents in patient care activities.**<br><br>1. A supervising member of the faculty or a more senior resident must be available on site whenever a transitional year resident is on call.<br><br>**VI.E.1. In-house call must occur no more frequently than every third night, averaged over a four-week period.**<br><br>a) In-house call is required to provide the experience of primary coverage for already hospitalized inpatients, and for the initial evaluation and treatment of urgent consultations or admissions on the service to which the resident is concurrently assigned. A resident should not be required to take in-house call on another service without a sound educational rationale for this assignment |
| Urology | Continuous on-site duty, including in-house call, must not exceed 24 | No new patients may be accepted after 24 hours of continuous duty. | VI.G.3. The Review Committee will not grant exceptions for up to 10% of the 80-hour limit. |

ACGME-ApprovedSpecialtySpecificDutyHour_AS_ADM_01_01_09.doc

| SPECIALTY | Common Requirements Section VI.E.2: (six hour post call period) | Common requirements Section VI.E.3: (Definition of new patient) | Other Changes (Common Program Requirements in Bold) |
|---|---|---|---|
| | consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. | a) A new patient is defined as any patient for whom the resident has not previously provided care. | |

**Common Program Requirements**
*Effective: July 1, 2007*

## VI. Resident Duty Hours in the Learning and Working Environment

A. Principles

1. The program must be committed to and be responsible for promoting patient safety and resident well-being and to providing a supportive educational environment.
2. The learning objectives of the program must not be compromised by excessive reliance on residents to fulfill service obligations.
3. Didactic and clinical education must have priority in the allotment of residents' time and energy.
4. Duty hour assignments must recognize that faculty and residents collectively have responsibility for the safety and welfare of patients.

B. Supervision of Residents

The program must ensure that qualified faculty provide appropriate supervision of residents in patient care activities.

C. Fatigue

Faculty and residents must be educated to recognize the signs of fatigue and sleep deprivation and must adopt and apply policies to prevent and counteract its potential negative effects on patient care and learning.

D. Duty Hours (the terms in this section are defined in the ACGME Glossary and apply to all programs)

Duty hours are defined as all clinical and academic activities related to the program; i.e., patient care (both inpatient and outpatient), administrative duties relative to patient care, the provision for transfer of patient care, time spent in-house during call activities, and scheduled activities, such as conferences. Duty hours do not include reading and preparation time spent away from the duty site.

1. Duty hours must be limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call activities.
2. Residents must be provided with one day in seven free from all educational and clinical responsibilities, averaged over a four-week period, inclusive of call.



THE OHIO LEGAL BLANK CO., INC.

EXHIBIT

10

MO  12-22-10

CLEVELAND, OHIO 44102-1799

3. Adequate time for rest and personal activities must be provided. This should consist of a 10-hour time period provided between all daily duty periods and after in-house call.

E. On-call Activities

1. In-house call must occur no more frequently than every third night, averaged over a four-week period.

2. Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care.

3. No new patients may be accepted after 24 hours of continuous duty.

4. At-home call (or pager call)

    a. The frequency of at-home call is not subject to the every-third-night, or 24+6 limitation. However at-home call must not be so frequent as to preclude rest and reasonable personal time for each resident.

    b. Residents taking at-home call must be provided with one day in seven completely free from all educational and clinical responsibilities, averaged over a four-week period.

    c. When residents are called into the hospital from home, the hours residents spend in-house are counted toward the 80-hour limit.

F. Moonlighting

1. Moonlighting must not interfere with the ability of the resident to achieve the goals and objectives of the educational program.

2. Internal moonlighting must be considered part of the 80-hour weekly limit on duty hours.

G. Duty Hours Exceptions

A Review Committee may grant exceptions for up to 10% or a maximum of 88 hours to individual programs based on a sound educational rationale.

1. In preparing a request for an exception, the program director must follow the duty hour exception policy from the ACGME Manual on Policies and Procedures.

2. Prior to submitting the request to the Review Committee, the program director must obtain approval of the institution's GMEC and DIO.

ACGME: February 2007; Effective: July 1, 2007

### Frequently-Asked Questions about the ACGME Common Duty Hour Standards
### *(Updated April 2007)*

This set of responses to frequently asked questions (FAQs) about the common duty hour standards was updated in April 2007, and is organized by standard for easy reference. It reflects the growing experience of programs in adapting to the standards, and the ACGME in promoting compliance with the standards.

In addition to these minimum standards, individual Review Committees (RCs) may set more restrictive limits, as warranted by patient safety, resident education and resident well-being considerations in their discipline. The responses below 1) offer general answers based on the common standards and programs should address specialty-specific questions to their RC team; and 2) may not be able to offer guidance in cases of rare patient care and other events. In these situations, the best professional judgment of the program director and/or DIO should be applied. The standards and the FAQ below, address situations where activities are scheduled or occur with some frequency in residency and fellowship programs.

We welcome your comments on this FAQ. Please send them via e-mail to iphilibert@acgme.org, or call Ingrid Philibert at 312/755-5003.

**"Duty hours must be limited to 80 hours per week."**

*Question: What is included in the definition of duty hours under the standard "duty hours must be limited to 80 hours per week?"*

Duty hours are defined as all clinical and academic activities related to the residency program. This includes clinical care, in-house call, short call, night float and day float, transfer of patient care, and administrative activities related to patient care. For call from home, only the hours spent in the hospital after being called in to provide care count toward the 80-hour weekly limit.

Hours spent on activities that are required by the accreditation standards, such as membership on a hospital committee, or that are accepted practice in residency programs, such as residents participating in interviewing residency candidates, must be included in the count of duty hours. It is not acceptable to expect residents to participate in these activities on their own hours, nor should residents be prohibited from taking part in them.

Duty hours do not include reading, studying, and academic preparation time spent away from the hospital or ambulatory site.

**"Residents must be provided with 1 day in 7 free from all educational and clinical responsibilities."**

*Question: The common duty hour standards state that residents must be provided with 1 day in 7 free from all responsibilities, with one day defined as one continuous 24-hour period. How should programs interpret this standard if the "day off" occurs after the resident's on-call day?*

**Answer:** The common duty hour standards call for a 24-hour day off. Many RCs have recommended that this day off should ideally be a "calendar day," e.g., the resident wakes up in his or her home and has a whole day available. Others have noted that it is not permissible to have the day off routinely scheduled on a resident's post-call day.



Having the day off always occur on a non-post-call day may be difficult to implement in some small programs, but the requirement for a rest period after in-house call would take part of a post-call day, making it less than a full 24 hours free of program duties. Because call from home does not require a rest period, the day after a pager call may be considered 24 hours off. Other RCs have not been as explicit, but would likely not consider it appropriate to have the residents' day off regularly scheduled on their post-call day.

*Question: Our program only has a few residents and residents prefer to be on call for two days during one weekend, so they can have another weekend completely free of duties. Does this practice comply with the duty hour standards?*

**Answer:** In some programs residents take call for an entire weekend (Friday and Sunday for instance), to allow them to take the next weekend off. So long as the schedule and total duty hours are within the limits specified by the relevant program requirements, this is acceptable. Note that for in-house call, residents must be accorded adequate rest (generally 10 hours) between the two weekend duty periods. There are no exceptions to this rule. Thus, in-house call on two consecutive nights (e.g., Friday and Saturday) must include adequate rest (generally 10 hours) between the two duty shifts.

**"Adequate time for rest and personal activities must be provided. This should consist of a 10 hour time period provided between all daily duty periods and after in-house call."**

*Question: The required 10-hour rest period continues to be problematic for my program. How does the ACGME interpret this common duty hour standard?*

**Answer:** The language of this requirement states, "Adequate time for rest and personal activities must be provided. This should consist of a 10-hour time period…" "Should" is used when a requirement is so important that an appropriate educational justification must be offered for its absence. An interpretation of what constitutes "appropriate justification" often cannot be made a priori, but allowing added time for didactic lectures of high importance, rare cases or cases with particular educational value for the given resident are examples most RCs would consider appropriate. It is important to remember that when an abbreviated rest period is offered either regularly or under special circumstances, the program director and faculty must monitor the resident for the signs of sleep deprivation.

**"In-house call must occur no more frequently than every third night, averaged over a four-week period."**

*Question: What is the definition of "on-call duty"?*

**Answer:** On-call duty is defined as a continuous duty period between the evening hours of the prior day and the next morning, generally scheduled in conjunction with a day of patient care duties prior to the call period. Call may be taken in-house or from home. Call from home is appropriate if the service intensity and frequency of being called is low.

Regular duty shifts, such as those worked in the ICU, on Emergency Medicine rotations and during "night float" used instead of in-house call to reduce the continuous duty period are exempt from the requirement that call be scheduled no more frequently than every third night.

"Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to 6 additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care as defined in the Program Requirements."

*Question: How is the 24-hour limit on in-house call duty applied?*

Answer: The activity that drives the 24-hour limit is "continuous duty." If a resident spends 12 hours in the hospital caring for patients, performing surgery, or attending conferences, followed by 12 hours on-call, he/she has spent 24 hours of "continuous duty" time. The resident now has up to 6 additional hours during which their activities are limited to participation in didactic activities, transferring care of patients, conducting continuity outpatient clinics, and maintaining continuity of medical and surgical care as defined in their specialty's Program Requirements."

*Question: What is the ACGME's interpretation of the use of the added period of up to six hours at the end of a 24-hour duty and on-call shift?*

Answer: The goal of the added hours at the end of the on-call period is to promote didactic learning and continuity of care, including ambulatory and surgical continuity. The RCs have developed clarifying language for activities that are permitted during the six hours after the end of the 24-hour continuous duty period. A summary document showing the language for each accredited core specialty can be found on the ACGME's Website under the duty hour pull-down menu, under "RC-specific duty hour language."

Questions have arisen on how the "no new patients" requirement applies to ambulatory clinic experiences, especially clinics where both new and return patients are seen. In specialties with longitudinal care experiences and those that permit post-call residents to participate in ambulatory clinics, programs are encouraged to contact their RC to learn whether residents may provide care for new patients scheduled among the return patients in these clinics.

"The frequency of at-home call is not subject to the every third night limitation."

*Question: Which standards apply to time in the hospital after being called in from home call?*

Answer: For call taken from home (pager call), the time the resident spends in the hospital after being called in is counted toward the weekly duty hour limit. The only other numeric duty hour standard that applies is that one day in seven must be free of all patient care responsibilities, which includes home call. The ACGME also requires that programs monitor the intensity and workload resulting from home call, through periodic assessment of the frequency of being called into the hospital and the length and intensity of the in-house activities.

Averaging of Selected Standards over a 4-Week Period

*Question: How should we handle the averaging of the duty hour standards (80-hour weekly limit, one day off in 7, and call every third night)? For example, what should be done if a resident takes a vacation week?*

Answer: A recurrent question concerns the averaging period that applies to the 80-hour weekly limit, and the requirements that one day in seven be free from all program duties and that in-house call be no more frequent than every third night. Averaging must occur by rotation, either a four-week or a one-month period, or the period of the rotation if it is shorter than four weeks. Where rotations are less than four weeks in length, averaging must be done over these shorter assignments. This avoids heavy and light assignments being combined mask compliance problems.

If a resident takes vacation or other leave, ACGME requires that vacation or leave days be taken out of the numerator and the denominator for calculating duty hours, call frequency or days off (i.e., if a resident is on vacation for one week, the hours for that rotation should be averaged over the remaining three weeks). The standards do not permit a "rolling average," because it may mask compliance problems by averaging across high and low duty hour rotations. The rotation with the greatest hours and frequency of call must comply with the common duty hour standards.

The program requirements for Internal Medicine do not permit averaging of the interval between in-house call. The ACGME expects that duty hours during the rotation with the greatest hours and frequency of call comply with the common standards.

*Question: Can residents take in-house call every other night for some part of the month, if they get extra time off later in the months?*

ACGME advises against scheduling in-house call every other night for any extended periods, because it can be demanding on the residents. The objectives for allowing the averaging of in-house call (in all specialties except Internal Medicine) is to offer flexibility in scheduling, not to permit every other night call for any length of time, even if done in the interest of creating longer periods of free time on weekends or later in the month.

**"An RC may grant exceptions for up to 10% of the 80-hour limit, to individual programs based on a sound educational rationale."**

*Question: We would like to extend duty hours for our surgical chief residents to 88 hours per week. Can we do this?*

**Answer:**  Programs interested in extending the duty hours for their chief residents can use the "88-hour exception" to request an increase up to 10% in duty hours on a program-by-program basis, with endorsement of the sponsoring institution's graduate medical education committee (GMEC) and the approval of the RC. Some RCs categorically do not permit programs to use the 10% exception, and that requests for an exception must be based on a sound educational justification.

*Question: What is meant by "sound educational justification" for a request to increase the weekly limit on duty hours by up to 10 percent?*

**Answer:** The ACGME's position is that increase in duty hours above 80 hours per week can be granted only when there is a very high likelihood that this will improve the residents' educational experience. This requires that all hours in the extended workweek contribute to resident education. An example is that a surgical program needs to demonstrate that residents do not attain the required case experiences in some categories, unless resident hours are extended beyond the weekly limit, and that all reasonable efforts to limit activities that do not contribute to enhancing their surgical skills have already been made.

