**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SARAH ARONSON, M.D. | ) | CASE NO. 1:10-cv-372 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge Christopher A. Boyko |
| v. | ) | |
| | ) | |
| UNIVERSITY HOSPITALS OF | ) | **DEFENDANT UNIVERSITY HOSPITALS** |
| CLEVELAND, INC. | ) | **OF CLEVELAND, INC.'S AMENDED** |
| | ) | **REPLY BRIEF IN SUPPORT OF ITS** |
| Defendant. | ) | **MOTION FOR SUMMARY JUDGMENT** |

Respectfully submitted,

*/s/Barton A. Bixenstine*
Barton A. Bixenstine (0034130)
Daniel L. Messeloff (0078900)
Ogletree, Deakins, Nash, Smoak, & Stewart, P.C.
4130 Key Tower
Cleveland, OH  44114
Ph:  216.241.6100
Fax:  216.357.4733
Email:  Bart.Bixenstine@OgletreeDeakins.com
         Daniel.Messeloff@OgletreeDeakins.com

*Attorneys for Defendant*
*University Hospitals of Cleveland, Inc.*

## <u>TABLE OF CONTENTS</u>

A.    Dr. Aronson's Brief Confirms that All of the Actions She Continues to
      Challenge Are Barred by the HCQIA and Ohio's Peer Review Statute .............................1

      1.    As to HCQIA Condition 1, Dr. Aronson Presents Only
            Irrelevant Assertions Concerning Dr. Wallace's Motives ..........................................1

      2.    As to HCQIA Condition 2, Dr. Aronson's Attempt to Bootstrap
            Dr. Shuck's June 2009 Assessment of Her Status Shows She
            Has No Triable Claim ................................................................................................2

      3.    As to HCQIA Condition 3, Dr. Aronson Raises No Triable
            Issue as to Whether Each Action Challenged by Complaint
            Counts I, II, V and VI Was Made after Adequate Notice And
            Fair Procedures or Where No Procedure Was Required ............................................3

      4.    As to HCQIA Condition 4, Dr. Aronson Offers only
            Irrelevant or Misrepresented Evidence ......................................................................5

      5.    Dr. Aronson Has Raised no Triable Issue as to Her Waiver
            of Any HCQIA Entitlement to Additional Procedure .................................................5

      6.    Under the Ohio State Peer Review Immunity Statute, UHC
            Is Entitled to Summary Judgment as to Dr. Aronson's
            State-Law Claims, Because Dr. Aronson Cannot Demonstrate
            that UHC Acted with Actual Malice ...........................................................................7

      7.    HCQIA Immunity and Ohio Peer Review Immunity Apply with
            Full Force to Dr. Aronson's Contractual "Due Process" Challenge
            to Her July-August 2008 Unsatisfactory Performance Evaluation ............................7

      8.    HCQIA Immunity and Ohio Peer Review Immunity Apply with
            Full Force to Dr. Aronson's Contractual "Excess Hours" Challenge
            to Her July-August 2008 Unsatisfactory Performance Evaluation ..........................10

B.    Separate and Apart from the Immunity Provided under the HCQIA and Ohio
      Law, Dr. Aronson Cannot Establish Any of Her Claims against UHC .............................10

      1.    Dr. Aronson's Breach of Contract Claim as to Her Working
            Hours (Count I) Fails as a Matter of Law, Because She Failed
            to Give The Program a Chance to Remedy any Breach, and
            She Can Show No Damages .....................................................................................10

      2.    Dr. Aronson's Contract Claim Arising from ACGME "Due Process"
            Requirements Fails Because the Negative Assessment and Residency
            Extension Was Not a Disciplinary Action, and Even If It Was a
            Disciplinary Action She Was Provided All the Required Process ...........................12

3.  Dr. Aronson's New Claim that UHC Violated its Own Policies and Procedures in Not Allowing Her To Grieve Her Negative Evaluation Raises No Triable Breach of Contract Claim .........................................13

4.  Dr. Aronson's Unjust Enrichment Claim (Count II) Fails Because There is a Written Contract Between Dr. Aronson and UHC ............................................................................................................14

5.  Dr. Aronson's Claim for Interference with Her 2008 Maternity Leave Under FMLA Fails as a Matter of Law, Because Dr. Aronson Suffered No Damages and Because UHC Would Have Taken the Same Actions Regardless of Whether Dr. Aronson Took FMLA Leave........................................................................................................15

6.  Dr. Aronson's Claim for Interference with Her August 2009 Adoption Leave Under FMLA Also Fails as a Matter of Law ...............................16

C.  Conclusion ...........................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Bakare v. Pinnacle Health, Inc.,*
    469 F. Supp.2d 272 (M.D.Pa.2006) ........................................9

*Benjamin v. Schuller*,
    400 F.Supp.2d 1055 (S.D. Ohio 2005) ........................................4

