# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| Sarah Aronson, M.D. | ) | CASE NO. 1:10-CV-00372 |
| | ) | |
|     Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | **FIRST AMENDED COMPLAINT** |
| | ) | [Jury Demand Endorsed Hereon] |
| University Hospitals of Cleveland, | ) | |
| | ) | |
| | ) | |
|     Defendant. | ) | |

## BACKGROUND

1. Plaintiff Dr. Sarah Aronson was employed as an anesthesiology residency training physician with the Defendant University Hospital of Cleveland/ Case School of Medicine between March 2006 and September 2009.

2. Dr. Aronson received her doctor of medicine degree from Brown University in 1987.

3. Before Dr. Aronson began her residency training with the Defendant, she had successfully completed residency training programs in internal medicine, psychiatry, and family practice. She completed each of these residency programs without any reported unsatisfactory performance evaluations.

4. Dr. Aronson has now completed her anesthesiology residency training with the Defendant.

5. Dr. Aronson is a board certified physician in psychiatry and neurology, and family practice. She completed a 1-year internal medicine residency training program at Norwalk Hospital/Yale University School of Medicine in 1988.  In 1993, she completed a 3-year psychiatry residency training program at Yale University School of Medicine.  In 1995, she completed a 2-year family practice residency training program at Middlesex Hospital/University of Connecticut School of Medicine.

6. Dr. Aronson earned board certification in psychiatry and neurology in 1994 and again in 2005.  She earned board certification in family practice in 1996 and again in 2003.

7. Before beginning her anesthesiology residency training at the Defendant University Hospitals of Cleveland, Dr. Aronson held professional positions as a consulting psychiatrist at University Hospitals of Cleveland; as a medical director at University Hospitals of Cleveland; as a consulting psychiatrist at Heather Hill Hospital; as Medical Director at Roland E. Miller Family Medicine Center in Erie, Pennsylvania; as an Associate Director at Hamot Family Practice Residency in Erie, Pennsylvania, and as an attending physician in the Emergency Department of Veteran's Memorial Medical Center in Meriden, Connecticut.  She has also served as an attending physician at Bristol Hospital in Bristol, Connecticut; at Whiting Forensic Psychiatric Hospital in Middletown, Connecticut; at Rivka Zieff Hospital in Tsfat (Safed), Israel, and on call for Israel Defense Forces/Kibbutz Misgaf Am Galil, Israel.

8. On August 4 2009, Dr. Aronson passed Part I of the anesthesiology board examination with a score in the 95th percentile.

9. To complete the anesthesiology residency program in accordance with the requirements of the American Board of Anesthesiology, Dr. Aronson had to fulfill 36 months of approved training in anesthesiology. During the training, she had to receive a satisfactory Certificate of Clinical Competence for each six month period of clinical training.

10. From the time Dr. Aronson began her residency training with the Defendant through the first half of 2008, she satisfactorily completed each 6-month training period and received nothing but satisfactory Certificates of Clinical Competence.

11. During each year of the residency training program, Dr. Aronson achieved scores on an In-Training Exam predictive of her passing the written anesthesiology board exam. These scores included the In-Training Exams she took in July 2006, 2007 and 2008 as well as March of 2009.

12. In the summer and fall of 2008, Dr. Aronson was anticipating her February 2009 graduation from the program and began to apply for post-residency positions as an anesthesiologist.

13. In the fall of 2008, Dr. Mathew Norcia, M.D., was Residency Program Director for the Defendant's anesthesiology residency program.

14. In the fall of 2008, Dr. Norcia wrote letters of reference to Dr. Aronson's prospective employers and described her as "good" or "excellent" in the full range of activities related to those anesthesiologist positions.

15. On September 2, 2008, Dr. Norcia completed for Dr. Aronson a reference verification request by Sheridan Healthcare in Sunrise, Florida. On the form, Dr. Norcia indicates that his review of Dr. Aronson was based on close personal observation and a composite of evaluation by supervisors. He rated her as "excellent" or "good" in every category for which he was able to evaluate her. He recommended her as qualified and competent.

