**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| SARAH ARONSON, M.D. | ) | CASE NO. 1:10-CV-372 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge Christopher A. Boyko |
| v. | ) | |
| | ) | |
| UNIVERSITY HOSPITALS OF | ) | **DEFENDANT UNIVERSITY HOSPITALS** |
| CLEVELAND, INC. | ) | **OF CLEVELAND, INC.'S TRIAL BRIEF** |
| | ) | |
| Defendant. | ) | |

Pursuant to the Court's October 12, 2010 Civil Trial Order, Defendant University Hospitals of Cleveland, Inc. ("Defendant" or "UHC") hereby provides the following Trial Brief in preparation for the trial of this matter, currently scheduled for Monday, May 23, 2011.

For the convenience of the Court, Defendant's Proposed Jury Instructions and Verdict Form, Special Interrogatories, Proposed Voir Dire Questions, as well as Defendant's Motions in Limine and the parties' Joint Preliminary Statement, will be filed separately.

Respectfully submitted,

*/s/Barton A. Bixenstine*
Barton A. Bixenstine (0034130)
Daniel L. Messeloff (0078900)
Ogletree, Deakins, Nash, Smoak, & Stewart, P.C.
4130 Key Tower
Cleveland, OH  44114
Ph:  216.241.6100
Fax:  216.357.4733
Email:  Bart.Bixenstine@OgletreeDeakins.com
           Daniel.Messeloff@OgletreeDeakins.com

*Attorneys for Defendant
University Hospitals of Cleveland, Inc.*

## TABLE OF CONTENTS

(a)     **Statement of Facts**.................................................................................................**1**

(b)     **Controlling Law Justifying Motion Under Fed. R. Civ. P. Rule 50** ...........................**13**

(c)     **Proposed Witness List** ..............................................................................................**34**

(d)     **Index of Proposed Exhibits** .....................................................................................**37**

(e)     **Evidentiary Issues Likely to Arise at Trial**..............................................................**43**

(f)     **Estimate of Length of Trial** .....................................................................................**43**

(a)      <u>**STATEMENT OF FACTS**</u>

     **A.**     **In March, 2006, Dr. Aronson Joins the Residency Program of the Case Medical Center, Department of Anesthesiology and Perioperative Medicine, with Impressive Credentials, and the Department Attempts <u>to Get Her Recognition of Her Ongoing Research Efforts</u>**

On March 1, 2006, Plaintiff Sarah Aronson, M.D. ("Plaintiff" or "Dr. Aronson") began a 3-year program as an anesthesiology resident at UHC's Case Medical Center.[1]  The UHC Anesthesiology Residency Program has three yearly levels after a clinical base year – labeled CA1, CA2 and CA3.  The Residency Program employs each resident under a yearly contract, which is renewed if he/she qualifies to be promoted to the next level.

Dr. Aronson came to the program with impressive credentials:  She had been an Assistant Professor of Psychiatry at the Case School of Medicine since September, 2001. She had been a Fellow in Clinical Neuroscience and Psychopharmacology at Yale University, was certified by the American Board of Family Medicine and the American Board of Psychiatry and Neurology, and had over a decade of medical practice.  She had recently been awarded a $200,000 grant to conduct a two-year study in the Case Medical Center's Cardiothoracic Surgery and Cardiothoracic Anesthesia departments.

     **B.**     **In her First 2 Years of Residency, Dr. Aronson's Performance is Mixed, <u>With Significant Concerns Raised About Efficiency and Responsiveness</u>**

Despite her impressive credentials, by December, 2007 there was a substantial gap between Dr. Aronson's performance as a resident and that of her peers in critical areas of hands-on anesthesiology, with a pattern of concern about efficiency and responsiveness.

Within her critical assessments in her first residency year was a pattern of concern about efficiency and responsiveness, reflected in the following evaluation comments:

---

[1] Evidentiary support for all facts asserted herein are contained in Defendants' Memorandum of Law in Support of Motion for Summary Judgment (ECF Doc. # 16).

| | |
|---|---|
| **Dr. Salim Hayek:** | Dr. Aronson is ***not as aggressive or rapidly responsive*** as the average Anesthesiology resident in our department. |
| **Dr. Kathleen Cho:** | ***I found that she lacked concentration & had difficulty making quick critical decisions that affected patient care.  She had difficulty in the OR with multitasking and thinking ahead.*** |
| **Dr. Matthew Norcia** | [I]n some tenser situations ***needs to speed up a bit … needs to move a little faster during some of the more hurried times*** |
| **Dr. Irving Hirsch:** | ***She seems tentative in her decision making and actions***, thus not allowing my to have confidence in her abilities |
| **Dr. Lisa Hacker:** | [Confidential] I've worked with interns that do a better job in the ICU. ***She seems to have a very difficult time completing her thoughts***. |

There were also positive assessments of Dr. Aronson, including those from Dr. Gerald Jonsyn, who provided the following assessments near the end of 2007:

| | |
|---|---|
| **Dr. Gerald Jonsyn:** | She is a rather hardworking resident with tremendous potential. |
| | She has definitely demonstrated improvement in her clinical and leadership skills. |

In light of sentiments like Dr. Jonsyn's, and the time remaining in her residency, UHC reported to the ABA that Dr. Aronson had performed satisfactorily for the July-December, 2007 reporting period.

Dr. Aronson's performance during the first half of 2008 declined relative to expectations on residents completing their second year of residency.  The same issues of responsiveness and efficiency were noted repeatedly, as shown below:

| | |
|---|---|
| **Dr. Mark Zahniser:** | Strengths: Unable to ascertain.  Weaknesses: ***Slow, unprepared, seems to have deficient knowledge of management of sick, complicated cases.*** *Poor knowledge of equipment and its use.* ***More interested in looking at the TEE than managing the actual patient.*** |
| **Dr. Gerald Jonsyn:** | Her overall performance was rather disappointing, definitely just below the level of her class. ***Her*** |

2

|  | *leadership and clinical skills and judgments were comparatively poor. She was neither reliable nor accountable and dependable during this rotation*. She would disappear during work hours without any explanation, compromising patient care. When confronted with the facts of her questionable performance and behavior, she became evasive, argumentative and she offered only excuses. Therefore, it was very difficult to offer her positive directives for her personal improvement. |
|---|---|
| **Dr. Salim Hayek:** | [Confidential]  *I would have major concerns with her being an Anesthesiologist. She does not appear to have the vigilance and temperament that is part and parcel of Anesthesiology practice*. |
| **Dr. Joshua Goldner:** | focus on problem at hand, *efficiency could be improved*. |
| **Dr. Peter Adamek:** | *biggest weakness is awareness of time and efficiency and continues to be lacking*, anesthesia is a team sport, we all depend on quick work that is also accurate, *it is important during residency to practice speed while under supervision …decision making at times needs to be quick … unable to multitask in a timely manner*. |
| **Dr. Mark Zahniser:** | [Confidential]  *This resident is your worst one...her basics are very weak.* She needs to be in only basic cases. |

These issues were addressed with Dr. Aronson by Dr. Norcia who, with Dr. Wallace, is the Co-Chair of the Anesthesia Department's Residency Program.  Because there were also many positive assessments of her, and because she still had another year to address the issues, she was reported to the ABA as performing satisfactorily for the January-June 2008 reporting period.

### C.  Concerns About Dr. Aronson's Performance in the Intensive Care Unit Lead Dr. Norcia and Dr. Wallace to Meet with Her on October 14, 2009

In September and October 2008, Dr. Aronson was assigned to work in the Intensive Care Unit ("ICU"), where she had previously received negative assessments.  Dr. Aronson worked with Dr. Matthew Norcia, one of the Co-Chairs of the Residency Program, on October 6-10, and he assessed that Dr. Aronson's verbal responses to many questions or statements were delayed, and her work took considerably longer than he expected.  Dr. Gerald Jonsyn (who had evaluated

her positively during her first residency year) reported her clinical performance as below average.  Dr. Tracy Bartone reported to Dr. Norcia that Dr. Aronson had pursued a clinical course on October 3-4 that was contrary to Dr. Bartone's instructions.

On October 14, 2008, Dr. Norcia and Dr. Matthew Wallace, the other Co-Chair of the Residency Program, met with Dr. Aronson to address the continued pattern of negative assessments.  Dr. Aronson offered no explanation for their concerns, claiming now that "[t]he concerns weren't specified in a way that allowed a response."  Drs. Norcia and Wallace warned Dr. Aronson that there was a possibility she would receive an overall unsatisfactory evaluation for the July-December 2008 ABA reporting period, urged her to get immediate feedback from faculty, and arranged with her to meet again in approximately six weeks.

### D.    On November 24, 2009, Drs. Norcia and Wallace Meet With Dr. Aronson to Address Her Unsatisfactory Performance for the October 2008 ICU Rotation

Dr. Jonsyn's experiences with Dr. Aronson in the second half of October were even more negative.  In his assessment (which was not formally entered into the evaluations database until January, 2009), Dr. Aronson did not take any responsibility for her actions, did not accept any leadership role for the service or the team, and was performing at the level of a first-year resident.  Dr. James Rowbottom reported to Dr. Norcia that there were many issues surrounding Dr. Aronson's month in the unit, including continued friction with Dr. Jonsyn and not taking responsibility for patients.

On November 24, 2008, Drs. Norcia and Wallace met with Dr. Aronson, and informed her that she had received an overall unsatisfactory assessment of her October ICU rotation, and again raised the same concerns about Dr. Aronson's lack of responsiveness and efficiency that were highlighted in the intensive care setting.

When Dr. Aronson could provide no explanation or rebuttal, Dr. Wallace asked Dr. Aronson whether she was taking any psychotropic medication.  Dr. Aronson disclosed she was taking Topamax for migraine headaches, with a recently increased dosage.  She raised as a "possibility" that side effects were impairing her performance, and suggested a referral to UHC's Employee Assistance Program ("EAP").

Dr. Wallace told her he would consult with the EAP about a fitness-for-duty examination, which would require that she be taken off duty.  Dr. Aronson offered no objection.  Drs. Norcia and Wallace also told Dr. Aronson that the Residency Program might have to report her to the ABA as performing unsatisfactorily for the July-December 2008 reporting period, and that she may need to extend her residency by six months.

