## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Sarah Aronson, M.D. | ) | CASE NO. 1:10-CV-00372 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | **PLAINTIFF'S TRIAL BRIEF** |
| | ) | |
| University Hospitals of Cleveland, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

**I.**　　**Dr. Aronson Successfully Begins Her Residency Training with Defendant**

Already board certified as a psychiatrist and as a family medicine physician, Plaintiff

Sarah Aronson began training in 2006 to become a board certified anesthesiologist.  She entered

into a contract with Defendant UHC for the training. Under the contract, UHC agreed to employ

her as a resident physician and provide her with training that would meet the standards of the

Accreditation Council of Graduate Medicine "ACGME". Among the ACGME standards that

UHC agreed to provide Dr. Aronson were a promise to limit her work hours and an opportunity

to appeal adverse decisions by her Resident Program.

To become certified by the American Board of Anesthesiology, Dr. Aronson had to

complete 36 months of clinical anesthesia training in addition the one year of base training that

she already had completed.  The ABA requires that for each six-months of training, she had to receive a satisfactory evaluation by the Resident Program.  UHC had to submit the evaluations to the ABA in January and July of each year.  In addition to the six month periodic evaluations, "In Training Examinations" were given annually to determine whether Dr. Aronson had knowledge that would likely be sufficient to pass the Board examinations that are prerequisites to certification.

In March 2006, Dr. Aronson began her anesthesiology residency training.  Her anticipated graduation date was February 28, 2009.  Until October 2008, all of the feedback Dr. Aronson received about her progress indicated that she was on pace to graduate on time.  Through June 2008, UHC evaluated her performance as satisfactory for each reporting period.  Each year of her residency, Dr. Aronson's test scores on the In Training Examination were always higher than the level that indicated she would likely pass her board certification exam.  In July 2008, she scored a 33 on the exam, and a 32 score or higher indicated likely success on the board examination.

On September 2, 2008, the Residency Program Director, Dr. Mathew Norcia provided a job recommendation for Dr. Aronson.  She was applying for an anesthesiologist position that was scheduled to begin on March 1, 2009.  The start date correlated to the date on which Dr. Aronson anticipated completing her residency.  Dr. Norcia provided a favorable recommendation.  Dr. Norcia held the opinion that based on his close observation of Dr. Aronson's work and a composite evaluation provided by her supervisors, Dr. Aronson was qualified and competent to be an anesthesiologist, and he held that opinion without reservation.

II.     **Defendant Informs Dr. Aronson That She Has a Potential Problem Based On Reports Submitted During a Period For Which Her Performance Was Satisfactory.**

In September 2008, Dr. Aronson began the first of two consecutive month rotations in the Surgical Intensive Care Unit. Under ACGME standards, UHC had to give Dr. Aronson 1 day in 7 free from all educational and clinical responsibilities. But from September 2 through 20, Dr. Aronson only had one day off – September 6. The ACGME standards also required that UHC limit Dr. Aronson's work in the rotation to no more than 80 hours per week averaged over a four week period. In October, however, she worked at least 362 hours over the four week period of the rotation.

The ACGME also has standards for the frequency that call assignments can be made to a resident. A typical call assignment lasts at least 24 hours and typically is approximately 28 hours long. During the call assignment, the resident remains in the hospital and available to perform services as required. Although not required to schedule call assignments less frequently than permitted by the ACGME, UHC nevertheless tried to do so. Its typical practice was to not give more than 4 call assignments per month to its residents in the SICU rotation.

Dr. Aronson was scheduled to be on call during the months of August, September, and October 2008. In August, her call assignments included the 29th and 31st of the Month. Then she began her stretch of working 18 of 19 days from September 2 through 20. In October, she was assigned 9 call duties. Three of Dr. Aronson's October call assignments were in the first five days of the month. From September 29 through October 5, Dr. Aronson worked 108 hours.

Her heavy workload continued through the first half of October. On October 14, Dr. Aronson was finishing her fifth call assignment that month.  After having worked a 28 hour shift, she was called into a meeting with Dr. Norcia and the Associate Program Director, Dr. David Wallace.  For the first time that Dr. Aronson could recall, they informed her that they were concerned that she was showing slow response times.  Indeed, Dr. Norcia's negative evaluation arose from his working with Dr. Aronson during the week of October 6-10, 2008.  Her response time was the primary concern raised at the meeting.  This was the first time in the reporting period that the issue was raised with Dr. Aronson.

Dr. Wallace had not supervised Dr. Aronson while she was on the SICU rotations in September or October.  At the October 14 meeting, he presented to Dr. Aronson documents reflecting negative evaluations as reported by other attending physicians supervising her.  But all of the negative evaluations were for Dr. Aronson's work before May 2008 and during periods for which her performance was ultimately rated by the Residency Program as satisfactory. During the meeting, Dr. Aronson asked Drs. Wallace and Norcia for specific examples of her performance during the reporting period that gave rise to their concerns, but neither Dr. Norcia nor Dr. Wallace could provide any.

Drs. Aronson, Norcia, and Wallace met again on November 24 to discuss her performance.  Dr. Norcia's opinion of Dr. Aronson's work had changed between September 2 and October 14.  But he could not recall anything specific about her performance from October 14 to November 24 that would cause his opinion to change one way or the other. As for Dr. Wallace, there was nothing specific about Dr. Aronson's performance between October 14 and

November 24 that he could recall.  Nevertheless, they again raised concerns with Dr. Aronson

that she was slow to respond to situations during her practice.  At no time during the meeting did

they acknowledge that the faculty evaluations of Dr. Aronson for November were satisfactory;

yet that was the case.

