**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **SARAH ARONSON, M.D.** | ) | **CASE NO.1:10CV372** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **UNIVERSITY HOSPITALS OF** | ) | **OPINION AND ORDER** |
| **CLEVELAND,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>CHRISTOPHER A. BOYKO, J:</u>**

This matter is before the Court on Defendant University Hospitals of Cleveland's ("UH")

Motion for Summary Judgment (ECF#16).  For the following reasons, the Court grants, in part,

and denies, in part, Defendant's Motion.

Plaintiff is a doctor alleging breach of contract, unjust enrichment, and two counts of

interference with Family Medical Leave Act (FMLA) rights in violation of 29 U.S.C. §

2615(a)(1), against Defendant UH arising from her residency with Defendant in its

anesthesiology department.[1]  Plaintiff alleges Defendant unfairly gave her low marks in her last

residency rotation, denied her contractual due process to challenge the negative evaluation,

causing her to lose a job opportunity, interfered with her FMLA and unfairly benefitted

financially from her extended service as a resident.

---

[1]     After the Motion for Summary Judgment was fully briefed, the parties stipulated to Plaintiff
amending her Complaint removing two claims of Tortious Interference with Contract.  The Court
will deem the Motion, Opposition and Reply as being filed on the Amended Complaint.

**Plaintiff's First Amended Complaint Allegations**

According to Plaintiff's First Amended Complaint ("FAC"), she was already a doctor of medicine when she entered Defendant's anesthesiology residency program in 2006.  She is a board certified physician in psychiatry, neurology, and family practice.  In the summer and fall of 2008, Plaintiff began applying for anesthesiologist positions in anticipation of her scheduled February 2009 graduation.  In the fall of 2008, Dr. Mathew Norcia, M.D., the Co-Chair of the Residency Program, wrote letters of reference for Plaintiff describing her as good or excellent in various skills associated with the practice of anesthesiology and recommended her as qualified and competent.

In September and October 2008, Plaintiff was assigned to the Surgical Intensive Care Unit. Plaintiff's residency with UH was governed by a Resident/Fellowship contract.  The contract required Defendant provide an educational program that meets, at minimum, the standards set by the Accreditation Council for Graduate Medical Education ("ACGME"). One of the ACGME standards limits residents to duty hours of no more than 80 hours a week subject to exception, with approval, allowing for an additional 8 hours per week for a total of 88 hours per week.  Plaintiff worked more than the 80 hours per week limit and Defendant did not obtain the requisite approval.

In mid-October 2008, in a meeting with the Residency Co-Chairs, Drs. Norcia and David Wallace, Plaintiff contends she was first presented with evaluations critical of her performance. The primary bases of their criticisms involved Plaintiff's speed and efficiency.  In November 2008, Plaintiff signed a contract to work for Sheridan Healthcare starting March 2, 2009, contingent upon her completing her residency with UH in February 2009.  Under the Sheridan

2

contract Plaintiff was to be paid an annual salary of $350,000.  Plaintiff's annual salary at UH

for her residency program was $55,000.  From May through November of 2008 Plaintiff

contends she received satisfactory to positive ratings from attending physicians supervising her

work while receiving no negative evaluations or comments.  She received an "above average"

faculty evaluation for November 2008.  On November 24, 2008, Plaintiff contends Drs. Norcia

and Wallace again met with her and were critical of her performance without giving specifics.

They questioned Plaintiff on her use of medications and whether medications were affecting her

ability to respond quickly.  Plaintiff disclosed she was taking the drug Topamax for migraines.

Shortly thereafter, Plaintiff was required to undergo a fitness for duty evaluation because of Dr.

Wallace's concern that Plaintiff's performance may be impaired due to substance abuse or

cognitive impairment. On December 4, 2008, Plaintiff's evaluation was complete with no

evidence of substance abuse or impairment.

On December 22, 2008, Plaintiff went on maternity leave. On December 31, 2008, while

Plaintiff was still on maternity leave, Dr. Norcia, citing Plaintiff's poor performance in the

Surgical Intensive Care Unit in October 2008, determined she should repeat the six month

rotation in the Surgical Intensive Care Unit.  Plaintiff was not given four months notice that she

would not complete the residency program nor was she given an opportunity to appeal the

extension of her training.

Plaintiff's six month extension was scheduled to begin February 2009.  On March 24,

2009, Plaintiff was informed by the American Board of Anesthesiology ("ABA") that Defendant

had filed a Clinical Competency Committee evaluation rating her performance in the fall and

winter of 2008 as unsatisfactory.  As a result of the extension, Sheridan withdrew its job offer to

Plaintiff.

On April 10, 2009, Plaintiff filed a formal complaint with the ACGME.  On June 4, 2009, Drs. Norcia and Wallace met with Plaintiff and produced notes and medical records to support their negative evaluation of her.  These criticisms had not been previously disclosed to Plaintiff and were inconsistent with verbal feedback Plaintiff had received from other attending physicians.

On June 28, 2009, Plaintiff submitted a request for a leave of absence for August 2009 to finalize the adoption of her son.  On July 10, 2009, Defendant assigned Plaintiff to the most demanding rotation during the last two weeks of August.  Plaintiff complained to the Director of Graduate Medical Education that she believed such scheduling was in retaliation for her requested leave.  In July 2009, Plaintiff secured another job offer with a yearly salary of $350,000, and a scheduled start date of September 3, 2009, following her expected August 31, 2009 graduation.

In mid-August 2009, Plaintiff was informed by the ABA that she had completed all required training as of June 2009.  After informing Defendant, Plaintiff was released from her training and received a letter from Defendant indicating she had completed all requirements. Plaintiff's start date with her new employer was delayed until October 5, 2009, because the employer received damaging information in Plaintiff's record.