Programs may ask for an extension that is less than the maximum of 8 additional weekly hours, and for a subgroup of the residents/fellows in the program (e.g., the chief resident year) or for individual rotations or experiences.

Duty Hour Limits and Resident Moonlighting and other Clinical Activities

*Question: Why does the ACGME distinguish between "in-house moonlighting," which is counted under the weekly duty hour limit, and external moonlighting, which is not included?*

**Answer:** The ACGME has two reasons for counting in-house moonlighting toward the weekly duty hours. First, this applies the same standard to all hours residents spend in teaching institutions, whether they are part of the required educational program or are spent moonlighting in-house. Second, it prevents institutions from inappropriately using in-house moonlighting to replace clinical service activities covered previously as part of the educational program.

The ACGME's purview extends to teaching programs and sponsoring institutions, but not resident activities outside of their educational program. In contrast, individual programs and sponsoring institutions may prohibit or limit resident moonlighting. Residents and applicants must be notified of this program- or institution-level restriction on moonlighting.

*Question: Our residents engage in "in-house moonlighting." Which ACGME duty hour standards apply?*

**Answer:** For internal moonlighting, the combined hours of residency education and internal moonlighting must comply with the 80-hour limit. None of the other numeric standards (e.g., 10 hours rest period, 1 in 7 free of all programs responsibilities) apply. However, the expectation is that the residents' total hours spent in-house will not exceed what is advisable from a patient safety and resident learning and well-being perspective.

*Question: Some of our residents volunteer in a free clinic sponsored by our institution. It is not a required element of our program and residents do not receive pay for this activity. We are not sure whether this constitutes 'in-house moonlighting,' since the activity is voluntary and they are not being compensated.*

**Answer:** Under the ACGME's definition, all clinical activities sponsored by the institution at which the resident trains are either part of the required educational program or 'in-house moonlighting.' If volunteer activities are done in lieu of other, regular program activities, they should be considered an elective. In that case, they are subject to all standards governing clinical activities that are part of the program.

If these volunteer activities are performed in addition to the hours in the program, they should be considered 'in-house moonlighting,' despite the fact that residents do not receive compensation.

### Duty Hour Limits and Research and Other Non-Patient Care Activities

*Question: How do the ACGME common duty hour standards apply to research activities?*

**Answer:** The ACGME duty hour standards pertain to all *required* hours in the residency program (the only exceptions are reading, self-learning, and time on call from home during which the resident is not required to be in the hospital). Research of up to 6 months scheduled during one or more of the accredited years of the program is required in many specialties and may also contain a clinical element. When research is a formal part of the residency and occurs during the accredited years of the program, research hours or any combination of research and patient care activities must comply with the weekly limit on hours and other pertinent duty hour standards.

There are only two situations when the ACGME duty hour standards do not apply to research. One is when programs offer an additional research year that is not part of the accredited years. In this case the ACGME standards do not apply to that year. The other case is when residents conduct research on their own time, which makes these hours identical to other personal pursuits. The combined hours spent on self-directed research and program-required activities should meet the test for a reasonably rested and alert resident when he or she participates in patient care.

*Question: How are the standards applied to rotations that combine research and clinical activities?*

Some programs have added clinical activities to "pure" research rotations, such as having research residents covering "night float." This combination of research and clinical assignments could result in hours that exceed the weekly limit and could also seriously undermine the goals of the research rotation. RCs have traditionally been concerned that required research not be diluted by combining it with significant patient care assignments. This suggests limits on clinical assignments during research rotations, both to ensure safe patient care, resident learning and resident well-being, and to promote the goals of the research rotation.

*Question: A journal club is held in the evening for 2 hours, outside the hospital. It is not held during the regularly scheduled duty hours, and attendance is strongly encouraged but not mandatory. Do these hours count toward the 80-hour weekly total?*

Answer: If attendance is "strongly encouraged," the hours should be included because duty hours apply to all required hours in the program, and it is difficult to distinguish between "strongly encouraged" and required. Another way to look at it is that such a journal club, if held weekly, would add two hours to the residents weekly time. A program in which two added hours result in a problem with compliance with the duty hour standards likely has a duty hour problem.

*Question: Some of our residents are going to a conference on the West Coast that requires travel. How should we count these hours for duty hour compliance?*

If attendance at the conference is required by the program or the resident is a representative for the program (e.g., he/she is presenting a paper or poster), the hours should be counted toward the weekly limit just as they would for an "on site" conference hosted by the program or its sponsoring institution. This means that the hours the resident is actively attending the conference should be recorded as duty hours. Travel time and non-conference hours while away do not meet the definition of "duty hours" in the ACGME standards.

## Institutional Monitoring and Oversight of Duty Hours

*Question: The ACGME states that it rigorously monitors duty hours in accredited programs, and that the sponsoring institution has the responsibility for duty hour oversight. Does this mean that our sponsoring institution must do electronic, "real-time" monitoring of duty hours in all accredited programs?*

Answer: The ACGME requires programs and their sponsoring institutions to monitor resident duty hours to ensure that they comply with the standards, but it does not specify how monitoring and tracking of duty hours should be handled. The only requirement related to ACGME monitoring is that all programs complete the six-question duty hour survey on the ACGME's Accreditation Database (ADS) and that this information be reviewed and endorsed by the Designated Institutional Official (DIO).

A number of approaches exist for monitoring resident hours, from resident self-reporting to swipe cards and other electronic measures. All of these have some advantages and some drawbacks, with none clearly being superior in every way and in all settings. ACGME does not mandate a specific monitoring approach, since the ideal approach should be tailored to the program and the sponsoring institution. The approach best suited for Neurological Surgery will be different from the one most appropriate for Preventive Medicine, Dermatology or Pediatrics. Programs and institutions may benefit from hearing what has worked in settings similar to theirs.

*Question: Our program completed the ACGME Resident Survey last fall. The data showed that a number of residents exceeded several of the duty hour limits. What will the ACGME do?*

Answer: The ACGME resident survey has several objectives, but perhaps its most important function is to serve as a focusing tool for the ACGME site visit. If your program will be site visited soon, the site surveyor will ask detailed questions about duty hour compliance to verify and clarify the information in the Resident Survey through on-site interviews and review of documents such as rotation and on-call schedules. The interview can highlight that the residents misunderstood the question or it can reveal problems with duty hour compliance. If your program is not scheduled for a site visit in the near future, resident survey results that suggest non-compliance with the duty hours may result in the RCs following up with your program to request data on duty hours and, if indicated, a corrective action plan. The RCs recognize that in many programs a few residents occasionally work beyond the limits, and limit follow-up to programs where the data suggest a potential program-level compliance problem.

Programs should note that the results of the ACGME Resident Survey are available to them and their sponsoring institution through the Accreditation Data System. Programs can use this information to determine if compliance problems suggested by the data are confirmed by the residents, and can also use the data to pinpoint compliance problems and to address them before their next ACGME site visit.

### Other Frequently Asked Questions

*Question: Now that the common duty hour standards have gone into effect, will the RCs continue to enforce their own more restrictive standards?*

Answer: Yes. The common duty hour standards establish a minimum for all specialties where no standards existed prior to July 2003. Specialties with more restrictive standards will continue to enforce those. This includes Emergency Medicine, which limits duty hours to 72 per week, and Internal Medicine, which does not permit averaging of the requirement that call be scheduled no more frequently than every three days.

*Question: What determines the duty hour limits for residents who rotate in another accredited program?*

The duty hour limits of the program in which the resident rotates apply to all residents, both those in the programs and rotators from another specialty. The common examples are that family medicine and TY residents in an emergency department rotation must comply with EM hours, but that EM residents who rotate in Otolaryngology or another specialty are held to those specialties' longer hours. This also applies when a program has an exception, but it helps to remember that the standard defines the *maximum allowable* hours, not required hours or hours for all residents, suggesting it is always possible to work fewer hours than the limit.

The exception is that when RCs have a specific requirement for particular assignments, the program through which the resident is rotating needs to comply. The example is that the RC for Internal Medicine has a standard that "during emergency medicine assignments, continuous duty must not exceed 12 hours." This precludes added assignments to conferences and journal clubs that would take a rotating IM resident beyond 12 hours while on an emergency department rotation, though the Emergency Medicine program requirements would permit that.

*Question: Can we "relax" the duty hour standards over holidays or during other times when the hospital is "short-staffed," during periods when some residents are ill or on leave, or when there is an unusually large patient census or demand for care.*

Answer: The ACGME expects that duty hours in any given four-week period comply with all

applicable standards. This includes months with holidays, during which institutions may have fewer staff members on duty. During the holiday period, residents not on vacation may be scheduled more frequently, but the scheduling for the rotation (generally 4 weeks of a month) must comply with the common and RC specific duty hour standards. The schedule during the holidays themselves may not violate common duty hour standards, such as the requirement for adequate rest between duty periods, or RC specific standards, such as the Internal Medicine requirement that averaging of the frequency of in-house call is not permitted.

Aronson, Sarah

| | | | |
|---|---|---|---|
| **From:** | Shuck, Jerry | **Sent:** | Sat 6/20/2009 13:59 |
| **To:** | Aronson, Sarah | | |
| **Cc:** | | | |
| **Subject:** | RE: Please meet with me. | | |
| **Attachments:** | | | |

Yes

**From:** Aronson, Sarah
**Sent:** Sat 6/20/2009 8:50 AM
**To:** Shuck, Jerry
**Subject:** RE: Please meet with me.

Dr. Shuck,
I just want to clarify/confirm my understanding of our conversation on the 16th. You indicated to me
that there was no plan to offer me an appeal process as that option is not available to me under the
current UH by-laws. You also said that you had had discussions with Drs. Norcia and Nearman,
instructing them to ensure that my working and evaluation conditions are objective and non-hostile.
You indicated that in that regard, Dr. Wallace was "no longer a player", and that you (of necessity)
would remain involved in this ongoing process. Am I summarizing this correctly?
Thanks,
Sarah

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

**From:** Shuck, Jerry
**Sent:** Mon 6/15/2009 11:06
**To:** Aronson, Sarah
**Subject:** Please meet with me.

Sarah -

Can you meet with me tomorrow (Tuesday) at 1:00? Thanks

Jerry M. Shuck, MD, D.Sc
Director Graduate Medical Education
Designated Institutional Official
Professor of Surgery
Associate Dean for Graduate Medical Education
Case Western Reserve University
University Hospitals of Cleveland
11100 Euclid Avenue
Cleveland, OH 44106
216-844-3872 (office)
216-844-1949 (facsimile)



EXHIBIT
12
mp 12-22-10

ARON 0194

January 7, 2009
Sarah Aronson, MD

This letter is being written as a brief response to the letter received on 7 January 2009 regarding the unsatisfactory report of my performance and the reasons cited for that evaluation.

I will comply with whatever plan is ultimately recommended by the committee. It is my intention to complete this program successfully, and I have always been willing to work to improve my practice. As soon as the issue of my performance was broached with me clearly at the end of November 2008, I raised the issue of my being on topiramate and discontinued this medication immediately when concerns were raised about 'cognitive difficulties.'

I disagree with the statement that I failed in my professional duty to report having been on topiramate for migraine prophylaxis. I concur that this medication had an effect on my performance, as I am now aware of the subtle recovery in my verbal skills and speed of execution since discontinuing the medication at the end of November. The dose I was taking was in the middle range as used for migraine prophylaxis. The cognitive side effects of topiramate have generally been considered to be related to dose and speed of titration, and have been thought to resolve over a short period of time. The research literature I have since reviewed suggests that the side effects tend to be subtle and persistent, though in general practice the prescription I had was not one that would typically require reporting to one's employer, as one would for a high dose anticonvulsant.

Similarly, the extensive neuropsychological testing to which I submitted over the course of two days did not demonstrate gross cognitive deficits.

I do not feel that my performance, as reflected in the evaluations I have received during this 6-month period, warrants the degree of censure noted in the letter. One would expect to see a more consistent and widespread indication of failure over several areas; for example, a pattern of consistent negative evaluations by faculty, earlier and more urgent intervention by the program directors to address these concerns, failure to provide proper patient care, failure on the in-training exam, neuropsychological testing which indicated a significant cognitive deficits, or being unable to secure a professional position after graduation. As it was, I received positive evaluations and a strong job reference from my program director throughout the period of July to December 2008.

I would like to respectfully request that the committee in charge of this matter review the above points and consider a course of action that addresses this as a medical issue. If so inclined, that might allow the committee some flexibility in choosing what will be required of me to make up this time and in how this is reflected in my permanent record.

If the committee chooses not revise the plan stated in the letter, in light of these events, it would be helpful to have written documentation of how I will be evaluated going forward, so that I can continue to have a clear idea of my status and plan accordingly. Thank you for your consideration of this matter.

Sarah Aronson, MD

THE OHIO LEGAL BLANK CO., INC.