*Board of Curators of University of Missouri v. Horowitz,*
    435 U.S. 78, 98 S.Ct. 948 (1978) ........................................4

*Firstar Bank, N.A. v. Prestige Motors, Inc.,*
    No. H-04-037, 2005-Ohio-4432, 2005 WL 2049174
    (Ohio App. 6th Dist. Aug. 26, 2005) ........................................14, 15

*Meyers v. Columbia/HCA Healthcare Corp.,*
    341 F.3d 461 (6th Cir.2003) ........................................9

*Moore v. John Deere Health Plan, Inc.*,
    Case No. 3:07-CV-484, 2010 WL 908924 (E.D.Tenn., March 11, 2010) ............8, 9

*Reyes v. Wilson Mem. Hosp.*
    102 F.Supp.2d 798 (S.D.Ohio, 1998) ........................................2

*Schaefer v. Brookdale Univ. Hosp. and Medical Ctr.,*
    859 N.Y.S.2d 899 (N.Y.Sup. 2008) ........................................4

*Smith v. Ricks,*
    31 F.3d 1478 (9th Cir. 1994) ........................................9

*Talwar v. Catholic Healthcare Partners,*
    258 Fed.Appx. 800 (6th Cir.2007) ........................................7, 8


STATUTES

42 U.S.C. §11111(a)(1) ........................................7

42 U.S.C. §11112(c)(1)(A) ........................................3, 4

42 U.S.C. §11151(9) ........................................1

42 U.S.C. §11151(11) ........................................1

**A.      Dr. Aronson's Brief Confirms That All Of The Actions She Continues To Challenge[1] Are Barred By The HCQIA And Ohio's Peer Review Statute**

Dr. Aronson does not deny that UHC qualifies for HCQIA protection as a statutory "health care entity," or that the group of attending physicians who provided assessments of Dr. Aronson are "professional review bod[ies]," 42 U.S.C. §11151(11), or that the assessments were the product of "professional review activit[ies]," or that each of the following actions by UHC of which Dr. Aronson complains are "professional review action[s]" under 42 U.S.C. §11151(9):

(i)     directing that she submit to a fitness-for-duty evaluation (Count V, as an FMLA violation relating to maternity leave taken in December 2008);

(ii)    assessing her July-August 2008 performance as unsatisfactory without providing an internal grievance procedure (Count I, as a breach of an alleged contractual "due process" entitlement);

(iii)   offering her a six-month remedial residency extension when the ABA would have permitted a 4-month extension (Count II, as unjust enrichment);

(iv)    assigning her to the ICU for the last rotation of her six-month remediation period (which it then changed at her request) (Count VI, as an FMLA violation).

Dr. Aronson also does not dispute that these same actions are peer review actions under Ohio's Peer Review Statute.

**1.      As To HCQIA Condition 1, Dr. Aronson Presents Only Irrelevant Assertions Concerning Dr. Wallace's Motives**

Dr. Aronson's Brief is laced with accusations and innuendo attacking the motives of Dr. Wallace.  She describes him as "seiz[ing] the opportunity … [to] refer[] her to the Employee Assistance Program. … " (Plaintiff's Brief at 9).  She refers to irrelevant testimony of Dr. Nearman concerning interactions between Dr. Aronson and Dr. Wallace in June 2009, long after the November-December 2008 professional review actions at issue, that Dr. Nearman perceived

---

[1] Per Dr. Aronson's Brief, she had abandoned the tortious interference claims asserted in Counts III and IV of her Complaint. (Plaintiff's Brief at 17 n. 4).

that the "interactions between Doctor Aronson and Doctor Wallace … had taken on more of an emotional-type of atmosphere than perhaps an objective discussion," and that he saw Dr. Wallace had having become "way too emotionally involved in this now to see any view other than his own." (Plaintiff's Brief at 11, 13; Nearman Dep. 21).

Because a professional review action satisfies HCQIA Condition 1 if there is an objectively reasonable belief that the action was taken in the furtherance of quality health care, both state and federal courts nationwide have unanimously concluded that evidence of bad faith is irrelevant. See *Reyes v. Wilson Mem. Hosp.* (S.D.Ohio, 1998), 102 F.Supp.2d 798, 812 ("Within the universe of published decisions addressing this issue, the courts are unanimous in holding that evidence of 'bad faith' does not suffice to overcome the presumption that a defendant acted 'reasonably.'").

Here, Dr. Aronson has no answer to the weight of evidence showing that Dr. Norcia, Dr. Wallace and Dr. Nearman had an objectively reasonable belief that the professional review actions at issue were in furtherance of quality health care. Instead, Dr. Aronson's only evidence concerns only one of the decision-makers involved in the professional review actions at issue, and pertains only to irrelevant matters arising long after the professional review actions at issue had been made (even the June 2009 assignment of Dr. Aronson to work in the ICU in August 2009 was based on the December 2008 determination that she needed to redo her ICU rotation).