16. In September and October 2008, Dr. Aronson was assigned to the Surgical Intensive Care Unit.

17. Throughout Dr. Aronson's employment with the Defendant, she was employed pursuant to a Resident/Fellowship contract. The contract for the period covering her employment from March 2008 through February 2009 was substantially the same as all other contracts throughout Dr. Aronson's residency with the Defendant. Because she is unable to locate a copy of the applicable contract now, the contract for the 2008 years is not attached. But upon information and belief, the contract obligated the Defendant to "provide an educational program that at a minimum meets the standards established by the ACGME. . . ."

18. ACGME is the Accreditation Council for Graduate Medical Education.

19. ACGME has standards regarding duty hours for anesthesiology residents. Those standards limit duty to 80 hours per week subject to an exception upon appropriate approval that allows for a ten percent increase up to 88 hours per week. The 80 hour limit is also applied as an average over four weeks subject to the four week period being shortened by vacation or a rotation not lasting the entire four weeks.

3

20. The Defendant did not obtain any approval from ACGME to exceed the 80 hour limit for Dr. Aronson's duty during September or October 2008.

21. During September 2008, Defendant scheduled Dr. Aronson to work more than the duty hour limits imposed by the ACGME standards.

22. During October 2008, Defendant scheduled Dr. Aronson to work more than the duty hour limits imposed by the ACGME standards.

23. The ACGME requires that Residents must be provided with 1 day in 7 free from all educational and clinical Responsibilities.

24. From September 2, 2008 through September 20, 2008, Dr. Aronson worked 18 of the 19 days.

25. From September 7, 2008 through September 13, 2008, Defendant required Dr. Aronson to work 93 duty hours.

26. From September 29, 2008 through October 5, 2008, Defendant required Dr. Aronson to work 108 duty hours.

27. From October 19, 2008 through October 25, 2008, Defendant required Dr. Aronson to work 98 duty hours.

28. For the month of October 2008, Defendant required Dr. Aronson to work 362 duty hours.

29. In Mid-October 2008, Dr. Norcia and the Residency Program Co-director for the Defendant's anesthesiology residency program, Dr. David A. Wallace, D.O., presented to Dr. Aronson, for the first time, some critical evaluations of her performance. The criticisms of Dr.

4

Aronson's performance primarily concerned her speed and efficiency. These evaluations pre-dated the Satisfactory Certificate of Completion Dr. Aronson received for the January-July 2008 training period, Dr. Aronson's successful July 2008 In-Training Exam, and Dr. Norcia's letters of recommendation and reference verification described in the paragraphs above.

30. In early November 2008, Dr. Aronson signed a contract to begin working for Sheridan Healthcare on March 2, 2009. Her employment with Sheridan Healthcare was contingent upon Dr. Aronson's completing her residency training as expected by February 28, 2009. Under the contract, Dr. Aronson was to earn a $350,000.00 annual salary.

31. Under her contract with the Defendant for the period ending February 28, 2009, Dr. Aronson was paid an annual salary of approximately $55,000.

32. Between May 2008 and November 23, 2008, Dr. Aronson had received periodic evaluations from attending physicians supervising her work. All of her evaluations presented to her by these attending physicians rated her performance from satisfactory to positive. She received no negative evaluations or comments. For November 2008, Dr. Aronson received an "above average" faculty evaluation of her work.

33. On November 24, 2008, Drs. Norcia and Wallace again met with Dr. Aronson and criticized her performance. She asked for concrete examples of performance deficiencies. They provided none. Drs. Norcia and Wallace informed Dr. Aronson that she might receive an "unsatisfactory" rating for her July 2008 – December 2008 training period.

34. When Dr. Aronson began her employment with Defendant as a resident physician in 2006, she informed the Defendant that she was taking medications for migraine headaches.