### E.    Dr. Aronson enters the EAP Program, and is Returned to Work to Her Next Scheduled Work Day After the EAP Program Releases Her

Dr. Wallace consulted the EAP, and Dr. Aronson was placed on paid leave to obtain a fitness-for-duty examination.  The Residency Program was barred from communicating with the EAP concerning Dr. Aronson, and she could not return to work until the EAP released her.  The EAP released her on December 15, and she returned to work on her next scheduled work day, December 18. Dr. Aronson then commenced a previously-scheduled FMLA leave on December 22.

### F.    After Raising No Issues with Her Negative Assessments or the EAP Referral When She Met with Drs. Norcia and Wallace, Dr. Aronson Submits a Written Rebuttal on November 28 and Attempts (Without Success) To Get Support From Other Attending Physicians

Aronson raised no issues concerning the negative assessments of her performance or the EAP referral until days after meeting with Drs. Wallace and Norcia.  However, by November 28, 2008, Dr. Aronson had prepared written statement attacking the grounds for her fitness-for-duty

exam and attempting to counter some of her negative evaluations.  She acknowledged that she had received "a pattern of evaluations regarding [her] need to improve my efficiency and speed of response," but countered with the irrelevant fact that, since the negative assessments of Dr. Norcia, Dr. Jonsyn and Dr. Rowbottom covering October, 2008 had not yet been officially entered into the Program's evaluation system, her "official" evaluations since May, 2008 were good.  Though she admitted that she herself had become "concerned that perhaps the topiramate that [she took] for migraine prophylaxis was creating a response delay in [her] of which [she] was not aware," and later acknowledged to the Accreditation Council for Graduate Medical Education ("ACGME") that she "saw a rapid improvement in [her] speed of execution upon stopping the medication," she called the fitness-for-duty examination not "justified."

While on paid leave, Dr. Aronson sought input from two attending physicians, Drs. Adam Haas and David Dininny, to counter the negative assessments of her, but their input only affirmed the assessments of others. Dr. Haas said "that *she took longer than most* senior residents to evaluate and assess the patients on the service."  Dr. Dininny said she lacked "*the ability to translate knowledge into action*."

### G.  When UHC Offers Her a 6-Month Residency Extension, Dr. Aronson Acknowledges the Validity of the Program's Concerns and Accepts the Offer Knowing it is a Non-Appealable Decision

In mid-December, Dr. Wallace told Dr. Aronson that he would rate her performance for the second half of 2008 as unsatisfactory.  The Program offered Dr. Aronson the opportunity to extend her residency for six months, through August 2009. An extension would not be reportable to the Ohio State Board of Medical Examiners, although under the UHC Residency Program rules it would not be appealable.  Dr. Aronson was told she could reject the residency extension offer, which would leave UHC with a decision on whether to pursue disciplinary action, place

her on probation, or refuse to graduate her at the end of her residency, all actions reportable to the Ohio State Board of Medical Examiners and for which she could appeal.

Dr. Aronson consulted with legal counsel and chose the extension option.  She then submitted a letter to Dr. Nearman, dated January 6, 2009, admitting the validity of the circumstances leading to the EAP referral and for extending her residency, stating:

> I want to say first that I'm committed to completing this residency successfully, and can only be grateful that *this difficult episode has resulted in my getting rid of a medication that was having a negative effect on my functioning. I'm alarmed that I needed a whack on the head to identify the topamax as a problem*. As soon as I considered the possibility I stopped it, any only wish I had done so sooner. *I feel significantly better, and my spouse confirms I'm considerably more with it. … I'm sure that Dr. Norcia and others were correct in noting a change in my performance. … I don't believe Drs. Wallace and Norcia have intended this process to be punitive*.

In deposition, Dr. Aronson now contends that her written representations to the Chair of the Department were lies intended to "appease" Dr. Nearman, with the objective of getting the extension decision overturned.  Dr. Aronson now claims that when she told Dr. Nearman that medication negatively affected function she was "willing to accept that as a possibility and work with it" but does not believe it now.  She now says that when she wrote that she was alarmed at the time that she needed a whack on the head to identify Topamax as a problem – "that is how I was thinking at the time" – but she does not believe it now.  She now says she was "endorsing that interpretation" that Dr. Norcia and others were correct in noting a change in her performance, but believes now it was just a matter of fatigue if there was actually any performance difference.  She now asserts that in saying she was sure they were not trying to be punitive she was "not entirely truthful."

7

On January 7, 2009, the Residency Program formally notified Dr. Aronson that she would receive an unsatisfactory evaluation on the semi-annual Clinical Competence Report to the ABA.  The Program cited three grounds for the evaluation:

> Under the category of Essential Attributes, the committee has determined that you have been unable to demonstrate the ability to react to stressful situations in an appropriate manner. Under the category of Professionalism, you have failed to carry out your professional responsibility of notifying the Residency Program Directors that you were taking a prescribed medication that could impair your judgment and/or job performance, as required by hospital policy. Additionally, under the category of Patient Care, you have failed to demonstrate your ability to recognize and respond appropriately to significant changes in the anesthetic course.

Under ABA rules, an unsatisfactory assessment on even a single assessment category results in an overall unsatisfactory assessment.

Under ABA Guidelines, a satisfactory report to the ABA covering the next calendar six month period – from January-June 2009 – would "undo" the prior six months of unsatisfactory performance and give Dr. Aronson the 36 months of satisfactory residency performance required for graduation by the ABA.  However, the Residency Program required that Dr. Aronson complete an additional six months of residency training, through August 2009, to demonstrate to the Residency Program that she was qualified to meet its own graduation standards.

On January 7, that same day she was formally notified of her unsatisfactory performance, Dr. Aronson wrote another letter to Dr. Nearman, in which she "concur[red] that this medication had an effect on [her] performance," and that she was "***aware of the subtle recovery in my verbal skills and speed of execution since discontinuing the medication at the end of November***."

Dr. Aronson now claims she was making more misrepresentations in this letter, to persuade the Program to remove the "professionalism" concern from its report to the ABA, shorten the duration of the residency extension, and recharacterize all of her performance

shortcomings as "a medical issue," so she could still accept a job offer from Sheridan Healthcare.

Dr. Aronson now simply "disavows" her representations that she "concur[red]" that this

medication had an effect on [her] performance" and that she was "aware of a subtle recovery in

[her] verbal skills and speed of execution since discontinuing the medication."

On January 15, 2009, Dr. Aronson submitted a letter to Dr. Longfellow, her key contact

at Sheridan Healthcare in Florida, in which she stated:

> Over the past year I had been taking a medication (Topamax) for migraine prophylaxis. During recent months the dose was increased and *I developed side effects which affected my clinical performance*. I continued to receive satisfactory evaluations from faculty and received an excellent score on the Anesthesia Residency In-Training Exam. Because of the gradual onset of the symptoms, however, *I did not identify the medication as a problem until December, when I received an unsatisfactory evaluation for my October ICU rotation*.
>
> As you know, if unsatisfactory performance is identified at any time during our final 6 months of training, the entire 6 month block must be repeated. *I promptly stopped the medication as soon as this concern arose, and have noted a significant difference, as have my family and colleagues*. I am distraught that this has occurred at this late date, though I'm certainly glad the problem was identified and corrected before I took a position as an independent practitioner.

On January 27, 2009, Dr. Nearman emailed to Dr. Aronson, stating:

> I find honesty is the best policy, but will leave the final decision to you. *Is it OK to tell him that your performance was not satisfactory*, and that, upon evaluating the possibilities as to why, we came up with the potential drug side effect.

On or around January 27, 2009, Dr. Aronson gave Dr. Nearman permission to the make

that statement to Sheridan Healthcare.

On February 4, 2009, Dr. Aronson met with Drs. Norcia and Wallace to plan for the

extension of her residency.  In a remediation plan document, Dr. Aronson agreed to a six-month

schedule that would include a month in ICU.  On February 25, she signed a contract committing

UHC to give her a 6-month extension of her residency, through the end of August, 2009.

**H.     With Her Residency Extension Contractually Guaranteed, Dr. Aronson Shifts Her Job-Preservation Strategy from What She Now Labels "Appeasement" to One of Confrontation.**

On February 28, 2009, three days after signing her extension contract, Dr. Aronson submitted a complaint to the ACGME concerning the extension of her residency.  In direct contradiction to her representations to Dr. Nearman and Dr. Longfellow, she claimed to the ACGME that she was the victim of "lack of documentation, lack of timely intervention and communication of performance concerns, and most significantly, the lack of access to mediation or appeal."  After representing to Dr. Longfellow, directly and through Dr. Nearman, that her performance was unsatisfactory for her October 2008 rotation in the ICU, and that she had 'developed side effects [from Topamax] which affected [her] clinical performance," she submitted to the ACGME the same accusations from her November 28, 2009 letter that she had publicly abandoned in January.

The next day, March 1, 2009, Dr. Aronson submitted an email to Jerry Shuck, UHC's Associate Dean and Director of Graduate Medical Education, offering the fabrication that "[m]y documented evaluations from faculty continue to be good, as they were in November prior to this process and were since March of last year. I am receiving minimal supervision in the OR."  Dr. Aronson then threatened Dr. Shuck that she was "preparing to submit a 'concern' or possibly a formal complaint to the ACGME regarding the lack of timely notification/intervention in my case, the lack of documentation, and particularly the lack of access to an appeal process."

On March 10, 2009, Dr. Aronson submitted a follow-up email to Dr. Shuck impugning the character and integrity of both of the Residency Program Co-Directors, Drs. Norcia and Wallace, and pressuring the Residency Program to agree to her tactic of characterizing her prior performance issues as simply a "transient medical issue":

> You asked me what I want at this point.  Ideally, at this point, I want the decision to extend my training reversed and my permanent record cleared.  Failing that, I want the right to an appeal and review of these decisions by an impartial committee without incurring the penalty of a recorded and reportable disciplinary action.  If that is denied, I want at the very minimum clear documentation in my record that addresses this as a transient medical issue and does not impugn my professionalism.

On April 10, 2009, Dr. Aronson included the same accusations in a formal complaint to the ACGME.