### III.    Dr. Wallace Removes Dr. Aronson From Clinical Service for 12 Days to Complete a Fitness For Duty Examination That Proved Negative For Any Impairment.

Drs. Norcia and Wallace asked Dr. Aronson whether she was taking any medications.

She explained that she was taking Topamax.  She had previously made the disclosure when she

began her residency training in 2006 and annually thereafter before she entered into each

contract.  Neither Dr. Aronson nor anyone at UHC had ever expressed any concern about the

medicine adversely affecting her performance. Now, however, with no explanations available for

the alleged slow response times, Dr. Aronson hypothesized that perhaps she was being affected

by the Topamax.  Until Dr. Aronson made the disclosure at the November 24 meeting, neither

Dr. Norcia nor Dr. Wallace had considered substance abuse as a problem for Dr. Aronson. But

now both claimed they became concerned about a potential problem concerning her impaired

functioning when she told them about her prescription.

The ABA permits no more than 60 days of absence from training during the 36 month

schedule. So Dr. Aronson was carefully monitoring her time away.  As December 2008 began,

she had 18 days of absence available to her.  She was expecting her partner to give birth to a

child that they would adopt, and Dr. Aronson knew this would require time away.  She had made

5

arrangements months in advance to take time off at the end of December 2008 for the child's birth.

During the November 24 meeting, Dr. Aronson suggested that she could be monitored to determine whether the Topamax was having any adverse affects on her.  She never contemplated that monitoring her would mean removing her from duty.  She believed her days away from training were too important to suggest taking additional days off for monitoring her based on using a prescription medication she had been taking for years.  But Dr. Wallace seized the opportunity, and on the following day he referred her to the Employee Assistance Program for a fitness for duty evaluation that required removing Dr. Aronson from service.

The testing was completed on December 4th.  Five days later, Dr. Aronson met with the evaluator who explained that the results were negative, Dr. Aronson had no discernible impairment, and she was fit for duty.  Nevertheless, neither Dr. Norcia nor Dr. Wallace approved of her return to work until December 15.  By then, she had lost 12 of the 18 days she had saved for her maternity leave.

## IV.   Defendant Requires Dr. Aronson To Extend Her Training And Gives Her No Opportunity To Appeal.

By the time the Residency Program approved Dr. Aronson's return to work, she only had three days scheduled to work in December before she took her scheduled maternity leave. Despite Dr. Aronson's working only three more days after the November 24 meeting, the Clinical Competence Committee comprised of Drs. Norcia, Wallace and Department Chair, Dr. Howard Nearman failed her for the July through December reporting period.

The failure was reported to both the ABA and Dr. Aronson. She received a letter signed by Drs. Norcia and Wallace and dated January 7, 2009. The Residency Program submitted its report to the ABA dated January 30, 2009. The report was approved by the UHC Program Director at 4:31:19 p.m. and the Clinical Competence Committee Chair at 4:32:37 p.m. Under ABA Requirements, neither the Program Director (Dr. Norcia) nor the Department Chair (Dr. Nearman) was permitted to Chair the Clinical Competence Committee. The ABA Booklet of Information that is incorporated into Dr. Aronson's contract provides: **"The Program Director or the Department Chair must not chair the clinical competence committee."**

To comply with the ABA requirement, only Dr. Wallace could have appropriately served as Chair of the Clinical Competence Committee. His objectivity regarding Dr. Aronson, however, would disqualify him from evaluating her. Dr. Jerry Shuck was the Director of Graduate Medical Education for UHC. Six months later, in June 2009 he decided that Dr. Wallace should no longer "be a player" regarding Dr. Aronson because Dr. Wallace lacked sufficient objectivity. The Department Chair, Dr. Nearman will testify to the same effect regarding Dr. Wallace's lack of objectivity in evaluating Dr. Aronson's performance.

Another member of the Committee that caused Dr. Aronson's training to be extended provided conflicting statements about her performance. Two weeks before approving the unsatisfactory report to the ABA, the Program Director, Dr. Norcia provided another letter of recommendation for Dr. Aronson to the Florida State Medical Board. He wrote:

> During her residency she has had no issues of unprofessionalism or misconduct. She has not been suspended, placed on probation or been named in any actions legal or otherwise.

7

The consensus of the department's Education Committee supports her licensure in your state.

In contrast, he wrote to Dr. Aronson that the report to the ABA indicated that she had been evaluated unsatisfactorily in three areas.  One of them was:

> Under the category of Professionalism, you have failed to carry out your professional responsibility of notifying the Residency Program Directors that you were taking a prescribed medication that could impair your judgment and/or job performance, as required by hospital policy.[1]

He approved the same language in the report to the ABA.

Dr. Aronson tried to appeal the adverse evaluation and decision to extend her training.  Her Department Chair, Dr. Nearman will testify that he told her she had that right: "The conversation was about, you have a right to appeal and you have a right to an objective analysis of it and you can go ahead and do that." The ABA likewise provides that: "Residents who wish to appeal an Evaluation of Clinical Competence, and applicants who wish to appeal final recommendations from the Program Director or Department Chair, must do so through the reporting institution's grievance and due process procedures."  Dr. Norcia acknowledged that the unsatisfactory evaluation given to Dr. Aronson was an evaluation of clinical competence.

By ACGME terms, UHC is a "Sponsoring Institution."  Like the ABA standards, The ACGME standards provide:

> The Sponsoring Institution must provide residents with fair, reasonable, and readily available written institutional policies and procedures for grievances and due process.  These policies and procedures must minimize conflict of interest by

---

[1] The other two areas for which she was rated unsatisfactory concerned her ability "to react to stressful situations in an appropriate manner" and her ability to "recognize and respond appropriately to significant changes in the anesthetic course."