Plaintiff contends Defendant breached its contract with Plaintiff by requiring her to work more than the ACGME required hours and breached her contractual due process rights by not allowing her to appeal the unsatisfactory evaluation.  Plaintiff further contends Defendant was unjustly enriched by paying Plaintiff a resident's salary while enjoying the benefits of her service

4

after she had obtained the training.  Lastly, she contends Defendant interfered with Plaintiff's FMLA rights in December 2008 and again in August of 2009.

**Defendant's Factual Representations**

Defendant argues that Plaintiff's performance during her anesthesiology residency fell below that of her peers in the area of hands-on anesthesiology, especially her efficiency and responsiveness.  Plaintiff's work was observed by Dr. Norcia and her evaluations by attending physicians during her residency were mixed.  On October 14, 2008, Drs. Norcia and Wallace, another Co-Chair of the Residency Program, met with Plaintiff to discuss their concerns over her performance.  Defendant contends Drs. Norcia and Wallace informed Plaintiff she would receive an unsatisfactory review for her July -December 2008 rotation.

On November 24, 2008, Drs. Norcia and Wallace again met with Plaintiff and informed her that she received an unsatisfactory evaluation for October 2008.  When Plaintiff failed to offer a rebuttal or explanation the Drs. inquired whether she was on any medications that would affect her performance.  Plaintiff acknowledged she was taking Topamax for migraines and offered that her dosage had recently been increased.  Plaintiff was referred for a fitness for duty examination and was told by Drs. Norcia and Wallace that she may have to extend her residency six months.  Plaintiff was determined to be fit for duty and returned to work on December 18, 2008.  She then commenced her scheduled FMLA leave on December 22, 2008.

According to Defendant's Motion, Plaintiff admitted she was concerned that her migraine medication was affecting her performance and admitted to the ACGME that she noticed rapid improvement in her speed of execution once she stopped taking the medication.

In December of 2008, Dr. Wallace informed Plaintiff he would rate her performance for

the second half of 2008 as unsatisfactory.  She was offered an opportunity to extend her

residency six months.  The extension would not be reportable to the Ohio State Board of Medical

Examiners but would also not be appealable under Defendants' Resident's & Fellows Manual.

If she chose to reject the extension of her residency, Defendant would have to determine whether

it would pursue disciplinary action, place her on probation or refuse to graduate her.  All these

actions, while appealable, would be reportable to the Ohio State Board of Medical Examiners.

After consulting with legal counsel, Plaintiff chose the extension.  On January 9, 2009, she then

submitted a letter to Dr. Nearman, a member of the Credentials Committee, admitting her

migraine medication, "was having a negative effect on my functioning." She went on to say,

"I'm sure that Dr. Norcia and others were correct in noting a change in my performance." On

Jan. 7, 2009, Plaintiff was informed, in writing, she would receive an unsatisfactory evaluation.

On February 4, 2009, Plaintiff met with Drs. Norcia and Wallace to plan her six month

extension.  The remediation plan agreed to by Plaintiff and Drs. Norcia and Wallace included a

month of work in the Intensive Care Unit.  On February 25, 2009, Plaintiff signed a contract to

work in the residency program for six months ending in August of 2009.

Plaintiff was allowed to schedule her monthly rotations in the six month extension and

scheduled her ICU rotation for June of 2009.  However, Plaintiff did not work her ICU rotation

in June, thus Defendant could only schedule it in August.  When Plaintiff objected, Defendant

relieved her of her commitment to complete the ICU rotation.  Defendant qualified Plaintiff to

graduate but expressed its reservations to credentialing bodies and prospective employers about

her ability to handle non-routine highly stressful situations or multitasking.

6

**<u>Defendant's Summary Judgment Motion</u>**

Defendant argues it is protected by the immunities granted professional review actions conferred by the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101 *et seq*. The HCQIA provides immunity for professional review actions taken or made in the conduct of "professional review activity." 42 U.S.C. § 11151.  "If a 'professional review action' satisfies certain reasonableness requirements, then those persons participating in the review 'shall not be liable in damages under any law of the United States or of any State ... with respect to the action.'" *Meyers v. Columbia/HCA Healthcare Corp.,* 341 F.3d 461, 467 (6th Cir. 2003), quoting 42 U.S.C. § 11111(a)(1).

A "professional review action" is defined as:

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such terms includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action. *Id.* § 11151(9).

"Professional review activity," is defined as "an activity of a health care entity with respect to an individual physician":

> (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity;
> (B) to determine the scope or conditions of such privileges or membership; or
> (C) to change or modify such privileges or membership.

*Id.* § 11151(10).

If a challenged action falls within this definition, it must meet four statutory

preconditions in order to immunize the reviewers.  Section 11112(a)(1-4) lists the four

conditions as follows: (1) the action was taken in the reasonable belief that it furthered quality

health care; (2) the action was taken after a reasonable effort to obtain the facts of the matter; (3)

adequate notice and hearing are provided to the physician; and (4) the action was warranted by

the facts.

42 U.S.C. § 11112(a).

> HCQIA immunizes:
> (A) the professional review body,
> (B) any person acting as a member or staff to the body,
> (C) any person under a contract or other formal agreement with the body, and
> (D) any person who participates with or assists the body with respect to the action.

42 U.S.C. § 11111(a)(1).

As the Sixth Circuit stated in *Meyers*, "[t]he term 'professional review body' includes a

'health care entity and the governing body or any committee of a health care entity which

conducts professional review activity.'" *Meyers* at 467, 42 U.S.C. § 11151(11).