EXHIBIT
13
md   12-32-10

ARON 0044

institution will inform the Residents as soon as possible. In the event of such a reduction or closure, the institution will make every effort to allow Residents already in the program to complete their education. If any Residents are displaced by the closure of a program or a reduction in the number of Residents, the institution will make every effort to assist the Residents in identifying a program in which they can continue their education.

RESTRICTIVE COVENANTS

University Hospitals Case Medical Center strictly prohibits the request for any Resident to sign non-competition guarantees.

EVALUATIONS

**Evaluation of Faculty**

All Residents are required by the ACGME to complete periodic evaluations of the faculty with whom they work. The number of faculty evaluations each Resident completes will vary depending on service assignments and/or the size of the attending staff. Faculty evaluations, which are retained in the individual Clinical Departments, are an important component of the professional review of each faculty member.

## Evaluation of a Resident's Performance

Residents will be periodically evaluated by their Program Directors at the frequency mandated by the Program Requirements for Resident Education of the specialty in which the Resident is training. Evaluations will be communicated to the Resident in a timely manner and a record of the evaluation will be permanently maintained in the Clinical Department. If a Resident physician requires an explanation or interpretation of his/her education records, he/she should make such a request directly to the Residency Program Director or to the Clinical Department Chair.

A. **Academic and Professional Standards**

1. Resident evaluations will be based, in part, on the Resident consistently meeting the academic and professional standards of the Residency Training Program, as well as the standards and policies of the Hospital. At any time during the Residency Training Program, the Residency Program Director, Clinical Department Chair or Director of GME may determine that the Resident is not meeting the standards of the program, or the profession for reasons that may include, but are not limited to:

   a. Conduct that is detrimental or potentially detrimental to Hospital patients or employees;

   b. Demonstrated inability to work with others or behavior that is reasonably likely to be disruptive to Hospital operations;

   c. Activities or professional conduct reasonably likely to be in violation of the Medical Staff Bylaws, Medical Staff Rules and Regulations, or Hospital policies and procedures;

   d. Deficiencies in attendance, punctuality, and availability; or

   e. Failure or inconsistency in adhering to institutional standards of conduct, rules and regulations, including program standards, and hospital and clinic rules with respect to scheduling, charting, chart completion, record keeping, and timely entries to Case Logs.

2. Additionally, Residents are expected to demonstrate proficiency in all of the six ACGME core competencies

   a. Patient care

   b. Medical knowledge

   c. Practice-based learning and improvement

   d. Interpersonal and communication skills

   e. Professionalism



    f.   Systems-based practice

## B. Performance Review Actions

A Performance Review Action is an opportunity for the Resident to address expected standards that need improvement. A Performance Review Action is not reportable to the State of Ohio Medical Board; it is not a Disciplinary Action (defined on next page); it cannot be appealed; and it becomes part of the Resident's permanent file.

1. **Performance Alert Notice.** A Performance Alert Notice is the formal written notification to a Resident concerning areas of marginal or unsatisfactory performance. The Program Director or Faculty Member should initiate a Performance Alert Notice and inform the resident within 7-10 days of identifying an area of concern.

2. **Remediation.** A remediation period is an opportunity for the resident to correct academic deficiencies and to develop and demonstrate appropriate levels of proficiency for patient care and advancement in the program. Being placed in remediation is notice to the resident of his or her failure to progress satisfactorily as reflected by evaluations and/or other assessment modalities. It is not to be used in lieu of a Disciplinary Action.

    a. Remediation may include, but is not limited to, one or more of the following:

        1) Limitations or restrictions on the amount and level of the Resident's patient care activities;

        2) Repeating one or more rotations;

        3) Participation in a special program;

        4) Continuing scheduled rotations with or without special conditions;

        5) Supplemental reading assignments;

        6) Attending undergraduate or graduate courses and/or additional clinics or rounds;

        7) Extending the period of training;

        8) Referral to the Employee Assistance Program (see UHCMC Policy HR-85 which shall apply to all aspects of the referral, process and determination); and/or

        9) Repeat training year - may be used in limited situations such as:

            a) Overall unsatisfactory performance during the entire academic year;

            b) Overall unsatisfactory performance for at least 50% of rotations during the academic year; or

            c) Cumulative time off in excess of amount permitted by the department or the training program during the current academic training year.

        The Resident will be notified of his/her requirement to repeat the academic year at least six (6) weeks prior to the end of the academic year.

    b. If remediation is required, the Resident shall be informed in a meeting with the Residency Program Director or Clinical Department Chair. The Resident's deficiencies will be identified, a remedial program plan will be established, and a frame for completion of the remedial program will be discussed, documented and signed by the Resident. A copy of the remediation plan will be given to the Resident, and a copy will be placed in the Resident's file. At the end of the remedial period, the Resident will receive an evaluation.

    c. The remediation measure(s) assigned and the period of time that the measures remain in place are determined by the Program Director or his/her designee. During or following a period of remediation, any resident who fails to correct a deficiency may be dismissed.

3. **Time Out Leave of Absence.** A "Time Out LOA" is an unpaid absence, for a predetermined period of time, elected by the Resident or offered by the Program Director, for the purpose of the Resident addressing medical or personal matters that are believed to be contributing to academic and/or professional issues within the training program. The Time Out LOA is not a Disciplinary Action and cannot be taken in lieu of remediation or a Disciplinary Action. If the Resident qualifies, and FMLA is more appropriate, FMLA

may be taken (see UHCMC FMLA Policy, HR-19, which shall apply to all aspects of the FMLA process). FMLA cannot be used to extend a Time Out LOA.

## C. Academic and Professional Disciplinary Actions

Disciplinary Actions are typically utilized for serious situations of academic incompetence or unprofessional conduct requiring definitive actions. These actions include suspension, probation, dismissal, nonrenewal of the Resident's contract, and denial of a certificate of completion of training, and should follow the process in Section D, below. Neither the residency program nor Graduate Medical Education is under any obligation to pursue a remediation action prior to recommending a Disciplinary Action. A Disciplinary Action becomes a permanent part of the Resident's training record and entitles the Resident to due process through the Resident Physician Appeals Process.

Where a Resident receives notice of a Disciplinary Action under the terms in this *Manual*, inclusive of any amendments to this *Manual* that are in effect on the date of receipt of the notice, this *Manual* shall govern, irrespective of any later amendments or revisions to the *Manual*.

1. **Suspension.** A resident may be suspended from all program activities and duties by his/her Program Director, Clinical Department Chair or Director of GME. Program suspension may be imposed for conduct that is deemed to be grossly unprofessional, incompetent, erratic, potentially criminal, noncompliant with UHCMC policies, procedures, Code of Conduct, federal health care program requirements, or conduct threatening to the well-being of patients, other residents, faculty, staff, employees or the resident.

   a. **Summary Suspension.** The suspension of all or any portion of the privileges of a Resident, effective immediately upon imposition, whenever action must be taken immediately in the best interest of patient care or the Hospital.

   b. **Automatic Suspension.** An automatic suspension is imposed and effective immediately upon action by the Ohio State Medical Board that results in revocation or suspension of the Resident's license or temporary certificate. During the suspension, the Resident will be on "unpaid leave status" and, in order to continue health benefits, will need to pay the premium directly since, in the absence of a paycheck, deduction of that premium is not possible. If the license or temporary certificate is reinstated, the Resident may apply for readmission into the program. If readmission into the program is denied, the Resident is entitled to the Resident Physician Appeals Process.

2. **Probation.** Probation is a notification to the resident that dismissal from the program can occur at any time during or at the conclusion of the probationary period. In most cases, remedial actions are utilized prior to placement on probation; however, a resident may be placed on probation without prior remediation action if recommended by the Program Director. Probation is typically the final step before dismissal occurs. However, dismissal prior to the conclusion of a probationary period will occur if there is further deterioration in performance or additional deficiencies are identified or if grounds for suspension or dismissal exist.

3. **Dismissal.** If it is determined that a resident's deficiency is of sufficient gravity to warrant dismissal, the resident may be dismissed without first being offered an opportunity for remediation.

   a. A Resident may be dismissed from the Residency Training Program for serious acts, which include but are not limited to the following:

      1) Serious acts of incompetence

      2) Impairment

      3) Unprofessional behavior

      4) Falsifying information / lying

      5) Noncompliance with Hospital policies

   b. Immediate dismissal will occur if the Resident is listed as an excluded individual by any of the following:

1) Department of Health and Human Services Office of the Inspector General's "List of Excluded Individuals/Entities"

2) General Services Administration "List of Parties Excluded from Federal Procurement and Non-Procurement Programs"

3) Convicted of a crime related to the provision of health care items or services for which one may be excluded under 42 USC 1320a-7(a).

c.  The Resident does not need to be on suspension or probation for dismissal to take place.

4.  **Nonrenewal of Resident's Contract.**  If a Residency Program Director or Department Chairman determines that a Resident is not meeting the standards of the program, he/she may make a recommendation for nonrenewal of the Resident's contract. Recommendations for nonrenewal should be made no later than four months prior to the end of the Resident's current contract in accordance with ACGME guidelines; however, documented extenuating circumstances may result in a shorter notice period.

5.  **Denial of Certificate of Completion.**  A Residency Program Director or Department Chair may recommend the Resident be denied a certificate of completion of training as a result of overall unsatisfactory performance during the final academic year of training. The recommendation, if approved by the Director of GME, should allow for the Resident to receive notification in writing by the Program Director as soon as possible and at least six (6) weeks prior to scheduled completion of program; however, documented extenuating circumstances may result in a shorter notice period.

## D.  Disciplinary Action Process

1.  **Recommendation.**  The Residency Program Director, Clinical Department Chair, or Director of GME may recommend suspension, probation, dismissal, nonrenewal of the Resident's contract, or denial of a certificate of completion of training. The recommendation will be made in writing, accompanied by any written documents necessary to support the recommendation, and will be filed with the Director of GME. The recommendation will include a time frame for a Leave of Absence or Suspension. Where summary suspension is of an urgent nature, the recommendation to Director of GME should follow immediately thereafter.

2.  **Review of Recommendation.**

    a.  If the Director of GME rejects the recommendation, the Disciplinary Action will not be instituted. If the Director of GME imposes no other sanction or action, the record of the event will be expunged from the Resident's file.

    b.  If the Director of GME upholds the recommendation, he/she will notify the Program Director who will inform the Resident in writing, either in person or by certified mail, return receipt requested, of the Disciplinary Action. The notice must specifically state the grounds for the Disciplinary Action and inform the Resident of his/her right of appeal as set forth below, in the Resident Physician Appeals Process. The writing also informs the Resident that he/she may appeal the decision by submitting within ten (10) calendar days after receiving the notice, a written request to the Director of GME either in person or by certified mail, return receipt requested, for a hearing before an Appeals Committee.

    c.  The action shall become effective immediately. If the Resident will not be permitted any clinical privileges, nor be permitted to attend Conferences or Rounds, then:

        ○  The Resident's keys, pass codes, entry cards, and hospital ID cards will be turned in and pass codes will be disabled.

        ○  Any Disciplinary Action that results in loss of privileges that are later be reinstated will result in an extension of the Resident's educational program.

        ○  Any Disciplinary Action (except for Automatic Suspension which results from an Ohio State Medical Board action) that results in loss of privileges will result in the Resident's salary and benefits continuing through the Resident Physician Appeals Process only so long as the Resident properly files an appeal no later than ten (10) calendar days after receipt of the written notice of the recommendation of the Director of GME.

### E. Actions Reportable to the Medical Board

1. The Hospital must report to the State Medical Board of Ohio a Disciplinary Action taken against a Resident within sixty (60) days of the date the Resident Physician Appeals Committee Chair confirms the decision in writing. This includes: any action resulting in the revocation, restriction, reduction, or termination of the Hospital's authorization for the Resident to provide health care services for violations of professional ethics, or for reasons of medical incompetence, medical malpractice, or drug or alcohol abuse; a summary action; an action that takes effect notwithstanding any appeal rights that may exist; and, an action that results in a Resident surrendering his/her health care services responsibilities while under investigation and during proceedings regarding the action being taken or in return for not being investigated or having proceedings held.

2. **Exceptions to this reporting requirement**: A Resident's personal issues, a desire to change to a different training program or training facility, or exceptional difficulty in the residency program may result in Nonrenewal of Resident's Contract, Denial of a Certificate of Completion, or a Resident's resignation or withdrawal from the program. Where any one of these actions meets all of the following criteria, no report will be made to the State Medical Board:  (a) Resident and Program Director mutually agree to the Nonrenewal of Resident's Contract, Denial of a Certificate of Completion, or a Resident's resignation or withdrawal from the program; (b) the action is not for the purpose of avoiding a Disciplinary Action or investigation; and, (c) the CMO, Associate CMO or President of UHCMC must approve the decision that there is no basis for reporting the action.

### F. Non-Academic Corrective Actions

Residents are also subject to UHCMC's and University Hospitals' Personnel Policies and Procedures. Copies of all applicable policies and procedures are available on the UHCMC Intranet or through he Office of Graduate Medical Education or the Department of Human Resources.