> **2.    As To HCQIA Condition 2, Dr. Aronson's Attempt To Bootstrap Dr. Shuck's June 2009 Assessment Of Her Status Shows She Has No Triable Claim**

Dr. Aronson contends there are disputed factual issues as to whether the challenged actions by UHC were taken after "reasonable efforts were made to obtain the facts," in satisfaction of the second HCQIA requirement. (Plaintiff's Brief at 22). Dr. Aronson cites only to an email assessment by Dr. Shuck, dated June 8, 2009, of issues he perceived to have arisen

from "negative evaluations [that] have come after the decision for extension."  (Plaintiff's Brief at Ex. 6, UHC Documents 1254-1255).  Thus, Dr. Aronson's evidence, on its face, has nothing to do with (i) the November 2008 EAP decision, (ii) the December 2008 decision to assess Dr. Aronson's July-December 2008 performance as unsatisfactory, (iii) the December 2008 offer to her of an extension of her residency into a fourth year, or (iv) the December 2008 decision that Dr. Aronson needed to repeat her ICU rotation, which she then avoided taking until she had to be assigned to work in the ICU in August 2009.

It appears that Dr. Aronson is asserting that the Residency Program should have looked into her disclosure of her use of Topamax during her pre-hire physical examinations, as some kind of failure by UHC to make a reasonable effort to obtain the facts of the matter concerning its negative assessment of her professionalism.  However, Dr. Aronson never raised this pre-hire disclosure as a defense <u>at the time</u>, and for good reasons -- her disclosure in a pre-hire physical was not disclosure to the Residency Program. (Aronson Dep. 210, Ex. V).

> **3.     As To HCQIA Condition 3, Dr. Aronson Raises No Triable Issue As To Whether Each Action Challenged By Complaint Counts I, II, V And VI Was Made After Adequate Notice And <u>Fair Procedures Or Where No Procedure Was Required</u>**

As to the HCQIA "fair procedures" requirement, Dr. Aronson offers a single sentence: "And the procedure offered by Defendant regarding the unsatisfactory evaluation of Dr. Aronson in 2008 and extension of her training plainly did not satisfy the notice and hearing criteria." (Plaintiff's Brief at 22-23).  She does not explain why.

Dr. Aronson does not dispute that the fitness-for-duty decision falls within the scope of 42 U.S.C. §11112(c)(1)(A) as well as §11112(c)(2).   She offers nothing to counter the undisputed evidence that she expressly waived any entitlement to further procedure concerning the decision by stating in a letter four days later that she was "willing to complete the process as currently laid out in a timely fashion." (Aronson Dep. Ex. AA). She offers no dispute that the

decision to assign her to the ICU in August 2009 falls within the scope of 42 U.S.C. §11112(c)(1)(A), as a decision for which the notice and procedure requirements of §11111 (a)(3) are not required.

Dr. Aronson also offers nothing to rebut the undisputed evidence that, as a matter of law, she was given all the due process which could legally be required of a negative evaluation of a resident.  As the U.S. Supreme Court has explained:

> The need for flexibility is well illustrated by the significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct.  This difference calls for far less stringent procedural requirements in the case of an academic dismissal.

*Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 85-86, 98 S.Ct. 948, 952-53 (1978) (citations omitted).  She does not dispute the events of October, November and December 2008, detailed in UHC's initial brief in support of its Motion for Summary Judgment, and those events establish as a matter of law that she was given "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Benjamin v. Schuller*, 400 F.Supp.2d 1055, 1065-66 (S.D. Ohio 2005) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893 (1976)).

As the Supreme Court held further, academic evaluations, including those resulting in dismissal, do not lend themselves to formal hearings, which may be "useless or harmful in finding out the truth as to scholarship." *Horwitz*, 435 U.S. at 90 (citation omitted).  As in *Schaefer v. Brookdale Univ. Hosp. and Medical Ctr.*, 859 N.Y.S.2d 899 (N.Y.Sup. 2008), and as Dr. Aronson does not dispute, she was given repeated notice of her deficiencies and an opportunity to explain or rebut them, <u>before</u> the negative evaluation was issued.  She was presented on October 14, 2008 and on November 24, 2008 with the negative assessments of attending physicians, and she responded by submitting her own objections to the evaluations (Aronson Dep. Ex. AA) and by soliciting and submitting input from attending physicians in her defense (from Drs. Dininny and Haas). (Norcia Afft. Exs. VV and WW).