5

Among the medications she was regularly taking and that she disclosed to the Defendant was topamax.

35. During the November 24, 2008 meeting described in paragraph 33, Drs. Norcia and Wallace asked whether Dr. Aronson was taking any medications. She acknowledged that she was taking topamax. They discussed whether the medication was causing a response delay of which she was unaware. So she suggested that she involve the Defendant's Employee Assistance Program as a third party monitor as she discontinued using the medication.

36. On the day following the meeting described in the preceding paragraph, and 3 weeks before Dr. Aronson's scheduled maternity leave, Dr. Wallace removed Dr. Aronson from her clinical duty and ordered her to undergo a fitness for duty evaluation. He cited concerns about substance abuse and/or cognitive impairment. Again, Dr. Aronson asked for an example of any behavior or performance that would justify the allegation that she was impaired. Again, none was given.

37. On December 4, 2008, the fitness for duty evaluation was completed. No evidence of substance abuse or cognitive impairment was found.

38. On December 9, 2008, Dr. Aronson met with the fitness for duty evaluator to review the report. Subsequently, she called Drs. Norcia, Wallace, and the EAP liaison to return to work. Defendant offered Dr. Aronson no response or plan for her return to work until December 16, 2008.

39. Dr. Aronson only performed clinical duties for three days in December 2008 before she began her previously scheduled maternity leave on December 22, 2008.

6

40. Under the requirements of the American Board of Anesthesiology, "the total of any and all absences may not exceed 60 working days (12 weeks)" during the three years of residency training.

41. While Dr. Aronson was on maternity leave on December 31, 2008, Dr. Norcia submitted an online evaluation of her and cited poor performance by Dr. Aronson in the Surgical Intensive Care Unit during the first week of October.  He indicated that based on that week, he did not feel Dr. Aronson was performing at the level of a third year anesthesiology resident and therefore should repeat the 6 month block.  She received no other notice of any specific performance concern communicated to either Dr. Norcia or Dr. Wallace.

42. Defendant is a "Sponsoring Institution" as that term is used by the ACGME in the ACGME's Institutional Requirements.

43. Under Section II.D.4.d).(1) of the ACGME Institutional Requirements, "when a resident will not be promoted to the next level of training, the Sponsoring Institution must ensure that its programs provide the resident(s) with a written notice of intent no later than four months prior to the end of the resident's current agreement.  If the primary reason(s) for the non-renewal or non-promotion occurs within the four months prior to the end of the agreement, the Sponsoring Institution must ensure that its programs provide the resident(s) with as much written notice of the intent not to renew or not to promote as circumstances will reasonably allow, prior to the end of the agreement."

44. On January 7, 2009, Defendant gave Dr. Aronson written notice that she had to extend her training for another 6 months.

45. Under Section II.D.4.e).(1) of the ACGME Institutional Requirements, the Sponsoring Institution must provide "policies and procedures for grievance and due process. These policies and procedures must minimize conflicts of interest by adjudicating parties in addressing: Academic or other disciplinary actions taken against residents that could result in dismissal, non-renewal of a resident's agreement, non-promotion of a resident to the next level of training, or other actions that could significantly threaten a resident's intended career development. . . ."

46. Dr. Aronson made repeated requests to appeal the decision to extend her training. All of her requests were refused by the Defendant.

47. Although Defendant notified Dr. Aronson that she had unsatisfactorily completed the July – December 2008 training period, Defendant informed Dr. Aronson that the "six month" additional training period would not begin until after her originally planned, February 28, 2009 graduation date.

48. On March 24, 2009, the American Board of Anesthesiology informed Dr. Aronson that Defendant had filed a Clinical Competency Committee evaluation of her and rated her performance for the six month period that ended December 31, 2008 as unsatisfactory.

49. As a direct and proximate result of Defendant's extending Dr. Aronson's training beyond the originally planned graduation date, Sheridan Healthcare withdrew its $350,000 a year job that it had offered to Dr. Aronson.