### I.  The Residency Program Allows Dr. Aronson to Set Her Schedule, so she Forces the Program to Schedule her in the ICU for August, and then Claims That Assignment Violated Her FMLA Rights

The Residency Program allowed Dr. Aronson to schedule her monthly rotations for the residency extension. As early as February 24, 2009, Dr. Aronson submitted a proposed schedule that omitted the ICU rotation that she had committed on February 4 to repeat.  Dr. Aronson finally scheduled her ICU rotation for June, but failed to work in the ICU in June, forcing the Program to schedule her for the ICU in August.  When she complained, the Residency Program accommodated her leave concerns by relieving her of her commitment to repeat the ICU rotation during her extension, to Dr. Aronson's admitted satisfaction.  Dr. Aronson thereby managed to avoid repeating the very rotation where she had shown herself in greatest need of additional work.

### J.  Based on Dr. Aronson's May 2009 Assessments and Other Complaints, Dr. Wallace Judges that She is Not Qualified to Graduate, But the Residency Program Concludes She Should Be Permitted to Graduate Despite Its Reservations About Her Performance in Some Non-Routine Situations

Just as a single month was the primary source of her negative assessments in the July-December 2008 period, the single month of May, 2009 was the source of several strongly-worded negative assessments of Dr. Aronson, that raised doubts about her ability to handle some non-routine situations.  Drs. Norcia and Wallace met with her on June 4, 2009, and Dr. Wallace told

her his opinion was that she was not going to get a satisfactory assessment for the six-month period from January-June 2009.  However, the Program's overall assessment of Dr. Aronson (over Dr. Wallace's dissent) was that she was qualified to graduate despite problems in some non-routine situations.

In substance, this was the message that was communicated to credentialing bodies and prospective employers – that Dr. Aronson had previously had a performance issue requiring the extension of her residency that was most likely related to taking medication, and she was qualified to practice anesthesiology, but that the Residency Program had reservations concerning her ability to handle some non-routine situations that involved high stress and the need to multitask.

**K.** **In Her Own Communications With Prospective Employers and Licensing Bodies, Dr. Aronson Continues to Misrepresent the Circumstances of Her Residency to Minimize the Damage to Her Professional Standing**

Dr. Aronson initially judged that her chances of being credentialed and licensed were maximized by casting her October, 2008 issues as the result of a "transient medical problem." She wrote to the Maryland State Licensing Board, stating, "In October of 2008, I had a transient medical problem (I was taking topiramate for migraine prophylaxis and experienced side effects) which caused me to lose some training time."  She also represented that "though all issues were entirely resolved by December of 2008, I was required to extend my training period 6 months to September of 2009."  As she now admits, "With the Maryland Medical Board, I chose to frame it as a medical problem because I felt that would be the least damaging to my professional standing."  She supplied the same "explanation" to the Federal Credentialing Verification Service.  In her more recent submissions, Dr. Aronson has abandoned the "transient medical

12

issue" story in favor of forewarning prospective employers and credentialing bodies to expect

negative information from UHC.

**(b)**     **CONTROLLING LAW JUSTIFYING MOTION UNDER FED. R. CIV. P. RULE 50**

      **A.**     **Under the HCQIA, UHC Will Be Entitled To Judgment As a Matter
of Law As To Every Claim in Dr. Aronson's Amended Complaint**

Where, as here, a physician asserts claims against a health care entity arising from

unsatisfactory performance evaluations or communications with outside peer review bodies,

"[t]he focus of [the physician's] . . . claims is the peer review process that ultimately led to the"

alleged damages. *Badri v. Huron Hosp.*, 691 F.Supp.2d 744, 764-68 (N.D. Ohio 2010).  As a

matter of law, all of the challenged UHC actions were professional review actions that are

immune from Dr. Aronson's challenges under the Health Care Quality Improvement Act

("HCQIA"), 42 U.S.C. §§ 11101, *et seq.*

The HCQIA was enacted to provide "effective peer review and interstate monitoring of

incompetent physicians, and to grant qualified immunity from damages for those who participate

in the peer review activities." *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 467

(6th Cir. 2003) (citing 42 U.S.C. § 11101).  The intent of the HCQIA is "to reinforce the

preexisting reluctance of courts to substitute their judgment on the merits for that of health care

professionals and of the governing bodies of hospitals in an area within their expertise." *Brader*

*v. Alleghany General Hospital*, 167 F.3d 832, 849 (3d Cir. 1999).

The HCQIA provides immunity for "professional review actions" which are "taken or

made in the conduct of professional review activity." 42 U.S.C. § 11151.  A "professional review

activity" is generally an activity taken by a health care entity (A) to determine whether the

physician may have clinical privileges with respect to, or membership in, the entity, (B) to

13

determine the scope or conditions of such privileges or membership, or (C) to change or modify

such privileges or membership. 42 U.S.C. § 11151(10).  A "professional review action" is:

> an action or recommendation of a professional review body which is taken or
> made in the conduct of professional review activity, which is based on the
> competence or professional conduct of an individual physician (which conduct
> affects or could affect adversely the health or welfare of a patient or patients), and
> which affects (or may affect) adversely the clinical privileges, or membership in a
> professional society, of the physician.

42 U.S.C. § 11151(9).

> The HCQIA also provides additional qualified immunity as follows:

> [N]o person . . . providing information to a professional review body regarding
> the competence or professional conduct of a physician shall be held, by reason of
> having provided such information, to be liable in damages under any law of the
> United States or of any State . . . unless such information is false and the person
> providing it knew that such information was false.

42 U.S.C. § 11111(a)(2).

A health care entity's "professional review action" is entitled to immunity under the

HCQIA if the following four conditions are met:

> (1)     it was taken in the reasonable belief that the action was in furtherance of
>         quality healthcare;

> (2)     it was taken after a reasonable effort to obtain the facts of the matter;

> (3)     it was taken after adequate notice and hearing procedures are afforded to
>         the physician involved or such other procedures as are fair to the physician
>         under the circumstances; and

> (4)     in the reasonable belief that the action was warranted by the facts known
>         after such reasonable effect to obtain the facts and after meeting the
>         requirement of paragraph (3).

42 U.S.C. § 11112(a). *See Meyers*, 341 F.3d at 467.

The HCQIA creates "a rebuttable presumption of immunity, forcing the plaintiff to prove

that the defendant's actions did **not** comply with the relevant standards." *Meyers*, 341 F.3d at

467-468 (emphasis added).  This presumption creates an "unconventional" legal standard for

14

judgment as a matter of law, which asks the question: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendant's actions are **outside** the scope of § 11112(a)?" *Id.*, at 468 (emphasis added). A plaintiff must overcome the presumption by showing that the review process was manifestly unreasonable. *Id.* "[B]ad faith on the part of the reviewers is irrelevant…." *Sugarbaker v. SSM Health Care*, 190 F.3d 905, 914 (8th Cir. 1999).

As shown by her response to UHC's Motion for Summary Judgment, Dr. Aronson does not deny that UHC qualifies for HCQIA protection as a statutory "health care entity," or that the group of attending physicians who provided assessments of Dr. Aronson are "professional review bod[ies]," 42 U.S.C. §11151(11), or that the assessments were the product of "professional review activit[ies]," or that each of the following actions by UHC of which Dr. Aronson complains are "professional review action[s]" under 42 U.S.C. §11151(9):

(i) directing that she submit to a fitness-for-duty evaluation (Count III, as an FMLA violation relating to maternity leave taken in December 2008);

(ii) assessing her July-August 2008 performance as unsatisfactory (Count I, as a breach of an alleged contractual "due process" entitlement);[2]

(iii) offering her a six-month remedial residency extension when the ABA would have permitted a 4-month extension (Count II, as unjust enrichment);

(iv) assigning her to the ICU for the last rotation of her remediation period (which it then changed at her request) (Count IV, as an FMLA violation).

As the product of "professional review activit[ies]," each of the four above-listed actions of which Dr. Aronson complains are "professional review action[s]" under 42 U.S.C. § 11151(9),

---

[2] Dr. Aronson asserts in her Summary Judgment response a cause of action absent from her Amended Complaint – that UHC committed a breach of contract because its Residents' & Fellows' Manual supposedly provided for an internal grievance concerning her negative evaluation. Putting aside that Dr. Aronson has not sought leave to assert this new cause of action, and that the new claim is barred by the HCQIA and Ohio's Peer Review Immunity Statute, she has no evidence to support it.

such that UHC is immune from Dr. Aronson's claims unless she can show by a preponderance of the evidence that UHC's actions "are outside the scope of § 11112(a)," *Meyers*, 341 F.3d at 468.

### 1.    Each Challenged Action was Taken in the Reasonable Belief that it Would Further the Quality of Health Care

The "reasonable belief" standard in § 11112(a)(1) of the HCQIA is satisfied if "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Badri*, 691 F.Supp.2d at 765 (quoting *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 635 (3rd Cir.1996)). This requirement is "an objective standard, rather than a subjective good faith requirement." *Meyers*, 341 F.3d at 468 (citing *Bryan*, 33 F.3d at 1323).

### a.    The Fitness-For-Duty Decision

As to the decision that Dr. Aronson undergo a fitness-for-duty examination after disclosing her use of Topamax, she admitted that "the highest priority is to ensure patient safety and clinical reliability" (Aronson Dep. Ex. AA) and that she saw "a rapid improvement in [her] speed of execution upon stopping the medication." (Aronson Dep. Ex. C).  Her admissions leave no dispute as to UHC's reasonable belief that Plaintiff's referral to the EAP furthered the quality of health care.  Because a professional review action satisfies HCQIA Condition 1 if there is an objectively reasonable belief that the action was taken in the furtherance of quality health care, both state and federal courts nationwide have unanimously concluded that evidence of bad faith is irrelevant. See *Reyes v. Wilson Mem. Hosp.* (S.D.Ohio, 1998), 102 F.Supp.2d 798, 812 ("Within the universe of published decisions addressing this issue, the courts are unanimous in holding that evidence of 'bad faith' does not suffice to overcome the presumption that a defendant acted 'reasonably.'").