8

adjudicating parties in addressing: Academic or other disciplinary action taken
against residents that could result in dismissal, non-renewal of a resident's
agreement, non-promotion of a resident to the next level of training, or other
actions that could significantly threaten a resident's intended career[.]

Dr. Shuck, UHC's Director of Graduate Medical Education, will testify that as a resident

satisfactorily completes one six month training period, she moves to another training level.

Furthermore, Dr. Norcia is expected to admit that the decision to extend Dr. Aronson's training

is likely to have a negative impact on her record.  Indeed, testimony by Dr. Aronson, Dr. Mike

Longfellow, Carey Weiss, and Mike Simon will confirm that the negative evaluation has since

caused Dr. Aronson to lose one job and at least three job opportunities.

Nevertheless, UHC took the position that Dr. Aronson was not entitled to appeal the

decision.  Dr. Shuck testified that Dr. Aronson had been placed in remediation, and because she

was in remediation she had no right to an appeal.  In the context of determining what remediation

is for the purposes of identifying appealable and non-appealable issues, the term remediation is

defined in UH's Residents' and Fellows' Manual.  Contrary to Dr. Shuck's deposition testimony,

Dr. Wallace is expected to testify that in the context of the Manual's definition of remediation

"This is not what is from this letter [informing Dr. Aronson about her unsatisfactory evaluation

and extended training]." Dr. Shuck will admit that Dr. Aronson's contract also incorporated the

terms of UH's Residents and Fellows' Manual.

As set forth by the Defendant's policies, remediation is "an opportunity for the resident to

correct academic deficiencies and to develop and demonstrate appropriate levels of proficiency

for patient care and advancement in the program."  As Dr. Wallace will point out, the letter to

Dr. Aronson did not address academic deficiencies.  The Defendant requires a written remediation plan when a resident is placed into remediation.   But Dr. Aronson will testify that no written remediation plan was ever provided to her.

The Manual sets forth the requirements for the remediation plan document:  "The Resident's deficiencies will be identified, a remedial program will be established, and a frame for completion of the remedial program will be discussed, documented, and signed by the Resident." Dr. Shuck is expected to testify that he did not recall seeing such a document for Dr. Aronson. He also wrote in June 2009 that her file did not contain "any disciplinary actions or letters she reviewed supporting poor performance."

Despite having testified that remediation was not what was from the January 7 letter to Dr. Aronson, Dr. Wallace may claim that a remediation plan document was delivered to Dr. Aronson on February 4, 2009.  But if he testifies consistent with his deposition, he will admit that the document says nothing about feedback on Dr. Aronson's performance since being placed into remediation; the document only indicates that, to improve her performance and demonstrate how she can perform, she should seek feedback; and "remediation" is never mentioned in the document.  He added that the document was not a documentation of the meeting held to discuss her remediation.

In any event, the January 7 letter made clear that UHC had decided to extend Dr. Aronson's training beyond her anticipated February 2009 graduation: "you will be required to remediate for an additional six month period in accordance with the American Board of Anesthesiology guidelines."  The ABA guidelines are: "To receive credit from the ABA for a

period of clinical anesthesia training that is not satisfactory, the resident must complete an

additional six months of uninterrupted clinical anesthesia training in the same program with

receipt of a satisfactory Certificate of Clinical Competence." Dr. Norcia admitted that in

accordance with the ABA guidelines, the six month reporting period for which Dr. Aronson had

to show satisfactory performance began on January 1, 2009.

**V.    A "Way Too Emotionally Involved" Dr. Wallace Tries to Fail Dr. Aronson Again.**

As the 2009 reporting period entered its final month, Dr. Wallace was prepared to give

Dr. Aronson another unsatisfactory rating.  On June 4, he met with Drs. Norcia and Aronson and

informed Dr. Aronson of his opinion.  But now, Dr. Wallace's criticisms were based on different

issues than those he cited as reasons for rating her unsatisfactory in 2008.

Late that night after the meeting, Dr. Aronson responded by e-mail to Drs. Norcia,

Wallace, Shuck, and Emily Vasiliou of the ACGME.  Dr. Aronson noted that the meeting came

immediately after UHC got notice of her complaint to the ACGME and that since February, Drs.

Norcia and Wallace had otherwise failed to provide her with monthly reviews to assist her with

completing the program.  She noted other failures such as the lack of any advance notice given to

her regarding alleged unsatisfactory performance even though such notice was required under the

Residents' and Fellows' Manual and ACGME standards.  She further requested that an objective

third party review her performance.

Dr. Shuck forwarded the e-mail to Dr. Nearman and asked whether Dr. Aronson's e-mail

was accurate.  Dr. Nearman suggested that she may have been accurate.  He also added: "Dave

[Wallace] is way too emotionally involved in this now to see any view other than his own."

Then Dr. Shuck responded on June 8th:

> This becomes very complicated because: 1) The Board has a recommendation of a six month extension, 2) the clear negative evaluations have come after the decision for extension, 3) any negatives before this were not acted upon, 4) the prior negatives were quite mixed and did not rise to the level of a dismissal, 5) each year non-renewal was not utilized if she were so bad, 6) feedback meeting were sporatic [sic] before and after the decision, 7) nowhere in her file were any disciplinary actions or letters she reviewed supporting poor performance, 8) at the end of three and half years you decide she can't finish. This is not a situation you want to be in.

One week after Dr. Shuck's e-mail, Dr. Aronson asked to meet with him. They met the next day, and at that June 16 meeting, Dr. Shuck informed Dr. Aronson that Dr. Wallace would "no longer be a player." For the reporting period ending June 30, 2009, Dr. Aronson received a satisfactory evaluation. Then she had 36 months of satisfactory evaluations.