In *Meyers,* the Sixth Circuit established the governing standard of review and

corresponding burdens of proof as follows:

> The HCQIA creates a rebuttable presumption of immunity, forcing the plaintiff to
> prove that the defendant's actions did not comply with the relevant standards. *Id.*
> § 11112(a) ("A professional review action shall be presumed to have met the
> preceding standards necessary for the protection set out in section 11111(a) of this
> title unless the presumption is rebutted by a preponderance of the evidence."). As
> the district court explained, this rebuttable presumption "creates an unusual
> summary judgment standard" that can be stated as follows: "Might a reasonable
> jury, viewing the facts in the best light for [the plaintiff], conclude that he has
> shown, by a preponderance of the evidence, that the defendants' actions are
> outside the scope of § 11112(a)?" *Bryan v. James E. Holmes Reg'l Med. Ctr.,* 33
> F.3d 1318, 1333 (11th Cir.1994) (quoting *Austin v. McNamara,* 979 F.2d 728,
> 734 (9th Cir.1992)). The plaintiff has the burden of overcoming the presumption

of immunity by showing that the review process was not reasonable. *Id.*

*Meyers* at 467-68.

Defendant contends its actions are subject to the immunity afforded by the HCQIA on all Plaintiff's claims.

Furthermore, Defendant argues Plaintiff's breach of contract claim fails because: 1) courts are discouraged from intervening in academic reviews; 2) Plaintiff was not assigned to work more than the ACGME limit of hours for a resident since she admits she did not work more than the limited hours in September of 2008.  Also, in October of 2008 she worked 9 hours over the limits but failed to report it as required by her contract, thus preventing Defendant from curing Plaintiff's overage; and, 3) Defendant provided Plaintiff with the requisite due process of which Plaintiff failed to avail herself.

Defendant contends Plaintiff's unjust enrichment claim fails since her entire employment period was governed by a contract.

Finally, Defendant contends Plaintiff's FMLA interference claims fail since her FMLA leave was for the child of her domestic partner, yet prior to June 22, 2010, Plaintiff did not qualify for status under 29 U.S.C. § 2611(12).  Also, Plaintiff was never prevented from taking leave in December 2008, and even though she might be required academically to make up for the leave used by her during her fitness for duty examination, it is not a cognizable harm under the FMLA, which is limited to employment actions.

Finally, Defendant argues Plaintiff's claim of FLMA interference as a result of Defendant scheduling her to the ICU rotation in August 2009 fails because Plaintiff alleges only that Defendant's action affected her academically and upon complaining of the assignment the

Defendant relieved her of her obligation, therefore, accommodating, not interfering with, her

FMLA leave.[2]

## LAW AND ANALYSIS

### Standard of Review

Summary judgment is proper if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *accord Int'l Union v.*

*Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006); *Turner v. City of Taylor*, 412 F.3d 629, 637

(6th Cir. 2005).  The initial burden to demonstrate the absence of a genuine issue of material fact

rests with the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "If a party

fails to properly support an assertion of fact or fails to properly address another party's assertion

of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or

address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary

judgment if the motion and supporting materials--including the facts considered undisputed--

show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P.

56(e).

The "mere existence of *some* alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the requirement is that there be

_____

[2]      Plaintiff's FAC, in her recitation of facts at paragraph 57, states "on July 13, 2009, Dr. Aronson
wrote to Dr. Jerry M. Shuck, the Defendant's Director of Graduate Medical Education, and
informed Dr. Shuck that she believed that she was being retaliated against because of hr (sic)
request for time off to adopt her son."  The FMLA provides two separate theories for recovery, one
is for interference with FMLA rights under 2615(a)(1).  The other is for retaliation or
discrimination for exercising FMLA rights under 2615(a)(2).  Plaintiff's FAC captions her 2009
claim for violation of FMLA rights as an "interference" claim and specifically cites to 2615(a)(1).
Thus, the Court analyzed her FMLA claim at Count IV of her FAC as an interference claim and
not a retaliation claim.

10

no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *accord Leadbetter v. Gilley*, 385 F.3d 683, 689-90 (6th Cir. 2004); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).  A fact is material only if its resolution "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005).  "Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004).  However, summary judgment should be granted if the party bearing the burden of proof at trial does not establish an essential element of its case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. 317). Furthermore, the court is not required "to search the entire record to establish that it is bereft of a genuine issue of material fact." *Betkerur v. Aultman Hosp. Ass'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996).  Rather, the burden falls on the non-moving party to designate specific facts or evidence in dispute. *Anderson*, 477 U.S. at 249-250.

## Count I Plaintiff's Breach of Contract Claim

According to Plaintiff's FAC, her residency program was governed by contract.  Plaintiff states that the express terms of the contract required Defendant to "provide an educational program that at a minimum meets the standards established by the ACGME." (FAC at pg. 3). Among the ACGME standards are a limitation of 80 hours per week that a resident may work (with an extension of up to 88 hours a week with approval). Also, the ACGME requires residents

11

be given one day in seven free from clinical and educational responsibilities. Plaintiff contends she exceeded the ACGME work requirements in September and October of 2008 and Defendant never received the extension approval. She further contends she was required to work eighteen of nineteen days from September 2, 2008 to September 20, 2008 in violation of ACGME requirements.

Plaintiff also alleges Defendant breached her contract by not complying with the ACGME written notice requirement that a resident be given four months notice if he/she will not be promoted. Plaintiff contends she received written notice on January 7, 2009, less than two months prior to the end of her residency that she would receive an unsatisfactory rating for her fall and winter 2008 residency.[3]

Furthermore, the ACGME requires Defendant to "provide policies and procedures for grievance and due process when academic or other disciplinary actions against a resident may result in dismissal, non-renewal or non-promotion or other actions significantly effecting resident's career development."  According to Plaintiff, she made repeated requests to appeal the decision but was refused the right to appeal even though such appeal rights are provided under ACGME, ABA and Defendant's own rules.