## GRIEVANCE PROCEDURES AND DUE PROCESS

A. Resident Physician Appeals Process

The Resident Physician Appeals Process affords the Resident a means to exercise his/her right to due process when an academic or other professional Disciplinary Actions is taken against the Resident.

1. To appeal a Disciplinary Action, the Resident must submit, within ten (10) calendar days after receiving the notice, a written request to the Director of GME either in person or by certified mail, return receipt requested, for a hearing before an Appeals Committee. No electronic requests will be accepted.

2. Upon receipt of a written request for a hearing, the Director of GME appoints an Appeals Committee consisting of seven individuals, five of whom have a vote. The Director of GME will chair the Committee. If the Resident requesting the hearing is from the same Department as the Director of GME, the Chief Medical Officer or his/her designee will function as the Chair. The voting members will include: 1) a Resident who is a member of the Graduate Medical Education Committee or a Chief Resident from a Clinical Department different from that of the Resident requesting the hearing, 2) two Residency Program Directors from different Departments than that of the Resident requesting the hearing; 3) a representative from Human Resources; and 4) a Medical Staff Member from a different Clinical Department than that of the Resident requesting the hearing and that of the two Program Directors on the Committee. The non-voting members will be the Director of GME and a Resident from a different Department, at a similar level of training as the Resident requesting the hearing. The non-voting Resident member may participate in all aspects of the deliberations prior to the vote.

3. The Director of GME, or his/her designee, determines the date, time, and place of the hearing and appoints the Manager or Coordinator of the Office of GME to serve as Secretary, to keep minutes of the hearing.

4. No later than ten (10) business days after receipt of the Resident's request for a hearing, the Director of GME or his/her designee notifies the Resident by certified mail, return receipt requested, of the date, time, and place of the hearing.

5. The hearing shall be held no fewer than twenty (20) and no more than thirty (30) business days after receipt of the Resident's request for a hearing. A hearing for a Resident who is under suspension shall be held no later than ten (10) calendar days from the date of receipt of the request for a hearing, unless extended by mutual consent.

6. Once the Resident's request for an appeal hearing is received, until the date of the hearing, the Resident may examine and duplicate any written materials that relate in any way to the Disciplinary Action upon a request to the Residency Program Director[2] or his/her designee. No later than five (5) business days prior to the scheduled hearing date, the parties shall provide each other with (a) the names of a maximum of no more than three (3) witnesses each intends to call to appear in person at the hearing and (b) the written testimonials of an unlimited number of witnesses (if any) for review by the Appeals Committee.

7. The Resident's personal presence is required at the hearing. The Resident may be aided or represented by another Resident in the Hospital's graduate medical education program or by a member of the Hospital's Medical Staff. None of the parties to the appeal shall be aided or represented at this hearing by an attorney.

8. The Residency Program Director and the Resident may each make an opening statement at the hearing. The Residency Program Director shall then present his/her case supporting the Disciplinary Action. The Resident shall then present his/her case opposing the Disciplinary Action. The Residency Program Director and the Resident may each present written evidence, examine witnesses, and cross-examine witnesses at the hearing. Both the Residency Program Director and the Resident may each make a closing argument.

9. The Rules of Evidence that govern proceedings in a court of law will not apply at any stage of the appeal or hearing.

10. The Appeals Committee decision is by a majority vote of its members and is based solely upon the written and oral evidence presented by the Residency Program Director and the Resident at the hearing. A written copy of the decision is forwarded to the Director of GME.

11. Within five (5) business days after the hearing, the Committee Chair prepares and sends to both the Residency Training Director or Clinical Department Director and the Resident by certified mail, return, receipt requested, a letter that confirms the decision, and affirms, modifies or reverses the Disciplinary Action.

12. The decision of the Appeals Committee is final and binding upon both the Residency Program Director and the Resident.

12. A Resident who has appealed a Disciplinary Action as provided herein may resume clinical practice only if recommended in writing by the Appeals Committee.

13. The Resident's failure to exercise any right provided by the Appeals Process constitutes an irrevocable waiver of such right.

B. Grievance Procedure

**Grievance**. If a Resident has reason to believe that established Hospital policies and procedures including applicable personnel policies (with the exception of any action, policy, practice or procedure connected with the periodic evaluation of a Resident, or a Disciplinary Action or appeal, as set forth in this *Manual*) were denied him/her or were erroneously applied to him/her, or if a Resident has a problem (collectively, hereinafter a "Grievance") with any employee of the Hospital, any member of the Hospital's Medical Staff, or any other individual affiliated or associated with the Resident's residency training program.

**Grievance Procedure**. This procedure affords the Resident a means to exercise his/her right to formally file a Grievance related to the work environment or issues related to the program or faculty. It is available to all Residents who are members of the Resident Staff of UHCMC; it is not applicable to Residents who are on rotation at UHCMC from affiliated institutions. The following steps are for the discussion and resolution of such a Grievance.

---

[2] The Clinical Department Chair may, at each or any step, take the place of the Program Director.

1. *Meeting with Manager of Graduate Medical Education*. The Resident makes an appointment to discuss the Grievance with the Manager of Graduate Medical Education ("Manager of GME"). The Manager of GME explains the established policies and procedures to assist the Resident in determining whether a formal Grievance should be filed. The Resident maintains authority over the final decision as to whether a Grievance exists and/or whether a formal Grievance is filed.

2. *Filing Grievance Notice*. If, after discussing the Grievance with the Manager of GME, the Resident believes that a Grievance exists, then the Resident must submit a written notice (the "Grievance Notice") of the Grievance to the Manager of GME and the Resident's respective Program Director. The Grievance Notice must set forth in reasonable and sufficient detail an explanation of the Resident's Grievance. The Grievance Notice must be properly filed by the respective Resident no later than ten (10) calendar days after the Resident discusses the Grievance with the Manager of GME.

4. *Form of Filing and Disclosure of Grievance*. A properly filed Grievance Notice is one that is either: (a) personally delivered by the Resident to each of the appropriate parties and for which the Resident obtains a time stamped copy (reflecting the date and time of delivery of the Grievance Notice) from each party to whom the Resident personally delivered the Grievance Notice; or (b) mailed by certified mail, return receipt requested to each appropriate party. No electronic notices will be accepted. The Manager of GME may provide copies of all Grievance Notices to the Resident's Clinical Department Chair, the Director of GME; and the Senior Vice President and General Counsel of the Hospital.

5. *Filing Grievance Notice with Alternate Parties and Chief Medical Officer*. If due to the nature of the Grievance, the Resident reasonably believes that it is inappropriate to file the Grievance Notice with the Program Director, then the Resident informs the Manager of GME who will instruct the Resident to file the Grievance Notice with the Director of GME. In lieu of filing the Grievance Notice with the Manager of GME or Program Director, the Resident may, for good cause, file the Grievance Notice directly with the Director of GME. "Good cause" is determined by the Director of GME in his sole discretion and he reserves the right to redirect the Resident to file the Grievance with any other party he deems appropriate by the Director of GME.

6. *Discussion with Program Director*. If the Resident filed the Grievance Notice with his/her respective Program Director pursuant to Step 3, above, then the Resident and the Program Director meet to discuss the Grievance. Such meeting shall occur no later than five (5) business days after the Program Director's receipt of the Grievance Notice, unless the Resident otherwise agrees,. If the Resident chooses, the Manager of GME may accompany him/her to this meeting to assist in the discussion of the Grievance. The Program Director provides a written response to the Resident's Grievance within five (5) business days after their meeting.

7. *Program Director Grievance Review*. At any time before, during or after a Resident meets with his/her respective Program Director, the Program Director may request the Resident to submit the names of two other Residents from his/her service whom the Program Director may want to ask about the Grievance or specific aspects thereof. In addition, the Program Director may ask the Resident's respective Chief Resident to answer questions relating to the Grievance and/or to be present at any meeting pertaining to the Resident's Grievance. In the event the Grievance concerns an incident that is not directly related to the Resident's training program, the Program Director may request the Resident to submit the names of two Hospital employees who witnessed the incident. If a person identified as a witness leaves the employ of the Hospital prior to resolution of the Grievance, that person shall nevertheless be recognized and accorded an opportunity to be heard during the Grievance Process set forth herein, provided that person left the Hospital in good standing.

8. *Follow-Up after Discussion with Program Director*: Filing of Continuation Notice. If the Resident is not satisfied with the Program Director's resolution, and desires to follow through on the Grievance to the next step, the Resident meets with the Manager of GME for assistance with a further review of the Grievance to enable the Resident to make an appropriate decision whether to pursue the Grievance. If the Resident desires to pursue the Grievance, then he/she files a written notice (the "Continuation Notice") that he or she wishes to continue to pursue the Grievance. This Continuation Notice may include a restatement of the Grievance Notice, but it must also further expand or explain the Resident's reasons for continuing to pursue the Grievance. This Continuation Notice must be filed with the Manager of GME within ten (10) calendar days after the Program Director issues his/her written resolution. The Continuation Notice is forwarded to the Department Chair or Division Chief, as applicable.

9. *Discussion with Department Chair or Division Chief.* The Resident meets with his/her respective Department Chair or Division Chief (depending on which is applicable) no later than five (5) business days after the Department Chair or Division Chief's receipt of the Grievance Notice, unless the Resident otherwise agrees. If the Resident chooses, the Manager of GME may assist in setting up the meeting and may accompany the Resident to assist in the discussion of the Grievance. The Department Chair or Division Chief provides a written response to the Resident's Grievance within five (5) business days after their meeting.

10. *Department Chair or Division Chief Grievance Review.* At any time before, during or after a Resident meets with his/her respective Department Chair or Division Chief (depending on which is applicable), such Department Chair or Division Chief shall follow the same process as in Step 7., above, offering only the same individuals an opportunity to be heard who were heard at Step 7.

11. *Follow-Up after Discussion with Department Chair or Division Chief.* Filing of Continuation Notice. If the Resident is not satisfied with the Department Chair or Division Chief's resolution, and desires to follow through on the Grievance to the next step, the Resident meets with the Manager of GME for assistance with a further review of the Grievance, to enable the Resident to make an appropriate decision whether to pursue his/her Grievance. If the Resident desires to pursue the Grievance, then he/she must file a written notice (the "Continuation Notice") that he or she wishes to continue to pursue the Grievance. This Continuation Notice may include a restatement of the Grievance Notice, but it must also further expand or explain the Resident's reasons for continuing to pursue the Grievance. This Continuation Notice must be filed with the Manager of GME within ten (10) calendar days after the Program Director issues his/her written resolution.

12. *Discussion with Director of GME.* After a Resident meets with his/her respective Department Chair or Division Chief, if the Resident desires to pursue the Grievance, then he/she meets with the Director of GME no later than five (5) business days after the Director of GME's receipt of the Grievance Notice, unless the Resident otherwise agrees. If the Resident chooses, the Manager of GME may assist in setting up the meeting and may accompany the Resident to assist in the discussion of the Grievance. The Director of GME shall reply in writing to the Resident's Grievance within five (5) business days after their meeting.

13. *Director of GME Grievance Review.* At any time before, during or after a Resident meets with the Director of GME the Director of GME shall follow the same process as in Step 7, above, offering only the same individuals an opportunity to be heard who were heard at Step 7.

14. *Follow-Up after Discussion with Director of GME:* Filing of Continuation Notice. If the Resident is not satisfied with the Director of GME's resolution, and desires to follow through on the Grievance to the next step, the Resident meets with the Manager of GME for assistance with a further review of the Grievance to enable the Resident to make an appropriate decision whether to pursue his/her Grievance. If the Resident desires to pursue the Grievance, then he/she shall file a written notice (the "Continuation Notice") that he or she wishes to continue to pursue the Grievance. This Continuation Notice may include a restatement of the Grievance Notice, but it must also further expand or explain the Resident's reasons for continuing to pursue the Grievance. This Continuation Notice must be filed with the Manager of GME within ten (10) calendar days after the Director of GME issues his/her written resolution.

15. *Establishment of Grievance Review Committee.* The Manager of GME will inform the Hospital's Senior Vice President of Human Resources (or his/her designee) in writing of the Resident's desire to proceed on the Grievance and will provide him/her with a copy of the Continuation Notice. The Senior Vice President of Human Resources: (a) selects three individuals to serve as members of the Grievance Review Committee in accordance with Step 16, below; and (b) arranges a mutually convenient meeting time to hold a hearing on the Grievance. Subject to extenuating circumstances, the hearing is held within five (5) business days after the Senior Vice President's receipt of the Continuation Notice.

16. *Composition and Administration of Grievance Committee.* The Grievance Review Committee consists of three persons: a Department Chair (or Division Chief), a General Administrative Officer of the Hospital, and a Residency Program Director. The Grievance Review Committee will not include anyone who has been involved in the Grievance. The Senior Vice President of Human Resources chairs the meeting and conducts the meeting pursuant to this Grievance Procedure and all applicable policies and procedures of University Hospitals and UHCMC to ensure an orderly and fair opportunity for all parties to present their positions.