4

### 4.     As To HCQIA Condition 4, Dr. Aronson Offers Only Irrelevant Or Misrepresented Evidence

Dr. Aronson's statement of "facts" makes several false representations of the record that appear to be an attempt to raise some question about whether there were reasonable grounds for the negative evaluation.  She mis-cites Dr. Norcia's testimony to suggest that he was raising a response time concern for the first time in October, when his testimony was, "It would have been based on the entire residency program, her duration of her residency training.  But most likely I would have made a reference to the most recent period that I worked with her, as well." (Plaintiff's Brief at 7; Norcia Dep. 16).  Dr. Aronson refers to the recommendation Dr. Norcia wrote for her in September 2008, and to her satisfactory feedback for November 2008, when the feedback that led to her unsatisfactory assessment arose from her October 2008 rotation in the ICU. (Compare Plaintiff's Brief at 5, 8, to Norcia Afft. ¶ 9 and Ex. NN at 24, ¶ 15 and Ex. QQ, ¶ 12 and Exs. NN at 29 and RR)).  Dr. Aronson cites to Dr. Norcia's recommendation that she be licensed in Florida as a physician, when UHC's concerns pertained to her performance as an anesthesiology resident. (Plaintiff's Brief at 11, and its attached Ex. 6 at UHC 1486-1487).

### 5.     Dr. Aronson Has Raised No Triable Issue As To Her Waiver Of Any HCQIA Entitlement To Additional Procedure

Dr. Aronson also offers nothing to raise a triable issue of whether she waived any procedural requirements that the HCQIA required.  She offers another single sentence:  "To suggest that she waived the right ignores the testimony of Drs. Nearman, Norcia, and Wallace (Nearman Dep. 52, 77 Ex. 4; Norcia Dep. 110; Wallace Dep. 62), not to mention Dr. Aronson who all stated that she wanted to appeal the decision." (Plaintiff's Brief at 18).

5

Timing is everything.  Dr. Aronson makes no attempt to counter the undisputed evidence that after being told that the extension offer could not be appealed, she consulted with her legal counsel and then dropped her objections to the evaluation decision to accept the offer. (Aronson Dep. 213).  She offers nothing to negate the force of her own communications to Dr. Nearman on January 6 and 7, 2009, that she no longer had objections to the unsatisfactory evaluation, telling him that she was "sure that Dr. Norcia and others were correct in noting a change in [her] performance" (Aronson Dep. Ex. Z), and "that this medication had an effect on [her] performance." (Aronson Dep. Ex. V).  She has no answer to her own acknowledgement to Dr. Nearman, near the end of January, 2009, just before the Program had to submit its July-December 2008 evaluation report to the ABA, that her performance for that period "was not satisfactory." (Aronson Dep. 214, Ex. CC; Norcia Afft. Ex. CCC).

The testimony Dr. Aronson cites only confirms that that she waived any entitlement to an internal grievance procedure.  Dr. Wallace's testimony is cited for his statement that "she chose to go a route that wasn't appealable, so I don't know of anything I can say in May, or whenever you said, about her attempting to have an appeal." (Wallace Dep. 62; emphasis added).  The cited testimony of Dr. Norcia confirms that Dr. Aronson wanted to have an appeal in December 2008, but was told that the extension offer was not appealable, and then accepted the extension offer. (Norcia Dep. 110).  Dr. Nearman's cited testimony conveys nothing about the timing of Dr. Aronson's demand for an appeal. (Nearman Dep. 52).

Dr. Aronson also has no answer as to how she could have appeal rights after she signed the residency extension contract on February 25, 2009, without any reservation of her objections to the negative evaluation, and thereby committing UHC to expend the time and resources to extend her residency education beyond the three years of a standard anesthesiology residency. (Aronson Dep. Ex. J).  Dr. Aronson offers no argument or case support for her notion that the

HCQIA (or even the ACGME) required that she be provided an internal grievance procedure concerning her negative evaluation after she <u>chose</u> to avoid possible disciplinary action by accepting the offer of an extension of her residency.   Under the HCQIA (and the ACGME), Dr. Aronson cannot legally have her cake and eat it too – she cannot force UHC to conduct a grievance proceeding when she did not assert those grievance rights until she obtained UHC's contractual commitment to the very residency extension she now claims was unwarranted.

> **6.    Under The Ohio State Peer Review Immunity Statute, UHC Is Entitled To Summary Judgment As To Dr. Aronson's State-Law Claims, Because Dr. Aronson Cannot Demonstrate That UHC Acted With Actual Malice**

Dr. Aronson's Brief confirms she has no evidence that any of the challenged UHC actions involved statements made with "knowledge they were false or with reckless disregard for whether they were true or false actual malice," and her attacks on the motives of Dr. Wallace and others are insufficient to defeat immunity under §2305.25.  *See Talwar  v. Catholic Healthcare Partners,* 258 Fed.Appx. 800, 808 (6th Cir.2007) (affirming summary judgment in favor of hospital under §2305.251, finding that "mere inaccuracies in statements and alleged improper motivations by speakers are insufficient to show actual malice.").