50. In the Spring of 2009, Dr. Aronson began to look for new anesthesiology positions, and applied for licensure in Maryland.

51. On or about April 10, 2009, Dr. Aronson wrote a formal complaint about the events that had been occurring in the course of her employment and training with the Defendant and submitted the complaint to the ACGME.

52. On or about May 27, 2009, the ACGME replied with a letter mailed to Drs. Aronson, Wallace, Norcia and Shuck.

53. On June 2, 2009 -- the first workday for Dr. Aronson after the ACGME's notice of her complaint had been delivered -- Dr. Aronson was informed that Drs. Norcia and Wallace would meet with her to review her performance. The meeting was held on June 4, 2009.

54. During the June 4 meeting, Dr. Wallace produced notes and medical records to support a wide range of criticisms and accusations against Dr. Aronson. Dr. Wallace argued that Dr. Aronson's clinical competency and professionalism were unsatisfactory and unlikely to lead to successful completion of the residency program. The accusations and criticisms had never been shared with Dr. Aronson before the June 4 meeting and were inconsistent with prior verbal feedback that she had received from attending physicians when they observed her work during the March 2009 training period.

55. On June 28, 2009, Dr. Aronson submitted a request to the Defendant for a leave of absence during the end of August to finalize the adoption of her son.

56. On July 10, 2009, Defendant assigned Dr. Aronson to the most demanding and stressful rotation of her training during the last 2 weeks of August – namely the intensive care unit. This was at a time when most graduating residents were on a flexible float schedule.

9

57. On July 13, 2009, Dr. Aronson wrote to Dr. Jerry M. Shuck, the Defendant's Director of Graduate Medical Education, and informed Dr. Shuck that she believed that she was being retaliated against because of hr request for time off to adopt her son.

58. On July 28, 2009, an ACGME representative visited the Defendant as part of a hospital-wide site review. During the visit, the representative met with Dr. Aronson to discuss her complaints. Upon information and belief, he shared her conversation with the Defendant.

59. By the end of July 2008, Dr. Aronson had secured another offer of employment for an anesthesiology position in Maryland at an annual salary of $350,000. Her employment was scheduled to begin on September 3, 2009, immediately following her scheduled August 31, 2009 graduation. The job offer was contingent upon Dr. Aronson's getting credentials in Maryland.

60. In mid-August 2009, Dr. Aronson discovered that according to the American Board of Anesthesiology, she had completed her additional six months of training as of the end of June 2009. So she informed the Defendant, and on August 27, 2009, the Defendant released Dr. Aronson from her training with a letter indicating that she had satisfied all requirements as of August 31, 2009.

61. Dr. Aronson's new employment in Maryland did not begin until October 5, 2009. The start date was delayed because her new employer received "damaging information" in Dr. Aronson's records that had been submitted by the Defendant, immediately following Dr. Aronson's discovery and disclosure to the ACGME regarding the Defendant's wrongly requiring her to continue the residency program until August 31, 2009.

## COUNT I
*(Breach of Contract)*

62. Dr. Aronson incorporates here by reference each and every statement set forth in paragraphs 1-61 above.

63. Defendant breached the Resident/Fellowship contract that it entered into with Dr. Aronson for the period ending February 28, 2009.

64. As a direct and proximate result of Defendant's breach, Dr. Aronson has suffered damages not less than $250,000.

## COUNT II
*(Unjust Enrichment)*

65. Dr. Aronson incorporates here by reference each and every statement set forth in paragraphs 1-64 above.

66. Defendant continued to employ Dr. Aronson as a resident after she had completed all training required of her to satisfy the residency training standards established by the ACGME.

67. Defendant continued to pay Dr. Aronson a salary commensurate with that of a physician in residency training while enjoying her services after she had obtained the training.