     **b.**     **The Decisions to Report Unsatisfactory Performance, Offer a 6-Month (Rather Than 4-Month) Residency Extension and Schedule the ICU Rotation in August**

The decisions to report Dr. Aronson as performing unsatisfactorily for July-December 2008, offer her a residency extension, and schedule her for an ICU rotation in August 2009, were also founded on a reasonable belief that they furthered the quality of health care.  Dr. Aronson acknowledged to the Program that taking Topamax "was having a negative effect on my functioning," and "affected [her] clinical performance." She informed Dr. Longfellow that she "developed side effects which affected my clinical performance," and that she "received an unsatisfactory evaluation for my October ICU rotation."  She authorized Dr. Nearman to tell Sheridan Healthcare that her performance was unsatisfactory in the second half of 2008.  If her own admissions were not enough, numerous anesthesiologists expressed serious concerns about her efficiency and responsiveness.  Her failure to disclose that she had been taking Topamax further called her decision-making abilities into question. *See Meyers*, 341 F.3d at 468 (affirming summary judgment under HCQIA in that "'quality health care' is not limited to clinical incompetence, but includes matters of general behavior and ethical conduct.'"). In light of these circumstances, UHC had reasonable concerns about Dr. Aronson's ability to provide quality health care and to behave in a professionally acceptable manner, and UHC, the Credentials Committee, and Drs. Norcia and Wallace reasonably believed their actions were taken "in the furtherance of quality health care," in satisfaction of 42 U.S.C. § 11112(a)(1).

     **2.**     **Each Challenged Action was Taken after a Reasonable Effort to Obtain the Facts, and Dr. Aronson's Attempt To Bootstrap Dr. Shuck's June 2009 Assessment Of Her Status Shows She Has No Claim as a Matter of Law**

The "reasonable efforts" inquiry under the HCQIA is "whether the 'totality of the process' leading up to the professional review action evinced a reasonable effort to obtain the

facts of the matter." *Meyers*, 341 F.3d at 469. The HCQIA does not require a comprehensive examination. *Id.*, at 468.

Over several months, as Dr. Aronson acknowledged in writing, several UHC anesthesiologists raised concerns about Dr. Aronson's efficiency and responsiveness.  Dr. Norcia and Dr. Wallace met with Dr. Aronson twice, on October 14, 2008 and on November 24, 2008, in a "reasonable effort to obtain the facts of the matter."  Dr. Aronson finally disclosed to them her use of Topamax and her own concern that "perhaps the topiramate …was creating a response delay in me of which I was not aware."  The totality of this process satisfies the second prong of immunity under 42 U.S.C. § 11112(a)(2) as to all of UHC's challenged actions.

Dr. Aronson will present an email assessment by Dr. Shuck, dated June 8, 2009, of issues he perceived to have arisen from "negative evaluations [that] have come <u>after</u> the decision for extension." It thus appears that Dr. Aronson is asserting that the Residency Program should have looked into her disclosure of her use of Topamax during her pre-hire physical examinations, as some kind of failure by UHC to make a reasonable effort to obtain the facts of the matter concerning its negative assessment of her professionalism.  However, Dr. Aronson never raised this pre-hire disclosure as a defense <u>at the time</u>, and for good reason – her disclosure in a pre-hire physical was not disclosure to the Residency Program.

### 3.    Each Challenged Action Was Made after Adequate Notice and Fair Procedures or Where No Procedure Was Required

The third element of the HCQIA immunity test requires that the challenged actions were taken "after adequate notice and hearing procedures afforded to physician or other such procedures that are fair to the physician." 42 U.S.C. § 11112(a)(3). "The HCQIA does not require that a professional review body's entire course of investigation conduct meet particular standards in order for it to be immune from liability for its ultimate decision." *Badri*, 691 F.Supp.2d at 768

18

(*quoting Brader*, 167 F.3d at 842).  The notice and procedure elements may be "waived voluntarily by the physician." 42 U.S.C. § 11112(b).  The notice and procedure elements are not required where "there is no adverse professional review action taken," or where the failure to impose "an immediate suspension or restriction of clinical privileges" "may result in an imminent danger to the health of any individual." 42 U.S.C. § 11112(c)(1)(A) and § 11112(c)(2).

### a.       The Fitness-For-Duty Decision

As reflected in her response to UHC's Summary Judgment Motion, Dr. Aronson does not dispute that the decision to require Dr. Aronson to undergo a fitness-for-duty examination was not an "adverse professional review action," and therefore falls within the scope of 42 U.S.C. § 11112(c)(1)(A) as well as § 11112(c)(2).  In any event, she was notified of the decision the same day she disclosed her use of Topamax and her concerns about its effects, and she then expressly waived any entitlement to further procedure concerning the decision, stating, "I am, however, willing to complete the process as currently laid out in a timely fashion." .

### b.       The Decisions to Report Unsatisfactory Performance and Offer a Residency Extension

There is also no dispute that Dr. Aronson was provided advance notice of UHC's decision to report to the ABA that she had unsatisfactory performance for the July-December 2008 reporting period.  She was informed of the possibility of such a report on October 14, 2008 and again on November 24, 2008.  She was provided advance notice of her options – to accept the offer to extend her residency or face academic disciplinary action that would be appealable.

Dr. Aronson cites in her Complaint the ACGME notice requirement concerning a decision "not to renew or not to promote."  However, Dr. Aronson was in the final months of her 3-year residency, so the negative evaluation did not involve a decision "not to renew or not to promote" her – UHC's choices were either to graduate her, refuse to graduate her, or offer her an

19

ad-hoc extension of her residency and then decide whether to graduate her or not if she refused the offer.  Dr. Aronson also alleges that UHC failed to comply with the ACGME requirement of an appeal of her negative evaluation, but the only ACGME due process requirement ACGME requirement is to provide an appeal process for "academic and other <u>disciplinary</u> actions."  In contrast to a suspension or dismissal from a program, a negative 6-months evaluation is not an academic disciplinary action.

Even assuming a negative evaluation was a form of discipline, Dr. Aronson can offer nothing to rebut the undisputed evidence that, as a matter of law, she was given all the due process which could legally be required to establish HCQIA immunity for the far more serious outcome that <u>did not</u> occur, an academic dismissal..  As the U.S. Supreme Court has explained in the case of academic dismissal (for which UHC provides an internal appeal):

> The need for flexibility is well illustrated by the significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct.  This difference calls for far less stringent procedural requirements in the case of an academic dismissal.

*Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 85-86, 98 S.Ct. 948, 952-53 (1978).  She does not dispute the events of October, November and December 2008, and those events establish as a matter of law that she was given "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Benjamin v. Schuller*, 400 F.Supp.2d 1055, 1065-66 (S.D. Ohio 2005) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893 (1976)).

As the Supreme Court held further, academic evaluations, including those resulting in dismissal, do not lend themselves to formal hearings, which may be "useless or harmful in finding out the truth as to scholarship." *Horowitz*, 435 U.S. at 90 (citation omitted).  As in *Schaefer v. Brookdale Univ. Hosp. and Medical Ctr.*, 859 N.Y.S.2d 899 (N.Y.Sup. 2008), and as Dr. Aronson does not dispute, she was given repeated notice of her deficiencies and an

opportunity to explain or rebut them, <u>before</u> the negative evaluation was issued.  She was presented on October 14, 2008 and on November 24, 2008 with the negative assessments of attending physicians, and she responded by submitting her own objections to the evaluations and by soliciting and submitting input from attending physicians in her defense (from Drs. Dininny and Haas).  In short, she had the opportunity for all the "informal give-and-take" that she wanted.

Dr. Aronson also waived her right to appeal, in satisfaction of 42 U.S.C. § 11112(b).  After consulting with her legal counsel, she dropped her objections to the evaluation decision, and chose the extension option that was offered to her with the explicit proviso that it carried with it no appeal entitlement.  She could have declined that offer and forced UHC to make the decision whether to refuse to graduate her (an appealable decision).  Instead, she chose to accept the extension offer to which she had no contractual or other legal entitlement, but could only choose to accept according to its own terms (which included no appeal of the negative evaluation).  She then conveyed to UHC, on multiple occasions, her acceptance of the negative evaluation.  She informed UHC that she was "sure that Dr. Norcia and others were correct in noting a change in [her] performance," and "that this medication had an effect on [her] performance."  She acknowledged to Dr. Nearman, near the end of January, just before the Program had to submit its July-December 2008 evaluation report to the ABA, that her performance for that period "was not satisfactory."  On February 25, 2009, still without any claim of opposition to negative evaluation, she signed a contract committing the Residency Program to continue her residency status for an additional 6 months.  Only <u>after</u> she had induced the Residency Program to make a contractual commitment to the residency extension did she claim an entitlement to appeal the negative evaluation – a no lose option for her now, since

losing the appeal mean only that she had to continue the residency extension she had already contractually committed to.

The testimony Dr. Aronson is expected to present will only confirm that that she waived any entitlement to an internal grievance procedure.  Dr. Wallace's only testimony pertaining to the appeal issues is that "she chose to go a route that wasn't appealable, so I don't know of anything I can say in May, or whenever you said, about her attempting to have an appeal."  The only relevant testimony of Dr. Norcia will be that Dr. Aronson wanted to have an appeal in December 2008, but was told that the extension offer was not appealable, and then accepted the extension offer.  Contrary to Dr. Aronson's representations in her Summary Judgment response, Dr. Nearman will have no relevant testimony on this issue, other than that abandoned all notion of pursuing an appeal until after she had contractually committed UHC to extend her residency.

Dr. Aronson had no answer, as a matter of law, as to how she could have appeal rights after she signed the residency extension contract on February 25, 2009, without any reservation of her objections to the negative evaluation, and thereby committing UHC to expend the time and resources to extend her residency education beyond the three years of a standard anesthesiology residency.  Dr. Aronson has no argument or case support for her notion that the HCQIA (or even the ACGME) required that she be provided an internal grievance procedure concerning her negative evaluation after she chose to avoid possible disciplinary action by accepting the offer of an extension of her residency.

Under the HCQIA (and the ACGME), Dr. Aronson cannot legally have her cake and eat it too.  She cannot force UHC to conduct a grievance proceeding when she did not assert those grievance rights until she obtained UHC's contractual commitment to the very residency extension she now claims was unwarranted.  She cannot seek an appeal of her adverse

22

evaluation, all the while holding UHC to its contractual commitment to her residency extension while she attempted to clear her record of the negative assessment.