## VI.    Dr. Aronson Fights Against The Hostility Until She Graduates.

On June 25, Drs. Norcia and Wallace received notice that Dr. Aronson requested time off to attend the adoption hearing that she had previously anticipated. It was scheduled for July 8. Two days after the scheduled leave, Dr. Aronson was assigned to an ICU rotation for the last two weeks of August. The ICU rotation was one of the most difficult rotations. Indeed, residents were not permitted to take vacation or meeting time during the ICU rotation because of the hours and staffing required. In contrast, placing a resident on a flexible float schedule was the usual assignment at the end of a graduating resident's program.

Three days after she learned of the ICU rotation assignment, Dr. Aronson sent a memorandum to Dr. Shuck. She outlined the reasons why she believed that Drs. Norcia and

Wallace were using the scheduling assignments to retaliate against her and interfering with her

FMLA leave rights.  The day after she sent the e-mail to Dr. Shuck, she met with Dr. Norcia to

discuss the scheduling issues she raised, and she was taken off the ICU rotation.

On August 27, 2009, UHC informed Dr. Aronson that effective August 31, 2009, she

graduated from its anesthesiology residency program.

## VII.    <u>Dr. Aronson Suffered Damages.</u>

In her last year of residency training with the Defendant, Dr. Aronson was paid a salary

of approximately $55,000.  Her damages for breach of contract and unjust enrichment began to

accrue when her residency was wrongfully extended beyond her February 28, 2009 anticipated

graduation date.  As of March 1, 2009, Dr. Aronson should have been earning a salary of

$350,000.  She and Dr. Mike Longfellow will testify that she had been offered a job to begin at

that salary as soon as she graduated at the end of February.  But because the training was

extended without an appeal, she lost the job.

She was able to find another job to begin immediately after her newly anticipated August

31, 2009 graduation.  Like the job offered by Dr. Longfellow, the new job also came with an

annual salary of $350,000.  But Dr. Aronson and Carey Weiss will testify that because Dr.

Aronson's training was extended without any available appeal process, Dr. Aronson's start date

was delayed by a month as she had to undergo a more rigorous credentialing process.  During

that month, Dr. Aronson was unemployed.

Carey Weiss will also testify that because of the trouble that Dr. Aronson had getting

credentialed that factor combined with others not directly related to Dr. Aronson caused her

employer to advise Dr. Aronson to seek other employment.  Accordingly, Dr. Aronson gave her

employer notice of resignation.  The employer replaced Dr. Aronson, and Dr. Aronson had

apparently located and obtained another job opportunity.

Again, however, the Defendant's having wrongfully extended Dr. Aronson's training

caused a delay in Dr. Aronson's getting credentialed by her potential new employer.  Mike

Simon and Dr. Aronson will testify that like the other jobs before, this new job would also come

with an annual salary of approximately $350,000.  But again, Dr. Aronson and Mike Simon will

likely testify that she lost the job offer because of the record of her residency training that was

created without her being given an opportunity to appeal it.   Simon will testify that he could not

wait to fill the position and hired a different anesthesiologist instead of Dr. Aronson.

Because Dr. Aronson had already given her notice of resignation to Carey Weiss, he

filled her old position while she was going through the credentialing process for her new

position.  When she was unable to get timely credentials for the new position, she was unable to

go back to her old job that was now filled.  So as of September 30, 2010, Dr. Aronson was again

out of a job.  This time she was able to mitigate her losses until she found new employment as of

January 1, 2011 at a salary higher than $350,000.

In addition to her lost wages, Dr. Aronson experienced out of pocket losses arising from

her FMLA leaves that she reduced under duress caused by the Defendant's interference with her

right to take those leaves.  Because she was unable to be with her partner and their children when

their son was born, the couple had to hire a cook to provide meals for their children at a cost of

$227.50.  In July 2009, when Dr. Aronson took leave for the adoption process she was forced to

14

drive separately from her partner because Dr. Aronson could only take one and a half days off. As a result, she incurred additional travel expenses.

## DISCUSSION OF LAW

The legal issues have been briefed in the memorandum opposing the motion for summary judgment and are incorporated here by reference. But for the convenience of the Court, a review is provided here.

Dr. Aronson currently asserts causes of action for: (1) Interference with her right to take leave under the Family Medical Leave Act; (2) Breach of Contract; and (3) Unjust Enrichment. As an affirmative defense, Defendant asserts that it is immune from suit under the Healthcare Quality Improvement Act of 1986 and the comparable state statute R.C. 2305.251. As explained in opposition to the motion for summary judgment, genuine issues of material fact exist regarding each claim and defense, and no directed verdict is likely to be appropriate.

## I.      The Law Regarding FMLA Interference.

The elements of Dr. Aronson's FMLA claims are that (1) she is an eligible employee as defined in the Act; (2) the defendant is an employer as defined in the Act; (3) she was entitled to FMLA leave; (4) she gave proper notice of her intention to take leave; and (5) the defendant denied her FMLA benefits to which she was entitled or otherwise interfered with her FMLA rights." *Hoge v. Honda of Am. Mfg.*, 384 F.3d 238, 244 (6th Cir. 2004). Whether Defendant disputes that Dr. Aronson was entitle to FMLA leave for the birth and adoption of her son is

unclear.  For the Defendant, the issue appears to be whether the FMLA applies because Dr.

Aronson's domestic partner gave birth to the son that Dr. Aronson subsequently adopted.