Defendant offers as responsive evidence Dr. Wallace's affidavit and attached work schedule demonstrating that Plaintiff was not assigned hours in excess of the ACGME standards. Furthermore, Defendant contends Plaintiff was contractually obligated to report any overages which she did failed to do, thus breaching her own contractual obligations to report her hours

---

[3] Plaintiff's Brief in Opposition does not discuss triable issues of fact on her failure to provide contractual notice claim and offers no evidence in response to Defendant's Motion for Summary Judgment, therefore, the Court finds Plaintiff has waived any claim for breach of contract for failure to provide notice.

worked and preventing Defendant from curing the overage.

Plaintiff's declaration asserts she worked 18 of 19 days in September 2008 and worked 108 hours in the week running from September 29, 2008 through October 5, 2008. Thus, she has submitted evidence that both violated her contract, as it incorporates the ACGME hourly restrictions.

The Court finds there is no dispute that Plaintiff's contract includes the ACGME work hours restrictions. There is a genuine issue of fact whether Plaintiff did work more than the ACGME permits as presented by the conflicting testimony of Plaintiff and Dr. Wallace. Therefore, a jury must determine the facts as to whether Plaintiff worked more than her contracted for hours.

**Count I Breach of Contract for Lack of Due Process**

According to Plaintiff, Defendant was obligated contractually to provide her an appeal of Defendant's decision to extend her residency. The parties do not dispute that the ACGME regulations were part of Plaintiff's contract with Defendant. As her FAC alleges:

> Under Section II.D.4.e).(1) of the ACGME Institutional Requirements, the Sponsoring Institution must provide "policies and procedures for grievance and due process. These policies and procedures must minimize conflicts of interest by adjudicating parties in addressing: Academic or other disciplinary actions taken against residents that could result in dismissal, non-renewal of a resident's agreement, non-promotion of a resident to the next level of training, or other actions that could significantly threaten a resident's intended career development. . . ." Dr. Aronson made repeated requests to appeal the decision to extend her training. All of her requests were refused by the Defendant.

Defendant argues Plaintiff was not entitled to an appeal because her unsatisfactory rating was not a disciplinary action and therefore, unappealable under Defendant's Residents' & Fellows Manual, wherein in states in Section B:

13

> A Performance Action is an opportunity for the Resident to address expected
> standards that need improvement.  A Performance Review... is not a Disciplinary
> Action: it cannot be appealed...

Dr. Shuck testified that "options were provided and remediation or extension of program is not appealable." (Shuck depo. at 34).  Shuck also testified that the ACGME does not require appeal for remediation. (*Id* at 36).  Plaintiff counters by attesting that no written remediation plan was ever provided her as required by the ACGME.

The Court finds Plaintiff has waived her contractual due process claim by signing the six month extension. Plaintiff does not contend her contract with Defendant for an additional six months of residency was entered into under duress, was fraudulent or illegal. In a letter dated January 6, 2009 to Dr. Nearman, Plaintiff acknowledges her use of Topamax had a negative effect on her performance.  She further wrote, "I will do whatever the program deems necessary to complete this training." She also wrote she did not "believe Drs. Wallace and Norcia have intended this process to be punitive..."  The letter further demonstrates she received Dr. Norcia's unsatisfactory rating of her performance on December 31, 2008 and acknowledges that a six month remediation plan was "academic intervention" and the six month period was a "training extension." She concludes by saying she is "glad this problem was identified and corrected." "If you and Drs. Wallace and Norcia believe that a 6 month training extension is best for me and the most appropriate way to proceed then I'll abide by your decision." (Defendant's Ex. Z to Summary Judgment Motion).

In her deposition at pages 212-214, Plaintiff acknowledged being offered the choice of six month remediation with no appeal or refusing the extension and appealing, which would have potentially subjected her to disciplinary action.  Importantly, she acknowledged consulting with

14

legal counsel before deciding and Plaintiff ultimately signed the contract for extension without reserving appeal rights.   The Sixth Circuit has held that contractual due process may be waived. See generally *Vistein v. American Registry of Radiologic,* 342 Fed. Appx. 113 (6th Cir., 2009). Because Plaintiff signed the extension after consulting with an attorney and the evidence demonstrates she had the option to sign the extension without right of appeal or challenge the unsatisfactory evaluation if the Defendant determined that a disciplinary action was required, Plaintiff waived her due process claim.  Therefore, the Court grants summary judgment for Defendant.[4]

Furthermore, Plaintiff has provided no guideline or rule, incorporated in her contract, that mandates a particular appeals process or requires a formal hearing.  As stated previously, the Defendant's unrebutted testimony and evidence demonstrate no appeal may be taken of a Performance Review Action that is not disciplinary.

## Count III FMLA Interference

Plaintiff's FAC alleges two counts of interference with FMLA rights.  Plaintiff contends in December of 2008, she was a covered employee under FMLA 29 U.S.C. § 2611(4). Defendant interfered with her FMLA rights in violation of 29 U.S.C. § 2615(a)(1) in December of 2008 when, three weeks before she was scheduled to take maternity leave, Defendant

---

[4]   Assuming, *arguendo*, that Plaintiff had not waived her due process claim the Court would find Plaintiff was afforded all due process under her contract.  She met with Drs. Norcia and Wallace twice, in October and November 2008, and was told her performance was unsatisfactory.  She was given the opportunity to explain or rebut their evaluations.  She was encouraged to get feedback from other physicians who supervised her work, which she did.  At least one submitted a letter to Dr. Norcia in response to a request from Dr. Aronson.  Finally, it is uncontested she was given the option of signing a six month extension or awaiting a possible disciplinary decision by Defendant, which could be appealed.  She chose the extension.  Plaintiff has not demonstrated that her contract required more.

removed Plaintiff from duty and ordered her to complete a fitness for duty evaluation.  Under

ABA requirements, residents are permitted no more than sixty days absence from training during

a three-year period.  By requiring Plaintiff to take days off for what Plaintiff terms an

"unnecessary" fitness for duty evaluation, Defendant discouraged Plaintiff from exercising her

right to take leave under the FMLA.