17. *Witnesses.* At any time prior to one (1) day before the hearing, the Resident may submit to the Senior Vice President of Human Resources the names of two Hospital employees who have information relating to the Grievance. These employees may be asked to appear before the Grievance Committee by the Resident, the Senior Vice President of Human Resources or by any member of the Committee. The Department Chair (or Division Chief) may also request not more than two people to appear before the Committee. The Resident's appearance before the Committee is limited to: (1) making a presentation not to exceed ten (10) minutes (unless a longer period of time is permitted by unanimous approval of the Committee); and (2) responding to questions posed by the Committee. Unless otherwise permitted by unanimous approval of the Committee, neither the Resident nor any witness is permitted to sit through, attend or participate in the entire hearing. The Committee has sole discretion to determine which portion(s), if any, of the hearing the Resident and/or any witnesses may attend.

18. *Additional Information Relating to Grievance.* The Committee has sole discretion to interview additional individuals and/or seek additional information from other persons, organizations or entities if the Committee believes that this would facilitate resolution of the Grievance.

19. *Providing Copies of Grievance.* The Senior Vice President of Human Resources has sole discretion whether or not to forward copies of the Grievance Continuation Notice to all persons (including any witnesses) scheduled to attend all or any portion of the hearing.

20. *Final Decision of Committee.* The Committee must use its best efforts to give its decision in writing to the Resident within three (3) business days after the hearing. The Committee's decision is final with no appeal available.

21. *Waiver of Grievance.* The Resident shall waive any and all rights under this Grievance Procedure in the event he/she materially fails, without good cause, to comply with any of the requirements set forth herein, including, without limitation, missing any deadline for filing a Grievance Notice or Continuation Notice or missing any meeting or hearing with any party hereunder. "Good cause" is determined by the Director of GME in his sole discretion, acting reasonably.

22. *Confidentiality.* All Grievances shall be kept confidential. The Resident, Manager of GME, Chief Resident, Program Director, Department Chair, Director of GME and any other Hospital employees, agents or representatives that receive a Grievance Notice or otherwise receive or initiate information pertaining to a Grievance shall keep all such information strictly confidential and shall disclose the same only to those other employees or agents of the Hospital or other third parties or government agencies having a reasonable need to know the Grievance and information pertaining thereto.

23. *Modification of Time Limits.* All Grievance Procedure time limits may be modified by mutual agreement of the parties based on the absence of one or more of the parties for good reason, such as scheduled vacation, previously determined work schedule, illness or similar absence.

## COMPENSATION

### PAYROLL

After registration through the Office of Graduate Medical Education ("Office of GME"), all Residents are on University Hospitals' payroll and commence with being paid an annual stipend. The stipend amount appropriate to a Resident's contracted Post-Graduate Year (PGY) level will be stated in his/her contract. These established stipend amounts are reviewed annually and amended from time to time. For information on the compensation schedule, please consult the Office of GME.

Payrolls are prepared for a bi-weekly period ending on Saturday. Pays are dispersed through direct deposit on the following Thursday, with the exception of a holiday week.

At the time of registration, each Resident must complete a Withholding Allowance Certificate (W-4) for the purpose of withholding Federal Income Tax and State of Ohio Withholding Exemption Certificate (IT-4) for the purpose of withholding State Income Tax. City income tax is also withheld. A Social Security number is required. All residents must also complete an I-9 form and provide supporting documentation of identity and eligibility to work in the United States. A new W-4 and IT-4 must be filed when there is a change in family status.

You replied on 3/1/2009 22:12.

Aronson, Sarah

| From: | Shuck, Jerry | | Sent: Tue 1/6/2009 16:24 |
|---|---|---|---|
| To: | Aronson, Sarah | | |
| Cc: | | | |
| Subject: | RE: question | | |
| Attachments: | | | |

Sarah -

I'm glad that you are seeing Dr. Nearman soon.  I have not spoken with him.  I think at this time I can't be seen as your advocate.  Your agenda is to get clarity as to the chances of success (from his perspective) of this extra time.  He needs to know if you are going to agree to this plan.  Ask for suggestions for improving your performances.  He will have been advised by Norcia/Wallace, I'm sure.  You need to have some face time with him, which can be invaluable as he becomes more engaged in the process.  It would be great if he could become your mentor, sympathizer, and/or advocate.  Good luck.

JMS

Jerry M. Shuck, MD, D.Sc
Director Graduate Medical Education
Designated Institutional Official
Professor of Surgery
Associate Dean for Graduate Medical Education
Case Western Reserve University
University Hospitals of Cleveland
11100 Euclid Avenue
Cleveland, OH 44106
216-844-3872 (office)
216-844-1949 (facsimile)

-----Original Message-----
From: Aronson, Sarah
Sent: Tuesday, January 06, 2009 3:58 PM
To: Shuck, Jerry
Subject: question

Dr. Shuck,
Thank you for talking with me yesterday. On your suggestion, I have a meeting scheduled with Dr. Nearman this Thursday.

I wanted to ask if you have  advice for me as to how I should approach that conversation, or any thoughts on what might come out of the meeting. Have you had opportunity to speak with him?

Thank you again for your time,

Sarah Aronson, MD
UHHS/Case School of Medicine



THE OHIO LEGAL BLANK CO., INC.

EXHIBIT
15

CLEVELAND, OHIO 44102-1799

ARON 0166

follow-up js.txt

From: Aronson, Sarah
Sent: Tuesday, March 10, 2009 11:45 AM
To: Jerry Shuck
Subject: follow-up

Attachments: Attachment Info.htm


Dr. Shuck,


I apologize for continuing to direct my concerns to you, but you are my only outlet
at present.   The longer my training situation continues as is without some
substantive response to me from my department, the more malignant it feels.  As a
result, with some sense of urgency, I find myself writing yet another letter.


I responded promptly and concretely, in good faith, to correct any possible
deficiencies in my performance. My file will show that I have attempted to
communicate with my supervisors throughout this process, expressing my concerns as
well as my willingness to develop a mutually acceptable plan of action.  This has
produced little response other than the continued execution of Dr. Wallace's
original remediation plan.  My evaluations from faculty who work with me have been
and continue to be good.  My program directors have not, in my opinion, been either
timely, honest, or objective in their dealings with me.


I believe my supervisors must be required to account for the lack of procedural
justice I feel I have experienced, and respond to the evidence which contradicts
their view.  I understand the relative immunity and sovereignty faculty enjoy in
the realm of academic appraisal, and the legal precedents and rationale for it. The
potential for abuse of power, however, is one reason the ACGME laid out requirements
for due process in both academic and disciplinary cases (attached). Being told that
at least my extra time won't go on record with the NPDB is about as comforting as
hearing that I'll get a misdemeanor instead of a felony, when my Miranda rights were
violated and the charge itself is questionable.  I should be allowed a disinterested
review that does not put me at additional professional risk by incurring a
disciplinary action.


I will tell you that Dr. Wallace threatened to fire me 2 years ago citing
"unprofessional behavior" when I had a foot surgery, and a longer than anticipated
period of non-weight-bearing complicated the call schedule. I believe that he is
biased in his assessment of me and was quite eager to impose both the EAP evaluation
and the subsequent 6-month penalty, though he could not cite a single example to me
of "cognitive impairment" when I asked him directly.  Dr. Norcia can only give me
examples when I didn't move or speak as fast as he would have liked or expected, but
has said that my actions and/or responses themselves were correct and appropriate.
I've not received at any time the specifics of any other concerns that may have been
communicated to the program directors.


I continue to consider entering a complaint with the ACGME, if only to improve the
process for future residents. I have no viable counter to oppose my treatment but
the expression of my opinion and my continued commitment to my medical practice.

THE OHIO LEGAL BLANK CO., INC.

EXHIBIT

16

CLEVELAND, OHIO 44102-1702

ARON 0204

follow-up js.txt

If an adequate response to my concerns doesn't materialize, I will still bring my best effort to complete my training here, though it will be with little faith in, or respect for, my department leadership. I envision that as an unpleasant but unavoidable circumstance as I work to minimize the adverse consequences for my career.


You asked me what I want at this point.  Ideally, at this point, I want the decision to extend my training reversed and my permanent record cleared.  Failing that, I want the right to an appeal and review of these decisions by an impartial committee without incurring the penalty of a recorded and reportable disciplinary action.  If that is denied, I want at the very minimum clear documentation in my record that addresses this as a transient medical issue and does not impugn my professionalism.


Thank you for being so accessible during what has become the most difficult passage in my professional career.  I considered cc'ing this to Dr. Nearman, but I wanted to hear back from you first.

Sincerely,


Sarah Aronson, MD


Sarah Aronson, MD
UHHS/Case School of Medicine

ARON 0205

Thanks, I will do that.  I will keep you posted, more succinctly and positively, I hope.
Sarah

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

---

**From:** Shuck, Jerry
**Sent:** Fri 3/13/2009 17:40
**To:** Aronson, Sarah
**Subject:** RE: follow-up

Sarah -

I have spoken to Dr. Nearman.  I suggest that you meet with him  -  not Norcia at this point.  Dr. Nearman understands the issues of fairness and preformance documentation.  Send him this letter and request a meeting, but leave out the last paragraph.  You can revise if you wish, since this is to him and not me.  Good luck.

JMS


Jerry M. Shuck, MD, D.Sc
Director Graduate Medical Education
Designated Institutional Official
Professor of Surgery
Associate Dean for Graduate Medical Education
Case Western Reserve University
University Hospitals of Cleveland
11100 Euclid Avenue
Cleveland, OH 44106
216-844-3872 (office)
216-844-1949 (facsimile)

---

**From:** Aronson, Sarah
**Sent:** Friday, March 13, 2009 3:40 PM
**To:** Shuck, Jerry
**Subject:** FW: follow-up

Dr. Shuck,
It's been about 10 days since we spoke.  What should I expect in terms of follow-up from our conversation?
I'm forwarding the below as I thought maybe I sent it to the wrong address.
Thanks,
SCA

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*



EXHIBIT
17
MP 12-A2-10

ARON 0170

FW follow-up.txt

From: Aronson, Sarah
Sent: Friday, March 13, 2009 3:40 PM
To: Shuck, Jerry
Subject: FW: follow-up

Attachments: Attachment Info.htm

Dr. Shuck,
It's been about 10 days since we spoke.  What should I expect in terms of follow-up
from our conversation?
I'm forwarding the below as I thought maybe I sent it to the wrong address.
Thanks,
SCA

Sarah Aronson, MD
UHHS/Case School of Medicine

----------------------------------------------------------------------------

From: Aronson, Sarah
Sent: Tue 3/10/2009 11:44
To: Jerry Shuck
Subject: follow-up


Dr. Shuck,


I apologize for continuing to direct my concerns to you, but you are my only outlet
at present.   The longer my training situation continues as is without some
substantive response to me from my department, the more malignant it feels.  As a
result, with some sense of urgency, I find myself writing yet another letter.


I responded promptly and concretely, in good faith, to correct any possible
deficiencies in my performance. My file will show that I have attempted to
communicate with my supervisors throughout this process, expressing my concerns as
well as my willingness to develop a mutually acceptable plan of action.  This has
produced little response other than the continued execution of Dr. Wallace's
original remediation plan.  My evaluations from faculty who work with me have been
and continue to be good.  My program directors have not, in my opinion, been either
timely, honest, or objective in their dealings with me.


I believe my supervisors must be required to account for the lack of procedural
justice I feel I have experienced, and respond to the evidence which contradicts
their view.  I understand the relative immunity and sovereignty faculty enjoy in
the realm of academic appraisal, and the legal precedents and rationale for it. The
potential for abuse of power, however, is one reason the ACGME laid out requirements
for due process in both academic and disciplinary cases (attached). Being told that
at least my extra time won't go on record with the NPDB is about as comforting as
hearing that I'll get a misdemeanor instead of a felony, when my Miranda rights were
violated and the charge itself is questionable.  I should be allowed a disinterested
review that does not put me at additional professional risk by incurring a
disciplinary action.

Page 1



EXHIBIT
18
ntp 12-22-10

ARON 0208

FW follow-up.txt

I will tell you that Dr. Wallace threatened to fire me 2 years ago citing "unprofessional behavior" when I had a foot surgery, and a longer than anticipated period of non-weight-bearing complicated the call schedule. I believe that he is biased in his assessment of me and was quite eager to impose both the EAP evaluation and the subsequent 6-month penalty, though he could not cite a single example to me of "cognitive impairment" when I asked him directly.  Dr. Norcia can only give me examples when I didn't move or speak as fast as he would have liked or expected, but has said that my actions and/or responses themselves were correct and appropriate. I've not received at any time the specifics of any other concerns that may have been communicated to the program directors.

I continue to consider entering a complaint with the ACGME, if only to improve the process for future residents. I have no viable counter to oppose my treatment but the expression of my opinion and my continued commitment to my medical practice.

If an adequate response to my concerns doesn't materialize, I will still bring my best effort to complete my training here, though it will be with little faith in, or respect for, my department leadership. I envision that as an unpleasant but unavoidable circumstance as I work to minimize the adverse consequences for my career.