> **7.    HCQIA Immunity And Ohio Peer Review Immunity Apply With Full Force To Dr. Aronson's Contractual "Due Process" Challenge To Her July-August 2008 Unsatisfactory Performance Evaluation**

Dr. Aronson contends, falsely:

> [W]hile the decision to evaluate Dr. Aronson's clinical competence during the last half of 2008 is dubious, the Court need not examine the issue to find a breach of contract … because Dr. Aronson was denied the opportunity to have the Defendant self-review the decision as required by the ACGME, ABA, and the Defendant's own standards.

(Plaintiff's Brief at 19).  Dr. Aronson's Complaint, on its face, seeks contractual damages from UHC's decision to assess her July-December 2008 performance as unsatisfactory without

providing an internal grievance procedure.  Title 42 U.S.C. §11111(a)(1) provides that "[i]f immunity applies, neither the professional review body, nor any person who participates with or assists the body with respect to the action, may be liable for damages under any law of the United States or of any State with respect to the action." (Emphasis added). Thus, as a matter of law, where the prerequisites to HCQIA immunity are satisfied, HCQIA immunity is a bar to claims for contractual "due process" entitlements that are alleged to extend beyond those required to establish HCQIA immunity.

Ohio's Peer Review Statute provides an even more comprehensive bar.  In the absence of proof of actual malice, no contractual claim of due process entitlements can be brought. *Talwar,* 258 Fed.Appx. at 808 (claims that defendant "temporarily suspended his surgical privileges without following the procedure set forth in the Credentials Manual" rejected despite disputed issues of fact, because "Defendants are insulated from liability on this claim under Ohio's peer review immunity statute …").

*Moore v. John Deere Health Plan, Inc*., Case No. 3:07-CV-484, 2010 WL 908924 (E.D.Tenn., March 11, 2010), is part of a long line of cases within the Sixth Circuit and elsewhere that reject Dr. Aronson's position.  There, the plaintiff medical doctor brought breach of contract and other claims against the defendant John Deere Health Plan, Inc., after the defendant Health Plan terminated its provider agreement with Dr. Moore and submitted an adverse action report concerning Dr. Moore to the National Healthcare Integrity and Protection Data Bank. *Id.* at *5.  Dr. Moore's breach of contract claims included the claim that:

> Defendants breached the provider agreement by failing to provide Dr. Moore, CHCCI, and the other physician employees of CHCCI with the due process review rights afforded to them under the provider agreement.

*Id*. at *20.  The Court found that the defendants were entitled to HCQIA immunity, and also to peer review immunity under Tennessee's Peer Review Law, which provides immunity for peer

8

review actions taken (1) in good faith, (2) without malice, and (3) on the basis of facts reasonably known or reasonably believed to exist.  *Id*. at \*14-15.  On that basis, the court rejected Dr. Moore's contractual due process and other contractual claims, explaining:

> The Court need not dwell on Dr. Moore's breach of contract claim, which arises from the peer review action in this case. As the Court has found *supra* Part III.A, defendants are immune from claims seeking money damages arising from that peer review action. *See Curtsinger,* 2007 WL 1241294, at \*13 ("[T]he HCQIA shields health care entities and individuals from liability for damages for actions performed in the course of monitoring the competence of health care personnel."). And "damages are always the default remedy for breach of contract." *United States v. Winstar Corp.,* 518 U.S. 839, 885, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *see also Riverside Park Realty Co. v. FDIC,* 465 F.Supp. 305, 316 (M.D.Tenn.1978) ("[C]laims arising from ... breach of contract are, of course, of the type that are normally adequately remediable by an award of damages and not the type for which injunctive relief is usually available."). Because Dr. Moore could not recover damages on his breach of contract claim even were he to satisfy all of the elements of that claim, summary judgment on that claim is appropriate as well.

Accord, *Meyers v. Columbia/HCA Healthcare Corp.,* 341 F.3d 461, 469-70 (6th Cir.2003) (rejecting an argument that failure to comply with hospital bylaws defeated immunity because "even assuming LMH did violate the bylaws, the notice and procedures provided complied with the HCQIA's statutory 'safe harbor'"); *Smith v. Ricks,* 31 F.3d 1478, 1487 n. 8 (9th Cir. 1994) (quoting §11111(a)(1)) (rejecting an argument that violations of state law and professional organization guidelines defeat HCQIA immunity "because once the immunity provisions of the HCQIA are met, defendants 'shall not be liable in damages under any law of the United States or of any State' based on a professional review action"); *Bakare v. Pinnacle Health, Inc.,* 469 F. Supp.2d 272, 287, 291 (M.D.Pa.2006) ("The court need not determine whether MEC followed the Bylaws. HCQIA immunity attaches when the reviewing body satisfies the requirements under HCQIA, regardless of its own policies and procedures." The HCQIA grants immunity "from all damages claims which arise out of the peer review process. … Provided that a peer

review action as defined by the statute complies with those standards, a failure to comply with hospital bylaws does not defeat a peer reviewer's right to HCQIA immunity from damages.")