68. Defendant was unjustly enriched by Dr. Aronson's providing those services.

69. As a direct and proximate result of the unjust enrichment, Dr. Aronson suffered damages not less than $147,500.

## COUNT III
*(FMLA Interference)*

70. Dr. Aronson incorporates here by reference each and every statement set forth in paragraphs 1-69 above.

71. In December 2008, Dr. Aronson was a covered employee under the Family Medical Leave Act, 29 U.S.C. §2611(2).

72. In December 2008, Defendant was a covered employer under the Family Medical Leave Act, 29 U.S.C. §2611(4).

73. Dr. Aronson requested maternity leave for December 2008. Her request was an attempt to exercise her right to leave under the Family Medical Leave Act, 29 U.S.C. §2612(a).

74. Defendant interfered with Dr. Aronson's right to maternity leave in violation of 29 U.S.C. §2615(a)(1).

75. Defendant's actions in violation of 29 U.S.C. §2615(a)(1) were not taken in good faith.

76. Defendant's acts have caused Dr. Aronson to suffer certain damages in the form of emotional distress, lost wages, benefits, and compensation, all in an amount to be proven at trial.

## COUNT IV
*(FMLA Interference)*

77. Dr. Aronson incorporates here by reference each and every statement set forth in paragraphs 1-76 above.

78. In June 2009, Dr. Aronson was a covered employee under the Family Medical Leave Act, 29 U.S.C. §2611(2).

79. In June 2009, Defendant was a covered employer under the Family Medical Leave Act, 29 U.S.C. §2611(4).

80. Dr. Aronson requested adoption leave in June 2009. Her request was an attempt to exercise her right to leave under the Family Medical Leave Act, 29 U.S.C. §2612(a).

81. Defendant interfered with Dr. Aronson's right to maternity leave in violation of 29 U.S.C. §2615(a)(1).

82. Defendant's actions in violation of 29 U.S.C. §2615(a)(1) were not taken in good faith.

83. Defendant's acts have caused Dr. Aronson to suffer certain damages in the form of emotional distress, lost wages, benefits, and compensation, all in an amount to be proven at trial.

**WHEREFORE,** Plaintiff Dr. Sarah Aronson, M.D. demands judgment against the Defendant as follows:

    a. On Count One for compensatory damages not less than $250,000 plus prejudgment and post judgment interest;

    b. On Count Two for compensatory damages not less than $147,500 plus prejudgment and post judgment interest;

    c. On Count Three for compensatory damages in excess of $25,000 plus, interest, liquidated damages, costs, and reasonable attorney fees as a result of Defendant's violations of the Family Medical Leave Act;

    d.        On Count Four for compensatory damages in excess of $25,000 plus, interest, liquidated damages, costs, and reasonable attorney fees as a result of Defendant's violations of the Family Medical Leave Act; and

    e.        Any other relief this Court deems just and proper.


        /s/ Gregory A. Gordillo
        GREGORY A. GORDILLO (0063445)
        ggordillo@eeoattorney.com
        MICHAEL J. GORDILLO (0073001)
        Gordillo & Gordillo, LLC
        1370 Ontario Street
        2000 Standard Building
        Cleveland, Ohio 44113
        (216) 875-5500
        (216) 583-03445 Fax

        Attorneys for Plaintiff

**JURY ENDORSEMENT**

A trial by jury is demanded on all issues so triable.

    /s/ Gregory A. Gordillo
GREGORY A. GORDILLO (0063445)
MICHAEL J. GORDILLO (0073001)
Gordillo & Gordillo LLC
2000 Standard Building
1370 Ontario Street
Cleveland, Ohio 44113
(216) 875-5500 – Telephone
(216) 583-0345 - Facsimile
ggordillo@eeoattorney.com
mgordillo@eeoattorney.com

## CERTIFICATE OF SERVICE

The foregoing First Amended Complaint was electronically filed and served on all parties through the Court's electronic filing system on April 19, 2011.

/s/ Gregory A. Gordillo
One of the attorneys for Plaintiff