### c.    The Decision to Assign Dr. Aronson to ICU in August

UHC's decision to assign Dr. Aronson to a rotation in the ICU in August 2009 was also not an "adverse professional review action," not only because there was nothing adverse to Dr. Aronson's professional standing in the assignment, but because Dr. Aronson's objections to the assignment led to the assignment being cancelled.  That decision therefore also constitutes a decision for which the notice and procedure requirements of § 11111(a)(3) are not required.

### 4.    Each Challenged Action Was Made in the Reasonable Belief that It Was Warranted

The final inquiry under 42 U.S.C. § 11112(a) is "whether the professional review action was taken in the reasonable belief that the action was warranted by the facts known after a reasonable effort to obtain those facts." *Brader*, 167 F.3d at 843.  This analysis closely tracks the analysis under the first inquiry under the HCQIA. *Id*.  Here, the same undisputed evidence, cited with respect to the first element, also satisfied the fourth element.

Dr. Aronson takes issue with the judgment of most of the anesthesiologists who submitted negative assessments of her, but "a plaintiff's showing 'that [the] doctors reached an incorrect conclusion on a particular medical issue because of a lack of understanding' does not meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality in participating in the peer review process." *Brader*, 167 F.3d at 843.  Dr. Aronson's personal attacks on Dr. Wallace cannot substitute for a showing, which she cannot make, that the facts relied upon by the Residency Program for its actions were "so obviously mistaken or inadequate as to make reliance on them unreasonable." *Mathews*, 87 F.3d at 638.

At trial, Dr. Aronson is expected to rely on nothing more than false representations of the record or irrelevant evidence in an attempt to raise some question about whether there were reasonable grounds for the negative evaluation.    Dr. Aronson will refer to the recommendation Dr. Norcia wrote for her in September 2008, and to her satisfactory feedback for November 2008, when the feedback that led to her unsatisfactory assessment arose from her October 2008 rotation in the ICU. She mis-cites Dr. Norcia's testimony to suggest that he was raising a response time concern for the first time in October, when his testimony was, "It would have been based on the entire residency program, her duration of her residency training.  But most likely I would have made a reference to the most recent period that I worked with her, as well."  Dr. Aronson will cite to Dr. Norcia's recommendation that she be licensed in Florida as a physician, when UHC's concerns pertained to her performance as an anesthesiology specialist.

> **5.    Aronson's Claim of Working Excess Hours Cannot Overcome HCQIA Immunity**

For HCQIA purposes, it does not matter that Dr. Aronson asserted that she worked excess hours.  What matters, for HCQIA (and Ohio Peer Review Statute) purposes, is that because she never raised any issue about extra hours or fatigue <u>at the time of the assessment she now challenges</u>, her hours assertions cannot raise a triable issue of UHC's compliance with the four HCQIA requirements (or of actual malice for Ohio Peer Review Statute Purposes).  Instead, Dr. Aronson has admitted that, at the November 24, 2008 meeting, she believed there were "no explanations available for the alleged slow response times," and she "hypothesized that perhaps she was being affected by the Topamax."  In her November 28, 2008 rebuttal to the negative evaluations of her performance, she made no reference to the supposed fatigue upon which she now places such significance.

6.    **HCQIA Immunity Applies With Full Force To Dr. Aronson's Contractual "Due Process" Challenge To Her July-December 2008 <u>Unsatisfactory Performance Evaluation</u>**

Dr. Aronson contends, falsely, that

> [W]hile the decision to evaluate Dr. Aronson's clinical competence during the last half of 2008 is dubious, the Court need not examine the issue to find a breach of contract … because Dr. Aronson was denied the opportunity to have the Defendant self-review the decision as required by the ACGME, ABA, and the Defendant's own standards.

(Plaintiff's Brief at 19).   Dr. Aronson's Complaint seeks contractual damages arising from UHC's decision to assess her July-December 2008 performance as unsatisfactory without providing an internal grievance procedure.   However, Section 11111(a)(1) of the HCQIA provides that "[i]f immunity applies, neither the professional review body, nor any person who participates with or assists the body with respect to the action, may be liable for damages under any law of the United States or of any State <u>with respect to the action</u>."   Thus, as a matter of law, where the prerequisites to HCQIA immunity are satisfied, HCQIA immunity is a bar to claims for contractual "due process" entitlements that are alleged to extend beyond those required to establish HCQIA immunity.

*Moore v. John Deere Health Plan, Inc*., Case No. 3:07-CV-484, 2010 WL 908924 (E.D.Tenn., March 11, 2010), is part of a long line of cases within the Sixth Circuit and elsewhere that reject Dr. Aronson's position.   There, the plaintiff medical doctor brought breach of contract and other claims against the defendant John Deere Health Plan, Inc., after the defendant Health Plan terminated its provider agreement with Dr. Moore and submitted an adverse action report concerning Dr. Moore to the National Healthcare Integrity and Protection Data Bank. *Id.* at *5.   Dr. Moore's breach of contract claims included the claim that:

> Defendants breached the provider agreement by failing to provide Dr. Moore, CHCCI, and the other physician employees of CHCCI with the due process review rights afforded to them under the provider agreement.

*Id*. at *20.  The Court found that the defendants were entitled to HCQIA immunity, and also to peer review immunity under Tennessee's Peer Review Law, which provides immunity for peer review actions taken (1) in good faith, (2) without malice, and (3) on the basis of facts reasonably known or reasonably believed to exist.  *Id*. at *14-15.  On that basis, the court rejected Dr. Moore's contractual due process and other contractual claims, explaining:

> The Court need not dwell on Dr. Moore's breach of contract claim, which arises from the peer review action in this case. As the Court has found *supra* Part III.A, defendants are immune from claims seeking money damages arising from that peer review action. *See Curtsinger,* 2007 WL 1241294, at *13 ("[T]he HCQIA shields health care entities and individuals from liability for damages for actions performed in the course of monitoring the competence of health care personnel."). And "damages are always the default remedy for breach of contract." *United States v. Winstar Corp.,* 518 U.S. 839, 885, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *see also Riverside Park Realty Co. v. FDIC,* 465 F.Supp. 305, 316 (M.D.Tenn.1978) ("[C]laims arising from ... breach of contract are, of course, of the type that are normally adequately remediable by an award of damages and not the type for which injunctive relief is usually available."). <u>Because Dr. Moore could not recover damages on his breach of contract claim even were he to satisfy all of the elements of that claim, summary judgment on that claim is appropriate as well.</u> (Emphasis added)

Accord, *Meyers v. Columbia/HCA Healthcare Corp.,* 341 F.3d 461, 469-70 (6th Cir.2003) (rejecting an argument that failure to comply with hospital bylaws defeated immunity because "even assuming LMH did violate the bylaws, the notice and procedures provided complied with the HCQIA's statutory 'safe harbor'");  *Bakare v. Pinnacle Health, Inc.,* 469 F. Supp.2d 272, 287, 291 (M.D.Pa.2006) ("The court need not determine whether MEC followed the Bylaws. HCQIA immunity attaches when the reviewing body satisfies the requirements under HCQIA, regardless of its own policies and procedures." The HCQIA grants immunity "from all damages claims which arise out of the peer review process. … Provided that a peer review action as

26

defined by the statute complies with those standards, a failure to comply with hospital bylaws does not defeat a peer reviewer's right to HCQIA immunity from damages.")

**B.** **Under the Ohio State Peer Review Immunity Statute, UHC Will Be Entitled Judgment as a Matter of Law as to Dr. Aronson's State-Law Claims, Because Dr. Aronson Cannot Demonstrate that UHC Acted with Actual Malice**

In addition to the HCQIA, Ohio's Peer Review Immunity Statute provides that "[n]o health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of a peer review committee of the health care entity." O.R.C. § 2305.251(A).  Like the HCQIA, Ohio state law also protects the communication of information:

> No person who provides information . . . without malice and in the reasonable belief that the information is warranted by the facts known to the person shall be subject to suit for civil damages as a result of providing the information.

O.R.C. § 2305.251(D).  For purposes of Ohio law, a "health care entity" includes entities such as UHC that conduct professional credentialing or quality review involving the competence, professional conduct, or quality of care provided by health care providers. *Talwar v. Catholic Healthcare Partners*, 258 Fed. Appx. 800, 809 (6th Cir. 2007) (citing O.R.C. § 2305.25(A)(1)). A "peer review committee" includes a committee that "[c]onducts professional credentialing or quality review activities involving the competence of, professional conduct of, or quality care provided by health care providers." *Id.* (citing O.R.C. § 2305.25(E)(1)(a)).

As shown by her response to UHC's Motion for Summary Judgment, Dr. Aronson does not dispute that the actions at issue in this case are all peer review actions under Ohio's Peer Review Immunity Statute.  To overcome the immunity under O.R.C. § 2305.251(D), "the party seeking relief must present clear and convincing evidence that defendants acted with actual malice." *Talwar*, 258 Fed. Appx. at 809.  "Actual malice" is established only by proof that UHC

27

made the statements "with knowledge they were false or with reckless disregard for whether they were true or false." *Id.*

For the same reasons that establish immunity under the HCQIA, Dr. Aronson cannot establish that UHC took any action or made any statement in connection with its peer review process of her with "actual malice," i.e., "with knowledge they were false or with reckless disregard for whether they were true or false." *Id.*  Her attacks on the motives of Dr. Wallace and others are insufficient to defeat immunity under §2305.25.  *See Talwar*, 258 Fed. Appx. at 808 (affirming summary judgment in favor of hospital under §2305.251, finding that "mere inaccuracies in statements and alleged improper motivations by speakers are insufficient to show actual malice.").  Likewise, in the absence of proof of actual malice, no contractual claim of due process entitlements can be brought. *Id.* (rejecting claims that defendant "temporarily suspended his surgical privileges without following the procedure set forth in the Credentials Manual" despite disputed issues of fact, because "Defendants are insulated from liability on this claim under Ohio's peer review immunity statute …").