Defendant has recognized that after the birth and adoption of Dr. Aronson's son, the

United States Department of Labor issued an interpretation indicating that Dr. Aronson's leave

was protected by the FMLA.  (*See* Dept. of Labor Admin. Interpretation No. 2010-3;

Defendant's Mem. in Support of Motion for Summary Judgment at 19, Appendix 8).  The issue

arose as a question under 29 C.F.R. §825.122(c)(3) which provides coverage when a person

stands in loco parentis to the child:

> For purposes of FMLA leave taken for birth or adoption, or to care
> for a family member with a serious health condition, son or
> daughter means a biological, adopted, or foster child, a stepchild, a
> legal ward, or a child of a person standing in loco parentis, who is
> either under age 18, or age 18 or older and "incapable of self-care
> because of a mental or physical disability" at the time that FMLA
> leave is to commence.
>
> * * *
>
>  (3) Persons who are "in loco parentis" include those with day-to-
> day responsibilities to care for and financially support a child, or,
> in the case of an employee, who had such responsibility for the
> employee when the employee was a child. A biological or legal
> relationship is not necessary.

This regulation left unclear whether an employee who will share equally in raising an

adopted child with a same-sex partner but does not have a legal relationship with the child would

be entitled to leave to bond with the child.  The recent interpretation, however, clarifies that the

right existed under the regulation and the statute:

16

> [A]n employee who will share equally in the raising of an adopted
> child with a same sex partner, but who does not have a legal
> relationship with the child, would be entitled to leave to bond with
> the child following placement, or to care for the child if the child
> had a serious health condition, because the employee stands in loco
> parentis to the child.

*See* Dept. of Labor Admin. Interpretation No. 2010-3.  The interpretation makes no change to

either the statute or the regulation.  Thus, no question should exist about whether Dr. Aronson

was an eligible employee regarding leave for the birth and adoption of her son.  She was.

Defendant also argued that no cognizable harm exists because Dr. Aronson was permitted

to take the leave she requested.  While she was permitted to take the leave; the length of the

leave in both cases was less than she desired within her rights.  More importantly, however,

providing her with all of the leave she requested is not a complete defense to an interference

claim.  A cognizable claim exists when the employee is discouraged from exercising her rights.

As the Sixth Circuit has held: "Interfering with the exercise of an employee's rights would

include, for example, not only refusing to authorize FMLA leave, but discouraging an employee

from using such leave." 29 C.F.R. §825.220(b); *see also Arban v. West Publ'g Co.,* 345 F.3d 390

(6th Cir. 2003).

Moreover, at least one federal circuit court has recognized that a cause of action for

interference can exist even when an employee is given all the leave requested:

> McFadden can succeed on her claim under the FMLA without
> showing Ballard Spahr denied her any leave she requested; she
> need only show the employer "interfere[d] with the exercise of"
> her FMLA rights, 29 U.S.C. § 2615(a)(1), and that she suffered
> "monetary losses as a direct result of the violation, such as the cost
> of providing care," 29 U.S.C. § 2617(a)(1)(A)(i)(II).

*McFadden v. Ballard Spahr Andrews Ingersoll LLP*, NO. 08-7140 (Fed. Cir. June 29, 2010). The same kind of facts will be presented at trial here.  Defendant interfered with Dr. Aronson's exercise of her rights, and she suffered monetary losses as a direct result.

## II.     The Law Regarding Simultaneous Claims of Breach of Contract and Unjust Enrichment.

Neither the law regarding Dr. Aronson's breach of contract claim nor the law regarding her unjust enrichment claim is unusual.  They are well-settled common law claims with elements undoubtedly familiar to this Court.  The unusual issue here arises because Dr. Aronson is claiming both causes of action simultaneously.

As a general rule, an unjust enrichment claim cannot be maintained when an express contract exists.  But an exception to the general rule exists when the contract exists as a result of the Defendant's bad faith or fraud.

> The courts of this state have refused to find unjust enrichment in cases where the parties have acted pursuant to the terms of a contract, *and where there has been no showing of fraud or bad faith.* [Emphasis added].

*Hunting Valley Builders, Inc. v. Women's Federal Sav. Bank*, 1990 WL 121272 (8th Dist. Ct. App.), *citing*, *Ullman v. May* (1947), 147 Ohio St. 468, 475; *S & M Constructors v. Columbus* (1982), 70 Ohio St.2d 69, 71.

The facts before this Court illustrate why the two claims can exist simultaneously when the contract is a product of bad faith.  Dr. Aronson was employed under a contract that expired on or about February 28, 2009.  She continued her employment under a contract that covered the

period beginning March 1, 2009 and ending August 31, 2009.  The breaches of contract first arose under the contract that ended February 28, 2009.  But her contractual damages did not begin until March 1, 2009.

Although the breach of the contractual obligation to provide Dr. Aronson with an appeal of the adverse decision that extended her training continued under the March 2009 contract, the breach claims did not initially arise under that contract.  Likewise, Dr. Aronson asserts that the contract was breached when the Defendant forced her to work excessive hours in 2008, but the same claim is not made under the March 2009 contract.  Nonetheless, Dr. Aronson was prejudiced and the Defendant was unjustly enriched by her work under the March contract.

Defendant continued to require Dr. Aronson to train in residency even though she had completed the training require of her by the accreditation agency, the Accreditation Council of Graduate Medicine (ACGME) and the American Board of Anesthesiology.  Armed with sufficient training, Dr. Aronson was able to provide the same services to Defendant's patients that an attending physician provided.  For this, she should have been paid as an attending physician.  Although no new breach of contract occurred after March 2009, forcing her to continue training she had already completed by withholding approval of the training was in bad faith.  Thus, Dr. Aronson should be permitted to recover contractual damages during her final 6 months of employment with Defendant regardless of whether Defendant breached the contract covering that period.

III.     **The Law Regarding The Healthcare Quality Improvement Act of 1986.**

To say the least, this law is complex.  Defendant asserts that it is immune from suit under the Act.  Many elements must be established to determine whether Defendant is correct, and the burden of proof is sometimes on the Defendant and other times on the Plaintiff.