According to Defendant, Plaintiff can demonstrate no damages from her time on leave for

her fitness for duty evaluation.  Plaintiff contends she lost twelve of the eighteen days she had

saved for her maternity leave.  Also, it was Plaintiff's own admission that Topamax may have

affected her performance that prompted Defendant to order she take the fitness for duty

evaluation.

Under the FMLA, an employer may not "interfere with, restrain or deny the exercise of

or attempt to exercise, any [FMLA] right provided." 29 U.S.C. § 2615(a)(1); *Hoge v. Honda of

Am. Mfg.,* 384 F.3d 238, 244 (6th Cir.2004).  "To prevail under the interference theory, the

employee must establish the following:  (1) he is an "[e]ligible employee," 29 U.S.C. § 2611(2);

(2) the defendant is an "[e]mployer," 29 U.S.C. § 2611(4); (3) the employee was entitled to leave

under the FMLA, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer notice of his

intention to take leave, 29 U.S.C. § 2612(e)(1); and (5) the employer denied the employee

FMLA benefits to which he was entitled." *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 447 (6th

Cir. 2007), quoting *Cavin v. Honda of Am. Mfg., Inc.,* 346 F.3d 713, 719 (6th Cir.2003).

Interfering with the exercise of an employee's rights under the FMLA includes "discouraging an

employee from using [FMLA] leave." *Arban v. West Publishing Corp.,* 345 F.3d 390, 402 (6th

Cir. 2003), quoting 29 C.F.R. § 825.220(b).

16

Plaintiff's FMLA interference claim in Court III of her First Amended Complaint presents an involuntary leave claim.  According to Plaintiff's Brief in Opposition to Summary Judgment, "Less than one month before she {Plaintiff} was scheduled to take the leave, they {Drs. Norcia and Wallace} forced her to use days off for an unnecessary fitness for duty examination.  As a result, they discouraged her from freely using the FMLA leave she had earned." (Plaintiff's Brief at pg. 21).

"An involuntary-leave claim is really a type of interference claim. An employee may have a claim under § 2615(a)(1) when an employer forces an employee to take FMLA leave when the employee does not have a "serious health condition" that precludes her from working." *Wysong v. The Dow Chemical Co.,* 503 F.3d 441, 449 (6th Cir. 2007), citing *Hicks v. Leroy's Jewelers, Inc.,* No. 98-6596, 2000 WL 1033029, at *3-4 (6th Cir. July 17, 2000) (unpublished). "However, the employee's claim ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past." *Wysong* at 449 citing  *Edgar v. JAC Prods., Inc.* 443 F.3d 501, 507 (6th Cir. 2006).

The Court finds there is no genuine issue of fact and Defendant is entitled to judgment as a matter of law on Plaintiff's FMLA interference claim set forth in Count III of her FAC.  Plaintiff contends she was "forced" to take "unnecessary" leave by Defendant which interfered with her previously scheduled FMLA leave.  However, there is no evidence that Plaintiff was denied any FMLA leave time to which she was entitled.  Plaintiff never alleged she requested FMLA leave at a later date and was denied, nor did Plaintiff allege she was ever denied FMLA leave.  Like the Plaintiff in *Wysong*, without such allegations or evidence, her claim fails as a

17

matter of law.

Furthermore, "interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Grace v. USCAR,* 521 F.3d 655, 670 (6th Cir. 2008), citing *Arban v. West Publ'g Corp.,* 345 F.3d 390, 401 (6th Cir.2003). "If the defendant proffers such a justification, then the plaintiff may seek to rebut it by a preponderance of the evidence."*Grace,* at 670, *citing Arban,* at 401. "Specifically, a plaintiff can 'refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.' " *Grace,* at 670 quoting *Wexler v. White's Fine Furniture,* 317 F.3d 564, 576 (6th Cir.2003).

Here, Defendant offers a letter from Plaintiff to a Dr. Longfellow dated January 15, 2009 (attached at Ex. W. to Defendant's Motion for Summary Judgment). Plaintiff admits in the letter that her taking Topamax "affected my clinical performance." Plaintiff goes on to say, "Because of the gradual onset of the symptoms, however, I did not identify the medication as a problem until December, when I received an unsatisfactory evaluation for my October ICU rotations." She continues, "I promptly stopped the medication as soon as this concern arose, and have noted a significant difference, as have my family and colleagues. I am distraught that this has occurred at this late date, though I'm certainly glad the problem was identified and corrected before I took a position as an independent practitioner." Plaintiff's admission that her use of Topamax affected her clinical performance militates in favor of dismissing this claim. Plaintiff's subsequent deposition testimony that Topamax did not affect her performance and, therefore,

18

Defendant's placing her on leave for a fitness for duty examination was "unnecessary" does not create a genuine issue of fact in order to defeat summary judgment.  See *Yanovich v. Zimmer Austin, Inc.,* 255 Fed.Appx. 957 (6th Cir.2007), citing *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 806 (1999).  Because of Plaintiff's admissions, she cannot refute Defendant's proffered, legitimate reason for placing her on leave while she underwent a fitness for duty examination.

Therefore, for the foregoing reasons, the Court grants summary judgment for Defendant on Count III of Plaintiff's First Amended Complaint.

## Count IV FMLA Interference

In Count IV of Plaintiff's FAC, she alleges Defendant interfered with her FMLA rights by assigning her to a rotation in the ICU in August of 2009 when she had previously requested leave under the FMLA to finalize the adoption of her son.  Plaintiff had requested the leave on June 28, 2009 and on July 10, 2009, Defendant assigned her to an ICU rotation for the last two weeks of August 2009.  When Plaintiff complained of the assignment, Defendant relieved her of the ICU rotation.  Again, there is nothing indicating Plaintiff was unable to use statutory FMLA leave.