You asked me what I want at this point.  Ideally, at this point, I want the decision to extend my training reversed and my permanent record cleared.  Failing that, I want the right to an appeal and review of these decisions by an impartial committee without incurring the penalty of a recorded and reportable disciplinary action.  If that is denied, I want at the very minimum clear documentation in my record that addresses this as a transient medical issue and does not impugn my professionalism.

Thank you for being so accessible during what has become the most difficult passage in my professional career.  I considered cc'ing this to Dr. Nearman, but I wanted to hear back from you first.

Sincerely,


Sarah Aronson, MD


Sarah Aronson, MD
UHHS/Case School of Medicine



ARON 0209

schuck.txt

From: Shuck, Jerry
Sent: Friday, April 10, 2009 11:24 AM
To: Aronson, Sarah
Cc: Nearman, Howard
Subject: RE: f/u

Meet with me before you contact ACGME.  Of course, it is your right to contact them,
but I have some concerns for the message plus the fact that the Institutional
(UHCMC) Review is in July, and the RRC for Anesthesiology is currently considering
some important issues regarding our department.

Jerry M. Shuck, MD, D.Sc
Director Graduate Medical Education
Designated Institutional Official
Professor of Surgery
Associate Dean for Graduate Medical Education
Case Western Reserve University
University Hospitals of Cleveland
11100 Euclid Avenue
Cleveland, OH 44106
216-844-3872 (office)
216-844-1949 (facsimile)


--------------------------------------------------------------------------------
From: Aronson, Sarah
Sent: Friday, April 10, 2009 11:09 AM
To: Shuck, Jerry
Cc: Nearman, Howard
Subject: f/u

Dr. Shuck,
I want to let you know that I finally had the opportunity today to talk with Dr.
Nearman about my concerns with the handling of my performance review.  To summarize,
he feels he has delegated the management of the residency training program to Drs.
Wallace and Norcia, and will not  take any active steps to influence the process
that has occurred to date.  He agrees that an objective review or appeal may be the
only way to resolve the issue.  He expressed support of my submitting a formal
complaint to the ACGME if that is the only way to secure due process.  I will plan
to proceed with that this week unless you have some other options.
Thank you,
Sarah


Sarah Aronson, MD
UHHS/Case School of Medicine



EXHIBIT
19

ARON 0215

# ACGME Institutional Requirements

*Effective: July 1, 2007*

Contents

I     INSTITUTIONAL ORGANIZATION AND RESPONSIBILITIES ........................................1

    A.    Sponsoring Institution..................................................................................1
    B.    Commitment to Graduate Medical Education (GME) ...........................................1
    C.    Institutional Agreements..............................................................................2
    D.    Accreditation for Patient Care in Sponsoring and Major Participating
         Sites that Are Hospitals ..............................................................................3

II    INSTITUTIONAL RESPONSIBILITIES FOR RESIDENTS ...........................................3

    A.    Eligibility and Selection of Residents..............................................................3
    B.    Financial Support for Residents. ....................................................................4
    C.    Benefits and Conditions of Appointment. .........................................................4
    D.    Agreement of Appointment............................................................................4
    E.    Resident Participation in Educational and Professional Activities..........................8
    F.    Resident Educational and Work Environment ...................................................8

III   GRADUATE MEDICAL EDUCATION COMMITTEE (GMEC) .........................................9

    A.    GMEC Composition and Meetings .................................................................9
    B.    GMEC Responsibilities..................................................................................9

IV   INTERNAL REVIEW ...................................................................................12

    A.    Process ...................................................................................................12
    B.    Internal Review Report ...............................................................................13



THE OHIO LEGAL BLANK CO., INC.

EXHIBIT
20

CLEVELAND, OHIO 44102-5199

I.        INSTITUTIONAL ORGANIZATION AND RESPONSIBILITIES

I.A.        Sponsoring Institution

I.A.1.        Residency programs accredited by the Accreditation Council for Graduate Medical Education (ACGME) must operate under the authority and control of one Sponsoring Institution. Institutional responsibility extends to resident assignments at all participating sites.

I.A.2.        A Sponsoring Institution must be in substantial compliance with the ACGME Institutional Requirements and must ensure that its ACGME-accredited programs* are in substantial compliance with the Institutional, Common and specialty-specific Program Requirements, and the ACGME Policies and Procedures.

I.A.3.        A Sponsoring Institution's failure to maintain accreditation will jeopardize the accreditation of all its sponsored programs.

I.B.        Commitment to Graduate Medical Education (GME)

I.B.1.        The Sponsoring Institution must provide graduate medical education (GME) that facilitates residents' professional, ethical, and personal development. The Sponsoring Institution and its GME programs, through curricula, evaluation, and resident supervision, must support safe and appropriate patient care.

I.B.2.        A written statement must document the Sponsoring Institution's commitment to provide the necessary educational, financial, and human resources to support GME. It must be reviewed, dated, and signed by representatives of the Sponsoring Institution's governing body, administration, and GME leadership within at least one year prior to the institutional site visit.

I.B.3.        An organized administrative system, led by a Designated Institutional Official (DIO) in collaboration with a Graduate Medical Education Committee (GMEC), must oversee all ACGME-accredited programs of the Sponsoring Institution.

I.B.4.        The DIO and GMEC must have authority and responsibility for the oversight and administration of the Sponsoring Institution's programs and responsibility for assuring compliance with ACGME Common, specialty/subspecialty-specific Program, and Institutional Requirements.

I.B.4.a)        The DIO must establish and implement procedures to ensure that s/he, or a designee in the absence of the DIO, reviews and cosigns all program information forms and any documents or correspondence submitted to the ACGME by program directors (See III.B.10.a-k).

I.B.4.b)        The DIO and/or the Chair of the GMEC must present an annual report to the Organized Medical Staff(s) (OMS) and the governing

body(s) of the Sponsoring Institution. This report must also be given to the OMS and governing body of major participating sites that do not sponsor GME programs. This annual report will review the activities of the GMEC during the past year with attention to, at a minimum, resident supervision, resident responsibilities, resident evaluation, compliance with duty-hour standards, and resident participation in patient safety and quality of care education.

I.B.5.    The Sponsoring Institution must provide sufficient institutional resources to ensure the effective implementation and support of its programs in compliance with the Institutional, Common, and specialty/subspecialty-specific Program Requirements.

I.B.5.a)    The Sponsoring Institution must ensure that the DIO has sufficient financial support and protected time to effectively carry out his/her educational and administrative responsibilities to the Sponsoring Institution.

I.B.5.b)    The Sponsoring Institution must ensure that program directors have sufficient financial support and protected time to effectively carry out their educational and administrative responsibilities to their respective programs.

I.B.5.c)    The Sponsoring Institution and the program must ensure sufficient salary support and resources (e.g., time, space, technology, supplies) to allow for effective administration of the GME Office and all of its programs.

I.B.6.    Faculty and residents must have ready access to adequate communication resources and technological support.

I.B.7.    Residents must have ready access to specialty/subspecialty-specific and other appropriate reference material in print or electronic format. Electronic medical literature databases with search capabilities should be available.

I.B.8.    The Sponsoring Institution must have a policy that addresses administrative support for GME programs and residents in the event of a disaster or interruption in patient care. This policy should include assistance for continuation of resident assignments.

I.C.    Institutional Agreements

I.C.1.    The Sponsoring Institution retains responsibility for the quality of GME, including when resident education occurs in other sites.

I.C.2.    Current master affiliation agreements must be renewed every five years and must exist between the Sponsoring Institution and all of its major participating sites. (See *ACGME Glossary* for definitions.)

I.C.3.    The Sponsoring Institution must assure that each of its programs has

established program letters of agreement with its participating sites in compliance with the Common Program Requirements.

I.D.  Accreditation for Patient Care in Sponsoring and Major Participating Sites that Are Hospitals

I.D.1.  Sponsoring Institutions and/or Major Participating Sites that are hospitals should be:

I.D.1.a)  accredited by The Joint Commission;

I.D.1.b)  accredited by another entity with reasonably equivalent standards as determined by the Institutional Review Committee (IRC);

I.D.1.c)  accredited by another entity granted "deeming authority" for participation in Medicare under federal regulations;

I.D.1.d)  certified as complying with the conditions of participation in Medicare set forth in federal regulations; or,

I.D.1.e)  recognized by another entity with reasonably equivalent standards as determined by the IRC.

I.D.2.  When a Sponsoring Institution or Major Participating Sites that is a hospital and is not so accredited or recognized, the Sponsoring Institution must provide an explanation satisfactory to the IRC of why neither has been granted or sought.

I.D.3.  When a Sponsoring Institution or a Major Participating Sites that is a hospital loses its accreditation or recognition, the Sponsoring Institution must notify and provide a plan of response to the IRC within 30 days of such loss. Based on the particular circumstances, the IRC may request the ACGME to invoke its "egregious or catastrophic" policy.

II.  INSTITUTIONAL RESPONSIBILITIES FOR RESIDENTS

II.A.  Eligibility and Selection of Residents: The Sponsoring Institution must have written policies and procedures for resident recruitment and appointment and must monitor each program for compliance. These eligibility requirements must address the following:

II.A.1.  Resident eligibility: Applicants with one of the following qualifications are eligible for appointment to programs:

II.A.1.a)  Graduates of medical schools in the United States and Canada accredited by the Liaison Committee on Medical Education (LCME).

II.A.1.b)  Graduates of colleges of osteopathic medicine in the United States accredited by the American Osteopathic Association (AOA).

II.A.1.c)  Graduates of medical schools outside the United States and Canada who meet one of the following qualifications:

II.A.1.c).(1)  Have received a currently valid certificate from the Educational Commission for Foreign Medical Graduates prior to appointment, or,

II.A.1.c).(2)  Have a full and unrestricted license to practice medicine in a US licensing jurisdiction in which they are training.

II.A.1.d)  Graduates of medical schools outside the United States who have completed a Fifth Pathway** program provided by an LCME-accredited medical school.

II.A.2.  Resident selection

II.A.2.a)  The Sponsoring Institution must ensure that its ACGME-accredited programs select from among eligible applicants on the basis of residency program-related criteria such as their preparedness, ability, aptitude, academic credentials, communication skills, and personal qualities such as motivation and integrity. ACGME-accredited programs must not discriminate with regard to sex, race, age, religion, color, national origin, disability, or any other applicable legally protected status.

II.A.2.b)  In selecting from among qualified applicants, it is strongly suggested that the Sponsoring Institution and all of its programs participate in an organized matching program, such as the National Resident Matching Program (NRMP), where such is available.

II.B.  Financial Support for Residents: Sponsoring and participating sites must provide all residents with appropriate financial support and benefits to ensure that they are able to fulfill the responsibilities of their educational programs.

II.C.  Benefits and Conditions of Appointment: Candidates for programs (applicants who are invited for an interview) must be informed, in writing or by electronic means, of the terms, conditions, and benefits of their appointment, including financial support; vacations; parental, sick, and other leaves of absence; professional liability, hospitalization, health, disability and other insurance provided for the residents and their families; and the conditions under which the Sponsoring Institution provides call rooms, meals, laundry services, or their equivalents.

II.D.  Agreement of Appointment

II.D.1.  The Sponsoring Institution and program directors must assure that residents are provided with a written agreement of appointment/contract outlining the terms and conditions of their appointment to a program.

II.D.2.  The Sponsoring Institution must monitor programs with regard to implementation of terms and conditions of appointment by program directors.

II.D.3.  The Sponsoring Institution and program directors must ensure that residents are informed of and adhere to established educational and clinical practices, policies, and procedures in all sites to which residents are assigned.

II.D.4.  The resident agreement/contract must contain or provide a reference to at least the following institutional policies:

II.D.4.a)  Residents' responsibilities;

II.D.4.b)  Duration of appointment;

II.D.4.c)  Financial support; and,

II.D.4.d)  Conditions for reappointment

II.D.4.d).(1)  Non-renewal of appointment or non-promotion: In instances where a resident's agreement will not be renewed, or when a resident will not be promoted to the next level of training, the Sponsoring Institution must ensure that its programs provide the resident(s) with a written notice of intent no later than four months prior to the end of the resident's current agreement. If the primary reason(s) for the non-renewal or non-promotion occurs within the four months prior to the end of the agreement, the Sponsoring Institution must ensure that its programs provide the resident(s) with as much written notice of the intent not to renew or not to promote as circumstances will reasonably allow, prior to the end of the agreement.

II.D.4.d).(2)  Residents must be allowed to implement the institution's grievance procedures if they receive a written notice either of intent not to renew their agreement(s) or of intent to renew their agreement(s) but not to promote them to the next level of training.