> **8.** **HCQIA Immunity And Ohio Peer Review Immunity Apply With Full Force To Dr. Aronson's Contractual "Excess Hours" Challenge To Her July-August 2008 Unsatisfactory Performance Evaluation**

Dr. Aronson claims that the concerns about her performance in October 2008 were tainted by fatigue arising from the nine (9) extra hours she worked in October beyond the ACGME limit.  For HCQIA purposes, it does not matter that Dr. Aronson's declaration makes assertions about her hours that contradict her communications to UHC at the time.  What matters, for HCQIA and Ohio Peer Review Statute purposes, is that because she never raised any issue about extra hours or fatigue <u>at the time of the assessment she now challenges</u>, her hours assertions cannot raise a triable issue of UHC's compliance with the four HCQIA requirements or of actual malice.  In her Brief, Dr. Aronson admits that at the November 24 meeting, she believed there were "no explanations available for the alleged slow response times," and she "hypothesized that perhaps she was being affected by the Topamax." (Plaintiff's Brief at 8).  In her November 28, 2008 rebuttal to the negative evaluations of her performance, she made no reference to the supposed fatigue upon which she now places such significance. (Aronson Dep. Ex. AA).

> **B.** **Separate And Apart From The Immunity Provided Under The HCQIA And Ohio Law, Dr. Aronson Cannot Establish Any Of Her Claims Against UHC**

> **1.** **Dr. Aronson's Breach Of Contract Claim As To Her Working Hours (Count I) Fails As A Matter of Law, Because She Failed To Give The Program A Chance To Remedy Any Breach, And She Can Show No Damages**

In another showing of duplicity, Dr. Aronson offers a new declaration that contradicts her prior written representations regarding both (i) whether she ever worked hours in excess of ACGME limits, and (ii) whether fatigue was ever a factor in her negative evaluations for October

2008.  She now offers a declaration that, in effect, she fabricated her written submission to UHC concerning her September 2008 duty hours, and that in responding to UHC's concerns about her October 2008 performance, she fabricated the reasons for her performance issues (which she now claims were the product of fatigue resulting from the nine (9) extra hours she claims she was required to work in October and not getting a day off each weekend in September).  Dr. Aronson claims, in effect, that she has a triable claim of breach of contract relating to duty hours despite her falsifications and concealments at the time, and claims that her failure to give UHC an opportunity to cure the supposed breach (by giving her compensating time off, or taking her supposed fatigue into account in her evaluations) is of no legal consequence.

Dr. Aronson had no answer for the fact that she breached her own contractual obligation to monitor her working hours and report any hours she worked in excess of ACGME requirements, both by submitting a report in writing and also directly contacting Dr. Wallace.[2] (Aronson Dep. 136-137; Wallace Afft. ¶ 9 and Ex. DDD).  She offers no counter to the legal implication of her omission – that she cannot claim consequential damages (the loss of employment opportunities arising from the negative evaluations arising from the poor October performance supposedly arising from fatigue arising from working excess hours), when she breached her own contractual obligation to contact Dr. Wallace concerning her hours so that the Residency Program would have a fair opportunity to address any real hours issues at the time, and to factor any such additional hours into its assessment of her.

Dr. Aronson also does not address the legal significance of the fact that she never communicated orally or in writing with anyone at UHC that fatigue was even a possible explanation for any performance issue. (Aronson Dep. 139-40).  As reflected in the Residency Program notification procedures that Dr. Aronson failed to follow, any attempt now to establish

---

[2] In all her Residency Contracts, she committed to "to follow Hospital policies and procedures … " (See Plaintiff's Brief, Aronson Dec., Ex. 6).

some proximate cause between her supposed fatigue and her negative evaluation would be wholly speculative.

Even now, Dr. Aronson offers no evidence that fatigue from working the nine (9) excess hours made the slightest contribution her performance issues in October 2008.  Instead, in her new Declaration, on this issue, she states only, "6. Because I had no explanations for the allegations of slow response times, nor specific examples I wondered, and hypothesized that perhaps I was being affected by my usage of the prescription medication Topamax." (Plaintiff's Brief, Aronson Dec. ¶ 6).

        **2.     Dr. Aronson's Contract Claim Arising From ACGME "Due Process" Requirements Fails Because The Negative Assessment And Residency Extension Was Not A Disciplinary Action, And Even If It Was A <u>Disciplinary Action She Was Provided All The Required Process</u>**

Separate and apart from the HCQIA, Dr. Aronson has raised no triable factual dispute to overcome UHC's defense that the ACGME due process requirement had no application to the negative evaluation of her performance, or to the residency extension offer that she accepted to avoid the possibility of a grievable disciplinary action.  In her Brief, Dr. Aronson casually describes the ACGME requirement as "an opportunity to appeal adverse decisions by her Resident Program." (Plaintiff's Brief at 4).  The actual ACGME requirement is to provide an appeal process for "academic and other <u>disciplinary</u> actions."  (Emphasis added.)  Dr. Aronson makes no attempt to explain how her negative evaluation could be disciplinary under the ACGME guidelines when it was not a "dismissal, non-renewal of a resident's agreement, [or] non-promotion of a resident to the next level of training."  Also, even assuming that her negative evaluation was disciplinary, Dr. Aronson has offered no evidence that the negative evaluation and extension of her residency qualified for an appeal under the ACGME standard as an action that "significantly threaten[ed her] intended career," when all it did was delay her graduation by six (6) months.