### C.  Separate and Apart from the Immunity Provided under the HCQIA and Ohio Law, Dr. Aronson Cannot Establish Any of Her Claims against UHC

#### 1.  Dr. Aronson's Breach of Contract Claim Fails as a Matter of Law

Dr. Aronson claims that UHC violated its contractual commitment "to provide an educational program that at a minimum meets the standards established by the ACGME," by (i) forcing her to work excessive hours in September and October 2008, and (ii) denying her "due process" in the form of an appeal of her unsatisfactory evaluation.

In an academic context, "judicial intervention in any form should be undertaken only with the greatest reluctance." *Doherty v. Southern College of Optometry*, 862 F.2d 570, 576 (6th

28

Cir. 1988) (citing *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985)). As explained in *Doherty*:

> The federal judiciary is ill equipped to evaluate the proper emphasis and content of a school's curriculum. This is the case especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession. This judicial deference to educators in their curriculum decisions is no less applicable in a clinical setting because evaluation in a clinical course "is no less an 'academic' judgment because it involves observation of ... skills and techniques in actual conditions of practice, rather than assigning a grade to ... written answers on an essay question."

*Id.*, at 576-77 (citing *Horowitz*, 435 U.S. at 89-91).

> a. **Dr. Aronson's Breach of Contract Claim as to Her Working Hours (Count I) Fails as a Matter of Law, Because She Failed to Give The Program a Chance to Cure any Breach, and She Can Show No Damages Even Assuming A Breach**

Dr. Aronson cannot recover contractual damages based on her claim that she was assigned hours in excess of ACGME standards.  She admitted in writing, at the time, that her September hours were within ACGME limits.  She now claims her October hours totaled 362, just 9 hours over the limit.  By way of background, in all her Residency contracts, Dr. Aronson committed to "to follow Hospital policies and procedures … "    However, the report form all Residents must submit each month concerning their monthly hours, states: "If you answered **NO** to any of the above questions please contact your Program Director or the Graduate Medical Education office."  Dr. Aronson admittedly failed to comply with this instruction.

Dr. Aronson offers no counter to the legal implication of her omission – that she cannot claim consequential damages (the loss of employment opportunities arising from the negative evaluations arising from the poor October performance supposedly arising from fatigue arising from working excess hours), when she breached her own contractual obligation to contact Dr.

Wallace concerning her hours so that the Residency Program, or raise an issue of fatigue when confronted with her performance issues, so that the Program would have a fair opportunity to address any real hours issues <u>at the time</u>, and to factor any claim of fatigue arising from such additional hours into its assessment of her.

Even now, Dr. Aronson will be able to offer no evidence that fatigue from working the nine (9) excess hours made the slightest contribution her performance issues in October 2008.  In her new Declaration, on this issue, she states only, "6. Because I had no explanations for the allegations of slow response times, nor specific examples I wondered, and hypothesized that perhaps I was being affected by my usage of the prescription medication Topamax."

> **b.  Plaintiff's Claim of Breach of Contract Arising from ACGME "Due Process" Requirements Fails Because the Negative Assessment and Residency Extension Was Not a Disciplinary Action, and Even If It Was a Disciplinary Action She Was Provided All the Process Required, And Then Waived any Appeal Right By Accepting the Extension Offer**

Lastly, as explained above, with regard to Dr. Aronson's claim that UHC breached its contract by extending her residency without any opportunity for appeal, UHC provided Dr. Aronson with the requisite level of "due process" as a matter of law (even assuming, against the evidence, that her negative evaluation was a disciplinary action) and, in any event, she waived an process entitlement by accepting UHC's Residency extension offer.

> **2.    Dr. Aronson's Unjust Enrichment Claim Fails as a Matter of Law <u>Because There is a Written Contract Between Dr. Aronson and UHC</u>**

A claim for unjust enrichment cannot apply when an express contract exists. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989).  Dr. Aronson claims that UHC was unjustly enriched by extending her residency.  However, Dr. Aronson entered into an

express contract with UHC to extend her residency training, so she can have no unjust enrichment claim.

Dr. Aronson claims she can pursue an unjust enrichment claim in circumvention of her residency contract because the contract was procured by fraud or bad faith, but she offers no evidence to raise a triable issue of fraud or of bad faith.  Her failure to specifically plead fraud in her complaint prevents her from alleging fraud at this stage of the litigation.  *See Firstar Bank, N.A. v. Prestige Motors, Inc.*, No. H-04-037, 2005-Ohio-4432, 2005 WL 2049174, at *2 (Ohio App. 6th Dist. Aug. 26, 2005) (upholding dismissal of unjust enrichment claim because plaintiff failed to specifically plead fraud in the complaint).   Dr. Aronson also offers no evidence that the extension contract was procured by fraud.

Finally, Dr. Aronson has presented no evidence that the contract extending her residency was procured by UHC in bad faith.  In *Firstar,* the court noted that bad faith "is not simply bad judgment.  It is not merely negligence.  It imports a dishonest purpose or some moral obliquity. It implies conscious doing of wrong.  It means a breach of a known duty through some motive of interest or ill will.  It partakes of the nature of fraud. * * *. It means with actual intent to mislead or deceive another."  *Id*. (*citing Slater v. Motorists Mut. Ins. Co.* (1962), 174 Ohio St. 148, 151, 187 N.E.2d 45, *overruled, in part, on other grounds by Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397).

Dr. Aronson offers no evidence that the offer of an extension contract, or any of the circumstances leading up to the offer, were the product of bad faith conduct by anyone.

> **3.** **Dr. Aronson's Claim for Interference with Her Maternity Leave Under The FMLA Fails as a Matter of Law, Because Dr. Aronson Suffered No Damages and Because UHC Would Have Taken the <u>Same Actions Regardless of Whether Dr. Aronson Took FMLA Leave</u>**

Dr. Aronson alleges in her Complaint that UHC "interfered with [her] right to maternity leave in violation of 29 U.S. C. § 2615(a)(1)."  To prevail on her FMLA interference claim, Dr. Aronson must prove, *inter alia*, that she was entitled to leave under the FMLA; and that UHC denied her FMLA benefits to which she was entitled. *Edgar,* 443 F.3d at 507. However, the FMLA is not a "strict-liability statute." *Id.*, at 507-08.  To show that an employer's interference has prevented the employee's "meaningful exercise of FMLA rights," a plaintiff must show that the interference resulted in harm. *Id.*, at 508 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). Actions also do not violate the FMLA if the employer has a legitimate basis for engaging in the challenged conduct. *Edgar*, 443 F.3d at 508.

Dr. Aronson makes no claim that she was denied the right to take FMLA leave to the full extent of the FMLA.  Her Complaint is that, because she was forced to take 12 days of leave for the fitness-for-duty examination process, her ability to take advantage of her FMLA leave entitlements could, under ABA rules, require her to make up the lost time.  Dr. Aronson now contends that the EAP leave decision "discouraged" her from taking FMLA leave that she otherwise would have taken, but her only evidence of such discouragement is the fact that her taking FMLA leave had <u>academic</u> implications (i.e., if she took enough FMLA leave she might have to make up the lost academic time under ABA rules).  As a matter of law, the potential consequence of being required <u>academically</u> to make up for FMLA leave days is not a harm under the FMLA and raises no FMLA issues.

Under the FMLA and the regulations applicable at the time, a son or daughter "means a biological, adopted, or foster child, a stepchild, a legal ward, or a child of a person standing in loco parentis." 29 U.S.C. § 2611(12); 29 C.F.R. § 825.122(c).  Dr. Aronson's request for leave in December, 2008 was for the birth of her domestic partner's child, which could be covered by the

32

FMLA only if Dr. Aronson had established, prior to childbirth, a qualifying status under 29 U.S.C. § 2611(12).[3]

Even if Dr. Aronson were entitled to FMLA leave, there is no dispute that the fitness-for-duty leave was paid leave that was not counted as FMLA leave, so that Dr. Aronson was never prevented by UHC from taking leave to the full extent permitted under the FMLA.  Also, she can offer no evidence that there was any connection between the decision to require her to take time off for the fitness-for-duty examination and her FMLA leave request.  She relies entirely on the timing of the EAP referral, which was about a month before her scheduled FMLA leave.  No causal inference can be drawn from that timing, because the EAP referral occurred immediately after Dr. Aronson disclosed her use of Topamax, which she admitted at the time to have an impact on her performance. (Aronson Dep. Exs. V and Z).

### 4. Dr. Aronson's Claim for Interference with Her 2009 Adoption Leave Under the FMLA Also Fails as a Matter of Law

Dr. Aronson alleges that UHC interfered with her FMLA rights by scheduling her for an ICU rotation during August, 2009, after she submitted a request for FMLA leave during the end of August to finalize the adoption of her son.  Here, again, she was never denied a request for FMLA leave, but asserts only that UNC took action (assigning her to an August 2009 ICU rotation) made taking FMLA leave more difficult academically.  In addition, immediately after Dr. Aronson complained about the scheduled rotation, UHC relieved her of the requirement to work the ICU rotation, thereby **accommodating** Dr. Aronson's request for FMLA leave rather than **interfering** with it.

---

[3] UHC recognizes that, on June 22, 2010, the U.S. Department of Labor revised the interpretation of "son or daughter" so as to include individuals who care for the child regardless of legal or biological relationship. *See* U.S. Dept. of Labor Admin. Interpretation No. 2010-3 (copy attached hereto with Appendix 8).  However, the interpretation was not in effect at the time Dr. Aronson requested her leave under the FMLA, nor is the interpretation retroactive.

Dr. Aronson appears to concede now that the only significance of the assignment of her to ICU in August, 2009, as far as her FMLA claims are concerned, is to provide retroactive evidence in support of her claim relating to her December 2008 FMLA leave.  The required inference – that Dr. Wallace's supposed desire to discourage her from taking FMLA leave in August 2009 establishes that he wanted to discourage her use of leave in December 2008 – is purely speculative.

For all the foregoing reasons, UHC anticipates that it will be entitled to judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure.

**(c)** **PROPOSED WITNESS LIST**

The following is a proposed list of witnesses who UHC may call at the trial of this matter, together with a summary of their expected testimony.