To begin, immunity exists for "professional review actions" of a "professional review body."  *See* 42 U.S.C. 11111(a):

> If a professional review action (as defined in section 431(9)) of a professional review body meets all the standards specified in section 412(a), except as provided in subsection (b)—
>
> (A)  the professional review body,
>
> (B)  any person acting as a member or staff to the body,
>
> (C)  any person under a contract or other formal agreement with the body, and
>
> (D)  any person who participates with or assists the body with respect to the action,
>
> shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action. . . .

Thus, Defendant must prove as an affirmative defense that the actions for which it claims immunity were the professional review actions of a professional review body.

To prove a "professional review action", Defendant must demonstrate that the action was:

> [A]n action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct

20

of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action. In this title, an action is not considered to be based on the competence or professional conduct of a physician if the action is primarily based on—

(A)  the physician's association, or lack of association, with a professional society or association,

(B)  the physician's fees or the physician's advertising or engaging in other competitive acts intended to solicit or retain business,

(C)  the physician's participation in prepaid group health plans, salaried employment, or any other manner of delivering health services whether on a fee-for-service or other basis,

(D)  a physician's association with, supervision of, delegation of authority to, support for, training of, or participation in a private group practice with, a member or members of a particular class of health care practitioner or professional, or

(E)  any other matter than does not relate to the competence or professional conduct of a physician.

42. U.S.C. §11151(9).

To prove that the professional review action was of a "professional review body",

Defendant must prove that the action was of "a health care entity and the governing body or any

committee of a health care entity which conducts professional review activity, and includes any

committee of the medical staff of such an entity when assisting the governing body in a

professional review activity." 42 U.S.C. §11151(11).  A "health care entity" means:

> (i) a hospital that is licensed to provide health care services by the
> State in which it is located,
>
> (ii)  an entity (including a health maintenance organization or
> group medical practice) that provides health care services and that
> follows a formal peer review process for the purpose of furthering
> quality health care (as determined under regulations of the
> Secretary), and
>
> (iii)  subject to subparagraph (B), a professional society (or
> committee thereof) of physicians or other licensed health care
> practitioners that follows a formal peer review process for the
> purpose of furthering quality health care (as determined under
> regulations of the Secretary).

42 U.S.C. §11151(4)(A).[2]

To prove that the action occurred by an entity that conducted a "professional review

activity", Defendant must show:

> [A]n activity of a health care entity with respect to an individual
> physician—
>
> (A)  to determine whether the physician may have clinical
> privileges with respect to, or membership in, the entity,
>
> (B)  to determine the scope or conditions of such privileges or
> membership, or
>
> (C)  to change or modify such privileges or membership.

42 U.S.C. §11151(10).  "The term 'clinical privileges' includes privileges, membership on the

medical staff, and the other circumstances pertaining to the furnishing of medical care under

---

[2] 42 U.S.C. §1151(4)(B) provides: "the term "health care entity" does not include a professional society (or
committee thereof) if, within the previous 5 years, the society has been found by the Federal Trade Commission or
any court to have engaged in any anti-competitive practice which had the effect of restricting the practice of licensed
health care practitioners."

which a physician or other licensed health care practitioner is permitted to furnish such care by a health care entity." 42 U.S.C. §11151(3).

If these burdens are carried by the Defendant, the professional review process must be reasonable for immunity to apply.  The statute identifies the following criteria as elements of reasonableness:

> For purposes of the protection set forth in section 411(a), a professional review action must be taken—
>
> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. §11112(a).  If the Defendant carries its burden of showing that the actions were professional review actions of a professional review body, then the elements of reasonableness are presumptively satisfied.  Thus the burden of proof becomes the Plaintiff's to rebut the presumption by a preponderance of the evidence.  *Id.*

## **PROPOSED WITNESSES**

Dr. Aronson anticipates calling the following witnesses at trial:

1.  Dr. Aronson may testify about all liability and damages issues.

2.  Dr. Mathew Norcia may testify on cross examination about the facts resulting in the interference of Dr. Aronson's FMLA rights, the breach of contract by the Defendant, and the unjust enrichment of the Defendant.

3.  Dr. David Wallace may testify on cross examination about the facts resulting in the interference of Dr. Aronson's FMLA rights, the breach of contract by the Defendant, and the unjust enrichment of the Defendant.

4.  Dr. Jerry Shuck may testify on cross examination about the breach of contract by the Defendant.

5.  Dr. Howard Niermann may testify on cross examination about the facts resulting in the interference of Dr. Aronson's FMLA rights, the breach of contract by the Defendant, and the unjust enrichment of the Defendant.

6.  Dr. Michael Longfellow may testify by video about the damages suffered by Dr. Aronson arising from her loss of an employment opportunity in March 2009.

7.  Dr. Carey Weiss may testify by video about the damages suffered by Dr. Aronson arising from her loss of an employment opportunity in September 2009 and loss of employment in September 2010.

8.  Dr. Mike Simon may testify by video about the damages suffered by Dr. Aronson arising from her loss of an employment opportunity in October 2010.

9.  Emily Vasiliou may testify by video about the breach of contract by the Defendant arising from the failure of Defendant to comply with standards set forth by the ACGME that are incorporated into Dr. Aronson's contracts with the Defendant.

10. Marsha Miller may testify by video about the breach of contract by the Defendant arising from the failure of Defendant to comply with standards set forth by the ACGME that are incorporated into Dr. Aronson's contracts with the Defendant.

11. Will Rebello may testify by video about the breach of contract by the Defendant arising from the failure of Defendant to comply with standards set forth by the ACGME that are incorporated into Dr. Aronson's contracts with the Defendant.