Plaintiff and Defendant agreed that her additional six month residency would include an additional rotation in the ICU.  (See Plaintiff depo at pg. 143.)  Plaintiff further acknowledged that she and Dr. Wallace would "arrange, discuss the sequence" of her residency rotations.  (*Id.*) A series of emails between Plaintiff and Dr. Wallace in February and March of 2009 show Plaintiff proposing several suggested rotations, including ICU, (See Plaintiff depo exhibits L, M, N) with a proposed ICU rotation in April of 2009.  Dr. Wallace indicated in a March 14, 2009

19

response that an April ICU rotation would not be possible.  Plaintiff also proposed a June ICU

rotation in a March 3, 2009 email titled "revised sched". Plaintiff, in her deposition, was unable

to recall why the ICU rotation appeared and disappeared from her schedule but testified that it

finally reappeared shortly after she made her FMLA request in June of 2009 to take intermittent

leave from July 8 to August 15, 2009.  As Plaintiff stated in her deposition, "there was some

uncertainty as to whether or when I was going to be doing the ICU preceding that." (Plaintiff

depo at 150-51).  She went on to say:

> During that time period starting in March and August, there was a period of time
> in there when I guess maybe I should say between February and August, there
> was a period of time during which I thought that I was going to be required to be
> in the ICU. A period of time when I thought, I was under the impression I was not
> required to be in the ICU. There was also times in there, I don't know if I have
> documentation of this, I was communicating with either Dr. Wallace and Dr.
> Norcia, or the chief resident, about whether I was going to be in the ICU and what
> is going on with the whole ICU question. There was confusion in there. It was not
> on my schedule as a set thing. Then I requested the FMLA for my adoption. Soon
> after that, I was informed that I would be in the ICU during those two weeks
> during which I requested the adoption."

(*Id* at 152-53).

Both Drs. Norcia and Wallace attest in their respective affidavits that Plaintiff did not

schedule herself for the ICU rotation through June of 2009, leaving them no choice but to

schedule it for August, her last month in the extended six month residency. Since Plaintiff did

not request FMLA leave to adopt her son until June 28, 2009, Defendant had no options but to

schedule the ICU rotation for August. (See Plaintiff's July 13, 2009 letter to Dr. Shuck Ex. ZZ to

Defendant's Motion for Summary Judgment).  Plaintiff's letter indicates Dr. Norcia was not

notified of Plaintiff's FMLA leave request until July 9, 2009, leaving him only August to set her

ICU rotation.

According to Plaintiff, the ICU rotation was not necessary since she had completed it in

20

October of 2008.  She was scheduled to work the ICU on July 10, 2009, one day after Dr. Norcia

received notice that she was taking FMLA in August.  Thus, according to Plaintiff, the timing of

her assignment creates an issue of fact whether it was in retaliation for requesting FMLA leave.

No one disputes that after she complained to Dr. Shuck, Plaintiff was not required to work the

ICU rotation in August and was able to take her requested FMLA leave.

Under the entitlement theory, otherwise known as the interference theory, as pled by

Plaintiff, "Employees seeking relief under the entitlement theory must therefore establish that the

employer's violation caused them harm." *Edgar* 443 F.3d at 508, citing *Ragsdale v. Wolverine*

*World Wide, Inc.,* 535 U.S. 81, 89 (2002) ("[Section] 2617 provides no relief unless the

employee has been prejudiced by the violation ....").   Plaintiff cannot show harm, as she was

excused from the ICU rotation, was able to take her requested FMLA leave in August 2009 and

graduated from Defendant's program.  Furthermore, there was no "chilling effect," since

Plaintiff was scheduled to leave Defendant's employ at the end of August and would not have

been entitled to additional FMLA leave thereafter.  Therefore, the Court finds Defendant is

entitled to summary judgment on Plaintiff's FMLA interference claim in Count IV.

## Count II Unjust Enrichment

Plaintiff's FAC alleges Defendant was unjustly enriched by benefitting from Plaintiff's

services as a fully trained anesthesiologist while paying her at resident rates.  Unjust enrichment

occurs when a person, "has and retains money or benefits which in justice and equity belong to

another." *Johnson v. Microsoft Corp.,* 106 Ohio St.3d 278, 834 N.E.2d 791, 799 (Ohio 2005).

Under Ohio law, there are three elements Plaintiff must prove in order to make out a claim for

unjust enrichment: there must be (1) a benefit conferred by the plaintiff upon the defendant, (2)

21

knowledge by the defendant of the benefit, and (3) retention of the benefit under the circumstances where it would be unjust to do so without payment. *Reisenfeld & Co. v. Network Group, Inc.*, 277 F.3d 856, 860 (6th Cir. 2002).  The doctrine of unjust enrichment does not apply when a contract actually exists; rather, it is an equitable remedy to be used only when the court finds there is no contract." *Everett v. Verizon Wireless, Inc.*, 460 F.3d 818 (6th Cir. 2006), (citing *All Occasion Limousine v. HMP Events*, No.2003-L-140, 2004 WL 2803383 at *4 (Ohio Ct.App. Sept. 24, 2004)). "In the absence of fraud or bad faith, a person is not entitled to compensation on the ground of unjust enrichment if he received from the other that which it was agreed between them the other should give in return." *Teknol, Inc. v. Buechel,* No. C-3-98-416, 1999 WL 33117391 (S.D. Ohio Aug.9, 1999).

Here, Plaintiff concedes that a contract existed but contends that Dr. Wallace's lack of objectivity and Defendant's denying Plaintiff due process "raise genuine issues about whether the Defendant kept employing a fully trained anesthesiologist as a resident at resident rates and did so in bad faith." (Brief in Opposition pg. 20).

Defendant argues Plaintiff's remediation for six months was pursuant to a contract thus, she cannot prevail on a claim for unjust enrichment under Ohio law.