II.D.4.e)  Grievance procedures and due process: The Sponsoring Institution must provide residents with fair, reasonable, and readily available written institutional policies and procedures for grievance and due process. These policies and procedures must minimize conflict of interest by adjudicating parties in addressing:

II.D.4.e).(1)  Academic or other disciplinary actions taken against residents that could result in dismissal, non-renewal of a resident's agreement, non-promotion of a resident to the next level of training, or other actions that could significantly threaten a resident's intended career

development; and,

| | |
|---|---|
| II.D.4.e).(2) | Adjudication of resident complaints and grievances related to the work environment or issues related to the program or faculty. |
| II.D.4.f) | Professional liability insurance |
| II.D.4.f).(1) | The Sponsoring Institution must provide residents with professional liability coverage and with a summary of pertinent information regarding this coverage. |
| II.D.4.f).(2) | Liability coverage must include legal defense and protection against awards from claims reported or filed after the completion of the program(s) if the alleged acts or omissions of the residents are within the scope of the program(s). |
| II.D.4.g) | Health and disability insurance: The Sponsoring Institution must provide hospital and health insurance benefits for the residents and their families. Coverage for such benefits should begin upon the first recognized day of their respective programs, unless statute or regulation requires a later date to begin coverage. The Sponsoring Institution must also provide access to insurance to all residents for disabilities resulting from activities that are part of the educational program. |
| II.D.4.h) | Leaves of absence |
| II.D.4.h).(1) | The Sponsoring Institution must provide written institutional policies on residents' vacation and other leaves of absence (with or without pay) to include parental and sick leave; these policies must comply with applicable laws. |
| II.D.4.h).(2) | The Sponsoring Institution must ensure that each program provides its residents with: |
| II.D.4.h).(2).(a) | a written policy in compliance with its Program Requirements concerning the effect of leaves of absence, for any reason, on satisfying the criteria for completion of the residency program, and; |
| II.D.4.h).(2).(b) | information relating to access to eligibility for certification by the relevant certifying board. |
| II.D.4.i) | Duty Hours: The Sponsoring Institution must have formal written policies and procedures governing resident duty hours. (See Common Program Requirements, VI) |

| | |
|---|---|
| II.D.4.j) | Moonlighting |
| II.D.4.j).(1) | The Sponsoring Institution must have a written policy that addresses moonlighting. The policy must: |
| II.D.4.j).(1).(a) | Specify that residents must not be required to engage in moonlighting; |
| II.D.4.j).(1).(b) | Require a prospective, written statement of permission from the program director that is included in the resident's file; and, |
| II.D.4.j).(1).(c) | State that the residents' performance will be monitored for the effect of these activities and that adverse effects may lead to withdrawal of permission. |
| II.D.4.j).(2) | Sponsoring Institutions and program directors must closely monitor all moonlighting activities. |
| II.D.4.k) | Counseling services: The Sponsoring Institution should facilitate residents' access to confidential counseling, medical, and psychological support services. |
| II.D.4.l) | Physician impairment: The Sponsoring Institution must have written policies that describe how it will address physician impairment, including that due to substance abuse. |
| II.D.4.m) | Harassment: The Sponsoring Institution must have written policies covering sexual and other forms of harassment. |
| II.D.4.n) | Accommodation for disabilities: The Sponsoring Institution must have a written policy regarding accommodation, which would apply to residents with disabilities. This policy need not be GME-specific. |
| II.D.5. | Closures and Reductions: The Sponsoring Institution must have a written policy that addresses a reduction in size or closure of a residency program or closure of the Institution. The policy must include the following: |
| II.D.5.a) | The Sponsoring Institution must inform the GMEC, the DIO, and the residents as soon as possible when it intends to reduce the size of or close one or more programs, or when the Sponsoring Institution intends to close; and, |
| II.D.5.b) | The Sponsoring Institution must either allow residents already in the program(s) to complete their education or assist the residents in enrolling in an ACGME-accredited program(s) in which they can continue their education. |



II.D.6. Restrictive Covenants: Neither the Sponsoring Institution nor its programs may require residents to sign a non-competition guarantee.

II.E. Resident Participation in Educational and Professional Activities

II.E.1. The Sponsoring Institution must ensure that each program provides effective educational experiences for residents that lead to measurable achievement of educational outcomes in the ACGME competencies as outlined in the Common and specialty/subspecialty-specific Program Requirements.

II.E.2. The Sponsoring Institution must ensure that residents:

II.E.2.a) Participate on committees and councils whose actions affect their education and/or patient care; and,

II.E.2.b) Participate in an educational program regarding physician impairment, including substance abuse and sleep deprivation.

II.F. Resident Educational and Work Environment

II.F.1. The Sponsoring Institution and its programs must provide an educational and work environment in which residents may raise and resolve issues without fear of intimidation or retaliation. Mechanisms to ensure this environment must include:

II.F.1.a) An organization or other forum for residents to communicate and exchange information on their educational and work environment, their programs, and other resident issues.

II.F.1.b) A process by which individual residents can address concerns in a confidential and protected manner.

II.F.2. The Sponsoring Institution must provide services and develop health care delivery systems to minimize residents' work that is extraneous to their GME programs' educational goals and objectives. These services and systems must include:

II.F.2.a) Patient support services: Peripheral intravenous access placement, phlebotomy, and laboratory and transporter services must be provided in a manner appropriate to and consistent with educational objectives and quality patient care.

II.F.2.b) Laboratory/pathology/radiology services: Laboratory, pathology, and radiology services must be in place to support timely and quality patient care.

II.F.2.c) Medical records: A medical records system that documents the course of each patient's illness and care must be available at all times and must be adequate to support quality patient care, residents' education, quality assurance activities, and provide a

resource for scholarly activity.

II.F.3.
The Sponsoring Institution must ensure a healthy and safe work environment that provides for:

II.F.3.a)
Food services: Residents must have access to appropriate food services 24 hours a day while on duty in all institutions.

II.F.3.b)
Call rooms: Residents on call must be provided with adequate and appropriate sleeping quarters that are safe, quiet, and private.

II.F.3.c)
Security/safety: Appropriate security and personal safety measures must be provided to residents at all locations including but not limited to: parking facilities, on-call quarters, hospital and institutional grounds, and related facilities.

III.
GRADUATE MEDICAL EDUCATION COMMITTEE (GMEC)

III.A.
GMEC Composition and Meetings

III.A.1.
The Sponsoring Institution must have a GMEC.

III.A.2.
Voting membership on the committee must include the DIO, residents nominated by their peers, representative program directors, and administrators. It may also include other members of the faculty or other members as determined.

III.A.3.
The GMEC must meet at least quarterly and maintain written minutes.

III.B.
GMEC Responsibilities: The GMEC must establish and implement policies and procedures regarding the quality of education and the work environment for the residents in all programs. These policies and procedures must include:

III.B.1.
Stipends and position allocation: Annual review and recommendations to the Sponsoring Institution regarding resident stipends, benefits, and funding for resident positions.

III.B.2.
Communication with program directors: The GMEC must:

III.B.2.a)
Ensure that communication mechanisms exist between the GMEC and all program directors within the institution.

III.B.2.b)
Ensure that program directors maintain effective communication mechanisms with the site directors at each participating site for their respective programs to maintain proper oversight at all clinical sites.

III.B.3.
Resident duty hours: The GMEC must:

III.B.3.a)
Develop and implement written policies and procedures regarding resident duty hours to ensure compliance with the Institutional,

Common, and specialty/subspecialty-specific Program Requirements.

III.B.3.b)    Consider for approval requests from program directors prior to submission to an RRC for exceptions in the weekly limit on duty hours up to 10 percent or up to a maximum of 88 hours in compliance with ACGME Policies and Procedures for duty hour exceptions.

III.B.4.    Resident supervision: Monitor programs' supervision of residents and ensure that supervision is consistent with:

III.B.4.a)    Provision of safe and effective patient care;

III.B.4.b)    Educational needs of residents;

III.B.4.c)    Progressive responsibility appropriate to residents' level of education, competence, and experience; and,

III.B.4.d)    Other applicable Common and specialty/subspecialty-specific Program Requirements.

III.B.5.    Communication with Medical Staff: Communication between leadership of the medical staff regarding the safety and quality of patient care that includes:

III.B.5.a)    The annual report to the OMS;

III.B.5.b)    Description of resident participation in patient safety and quality of care education; and,

III.B.5.c)    The accreditation status of programs and any citations regarding patient care issues

III.B.6.    Curriculum and evaluation: Assurance that each program provides a curriculum and an evaluation system that enables residents to demonstrate achievement of the ACGME general competencies as defined in the Common and specialty/subspecialty-specific Program Requirements.

III.B.7.    Resident status: Selection, evaluation, promotion, transfer, discipline, and/or dismissal of residents in compliance with the Institutional and Common Program Requirements.

III.B.8.    Oversight of program accreditation: Review of all ACGME program accreditation letters of notification and monitoring of action plans for correction of citations and areas of noncompliance.

III.B.9.    Management of institutional accreditation: Review of the Sponsoring Institution's ACGME letter of notification from the IRC and monitoring of action plans for correction of citations and areas of noncompliance.

| III.B.10. | Oversight of program changes: Review of the following for approval, prior to submission to the ACGME by program directors: |
|---|---|
| III.B.10.a) | All applications for ACGME accreditation of new programs; |
| III.B.10.b) | Changes in resident complement; |
| III.B.10.c) | Major changes in program structure or length of training; |
| III.B.10.d) | Additions and deletions of participating sites; |
| III.B.10.e) | Appointments of new program directors; |
| III.B.10.f) | Progress reports requested by any Review Committee; |
| III.B.10.g) | Responses to all proposed adverse actions; |
| III.B.10.h) | Requests for exceptions of resident duty hours; |
| III.B.10.i) | Voluntary withdrawal of program accreditation; |
| III.B.10.j) | Requests for an appeal of an adverse action; and, |
| III.B.10.k) | Appeal presentations to a Board of Appeal or the ACGME. |
| III.B.11. | Experimentation and innovation: Oversight of all phases of educational experiments and innovations that may deviate from Institutional, Common, and specialty/subspecialty-specific Program Requirements, including: |
| III.B.11.a) | Approval prior to submission to the ACGME and/or respective Review Committee; |
| III.B.11.b) | Adherence to Procedures for "Approving Proposals for Experimentation or Innovative Projects" in *ACGME Policies and Procedures*; and, |
| III.B.11.c) | Monitoring quality of education provided to residents for the duration of such a project. |
| III.B.12. | Oversight of reductions and closures: Oversight of all processes related to reductions and/or closures of: |
| III.B.12.a) | Individual programs; |
| III.B.12.b) | Major participating sites; and, |
| III.B.12.c) | The Sponsoring Institution. |

III.B.13.    Vendor interactions: Provision of a statement or institutional policy (not necessarily GME-specific) that addresses interactions between vendor representatives/corporations and residents/GME programs.

IV.    INTERNAL REVIEW

IV.A.    Process

IV.A.1.    The GMEC must develop, implement, and oversee an internal review process as follows:

IV.A.1.a)    An internal review committee(s) for each program must include at least one faculty member and at least one resident from within the Sponsoring Institution but not from within GME programs being reviewed. Additional internal or external reviewers may be included on the internal review committee as determined by the GMEC. Administrators from outside the program may also be included.

IV.A.1.b)    A written protocol approved by the GMEC that incorporates, at a minimum, the requirements in this Section IV of the Institutional Requirements.

IV.A.2.    Internal reviews must be in process and documented in the GMEC minutes by approximately the midpoint of the accreditation cycle. The accreditation cycle is calculated from the date of the meeting at which the final accreditation action was taken to the time of the next site visit. (See *ACGME Policies and Procedures*, II.B.4)

IV.A.3.    When a program has no residents enrolled at the mid-point of the review cycle, the following circumstances apply:

IV.A.3.a)    The GMEC must demonstrate continued oversight of those programs through a modified internal review that ensures the program has maintained adequate faculty and staff resources, clinical volume, and other necessary curricular elements required to be in substantial compliance with the Institutional, Common and specialty-specific Program Requirements prior to the program enrolling a resident.

IV.A.3.b)    After enrolling a resident, an internal review must be completed within the second six-month period of the resident's first year in the program.