3.   **Dr. Aronson's New Claim That UHC Violated Its Own Policies And Procedures In Not Allowing Her To Grieve Her Negative Evaluation Raises No Triable Breach Of Contract Claim**

Dr. Aronson asserts in her Brief a cause of action absent from her Complaint – that UHC committed a breach of contract because its Residents' & Fellows' Manual supposedly provided for an internal grievance concerning her negative evaluation.  Putting aside that Dr. Aronson has not sought leave to assert this new cause of action, and that the new claim is barred by the HCQIA and Ohio's Peer Review Immunity Statute, Dr. Aronson has no evidence to support the claim.

The Residents' & Fellows' Manual is unambiguous:

B.   **Performance Review Actions**

A Performance Review Action is an opportunity for the Resident to address expected standards that need improvement. A Performance Review … is not a Disciplinary Action (defined on next page); it cannot be appealed; and it becomes part of the Resident's permanent file. …

2.  **Remediation.**  A remediation period is an opportunity for the resident to correct academic deficiencies and to develop and demonstrate appropriate levels of proficiency for patient care and advancement in the program…. It is not to be used in lieu of a Disciplinary Action. (Emphasis added).

Nearman's testimony (Nearman Dep. 83) that Dr. Aronson now cites concerned his communication with her about an "appeal" to the ACGME in April 2009, and she knew that at the time, as shown by the same document she now cites (Nearman Dep. Ex. 5), and by the contents of her appeal to the ACGME.  In her April 10, 2009 email to Dr. Shuck, she stated:  "He [Dr. Nearman] expressed support of my submitting a formal complaint to the ACGME if that is the only way to secure due process." (Nearman Dep. Ex. 5).  In her complaint to the ACGME, dated that same day, Dr. Aronson told the ACGME that her letter was "to communicate a formal complaint regarding my hospital's existing policies and my residency program's handling of my performance review." (Aronson Dep. Ex. EE; emphasis added).  She listed in her letter, as one reason for her Complaint, "3. Hospital policy states that no appeal is available to a resident who

13

is not promoted or whose training is extended for academic reasons."  She described in that letter the options that UHC had given her as:

> (1) accept the 6-month training extension <u>without an appeal</u>, or (2) refuse the extension, at which point I would be subject to a disciplinary action or termination without a certificate of completion, which I could then appeal, but with the caveat that I could then be terminated, and any disciplinary action would be reported to the state medical board.

She concluded her letter by stating, "<u>Both Dr. Shuck and Dr. Nearman agree that I have exhausted the options for reaching an internal resolution of this situation</u>. They are aware that I am submitting this Complaint to you." (*Id*., emphasis added).

Dr. Wallace's cited testimony is in response to the question, "How is remediation that's referred to in the letter that is Exhibit 1 [the January 7, 2009 formal notice to Aronson [of unsatisfactory performance] different from remediation that you're looking at in Exhibit 14 [the excerpt from the Residents' & Fellows' Manual]?"  Dr. Wallace's answer is, "<u>I suspect that this is consistent</u>, but the remediation in this letter is related to the six months unsatisfactory that would need to be repeated." (Emphasis added.)

### 4. Dr. Aronson's Unjust Enrichment Claim (Count II) Fails Because There Is A Written Contract Between Dr. Aronson And UHC

Dr. Aronson claims she can pursue an unjust enrichment claim in circumvention of her residency contract because the contract was procured by fraud or bad faith, but she offers no evidence to raise a triable issue of fraud or bad faith.  Her failure to specifically plead fraud in her complaint prevents her from alleging fraud at this stage of the litigation.  *See Firstar Bank, N.A. v. Prestige Motors, Inc.*, No. H-04-037, 2005-Ohio-4432, 2005 WL 2049174, at *2 (Ohio App. 6th Dist. Aug. 26, 2005) (upholding dismissal of plaintiff's complaint which alleged unjust enrichment and conversion claims because plaintiff failed to specifically plead fraud in the complaint). Dr. Aronson also offers no evidence that the extension contract was procured by fraud.

14

Finally, Dr. Aronson has presented no evidence that the contract extending her residency was procured by UHC in bad faith.  In *Firstar,* the court noted that bad faith "is not simply bad judgment.  It is not merely negligence.  It imports a dishonest purpose or some moral obliquity.  It implies conscious doing of wrong.  It means a breach of a known duty through some motive of interest or ill will.  It partakes of the nature of fraud. * * *. It means with actual intent to mislead or deceive another." *Id.* (*citing Slater v. Motorists Mut. Ins. Co.* (1962), 174 Ohio St. 148, 151, 187 N.E.2d 45, *overruled  in part on other grounds by Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397).