1. <u>Plaintiff, Dr. Sarah C. Aronson</u>: Plaintiff is expected to testify regarding the circumstances of her residency with UHC; her employment subsequent to the completion of her residency, and the allegations contained in the Complaint.

2. <u>Dr. Matthew P. Norcia, Vice-Chair of Education, Residency Program Director, UHCMC Department of Anesthesiology and Perioperative Medicine</u>: Dr. Norcia is expected to testify regarding the circumstances of Plaintiff's residency with UHC; and the allegations contained in the Complaint.

3. <u>Dr. David A. Wallace, Vice-Chair of Education, Residency Program Co-Director, UHCMC Department of Anesthesiology and Perioperative Medicine</u>: Dr. Wallace is expected to testify regarding the circumstances of Plaintiff's residency with UHC; and the allegations contained in the Complaint.

4. <u>Dr. Jerry M. Shuck, UHC Director Graduate Medical Education, Designated Institutional Official, Professor of Surgery, Associate Dean for Graduate Medical Education, Case Western Reserve University</u>: Dr. Shuck is expected to testify regarding UHC's applicable residency policies and procedures and his interactions with Plaintiff and with UHC anesthesiology staff and anesthesiology residency management concerning Plaintiff, and the allegations contained in the Complaint.

5. <u>Dr. Howard S. Nearman, Professor and Chair, UHCMC Department of Anesthesiology and Perioperative Medicine</u>: Dr. Nearman is expected to testify

regarding UHC's handling of Plaintiff's performance issues and Plaintiff's conduct as a resident.

6.   <u>Dr. Marin K. Mannix, Co-Chief Resident 2009-2010, UHCMC Department of Anesthesiology and Perioperative Medicine</u>: Dr. Marin is expected to testify regarding the schedule of Plaintiff's duties as a resident during 2009.

7.   <u>Dr. Heather D. McFarland, former UHCMC Co-Chief Resident 2008-2009, Department of Anesthesiology and Perioperative Medicine</u>.  Dr. McFarland is expected to testify concerning Plaintiff's duty hours.

8.   <u>Will Rebello, Manager, UHCMC Graduate Medical Education Office</u>: Mr. Rebello is expected to testify regarding UHC's handling of Plaintiff's leave requests and her time off of work as a resident.

9.   <u>Dr. Patrick M. Pickett, Co-Chief Resident 2010-2011, UHCMC Department of Anesthesiology and Perioperative Medicine</u>: Dr. Pickett is expected to testify regarding Plaintiff's performance as a resident.

10.  <u>David Zagorski, Certified Anesthesiology Assistant, UHCMC Department of Anesthesiology and Perioperative Medicine</u>: Mr. Zagorski is expected to testify regarding Plaintiff's performance as a resident.

11.  <u>Christine Adamovich, Residency Education Coordinator, UHCMC Department of Anesthesiology and Perioperative Medicine.</u>  Ms. Adamovich is expected to testify regarding the records relating to Plaintiff's residency.

12.  <u>Dr. Harold E. Johnstone, ACGME</u>: Dr. Johnstone is expected to testify as to the position of the ACGME concerning the application of its "due process" procedures to the negative resident evaluation of Dr. Aronson – unless we use Pat Surdyk, Mary Joyce Johnston, or Billy Hart, or Marsha A. Miller, Associate Vice President.- Office of Resident Services, ACGME, 515 N. State Street, Chicago, IL 60654, mmiller@acgme.org

13.  <u>Marsha A. Miller, Accreditation Council for Graduate Medical Education ("ACGME")</u>: Ms. Miller is expected to testify regarding UHC's compliance with ACGME standards.

14.  <u>Dr. Lois Bready, Professor of Anesthesiology, University of Texas Health Science Center, San Antonio, TX:</u> Dr. Bready is expected to testify regarding UHC's compliance with ACGME standards.

The following may be called as rebuttal witnesses, depending on the testimony of Dr. Aronson:

15.     Dr. Michael J. Longfellow. Sheridan Healthcorp, Inc. 1613 NW 136th Ave Ste 200, Sunrise, FL.   Dr. Longfellow is expected to testify regarding Plaintiff's communications concerning the circumstances of her residency and the extension of her residency at UHC.

16.     Thomas A. Boyd, Psy.D.: Dr. Boyd is expected to testify regarding Plaintiff's "fitness for duty" testing in December 2008.

17.     Dr. George W. Williams, UHCMC Department of Anesthesiology and Perioperative Medicine faculty, previously UHCMC Co-Chief Resident 2008-2009: Dr. Williams is expected to testify regarding Plaintiff's performance as a resident.

18.     Dr. Mark H. Zahniser, UHCMC Department of Anesthesiology and Perioperative Medicine Faculty: Dr. Zahniser is expected to testify regarding Plaintiff's performance as a resident.

19.     Dr. Gerald H. Jonsyn, UHCMC Department of Anesthesiology and Perioperative Medicine Faculty: Dr. Jonsyn is expected to testify regarding Plaintiff's performance as a resident.

20.     Dr. Lora B. Levin, UHCMC Department of Anesthesiology and Perioperative Medicine Faculty: Dr. Levin is expected to testify regarding Plaintiff's performance as a resident.

21.     Dr. Salim M. Hayek, UHCMC Department of Anesthesiology and Perioperative Medicine Faculty and Pain Medicine Fellowship Director: Dr. Hayek is expected to testify regarding Plaintiff's performance as a resident.

22.     Dr. Peter M. Adamek, UH Bedford Medical Center Medical Director: Dr. Adamek is expected to testify regarding Plaintiff's performance as a resident.

23.     Dr. Tracy M. Bartone, UHCMC Department of Anesthesiology and Perioperative Medicine Faculty: Dr. Bartone is expected to testify regarding Plaintiff's performance as a resident.

24.     Dr. Adam J, Haas, UHCMC Department of Anesthesiology and Perioperative Medicine Faculty: Dr. Haas may be contacted only through the undersigned counsel.   Dr. Haas is likely to have discoverable information concerning Plaintiff's performance as a resident.

25.     Dr. David R. Dininny, UHCMC Department of Anesthesiology and Perioperative Medicine Faculty: Dr. Dininny is expected to testify regarding Plaintiff's performance as a resident.

26.     Dr. James Rowbottom, UHCMC Department of Anesthesiology and Perioperative Medicine Faculty: Dr. Rowbottom is expected to testify regarding Plaintiff's performance as a resident.

UHC reserves the right to supplement this list in accordance with the evidence presented at trial, to call any individual listed on Plaintiff's Witness List, and to call any witness whose testimony may be needed for impeachment or rebuttal purposes or whose testimony could not reasonably be anticipated at this time.

**(d)     INDEX OF PROPOSED EXHIBITS**

1.     ACGME Institutional Requirements

2.     ACGME Common Program Requirements

3.     ACGME Section VI. D.: Resident Duty Hours in the Learning and Working Environment

4.     The American Board of Anesthesiology Inc.: Defining the First Step Toward Board Certification and Maintenance of Certification in Anesthesiology

5.     The American Board of Anesthesiology Inc.: Booklet of Information, Dated February 2009

6.     University Hospitals' HR-9 Substance Abuse Policy, dated September 2008

8.     University Hospitals Case Medical Center Residents' and Fellows' Manual, dated November 1, 2006

9.     Deposition Transcript of Sarah Aronson, M.D., dated December 13, 2010

10.    Resident Comments, All Evaluations for Dr. Aronson, dated March 1, 2006-June 3, 2009

11.    Summary of Competencies for Dr. Aronson, dated December 27, 2007

12.    Summary Evaluations for Dr. Aronson, dated May-August, 2008

a.     Resident Comments, All Evaluations for Dr. Aronson, dated December 27, 2007-October 13, 2008

13.    Summary of Competencies for Dr. Aronson, dated October 13, 2008

14.    Aronson Evaluation by Norcia for October 6-10, 2008, dated December 26, 2008

a.      Dr. Aronson Evaluation by Dr. Norcia for October 6-10, 2008, dated December 26, 2008

15.     Email to Dr. Wallace from EarlyWarning@MyEvaluations.com regarding Dr. Aronson Evaluation by Dr. Norcia for October 6-10, 2008, dated December 26, 2008

16.     Email to Dr. Wallace from EarlyWarning@MyEvaluations.com regarding Dr. Aronson Evaluation by Dr. Jonsyn for October 13-24, 2008, dated January 14, 2009

17.     Email to Dr. Wallace from EarlyWarning@MyEvaluations.com regarding Dr. Aronson Evaluation by Dr. Jonsyn for October 27-31, 2008, dated January 14, 2009

18.     Email to Dr. Wallace from EarlyWarning@MyEvaluations.com regarding Dr. Aronson Evaluation by Dr. Zahniser for January 13, 2009, dated January 14, 2009

19.     Email to Dr. Wallace from Dr. Norcia forwarding MyEvaluations.com regarding Dr. Aronson Evaluation by Dr. Rubin for April 2, 2009, dated May 5, 2009

20.     Email to Dr. Wallace from Dr. Norcia forwarding MyEvaluations.com regarding Dr. Aronson Evaluation by Dr. Rubin for April 2, 2009, dated May 5, 2009

21.     Negative Report regarding Dr. Aronson for May 6, 2009

22.     Assessment by Dr. Cho regarding Dr. Aronson for May 6-7, 2009, dated May 8, 2009

23.     Assessment by Dr. Cho regarding Dr. Aronson for May 6-7, 2009, dated May 9, 2009, including Dr. Aronson note to Dr. Cho dated June 4, 2009

24.     Email to Dr. Wallace from EarlyWarning@MyEvaluations.com regarding Dr. Aronson Evaluation by Dr. Hacker for May 21-22, 2009, dated May 28, 2009