12. Jill Fulton-Royer may testify about the interference with Dr. Aronson's FMLA rights in December 2008.

13. Dr. Virginia Ayers may testify about Dr. Aronson's FMLA damages.

14. Plaintiff may call any witness identified by the Defendant.

15. Plaintiff may call any witness not yet identified because the witness may be needed to provide rebuttal evidence that is not yet apparent to Plaintiff but may develop at trial.

**EXHIBIT INDEX**

| No. | Description |
|---|---|
| 1 | ARON 0001 UHHS EAP Referral Form 11/25/08 |
| 2 | ARON 0002-4 UHHS EAP Referral Policy |
| 3 | ARON 0006 Norcia Letter 8/27/09 regarding notice of program completion |
| 4 | ARON 0007 1/7/09 Letter regarding notice of training extension |
| 5 | ARON 0008 11/24/08 Letter regarding meeting among Drs. Aronson, Norcia and Wallace |
| 6 | ARON 0009-10 5/6/09 Maryland Verification of Postgraduate Medical Education |
| 7 | ARON 0011-12 9/2/08 Sheridan Healthcare Reference Verification Request |
| 8 | ARON 0019-20 7/13/09 Aronson letter to Shuck regarding request for intervention |
| 9 | ARON 0036-38 Evaluation reports of Aronson performance |
| 10 | ARON 0041-42 12/23/08 Aronson letter to Shuck regarding request for appeal |
| 11 | ARON 0044 1/7/09 Aronson Letter in response to /1/7/09 letter extending her training |
| 12 | ARON 0057 8/19/09 Norcia letter of anticipated program completion |
| 13 | ARON 0138 2006 Aronson In Training Examination Personal Performance Report |
| 14 | ARON 0137 2007 Aronson In Training Examination Personal Performance Report |
| 15 | ARON 0135 2008 Aronson In Training Examination Personal Performance Report |
| 16 | ARON 0136 2009 Aronson In Training Examination Personal Performance Report |
| 17 | ARON 0152-53 12/4/08 Aronson e-mail and attachment to Norcia and Nearman regarding EAP document |

| 18 | ARON 0162-63 Aronson e-mail string regarding time off during EAP evaluation |
| 19 | ARON 0168 3/2/09 Aronson e-mail string with Shuck regarding follow up to meeting with Nearman and Norcia |
| 20 | ARON 0169-70 3/7/09 Aronson e-mail string with Shuck regarding follow up with Nearman |
| 21 | ARON 0208-209 3/13/09 Aronson e-mail string with Shuck regarding follow up with Nearman |
| 22 | ARON 0173-76 3/24/09 Nearman e-mail string with Aronson regarding concerns about her training situation. |
| 23 | ARON 0185 6/3/09 Aronson e-mail to Shuck regarding scheduled meeting with Norcia and Wallace |
| 24 | ARON 0186-87 6/4/09 Aronson letter to Shuck, Vasiliou, Wallace, Norcia regarding 6/4/09 meeting with Wallace and Norcia |
| 25 | ARON 0194 6/20/09 Shuck e-mail string with Aronson re: "Please meet with me." |
| 26 | ARON 0206 4/10/09 Aronson to Shuck e-mail regarding Nearman meeting |
| 27 | ARON 0207 4/2/09 Aronson to Nearman e-mail regarding "f/u" |
| 28 | ARON 0215 4/10/09 Shuck email string with Aronson regarding "f/u" |
| 29 | ARON 0220 12/8/08 Norcia-Aronson emails regarding recommendation letter. |
| 30 | ARON 0225-224 Resident Comments All Evaluations 12/27/07-10/13/08 |
| 31 | ARON 005 7/8/09 FMLA Leave approval |
| 32 | ARON 0013 ABA Training Summary |
| 33 | ARON 0017 6/29/09 UH letter to Aronson acknowledging FMLA leave request |
| 34 | ARON 0018 5/27/09 Vasiliou letter to Aronson regarding notice of delivering ACGME noncompliance allegations to Anesthesiology Dept. at UH CMC |

| 35 | ARON 0053 Aronson letter to Longfellow |
|----|----|
| 36 | ARON 0063-79 Sheridan Healthcorp. Employment Offer November 2008 |
| 37 | ARON 0080-84 Expense receipts and checks |
| 38 | ARON 0085-0087 February 2010 Sheridan Healthcorp. Maryland Contract |
| 39 | ARON 0088-0122 June 2009 Sheridan Maryland Contract |
| 40 | ARON 0124 5/28/10 Aronson letter of resignation from Sheridan Maryland |
| 41 | ARON 0164 12/16/08 Aronson to Rebello email regarding return to work. |
| 42 | ARON 0167 UH CMC Contract 3/1/09 – 8/31/09 |
| 43 | ARON 0171 3/24/09 ABA notice of unsatisfactory performance |
| 44 | ARON 0172 3/25/09 Aronson email to Nearman requesting follow up response |
| 45 | ARON 0203 1/31/09 Aronson email to Wallace regarding meeting follow up |
| 46 | ARON 0213-14 12/15/08 Aronson email string with Norcia regarding return to work from EAP evaluation |
| 47 | ARON 0342-346 Aronson calendars for Aug – Dec 2008 |
| 48 | ARON 0446-450 Aronson UH Medical Health Inventory 2006, 2007, 2008 |
| 49 | Pltf Dep Ex. 2 Email string 8/27/09 Aronson – Norcia regarding "paperwork" |
| 50 | Pltf Dep. Ex 7 UH CMC Aronson Contract 3/1/07 – 2/29/08 |
| 51 | Pltf Dep. Ex. 8  Residents & Fellows Manual pages 28-30 |
| 52 | Pltf Dep. Ex. 9 ACGME Approved Specialty Specific Duty Hour Language |
| 53 | Pltf Dep. Ex 10  Resident Duty Hour Requirements |
| 54 | Pltf Dep. Ex 11 ACGME FAQ regarding duty hours |