The Court finds Plaintiff's First Amended Complaint fails to allege with sufficient particularity any fraud by Defendant.  Furthermore, Plaintiff's Brief in Opposition does not allege fraud but only bad faith.

The Court finds Plaintiff's unjust enrichment claim fails for several reasons.  First, Plaintiff did not allege bad faith in her unjust enrichment claim.  Plaintiff's First Amended Complaint was filed after the parties' briefed the summary judgment motion.  Neither her

22

original Complaint nor her First Amended Complaint allege Defendant's bad faith.

Second, Plaintiff does not contend her contract with Defendant for an additional six months of residency was entered into under duress, was fraudulent or illegal.   As previously discussed, Plaintiff acknowledged her use of Topamax had a negative effect on her performance. Plaintiff subsequently disavowed the effects Topamax had on her performance.  (Plaintiff's depo at pg. 180)  She further stated, "I will do whatever the program deems necessary to complete this training."(Defendant's Ex. Z to Summary Judgment Motion).

Based on Plaintiff's own admissions, she cannot demonstrate a genuine issue of fact that her six month contract extension was a result of Defendant's bad faith.  Furthermore, her Opposition Brief alleges Dr. Wallace's lack of objectivity played a role in her residency extension.  However, Dr. Shuck signed Plaintiff's contract extension on behalf of Defendant and Plaintiff attributes no bad faith to Dr. Shuck.

Thus, the Court finds Plaintiff's unjust enrichment fails because no bad faith was plead in her unjust enrichment claim and Plaintiff cannot prove Defendant's bad faith in extending her residency an additional six months.

**HCQIA Immunity**

Plaintiff does not challenge that Defendant's acts are governed by the HCQIA so long as the preconditions are met.  Plaintiff also does not contest that: (1) the decisions by Drs. Norcia, Dr. Wallace and, Dr. Nearman, comprise the Credentials Committee of Defendant's Anesthesiology Department; and, (2) said Committee is vested with assessing the qualifications of physicians within the department to provide health care services; and (3) also determines whether an individual physician may have clinical privileges in the department and the scope or

conditions of such services.  (See Norcia Aff at ¶ 4).  Thus, Plaintiff does not contest that the

Committee's decision to rate Plaintiff's latter half of 2008 performance as unsatisfactory

constitutes a professional review activity for purposes of the HCQIA.

Plaintiff does contend that genuine issues of fact exist whether Defendant has met the

four qualifications for immunity set forth in 42 U.S.C. § 11112(a). The Court does find that

Defendant's review and assessment of Plaintiff's performance, while a resident, is a peer review

action subject to the HCQIA.   The Court must proceed to analyze the four requirements with the

rebuttable presumption that the four have been met.  Furthermore, Plaintiff must rebut the

presumption by a preponderance of evidence.

**Reasonable belief action taken furthered the quality of healthcare**

Plaintiff offers no argument or evidence challenging the first condition for immunity

under the HCQIA and does not challenge that the actions were taken in furtherance of quality of

healthcare.

**No Reasonable effort to obtain the facts**

Plaintiff contends that Dr. Jerry Shuck, Director of Graduate Medical Education at

Defendant hospital, stated in a June 4, 2009 email that "the clear negative evaluations have come

after the decision for extension..." and later in the same email "nowhere in her file were any

disciplinary actions or letters she (Plaintiff) reviewed supporting poor performance." (Shuck

email ECF #20-1, pg 1091)(Parenthetical added). According to Plaintiff, this evidences that Drs.

Norcia and Wallace's unsatisfactory evaluation of Plaintiff was not based on reasonable efforts

to obtain the facts. Plaintiff also contends that she cited her use of Topamax at the time of her

pre-hire physical, therefore, Defendant's failure to discover Plaintiff's declared use of Topamax

24

at the time she entered Defendant's anesthesiology program creates a genuine issue of fact on the reasonableness of its investigation.

Defendant offers the affidavit statements of Dr. Norcia, wherein he cites to negative evaluations of Plaintiff's performance by Drs. Jonsyn and Bartone.  Defendant discounts Dr. Shuck's statements, in the above email, that there did not appear to be any negative evaluations in Plaintiff's file, because the email is dated June of 2009 and, on its face, involves negative evaluations post-dating the complained of six month remediation decision.  Therefore, it is not relevant to the reasonableness of Defendant's attempts to gather facts on Plaintiff's 2008 evaluation.

Defendant relies on the number of Plaintiff's negative evaluations attached to its Motion for Summary Judgment at Ex 5.  Defendant also points to undisputed facts that Drs. Norcia and Wallace met with Plaintiff on two occasions to discuss her unsatisfactory performance, gave her a chance to explain, entertained letters on Plaintiff's behalf from other supervising physicians and Plaintiff admitted that Topamax affected her performance to demonstrate the adequacy of Defendant's fact-finding.

The Court finds Defendant has demonstrated it made reasonable efforts to obtain the facts as described above.  Based on the physicians personal observations of Plaintiff's work, input from other attending physicians critical of Plaintiff's work, two meetings with Plaintiff wherein they afforded her an opportunity to explain her performance problems, and letters from other physicians on behalf of Plaintiff and Plaintiff's own admission that her use of Topamax affected her performance, demonstrate Defendant's efforts were reasonable.

**Adequate Notice and Hearing Procedures**

25

42 U.S.C. §11101 establishes the notice and hearing requirements of the HCQIA:

(b) Adequate notice and hearing

A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):

(1) Notice of proposed action

The physician has been given notice stating--

**(A)(i)** that a professional review action has been proposed to be taken against the physician,

**(ii)** reasons for the proposed action,

**(B)(i)** that the physician has the right to request a hearing on the proposed action,

**(ii)** any time limit (of not less than 30 days) within which to request such a hearing, and
(C) a summary of the rights in the hearing under paragraph (3).