IV.A.4.    The internal review should assess each program's:

IV.A.4.a)    Compliance with the Common, specialty/subspecialty-specific Program, and Institutional Requirements;

IV.A.4.b)    Educational objectives and effectiveness in meeting those objectives;

| | |
|---|---|
| IV.A.4.c) | Educational and financial resources; |
| IV.A.4.d) | Effectiveness in addressing areas of non-compliance and concerns in previous ACGME accreditation letters of notification and previous internal reviews; |
| IV.A.4.e) | Effectiveness of educational outcomes in the ACGME general competencies; |
| IV.A.4.f) | Effectiveness in using evaluation tools and outcome measures to assess a resident's level of competence in each of the ACGME general competencies; and, |
| IV.A.4.g) | Annual program improvement efforts in: |
| IV.A.4.g).(1) | resident performance using aggregated resident data; |
| IV.A.4.g).(2) | faculty development; |
| IV.A.4.g).(3) | graduate performance including performance of program graduates on the certification examination; and, |
| IV.A.4.g).(4) | program quality. (see Common Program Requirements, V.C.) |
| IV.A.5. | Materials and data to be used in the review process must include: |
| IV.A.5.a) | The ACGME Common, specialty/subspecialty-specific Program, and Institutional Requirements in effect at the time of the review; |
| IV.A.5.b) | Accreditation letters of notification from previous ACGME reviews and progress reports sent to the respective RRC; |
| IV.A.5.c) | Reports from previous internal reviews of the program; |
| IV.A.5.d) | Previous annual program evaluations; and, |
| IV.A.5.e) | Results from internal or external resident surveys, if available. |
| IV.A.6. | The internal review committee must conduct interviews with the program director, key faculty members, at least one peer-selected resident from each level of training in the program, and other individuals deemed appropriate by the committee. |
| IV.B. | Internal Review Report |
| IV.B.1. | The written report of the internal review for each program must contain, at a minimum: |
| IV.B.1.a) | The name of the program reviewed; |

| IV.B.1.b) | The date of the assigned midpoint and the status of the GMEC's oversight of the internal review at that midpoint; |
|---|---|
| IV.B.1.c) | The names and titles of the internal review committee members; |
| IV.B.1.d) | A brief description of how the internal review process was conducted, including the list of the groups/individuals interviewed and the documents reviewed; |
| IV.B.1.e) | Sufficient documentation to demonstrate that a comprehensive review followed the GMEC's internal review protocol; |
| IV.B.1.f) | A list of the citations and areas of non-compliance or any concerns or comments from the previous ACGME accreditation letter of notification with a summary of how the program and/or institution subsequently addressed each item. |
| IV.B.2. | The DIO and the GMEC must monitor the response by the program to actions recommended by the GMEC in the internal review process. |
| IV.B.3. | The Sponsoring Institution must submit the most recent internal review report for each training program as a part of the Institutional Review Document (IRD). If the institutional site visitor simultaneously conducts individual program reviews at the same time as the institutional review, the internal review reports for those programs must not be shared with the site visitor. |

ACGME Approved: February 2007   Effective: July 1, 2007
ACGME Approved Minor Revision: June 14, 2009   Effective: July 1, 2009

Footnote for I.A.2

\*    Further use in this document of the term "program(s)" will refer to "ACGME-accredited program(s)."

Footnote for II.A.1.d

\*\*    A Fifth Pathway program is an academic year of supervised clinical education provided by an LCME-accredited medical school to students who meet the following conditions: (1) have completed, in an accredited college or university in the United States, undergraduate premedical education of the quality acceptable for matriculation in an accredited United States medical school; (2) have studied at a medical school outside the United States and Canada but listed in the World Health Organization Directory of Medical Schools; (3) have completed all of the formal requirements of the foreign medical school except internship and/or social service; (4) have attained a score satisfactory to the sponsoring medical school on a screening examination; and (5) have passed either the Foreign Medical Graduate Examination in the Medical Sciences, Parts I and II of the examination of the National Board of Medical Examiners, or Steps 1 and 2 of the United States Medical Licensing Examination (USMLE).

To:          Shuck, Jerry                              Sent: Weds 6/3/2009 15:09

From:        Aronson, Sarah

Subject:     question

Dr. Shuck,

I'd like your advice regarding a meeting with Drs Norcia and Wallace tentatively scheduled
for tomorrow afternoon (Thursday).

If this meeting takes place, it will be the first time the PDs have met with me since
February, when the training extension started. I've made several attempts to schedule a
review meeting, which were supposed to occur monthly during this time.

Last week, I received a letter from the ACGME that notification of my formal complaint had
been sent to you and Dr. Norcia.

I am concerned that any meeting I have with the PDs at this point stay on the intended
topic, i.e. providing feedback regarding my training. As I've not had a training review
meeting yet during this extension period, I don't know what exactly to expect. I do know
that I will not feel comfortable meeting with Drs Norcia and Wallace by myself if they
choose to engage in a discussion or debate about the concerns I've submitted to the
ACGME. That dialogue, at this point, is between them and the RRC. Do you have any
advice as to how I should handle this upcoming meeting?  Should I look into having
another faculty member sit in with me?

I appreciate your input,
Thank you,
Sarah

*Sarah Aronson, MD*
*UHHS/Case School of Medicine*

EXHIBIT

21

mp 12-22-10

ARON 0185

To:    Jerry Shuck, MD; Emily Vasiliou; David Wallace, DO; Matthew Norcia, MD

From:  Sarah Aronson, MD

Re:    Meeting 6/4/09

4 June 2009

This is in response to the training review meeting held between Dr. Wallace, Dr. Norcia and myself on June 4, 2009.

The ACGME sent a letter to the relevant parties dated May 27, 2009. I received my letter from ACGME on Friday, May 29, 2009. The residency program directors and Dr. Shuck received the same notification from the ACGME (a formal complaint that I had submitted). That complaint cited multiple violations of ACGME institutional requirements with regard to the residency program's handling of a summary evaluation and decision to extend my training period.

On Tuesday, June 2nd, my first workday after this complaint notification was received, I was told that w and n would be available to meet with me on June 4th. This is the first review meeting that has been convened since the beginning of my training extension period on March 1 2009. I was initially told that my performance during this 6 month extension would be reviewed monthly and that I would be provided detailed feedback regarding my status so that I might successfully complete the program. I had made several attempts to schedule a meeting throughout that 3 month time period, only to have any meeting cancelled.

This first performance review (since mid February 2009) occurred on Thursday June 4, 2009, 8 days after the date of the ACGME letter. At this meeting, Dr. Wallace brought copious and detailed notes as well as copies of OR anesthesia records to support a wide range of criticisms and accusations, on the basis of which he argued that my clinical competence and my professionalism were unsatisfactory and unlikely to lead to successful completion of the residency program. These criticisms were based in part on work done in collaboration with Dr. Wallace primarily during the months of January to April 2009. No written negative feedback or documentation of my performance was given prior to this June 4, 2009 meeting. Verbal feedback was given at the time of the collaborative work and was unremarkable for the level of accusations which arose in the June 4, 2009 meeting.

> The University Hospitals Resident and Fellows Manual states: **"A Performance Alert Notice is the formal written notification to a Resident concerning areas of marginal or unsatisfactory performance. The Program Director or Faculty Member should initiate a Performance Alert Notice and inform the resident within 7-10 days of identifying an area of concern."**

 Dr Wallace has not provided me with any such notice since the beginning of the training extension.

> The ACGME Requirements state: **"Non-renewal of appointment or non-promotion: In instances where a resident's agreement will not be renewed, or**

EXHIBIT

22

M P 12 22 10

ARON 0186

when a resident will not be promoted to the next level of training, the Sponsoring Institution must ensure that its programs provide the resident(s) with a written notice of intent no later than four months prior to the end of the resident's current agreement. If the primary reason(s) for the non-renewal or non-promotion occurs within the four months prior to the end of the agreement, the Sponsoring Institution must ensure that its programs provide the resident(s) with as much written notice of the intent not to renew or not to promote as circumstances will reasonably allow, prior to the end of the agreement."

 If the program directors intend not to provide me with a Certificate of Completion at the end of August 2009 based on Dr. Wallace's stated concerns they were required to notify me of that decision before May 1st of 2009.

In a Special Message dated September 18, 2008, the CEO of the ACGME wrote: **"Finally, in all its reviews and actions, through the Resident Survey, site visit interviews with residents, the formal resident complaint process, and a soon to be announced simplified resident complaint system, the ACGME and its Review Committees will scrupulously look for evidence of resident harassment, resident intimidation, or resident retaliation related to…any aspect of the learning environment."** Dr. David Leach, in the 4/04 ACGME e-Bulletin, states: **"If there is retaliation, even in subtle ways, it violates an institutional requirement. It also speaks to deficiencies in the professional climate in which resident formation occurs and thus has broader implications for society."**

It is striking that this extensive critical documentation was first presented to me at this June 4th meeting, after receipt of the ACGME letter. Before this letter, Dr. Wallace had submitted no negative documentation, in fact, no performance review meeting had even been scheduled. There was no sense of urgency about my performance at all.

Given the appearance of retaliation in the above mentioned events, any further evaluation of my performance as a resident during these last 12 weeks should be conducted by an objective third party.

A potentially related concern may exist in Dr. Wallace's failure to review and process receipts from an approved professional conference I attended in March. His approval is required for any reimbursement. He has been in possession of those receipts, which amount to more than $2300, since the end of March 2009. He has not yet signed off on them.

I am attaching a copy of the email I sent to Dr. Shuck on Wednesday June 3rd in anticipation of this meeting.

Sincerely,


Sarah Aronson, MD
Case School of Medicine

ARON 0187

July 13, 2009

Dr. Shuck,

I would appreciate your intervention on my behalf regarding the concerns addressed in this letter.  I am eager to graduate on time without continued roadblocks that are clearly discriminating me from other residents when my performance has been satisfactory.

June 28, 2009: I submitted a request for FMLA time for the adoption of my son. This was approved through the usual HR channels.

July 7, 2009: I asked the residency coordinator and chief resident whether my trauma rotation at Metro had been arranged as previously discussed with the program directors. She indicated that the rotation had not been arranged and she would look into it. This is the only required training I have left to do, as it was bumped from the schedule in January 2009.

July 9, 2009: I approached Dr. Nearman to clarify how I would make up any FMLA day(s) I would use that went over allowed time away from residency. He directed me to Dr. Norcia, and I contacted him with the same question.

July 10, 2009: I heard back from the chief resident with a cc to Dr. Wallace.  In this email I was told that I would be going to Metro for the first half of the month and would be in the ICU for the second half, that being my last 2 weeks of the residency.

The original question of how the FMLA time would be made up has not yet been addressed.

I have several concerns:

1. How can the FMLA time be made up in a way to allow me to graduate August 31, 2009? Weekend? Evening?

2. The timing of the request for FMLA to Dr. Norcia (July 9, 2009) and the subsequent scheduling (July 10, 2009) of the most demanding and stressful service during a time when most graduating residents would be on a flexible float schedule gives the appearance of retaliation and discrimination for the FMLA request.  Drs. Norcia and Wallace have had 6 months to schedule the ICU if they felt it important (I inquired about it a number of times). I object to discriminatory and punitive scheduling, while basic educational responsibilities are neglected.

3. This abrupt scheduling of the ICU rotation will now occur while I have approved FMLA time to adopt my son. Drs. Norcia and Wallace again



THE OHIO LEGAL BLANK CO., INC.

EXHIBIT
23
mb  12-22-10

ARON 0019

disregard any concerns about educational training until it involves a request for leave to attend the birth of my son (December 2008) or to adopt my son (August 2009).  This pattern of retaliation/discrimination was first carried out in December 2008 when 12 days of PTO was used by Drs. Wallace and Norcia to obtain a "fitness for duty" exam when my maternity leave had been scheduled months in advance (due date: December 22, 2008). The incident for which they pulled me off duty in December 2008 ostensibly occurred first week of October 2008 when I was in the ICU, at which time they left me on duty to complete the rotation.

4. Given Dr. Wallace's primary role in these scheduling assignments, and his evident desire to find a reason to dismiss me, this points to a lack of concern about educational training and instead a desire to retaliate against me and discriminate me from other residents. Dr. Wallace's and Dr. Norcia's behaviors continue to create a hostile work environment that is not conducive to resident training.

5. I need a reading day for August 3, 2009 as boards are on August 4, 2009 (I have never been given a reading day during the residency of 3.5 years). Can you assist in securing this day?

Thank you for taking the time to address these concerns.

13 July 2009
S. Aronson, MD
Clinical Asst Prof, Case School of Medicine

EXHIBIT
24

From: Norcia, Matthew
Sent: Wednesday, July 15, 2009 1:20 PM
To: Aronson, Sarah
Cc: Shuck, Jerry; Manson, Marcie; Nearman, Howard; Wallace, David
Subject: RE: schedule issue

Sarah,

This memo is to summarize what we discussed yesterday (7-14) afternoon concerning the issues you presented to Dr Shuck.

In regard to the FMLA make up time which will be one day for sure (8-10) and possibly a second day that we do not know at this time, you can cover a single 8 hour shift in the OR for each day that you need or you can cover 2 late-duty shifts (approx 4.5 hours each) for each day that you need.

To make your August work duty schedule less taxing and more flexible we will attempt the following (keeping in mind that you do not have any personal obligations in the last 2 weeks of August):
    -remove the SICU rotation (originally scheduled for the last 2 weeks)
    -reschedule the Metro rotation for the last 2 weeks of the month (so you can get your trauma numbers)
    -replace the first 2 weeks of the month with a "float" rotation
This schedule will make it easier to grant a "reading day" prior to the exam and to allow you to have your FMLA day on 8-10.

Please reply as to whether these are the terms we discussed.
Thanks.

Matt

---

From: Shuck, Jerry
Sent: Monday, July 13, 2009 4:12 PM
To: Norcia, Matthew
Subject: FW: schedule issue
Importance: High

The letter.

Jerry M. Shuck, MD, D.Sc
Director Graduate Medical Education
Designated Institutional Official
Professor of Surgery
Associate Dean for Graduate Medical Education
Case Western Reserve University
University Hospitals of Cleveland
11100 Euclid Avenue
Cleveland, OH 44106
216-844-3872 (office)
216-844-1949 (facsimile)

---

From: Aronson, Sarah
Sent: Sunday, July 12, 2009 9:33 PM
To: Shuck, Jerry
Subject: schedule issue