Dr. Aronson offers no evidence that the offer of an extension contract, or any of the circumstances leading up to the offer, were the product of bad faith conduct by anyone.

> ### 5. Dr. Aronson's Claim For Interference With Her 2008 Maternity Leave Under FMLA Fails As A Matter Of Law, Because Dr. Aronson Suffered No Damages And Because UHC Would Have Taken The Same Actions <u>Regardless Of Whether Dr. Aronson Took FMLA Leave</u>

Dr. Aronson now contends that the EAP leave decision "discouraged" her from taking FMLA leave that she otherwise would have taken, but her only evidence of such discouragement is the fact that her taking FMLA leave had <u>academic</u> implications (i.e., if she took enough FMLA leave she might have to make up the lost academic time under ABA rules).  As a matter of law, the potential consequence of being required <u>academically</u> to make up for FMLA leave days is not a harm under the FMLA and raises no FMLA issues.

Even assuming that the academic implications of Dr. Aronson's EAP leave could be viewed as raising a factual issue of "discouragement" for FMLA purposes, Dr. Aronson offers no evidence that her 2008 FMLA plans had any causal connection to the decision to require her to take EAP leave.  She relies entirely on the timing of the EAP referral, which was about a month before her scheduled FMLA leave.  No causal inference can be drawn from that timing, because

the EAP referral occurred <u>immediately</u> after Dr. Aronson disclosed her use of Topamax, which she admitted <u>at the time</u> to have an impact on her performance. (Aronson Dep. Exs. V and Z).

It appears that Dr. Aronson is attempting to bootstrap her issues concerning her August 2009 FMLA leave into some kind of evidence of a causal connection between the November 2008 EAP referral and her December 2008 leave.  Even assuming that some causal connection could be established between Dr. Aronson's June 2009 assignment to the ICU in August 2009 and her August 2009 FMLA leave, the required inference – that Dr. Wallace's supposed desire to discourage her from taking FMLA leave in August 2009 establishes that he wanted to discourage her use of leave in December 2008 – is purely speculative.  And, as shown below, there is no triable issue of a causal connection between the assignment of Dr. Aronson to ICU in August 2009 and her August 2009 FMLA leave plans, and no evidence she suffered damages relating to the EAP referral.  Dr. Aronson makes no assertion that she took less leave than she otherwise would have, or that she was thereafter deterred from seeking additional FMLA leave.

**6.      Dr. Aronson's Claim for Interference with Her August 2009 Adoption Leave Under FMLA Also Fails as a Matter of Law**

Dr. Aronson appears to concede now that the only significance of the assignment of her to ICU in August, 2009, as far as her FMLA claims are concerned, is to provide retroactive evidence in support of her claim relating to her December 2008 FMLA leave.  She has no answer for the undisputed evidence that, immediately after Dr. Aronson informed UHC that her scheduled rotation conflicted with her FMLA leave, UHC relieved her of the requirement to work the ICU rotation, thereby accommodating Dr. Aronson's request for FMLA leave rather than interfering with it. (Aronson Dep. 169-170).

16

III.    **CONCLUSION**

Summary judgment in favor of UHC is appropriate because there is undisputed evidence that UHC is immune under both federal and state law from Dr. Aronson's claims, and furthermore that Dr. Aronson cannot establish the required elements of any of her claims.  For all the foregoing reasons, the Court should grant UHC's motion and dismiss all of Dr. Aronson's claims.

Respectfully submitted,

*/s/Barton A. Bixenstine*
Barton A. Bixenstine (0034130)
Daniel L. Messeloff (0078900)
Ogletree, Deakins, Nash, Smoak, & Stewart, P.C.
4130 Key Tower
Cleveland, OH  44114
Ph:  216.241.6100
Fax:  216.357.4733
Email:  Barton.Bixenstine@OgletreeDeakins.com
            Daniel.Messeloff@OgletreeDeakins.com

*Attorneys for Defendant*
*University Hospitals of Cleveland, Inc.*

## **LOC. R. 7.1(f) CERTIFICATION**

I hereby certify that this case is on the standard track and that this Memorandum adheres to the page limitation established in Loc. R. 7.1(f).

*/s/Daniel L. Messeloff*
Attorney for Defendant
University Hospitals of Cleveland, Inc.


## **CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2011, a copy of the foregoing *Defendant University Hospitals of Cleveland, Inc.'s Amended Reply Brief* was filed electronically with the Court using the CM/ECF system.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/Daniel L. Messeloff*
Attorney for Defendant
University Hospitals of Cleveland, Inc.

9602010.1 (OGLETREE)