25.     Summary of Competencies for Dr. Aronson, dated June 4, 2009

26.     Evaluation by Dr. Dininny regarding Dr. Aronson, dated June 12, 2009

27.     Evaluation by Dr. Grass regarding Dr. Aronson, dated February 18, 2009

28.     Evaluation by Dr. Grass regarding Dr. Aronson, dated February 23, 2009

29.     Evaluation by Dr. Ro regarding Dr. Aronson, dated May 19, 2009

30.     Evaluation by Dr. Dininny regarding Dr. Aronson, dated June 12, 2009

31.     Resident Comments, All Evaluations for Dr. Aronson, for October 1-31, 2008, dated August 9, 2010

32.   Resident Fellowship Contract for Dr. Aronson, for March 1, 2006-February 28, 2007, dated February 6, 2006

33.   Resident Fellowship Contract for Dr. Aronson, for March 1, 2007-February 28, 2008, dated February 20, 2007

34.   Resident Fellowship Contract for Dr. Aronson, for March 1, 2008-February 28, 2008, dated February 15, 2008

35.   Resident Fellowship Contract for Dr. Aronson, for March 1, 2009-August 31, 2009, dated February 6, 2009

36.   Letter to Credentials Committee from Drs. Nearman, Wallace and Norcia regarding Dr. Aronson, dated October 24, 2006

37.   Recommendation to Sheridan Healthcare by Dr. Norcia regarding Dr. Aronson, dated September 2, 2008

38.   Email Stream to Dr. Aronson, et al. from Dr. McFarland regarding September, 2008 ICU scheduling and trying to stay below duty hours, dated September 7, 2008

39.   Dr. Aronson Response to Resident Duty Hours Tracking Survey for September 2008

40.   Email to Drs. Norcia and Wallace from Dr. Aronson, thanking for meeting and referring to Mac house issue, dated October 14, 2008

41.   Resident SICU CTICU Calendar for October, 2008

42.   Dr. Aronson Response to Resident Duty Hours Tracking Survey for October, 2008

43.   Memo to Dr. Aronson from Drs. Norcia and Wallace regarding negative evaluations and possible need to extend residency 6 months, dated November 24, 2008

44.   Dr. Aronson Employee Assistance Program Referral, dated November 25, 2008

45.   Email to Fulton-Royer from Dr. Wallace regarding reasons for EAP referral, dated November 25, 2008

46.   Email stream between Fulton-Royer and Dr. Aronson regarding follow-up in setting up FFD, dated November 25-26, 2008

47.   Email to Dr. Aronson from Herself, attaching her monthly schedule over her residency, dated November 27, 2008

        a.      Dr. Aronson Rotation Schedule, dated November 27, 2008

48.   Letter from Dr. Aronson, rebuttal to evaluations, dated November 28, 2008

49.     Email to Dr. Aronson from Herself, dated November 30, 2008

50.     Email stream between Dr. Dininny and Dr. Aronson, dated December 1, 2008

51.     Dr. Aronson Response to performance review, dated December 4, 2008

52.     Assessment by Dr. Haas regarding Dr. Aronson, dated December 9, 2008

53.     Email stream between Drs. Aronson, Rebello, Norcia and Wallace, dated December 12, 2008

54.     Email stream between Drs. Aronson and Rebello, dated December 12, 2008

55.     Dr. Aronson Memo of Complaints, dated December 14, 2008

56.     Email stream between Drs. Aronson and Norcia, dated December 15, 2008

57.     Email stream between Drs. Aronson and Norcia, dated December 15, 2008

58.     Email to Dr. Rebello from Dr. Aronson, dated December 16, 2008

59.     Memo to Dr. Wallace from Dr. Bartone, dated December 17, 2008

60.     Email stream between Drs. Rebello, Norcia and Wallace, dated December 18, 2008

61.     Email to Drs. Norcia and Wallace from Dr. Aronson, dated December 23, 2008

62.     Letter to Dr. Shuck from Dr. Aronson, dated December 23, 2008

63.     Email Stream between Drs. Aronson and Rebello, dated December 23, 2008

64.     Dr. Aronson Schedule for December, 2008

65.     Draft Email to Dr. Nearman, dated January 6, 2009 (handwritten date)

66.     Email stream between Drs. Aronson and Shuck, dated January 6, 2009

67.     Letter from Dr. Aronson, dated January 7, 2009

68.     Letter to Dr. Aronson from Drs. Norcia and Wallace, dated January 7, 2009

69.     Email to Dr. Wallace from Dr. Aronson, dated January 12, 2009

70.     Letter to Dr. Longfellow from Dr. Aronson, dated January 12, 2009

71.     Email stream between Drs. Aronson and Norcia, dated January 12, 2009

72.     Letter to Dr. Longfellow from Dr. Aronson, dated January 15, 2009

73.     Letter of Recommendation from Dr. Norcia, dated January 16, 2009

40

74.    Email stream between Drs. Aronson and Nearman, dated January 27, 2009

75.    ABA Clinical Competence Report, dated January 30, 2009

76.    Email to Dr. Wallace from Dr. Aronson, dated January 31, 2009

77.    Memo from Drs. Norcia and Wallace, dated February 4, 2009

79.    Email to Drs. Adamovich and Wallace from Dr. Aronson, dated February 7, 2009

80.    Email to Drs. Norcia and Wallace from Dr. Aronson, dated February 9, 2009

81.    Email stream between Drs. Aronson and Forrest, dated February 17, 2009

82.    Letter to Dr. Norcia, dated February 19, 2009

83.    Email to Drs. Norcia, Wallace and Adamovich from Dr. Aronson, dated February 24, 2009

84.    Email stream between Drs. Aronson, Norcia, Wallace and Adamovich, REVISED SCHED, dated February 27, 2009

85.    Letter to Ms. Miller at ACGME from Dr. Aronson, dated February 28, 2009

86.    Email Stream between Drs. Aronson and Shuck, dated March 2, 2009

87.    Email stream between Drs. Aronson and Wallace, REVISED SCHED, dated March 3, 2009

88.    Email to Dr. Shuck from Dr. Aronson, dated March 7, 2009

89.    Email to Dr. Shuck from Dr. Aronson, dated March 10, 2009

90.    Email stream between Drs. Aronson and Shuck, dated March 13, 2009

91.    Email Stream between Drs. Aronson and Shuck, dated March 13, 2009

92.    Email Stream between Drs. Aronson and Shuck, dated March 13, 2009

93.    Email to Dr. Nearman from Dr. Aronson, dated March 14, 2009

94.    Email to Dr. Aronson from Dr. Wallace, dated March 14, 2009

95.    American Board of Anesthesiology Evaluation Letter, dated March 24, 2009

96.    Email stream between Drs. Aronson and Nearman, dated March 25, 2009

97.    E-mail to Dr. Shuck from Dr. Aronson, dated April 10, 2009

98.   Letter to Dr. Vasiliou from Dr. Aronson, dated April 10, 2009

99.   Negative Report regarding Dr. Aronson for May 1, 2009

100.  Negative Report regarding Dr. Aronson for May 6, 2009

101.  Email stream between Drs. Cho and Wallace, dated May 8, 2009

102.  Off-cycle note, Attachment to Email to Dr. Aronson from pdrp@uhhs.com, dated May 9, 2009

103.  Email stream between Drs. Aronson and Adamovich, dated May 21, 2009

104.  Negative Report regarding Dr. Aronson for May 22, 2009

105.  Email stream between Drs. Aronson, Adamovich, Wallace and Norcia, dated May 27, 2009

106.  Email to Dr. Wallace from EarlyWarning@MyEvaluations.com, regarding Dr. Aronson evaluation by Dr. Hacker for May 21-22, 2008, dated May 28, 2009

107.  Draft Email from Dr. Aronson, dated June 4, 2009

108.  Letter to Dr. Shuck from Dr. Aronson, dated June 4, 2009

109.  Email stream between Drs. Shuck and Nearman, dated June 8, 2009

110.  MyEvaluations.com Assessment of Dr. Aronson by Dr. Dinniny, dated June 15, 2009

111.  Memo from Dr. Aronson, regarding June 16, 2009 case

112.  Email to Dr. Wallace from Dr. Sweetman, dated June 17, 2009

113.  E-mail to Dr. Shuck from Dr. Aronson, dated June 20, 2009

114.  Email to Drs. Wallace and Norcia from Dr. Patrzyk, dated June 25, 2009

115.  Letter to ACGME from Drs. Norcia and Shuck, dated June 29, 2009

116.  Letter to Dr. Aronson, dated June 29, 2009

117.  Email to Dr. Norcia from Dr. Aronson, dated July 9, 2009

118.  Email stream between Drs. Aronson and Mannix, dated July 10, 2009

119.  Email stream between Drs. Patrzyk, Norcia and Wallace, dated July 10, 2009

120.  Letter to Dr. Shuck from Dr. Aronson, dated July 13, 2009

121.    Letter to Dr. Shuck from Dr. Aronson, with notes, dated July 13, 2009

122.    Email Stream between Drs. Aronson and Norcia, dated July 15, 2009

123.    Email to Dr. Norcia from Dr. Aronson, dated July 21, 2009

124.    Peninsula Regional Medical Center Authorization and Unconditional Release, dated July 27, 2009

125.    Verification by Norcia of Postgraduate Medical Education, dated July 29, 2009

UHC reserves the right to supplement this list in accordance with the evidence presented

at trial.

**(e)**    **EVIDENTIARY ISSUES LIKELY TO ARISE AT TRIAL**

1.    Dr. Aronson's handwritten calendars for September and October

2.    Dr. Aronson's anticipated testimony as to what she was told about results of EAP.

3.    Maintaining confidentiality of patients' medical records per HIPAA

**(f)**    **ESTIMATE OF LENGTH OF TRIAL**

UHC estimates that the trial of this matter will last three (3) to (4) days.

Respectfully submitted,

*/s/Barton A. Bixenstine*
Barton A. Bixenstine (0034130)
Daniel L. Messeloff (0078900)
Ogletree, Deakins, Nash, Smoak, & Stewart, P.C.
4130 Key Tower
Cleveland, OH  44114
Ph:  216.241.6100
Fax:  216.357.4733
Email:  Bart.Bixenstine@OgletreeDeakins.com
          Daniel.Messeloff@OgletreeDeakins.com

*Attorneys for Defendant*
*University Hospitals of Cleveland, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2011, a copy of the foregoing *Defendant University Hospitals of Cleveland, Inc.'s Trial Brief* was filed electronically with the Court using the CM/ECF system.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/Barton A. Bixenstine*
Attorney for Defendant
University Hospitals of Cleveland, Inc.

9602010.1 (OGLETREE)

44