| | |
|---|---|
| 55 | Pltf Dep. Ex. 12 6/20/09 Aronson – Shuck email string regarding "please meet me" |
| 56 | UH Residents & Fellows Manual |
| 57 | Pltf Dep. Ex. 20 ACGME Institutional Requirements |
| 58 | Pltf Dep. Ex 24 7/15/09 Norcia email string regarding "schedule issue" |
| 59 | Pltf Dep. Ex. 29 8/27/09 Norcia-Aronson email string |
| 60 | Pltf Dep. Ex 26 Glossary of Terms |
| 61 | Pltf Dep Ex 35 11/25/08 Wallace email to Fulton-Royer regarding Wallace and Norcia meeting with Aronson |
| 62 | February 4, 2009 letter from Norcia and Wallace to Aronson regarding meeting to discuss her current perspective. |
| 63 | Pltf Ex 41 Wallace evaluation of Aronson |
| 64 | Pltf Ex. 42 2/19/09 Norcia Evaluation of Aronson for Florida Hospital |
| 65 | ABA Booklet of Information |
| 66 | 8/18/09 Aronson memo to Shuck regarding residency completion certificate |
| 67 | ABA Status information for Aronson 11/15/08 |
| 68 | 8/10/10 Letter from Hamot regarding credential interview of Aronson |
| 69 | UH CMC Contract 3/1/08-2/28/09 |
| 70 | Resident Duty Hours Tracking Sept 08 |
| 71 | Resident Duty Hours Tracking Oct 08 |
| 72 | UHC 22-23 Sept-Oct 2008 Calendars |
| 73 | UHC 118 11/28/08 Aronson Memo |

| | |
|---|---|
| 74 | UHC 1254 6/4/09 Shuck - Nearman email string regarding "6/4/09 mtg" |
| 75 | UHC 1256 6/4/09 Shuck - Nearman email string regarding "6/4/09 mtg" |
| 76 | UHC 1257 6/11/09 Aronson – Shuck email re "f/u question" |
| 77 | UHC 1259 6/8/09 Aronson – Shuck email re "process" |
| 78 | UHC 1260-63 Norcia letter "To some asshole at the ACGME" |
| 79 | UHC 1328-30 8/27/09 Norcia – Nearman e-mail string regarding "Paperwork" |
| 80 | UHC 1331-1332 9/8/09 Nearman – Norcia email string regarding "Outlook" |
| 81 | UHC 1370-71 2/27/09 Aronson memo to Norcia |
| 82 | UHC 1473-74 ACGME letter to UH regarding notice of Aronson complaint. |
| 83 | UHC 1487 1/16/09 Norcia letter of recommendation for Aronson to Florida Board |

## EVIDENTIARY ISSUES LIKELY TO ARISE AT TRIAL

Currently, counsel for Dr. Aronson is not aware of any evidentiary issues that are likely to arise at trial.  Although some risk may exist regarding inadvertent disclosure of privacy protected health information regarding patients, the parties have worked cooperatively throughout the litigation to prevent such a disclosure, and any such risk at trial appears to be remote.

## ESTIMATED LENGTH OF TRIAL

Plaintiff's case in chief is estimated to last approximately two full days of trial.  If rebuttal is required, it should not be longer than one half day of trial.

## PARTIES' JOINT STATEMENT

As instructed by the Court, the parties have conferred and agree upon the following statement of the case:

The Plaintiff, Dr. Sarah Aronson, was an Anesthesiology Resident at Defendant University Hospitals Case Medical Center ("University Hospitals") from March 2006 through August 2009.  She now raises 4 claims against UHCMC, arising from her residency with University Hospitals.

Her first claim is that University Hospitals breached its residency contracts with Dr. Aronson The result, she claims, is that she lost job opportunities that would have paid her a much higher salary than her residency program paid her.  University Hospitals asserts that it has immunity from all of Plaintiff's claims under the federal law called the Health Care Quality Improvement Act ("HCQIA"), as well as the Ohio state peer review immunity statute. University Hospitals further denies any breach of contract.

Plaintiff's second claim is that University Hospitals was unjustly enriched by requiring her to extend her residency.  The result, she claims, is that University Hospitals obtained her anesthesiology services for the salary of a resident when she provided them services that were worth a much higher salary than her residency program paid her.  University Hospitals asserts that the HCQIA and Ohio state law protect its actions in this regard.  University Hospitals further denies that it was unjustly enriched in any way by extending Dr. Aronson's residency.

Dr. Aronson's third and fourth claim is that University Hospitals interfered with her leave entitlements under the Family and Medical Leave Act ("FMLA").  University Hospitals asserts that its decision was protected by the HCQIA and Ohio state law.  University Hospitals further asserts in its defense that there was no violation of any of Dr. Aronson's FMLA rights.

Respectfully Submitted,


/s/ Gregory A. Gordillo
GREGORY A. GORDILLO (0063445)
ggordillo@eeoattorney.com
MICHAEL J. GORDILLO (0073001)
Gordillo & Gordillo, LLC
1370 Ontario Street
2000 Standard Building
Cleveland, Ohio 44113
(216) 875-5500
(216) 583-03445 Fax

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

A copy of the foregoing Plaintiff's Trial Brief was electronically filed and served on all parties this May 9, 2011.

/s/ Gregory A. Gordillo
One of the attorneys for the Plaintiff