(2) Notice of hearing

If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating--

**(A)** the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

**(B)** a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3) Conduct of hearing and notice
If a hearing is requested on a timely basis under paragraph (1)(B)--
(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)--
(i) before an arbitrator mutually acceptable to the physician and the health care entity,
(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or
(iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;
(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;
(C) in the hearing the physician involved has the right--

(i) to representation by an attorney or other person of the physician's choice,
(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation

26

thereof,
(iii) to call, examine, and cross-examine witnesses,
(iv) to present evidence determined to be relevant by the hearing officer, regardless of its
admissibility in a court of law, and
(v) to submit a written statement at the close of the hearing; and
(D) upon completion of the hearing, the physician involved has the right--
(i) to receive the written recommendation of the arbitrator, officer, or panel, including a
statement of the basis for the recommendations, and
(ii) to receive a written decision of the health care entity, including a statement of the
basis for the decision.

A professional review body's failure to meet the conditions described in this subsection
shall not in itself, constitute failure to meet the standards of subsection (a)(3) of this
section.

Here, Plaintiff can show she requested a hearing on the decision to give her an

unsatisfactory rating, which Defendant did not provide.  (See Norcia depo. pg. 110).  For

Defendant to say she dropped an appeal is not entirely accurate as she was told none was

permitted for remediation under the hospital's Resident's & Fellow's Manual.  While it is a

separate issue as to what due process was required under her contract versus what is required

under the HCQIA, the Court finds the requirements established under 42 USC §11101 were not

met regarding Plaintiff's breach of contract due process claim and therefore, the Court finds

HCQIA immunity does not apply to Defendant's denying her appeal of her unsatisfactory rating.

Therefore, the Court finds Defendant has failed to establish its actions are immune under the

HCQIA.

**Immunity Under Ohio Revised Code Section 2305.251**

Defendant further contends it is immune from liability from Plaintiff's State Law Claims

for Unjust Enrichment and Breach of Contract under Ohio Revised Code Section 2305.251,

which reads in pertinent part:

(A) No health care entity shall be liable in damages to any person for any acts,

27

omissions, decisions, or other conduct within the scope of the functions of a peer review committee of the health care entity. No individual who is a member of or works for or on behalf of a peer review committee of a health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of the peer review committee.

Defendant argues its decision to give Plaintiff an unsatisfactory evaluation was done under the auspices of its Credential Committee, which is a Peer Review Committee. The Ohio statute affords broad immunity to Defendant governing Plaintiff's claims.

Plaintiff does not challenge that the Credentials Committee was a Peer Review Committee under the statute. Plaintiff contends her claims are rights guaranteed under her contract and, therefore, not subject to ORC § 2305.251 immunity defenses.

The Court finds Plaintiff's due process contract claim is subject to Ohio statutory immunity. Defendant meets the statutory definition of health care entity. O.R.C. §2305.25(A)(1) defines health care entity as:

an entity, whether acting on its own behalf or on behalf of or in affiliation with other health care entities, that conducts as part of its regular business activities professional credentialing or quality review activities involving the competence of, professional conduct of, or quality of care provided by health care providers, including both individuals who provide health care and entities that provide health care.
Subsection (E)(1) defines a "peer review committee" as:

... a utilization review committee, quality assessment committee, performance improvement committee, tissue committee, credentialing committee, or other committee that does either of the following:

(a) Conducts professional credentialing or quality review activities involving the competence of, professional conduct of, or quality of care provided by health care providers, including both individuals who provide health care and entities that provide health care; ...

Dr. Norcia's affidavit at ¶ 4 confirms Defendant satisfies the above definition, as the Credentials

28

Committee is charged with quality review of the physicians in its residency program.

Because Plaintiff's unsatisfactory evaluation falls within the broad definition of peer review Defendant's decision requiring Plaintiff to complete an additional six months falls within the immunity afforded.  Regardless of whether Plaintiff was afforded contractual due process, the hospital cannot be held liable since her appeal would be of a Peer Review Committee action which is immune under the Ohio statute.  Thus, Plaintiff's contractual due process claim falls under the immunities afforded Defendant and Plaintiff cannot prevail.

Furthermore, "to overcome the peer review immunity privilege, 'the party seeking relief must present clear and convincing evidence that defendants acted with actual malice.'" *Talwar v. Catholic Healthcare Partners*, 258 Fed.Appx. 800, 809(6th Cir. 2007) *quoting Wall v. Ohio Permanente Med. Group, Inc.,* 119 Ohio App.3d 654, 666, (Ohio Ct. App.1997). "Actual malice in this context requires proof that defendants made statements in connection with the peer review process with knowledge they were false or with reckless disregard for whether they were true or false." *Wall,* 119 Ohio App.3d at 666.  Plaintiff neither alleges nor offers evidence of Defendant's actual malice.  Thus, Defendant's are immune from liability for any lack of contractual due process.

However, because the Court finds no Peer Review Committee action was involved in whether Defendant breached its contract with Plaintiff by causing her to work more than the permitted ACGME hours, such claim is not encompassed in the immunity statute.

Furthermore, the Court finds Defendant is immune from liability for Plaintiff's unjust enrichment claim, even if it were permitted to proceed on the merits.  Her contention that Defendant's were unjustly enriched by paying her a resident's salary while benefitting from her

29

work as a fully trained anesthesiologist cannot overcome Ohio statutory immunity, since her six month residency extension resulted from a Peer Review action.

Therefore, for the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's FMLA claims, unjust enrichment claim and breach of contractual due process claim.  The Court denies Defendant's Motion for Summary Judgment on Plaintiff's Breach of Contract claim for hours worked in violation of the ACGME requirements.

IT IS SO ORDERED.


        S/Christopher A. Boyko
CHRISTOPHER A. BOYKO
United States District Judge


May 11, 2011